Philip J. Graves
(SBN 153441 | pgraves@gravesshaw.com)
Greer N. Shaw
(SBN 197960 | gshaw@gravesshaw.com
GRAVES & SHAW LLP
355 S. Grand Ave., Suite 2450
Los Angeles, CA 90071
Telephone: (213) 204-5101

Kalpana Srinivasan
(SBN 237460 | ksrinivasan@susmangodfrey.com)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029)
Telephone: (310) 789-3100
Facsimile:  (310) 789-3150

Brian D. Melton
SUSMAN GODFREY L.L.P.
(Admitted PHV | bmelton@susmangodfrey.com)
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

*Attorneys for Plaintiff Neonode Smartphone LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NEONODE SMARTPHONE LLC,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | No.  3:21-cv-08872-EMC<br><br>**DECLARATION OF COREY M. LIPSCHUTZ IN SUPPORT OF PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF** |

DECLARATION OF COREY M. LIPSCHUTZ IN SUPPORT OF
PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. 3:21-CV-08872-EMC

I, Corey M. Lipschutz, hereby declare as follows:

1.    I am an attorney at the law firm of Susman Godfrey L.L.P., counsel of record for Plaintiff Neonode Smartphone LLC ("Neonode") in the above-captioned matter. I have personal knowledge of all the facts contained herein and, if called as a witness, I could and would testify competently thereto.

2.    Exhibit 1 to this declaration is a true and correct copy of U.S. Patent No. 8,095,879 ("'879 Patent").

3.    Exhibit 2 to this declaration is a true and correct copy of the prosecution file history of U.S. Patent Application No. 10/315,250 produced as Bates numbers NEONODE0000001–NEONODE0000665 ("Pros. File").

4.    Exhibit 3 to this declaration is a true and correct copy of the Expert Report of Anthony D. Andre, Ph.D., CPE Regarding Claim Construction dated February 24, 2026 ("Andre Rpt.").

5.    Exhibit 4 to this declaration is a true and correct copy of the Supplemental Expert Report of Anthony D. Andre, Ph.D., CPE Regarding Claim Construction dated March 16, 2026 ("Andre Supp. Rpt.").

6.    Exhibit 5 to this declaration is a true and correct copy of the Supplemental Expert Witness Report of Dr. Andrew Cockburn Regarding Claim Construction dated March 16, 2026 ("Cockburn Rpt.").

7.    Exhibit 6 to this declaration is a true and correct copy of the Opening Expert Witness Report of Dr. Andrew Cockburn Regarding Claim Construction dated February 24, 2026 ("Cockburn Original Rpt.").

8.    Exhibit 7 to this declaration is a true and correct copy of the transcript of the March 19, 2026 deposition of Dr. Andrew Cockburn ("Cockburn Depo.").

9.    Exhibit 8 to this declaration is a true and correct copy of the Neonode N2 Advertisement Video produced as Bates number NEONODE008209 ("Neonode N2 Advertisement Video").

10.    Exhibit 9 to this declaration is a true and correct copy of the Final Written Decision Determining No Challenged Claims Unpatentable (Paper 59) in *Samsung Electronics Co., Ltd. v. Neonode Smartphone LLC*, No. IPR2021-00144 (P.T.A.B. Dec. 15, 2022) ("Apple IPR FWD").

11.    Exhibit 10 to this declaration is a true and correct copy of Patent Owner Neonode Smartphone LLC's Preliminary Response (Paper 23) in *Samsung Electronics Co., Ltd. v. Neonode Smartphone LLC*, No. IPR2021-00144 (P.T.A.B. Mar. 17, 2021) ("Apple IPR POPR").

12.    Exhibit 11 to this declaration is a true and correct copy of a redacted version of Patent Owner's Sur-Reply (Exhibit 1073) in *Samsung Electronics Co., Ltd. v. Neonode Smartphone LLC*, No. IPR2021-00144 (P.T.A.B. Aug. 5, 2022) ("Apple IPR Sur-Reply").

13.    Exhibit 12 to this declaration is a true and correct copy of the Hearing Transcript (Paper 55) in *Samsung Electronics Co., Ltd. v. Neonode Smartphone LLC*, No. IPR2021-00144 (P.T.A.B. Oct. 12, 2022) ("Apple IPR Hrng. Tr.").

14.    Exhibit 13 to this declaration is a true and correct copy of the *Wiley Electrical and Electronics Engineering Dictionary* document produced by Apple at Bates numbers APL-NEO_00928808–10.

15.    Exhibit 14 to this declaration is a true and correct copy of the *New Oxford American Dictionary* document produced by Apple at Bates numbers APL-NEO_00928811–13.

16.    Exhibit 15 to this declaration is a true and correct copy of the *American Heritage Dictionary of the English Language* document produced by Apple at Bates numbers APL-NEO 00935930–32.

17.    Exhibit 16 to this declaration is a true and correct copy of the *Paperback Oxford English Dictionary* document produced by Neonode at Bates numbers NEONODE0018632–35.

18.    Exhibit 17 to this declaration is a true and correct copy of the *American Heritage College Dictionary* document produced by Neonode at Bates numbers NEONODE0018636–39.

19.    Exhibit 18 to this declaration is a true and correct copy of the *Merriam Webster's Collegiate Dictionary* document produced by Neonode at Bates numbers NEONODE0018670–74.

DECLARATION OF COREY M. LIPSCHUTZ IN SUPPORT OF
PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. 3:21-CV-08872-EMC

20.　　Exhibit 19 to this declaration is a true and correct copy of the *Concise Oxford English Dictionary* document produced by Neonode at Bates numbers NEONODE0018699–18702.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27th day of March, 2026, in Houston, Texas.

/s/　　*Corey M. Lipschutz*　　　
Corey M. Lipschutz

4　　DECLARATION OF COREY M. LIPSCHUTZ IN SUPPORT OF
PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. 3:21-CV-08872-EMC

# EXHIBIT 1

US008095879B2

## (12) United States Patent
### Goertz

(10) **Patent No.:** **US 8,095,879 B2**
(45) **Date of Patent:** **Jan. 10, 2012**

(54) **USER INTERFACE FOR MOBILE HANDHELD COMPUTER UNIT**

(75) Inventor: **Magnus Goertz**, Stockholm (SE)

(73) Assignee: **Neonode Inc.**, Santa Clara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1228 days.

(21) Appl. No.: **10/315,250**

(22) Filed: **Dec. 10, 2002**

(65) **Prior Publication Data**

US 2004/0109013 A1    Jun. 10, 2004

(51) **Int. Cl.**
*G06F 3/00* (2006.01)

(52) **U.S. Cl.** .......................... **715/716**; 715/864; 715/702

(58) **Field of Classification Search** .................. 715/864, 715/702
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,790,028 | A | 12/1988 | Ramage | |
| 5,053,758 | A * | 10/1991 | Cornett et al. ................ | 345/174 |
| 5,283,558 | A | 2/1994 | Chan | |
| 5,406,307 | A * | 4/1995 | Hirayama et al. ............ | 715/800 |
| 5,603,053 | A * | 2/1997 | Gough et al. ...................... | 710/5 |
| 5,900,875 | A * | 5/1999 | Haitani et al. ................ | 715/840 |
| 5,956,030 | A * | 9/1999 | Conrad et al. ................ | 715/769 |
| 6,052,279 | A * | 4/2000 | Friend et al. .................. | 361/686 |
| 6,085,204 | A * | 7/2000 | Chijiwa et al. ................ | 715/246 |
| 6,346,935 | B1 * | 2/2002 | Nakajima et al. ............. | 345/173 |
| 6,542,191 | B1 * | 4/2003 | Yonezawa ................ | 348/333.01 |
| 6,597,345 | B2 * | 7/2003 | Hirshberg ..................... | 345/168 |
| 6,639,584 | B1 | 10/2003 | Li | |
| 6,727,917 | B1 * | 4/2004 | Chew et al. ................... | 715/765 |
| 6,734,883 | B1 * | 5/2004 | Wynn et al. ................... | 715/830 |
| 6,833,827 | B2 * | 12/2004 | Lui et al. ....................... | 345/173 |
| 6,988,246 | B2 * | 1/2006 | Kopitzke et al. ............. | 715/810 |
| 7,006,077 | B1 * | 2/2006 | Uusimaki ..................... | 345/173 |
| 7,030,861 | B1 * | 4/2006 | Westerman et al. .......... | 345/173 |

(Continued)

### FOREIGN PATENT DOCUMENTS

| EP | 0 330 767 | B1 | 10/1993 |
|---|---|---|---|

### OTHER PUBLICATIONS

Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Peachpit Press. 2000. Berkeley, CA. Pages xiii, 12, 25, 26, 28-30, 40, 47, 246 and 253.*

(Continued)

*Primary Examiner* — Ryan Pitaro
(74) *Attorney, Agent, or Firm* — Soquel Group LLC

(57) **ABSTRACT**

The present invention relates to a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area (**1**), which is divided into a menu area (**2**) and a display area (**3**). The computer unit is adapted to run several applications simultaneously and to present an active application on top of any other application on the display area (**3**). The menu area (**2**) is adapted to present a representation of a first (**21**), a second (**22**) and a third predefined (**23**) function. The first function (**21**) is a general application dependent function, the second function (**22**) is a keyboard function, and the third function (**23**) is a task and file manager. Any one of these three functions can be activated when the touch sensitive area (**1**) detects a movement of an object with its starting point within the representation of the function on the menu area (**2**) and with a direction from the menu area (**2**) to the display area (**3**).

**17 Claims, 4 Drawing Sheets**



# US 8,095,879 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,159,763 | B2 * | 1/2007 | Yap et al. | 235/375 |
| 7,225,408 | B2 * | 5/2007 | O'Rourke | 715/743 |
| 7,286,063 | B2 * | 10/2007 | Gauthey et al. | 341/34 |
| 7,880,724 | B2 * | 2/2011 | Nguyen et al. | 345/168 |
| 2001/0002694 | A1 | 6/2001 | Nakazawa et al. | |
| 2001/0022579 | A1 | 9/2001 | Hirabayashi | |
| 2001/0026268 | A1 | 10/2001 | Ito | |
| 2001/0028344 | A1 | 10/2001 | Iwamoto et al. | |
| 2001/0055006 | A1 | 12/2001 | Sano et al. | |
| 2002/0002326 | A1 * | 1/2002 | Causey et al. | 600/300 |
| 2002/0027549 | A1 * | 3/2002 | Hirshberg | 345/168 |
| 2002/0046353 | A1 * | 4/2002 | Kishimoto | 713/202 |
| 2002/0171691 | A1 * | 11/2002 | Currans et al. | 345/864 |
| 2004/0021643 | A1 * | 2/2004 | Hoshino et al. | 345/173 |
| 2004/0100510 | A1 * | 5/2004 | Milic-Frayling et al. | 345/864 |
| 2005/0035956 | A1 * | 2/2005 | Sinclair et al. | 345/184 |

## OTHER PUBLICATIONS

Strietelmeier, Julie. "Palm m100." The Gadgeteer. 2000. <http://www.the-gadgeteer.com/review/palm_m100_review> pp. 1-8.*

Venolia et al, T-Cube: A Fast, Self-Disclosing Pen-Based Alphabet, Apr. 24, 1994, pp. 265-270.*

Venoila et al, T-Cube: A Fast, Self Disclosing Pen-Based Alphabet, 1994, pp. 265-270.*

Karlson et al, AppLens and LaunchTile:Two Designs for One-Handed Thumb Use on Small Devices, CHI 2005.*

Dulberg et al, An Imprecise Mouse Gesture for the FAst Activation of Controls, Interact 1999, pp. 1-8.*

Rogue, Palm Pilot: The Ultimate Guide, 2nd Edition,1998, O'Reilly and Associates, Inc. pp. 1-17.*

* cited by examiner



Fig. 1.

Fig. 2.

Fig. 3.

Fig. 4.

Fig. 5.



Fig. 6.

Fig. 7.



Fig. 8.



Fig. 9.



Fig. 10.



Fig. 11.



Fig. 12.



## Fig. 13.



## Fig. 14.

US 8,095,879 B2

# 1

## USER INTERFACE FOR MOBILE HANDHELD COMPUTER UNIT

### TECHNICAL FIELD

The present invention relates to a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area, and which touch sensitive area is divided into a menu area and a display area.

The computer unit is adapted to run several applications simultaneously and to present any active application on top of any other application on the display area.

The present invention also relates to an enclosure for a handheld computer unit.

The present invention also relates to a computer readable medium. A computer program product with computer program code is stored within the computer readable medium, which code, when read by a computer, will make it possible for this computer to present a user interface according to the invention.

### DESCRIPTION OF BACKGROUND ART

Mobile handheld computers are known in various embodiments. One kind of handheld computer is the personal digital assistant (PDA), which is getting more and more powerful.

Another kind of handheld computer unit is the mobile phone, which also is getting more and more powerful. There are also examples of where the mobile phone and the PDA are merging into one unit.

A third kind of handheld computer is the laptop computer, which is getting smaller and smaller, even competing in size with the PDA's.

The need to manage more information has led the development towards new solutions regarding user interfaces and navigation. The PDA's and mobile phones are getting larger and larger in order to provide a user-friendly interface.

Since the users have gotten used to small handheld units, it is hard to move towards larger units. This has led to foldable keyboards, different kinds of joy sticks and different kinds of touch sensitive displays and pads intended to help in providing a user interface that is suitable for small handheld computer units.

### SUMMARY OF THE PRESENT INVENTION

#### Technical Problems

It is a problem to provide a user-friendly interface that is adapted to handle a large amount of information and different kinds of traditional computer-related applications on a small handheld computer unit.

It is a problem to provide a user interface that is simple to use, even for inexperienced users of computers or handheld devices.

It is a problem to provide a small handheld computer unit with an easily accessible text input function.

It is also a problem to provide a simple way to make the most commonly used functions for navigation and management available in the environment of a small handheld computer unit.

#### Solution

Taking these problems into consideration, and with the staring point from a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area, which touch sensitive area is divided into a menu area and a display area, which computer unit is adapted to run several applications simultaneously and to present an active application on top of any other application on the display area, the present invention teaches that the menu area is adapted to present a representation of a first, a second and a third predefined function, where the first function is a general application dependent function, the second function is a keyboard function, and the third function is a task and file manager. The present invention also teaches that any one of these three functions can be activated when the touch sensitive area detects a movement of an object with its starting point within the representation of the function on the menu area and with a direction from the menu area to the display area.

With the purpose of providing a simple way of managing any application or the operations system, the present invention teaches that if the first function is activated, the display area is adapted to display icons representing services or settings, depending on the current active application. One of the icons always represents a "help"-service, regardless of application. The icons are adapted to represent services or settings of the operations system of said computer unit, such as background picture, clock, users, help, etc. if no application is currently active on the computer unit.

Selections of preferred service or setting is done by tapping on corresponding icon.

With the purpose of providing the access to a text input function in any application in the computer unit, the present invention teaches that when the second function is activated, the display area is adapted to display a keyboard and a text field,

If a text passage in an active application is highlighted, then this text passage is displayed in the text field for editing through the keyboard and that the highlighted text passage is replaced by the edited text passage when the second function is deactivated.

If no text passage in an active application is highlighted, then the text field is available for inputting and editing of text through the keyboard.

In the case of the latter the first function can be activated, or the second function can be closed, in which a choice of saving or deleting the inputted text is given. The choice of saving the inputted text results in an activation of the first function. In this case the first function will present services or settings available for the inputted text, such as saving the inputted text for later use, using the inputted text as telephone number in a telephone application, or sending the inputted text as message in communications application.

In order to provide a task and file management in a user interface for a handheld mobile computer, the present invention teaches that, if the third function is activated, the display area is adapted to display a list with a library of available applications and files on the computer unit. A selection of an application will start the application, and a selection of a file will open the file in an application intended for the file.

A selection of an application or a file is done by moving the object so that the representation of desired application or file is highlighted, removing the object from the touch sensitive area, and then tapping on the touch sensitive area.

According to the present invention a navigation in the list is performed by moving the object in a direction towards the top of the list or towards the bottom of the list. This will cause the marking to move in the same direction. The speed of the movement of the marking is lower than the speed of the movement of the object, with the purpose of making the navigation easier.

US 8,095,879 B2

3

The user interface of the present invention is specifically adapted to be used with a small computer unit where the size of the touch sensitive area is in the order of 2-3 inches, The user interface is also adapted to be operated by one hand, where the object can be a finger, such as the thumb, of a user of the computer unit.

Advantages

Those advantages that can be primarily associated with a user interface or a computer readable medium according to the present invention reside in the ability to establish a user-friendly interface for small handheld computers, both regarding general application set-up functions, text input functions, and file and task management.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will now be described in more detail with reference to the accompanying drawings, in which

FIG. 1 is a schematic and highly simplified view of a touch sensitive area on a mobile handheld computer unit;

FIG. 2 is a schematic side view illustrating the activation of a function;

FIG. 3 is a schematic illustration of a first function;

FIG. 4 is a schematic side view illustrating the selection of a service or setting represented by an icon;

FIG. 5 is a schematic illustration of a second function;

FIG. 6 is a schematic side view illustrating the selection of a third function;

FIG. 7 is a schematic illustration of an application or file;

FIG. 8 is a schematic illustration on how navigation is performed;

FIG. 9 is a schematic illustration of how the content of the display are is changed;

FIG. 10 is a schematic side view further illustrating how navigation is performed;

FIG. 11 is a schematic illustration of moving forwards in an application;

FIG. 12 is a schematic illustration of moving backwards in, or closing, an application;

FIG. 13 is a schematic illustration of an enclosure

FIG. 14 shows a computer readable medium in the form of a solid state memory.

DESCRIPTION OF EMBODIMENTS AT
PRESENT PREFERRED

FIG. 1 illustrates a user interface for a mobile handheld computer unit. The user interface according to the present invention is specifically adapted to computer units comprising a touch sensitive area 1, which is divided into a menu area 2 and a display area 3. It should be understood that there are several different kinds of known touch sensitive displays and that the present invention does not depend on what kind of touch sensitive display that is used in relation to the inventive user interface.

The computer unit is adapted to run several applications simultaneously and to present an active application on top of any other application on the display area 3. It should be understood that by simultaneously it is meant any technology that will make it appear to a user of the computer unit that applications are run simultaneously and that the present invention does not depend on how this is realised, whether it is through time-sharing of one processor, parallel use of several processors, or any other technique.

4

According to the present invention the menu area 2 is adapted to present a representation of a first 21, a second 22 and a third 23 predefined function.

The first function 21 is a general application dependent function, the second function 22 is a keyboard function, and the third function 23 is a task and file manager.

FIG. 2 shows that any one of these three functions 21, 22, 23 can be activated when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3.

FIG. 3 shows that if the first function 21 is activated, then the display area 3 is adapted to display icons 211, 212, 213, 214, 215, 216 representing services or functions depending on the current active application. One of the icons, in the figure exemplified by icon 211, always represents a "help"-service, regardless of application. Any key that, because of lack of space on the display area, or because the key should be hidden from the active application, or because of any other reason is not shown on the display area of an active application, can be represented by one of the icons 212, 213, 214, 215, 216 that is shown when the first function 21 is activated.

If for instance the active application handles a picture, then the icons that are shown when the first function is activated can be services such as "save to disk", "send as SMS", or "delete" and they can be settings such as "resolution", "colour", or "brightness".

If no application is currently active on the computer unit, then the icons 211, 212, 213, 214, 215, 216 are adapted to represent services or settings of the operations system of the computer unit, such as background picture, clock, alarm 215, users 213, help 211, etc.

FIG. 4 shows that selection of a preferred service or setting is done by tapping C, D on corresponding icon 213.

FIG. 5 shows that if the second function 22 is activated, then the display area 3 is adapted to display a keyboard 221 and a text field 222.

Two different scenarios can be at hand when this function key is activated. A first scenario can be that a text passage in the active application is highlighted as the second function is activated. If this is the case then the highlighted text passage is displayed in the text field 222 for editing through the keyboard 221.

The highlighted text passage is replaced by the edited text passage when the second function 21 is deactivated.

A second scenario can be that no text passage in the active application is highlighted. If this is the case then the text field 222 is available for inputting and editing of text through the keyboard 221.

In the case of the latter scenario, the first function 21 can be activated, or the second function 22 can be closed. If the second function 22 is closed then a choice of saving or deleting the inputted text is given, where the choice of saving the inputted text results in an activation of the first function 21.

As the first function 21 is activated with the second function 22 as currently active application the first function 21 will present services or settings available for the inputted text, such as saving the inputted text for later use, using the inputted text as telephone number in a telephone application, or sending the inputted text as message in communications application, such as e-mail, SMS, or fax.

FIG. 6 shows that if the third function 23 is activated, then the display area 3 is adapted to display a list 231 with a library of available applications and files on the computer unit.

A selection of an application will start the application, and a selection of a file will open the file in an application intended

US 8,095,879 B2

5

for the file. The name of a selected file can be edited by activation of the second function **22** as the file is highlighted.

FIG. **7** shows that a selection of an application or a file is done by moving E the object **4** so that the representation of desired application or file is highlighted, removing F the object **4** from the touch sensitive area **1**, and then tapping G, H on the touch sensitive area **1**.

An application or file is highlighted by placing some kind of marking **232** on the representation of the application or file. This marking can be done in different ways, for example by putting a frame around the representation of the application or file, as shown in the figure, or by inverting the representation of the application or file.

It should be understood that all lists in the computer unit, such as a list of contact information in an address book, a list of e-mail messages in a mailbox, or a telephone log, can be managed in the above described manner.

The list **231** can be adapted to present only files or only applications. In this case, the top area of the list **231** can present a field **233** through which the content of the list **231** can be altered. If the list only presents files, then the field **233** can display a representation of a task manager and a selection of the field **233** will cause the list **231** to after to present only applications, and if the list **231** only presents applications, then the field **233** displays a representation of a file manager and a selection of the field **233** will cause the list **231** to after and present only files.

FIG. **8** shows that navigation in the list is performed by moving the object **4** in a direction I towards the top **231***a* of the list **231** or towards J the bottom **231***b* of the list **231**. This movement I, J of the object **4** will cause the marking **232** to move K, L in the same direction. The speed of the movement K, L of the marking **232** is lower than the speed of the movement I, J of the object **4**.

FIG. **9** shows that if the number of applications and/or files in the list **231** exceeds the number of applications and/or files that can be presented on the display area **3**, and if the object **4** is moved to the top or bottom position of the display area, then lifted, replaced on the display area, and then again moved to the top or bottom of the display area, then the content of the display area will be replaced one whole page, meaning that if the object **4** is positioned N at the bottom **3***b* of the display area **3**, then lifted, replaced on the display area **3**, and then again moved M to the bottom **3***b* of the display area **3**, then the content **31** of the display area **3** will be replaced P by the following applications and/or files **32** in the list **231**. In the same way, but not shown in the figure, if the object is positioned at the top of the display area, then lifted, replaced on the display area **3**, and then again moved to the top of the display area, the content of the display area will be replaced by the preceding applications and/or files in the list.

FIG. **10** shows that if the object **4** is removed Q from a first position **33** on the display area **3** and then replaced R, S on a second position **34** on the display area **3**, then the navigation can be continued T from the second position **34**.

FIG. **11** shows that moving U the object **4** from the left of the display area **3** to the right of the display area **3** moves the active application, function, service or setting on one step forwards. FIG. **12** shows that, in a similar manner, the active application, function, service or setting is closed or backed one step by moving V the object **4** from the right of the display area **3** to the left of the display area **3**.

As shown in FIG. **1**, the menu area **2** is positioned at the bottom of the touch sensitive area **1**. The representation of the first function **21** is positioned at the left side of the menu area **2**, the representation of the second function **22** is positioned at

6

the middle of the menu area **2**, and the representation of the third function **23** is positioned at the right side of the menu area **2**.

As shown in FIG. **13**, the present invention relates to a user interface for a hand held mobile unit that preferably can be manageable with one hand. Hence the present invention teaches that the user interface is adapted to a touch sensitive area **1** with a size that is in the order of 2-3 inches, meaning the diagonal distance W between two corners of the touch sensitive area **1**.

The user interface is adapted to be operated by one hand, where the object **4** can be a finger, such as the thumb shown in the figures, of a user of the computer unit. It should be understood though that the present invention might also be used with another object, such as a pen or other pointing device.

According to one preferred embodiment of the present invention the computer unit is covered with an enclosure **5**, which is provided with an opening **51** for the display area **3**, and where the representations of the menu area **2** is printed on top of the enclosure **5**. It should be understood that the opening **51** might be a transparent part of the enclosure **5** or that it might be an open aperture depending on among other things technical considerations pertaining to the touch sensitive area **1**.

This makes it possible to allow the enclosure **5** to be removable and exchangeable.

FIG. **14** shows a computer readable medium, in the figure schematically shown as a solid-state memory **61**. A computer program product is stored within the computer readable medium. This computer program product comprises computer readable code **62**, which, when read by a computer **6**, will make it possible for the computer **6** to present a user interface according to the present invention.

The present invention also teaches that the computer program product is adapted to function as a shell upon an operations system.

It will be understood that the invention is not restricted to the aforedescribed and illustrated exemplifying embodiments thereof, and that these embodiments can be modified within the scope of the inventive concept illustrated in the accompanying Claims.

The invention claimed is:

1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
   a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

2. The computer readable medium of claim **1**, wherein the function, when activated, causes the user interface to display icons representing different services or settings for a currently active application.

3. The computer readable medium of claim **2**, wherein the user interface is characterised in, that a selection of a preferred service or setting is done by tapping on a display icon corresponding to the preferred service or setting.

US 8,095,879 B2

7

**4**. The computer readable medium of claim **1**, wherein the function, when activated, causes the user interface to display a keyboard and a text field.

**5**. The computer readable medium of claim **4**, wherein said text field is used for inputting and editing of text through said keyboard.

**6**. The computer readable medium of claim **1**, wherein the function, when activated, causes the user interface to display a list with a library of available applications and files on the mobile handheld computer unit.

**7**. The computer readable medium of claim **6**, wherein the user interface is characterised in, that a selection of an application or file is done by gliding the object along said touch sensitive area so that a representation of a desired one of said application or file is highlighted, raising said object from said touch sensitive area, and then tapping on said touch sensitive area.

**8**. The computer readable medium of claim **7**, wherein the user interface is characterised in, that at any given time said list presents only files or only applications, and that an area of said list presents a field through which said list can be changed from presenting files to presenting applications, or from presenting applications to presenting files.

**9**. The computer readable medium of claim **7**, wherein the user interface is characterised in, that, one item in said list is highlighted by a moveable marking, and the user interface enables list navigation whereby gliding the object along the touch sensitive area in a direction towards the top of said list or towards the bottom of said list causes said marking to move in the same direction without scrolling the list.

**10**. The computer readable medium of claim **9**, wherein the user interface is characterised in, that, if the number of applications or files in said list exceeds the number of applications or files that can be presented on said touch sensitive area as content, and if the object is (i) glided along said touch sensi-

8

tive area to the top or bottom of said touch sensitive area, then (ii) raised above said touch sensitive area, then (iii) replaced on said touch sensitive area, and then (iv) again glided along said touch sensitive area to the top or bottom of said touch sensitive area, said list navigation pages the content of said list up or down by one whole page.

**11**. The computer readable medium of claim **10**, wherein the user interface is characterised in, that if the object is raised from any first position on said touch sensitive area and then replaced on any second position on said touch sensitive area, said list navigation can be continued from said second position.

**12**. The computer readable medium of claim **1**, wherein the user interface is characterised in, that an active application, function, service or setting is advanced one step by gliding the object along the touch sensitive area from left to right, and that the active application, function, service or setting is closed or backed one step by gliding the object along the touch sensitive area from right to left.

**13**. The computer readable medium of claim **1**, wherein the user interface is characterised in, that said representation of said function is located at the bottom of said touch sensitive area.

**14**. The computer readable medium of claim **1**, wherein the touch sensitive area is 2-3 inches in diagonal dimension.

**15**. The computer readable medium of claim **1**, characterised in, that said computer program code is adapted to function as a shell upon an operating system.

**16**. The computer readable medium of claim **1**, wherein the representation is finger-sized.

**17**. The computer readable medium of claim **1**, wherein the location where the representation is provided does not provide touch functionality for a different function.

\* \* \* \* \*

# EXHIBIT 2

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
**REQUEST FOR FILING APPLICATION UNDER 37 C.F.R. 1.53(b)**
**WITHOUT FILING FEE *AND/OR* WITHOUT EXECUTED INVENTOR'S DECLARATION**

Assistant Commissioner for Patents
Washington, DC 20231

Atty. Dkt. 3682-32

Date: December 10, 2002

This is a request for filing a new PATENT APPLICATION under Rule 53(b) entitled:

**USER INTERFACE**

without a filing fee and/or without an executed inventor's oath/declaration. This application is made by the below identified inventor(s). Attached hereto are the following papers:

☐ Newly executed Declaration, ☐ Copy of Declaration from prior application, ☒ Abstract

13 pages of specification and claims (including 18 numbered claims), and

4 sheets of accompanying drawing/s.

☐ Record the attached assignment and return to the undersigned.
☐ Attached is a Power of Attorney.
☐ Priority is hereby claimed under 35 U.S.C. § 119 based on the following foreign applications:

| **Application Number** | **Country** | **Day/Month/Year Filed** |
|---|---|---|
| | | |

, respectively, the entire content of which is hereby incorporated by reference in this application..

☐ Certified copy(ies) of foreign application(s) is/are attached.
☐ Certified copy(ies) filed on _____ in prior application no. _____ filed _____
☐ Please amend the specification by inserting the following paragraph before the first line: --This application claims the benefit of Provisional Application No. ___ , filed ___ , the entire content of which is hereby incorporated by reference in this application.--
☐ Please amend the specification by inserting the following paragraph before the first line: --This application is a ☐ continuation/☐ division/☐ continuation-in-part of Application No. ___ , filed ___ , ___ , the entire content of which is hereby incorporated by reference in this application.--
☐ Petition filed in prior application to extend its life to insure co-pendency.
☐ The prior application is assigned to ___ .
☐ It is hereby requested that the Examiner consider the art cited in the above parent application(s) by applicant and/or the Examiner for the reasons stated therein. A listing of that art is attached, but pursuant to Rule 98(d) copies are not required.
☒ Applicant claims "small entity" status.   ☐ "Small entity" statement attached.
☒ Please enter the attached and/or below preliminary amendment **prior** to calculation of filing fee:

☐ Also attached: ☐ **Information Disclosure Statement;** ☐ **Non-Publication Request;** ☐ **Nucleotide and/or Amino Acid Sequence Submission;** ☐ **Statement deleting Inventor(s) named in prior application;** ☐ **Other:**

1. Inventor: Magnus (first) MI GOERTZ (last) Swedish (citizenship)
   Residence: (city) Stockholm (state/country) SWEDEN
   Mailing Address: Engelbrektsgatan 14A, Stockholm, SWEDEN
   (Zip Code) SE-114 32

2. Inventor: ___ (first) MI ___ (last) ___ (citizenship)
   Residence: (city) ___ (state/country) ___
   Mailing Address: ___ , ___ ,
   (Zip Code) ___

☐ *See attached sheet(s) for additional inventor(s) information!!*

**Address all future communications to NIXON & VANDERHYE P.C., 1100 North Glebe Road, 8th Floor, Arlington, VA 22201.**

1100 North Glebe Road, 8th Floor
Arlington, Virginia 22201-4714
Telephone: (703) 816-4000
Facsimile: (703) 816-4100
RGB:lhl

**NIXON & VANDERHYE P.C.**
By Atty: Richard G. Besha, Reg. No. 22,770

Signature: _Richard Besha_

NEONODE0000001

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent Application of

Magnus GOERTZ                                    Atty. Ref.:  3682-32

Serial No.  Unassigned                           Group:

Filed:  December 10, 2002                         Examiner:

For:  USER INTERFACE

\* \* \* \* \* \* \* \* \* \* \*

December 10, 2002

Assistant Commissioner for Patents
Washington, DC  20231

Sir:

## PRELIMINARY AMENDMENT

In order to place the above-identified application in better condition for examination, please amend the application as follows:

## IN THE CLAIMS

Please substitute the following amended claim(s) for corresponding claim(s) previously presented.  A copy of the amended claim(s) showing current revisions is attached.

9.    (Amended) User interface according to Claim 7, characterised in, that, a navigation in said list is performed by moving said object in a direction towards the top of said list or towards the bottom of said list, that the movement of said object will cause said marking to move in the same direction, and that the speed of the movement of said marking is lower than the speed of the movement of said object.

691139

NEONODE0000002

**Magnus** GOERTZ
Serial No. **Unassigned**

12.    (Amended) User interface according to Claim 1, characterised in, that an active application, function, service or setting is moved on one step by moving said object from the left of said display area to the right of said display area, and that the active application, function, service or setting is closed or backed one step by moving said object from the right of said display area to the left of said display area.

13.    (Amended) User interface according to Claim 1, characterised in, that said menu area is positioned at the bottom of said touch sensitive area, that said representation of said first function is positioned at the left side of said menu area, that said representation of said second function is positioned at the middle of said menu area, and that said representation of said third function is positioned at the right side of said menu area.

14.    (Amended) User interface according to Claim 1, characterised in, that said user interface is adapted to a touch sensitive area with a size that is in the order of 2-3 inches, and that said user interface is adapted to be operated by one hand, where said object can be a finger, such as the thumb, or a user of said computer unit.

15.    (Amended) An enclosure adapted to cover a computer unit, said computer unit being adapted to present a user interface according to Claim 1, characterised in, that

- 2 -

691139

NEONODE0000003

**Magnus** GOERTZ
Serial No. **Unassigned**

said enclosure is provided with an opening for said display area, and that a representation

of said menu area is printed on top of said enclosure.

17.    (Amended) A computer readable medium, with a computer program

product stored therein, characterised in, that said computer program product comprises

computer readable code, which, when read by a computer, will make it possible for said

computer to present a user interface according to Claim 1.

- 3 -

691139

NEONODE0000004

**Magnus GOERTZ**
Serial No. **Unassigned**

## REMARKS

This Preliminary Amendment has been presented to place the claims in condition for allowance.

Attached hereto is a marked-up version of the changes made to the specification and claim(s) by the current amendment. The attached page(s) is captioned "**Version With Markings To Show Changes Made.**"

Respectfully submitted,

**NIXON & VANDERHYE P.C.**

By: _Richard Besha_____
Richard G. Besha
Reg. No. 22,770

RGB:lhl
1100 North Glebe Road, 8th Floor
Arlington, VA 22201-4714
Telephone: (703) 816-4000
Facsimile: (703) 816-4100

- 4 -

691139

NEONODE0000005

**Magnus** GOERTZ
Serial No. **Unassigned**

## VERSION WITH MARKINGS TO SHOW CHANGES MADE

## IN THE CLAIMS

9.    (Amended)  User interface according to Claim 7 [or 8], characterised in, that, a navigation in said list is performed by moving said object in a direction towards the top of said list or towards the bottom of said list, that the movement of said object will cause said marking to move in the same direction, and that the speed of the movement of said marking is lower than the speed of the movement of said object.

12.    (Amended)  User interface according to [any preceding] Claim 1, characterised in, that an active application, function, service or setting is moved on one step by moving said object from the left of said display area to the right of said display area, and that the active application, function, service or setting is closed or backed one step by moving said object from the right of said display area to the left of said display area.

13.    (Amended)  User interface according to [any preceding] Claim 1, characterised in, that said menu area is positioned at the bottom of said touch sensitive area, that said representation of said first function is positioned at the left side of said menu area, that said representation of said second function is positioned at the middle of said menu area, and that said representation of said third function is positioned at the right side of said menu area.

- 5 -

691139

NEONODE0000006

**Magnus** GOERTZ
Serial No. **Unassigned**

14.    (Amended)  User interface according to [any preceding] Claim 1, characterised in, that said user interface is adapted to a touch sensitive area with a size that is in the order of 2-3 inches, and that said user interface is adapted to be operated by one hand, where said object can be a finger, such as the thumb, or a user of said computer unit.

15.    (Amended)  An enclosure adapted to cover a computer unit, said computer unit being adapted to present a user interface according to [any of Claims] Claim 1 [to 14], characterised in, that said enclosure is provided with an opening for said display area, and that a representation of said menu area is printed on top of said enclosure.

17.    (Amended)  A computer readable medium, with a computer program product stored therein, characterised in, that said computer program product comprises computer readable code, which, when read by a computer, will make it possible for said computer to present a user interface according to [any of Claims] Claim 1 [to 14].

691139

NEONODE0000007

10/12 '02 14:00 FAX 46 8 31 67 67        GROTH & CO              → NIXON & VANDERHY    ☑002

## USER INTERFACE

### *Technical field*

The present invention relates to a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area, and which touch sensitive area is divided into a menu area and a display area.

The computer unit is adapted to run several applications simultaneously and to present any active application on top of any other application on the display area.

The present invention also relates to an enclosure for a handheld computer unit.

The present invention also relates to a computer readable medium. A computer program product with computer program code is stored within the computer readable medium, which code, when read by a computer, will make it possible for this computer to present a user interface according to the invention.

### *Description of background art*

Mobile handheld computers are known in various embodiments. One kind of handheld computer is the personal digital assistant (PDA), which is getting more and more powerful.

Another kind of handheld computer unit is the mobile phone, which also is getting more and more powerful. There are also examples of where the mobile phone and the PDA are merging into one unit.

A third kind of handheld computer is the laptop computer, which is getting smaller and smaller, even competing in size with the PDA's.

The need to manage more information has led the development towards new solutions regarding user interfaces and navigation. The PDA's and mobile phones are getting larger and larger in order to provide a user-friendly interface.

Since the users have gotten used to small handheld units, it is hard to move towards larger units. This has led to foldable keyboards, different kinds if joy sticks and different kinds of touch sensitive displays and pads intended to help in providing a user interface that is suitable for small handheld compute units.

NEONODE0000008

10/12 '02 14:00 FAX 46 8 31 67 67    GROTH & CO    → NIXON & VANDERHY  ☒003

2

## Summary of the present invention

Technical problems

It is a problem to provide a user-friendly interface that is adapted to handle large amount of information and different kinds of traditional computer-related applications on a small handheld computer unit.

It is a problem to provide a user interface that is simple to use, even for inexperienced users of computers or handheld devices.

It is a problem to provide a small handheld computer unit with an easily accessible text input function.

It is also a problem to provide a simple way to make the most commonly used functions for navigation and management available in the environment of a small handheld computer unit.

Solution

Taking these problems into consideration, and with the staring point from a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area, which touch sensitive area is divided into a menu area and a display area, which computer unit is adapted to run several applications simultaneously and to present an active application on top of any other application on the display area, the present invention teaches that the menu area is adapted to present a representation of a first, a second and a third predefined function, where the first function is a general application dependent function, the second function is a keyboard function, and the third function is a task and file manager. The present invention also teaches that any one of these three functions can be activated when the touch sensitive area detects a movement of an object with its starting point within the representation of the function on the menu area and with a direction from the menu area to the display area.

With the purpose of providing a simple way of managing any application or the operations system, the present invention teaches that if the first function is activated, the display area is adapted to display icons representing services or settings, depending on the current active application. One of the icons always represents a "help"-service, regardless of application. The icons are adapted to represent services or settings of the operations system of said computer unit, such

NEONODE0000009

10/12 '02 14:00 FAX 46 8 31 67 67          GROTH & CO          → NIXON & VANDERHY   ☑004

3

as background picture, clock, users, help, etc. if no application is currently active on the computer unit.

Selections of preferred service or setting is done by tapping on corresponding icon.

With the purpose of providing the access to a text input function in any application in the computer unit, the present invention teaches that when the second function is activated, the display area is adapted to display a keyboard and a text field,

If a text passage in an active application is highlighted, then this text passage is displayed in the text field for editing through the keyboard and that the highlighted text passage is replaced by the edited text passage when the second function is deactivated.

If no text passage in an active application is highlighted, then the text field is available for inputting and editing of text through the keyboard.

In the case of the latter the first function can be activated, or the second function can be closed, in which a choice of saving or deleting the inputted text is given. The choice of saving the inputted text results in an activation of the first function. In this case the first function will present services or settings available for the inputted text, such as saving the inputted text for later use, using the inputted text as telephone number in a telephone application, or sending the inputted text as message in communications application.

In order to provide a task and file management in a user interface for a handheld mobile computer, the present invention teaches that, if the third function is activated, the display area is adapted to display a list with a library of available applications and files on the computer unit A selection of an application will start the application, and a selection of a file will open the file in an application intended for the file.

A selection of an application or a file is done by moving the object so that the representation of desired application or file is highlighted, removing the object from the touch sensitive area, and then tapping on the touch sensitive area.

According to the present invention a navigation in the list is performed by moving the object in a direction towards the top of the list or towards the bottom of the list. This will cause the marking to move in the same direction. The speed of

NEONODE0000010

10/12 '02 14:00 FAX 46 8 31 67 67        GROTH & CO          → NIXON & VANDERHY   ☑005

**4**

the movement of the marking is lower than the speed of the movement of the object, with the purpose of making the navigation easier.

The user interface of the present invention is specifically adapted to be used with a small computer unit where the size of the touch sensitive area is in the order of 2-3 inches. The user interface is also adapted to be operated by one hand, where the object can be a finger, such as the thumb, of a user of the computer unit.

Advantages

Those advantages that can be primarily associated with a user interface or a computer readable medium according to the present invention reside in the ability to establish a user-friendly interface for small handheld computers, both regarding general application set-up functions, text input functions, and file and task management.

*Brief description of the drawings*

The present invention will now be described in more detail with reference to the accompanying drawings, in which

Figure 1    is a schematic and highly simplified view of a touch sensitive area on a mobile handheld computer unit;

Figure 2    is a schematic side view illustrating the activation of a function;

Figure 3    is a schematic illustration of a first function;

Figure 4    is a schematic side view illustrating the selection of a service or setting represented by an icon;

Figure 5    is a schematic illustration of a second function;

Figure 6    is a schematic side view illustrating the selection of a third function;

Figure 7    is a schematic illustration of an application or file;

Figure 8    is a schematic illustration on how navigation is performed;

Figure 9    is a schematic illustration of how the content of the display are is changed;

Figure 10   is a schematic side view further illustrating how navigation is performed;

Figure 11   is a schematic illustration of moving forwards in an application;

NEONODE0000011

10/12 '02 14:01 FAX 46 8 31 67 67        GROTH & CO            → NIXON & VANDERHY  ☑006

5

Figure 12  is a schematic illustration of moving backwards in, or closing, an application;

Figure 13  is a schematic illustration of an enclosure

### Description of embodiments at present preferred

Figure 1 illustrates a user interface for a mobile handheld computer unit. The user interface according to the present invention is specifically adapted to computer units comprising a touch sensitive area 1, which is divided into a menu area 2 and a display area 3. It should be understood that there are several different kinds of known touch sensitive displays and that the present invention does not depend on what kind of touch sensitive display that is used in relation to the inventive user interface.

The computer unit is adapted to run several applications simultaneously and to present an active application on top of any other application on the display area 3. It should be understood that by simultaneously it is meant any technology that will make it appear to a user of the computer unit that applications are run simultaneously and that the present invention does not depend on how this is realised, whether it is through time-sharing of one processor, parallel use of several processors, or any other technique.

According to the present invention the menu area 2 is adapted to present a representation of a first 21, a second 22 and a third 23 predefined function.

The first function 21 is a general application dependent function, the second function 22 is a keyboard function, and the third function 23 is a task and file manager.

Figure 2 shows that any one of these three functions 21, 22, 23 can be activated when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3.

Figure 3 shows that if the first function 21 is activated, then the display area 3 is adapted to display icons 211, 212, 213, 214, 215, 216 representing services or functions depending on the current active application. One of the icons, in the figure exemplified by icon 211, always represents a "help"-service, regardless of application. Any key that, because of lack of space on the display area, or because the key should be hidden from the active application, or because

NEONODE0000012

10/12 '02 14:01 FAX 46 8 31 87 67    GROTH & CO    → NIXON & VANDERHY    ☑007

6

of any other reason is not shown on the display area of an active application, can be represented by one of the icons 212, 213, 214, 215, 216 that is shown when the first function 21 is activated.

If for instance the active application handles a picture, then the icons that are shown when the first function is activated can be services such as "save to disk", "send as SMS", or "delete" and they can be settings such as "resolution", "colour", or "brightness".

If no application is currently active on the computer unit, then the icons 211, 212, 213, 214, 215, 216 are adapted to represent services or settings of the operations system of the computer unit, such as background picture, clock, alarm 215, users 213, help 211, etc.

Figure 4 shows that selection of a preferred service or setting is done by tapping C, D on corresponding icon 213.

Figure 5 shows that if the second function 22 is activated, then the display area 3 is adapted to display a keyboard 221 and a text field 222.

Two different scenarios can be at hand when this function key is activated. A first scenario can be that a text passage in the active application is highlighted as the second function is activated. If this is the case then the highlighted text passage is displayed in the text field 222 for editing through the keyboard 221.

The highlighted text passage is replaced by the edited text passage when the second function 21 is deactivated.

A second scenario can be that no text passage in the active application is highlighted. If this is the case then the text field 222 is available for inputting and editing of text through the keyboard 221.

In the case of the latter scenario, the first function 21 can be activated, or the second function 22 can be closed. If the second function 22 is closed then a choice of saving or deleting the inputted text is given, where the choice of saving the inputted text results in an activation of the first function 21.

As the first function 21 is activated with the second function 22 as currently active application the first function 21 will present services or settings available for the inputted text, such as saving the inputted text for later use, using the inputted text as telephone number in a telephone application, or sending the inputted text as message in communications application, such as e-mail, SMS, or fax.

NEONODE0000013

10/12 '02 14:01 FAX 46 8 31 67 67          GROTH & CO              → NIXON & VANDERHY    ☑008

7

Figure 6 shows that if the third function 23 is activated, then the display area 3 is adapted to display a list 231 with a library of available applications and files on the computer unit.

A selection of an application will start the application, and a selection of a file will open the file in an application intended for the file. The name of a selected file can be edited by activation of the second function 22 as the file is highlighted.

Figure 7 shows that a selection of an application or a file is done by moving E the object 4 so that the representation of desired application or file is highlighted, removing F the object 4 from the touch sensitive area 1, and then tapping G, H on the touch sensitive area 1.

An application or file is highlighted by placing some kind of marking 232 on the representation of the application or file. This marking can be done in different ways, for example by putting a frame around the representation of the application or file, as shown in the figure, or by inverting the representation of the application or file.

It should b understood that all lists in the computer unit, such as a list of contact information in an address book, a list of e-mail messages in a mailbox, or a telephone log, can be managed in the above described manner.

The list 231 can be adapted to present only files or only applications. In this case, the top area of the list 231 can present a field 233 through which the content if the list 231 can be altered. If the list only presents files, then the field 233 can display a representation of a task manager and a selection of the field 233 will cause the list 231 to alter to present only applications, and if the list 231 only presents applications, then the field 233 displays a representation of a file manager and a selection of the field 233 will cause the list 231 to alter and present only files.

Figure 8 shows that navigation in the list is performed by moving the object 4 in a direction I towards the top 231a of the list 231 or towards J the bottom 231b of the list 231. This movement I, J of the object 4 will cause the marking 232 to move K, L in the same direction. The speed of the movement K, L of the marking 232 is lower than the speed of the movement I, J of the object 4.

Figure 9 shows that if the number of applications and/or files in the list 231 exceeds the number of applications and/or files that can be presented on the display area 3, and if the object 4 is moved to the top or bottom position of the

NEONODE0000014

10/12 '02 14:02 FAX 46 8 31 87 87        GROTH & CO              → NIXON & VANDERHY    ☒009

8

display area, then lifted, replaced on the display area, and then again moved to the top or bottom of the display area, then the content of the display area will be replaced one whole page, meaning that if the object 4 is positioned N at the bottom 3b of the display area 3, then lifted, replaced on the display area 3, and then again moved M to the bottom 3b of the display area 3, then the content 31 of the display area 3 will be replaced P by the following applications and/or files 32 in the list 231. In the same way, but not shown in the figure, if the object is position at the top of the display area, then lifted, replaced on the display area 3, and then again moved to the top of the display area, the content of the display area will be replaced by the preceding applications and/or files in the list.

Figure 10 shows that if the object 4 is removed Q from a first position 33 on the display area 3 and then replaced R, S on a second position 34 on the display area 3, then the navigation can be continued T from the second position 34.

Figure 11 shows that moving U the object 4 from the left of the display area 3 to the right of the display area 3 moves the active application, function, service or setting on one step forwards. Figure 12 shows that, in a similar manner, the active application, function, service or setting is closed or backed one step by moving V the object 4 from the right of the display area 3 to the left of the display area 3.

As shown in figure 1, the menu area 2 is positioned at the bottom of the touch sensitive area 1. The representation of the first function 21 is positioned at the left side of the menu area 2, the representation of the second function 22 is positioned at the middle of the menu area 2, and the representation of the third function 23 is positioned at the right side of the menu area 2.

As shown in figure 13, the present invention relates to a user interface for a hand held mobile unit that preferably can be manageable with one hand. Hence the present invention teaches that the user interface is adapted to a touch sensitive area 1 with a size that is in the order of 2-3 inches, meaning the diagonal distance W between two corners of the touch sensitive area 1.

The user interface is adapted to be operated by one hand, where the object 4 can be a finger, such as the thumb shown in the figures, of a user of the computer unit. It should be understood though that the present invention might also be used with another object, such as a pen or other pointing device.

NEONODE0000015

10/12 '02 14:02 FAX 46 8 31 67 67          GROTH & CO             → NIXON & VANDERHY  ☒010

9

According to one preferred embodiment of the present invention the computer unit is covered with an enclosure 5, which is provided with an opening 51 for the display area 3, and where the representations of the menu area 2 is printed on top of the enclosure 5. It should be understood that the opening 51 might be a transparent part of the enclosure 5 or that it might be an open aperture depending on among other things technical considerations pertaining to the touch sensitive area 1.

This makes it possible to allow the enclosure 5 to be removable and exchangeable.

Figure 14 shows a computer readable medium, in the figure schematically shown as a solid-state memory 61. A computer program product is stored within the computer readable medium. This computer program product comprises computer readable code 62, which, when read by a computer 6, will make it possible for the computer 6 to present a user interface according to the present invention.

The present invention also teaches that the computer program product is adapted to function as a shell upon an operations system.

It will be understood that the invention is not restricted to the aforedescribed and illustrated exemplifying embodiments thereof, and that these embodiments can be modified within the scope of the inventive concept illustrated in the accompanying Claims.

10/12 '02 14:02 FAX 46 8 31 87 87        GROTH & CO              → NIXON & VANDERHY  ☑011

10

CLAIMS

1.    User interface for a mobile handheld computer unit, where said computer unit comprises a touch sensitive area, which touch sensitive area is divided into a menu area and a display area, where said computer unit is adapted to run several applications simultaneously, and to present an active application on top of any other application on said display area, **characterised** in, that said menu area is adapted to present a representation of a first, a second and a third predefined function, that said first function is a general application dependent function, that said second function is a keyboard function, that said third function is a task and file manager, and that any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area.

2.    User interface according to Claim 1, **characterised** in, that, if said first function is activated, said display area is adapted to display icons representing different services or settings depending on the current active application, that one of said icons always represents a "help"-service, regardless of application, and that, if no application is currently active on said computer unit, said icons are adapted to represent services or settings of the operations system of said computer unit, such as background picture, clock, users, help, etc.

3.    User interface according to Claim 2, **characterised** in, that that a selection of a preferred service or setting is done tapping on corresponding icon.

4.    User interface according to Claim 1, **characterised** in, that, if said second function is activated, said display area is adapted to display a keyboard and a text field,
   - that, if a text passage in said active application is highlighted, said text passage is displayed in said text field for editing through said keyboard and that said highlighted text passage is replaced by said edited text passage when said second function is deactivated, and

NEONODE0000017

Case 3:21-cv-08872-EMC    Document 181-1    Filed 03/27/26    Page 34 of 1245

10/12 '02 14:02 FAX 46 8 31 67 67        GROTH & CO              → NIXON & VANDERHY  ☒012

11

- that, if no text passage in said active application is highlighted, said text field is available for inputting and editing of text through said keyboard.

5.      User interface according to Claim 4, **characterised** in, that if no text passage in said active application is highlighted, and said text field is used for inputting and editing of text through said keyboard, then
- said first function can be activated, or
- said second function can be closed, in which a choice of saving or deleting said inputted text is given, where the choice of saving said inputted text results in an activation of said first function,
in which said first function will present services or settings available for said inputted text, such as saving said inputted text for later use, using said inputted text as telephone number in a telephone application, or sending said inputted text as message in communications application.

6.      User interface according to Claim 1, **characterised** in, that, if said third function is activated, said display area is adapted to display a list with a library of available applications and files on said computer unit, that a selection of an application will start said application, and that a selection of a file will open said file in an application intended for said file.

7.      User interface according to Claim 6, **characterised** in, that a selection of an application or a file is done by moving said object so that the representation of desired application or file is highlighted, removing said object from said touch sensitive area, and then tapping on said touch sensitive area, and that an application or file is highlighted by placing some kind of marking on the representation of said application or file, such as positioning a frame around the representation of said application or file or inverting the representation of said application or file.

8.      User interface according to Claim 7, **characterised** in, that said list is adapted to present only said files or only said applications, that the top area of said list presents a field through which the content if said list can be altered, that, if said list only presents files, said field displays a representation of a task manager

NEONODE0000018

10/12 '02 14:03 FAX 46 8 31 87 67        GROTH & CO                → NIXON & VANDERHY  @013

12

and a selection of said field will cause said list to alter to present only applications, and that, if said list only presents applications, said field displays a representation of a file manager and a selection of said field will cause said list to alter and present only files.

9.    User interface according to Claim 7 or 8, **characterised** in, that, a navigation in said list is performed by moving said object in a direction towards the top of said list or towards the bottom of said list, that the movement of said object will cause said marking to move in the same direction, and that the speed of the movement of said marking is lower than the speed of the movement of said object.

10.    User interface according to Claim 9, **characterised** in, that, if the number of applications and/or files in said list exceeds the number of applications and files that can be presented on said display area, and if said object is moved to the top or bottom position of said display area, then lifted, replaced on said display area, and again moved to the top or bottom of said display area, the content of said display area will be replaced one whole page, meaning that if said object is position at the bottom of said display area, then lifted, replaced on said display area, and then again moved to the bottom of said display area, the content of said display area will be replaced by the following applications and/or files in said list, and if said object is position at the top of said display area, then lifted, replaced on said display area, and then again moved to the top of said display area, the content of said display area will be replaced by the preceding applications and/or files in said list.

11.    User interface according to Claim 10, **characterised** in, that if said object is removed from a first position on said display area and then replaced on a second position on said display area, said navigation can be continued from said second position.

12.    User interface according to any preceding Claim, **characterised** in, that an active application, function, service or setting is moved on one step by moving said object from the left of said display area to the right of said display area, and that the active application, function service or setting is closed or backed one step

NEONODE0000019

10/12 '02 14:03 FAX 46 8 31 67 67        GROTH & CO            → NIXON & VANDERHY   @014

13

by moving said object from the right of said display area to the left of said display area.

13.     User interface according to any preceding Claim, **characterised** in, that said menu area is positioned at the bottom of said touch sensitive area, that said representation of said first function is positioned at the left side of said menu area, that said representation of said second function is positioned at the middle of said menu area, and that said representation of said third function is positioned at the right side of said menu area.

14.     User interface according to any preceding Claim, **characterised** in, that said user interface is adapted to a touch sensitive area with a size that is in the order of 2-3 inches, and that said user interface is adapted to be operated by one hand, where said object can be a finger, such as the thumb, of a user of said computer unit.

15.     An enclosure adapted to cover a computer unit, said computer unit being adapted to present a user interface according to any of Claims 1 to 14, **characterised** in, that said enclosure is provided with an opening for said display area, and that a representation of said menu area is printed on top of said enclosure.

16.     Enclosure according to Claim 15, **characterised** in, that said enclosure is removable and exchangeable.

17.     A computer readable medium, with a computer program product stored therein, **characterised** in, that said computer program product comprises computer readable code, which, when read by a computer, will make it possible for said computer to present a user interface according to any of Claims 1 to 14.

18.     A computer readable medium according to Claim 17, **characterised** in, that said computer program product is adapted to function as a shell upon an operations system.

NEONODE0000020

10/12 '02 14:03 FAX 46 8 31 87 87        GROTH & CO        → NIXON & VANDERHY  ☑015

14

## ABSTRACT

The present invention relates to a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area (1), which is divided into a menu area (2) and a display area (3). The computer unit is adapted to run several applications simultaneously and to present an active application on top of any other application on the display area (3). The menu area (2) is adapted to present a representation of a first (21), a second (22) and a third predefined (23) function. The first function (21) is a general application dependent function, the second function (22) is a keyboard function, and the third function (23) is a task and file manager. Any one of these three functions can be activated when the touch sensitive area (1) detects a movement of an object with its starting point within the representation of the function on the menu area (2) and with a direction from the menu area (2) to the display area (3).

(Fig. 1)

NEONODE0000021

10/12 '02 14:03 FAX 46 8 31 67 67        GROTH & CO        → NIXON & VANDERHY    ☑016



1/4

Fig. 1.

Fig. 2.

Fig. 3.

Fig. 4.

Fig. 5.

NEONODE0000022

10/12 '02 14:03 FAX 46 8 31 67 67    GROTH & CO    → NIXON & VANDERHY  ☑017

2/4



Fig. 6.

23

Fig. 7.



Fig. 8.

NEONODE0000023

10/12 '02 14:04 FAX 46 8 31 67 67       GROTH & CO           → NIXON & VANDERHY   ☑018

3/4





Fig. 9.



Fig. 10.



Fig. 11.

Fig. 12.

NEONODE0000024

10/12 '02 14:04 FAX 46 8 31 67 67        GROTH & CO        → NIXON & VANDERHY  @019

4/4



Fig. 13.



Fig. 14.

NEONODE0000025

BEST AVAILABLE COPY

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Effective October 1, 2001 | Application or Docket Number<br>10315250 |
| --- | --- |

## CLAIMS AS FILED - PART I

| | (Column 1) | (Column 2) |
| --- | --- | --- |
| TOTAL CLAIMS | 18 | |
| FOR | NUMBER FILED | NUMBER EXTRA |
| TOTAL CHARGEABLE CLAIMS | 18 minus 20= | * |
| INDEPENDENT CLAIMS | 1 minus 3 = | * |
| MULTIPLE DEPENDENT CLAIM PRESENT | | ☐ |

* If the difference in column 1 is less than zero, enter "0" in column 2

| | SMALL ENTITY<br>TYPE ☐ | | OR | OTHER THAN<br>SMALL ENTITY | |
| --- | --- | --- | --- | --- | --- |
| | RATE | FEE | | RATE | FEE |
| BASIC FEE | | 370.00 | OR | BASIC FEE | 740.00 |
| | X$ 9= | | OR | X$18= | |
| | X42= | | OR | X84= | |
| | +140= | | OR | +280= | |
| | TOTAL | | OR | TOTAL | |

## CLAIMS AS AMENDED - PART II

**AMENDMENT A**

| | (Column 1)<br>CLAIMS REMAINING AFTER AMENDMENT | | (Column 2)<br>HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3)<br>PRESENT EXTRA |
| --- | --- | --- | --- | --- |
| Total | * | Minus | ** | = |
| Independent | * | Minus | *** | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | ☐ |

| | SMALL ENTITY | | OR | OTHER THAN<br>SMALL ENTITY | |
| --- | --- | --- | --- | --- | --- |
| | RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
| | X$ 9= | | OR | X$18= | |
| | X42= | | OR | X84= | |
| | +140= | | OR | +280= | |
| | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

**AMENDMENT B**

| | (Column 1)<br>CLAIMS REMAINING AFTER AMENDMENT | | (Column 2)<br>HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3)<br>PRESENT EXTRA |
| --- | --- | --- | --- | --- |
| Total | * | Minus | ** | = |
| Independent | * | Minus | *** | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | ☐ |

| | RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
| --- | --- | --- | --- | --- | --- |
| | X$ 9= | | OR | X$18= | |
| | X42= | | OR | X84= | |
| | +140= | | OR | +280= | |
| | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

**AMENDMENT C**

| | (Column 1)<br>CLAIMS REMAINING AFTER AMENDMENT | | (Column 2)<br>HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3)<br>PRESENT EXTRA |
| --- | --- | --- | --- | --- |
| Total | * | Minus | ** | = |
| Independent | * | Minus | *** | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | ☐ |

| | RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
| --- | --- | --- | --- | --- | --- |
| | X$ 9= | | OR | X$18= | |
| | X42= | | OR | X84= | |
| | +140= | | OR | +280= | |
| | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20."
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3."
    The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

FORM PTO-875 (Rev. 8/01)          ☆U S GPO.2001 482-124 / 59197          Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE

NEONODE0000026

BEST AVAILABLE COPY

| MULTIPLE DEPENDENT CLAIM FEE CALCULATION SHEET (FOR USE WITH FORM PTO-875) | SERIAL NO. 10315250 | FILING DATE 12/10/02 |
| --- | --- | --- |
| | APPLICANT(S) | |

CLAIMS

| | AS FILED | | AFTER 1st AMENDMENT | | AFTER 2nd AMENDMENT | | | | * | | * | | * | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | IND. | DEP. | IND. | DEP. | IND. | DEP. | | | IND. | DEP. | IND. | DEP. | IND. | DEP. |
| 1 | | | | | | | | 51 | | | | | | |
| 2 | | | | | | | | 52 | | | | | | |
| 3 | | | | | | | | 53 | | | | | | |
| 4 | | | | | | | | 54 | | | | | | |
| 5 | | | | | | | | 55 | | | | | | |
| 6 | | | | | | | | 56 | | | | | | |
| 7 | | | | | | | | 57 | | | | | | |
| 8 | | | | | | | | 58 | | | | | | |
| 9 | | | | | | | | 59 | | | | | | |
| 10 | | | | | | | | 60 | | | | | | |
| 11 | | | | | | | | 61 | | | | | | |
| 12 | | | | | | | | 62 | | | | | | |
| 13 | | | | | | | | 63 | | | | | | |
| 14 | | | | | | | | 64 | | | | | | |
| 15 | | | | | | | | 65 | | | | | | |
| 16 | | | | | | | | 66 | | | | | | |
| 17 | | | | | | | | 67 | | | | | | |
| 18 | | | | | | | | 68 | | | | | | |
| 19 | | | | | | | | 69 | | | | | | |
| 20 | | | | | | | | 70 | | | | | | |
| 21 | | | | | | | | 71 | | | | | | |
| 22 | | | | | | | | 72 | | | | | | |
| 23 | | | | | | | | 73 | | | | | | |
| 24 | | | | | | | | 74 | | | | | | |
| 25 | | | | | | | | 75 | | | | | | |
| 26 | | | | | | | | 76 | | | | | | |
| 27 | | | | | | | | 77 | | | | | | |
| 28 | | | | | | | | 78 | | | | | | |
| 29 | | | | | | | | 79 | | | | | | |
| 30 | | | | | | | | 80 | | | | | | |
| 31 | | | | | | | | 81 | | | | | | |
| 32 | | | | | | | | 82 | | | | | | |
| 33 | | | | | | | | 83 | | | | | | |
| 34 | | | | | | | | 84 | | | | | | |
| 35 | | | | | | | | 85 | | | | | | |
| 36 | | | | | | | | 86 | | | | | | |
| 37 | | | | | | | | 87 | | | | | | |
| 38 | | | | | | | | 88 | | | | | | |
| 39 | | | | | | | | 89 | | | | | | |
| 40 | | | | | | | | 90 | | | | | | |
| 41 | | | | | | | | 91 | | | | | | |
| 42 | | | | | | | | 92 | | | | | | |
| 43 | | | | | | | | 93 | | | | | | |
| 44 | | | | | | | | 94 | | | | | | |
| 45 | | | | | | | | 95 | | | | | | |
| 46 | | | | | | | | 96 | | | | | | |
| 47 | | | | | | | | 97 | | | | | | |
| 48 | | | | | | | | 98 | | | | | | |
| 49 | | | | | | | | 99 | | | | | | |
| 50 | | | | | | | | 100 | | | | | | |
| TOTAL IND. | | | | | | | | TOTAL IND. | | | | | | |
| TOTAL DEP. | | | 17 | | | | | TOTAL DEP. | | | | | | |
| TOTAL CLAIMS | | | 8 | | | | | TOTAL CLAIMS | | | | | | |

PTO-1360 (3-78)

*MAY BE USED FOR ADDITIONAL CLAIMS OR AMENDMENTS    U.S. DEPARTMENT of COMMERCE Patent and Trademark Office

NEONODE0000027

 


**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
Washington, DC 20231
www.uspto.gov

| APPLICATION NUMBER | FILING RECEIPT DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NUMBER |
|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | 3682-32 |

**CONFIRMATION NO. 1226**

NIXON & VANDERHYE P.C.
8th Floor
1100 North Glebe Road
Arlington, VA 22201

**FORMALITIES LETTER**

*OC000000009390646*

Date Mailed: 01/16/2003

# NOTICE TO FILE MISSING PARTS OF NONPROVISIONAL APPLICATION

## FILED UNDER 37 CFR 1.53(b)

### *Filing Date Granted*

## Items Required To Avoid Abandonment:

An application number and filing date have been accorded to this application. The item(s) indicated below, however, are missing. Applicant is given **TWO MONTHS** from the date of this Notice within which to file all required items and pay any fees required below to avoid abandonment. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a).

- The statutory basic filing fee is missing.
  *Applicant must submit $ 370 to complete the basic filing fee for a small entity.*
- The oath or declaration is missing.
  *A properly signed oath or declaration in compliance with 37 CFR 1.63, identifying the application by the above Application Number and Filing Date, is required.*
- To avoid abandonment, a late filing fee or oath or declaration surcharge as set forth in 37 CFR 1.16(e) of $65 for a small entity in compliance with 37 CFR 1.27, must be submitted with the missing items identified in this letter.

## SUMMARY OF FEES DUE:

Total additional fee(s) required for this application is $435 for a Small Entity

- $370 Statutory basic filing fee.
- $65 Late oath or declaration Surcharge.

---

*A copy of this notice **MUST** be returned with the reply.*

NEONODE0000028

  

Customer Service Center
Initial Patent Examination Division (703) 308-1202

PART 3 - OFFICE COPY

NEONODE0000029

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Patent Application of:

GOERTZ

Serial No.   10/315,250

Filed:   December 10, 2002

For:   USER INTERFACE

Attention: A  ation Branch

Atty. Dkt.   3682-32

Date:   March 10, 2003

Assistant Commissioner for Patents
Washington, D.C. 20231

The attached <u>completes</u> filing of the above-identified patent application:

☒ **Correspondence Address Indication Form Attached.**

☒ Signed Rule 63 Declaration alone, ☐ Copy of Declaration from prior application alone, <u>OR</u>
☐ Signed Declaration plus attached copy of originally filed specification/drawings.
☒ **NOTICE TO FILE MISSING PARTS OF APPLICATION FILING DATE GRANTED** form.
☐ Record the attached assignment and return to the undersigned.
☐ Attached is a Power of Attorney.
☐ Priority is hereby claimed under 35 U.S.C. § 119 based on the following foreign applications:
   **Application Number              Country              Day/Month/Year Filed**

respectively.
☐ Certified copy(ies) of foreign application(s) is/are attached.
☐ Certified copy(ies) filed on _____ in prior application no. _____, filed _____.
☒ Applicant claims "small entity" status.   ☐ "Small entity" statement attached.
☐ Please enter the attached and/or below preliminary amendment **prior** to calculation of filing fee.
☐ Also attached: ☐ **Information Disclosure Statement;** ☐ **Nucleotide and/or Amino Acid Sequence Submission;** ☐ **Other:**

**Fees due are calculated below:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Basic filing fee | | | | | | | $ | 750.00 |
| Total Effective claims | 18 | - 20 = | 0 | x $ | 18.00 | | $ | 0.00 |
| Independent claims | 1 | - 3 = | 0 | x $ | 84.00 | | $ | 0.00 |
| If any proper multiple dependent claims now added for first time, add $280.00 (ignore improper) | | | | | | | $ | 0.00 |
| | | | | | | **FILING FEE** | $ | 750.00 |

Petition is hereby made to extend the current due date so as to cover the filing date of this paper
and attachment(s) ($110.00/1 month; $410.00/2 months; $930.00/3 months; $1450.00/4 months)   $

| | | |
|---|---|---|
| Surcharge ($130.00) if Declaration or filing fee first now submitted | $ | 130.00 |
| English translation of specification and claims ($130.00) | $ | 0.00 |
| **FIRST SUBTOTAL** | $ | 880.00 |
| If "small entity," enter half (½) of subtotal and subtract | -$ | 440.00 |
| **SECOND SUBTOTAL** | $ | 440.00 |
| Assignment Recording Fee ($40.00) | $ | 0.00 |
| **TOTAL FEE DUE** | $ | 440.00 |
| Check enclosed (Pre-Bill)* | $ | 440.00 |
| Check enclosed (non Pre-Bill)* | $ | |
| **TOTAL FEE ENCLOSED** | $ | **440.00** |

Any future submission requiring an extension of time is hereby stated to include a petition for such time extension.
The Commissioner is hereby authorized to charge any <u>deficiency</u>, or credit any overpayment, in the fee(s) filed, or
asserted to be filed, or which should have been filed herewith (or with any paper hereafter filed in this application
by this firm) to our **Account No. 14-1140.** A <u>duplicate</u> copy of this sheet is attached.

1100 North Glebe Road, 8th Floor
Arlington, Virginia 22201-4714
Telephone: (703) 816-4000
Facsimile: (703) 816-4100
RGB:alm

NIXON & VANDERHYE P.C.
By Atty: Richard G. Besha, Reg. No. 22,770

Signature: _Richard Besha_____

717322

NEONODE0000030

#3  Page 1 of 2



**UNITED STATES PATENT AND TRADEMARK OFFICE**

MAR 1 0 2003

Commissioner for Patents
Washington, DC 20231
www.uspto.gov

| APPLICATION NUMBER | FILING/RECEIPT DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NUMBER |
|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | 3682-32 |

**CONFIRMATION NO. 1226**

NIXON & VANDERHYE P.C.
8th Floor
1100 North Glebe Road
Arlington, VA 22201

**FORMALITIES LETTER**

*OC000000009390646*

Date Mailed: 01/16/2003

# NOTICE TO FILE MISSING PARTS OF NONPROVISIONAL APPLICATION

## FILED UNDER 37 CFR 1.53(b)

### *Filing Date Granted*

## Items Required To Avoid Abandonment:

An application number and filing date have been accorded to this application. The item(s) indicated below, however, are missing. Applicant is given **TWO MONTHS** from the date of this Notice within which to file all required items and pay any fees required below to avoid abandonment. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a).

- The statutory basic filing fee is missing.
  *Applicant must submit $ 370 to complete the basic filing fee for a small entity.*
- The oath or declaration is missing.
  *A properly signed oath or declaration in compliance with 37 CFR 1.63, identifying the application by the above Application Number and Filing Date, is required.*
- To avoid abandonment, a late filing fee or oath or declaration surcharge as set forth in 37 CFR 1.16(e) of $65 for a small entity in compliance with 37 CFR 1.27, must be submitted with the missing items identified in this letter.

## SUMMARY OF FEES DUE:

Total additional fee(s) required for this application is $435 for a Small Entity

- $370 Statutory basic filing fee.
- $65 Late oath or declaration Surcharge.

03/13/2003 BNGUYEN1 00000018 10315250

01 FC:2001        375.00 OP
02 FC:2051         65.00 OP

*A copy of this notice **MUST** be returned with the reply.*

NEONODE0000031

Customer Service Center
Initial Patent Examination Division (703) 308-1202
PART 2 - COPY TO BE RETURNED WITH RESPONSE

NEONODE0000032

07/03 '03 15:25 FAX 46 8 31 67 67          GROTH & CO          → NIXON & VANDERHY  ☒002/002

#3

3682-32
P02-700/UK/MLE

Nixon & Vanderhye P.C. (10/99)
(Domestic Non-Assigned/Foreign)  Page 1

**RULE 63 (37 C.F.R. 1.63)**
**INVENTORS DECLARATION FOR PATENT APPLICATION**
**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

As a below named inventor, I hereby declare that my residence, mailing address and citizenship are as stated below next to my name, and I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

**USER INTERFACE**

the specification of which (check applicable box(s)):

[ ]  is attached hereto
[X]  was filed on          December 10, 2002          as U.S. Application Serial No.     Unassigned          (Atty. Dkt. No. 3682-32)
[ ]  was filed as PCT International application No.                                on
and (if applicable to U.S. or PCT application) was amended on

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above. I acknowledge the duty to disclose to the Patent Office all information known to me to be material to patentability as defined in 37 C.F.R. 1.56. I hereby claim foreign priority benefits under 35 U.S.C. 119/365 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed or, if no priority is claimed, before the filing date of this application:

Priority Foreign Application(s):

| Application Number | Country | Day/Month/Year Filed |
|---|---|---|
| | | |

I hereby claim the benefit under 35 U.S.C. §119(e) of any United States provisional application(s) listed below.

| Application Number | Date/Month/Year Filed |
|---|---|
| | |

I hereby claim the benefit under 35 U.S.C. 120/365 of all prior United States and PCT international applications listed above or below:

| Prior U.S./PCT Application(s): Application Serial No. | Day/Month/Year Filed | Status: patented pending, abandoned |
|---|---|---|
| | | |

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon. And on behalf of the owner(s) hereof, I hereby appoint NIXON & VANDERHYE P.C., 1100 North Glebe Rd., 8th Floor, Arlington, VA 22201-4714, telephone number (703) 816-4000 (to whom all communications are to be directed), and the following attorneys thereof (of the same address) individually and collectively owner's/owners' attorneys to prosecute this application and to transact all business in the Patent and Trademark Office connected therewith and with the resulting patent: Larry S. Nixon, 25640; Arthur R. Crawford, 25327; James T. Hosmer, 30184; Robert W. Faris, 31352; Richard G. Besha, 22770; Mark E. Nusbaum, 32348; Michael J. Keenan, 32106; Bryan H. Davidson, 30251; Stanley C. Spooner, 27393; Leonard C. Mitchard, 29009; Duane M. Byers, 33363; Jeffry H. Nelson, 30481; John R. Lastova, 33149; H. Warren Burnam, Jr. 29366; Mary J. Wilson, 32955; J. Scott Davidson, 33489; Alan M. Kagen, 36178; Robert A. Molan, 29834; B. J. Sadoff, 36663; James D. Berquist, 34776; Updeep S. Gill, 37334; Michael J. Shea, 34725; Donald L. Jackson, 41090; Michelle N. Lester, 32331; Frank P. Presta, 19828; Joseph S. Presta, 35329; Joseph A. Rhoa, 37515; Raymond Y. Mah, 41426; Chris Comuntzis, 31097; Gary R. Tanigawa, 43180. I also authorize Nixon & Vanderhye to delete any attorney names/numbers no longer with the firm and to act and rely solely on instructions directly communicated from the person, assignee, attorney, firm, or other organization sending instructions to Nixon & Vanderhye on behalf of the owner(s).

1.  Inventor's Signature:                                          Date: 2003-03-05
    Inventor:        Magnus          MI          BOERTZ          Swedish
                     (first)         (MI)        (last)          (citizenship)
    Residence: (city)  Stockholm          (state/country)  SWEDEN
    Mailing Address:   Engelbrektsgatan 14A, Stockholm, SWEDEN
    (Zip Code)         SE-114 32

2.  Inventor's Signature:                                          Date:
    Inventor:
                     (first)         MI          (last)          (citizenship)
    Residence: (city)          (state/country)
    Mailing Address:
    (Zip Code)

**[ ] *See attached sheet(s) for additional inventor(s) information!!***

NEONODE0000033

  

Please type a plus sign (+) inside this box → [+]

#4 3682-32

PTO/SB/121 (10-00)
Approved for use through 10/31/2002. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| CORRESPONDENCE ADDRESS INDICATION FORM | **Address to:**<br><br>Assistant Commissioner for Patents<br>Box CN<br>Washington, DC 20231 |  |
|---|---|---|

**Direct all correspondence to:**

☒  **Customer Number:**    **23117**

Place Customer
Number Bar
Label Here →

*OR*

*Type Customer Number here*

☐   Request for Customer Number (PTO/SB/125) submitted herewith.

**in the following listed application(s) or patent(s):**

| Patent Number (if appropriate) | Application Number | Patent Date (if appropriate) | U.S. Filing Date |
|---|---|---|---|
| | 10/315,250 | | December 10, 2002 |

| | | *(check one)* | |
|---|---|---|---|
| Typed or Printed Name | Richard G. Besha | ☐ | Applicant or Patentee |
| Signature | *Richard Besha* | ☐ | Assignee of record of the entire interest. Statement under 37 C.F.R. § 3.73(b) is enclosed. (Form PTO/SB/96) |
| Date | March 10, 2003 | | |
| Address of signer: | 1100 North Glebe Road, 8th Floor Arlington, VA 22202 | ☒ | Attorney or Agent of record<br><br>22,770<br>(Reg. No.) |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below*.

☒  *Total of [ 1 ] forms are submitted.

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS: SEND TO: Assistant Commissioner of Patents, Box CN, Washington, DC 20231.

717321

NEONODE0000034

10315250

PLUS Search Results for S/N 10315250, Searched March 06, 2006

The Patent Linguistics Utility System (PLUS) is a USPTO automated search
system for U.S. Patents from 1971 to the present.  PLUS is a
query-by-example search system which produces a list of patents that are
most closely related linguistically to the application searched.  This
search was prepared by the staff of the Scientific and Technical
Information Center, SIRA.

5671420
5978568
5905862
4949248
5367573
5692191
5983259
6035303
6098158
4336458
4357021
4368669
4503533
4506336
4782463
5016308
5178418
5301269
5392212
5428744
5442788
5524199
5524200
5526018
5533148
5544301
5546534
5555369
5555368
5559903
5561811
5568770
5570109
5596639
5598534
5636133
5642495
5664208
5677710
5733278
5740455
5781901
5793498
5796402
5796397
5864848
5870611
5881286
5881242
5897644

NEONODE0000035

# EAST Search History

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S2 | 1 | ("20040109013").PN. | US-PGPUB; USPAT | OR | OFF | 2006/03/15 10:39 |
| S3 | 2 | goertz-magnus.in. | US-PGPUB; USPAT | OR | ON | 2006/03/08 17:25 |
| S4 | 1 | (((handheld adj computer)or pda) near2 enclosure).ti. | US-PGPUB; USPAT | OR | ON | 2006/03/05 18:56 |
| S5 | 22 | (((handheld adj computer)or pda) near2 enclosure) | US-PGPUB; USPAT | OR | ON | 2006/03/05 18:56 |
| S6 | 50 | ("5671420" "5978568" "5905862" "4949248" "5367573" "5692191" "5983259" "6035303" "6098158" "4336458" "4357021" "4368669" "4503533" "4506336" "4782463" "5016308" "5178418" "5301269" "5392212" "5428744" "5442788" "5524199" "5524200" "5526018" "5533148" "5544301" "5546534" "5555369" "5555368" "5559903" "5561811" "5568770" "5570109" "5596639" "5598534" "5636133" "5642495" "5664208" "5677710" "5733278" "5740455" "5781901" "5793498" "5796402" "5796397" "5864848" "5870611" "5881286" "5881242" "5897644").pn. | US-PGPUB; USPAT | OR | ON | 2006/03/08 16:39 |
| S7 | 245 | 715/864.ccls. | US-PGPUB; USPAT | OR | ON | 2006/03/09 15:23 |
| S8 | 5702 | S7 ((menu and display) with area) | US-PGPUB; USPAT | OR | ON | 2006/03/08 17:28 |
| S9 | 245 | S8 and S7 | US-PGPUB; USPAT | OR | ON | 2006/03/08 17:28 |
| S10 | 464 | S7 ((menu and display) adj area) | US-PGPUB; USPAT | OR | ON | 2006/03/08 17:28 |
| S11 | 245 | S10 and S7 | US-PGPUB; USPAT | OR | ON | 2006/03/08 17:30 |
| S12 | 12754 | (touch adj sensitive) or (tactile adj based) | US-PGPUB; USPAT | OR | ON | 2006/03/08 17:31 |
| S13 | 54 | S12 and S7 | US-PGPUB; USPAT | OR | ON | 2006/03/08 18:00 |
| S14 | 106 | 715/702.ccls. | US-PGPUB; USPAT | OR | ON | 2006/03/08 18:00 |
| S15 | 1 | S14 and S7 | US-PGPUB; USPAT | OR | ON | 2006/03/08 18:01 |
| S16 | 25 | S14 and S12 | US-PGPUB; USPAT | OR | ON | 2006/03/08 18:01 |
| S17 | 20 | ("5327161" | "5406307" | "5473745" | "5594471" | "5617526" | "5745109" | "5757368" | "5757371" | "5910802").PN. OR ("6304261"). URPN. | US-PGPUB; USPAT; USOCR | OR | ON | 2006/03/08 18:11 |
| S18 | 14 | ("4475239" | "4839634" | "4855725" | "4965558" | "5075675" | "5347628").PN. OR ("6100878").URPN. | US-PGPUB; USPAT; USOCR | OR | ON | 2006/03/09 09:11 |

NEONODE0000036

# EAST Search History

| S19 | 92 | ("3761877" \| "3772685" \| "3832693" \| "3990070" \| "4058849" \| "4125873" \| "4190833" \| "4363029" \| "4639720").PN. OR ("4839634"). URPN. | US-PGPUB; USPAT; USOCR | OR | ON | 2006/03/09 09:14 |
|-----|-----|-----|-----|-----|-----|-----|
| S20 | 134 | ("3699439" \| "3832693" \| "4016542" \| "4055726" \| "4071691" \| "4112415" \| "4129747" \| "4177354" \| "4184147" \| "4198539" \| "4262281" \| "4293734" \| "4302011" \| "4318096" \| "4353552" \| "4365235" \| "4371746" \| "4456787" \| "4475239" \| "4520357" \| "4641354" \| "4672677" \| "4679241" \| "4680430" \| "4680804" \| "4764885" \| "4786765" \| "4831556" \| "4839634" \| "4972496" \| "5050105" \| "5053758" \| "5151950").PN. OR ("5347295"). URPN. | US-PGPUB; USPAT; USOCR | OR | ON | 2006/03/09 09:52 |
| S21 | 46 | ("3603983" \| "3617666" \| "3864024" \| "3911215" \| "4017858" \| "4180711" \| "4220815" \| "4373124" \| "4594482" \| "4604605" \| "4607147" \| "4626961" \| "4707570" \| "4734218" \| "4737310" \| "4740781" \| "4745241" \| "4778619" \| "4780531" \| "4815826" \| "4838660" \| "4839634" \| "4841290" \| "Re28365").PN. OR ("4990900").URPN. | US-PGPUB; USPAT; USOCR | OR | ON | 2006/03/09 09:55 |
| S22 | 4 | kang-beng-hong.in. | US-PGPUB; USPAT | OR | ON | 2006/03/09 14:29 |
| S23 | 247 | 715/864.ccls. | US-PGPUB; USPAT | OR | ON | 2006/03/10 11:19 |
| S24 | 37 | S23 and drag$4 | US-PGPUB; USPAT | OR | ON | 2006/03/09 15:23 |
| S25 | 34 | hirayama-tomoshi.in. | US-PGPUB; USPAT | OR | ON | 2006/03/09 16:30 |
| S26 | 2 | S25 and (display and menu and drag$4) | US-PGPUB; USPAT | OR | ON | 2006/03/09 17:04 |
| S27 | 5 | S25 and (display and "45" and drag$4) | US-PGPUB; USPAT | OR | ON | 2006/03/09 17:04 |

NEONODE0000037

# EAST Search History

| S28 | 72 | (US-20050229117-$ or US-20050120312-$ or US-20050114797-$ or US-20030007018-$ or US-20050102639-$ or US-20020060702-$ or US-20020078143-$ or US-20040160442-$ or US-20030005003-$ or US-20020050996-$ or US-20040109013-$ or US-20060010405-$ or US-20030081016-$ or US-20030081015-$ or US-20030001909-$ or US-20060026521-$ or US-20030231197-$).did. or (US-5949408-$ or US-5917493-$ or US-7007239-$ or US-6938220-$ or US-6956562-$ or US-6938222-$ or US-6801190-$ or US-6938221-$ or US-6876368-$ or US-6833827-$ or US-6356287-$ or US-6100878-$ or US-5406307-$ or US-5903268-$ or US-5424966-$ or US-5796397-$ or US-5677710-$ or US-5570109-$ or US-5555369-$ or US-4782463-$ or US-6980200-$ or US-6904570-$ or US-6882865-$ or US-6996784-$ or US-6741235-$ or US-6714220-$).did. or (US-6335725-$ or US-6304261-$ or US-5627567-$ or US-5821930-$ or US-5910802-$ or US-5757371-$ or US-5594471-$ or US-5327161-$ or US-4839634-$ or US-5757368-$ or US-6502114-$ or US-5453761-$ or US-5347295-$ or US-5570113-$ or US-6903730-$ or US-6664991-$ or US-6094197-$ or US-6262719-$ or US-6181344-$ or US-5798758-$ or US-5760773-$ or US-5726687-$ or US-5583543-$ or US-5523775-$ or US-5517578-$ or US-5502803-$ or US-4680804-$).did. or (US-5524201-$ or US-5483261-$).did. | US-PGPUB; USPAT | OR | ON | 2006/03/10 09:06 |
| S29 | 1 | S28 and ((task adj manager) or (file adj manager)) | US-PGPUB; USPAT | OR | ON | 2006/03/10 11:24 |
| S30 | 44 | S28 and ((task) or (file)) | US-PGPUB; USPAT | OR | ON | 2006/03/10 09:08 |
| S31 | 4 | S28 and ((task) with (file)) | US-PGPUB; USPAT | OR | ON | 2006/03/10 09:09 |
| S32 | 13 | S28 and ((task or file) with manage$4) | US-PGPUB; USPAT | OR | ON | 2006/03/10 12:05 |
| S33 | 0 | S28 and ((taskmanage$4 or filemanage$4)) | US-PGPUB; USPAT | OR | ON | 2006/03/10 11:32 |
| S34 | 0 | S28 and ((task-manage$4 or file-manage$4)) | US-PGPUB; USPAT | OR | ON | 2006/03/10 11:33 |
| S35 | 247 | 715/864.ccls. | US-PGPUB; USPAT | OR | ON | 2006/03/10 11:30 |
| S36 | 1 | S35 and ((task adj manager) or (file adj manager)) | US-PGPUB; USPAT | OR | ON | 2006/03/10 11:30 |
| S37 | 0 | S35 and ((taskmanage$4 or filemanage$4)) | US-PGPUB; USPAT | OR | ON | 2006/03/10 11:33 |
| S38 | 0 | S35 and ((task-manage$4 or file-manage$4)) | US-PGPUB; USPAT | OR | ON | 2006/03/10 11:33 |

NEONODE0000038

# EAST Search History

| S39 | 18 | S35 and ((task or file) with manage$4) | US-PGPUB; USPAT | OR | ON | 2006/03/10 11:33 |
|---|---|---|---|---|---|---|
| S40 | 72 | (US-20050229117-$ or US-20050120312-$ or US-20050114797-$ or US-20030007018-$ or US-20050102639-$ or US-20020060702-$ or US-20020078143-$ or US-20040160442-$ or US-20030005003-$ or US-20020050996-$ or US-20040109013-$ or US-20060010405-$ or US-20030081016-$ or US-20030081015-$ or US-20030001909-$ or US-20060026521-$ or US-20030231197-$).did. or (US-5949408-$ or US-5917493-$ or US-7007239-$ or US-6938220-$ or US-6956562-$ or US-6938222-$ or US-6801190-$ or US-6938221-$ or US-6876368-$ or US-6833827-$ or US-6356287-$ or US-6100878-$ or US-5406307-$ or US-5903268-$ or US-5424966-$ or US-5796397-$ or US-5677710-$ or US-5570109-$ or US-5555369-$ or US-4782463-$ or US-6980200-$ or US-6904570-$ or US-6882865-$ or US-6996784-$ or US-6741235-$ or US-6714220-$).did. or (US-6335725-$ or US-6304261-$ or US-5627567-$ or US-5821930-$ or US-5910802-$ or US-5757371-$ or US-5594471-$ or US-5327161-$ or US-4839634-$ or US-5757368-$ or US-6502114-$ or US-5453761-$ or US-5347295-$ or US-5570113-$ or US-6903730-$ or US-6664991-$ or US-6094197-$ or US-6262719-$ or US-6181344-$ or US-5798758-$ or US-5760773-$ or US-5726687-$ or US-5583543-$ or US-5523775-$ or US-5517578-$ or US-5502803-$ or US-4680804-$).did. or (US-5524201-$ or US-5483261-$).did. | US-PGPUB; USPAT | OR | ON | 2006/03/10 12:18 |
| S41 | 13 | S40 and ((task or file) with manage$4) | US-PGPUB; USPAT | OR | ON | 2006/03/10 11:33 |
| S42 | 13 | S39 not S41 | US-PGPUB; USPAT | OR | ON | 2006/03/10 11:34 |
| S43 | 18 | S35 and ((task or file) with manage$4) | US-PGPUB; USPAT | OR | ON | 2006/03/10 12:05 |
| S44 | 5 | S43 not S42 | US-PGPUB; USPAT | OR | ON | 2006/03/10 12:15 |
| S45 | 1 | S40 and (start adj menu) | US-PGPUB; USPAT | OR | ON | 2006/03/10 12:38 |
| S46 | 32 | chew-chee-h.in. | US-PGPUB; USPAT | OR | ON | 2006/03/10 12:38 |
| S47 | 3 | ("5588105" | "5666438" | "6243071").PN. OR ("6727917").URPN. | US-PGPUB; USPAT; USOCR | OR | ON | 2006/03/10 12:42 |

NEONODE0000039

# EAST Search History

| S48 | 80 | (US-20050216867-$ or US-20060010405-$ or US-20030001909-$ or US-20020078143-$ or US-20030007018-$ or US-20050229117-$ or US-20050120312-$ or US-20050114797-$ or US-20040160442-$ or US-20030231197-$ or US-20030081016-$ or US-20030081015-$ or US-20060026521-$ or US-20020060702-$ or US-20020050996-$ or US-20050102639-$ or US-20040109013-$ or US-20030005003-$).did. or (US-6674453-$ or US-5757371-$ or US-6996784-$ or US-7007239-$ or US-6956562-$ or US-6938221-$ or US-6938220-$ or US-6903730-$ or US-6882865-$ or US-6876368-$ or US-6801190-$ or US-6980200-$ or US-6741235-$ or US-6664991-$ or US-6938222-$ or US-6502114-$ or US-6356287-$ or US-6335725-$ or US-6904570-$ or US-6304261-$ or US-6262719-$ or US-6181344-$ or US-6833827-$ or US-6100878-$ or US-6094197-$ or US-5949408-$).did. or (US-6714220-$ or US-5917493-$ or US-5910802-$ or US-5903268-$ or US-5798758-$ or US-5796397-$ or US-5760773-$ or US-5757368-$ or US-5726687-$ or US-5677710-$ or US-5627567-$ or US-5594471-$ or US-5583543-$ or US-5570113-$ or US-5570109-$ or US-5555369-$ or US-5524201-$ or US-5821930-$ or US-5523775-$ or US-5517578-$ or US-5483261-$ or US-5453761-$ or US-5424966-$ or US-5347295-$ or US-5327161-$ or US-4839634-$ or US-4680804-$).did. or (US-6072486-$ or US-5502803-$ or US-5920316-$ or US-5680559-$ or US-5406307-$ or US-4782463-$ or US-6727917-$ or US-6008806-$ or US-5673406-$).did. | US-PGPUB; USPAT | OR | ON | 2006/03/13 10:16 |
| S49 | 27 | S48 and ((several or multiple or plurality) near2 (application or program or process or window)) | US-PGPUB; USPAT | OR | ON | 2006/03/13 10:17 |

NEONODE0000040

# EAST Search History

| S50 | 80 | (US-20050216867-$ or US-20060010405-$ or US-20030001909-$ or US-20020078143-$ or US-20030007018-$ or US-20050229117-$ or US-20050120312-$ or US-20050114797-$ or US-20040160442-$ or US-20030231197-$ or US-20030081016-$ or US-20030081015-$ or US-20060026521-$ or US-20020060702-$ or US-20020050996-$ or US-20050102639-$ or US-20040109013-$ or US-20030005003-$).did. or (US-6674453-$ or US-5757371-$ or US-6996784-$ or US-7007239-$ or US-6956562-$ or US-6938221-$ or US-6938220-$ or US-6903730-$ or US-6882865-$ or US-6876368-$ or US-6801190-$ or US-6980200-$ or US-6741235-$ or US-6664991-$ or US-6938222-$ or US-6502114-$ or US-6356287-$ or US-6335725-$ or US-6904570-$ or US-6304261-$ or US-6262719-$ or US-6181344-$ or US-6833827-$ or US-6100878-$ or US-6094197-$ or US-5949408-$).did. or (US-6714220-$ or US-5917493-$ or US-5910802-$ or US-5903268-$ or US-5798758-$ or US-5796397-$ or US-5760773-$ or US-5757368-$ or US-5726687-$ or US-5677710-$ or US-5627567-$ or US-5594471-$ or US-5583543-$ or US-5570113-$ or US-5570109-$ or US-5555369-$ or US-5524201-$ or US-5821930-$ or US-5523775-$ or US-5517578-$ or US-5483261-$ or US-5453761-$ or US-5424966-$ or US-5347295-$ or US-5327161-$ or US-4839634-$ or US-4680804-$).did. or (US-6072486-$ or US-5502803-$ or US-5920316-$ or US-5680559-$ or US-5406307-$ or US-4782463-$ or US-6727917-$ or US-6008806-$ or US-5673406-$).did. | US-PGPUB; USPAT | OR | ON | 2006/03/13 11:55 |
|-----|-----|-----|-----|-----|-----|-----|
| S51 | 30 | S50 and help | US-PGPUB; USPAT | OR | ON | 2006/03/13 12:28 |
| S52 | 247 | 715/864.ccls. | US-PGPUB; USPAT | OR | ON | 2006/03/13 12:28 |
| S53 | 67 | S52 and help | US-PGPUB; USPAT | OR | ON | 2006/03/13 12:53 |
| S54 | 23811 | "715"/$.ccls. | US-PGPUB; USPAT | OR | ON | 2006/03/13 12:53 |
| S55 | 5557 | help near2 (button or menu or icon) | US-PGPUB; USPAT | OR | ON | 2006/03/13 12:54 |
| S56 | 1155 | S54 and S55 | US-PGPUB; USPAT | OR | ON | 2006/03/13 12:54 |
| S57 | 247 | S54 and S52 | US-PGPUB; USPAT | OR | ON | 2006/03/13 12:54 |
| S58 | 4116 | help adj (button or menu or icon) | US-PGPUB; USPAT | OR | ON | 2006/03/13 12:54 |

NEONODE0000041

# EAST Search History

| S59 | 15 | S52 and S55 | US-PGPUB; USPAT | OR | ON | 2006/03/13 12:59 |
|---|---|---|---|---|---|---|
| S60 | 467 | S52 ((menu and display) adj area) | US-PGPUB; USPAT | OR | ON | 2006/03/13 12:59 |
| S61 | 247 | S60 and S52 | US-PGPUB; USPAT | OR | ON | 2006/03/13 12:59 |
| S62 | 106 | 715/702.ccls. | US-PGPUB; USPAT | OR | ON | 2006/03/13 12:59 |
| S63 | 1 | S62 and S61 | US-PGPUB; USPAT | OR | ON | 2006/03/13 13:01 |
| S64 | 2 | S62 and S55 | US-PGPUB; USPAT | OR | ON | 2006/03/13 12:59 |
| S65 | 0 | S62 and S58 | US-PGPUB; USPAT | OR | ON | 2006/03/13 13:01 |
| S66 | 25 | S62 and help | US-PGPUB; USPAT | OR | ON | 2006/03/13 14:30 |
| S67 | 26 | S50 and sav$3 | US-PGPUB; USPAT | OR | ON | 2006/03/13 15:37 |
| S68 | 2 | S52 and (sav$3 near2 text) | US-PGPUB; USPAT | OR | ON | 2006/03/13 15:45 |
| S69 | 7 | S52 and (sav$3 with text) | US-PGPUB; USPAT | OR | ON | 2006/03/13 15:51 |
| S70 | 3 | S62 and (sav$3 with text) | US-PGPUB; USPAT | OR | ON | 2006/03/13 15:53 |
| S71 | 41 | S54 and (sav$3 with text with delet$3) | US-PGPUB; USPAT | OR | ON | 2006/03/13 15:54 |
| S72 | 18 | S54 and ((sav$3 with text with delet$3) and (phone or telephone or (text adj message))) | US-PGPUB; USPAT | OR | ON | 2006/03/13 15:55 |
| S73 | 176 | S54 and ((file adj (menu or button or icon)) with save) | US-PGPUB; USPAT | OR | ON | 2006/03/13 16:25 |
| S74 | 47 | S54 and (((file adj (menu or button or icon)) with save) and (telephone or phone or (text adj message))) | US-PGPUB; USPAT | OR | ON | 2006/03/13 16:25 |
| S78 | 1 | ("6542191").PN. | US-PGPUB; USPAT | OR | OFF | 2006/03/13 17:11 |
| S79 | 1982 | (remov$4 and exchang$4) same enclosure | US-PGPUB; USPAT | OR | ON | 2006/03/13 18:32 |
| S80 | 5 | S54 and S79 | US-PGPUB; USPAT | OR | ON | 2006/03/13 18:30 |
| S81 | 0 | S80 and (hand or portable or pda) | US-PGPUB; USPAT | OR | ON | 2006/03/13 18:31 |
| S82 | 0 | S80 and (handheld or hand-held or portable or pda or phone) | US-PGPUB; USPAT | OR | ON | 2006/03/13 18:32 |
| S83 | 0 | S82 and S79 | US-PGPUB; USPAT | OR | ON | 2006/03/13 18:32 |
| S84 | 302 | S79 and (handheld or hand-held or portable or pda or phone) | US-PGPUB; USPAT | OR | ON | 2006/03/13 18:33 |
| S85 | 916 | (remov$4 and exchang$4) with enclosure | US-PGPUB; USPAT | OR | ON | 2006/03/13 18:38 |

NEONODE0000042

# EAST Search History

| S86 | 126 | S85 and (handheld or hand-held or portable or pda or phone) | US-PGPUB; USPAT | OR | ON | 2006/03/13 18:39 |
|---|---|---|---|---|---|---|
| S87 | 0 | (removable and exchangable) with enclosure | US-PGPUB; USPAT | OR | ON | 2006/03/13 18:39 |
| S88 | 4927 | (removable or exchangable) with enclosure | US-PGPUB; USPAT | OR | ON | 2006/03/13 18:40 |
| S89 | 1144 | S88 and (handheld or hand-held or portable or pda or phone) | US-PGPUB; USPAT | OR | ON | 2006/03/13 18:39 |
| S90 | 182 | (removable or exchangable) with enclosure with (handheld or hand-held or portable or pda or phone or cellphone or telephone) | US-PGPUB; USPAT | OR | ON | 2006/03/13 18:40 |
| S91 | 9 | ("20010034250" | "5768100" | "6035214" | "6052279" | "6085112" | "6137686" | "6157533" | "6259932" | "6317315").PN. | US-PGPUB; USPAT; USOCR | OR | ON | 2006/03/13 18:50 |
| S92 | 120 | 715/823.ccls. | US-PGPUB; USPAT | OR | ON | 2006/03/14 16:44 |
| S93 | 399 | ((hard or physical or mechanical) adj (key or button)) with ((soft) adj (button or key)) | US-PGPUB; USPAT | OR | ON | 2006/03/14 16:46 |
| S94 | 8 | ((hard or physical or mechanical) adj (key or button)) with ((soft) adj (button or key)) with (interchang$4 or instead) | US-PGPUB; USPAT | OR | ON | 2006/03/14 16:50 |
| S95 | 364236 | S93 (portable or handheld or hand-held or pda) | US-PGPUB; USPAT | OR | ON | 2006/03/14 16:50 |
| S96 | 399 | S93 and S95 | US-PGPUB; USPAT | OR | ON | 2006/03/14 16:51 |
| S97 | 114 | 715/860.ccls. | US-PGPUB; USPAT | OR | ON | 2006/03/15 10:39 |
| S98 | 52 | S97 and (speed or fast$2 or slow$2) | US-PGPUB; USPAT | OR | ON | 2006/03/15 10:56 |
| S99 | 0 | ((cursor or pointer or mouse) adj speed with (fast$2 or slow$2) with (highlight$3 or high-light$3)) | US-PGPUB; USPAT | OR | ON | 2006/03/15 10:55 |
| S100 | 1 | ((cursor or pointer or mouse or marker) with speed with (fast$2 or slow$2 or low$2) with (highlight$3 or high-light$3)) | US-PGPUB; USPAT | OR | ON | 2006/03/15 10:56 |
| S101 | 0 | 715/830.ccls | US-PGPUB; USPAT | OR | ON | 2006/03/15 10:56 |
| S102 | 55 | 715/830.ccls. | US-PGPUB; USPAT | OR | ON | 2006/03/15 10:56 |
| S103 | 42 | S102 and (speed or fast$2 or slow$2 or low$2) | US-PGPUB; USPAT | OR | ON | 2006/03/15 10:57 |
| S104 | 9 | ("4879648" | "5363481" | "5721847" | "5790115" | "5844560" | "6144378" | "6295057" | "6300967" | "6388686").PN. | US-PGPUB; USPAT; USOCR | OR | ON | 2006/03/15 12:15 |
| S105 | 106 | 715/702.ccls. | US-PGPUB; USPAT; USOCR | OR | ON | 2006/03/15 12:16 |
| S106 | 28 | S105 and ((cursor or marking or marker or pointer or mouse or stylus or finger) with (speed or low$2 or slow$2 or fast$2)) | US-PGPUB; USPAT; USOCR | OR | ON | 2006/03/15 12:17 |

NEONODE0000043

## EAST Search History

| S107 | 2 | goertz-magnus.in. | US-PGPUB; USPAT; USOCR; EPO; JPO; DERWENT ; IBM_TDB | OR | ON | 2006/03/15 16:32 |
|---|---|---|---|---|---|---|

NEONODE0000044

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | 3682-32 | 1226 |

23117    7590    03/23/2006

NIXON & VANDERHYE, PC
901 NORTH GLEBE ROAD, 11TH FLOOR
ARLINGTON, VA  22203

| EXAMINER |
|---|
| PURCELL, IAN M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2174 | |

DATE MAILED: 03/23/2006

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

NEONODE0000045

*E*

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 10/315,250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** | |
| | Ian M. Purcell | 2174 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *3* MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *10 December 2002*.

2a)☐ This action is **FINAL**.          2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) *1-18* is/are pending in the application.

   4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) *1-18* is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☒ The specification is objected to by the Examiner.

10)☒ The drawing(s) filed on *10 December 2002* is/are: a)☐ accepted or b)☒ objected to by the Examiner.

   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All   b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

   * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)
2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3)☐ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08) Paper No(s)/Mail Date _____.
4)☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.
5)☐ Notice of Informal Patent Application (PTO-152)
6)☐ Other: _____.

U.S. Patent and Trademark Office
PTOL-326 (Rev. 7-05)          Office Action Summary          Part of Paper No./Mail Date 20060308

NEONODE0000046

Application/Control Number: 10/315,250                                    Page 2
Art Unit: 2174

## DETAILED ACTION

### *Drawings*

1.    The drawings are objected to as failing to comply with 37 CFR 1.84(p)(5)

because they include the following reference character(s) not mentioned in the

description:

(a.) Fig. 14 is not mentioned in the Brief Description of the Drawings.

Corrected drawing sheets in compliance with 37 CFR 1.121(d), or amendment to

the specification to add the reference character(s) in the description in compliance with

37 CFR 1.121(b) are required in reply to the Office action to avoid abandonment of the

application. Any amended replacement drawing sheet should include all of the figures

appearing on the immediate prior version of the sheet, even if only one figure is being

amended. Each drawing sheet submitted after the filing date of an application must be

labeled in the top margin as either "Replacement Sheet" or "New Sheet" pursuant to 37

CFR 1.121(d). If the changes are not accepted by the examiner, the applicant will be

notified and informed of any required corrective action in the next Office action. The

objection to the drawings will not be held in abeyance.


### *Specification*

2.    The title of the invention is not descriptive.  A new title is required that is clearly

indicative of the invention to which the claims are directed.

NEONODE0000047

Application/Control Number: 10/315,250                                      Page 3
Art Unit: 2174

### *Claim Objections*

3.     Claim 3 objected to because of the following informalities:

(a.) Claim 3 states "characterised in, that that a selection of a preferred service or setting is done tapping" and should be changed to --characterised in, that a selection of a preferred service or setting is done by tapping –

(b.) Claim 8 states "content if said list" should be changed to -content of said list - Appropriate correction is required.

4.     Claim 11 is objected to under 37 CFR 1.75(c), as being of improper dependent form for failing to further limit the subject matter of a previous claim.  Applicant is required to cancel the claim(s), or amend the claim(s) to place the claim(s) in proper dependent form, or rewrite the claim(s) in independent form.  Claim 11 fails to further limit claim 10.

### *Claim Rejections - 35 USC § 112*

5.     The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Claims 2, 5, 7 and 14 rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

Regarding claims 2, 5, 7 and 14 the phrase "such as" renders the claim indefinite because it is unclear whether the limitations following the phrase are part of the claimed invention.  See MPEP § 2173.05(d).

NEONODE0000048

Application/Control Number: 10/315,250                                          Page 4
Art Unit: 2174

### Claim Rejections - 35 USC § 102

6.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

7.      Claims 1, 4-7, 12, 15 and 17 are rejected under 35 U.S.C. 102(b) as being

anticipated by Carlson ("Carlson", Carlson, Jeff. <u>Visual Quickstart Guide Palm</u>

<u>Organizers</u>. Peachpit Press. 2000. Berkeley, CA.).

8.      As per claim 1, Carlson teaches a user interface for a mobile handheld computer

unit (Introduction, page xiii), where said computer unit comprises a touch sensitive area

(page 26, *the screen is touch sensitive*), which touch sensitive area is divided into a

menu area (page 12, fig. 1.10 *silk screen graffiti area*) and a display area, where said

computer unit is adapted to run several applications simultaneously (page 47, *all of the*

*applications are running concurrently*), and to present an active application on top of

any other application on said display area, characterised in, that said menu area is

adapted to present a representation of a first, a second and a third predefined function,

that said first function is a general application dependent function (page 28, *the Menu*

*icon*, fig. 2.4), that said second function is a keyboard function (page 30, *either the abc*

*or 123 dots in the lower corner of the Graffiti area*), that said third function is a task and

file manager (page 47, *the Applications screen* & fig. 2.35), and that any one of said

three functions can be activated when said touch sensitive area detects a movement of

NEONODE0000049

Application/Control Number: 10/315,250                                        Page 5
Art Unit: 2174

an object with its starting point within the representation of said function on said menu

area and with a direction from said menu area to said display area (page 40, *bottom-to-*

*top screen stroke shortcut* fig. 2.22 & page 30, *drag the stylus vertically across the*

*screen from bottom to top*).

9.      As per claim 4, Carlson teaches the user interface according to claim 1,

characterised in, that, if said second function is activated, said display area is adapted

to display a keyboard and a text field, that, if a text passage in said active application is

highlighted, said text passage is displayed in said text field for editing through said

keyboard and that said highlighted text passage is replaced by said edited text passage

when said second function is deactivated, and that, if no text passage in said active

application is highlighted, said text field is available for inputting and editing of text

through said keyboard (page 30, fig 2.7).

10.     As per claim 5. User interface according to claim 4, characterized in, that if no

text passage in said active application is highlighted, and said text field is used for

inputting and editing of text through said keyboard (page 30, fig 2.7), then said first

function can be activated, or said second function can be closed, in which a choice of

saving or deleting said inputted text is given, where the choice of saving said inputted

text results in an activation of said first function, in which said first function will present

services or settings available for said inputted text, such as saving said inputted text for

later use, using said inputted text as telephone number in a telephone application, or

sending said inputted text as message in communications application (page 28, fig. 2.4

*Beam Memo*).

NEONODE0000050

Application/Control Number: 10/315,250                                    Page 6
Art Unit: 2174

11.    As per claim 6, Carlson teaches the user interface according to claim 1,
characterised in, that, if said third function is activated, said display area is adapted to
display a list with a library of available applications and files on said computer unit, that
a selection of an application will start said application, and that a selection of a file will
open said file in an application intended for said file (page 47, fig. 2.35).

12.    As per claim 7, Carlson teaches the user interface according to claim 6,
characterised in, that a selection of an application or a file is done by moving said object
so that the representation of desired application or file is highlighted, removing said
object from said touch sensitive area, and then tapping on said touch sensitive area,
and that an application or file is highlighted by placing some kind of marking on the
representation of said application or file, such as positioning a frame around the
representation of said application or file or inverting the representation of said
application or file (pages 26 & 27).

13.    As per claim 12, Carlson teaches the user interface according to Claim 1,
characterised in, that an active application, function, service or setting is moved on one
step by moving said object from the left of said display area to the right of said display
area, and that the active application, function service or setting is closed or backed one
step by moving said object from the right of said display area to the left of said display
area (page 246, fig. 14.2, *Drag to scroll through file*).

14.    As per claim 15, Carlson teaches an enclosure adapted to cover a computer unit,
said computer unit being adapted to present a user interface according Claim 1,
characterised in, that said enclosure is provided with an opening for said display area,

NEONODE0000051

Application/Control Number: 10/315,250                                    Page 7

Art Unit: 2174

and that a representation of said menu area is printed on top of said enclosure (page

12, *Silkscreen Graffiti area* & fig. 1.10).

15.    As per claim 17, Carlson teaches a computer readable medium, with a computer

program product stored therein, characterised in, that said computer program product

comprises computer readable code, which, when read by a computer, will make it

possible for said computer to present a user interface according to Claim 1 (page 25,

*Palm OS*).


## *Claim Rejections - 35 USC § 103*

16.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

17.    Claims 2 and 3 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Peachpit

Press. 2000. Berkeley, CA.) in view of Kopitzke et al. ("Kopitzke", US # 6,988,246 B2).

18.    As per claim 2, Carlson teaches the user interface according to claim 1,

characterised in, that, if said first function is activated, said display area is adapted to

display icons representing different services or settings depending on the current active

application (page 28, *the Menu icon*, fig. 2.4), and that, if no application is currently

active on said computer unit, said icons are adapted to represent services or settings of

NEONODE0000052

Application/Control Number: 10/315,250                                          Page 8
Art Unit: 2174

the operations system of said computer unit, such as background picture, clock (page 47, fig. 2.36, *12:11 am*), users, help, etc.

However Carlson does not teach expressly the user interface according to claim 1, characterised in, that, if said first function is activated, said display area is adapted to display icons representing different services or settings depending on the current active application, that one of said icons always represents a "help"-service, regardless of application.

Kopitzke teaches the user interface according to claim 1, characterised in, that said display area is adapted to display icons representing different services or settings depending on the current active application, that one of said icons always represents a "help"-service, regardless of application (column 4, lines 36-53 & fig. 1, *Help key or button* 6).

Carlson and Kopitzke are analogous art because they are in the same field of endeavor, namely graphical user interfaces with touch sensitive displays.

At the time of the invention it would have been obvious to a person of ordinary skill in the art to provide the help function as taught by Kopitzke within the user interface of Carlson in order to provide context sensitive information.

As per claim 3, the modified Carlson teaches the user interface according to claim 2, characterised in, that a selection of a preferred service or setting is done by tapping on corresponding icon (Carlson, page 26, fig. 2.1 *Tapping just about any interface element in the Palm OS evokes a response*).

NEONODE0000053

Application/Control Number: 10/315,250                    .    Page 9
Art Unit: 2174

19.    Claims 8-11 and 13 is rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff. <u>Visual Quickstart Guide Palm Organizers</u>. Peachpit Press. 2000. Berkeley, CA.) in view of Wynn et al. ("Wynn", US # 6,734,883 B1).

20.    As per claim 8, Carlson teaches the user interface according to claim 7.

However Carlson does not teach expressly the user interface, characterised in, that said list is adapted to present only said files or only said applications, that the top area of said list presents a field through which the content of said list can be altered, that, if said list only presents files, said field displays a representation of a task manager and a selection of said field will cause said list to alter to present only applications, and that, if said list only presents applications, said field displays a representation of a file manager and a selection of said field will cause said list to alter and present only files.

Wynn teaches a user interface control, characterised in, that said list is adapted to present only said files or only said applications, that the top area of said list presents a field through which the content of said list can be altered (column 3, lines 4-8, *dialog box* 32), that, if said list only presents files, said field displays a representation of a task manager and a selection of said field will cause said list to alter to present only applications, and that, if said list only presents applications, said field displays a representation (column 3, lines 4-8, *label* 31) of a file manager and a selection of said field will cause said list to alter and present only files (column 3, lines 15-31).

NEONODE0000054

Application/Control Number: 10/315,250                                      Page 10
Art Unit: 2174

Carlson and Wynn are analogous art because they are in the same field of endeavor, namely scrolling within graphical user interfaces with touch sensitive displays.

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the selection list format as taught by Wynn within the user interface of Carlson in order to provide a conventional list format.

21.    As per claim 9, Carlson teaches the user interface according to claim 7, characterised in, that, a navigation in said list is performed by moving said object in a direction towards the top of said list or towards the bottom of said list, that the movement of said object will cause said marking to move in the same direction (page 27, *a quicker way to view the full list is to tap and hold on the dark solid portion of the scroll bar, then drag it vertically*).

However Carlson does not teach expressly that the speed of the movement of said marking is lower than the speed of the movement of said object.

Wynn teaches a user interface control, characterised in, that, a navigation in said list is performed by moving said object in a direction towards the top of said list or towards the bottom of said list, that the movement of said object will cause said marking to move in the same direction (column 3, lines 32-39 & figs. 5) and that the speed of the movement of said marking is lower than the speed of the movement of said object (column 4, lines 24-30).

NEONODE0000055

Application/Control Number: 10/315,250 Page 11

Art Unit: 2174

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the scrolling function as taught by Wynn within the user interface of Carlson in order to provide a conventional selection list.

22. As per claim 10, the modified Carlson in view of Wynn teaches the user interface according to claim 9, characterised in, that, if the number of applications and/or files in said list exceeds the number of applications and files that can be presented on said display area, and if said object is moved to the top or bottom position of said display area, then lifted, replaced on said display area, and again moved to the top or bottom of said display area, the content of said display area will be replaced one whole page, meaning that if said object is position at the top of said display area, then lifted, replaced on said display area, and then again moved to the top of said display area, the content of said display area will be replaced by the preceding applications and/or files in said list (Carlson, page 253, fig. 14.15 *Full Page Up*).

The modified Carlson in view of Wynn does not disclose expressly the user interface, characterised in that if said object is position at the bottom of said display area, then lifted, replaced on said display area, and then again moved to the bottom of said display area, the content of said display area will be replaced by the following applications and/or files in said list.

At the time of the invention, it would have been an obvious matter of design choice to a person of ordinary skill in the art to modify the *Full Page Up* function (Carlson, page 253, fig 14.15) to work as a Full Page Down function by tapping on the bottom of the display area because Applicant has not disclosed that *if said object is*

NEONODE0000056

Application/Control Number: 10/315,250 Page 12
Art Unit: 2174

*position at the bottom of said display area, then lifted, replaced on said display area,*
*and then again moved to the bottom of said display area, the content of said display*
*area will be replaced by the following applications and/or files in said list* provides an
advantage, is used for a particular purpose, or solves a stated problem. One of ordinary
skill in the art, furthermore, would have expected Applicant's invention to perform
equally well with the modified Full Page Up function as taught by Carlson because it
would only need to be implemented to scroll down instead of up, when the display area
is tapped on the bottom, instead of the top.

23.    As per claim 11, the modified Carlson in view of Wynn teaches the user interface
according to claim 10, characterised in, that if said object is removed from a first
position on said display area and then replaced on a second position on said display
area, said navigation can be continued from said second position (Carlson, page 253,
fig. 14.15).

Claim 13 is rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson
("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Peachpit Press.
2000. Berkeley, CA.)

24.    As per claim 13, Carlson teaches the user interface according to Claim 1,
characterised in, that said menu area is positioned at the bottom of said touch sensitive
area, that said representation of said first function is positioned at the left side of said
menu area, and that said representation of said second function is positioned at the
middle of said menu area.

NEONODE0000057

Application/Control Number: 10/315,250                              Page 13
Art Unit: 2174

Carlson does not teach expressly that said representation of said third function is positioned at the right side of said menu area.

At the time the invention was made, it would have been an obvious matter of design choice to a person of ordinary skill in the art to place the third function on the right side of the display area instead of the left, because Applicant has not disclosed that *said representation of said third function is positioned at the right side of said menu area* provides an advantage, is used for a particular purpose or solves a stated problem. One of ordinary skill in the art, furthermore would have expected Applicant's invention to perform equally well with the third function on the left side of the display area because the placement of the representation would not change its functionality.

25.     Claims 14 and 16 are rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Berkeley, CA: Peachpit Press, 2000) in view of Strietelmeier ("Strietelmeier", Strietelmeier, Julie. "Palm m100." The Gadgeteer. 2000. <http://www.the-gadgeteer.com/review/palm_m100_review>).

26.     As per claim 14, Carlson teaches the user interface according to Claim 1, characterised in, that said user interface is adapted to a touch sensitive area and that said user interface is adapted to be operated by one hand, where said object can be a finger, such as the thumb, of a user of said computer unit (page 12, *stylus...includes fingers*).

However Carlson does not teach expressly a touch sensitive area with a size that is in the order of 2-3 inches.

NEONODE0000058

Application/Control Number: 10/315,250                                    Page 14
Art Unit: 2174

Strietelmeier teaches a user interface, characterised in, a touch sensitive area with a size that is in the order of 2-3 inches (page 4).

Carlson and Strietelmeier are analogous art because they are in the same field of endeavor, namely palm-sized computer organizers.

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the dimensions of a touch sensitive area as taught by Strietelmeier within the user interface of Carlson in order to provide a touch sensitive area with the manufacturer's dimensions.

27.    As per claim 16, Carlson teaches an enclosure according to claim 15.  However, Carlson does not disclose an enclosure characterised in, that said enclosure is removable and exchangeable.

Strietelmeier teaches an enclosure characterised in, that said enclosure is removable and exchangeable (page 3, *you can also remove the entire face plate... there will be different face plates available*).

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the customizable enclosures as taught by Strietelmeier within the enclosure of Carlson in order to tailor an enclosure to a user's preferences.

28.    Claim 18 is rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Berkeley, CA: Peachpit Press, 2000) in view of Chew et al. ("Chew", US # 6,727,917).

As per claim 18, Carlson teaches a computer readable medium according to claim 17.

NEONODE0000059

Application/Control Number: 10/315,250                                    Page 15
Art Unit: 2174

However Carlson does not teach expressly, that said computer program product is adapted to function as a shell upon an operations system.

Chew teaches a user interface for a palm-sized computer device, characterised in, that said computer program product is adapted to function as a shell upon an operations system (column 2, lines 1-5).

Carlson and Chew are analogous art because they are in the same field of endeavor, namely graphical user interfaces for hand-held personal computing devices with touch sensitive displays.

At the time of the invention it would have been obvious to a person of ordinary skill in the art to modify the Carlson's program to function as shell as taught by Chew in order to efficiently display information.


### Conclusion

29.    The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.

Hirayama et al. (US # 5,406,307) teaches a method of activating functions.

Lui et al. (US # 6,833,827) teaches a keyboard function, a general application function and a file and task manager function.

Yonezawa (US # 6,542,191 B1) teaches a save function.

Friend et al. (US # 6,052,279) teaches a customizable hand-held computer.

NEONODE0000060

Application/Control Number: 10/315,250                                    Page 16

Art Unit: 2174

30.     Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Ian M. Purcell whose telephone number is (571) 272-

5755. The examiner can normally be reached on Monday - Friday 8:30 - 5:00.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Kristine Kincaid can be reached on (571) 272-4063. The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system. Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free).

Ian M. Purcell
Examiner

*Kristine Kincaid*
KRISTINE KINCAID
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 2100

NEONODE0000061

Application/Control Number: 10/315,250                                    Page 17
Art Unit: 2174

NEONODE0000062

| *Notice of References Cited* | | Application/Control No. 10/315,250 | | Applicant(s)/Patent Under Reexamination GOERTZ, MAGNUS | |
|---|---|---|---|---|---|
| | | Examiner Ian M. Purcell | | Art Unit 2174 | Page 1 of 1 |

### U.S. PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-6,988,246 B2 | 01-2006 | Kopitzke et al. | 715/810 |
| * | B | US-6,727,917 B1 | 04-2004 | Chew et al. | 715/765 |
| * | C | US-6,734,883 B1 | 05-2004 | Wynn et al. | 715/830 |
| * | D | US-6,052,279 | 04-2000 | Friend et al. | 361/686 |
| * | E | US-6,542,191 B1 | 04-2003 | Yonezawa, Hiroki | 348/333.01 |
| * | F | US-6,833,827 B2 | 12-2004 | Lui et al. | 345/173 |
| * | G | US-5,406,307 | 04-1995 | Hirayama et al. | 715/800 |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

### FOREIGN PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

### NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Peachpit Press. 2000. Berkeley, CA. Pages xiii, 12, 25, 26, 28-30, 40, 47, 246 and 253. |
| | V | Strietelmeier, Julie. "Palm m100." The Gadgeteer. 2000. <http://www.the-gadgeteer.com/review/palm_m100_review> Pages 1-8. |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

NEONODE0000063

| Index of Claims | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 10/315,250 | GOERTZ, MAGNUS |
| | Examiner | Art Unit |
| | Ian M. Purcell | 2174 |

| | | |
|---|---|---|
| √ Rejected | − (Through numeral) Cancelled | N Non-Elected | A Appeal |
| = Allowed | ÷ Restricted | I Interference | O Objected |

| Claim (Final) | Claim (Original) | Date 3/16/06 | | Claim (Final) | Claim (Original) | Date | | Claim (Final) | Claim (Original) | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | √ | | | 51 | | | | 101 | |
| | 2 | √ | | | 52 | | | | 102 | |
| | 3 | √ | | | 53 | | | | 103 | |
| | 4 | √ | | | 54 | | | | 104 | |
| | 5 | √ | | | 55 | | | | 105 | |
| | 6 | √ | | | 56 | | | | 106 | |
| | 7 | √ | | | 57 | | | | 107 | |
| | 8 | √ | | | 58 | | | | 108 | |
| | 9 | √ | | | 59 | | | | 109 | |
| | 10 | √ | | | 60 | | | | 110 | |
| | 11 | √ | | | 61 | | | | 111 | |
| | 12 | √ | | | 62 | | | | 112 | |
| | 13 | √ | | | 63 | | | | 113 | |
| | 14 | √ | | | 64 | | | | 114 | |
| | 15 | √ | | | 65 | | | | 115 | |
| | 16 | √ | | | 66 | | | | 116 | |
| | 17 | √ | | | 67 | | | | 117 | |
| | 18 | √ | | | 68 | | | | 118 | |
| | 19 | | | | 69 | | | | 119 | |
| | 20 | | | | 70 | | | | 120 | |
| | 21 | | | | 71 | | | | 121 | |
| | 22 | | | | 72 | | | | 122 | |
| | 23 | | | | 73 | | | | 123 | |
| | 24 | | | | 74 | | | | 124 | |
| | 25 | | | | 75 | | | | 125 | |
| | 26 | | | | 76 | | | | 126 | |
| | 27 | | | | 77 | | | | 127 | |
| | 28 | | | | 78 | | | | 128 | |
| | 29 | | | | 79 | | | | 129 | |
| | 30 | | | | 80 | | | | 130 | |
| | 31 | | | | 81 | | | | 131 | |
| | 32 | | | | 82 | | | | 132 | |
| | 33 | | | | 83 | | | | 133 | |
| | 34 | | | | 84 | | | | 134 | |
| | 35 | | | | 85 | | | | 135 | |
| | 36 | | | | 86 | | | | 136 | |
| | 37 | | | | 87 | | | | 137 | |
| | 38 | | | | 88 | | | | 138 | |
| | 39 | | | | 89 | | | | 139 | |
| | 40 | | | | 90 | | | | 140 | |
| | 41 | | | | 91 | | | | 141 | |
| | 42 | | | | 92 | | | | 142 | |
| | 43 | | | | 93 | | | | 143 | |
| | 44 | | | | 94 | | | | 144 | |
| | 45 | | | | 95 | | | | 145 | |
| | 46 | | | | 96 | | | | 146 | |
| | 47 | | | | 97 | | | | 147 | |
| | 48 | | | | 98 | | | | 148 | |
| | 49 | | | | 99 | | | | 149 | |
| | 50 | | | | 100 | | | | 150 | |

U.S. Patent and Trademark Office

Part of Paper No. 20060308

NEONODE0000064

Page 1



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

Bib Data Sheet

**CONFIRMATION NO. 1226**

| SERIAL NUMBER 10/315,250 | FILING DATE 12/10/2002 RULE | CLASS 345 | GROUP ART UNIT 2174 | ATTORNEY DOCKET NO. 3682-32 |
|---|---|---|---|---|

APPLICANTS

　　Magnus Goertz, Stockholm, SWEDEN;

** CONTINUING DATA *************************  None

** FOREIGN APPLICATIONS ******************  None

IF REQUIRED, FOREIGN FILING LICENSE GRANTED　　** SMALL ENTITY **
** 01/16/2003

| Foreign Priority claimed ☐ yes ☒ no<br>35 USC 119 (a-d) conditions met ☒ yes ☒ no ☐ Met after Allowance<br>Verified and Acknowledged ___ Examiner's Signature ___ Initials | STATE OR COUNTRY SWEDEN | SHEETS DRAWING 4 | TOTAL CLAIMS 18 | INDEPENDENT CLAIMS 1 |
|---|---|---|---|---|

ADDRESS
23117
NIXON & VANDERHYE, PC
901 NORTH GLEBE ROAD, 11TH FLOOR
ARLINGTON , VA
22203

TITLE
User interface

| FILING FEE<br><br>RECEIVED<br>440 | FEES: Authority has been given in Paper<br>No. _____ to charge/credit DEPOSIT ACCOUNT<br>No. _____ for following: | ☐ All Fees |
|---|---|---|
| | | ☐ 1.16 Fees ( Filing ) |
| | | ☐ 1.17 Fees ( Processing Ext. of time ) |
| | | ☐ 1.18 Fees ( Issue ) |
| | | ☐ Other _____ |
| | | ☐ Credit |

NEONODE0000065

| Search Notes | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 10/315,250 | GOERTZ, MAGNUS |
| | Examiner | Art Unit | |
| | Ian M. Purcell | 2174 | |

### SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| 715 | 864 | 3/13/2006 | IP |
| 715 | 702 | 3/8/2006 | IP |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### SEARCH NOTES (INCLUDING SEARCH STRATEGY)

| | DATE | EXMR |
|---|---|---|
| See EAST Search History | 3/16/2006 | IP |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

### INTERFERENCE SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

U.S. Patent and Trademark Office

Part of Paper No. 20060308

NEONODE0000066

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Patent Application of:
GOERTZ
Serial No.   10/315,250
Filed:   April 29, 2004
For:   User Interface

Attention:
Atty. Dkt.   3682-32

Date:   July 27, 2006

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

The attached <u>completes</u> filing of the above-identified patent application:

☐ **Correspondence Address Indication Form Attached.**

☐ Signed Rule 63 Declaration alone, ☐ Copy of Declaration from prior application alone, <u>OR</u>

☐ Signed Declaration plus attached copy of originally filed specification/drawings.

☐ **NOTICE TO FILE MISSING PARTS OF APPLICATION FILING DATE GRANTED** form.

☒ Record the attached change of name from Neonode Sweden AB to Neonode AB, Stockholm, Sweden and return to the undersigned.

☐ Attached is a Power of Attorney.

☐ Priority is hereby claimed under 35 U.S.C. § 119 based on the following foreign applications:
**Application Number            Country            Day/Month/Year Filed**

respectively.

☐ Certified copy(ies) of foreign application(s) is/are attached.

☐ Certified copy(ies) filed on _____ in prior application no. _____, filed _____.

☐ Applicant claims "small entity" status.   ☐ "Small entity" statement attached.

☐ Please enter the attached preliminary amendment <u>prior</u> to calculation of filing fee.

☒ Also attached: ☐ **Information Disclosure Statement;** ☐ **Nucleotide and/or Amino Acid Sequence Submission;** ☒ **Other: Notification of Change of Entitlement to Small Entity Status Pursuan tto 37 CFR 1.27(g)(2)**

**Fees due are calculated below:**

| | | |
|---|---|---|
| Basic filing fee | $300.00 (1011)/$)150.00 (2011) | $ |
| Search Fee | $500.00 (1111)/$250.00 (2111) | $ |
| Examination Fee | $200.00 (1311)/$100.00 (2311) | $ |

Application Size Fee for each add'l 50 sheets that exceeds 100 sheets)
Total pages: 0-100 =    0.00                0    $0.00(1081)/        $0.00 (2081)  $
Total effective claims   0    - 20 (at least 20) =    0   x  $50.00 = $0.00 (1202)/$0.00 (2202)  $
Independent claims   0    - 3 (at least 3) =    0   x  $200.00 = $0.00 (1201)/$0.00 (2201)  $
If any proper multiple dependent claims now added for first time (ignore improper), add
                                                        $360.00 (1203)/$180.00 (2203)  $
Petition is hereby made to extend the current due date so as to cover the filing date of this paper and
attachment(s)                        One Month Extension $120.00 (1251)/$60.00 (2251)
                                     Two Month Extensions $450.00 (1252)/$225.00 (2252)
                                     Three Month Extensions $1020.00 (1253/$510.00 (2253)
                                     Four Month Extensions $1590.00 (1254/$795.00 (2254)
                                     Five Month Extensions $2160.00 (1255)/$1080.00 (2255)  $
Surcharge if Declaration or filing fee first now submitted:        $130.00 (1051)/$65.00 (2051)  $
English translation of specification and claims                    $130.00 (1053)  $
Assignment Recording Fee                                           $40.00 (8021)  $    40.00
                                                        **TOTAL FEE DUE**  $    40.00

☐ **CREDIT CARD PAYMENT FORM ATTACHED.**

Any future submission requiring an extension of time is hereby stated to include a petition for such time extension. The Commissioner is hereby authorized to charge any <u>deficiency</u>, or credit any overpayment, in the fee(s) filed, or asserted to be filed, or which should have been filed herewith (or with any paper hereafter filed in this application by this firm) to our **Account No. 14-1140**. A <u>duplicate</u> copy of this sheet is attached.

901 North Glebe Road, 11th Floor
Arlington, Virginia 22203-1808
Telephone: (703) 816-4000
Facsimile: (703) 816-4100
RAM:jsm

NIXON & VANDERHYE P.C.
By Atty: Robert A. Molan, Reg. No. 29,834

Signature: _Robert A. Molan_

1098992

NEONODE0000067



IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent Application of

GOERTZ                                    Atty. Ref.:   3682-32

Serial No.    10/315,250                  Group:       2174

Filed:    December 10, 2002               Examiner:    Purcell, Ian M.

For:   User Interface

\* \* \* \* \* \* \* \* \* \* \*

July 27, 2006

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

### NOTIFICATION OF CHANGE OF ENTITLEMENT TO
### SMALL ENTITY STATUS PURSUANT TO 37 CFR 1.27(g)(2)

Notification pursuant to 37 CFR 1.27(g)(2) is hereby given of a change in entitlement to small entity status in the present application.  In particular, Applicant states that this application is no longer entitled to small entity status.

While it is believed that no additional large entity fees are due at this time, nonetheless, the Commissioner is hereby authorized to charge any deficiency in the

1098996

NEONODE0000068

GOERTZ
Application Serial No. 10/315,250

fee(s) filed, or asserted to be filed, or which should have been filed herewith (or with

any paper previously filed in this application by this firm) to our **Account No. 14-1140.**

Respectfully submitted,

**NIXON & VANDERHYE P.C.**

By: _Robert A. Molan_

Robert A. Molan
Reg. No. 29,834

RAM:jsm
901 North Glebe Road, 11th Floor
Arlington, VA 22203-1808
Telephone: (703) 816-4000
Facsimile:  (703) 816-4100

- 2 -

1098996

NEONODE0000069

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Patent Application of

GOERTZ                                          Atty. Ref.: 3682-32

Serial No.: 10/315,250                          Group: 2174

Filed: December 10, 2002                        Examiner: Purcell, Ian M.

For: USER INTERFACE

$$* \quad * \quad * \quad * \quad * \quad * \quad * \quad * \quad * \quad * \quad *$$

August 22, 2006

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## AMENDMENT

Sir:

In response to the Office Action dated March 23, 2006, please amend the above-identified application as follows:

**Amendments to the Title** begin on page 2 of this paper.

**Amendments to the Specification** begin on page 3 of this paper.

**Amendments to the Claims** are reflected in the listing of claims which begins on page 4 of this paper.

**Remarks/Arguments** begin on page 10 of this paper.

1105263

NEONODE0000070

GOERTZ
Serial No.:  10/315,250

## **AMENDMENTS TO THE TITLE**

Please amend the title as follows:

USER INTERFACE FOR MOBILE HANDHELD COMPUTER UNIT

- 2 -

1105263

NEONODE0000071

GOERTZ
Serial No.: 10/315,250

## AMENDMENTS TO THE SPECIFICATION

On page 5 of the application, please add the following new paragraph after line 3, as follows:

Figure 14 shows a computer readable medium in the form of a solid state memory.

- 3 -

1105263

NEONODE0000072

GOERTZ
Serial No.: 10/315,250

## AMENDMENTS TO THE CLAIMS

This listing of claims will replace all prior versions, and listings, of claims in the application.

1. (Currently Amended) ~~User~~ A user interface for a mobile handheld computer unit, where said computer unit comprises a touch sensitive area, which touch sensitive area is divided into a menu area and a display area, where said computer unit is adapted to run several applications simultaneously, and to present an active application on top of any other application on said display area, characterised in, that said menu area is adapted to present a representation of a first, a second and a third predefined function, that said first function is a general application dependent function, that said second function is a keyboard function, that said third function is a task and file manager, and that any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area, said user interface allowing low precision navigation using a blunt object, whereby said user interface can be operated by one hand, where said object can be a finger.

2. (Currently Amended) ~~User~~ The user interface according to Claim 1, ~~characterised~~ characterized in, that, if said first function is activated, said display area is adapted to display icons representing different services or settings depending on the current active application, that one of said icons always represents a "help"-service, regardless of application, and that, if no application is currently active on said computer unit, said icons are adapted to represent services

- 4 -

1105263

NEONODE0000073

GOERTZ
Serial No.: 10/315,250

or settings of the operations system of said computer unit, such as background picture, clock, users, help, etc.

3. (Currently Amended) User The user interface according to Claim 2, characterised in, that that a selection of a preferred service or setting is done by tapping on corresponding icon.

4. (Currently Amended) User The user interface according to Claim 1, characterised in,

- that, if said second function is activated, said display area is adapted to display a keyboard and a text field,

- that, if a text passage in said active application is highlighted, said text passage is displayed in said text field for editing through said keyboard and that said highlighted text passage is replaced by said edited text passage when said second function is deactivated, and

- that if no text passage in said active application is highlighted, said text field is available for inputting and editing of text through said keyboard.

5. (Currently Amended) User The user interface according to Claim 4, characterised in, that if no text passage in said active application is highlighted, said text field is used for inputting and editing of text through said keyboard, then

- said first function can be activated, or

- said second function can be closed, in which a choice of saving or deleting said inputted text is given, where the choice of saving said inputted text results in an activation of said

- 5 -

1105263

NEONODE0000074

GOERTZ
Serial No.: 10/315,250

first function,

in which said first function will present services or settings available for said inputted

text, such as saving said inputted text for later use, using said inputted text as telephone number

in a telephone application, or sending said inputted text as message in communications

application.


6. (Currently Amended) ~~User~~ The user interface according to Claim 1, characterised in,

that, if said third function is activated, said display area is adapted to display a list with a library

of available applications and files on said computer unit, that a selection of an application will

start said application, and that a selection of a file will open said file in an application intended

for said file.


7. (Currently Amended) ~~User~~ The user interface according to Claim 6, characterised in,

that a selection of an application or a file is done by moving said object so that the representation

of desired application or file is highlighted, removing said object from said touch sensitive area,

and then tapping on said touch sensitive area, and that an application or file is highlighted by

placing some kind of marking on the representation of said application or file, such as

positioning a frame around the representation of said application or file or inverting the

representation of said application or file.


8. (Currently Amended) ~~User~~ The user interface according to Claim 7, characterised in,

1105263

NEONODE0000075

GOERTZ
Serial No.: 10/315,250

that said list is adapted to present only said files or only said applications, that the top area of said

list presents a field through which the content if of said list can be altered, that, if said list only

presents files, said field displays a representation of a task manager and a selection of said field

will cause said list to alter to present only applications, and that, if said list only presents

applications, said field displays a representation of a file manager and a selection of said field

will cause said list to alter and present only files.

9. (Currently Amended) User The user interface according to Claim 7, characterised in,

that, a navigation in said list is performed by moving said object in a direction towards the top of

said list or towards the bottom of said list, that the movement of said object will cause said

marking to move in the same direction, and that the speed of the movement of said marking is

lower than the speed of the movement of said object.

10. (Currently Amended) User The user interface according to Claim 9, characterised in,

that, if the number of applications and/or files in said list exceeds the number of applications and

files that can be presented on said display area, and if said object is moved to the top or bottom

position of said display area, then lifted, replaced on said display area, and again moved to the

top or bottom of said display area, the content of said display area will be replaced one whole

page, meaning that if said object is positioned at the bottom of said display area, then lifted,

replaced on said display area, and then again moved to the bottom of said display area, the

content of said display area will be replaced by the following applications and/or files in said list,

- 7 -

1105263

NEONODE0000076

GOERTZ
Serial No.: 10/315,250

and if said object is positioned at the top of said display area, then lifted, replaced on said display area, and then again moved to the top of said display area, the content of said display area will be replaced by the preceding applications and/or files in said list.

11. (Currently Amended) ~~User~~ The user interface according to Claim 10, characterised in, that if said object is removed from a~~ny~~ first position on said display area and then replaced on a~~ny~~ second position on said display area, said navigation can be continued from said second position.

12. (Currently Amended) ~~User~~ The user interface according to Claim 1, characterised in, that an active application, function, service or setting is moved on one step by moving said object from the left of said display area to the right of said display area, and that the active application, function, service or setting is closed or backed one step by moving said object from the right of said display area to the left of said display area.

13. (Currently Amended) ~~User~~ The user interface according to Claim 1, characterised in, that said menu area is positioned at the bottom of said touch sensitive area, that said representation of said first function is positioned at the left side of said menu area, that said representation of said second function is positioned at the middle of said menu area, and that said representation of said third function is positioned at the right side of said menu area.

- 8 -

1105263

NEONODE0000077

GOERTZ
Serial No.: 10/315,250

14. (Currently Amended) ~~User~~ The user interface according to Claim 1, characterised in, that said user interface is adapted to a touch sensitive area with a size that is in the order of 2-3 inches, and that said user interface is adapted to be operated by one hand, where said object can be a finger~~, such as the thumb, or a user of said computer unit~~.

15. (Currently Amended) An enclosure adapted to cover a computer unit, said computer unit being adapted to present a user interface according to Claim 1, characterised in, that said enclosure is provided with an opening for said display area, and that a representation of said menu area is printed on top of said enclosure.

16. (Currently Amended) ~~Enclosure~~ The enclosure according to Claim 15, characterised in, that said enclosure is removable and exchangeable.

17. (Original) A computer readable medium, with a computer program product stored therein, characterised in, that said computer program product comprises computer readable code, which, when read by a computer, will make it possible for said computer to present a user interface according to Claim 1.

18. (Original) A computer readable medium according to Claim 17, characterised in, that said computer program product is adapted to function as a shell upon an operations system.

- 9 -

1105263

NEONODE0000078

GOERTZ
Serial No.: 10/315,250

## REMARKS

Reconsideration of this application is respectfully requested.

Claims 1-18 are pending in the application. Upon entry of this Amendment, claims 1-16 will be amended to, *inter alia,* conform such claims to U.S. claim practice.

In the outstanding Office Action of March 23, 2006, the Examiner objected to the title of the invention as not being descriptive. The title of the invention has now been amended. Accordingly, the Examiner's objection to the title of the invention should now be withdrawn.

The Examiner objected to claims 3 and 8 because of certain informalities noted in these claims. The proposed amendments by the Examiner have now been made and, as such, the Examiner's objection to claims 3 and 8 should now be withdrawn.

The Examiner also objected to claim 11 under 37 CFR §1.75(c) as being of improper dependent form for failing to further limit the subject matter of a previous claim. In particular, the Examiner contends that claim 11 fails to further limit claim 10. Claim 11 has now been amended to clarify that the first and second positions on the display area can be any positions, as opposed to the top or bottom positions recited in claim 10. As such, the Examiner's objection to claim 11 should now be withdrawn.

The Examiner rejected claims 2, 5, 7 and 14 under 35 U.S.C. §112, second paragraph, as being indefinite, contending that the phrase "such as" and the following text in these claims renders the claims indefinite. Claims 2, 5, 7 and 14 have now been amended to delete the "such as" phrases. Accordingly, the Examiner's rejection of claims 2, 5, 7 and 14 under §112, second paragraph, should now be withdrawn.

- 10 -

1105263

NEONODE0000079

GOERTZ
Serial No.: 10/315,250

The Examiner also rejected claims 1, 4-7, 12, 15 and 17 under 35 U.S.C. §102(b) as being anticipated by Carlson (Carlson, Jeff, *Visual Quickstart Guide Palm Organizers,* Peachpit Press, 2000, Berkeley, CA; hereinafter "Carlson"). The Examiner further rejected, as being unpatentable under 35 U.S.C. §103(a), claims 2 and 3 over Carlson in view of Kopitzke (USP 6,988,246; hereinafter "Kopitzke"); claims 8-11 and 13 over Carlson in view of Wynn et al. (USP 6,734883; hereinafter Wynn); claim 13 over Carlson alone; claims 14 and 16 over Carlson in view of Strietelmeier (Strietelmeier, Julie, *Palm* m100, The Gadgeteer, 2000, http://www.the-gadgeteer.com/review/palm_m100_review; hereinafter Strietelmeier); and claim 18 over Carlson in view of Chew et al. (USP 6,727, 917; hereinafter Chew). The Examiner's rejections are respectfully traversed.

For a claimed invention to be anticipated by a prior art reference, every element of the claim must be disclosed in the reference. For a claimed invention to be obvious over a combination of prior art references, there must be some suggestion, motivation or teaching in the prior art that would have led one of ordinary skill in the art to combine the references to produce the claimed invention. *E.g., Ashland Oil, Inc. v. Delta Resins & Refracs.,* 776 F.2d 281, 293 (Fed. Cir. 1985). Here, the claimed invention of the present application is neither anticipated nor obvious over the cited references because such references do not disclose or suggest all of the limitations of the claimed invention. Even assuming, *arguendo,* that the Examiner properly combined the cited references, the resulting combination still would not be the claimed invention given the deficiencies noted below in the primary Carlson reference.

Amended independent claim 1 now recites a "user interface allowing low precision

- 11 -

1105263

NEONODE0000080

GOERTZ
Serial No.: 10/315,250

navigation using a blunt object, whereby said user interface can be operated by one hand, where said object can be a finger." Independent claim 17 describes a computer readable medium, with a computer program product stored therein that makes it possible for a computer to present a user interface according to Claim 1. Independent claims 1 and 17, and thus dependent claims 4-7, 12, and 15, which depend either directly or indirectly from claim 1, are not anticipated by Carlson because Carlson does not disclose this feature of the claimed invention.

The user interface described in the claims of the present invention is designed to be used with a user's hand and fingers, rather than any tools, such as the stylus used with a Palm Pilot. The user interface described in the claims of the present invention is designed to be navigated with a finger, and preferably using only one hand, holding the device with that hand and navigating with a user's thumb. This allows low precision navigation, with a blunt object, such as a finger, through the recognition of the finger's movements across a touch sensitive area. The claims of the present application describe movement patterns that allow such low resolution navigation using a blunt object, such as a finger. For example, claim 14 recites the feature of a one hand device and navigation through a finger.

The Palm Pilot device described in the cited Carlson reference is, in contrast, designed to navigate on small icons and buttons with a relatively sharp tip from a stylus or pen. The use of a stylus allows high precision navigation and, thus, the possibility of pressing a single button on a Palm Pilot screen. The Carlson reference purports to be a guide to Palm organizers. Although the Examiner notes that Carlson states, on page 12, that "anything that isn't sharper than a No. 2 pencil can work (that includes fingers and toes too!)", the navigation system in a Palm organizer

- 12 -

1105263

NEONODE0000081

GOERTZ
Serial No.: 10/315,250

is, in fact, designed to use the stylus mentioned in the Carlson reference. Using a Palm organizer

with a blunt object, such as a thumb, would give very limited use because of the lack of precision

available from using a thumb. Indeed, Carlson, in mentioning the use of a "finger or toe", does

so in a somewhat joking way, noting later that the "three basic methods of interacting within the

Palm OS, all . . . depend on the stylus (or a similar writing instrument)." *See, e.g.,* Carlson, page

26, paragraph titled "Navigating the Palm OS".

This is in sharp contrast to the menus and movements described in the claims of the

present application, which allow the use of a blunt object, such as a finger, for all navigation and

use of the claimed user interface. Thus, the movement patterns described in the claims of the

present application allow the use of the user interface with one hand only and navigation of the

user interface with the thumb of that hand.

Independent claim 1 of the present application also recites:

> [a] menu area . . . adapted to present a representation of a first, a
> second and a third predefined function, that said first function is a
> general application dependent function, that said second function is
> a keyboard function, that said third function is a task and file
> manager, and that any one of said three functions can be activated
> when said touch sensitive area detects a movement of an object
> with its starting point within the representation of said function on
> said menu area and with a direction from said menu area to said
> display area.

Independent claims 1 and 17, and dependent claims 4-7, 12, and 15, are also not anticipated by

Carlson because Carlson also does not disclose the recited first, second and third predefined

functions represented in a menu area, or activating any one of these three functions by moving an

object from a starting point within the representation of the function on the menu area in a

- 13 -

NEONODE0000082

GOERTZ
Serial No.: 10/315,250

direction from the menu area to the display area. One embodiment of this feature is depicted in Figures 1 and 2 of the present application.

Claim 1 describes the first function as a general application dependent function which, in the embodiment of the invention described in the application, are services or functions dependent upon a current active application. One of the services is described as a help service, regardless of the application. Others are described as "save to disk", "send as SMS", or "delete", or settings such as "resolution", "colour", or "brightness". If no application is active, the services or settings can be of the operations system, such as background picture, clock, alarm, users, help, etc. *See, e.g.,* Application, pages 5-6.

The Examiner looks to page 28 of Carlson and a "menu" icon shown in Figure 2.4 on page 28 of Carlson as meeting the first function feature recited in claim 1; however, what page 28 of Carlson shows is instructions for accessing menus in applications. In any event, no where does page 28 of Carlson show such menus as being selected by movement of an object, such as a finger, from a menu area to a display area, as recited in claim 1. Rather, Carlson discusses at page 28 using a stylus to tap "menu icons" and "words" to see drop-down menus.

Claim 1 also describes the second function as a keyboard function. The Examiner looks to page 30 of Carlson as showing the keyboard function. Page 30 of Carlson does describe an "onscreen keyboard". While page 30 of Carlson does mention accessing the keyboard by "drag[ging] the stylus vertically across the screen from bottom to top", it also mentions other methods, such as tapping on "abc" or "123" dots, selecting "Keyboard" from an Edit menu, or writing certain characters in a Graffiti area. In any event, no where does cited page 30 of Carlson

- 14 -

1105263

NEONODE0000083

GOERTZ
Serial No.: 10/315,250

show such keyboard as being selected by movement of an object, such as a finger, from a menu area to a display area, as recited in claim 1.

Claim 1 describes the third function as a task and file manager. The Examiner looks to page 47 of Carlson, and particularly the applications screen in Figure 2.35 of Carlson as meeting this function. In the embodiment of the invention described in the present application, the third function is described as displaying a list with a library of available applications and files on the computer unit. *See, e.g.,* Application, page. 7. While page 47 of Carlson shows applications and application icons, it describes launching applications by bringing up the Application screen by tapping the "silkscreened Applications icon" first and then tapping a program's name or icon to launch it. Nowhere does cited page 47 of Carlson show the applications as being selected by movement of an object, such as a finger, from a menu area to a display area, as recited in claim 1.

Since Carlson shows different screens for the menu shown on page 28, the keyboard shown on page 30, and the applications shown on page 47, Carlson also does not disclose a menu area presenting a representation of first, second and third predefined functions, as recited in claim 1. In view of the foregoing, clearly, Carlson does not anticipate independent claims 1 and 17 or dependent claims 4-7, 12, and 15.

Finally, because Carlson does not anticipate the claimed invention as recited in independent claims 1 and 17 (which references claim 1), given the deficiencies noted above in the teachings of the primary Carlson reference, the remaining claims rejected in the outstanding Office Action under §103(a), *i.e.,* claims 2, 3, 8-11, 13, 14, 16 and 18, which depend either

- 15 -

1105263

NEONODE0000084

GOERTZ
Serial No.: 10/315,250

directly or indirectly from claim 1 or claim 17, are also not obvious over Carlson alone or in

combination with the other references cited by the Examiner.

In view of the foregoing, it is believed that all of the claims pending in the application,

i.e., claims 1 – 18, are now in condition for allowance, which action is earnestly solicited. If any

issues remain in this application, the Examiner is urged to contact the undersigned at the

telephone number listed below.

Respectfully submitted,

**NIXON & VANDERHYE P.C.**

By: _Robert A. Molan_

Robert A. Molan
Reg. No. 29,834

RAM:jsm

901 North Glebe Road, 11th Floor
Arlington, VA 22203
Telephone: (703) 816-4000
Facsimile: (703) 816-4100

- 16 -

1105263

NEONODE0000085

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent Application of

GOERTZ

Serial No. 10/315,250

Filed:    December 10, 2002

Title:    USER INTERFACE

Atty    3682-32
Dkt.

    C#    M#

TC/A.U.    2174

Examiner: PURCELL, Ian M.

Date: August 22, 2006

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

### RESPONSE/AMENDMENT/LETTER

This is a response/amendment/letter in the above-identified application and includes an attachment which is hereby incorporated by reference and the signature below serves as the signature to the attachment in the absence of any other signature thereon.

☐ **Correspondence Address Indication Form Attached.**

**Fees are attached as calculated below:**

Total effective claims after amendment    **18**    minus highest number
previously paid for    **20**    (at least 20) =    0    x $50.00    $0.00 (1202)/$0.00 (2202) $

Independent claims after amendment    **0**    minus highest number
previously paid for    **3**    (at least 3) =    0    x $200.00    $0.00 (1201)/$0.00 (2201) $

If proper multiple dependent claims now added for first time, (ignore improper); add
$360.00 (1203)/$180.00 (2203) $

Petition is hereby made to extend the current due date so as to cover the filing date of this
paper and attachment(s)    One Month Extension $120.00 (1251)/$60.00 (2251)
Two Month Extensions $450.00 (1252)/$225.00 (2252)
Three Month Extensions $1020.00 (1253/$510.00 (2253)
Four Month Extensions $1590.00 (1254/$795.00 (2254)
Five Month Extensions $2160.00 (1255/$1080.00 (2255) $    450.00

Terminal disclaimer enclosed, add    $130.00 (1814)/ $65.00 (2814) $

☐ Applicant claims "small entity" status.    ☐ Statement filed herewith

Rule 56 Information Disclosure Statement Filing Fee    $180.00 (1806) $    0.00

Assignment Recording Fee    $40.00 (8021) $    0.00

Other:    $    **0.00**

**TOTAL FEE ENCLOSED** $    **450.00**

The Commissioner is hereby authorized to charge any <u>deficiency</u>, or credit any overpayment, in the fee(s) filed, or asserted to be filed, or which should have been filed herewith (or with any paper hereafter filed in this application by this firm) to our Account No. 14-1140. A <u>duplicate</u> copy of this sheet is attached.

901 North Glebe Road, 11th Floor
Arlington, Virginia 22203-1808
Telephone: (703) 816-4000
Facsimile: (703) 816-4100
RAM:jsm

NIXON & VANDERHYE P.C.
By Atty: Robert A. Molan, Reg. No. 29,834

Signature: _Robert A. Molan_

08/23/2006 FMETEKI1 00000023 10315250

01 FC:1252    450.00 OP

1108465

NEONODE0000086

BEST AVAILABLE COPY

## PATENT APPLICATION FEE DETERMINATION RECORD
### Effective October 1, 2001

**Application or Docket Number:** 10315250

### CLAIMS AS FILED - PART I

|  | (Column 1) | (Column 2) |
|---|---|---|
| TOTAL CLAIMS | 18 | |
| FOR | NUMBER FILED | NUMBER EXTRA |
| TOTAL CHARGEABLE CLAIMS | 18 minus 20= | * |
| INDEPENDENT CLAIMS | 1 minus 3 = | * |
| MULTIPLE DEPENDENT CLAIM PRESENT | | ☐ |

* If the difference in column 1 is less than zero, enter "0" in column 2

**SMALL ENTITY TYPE ☐** OR **OTHER THAN SMALL ENTITY**

| RATE | FEE | | RATE | FEE |
|---|---|---|---|---|
| BASIC FEE | 370.00 | OR | BASIC FEE | 740.00 |
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL | | OR | TOTAL | |

### CLAIMS AS AMENDED - PART II

**AMENDMENT A**

|  | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | * 18 | Minus | ** 20 | • |
| Independent | * 1 | Minus | *** 3 | • |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | ☐ | |

**SMALL ENTITY** OR **OTHER THAN SMALL ENTITY**

| RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
|---|---|---|---|---|
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

**AMENDMENT B**

|  | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | * | Minus | ** | = |
| Independent | * | Minus | *** | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | ☐ | |

| RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
|---|---|---|---|---|
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

**AMENDMENT C**

|  | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | * | Minus | ** | = |
| Independent | * | Minus | *** | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | ☐ | |

| RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
|---|---|---|---|---|
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20."
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3."
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

FORM PTO-875 (Rev. 8/01)    ☆U.S. GPO.2001 482-124/59197    Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE

NEONODE0000087





UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | 3682-32 | 1226 |

23117    7590    11/15/2006

NIXON & VANDERHYE, PC
901 NORTH GLEBE ROAD, 11TH FLOOR
ARLINGTON, VA  22203

| EXAMINER |
|---|
| PURCELL, IAN M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2174 | |

DATE MAILED: 11/15/2006

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

NEONODE0000088

| | **Application No.** | **Applicant(s)** |
|---|---|---|
| ***Office Action Summary*** | 10/315,250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** | |
| | Ian M. Purcell | 2174 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE _3_ MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒  Responsive to communication(s) filed on _22 August 2006_.

2a)☒  This action is **FINAL**.        2b)☐  This action is non-final.

3)☐  Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒  Claim(s) _1-18_ is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐  Claim(s) _____ is/are allowed.

6)☒  Claim(s) _1-18_ is/are rejected.

7)☐  Claim(s) _____ is/are objected to.

8)☐  Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐  The specification is objected to by the Examiner.

10)☐  The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐  The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐  Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some * c)☐ None of:

      1.☐  Certified copies of the priority documents have been received.

      2.☐  Certified copies of the priority documents have been received in Application No. _____.

      3.☐  Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☐ Notice of References Cited (PTO-892)
2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3)☐ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.
5)☐ Notice of Informal Patent Application
6)☐ Other: _____.

U.S. Patent and Trademark Office
PTOL-326 (Rev. 08-06)                    Office Action Summary                    Part of Paper No./Mail Date 20061109

NEONODE0000089

Application/Control Number: 10/315,250                                        Page 2

Art Unit: 2174

## DETAILED ACTION

1.     This communication is responsive to the Amendment filed 8/22/2006.

Claims 1-18 are pending in this application. Claims 1, 15 and 17 are

independent claims. In the Amendment the Specification and the Claims were

amended. Claims 1-16 were amended.

The text of those sections of Title 35, U.S. Code not included in this action can

be found in a prior Office action.

### *Claim Rejections - 35 USC § 102*

2.     Claims 1, 4-7, 12, 15 and 17 are rejected under 35 U.S.C. 102(b) as being

anticipated by Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm

Organizers. Peachpit Press. 2000. Berkeley, CA.).

3.     As per claim 1, Carlson teaches a user interface for a mobile handheld computer

unit (Introduction, page xiii), where said computer unit comprises a touch sensitive area

(page 26, *the screen is touch sensitive*), which touch sensitive area is divided into a

menu area (page 12, fig. 1.10 *silk screen graffiti area*) and a display area, where said

computer unit is adapted to run several applications simultaneously (page 47, *all of the*

*applications are running concurrently*), and to present an active application on top of

any other application on said display area, characterised in, that said menu area is

adapted to present a representation of a first, a second and a third predefined function,

that said first function is a general application dependent function (page 28, *the Menu*

NEONODE0000090

Application/Control Number: 10/315,250                                    Page 3
Art Unit: 2174

*icon*, fig. 2.4), that said second function is a keyboard function (page 30, *either the abc or 123 dots in the lower corner of the Graffiti area*), that said third function is a task and file manager (page 47, *the Applications screen* & fig. 2.35), and that any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area (page 40, *bottom-to-top screen stroke shortcut* fig. 2.22 & page 30, *drag the stylus vertically across the screen from bottom to top*), said user interface allowing low precision navigation using a blunt object, whereby said user interface can be operated by one hand (page 12, "*The stylus is the main method of interacting with the PalmPilot*" *and it inherently involves one hand to use the stylus*. Also, if a finger was used, that would also be considered using one hand), where said object can be a finger (page 12, "*The stylus is the main method of interacting*" **though** anything including fingers **can** work).

4.    As per claim 4, Carlson teaches the user interface according to claim 1, characterised in,

that, if said second function is activated, said display area is adapted to display a keyboard and a text field,

that, if a text passage in said active application is highlighted, said text passage is displayed in said text field for editing through said keyboard and that said highlighted text passage is replaced by said edited text passage when said second function is deactivated, and

NEONODE0000091

Application/Control Number: 10/315,250                                    Page 4

Art Unit: 2174

that, if no text passage in said active application is highlighted, said text field is available for inputting and editing of text through said keyboard (page 30, fig 2.7).

5.    As per claim 5, Carlson teaches the user interface according to claim 4, characterized in, that if no text passage in said active application is highlighted, and said text field is used for inputting and editing of text through said keyboard (page 30, fig 2.7), then

said first function can be activated, or

said second function can be closed, in which a choice of saving or deleting said inputted text is given, where the choice of saving said inputted text results in an activation of said first function,

in which said first function will present services or settings available for said inputted text (page 28, fig. 2.4 *Beam Memo*).

6.    As per claim 6, Carlson teaches the user interface according to claim 1, characterised in, that, if said third function is activated, said display area is adapted to display a list with a library of available applications and files on said computer unit, that a selection of an application will start said application, and that a selection of a file will open said file in an application intended for said file (page 47, fig. 2.35).

7.    As per claim 7, Carlson teaches the user interface according to claim 6, characterised in, that a selection of an application or a file is done by moving said object so that the representation of desired application or file is highlighted, removing said object from said touch sensitive area, and then tapping on said touch sensitive area,

NEONODE0000092

Application/Control Number: 10/315,250                                          Page 5
Art Unit: 2174

and that an application or file is highlighted by placing some kind of marking on the representation of said application or file (pages 26 & 27).

8.    As per claim 12, Carlson teaches the user interface according to Claim 1, characterised in, that an active application, function, service or setting is moved on one step by moving said object from the left of said display area to the right of said display area, and that the active application, function service or setting is closed or backed one step by moving said object from the right of said display area to the left of said display area (page 246, fig. 14.2, *Drag to scroll through file*).

9.    As per claim 15, Carlson teaches an enclosure adapted to cover a computer unit, said computer unit being adapted to present a user interface according Claim 1, characterised in, that said enclosure is provided with an opening for said display area, and that a representation of said menu area is printed on top of said enclosure (page 12, *Silkscreen Graffiti area* & fig. 1.10).

10.    As per claim 17, Carlson teaches a computer readable medium, with a computer program product stored therein, characterised in, that said computer program product comprises computer readable code, which, when read by a computer, will make it possible for said computer to present a user interface according to Claim 1 (page 25, *Palm OS*).

NEONODE0000093

Application/Control Number: 10/315,250                                          Page 6
Art Unit: 2174

### Claim Rejections - 35 USC § 103

11.     Claims 2 and 3 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Peachpit

Press. 2000. Berkeley, CA.) in view of Kopitzke et al. ("Kopitzke", US # 6,988,246 B2).

12.     As per claim 2, Carlson teaches the user interface according to claim 1,

characterized in, that, if said first function is activated, said display area is adapted to

display icons representing different services or settings depending on the current active

application (page 28, *the Menu icon*, fig. 2.4), and that, if no application is currently

active on said computer unit, said icons are adapted to represent services or settings of

the operations system of said computer unit (page 47, fig. 2.36, *12:11 am*).

However Carlson does not teach expressly the user interface according to claim

1, characterized in, that, if said first function is activated, said display area is adapted to

display icons representing different services or settings depending on the current active

application, that one of said icons always represents a "help"-service, regardless of

application.

Kopitzke teaches the user interface according to claim 1, characterised in, that

said display area is adapted to display icons representing different services or settings

depending on the current active application, that one of said icons always represents a

"help"-service, regardless of application (column 4, lines 36-53 & fig. 1, *Help key or*

*button* 6).

Carlson and Kopitzke are analogous art because they are in the same field of

endeavor, namely graphical user interfaces with touch sensitive displays.

NEONODE0000094

Application/Control Number: 10/315,250                                                    Page 7
Art Unit: 2174

At the time of the invention it would have been obvious to a person of ordinary skill in the art to provide the help function as taught by Kopitzke within the user interface of Carlson in order to provide context sensitive information.

As per claim 3, the modified Carlson teaches the user interface according to claim 2, characterised in, that a selection of a preferred service or setting is done by tapping on corresponding icon (Carlson, page 26, fig. 2.1 *Tapping just about any interface element in the Palm OS evokes a response*).

13.    Claims 8-11 and 13 is rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff. <u>Visual Quickstart Guide Palm Organizers</u>. Peachpit Press. 2000. Berkeley, CA.) in view of Wynn et al. ("Wynn", US # 6,734,883 B1).

14.    As per claim 8, Carlson teaches the user interface according to claim 7. However Carlson does not teach expressly the user interface, characterised in, that said list is adapted to present only said files or only said applications, that the top area of said list presents a field through which the content of said list can be altered, that, if said list only presents files, said field displays a representation of a task manager and a selection of said field will cause said list to alter to present only applications, and that, if said list only presents applications, said field displays a representation of a file manager and a selection of said field will cause said list to alter and present only files.

Wynn teaches a user interface control, characterised in, that said list is adapted to present only said files or only said applications, that the top area of said list presents a field through which the content of said list can be altered (column 3, lines 4-8, *dialog*

NEONODE0000095

Application/Control Number: 10/315,250                                    Page 8
Art Unit: 2174

*box* 32), that, if said list only presents files, said field displays a representation of a task

manager and a selection of said field will cause said list to alter to present only

applications, and that, if said list only presents applications, said field displays a

representation (column 3, lines 4-8, *label* 31) of a file manager and a selection of said

field will cause said list to alter and present only files (column 3, lines 15-31).

Carlson and Wynn are analogous art because they are in the same field of

endeavor, namely scrolling within graphical user interfaces with touch sensitive

displays.

At the time of the invention it would have been obvious to a person of ordinary

skill in the art to have the selection list format as taught by Wynn within the user

interface of Carlson in order to provide a conventional list format.

15.     As per claim 9, Carlson teaches the user interface according to claim 7,

characterised in, that, a navigation in said list is performed by moving said object in a

direction towards the top of said list or towards the bottom of said list, that the

movement of said object will cause said marking to move in the same direction (page

27, *a quicker way to view the full list is to tap and hold on the dark solid portion of the*

*scroll bar, then drag it vertically*).

However Carlson does not teach expressly that the speed of the movement of

said marking is lower than the speed of the movement of said object.

Wynn teaches a user interface control, characterised in, that, a navigation in said

list is performed by moving said object in a direction towards the top of said list or

towards the bottom of said list, that the movement of said object will cause said marking

Application/Control Number: 10/315,250                                         Page 9
Art Unit: 2174

to move in the same direction (column 3, lines 32-39 & figs. 5) and that the speed of the

movement of said marking is lower than the speed of the movement of said object

(column 4, lines 24-30).

At the time of the invention it would have been obvious to a person of ordinary

skill in the art to have the scrolling function as taught by Wynn within the user interface

of Carlson in order to provide a conventional selection list.

16.    As per claim 10, the modified Carlson in view of Wynn teaches the user interface

according to claim 9, characterised in, that, if the number of applications and/or files in

said list exceeds the number of applications and files that can be presented on said

display area, and if said object is moved to the top or bottom position of said display

area, then lifted, replaced on said display area, and again moved to the top or bottom of

said display area, the content of said display area will be replaced one whole page,

meaning that if said object is positioned at the top of said display area, then lifted,

replaced on said display area, and then again moved to the top of said display area, the

content of said display area will be replaced by the preceding applications and/or files in

said list (Carlson, page 253, fig. 14.15 *Full Page Up*).

The modified Carlson in view of Wynn does not disclose expressly the user

interface, characterised in that if said object is positioned at the bottom of said display

area, then lifted, replaced on said display area, and then again moved to the bottom of

said display area, the content of said display area will be replaced by the following

applications and/or files in said list.

Application/Control Number: 10/315,250                                    Page 10
Art Unit: 2174

At the time of the invention, it would have been an obvious matter of design choice to a person of ordinary skill in the art to modify the *Full Page Up* function (Carlson, page 253, fig 14.15) to work as a Full Page Down function by tapping on the bottom of the display area because Applicant has not disclosed that *if said object is positioned at the bottom of said display area, then lifted, replaced on said display area, and then again moved to the bottom of said display area, the content of said display area will be replaced by the following applications and/or files in said list* provides an advantage, is used for a particular purpose, or solves a stated problem. One of ordinary skill in the art, furthermore, would have expected Applicant's invention to perform equally well with the modified Full Page Up function as taught by Carlson because it would only need to be implemented to scroll down instead of up, when the display area is tapped on the bottom, instead of the top.

17.    As per claim 11, the modified Carlson in view of Wynn teaches the user interface according to claim 10, characterised in, that if said object is removed from any first position on said display area and then replaced on any second position on said display area, said navigation can be continued from said second position (Carlson, page 253, fig. 14.15).

Claim 13 is rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff. <u>Visual Quickstart Guide Palm Organizers</u>. Peachpit Press. 2000. Berkeley, CA.)

18.    As per claim 13, Carlson teaches the user interface according to Claim 1, characterised in, that said menu area is positioned at the bottom of said touch sensitive

NEONODE0000098

Application/Control Number: 10/315,250                                    Page 11
Art Unit: 2174

area, that said representation of said first function is positioned at the left side of said menu area, and that said representation of said second function is positioned at the middle of said menu area.

Carlson does not teach expressly that said representation of said third function is positioned at the right side of said menu area.

At the time the invention was made, it would have been an obvious matter of design choice to a person of ordinary skill in the art to place the third function on the right side of the display area instead of the left, because Applicant has not disclosed that *said representation of said third function is positioned at the right side of said menu area* provides an advantage, is used for a particular purpose or solves a stated problem. One of ordinary skill in the art, furthermore would have expected Applicant's invention to perform equally well with the third function on the left side of the display area because the placement of the representation would not change its functionality.

19.     Claims 14 and 16 are rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Berkeley, CA: Peachpit Press, 2000) in view of Strietelmeier ("Strietelmeier", Strietelmeier, Julie. "Palm m100." The Gadgeteer. 2000. <http://www.the-gadgeteer.com/review/palm_m100_review>).

20.     As per claim 14, Carlson teaches the user interface according to Claim 1, characterised in, that said user interface is adapted to a touch sensitive area and that said user interface is adapted to be operated by one hand, where said object can be a finger (page 12, *stylus...includes fingers*).

NEONODE0000099

Application/Control Number: 10/315,250                                                Page 12
Art Unit: 2174

However Carlson does not teach expressly a touch sensitive area with a size that is in the order of 2-3 inches.

Strietelmeier teaches a user interface, characterised in, a touch sensitive area with a size that is in the order of 2-3 inches (page 4).

Carlson and Strietelmeier are analogous art because they are in the same field of endeavor, namely palm-sized computer organizers.

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the dimensions of a touch sensitive area as taught by Strietelmeier within the user interface of Carlson in order to provide a touch sensitive area with the manufacturer's dimensions.

21.    As per claim 16, Carlson teaches the enclosure according to claim 15.  However, Carlson does not disclose the enclosure characterised in, that said enclosure is removable and exchangeable.

Strietelmeier teaches an enclosure characterised in, that said enclosure is removable and exchangeable (page 3, *you can also remove the entire face plate… there will be different face plates available*).

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the customizable enclosures as taught by Strietelmeier within the enclosure of Carlson in order to tailor an enclosure to a user's preferences.

22.    Claim 18 is rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Berkeley, CA: Peachpit Press, 2000) in view of Chew et al. ("Chew", US # 6,727,917).

NEONODE0000100

Application/Control Number: 10/315,250                                      Page 13
Art Unit: 2174

As per claim 18, Carlson teaches a computer readable medium according to claim 17.

However Carlson does not teach expressly, that said computer program product is adapted to function as a shell upon an operations system.

Chew teaches a user interface for a palm-sized computer device, characterised in, that said computer program product is adapted to function as a shell upon an operations system (column 2, lines 1-5).

Carlson and Chew are analogous art because they are in the same field of endeavor, namely graphical user interfaces for hand-held personal computing devices with touch sensitive displays.

At the time of the invention it would have been obvious to a person of ordinary skill in the art to modify the Carlson's program to function as shell as taught by Chew in order to efficiently display information.

### Response to Arguments

23.    Applicant's arguments with respect to claims 2, 4, 6-8, 10, 12, 14-16, 18, 20, 22-24 in the Amendment have been fully considered but they are not persuasive.

Applicant argued the following:

(a) Carlson does not teach using a blunt object, whereby the user can operate the interface with one hand, where said object can be a finger.

(b) Carlson does not disclose the recited first, second, and third predefined functions represented in a menu area, or activating anyone one of these three functions

NEONODE0000101

Application/Control Number: 10/315,250                                              Page 14
Art Unit: 2174

by moving an object from a starting point within the representation of the function on the

menu in a direction from the menu area to the display area.

The Examiner disagrees for the following reasons:

Per (a),  The stylus is the main method of interacting, however anything including

fingers can work (page 12).  It is simply an allegation that Carlson is portraying the use

of a finger in "a somewhat joking way".  It is more likely that Carlson is portraying the

use of a toe in "a somewhat joking way".  However, joking or not, Carlson teaches the

use of a finger or a toe as said object.  Furthermore, Carlson states on page 26, "three

basic methods of interacting within the Palm ... depend on the stylus."  As disclosed

earlier, Carlson teaches that a finger can work as the stylus (page 12, *Stylus*).

Moreover, the basic methods of interacting depend on the stylus, does not imply that all

methods of interacting depend on the stylus.

Per (b), during patent examination, the pending claims must be "given >their<

broadest reasonable interpretation consistent with the specification." > In re Hyatt, 211

F.3d 1367, 1372, 54 USPQ2d 1664, 1667 (Fed. Cir. 2000).  Despite the claims being

interpreted in light of the specification, limitations from the specification are not being

read into the claims. See In re Van Geuns, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir.

1993).

Applicant always has the opportunity to amend the claims during prosecution, and

broad interpretation by the examiner reduces the possibility that the claim, once issued,

NEONODE0000102

Application/Control Number: 10/315,250                                    Page 15
Art Unit: 2174

will be interpreted more broadly than is justified. In re Prater, 415 F.2d 1393, 1404-05,

162 USPQ 541, 550-51 (CCPA 1969).

In this case, Carlson teaches the recited first (page 28, the *Menu icon*, fig. 2.4),

second (page 30, *either the abc or 123 dots in the lower corner of the Graffiti area*) and

third predefined functions (page 47, the *Applications screen* & fig. 2.35) represented in a

menu area (page 12, fig. 1.10 *silk screen graffiti area*).  Furthermore, Carlson teaches

activating **anyone one of these three** functions by moving an object from a starting

point within the representation of the function on the menu in a direction from the menu

area to the display area.  Carlson teaches activating the second function by moving an

object from a starting point within the representation of the function on the menu in a

direction from the menu area to the display area (page 40, *bottom-to-top screen stroke*

*shortcut,* fig. 2.22 & page 30, *to activate the keyboard ... drag the stylus vertically*

*across the screen from bottom to top*).

### Conclusion

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Ian M. Purcell whose telephone number is (571) 272-

5755.  The examiner can normally be reached on Monday - Friday 8:30 - 5:00.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Kristine Kincaid can be reached on (571) 272-4063.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

NEONODE0000103

Application/Control Number: 10/315,250                               Page 16
Art Unit: 2174

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system. Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


                                        Ian M. Purcell
                                        Examiner


                                        *Kristine Kincaid*

                                        KRISTINE KINCAID
                                        SUPERVISORY PATENT EXAMINER
                                        TECHNOLOGY CENTER 2100


NEONODE0000104

| | Index of Claims | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|---|
| | | 10/315,250 | GOERTZ, MAGNUS |
| | | Examiner | Art Unit |
| | | Ian M. Purcell | 2174 |

| √ | Rejected | — | (Through numeral) Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| Final | Original | 3/16/06 | 11/9/06 | | | | | | | Final | Original | | | | | | | | | Final | Original | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | √ | √ | | | | | | | | 51 | | | | | | | | | | 101 | | | | | | | | |
| | 2 | √ | v | | | | | | | | 52 | | | | | | | | | | 102 | | | | | | | | |
| | 3 | √ | √ | | | | | | | | 53 | | | | | | | | | | 103 | | | | | | | | |
| | 4 | √ | √ | | | | | | | | 54 | | | | | | | | | | 104 | | | | | | | | |
| | 5 | √ | √ | | | | | | | | 55 | | | | | | | | | | 105 | | | | | | | | |
| | 6 | √ | √ | | | | | | | | 56 | | | | | | | | | | 106 | | | | | | | | |
| | 7 | √ | √ | | | | | | | | 57 | | | | | | | | | | 107 | | | | | | | | |
| | 8 | √ | √ | | | | | | | | 58 | | | | | | | | | | 108 | | | | | | | | |
| | 9 | √ | √ | | | | | | | | 59 | | | | | | | | | | 109 | | | | | | | | |
| | 10 | √ | √ | | | | | | | | 60 | | | | | | | | | | 110 | | | | | | | | |
| | 11 | √ | √ | | | | | | | | 61 | | | | | | | | | | 111 | | | | | | | | |
| | 12 | √ | √ | | | | | | | | 62 | | | | | | | | | | 112 | | | | | | | | |
| | 13 | √ | √ | | | | | | | | 63 | | | | | | | | | | 113 | | | | | | | | |
| | 14 | √ | √ | | | | | | | | 64 | | | | | | | | | | 114 | | | | | | | | |
| | 15 | √ | √ | | | | | | | | 65 | | | | | | | | | | 115 | | | | | | | | |
| | 16 | √ | √ | | | | | | | | 66 | | | | | | | | | | 116 | | | | | | | | |
| | 17 | √ | √ | | | | | | | | 67 | | | | | | | | | | 117 | | | | | | | | |
| | 18 | √ | √ | | | | | | | | 68 | | | | | | | | | | 118 | | | | | | | | |
| | 19 | | | | | | | | | | 69 | | | | | | | | | | 119 | | | | | | | | |
| | 20 | | | | | | | | | | 70 | | | | | | | | | | 120 | | | | | | | | |
| | 21 | | | | | | | | | | 71 | | | | | | | | | | 121 | | | | | | | | |
| | 22 | | | | | | | | | | 72 | | | | | | | | | | 122 | | | | | | | | |
| | 23 | | | | | | | | | | 73 | | | | | | | | | | 123 | | | | | | | | |
| | 24 | | | | | | | | | | 74 | | | | | | | | | | 124 | | | | | | | | |
| | 25 | | | | | | | | | | 75 | | | | | | | | | | 125 | | | | | | | | |
| | 26 | | | | | | | | | | 76 | | | | | | | | | | 126 | | | | | | | | |
| | 27 | | | | | | | | | | 77 | | | | | | | | | | 127 | | | | | | | | |
| | 28 | | | | | | | | | | 78 | | | | | | | | | | 128 | | | | | | | | |
| | 29 | | | | | | | | | | 79 | | | | | | | | | | 129 | | | | | | | | |
| | 30 | | | | | | | | | | 80 | | | | | | | | | | 130 | | | | | | | | |
| | 31 | | | | | | | | | | 81 | | | | | | | | | | 131 | | | | | | | | |
| | 32 | | | | | | | | | | 82 | | | | | | | | | | 132 | | | | | | | | |
| | 33 | | | | | | | | | | 83 | | | | | | | | | | 133 | | | | | | | | |
| | 34 | | | | | | | | | | 84 | | | | | | | | | | 134 | | | | | | | | |
| | 35 | | | | | | | | | | 85 | | | | | | | | | | 135 | | | | | | | | |
| | 36 | | | | | | | | | | 86 | | | | | | | | | | 136 | | | | | | | | |
| | 37 | | | | | | | | | | 87 | | | | | | | | | | 137 | | | | | | | | |
| | 38 | | | | | | | | | | 88 | | | | | | | | | | 138 | | | | | | | | |
| | 39 | | | | | | | | | | 89 | | | | | | | | | | 139 | | | | | | | | |
| | 40 | | | | | | | | | | 90 | | | | | | | | | | 140 | | | | | | | | |
| | 41 | | | | | | | | | | 91 | | | | | | | | | | 141 | | | | | | | | |
| | 42 | | | | | | | | | | 92 | | | | | | | | | | 142 | | | | | | | | |
| | 43 | | | | | | | | | | 93 | | | | | | | | | | 143 | | | | | | | | |
| | 44 | | | | | | | | | | 94 | | | | | | | | | | 144 | | | | | | | | |
| | 45 | | | | | | | | | | 95 | | | | | | | | | | 145 | | | | | | | | |
| | 46 | | | | | | | | | | 96 | | | | | | | | | | 146 | | | | | | | | |
| | 47 | | | | | | | | | | 97 | | | | | | | | | | 147 | | | | | | | | |
| | 48 | | | | | | | | | | 98 | | | | | | | | | | 148 | | | | | | | | |
| | 49 | | | | | | | | | | 99 | | | | | | | | | | 149 | | | | | | | | |
| | 50 | | | | | | | | | | 100 | | | | | | | | | | 150 | | | | | | | | |



IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent Application of

GOERTZ                                    Atty. Ref.: 5042-2
                                          (Formerly 3682-32)

Serial No.: 10/315,250                    Group: 2174

Filed: December 10, 2002                  Examiner: Purcell, Ian M.

For: USER INTERFACE


\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*


                                          March 15, 2007

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450


## AMENDMENT AFTER FINAL REJECTION

Sir:

In response to the Final Office Action mailed November 15, 2006, please amend the

above-identified application as follows:

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2

of this paper.

**Remarks/Arguments** begin on page 9 of this paper.


1182121

NEONODE0000106



GOERTZ
Serial No.:  10/315,250

## AMENDMENTS TO THE CLAIMS

This listing of claims will replace all prior versions, and listings, of claims in the application.

1.  (Currently Amended)  A user interface for a mobile handheld computer unit, where said computer unit comprises comprising:

a touch sensitive area, which touch sensitive area is that is simultaneously divided into a menu area and a display area,

where said the computer unit is being adapted to run several applications simultaneously, and to present an active application on top of any other application on said the display area, characterised in, that

said the menu area is being adapted to simultaneously present a representations of a first, a second and a third predefined function, that said a first function that is a general application dependent function, that said a second function that is a keyboard function, that said and a third function that is a task and file manager, and

that any one of said each of the three functions simultaneously represented in the menu area can being activated when said by the single step of an object moving in a direction from a starting point that is the representation of the function in the menu area to the display area being detected by the touch sensitive area, detects a movement of an object moving with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area, said user interface thereby allowing low precision navigation of the user interface using a blunt object, whereby said so that the user interface can be operated by

- 2 -

1182121

NEONODE0000107

GOERTZ
Serial No.: 10/315,250

one hand, where ~~said~~ the blunt object ~~can be~~ is a finger.

2. (Previously Presented) The user interface according to Claim 1, characterized in, that, if said first function is activated, said display area is adapted to display icons representing different services or settings depending on the current active application, that one of said icons always represents a "help"-service, regardless of application, and that, if no application is currently active on said computer unit, said icons are adapted to represent services or settings of the operations system of said computer unit.

3. (Previously Presented) The user interface according to Claim 2, characterised in, that ~~that~~ a selection of a preferred service or setting is done by tapping on corresponding icon.

4. (Previously Presented) The user interface according to Claim 1, characterised in,

- that, if said second function is activated, said display area is adapted to display a keyboard and a text field,

- that, if a text passage in said active application is highlighted, said text passage is displayed in said text field for editing through said keyboard and that said highlighted text passage is replaced by said edited text passage when said second function is deactivated, and

- that if no text passage in said active application is highlighted, said text field is available for inputting and editing of text through said keyboard.

- 3 -

1182121

NEONODE0000108

GOERTZ
Serial No.: 10/315,250

5. (Previously Presented) The user interface according to Claim 4, characterised in, that

if no text passage in said active application is highlighted, said text field is used for inputting and

editing of text through said keyboard, then

- said first function can be activated, or

- said second function can be closed, in which a choice of saving or deleting said

inputted text is given, where the choice of saving said inputted text results in an activation of said

first function,

in which said first function will present services or settings available for said inputted

text.


6. (Previously Presented)  The user interface according to Claim 1, characterised in, that,

if said third function is activated, said display area is adapted to display a list with a library of

available applications and files on said computer unit, that a selection of an application will start

said application, and that a selection of a file will open said file in an application intended for

said file.


7. (Previously Presented)  The user interface according to Claim 6, characterised in, that

a selection of an application or a file is done by moving said object so that the representation of

desired application or file is highlighted, removing said object from said touch sensitive area, and

then tapping on said touch sensitive area, and that an application or file is highlighted by placing

some kind of marking on the representation of said application or file.

- 4 -

1182121

NEONODE0000109

GOERTZ
Serial No.: 10/315,250

8. (Previously Presented) The user interface according to Claim 7, characterised in, that said list is adapted to present only said files or only said applications, that the top area of said list presents a field through which the content of said list can be altered, that, if said list only presents files, said field displays a representation of a task manager and a selection of said field will cause said list to alter to present only applications, and that, if said list only presents applications, said field displays a representation of a file manager and a selection of said field will cause said list to alter and present only files.

9. (Previously Presented) The user interface according to Claim 7, characterised in, that, a navigation in said list is performed by moving said object in a direction towards the top of said list or towards the bottom of said list, that the movement of said object will cause said marking to move in the same direction, and that the speed of the movement of said marking is lower than the speed of the movement of said object.

10. (Previously Presented) The user interface according to Claim 9, characterised in, that, if the number of applications and/or files in said list exceeds the number of applications and files that can be presented on said display area, and if said object is moved to the top or bottom position of said display area, then lifted, replaced on said display area, and again moved to the top or bottom of said display area, the content of said display area will be replaced one whole page, meaning that if said object is positioned at the bottom of said display area, then lifted,

- 5 -

1182121

NEONODE0000110

GOERTZ
Serial No.: 10/315,250

replaced on said display area, and then again moved to the bottom of said display area, the content of said display area will be replaced by the following applications and/or files in said list, and if said object is positioned at the top of said display area, then lifted, replaced on said display area, and then again moved to the top of said display area, the content of said display area will be replaced by the preceding applications and/or files in said list.

11. (Previously Presented) The user interface according to Claim 10, characterised in, that if said object is removed from any first position on said display area and then replaced on any second position on said display area, said navigation can be continued from said second position.

12. (Previously Presented) The user interface according to Claim 1, characterised in, that an active application, function, service or setting is moved on one step by moving said object from the left of said display area to the right of said display area, and that the active application, function, service or setting is closed or backed one step by moving said object from the right of said display area to the left of said display area.

13. (Previously Presented) The user interface according to Claim 1, characterised in, that said menu area is positioned at the bottom of said touch sensitive area, that said representation of said first function is positioned at the left side of said menu area, that said

- 6 -

1182121

NEONODE0000111

GOERTZ
Serial No.: 10/315,250

representation of said second function is positioned at the middle of said menu area, and that said representation of said third function is positioned at the right side of said menu area.

14. (Previously Presented) The user interface according to Claim 1, characterised in, that said user interface is adapted to a touch sensitive area with a size that is in the order of 2-3 inches, and that said user interface is adapted to be operated by one hand, where said object can be a finger.

15. (Previously Presented) An enclosure adapted to cover a computer unit, said computer unit being adapted to present a user interface according to Claim 1, characterised in, that said enclosure is provided with an opening for said display area, and that a representation of said menu area is printed on top of said enclosure.

16. (Previously Presented) The enclosure according to Claim 15, characterised in, that said enclosure is removable and exchangeable.

17. (Original) A computer readable medium, with a computer program product stored therein, characterised in, that said computer program product comprises computer readable code, which, when read by a computer, will make it possible for said computer to present a user interface according to Claim 1.

- 7 -

1182121

NEONODE0000112

GOERTZ
Serial No.: 10/315,250

18. (Original) A computer readable medium according to Claim 17, characterised in,

that said computer program product is adapted to function as a shell upon an operations system.

- 8 -

1182121

NEONODE0000113

GOERTZ
Serial No.: 10/315,250

## REMARKS

Reconsideration of this application is respectfully requested. To this end, petition is hereby made for a one month extension of time to respond to the Final Office Action mailed November 15, 2006. In addition, a Request for Continued Examination is being filed with this Amendment After Final Rejection.

The Examiner and his Supervisory Primary Examiner, Kristine Kincaid, are thanked for allowing the undersigned to interview this application on March 13, 2007. The remarks in this Amendment, in essence, constitute the substance of the interview.

Claims 1-18 are pending in the application. Upon entry of this Amendment, independent claim 1 will be amended.

In the outstanding Final Office Action of November 15, 2006, the Examiner again rejected claims 1, 4-7, 12, 15 and 17 under 35 U.S.C. §102(b) as being anticipated by Carlson (Carlson, Jeff, *Visual Quickstart Guide Palm Organizers,* Peachpit Press, 2000, Berkeley, CA; hereinafter "Carlson"). The Examiner further rejected, as being unpatentable under 35 U.S.C. §103(a), claims 2 and 3 over Carlson in view of Kopitzke (USP 6,988,246; hereinafter "Kopitzke"); claims 8-11 and 13 over Carlson in view of Wynn et al. (USP 6,734883; hereinafter Wynn); claim 13 over Carlson alone; claims 14 and 16 over Carlson in view of Strietelmeier (Strietelmeier, Julie, *Palm* m100, The Gadgeteer, 2000, http://www.the-gadgeteer.com/review/palm_m100_review; hereinafter Strietelmeier); and claim 18 over Carlson in view of Chew et al. (USP 6,727, 917; hereinafter Chew). The Examiner's rejections are again respectfully traversed.

- 9 -

1182121

NEONODE0000114

GOERTZ
Serial No.: 10/315,250

For a claimed invention to be anticipated by a prior art reference, every element of the claim must be disclosed in the reference. For a claimed invention to be obvious over a combination of prior art references, there must be some suggestion, motivation or teaching in the prior art that would have led one of ordinary skill in the art to combine the references to produce the claimed invention. *E.g., Ashland Oil, Inc. v. Delta Resins & Refracs.*, 776 F.2d 281, 293 (Fed. Cir. 1985). Here, the claimed invention of the present application is neither anticipated nor obvious over the cited references because such references do not disclose or suggest all of the limitations of the claimed invention. Even assuming, *arguendo*, that the Examiner properly combined the cited references, the resulting combination still would not be the claimed invention given the deficiencies noted below in the primary Carlson reference.

Amended independent claim 1 describes a user interface for a hand held computer unit that includes a touch sensitive area simultaneously divided into a menu area and a display area, with the menu area simultaneously presenting a first function that is a general application dependent function, a second function that is a keyboard function, and a third function that is a task and file manager. Amended independent claim 1 has been amended to clarify that each of the three functions simultaneously represented in the menu area are activated by the touch sensitive area detecting the single step of an object moving in a direction from a starting point that is the representation of the function in the menu area to the display area. This single step function launching movement is not described in the primary Carlson reference.

The Examiner is thanked for discussing with the undersigned in connection with the Interview mentioned above the clarification of claim 1 by reciting a single step function

- 10 -

1182121

NEONODE0000115

GOERTZ
Serial No.: 10/315,250

launching movement and noting that the recitation of this single step in claim 1 would likely overcome the cited primary Carlson reference.

The user interface described in claim 1 of the present application is designed to be used with a user's hand and fingers, rather than any tools, such as the stylus used with a Palm Pilot. This user interface is designed to be navigated with a finger, and preferably using only one hand, holding the device with that hand and navigating with a user's finger. This allows the launching of the functions described in claim 1 with a finger, through the recognition of the finger's movement across a touch sensitive area in a direction from a starting point that is the representation of the function in the menu area to the display area. Claim 1 has been amended to better describe this single step function launching movement.

The Palm Pilot device described in the cited Carlson reference is, in contrast, designed to navigate on small icons and buttons with a relatively sharp tip from a stylus or pen. The Carlson reference purports to be a guide to Palm organizers. The Examiner looks to pages 30 and 40 of the Carlson reference as purporting to show the single step function launching movement recited in claim 1 and discussed above. In particular, the Examiner looks to Figure 2.22, on page 40 of Carlson, and the excerpt from page 30, titled "To activate the keyboard". In this excerpt from page 30, Carlson teaches that there are four ways of accessing the Palm Pilot keyboard function, one of which includes "drag[ing] the stylus vertically across the screen from bottom to top." The stylus is purported to be shown in Figure 2.22, page 40, of Carlson. However, alongside the representation of the stylus in this Figure is a menu including several entries, one of which is the keyboard function, and another of which, *i.e.*, the "backlight" function, appears to be highlighted.

- 11 -

1182121

NEONODE0000116

GOERTZ
Serial No.: 10/315,250

There are several reasons why the disclosure on pages 30 and 40 of Carlson do not show the function launching feature recited in claim 1 of the present application. First, claim 1 describes three broad based functions using the function launching features described in claim 1, to wit, a first general application-dependent function, a second keyboard function, and a third task and file manager function. The scope of these functions can be appreciated by the embodiment of the invention described in the specification of the present application and, in particular, the examples of these three functions shown in Figures 3, 5 and 6, respectively, of the present application. This is in sharp contrast to the limited keyboard function described in the Carlson reference with respect to the dragging of the stylus across the screen from to top on page 30 of Carlson.

Second, it is clear from page 40 of Carlson that what is described in Figure 2.22 is a two-step sequence in which a function is highlighted before the stylus is dragged. The grouping of possibilities shown to the right of the stylus in Figure 2.22 includes the keyboard function. This is in contrast to the single step function-launching movement described in claim 1, where a function is launched by the single step of an object, such as a finger, moving from a function icon in the menu area to the display area. It is this simple function-launching movement that allows the user interface and computer unit described in claim 1 to be operated by a single hand and finger.

Finally, even in describing the step of dragging a stylus vertically across a screen from bottom to top to activate a keyboard function, there is nothing in Carlson which teaches placing the stylus in the first instance on an icon describing or corresponding to the keyboard function

- 12 -

1182121

NEONODE0000117

GOERTZ
Serial No.: 10/315,250

and moving the stylus, or some other object, from that keyboard icon across the screen. Indeed, Figure 2.22 shows the pen-dragging function from the writing area to the top of the screen with the pen or stylus beginning at a location that is not a selected feature, such as those shown in Figure 2.22 that include the keyboard function.

Independent claim 17 describes a computer readable medium, with a computer program product stored therein that makes it possible for a computer to present a user interface according to Claim 1. Independent claims 1 and 17, and thus dependent claims 4-7, 12, and 15, which depend either directly or indirectly from claim 1, are not anticipated by Carlson because Carlson does not disclose the foregoing function launching feature described in amended claim 1.

Independent claims 1 and 17, and dependent claims 4-7, 12, and 15, are also not anticipated by Carlson because Carlson also does not disclose the recited first, second and third predefined functions simultaneously represented in the menu area, much less activating any one of these three functions by moving an object from a starting point that is within the representation of the function in the menu area in a direction from the menu area to the display area, as discussed above.

Claim 1 describes the first function as a general application dependent function which, in the embodiment of the invention described in the application, are services or functions dependent upon a current active application. One of the services is described as a help service, regardless of the application. Others are described as "save to disk", "send as SMS", or "delete", or settings such as "resolution", "colour", or "brightness". If no application is active, the services or settings

- 13 -

1182121

NEONODE0000118

GOERTZ
Serial No.: 10/315,250

can be of the operations system, such as background picture, clock, alarm, users, help, etc. *See, e.g.,* Application, pages 5-6.

The Examiner looks to page 28 of Carlson and a "menu" icon shown in Figure 2.4 on page 28 of Carlson as meeting the first function feature recited in claim 1; however, what page 28 of Carlson shows is instructions for accessing menus in applications.

Claim 1 also describes the second function as a keyboard function. The Examiner looks to page 30 of Carlson as showing the keyboard function. Page 30 of Carlson does describe an "onscreen keyboard".

Claim 1 describes the third function as a task and file manager. The Examiner looks to page 47 of Carlson, and particularly the applications screen in Figure 2.35 of Carlson as meeting this function. In the embodiment of the invention described in the present application, the third function is described as displaying a list with a library of available applications and files on the computer unit. *See, e.g.,* Application, page. 7.

Assuming, *arguendo,* that the selected portions of Carlson show functions generally corresponding to the functions described in claim 1, because Carlson shows <u>multiple screens</u> for the menu shown on page 28, the keyboard shown on page 30, and the applications shown on page 47, Carlson also does <u>not</u> disclose a menu area <u>simultaneously</u> presenting a representation of the first, second and third predefined functions recited in claim 1. In view of the foregoing, clearly, Carlson does not anticipate independent claims 1 and 17 or dependent claims 4-7, 12, and 15.

- 14 -

1182121

NEONODE0000119

GOERTZ
Serial No.: 10/315,250

Finally, because Carlson does not anticipate the claimed invention as recited in independent claims 1 and 17 (which references claim 1), given the deficiencies noted above in the teachings of the primary Carlson reference, the remaining claims rejected in the outstanding Office Action under §103(a), *i.e.,* claims 2, 3, 8-11, 13, 14, 16 and 18, which depend either directly or indirectly from claim 1 or claim 17, are also not obvious over Carlson alone or in combination with the other references cited by the Examiner.

In view of the foregoing, it is believed that all of the claims pending in the application, *i.e.*, claims 1 – 18, are now in condition for allowance, which action is earnestly solicited. If any issues remain in this application, the Examiner is urged to contact the undersigned at the telephone number listed below.

The Commissioner is hereby authorized to charge any deficiency, or credit any overpayment, in the fee(s) filed, or asserted to be filed, or which should have been filed herewith (or with any paper hereafter filed in this application by this firm) to our Account No. 14-1140.

Respectfully submitted,

**NIXON & VANDERHYE P.C.**

By: *Robert A. Molan*
Robert A. Molan
Reg. No. 29,834

RAM:jsm

901 North Glebe Road, 11th Floor
Arlington, VA 22203
Telephone: (703) 816-4000
Facsimile: (703) 816-4100

- 15 -

1182121

NEONODE0000120

Modified PTO/SB/30 (09-04)
Approved for use through 10/31/2002, OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# REQUEST
## FOR
## CONTINUED EXAMINATION (RCE) TRANSMITTAL

Address to:
Mail Stop RCE
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

[Stamp: MAR 15 2007 PATENT & TRADEMARK OFFICE]

| Field | Value |
|---|---|
| Application Number | 10/315,250 |
| Filing Date | December 10, 2002 |
| First Named Inventor | GOERTZ |
| Group Art Unit | 2174; Conf. 1226 |
| Examiner Name | Purcell, Ian M. |
| Attorney Docket Number | 5042-2 (formerly 3682-32) |

This is a Request for Continued Examination (RCE) under 37 C.F.R. §1.114 of the above-identified application.
Request for continued Examination (RCE) practice under 37 C.F.R. § 1.114 does not apply to any utility or plant application filed prior to June 8, 1995, or to any design application. See Instruction Sheet for RCEs (not to be submitted to the USPTO) on page 2.

1. **Submission required under 37 C.F.R. § 1.114.**

   a. ☐ Previously submitted (Note: Any previously filed unentered amendments will be entered unless applicant instructs otherwise. If applicant does not wish to have previously filed unentered amendment(s) entered, applicant must request non-entry of such amendment(s).
      i. ☐ Consider the amendment(s)/reply under 37 C.F.R. § 1.116 previously filed on _____
      ii. ☐ Consider the arguments in the Appeal Brief or Reply Brief previously filed on _____
      iii. ☐ Other _____

   b. ☒ Enclosed
      i. ☒ **Amendment After Final Rejection**
      ii. ☐ Affidavit(s)/Declaration(s)
      iii. ☐ Information Disclosure Statement (IDS)
      iv. ☐ Other _____

   *03/16/2007 ABERHE    00000053 10315250*
   *01 FC:2801                              395.00 OP*

2. **Miscellaneous**

   a. ☐ Suspension of action on the above-identified application is requested under 35 C.F.R. § 1.103(c) for a period of _____ months. (Period of suspension shall not exceed 3 months; Fee under 37 C.F.R. § 1.17(i) required)
   b. ☐ Other _____

3. **Fees** The RCE fee under 37 C.F.R. § 1.17(e) is required by 37 C.F.R. § 1.114 when the RCE is filed.

   a. ☒ Applicant claims "small entity" status.
   b. ☒ Fees are attached as calculated below:
      i. ☒ RCE fee required under 37 C.F.R. § 1.17(e)    $790.00 (1801)/$395.00 (2801)    $ 395.00
      ii. ☒ Petition is made to extend the due date 1 months (less 0 months previously paid)    $ 60.00
      iii. ☐ Other _____    $
   c. ☒ Check in the amount of $ 455.00 enclosed.
   d. ☐ Payment by credit card (credit card payment form attached) in the amount of $ 0.00
   e. ☒ The Director is hereby authorized to charge any deficiency in the fee(s) filed or which should have been filed herewith (or with any paper hereafter filed in this application by this firm), to Deposit Account No. **14-1140**

## SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED

| Name (Print Type) | Robert A. Molan | Registration No. (Attorney/Agent) | 29,834 |
|---|---|---|---|
| Signature | *Robert A. Molan* | Date | March 15, 2007 |

## CERTIFICATE OF MAILING OR TRANSMISSION

I hereby certify that this correspondence is being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Mail Stop RCE, Commissioner For Patents, P.O. Box 1450, Alexandria, VA 22313-1450, or facsimile transmitted to the U.S. Patent and Trademark Office on:    *03/16/2007 ABERHE    00000053 10315250*

*02 FC:2251                              60.00 OP*

| Name (Print Type) | |
|---|---|
| Signature | Date |

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Mail Stop RCE, **Commissioner for Patents, Box RCE, P.O. Box 1450, Alexandria, VA 22313-1450,**

NEONODE0000121

## PATENT APPLICATION FEE DETERMINATION RECORD
### Effective October 1, 2001

**Application or Docket Number:** 10315250

### CLAIMS AS FILED - PART I

| | (Column 1) NUMBER FILED | (Column 2) NUMBER EXTRA |
|---|---|---|
| TOTAL CLAIMS | 18 | |
| FOR | | |
| TOTAL CHARGEABLE CLAIMS | 18 minus 20= | * |
| INDEPENDENT CLAIMS | 1 minus 3 = | * |
| MULTIPLE DEPENDENT CLAIM PRESENT | ☐ | |

* If the difference in column 1 is less than zero, enter "0" in column 2

| SMALL ENTITY TYPE ☐ | | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|
| | RATE | FEE | | RATE | FEE |
| BASIC FEE | 370.00 | | OR | BASIC FEE | 740.00 |
| | X$ 9= | | OR | X$18= | |
| | X42= | | OR | X84= | |
| | +140= | | OR | +280= | |
| | TOTAL | | OR | TOTAL | |

### CLAIMS AS AMENDED - PART II

**AMENDMENT A**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | * 18 | Minus | ** 20 | * |
| Independent | * 1 | Minus | *** 3 | * |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | | |

| SMALL ENTITY | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|
| RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

315-07

**AMENDMENT B**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | * 18 | Minus | ** 20 | = |
| Independent | * 1 | Minus | *** 3 | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | | |

| RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
|---|---|---|---|---|
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

**AMENDMENT C**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | * | Minus | ** | = |
| Independent | * | Minus | *** | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | | |

| RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
|---|---|---|---|---|
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20."
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3."
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

FORM PTO-875 (Rev. 8/01)

Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE

NEONODE0000122



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | 3682-32 | 1226 |

23117    7590    03/20/2007
NIXON & VANDERHYE, PC
901 NORTH GLEBE ROAD, 11TH FLOOR
ARLINGTON, VA 22203

| EXAMINER |
|---|
| PURCELL, IAN M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2174 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 03/20/2007 | PAPER |

Please find below and/or attached an Office communication concerning this application or proceeding.

PTOL-90A (Rev. 10/06)

NEONODE0000123

| ***Interview Summary*** | Application No. | Applicant(s) |
|---|---|---|
| | 10/315,250 | GOERTZ, MAGNUS |
| | Examiner | Art Unit |
| | Ian M. Purcell | 2174 |

All participants (applicant, applicant's representative, PTO personnel):

(1) *Ian M. Purcell.*     (3)*Robert A. Molan.*

(2) *Kristine Kincaid.*     (4)_____.

Date of Interview: *13 March 2007.*

Type: a)☐ Telephonic b)☐ Video Conference
   c)☒ Personal [copy given to: 1)☐ applicant 2)☒ applicant's representative]

Exhibit shown or demonstration conducted: d)☐ Yes e)☒ No.
 If Yes, brief description: _____.

Claim(s) discussed: *Claim 1.*

Identification of prior art discussed: *Carlson.*

Agreement with respect to the claims f)☐ was reached. g)☒ was not reached. h)☐ N/A.

Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments: *Discussed the proposed amendments to independent claim 1. The examiner will provide possible amendments to the claim language in order to clarify the claimed invention.*

(A fuller description, if necessary, and a copy of the amendments which the examiner agreed would render the claims allowable, if available, must be attached. Also, where no copy of the amendments that would render the claims allowable is available, a summary thereof must be attached.)

THE FORMAL WRITTEN REPLY TO THE LAST OFFICE ACTION MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW. (See MPEP Section 713.04). If a reply to the last Office action has already been filed, APPLICANT IS GIVEN A NON-EXTENDABLE PERIOD OF THE LONGER OF ONE MONTH OR THIRTY DAYS FROM THIS INTERVIEW DATE, OR THE MAILING DATE OF THIS INTERVIEW SUMMARY FORM, WHICHEVER IS LATER, TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW. See Summary of Record of Interview requirements on reverse side or on attached sheet.

*Kristine Kincaid*
KRISTINE KINCAID
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 2100

Examiner Note: You must sign this form unless it is an Attachment to a signed Office action.

Examiner's signature, if required

NEONODE0000124

## Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**

A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

### Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews

**Paragraph (b)**

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

### 37 CFR §1.2 Business to be transacted in writing.

All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

---

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
- Application Number (Series Code and Serial Number)
- Name of applicant
- Name of examiner
- Date of interview
- Type of interview (telephonic, video-conference, or personal)
- Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
- An indication whether or not an exhibit was shown or a demonstration conducted
- An identification of the specific prior art discussed
- An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
- The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
   (The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.

Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

2

NEONODE0000125



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | 3682-32 | 1226 |

23117    7590    05/24/2007
NIXON & VANDERHYE, PC
901 NORTH GLEBE ROAD, 11TH FLOOR
ARLINGTON, VA 22203

| EXAMINER |
|---|
| PITARO, RYAN F |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2174 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/24/2007 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

NEONODE0000126

Best Available Copy

| | Application No. | Applicant(s) |
|---|---|---|
| ***Office Action Summary*** | 10/315,250 | GOERTZ, MAGNUS |
| | Examiner | Art Unit | |
| | Ryan F. Pitaro | 2174 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *3* MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on *15 March 2007*.

2a) ☐ This action is **FINAL.**    2b) ☒ This action is non-final.

3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4) ☒ Claim(s) *1-18* is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5) ☐ Claim(s) _____ is/are allowed.

6) ☒ Claim(s) *1-18* is/are rejected.

7) ☐ Claim(s) _____ is/are objected to.

8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9) ☐ The specification is objected to by the Examiner.

10) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All    b) ☐ Some *  c) ☐ None of:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____.

      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date _____.

4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

U.S. Patent and Trademark Office
PTOL-326 (Rev. 08-06)    Office Action Summary    Part of Paper No./Mail Date 20070517

NEONODE0000127

Best Available Copy

Application/Control Number: 10/315,250                                         Page 2

Art Unit: 2174

## DETAILED ACTION

### *Response to Amendment*

This communication is responsive to the Amendment filed 3/15/2007.

Claims 1-18 are pending in this application. Claims 1, 15 and 17 are

independent claims. In the Amendment the Specification and the Claims were

amended. Claims 1-18 were amended.

### *Claim Rejections - 35 USC § 101*

35 U.S.C. 101 reads as follows:

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

Claims 1-16 are rejected under 35 U.S.C. 101 because the claimed invention is

directed to non-statutory subject matter. A graphical user interface is simply non

functional descriptive material per se, and therefore lacks an actual data structure to be

considered statutory. To be an actual data structure it must be a physical or logical

relationship among data elements designed to support specific data manipulation

functions.

NEONODE0000128

Best Available Copy

Application/Control Number: 10/315,250

Page 3

Art Unit: 2174

## Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Claims 1, 4-7, 12, 15 and 17 are rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Peachpit Press. 2000. Berkeley, CA.) in view of Haitani et al ("Haitani", US 5,900875) in view of Venolia et al ("Venolia", T-Cube: A Fast, Self-Disclosing Pen-Based Alphabet).

1.      As per claim 1, Carlson teaches a user interface for a mobile handheld computer unit (Introduction, page xiii), where said computer unit comprises a touch sensitive area (page 26, *the screen is touch sensitive*), that is simultaneously divided into a menu area (page 12, fig. 1.10 *silk screen graffiti area*) and a display area, the computer unit is being adapted to run several applications simultaneously (page 47, *all of the applications are running concurrently*), and to present an active application on top of any other application on said display area, characterised in, that said menu area is adapted to present a representation of a first, a second and a third predefined function, that said first function is a general application dependent function (page 28, *the Menu icon*, fig. 2.4), that said second function is a keyboard function (page 30, *either the abc*

NEONODE0000129

Best Available Copy

Application/Control Number: 10/315,250    Page 4
Art Unit: 2174

*or 123 dots in the lower corner of the Graffiti area*), that said third function is a task and file manager (page 47, *the Applications screen* & fig. 2.35), and that any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area (page 40, *bottom-to-top screen stroke shortcut* fig. 2.22 & page 30, *drag the stylus vertically across the screen from bottom to top*), said user interface allowing low precision navigation using a blunt object, whereby said user interface can be operated by one hand (page 12, "*The stylus is the main method of interacting with the PalmPilot*" *and it inherently involves one hand to use the stylus.* Also, if a finger was used, that would also be considered using one hand), where said blunt object is a finger (page 12, "*The stylus is the main method of interacting*" **though** anything including fingers **can** work). Carlson fails to distinctly point out simultaneously displaying a first, second, and third function. However, Haitani teaches the menu area being adapted to simultaneously present representations of a first function that is a general application dependent function (Figure 1 items 151,153), a second function that is a keyboard function (Figure 1 item 145) and a third function that is a task and file manager (Figure 1 item 141). Therefore it would have been obvious to an artisan at the time of the invention to combine the teaching of Haitani with the interface of Carlson. Motivation to do so would have been to provide a way to view information that does not fit on the display. The modified Carlson still does not explicitly point out activation by a single step of an object moving in a direction on the touch sensitive area. However, Venolia teaches activating by the single

NEONODE0000130

Best Available Copy

Application/Control Number: 10/315,250                                              Page 5
Art Unit: 2174

step of an object moving in a direction from a starting point that is representation of the

function in the menu area to the display area (Column 2, flick gestures). Therefore it

would have been obvious to an artisan at the time of the invention to combine the

teaching of Venolia with the modified Carlson. Motivation to do so would have been to

provide a fast way of selecting functions.

2.      As per claim 4, the modified Carlson teaches the user interface according to

claim 1, characterised in,

        that, if said second function is activated, said display area is adapted to display a

keyboard and a text field,

        that, if a text passage in said active application is highlighted, said text passage

is displayed in said text field for editing through said keyboard and that said highlighted

text passage is replaced by said edited text passage when said second function is

deactivated, and

        that, if no text passage in said active application is highlighted, said text field is

available for inputting and editing of text through said keyboard (Carlson, page 30, fig

2.7).

3.      As per claim 5, the modified Carlson teaches the user interface according to

claim 4, characterized in, that if no text passage in said active application is highlighted,

and said text field is used for inputting and editing of text through said keyboard

(Carlson, page 30, fig 2.7), then

        said first function can be activated, or

NEONODE0000131

Best Available Copy

Application/Control Number: 10/315,250                                                   Page 6

Art Unit: 2174

said second function can be closed, in which a choice of saving or deleting said inputted text is given, where the choice of saving said inputted text results in an activation of said first function,

in which said first function will present services or settings available for said inputted text (Carlson, page 28, fig. 2.4 *Beam Memo*).

4.      As per claim 6, the modified Carlson teaches the user interface according to claim 1, characterised in, that, if said third function is activated, said display area is adapted to display a list with a library of available applications and files on said computer unit, that a selection of an application will start said application, and that a selection of a file will open said file in an application intended for said file (Carlson, page 47, fig. 2.35).

5.      As per claim 7, the modified Carlson teaches the user interface according to claim 6, characterised in, that a selection of an application or a file is done by moving said object so that the representation of desired application or file is highlighted, removing said object from said touch sensitive area, and then tapping on said touch sensitive area, and that an application or file is highlighted by placing some kind of marking on the representation of said application or file (Carlson, pages 26 & 27).

6.      As per claim 12, the modified Carlson teaches the user interface according to Claim 1, characterised in, that an active application, function, service or setting is moved on one step by moving said object from the left of said display area to the right of said display area, and that the active application, function service or setting is closed or

NEONODE0000132

Best Available Copy

Application/Control Number: 10/315,250                                    Page 7

Art Unit: 2174

backed one step by moving said object from the right of said display area to the left of said display area (Carlson, page 246, fig. 14.2, *Drag to scroll through file*).

7.    As per claim 15, the modified Carlson teaches an enclosure adapted to cover a computer unit, said computer unit being adapted to present a user interface according Claim 1, characterised in, that said enclosure is provided with an opening for said display area, and that a representation of said menu area is printed on top of said enclosure (Carlson, page 12, *Silkscreen Graffiti area* & fig. 1.10).

8.    As per claim 17, the modified Carlson teaches a computer readable medium, with a computer program product stored therein, characterised in, that said computer program product comprises computer readable code, which, when read by a computer, will make it possible for said computer to present a user interface according to Claim 1 (Carlson, page 25, *Palm OS*).

Claims 2 and 3 are rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff. <u>Visual Quickstart Guide Palm Organizers</u>. Peachpit Press. 2000. Berkeley, CA.), Haitani et al ("Haitani", US 5,900875), and Venolia et al ("Venolia", T-Cube: A Fast, Self-Disclosing Pen-Based Alphabet) in view of Kopitzke et al. ("Kopitzke", US # 6,988,246 B2).

9.    As per claim 2, the modified Carlson teaches the user interface according to claim 1, characterized in, that, if said first function is activated, said display area is adapted to display icons representing different services or settings depending on the current active application (Carlson, page 28, *the Menu icon*, fig. 2.4), and that, if no

NEONODE0000133

**Best Available Copy**

Application/Control Number: 10/315,250                                        Page 8

Art Unit: 2174

application is currently active on said computer unit, said icons are adapted to represent services or settings of the operations system of said computer unit (Carlson, page 47, fig. 2.36, *12:11 am*).

However the modified Carlson does not teach expressly the user interface according to claim 1, characterized in, that, if said first function is activated, said display area is adapted to display icons representing different services or settings depending on the current active application, that one of said icons always represents a "help"-service, regardless of application.

Kopitzke teaches the user interface according to claim 1, characterised in, that said display area is adapted to display icons representing different services or settings depending on the current active application, that one of said icons always represents a "help"-service, regardless of application (column 4, lines 36-53 & fig. 1, *Help key or button* 6).

The modified Carlson and Kopitzke are analogous art because they are in the same field of endeavor, namely graphical user interfaces with touch sensitive displays.

At the time of the invention it would have been obvious to a person of ordinary skill in the art to provide the help function as taught by Kopitzke within the user interface of the modified Carlson in order to provide context sensitive information.

As per claim 3, the modified Carlson teaches the user interface according to claim 2, characterised in, that a selection of a preferred service or setting is done by tapping on corresponding icon (Carlson, page 26, fig. 2.1*Tapping just about any interface element in the Palm OS evokes a response*).

NEONODE0000134

**Best Available Copy**

Application/Control Number: 10/315,250                                      Page 9

Art Unit: 2174

Claims 8-11 and 13 is rejected under 35 U.S.C. 103(a) as being unpatentable

over Carlson ("Carlson", Carlson, Jeff. <u>Visual Quickstart Guide Palm Organizers</u>.

Peachpit Press. 2000. Berkeley, CA.), Haitani et al ("Haitani", US 5,900875), and

Venolia et al ("Venolia", T-Cube: A Fast, Self-Disclosing Pen-Based Alphabet) in view of

Wynn et al. ("Wynn", US # 6,734,883 B1).

10.     As per claim 8, the modified Carlson teaches the user interface according to

claim 7.  However the modified Carlson does not teach expressly the user interface,

characterised in, that said list is adapted to present only said files or only said

applications, that the top area of said list presents a field through which the content of

said list can be altered, that, if said list only presents files, said field displays a

representation of a task manager and a selection of said field will cause said list to alter

to present only applications, and that, if said list only presents applications, said field

displays a representation of a file manager and a selection of said field will cause said

list to alter and present only files.

Wynn teaches a user interface control, characterised in, that said list is adapted

to present only said files or only said applications, that the top area of said list presents

a field through which the content of said list can be altered (column 3, lines 4-8, *dialog

box* 32), that, if said list only presents files, said field displays a representation of a task

manager and a selection of said field will cause said list to alter to present only

applications, and that, if said list only presents applications, said field displays a

representation (column 3, lines 4-8, *label* 31) of a file manager and a selection of said

field will cause said list to alter and present only files (column 3, lines 15-31).

NEONODE0000135

**Best Available Copy**

Application/Control Number: 10/315,250                          Page 10
Art Unit: 2174

The modified Carlson and Wynn are analogous art because they are in the same field of endeavor, namely scrolling within graphical user interfaces with touch sensitive displays.

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the selection list format as taught by Wynn within the user interface of the modified Carlson in order to provide a conventional list format.

11.     As per claim 9, the modifiedCarlson teaches the user interface according to claim 7, characterised in, that, a navigation in said list is performed by moving said object in a direction towards the top of said list or towards the bottom of said list, that the movement of said object will cause said marking to move in the same direction (Carlson, page 27, *a quicker way to view the full list is to tap and hold on the dark solid portion of the scroll bar, then drag it vertically*).

However the modified Carlson does not teach expressly that the speed of the movement of said marking is lower than the speed of the movement of said object.

Wynn teaches a user interface control, characterised in, that, a navigation in said list is performed by moving said object in a direction towards the top of said list or towards the bottom of said list, that the movement of said object will cause said marking to move in the same direction (column 3, lines 32-39 & figs. 5) and that the speed of the movement of said marking is lower than the speed of the movement of said object (column 4, lines 24-30).

NEONODE0000136

Best Available Copy

Application/Control Number: 10/315,250                                    Page 11
Art Unit: 2174

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the scrolling function as taught by Wynn within the user interface of the modifiedCarlson in order to provide a conventional selection list.

12.    As per claim 10, the modified Carlson in view of Wynn teaches the user interface according to claim 9, characterised in, that, if the number of applications and/or files in said list exceeds the number of applications and files that can be presented on said display area, and if said object is moved to the top or bottom position of said display area, then lifted, replaced on said display area, and again moved to the top or bottom of said display area, the content of said display area will be replaced one whole page, meaning that if said object is positioned at the top of said display area, then lifted, replaced on said display area, and then again moved to the top of said display area, the content of said display area will be replaced by the preceding applications and/or files in said list (Carlson, page 253, fig. 14.15 *Full Page Up*).

The modified Carlson in view of Wynn does not disclose expressly the user interface, characterised in that if said object is positioned at the bottom of said display area, then lifted, replaced on said display area, and then again moved to the bottom of said display area, the content of said display area will be replaced by the following applications and/or files in said list.

At the time of the invention, it would have been an obvious matter of design choice to a person of ordinary skill in the art to modify the *Full Page Up* function (Carlson, page 253, fig 14.15) to work as a Full Page Down function by tapping on the bottom of the display area because Applicant has not disclosed that *if said object is*

NEONODE0000137

**Best Available Copy**

Application/Control Number: 10/315,250                                        Page 13
Art Unit: 2174

14.     As per claim 13, the modified Carlson teaches the user interface according to Claim 1, characterised in, that said menu area is positioned at the bottom of said touch sensitive area, that said representation of said first function is positioned at the left side of said menu area, and that said representation of said second function is positioned at the middle of said menu area.

The modified Carlson does not teach expressly that said representation of said third function is positioned at the right side of said menu area.

At the time the invention was made, it would have been an obvious matter of design choice to a person of ordinary skill in the art to place the third function on the right side of the display area instead of the left, because Applicant has not disclosed that *said representation of said third function is positioned at the right side of said menu area* provides an advantage, is used for a particular purpose or solves a stated problem. One of ordinary skill in the art, furthermore would have expected Applicant's invention to perform equally well with the third function on the left side of the display area because the placement of the representation would not change its functionality.

Claims 14 and 16 are rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Berkeley, CA: Peachpit Press, 2000), Haitani et al ("Haitani", US 5,900875), and Venolia et al ("Venolia", T-Cube: A Fast, Self-Disclosing Pen-Based Alphabet) in view of Strietelmeier ("Strietelmeier", Strietelmeier, Julie. "Palm m100." The Gadgeteer. 2000. <http://www.the-gadgeteer.com/review/palm_m100_review>).

NEONODE0000138

Best Available Copy

Application/Control Number: 10/315,250                                    Page 12
Art Unit: 2174

*positioned at the bottom of said display area, then lifted, replaced on said display area,
and then again moved to the bottom of said display area, the content of said display
area will be replaced by the following applications and/or files in said list* provides an
advantage, is used for a particular purpose, or solves a stated problem.  One of ordinary
skill in the art, furthermore, would have expected Applicant's invention to perform
equally well with the modified Full Page Up function as taught by Carlson because it
would only need to be implemented to scroll down instead of up, when the display area
is tapped on the bottom, instead of the top.

13.    As per claim 11, the modified Carlson in view of Wynn teaches the user interface
according to claim 10, characterised in, that if said object is removed from any first
position on said display area and then replaced on any second position on said display
area, said navigation can be continued from said second position (Carlson, page 253,
fig. 14.15).

Claim 13 is rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson
("Carlson", Carlson, Jeff.  Visual Quickstart Guide Palm Organizers. Peachpit Press.
2000.  Berkeley, CA.) in view of Haitani et al ("Haitani", US 5,900875) in view of Venolia
et al ("Venolia", T-Cube: A Fast, Self-Disclosing Pen-Based Alphabet).

NEONODE0000139

Best Available Copy

Application/Control Number: 10/315,250                                      Page 14
Art Unit: 2174

15.    As per claim 14, the modified Carlson teaches the user interface according to Claim 1, characterised in, that said user interface is adapted to a touch sensitive area and that said user interface is adapted to be operated by one hand, where said object can be a finger (page 12, *stylus...includes fingers*).

However the modified Carlson does not teach expressly a touch sensitive area with a size that is in the order of 2-3 inches.

Strietelmeier teaches a user interface, characterised in, a touch sensitive area with a size that is in the order of 2-3 inches (page 4).

The modified Carlson and Strietelmeier are analogous art because they are in the same field of endeavor, namely palm-sized computer organizers.

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the dimensions of a touch sensitive area as taught by Strietelmeier within the user interface of the modified Carlson in order to provide a touch sensitive area with the manufacturer's dimensions.

16.    As per claim 16, the modified Carlson teaches the enclosure according to claim 15. However, the modified Carlson does not disclose the enclosure characterised in, that said enclosure is removable and exchangeable.

Strietelmeier teaches an enclosure characterised in, that said enclosure is removable and exchangeable (page 3, *you can also remove the entire face plate... there will be different face plates available*).

**Best Available Copy**

Application/Control Number: 10/315,250                                    Page 15
Art Unit: 2174

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the customizable enclosures as taught by Strietelmeier within the enclosure of the modified Carlson in order to tailor an enclosure to a user's preferences.

17.    Claim 18 is rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff. <u>Visual Quickstart Guide Palm Organizers</u>. Berkeley, CA: Peachpit Press, 2000) in view of Chew et al. ("Chew", US # 6,727,917), Haitani et al ("Haitani", US 5,900875), and Venolia et al ("Venolia", T-Cube: A Fast, Self-Disclosing Pen-Based Alphabet).

As per claim 18, the modified Carlson teaches a computer readable medium according to claim 17.

However the modified Carlson does not teach expressly, that said computer program product is adapted to function as a shell upon an operations system.

Chew teaches a user interface for a palm-sized computer device, characterised in, that said computer program product is adapted to function as a shell upon an operations system (column 2, lines 1-5).

The modified Carlson and Chew are analogous art because they are in the same field of endeavor, namely graphical user interfaces for hand-held personal computing devices with touch sensitive displays.

At the time of the invention it would have been obvious to a person of ordinary skill in the art to further modify the modified Carlson program to function as shell as taught by Chew in order to efficiently display information.

NEONODE0000141

Best Available Copy

Application/Control Number: 10/315,250                                    Page 16

Art Unit: 2174

### Response to Arguments

Applicant's arguments with respect to claims 1-18 have been considered but are moot in view of the new ground(s) of rejection.

### Conclusion

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Ryan F. Pitaro whose telephone number is 571-272-4071. The examiner can normally be reached on 7:00am - 4:30pm Mondays through Fridays.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Kristine Kincaid can be reached on 571-272-4063. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

NEONODE0000142

Best Available Copy

Application/Control Number: 10/315,250                                    Page 17
Art Unit: 2174

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

Ryan Pitaro
Patent Examiner
Art unit 2174

RFP

KRISTINE KINCAID
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 2100

NEONODE0000143

**Best Available Copy**

| | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| **Notice of References Cited** | 10/315,250 | GOERTZ, MAGNUS |
| | Examiner | Art Unit | |
| | Ryan F. Pitaro | 2174 | Page 1 of 1 |

### U.S. PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-5,900,875 A | 05-1999 | Haitani et al. | 715/840 |
| * | B | US-2002/0046353 A1 | 04-2002 | Kishimoto, Toyoaki | 713/202 |
| * | C | US-2002/0002326 | 01-2002 | Causey et al. | 600/300 |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

### FOREIGN PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

### NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | Venolia et al, "T-Cube: A Fast, Self-Disclosing Pen-Based Alphabet, April 24, 1994, Pages 265-270 |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

NEONODE0000144

Best Available Copy

| Search Notes | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 10/315,250 | GOERTZ, MAGNUS |
| | Examiner | Art Unit |
| | Ryan F. Pitaro | 2174 |

| SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| Update | Search | 5/16/2007 | RFP |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| SEARCH NOTES (INCLUDING SEARCH STRATEGY) | | | |
|---|---|---|---|
| | | DATE | EXMR |
| Updated Search | | 5/17/2007 | RFP |
| Internet, IEEE | | 5/17/2007 | RFP |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| INTERFERENCE SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| | | | |
| | | | |
| | | | |
| | | | |

U.S. Patent and Trademark Office                                    Part of Paper No. 20070517

NEONODE0000145

Best Available Copy

| Index of Claims | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| ‖‖‖‖‖‖‖‖‖ (barcode) | 10/315,250 | GOERTZ, MAGNUS |
| | Examiner | Art Unit |
| | Ryan F. Pitaro | 2174 |

| √ | Rejected | – | (Through numeral) Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| Final | Original | 5/17/07 | | Final | Original | | | Final | Original | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | √ | | | 51 | | | | 101 | |
| | 2 | √ | | | 52 | | | | 102 | |
| | 3 | √ | | | 53 | | | | 103 | |
| | 4 | √ | | | 54 | | | | 104 | |
| | 5 | √ | | | 55 | | | | 105 | |
| | 6 | √ | | | 56 | | | | 106 | |
| | 7 | √ | | | 57 | | | | 107 | |
| | 8 | √ | | | 58 | | | | 108 | |
| | 9 | √ | | | 59 | | | | 109 | |
| | 10 | √ | | | 60 | | | | 110 | |
| | 11 | √ | | | 61 | | | | 111 | |
| | 12 | √ | | | 62 | | | | 112 | |
| | 13 | √ | | | 63 | | | | 113 | |
| | 14 | √ | | | 64 | | | | 114 | |
| | 15 | √ | | | 65 | | | | 115 | |
| | 16 | √ | | | 66 | | | | 116 | |
| | 17 | √ | | | 67 | | | | 117 | |
| | 18 | √ | | | 68 | | | | 118 | |
| | 19 | | | | 69 | | | | 119 | |
| | 20 | | | | 70 | | | | 120 | |
| | 21 | | | | 71 | | | | 121 | |
| | 22 | | | | 72 | | | | 122 | |
| | 23 | | | | 73 | | | | 123 | |
| | 24 | | | | 74 | | | | 124 | |
| | 25 | | | | 75 | | | | 125 | |
| | 26 | | | | 76 | | | | 126 | |
| | 27 | | | | 77 | | | | 127 | |
| | 28 | | | | 78 | | | | 128 | |
| | 29 | | | | 79 | | | | 129 | |
| | 30 | | | | 80 | | | | 130 | |
| | 31 | | | | 81 | | | | 131 | |
| | 32 | | | | 82 | | | | 132 | |
| | 33 | | | | 83 | | | | 133 | |
| | 34 | | | | 84 | | | | 134 | |
| | 35 | | | | 85 | | | | 135 | |
| | 36 | | | | 86 | | | | 136 | |
| | 37 | | | | 87 | | | | 137 | |
| | 38 | | | | 88 | | | | 138 | |
| | 39 | | | | 89 | | | | 139 | |
| | 40 | | | | 90 | | | | 140 | |
| | 41 | | | | 91 | | | | 141 | |
| | 42 | | | | 92 | | | | 142 | |
| | 43 | | | | 93 | | | | 143 | |
| | 44 | | | | 94 | | | | 144 | |
| | 45 | | | | 95 | | | | 145 | |
| | 46 | | | | 96 | | | | 146 | |
| | 47 | | | | 97 | | | | 147 | |
| | 48 | | | | 98 | | | | 148 | |
| | 49 | | | | 99 | | | | 149 | |
| | 50 | | | | 100 | | | | 150 | |

U.S. Patent and Trademark Office

Part of Paper No. 20070517

NEONODE0000146

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Patent Application of

GOERTZ

Serial No. 10/315,250

Filed:    December 10, 2002

Title:    USER INTERFACE

Atty Dkt.    5042-2 (formerly 3682-32)
            C#    M#

TC/A.U.    2174; Conf. 1226

Examiner: Pitaro, Ryan F.

Date: August 23, 2007

AUG 23 2007

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

## AMENDMENT

This is a response/amendment/letter in the above-identified application and includes an attachment which is hereby incorporated by reference and the signature below serves as the signature to the attachment in the absence of any other signature thereon.

**Fees are attached as calculated below:**

Total effective claims after amendment    18    minus highest number previously paid for    **20**    (at least 20) =    0    x $50.00        $0.00 (1202)/$0.00 (2202)  $        0.00

Independent claims after amendment    1    minus highest number previously paid for    **3**    (at least 3) =    0    x $200.00        $0.00 (1201)/$0.00 (2201)  $        0.00

If proper multiple dependent claims now added for first time, (ignore improper); add
                                                                $360.00 (1203)/$0.00 (2203)  $

Petition is hereby made to extend the current due date so as to cover the filing date of this paper and attachment(s)
                        One Month Extension $120.00 (1251)/$0.00 (2251)
                        Two Month Extensions $450.00 (1252)/$0.00 (2252)
                        Three Month Extensions $1020.00 (1253/$0.00 (2253)
                        Four Month Extensions $1590.00 (1254/$0.00 (2254)
                        Five Month Extensions $2160.00 (1255/$1080.00 (2255)  $        0.00

Terminal disclaimer enclosed, add                    $130.00 (1814)/ $0.00 (2814)  $

☒ Applicant claims "small entity" status.    ☐ Statement filed herewith

Rule 56 Information Disclosure Statement Filing Fee            $180.00 (1806)  $        0.00

Assignment Recording Fee                        $40.00 (8021)  $        0.00

Other: **Attachments A and B attached to Amendment**                $        **0.00**

                                    **TOTAL FEE**  $        **0.00**

The Commissioner is hereby authorized to charge any deficiency, or credit any overpayment, in the fee(s) filed, or asserted to be filed, or which should have been filed herewith (or with any paper hereafter filed in this application by this firm) to our Account No. 14-1140. A duplicate copy of this sheet is attached.

901 North Glebe Road, 11th Floor
Arlington, Virginia 22203-1808
Telephone: (703) 816-4000
Facsimile: (703) 816-4100
RAM:drt

NIXON & VANDERHYE P.C.
By Atty: Robert A. Molan, Reg. No. 29,834

Signature: _Robert A. Molan_

#1241914 V1 - Amendment Transmittal

NEONODE0000147



**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Patent Application of

GOERTZ

Serial No.: 10/315,250

Filed: December 10, 2002

For: USER INTERFACE

Atty. Ref.: 5042-2
(Formerly 3682-32)

Group: 2174; Conf. No. 1226

Examiner: Pitaro, Ryan F.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

August 23, 2007

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

**AMENDMENT**

Sir:

In response to the Office Action mailed May 24, 2007, please amend the above-identified application as follows:

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this paper.

**Remarks/Arguments** begin on page 9 of this paper.

1237070

NEONODE0000148

GOERTZ
Serial No.: 10/315,250

## AMENDMENTS TO THE CLAIMS

This listing of claims will replace all prior versions, and listings, of claims in the application.

1. (Currently Amended)  A computer readable medium storing a computer program with computer program code, which code, when read by a mobile handheld computer unit, allows the computer to present a user interface for a the mobile handheld computer unit, the user interface comprising:

a touch sensitive area that is simultaneously divided into a menu area and a display area,

the computer unit being adapted to run several applications simultaneously, and to present an active application on top of any other application on the display area, characterised in, that

the menu area being adapted to simultaneously presenting representations of a first function that is a general application dependent function, a second function that is a keyboard function, and a third function that is a task and file manager, and

each of the three functions simultaneously represented in the menu area being activated by the single step of an object moving in a direction from a starting point that is the representation of the function in the menu area to the display area being detected by the touch sensitive area, thereby allowing low precision navigation of the user interface using a blunt object, so that the user interface can be operated by one hand, where the blunt object is a finger.

2. (Currently Amended)  The computer readable medium of claim 1, wherein the user interface according to Claim 1, is characterized in, that, if said first function is activated, said

- 2 -

1237070

NEONODE0000149

GOERTZ
Serial No.: 10/315,250

display area is adapted to display icons representing different services or settings depending on the current active application, that one of said icons always represents a "help"-service, regardless of application, and that, if no application is currently active on said computer unit, said icons are adapted to represent services or settings of the operations system of said computer unit.

3. (Currently Amended) The computer readable medium of claim 2, wherein the user interface according to Claim 2, is characterised in, that a selection of a preferred service or setting is done by tapping on corresponding icon.

4. (Currently Amended) The computer readable medium of claim 1, wherein the user interface according to Claim 1, is characterised in,

- that, if said second function is activated, said display area is adapted to display a keyboard and a text field,

- that, if a text passage in said active application is highlighted, said text passage is displayed in said text field for editing through said keyboard and that said highlighted text passage is replaced by said edited text passage when said second function is deactivated, and

- that if no text passage in said active application is highlighted, said text field is available for inputting and editing of text through said keyboard.

5. (Currently Amended) The computer readable medium of claim 4, wherein the user interface according to Claim 4, is characterised in, that if no text passage in said active

- 3 -

1237070

NEONODE0000150

GOERTZ
Serial No.: 10/315,250

application is highlighted, said text field is used for inputting and editing of text through said

keyboard, then

- said first function can be activated, or

- said second function can be closed, in which a choice of saving or deleting said

inputted text is given, where the choice of saving said inputted text results in an activation of said

first function,

in which said first function will present services or settings available for said inputted

text.

6. (Currently Amended) The computer readable medium of claim 1, wherein the user

interface according to Claim 1, is characterised in, that, if said third function is activated, said

display area is adapted to display a list with a library of available applications and files on said

computer unit, that a selection of an application will start said application, and that a selection of

a file will open said file in an application intended for said file.

7. (Currently Amended) The computer readable medium of claim 6, wherein the user

interface according to Claim 6, is characterised in, that a selection of an application or a file is

done by moving said object so that the representation of desired application or file is highlighted,

removing said object from said touch sensitive area, and then tapping on said touch sensitive

area, and that an application or file is highlighted by placing some kind of marking on the

representation of said application or file.

- 4 -

1237070

NEONODE0000151

GOERTZ
Serial No.: 10/315,250

8. (Currently Amended)  The computer readable medium of claim 7, wherein the user interface according to Claim 7, is characterised in, that said list is adapted to present only said files or only said applications, that the top area of said list presents a field through which the content of said list can be altered, that, if said list only presents files, said field displays a representation of a task manager and a selection of said field will cause said list to alter to present only applications, and that, if said list only presents applications, said field displays a representation of a file manager and a selection of said field will cause said list to alter and present only files.

9. (Currently Amended)  The computer readable medium of claim 7, wherein the user interface according to Claim 7, is characterised in, that, a navigation in said list is performed by moving said object in a direction towards the top of said list or towards the bottom of said list, that the movement of said object will cause said marking to move in the same direction, and that the speed of the movement of said marking is lower than the speed of the movement of said object.

10. (Currently Amended)  The computer readable medium of claim 9, wherein the user interface according to Claim 9, is characterised in, that, if the number of applications and/or files in said list exceeds the number of applications and files that can be presented on said display area, and if said object is moved to the top or bottom position of said display area, then lifted,

- 5 -

1237070

NEONODE0000152

GOERTZ
Serial No.: 10/315,250

replaced on said display area, and again moved to the top or bottom of said display area, the content of said display area will be replaced one whole page, meaning that if said object is positioned at the bottom of said display area, then lifted, replaced on said display area, and then again moved to the bottom of said display area, the content of said display area will be replaced by the following applications and/or files in said list, and if said object is positioned at the top of said display area, then lifted, replaced on said display area, and then again moved to the top of said display area, the content of said display area will be replaced by the preceding applications and/or files in said list.

11.  (Currently Amended)  The computer readable medium of claim 10, wherein the user interface according to Claim 10, is characterised in, that if said object is removed from any first position on said display area and then replaced on any second position on said display area, said navigation can be continued from said second position.

12.  (Currently Amended)  The computer readable medium of claim 1, wherein the user interface according to Claim 1, is characterised in, that an active application, function, service or setting is moved on one step by moving said object from the left of said display area to the right of said display area, and that the active application, function, service or setting is closed or backed one step by moving said object from the right of said display area to the left of said display area.

- 6 -

1237070

NEONODE0000153

GOERTZ
Serial No.: 10/315,250

13. (Currently Amended) The computer readable medium of claim 1, wherein the user interface ~~according to Claim 1,~~ is characterised in, that said menu area is positioned at the bottom of said touch sensitive area, that said representation of said first function is positioned at the left side of said menu area, that said representation of said second function is positioned at the middle of said menu area, and that said representation of said third function is positioned at the right side of said menu area.

14. (Currently Amended) The computer readable medium of claim 1, wherein the user interface ~~according to Claim 1,~~ is characterised in, that said user interface is adapted to a touch sensitive area with a size that is in the order of 2-3 inches, and that said user interface is adapted to be operated by one hand, where said object can be a finger.

15. (Currently Amended) An enclosure adapted to cover a computer unit, said computer unit being adapted to read computer program code of a computer program stored on a computer readable medium, which code, when read, presents a user interface according to Claim 1, characterised in, that said enclosure is provided with an opening for said display area, and that a representation of said menu area is printed on top of said enclosure.

16. (Previously Presented) The enclosure according to Claim 15, characterised in, that said enclosure is removable and exchangeable.

- 7 -

1237070

NEONODE0000154

GOERTZ
Serial No.: 10/315,250

17. (Original)  A computer readable medium, with a computer program product stored therein, characterised in, that said computer program product comprises computer readable code, which, when read by a computer, will make it possible for said computer to present a user interface according to Claim 1.

18. (Original)  A computer readable medium according to Claim 17, characterised in, that said computer program product is adapted to function as a shell upon an operations system.

1237070

NEONODE0000155

GOERTZ
Serial No.: 10/315,250

## REMARKS

Reconsideration of this application is respectfully requested.

Claims 1-18 are pending in the application. Upon entry of this amendment, claims 1-15 will be amended.

In the outstanding Office Action of May 24, 2007, the Examiner rejected claims 1-16, under 35 U.S.C. §101, as being directed to non-statutory subject matter, arguing that the claimed user interface "is simply nonfunctional descriptive material *per se*, and therefore lacks actual data structure to be considered statutory." 5/24/07 Office Action, p. 2. The Examiner's rejection is respectfully traversed.

Annex IV, titled "Computer-Related Non-Statutory Subject Matter", of the "Interim Guidelines for Examination of Patent Applications for Patent Subject Matter Eligibility", published in the November 22, 2005 Official Gazette of the United States Patent and Trademark Office defines both "functional descriptive material" and "non-functional descriptive material". "Functional descriptive material" is defined by Annex IV as material consisting of data structures and computer programs which impart functionality when employed as a computer component. A "data structure" is defined by Annex IV as a physical or logical relationship among data elements, designed to support specific data manipulation functions, quoting The New IEEE Standard Dictionary of Electrical and Electronics Terms 308 (5th ed. 1993). In contrast, "non-functional descriptive material" is defined by Annex IV as including, but not being limited to, music, literary works and a compilation or mere arrangement of data. A copy of Annex IV from

- 9 -

1237070

NEONODE0000156

GOERTZ
Serial No.: 10/315,250

the November 22, 2005 OG Notice is submitted with this Amendment as Attachment A to this Amendment.

Claim 1 of the present application, the only independent claim in the present application, has now been amended to recite a computer readable medium storing a computer program with computer program code, which code, when read by a mobile handheld computer unit, makes it possible for the computer to present a user interface for the computer that is described in claim 1 of the present application. The user interface, which is divided into a menu area and a display area, simultaneously presents, in the menu area, a first function that is a general application dependent function, a second function that is a keyboard function, and a third function that is a task and file manager. The touch sensitive user interface allows these functions to be activated by a single step of an object moving in a direction from a starting point that is a representation of the function in the menu area to the display area, thereby allowing a user to use the computer with a single hand and activate the recited functions with a blunt object, such as a finger. Clearly, in its amended form, claim 1 recites functional material. Claims 2-14 have been amended to conform them to amended claim 1. In addition, claim 15 has been amended to recite that the computer unit recited in the claim is adapted to read computer program code of a computer program stored on a computer-readable medium, which code, when read, presents the user interface of claim 1. As such, applicant believes that claims 1-16 now recite statutory subject matter, and that the Examiner's rejection of claims 1-16 under §101 should now be withdrawn. Support for the foregoing amendments to claims 1-15 appear at least at page 1, lines 12-15 of the specification of the present application.

- 10 -

1237070

NEONODE0000157

GOERTZ
Serial No.: 10/315,250

In the outstanding Office Action, the Examiner also rejected , as being unpatentable under

35 U.S.C. §103(a), claims 1, 4-7, 12, 15 and 17 over Carlson ("Carlson", Carlson, Jeff. Visual

Quickstart Guide Palm Organizers, Peachpit Press. 2000. Berkely, CA.) in view of Haitini *et al.*

(USP 5,900,875) and further in view of Venolia *et al.* ("Venolia", T-Cube: A Fast, Self-

Disclosing Pen-Based Alphabet), claims 2 and 3 over Carlson, Haitini *et al.* and Venolia *et al.* in

view of Kopitzke *et al.* (USP 6,988,246 B2), claim 8-11 over Carlson in view of Haitini *et al.* in

view of Venolia, in view of Wynn *et al.* (USP 6,734,833 B1), claim 13 over Carlson in view of

Haitini in view of Venolia, claims 14 and 16 over Carlson, Haitini *et al.* and Venolia in view of

Strietelmeier ("Strietelmeier, Julia "Palm m100. The Gadgeteer. 2000. http://www.the-

gadgeteer.com/review/palm_m100_review>), and claim 18 over Carlson in view of Chew *et al.*

(USP 6,727,917), Haitani *et al.* and Venolia *et al.* The Examiner's rejections are respectfully

traversed.

Assuming, *arguendo*, that the Examiner properly combined the cited references, the

resulting combination would still not be the claimed invention because such references do not

disclose or suggest all of the limitations of the claimed invention. Specifically, claim 1 of the

present application, the only independent claim pending in the application and the one claim

from which claims 2 – 18 depend, either directly or indirectly, recites a user interface for a hand

held computer unit that includes a touch sensitive area simultaneously divided into a menu area

and a display area, with the menu area simultaneously presenting a first function that is a general

application dependent function, a second function that is a keyboard function, and a third

function that is a task and file manager. Claim 1 also recites that each of the three functions

- 11 -

1237070

NEONODE0000158

GOERTZ
Serial No.: 10/315,250

simultaneously presented in the menu area are activated by the single step of an object moving in a direction from a starting point that is the representation of the function in the menu area to the display area being detected by the touch sensitive area, thereby allowing low precision navigation of the user interface using a blunt object, so that the user interface can be operated by one hand, where the blunt object is a finger. One embodiment of the three functions recited in claim 1 is described in the specification of the present application in reference to Figures 3, 5 and 6, respectively, of the present application.

The three functions simultaneously represented in the menu area and activated by a touch sensitive area detecting the single step of an object moving in a direction from a starting point that is the representation of the function in the menu area to a display area, as recited in independent claim 1, are not described in the primary Carlson reference, the secondary Haitani reference or the tertiary Venolia reference cited by the Examiner in the claim rejections set forth in the outstanding Office Action. Given these deficiencies in the cited references, discussed below, it must be concluded that claims 1 – 18 of the present application are not obvious over the cited references.

In the outstanding Office Action, the Examiner recognized that Carlson fails to disclose the first, second and third functions recited in independent claim 1 of the present application, 5/24/07 Office Action, p. 4, as argued by applicant in the Amendment After Final Rejection previously filed on March 15, 2007. In an effort to overcome this deficiency in the teaching of Carlson, the Examiner points to the Haitani patent as disclosing a "menu area being adapted to simultaneously present representations of a first function that is a general application-dependent

- 12 -

1237070

NEONODE0000159

GOERTZ
Serial No.: 10/315,250

function (Figure 1, items 151, 153), a second function that is a keyboard function (Figure 1, item

145) and a third function that is a task and file manager (Figure 1, item 141)." 5/24/07 Office

Action, p. 4. A review of Haitani reveals, however, that this patent does not disclose the first,

second and third functions recited in independent claim 1, as argued by the Examiner.

Haitani discloses a portable computer system 100 that is shown in Figure 1 of Haitani.

The computer system 100 shown in Figure 1 includes a screen display area 181 that is used to

display information to a user. Haitani, col. 2, lns. 40 – 42. Below the display area 181 is a user

input area 183. Haitani, col. 2, ln. 45. The user input area 183 is used to input text in the

Graffiti® writing area 145 and interact with the application buttons 141 through 144. Haitani,

col. 2, lns. 45 – 48. Both the screen display area and the user input area 183 are covered by a

digitizer pad that can detect user interaction with a stylus or finger. Haitani, col. 2, lns. 42 – 44

and 48 – 49. Below the area 183 is a mechanical button input area 185 that includes seven

different mechanical buttons 121, 123, 125, 127, 129 and 131. Haitani, col. 2, lns. 50-53. Thus,

it should first be noted that items 141, 145 and 151 and 153 are not all located in the same menu

area, as are the representations of the three functions recited in claim 1 of the present application.

Haitani describes the seven mechanical buttons as including "[a] pair of scrolling buttons

131 that are used to scroll information in the display area 181 up and down." Haitani, col. 2, lns.

64 – 65. Haitani also states that "[t]he scrolling buttons 141 [sic] allow a user to view a list of

information that does not fit on the display." Haitani, col. 2, lns. 65 – 67. This last statement

appears to conflict with the earlier description of item 141 as being one of the application buttons

141 through 144 located in Graffiti® writing area 145. Indeed, item 141 is not shown in Figure 1

- 13 -

1237070

NEONODE0000160

GOERTZ
Serial No.: 10/315,250

as a <u>pair of buttons</u>, but, rather, a <u>single icon</u> including an arrow symbol in a circle and the word "applications" underneath the arrow symbol and circle. *See* Haitani, Figure 1.

There is no description in Haitani of the items 151 and 153 shown in the screen display area 181 of Figure 1 of Haitani and cited by the Examiner as being "a general application-dependent function (Figure 1, items 151, 153)". 5/24/07 Office Action, p. 4. Thus, it is not clear how the Examiner has concluded that items 151 and 153 in Figure 1 represent the first function that is a general application-dependent function recited in claim 1 of the present application, particularly when Haitani does not even discuss items 151 and 153.

In addition, the "Graffiti® writing area" 145 shown in Figure 1 of Haitani is not the second, keyboard function recited in claim 1 of the present application. The Graffiti® writing area 145 is clearly not a keyboard, but rather an input area that is used to input <u>written characters</u>. *See, e.g.,* Attachment B to this Amendment.

Finally, as discussed above, item 141 is not the third, task and file manager function recited in claim 1, since it is described by Haitani as being part of the application buttons and shown in Figure 1 of Haitani as an icon including an arrow symbol in a circle and the word "applications" underneath the arrow symbol and circle.

Putting aside claim 1's recitation that each of the three functions simultaneously presented in the menu area are activated by the single step of an object moving in a direction from a starting point that is the representation of the function in the menu area to the display area so as to be detected by the touch sensitive area, it is clear from the foregoing discussion of

- 14 -

1237070

NEONODE0000161

GOERTZ
Serial No.: 10/315,250

Carlson and Haitani these a combination of these two references would not result in the invention described in independent claim 1 of the present application.

In the outstanding Office Action, the Examiner also recognized that Carlson, even as modified by Haitani, still does not disclose the single step function activation feature recited in claim 1. 5/24/07 Office Action, pp. 4 and 5. To compensate for this deficiency, the Examiner next argues that "Venolia teaches activating by the single step of an object moving in a direction from a starting point that is representation [sic] of the function in the menu area to the display area (Column 2, flick gestures)", described in column 2 of Venolia. It should be noted here that claim 1 of the present application recites not just a step of an object moving in a given direction for activation, but, rather, that each of the three <u>functions</u> recited in claim 1 are <u>activated</u> by the single step of an object moving in a direction from a starting point that is the representation of the function in the menu area to the display area, which is detected by touching the sensitive area, thereby allowing low precision navigation of a user interface using a blunt object, such as a finger, so that the user interface can be operated by one hand.

Contrary to the Examiner's assertion, Venolia does not disclose activating various functions in a computer by the single step of moving an object in a direction from a starting point that is a representation of a selected function in a menu area to a display area, as recited in independent claim 1 of the present application. Rather, Venolia discloses a technique for entering text to a pen-based computer based on a "new alphabet" where each letter in the alphabet is a entered using a flick gesture. The flick gestures are self-disclosing using prime

- 15 -

1237070

NEONODE0000162

GOERTZ
Serial No.: 10/315,250

menus. There is an assignment of characters to the gestures used with the pen-based computer disclosed in Venolia.

The method of entering text using a pen and flick gestures described in Venolia is identified as "T-Cube". Venolia does describe as part of T-Cube the use of a flick gesture with a starting point and a direction. The user presses the pen in one of nine target cells so that a pie menu appears offset from the pen. The direction of the flick of the pen can be vertical, horizontal or directional, specifying one of eight directions. A combination of these eight directions and nine starting cells in a pie menu yields 72 different gestures, with each gesture representing a character, such as "w" or "7", or an operation, such as a backspace, return or shift. Thus, the pen movements described in Venolia are not intended to activate a function, but, rather, to enter characters in a small computer. The flick gestures described in Venolia do not describe a single step of an object moving in a direction from a starting point that is the representation of one of several functions in a menu area to a display area to activate a selected function, as recited in independent claim 1 of the present application. Thus, it is clear that the combination of Carlson, Haitani and Venolia does not result in the invention described in independent claim 1 of the present application.

The other additional references cited by the Examiner do not compensate for the deficiencies in the Carlson, Haitani and Venolia references discussed above.

Kopitzke *et al.* discloses a monitoring and control device includes a touch sensitive LCD screen, with a basic layout including a display area and touch sensitive keys depicted with associated system and function symbols. A main menu or any one of plural system menus can be

- 16 -

1237070

NEONODE0000163

GOERTZ
Serial No.: 10/315,250

selectively displayed in the display area. The system menus relate to cabin systems such as audio,

lighting, and water systems. The selected system menu displays status information and touch

input keys for the user to monitor the status and to select and control the operation of the system.

The main menu is a top level window providing essential information regarding all of the cabin

systems and allows a user to select any one of the system menus.

Wynn *et al.* discloses a graphical user interface control for entering a user selection from

a list of possible selections in which the user can "spin" through a list of items shown on preview

and postview option lists. The control allows the user to spin forwards and backwards, with a

preview list of items and a postview list of items being displayed on opposing sides of the

currently selected item dialog box. By providing visibility to the upcoming and recently past

selections during the spin, a user can operate the spin control at a higher speed, thereby reducing

the amount of time necessary to find the desired item on the list.

Chew *et al.* discloses a hand-held computing device user interface that displays

information for an active application program in a middle portion of the screen, and displays a

shell program controlled navigation bar at a top portion of the screen. The navigation bar

includes a navigation icon which, when tapped by the stylus, aids the user in navigating to other

application programs. The navigation bar also includes a title for the active application program

to save vertical real estate on the screen. The user interface also displays an application menu bar

at a bottom portion of the screen so that the user can manipulate data from the active application

by tapping menu items with a stylus without blocking view of the middle portion of the display.

- 17 -

1237070

NEONODE0000164

GOERTZ
Serial No.: 10/315,250

The Gadgeteer article by Strietelmeier is a review of the Palm m100. The article talks about the Palm m100 having a cheaper feel than the prior Palm IIIc. It also talks about new features on the m100, such as an integrated flip cover, a small window that allows viewing of time and date when the up hardware scroll button is pressed, the removability of the flip cover for use of different color face plates, large and separate up/down scroll buttons, a smaller plastic LCD display, an IR port for beaming files back and forth to other Palm devices, a battery door, reset switch, stylus silo and hot sync port on the back of the unit, a louder internal speaker, limited RAM of 2MB, use of AAA batteries to power the device, and changes to the m100 software, such as the addition of a notepad application and a clock application and the removal of mail or expense applications.

Thus, it is clear that independent claim 1 of the present application is not obvious over the references of record cited by the Examiner in the outstanding Office Action of May 24, 2007. And, because independent claim 1 is not obvious over such references, dependent claims 2-18, which depend either directly or indirectly from claim 1, are also not obvious over such references.

In view of the foregoing, it is believed that all of the claims pending in the application, *i.e.*, claims 1 – 18, are now in condition for allowance, which action is earnestly solicited. If any

- 18 -

1237070

NEONODE0000165

GOERTZ
Serial No.:  10/315,250

issues remain in this application, the Examiner is urged to contact the undersigned at the

telephone number listed below.

Respectfully submitted,

**NIXON & VANDERHYE P.C.**

By:  _Robert A. Molan_

Robert A. Molan
Reg. No. 29,834

RAM:drt

901 North Glebe Road, 11th Floor
Arlington, VA  22203
Telephone:  (703) 816-4000
Facsimile:  (703) 816-4100

- 19 -

1237070

NEONODE0000166



## United States Patent and Trademark Office <u>OG Notices: 22 November 2005</u>

Interim Guidelines for Examination of Patent Applications
for Patent Subject Matter Eligibility

In the mid-1990's, the USPTO sought to clarify the legal requirements for statutory subject matter with regard to computer-related inventions. See Examination Guidelines for Computer Related Inventions, 61 Fed. Reg. 7478 (1996). Subsequent to the publication of those guidelines, the Court of Appeals for the Federal Circuit issued opinions in State Street Bank & Trust Co. v. Signature Financial Group Inc., 149 F. 3d 1368, 47 USPQ2d 1596 (Fed. Cir. 1998) and AT&T Corp. v. Excel Communications, Inc., 172 F.3d 1352, 50 USPQ2d 1447 (Fed. Cir. 1999). These decisions explained that, to be eligible for patent protection, the claimed invention as a whole must accomplish a practical application. That is, it must produce a "useful, concrete and tangible result." State Street, 149 F.3d at 1373-74, 47 USPQ2d at 1601-02. Since this time, the USPTO has seen increasing numbers of applications outside the realm of computer-related inventions that raise subject matter eligibility issues. In order to assist examiners in identifying and resolving these issues, the USPTO is issuing these interim examination guidelines to assist USPTO personnel in the examination of patent applications to determine whether the subject matter as claimed is eligible for patent protection.

The principal objective of these guidelines is to assist examiners in determining, on a case-by-case basis, whether a claimed invention falls within a judicial exception to statutory subject matter (i.e., is nothing more than an abstract idea, law of nature, or natural phenomenon), or whether it is a practical application of a judicial exception to statutory subject matter. The guidelines explain that a practical application of a 35 U.S.C. Sec. 101 judicial exception is claimed if the claimed invention physically transforms an article or physical object to a different state or thing, or if the claimed invention otherwise produces a useful, concrete, and tangible result.

I. INTRODUCTION

These Examination Guidelines ("Guidelines") are based on the USPTO's current understanding of the law and are believed to be fully consistent with binding precedent of the Supreme Court, the Federal Circuit and the Federal Circuit's predecessor courts.

These Guidelines do not constitute substantive rulemaking and hence do not have the force and effect of law. These Guidelines have been designed to assist USPTO personnel in analyzing claimed subject matter for compliance with substantive law. Rejections will be based upon the substantive law and it is these rejections which are appealable. Consequently, any failure by USPTO personnel to follow the Guidelines is neither appealable nor petitionable.

The Guidelines set forth the procedures USPTO personnel will follow when examining applications. USPTO personnel are to rely on these Guidelines in the event of any inconsistent treatment of issues between these Guidelines and any earlier provided guidance from the USPTO.

Inquiries concerning these Interim Guidelines may be directed to Linda Therkorn, Office of the Deputy Commissioner for Patent Examination Policy, by telephone at 571-272-8800, or Ray Chen, Office of the Solicitor, by

NEONODE0000167

claim would be found to be statutory.

The Federal Circuit held that the mere manipulations of abstract ideas are not patentable. Schrader, 22 F.3d at 292-93, 30 USPQ2d at 1457-58. If a claimed process manipulates only numbers, abstract concepts or ideas, or signals representing any of the foregoing, the claim is not being applied to appropriate subject matter. Schrader, 22 F.3d at 294-95, 30 USPQ2d at 1458-59. The Federal Circuit also recognizes that the fact that a nonstatutory method is carried out on a programmed computer does not make the process claim statutory. Grams, 888 F.2d at 841, 12 USPQ2d at 1829 (claim 16 ruled nonstatutory even though it was a computer-implemented process).

In addition, the Federal Circuit has recently noted that a "structural inquiry is unnecessary" when determining whether a process claim is eligible for patent protection. AT&T, 172 F.3d at 1359, 50 USPQ2d at 1452.

Thus, a finding that a claim fails to recite a computer-implemented process is not determinative in whether that claim passes muster under Sec. 101. Therefore, USPTO personnel should no longer rely on the machine implemented test to determine whether a claimed invention is directed to statutory subject matter.

### e. Per Se Data Transformation Test

Identifying that a claim transforms data from one value to another is not by itself sufficient for establishing that the claim is eligible for patent protection. See, e.g., Benson, 409 U.S. 63, 175 USPQ 673 (finding machine-implemented method of converting binary-coded decimal numbers into pure binary numbers unpatentable). In Benson, the claims invention was held to be merely a series of mathematical calculations having "no substantial practical application." Id. at 71, 175 USPQ at 676. Therefore, claims that perform data transformation must still be examined for whether there is a practical application of an abstract idea that produces a useful, concrete, and tangible result.

### ANNEX IV
### Computer-Related Nonstatutory Subject Matter

Descriptive material can be characterized as either "functional descriptive material" or "nonfunctional descriptive material." In this context, "functional descriptive material" consists of data structures and computer programs which impart functionality when employed as a computer component. (The definition of "data structure" is "a physical or logical relationship among data elements, designed to support specific data manipulation functions." The New IEEE Standard Dictionary of Electrical and Electronics Terms 308 (5th ed. 1993).) "Nonfunctional descriptive material" includes but is not limited to music, literary works and a compilation or mere arrangement of data.

Both types of "descriptive material" are nonstatutory when claimed as descriptive material per se. Warmerdam, 33 F.3d at 1360, 31 USPQ2d at 1759. When functional descriptive material is recorded on some computer-readable medium it becomes structurally and functionally interrelated to the medium and will be statutory in most cases since use of technology permits the function of the descriptive material to be realized. Compare In re Lowry, 32 F.3d 1579, 1583-84, 32

NEONODE0000168

USPQ2d 1031, 1035 (Fed. Cir. 1994) (claim to data structure stored on a computer readable medium that increases computer efficiency held statutory) and Warmerdam, 33 F.3d at 1360-61, 31 USPQ2d at 1759 (claim to computer having a specific data structure stored in memory held statutory product-by-process claim) with Warmerdam, 33 F.3d at 1361, 31 USPQ2d at 1760 (claim to a data structure per se held nonstatutory).

When nonfunctional descriptive material is recorded on some computer-readable medium, in a computer or on an electromagnetic carrier signal, it is not statutory since no requisite functionality is present to satisfy the practical application requirement. Merely claiming nonfunctional descriptive material, i.e., abstract ideas, stored in a computer-readable medium, in a computer, on an electromagnetic carrier signal does not make it statutory. See Diehr, 450 U.S. at 185-86, 209 USPQ at 8 (noting that the claims for an algorithm in Benson were unpatentable as abstract ideas because "[t]he sole practical application of the algorithm was in connection with the programming of a general purpose computer."). Such a result would exalt form over substance. In re Sarkar, 588 F.2d 1330, 1333, 200 USPQ 132, 137 (CCPA 1978) ("[E]ach invention must be evaluated as claimed; yet semantogenic considerations preclude a determination based solely on words appearing in the claims. In the final analysis under Sec. 101, the claimed invention, as a whole, must be evaluated for what it is.") (quoted with approval in Abele, 684 F.2d at 907, 214 USPQ at 687). See also In re Johnson, 589 F.2d 1070, 1077, 200 USPQ 199, 206 (CCPA 1978) ("form of the claim is often an exercise in drafting"). Thus, nonstatutory music is not a computer component and it does not become statutory by merely recording it on a compact disk. Protection for this type of work is provided under the copyright law.

When nonfunctional descriptive material is recorded on some computer-readable medium, in a computer or on an electromagnetic carrier signal, it is not statutory and should be rejected under 35 U.S.C. Sec. 101. In addition, the examiner should inquire whether there should be a rejection under 35 U.S.C. Sec. 102 or 103. The examiner should determine whether the claimed nonfunctional descriptive material be given patentable weight. The USPTO must consider all claim limitations when determining patentability of an invention over the prior art. In re Gulack, 703 F.2d 1381, 1385, 217 USPQ 401, 403-04 (Fed. Cir. 1983). The USPTO may not disregard claim limitations comprised of printed matter. See Gulack, 703 F.2d at 1384, 217 USPQ at 403; see also Diehr, 450 U.S. at 191, 209 USPQ at 10. However, the examiner need not give patentable weight to printed matter absent a new and unobvious functional relationship between the printed matter and the substrate. See In re Lowry, 32 F.3d 1579, 1583-84, 32 USPQ2d 1031, 1035 (Fed. Cir. 1994); In re Ngai, 367 F.3d 1336, 70 USPQ2d 1862 (Fed. Cir. 2004).

>           (a) Functional Descriptive Material: "Data Structures"
>           Representing Descriptive Material Per Se or Computer Programs
>           Representing Computer Listings Per Se

Data structures not claimed as embodied in computer-readable media are descriptive material per se and are not statutory because they are not capable of causing functional change in the computer. See, e.g., Warmerdam, 33 F.3d at 1361, 31 USPQ2d at 1760 (claim to a data structure per se held nonstatutory). Such claimed data structures do not define any structural and functional

NEONODE0000169

interrelationships between the data structure and other claimed aspects of the invention which permit the data structure's functionality to be realized. In contrast, a claimed computer-readable medium encoded with a data structure defines structural and functional interrelationships between the data structure and the computer software and hardware components which permit the data structure's functionality to be realized, and is thus statutory.

Similarly, computer programs claimed as computer listings per se, i.e., the descriptions or expressions of the programs, are not physical "things." They are neither computer components nor statutory processes, as they are not "acts" being performed. Such claimed computer programs do not define any structural and functional interrelationships between the computer program and other claimed elements of a computer which permit the computer program's functionality to be realized. In contrast, a claimed computer-readable medium encoded with a computer program is a computer element which defines structural and functional interrelationships between the computer program and the rest of the computer which permit the computer program's functionality to be realized, and is thus statutory. See Lowry, 32 F.3d at 1583-84, 32 USPQ2d at 1035. Accordingly, it is important to distinguish claims that define descriptive material per se from claims that define statutory inventions.

Computer programs are often recited as part of a claim. USPTO personnel should determine whether the computer program is being claimed as part of an otherwise statutory manufacture or machine. In such a case, the claim remains statutory irrespective of the fact that a computer program is included in the claim. The same result occurs when a computer program is used in a computerized process where the computer executes the instructions set forth in the computer program. Only when the claimed invention taken as a whole is directed to a mere program listing, i.e., to only its description or expression, is it descriptive material per se and hence nonstatutory. Since a computer program is merely a set of instructions capable of being executed by a computer, the computer program itself is not a process and USPTO personnel should treat a claim for a computer program, without the computer-readable medium needed to realize the computer program's functionality, as nonstatutory functional descriptive material. When a computer program is claimed in a process where the computer is executing the computer program's instructions, USPTO personnel should treat the claim as a process claim. See paragraph IV.B.2(b), below. When a computer program is recited in conjunction with a physical structure, such as a computer memory, USPTO personnel should treat the claim as a product claim. See paragraph IV.B.2(a), below.

(b) Nonfunctional Descriptive Material

Nonfunctional descriptive material that does not constitute a statutory process, machine, manufacture or composition of matter and should be rejected under 35 U.S.C. Sec. 101. Certain types of descriptive material, such as music, literature, art, photographs and mere arrangements or compilations of facts or data, without any functional interrelationship is not a process, machine, manufacture or composition of matter. USPTO personnel should be prudent in applying the foregoing guidance. Nonfunctional descriptive material may be claimed in combination with other functional descriptive multi-media material on a computer-readable medium to provide the necessary functional and structural interrelationship to satisfy the requirements of 35 U.S.C. Sec. 101. The presence of the claimed nonfunctional descriptive material

NEONODE0000170

is not necessarily determinative of nonstatutory subject matter. For example, a computer that recognizes a particular grouping of musical notes read from memory and upon recognizing that particular sequence, causes another defined series of notes to be played, defines a functional interrelationship among that data and the computing processes performed when utilizing that data, and as such is statutory because it implements a statutory process.

### (c) Electro-Magnetic Signals

Claims that recite nothing but the physical characteristics of a form of energy, such as a frequency, voltage, or the strength of a magnetic field, define energy or magnetism, per se, and as such are nonstatutory natural phenomena. O'Reilly, 56 U.S. (15 How.) at 112-14. Moreover, it does not appear that a claim reciting a signal encoded with functional descriptive material falls within any of the categories of patentable subject matter set forth in Sec. 101.

First, a claimed signal is clearly not a "process" under Sec. 101 because it is not a series of steps. The other three Sec. 101 classes of machine, compositions of matter and manufactures "relate to structural entities and can be grouped as `product' claims in order to contrast them with process claims." 1 D. Chisum, Patents Sec. 1.02 (1994). The three product classes have traditionally required physical structure or material.

"The term machine includes every mechanical device or combination of mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result." Corning v. Burden, 56 U.S. (15 How.) 252, 267 (1854). A modern definition of machine would no doubt include electronic devices which perform functions. Indeed, devices such as flip-flops and computers are referred to in computer science as sequential machines. A claimed signal has no physical structure, does not itself perform any useful, concrete and tangible result and, thus, does not fit within the definition of a machine.

A "composition of matter" "covers all compositions of two or more substances and includes all composite articles, whether they be results of chemical union, or of mechanical mixture, or whether they be gases, fluids, powders or solids." Shell Development Co. v. Watson, 149 F. Supp. 279, 280, 113 USPQ 265, 266 (D.D.C. 1957), aff'd, 252 F.2d 861, 116 USPQ 428 (D.C. Cir. 1958). A claimed signal is not matter, but a form of energy, and therefore is not a composition of matter.

The Supreme Court has read the term "manufacture" in accordance with its dictionary definition to mean "the production of articles for use from raw or prepared materials by giving to these materials new forms, qualities, properties, or combinations, whether by hand-labor or by machinery." Diamond v. Chakrabarty, 447 U.S. 303, 308, 206 USPQ 193, 196-97 (1980) (quoting American Fruit Growers, Inc. v. Brogdex Co., 283 U.S. 1, 11, 8 USPQ 131, 133 (1931), which, in turn, quotes the Century Dictionary). Other courts have applied similar definitions. See American Disappearing Bed Co. v. Arnaelsteen, 182 F. 324, 325 (9th Cir. 1910), cert. denied, 220 U.S. 622 (1911). These definitions require physical substance, which a claimed signal does not have. Congress can be presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change. Lorillard v. Pons, 434 U.S. 575, 580

NEONODE0000171

(1978). Thus, Congress must be presumed to have been aware of the interpretation of manufacture in American Fruit Growers when it passed the 1952 Patent Act.

A manufacture is also defined as the residual class of product. 1 Chisum, Sec. 1.02[3] (citing W. Robinson, The Law of Patents for Useful Inventions 270 (1890)). A product is a tangible physical article or object, some form of matter, which a signal is not. That the other two product classes, machine and composition of matter, require physical matter is evidence that a manufacture was also intended to require physical matter. A signal, a form of energy, does not fall within either of the two definitions of manufacture. Thus, a signal does not fall within one of the four statutory classes of Sec. 101.

On the other hand, from a technological standpoint, a signal encoded with functional descriptive material is similar to a computer-readable memory encoded with functional descriptive material, in that they both create a functional interrelationship with a computer. In other words, a computer is able to execute the encoded functions, regardless of whether the format is a disk or a signal.

These interim guidelines propose that such signal claims are ineligible for patent protection because they do not fall within any of the four statutory classes of Sec. 101. Public comment is sought for further evaluation of this question.

ANNEX 5
Mathematical Algorithms

Claims to processes that do nothing more than solve mathematical problems or manipulate abstract ideas or concepts are complex to analyze and are addressed herein.

If the "acts" of a claimed process manipulate only numbers, abstract concepts or ideas, or signals representing any of the foregoing, the acts are not being applied to appropriate subject matter. Benson, 409 U.S. at 71-72, 175 USPQ at 676. Thus, a process consisting solely of mathematical operations, i.e., converting one set of numbers into another set of numbers, does not manipulate appropriate subject matter and thus cannot constitute a statutory process.

In practical terms, claims define nonstatutory processes if they:

- consist solely of mathematical operations without some claimed practical application (i.e., executing a "mathematical algorithm"); or

- simply manipulate abstract ideas, e.g., a bid (Schrader, 22 F.3d at 293-94, 30 USPQ2d at 1458-59) or a bubble hierarchy (Warmerdam, 33 F.3d at 1360, 31 USPQ2d at 1759), without some claimed practical application.

Cf. Alappat, 33 F.3d at 1543 n.19, 31 USPQ2d at 1556 n.19 in which the Federal Circuit recognized the confusion:

The Supreme Court has not been clear . . . as to whether such subject matter is excluded from the scope of Sec. 101 because it represents laws of nature, natural phenomena, or abstract ideas. See Diehr, 450 U.S. at 186 (viewed mathematical algorithm as a law of nature); Gottschalk v. Benson,

NEONODE0000172

ß

**Writers Guide to the Pocket PC and Palm**

*Graffiti Writing Guide*

<u>Block Recognizer</u> on the Pocket PC uses Palm Graffiti.  Letters go in the left block and numbers are written in the right block













Nancy Clark, M.Ed.                    FSU College of Medicine                                                    1

NEONODE0000173

**Writers Guide to the Pocket PC and Palm**

*Graffiti 2*
The latest version of Graffiti, that comes on the Palm Tungsten T3 and higher, is a slight modification of the original Graffiti.

| Draw letters on LEFT side of Graffiti 2 writing area | | | |
|---|---|---|---|
| **Letter** | **Strokes** | **Letter** | **Strokes** |
| A | Λ | B | Ɓ |
| C | C | D | Ɗ |
| E | Ɛ | F | Γ |
| G | G | H | h |
| I | 1 ï 2 | J | J |

| Draw numbers on RIGHT side of Graffiti 2 writing area | | | |
|---|---|---|---|
| **Number** | **Strokes** | **Number** | **Strokes** |
| 0 | O | 1 | I |
| 2 | 2 | 3 | 3 |
| 4 | 1 4 2 | 5 | 5 |
| 6 | 6 | 7 | 7 |
| 8 | 8 | 9 | 9 |

| Draw letters on LEFT side of Graffiti 2 writing area | | | |
|---|---|---|---|
| **Letter** | **Strokes** | **Letter** | **Strokes** |
| K | 1 K 2 | L | L |
| M | m | N | N |
| O | O | P | p |
| Q | q | R | R |
| S | S | T | 2 T 1 |
| U | U | V | V |
| W | W | X | 1 X 2 |
| Y | y | Z | Z |

Write letters here — Write numbers here
Write capital letters across the imaginary division line
Division marks

**Palm devices only**

| Draw these marks on LEFT side of Graffiti 2 writing area | | | |
|---|---|---|---|
| **Mark** | **Stroke** | **Mark** | **Stroke** |
| Period . | • | Ampersand & | & |
| Comma , | ˩ | Carriage return | / |
| Apostrophe ' | ˥ | At @ | @ |
| Space | — | Straight quotes " | ᛐ |
| Question ? | 1 ? 2 | Tab | ⌐ |
| Exclamation ! | 1 ! 2 | | |

| Draw these marks on RIGHT side of Graffiti 2 writing area | | | |
|---|---|---|---|
| **Mark** | **Stroke** | **Mark** | **Stroke** |
| Period . | ▪ | Backslash \ | \ |
| Comma , | ˩ | Slash / | / |
| Tilde ~ | N | Left Paren ( | C |
| Dash – | — | Right Paren ) | ) |
| Plus + | 1 + 2 | Equal = | = |
| Asterisk * | 1 X 2 | | |

NEONODE0000174

## Writers Guide to the Pocket PC and Palm

### Jot Users Guide

Letter Recognizer on the PocketPC recognizes many variations of character input similar to the Palm program Jot. Capital letters go in the first block, lowercase letters in the middle, and numbers on the right.



Jot® for Palm OS Quick Start Card

Palm OS™ Emulator

Write in full screen or box mode

Nancy Clark, M.Ed.          FSU College of Medicine                        3

NEONODE0000175

## Writers Guide to the Pocket PC and Palm

| a | | l | | w | | double quote | |
|---|---|---|---|---|---|---|---|
| b | | m | | x | | tab | |
| c | | n | | y | | space | |
| d | | o | | z | | backspace | |
| e | | p | | period | • or \ * | new line | |
| f | | q | | comma | | cut | |
| g | | r | | aspostrophe | | copy | |
| h | | s | | question | | paste | |
| i | | t | | exclamation | | undo | |
| j | | u | | ampersand | | command | |
| k | | v | | at | | | |

\* • or •• is written in the writing area.
\\ or \\\\ is used when writing on the display.

Write numbers and the following symbols to the right of the division marks.

| 0 | | 6 | | dash | | ( | |
|---|---|---|---|---|---|---|---|
| 1 | | 7 | | tilde | | ) | |
| 2 | | 8 | | + | | = | |
| 3 | | 9 | | * | | backspace | |
| 4 | | period | • or \ * | / | | | |
| 5 | | comma | | \ | | | |

Write accent marks to the right of the division marks after writing an upper or lower case letter.

| à | | â | | ä | •• or \\\\ * |
|---|---|---|---|---|---|
| á | | ã | | å | |

Nancy Clark, M.Ed.          FSU College of Medicine                    4

NEONODE0000176

## Writers Guide to the Pocket PC and Palm

### Jot Special characters

| char | gesture | char | gesture | char | gesture | char | gesture |
|---|---|---|---|---|---|---|---|
| . | • | : | ⋮ | □ | ⊗ | ® | Ⓡ |
| , | ⌐ | = | ⩵ | « | ≪ | © | Ⓒ |
| ' | ⌐ | # | ♯ | » | ≫ | ^ | ∧ |
| - | — | ☆ | ✳ ✳ | ″ | ··| | § | § |
| _ | —· | & | Ɛ & | ¯ | ——| | ¢ | ₵ |
| ~ | N | Æ | AƐ| | · | ·— | ‡ | ‡ |
| @ | @ @ | æ | a e | ¬ | ⌐| | ... | ··· |
| < | < | Ç | Ç²| | ` | \ | | • | ·|| |
| > | > | ç | Ç²| | ´ | / | | - | ———— |
| ( | ( | ª | a | ¦ | ||— | — | ———— |
| ) | ) | º | ○ | - | —/ | ‹ | ◁| |
| [ | ⊏ | , | J|| | ™ | ∇M | › | >| |
| ] | ⊐ | ¿ | C² | Œ | OƐ| | ƒ | ƒ |
| } | } | ¡ | ²| | œ | Oe | š | š| |
| { | { | þ | þ| | ‰ | ‰ | š | š |
| \| | ↑ | Þ | þ | † | +| | ^ | ∧| |
| ! | ! | Ð | Đ| | 1 | |||| | ~ | N| |
| ? | ? | ð | Đ | 2 | 2| | ‘ | L |
| $ | $ $ | Ø | Ø²| | 3 | ß| | ’ | ⌐|— |
| % | % | ø | Ø² | ± | ± | " | LL |
| / | / | ß | β | × | X² | " | JJ |
| \ | \ | µ | M | ÷ | ÷ | , | ⌐|| |
| " | ⌐⌐ | ¥ | ¥ | ¼ | ¼ ¼ | „ | //| ⫴ |
| + | ·+ | £ | £ | ½ | ½ ½ | € | € |
| ; | ²| ²| | ¶ | C|| | ¾ | ¾ ¾ | | |

NEONODE0000177

## PATENT APPLICATION FEE DETERMINATION RECORD
### Effective October 1, 2001

**Application or Docket Number**

10315250

### CLAIMS AS FILED - PART I

| | (Column 1) | (Column 2) |
|---|---|---|
| TOTAL CLAIMS | 18 | |
| FOR | NUMBER FILED | NUMBER EXTRA |
| TOTAL CHARGEABLE CLAIMS | 18 minus 20= | * |
| INDEPENDENT CLAIMS | 1 minus 3 = | * |
| MULTIPLE DEPENDENT CLAIM PRESENT | | ☐ |

* If the difference in column 1 is less than zero, enter "0" in column 2

**SMALL ENTITY TYPE ☐** OR **OTHER THAN SMALL ENTITY**

| RATE | FEE | | RATE | FEE |
|---|---|---|---|---|
| BASIC FEE | 370.00 | OR | BASIC FEE | 740.00 |
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL | | OR | TOTAL | |

### CLAIMS AS AMENDED - PART II

**AMENDMENT A**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|
| Total | 16 | Minus ** 20 | * |
| Independent | 1 | Minus *** 3 | * |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | ☐ |

**SMALL ENTITY** OR **OTHER THAN SMALL ENTITY**

| RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
|---|---|---|---|---|
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

315-07

**AMENDMENT B**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|
| Total | 18 | Minus ** 20 | * |
| Independent | 1 | Minus *** 3 | * |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | ☐ |

| RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
|---|---|---|---|---|
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

8 -237.7

**AMENDMENT C**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|
| Total | 18 | Minus ** 20 | * |
| Independent | 1 | Minus *** 3 | * |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | ☐ |

| RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
|---|---|---|---|---|
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20."
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3."
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

FORM PTO-875  (Rev. 8/01)

Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE

NEONODE0000178

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | 3682-32 | 1226 |

23117        7590        11/14/2007
NIXON & VANDERHYE, PC
901 NORTH GLEBE ROAD, 11TH FLOOR
ARLINGTON, VA 22203

| EXAMINER |
|---|
| PITARO, RYAN F |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2174 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/14/2007 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

NEONODE0000179

| | **Application No.** | **Applicant(s)** |
|---|---|---|
| ***Office Action Summary*** | 10/315,250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** | |
| | Ryan F. Pitaro | 2174 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>23 August 2007</u>.

2a)☐ This action is **FINAL**.    2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-18</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>1-18</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All    b)☐ Some * c)☐ None of:

        1.☐ Certified copies of the priority documents have been received.

        2.☐ Certified copies of the priority documents have been received in Application No. _____.

        3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date _____.

4) ☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

NEONODE0000180

Application/Control Number: 10/315,250                                                          Page 2
Art Unit: 2174

## DETAILED ACTION

### *Response to Amendment*

This communication is responsive to the Amendment filed 8/23/2007.

Claims 1-18 are pending in this application.  Claims 1, 15 and 17 are independent

claims.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

Claims 1, 4-7, 12, 15 and 17 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Carlson ("Carlson", Carlson, Jeff.  <u>Visual Quickstart Guide Palm</u>

<u>Organizers</u>. Peachpit Press. 2000.  Berkeley, CA.) in view of Milic-Frayling et al ("Milic-

Frayling", US 2004/0100510) in view of Conrad et al ("Conrad", US 5,956,030).

NEONODE0000181

Application/Control Number: 10/315,250                                      Page 3
Art Unit: 2174

1.      As per claim 1, Carlson teaches a computer readable medium storing a computer

program with computer program code, which code, when read by a mobile computer unit

allows the computer to present a user interface for a mobile handheld computer unit

(Introduction, page xiii), where said computer unit comprises a touch sensitive area (page

26, *the screen is touch sensitive*), that is simultaneously divided into a menu area (page

12, fig. 1.10 *silk screen graffiti area*) and a display area, the computer unit is being

adapted to run several applications simultaneously (page 47, *all of the applications are*

*running concurrently*), and to present an active application on top of any other

application on said display area, characterised in, that said menu area is adapted to

present a representation of a first, a second and a third predefined function, that said first

function is a general application dependent function (page 28, *the Menu icon*, fig. 2.4),

that said second function is a keyboard function (page 30, *either the abc or 123 dots in*

*the lower corner of the Graffiti area*), that said third function is a task and file manager

(page 47, *the Applications screen* & fig. 2.35), and that any one of said three functions

can be activated when said touch sensitive area detects a movement of an object with its

starting point within the representation of said function on said menu area and with a

direction from said menu area to said display area (page 40, *bottom-to-top screen stroke*

*shortcut* fig. 2.22 & page 30, *drag the stylus vertically across the screen from bottom to*

*top*), said user interface allowing low precision navigation using a blunt object, whereby

said user interface can be operated by one hand (page 12, *"The stylus is the main method*

*of interacting with the PalmPilot"* and it inherently involves one hand to use the stylus.

Also, if a finger was used, that would also be considered using one hand), where said

blunt object is a finger (page 12, *"The stylus is the main method of interacting"* **though**

Application/Control Number: 10/315,250                                              Page 4
Art Unit: 2174

anything including fingers **can** work). Carlson fails to distinctly point out simultaneously

displaying a first, second, and third function. Milic-Frayling teaches the menu area being

adapted to simultaneously present representations of a first function, a second function,

and a third function (Figure 1 view Tools toolbar, with keyboard, file manager, etc.).

Therefore it would have been obvious to an artisan at the time of the invention to

combine the teaching of Milic-Frayling with the interface of Carlson. Motivation to do so

would have been to provide away to quickly access common functions and provide a user

with a large enough space.  The modified Carlson still does not explicitly point out

activation by a single step of an object moving in a direction on the touch sensitive area.

However, Conrad teaches activating by the single step of an object moving in a direction

from a starting point that is representation of the function in the menu area to the display

area (Figure 2, Column 2 lines 15-62). Therefore it would have been obvious to an artisan

at the time of the invention to combine the teaching of Venolia with the modified

Carlson. Motivation to do so would have been to provide easy access to windows.


2.      As per claim 4, the modified Carlson teaches the user interface according to claim

1, characterised in,

        that, if said second function is activated, said display area is adapted to display a

keyboard and a text field,

        that, if a text passage in said active application is highlighted, said text passage is

displayed in said text field for editing through said keyboard and that said highlighted

text passage is replaced by said edited text passage when said second function is

deactivated, and

Application/Control Number: 10/315,250                                    Page 5
Art Unit: 2174

that, if no text passage in said active application is highlighted, said text field is available for inputting and editing of text through said keyboard (Carlson, page 30, fig 2.7).

3.      As per claim 5, the modified Carlson teaches the user interface according to claim 4, characterized in, that if no text passage in said active application is highlighted, and said text field is used for inputting and editing of text through said keyboard (Carlson, page 30, fig 2.7), then

said first function can be activated, or

said second function can be closed, in which a choice of saving or deleting said inputted text is given, where the choice of saving said inputted text results in an activation of said first function,

in which said first function will present services or settings available for said inputted text (Carlson, page 28, fig. 2.4 *Beam Memo*).

4.      As per claim 6, the modified Carlson teaches the user interface according to claim 1, characterised in, that, if said third function is activated, said display area is adapted to display a list with a library of available applications and files on said computer unit, that a selection of an application will start said application, and that a selection of a file will open said file in an application intended for said file (Carlson, page 47, fig. 2.35).

5.      As per claim 7, the modified Carlson teaches the user interface according to claim 6, characterised in, that a selection of an application or a file is done by moving said object so that the representation of desired application or file is highlighted, removing said object from said touch sensitive area, and then tapping on said touch sensitive area,

NEONODE0000184

Application/Control Number: 10/315,250    Page 6
Art Unit: 2174

and that an application or file is highlighted by placing some kind of marking on the representation of said application or file (Carlson, pages 26 & 27).

6.    As per claim 12, the modified Carlson teaches the user interface according to Claim 1, characterised in, that an active application, function, service or setting is moved on one step by moving said object from the left of said display area to the right of said display area, and that the active application, function service or setting is closed or backed one step by moving said object from the right of said display area to the left of said display area (Carlson, page 246, fig. 14.2, *Drag to scroll through file*).

7.    As per claim 15, the modified Carlson teaches an enclosure adapted to cover a computer unit, said computer unit being adapted to present a user interface according Claim 1, characterised in, that said enclosure is provided with an opening for said display area, and that a representation of said menu area is printed on top of said enclosure (Carlson, page 12, *Silkscreen Graffiti area* & fig. 1.10).

8.    As per claim 17, the modified Carlson teaches a computer readable medium, with a computer program product stored therein, characterised in, that said computer program product comprises computer readable code, which, when read by a computer, will make it possible for said computer to present a user interface according to Claim 1 (Carlson, page 25, *Palm OS*).


Claims 2 and 3 are rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Peachpit Press. 2000. Berkeley, CA.), Milic-Frayling et al ("Milic-Frayling", US 2004/0100510)

NEONODE0000185

Application/Control Number: 10/315,250                                                    Page 7

Art Unit: 2174

and Conrad et al ("Conrad", US 5,956,030) in view of Kopitzke et al. ("Kopitzke", US #

6,988,246 B2).

9.      As per claim 2, the modified Carlson teaches the user interface according to claim

1, characterized in, that, if said first function is activated, said display area is adapted to

display icons representing different services or settings depending on the current active

application (Carlson, page 28, *the Menu icon*, fig. 2.4), and that, if no application is

currently active on said computer unit, said icons are adapted to represent services or

settings of the operations system of said computer unit (Carlson, page 47, fig. 2.36, *12:11*

*am*).

However the modified Carlson does not teach expressly the user interface

according to claim 1, characterized in, that, if said first function is activated, said display

area is adapted to display icons representing different services or settings depending on

the current active application, that one of said icons always represents a "help"-service,

regardless of application.

Kopitzke teaches the user interface according to claim 1, characterized in, that

said display area is adapted to display icons representing different services or settings

depending on the current active application, that one of said icons always represents a

"help"-service, regardless of application (column 4, lines 36-53 & fig. 1, *Help key or*

*button* 6).

The modified Carlson and Kopitzke are analogous art because they are in the

same field of endeavor, namely graphical user interfaces with touch sensitive displays.

NEONODE0000186

Application/Control Number: 10/315,250                                          Page 8
Art Unit: 2174

At the time of the invention it would have been obvious to a person of ordinary skill in the art to provide the help function as taught by Kopitzke within the user interface of the modified Carlson in order to provide context sensitive information.

As per claim 3, the modified Carlson teaches the user interface according to claim 2, characterised in, that a selection of a preferred service or setting is done by tapping on corresponding icon (Carlson, page 26, fig. 2.1 *Tapping just about any interface element in the Palm OS evokes a response*).

Claims 8-11 and 13 is rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Peachpit Press. 2000. Berkeley, CA.), Milic-Frayling et al ("Milic-Frayling", US 2004/0100510) and Conrad et al ("Conrad", US 5,956,030) in view of Wynn et al. ("Wynn", US # 6,734,883 B1).

10.     As per claim 8, the modified Carlson teaches the user interface according to claim 7. However the modified Carlson does not teach expressly the user interface, characterized in, that said list is adapted to present only said files or only said applications, that the top area of said list presents a field through which the content of said list can be altered, that, if said list only presents files, said field displays a representation of a task manager and a selection of said field will cause said list to alter to present only applications, and that, if said list only presents applications, said field displays a representation of a file manager and a selection of said field will cause said list to alter and present only files.

Application/Control Number: 10/315,250                                Page 9
Art Unit: 2174

Wynn teaches a user interface control, characterized in, that said list is adapted to present only said files or only said applications, that the top area of said list presents a field through which the content of said list can be altered (column 3, lines 4-8, *dialog box 32*), that, if said list only presents files, said field displays a representation of a task manager and a selection of said field will cause said list to alter to present only applications, and that, if said list only presents applications, said field displays a representation (column 3, lines 4-8, *label* 31) of a file manager and a selection of said field will cause said list to alter and present only files (column 3, lines 15-31).

The modified Carlson and Wynn are analogous art because they are in the same field of endeavor, namely scrolling within graphical user interfaces with touch sensitive displays.

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the selection list format as taught by Wynn within the user interface of the modified Carlson in order to provide a conventional list format.

11.     As per claim 9, the modifiedCarlson teaches the user interface according to claim 7, characterised in, that, a navigation in said list is performed by moving said object in a direction towards the top of said list or towards the bottom of said list, that the movement of said object will cause said marking to move in the same direction (Carlson, page 27, *a quicker way to view the full list is to tap and hold on the dark solid portion of the scroll bar, then drag it vertically*).

However the modified Carlson does not teach expressly that the speed of the movement of said marking is lower than the speed of the movement of said object.

Application/Control Number: 10/315,250                                              Page 10
Art Unit: 2174

Wynn teaches a user interface control, characterised in, that, a navigation in said list is performed by moving said object in a direction towards the top of said list or towards the bottom of said list, that the movement of said object will cause said marking to move in the same direction (column 3, lines 32-39 & figs. 5) and that the speed of the movement of said marking is lower than the speed of the movement of said object (column 4, lines 24-30).

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the scrolling function as taught by Wynn within the user interface of the modifiedCarlson in order to provide a conventional selection list.


12.    As per claim 10, the modified Carlson in view of Wynn teaches the user interface according to claim 9, characterised in, that, if the number of applications and/or files in said list exceeds the number of applications and files that can be presented on said display area, and if said object is moved to the top or bottom position of said display area, then lifted, replaced on said display area, and again moved to the top or bottom of said display area, the content of said display area will be replaced one whole page, meaning that if said object is positioned at the top of said display area, then lifted, replaced on said display area, and then again moved to the top of said display area, the content of said display area will be replaced by the preceding applications and/or files in said list (Carlson, page 253, fig. 14.15 *Full Page Up*).

The modified Carlson in view of Wynn does not disclose expressly the user interface, characterised in that if said object is positioned at the bottom of said display area, then lifted, replaced on said display area, and then again moved to the bottom of

NEONODE0000189

Application/Control Number: 10/315,250                                  Page 11
Art Unit: 2174

said display area, the content of said display area will be replaced by the following applications and/or files in said list.

At the time of the invention, it would have been an obvious matter of design choice to a person of ordinary skill in the art to modify the *Full Page Up* function (Carlson, page 253, fig 14.15) to work as a Full Page Down function by tapping on the bottom of the display area because Applicant has not disclosed that *if said object is positioned at the bottom of said display area, then lifted, replaced on said display area, and then again moved to the bottom of said display area, the content of said display area will be replaced by the following applications and/or files in said list* provides an advantage, is used for a particular purpose, or solves a stated problem. One of ordinary skill in the art, furthermore, would have expected Applicant's invention to perform equally well with the modified Full Page Up function as taught by Carlson because it would only need to be implemented to scroll down instead of up, when the display area is tapped on the bottom, instead of the top.

13.     As per claim 11, the modified Carlson in view of Wynn teaches the user interface according to claim 10, characterised in, that if said object is removed from any first position on said display area and then replaced on any second position on said display area, said navigation can be continued from said second position (Carlson, page 253, fig. 14.15).


Claim 13 is rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Peachpit Press.

NEONODE0000190

Application/Control Number: 10/315,250                                    Page 12
Art Unit: 2174

2000. Berkeley, CA.) Milic-Frayling et al ("Milic-Frayling", US 2004/0100510) and

Conrad et al ("Conrad", US 5,956,030).


14.     As per claim 13, the modified Carlson teaches the user interface according to

Claim 1, characterised in, that said menu area is positioned at the bottom of said touch

sensitive area, that said representation of said first function is positioned at the left side of

said menu area, and that said representation of said second function is positioned at the

middle of said menu area.

The modified Carlson does not teach expressly that said representation of said

third function is positioned at the right side of said menu area.

At the time the invention was made, it would have been an obvious matter of

design choice to a person of ordinary skill in the art to place the third function on the

right side of the display area instead of the left, because Applicant has not disclosed that

*said representation of said third function is positioned at the right side of said menu area*

provides an advantage, is used for a particular purpose or solves a stated problem. One of

ordinary skill in the art, furthermore would have expected Applicant's invention to

perform equally well with the third function on the left side of the display area because

the placement of the representation would not change its functionality.


Claims 14 and 16 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers. Berkeley,

CA: Peachpit Press, 2000), Milic-Frayling et al ("Milic-Frayling", US 2004/0100510)

NEONODE0000191

Application/Control Number: 10/315,250

Page 13

Art Unit: 2174

and Conrad et al ("Conrad", US 5,956,030) in view of Strietelmeier ("Strietelmeier", Strietelmeier, Julie. "Palm m100." The Gadgeteer. 2000. <http://www.the-gadgeteer.com/review/palm_m100_review>).

15.    As per claim 14, the modified Carlson teaches the user interface according to Claim 1, characterised in, that said user interface is adapted to a touch sensitive area and that said user interface is adapted to be operated by one hand, where said object can be a finger (page 12, *stylus…includes fingers*).

However the modified Carlson does not teach expressly a touch sensitive area with a size that is in the order of 2-3 inches.

Strietelmeier teaches a user interface, characterised in, a touch sensitive area with a size that is in the order of 2-3 inches (page 4).

The modified Carlson and Strietelmeier are analogous art because they are in the same field of endeavor, namely palm-sized computer organizers.

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the dimensions of a touch sensitive area as taught by Strietelmeier within the user interface of the modified Carlson in order to provide a touch sensitive area with the manufacturer's dimensions.

16.    As per claim 16, the modified Carlson teaches the enclosure according to claim 15. However, the modified Carlson does not disclose the enclosure characterised in, that said enclosure is removable and exchangeable.

NEONODE0000192

Application/Control Number: 10/315,250                                                    Page 14
Art Unit: 2174

Strietelmeier teaches an enclosure characterised in, that said enclosure is removable and exchangeable (page 3, *you can also remove the entire face plate… there will be different face plates available*).

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the customizable enclosures as taught by Strietelmeier within the enclosure of the modified Carlson in order to tailor an enclosure to a user's preferences.

17.    Claim 18 is rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff.  Visual Quickstart Guide Palm Organizers. Berkeley, CA: Peachpit Press, 2000), Milic-Frayling et al ("Milic-Frayling", US 2004/0100510) and Conrad et al ("Conrad", US 5,956,030) in view of Chew et al. ("Chew", US # 6,727,917).

18.    As per claim 18, the modified Carlson teaches a computer readable medium according to claim 17.

However the modified Carlson does not teach expressly, that said computer program product is adapted to function as a shell upon an operations system.

Chew teaches a user interface for a palm-sized computer device, characterized in, that said computer program product is adapted to function as a shell upon an operations system (column 2, lines 1-5).

The modified Carlson and Chew are analogous art because they are in the same field of endeavor, namely graphical user interfaces for hand-held personal computing devices with touch sensitive displays.

NEONODE0000193

Application/Control Number: 10/315,250                                    Page 15
Art Unit: 2174

At the time of the invention it would have been obvious to a person of ordinary skill in the art to further modify the modified Carlson program to function as shell as taught by Chew in order to efficiently display information.

### *Response to Arguments*

Applicant's arguments with respect to claims 1-18 have been considered but are moot in view of the new ground(s) of rejection.

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Ryan F. Pitaro whose telephone number is 571-272-4071. The examiner can normally be reached on 7:00am - 4:30pm Mondays through Fridays.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Kristine Kincaid can be reached on 571-272-4063. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

NEONODE0000194

Application/Control Number: 10/315,250                                    Page 16
Art Unit: 2174

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system. Status information for

published applications may be obtained from either Private PAIR or Public PAIR. Status

information for unpublished applications is available through Private PAIR only. For

more information about the PAIR system, see http://pair-direct.uspto.gov. Should you

have questions on access to the Private PAIR system, contact the Electronic Business

Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO

Customer Service Representative or access to the automated information system, call

800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Sy D Luu/
Primary Examiner, Art Unit 2174

Ryan Pitaro
Patent Examiner
Art unit 2174

RFP

NEONODE0000195

| | Notice of References Cited | Application/Control No. 10/315,250 | Applicant(s)/Patent Under Reexamination GOERTZ, MAGNUS | |
|---|---|---|---|---|
| | | Examiner Ryan F. Pitaro | Art Unit 2174 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-5,956,030 | 09-1999 | Conrad et al. | 715/769 |
| * | B | US-2004/0100510 | 05-2004 | Milic-Frayling et al. | 345/864 |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**                    Part of Paper No. 20071109

NEONODE0000196

| | Index of Claims | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| | | 10315250 | GOERTZ, MAGNUS |
| | | Examiner | Art Unit |
| | | Ryan F Pitaro | 2174 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| ☐ Claims renumbered in the same order as presented by applicant | | ☐ CPA | ☐ T.D. | ☐ R.1.47 |
|---|---|---|---|---|

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | | | | | | | | |
| | 1 | ✓ | | | | | | | | |
| | 2 | ✓ | | | | | | | | |
| | 3 | ✓ | | | | | | | | |
| | 4 | ✓ | | | | | | | | |
| | 5 | ✓ | | | | | | | | |
| | 6 | ✓ | | | | | | | | |
| | 7 | ✓ | | | | | | | | |
| | 8 | ✓ | | | | | | | | |
| | 9 | ✓ | | | | | | | | |
| | 10 | ✓ | | | | | | | | |
| | 11 | ✓ | | | | | | | | |
| | 12 | ✓ | | | | | | | | |
| | 13 | ✓ | | | | | | | | |
| | 14 | ✓ | | | | | | | | |
| | 15 | ✓ | | | | | | | | |
| | 16 | ✓ | | | | | | | | |
| | 17 | ✓ | | | | | | | | |
| | 18 | ✓ | | | | | | | | |

U.S. Patent and Trademark Office

Part of Paper No. : 20071109

NEONODE0000197

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 10315250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** |
| | Ryan F Pitaro | 2174 |

## SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| Update | Search | 11/8/2007 | RFP |

## SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| Update Search | 11/8/2007 | RFP |

## INTERFERENCE SEARCH

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

U.S. Patent and Trademark Office

Part of Paper No. : 20071109

NEONODE0000198

PTO/SB/06 (07-06)
Approved for use through 1/31/2007. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>10/315,250 | Filing Date<br>12/10/2002 | ☐ To be Mailed |
|---|---|---|---|

## APPLICATION AS FILED – PART I

| | (Column 1) | (Column 2) | SMALL ENTITY ☒ | | OR | OTHER THAN<br>SMALL ENTITY | |
|---|---|---|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) | | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | X $ = | | OR | X $ = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | X $ = | | | X $ = | |
| ☐ APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | | TOTAL | |

## APPLICATION AS AMENDED – PART II

| | | (Column 1) | | (Column 2) | (Column 3) | SMALL ENTITY | | OR | OTHER THAN<br>SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 03/13/2008 | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | | RATE ($) | ADDITIONAL FEE ($) |
| AMENDMENT | Total (37 CFR 1.16(i)) | * 47 | Minus | ** 20 | = | X $ = | | OR | X $ = | |
| | Independent (37 CFR 1.16(h)) | * 8 | Minus | ***3 | = | X $ = | | OR | X $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

| | | (Column 1) | | (Column 2) | (Column 3) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | | RATE ($) | ADDITIONAL FEE ($) |
| AMENDMENT | Total (37 CFR 1.16(i)) | * | Minus | ** | = | X $ = | | OR | X $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | X $ = | | OR | X $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Legal Instrument Examiner:
/JAMES F. ELLIOTT/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

NEONODE0000199

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of: Magnus Goertz

Serial No.: 10/315,250

Filed: December 10, 2002

Title: User Interface

Attorney Docket No.: 12511-00003 (New)
        (3682-32) (Previous)

Group Art Unit: 2174

Examiner: Ryan F. Pitaro

Confirmation No.: 1226

Commissioner for Patents           March 14, 2008
Alexandria, VA 22313-1450

## AMENDMENT AND RESPONSE TO NON-FINAL OFFICE ACTION

This is in response to the Office Action (paper no. 20071109) regarding the above-identified patent application that was mailed from the U.S. Patent and Trademark Office on November 14, 2007.

A **Status of the Claims** starts on the following page 2.

**Remarks concerning the Office Action** start on the following page 15.

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375

Page 1 of 32

NEONODE0000200

**STATUS OF THE CLAIMS**

1.  **(Currently Amended)**  A computer readable medium storing a computer program with computer program code, which ~~code~~, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

    a touch sensitive area that is simultaneously divided into a menu area and a display area,

    the mobile handheld computer unit being adapted to run several applications simultaneously, and to present an active application on top of any other application on ~~the~~ said display area, characterised in, that:

    ~~the~~ said menu area simultaneously ~~presenting~~ presents representations of a first function that is a general application dependent function, a second function that is a keyboard function, and a third function that is a task and file manager, and

    each of ~~the three~~ said first, second, and third functions simultaneously represented in ~~the~~ said menu area being activated by the single step of ~~an~~ a blunt object moving in a direction from a starting point that is the representation of the corresponding one of said first, second, and third functions in ~~the~~ said menu area to ~~the~~ said display area being detected by ~~the~~ said touch sensitive area, thereby allowing low precision navigation of the user interface using ~~a~~ the blunt object, so that the user interface can be operated by one hand, where the blunt object is a finger.

2.  **(Currently Amended)**  The computer readable medium of claim 1, wherein the mobile handheld computer unit runs an operating system, the user interface is ~~characterized~~ characterised in, that, if said first function is activated, ~~said display area~~ the user interface is adapted to display icons representing different services or settings depending on the current active application, that one of said icons always represents a "help"-service, regardless of application, and that, if no application is current active on ~~said~~ the mobile handheld computer unit, said icons are adapted to represent services or settings of the operating system of ~~said~~ the mobile handheld computer unit.

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

Page 2 of 32

NEONODE0000201

3.  **(Previously Presented)**  The computer readable medium of claim 2, wherein the user interface is characterised in, that a selection of a preferred service or setting is done by tapping on a corresponding icon.

4.  **(Previously Presented)**  The computer readable medium of claim 1, wherein the user interface is characterised in,
    - that, if said second function is activated, said display area is adapted to display a keyboard and a text field,
    - that, if a text passage in said active application is highlighted, said text passage is displayed in said text field for editing through said keyboard and that said highlighted test passage is replaced by said edited text passage when said second function is deactivated, and
    - that, if no text passage in said active application is highlighted, said text field is available for inputting and editing of text through said keyboard.

5.  **(Previously Presented)**  The computer readable medium of claim 4, wherein the user interface is characterised in, that if no text passage in said active application is highlighted, said text field is used for inputting and editing of text through said keyboard, then
    - said first function can be activated, or
    - said second function can be closed, in which a choice of saving or deleting said inputted text is given, where the choice of saving said inputted text results in an activation of said first function,
    in which said first function will present services or settings available for said inputted text.

6.  **(Currently Amended)**  The computer readable medium of claim 1, wherein the user interface is characterised in, that, if said third function is activated, said display area is adapted to display a list with a library of available applications and files on ~~said~~the mobile handheld computer unit, that a selection of an application will start said application, and that a selection of a file will open said file in an application intended for said file.

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

NEONODE0000202

7. **(Currently Amended)**  The computer readable medium of claim 6, wherein the user interface is characterised in, that a selection of an application or file is done by moving ~~said~~ the blunt object so that ~~the~~ a representation of a desired one of said application or file is highlighted, removing said object from said touch sensitive area, and then tapping on said touch sensitive area, and that ~~an~~ said desired one of said application or file is highlighted by placing some kind of marking on ~~the~~ said representation of said application or file.

8. **(Currently Amended)**  The computer readable medium of claim 7, wherein the user interface is characterised in, that said list is adapted to present only said files or only said applications, that ~~the~~ a top area of said list presents a field through which the content of said list can be altered, that, if said list only presents files, said field displays a representation of a task manager and a selection of said field will cause said list to alter to present only applications, and that, if said list only presents applications, said field displays a representation of a file manager and a selection of said field will cause said list to alter and present only files.

9. **(Currently Amended)**  The computer readable medium of claim 7, wherein the user interface is characterised in, that, a navigation in said list is performed by moving ~~said~~ the blunt object in a direction towards the top of said list or towards the bottom of said list, that the movement of ~~said~~ the blunt object will cause said marking to move in the same direction, and that the speed of movement of said marking is lower than the speed of movement of ~~said~~ the blunt object.

10. **(Currently Amended)**  The computer readable medium of claim 9, wherein the user interface is characterised in, that, if the number of applications and/or files in said list exceeds the number of application and files that can be presented on said display area as content, and if ~~said~~ the blunt object is moved to the top of bottom position of said display area, then lifted, replaced on said display area, and again moved to the top of bottom of said display area, the content of said display area will be replaced one whole page, meaning that if

Page 4 of 32

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

NEONODE0000203

said the blunt object is positioned at the bottom of said display area, replaced on said display area, and then again moved to the bottom of said display area, the content of said display area will be replaced by the following applications and/or files in said list, and if said the blunt object is positioned at the top of said display area, then lifted, replaced on said display area, and then again moved to the top of said display area, the content of said display area will be replaced by the preceding applications and/or files in the list.

11. **(Currently Amended)** The computer readable medium of claim 10, wherein the user interface is characterised in, that if said the blunt object is removed from any first position on said display area and then replaced on any second position on said display area, said navigation can be continued from said second position.

12. **(Currently Amended)** The computer readable medium of claim 1, wherein the user interface is characterised in, that an active application, function, service or setting is moved on one step by moving said the blunt object from the left of said display area to the right of said display area, and that the active application, function, service or setting is closed or backed one step by moving said the blunt object from the right of said display area to the left of said display area.

13. **(Previously Presented)** The computer readable medium of claim 1, wherein the user interface is characterised in, that said menu area is positioned at the bottom of said touch sensitive area, that said representation of said first function is positioned at the left side of said menu area, that said representation of said second function is positioned at the middle of said menu area, and that said representation of said third function is positioned at the right side of said menu area.

14. **(Currently Amended)** The computer readable medium of claim 1, wherein the user interface is characterised in, that said user interface is adapted to a touch sensitive area with a size that is on the order of 2-3 inches in diagonal dimension, and that said user interface is

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375

NEONODE0000204

adapted to be operated by one hand when the mobile handheld computer unit is held in the one hand, wherein said blunt object ~~can be~~is a ~~finger~~fleshy part of the thumb of the one hand.

15. **(Currently Amended)**  An enclosure adapted to cover ~~a computer unit, said computer unit being adapted to read computer program code of a computer program stored on a computer readable medium, which code, when read, presents a user interface~~the mobile handheld computer unit according to Claim 1, characterised in, that said enclosure is provided with an opening for said display area, and that a representation of said menu area is printed on top of said enclosure.

16. **(Previously Presented)**  The enclosure according to claim 15, characterised in, that said enclosure is removable and exchangeable.

17. **(Original)**  A computer readable medium, with a computer program product stored therein, characterised in, that said computer program product comprises computer readable code, which, when read by a computer, will make it possible for said computer to present a user interface according to Claim 1.

18. **(Original)**  A computer readable medium according to claim 17, characterized in, that said computer program product is adapted to function as a shell upon an operating system.

19. **(New)**  An apparatus, comprising:

a computing device configured to provide a plurality of features and/or services to a user, said computing device including a user interface that comprises:

a touchscreen for displaying to the user, individually at differing times, a plurality of display screens corresponding to said plurality of features and/or services and for allowing the user to navigate among said various differing features and/or services and among said plurality of display screens; and

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

NEONODE0000205

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to navigate among said plurality of features and/or services and among said plurality of display screens, said user interface software configured to:

when said touchscreen is displaying a first display screen of said plurality of display screens, cause said computing device to display a second display screen of said plurality of display screens in response to a first sweeping movement of the object along said touchscreen in a first direction, said computing device displaying said second display screen after the object has traversed a first predetermined extent of said touchscreen along said first direction; and

when said touchscreen is displaying said second display screen, cause said computing device to display said first display screen in response to a second sweeping movement of the object along said touchscreen in a second direction opposite said first direction, said computing device displaying said first display screen only after the object has traversed a second predetermined extent of said touchscreen along said second direction.

20. **(New)** An apparatus according to claim 19, wherein said touchscreen has a left edge and a right edge when said touchscreen is properly oriented for viewing by the user and said first direction proceeds from a location at or proximate said left edge toward said right edge and said second direction proceeds from a location at or proximate said right edge toward said left edge.

21. **(New)** An apparatus according to claim 20, wherein said touchscreen has a width extending from said left edge to said right edge and each of said first and second extents is substantially equal to said width.

22. **(New)** An apparatus according to claim 21, wherein said touchscreen has a diagonal dimension of two inches to three inches.

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

NEONODE0000206

23. **(New)** An apparatus according to claim 19, wherein said computing device is sized to be cradled in a hand of an adult human user and so that, when so cradled, all points on said touchscreen are touchable by the thumb of the adult human user, the object being the thumb of the hand.

24. **(New)** An apparatus according to claim 19, wherein each of the first and second sweeping movements does not drag any graphical feature displayed on said touchscreen during that one of the first and second sweeping movements.

25. **(New)** An apparatus, comprising:

a computing device configured to provide first and second menu-area functions to a user, said first menu-area function having a first-function display screen and said second menu-area function having a second-function display screen differing from said first-function display screen, said computing device including a user interface that comprises:

a touchscreen simultaneously divided into a menu region and a display region, said menu region containing first and second representations corresponding respectively to said first and second menu-area functions, said display region for displaying to the user at differing times said first-function and second-function display screens; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to select at differing times each of said first and second menu-area functions, said user interface software configured to:

display said first-function display screen in response to a first sweeping movement of the object along said touchscreen, the first sweeping movement starting at said first representation in said menu region and proceeding into said display region; and

display said second-function display screen in response to a second sweeping movement of the object along said touchscreen, the second sweeping movement starting at said second representation in said menu region and proceeding into said display region.

Page 8 of 32

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375

NEONODE0000207

26. **(New)** An apparatus according to claim 25, wherein:

said touchscreen has a first edge and a second edge spaced from said first edge;

said first and second representations are each located proximate said first edge and spaced from one another along said first edge; and

the first and second sweeping movements each proceed in a direction toward said second edge.

27. **(New)** An apparatus according to claim 25, wherein said first-function display screen contains a plurality of icons corresponding respectively to a plurality of applications, said user interface software configured to activate any one of said plurality of applications in response to the user tapping the object on said touchscreen at a corresponding one of said plurality of icons.

28. **(New)** An apparatus according to claim 27, wherein said second-function display screen contains a set of application functions, said set varying as a function of which one of said plurality of applications is active when the user makes the second movement.

29. **(New)** An apparatus according to claim 27, wherein a particular application of said plurality of applications has a plurality of application screen displays, said user interface software configured so that when said particular application is active, the user forwardly steps through said plurality of application screen displays by sweeping the object across said touchscreen in a first direction and reversely steps through said plurality of application screen displays by sweeping the object across said touchscreen in a second direction opposite said first direction.

30. **(New)** An apparatus according to claim 25, wherein said first display screen contains a soft-interface telephony keypad.

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375

NEONODE0000208

31. **(New)** An apparatus, comprising:

a computing device configured to run a software application configured to display a plurality of predetermined display screens, said computing device including a user interface that comprises:

a touchscreen for displaying to the user, individually at differing times, said plurality of predetermined display screens and for allowing the user to navigate among said plurality of predetermined display screens; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to navigate among said plurality of predetermined display screens, said user interface software configured to:

activate said software application in response to a particular interaction of the object with said touchscreen;

forwardly step in series through ones of said plurality of predetermined display screens in response to corresponding respective individual instances of a first sweeping movement of the object along said touchscreen in a first direction; and

reversely step in series through ones of said plurality of predetermined display screens in response to corresponding respective individual instances of a second sweeping movement of the object along said touchscreen in a second direction different from said first direction.

32. **(New)** An apparatus according to claim 31, wherein said particular interaction of the object with said touchscreen to activate said software application is a third sweeping movement of the object along said touchscreen in a third direction different from each of said first and second directions.

33. **(New)** An apparatus according to claim 32, wherein said first and second directions are opposite one another and said third direction is perpendicular to each of said first and second directions.

Page 10 of 32

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

NEONODE0000209

34. **(New)** An apparatus, comprising:

a computing device configured to run software for providing to a user a plurality of services and/or functions, said computing device including:

a touchscreen for displaying to the user a graphical user interface and for allowing the user to navigate among said plurality of services and/or functions; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to navigate among said plurality of services and/or functions, said user interface software configured to:

present, in response to a sweeping movement of the object across said touchscreen, a display screen containing a plurality of display icons corresponding respectively to ones of said plurality of services and/or functions, the sweeping movement being spatially uncorrelated with information displayed on said touchscreen; and

when said touchscreen is displaying said plurality of display icons, launch one of said plurality of services and/or functions in response to the user tapping the object on said touchscreen at a location where said touchscreen displays the corresponding one of said plurality of display icons.

35. **(New)** An apparatus according to claim 34, wherein said computing device contains a software application and said user interface is configured to present said plurality of display icons only if said software application is active during the sweeping movement of the object.

36. **(New)** An apparatus according to claim 35, wherein when said software application is active during the sweeping of the object, said display icons correspond to services and/or functions specific to said software application.

37. **(New)** An apparatus, comprising:

a computing device containing software for providing to a user a plurality of services and/or functions, said computing device including:

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375

NEONODE0000210

a touchscreen for displaying to the user, individually at differing times, ones of various display screens associated with said plurality of services and/or functions and for allowing the user to navigate among said plurality of display screens so as to provide the user with access to said plurality of services and/or functions and for allowing the user to control functioning of ones of said plurality of services and/or functions; and

user interface software responsive to a set of movements of an object with respect to said touchscreen so as to allow the user to navigate among said plurality of display screens and to control functioning of ones of said plurality of services and/or functions, said set of movements including a plurality of sweeping movements having differing directionalities along said touchscreen, wherein said plurality of sweeping movements being spatially uncorrelated with information displayed on said touchscreen, said user interface software being configured to distinguish the plurality of sweeping movements from one another as a function of the differing directionalities so as to provide differing responses as a function of said differing directionalities.

38. **(New)** An apparatus according to claim 37, wherein two sweeping movements of the plurality of sweeping movements have opposing directionality and said user interface software is configured to provide two opposing responses corresponding respectively to said two sweeping movements.

39. **(New)** An apparatus according to claim 38, wherein one of the two opposing responses is moving forward in a series of display screens and the other of the two opposing responses is moving backward in the series of display screens.

40. **(New)** An apparatus according to claim 37, wherein each of the plurality of sweeping movements does not drag any graphical feature displayed on said touchscreen during that one of the plurality of sweeping movements.

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

NEONODE0000211

41. **(New)** An apparatus, comprising:

a computing device configured to provide a plurality of features, settings, applications and/or services to a user, said computing device including a user interface that comprises:

a touchscreen for displaying to the user a list of items corresponding to at least one of a plurality of features, settings, applications and/or services and for allowing the user to select any one of said items using said list; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to navigate among said list and to select any one of said items, said user interface software configured to move a highlight marking, having a displayed location on said touchscreen, in a desired direction within said list in response to the user:

(a) contacting said touchscreen with the object at a first location that is a function of the desired direction, not said displayed location of said highlight marking;

(b) while keeping the object in contact with said touchscreen, moving the object along said touchscreen in the desired direction to a second location; and

(c) immediately following said moving of the object along said touchscreen to said second location, lifting the object from said touchscreen so as to establish a new location of said highlight marking.

42. **(New)** An apparatus according to claim 41, wherein said user interface software is configured to, after the user has marked a desired one of said items by performing steps (a) through (c) so as to highlight said desired one with the highlight marking, select said desired one in response to the user tapping the object on said touchscreen without regard to said display location of the highlight marking.

43. **(New)** An apparatus, comprising:

a computing device configured to provide a plurality of features, settings, applications and/or services to a user, said computing device including a user interface that comprises:

Page 13 of 32

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375

NEONODE0000212

a touchscreen for displaying to the user a list of items corresponding to at least one of said plurality of features, settings, applications and/or services and for allowing the user to select any one of said items using said list; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to scroll said list and to select any one of said plurality items, said user interface software configured to scroll said list in a desired direction in response to the user:

    (a) contacting said touchscreen with the object at a first location that is a function of the desired direction of said scroll and that is not based on any soft scroll control displayed on said touchscreen; and

    (b) while keeping the object in contact with said touchscreen, moving the object along said touchscreen in the desired direction to a second location, wherein said moving of the object causes said list to scroll in the desired direction.

44. **(New)** An apparatus according to claim 43, wherein said user interface software is configured to activate a selected one of said items in response to a user tapping the object on said touchscreen following the user lifting the object from the touchscreen after the user performs step (b).

45. **(New)** An apparatus according to claim 43, wherein said items are files.

46. **(New)** An apparatus according to claim 43, wherein said items are email messages.

47. **(New)** An apparatus according to claim 43, wherein each item is contact information for a corresponding contact.

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

NEONODE0000213

## REMARKS

Claims 1-47 are presently pending. Claims 1, 2 and 6-12, 14 and 15 have been amended for form and not for reasons relating to patentability of the claims in view of the references of record. Claims 19-47 are new.

Applicant respectfully requests reconsideration of the application in view of the foregoing amendments and the remarks appearing below.

### The Current Patent Application

Before addressing in detail the specific rejections made in the current Office Action, Applicant would like to emphasize that the unique touchscreen-based user interface of the current patent application allows a user to navigate among, for example, applications, display screens, services, functions and settings using "low-precision" navigation techniques. These techniques are very different from conventional touchscreen interfaces, such as the touchscreen-based user interface of the Palm operating system described in the Carlson publication, which is addressed in detail below in the context of the rejections set forth in the present Office Action. Such conventional touchscreen-based user interfaces typically require the precise locating of a pointing object, for example a stylus, within clearly identified bounds of a displayed graphical feature, such as a page-up or page-down icon, scroll bar, button, menu item, application icon, etc., to effect a desired action.

Low-precision navigation user interfaces made in accordance with the current application can be implemented on very small touchscreens, for example, on the order of 2 inches to 3-inches in diagonal dimension, yet still allow very easy and accurate navigation with, for example, a user's thumb (even when gloved), despite the fact that the (gloved) thumb covers a significant portion of the small screen during a navigation operation. For a demonstration of a number of features disclosed in the current patent application and covered by the claims therein and in the present Response, the Examiner is encouraged to access http://www.neonode.com/en-us/on-stage/products/n2/introduction/ and watch the video demonstration of the N2 mobile phone/personal digital assistant device made by Neonode AB. The N2 device and its

Page 15 of 32

NEONODE0000214

predecessor N1 device each incorporate many of the low-precision navigation features originally disclosed in the current application. Applicant encourages the Examiner to view the demonstration video at the above-identified URL prior to reviewing Applicant's arguments below. If the Examiner is unable to view the demonstration video, Applicant respectfully requests that the Examiner contact the below-signed attorney to arrange an alternative demonstration of the N2 and/or N1 devices.

## Rejections under 35 U.S.C. § 103

### *Carlson/Milic-Frayling/Conrad*

Claims 1, 4-7, 12, 15 and 17 stand rejected under 35 U.S.C. § 103(a) as being obvious in view of a combination of Carlson, Jeff, Visual Quickstart Guide Palm Organizers, Peachpit Press, Berkley, California, 2000 ("the Carlson publication"), U.S. Patent Application Publication No. 2004/0100510 to Milic-Frayling et al. ("the Milic-Frayling publication") and U.S. Patent No. 5,956,030 to Conrad et al. ("the Conrad patent"). Applicant respectfully disagrees.

The Carlson publication describes features and functionality of the Palm operating system (OS) (circa version 3.5) for personal organizer devices. Particular aspects of the Palm OS are described below in connection with specific rejections in which the U.S. Patent and Trademark Office (USPTO) raises those particular aspects. At a high level, however, Applicant notes that the Palm OS provides a user interface for use with a stylus or other object that primarily functions as either a pointer (e.g., when selecting a button, when selecting a menu choice, when dragging a slider-type icon or when highlighting text) or as a writing implement (e.g., when using the Palm GRAFFITI® handwriting recognition software to input letters and numerals). It is noted that, prior to the Palm OS, both of these functionalities were well known to be implemented in conventional mouse-based and tablet-based user interfaces. An exception to these functionalities in the context of the Palm OS is the ability to activate a single user-selected one of a predetermined set of features, namely, the backlight, keyboard, Graffiti-help, turn-off-and-lock, and beam-data features. See FIG. 2.22 and accompanying text of the Carlson publication directed to customizing buttons and selecting preferences for a description of this

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

NEONODE0000215

functionality. In this exception, the Palm OS provides a single bottom-of-screen-to-top-of-screen stroke shortcut for quickly activating the chosen feature from the set of features.

The Milic-Frayling publication discloses a Web browser adapted for use on small displays, such as touchscreens, as typically found on handheld devices. Generally, the Milic-Frayling browser includes a page-display region and software that selects Web page content for displaying in the page-display region and formats that content for the small page display region. The browser has a menu bar beneath the display region. Referring to FIG. 2 of the Milic-Frayling publication, the menu bar contains a number of buttons including what appears to be a home button, a back button, a reload-page button, a "View Tools" button and a folder button, among others. It appears that a user can select any one of these buttons by tapping with a stylus on the touchscreen at the location of the desired button. See, for example, paragraph [0041] of the Milic-Frayling publication.

The Conrad patent discloses a system for managing windows on a computer screen. The system allows a user to, effectively, close windows by dragging them to a drawer region. When a window is in the drawer region of the screen, it is represented by a "drawer identifier" (see, e.g., drawer identifiers D1 through D4 in each of FIGS. 1-3 of the Conrad patent) that takes up much less screen-space than the window when open. When a window is in a drawer state, a user can open the window by clicking on the drawer identifier or dragging a cursor or an object, such as a file or folder, to the drawer identifier. An open window may be put into the drawer state by double clicking in a menu bar of the open window.

Turning now to the specific claim rejections, claim 1, as amended for clarity and not patentability, requires among other things that "each of said first, second, and third functions simultaneously represented in said menu area being activated by the single step of a blunt object moving in a direction from a starting point that is the representation of the corresponding one of said first, second, and third functions in said menu area to said display area being detected by said touch sensitive area." In rejecting independent claim 1, the USPTO asserts that the Carlson publication teaches this step by virtue of the Palm OS's bottom-of-screen-to-top-of-screen

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

NEONODE0000216

single-stroke shortcut described above that allows a user to activate a single pre-selected feature of a small set of available features.

Two points regarding the Palm OS single-stroke shortcut are in order. First, the stroking movement is not linked at all to a corresponding representation of the feature activated by the stroke. In other words, the shortcut stroke itself has no relation whatsoever to the presence of representations in the menu area. Again, it is simply a shortcut set to the user's preference without regard to any representations being in the menu area. Second, the shortcut stroke must start in the Graffiti region. If the stroke is started over one of the icons to the left or right of the Graffiti region, the feature set as a preference will not start. Furthermore, none of the features (home, menu, calculator, find) having a representation outside the Graffiti region can be activated using the shortcut stroke. Again, the only features that the Palm OS allows for assigning to the shortcut stroke are the backlight, keyboard, Graffiti-help, turn-off-and-lock, and beam-data features, and only one feature can ever be activated using the shortcut stroke without the user changing the preference selected.

In view of the foregoing, it is clear that the Carlson publication does not disclose or suggest the limitation of claim 1 of "each of said first, second, and third functions simultaneously represented in said menu area being activated by the single step of a blunt object moving in a direction from a starting point that is the representation of the corresponding one of said first, second, and third functions in said menu area to said display area being detected by said touch sensitive area." Emphasis added. More particularly, the Carlson publication does not disclose or suggest that each of three functions having simultaneous representations in the menu area can be activated by the single step movement nor that the movement starts on the corresponding representation of the function to be activated.

Also in rejecting independent claim 1, the USPTO asserts that "Conrad teaches activating by a single step of an object moving in a direction from a starting point that is [the] representation of the function in the menu area to the display area" and directs Applicant to Figure 2 and col. 2, lines 15-62 of the Conrad patent in support of this asserted teaching. Applicant respectfully disagrees that the Conrad patent teaches this.

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375

NEONODE0000217

Applicant has reviewed the cited passage at col. 2, lines 15-62 of the Conrad patent and fails to find any mention of activating by moving an object away from a menu area into a display area. In fact, the Conrad patent appears to teach the opposite. The cited passage teaches opening for viewing a window "parked" in the drawer region (which is at the bottom of the screen) in three ways: 1) clicking in the drawer identifier (menu title bar); 2) dragging the cursor from the display region above the drawer identifier into the identifier; and 3) dragging an object desired to be placed in the parked window from the display region above the drawer identifier into the identifier. None of these actions involves movement of an object from a representation of a function in a menu area to a display area. In fact, all three disclosed movements are in the opposite direction relative to the direction of movement in claim 1.

This is further supported by Figures 1 and 2 of the Conrad patent. According to the written description of Figures 1 and 2 appearing at col. 5, line 64 to col. 6, line 23, of the Conrad patent, Figure 1 illustrates a path (6) along which a user moves a cursor (5) from a window region (8) of a desktop (20) toward a drawer region (9) (specifically, drawer D2 in this example) in anticipation of opening the window (200 in FIG. 2) corresponding to drawer D2. As explained at col. 6, lines 21-23, of the Conrad patent in connection with FIG. 2, window 200 is opened in response to the user moving the cursor 5 into the drawer region 9, specifically drawer D2. Window 200 is moved off screen, i.e., the drawer is closed, by the user moving the cursor 5 along the path (203) illustrated in Figure 2.

Generally drawing parallels between the window (drawer) opening and closing functionality disclosed in the Conrad patent and the function-opening functionality of the movement described in claim 1 (and setting aside the fact that the cursor (5) of the Conrad patent is not a user's thumb), it is readily seen that the corresponding respective movements are opposite one another. In Conrad, a window (drawer) is opened by moving a cursor toward and into the drawer region from the window region, and in present claim 1, a function is activated by moving an object (finger) from the menu area into the display area. Consequently, Applicant respectfully submits that the Conrad patent, in fact, does not disclose or suggest the step of activating a function by moving a blunt object "in a direction from a starting point that is the

Page 19 of 32

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

NEONODE0000218

representation of the corresponding one of said first, second, and third functions in said menu area to said display area." Furthermore, the Conrad patent is completely silent on the movement being of a "blunt object" and "being detected by said touch sensitive area," as also required by amended claim 1.

For at least the foregoing reasons, Applicant respectfully submits that neither amended independent claim 1, nor claims 4-7, 12, 15 and 17 that depend therefrom, are rendered obvious in view of the applied combination.

Regarding claim 4, this claim requires among other things the limitation of "if a text passage in said active application is highlighted, said text passage is displayed in said text field for editing through said keyboard." In contrast, the Palm OS does not display the highlighted text as a function of the highlighting but rather as a function of which data field is active when the keyboard is opened. For example, in the Palm address application, if an address field is selected when the keyboard is opened, the keyboard displays the contents of that field, regardless of whether or not it contains any text and whether or not text is highlighted. Since the Carlson publication does not disclose or suggest the limitation of "if a text passage in said active application is highlighted, said text passage is displayed in said text field for editing through said keyboard," dependent claim 4 is not rendered obvious by the applied combination for at least this additional reason.

Regarding dependent claim 5, this claim requires among other things the limitation that "said second function can be closed, in which a choice of saving or deleting said inputted text is given, where the choice of saving said inputted text results in an activation of said first function." [Emphasis added.] The keyboard function of the Palm OS does not give the user a choice of saving or deleting in connection with the second function (i.e., keyboard) being closed. Rather, when a user closes the keyboard of the Palm OS, the contents of the keyboard text field will automatically be input to text field that was active when the user opened the keyboard. The Palm OS does not provide any choices upon closing the keyboard. In addition, since there is no choice of saving in the Palm OS, *a fortiori*, there also is no activation of a first function as a result of the choice of saving as also required by the above-recited limitation of claim 5. Regarding the

Page 20 of 32

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375

NEONODE0000219

USPTO's assertion in item 3 on page 5 of the current Office Action that the "beam memo" feature has relevance to the recited limitation, Applicant respectfully asserts that this feature must be manually selected by the user, either using a drop-down menu in the memo application of the Palm OS or using the shortcut stroke discussed above. For at least these additional reasons, the applied combination cannot render obvious dependent claim 5.

Regarding dependent claim 6, the claim requires among other things the limitation of "a selection of an application will start said application, and that <u>a selection of a file will open said file in an application intended for said file</u>." [Emphasis added.] In rejecting this claim, the USPTO directs Applicant to page 47 and Figure 2.35 of the Carlson publication. However, Figure 2.35 clearly shows that the Palm OS only displays applications in a list, not files. Therefore, Carlson fails to disclose or suggest at least the limitation of claim 6 that the selection of a file will open that file in an application intended for the file. Moreover, the USPTO is reminded that there is no teaching or suggestion in any of the references of the applied combination for opening a third function (file and task manager) as discussed above relative to claim 1. For at least these additional reasons, dependent claim 6 is not rendered obvious by the applied combination.

Regarding claim 7, this claim requires among other things the limitation that "a selection of an application or file is done by moving the blunt object so that a representation of a desired one of said application or file is highlighted, <u>removing said object from said touch sensitive area, and then tapping</u> on said touch sensitive area." [Emphasis added.] In rejecting this claim, the USPTO directs Applicant to pages 26 and 27 of the Carlson publication. Applicant respectfully disagrees that the Palm OS that is the subject of the Carlson publication works in the manner expressed in the above excerpt from claim 7.

An important distinction needs to be made here. Other than the Graffiti feature, the Palm OS provides, for all intents and purposes, a pointer-based touchscreen interface in which a stylus (or other fine-tipped object) is used to make menu selections, initiate applications, drag scroll-bars, etc. by touching the stylus to the screen at precisely the desired location. (In this connection, while a finger can be used in the Palm OS for at least some functions, there are many

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

Page 21 of 32

NEONODE0000220

instances when the proper response can be had only by very carefully using one's fingernail, as opposed to the fleshy tip of the finger. The Palm OS is certainly not designed for low-precision navigation as is the interface of the present invention.)

In the Palm OS, to select a desired option from a dropdown menu containing a list of options, the user typically simply taps the stylus on the touchscreen precisely at the location of the desired option. See page 26 of the Carlson publication that describes the "tap" function. When the user taps the touchscreen at the desired option, the selected option is briefly highlighted before the corresponding function is performed. If the user holds the stylus on the touchscreen over an option, that option remains highlighted until the user either slides the stylus on the touchscreen out of the region over the option or, with the stylus still over the option, removes the stylus from the touchscreen. The former does not cause the function corresponding to the initially highlighted option to be performed. In fact, in a list of options, the user may move the stylus from one to another while still touching the touchscreen, and all that will happen is that each will become highlighted whenever the stylus is over that option. However, the latter, i.e., the removing of the stylus from the region over the option, causes the corresponding function to be executed. In other words, an option is selected by the removal of the stylus from the screen while the option is highlighted.

Returning to the above-quoted excerpt from claim 7, that language clearly requires that after the application or file is highlighted, the object is removed from the touch sensitive area. Then, the selection of the application or file is made by then tapping on the touch sensitive area. The Palm OS clearly does not work this way. In the Palm OS, when the user highlights an item, it is selected by the mere removal of the object from touchscreen. There simply is no follow-on tapping, because the removal of the object has already caused the selection. Therefore, the Carlson publication does not teach at least the highlighting, object removal and tapping sequence required by claim 7. For at least this additional reason, claim 7 is not rendered obvious by the applied combination.

Regarding dependent claim 12, this claim as amended requires among other things the limitation that "an active application, function, service or setting is moved on one step by

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375

NEONODE0000221

moving said <u>blunt object</u> from <u>the left</u> of said display area to <u>the right</u> of said display area, and that the active application, function, service or setting is closed or backed one step by moving said blunt object from the right of said display area to the left of said display area." [Emphasis added.] In rejecting this claim, the USPTO directs Applicant to the horizontal scroll bar feature in the TealDoc application described on page 246 of the Carlson publication. As seen in FIG. 14.2 of the Carlson publication, the TealDoc application presents a horizontal conventional-type scroll bar near the bottom of the display screen. As seen in that figure, the scroll slider the user must drag with a fine-tipped object (e.g., stylus) is relatively very small. When the user drags the slider with the fine-tipped object, the displayed text scrolls up or down, depending on the direction the user drags the slider.

Applicant respectfully asserts that the TealDoc scrolling feature does not correspond to the limitation recited in claim 12. First, Applicant respectfully asserts that scrolling through a document, which is a continuous, flowing process during the drag of the slider, cannot reasonably be said to be "moving on one step" or "backed one step," each of which is inherently a discrete action. Second, Applicant respectfully asserts that due to the very small size of the TealDoc slider, the scrolling in fact cannot be accomplished using a blunt object. The slider is very small and requires the user to precisely locate a fine-tipped object within the boundary of the slider so that the user can drag the slider. Third, claim 12 requires that the object be moved from the left of the touchscreen to the right of the touchscreen. The TealDoc scroll bar does not start anywhere near the left of the touchscreen, but rather it starts near the center of the touchscreen. Because the Carlson publication does not disclose or suggest at least these limitations of dependent claim 12, the foregoing reasons are additional reasons why the applied combination cannot render obvious this claim.

Regarding claim 15, this claim as amended requires among other things the limitation that "said <u>enclosure is provided with an opening</u> for said display area, and that a representation of said menu area is <u>printed on top of said enclosure</u>." [Emphasis added.] In rejecting this claim, the USPTO directs Applicant to the portion of page 12 of the Carlson publication directed to the silkscreened Graffiti area at the bottom of the touchscreen of the Palm device. Applicant

Page 23 of 32

Law Offices of<br>
<b>Downs Rachlin Martin PLLC</b><br>
199 Main Street, P.O. Box 190<br>
Burlington, VT 05402-0190<br>
(802) 863-2375

NEONODE0000222

respectfully disagrees that the silkscreened Graffiti area corresponds to the limitations of claim 15.

The Carlson publication, on page 12, states that the "Graffiti input area and the buttons on either side of it are printed on a layer of glass by a silkscreening process." Upon review of a Palm device, particularly a Palm IIIc device, it appears that the layer of glass is part of the entire touchscreen (including both the menu area and display area). Therefore, it is Applicant's position that it is not reasonable to refer to this layer of glass as an "enclosure . . . provided with an opening for said display area," as required by claim 15, because it is in fact part of the display area and indeed part of the entire touchscreen. Since the Palm glass layer is not an enclosure, the Carlson publication also does not disclose or suggest an enclosure having a "of said menu area is printed on top of said enclosure" as also required by claim 15. Because the Carlson publication does not disclose or suggest at least these limitations of amended dependent claim 15, the foregoing reasons are additional reasons why the applied combination cannot render obvious this claim.

For at least the foregoing reasons, Applicant respectfully requests withdrawal of the present rejection.

### Carlson/Milic-Frayling/Conrad/Kopitzke

Claims 2 and 3 stand rejected under 35 U.S.C. § 103(a) as being obvious in view of a combination of the Carlson publication, the Milic-Frayling publication, the Conrad patent and U.S. Patent No. 6,988,246 to Kopitzke et al. ("the Kopitzke patent"). Applicant respectfully disagrees.

The teachings of each of the Carlson publication, the Milic-Frayling publication and the Conrad patent are as described above relative to the rejection in view of the Carlson/Milic-Frayling/Conrad combination.

The Kopitzke patent discloses a device and a software application that together present a touch sensitive user interface for monitoring systems aboard an aircraft. The application displays various screens and menus that change depending on what system a user desires to monitor. The

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375

NEONODE0000223

user interface displays an onscreen help key or button (6) that is displayed regardless of the contents of the display area (2).

Turning now to the rejected claims, it is noted that claims 2 and 3 both depend from claim 1. As discussed above relative to the rejection in view of the Carlson/Milic-Frayling/Conrad combination, claim 1 is not obvious in view of that combination because the combination lacks a number of the limitations of claim 1. The Kopitzke patent does not disclose or suggest the limitations missing from the Carlson/Milic-Frayling/Conrad combination. Therefore, claims 2 and 3 are not obvious in view of the present Carlson/Milic-Frayling/Conrad/Kopitzke combination.

For at least this reason, Applicant respectfully requests withdrawal of the present rejection.

### Carlson/Milic-Frayling/Conrad/Wynn

Claims 8-11 stand rejected under 35 U.S.C. § 103(a) as being obvious in view of a combination of the Carlson publication, the Milic-Frayling publication, the Conrad patent and U.S. Patent No. 6,734,883 to Wynn et al. ("the Wynn patent"). Applicant respectfully disagrees.

The teachings of each of the Carlson publication, the Milic-Frayling publication and the Conrad patent are as described above relative to the rejection in view of the Carlson/Milic-Frayling/Conrad combination.

The Wynn patent discloses a graphical user interface control that allows a user to "spin" forward and backward through a list of items while the interface displays preview and postview segments of the list. According to the Wynn patent, by providing visible access to the upcoming and recently past selections, the user can operate the spin control at a higher speed, thereby increasing efficiency.

Turning now to the rejected claims, it is noted that claims 8-11 each depend from claim 1. As discussed above relative to the rejection in view of the Carlson/Milic-Frayling/Conrad combination, claim 1 is not obvious in view of that combination because the combination lacks a number of the limitations of claim 1. The Kopitzke patent does not disclose or suggest the

Page 25 of 32

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375

NEONODE0000224

limitations missing from the Carlson/Milic-Frayling/Conrad combination. Therefore, claims 8-11 are not obvious in view of the present Carlson/Milic-Frayling/Conrad/Wynn combination.

Looking now more specifically at the claims individually, dependent claim 8 requires among other things that "a top area of said list presents a field through which the content of said list can be altered, that, if said list only presents files, said field displays a representation of a task manager and a selection of said field will cause said list to alter to present only applications, and that, if said list only presents applications, said field displays a representation of a file manager and a selection of said field will cause said list to alter and present only files." [Emphasis added.] In rejecting this claim, the USPTO directs Applicant to col. 3, lines 4-8, of the Wynn patent and asserts that the Wynn dialog box 32 is a field through which the content of a list can be altered in the manner required by claim 8. Applicant respectfully disagrees.

A careful reading of claim 8 counsels that the "field" of the claim is used to toggle the content of the list between applications and files. When a representation of a task manager appears in this field, the list displays files, and when a representation of a file manager appears in the field, the list displays applications. When a user selects the field (which contains a representation of either a task manager or file manager), the field toggles to the opposite representation (i.e., from file manager to task manager, or vice versa) and the list toggles to the opposite type list (i.e., from applications to files, or vice versa).

In contrast Wynne et al. describe dialog box 32 (i.e., "field") of the Wynn patent as being a place for a user to either type in a choice or populate using a drop-down menu of choices. Col. 3, lines 8-14. The Wynn patent also discloses that this dialog box, or field, has a label 31 identifying what the field is for, e.g., URLs, file to open, locations visited, etc. Col. 3, lines 6-32. Applicant respectfully asserts that the Wynn patent does not disclose the "toggling" inherent in claim 8 as noted above. Regardless of what a user inputs into dialog box 32 and regardless of how label 31 is changed (which it is not for a given dialog box because it is simply a static label), the character of the list corresponding to the dialog box never toggles from application to file. Because the Wynn patent does not disclose or suggest what the USPTO asserts, for at least this

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

NEONODE0000225

additional reason, the Carlson/Milic-Frayling/Conrad/Wynn combination cannot render obvious claim 8.

In addition, the undersigned notes he is confused by the rejection in that the text of the rejection in item 10 on page 9 of the current Office Action appears to assert that the dialog box 32 corresponds to the "field" of claim 8 and that this field displays a label (31), which corresponds to the "representation" of claim 8. The undersigned respectfully asserts this construction of the Wynn teachings does not appear to make sense in the context of claim 8. Claim 8 requires the field (dialog box) to display the representation (label). However, in the Wynn patent, the dialog box does not display the label, rather the label is displayed adjacent to the dialog box. Thus, the undersigned believes there is an internal discrepancy within the rejection.

Regarding dependent claim 9, this claim as amended requires among other things the limitation that "a navigation in said list is performed by moving said blunt object in a direction towards the top of said list or towards the bottom of said list, that the movement of said blunt object will cause said marking to move in the same direction, and that the speed of movement of said marking is lower than the speed of movement of said blunt object." [Emphasis added.] In rejecting this claim, the USPTO asserts that col. 3, lines 32-39, and Figure 5 of the Wynn patent disclose moving of the blunt object to navigate in the list and that col. 4, lines 24-30, discloses the differing speed aspect of the claim. Applicant respectfully disagrees.

As for the Wynn patent's teachings at col. 3, lines 32-39, all Wynn et al. disclose there is that a user can select an item using a cursor-type pointer or an arrow or tab key. There is no mention whatsoever that the navigation is performed with a blunt object. As for the Wynn patent's teachings at col. 4, lines 24-30, all that Wynn et al. state there is that conventional graphical user interface controls can be difficult to operate rapidly due to the inability of the user to scroll through a list and select a choice at the same speed as the computer can print the choices to the screen. There is absolutely no mention of any relationship between the speed of moving a blunt object along a touch sensitive region and the speed at which a marking in a list is moved. Because the Wynn patent does not disclose or suggest at least these limitation of claim 9, the

Page 27 of 32

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375

NEONODE0000226

Carlson/Milic-Frayling/Conrad/Wynn combination cannot render obvious this claim for these additional reasons.

Regarding dependent claim 10, this claim as amended requires among other things the limitation that "if said blunt object is positioned at the bottom of said display area, replaced on said display area, and then again moved to the bottom of said display area, the content of said display area will be replaced by the following applications and/or files in said list." [Emphasis added.] In rejecting this claim, the USPTO asserts that the "Full Page Up" feature described on page 253 of the Carlson publication corresponds to the above-quoted excerpt from claim 10. Applicant respectfully disagrees.

As discussed above in detail relative to the rejection of claim 7 in view of the Carlson/Milic-Frayling/Conrad combination, the Palm OS activates a selection upon removal of an object from the touchscreen. This is typically done in the form of a tap (i.e., a rapid contact and withdraw movement) using a stylus. In connection with the split-screen scroll options described on page 253 of the Carlson publication, Carlson indeed describes the split-screen regions as "letting you control the amount of scrolling based on where you tap." [Emphasis added.] Thus, the mere movement of a blunt object to the bottom of the display area as required by claim 10 will, in fact, not cause the scrolling effect. Rather, the scrolling will not occur until the object is lifted. Since the Carlson publication does not disclose or suggest this feature of claim 10 as asserted, the Carlson/Milic-Frayling/Conrad/Wynn combination cannot render obvious this claim for this additional reason.

For at least the foregoing reasons, Applicant respectfully requests withdrawal of the present rejection.

### Carlson/Milic-Frayling/Conrad/Design Choice

Claim 13 stands rejected under 35 U.S.C. § 103(a) as being obvious in view of a combination of the Carlson publication, the Milic-Frayling publication, the Conrad patent and design choice of someone of ordinary skill in the art at the time of the invention. Applicant respectfully disagrees.

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

Page 28 of 32

NEONODE0000227

Claim 13 depends from claim 1. As discussed above relative to the rejection in view of the Carlson/Milic-Frayling/Conrad combination, claim 1 is not obvious in view of that combination because the combination lacks a number of the limitations of that claim. Since claim 13 depends from claim 1, claim 13 is not obvious in view of the present Carlson/Milic-Frayling/Conrad/Design Choice combination. Therefore, Applicant respectfully requests withdrawal of the present rejection.

### *Carlson/Milic-Frayling/Conrad/Strietelmeier*

Claims 14 and 16 stand rejected under 35 U.S.C. § 103(a) as being obvious in view of a combination of the Carlson publication, the Milic-Frayling publication, the Conrad patent and Strietelmeier, Julie, "Palm m100," The Gadgeteer, 2000 ("the Strietelmeier publication"). Applicant respectfully disagrees.

The teachings of each of the Carlson publication, the Milic-Frayling publication and the Conrad patent are as described above relative to the rejection in view of the Carlson/Milic-Frayling/Conrad combination.

The Strietelmeier publication describes features of the Palm m100 personal digital assistant that runs the same stylus-based Palm OS 3.5 described in the Carlson publication discussed above. The Strietelmeier publication lists that the area of the display of the m100 device is 2.675 in. x 1.965 in. (which yields a diagonal dimension of about 3.32 in.). The display area of the m100 device is the smallest of the five devices listed in the Strietelmeier publication.

Turning to the rejected claims, claim 14 depends from claim 1, and claim 16 incorporates limitations from claim 1 via claim 15 from which claim 16 depends. As discussed above relative to the rejection in view of the Carlson/Milic-Frayling/Conrad combination, claim 1 is not obvious in view of that combination because the combination lacks a number of the limitations of that claim. The Strietelmeier publication does not disclose or suggest the limitations missing from the Carlson/Milic-Frayling/Conrad combination. Since claim 14 depends from claim 1 and claim 16 incorporates limitations of claim 1, claim 14 and 16 are not obvious in view of the present Carlson/Milic-Frayling/Conrad/Strietelmeier combination.

Law Offices of<br>
**Downs Rachlin Martin PLLC**<br>
199 Main Street, P.O. Box 190<br>
Burlington, VT  05402-0190<br>
(802) 863-2375

Page 29 of 32

NEONODE0000228

In addition, specifically regarding claim 14, this claim as amended requires that the touch sensitive area have "a size that is 2-3 inches in diagonal dimension, and that said user interface is adapted to be operated by one hand when the mobile handheld computer unit is held in the one hand, wherein said blunt object is a thumb of the one hand." [Emphasis added.] Regarding the area of the touch sensitive area, the 3.32 in. diagonal dimension of the m100 device is larger than the 3 in. upper end of the claimed range. While 0.32 in. may not on its face seem to be much of a difference, Applicant notes that the difference is in fact substantial when the device is used in the manner of claim 14, i.e., cradled in one hand and operated by the fleshy part of the thumb of that same hand for true single-hand operation. If the Examiner has access to any of the Palm devices the Strietelmeier publication lists (i.e., the m100, III/IIIx, V and IIIc devices), Applicant respectfully requests that the Examiner try to operate that Palm device in a truly one-handed manner using the fleshy part of the holding hand to use the touchscreen. Applicant believes the Examiner will find that it is challenging and awkward to access the touchscreen with the thumb in any meaningful manner. Applicant respectfully requests that this experience be compared to the video demonstration mentioned above that is available at the www.neonode.com Website.

Regarding the limitations of claim 14 directed specifically to the holding of the computer unit in one hand and navigating using the fleshy part of the thumb of that same hand, Applicant again respectfully points out that the Palm OS is intended to be used with a stylus or other fine-tipped object. The designers of the Palm OS clearly did not intend the use of a blunt object, especially the fleshy part of a thumb. If the fleshy part of the thumb works at all on a device running the circa-version-3.5 of the Palm OS, it is usually by mere luck that the user selects a desired action using that part of the thumb. Since the Strietelmeier publication does not disclose or suggest the features of claim 14 as asserted, the Carlson/Milic-Frayling/Conrad/ Strietelmeier combination cannot render obvious this claim for this additional reason.

For at least the foregoing reasons, Applicant respectfully requests withdrawal of the present rejection.

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT 05402-0190
(802) 863-2375

NEONODE0000229

*Carlson/Milic-Frayling/Conrad/Chew*

Claim 18 stands rejected under 35 U.S.C. § 103(a) as being obvious in view of a combination of the Carlson publication, the Milic-Frayling publication, the Conrad patent and U.S. Patent No. 5,956,030 to Chew et al. ("the Chew patent"). Applicant respectfully disagrees.

Claim 18 incorporates limitations from claim 1 via its dependency from claim 17. As discussed above relative to the rejection in view of the Carlson/Milic-Frayling/Conrad combination, claim 1 is not obvious in view of that combination because the combination lacks a number of the limitations of that claim. Since claim 18 includes limitations of claim 1, claim 18 is not obvious in view of the present Carlson/Milic-Frayling/Conrad/Chew combination. Therefore, Applicant respectfully requests withdrawal of the present rejection.

**New Claims 19-47**

Applicant has added new claims 19-47 on the belief they are enabled by the original application and are patentable over the references of record. Applicant respectfully requests that the Examiner take appropriate action on these new claims.

**CONCLUSION**

In view of the foregoing, Applicant submits that claims 1-47, as amended and newly presented, are in condition for allowance. Therefore, prompt issuance of a Notice of Allowance is respectfully solicited. If any issues remain, the Examiner is encouraged to call the undersigned attorney at the number listed below.

Law Offices of
**Downs Rachlin Martin PLLC**
199 Main Street, P.O. Box 190
Burlington, VT  05402-0190
(802) 863-2375

Page 31 of 32

Respectfully submitted,

MAGNUS GOERTZ

By: _____
Morgan S. Heller II
Registration No.: 44,756

Downs Rachlin Martin PLLC
Tel: (802) 863-2375
Attorneys for Applicant

2403177.1

Page 32 of 32

NEONODE0000231

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 10315250 |
| **Filing Date:** | 10-Dec-2002 |
| **Title of Invention:** | User interface |
| First Named Inventor/Applicant Name: | Magnus Goertz |
| **Filer:** | Morgan Heller/Karen Jeffer |
| **Attorney Docket Number:** | 3682-32 |

Filed as Small Entity

### Utility      Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| Claims in excess of 20 | 2202 | 27 | 25 | 675 |
| Independent claims in excess of 3 | 2201 | 5 | 105 | 525 |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| Post-Allowance-and-Post-Issuance: | | | | |

NEONODE0000232

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Extension-of-Time:** | | | | |
| Extension - 1 month with $0 paid | 2251 | 1 | 60 | 60 |
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **1260** |

NEONODE0000233

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 3002818 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus  Goertz |
| **Customer Number:** | 23117 |
| **Filer:** | Morgan Heller/Karen Jeffer |
| **Filer Authorized By:** | Morgan Heller |
| **Attorney Docket Number:** | 3682-32 |
| **Receipt Date:** | 14-MAR-2008 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 16:16:21 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $1260 |
| RAM confirmation Number | 1756 |
| Deposit Account | 041588 |
| Authorized User | HELLER,MORGAN |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |
| Charge any Additional Fees required under 37 C.F.R. Section 1.21 (Miscellaneous fees and charges) | |

NEONODE0000234

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Power of Attorney | POA.pdf | 50721 / 17f5deab6170790fd983c484a8e08617bd6b8830 | no | 2 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 2 | Extension of Time | PetitionExtensionTime.pdf | 71471 / 7d6e68164345e6678730ca9ad1d86d459d3b58e7 | no | 1 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 3 | | ResponseOfficeAction.pdf | 1812549 / cec402c4cf0ee398e747e2b049ef51feb4f7bbc3 | yes | 32 |

| Multipart  Description/PDF files in .zip description | | |
|---|---|---|
| Document Description | Start | End |
| Amendment - After Non-Final Rejection | 1 | 1 |
| Claims | 2 | 14 |
| Applicant Arguments/Remarks Made in an Amendment | 15 | 32 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 4 | Fee Worksheet (PTO-06) | fee-info.pdf | 8399 / 3936df4179a7875907942b48c66cb30a8ab9f1f5 | no | 2 |

**Warnings:**

**Information:**

| | | |
|---|---|---|
| **Total Files Size (in bytes):** | | 1943140 |

NEONODE0000235

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000236

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Inventor: Magnus Goertz

Assignee: Neonode AB

Serial No.: 10/315,250

Filed: December 10, 2002

Title: User Interface

Attorney Docket No.: 12511-00003  (New)
3682-32  (Previous)

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

## REVOCATION OF POWER OF ATTORNEY AND APPOINTMENT OF NEW ATTORNEY

Assignee of record of the entire interest for the above-identified application hereby revokes any other previous powers of attorney, and appoints: Lawrence H. Meier, Esq., Registration No. 31,446, and Morgan S. Heller II, Registration No. 44,756, attorneys with the firm of Downs Rachlin Martin PLLC, and members of the Bar of the State of Vermont, as its attorneys, with the full power of association, revocation and substitution, to transact all business in the U.S. Patent and Trademark Office in connection therewith.

Please change the correspondence address for the above-identified application to the address associated with Customer Number 21918.

P225-02/04                                    1

Law Offices Of
Downs Rachlin Martin PLLC
199 Main Street
P.O. Box 190
Burlington, Vermont 05402-0190
(802) 863-2375

NEONODE0000237

**PATENT**

Respectfully submitted,

NEONODE AB

Date: _____10/3/2008    By:_____

Name: Magnus Goertz
Title: CTO
Address: Biblioteksgatan 11, Ltr.
             Stockholm, Sweden  11146

2384848.1

P225-02/04                                2

Law Offices Of
Downs Rachlin Martin PLLC
199 Main Street
P.O. Box 190
Burlington, Vermont 05402-0190
(802) 863-2375

NEONODE0000238

PTO/SB/22 (01-08)
Approved for use through 03/31/2008. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless if displays a valid OMB control number.

| PETITION FOR EXTENSION OF TIME UNDER 37 CFR 1.136(a) **FY 2008** *(Fees pursuant to the Consolidated Appropriations Act, 2005 (H.R. 4818).)* | Docket Number (Optional) 12511-00003 |
|---|---|
| Application Number    10/315,250 | Filed  12/10/2002 |
| For  User Interface | |
| Art Unit    2174 | Examiner  Ryan F. Pitaro |

This is a request under the provisions of 37 CFR 1.136(a) to extend the period for filing a reply in the above identified application.

The requested extension and fee are as follows (check time period desired and enter the appropriate fee below):

| | | Fee | Small Entity Fee | |
|---|---|---|---|---|
| [X] | One month (37 CFR 1.17(a)(1)) | $120 | $60 | $ __60.00__ |
| [ ] | Two months (37 CFR 1.17(a)(2)) | $460 | $230 | $ _____ |
| [ ] | Three months (37 CFR 1.17(a)(3)) | $1050 | $525 | $ _____ |
| [ ] | Four months (37 CFR 1.17(a)(4)) | $1640 | $820 | $ _____ |
| [ ] | Five months (37 CFR 1.17(a)(5)) | $2230 | $1115 | $ _____ |

[X] Applicant claims small entity status. See 37 CFR 1.27.

[ ] A check in the amount of the fee is enclosed.

[X] Payment by credit card. Form PTO-2038 is attached.

[ ] The Director has already been authorized to charge fees in this application to a Deposit Account.

[X] The Director is hereby authorized to charge any fees which may be required, or credit any overpayment, to Deposit Account Number  04-1588 _____ .  I have enclosed a duplicate copy of this sheet.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the

[ ] applicant/inventor.

[ ] assignee of record of the entire interest. See 37 CFR 3.71.
    Statement under 37 CFR 3.73(b) is enclosed (Form PTO/SB/96).

[X] attorney or agent of record. Registration Number  44756 _____

[ ] attorney or agent under 37 CFR 1.34.
    Registration number if acting under 37 CFR 1.34 _____

| Signature | 3/14/2008 Date |
|---|---|
| Morgan S. Heller II Typed or printed name | 802-863-2375 Telephone Number |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below.

[X] Total of ____1____ forms are submitted.

This collection of information is required by 37 CFR 1.136(a). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 6 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

NEONODE0000239

May 14 2008 5:19PM    PROPATS    RECEIVED2 9 9541975    p.1

**CENTRAL FAX CENTER**

2008 Maj 13 12:39    HP LASERJET-FAX    **MAY 1 4 2008**    si3

PTO/SB92 (01-08)
Approved for use through 12/31/2008. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| REVOCATION OF POWER OF ATTORNEY WITH NEW POWER OF ATTORNEY AND CHANGE OF CORRESPONDENCE ADDRESS | Application Number | 10 /315, 250 |
| | Filing Date | 12 -10 -2002 |
| | First Named Inventor | Magnus Goertz |
| | Art Unit | 2174 |
| | Examiner Name | PITARO, Ryan F |
| | Attorney Docket Number | |

**I hereby revoke all previous powers of attorney given in the above-identified application.**

☐ A Power of Attorney is submitted herewith.

OR

☒ I hereby appoint the practitioners associated with the Customer Number: **60956**

☒ Please change the correspondence address for the above-identified application to:

☒ The address associated with Customer Number: **60956**

OR

| ☐ Firm or Individual Name | |
| Address | |
| City | | State | | Zip | |
| Country | |
| Telephone | | Email | |

I am the:

☐ Applicant/Inventor.

☒ Assignee of record of the entire interest. See 37 CFR 3.71. Statement under 37 CFR 3.73(b) is enclosed. (Form PTO/SB/96)

**SIGNATURE of Applicant or Assignee of Record**

| Signature | |
| Name | MIKAEL HAGMAN |
| Date | 13 MAY 2008 | Telephone | +46 8 586 22 810 |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below.

☐ *Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.36. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

NEONODE0000240

May 14 2008 5:19PM    PROPATS                    +972 9 9541975           p.2

2008 Maj 13 12:39    HP LASERJET-FAX                                        s i 4

PTO/SB/96 (01-08)
Approved for use through 08/31/2008. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## STATEMENT UNDER 37 CFR 3.73(b)

Applicant/Patent Owner: _Gcertz, Magnus_

Application No./Patent No.: _112/315,250_    Filed/Issue Date: _12:16:2002_

Entitled: _User Interface_

_NEONODE AB_, a _CORPORATION_
(Name of Assignee)                (Type of Assignee, e.g., corporation, partnership, university, government agency, etc.)

states that it is:

1. ☒ the assignee of the entire right, title, and interest; or

2. ☐ an assignee of less than the entire right, title and interest
   (The extent (by percentage) of its ownership interest is _____ %)

in the patent application/patent identified above by virtue of either:

A. ☐ An assignment from the inventor(s) of the patent application/patent identified above. The assignment was recorded in the United States Patent and Trademark Office at Reel _____, Frame _____, or for which a copy thereof is attached.

OR

B. ☒ A chain of title from the inventor(s), of the patent application/patent identified above, to the current assignee as follows:

1. From: _Gcertz, Magnus_    To: _Neonode Sweden AB_
   The document was recorded in the United States Patent and Trademark Office at
   Reel _018168_, Frame _0611_, or for which a copy thereof is attached.

2. From: _Neonode Sweden AB_    To: _Neonode AB_
   The document was recorded in the United States Patent and Trademark Office at
   Reel _018137_, Frame _0448_, or for which a copy thereof is attached.

3. From: _____    To: _____
   The document was recorded in the United States Patent and Trademark Office at
   Reel _____, Frame _____, or for which a copy thereof is attached.

☐ Additional documents in the chain of title are listed on a supplemental sheet.

☒ As required by 37 CFR 3.73(b)(1)(i), the documentary evidence of the chain of title from the original owner to the assignee was, or concurrently is being, submitted for recordation pursuant to 37 CFR 3.11.

(NOTE: A separate copy (i.e., a true copy of the original assignment document(s)) must be submitted to Assignment Division in accordance with 37 CFR Part 3, to record the assignment in the records of the USPTO. See MPEP 302.08)

The undersigned (whose title is supplied below) is authorized to act on behalf of the assignee.

_____            _13 MAY 2008_
Signature                                   Date
_MIKAEL HAGMAN_                             _+46 8 586 22 81_
Printed or Typed Name                       Telephone Number
_CEO_
Title

This collection of information is required by 37 CFR 3.73(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PAGE 2/2 * RCVD AT 5/14/2008 11:20:57 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/2 * DNIS:2738300 * CSID:+972 9 9541975 * DURATION (mm-ss):01-24

NEONODE0000241



# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | 3682-32 | 1226 |

23117    7590    07/11/2008
NIXON & VANDERHYE, PC
901 NORTH GLEBE ROAD, 11TH FLOOR
ARLINGTON, VA 22203

| EXAMINER |
|---|
| PITARO, RYAN F |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2174 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 07/11/2008 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

NEONODE0000242

| | **Application No.** | **Applicant(s)** |
|---|---|---|
| ***Office Action Summary*** | 10/315,250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** | |
| | RYAN F. PITARO | 2174 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *3* MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒  Responsive to communication(s) filed on *3/14/2008*.

2a)☒  This action is **FINAL**.          2b)☐  This action is non-final.

3)☐  Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒  Claim(s) *1-47* is/are pending in the application.

    4a) Of the above claim(s) *19-47* is/are withdrawn from consideration.

5)☐  Claim(s) _____ is/are allowed.

6)☐  Claim(s) *1-18* is/are rejected.

7)☐  Claim(s) _____ is/are objected to.

8)☐  Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐  The specification is objected to by the Examiner.

10)☐  The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐  The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐  Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

        1.☐  Certified copies of the priority documents have been received.

        2.☐  Certified copies of the priority documents have been received in Application No. _____.

        3.☐  Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☐ Notice of References Cited (PTO-892)
2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3)☐ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .
5)☐ Notice of Informal Patent Application
6)☐ Other: _____.

NEONODE0000243

Application/Control Number: 10/315,250                                         Page 2
Art Unit: 2178

## DETAILED ACTION

### *Response to Amendment*

This communication is responsive to the Amendment filed 3/14/2008.

Claims 1-18 are pending in this application. Claims 1, 15 and 17 are
independent claims.

### *Election/Restrictions*

Newly submitted claims 19-47 are directed to an invention that is independent or
distinct from the invention originally claimed for the following reasons: Claims 19-47 are
directed to distinct individual instances of sweeping motions of a particular kind in order
to navigate among said predetermined display screens whereas the claimed invention is
more directed to a simplified touch interface.

Since applicant has received an action on the merits for the originally presented
invention, this invention has been constructively elected by original presentation for
prosecution on the merits. Accordingly, claims 19-47 are withdrawn from consideration
as being directed to a non-elected invention. See 37 CFR 1.142(b) and MPEP §
821.03.

NEONODE0000244

Application/Control Number: 10/315,250                                              Page 3

Art Unit: 2178

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

Claims 1, 4-7, 12, 15 and 17 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm

Organizers. Peachpit Press. 2000. Berkeley, CA.) in view of Milic-Frayling et al ("Milic-

Frayling", US 2004/0100510) in view of Conrad et al ("Conrad", US 5,956,030).

1.      As per claim 1, Carlson teaches a computer readable medium storing a computer

program with computer program code, which code, when read by a mobile computer

unit allows the computer to present a user interface for a mobile handheld computer unit

(Introduction, page xiii), where said computer unit comprises a touch sensitive area

(page 26, *the screen is touch sensitive*), that is simultaneously divided into a menu area

(page 12, fig. 1.10 *silk screen graffiti area*) and a display area, the computer unit is

being adapted to run several applications simultaneously (page 47, *all of the*

*applications are running concurrently*), and to present an active application on top of

any other application on said display area, characterised in, that said menu area is

adapted to present a representation of a first, a second and a third predefined function,

that said first function is a general application dependent function (page 28, *the Menu*

NEONODE0000245

Application/Control Number: 10/315,250                                                Page 4
Art Unit: 2178

*icon*, fig. 2.4), that said second function is a keyboard function (page 30, *either the abc or 123 dots in the lower corner of the Graffiti area*), that said third function is a task and file manager (page 47, *the Applications screen* & fig. 2.35), and that any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area (page 40, *bottom-to-top screen stroke shortcut* fig. 2.22 & page 30, *drag the stylus vertically across the screen from bottom to top*), said user interface allowing low precision navigation using a blunt object, whereby said user interface can be operated by one hand (page 12, "*The stylus is the main method of interacting with the PalmPilot*" *and it inherently involves one hand to use the stylus.* Also, if a finger was used, that would also be considered using one hand), where said blunt object is a finger (page 12, "*The stylus is the main method of interacting*" **though** anything including fingers **can** work). Carlson fails to distinctly point out simultaneously displaying a first, second, and third function. Milic-Frayling teaches the menu area being adapted to simultaneously present representations of a first function, a second function, and a third function (Figure 1 view Tools toolbar, with keyboard, file manager, etc.). Therefore it would have been obvious to an artisan at the time of the invention to combine the teaching of Milic-Frayling with the interface of Carlson. Motivation to do so would have been to provide away to quickly access common functions and provide a user with a large enough space. The modified Carlson still does not explicitly point out activation by a single step of an object moving in a direction on the touch sensitive area. However, Conrad teaches activating by the

NEONODE0000246

Application/Control Number: 10/315,250                                    Page 5
Art Unit: 2178

single step of an object moving in a direction from a starting point that is representation

of the function in the menu area to the display area (Figure 2, Column 2 lines 15-62).

Therefore it would have been obvious to an artisan at the time of the invention to

combine the teaching of Venolia with the modified Carlson. Motivation to do so would

have been to provide easy access to windows.


2.      As per claim 4, the modified Carlson teaches the user interface according to

claim 1, characterised in,

        that, if said second function is activated, said display area is adapted to display a

keyboard and a text field,

        that, if a text passage in said active application is highlighted, said text passage

is displayed in said text field for editing through said keyboard and that said highlighted

text passage is replaced by said edited text passage when said second function is

deactivated, and

        that, if no text passage in said active application is highlighted, said text field is

available for inputting and editing of text through said keyboard (Carlson, page 30, fig

2.7).

3.      As per claim 5, the modified Carlson teaches the user interface according to

claim 4, characterized in, that if no text passage in said active application is highlighted,

and said text field is used for inputting and editing of text through said keyboard

(Carlson, page 30, fig 2.7), then

        said first function can be activated, or

NEONODE0000247

Application/Control Number: 10/315,250                                    Page 6
Art Unit: 2178

said second function can be closed, in which a choice of saving or deleting said

inputted text is given, where the choice of saving said inputted text results in an

activation of said first function,

in which said first function will present services or settings available for said

inputted text (Carlson, page 28, fig. 2.4 *Beam Memo*).

4.      As per claim 6, the modified Carlson teaches the user interface according to

claim 1, characterised in, that, if said third function is activated, said display area is

adapted to display a list with a library of available applications and files on said

computer unit, that a selection of an application will start said application, and that a

selection of a file will open said file in an application intended for said file (Carlson, page

47, fig. 2.35).

5.      As per claim 7, the modified Carlson teaches the user interface according to

claim 6, characterised in, that a selection of an application or a file is done by moving

said object so that the representation of desired application or file is highlighted,

removing said object from said touch sensitive area, and then tapping on said touch

sensitive area, and that an application or file is highlighted by placing some kind of

marking on the representation of said application or file (Carlson, pages 26 & 27).

6.      As per claim 12, the modified Carlson teaches the user interface according to

Claim 1, characterised in, that an active application, function, service or setting is

moved on one step by moving said object from the left of said display area to the right of

said display area, and that the active application, function service or setting is closed or

Application/Control Number: 10/315,250                                             Page 7
Art Unit: 2178

backed one step by moving said object from the right of said display area to the left of

said display area (Carlson, page 246, fig. 14.2, *Drag to scroll through file*).

7.      As per claim 15, the modified Carlson teaches an enclosure adapted to cover a

computer unit, said computer unit being adapted to present a user interface according

Claim 1, characterised in, that said enclosure is provided with an opening for said

display area, and that a representation of said menu area is printed on top of said

enclosure (Carlson, page 12, *Silkscreen Graffiti area* & fig. 1.10).

8.      As per claim 17, the modified Carlson teaches a computer readable medium,

with a computer program product stored therein, characterised in, that said computer

program product comprises computer readable code, which, when read by a computer,

will make it possible for said computer to present a user interface according to Claim 1

(Carlson, page 25, *Palm OS*).


        Claims 2 and 3 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Carlson ("Carlson", Carlson, Jeff.  Visual Quickstart Guide Palm Organizers. Peachpit

Press. 2000.  Berkeley, CA.), Milic-Frayling et al ("Milic-Frayling", US 2004/0100510)

and Conrad et al ("Conrad", US 5,956,030) in view of Kopitzke et al. ("Kopitzke", US #

6,988,246 B2).


9.      As per claim 2, the modified Carlson teaches the user interface according to

claim 1, characterized in, that, if said first function is activated, said display area is

adapted to display icons representing different services or settings depending on the

NEONODE0000249

Application/Control Number: 10/315,250                                    Page 8
Art Unit: 2178

current active application (Carlson, page 28, *the Menu icon*, fig. 2.4), and that, if no application is currently active on said computer unit, said icons are adapted to represent services or settings of the operations system of said computer unit (Carlson, page 47, fig. 2.36, *12:11 am*).

However the modified Carlson does not teach expressly the user interface according to claim 1, characterized in, that, if said first function is activated, said display area is adapted to display icons representing different services or settings depending on the current active application, that one of said icons always represents a "help"-service, regardless of application.

Kopitzke teaches the user interface according to claim 1, characterized in, that said display area is adapted to display icons representing different services or settings depending on the current active application, that one of said icons always represents a "help"-service, regardless of application (column 4, lines 36-53 & fig. 1, *Help key or button* 6).

The modified Carlson and Kopitzke are analogous art because they are in the same field of endeavor, namely graphical user interfaces with touch sensitive displays. At the time of the invention it would have been obvious to a person of ordinary skill in the art to provide the help function as taught by Kopitzke within the user interface of the modified Carlson in order to provide context sensitive information.

As per claim 3, the modified Carlson teaches the user interface according to claim 2, characterised in, that a selection of a preferred service or setting is done by

NEONODE0000250

Application/Control Number: 10/315,250                                    Page 9

Art Unit: 2178

tapping on corresponding icon (Carlson, page 26, fig. 2.1 *Tapping just about any*

*interface element in the Palm OS evokes a response*).

Claims 8-11 and 13 is rejected under 35 U.S.C. 103(a) as being unpatentable

over Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers.

Peachpit Press. 2000. Berkeley, CA.), Milic-Frayling et al ("Milic-Frayling", US

2004/0100510) and Conrad et al ("Conrad", US 5,956,030) in view of Wynn et al.

("Wynn", US # 6,734,883 B1).

10.    As per claim 8, the modified Carlson teaches the user interface according to

claim 7. However the modified Carlson does not teach expressly the user interface,

characterized in, that said list is adapted to present only said files or only said

applications, that the top area of said list presents a field through which the content of

said list can be altered, that, if said list only presents files, said field displays a

representation of a task manager and a selection of said field will cause said list to alter

to present only applications, and that, if said list only presents applications, said field

displays a representation of a file manager and a selection of said field will cause said

list to alter and present only files.

Wynn teaches a user interface control, characterized in, that said list is adapted

to present only said files or only said applications, that the top area of said list presents

a field through which the content of said list can be altered (column 3, lines 4-8, *dialog*

*box* 32), that, if said list only presents files, said field displays a representation of a task

NEONODE0000251

Application/Control Number: 10/315,250                                                  Page 10
Art Unit: 2178

manager and a selection of said field will cause said list to alter to present only

applications, and that, if said list only presents applications, said field displays a

representation (column 3, lines 4-8, *label* 31) of a file manager and a selection of said

field will cause said list to alter and present only files (column 3, lines 15-31).

The modified Carlson and Wynn are analogous art because they are in the same

field of endeavor, namely scrolling within graphical user interfaces with touch sensitive

displays.

At the time of the invention it would have been obvious to a person of ordinary

skill in the art to have the selection list format as taught by Wynn within the user

interface of the modified Carlson in order to provide a conventional list format.


11.    As per claim 9, the modifiedCarlson teaches the user interface according to claim

7, characterised in, that, a navigation in said list is performed by moving said object in a

direction towards the top of said list or towards the bottom of said list, that the

movement of said object will cause said marking to move in the same direction

(Carlson, page 27, *a quicker way to view the full list is to tap and hold on the dark solid*

*portion of the scroll bar, then drag it vertically*).

However the modified Carlson does not teach expressly that the speed of the

movement of said marking is lower than the speed of the movement of said object.

Wynn teaches a user interface control, characterised in, that, a navigation in said

list is performed by moving said object in a direction towards the top of said list or

towards the bottom of said list, that the movement of said object will cause said marking

NEONODE0000252

Application/Control Number: 10/315,250                                          Page 11

Art Unit: 2178

to move in the same direction (column 3, lines 32-39 & figs. 5) and that the speed of the

movement of said marking is lower than the speed of the movement of said object

(column 4, lines 24-30).

> At the time of the invention it would have been obvious to a person of ordinary skill in the art
>
> to have the scrolling function as taught by Wynn within the user interface of the
>
> modifiedCarlson in order to provide a conventional selection list.


12.     As per claim 10, the modified Carlson in view of Wynn teaches the user interface

according to claim 9, characterised in, that, if the number of applications and/or files in

said list exceeds the number of applications and files that can be presented on said

display area, and if said object is moved to the top or bottom position of said display

area, then lifted, replaced on said display area, and again moved to the top or bottom of

said display area, the content of said display area will be replaced one whole page,

meaning that if said object is positioned at the top of said display area, then lifted,

replaced on said display area, and then again moved to the top of said display area, the

content of said display area will be replaced by the preceding applications and/or files in

said list (Carlson, page 253, fig. 14.15 *Full Page Up*).

The modified Carlson in view of Wynn does not disclose expressly the user

interface, characterised in that if said object is positioned at the bottom of said display

area, then lifted, replaced on said display area, and then again moved to the bottom of

said display area, the content of said display area will be replaced by the following

applications and/or files in said list.

NEONODE0000253

Application/Control Number: 10/315,250                                              Page 12
Art Unit: 2178

At the time of the invention, it would have been an obvious matter of design

choice to a person of ordinary skill in the art to modify the *Full Page Up* function

(Carlson, page 253, fig 14.15) to work as a Full Page Down function by tapping on the

bottom of the display area because Applicant has not disclosed that *if said object is*

*positioned at the bottom of said display area, then lifted, replaced on said display area,*

*and then again moved to the bottom of said display area, the content of said display*

*area will be replaced by the following applications and/or files in said list* provides an

advantage, is used for a particular purpose, or solves a stated problem.  One of ordinary

skill in the art, furthermore, would have expected Applicant's invention to perform

equally well with the modified Full Page Up function as taught by Carlson because it

would only need to be implemented to scroll down instead of up, when the display area

is tapped on the bottom, instead of the top.

13.     As per claim 11, the modified Carlson in view of Wynn teaches the user interface

according to claim 10, characterised in, that if said object is removed from any first

position on said display area and then replaced on any second position on said display

area, said navigation can be continued from said second position (Carlson, page 253,

fig. 14.15).


        Claim 13 is rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson

("Carlson", Carlson, Jeff.  Visual Quickstart Guide Palm Organizers. Peachpit Press.

NEONODE0000254

Application/Control Number: 10/315,250                                              Page 13

Art Unit: 2178

2000. Berkeley, CA.) Milic-Frayling et al ("Milic-Frayling", US 2004/0100510) and

Conrad et al ("Conrad", US 5,956,030).


14.     As per claim 13, the modified Carlson teaches the user interface according to

Claim 1, characterised in, that said menu area is positioned at the bottom of said touch

sensitive area, that said representation of said first function is positioned at the left side

of said menu area, and that said representation of said second function is positioned at

the middle of said menu area.

        The modified Carlson does not teach expressly that said representation of said

third function is positioned at the right side of said menu area.

        At the time the invention was made, it would have been an obvious matter of

design choice to a person of ordinary skill in the art to place the third function on the

right side of the display area instead of the left, because Applicant has not disclosed

that *said representation of said third function is positioned at the right side of said menu

area* provides an advantage, is used for a particular purpose or solves a stated problem.

One of ordinary skill in the art, furthermore would have expected Applicant's invention to

perform equally well with the third function on the left side of the display area because

the placement of the representation would not change its functionality.


        Claims 14 and 16 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Carlson ("Carlson", Carlson, Jeff. Visual Quickstart Guide Palm Organizers.

Berkeley, CA: Peachpit Press, 2000), Milic-Frayling et al ("Milic-Frayling", US

NEONODE0000255

Application/Control Number: 10/315,250                                    Page 14
Art Unit: 2178

2004/0100510) and Conrad et al ("Conrad", US 5,956,030) in view of Strietelmeier

("Strietelmeier", Strietelmeier, Julie. "Palm m100." The Gadgeteer. 2000.

<http://www.the-gadgeteer.com/review/palm_m100_review>).


15.    As per claim 14, the modified Carlson teaches the user interface according to

Claim 1, characterised in, that said user interface is adapted to a touch sensitive area

and that said user interface is adapted to be operated by one hand, where said object

can be a finger (page 12, stylus...includes fingers).

However the modified Carlson does not teach expressly a touch sensitive area

with a size that is in the order of 2-3 inches.

Strietelmeier teaches a user interface, characterised in, a touch sensitive area

with a size that is in the order of 2-3 inches (page 4).

The modified Carlson and Strietelmeier are analogous art because they are in

the same field of endeavor, namely palm-sized computer organizers.

At the time of the invention it would have been obvious to a person of ordinary

skill in the art to have the dimensions of a touch sensitive area as taught by

Strietelmeier within the user interface of the modified Carlson in order to provide a touch

sensitive area with the manufacturer's dimensions.


16.    As per claim 16, the modified Carlson teaches the enclosure according to claim

15. However, the modified Carlson does not disclose the enclosure characterised in,

that said enclosure is removable and exchangeable.

NEONODE0000256

Application/Control Number: 10/315,250                                      Page 15
Art Unit: 2178

Strietelmeier teaches an enclosure characterised in, that said enclosure is removable and exchangeable (page 3, *you can also remove the entire face plate… there will be different face plates available*).

At the time of the invention it would have been obvious to a person of ordinary skill in the art to have the customizable enclosures as taught by Strietelmeier within the enclosure of the modified Carlson in order to tailor an enclosure to a user's preferences.

17.    Claim 18 is rejected under 35 U.S.C. 103(a) as being unpatentable over Carlson ("Carlson", Carlson, Jeff.  Visual Quickstart Guide Palm Organizers. Berkeley, CA: Peachpit Press, 2000), Milic-Frayling et al ("Milic-Frayling", US 2004/0100510) and Conrad et al ("Conrad", US 5,956,030) in view of Chew et al. ("Chew", US # 6,727,917).

18.    As per claim 18, the modified Carlson teaches a computer readable medium according to claim 17.

However the modified Carlson does not teach expressly, that said computer program product is adapted to function as a shell upon an operations system.

Chew teaches a user interface for a palm-sized computer device, characterized in, that said computer program product is adapted to function as a shell upon an operations system (column 2, lines 1-5).

The modified Carlson and Chew are analogous art because they are in the same field of endeavor, namely graphical user interfaces for hand-held personal computing devices with touch sensitive displays.

NEONODE0000257

Application/Control Number: 10/315,250                                    Page 16
Art Unit: 2178

At the time of the invention it would have been obvious to a person of ordinary skill in the art to further modify the modified Carlson program to function as shell as taught by Chew in order to efficiently display information.

### *Response to Arguments*

The Examiner reviewed the demonstration as encouraged by the Applicant. In light of the video demonstration, the Examiner can now see the difference between the prior art of record and the present application. With that being said the Examiner feels that the limitations, as claimed, were reasonably interpreted and the current limitations are still too broad to suggest without research what was shown in the video demonstration. For instance Conrad teaches as pointed out by applicant clicking a window in a menu title bar, dragging the cursor and placing it in the display region (page 19 of 32), which is exactly activating by a single step of an object moving in a direction from a starting point that is a representation of the function in the menu area to the display area. The function being activating or parking the window in the display area. The combination of the references is what teaches the limitations of claim 1, not Conrad or Palm OS alone.

NEONODE0000258

Application/Control Number: 10/315,250                                                       Page 17
Art Unit: 2178

## *Conclusion*

**THIS ACTION IS MADE FINAL.**  Applicant is reminded of the extension of time

policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the mailing date of this final action.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to RYAN F. PITARO whose telephone number is

(571)272-4071.  The examiner can normally be reached on 9:00am - 5:30pm Mondays

through Fridays.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, David Wiley can be reached on 571-272-3923.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

NEONODE0000259

Application/Control Number: 10/315,250                                    Page 18
Art Unit: 2178

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/R. F. P./                                      /Stephen S. Hong/
Primary Examiner, Art Unit 2174                 Supervisory Patent Examiner, Art
                                                Unit 2178

NEONODE0000260

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 10315250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** |
| | Ryan F Pitaro | 2174 |

## SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| Update | Search | 11/8/2007 | RFP |
| Update | Search | 6/17/2008 | RFPF |

## SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| Update Search | 11/8/2007 | RFP |
| Update Search | 6/17/2008 | RFP |

## INTERFERENCE SEARCH

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

U.S. Patent and Trademark Office                    Part of Paper No. : 20080623

NEONODE0000261

| | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| **Index of Claims** | 10315250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** |
| | Ryan F Pitaro | 2174 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| ☐ Claims renumbered in the same order as presented by applicant | | | ☐ CPA | ☐ T.D. | ☐ R.1.47 | | | | |

| CLAIM | | DATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | 06/23/2008 | | | | | | |
| | 1 | ✓ | ✓ | | | | | | |
| | 2 | ✓ | ✓ | | | | | | |
| | 3 | ✓ | ✓ | | | | | | |
| | 4 | ✓ | ✓ | | | | | | |
| | 5 | ✓ | ✓ | | | | | | |
| | 6 | ✓ | ✓ | | | | | | |
| | 7 | ✓ | ✓ | | | | | | |
| | 8 | ✓ | ✓ | | | | | | |
| | 9 | ✓ | ✓ | | | | | | |
| | 10 | ✓ | ✓ | | | | | | |
| | 11 | ✓ | ✓ | | | | | | |
| | 12 | ✓ | ✓ | | | | | | |
| | 13 | ✓ | ✓ | | | | | | |
| | 14 | ✓ | ✓ | | | | | | |
| | 15 | ✓ | ✓ | | | | | | |
| | 16 | ✓ | ✓ | | | | | | |
| | 17 | ✓ | ✓ | | | | | | |
| | 18 | ✓ | ✓ | | | | | | |
| | 19 | | ÷ | | | | | | |
| | 20 | | ÷ | | | | | | |
| | 21 | | ÷ | | | | | | |
| | 22 | | ÷ | | | | | | |
| | 23 | | ÷ | | | | | | |
| | 24 | | ÷ | | | | | | |
| | 25 | | ÷ | | | | | | |
| | 26 | | ÷ | | | | | | |
| | 27 | | ÷ | | | | | | |
| | 28 | | ÷ | | | | | | |
| | 29 | | ÷ | | | | | | |
| | 30 | | ÷ | | | | | | |
| | 31 | | ÷ | | | | | | |
| | 32 | | ÷ | | | | | | |
| | 33 | | ÷ | | | | | | |
| | 34 | | ÷ | | | | | | |
| | 35 | | ÷ | | | | | | |
| | 36 | | ÷ | | | | | | |

U.S. Patent and Trademark Office                                    Part of Paper No. : 20080623

NEONODE0000262

| | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| **Index of Claims** | 10315250 | GOERTZ, MAGNUS |
| | Examiner | Art Unit |
| | Ryan F Pitaro | 2174 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| ☐ Claims renumbered in the same order as presented by applicant | | ☐ CPA | ☐ T.D. | ☐ R.1.47 |
|---|---|---|---|---|

| CLAIM | | DATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | 06/23/2008 | | | | | | |
| | 37 | | ÷ | | | | | | |
| | 38 | | ÷ | | | | | | |
| | 39 | | ÷ | | | | | | |
| | 40 | | ÷ | | | | | | |
| | 41 | | ÷ | | | | | | |
| | 42 | | ÷ | | | | | | |
| | 43 | | ÷ | | | | | | |
| | 44 | | ÷ | | | | | | |
| | 45 | | ÷ | | | | | | |
| | 46 | | ÷ | | | | | | |
| | 47 | | ÷ | | | | | | |
| | 48 | | | | | | | | |
| | 49 | | | | | | | | |
| | 50 | | | | | | | | |
| | 51 | | | | | | | | |
| | 52 | | | | | | | | |
| | 53 | | | | | | | | |
| | 54 | | | | | | | | |
| | 55 | | | | | | | | |
| | 56 | | | | | | | | |
| | 57 | | | | | | | | |
| | 58 | | | | | | | | |
| | 59 | | | | | | | | |
| | 60 | | | | | | | | |
| | 61 | | | | | | | | |
| | 62 | | | | | | | | |
| | 63 | | | | | | | | |
| | 64 | | | | | | | | |
| | 65 | | | | | | | | |

NEONODE0000263

Jul 24 2008 1:10PM    GTT    +972 9 9541975    P.1

2008 Maj 13 12:39    HP LASERJET-FAX    si3

RECEIVED
CENTRAL FAX CENTER

JUL 2 4 2008

PTO/SB/80 (01-06)
Approved for use through 12/31/2008. OMB 0651-0035
U.S. Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| **REVOCATION OF POWER OF ATTORNEY WITH NEW POWER OF ATTORNEY AND CHANGE OF CORRESPONDENCE ADDRESS** | Application Number | 10 /315, 250 |
| | Filing Date | 12 -10 -2002 |
| | First Named Inventor | Magnus Goetz |
| | Art Unit | 2174 |
| | Examiner Name | ATABO, Ryan F |
| | Attorney Docket Number | |

I hereby revoke all previous powers of attorney given in the above-identified application.

☐ A Power of Attorney is submitted herewith.

OR

☒ I hereby appoint the practitioners associated with the Customer Number:    60956

☒ Please change the correspondence address for the above-identified application to:

☒ The address associated with Customer Number:    60956

OR

☐ Firm or Individual Name

| Address | |
| City | | State | | Zip | |
| Country | |
| Telephone | | Email | |

I am the:

☐ Applicant/Inventor.

☒ Assignee of record of the entire interest. See 37 CFR 3.71. Statement under 37 CFR 3.73(b) is enclosed. (Form PTO/SB/96)

**SIGNATURE of Applicant or Assignee of Record**

| Signature | |
| Name | MIKAEL HAGMAN |
| Date | 13 MAY 2008 | Telephone | +46 8 586 22 810 |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below*.

☐ *Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.36. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

NEONODE0000264

Jul 24 2008 1:10PM    GTT                                    +972 9 9541975              P.2

2008 Maj 13 12:39    HP LASERJET-FAX                                                    si4

RECEIVED
CENTRAL FAX CENTER

JUL 2 4 2008

PTO/SB/96 (04-08)
Approved for use through 09/31/2008. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## STATEMENT UNDER 37 CFR 3.73(b)

Applicant/Patent Owner: _Civcitz, Magnus_

Application No./Patent No.: _10/315,250_   Filed/Issue Date: _12-10-2002_

Entitled: _User Interface_

_NEONODE AB_ , a _CORPORATION)_
(Name of Assignee)          (Type of Assignee, e.g., corporation, partnership, university, government agency, etc.)

states that it is:

1. ☒ the assignee of the entire right, title, and interest; or

2. ☐ an assignee of less than the entire right, title and interest
   (The extent (by percentage) of its ownership interest is _____ %)

in the patent application/patent identified above by virtue of either:

A. ☐ An assignment from the inventor(s) of the patent application/patent identified above. The assignment was recorded in the United States Patent and Trademark Office at Reel _____, Frame _____, or for which a copy thereof is attached.

OR

B. ☒ A chain of title from the inventor(s), of the patent application/patent identified above, to the current assignee as follows:

   1. From: _Crcxrtz, Magnus_ To: _Neonode Sweden AB_
      The document was recorded in the United States Patent and Trademark Office at Reel _018163_, Frame _0611_, or for which a copy thereof is attached.

   2. From: _Neonode Sweden AB_ To: _Neonode AB_
      The document was recorded in the United States Patent and Trademark Office at Reel _018137_, Frame _044X_, or for which a copy thereof is attached.

   3. From: _____ To: _____
      The document was recorded in the United States Patent and Trademark Office at Reel _____, Frame _____, or for which a copy thereof is attached.

   ☐ Additional documents in the chain of title are listed on a supplemental sheet.

☒ As required by 37 CFR 3.73(b)(1)(i), the documentary evidence of the chain of title from the original owner to the assignee was, or concurrently is being, submitted for recordation pursuant to 37 CFR 3.11.

   (NOTE: A separate copy (i.e., a true copy of the original assignment document(s)) must be submitted to Assignment Division in accordance with 37 CFR Part 3, to record the assignment in the records of the USPTO. See MPEP 302.08)

The undersigned (whose title is supplied below) is authorized to act on behalf of the assignee.

_____              _13 MAY 2008_
Signature                              Date

_MIKAEL HAGMAN_                        _+46 8 586 22.81P_
Printed or Typed Name                  Telephone Number

_CEO_
Title

This collection of information is required by 37 CFR 3.73(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

NEONODE0000265

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | 3682-32 |

**CONFIRMATION NO. 1226**

23117
NIXON & VANDERHYE, PC
901 NORTH GLEBE ROAD, 11TH FLOOR
ARLINGTON, VA 22203

**POA ACCEPTANCE LETTER**

*OC000000029481481*

Date Mailed: 08/05/2008

## NOTICE OF ACCEPTANCE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 03/13/2008.

The Power of Attorney in this application is accepted. Correspondence in this application will be mailed to the above address as provided by 37 CFR 1.33.

/jelliott/

Office of Data Management, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

page 1 of 1

NEONODE0000266

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | 3682-32 |

**CONFIRMATION NO. 1226**

23117
NIXON & VANDERHYE, PC
901 NORTH GLEBE ROAD, 11TH FLOOR
ARLINGTON, VA 22203

**POWER OF ATTORNEY NOTICE**

*OC000000029481473*

Date Mailed: 08/05/2008

## NOTICE REGARDING CHANGE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 03/13/2008.

• The Power of Attorney to you in this application has been revoked by the assignee who has intervened as provided by 37 CFR 3.71. Future correspondence will be mailed to the new address of record(37 CFR 1.33).

/jelliott/

Office of Data Management, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

page 1 of 1

NEONODE0000267

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | 3682-32 |

**CONFIRMATION NO. 1226**

23117
NIXON & VANDERHYE, PC
901 NORTH GLEBE ROAD, 11TH FLOOR
ARLINGTON, VA 22203

**POWER OF ATTORNEY NOTICE**

*OC000000031414766*

Date Mailed: 08/06/2008

## NOTICE REGARDING CHANGE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 07/24/2008.

• The Power of Attorney to you in this application has been revoked by the assignee who has intervened as provided by 37 CFR 3.71. Future correspondence will be mailed to the new address of record(37 CFR 1.33).

/nhtang/

---

Office of Data Management, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

NEONODE0000268

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | 3682-32 |

**CONFIRMATION NO. 1226**

60956
Professional Patent Solutions
P.O. BOX 654
HERZELIYA PITUACH, 46105
ISRAEL

**POA ACCEPTANCE LETTER**

*OC000000031414774*

Date Mailed: 08/06/2008

## NOTICE OF ACCEPTANCE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 07/24/2008.

The Power of Attorney in this application is accepted. Correspondence in this application will be mailed to the above address as provided by 37 CFR 1.33.

/nhtang/

Office of Data Management, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

page 1 of 1

NEONODE0000269

3.SEP.2008    8:43    MARC BERGER 972 8 9315208                    NO.964    P.4/39

**RECEIVED**
**CENTRAL FAX CENTER**

SEP 0 3 2008

PTO/SB/81 (07-08)
Approved for use through 12/31/2008. OMB 0851-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| POWER OF ATTORNEY OR REVOCATION OF POWER OF ATTORNEY WITH A NEW POWER OF ATTORNEY AND CHANGE OF CORRESPONDENCE ADDRESS | Application Number | 10/315,250 |
| | Filing Date | December 10, 2002 |
| | First Named Inventor | Magnus Goertz |
| | Title | USER INTERFACE |
| | Art Unit | 2174 |
| | Examiner Name | Pitaro, Ryan F. |
| | Attorney Docket Number | NEONODE.P004 |

I hereby revoke all previous powers of attorney given in the above-identified application.

☐ A Power of Attorney is submitted herewith.
OR

☒ I hereby appoint Practitioner(s) associated with the following Customer Number as my/our attorney(s) or agent(s) to prosecute the application identified above, and to transact all business in the United States Patent and Trademark Office connected therewith:

| | 75660 |

OR

☐ I hereby appoint Practitioner(s) named below as my/our attorney(s) or agent(s) to prosecute the application identified above, and to transact all business in the United States Patent and Trademark Office connected therewith:

| Practitioner(s) Name | Registration Number |
|---|---|
| | |
| | |
| | |
| | |

Please recognize or change the correspondence address for the above-identified application to:

☒ The address associated with the above-mentioned Customer Number.
OR

☐ The address associated with Customer Number:
OR

| ☐ Firm or Individual Name | |
|---|---|
| Address | |
| City | | State | | Zip | |
| Country | |
| Telephone | | Email | |

I am the:

☐ Applicant/Inventor.
OR

☒ Assignee of record of the entire interest. See 37 CFR 3.71.
Statement under 37 CFR 3.73(b) (Form PTO/SB/96) submitted herewith or filed on _____

**SIGNATURE of Applicant or Assignee of Record**

| Signature | | Date | 28 August 2008 |
|---|---|---|---|
| Name | Per Bystedt | Telephone | + 46 8 678 1850 |
| Title and Company | CEO, Neonode | | |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below.

☐ *Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.31, 1.32 and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

PAGE 4/39 * RCVD AT 9/3/2008 3:08:58 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/10 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):05-46

NEONODE0000270

**RECEIVED**
CENTRAL FAX CENTER

SEP 03 2008

PTO/SB/96 (08-08)
Approved for use through 08/31/2008. OMB 0551-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## STATEMENT UNDER 37 CFR 3.73(b)

Applicant/Patent Owner: _Neonode AB_

Application No./Patent No.: _10/315,250_    Filed/Issue Date: _December 10, 2002_

Entitled:    USER INTERFACE

_Neonode AB_ , a _corporation_
(Name of Assignee)    (Type of Assignee, e.g., corporation, partnership, university, government agency, etc.)

states that it is:

1. [✓] the assignee of the entire right, title, and interest; or

2. [ ] an assignee of less than the entire right, title and interest
   (The extent (by percentage) of its ownership interest is _____ %)

in the patent application/patent identified above by virtue of either:

A. [ ] An assignment from the inventor(s) of the patent application/patent identified above. The assignment was recorded in the United States Patent and Trademark Office at Reel _____, Frame _____, or for which a copy thereof is attached.

OR

B. [✓] A chain of title from the inventor(s), of the patent application/patent identified above, to the current assignee as follows:

1. From: _Magnus Goertz_    To: _Neonode Sweden AB_
   The document was recorded in the United States Patent and Trademark Office at
   Reel _018163_ , Frame _0611_ , or for which a copy thereof is attached.

2. From: _Neonode Sweden AB_    To: _Neonode AB_
   The document was recorded in the United States Patent and Trademark Office at
   Reel _018137_ , Frame _0448_ , or for which a copy thereof is attached.

3. From: _____    To: _____
   The document was recorded in the United States Patent and Trademark Office at
   Reel _____ , Frame _____ , or for which a copy thereof is attached.

[ ] Additional documents in the chain of title are listed on a supplemental sheet.

[✓] As required by 37 CFR 3.73(b)(1)(i), the documentary evidence of the chain of title from the original owner to the assignee was, or concurrently is being, submitted for recordation pursuant to 37 CFR 3.11.

[NOTE: A separate copy (i.e., a true copy of the original assignment document(s)) must be submitted to Assignment Division in accordance with 37 CFR Part 3, to record the assignment in the records of the USPTO. See MPEP 302.08]

The undersigned (whose title is supplied below) is authorized to act on behalf of the assignee.

_____    _28 August 2008_
Signature    Date

_Per Bystedt_    _+46 8 678 1850_
Printed or Typed Name    Telephone Number

_CEO, Neonode_
Title

This collection of information is required by 37 CFR 3.73(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA  22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

NEONODE0000271

3. SEP.2008    8:43    MARC BERGER 972 8 9315208              NO.964    P.1/39



**RECEIVED**
**CENTRAL FAX CENTER**

SEP 03 2008

29 Aharoni Street, Suite #13 • Rechovot 76282 • Israel • Phone: 972-8-9315207 • Fax: 972-8-9315208

## FACSIMILE COVER LETTER

**Note:** This facsimile contains PRIVILEGED and CONFIDENTIAL information intended only for use of the specific individual or entity named below. If you or your employer is not the intended recipient of this facsimile or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any unauthorized dissemination or copying of this facsimile or the information contained in it is strictly prohibited. If you have received this facsimile in error, please immediately notify the person named below at once by telephone and return the original facsimile to us at the address below. Thank you.

SENDER'S NAME:        Marc Berger
                     **Soquel Group LLC**
                     29 Aharoni Street, Suite #13
                     Rehovot 76282
                     ISRAEL

TRANSMISSION DATE:   September 3, 2008

PLEASE DELIVER TO:

        Recipient:         Examiner Ryan F. Pitaro, AU 2174
        Firm:              **United States Patent & Trademark Office**
        Fax No.:           571-273-8300
        City/State/Country: Alexandria, VA  USA

COMMENTS:
Interview agenda for US Serial No. 10/315,250

WE ARE TRANSMITTING 39 PAGE(S) (including this cover letter) from:

FAX NO. 011-972-8-9315208

If you do not receive all of the pages or if any pages received are illegible, please contact our office.

www.soquelgroup.com

NEONODE0000272

3.SEP.2008   8:43     MARC BERGER 972 8 9315208              NO.964    P.2/39



**RECEIVED**
**CENTRAL FAX CENTER**

SEP 03 2008

29 Aharoni Street, Suite #13 • Rechovot 76282 • Israel • Phone: 972-8-9315207 • Fax: 972-8-9315208

September 3, 2008

<u>BY FACSIMILE</u>

Examiner Ryan F. Pitaro
**United States Patent & Trademark Office**
Alexandria, VA
USA

Dear Examiner Pitaro,

**RE:** Interview agenda for US Serial No. 10/315,250
        USER INTERFACE FOR MOBILE HANDHELD COMPUTER UNIT
        Filed on December 10, 2002
        <u>In the name of Neonode AB</u>

This letter regards the agenda for our telephone interview, which is scheduled for Thursday, September 4, 2008 at 10:30 AM.

The above referenced application was recently transferred to me, and I am attaching the Power of Attorney I received and mailed to the USPTO.

For the interview, I would like to discuss the attached draft proposed amendment. Specifically, I would like to discuss the touch-and-glide thumb movement, variously referred to as "swiping", "rubbing", "gliding" and "sliding". This movement is described in claim 1 as "an object touching a location in the touch sensitive area at which the representation of the function is displayed and then gliding along the touch sensitive area away from the location."

I understand that you have seen a demonstration of Neonode's touch-sensitive user interface. I believe that the touch-and-glide movement of the claimed invention is different than the input movements disclosed in the cited prior art of Carlson, Milic-Frayling, Conrad, Kopitzke, Wynn, Strietelmeier and Chew.

www.soquelgroup.com

PAGE 2/39 * RCVD AT 9/3/2008 3:08:58 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/10 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):05-46

NEONODE0000273

3.SEP.2008   8:43      MARC BERGER 972 8 9315208                    NO.964    P.3/39

Interview Agenda for US Serial No. 10/315,250                    September 3, 2008

The tables provided in the draft response summarize some of the distinguishing features of the touch-and-glide movement. In this regard, I would like to point out the following distinctions.

a.  The touch-and-glide movement activates the function displayed at the touch point.

b.  At any given time, the touch-and-glide movement may be used for activating any one of a plurality of different functions.

c.  The touch-and-glide movement may also be used for scrolling up or down through a list.

d.  Processing the touch-and-glide movement requires that the user interface recognize a glide and identify the function displayed at the starting location of the glide.

e.  Processing the touch-and-glide movement requires that the user interface recognize a glide in any of a plurality of directions.

f.  The same hand may be used to hold the device and perform the touch-and-glide thumb movement.

This is what I would like to discuss during our telephone interview.

I am also attaching a clean version of the proposed amended claims, without markings, for ease of reference.

I appreciate your courtesy of granting the interview, and I look forward to speaking with you.

Sincerely yours,

Marc A. Berger
U.S. Reg. No. 44,029

Encl.  Power of Attorney (2 pages)
       Draft proposed amendment – not to be entered (29 pages)
       Clean version of amended claims without markings (5 pages)

2

NEONODE0000274

3.SEP.2008   8:44     MARC BERGER 972 8 9315208                     NO.964¨¨  P.6/39

**RECEIVED**
**CENTRAL FAX CENTER**

Attorney's Docket No.: NEONODE.P004      *PATENT*     SEP 0 3 2008

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In Re Patent Application of: | ) |
| Magnus Goertz | ) Examiner: Ryan F. Pitaro |
| | ) |
| Application No: 10/315,250 | ) Art Unit:   2174 |
| | ) |
| Filed:   December 10, 2002 | ) |
| | ) |
| For:   USER INTERFACE FOR | ) |
| MOBILE HANDHELD | ) |
| COMPUTER UNIT | ) |

Mail Stop AMENDMENT
Commissioner for Patents
P. O. Box 1450
Alexandria, VA   22313-1450

### DRAFT PROPOSED AMENDMENT --

### NOT TO BE ENTERED

Sir:

In response to the Office Action dated July 11, 2008, applicant respectfully requests that the above-identified application be amended as follows:

Atty. Docket No. NEONODE.P004      -1-

PAGE 6/39 * RCVD AT 9/3/2008 3:08:58 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/10 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):05-46

NEONODE0000275

IN THE DESCRIPTION:

        Please amend the specification as follows.

Page 1, ninth full paragraph:

        Since the users have gotten used to small handheld units, it is hard to move towards larger units.  This has led to foldable keyboards, different kinds [[if]] of joy sticks and different kinds of touch sensitive displays and pads intended to help in providing a user interface that is suitable for small handheld compute computer units.

Page 2, first full paragraph:

        It is a problem to provide a user-friendly interface that is adapted to handle a large amount of information and different kinds of traditional computer-related applications on a small handheld computer unit.

Page 3, sixth full paragraph:

        In order to provide a task and file management in a user interface for a handheld mobile computer, the present invention teaches that, if the third function is activated, the display area is adapted to display a list with a library of available applications and files on the computer [[unit]] unit.  A selection of an application will start the application, and a selection of a file will open the file in an application intended for the file.

Page 7, fifth full paragraph:

        It should [[b]] be understood that all lists in the computer unit, such as a list of contact information in an address book, a

Atty. Docket No. NEONODE.P004          -2-

NEONODE0000276

list of e-mail messages in a mailbox, or a telephone log, can be managed in the above described manner.

Page 7, sixth full paragraph:

The list 231 can be adapted to present only files or only applications. In this case, the top area of the list 231 can present a field 233 through which the content [[if]] of the list 231 can be altered. If the list only presents files, then the field 233 can display a representation of a task manager and a selection of the field 233 will cause the list 231 to alter to present only applications, and if the list 231 only presents applications, then the field 233 displays a representation of a file manager and a selection of the field 233 will cause the list 231 to alter and present only files.

Page 7, eighth full paragraph:

Figure 9 shows that if the number of applications and/or files in the list 231 exceeds the number of applications and/or files that can be presented on the display area 3, and if the object 4 is moved to the top or bottom position of the display area, then lifted, replaced on the display area, and then again moved to the top or bottom of the display area, then the content of the display area will be replaced one whole page, meaning that if the object 4 is positioned N at the bottom 3b of the display area 3, then lifted, replaced on the display area 3, and then again moved M to the bottom 3b of the display area 3, then the content 31 of the display area 3 will be replaced P by the following applications and/or files 32 in the list 231. In the same way, but not shown in the figure, if the object is ~~position~~ positioned at the top of the display area, then lifted, replaced on the display area 3, and then again moved to the top of the

Atty. Docket No. NEONODE.P004        -3-

NEONODE0000277

3.SEP.2008    8:44    MARC BERGER 972 8 9315208    NO.964.    P.9/39

display area, the content of the display area will be replaced by the preceding applications and/or files in the list.

Publication No. US 2004/0109013 A1, paragraph [0069]:

As shown in figure 13, the present invention relates to a user interface for a hand held mobile unit that preferably can be manageable with one hand.  Hence the present invention teaches that the user interface is adapted to a touch sensitive area [[I]] $\underline{1}$ with a size that is in the order of 2-3 inches, meaning the diagonal distance W between two corners of the touch sensitive area 1.

Atty. Docket No. NEONODE.P004        -4-

PAGE 9/39 * RCVD AT 9/3/2008 3:08:58 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/10 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):05-46

NEONODE0000278

3.SEP.2008    8:44    MARC BERGER 972 8 9315208                NO.964    P.10/39

**RECEIVED**
**CENTRAL FAX CENTER**

SEP 03 2008

IN THE CLAIMS:

Please substitute the following claims for the pending claims with the same number:

**1.** (currently amended)    A computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

a touch sensitive area ~~that is simultaneously divided into a menu area and a display area, the mobile handheld computer unit being adapted to run several applications simultaneously, and to present an active application on top of any other application on said display area, characterised in, that:~~

~~said menu area simultaneously presents~~ in which representations of a ~~first function that is a general application dependent function, a second function that is a keyboard function, and a third function that is a task and file manager~~ plurality of functions are displayed, and

each function of said ~~first, second, and third functions simultaneously represented in said menu area~~ plurality of functions being activated by ~~the single step of a blunt~~ an object touching a location in the touch sensitive area at which the representation of the function is displayed and then gliding along the touch sensitive area away from the location ~~moving in a direction from a starting point that is the representation of the corresponding one of said first, second, and third functions in said menu area to said display area being detected by said touch sensitive area, thereby allowing low precision navigation of the user~~

Atty. Docket No. NEONODE.P004        -5-

NEONODE0000279

3.SEP.2008    8:44    MARC BERGER 972 8 9315208                    NO.964    P.11/39

interface using the blunt object, so that the user interface can be operated by one hand, where the blunt object is a finger.

2. (currently amended)        The computer readable medium of claim 1, wherein one function from the plurality of functions, when the mobile handheld computer unit runs an operating system, the user interface is characterised in, that, if said first function is activated, causes the user interface is adapted to display icons representing different services or settings depending on the current for a currently active application, that one of said icons always represents a "help" service, regardless of application, and that, if no application is current active on the mobile handheld computer unit, said icons are adapted to represent services or settings of the operating system of the mobile handheld computer unit.

3. (currently amended)        The computer readable medium of claim 2, wherein the user interface is characterised in, that a selection of a preferred service or setting is done by tapping on a corresponding display icon corresponding to the preferred service or setting.

4. (currently amended)        The computer readable medium of claim 1, wherein the user interface is characterised in,

        that, if said second one function from the plurality of functions, when [[is]] activated, said display area is adapted causes the user interface to display a keyboard and a text field,

        that, if a text passage in said active application is highlighted, said text passage is displayed in said text field for editing through said keyboard and that said highlighted test passage is replaced by said edited text passage when said second function is deactivated, and

Atty. Docket No. NEONODE.P004        -6-

PAGE 11/39 * RCVD AT 9/3/2008 3:08:58 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/10 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):05-46

NEONODE0000280

~~that, if no text passage in said active application is highlighted, said text field is available for inputting and editing of text through said keyboard.~~

**5.** (currently amended)    The computer readable medium of claim **4,** wherein ~~the user interface is characterised in, that if no text passage in said active application is highlighted,~~ said text field is used for inputting and editing of text through said keyboard~~, then~~

~~said first function can be activated, or~~

~~said second function can be closed, in which a choice of saving or deleting said inputted text is given, where the choice of saving said inputted text results in an activation of said first function, in which said first function will present services or settings available for said inputted text.~~

**6.** (currently amended)    The computer readable medium of claim **1,** wherein ~~the user interface is characterised in, that, if said third~~ <u>one</u> function <u>from the plurality of functions, when</u> [[is]] activated, ~~said display area is adapted~~ <u>causes the user interface</u> to display a list with a library of available applications and files on the mobile handheld computer unit~~, that a selection of an application will start said application, and that a selection of a file will open said file in an application intended for said file.~~

**7.** (currently amended)    The computer readable medium of claim **6,** wherein the user interface is characterised in, that a selection of an application or file is done by ~~moving~~ <u>gliding</u> the ~~blunt~~ object <u>along said touch sensitive area</u> so that a representation of a desired one of said application or file is highlighted, ~~removing~~ <u>raising</u> said object from said

Atty. Docket No. NEONODE.P004        -7-

NEONODE0000281

touch sensitive area, and then tapping on said touch sensitive area, ~~and that said desired one of said application or file is highlighted by placing some kind of marking on said representation of said application or file~~.

**8.** (currently amended)        The computer readable medium of claim **7,** wherein the user interface is characterised in, that <u>at any given time</u> said list ~~is adapted to present~~ <u>presents</u> only ~~said~~ files or only ~~said~~ applications, <u>and</u> that ~~a top~~ <u>an</u> area of said list presents a field through which ~~the content of~~ said list can be ~~altered~~ <u>changed from presenting files to presenting applications, or from presenting applications to presenting files</u>~~, that, if said list only presents files, said field displays a representation of a task manager and a selection of said field will cause said list to alter to present only applications, and that, if said list only presents applications, said field displays a representation of a file manager and a selection of said field will cause said list to alter and present only files~~.

**9.** (currently amended)        The computer readable medium of claim **7,** wherein the user interface is characterised in, that, [[a]] navigation in said list is performed by ~~moving~~ <u>gliding</u> the ~~blunt~~ object <u>along the touch sensitive area</u> in a direction towards the top of said list or towards the bottom of said list~~, that the movement of the blunt object will cause said marking to move in the same direction, and that the speed of movement of said marking is lower than the speed of movement of the blunt object~~.

**10.** (currently amended)        The computer readable medium of claim **9,** wherein the user interface is characterised in, that, if the number of applications ~~and/~~or files in said list exceeds the number of ~~application~~

Atty. Docket No. NEONODE.P004        -8-

NEONODE0000282

applications [[and]] or files that can be presented on said ~~display~~ touch sensitive area as content, and if the ~~blunt~~ object is ~~moved~~ glided along said touch sensitive area to the top or bottom position of said ~~display~~ touch sensitive area, then ~~lifted~~ raised, replaced on said ~~display~~ touch sensitive area, and again ~~moved~~ glided along said touch sensitive area to the top or bottom of said ~~display~~ touch sensitive area, the content of said ~~display~~ touch sensitive area will be replaced one whole page~~, meaning that if the blunt object is positioned at the bottom of said display area, replaced on said display area, and then again moved to the bottom of said display area, the content of said display area will be replaced by the following applications and/or files in said list, and if the blunt object is positioned at the top of said display area, then lifted, replaced on said display area, and then again moved to the top of said display area, the content of said display area will be replaced by the preceding applications and/or files in the list~~.

**11.** (currently amended)    The computer readable medium of claim **10**, wherein the user interface is characterised in, that if the ~~blunt~~ object is ~~removed~~ raised from any first position on said ~~display~~ touch sensitive area and then replaced on any second position on said ~~display~~ touch sensitive area, said navigation can be continued from said second position.

**12.** (currently amended)    The computer readable medium of claim **1**, wherein the user interface is characterised in, that an active application, function, service or setting is moved on one step by ~~moving~~ gliding the ~~blunt~~ object along the touch sensitive area from ~~the~~ left ~~of said display area~~ to the right ~~of said display area~~, and that the active application,

NEONODE0000283

3.SEP.2008    8:45    MARC BERGER 972 8 9315208    NO.964    P.15/39

function, service or setting is closed or backed one step by ~~moving~~ gliding the ~~blunt~~ object along the touch sensitive area from ~~the~~ right ~~of said display area~~ to ~~the~~ left ~~of said display area~~.

**13.** (currently amended)    The computer readable medium of claim **1**, wherein the user interface is characterised in, that said ~~menu area is positioned~~ representations of said plurality of functions are located at the bottom of said touch sensitive area~~, that said representation of said first function is positioned at the left side of said menu area, that said representation of said second function is positioned at the middle of said menu area, and that said representation of said third function is positioned at the right side of said menu area~~.

**14.** (currently amended)    The computer readable medium of claim **1**, wherein the ~~user interface is characterised in, that said user interface is adapted to a~~ touch sensitive area ~~with a size that~~ is 2-3 inches in diagonal dimension~~, and that said user interface is adapted to be operated by one hand when the mobile handheld computer unit is held in the one hand, wherein said blunt object is a fleshy part of the thumb of the one hand~~.

**15.** (currently amended)    An enclosure adapted to cover the mobile handheld computer unit according to Claim **1**, characterised in, that said enclosure is provided with an opening for said ~~display~~ touch sensitive area~~, and that a representation of said menu area is printed on top of said enclosure~~.

**16.** (previously presented)    The enclosure according to Claim **15**, characterised in, that said enclosure is removable and exchangeable.

Atty. Docket No. NEONODE.P004        -10-

PAGE 15/39 * RCVD AT 9/3/2008 3:08:58 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/10 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):05-46

NEONODE0000284

**17.** (previously presented)    A computer readable medium, with a computer program product stored therein, characterised in, that said computer program product comprises computer readable code, which, when read by a computer, will make it possible for said computer to present a user interface according to Claim **1.**

**18.** (original)    A computer readable medium according to Claim **17,** characterised in, that said computer program product is adapted to function as a shell upon an operations system.

**19.** (withdrawn)  An apparatus, comprising:

a computing device configured to provide a plurality of features and/or services to a user, said computing device including a user interface that comprises:

a touchscreen for displaying to the user, individually at differing times, a plurality of display screens corresponding to said plurality of features and/or services and for allowing the user to navigate among said various differing features and/or services and among said plurality of display screens; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to navigate among said plurality of features and/or services and among said plurality of display screens, said user interface software configured to:

when said touchscreen is displaying a first display screen of said plurality of display screens, cause said computing device to display a second display screen of said plurality of display screens in response to a first sweeping movement of the object along said touchscreen in a first direction, said computing device displaying said

Atty. Docket No. NEONODE.P004        -11-

NEONODE0000285

second display screen after the object has traversed a first predetermined extent of said touchscreen along said first direction; and

when said touchscreen is displaying said second display screen, cause said computing device to display said first display screen in response to a second sweeping movement of the object along said touchscreen in a second direction opposite said first direction, said computing device displaying said first display screen only after the object has traversed a second predetermined extent of said touchscreen along said second direction.

20. (withdrawn) An apparatus according to claim 19, wherein said touchscreen has a left edge and a right edge when said touchscreen is properly oriented for viewing by the user and said first direction proceeds from a location at or proximate said left edge toward said right edge and said second direction proceeds from a location at or proximate said right edge toward said left edge.

21. (withdrawn) An apparatus according to claim 20, wherein said touchscreen has a width extending from said left edge to said right edge and each of said first and second extents is substantially equal to said width.

22. (withdrawn) An apparatus according to claim 21, wherein said touchscreen has a diagonal dimension of two inches to three inches.

23. (withdrawn) An apparatus according to claim 19, wherein said computing device is sized to be cradled in a hand of an adult human user and so that, when so cradled, all points on said touchscreen are touchable

Atty. Docket No. NEONODE.P004          -12-

NEONODE0000286

3.SEP.2008    8:45      MARC BERGER 972 8 9315208                    NO.964    P.18/39

by the thumb of the adult human user, the object being the thumb of the hand.

**24.** (withdrawn) An apparatus according to claim **19**, wherein each of the first and second sweeping movements does not drag any graphical feature displayed on said touchscreen during that one of the first and second sweeping movements.

**25.** (withdrawn) An apparatus, comprising:

a computing device configured to provide first and second menu-area functions to a user, said first menu-area function having a first-function display screen and said second menu-area function having a second-function display screen differing from said first-function display screen, said computing device including a user interface that comprises:

a touchscreen simultaneously divided into a menu region and a display region, said menu region containing first and second representations corresponding respectively to said first and second menu-area functions, said display region for displaying to the user at differing times said first-function and second-function display screens; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to select at differing times each of said first and second menu-area functions, said user interface software configured to:

display said first-function display screen in response to a first sweeping movement of the object along said touchscreen, the first sweeping movement starting at said first

Atty. Docket No. NEONODE.P004        -13-

PAGE 18/39 * RCVD AT 9/3/2008 3:08:58 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/10 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):05-46

NEONODE0000287

3.SEP.2008   8:45     MARC BERGER 972 8 9315208               NO.964   P.19/39

representation in said menu region and proceeding into said display region; and

display said second-function display screen in response to a second sweeping movement of the object along said touchscreen, the second sweeping movement starting at said second representation in said menu region and proceeding into said display region.

**26.** (withdrawn)  An apparatus according to claim **25**, wherein:

said touchscreen has a first edge and a second edge spaced from said first edge;

said first and second representations are each located proximate said first edge and spaced from one another along said first edge; and

the first and second sweeping movements each proceed in a direction toward said second edge.

**27.** (withdrawn)  An apparatus according to claim **25**, wherein said first-function display screen contains a plurality of icons corresponding respectively to a plurality of applications, said user interface software configured to activate any one of said plurality of applications in response to the user tapping the object on said touchscreen at a corresponding one of said plurality of icons.

**28.** (withdrawn) An apparatus according to claim **27**, wherein said second-function display screen contains a set of application functions, said set varying as a function of which one of said plurality of applications is active when the user makes the second movement.

PAGE 19/39 * RCVD AT 9/3/2008 3:08:58 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/10 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):05-46

NEONODE0000288

**29.** (withdrawn) An apparatus according to claim **27**, wherein a particular application of said plurality of applications has a plurality of application screen displays, said user interface software configured so that when said particular application is active, the user forwardly steps through said plurality of application screen displays by sweeping the object across said touchscreen in a first direction and reversely steps through said plurality of application screen displays by sweeping the object across said touchscreen in a second direction opposite said first direction.

**30.** (withdrawn) An apparatus according to claim **25**, wherein said first display screen contains a soft-interface telephony keypad.

**31.** (withdrawn) An apparatus, comprising:

a computing device configured to run a software application configured to display a plurality of predetermined display screens, said computing device including a user interface that comprises:

a touchscreen for displaying to the user, individually at differing times, said plurality of predetermined display screens and for allowing the user to navigate among said plurality of predetermined display screens; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to navigate among said plurality of predetermined display screens, said user interface software configured to:

activate said software application in response to a particular interaction of the object with said touchscreen;

Atty. Docket No. NEONODE.P004        -15-

NEONODE0000289

forwardly step in series through ones of said plurality of predetermined display screens in response to corresponding respective individual instances of a first sweeping movement of the object along said touchscreen in a first direction; and

reversely step in series through ones of said plurality of predetermined display screens in response to corresponding respective individual instances of a second sweeping movement of the object along said touchscreen in a second direction different from said first direction.

32. (withdrawn) An apparatus according to claim 31, wherein said particular interaction of the object with said touchscreen to activate said software application is a third sweeping movement of the object along said touchscreen in a third direction different from each of said first and second directions.

33. (withdrawn) An apparatus according to claim 32, wherein said first and second directions are opposite one another and said third direction is perpendicular to each of said first and second directions.

34. (withdrawn) An apparatus, comprising:
a computing device configured to run software for providing to a user a plurality of services and/or functions, said computing device including:
a touchscreen for display to the user a graphical user interface and for allowing the user to navigate among said plurality of services and/or functions; and

Atty. Docket No. NEONODE.P004          -16-

NEONODE0000290

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to navigate among said plurality of services and/or functions, said user interface software configured to:

present, in response to a sweeping movement of the object across said touchscreen, a display screen containing a plurality of display icons corresponding respectively to ones of said plurality of services and/or functions, the sweeping movement being spatially uncorrelated with information displayed on said touchscreen; and

when said touchscreen is displaying said plurality of display icons, launch one of said plurality of services and/or functions in response to the user tapping the object on said touchscreen at a location where said touchscreen displays the corresponding one of said plurality of display icons.

**35.** (withdrawn) An apparatus according to claim **34,** wherein said computing device contains a software application and said user interface is configured to present said plurality of display icons only if said software application is active during the sweeping movement of the object.

**36.** (withdrawn) An apparatus according to claim **35,** wherein when said software application is active during the sweeping of the object, said display icons correspond to services and/or functions specific to said software application.

**37.** (withdrawn) An apparatus, comprising:

Atty. Docket No. NEONODE.P004         -17-

NEONODE0000291

a computing device containing software for providing to a user a plurality of services and/or functions, said computing device including:

a touchscreen for displaying to the user, individually at differing times, ones of various display screens associated with said plurality of services and/or functions and for allowing the user to navigate among said plurality of display screens so as to provide the user with access to said plurality of services and/or functions and for allowing the user to control functioning of ones of said plurality of services and/or functions; and

user interface software responsive to a set of movements of an object with respect to said touchscreen so as to allow the user to navigate among said plurality of display screens and to control functioning of ones of said plurality of services and/or functions, said set of movements including a plurality of sweeping movements having differing directionalities along said touchscreen, wherein said plurality of sweeping movements being spatially uncorrelated with information displayed on said touchscreen, said user interface software being configured to distinguish the plurality of sweeping movements from one another as a function of the differing directionalities so as to provide differing responses as a function of said differing directionalities.

38. (withdrawn) An apparatus according to claim 37, wherein two sweeping movements of the plurality of sweeping movements have opposing directionality and said user interface software is configured to provide two opposing responses corresponding respectively to said two sweeping movements.

Atty. Docket No. NEONODE.P004          -18-

NEONODE0000292

**39.** (withdrawn) An apparatus according to claim **38**, wherein one of the two opposing responses is moving forward in a series of display screens and the other of the two opposing responses is moving backward in the series of display screens.

**40.** (withdrawn) An apparatus according to claim **37**, wherein each of the plurality of sweeping movements does not drag any graphical feature displayed on said touchscreen during that one of the plurality of sweeping movements.

**41.** (withdrawn) An apparatus, comprising:

a computing device configured to provide a plurality of features, settings, applications and/or services to a user, said computing device including a user interface that comprises:

a touchscreen for displaying to the user a list of items corresponding to at least one of a plurality of features, settings, applications and/or services and for allowing the user to select any one of said items using said list; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to navigate among said list and to select any one of said items, said user interface software configured to move a highlight marking, having a displayed location on said touchscreen, in a desired direction within said list in response to the user:

(a)  contacting  said touchscreen with the object at a first location that is a function of the desired direction, not said displayed location of said highlight marking;

Atty. Docket No. NEONODE.P004        -19-

NEONODE0000293

(b) while keeping the object in contact with said touchscreen, moving the object along said touchscreen in the desired direction to a second location; and

(c) immediately following said moving of the object along said touchscreen to said second location, lifting the object from said touchscreen so as to establish a new location of said highlight marking.

**42.** (withdrawn) An apparatus according to claim **41,** wherein said user interface software is configured to, after the user has marked a desired one of said items by performing steps (a) through (c) so as to highlight said desired one with the highlight marking, select said desired one in response to the user tapping the object on said touchscreen without regard to said display location of the highlight marking.

**43.** (withdrawn) An apparatus, comprising:

a computing device configured to provide a plurality of features, settings, applications and/or services to a user, said computing device including a user interface that comprises:

a touchscreen for displaying to the user a list of items corresponding to at least one of said plurality of features, settings, applications and/or services and for allowing the user to select any one of said items using said list; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to scroll said list and to select any one of said plurality items, said user interface software configured to scroll said list in a desired direction in response to the user:

Atty. Docket No. NEONODE.P004      -20-

NEONODE0000294

3.SEP.2008  8:46    MARC BERGER 972 8 9315208              NO.964  P.26/39

(a)    contacting    said touchscreen with the object at a first location that is a function of the desired direction of said scroll and that is not based on any soft scroll control displayed on said touchscreen; and

(b) while keeping the object in contact with said touchscreen, moving the object along said touchscreen in the desired direction to a second location, wherein said moving of the object causes said list to scroll in the desired direction.

44. (withdrawn) An apparatus according to claim 43, wherein said user interface software is configured to activate a selected one of said items in response to a user tapping the object on said touchscreen following the user lifting the object from the touchscreen after the user performs step (b).

45. (withdrawn) An apparatus according to claim 43, wherein said items are files.

46. (withdrawn) An apparatus according to claim 43, wherein said items are email messages.

47. (withdrawn) An apparatus according to claim 43, wherein each item is contact information for a corresponding contact.

Atty. Docket No. NEONODE.P004        -21-

NEONODE0000295

## REMARKS

Applicant has carefully studied the outstanding Office Action. The present amendment is intended to place the application in condition for allowance and is believed to overcome all of the objections and rejections made by the Examiner. Favorable reconsideration and allowance of the application are respectfully requested.

Applicant has withdrawn claims **19 – 47**, and amended claims **1 – 15** to properly claim the present invention. No new matter has been added. Claims **1 – 18** are presented for examination.

In paragraphs 1 - 8 of the Office Action, the Examiner has rejected claims **1, 4 – 7, 12, 15** and **17** under 35 U.S.C. §103(a) as being unpatentable over Carlson, F., Visual Quickstart Guide: Palm Organizers ("Carlson") in view of Milic-Frayling et al., US Publication No. 2004/0100510 ("Milic-Frayling"), and further in view of Conrad et al., US Patent No. 5,956,030 ("Conrad").

In paragraph 9 of the Office Action, the Examiner has rejected claims **2** and **3** under 35 U.S.C. §103(a) as being unpatentable over Carlson in view of Milic-Frayling, in view of Conrad, and further in view of Kopitzke et al., US Patent No. 6,988,246 ("Kopitzke").

In paragraph 10 – 13 of the Office Action, the Examiner has rejected claims **8 – 11** under 35 U.S.C. §103(a) as being unpatentable over Carlson in view of Milic-Frayling, in view of Conrad, and further in view of Wynn et al., US Patent No. 6,734,883 ("Wynn").

In paragraph 14 of the Office Action, the Examiner has rejected claim **13** under 35 U.S.C. §103(a) as being unpatentable over Carlson, in view of Milic-Frayling, and further in view of Conrad.

Atty. Docket No. NEONODE.P004        -22-

NEONODE0000296

In paragraphs 15 and 16 of the Office Action, the Examiner has rejected claims **14** and **16** under 35 U.S.C. §103(a) as being unpatentable over Carlson, in view of Milic-Frayling, in view of Conrad, and further in view of Strietelmeier, Palm m100, <u>The Gadgeteer</u> ("Strietelmeier").

In paragraphs 17 and 18 of the Office Action, the Examiner has rejected claim **18** under 35 U.S.C. §103(a) as being unpatentable over Carlson, in view of Milic-Frayling, in view of Conrad, and further in view of Chew et al., US Patent No. 6,727,917 ("Chew").

## <u>Distinctions between Claimed Invention and Carlson, F., Visual Quickstart Guide: Palm Organizers, US Publication No. 2004/0100510 of Milic-Frayling et al., US Patent No. 5,956,030 to Conrad et al., US Patent No. 6,988,246 to Kopitzke et al., US Patent No. 6,734,883 to Wynn et al., Strietelmeier, Palm m100, The Gadgeteer, and US Patent No. 6,727,917 to Chew et al.</u>

Aspects of the subject invention concern a touch-based user interface with functionalities for running interactive applications using touch-based icons, for inputting text using a touch-based keypad, and for managing files using a touch-based file listing. User inputs include finger taps and thumb movements. One such movement is a thumb touch-and-glide, where the thumb touches a touch screen at a location where an icon for a function is displayed, and glides along the touch screen away from the location, as illustrated in FIG. 2 of the subject application.

Carlson describes how to use the Palm Organizer touch-based user interface. Through a series of pictures, Carlson shows how to

Atty. Docket No. NEONODE.P004          -23-

NEONODE0000297

run applications, view documents, access menus, and use an onscreen keyboard.

Milic-Frayling describes an interactive user interface for presenting search results on small display screens of handheld devices. Search results are annotated to highlight search hits, and text is wrapped so as to avoid the need for horizontal scrolling.

Conrad describes a window management system for keeping open windows offscreen in a drawer area (Conrad/ elements D1 – D4 of FIG. 1), and available for popping them back onscreen by clicking on a title bar or drawer handle of the offscreen window (Conrad/ FIGS. 2 – 4). Conrad also describes "spring loaded" enclosures for opening temporary windows for enclosure identifiers, during a drag operation (Conrad/ FIGS. 8A – 8D and 9A – 9E).

Kopitzke describes a touch-sensitive user interface for use in an aircraft with multiple cabin systems. A main menu (Kopitzke/ FIG. 4) provides an overview of cabin status, and information and data regarding the cabin systems. The main menu includes touch input keys for bringing up menus for each of the individual aircraft cabin systems, for monitoring and controlling their operation. Cabin systems include inter alia an audio system (Kopitzke/ FIG. 5), a video system, a lighting system (Kopitzke/ FIG. 6), a climate control system, a doors & hatches system (Kopitzke/ FIG. 7), a water supply system (Kopitzke/ FIG. 8), an electric power supply system, and a data communication system.

Wynn describes a user interface for spinning through a list of items. The user interface displays a preview list of items and a postview list of items on opposite sides of a currently selected item in the list (Wynn/ FIG. 7).

Atty. Docket No. NEONODE.P004          -24-

NEONODE0000298

3.SEP.2008   8:47     MARC BERGER 972 8 9315208                    NO.964   P.30/39

Strietelmeier describes the mechanical casing, hardware components and software applications of the Palm m100 Organizer, in comparison with the Palm IIIc, the Palm V and the Handspring Visor.

Chew describes a user interface for running and interacting with multiple applications on small handheld device display screens. Chen describes a user interface display having a top portion with a navigation bar (Chew/ element 302 of FIG. 3) for navigating between different applications, a middle portion for graphically displaying outputs of a currently active application, and a bottom portion with an application menu bar (Chew/ element 304 of FIG. 3) for entering inputs to the currently active application.

The touch-based user interface of the subject claimed invention is generally operated by the thumb. The touch-based user interface of Carlson is generally operated by a stylus. Although, the user interface of Carlson may also be operated by the thumb, the natures of the two user interfaces are distinct. The subject claimed invention teaches "rubbing", "touch-and-glide" movements to operate a user interface, whereby the thumb touches a touch-sensitive screen and rubs, or glides, along the screen without lifting the thumb. In distinction, tap movements and one-stroke pen drags are used to operate the touch-based user interface of Carlson. In terms of motor skill, the touch-and-glide movements of the subject claimed invention are akin to pressing with the thumb on a mechanical slider button, such as the slider button with HI/LO/OFF settings on a hair-dryer handle, and sliding the button up or down while it is pressed.

The touch-and-glide movements of the subject claimed invention are illustrated in FIGS. 2, 7 and 10 by a left-arrow and a thumb touching a touch-sensitive screen.

Atty. Docket No. NEONODE.P004        -25-

PAGE 30/39 * RCVD AT 9/3/2008 3:08:58 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/10 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):05-46

NEONODE0000299

The touch-and-glide movements of the subject claimed invention are used to activate functions (original specification/ Abstract; page 2, lines 25 – 28; page 5, lines 24 – 27; FIG. 2; original claim **1**), and to scroll a selector forward and backward within a list to select a desired item in the list, and to page up and page down within a list (original specification/ page 3, lines 28 – page 4, line 2; page 7, lines 7 – 10; page 7, line 27 – page 9, line 14; FIGS. 7 and 10; original claims **7, 9** and **10**).

The touch-and-glide movements of the subject claimed invention activate a function located at the touch point. The one-stroke pen drag movement of Carlson activates a pre-designated program, irrespective of where the pen drag begins; namely, the onscreen keyboard or a custom pre-designated program that may be substituted therefor.

Other conventional finger-based touch screens, such as the large touch screens used for self-serve check-in at airport terminals, use touch-sensitive input keys. In distinction, the touch-and-glide inputs of the subject claimed invention are of particular advantage for small handheld devices, where screen space is minimal.

**Response to Examiner's Arguments**

In rejecting independent claim **1**, the Examiner has cited the "one-stroke pen drag" (Carlson/ page 30; FIG. 2.22) as teaching that "*any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area*". In rejecting dependent claim **9**, the Examiner has cited dragging a vertical scroll bar

Atty. Docket No. NEONODE.P004           -26-

NEONODE0000300

3.SEP.2008    8:47    MARC BERGER 972 8 9315208    NO.964    P.32/39

(Carlson/ page 27). In rejecting dependent claim **12**, the Examiner has cited dragging a horizontal scroll bar (Carlson/ page 246; FIG. 14.2).

Applicant respectfully submits that the one-stroke drag of Carlson is very distinct from the location-based touch-and-glide movement of the subject invention (original specification/ FIG. 2). The following table summarizes some of the relevant distinctions.

| TABLE I: Partial list of distinctions between one-stroke drag of Carlson and location-based touch-and-glide movement of the claimed invention ||
| --- | --- |
| **One-stroke drag** | **Location-based touch-and-glide** |
| Default function is the onscreen keyboard; may be customized to activate a different pre-designated function. | The function displayed at the touch point is activated. |
| At any given time, may be used for activating only one pre-designated function. | At any given time, may be used for activating whichever function is touched, from among a plurality of functions. |
| The starting location has no bearing on the function that is activated. | The starting location determines which of the plurality of functions is activated. |
| Performed by a stylus. | Performed by the thumb. |
| Requires the user interface to recognize a vertical drag. | Requires the user interface to recognize a glide and identify the function displayed at the starting location of the glide. |
| Requires one hand to hold the device and another hand to perform the stylus movement. | The same hand may be used to hold the device and perform the thumb movement. |
| Not used for scrolling through a list. | Used for scrolling through a list. |

Applicant further respectfully submits that the scroll slider drag of Carlson is very distinct from the location-based touch-and-glide movement of the subject invention. The following table summarizes some of the relevant distinctions.

Atty. Docket No. NEONODE.P004    -27-

PAGE 32/39 * RCVD AT 9/3/2008 3:08:58 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/10 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):05-46

NEONODE0000301

3.SEP.2008    8:47    MARC BERGER 972 8 9315208                NO.964    P.33/39

| TABLE II: Partial list of distinctions between scroll slider drag of Carlson and location-based touch-and-glide movement of the claimed invention | |
|---|---|
| **Scroll slider drag** | **Location-based touch-and-glide** |
| Requires the user interface to recognize a horizontal drag or a vertical drag. | Requires the user interface to recognize a glide in any of a plurality of directions. |
| Performed by a stylus. | Performed by the thumb. |
| Requires one hand to hold the device and another hand to perform the stylus movement. | The same hand may be used to hold the device and perform the thumb movement. |
| Not used for scrolling through a list. | Used for scrolling through a list. |

In order to clarify these distinctions, applicant has amended claim **1** to include the limitation of each function of said plurality of functions being activated by an object touching a location in the touch sensitive area at which the representation of the function is displayed and then gliding the object along the touch sensitive area away from the location.

Applicant has carefully reviewed all of the cited prior art. None of the cited prior art teaches the location-based touch-and-glide thumb movement of the subject claimed invention. Specifically, Milic-Frayling and Conrad do not use touch screens. Kopitzke uses touch input keys. Wynn mentions touch sensitive displays with stylus pens. Strietelmeier mentions writing with a stylus. Chew uses a stylus to tap on a touch screen.

The rejections of the claims **1 – 18** in paragraphs 1 - 18 of the Office Action will now be dealt with specifically.

As to amended independent claim **1** for a computer readable medium, applicant respectfully submits that the limitation in claim **1** of

"*each function of said plurality of functions being activated by an object touching a location in the touch sensitive area at*

Atty. Docket No. NEONODE.P004        -28-

NEONODE0000302

*which the representation of the function is displayed and gliding along the touch sensitive area away from the location"*

is neither shown nor suggested in Carlson, Milic-Frayling, Conrad, Kopitzke, Wynn, Strietelmeier or Chew.

Because claims **2 - 18** depend from claim **1** and include additional features, applicant respectfully submits that claims **2 - 18** are not anticipated or rendered obvious by Carlson, Milic-Frayling, Conrad, Kopitzke, Wynn, Strietelmeier, Chew, or a combination of Carlson, Milic-Frayling, Conrad, Kopitzke, Wynn, Strietelmeier and Chew.

Accordingly claims **1 - 18** are deemed to be allowable.

## Support for Amended Claims in Original Specification

Independent claim **1** has been amended to include the limitation of an object touching a location in the touch sensitive area at which the representation of the function is displayed and gliding along the touch sensitive area away from the location. This limitation is supported in the original specification at least at FIGS. 2, 7 and 10.

For the foregoing reasons, applicant respectfully submits that the applicable objections and rejections have been overcome and that the claims are in condition for allowance.

Respectfully submitted,

Dated: _____ , 2008

_____
Marc A. Berger
Reg. No. 44,029

P.O. Box 691
Soquel, CA  95073
(831) 426-8200

Atty. Docket No. NEONODE.P004        -29-

NEONODE0000303

3.SEP.2008   8:47   MARC BERGER 972 8 9315208                    NO.964   P.35/39

## CLEAN VERSION OF PROPOSED AMENDED CLAIMS
## WITHOUT MARKINGS – NOT TO BE ENTERED

**1.**        A computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising a touch sensitive area in which representations of a plurality of functions are displayed, and each function of said plurality of functions being activated by an object touching a location in the touch sensitive area at which the representation of the function is displayed and then gliding along the touch sensitive area away from the location.

**2.**        The computer readable medium of claim **1**, wherein one function from the plurality of functions, when activated, causes the user interface to display icons representing different services or settings for a currently active application.

**3.**        The computer readable medium of claim **2**, wherein the user interface is characterised in, that a selection of a preferred service or setting is done by tapping on a display icon corresponding to the preferred service or setting.

Atty. Docket No. NEONODE.P004        -1-

NEONODE0000304

3.SEP.2008   8:48     MARC BERGER 972 8 9315208              NO.964    P.36/39

4.          The computer readable medium of claim **1**, wherein one function from the plurality of functions, when activated, causes the user interface to display a keyboard and a text field.

5.          The computer readable medium of claim **4**, wherein said text field is used for inputting and editing of text through said keyboard.

6.          The computer readable medium of claim **1**, wherein one function from the plurality of functions, when activated, causes the user interface to display a list with a library of available applications and files on the mobile handheld computer unit.

7.          The computer readable medium of claim **6**, wherein the user interface is characterised in, that a selection of an application or file is done by gliding the object along said touch sensitive area so that a representation of a desired one of said application or file is highlighted, raising said object from said touch sensitive area, and then tapping on said touch sensitive area.

8.          The computer readable medium of claim **7**, wherein the user interface is characterised in, that at any given time said list presents only files or only applications, and that a–an area of said list presents a field through which said list can be changed from presenting files to presenting applications, or from presenting applications to presenting files.

Atty. Docket No. NEONODE.P004        -2-

PAGE 36/39 * RCVD AT 9/3/2008 3:08:58 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/10 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):05-46

NEONODE0000305

3.SEP.2008   8:48      MARC BERGER 972 B 9315208                      NO.964     P.37/39

9.          The computer readable medium of claim **7**, wherein the user interface is characterised in, that, navigation in said list is performed by gliding the object along the touch sensitive area in a direction towards the top of said list or towards the bottom of said list.

10.          The computer readable medium of claim **9**, wherein the user interface is characterised in, that, if the number of applications or files in said list exceeds the number of applications or files that can be presented on said touch sensitive area as content, and if the object is glided along said touch sensitive area to the top or bottom position of said touch sensitive area, then raised, replaced on said touch sensitive area, and again glided along said touch sensitive area to the top or bottom of said touch sensitive area, the content of said touch sensitive area will be replaced one whole page.

11.          The computer readable medium of claim **10**, wherein the user interface is characterised in, that if the object is raised from any first position on said touch sensitive area and then replaced on any second position on said touch sensitive area, said navigation can be continued from said second position.

Atty. Docket No. NEONODE.P004          -3-

PAGE 37/39 * RCVD AT 9/3/2008 3:08:58 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/10 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):05-46

NEONODE0000306

**12.**        The computer readable medium of claim **1**, wherein the user interface is characterised in, that an active application, function, service or setting is moved on one step by gliding the object along the touch sensitive area from left to right, and that the active application, function, service or setting is closed or backed one step by gliding the object along the touch sensitive area from right to left.

**13.**        The computer readable medium of claim **1**, wherein the user interface is characterised in, that said representations of said plurality of functions are located at the bottom of said touch sensitive area.

**14.**        The computer readable medium of claim **1**, wherein the touch sensitive area is 2-3 inches in diagonal dimension.

**15.**        An enclosure adapted to cover the mobile handheld computer unit according to Claim **1**, characterised in, that said enclosure is provided with an opening for said touch sensitive area.

**16.**        The enclosure according to Claim **15**, characterised in, that said enclosure is removable and exchangeable.

Atty. Docket No. NEONODE.P004        -4-

PAGE 38/39 * RCVD AT 9/3/2008 3:08:58 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/10 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):05-46

NEONODE0000307

3.SEP.2008    8:48      MARC BERGER 972 8 9315208                    NO.964    P.39/39

17.            A computer readable medium, with a computer program product stored therein, characterised in, that said computer program product comprises computer readable code, which, when read by a computer, will make it possible for said computer to present a user interface according to Claim **1**.

18.            A computer readable medium according to Claim **17**, characterised in, that said computer program product is adapted to function as a shell upon an operations system.

Atty. Docket No. NEONODE.P004            -5-

PAGE 39/39 * RCVD AT 9/3/2008 3:08:58 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/10 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):05-46

NEONODE0000308

3.SEP.2008    8:40    MARC BERGER 972 8 9315208                    NO.963    P.1/2



**RECEIVED**
CENTRAL FAX CENTER

**SEP 0 3 2008**

29 Aharoni Street, Suite #13 • Rechovot 76282 • Israel • Phone: 972-8-9315207 • Fax: 972-8-9315208

## FACSIMILE COVER LETTER

<u>Note:</u> This facsimile contains <u>PRIVILEGED</u> and <u>CONFIDENTIAL</u> information intended only for use of the specific individual or entity named below. If you or your employer is not the intended recipient of this facsimile or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any unauthorized dissemination or copying of this facsimile or the information contained in it is strictly prohibited. If you have received this facsimile in error, please immediately notify the person named below at once by telephone and return the original facsimile to us at the address below. Thank you.

SENDER'S NAME:    Marc Berger
                 **Soquel Group LLC**
                 29 Aharoni Street, Suite #13
                 Rehovot  76282
                 ISRAEL

TRANSMISSION DATE:  September 3, 2008

PLEASE DELIVER TO:

      Recipient:        Examiner Ryan F. Pitaro, AU 2174
      Firm:             **United States Patent & Trademark Office**
      Fax No.:          571-273-8300
      City/State/Country: Alexandria, VA  USA

COMMENTS:
Interview agenda for US Serial No. 10/315,250

WE ARE TRANSMITTING 39 PAGE(S) (including this cover letter) from:

FAX NO. 011-972-8-9315208

If you do not receive all of the pages or if any pages received are illegible, please contact our office.

www.soquelgroup.com

NEONODE0000309

3.SEP.2008    8:40    MARC BERGER 972 8 9315208    NO.963    P.2/2

RECEIVED
CENTRAL FAX CENTER
SEP 0 3 2008

PTO/SB/81 (07-08)
Approved for use through 12/31/2008. OMB 0851-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| POWER OF ATTORNEY OR REVOCATION OF POWER OF ATTORNEY WITH A NEW POWER OF ATTORNEY AND CHANGE OF CORRESPONDENCE ADDRESS | | |
|---|---|---|
| Application Number | 10/315,250 | |
| Filing Date | December 10, 2002 | |
| First Named Inventor | Magnus Goertz | |
| Title | USER INTERFACE | |
| Art Unit | 2174 | |
| Examiner Name | Flanza, Ryan F. | |
| Attorney Docket Number | NEONODE.P004 | |

I hereby revoke all previous powers of attorney given in the above-identified application.

[ ] A Power of Attorney is submitted herewith.

OR

[X] I hereby appoint Practitioner(s) associated with the following Customer Number as my/our attorney(s) or agent(s) to prosecute the application identified above, and to transact all business in the United States Patent and Trademark Office connected therewith:

75660

OR

[ ] I hereby appoint Practitioner(s) named below as my/our attorney(s) or agent(s) to prosecute the application identified above, and to transact all business in the United States Patent and Trademark Office connected therewith:

| Practitioner(s) Name | Registration Number |
|---|---|
| | |
| | |
| | |
| | |

Please recognize or change the correspondence address for the above-identified application to:

[X] The address associated with the above-mentioned Customer Number.

OR

[ ] The address associated with Customer Number:

OR

| [ ] Firm or Individual Name | |
|---|---|
| Address | |
| City | | State | | Zip | |
| Country | |
| Telephone | | Email | |

I am the:

[ ] Applicant/Inventor.

OR

[X] Assignee of record of the entire interest. See 37 CFR 3.71.
Statement under 37 CFR 3.73(b) (Form PTO/SB/96) submitted herewith or filed on _____

SIGNATURE of Applicant or Assignee of Record

| Signature | | Date | 28 August 2008 |
|---|---|---|---|
| Name | Per Bystedt | Telephone | +46 8 678 1850 |
| Title and Company | CEO, Neonode | | |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below*.

[ ] *Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.31, 1.32 and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

NEONODE0000310

3: SEP 2008      8:38      MARC BERGER 972 8 9315208                          NO.962    P.1



**RECEIVED**
**CENTRAL FAX CENTER**
**SEP 0 3 2008**

29 Aharoni Street, Suite #13 • Rechovot 76282 • Israel • Phone: 972-8-9315207 • Fax: 972-8-9315208

## FACSIMILE COVER LETTER

<u>Note:</u> This facsimile contains <u>PRIVILEGED</u> and <u>CONFIDENTIAL</u> information intended only for use of the specific individual or entity named below. If you or your employer is not the intended recipient of this facsimile or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any unauthorized dissemination or copying of this facsimile or the information contained in it is strictly prohibited. If you have received this facsimile in error, please immediately notify the person named below at once by telephone and return the original facsimile to us at the address below. Thank you.

SENDER'S NAME:        Marc Berger
                      **Soquel Group LLC**
                      29 Aharoni Street, Suite #13
                      Rehovot  76282
                      ISRAEL

TRANSMISSION DATE:    September 3, 2008

PLEASE DELIVER TO:

         Recipient:          Examiner Ryan F. Pitaro, AU 2174
         Firm:               **United States Patent & Trademark Office**
         Fax No.:            571-273-8300
         City/State/Country: Alexandria, VA   USA

COMMENTS:
Interview agenda for US Serial No. 10/315,250

WE ARE TRANSMITTING 39 PAGE(S) (including this cover letter) from:

                      FAX NO. 011-972-8-9315208

If you do not receive all of the pages or if any pages received are illegible, please contact our office.

www.soquelgroup.com

PAGE 1/2 * RCVD AT 9/3/2008 3:04:12 AM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/8 * DNIS:2738300 * CSID:972 8 9315208 * DURATION (mm-ss):01-00

NEONODE0000311

3.SEP.2008   8:38   MARC BERGER 972 8 9315208 ─── ─── ─── ─NO.962──P.2 ·──·---

RECEIVED
CENTRAL FAX CENTER

SEP 0 3 2008

PTO/SB/81 (07-08)
Approved for use through 12/31/2008. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| POWER OF ATTORNEY OR REVOCATION OF POWER OF ATTORNEY WITH A NEW POWER OF ATTORNEY AND CHANGE OF CORRESPONDENCE ADDRESS | Application Number | 10315230 |
|---|---|---|
| | Filing Date | December 10, 2002 |
| | First Named Inventor | Abigaile Goertz |
| | Title | USER INTERFACE |
| | Art Unit | 2174 |
| | Examiner Name | Pham, Ryan R. |
| | Attorney Docket Number | NEONODE.P004 |

I hereby revoke all previous powers of attorney given in the above-identified application.

☐ A Power of Attorney is submitted herewith.

OR

☒ I hereby appoint Practitioner(s) associated with the following Customer Number as my/our attorney(s) or agent(s) to prosecute the application identified above, and to transact all business in the United States Patent and Trademark Office connected therewith:

75660

OR

☐ I hereby appoint Practitioner(s) named below as my/our attorney(s) or agent(s) to prosecute the application identified above, and to transact all business in the United States Patent and Trademark Office connected therewith:

| Practitioner(s) Name | Registration Number |
|---|---|
| | |
| | |
| | |
| | |

Please recognize or change the correspondence address for the above-identified application to:

☒ The address associated with the above-mentioned Customer Number.

OR

☐ The address associated with Customer Number:

OR

| ☐ Firm or Individual Name | |
|---|---|
| Address | |
| City | State | Zip |
| Country | |
| Telephone | Email |

I am the:

☐ Applicant/Inventor.

OR

☒ Assignee of record of the entire interest. See 37 CFR 3.71.
Statement under 37 CFR 3.73(b) (Form PTO/SB/96) submitted herewith or filed on _____.

SIGNATURE of Applicant or Assignee of Record

| Signature | [signature] | Date | 28 August 2008 |
|---|---|---|---|
| Name | Per Bystedt | Telephone | + 46 8 678 1850 |
| Title and Company | CEO, Neonode | | |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below*.

☐ *Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.31, 1.32 and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

BEST AVAILABLE C[illegible]

NEONODE0000312

Attorney's Docket No.: <u>NEONODE.P004</u>     *PATENT*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In Re Patent Application of: ) | |
| ) | Examiner:  Ryan F. Pitaro |
| Magnus Goertz ) | |
| ) | Art Unit:   2174 |
| Application No: 10/315,250 ) | |
| ) | |
| Filed:     December 10, 2002 ) | |
| ) | |
| For:     USER INTERFACE FOR ) | |
| MOBILE HANDHELD ) | |
| COMPUTER UNIT ) | |
| _____ ) | |

Mail Stop AMENDMENT
Commissioner for Patents
P. O. Box 1450
Alexandria, VA   22313-1450

## <u>AMENDMENT AND RESPONSE TO OFFICE ACTION</u>

## <u>UNDER 37 C.F.R. §1.116</u>

Sir:

        In response to the Office Action dated July 11, 2008, applicant respectfully requests that the above-identified application be amended as follows:

Atty. Docket No. NEONODE.P004        -1-

NEONODE0000313

IN THE DESCRIPTION:

Please amend the specification as follows.

Page 1, ninth full paragraph:

Since the users have gotten used to small handheld units, it is hard to move towards larger units.  This has led to foldable keyboards, different kinds [[if]] of joy sticks and different kinds of touch sensitive displays and pads intended to help in providing a user interface that is suitable for small handheld compute computer units.

Page 2, first full paragraph:

It is a problem to provide a user-friendly interface that is adapted to handle a large amount of information and different kinds of traditional computer-related applications on a small handheld computer unit.

Page 3, sixth full paragraph:

In order to provide a task and file management in a user interface for a handheld mobile computer, the present invention teaches that, if the third function is activated, the display area is adapted to display a list with a library of available applications and files on the computer [[unit]] unit.  A selection of an application will start the application, and a selection of a file will open the file in an application intended for the file.

Page 7, fifth full paragraph:

It should [[b]] be understood that all lists in the computer unit, such as a list of contact information in an address book, a

Atty. Docket No. NEONODE.P004          -2-

NEONODE0000314

list of e-mail messages in a mailbox, or a telephone log, can be managed in the above described manner.

Page 7, sixth full paragraph:

The list 231 can be adapted to present only files or only applications.  In this case, the top area of the list 231 can present a field 233 through which the content [[if]] of the list 231 can be altered.  If the list only presents files, then the field 233 can display a representation of a task manager and a selection of the field 233 will cause the list 231 to alter to present only applications, and if the list 231 only presents applications, then the field 233 displays a representation of a file manager and a selection of the field 233 will cause the list 231 to alter and present only files.

Page 7, eighth full paragraph:

Figure 9 shows that if the number of applications and/or files in the list 231 exceeds the number of applications and/or files that can be presented on the display area 3, and if the object 4 is moved to the top or bottom position of the display area, then lifted, replaced on the display area, and then again moved to the top or bottom of the display area, then the content of the display area will be replaced one whole page, meaning that if the object 4 is positioned N at the bottom 3b of the display area 3, then lifted, replaced on the display area 3, and then again moved M to the bottom 3b of the display area 3, then the content 31 of the display area 3 will be replaced P by the following applications and/or files 32 in the list 231.  In the same way, but not shown in the figure, if the object is ~~position~~ positioned at the top of the display area, then lifted, replaced on the display area 3, and then again moved to the top of the

Atty. Docket No. NEONODE.P004          -3-

NEONODE0000315

display area, the content of the display area will be replaced by the preceding applications and/or files in the list.

Publication No. US 2004/0109013 A1, paragraph [0069]:

As shown in figure 13, the present invention relates to a user interface for a hand held mobile unit that preferably can be manageable with one hand.  Hence the present invention teaches that the user interface is adapted to a touch sensitive area [[I]] 1 with a size that is in the order of 2-3 inches, meaning the diagonal distance W between two corners of the touch sensitive area 1.

Atty. Docket No. NEONODE.P004          -4-

NEONODE0000316

IN THE CLAIMS:

Please substitute the following claims for the pending claims with the same number:

**1.** (currently amended)    A computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

a touch sensitive area ~~that is simultaneously divided into a menu area and a display area, the mobile handheld computer unit being adapted to run several applications simultaneously, and to present an active application on top of any other application on said display area, characterised in, that:~~

~~said menu area simultaneously presents~~ in which representations of a ~~first function that is a general application dependent function, a second function that is a keyboard function, and a third function that is a task and file manager~~ plurality of functions are displayed, and

each function of said ~~first, second, and third functions simultaneously represented in said menu area~~ plurality of functions being mapped to a corresponding location in the touch sensitive area at which the representation of the function is displayed, and being activated by ~~the single step of a blunt~~ an object touching the corresponding location and then gliding along the touch sensitive area away from the location ~~moving in a direction from a starting point that is the representation of the corresponding one of said first, second, and third functions in said menu area to said display area being detected by~~

Atty. Docket No. NEONODE.P004        -5-

NEONODE0000317

said touch sensitive area, thereby allowing low precision navigation of the user interface using the blunt object, so that the user interface can be operated by one hand, where the blunt object is a finger.

**2.** (currently amended)         The computer readable medium of claim **1**, wherein one function from the plurality of functions, when the mobile handheld computer unit runs an operating system, the user interface is characterised in, that, if said first function is activated, causes the user interface is adapted to display icons representing different services or settings depending on the current for a currently active application, that one of said icons always represents a "help" service, regardless of application, and that, if no application is current active on the mobile handheld computer unit, said icons are adapted to represent services or settings of the operating system of the mobile handheld computer unit.

**3.** (currently amended)         The computer readable medium of claim **2**, wherein the user interface is characterised in, that a selection of a preferred service or setting is done by tapping on a corresponding display icon corresponding to the preferred service or setting.

**4.** (currently amended)         The computer readable medium of claim **1**, wherein the user interface is characterised in,

        that, if said second one function from the plurality of functions, when [[is]] activated, said display area is adapted causes the user interface to display a keyboard and a text field,

        that, if a text passage in said active application is highlighted, said text passage is displayed in said text field for editing

NEONODE0000318

~~through said keyboard and that said highlighted test passage is replaced by said edited text passage when said second function is deactivated, and~~

~~that, if no text passage in said active application is highlighted, said text field is available for inputting and editing of text through said keyboard~~.

**5.** (currently amended)        The computer readable medium of claim **4**, wherein ~~the user interface is characterised in, that if no text passage in said active application is highlighted,~~ said text field is used for inputting and editing of text through said keyboard~~, then~~

~~said first function can be activated, or~~

~~said second function can be closed, in which a choice of saving or deleting said inputted text is given, where the choice of saving said inputted text results in an activation of said first function,~~ ~~in which said first function will present services or settings available for said inputted text~~.

**6.** (currently amended)        The computer readable medium of claim **1**, wherein ~~the user interface is characterised in, that, if said third~~ <u>one</u> function <u>from the plurality of functions, when</u> [[is]] activated, ~~said display area is adapted~~ <u>causes the user interface</u> to display a list with a library of available applications and files on the mobile handheld computer unit~~,~~ ~~that a selection of an application will start said application, and that a selection of a file will open said file in an application intended for said file~~.

**7.** (currently amended)        The computer readable medium of claim **6**, wherein the user interface is characterised in, that a selection of an application or file is done by ~~moving~~ <u>gliding</u> the ~~blunt~~ object <u>along said</u>

NEONODE0000319

touch sensitive area so that a representation of a desired one of said application or file is highlighted, ~~removing~~ <u>raising</u> said object from said touch sensitive area, and then tapping on said touch sensitive area~~, and that said desired one of said application or file is highlighted by placing some kind of marking on said representation of said application or file~~.

**8.** (currently amended)       The computer readable medium of claim **7**, wherein the user interface is characterised in, that <u>at any given time</u> said list ~~is adapted to present~~ <u>presents</u> only ~~said~~ files or only ~~said~~ applications, <u>and</u> that ~~a top~~ <u>an</u> area of said list presents a field through which ~~the content of~~ said list can be ~~altered~~ <u>changed from presenting files to presenting applications, or from presenting applications to presenting files</u>~~, that, if said list only presents files, said field displays a representation of a task manager and a selection of said field will cause said list to alter to present only applications, and that, if said list only presents applications, said field displays a representation of a file manager and a selection of said field will cause said list to alter and present only files~~.

**9.** (currently amended)       The computer readable medium of claim **7**, wherein the user interface is characterised in, that, [[a]] <u>one item in said list is highlighted by a moveable marking, and</u> ~~navigation in said list is performed by moving~~ <u>gliding</u> the ~~blunt~~ object <u>along the touch sensitive area</u> in a direction towards the top of said list or towards the bottom of said list~~, that the movement of the blunt object will cause~~ <u>causes</u> said marking to move in the same direction <u>without scrolling the list</u>~~, and that the speed of movement of said marking is lower than the speed of movement of the blunt object~~.

NEONODE0000320

**10.** (currently amended)        The computer readable medium of claim **9**, wherein the user interface is characterised in, that, if the number of applications ~~and/~~or files in said list exceeds the number of ~~application~~ applications [[and]] or files that can be presented on said ~~display~~ touch sensitive area as content, and if the ~~blunt~~ object is ~~moved~~ glided along said touch sensitive area to the top or bottom position of said ~~display~~ touch sensitive area, then ~~lifted~~ raised, replaced on said ~~display~~ touch sensitive area, and again ~~moved~~ glided along said touch sensitive area to the top or bottom of said ~~display~~ touch sensitive area, the content of said ~~display~~ touch sensitive area will be replaced one whole page~~, meaning that if the blunt object is positioned at the bottom of said display area, replaced on said display area, and then again moved to the bottom of said display area, the content of said display area will be replaced by the following applications and/or files in said list, and if the blunt object is positioned at the top of said display area, then lifted, replaced on said display area, and then again moved to the top of said display area, the content of said display area will be replaced by the preceding applications and/or files in the list~~.

**11.** (currently amended)        The computer readable medium of claim **10**, wherein the user interface is characterised in, that if the ~~blunt~~ object is ~~removed~~ raised from any first position on said ~~display~~ touch sensitive area and then replaced on any second position on said ~~display~~ touch sensitive area, said navigation can be continued from said second position.

**12.** (currently amended)        The computer readable medium of claim **1**, wherein the user interface is characterised in, that an active application,

NEONODE0000321

function, service or setting is moved on one step by ~~moving~~ <u>gliding</u> the ~~blunt~~ object <u>along the touch sensitive area</u> from ~~the~~ left ~~of said display area~~ to ~~the~~ right ~~of said display area~~, and that the active application, function, service or setting is closed or backed one step by ~~moving~~ <u>gliding</u> the ~~blunt~~ object <u>along the touch sensitive area</u> from ~~the~~ right ~~of said display area~~ to ~~the~~ left ~~of said display area~~.

**13.** (currently amended)     The computer readable medium of claim **1**, wherein the user interface is characterised in, that said ~~menu area is positioned~~ <u>representations of said plurality of functions are located</u> at the bottom of said touch sensitive area~~, that said representation of said first function is positioned at the left side of said menu area, that said representation of said second function is positioned at the middle of said menu area, and that said representation of said third function is positioned at the right side of said menu area~~.

**14.** (currently amended)     The computer readable medium of claim **1**, wherein the ~~user interface is characterised in, that said user interface is adapted to a~~ touch sensitive area ~~with a size that~~ is 2-3 inches in diagonal dimension~~, and that said user interface is adapted to be operated by one hand when the mobile handheld computer unit is held in the one hand, wherein said blunt object is a fleshy part of the thumb of the one hand~~.

**15.** (currently amended)     An enclosure adapted to cover the mobile handheld computer unit according to Claim **1**, characterised in, that said enclosure is provided with an opening for said ~~display~~ <u>touch sensitive</u> area~~, and that a representation of said menu area is printed on top of said enclosure~~.

Atty. Docket No. NEONODE.P004          -10-

NEONODE0000322

**16.** (previously presented)    The enclosure according to Claim **15**, characterised in, that said enclosure is removable and exchangeable.

**17.** (previously presented)    A computer readable medium, with a computer program product stored therein, characterised in, that said computer program product comprises computer readable code, which, when read by a computer, will make it possible for said computer to present a user interface according to Claim **1**.

**18.** (original)    A computer readable medium according to Claim **17**, characterised in, that said computer program product is adapted to function as a shell upon an operations system.

**19.** (withdrawn)  An apparatus, comprising:

a computing device configured to provide a plurality of features and/or services to a user, said computing device including a user interface that comprises:

a touchscreen for displaying to the user, individually at differing times, a plurality of display screens corresponding to said plurality of features and/or services and for allowing the user to navigate among said various differing features and/or services and among said plurality of display screens; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to navigate among said plurality of features and/or services and among said plurality of display screens, said user interface software configured to:

when said touchscreen is displaying a first display screen of said plurality of display screens, cause said computing

Atty. Docket No. NEONODE.P004        -11-

NEONODE0000323

device to display a second display screen of said plurality of display screens in response to a first sweeping movement of the object along said touchscreen in a first direction, said computing device displaying said second display screen after the object has traversed a first predetermined extent of said touchscreen along said first direction; and

when said touchscreen is displaying said second display screen, cause said computing device to display said first display screen in response to a second sweeping movement of the object along said touchscreen in a second direction opposite said first direction, said computing device displaying said first display screen only after the object has traversed a second predetermined extent of said touchscreen along said second direction.

20. (withdrawn) An apparatus according to claim 19, wherein said touchscreen has a left edge and a right edge when said touchscreen is properly oriented for viewing by the user and said first direction proceeds from a location at or proximate said left edge toward said right edge and said second direction proceeds from a location at or proximate said right edge toward said left edge.

21. (withdrawn) An apparatus according to claim 20, wherein said touchscreen has a width extending from said left edge to said right edge and each of said first and second extents is substantially equal to said width.

22. (withdrawn) An apparatus according to claim 21, wherein said touchscreen has a diagonal dimension of two inches to three inches.

NEONODE0000324

**23.** (withdrawn) An apparatus according to claim **19**, wherein said computing device is sized to be cradled in a hand of an adult human user and so that, when so cradled, all points on said touchscreen are touchable by the thumb of the adult human user, the object being the thumb of the hand.

**24.** (withdrawn) An apparatus according to claim **19**, wherein each of the first and second sweeping movements does not drag any graphical feature displayed on said touchscreen during that one of the first and second sweeping movements.

**25.** (withdrawn)  An apparatus, comprising:

a computing device configured to provide first and second menu-area functions to a user, said first menu-area function having a first-function display screen and said second menu-area function having a second-function display screen differing from said first-function display screen, said computing device including a user interface that comprises:

a touchscreen simultaneously divided into a menu region and a display region, said menu region containing first and second representations corresponding respectively to said first and second menu-area functions, said display region for displaying to the user at differing times said first-function and second-function display screens; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to select at differing times each of said first and second menu-area functions, said user interface software configured to:

Atty. Docket No. NEONODE.P004          -13-

NEONODE0000325

display said first-function display screen in response to a first sweeping movement of the object along said touchscreen, the first sweeping movement starting at said first representation in said menu region and proceeding into said display region; and

display said second-function display screen in response to a second sweeping movement of the object along said touchscreen, the second sweeping movement starting at said second representation in said menu region and proceeding into said display region.

**26.** (withdrawn)  An apparatus according to claim **25**, wherein:

said touchscreen has a first edge and a second edge spaced from said first edge;

said first and second representations are each located proximate said first edge and spaced from one another along said first edge; and

the first and second sweeping movements each proceed in a direction toward said second edge.

**27.** (withdrawn)  An apparatus according to claim **25**, wherein said first-function display screen contains a plurality of icons corresponding respectively to a plurality of applications, said user interface software configured to activate any one of said plurality of applications in response to the user tapping the object on said touchscreen at a corresponding one of said plurality of icons.

Atty. Docket No. NEONODE.P004        -14-

NEONODE0000326

**28.** (withdrawn) An apparatus according to claim **27**, wherein said second-function display screen contains a set of application functions, said set varying as a function of which one of said plurality of applications is active when the user makes the second movement.

**29.** (withdrawn) An apparatus according to claim **27**, wherein a particular application of said plurality of applications has a plurality of application screen displays, said user interface software configured so that when said particular application is active, the user forwardly steps through said plurality of application screen displays by sweeping the object across said touchscreen in a first direction and reversely steps through said plurality of application screen displays by sweeping the object across said touchscreen in a second direction opposite said first direction.

**30.** (withdrawn) An apparatus according to claim **25**, wherein said first display screen contains a soft-interface telephony keypad.

**31.** (withdrawn) An apparatus, comprising:

a computing device configured to run a software application configured to display a plurality of predetermined display screens, said computing device including a user interface that comprises:

a touchscreen for displaying to the user, individually at differing times, said plurality of predetermined display screens and for allowing the user to navigate among said plurality of predetermined display screens; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to

Atty. Docket No. NEONODE.P004          -15-

NEONODE0000327

navigate among said plurality of predetermined display screens, said user interface software configured to:

activate said software application in response to a particular interaction of the object with said touchscreen;

forwardly step in series through ones of said plurality of predetermined display screens in response to corresponding respective individual instances of a first sweeping movement of the object along said touchscreen in a first direction; and

reversely step in series through ones of said plurality of predetermined display screens in response to corresponding respective individual instances of a second sweeping movement of the object along said touchscreen in a second direction different from said first direction.

**32.** (withdrawn) An apparatus according to claim **31**, wherein said particular interaction of the object with said touchscreen to activate said software application is a third sweeping movement of the object along said touchscreen in a third direction different from each of said first and second directions.

**33.** (withdrawn) An apparatus according to claim **32**, wherein said first and second directions are opposite one another and said third direction is perpendicular to each of said first and second directions.

**34.** (withdrawn)  An apparatus, comprising:

Atty. Docket No. NEONODE.P004          -16-

NEONODE0000328

a computing device configured to run software for providing to a user a plurality of services and/or functions, said computing device including:

a touchscreen for display to the user a graphical user interface and for allowing the user to navigate among said plurality of services and/or functions; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to navigate among said plurality of services and/or functions, said user interface software configured to:

present, in response to a sweeping movement of the object across said touchscreen, a display screen containing a plurality of display icons corresponding respectively to ones of said plurality of services and/or functions, the sweeping movement being spatially uncorrelated with information displayed on said touchscreen; and

when said touchscreen is displaying said plurality of display icons, launch one of said plurality of services and/or functions in response to the user tapping the object on said touchscreen at a location where said touchscreen displays the corresponding one of said plurality of display icons.

**35.** (withdrawn) An apparatus according to claim **34**, wherein said computing device contains a software application and said user interface is configured to present said plurality of display icons only if said software application is active during the sweeping movement of the object.

NEONODE0000329

**36.** (withdrawn)  An apparatus according to claim **35**, wherein when said software application is active during the sweeping of the object, said display icons correspond to services and/or functions specific to said software application.

**37.** (withdrawn)  An apparatus, comprising:

a computing device containing software for providing to a user a plurality of services and/or functions, said computing device including:

a touchscreen for displaying to the user, individually at differing times, ones of various display screens associated with said plurality of services and/or functions and for allowing the user to navigate among said plurality of display screens so as to provide the user with access to said plurality of services and/or functions and for allowing the user to control functioning of ones of said plurality of services and/or functions; and

user interface software responsive to a set of movements of an object with respect to said touchscreen so as to allow the user to navigate among said plurality of display screens and to control functioning of ones of said plurality of services and/or functions, said set of movements including a plurality of sweeping movements having differing directionalities along said touchscreen, wherein said plurality of sweeping movements being spatially uncorrelated with information displayed on said touchscreen, said user interface software being configured to distinguish the plurality of sweeping movements from one another as a function of the differing directionalities so as to provide differing responses as a function of said differing directionalities.

NEONODE0000330

**38.** (withdrawn) An apparatus according to claim **37**, wherein two sweeping movements of the plurality of sweeping movements have opposing directionality and said user interface software is configured to provide two opposing responses corresponding respectively to said two sweeping movements.

**39.** (withdrawn)  An apparatus according to claim **38**, wherein one of the two opposing responses is moving forward in a series of display screens and the other of the two opposing responses is moving backward in the series of display screens.

**40.** (withdrawn) An apparatus according to claim **37**, wherein each of the plurality of sweeping movements does not drag any graphical feature displayed on said touchscreen during that one of the plurality of sweeping movements.

**41.** (withdrawn)  An apparatus, comprising:

a computing device configured to provide a plurality of features, settings, applications and/or services to a user, said computing device including a user interface that comprises:

a touchscreen for displaying to the user a list of items corresponding to at least one of a plurality of features, settings, applications and/or services and for allowing the user to select any one of said items using said list; and

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to navigate among said list and to select any one of said items, said user interface software configured to move a highlight marking, having a

Atty. Docket No. NEONODE.P004          -19-

NEONODE0000331

displayed location on said touchscreen, in a desired direction within said list in response to the user:

(a) contacting said touchscreen with the object at a first location that is a function of the desired direction, not said displayed location of said highlight marking;

(b) while keeping the object in contact with said touchscreen, moving the object along said touchscreen in the desired direction to a second location; and

(c) immediately following said moving of the object along said touchscreen to said second location, lifting the object from said touchscreen so as to establish a new location of said highlight marking.

**42.** (withdrawn)  An apparatus according to claim **41**, wherein said user interface software is configured to, after the user has marked a desired one of said items by performing steps (a) through (c) so as to highlight said desired one with the highlight marking, select said desired one in response to the user tapping the object on said touchscreen without regard to said display location of the highlight marking.

**43.** (withdrawn)  An apparatus, comprising:

a computing device configured to provide a plurality of features, settings, applications and/or services to a user, said computing device including a user interface that comprises:

a touchscreen for displaying to the user a list of items corresponding to at least one of said plurality of features, settings, applications and/or services and for allowing the user to select any one of said items using said list; and

Atty. Docket No. NEONODE.P004          -20-

NEONODE0000332

user interface software responsive to interaction of an object with said touchscreen so as to allow the user to scroll said list and to select any one of said plurality items, said user interface software configured to scroll said list in a desired direction in response to the user:

(a) contacting said touchscreen with the object at a first location that is a function of the desired direction of said scroll and that is not based on any soft scroll control displayed on said touchscreen; and

(b) while keeping the object in contact with said touchscreen, moving the object along said touchscreen in the desired direction to a second location, wherein said moving of the object causes said list to scroll in the desired direction.

**44.** (withdrawn)  An apparatus according to claim **43**, wherein said user interface software is configured to activate a selected one of said items in response to a user tapping the object on said touchscreen following the user lifting the object from the touchscreen after the user performs step (b).

**45**. (withdrawn)  An apparatus according to claim **43**, wherein said items are files.

**46.** (withdrawn)  An apparatus according to claim **43**, wherein said items are email messages.

**47.** (withdrawn)  An apparatus according to claim **43**, wherein each item is contact information for a corresponding contact.

Atty. Docket No. NEONODE.P004        -21-

NEONODE0000333

REMARKS

Applicant expresses appreciation to the Examiner for the courtesy of an interview granted to applicant's representative Marc A. Berger (Reg. No. 44,029).  The interview was held by telephone on Thursday, September 4, 2008.  The substance of the interview is contained in the Interview Summary, Form PTOL-413, prepared and entered by the Examiner.  Claims **1** - **15** have been amended in accordance with the conclusions of the interview.

Applicant has carefully studied the outstanding Office Action.  The present amendment is intended to place the application in condition for allowance and is believed to overcome all of the objections and rejections made by the Examiner.  Favorable reconsideration and allowance of the application are respectfully requested.

Applicant has withdrawn claims **19** – **47**, and amended claims **1** – **15** to properly claim the present invention.  No new matter has been added.  Claims **1** – **18** are presented for examination.

In paragraphs 1 - 8 of the Office Action, the Examiner has rejected claims **1**, **4** – **7**, **12**, **15** and **17** under 35 U.S.C. §103(a) as being unpatentable over Carlson, F., Visual Quickstart Guide: Palm Organizers ("Carlson") in view of Milic-Frayling et al., US Publication No. 2004/0100510 ("Milic-Frayling"), and further in view of Conrad et al., US Patent No. 5,956,030 ("Conrad").

In paragraph 9 of the Office Action, the Examiner has rejected claims **2** and **3** under 35 U.S.C. §103(a) as being unpatentable over Carlson in view of Milic-Frayling, in view of Conrad, and further in view of Kopitzke et al., US Patent No. 6,988,246 ("Kopitzke").

NEONODE0000334

In paragraph 10 – 13 of the Office Action, the Examiner has rejected claims **8 – 11** under 35 U.S.C. §103(a) as being unpatentable over Carlson in view of Milic-Frayling, in view of Conrad, and further in view of Wynn et al., US Patent No. 6,734,883 ("Wynn").

In paragraph 14 of the Office Action, the Examiner has rejected claim **13** under 35 U.S.C. §103(a) as being unpatentable over Carlson, in view of Milic-Frayling, and further in view of Conrad.

In paragraphs 15 and 16 of the Office Action, the Examiner has rejected claims **14** and **16** under 35 U.S.C. §103(a) as being unpatentable over Carlson, in view of Milic-Frayling, in view of Conrad, and further in view of Strietelmeier, Palm m100, The Gadgeteer ("Strietelmeier").

In paragraphs 17 and 18 of the Office Action, the Examiner has rejected claim **18** under 35 U.S.C. §103(a) as being unpatentable over Carlson, in view of Milic-Frayling, in view of Conrad, and further in view of Chew et al., US Patent No. 6,727,917 ("Chew").

**Distinctions between Claimed Invention and Carlson, F., Visual Quickstart Guide: Palm Organizers, US Publication No. 2004/0100510 of Milic-Frayling et al., US Patent No. 5,956,030 to Conrad et al., US Patent No. 6,988,246 to Kopitzke et al., US Patent No. 6,734,883 to Wynn et al., Strietelmeier, Palm m100, The Gadgeteer, and US Patent No. 6,727,917 to Chew et al.**

Aspects of the subject invention concern a touch-based user interface with functionalities for running interactive applications using touch-based icons, for inputting text using a touch-based keypad, and for managing files using a touch-based file listing. User inputs include finger taps and thumb movements. One such movement is a

Atty. Docket No. NEONODE.P004          -23-

NEONODE0000335

thumb touch-and-glide, where the thumb touches a touch screen at a location where an icon for a function is displayed, and glides along the touch screen away from the location, as illustrated in FIG. 2 of the subject application.

Carlson describes how to use the Palm Organizer touch-based user interface.  Through a series of pictures, Carlson shows how to run applications, view documents, access menus, and use an onscreen keyboard.

Milic-Frayling describes an interactive user interface for presenting search results on small display screens of handheld devices. Search results are annotated to highlight search hits, and text is wrapped so as to avoid the need for horizontal scrolling.

Conrad describes a window management system for keeping open windows offscreen in a drawer area (Conrad/ elements D1 – D4 of FIG. 1), and available for popping them back onscreen by clicking on a title bar or drawer handle of the offscreen window (Conrad/ FIGS. 2 – 4).  Conrad also describes "spring loaded" enclosures for opening temporary windows for enclosure identifiers, during a drag operation (Conrad/ FIGS. 8A – 8D and 9A – 9E).

Kopitzke describes a touch-sensitive user interface for use in an aircraft with multiple cabin systems.  A main menu (Kopitzke/ FIG. 4) provides an overview of cabin status, and information and data regarding the cabin systems.  The main menu includes touch input keys for bringing up menus for each of the individual aircraft cabin systems, for monitoring and controlling their operation.  Cabin systems include inter alia an audio system (Kopitzke/ FIG. 5), a video system, a lighting system (Kopitzke/ FIG. 6), a climate control system, a doors & hatches

Atty. Docket No. NEONODE.P004          -24-

NEONODE0000336

system (Kopitzke/ FIG. 7), a water supply system (Kopitzke/ FIG. 8), an electric power supply system, and a data communication system.

Wynn describes a user interface for spinning through a list of items. The user interface displays a preview list of items and a postview list of items on opposite sides of a currently selected item in the list (Wynn/ FIG. 7).

Strietelmeier describes the mechanical casing, hardware components and software applications of the Palm m100 Organizer, in comparison with the Palm IIIc, the Palm V and the Handspring Visor.

Chew describes a user interface for running and interacting with multiple applications on small handheld device display screens. Chen describes a user interface display having a top portion with a navigation bar (Chew/ element 302 of FIG. 3) for navigating between different applications, a middle portion for graphically displaying outputs of a currently active application, and a bottom portion with an application menu bar (Chew/ element 304 of FIG. 3) for entering inputs to the currently active application.

The touch-based user interface of the subject claimed invention is generally operated by the thumb. The touch-based user interface of Carlson is generally operated by a stylus. Although, the user interface of Carlson may also be operated by the thumb, the natures of the two user interfaces are distinct. The subject claimed invention teaches "rubbing", "touch-and-glide" movements to operate a user interface, whereby the thumb touches a touch-sensitive screen and rubs, or glides, along the screen without lifting the thumb. In distinction, tap movements and one-stroke pen drags are used to operate the touch-based user interface of Carlson. In terms of motor skill, the touch-and-glide movements of the subject claimed invention are akin to pressing

Atty. Docket No. NEONODE.P004          -25-

NEONODE0000337

with the thumb on a mechanical slider button, such as the slider button with HI/LO/OFF settings on a hair-dryer handle, and sliding the button up or down while it is pressed.

The touch-and-glide movements of the subject claimed invention are illustrated in FIGS. 2, 7 and 10 by a left-arrow and a thumb touching a touch-sensitive screen.

The touch-and-glide movements of the subject claimed invention are used to activate functions (original specification/ Abstract; page 2, lines 25 – 28; page 5, lines 24 – 27; FIG. 2; original claim **1**), and to scroll a selector forward and backward within a list to select a desired item in the list, and to page up and page down within a list (original specification/ page 3, lines 28 – page 4, line 2; page 7, lines 7 – 10; page 7, line 27 – page 9, line 14; FIGS. 7 and 10; original claims **7, 9** and **10**).

The touch-and-glide movements of the subject claimed invention activate a function located at the touch point.  The one-stroke pen drag movement of Carlson activates a pre-designated program, irrespective of where the pen drag begins; namely, the onscreen keyboard or a custom pre-designated program that may be substituted therefor.

Other conventional finger-based touch screens, such as the large touch screens used for self-serve check-in at airport terminals, use touch-sensitive input keys.  In distinction, the touch-and-glide inputs of the subject claimed invention are of particular advantage for small handheld devices, where screen space is minimal.

Atty. Docket No. NEONODE.P004        -26-

NEONODE0000338

**Response to Examiner's Arguments**

In rejecting independent claim **1**, the Examiner has cited the "one-stroke pen drag" (Carlson/ page 30; FIG. 2.22) as teaching that "*any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area*". In rejecting dependent claim **9**, the Examiner has cited dragging a vertical scroll bar (Carlson/ page 27). In rejecting dependent claim **12**, the Examiner has cited dragging a horizontal scroll bar (Carlson/ page 246; FIG. 14.2).

Applicant respectfully submits that the one-stroke drag of Carlson is very distinct from the location-based touch-and-glide movement of the subject invention (original specification/ FIG. 2). The following table summarizes some of the relevant distinctions.

| TABLE I: Partial list of distinctions between one-stroke drag of Carlson and location-based touch-and-glide movement of the claimed invention | |
|---|---|
| **One-stroke drag** | **Location-based touch-and-glide** |
| Default function is the onscreen keyboard; may be customized to activate a different pre-designated function. | The function displayed at the touch point is activated. |
| At any given time, may be used for activating only one pre-designated function. | At any given time, may be used for activating whichever function is touched, from among a plurality of functions. |
| The starting location has no bearing on the function that is activated. | The starting location determines which of the plurality of functions is activated. |
| Performed by a stylus. | Performed by the thumb. |
| Requires the user interface to recognize a vertical drag. | Requires the user interface to recognize a glide and identify the function displayed at the starting location of the glide. |
| Requires one hand to hold the device and another hand to perform the stylus movement. | The same hand may be used to hold the device and perform the thumb movement. |
| Not used for scrolling through a list. | Used for scrolling through a list. |

Atty. Docket No. NEONODE.P004          -27-

NEONODE0000339

Applicant further respectfully submits that the scroll slider drag of Carlson is very distinct from the location-based touch-and-glide movement of the subject invention.  The following table summarizes some of the relevant distinctions.

| TABLE II: Partial list of distinctions between scroll slider drag of Carlson and location-based touch-and-glide movement of the claimed invention | |
| --- | --- |
| **Scroll slider drag** | **Location-based touch-and-glide** |
| Requires the user interface to recognize a horizontal drag or a vertical drag. | Requires the user interface to recognize a glide in any of a plurality of directions. |
| Performed by a stylus. | Performed by the thumb. |
| Requires one hand to hold the device and another hand to perform the stylus movement. | The same hand may be used to hold the device and perform the thumb movement. |
| Not used for scrolling through a list. | Used for scrolling through a list. |

In order to clarify these distinctions, applicant has amended claim **1** to include the limitation of each of the plurality of functions being mapped to a corresponding location in the touch sensitive area, and being activated by an object touching the corresponding location and then gliding along the touch sensitive area away from the location.

Applicant has carefully reviewed all of the cited prior art.  None of the cited prior art teaches the location-based touch-and-glide thumb movement of the subject claimed invention.  Specifically, Milic-Frayling and Conrad do not use touch screens.  Kopitzke uses touch input keys.  Wynn mentions touch sensitive displays with stylus pens.  Strietelmeier mentions writing with a stylus.  Chew uses a stylus to tap on a touch screen.

The rejections of the claims **1 – 18** in paragraphs 1 - 18 of the Office Action will now be dealt with specifically.

NEONODE0000340

As to amended independent claim **1** for a computer readable medium, applicant respectfully submits that the limitation in claim **1** of

"*each function of said plurality of functions being mapped to a corresponding location in the touch sensitive area at which the representation of the function is displayed, and being activated by an object touching the corresponding location and then gliding along the touch sensitive area away from the location*"
is neither shown nor suggested in Carlson, Milic-Frayling, Conrad, Kopitzke, Wynn, Strietelmeier or Chew.

Because claims **2 – 18** depend from claim **1** and include additional features, applicant respectfully submits that claims **2 – 18** are not anticipated or rendered obvious by Carlson, Milic-Frayling, Conrad, Kopitzke, Wynn, Strietelmeier, Chew, or a combination of Carlson, Milic-Frayling, Conrad, Kopitzke, Wynn, Strietelmeier and Chew.

Accordingly claims **1 – 18** are deemed to be allowable.


## **Support for Amended Claims in Original Specification**

Independent claim **1** has been amended to include the limitation of each of a plurality of functions being mapped to a corresponding location in a touch sensitive area, and being activated by an object touching the corresponding location and then gliding along the touch sensitive area away from the location.  This limitation is supported in the original specification at least at page 2, lines 25 – 28, at page 5, lines 19 – 27, at FIGS. 1, 2, 7 and 10, and in the Abstract.

Atty. Docket No. NEONODE.P004        -29-

NEONODE0000341

For the foregoing reasons, applicant respectfully submits that the applicable objections and rejections have been overcome and that the claims are in condition for allowance.

Respectfully submitted,

Dated: September 8, 2008

/Marc A. Berger/
Marc A. Berger
Reg. No. 44,029

P.O. Box 691
Soquel, CA   95073
(831) 426-8200

Atty. Docket No. NEONODE.P004          -30-

NEONODE0000342

## Electronic Acknowledgement Receipt

| | |
|---|---|
| EFS ID: | 3900808 |
| Application Number: | 10315250 |
| International Application Number: | |
| Confirmation Number: | 1226 |
| Title of Invention: | User interface |
| First Named Inventor/Applicant Name: | Magnus  Goertz |
| Customer Number: | 60956 |
| Filer: | Marc Aron Berger |
| Filer Authorized By: | |
| Attorney Docket Number: | 3682-32 |
| Receipt Date: | 08-SEP-2008 |
| Filing Date: | 10-DEC-2002 |
| Time Stamp: | 11:05:11 |
| Application Type: | Utility under 35 USC 111(a) |

## Payment information:

| Submitted with Payment | no |
|---|---|

### File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Amendment After Final | NEONODEP004AmendmentAfterFinal.pdf | 141398<br>6268086be27b48a9dbd06ec1463153810dd11690 | no | 30 |

| Warnings: |
|---|
| **Information:** |

NEONODE0000343

| Total Files Size (in bytes): | 141398 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000344



PTO/SB/81 (07-08)
Approved for use through 12/31/2008. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| POWER OF ATTORNEY OR REVOCATION OF POWER OF ATTORNEY WITH A NEW POWER OF ATTORNEY AND CHANGE OF CORRESPONDENCE ADDRESS | | |
|---|---|---|
| Application Number | 10/315,250 | |
| Filing Date | December 10, 2002 | |
| First Named Inventor | Magnus Goertz | |
| Title | USER INTERFACE | |
| Art Unit | 2174 | |
| Examiner Name | Pitaro, Ryan F. | |
| Attorney Docket Number | NEONODE.P004 | |

I hereby revoke all previous powers of attorney given in the above-identified application.

☐ A Power of Attorney is submitted herewith.

OR

☒ I hereby appoint Practitioner(s) associated with the following Customer Number as my/our attorney(s) or agent(s) to prosecute the application identified above, and to transact all business in the United States Patent and Trademark Office connected therewith:

**75660**

OR

☐ I hereby appoint Practitioner(s) named below as my/our attorney(s) or agent(s) to prosecute the application identified above, and to transact all business in the United States Patent and Trademark Office connected therewith:

| Practitioner(s) Name | Registration Number |
|---|---|
| | |
| | |
| | |
| | |

Please recognize or change the correspondence address for the above-identified application to:

☒ The address associated with the above-mentioned Customer Number.

OR

☐ The address associated with Customer Number:

OR

| ☐ Firm or Individual Name | |
|---|---|
| Address | |
| City | State | Zip |
| Country | |
| Telephone | Email |

I am the:

☐ Applicant/Inventor.

OR

☒ Assignee of record of the entire interest. See 37 CFR 3.71.
Statement under 37 CFR 3.73(b) (Form PTO/SB/96) submitted herewith or filed on _____.

**SIGNATURE of Applicant or Assignee of Record**

| Signature | | Date | 28 August 2008 |
|---|---|---|---|
| Name | Per Bystedt | Telephone | +46 8 678 1850 |
| Title and Company | CEO, Neonode | | |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below*.

☐ *Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.31, 1.32 and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

NEONODE0000345



PTO/SB/96 (08-08)
Approved for use through 08/31/2008. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## STATEMENT UNDER 37 CFR 3.73(b)

Applicant/Patent Owner: __Neonode AB__

Application No./Patent No.: __10/315,250__          Filed/Issue Date: __December 10, 2002__

Entitled:      USER INTERFACE

__Neonode AB_____ , a   __corporation_____
(Name of Assignee)                                    (Type of Assignee, e.g., corporation, partnership, university, government agency, etc.)

states that it is:
1. [✓] the assignee of the entire right, title, and interest; or

2. [ ] an assignee of less than the entire right, title and interest
   (The extent (by percentage) of its ownership interest is _____ %)

in the patent application/patent identified above by virtue of either:

A. [ ] An assignment from the inventor(s) of the patent application/patent identified above. The assignment was recorded in the United States Patent and Trademark Office at Reel _____, Frame _____, or for which a copy thereof is attached.

**OR**

B. [✓] A chain of title from the inventor(s), of the patent application/patent identified above, to the current assignee as follows:

   1. From: __Magnus Goertz_____     To: __Neonode Sweden AB_____
      The document was recorded in the United States Patent and Trademark Office at
      Reel __018163____, Frame __0611_____, or for which a copy thereof is attached.

   2. From: __Neonode Sweden AB_____     To: __Neonode AB_____
      The document was recorded in the United States Patent and Trademark Office at
      Reel __018137_____, Frame __0448_____, or for which a copy thereof is attached.

   3. From: _____     To: _____
      The document was recorded in the United States Patent and Trademark Office at
      Reel _____, Frame _____, or for which a copy thereof is attached.

   [ ] Additional documents in the chain of title are listed on a supplemental sheet.

[✓] As required by 37 CFR 3.73(b)(1)(i), the documentary evidence of the chain of title from the original owner to the assignee was, or concurrently is being, submitted for recordation pursuant to 37 CFR 3.11.

   [NOTE: A separate copy (*i.e.*, a true copy of the original assignment document(s)) must be submitted to Assignment Division in accordance with 37 CFR Part 3, to record the assignment in the records of the USPTO. See MPEP 302.08]

The undersigned (whose title is supplied below) is authorized to act on behalf of the assignee.

_____          __28 August 2008_____
Signature                                           Date

_____          +46 8 678 1850
Per Bystedt

Printed or Typed Name                          Telephone Number

_____
CEO, Neonode
Title

This collection of information is required by 37 CFR 3.73(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE. P004 |

**CONFIRMATION NO. 1226**

**POA ACCEPTANCE LETTER**

75660
Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073



*OC000000032006069*

Date Mailed: 09/11/2008

## NOTICE OF ACCEPTANCE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 09/03/2008.

The Power of Attorney in this application is accepted. Correspondence in this application will be mailed to the above address as provided by 37 CFR 1.33.

/sleutchit/

Office of Data Management, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

NEONODE0000347

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | 3682-32 |

**CONFIRMATION NO. 1226**

60956
Professional Patent Solutions
P.O. BOX 654
HERZELIYA PITUACH, 46105
ISRAEL

**POWER OF ATTORNEY NOTICE**

*OC000000032006022*

Date Mailed: 09/11/2008

## NOTICE REGARDING CHANGE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 09/03/2008.

- The Power of Attorney to you in this application has been revoked by the assignee who has intervened as provided by 37 CFR 3.71. Future correspondence will be mailed to the new address of record(37 CFR 1.33).

/sleutchit/

Office of Data Management, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

page 1 of 1

NEONODE0000348

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

75660     7590     10/15/2008
Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073

| EXAMINER |
|---|
| PITARO, RYAN F |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2174 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/15/2008 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

NEONODE0000349

| *Advisory Action*<br>*Before the Filing of an Appeal Brief* | Application No.<br>*10/315,250* | Applicant(s)<br>GOERTZ, MAGNUS | |
|---|---|---|---|
| | Examiner<br>RYAN F. PITARO | Art Unit<br>2174 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

THE REPLY FILED <u>08 September 2008</u> FAILS TO PLACE THIS APPLICATION IN CONDITION FOR ALLOWANCE.

1. ☐ The reply was filed after a final rejection, but prior to or on the same day as filing a Notice of Appeal. To avoid abandonment of this application, applicant must timely file one of the following replies: (1) an amendment, affidavit, or other evidence, which places the application in condition for allowance; (2) a Notice of Appeal (with appeal fee) in compliance with 37 CFR 41.31; or (3) a Request for Continued Examination (RCE) in compliance with 37 CFR 1.114. The reply must be filed within one of the following time periods:

a) ☐ The period for reply expires _____ months from the mailing date of the final rejection.

b) ☐ The period for reply expires on: (1) the mailing date of this Advisory Action, or (2) the date set forth in the final rejection, whichever is later. In no event, however, will the statutory period for reply expire later than SIX MONTHS from the mailing date of the final rejection.

Examiner Note: If box 1 is checked, check either box (a) or (b). ONLY CHECK BOX (b) WHEN THE FIRST REPLY WAS FILED WITHIN TWO MONTHS OF THE FINAL REJECTION. See MPEP 706.07(f).

Extensions of time may be obtained under 37 CFR 1.136(a). The date on which the petition under 37 CFR 1.136(a) and the appropriate extension fee have been filed is the date for purposes of determining the period of extension and the corresponding amount of the fee. The appropriate extension fee under 37 CFR 1.17(a) is calculated from: (1) the expiration date of the shortened statutory period for reply originally set in the final Office action; or (2) as set forth in (b) above, if checked. Any reply received by the Office later than three months after the mailing date of the final rejection, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

<u>NOTICE OF APPEAL</u>

2. ☐ The Notice of Appeal was filed on _____. A brief in compliance with 37 CFR 41.37 must be filed within two months of the date of filing the Notice of Appeal (37 CFR 41.37(a)), or any extension thereof (37 CFR 41.37(e)), to avoid dismissal of the appeal. Since a Notice of Appeal has been filed, any reply must be filed within the time period set forth in 37 CFR 41.37(a).

<u>AMENDMENTS</u>

3. ☒ The proposed amendment(s) filed after a final rejection, but prior to the date of filing a brief, will <u>not</u> be entered because

(a)☒ They raise new issues that would require further consideration and/or search (see NOTE below);

(b)☐ They raise the issue of new matter (see NOTE below);

(c)☐ They are not deemed to place the application in better form for appeal by materially reducing or simplifying the issues for appeal; and/or

(d)☐ They present additional claims without canceling a corresponding number of finally rejected claims.

NOTE: *The newly added claim amendments would require further search and consideration as discussed in an interview*. (See 37 CFR 1.116 and 41.33(a)).

4. ☐ The amendments are not in compliance with 37 CFR 1.121. See attached Notice of Non-Compliant Amendment (PTOL-324).

5. ☐ Applicant's reply has overcome the following rejection(s): _____.

6. ☐ Newly proposed or amended claim(s) _____ would be allowable if submitted in a separate, timely filed amendment canceling the non-allowable claim(s).

7. ☒ For purposes of appeal, the proposed amendment(s): a) ☒ will not be entered, or b) ☐ will be entered and an explanation of how the new or amended claims would be rejected is provided below or appended.

The status of the claim(s) is (or will be) as follows:

Claim(s) allowed: _____.

Claim(s) objected to: _____.

Claim(s) rejected: _____.

Claim(s) withdrawn from consideration: _____.

<u>AFFIDAVIT OR OTHER EVIDENCE</u>

8. ☐ The affidavit or other evidence filed after a final action, but before or on the date of filing a Notice of Appeal will <u>not</u> be entered because applicant failed to provide a showing of good and sufficient reasons why the affidavit or other evidence is necessary and was not earlier presented. See 37 CFR 1.116(e).

9. ☐ The affidavit or other evidence filed after the date of filing a Notice of Appeal, but prior to the date of filing a brief, will <u>not</u> be entered because the affidavit or other evidence failed to overcome <u>all</u> rejections under appeal and/or appellant fails to provide a showing a good and sufficient reasons why it is necessary and was not earlier presented. See 37 CFR 41.33(d)(1).

10. ☐ The affidavit or other evidence is entered. An explanation of the status of the claims after entry is below or attached.

<u>REQUEST FOR RECONSIDERATION/OTHER</u>

11. ☐ The request for reconsideration has been considered but does NOT place the application in condition for allowance because: _____.

12. ☐ Note the attached Information *Disclosure Statement*(s). (PTO/SB/08) Paper No(s). _____

13. ☐ Other: _____.

/Stephen S. Hong/
Supervisory Patent Examiner, Art Unit 2178

NEONODE0000350

**Continuation Sheet (PTOL-303)**                                        **Application No.**

2

NEONODE0000351

Attorney's Docket No.: <u>NEONODE.P004</u>      *PATENT*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In Re Patent Application of: ) | |
| ) | Examiner:  Ryan F. Pitaro |
| Magnus Goertz ) | |
| ) | Art Unit:    2174 |
| Application No: 10/315,250 ) | |
| ) | |
| Filed:    December 10, 2002 ) | |
| ) | |
| For:    USER INTERFACE FOR ) | |
| MOBILE HANDHELD ) | |
| COMPUTER UNIT ) | |
| _____ ) | |

Mail Stop AMENDMENT
Commissioner for Patents
P. O. Box 1450
Alexandria, VA   22313-1450

## <u>AMENDMENT AND RESPONSE TO OFFICE ACTION</u>

### <u>UNDER 37 C.F.R. §1.116</u>

Sir:

In response to the Office Action dated July 11, 2008, applicant respectfully requests that the above-identified application be amended as follows:

DO NOT ENTER: /R.P./

10/06/2008

NEONODE0000352

Doc code: RCEX
Doc description: Request for Continued Examination (RCE)

PTO/SB/30EFS (09-08)
Approved for use through 10/31/2008. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

## REQUEST FOR CONTINUED EXAMINATION(RCE)TRANSMITTAL
## (Submitted Only via EFS-Web)

| Application Number | 10/315,250 | Filing Date | 2002-12-10 | Docket Number (if applicable) | NEONODE.P004 | Art Unit | 2174 |
|---|---|---|---|---|---|---|---|
| First Named Inventor | Magnus Goertz | | | Examiner Name | Ryan F. Pitaro | | |

**This is a Request for Continued Examination (RCE) under 37 CFR 1.114 of the above-identified application.**
Request for Continued Examination (RCE) practice under 37 CFR 1.114 does not apply to any utility or plant application filed prior to June 8, 1995, or to any design application. The Instruction Sheet for this form is located at WWW.USPTO.GOV

### SUBMISSION REQUIRED UNDER 37 CFR 1.114

Note: If the RCE is proper, any previously filed unentered amendments and amendments enclosed with the RCE will be entered in the order in which they were filed unless applicant instructs otherwise. If applicant does not wish to have any previously filed unentered amendment(s) entered, applicant must request non-entry of such amendment(s).

[X] Previously submitted. If a final Office action is outstanding, any amendments filed after the final Office action may be considered as a submission even if this box is not checked.

    [ ] Consider the arguments in the Appeal Brief or Reply Brief previously filed on _____

    [ ] Other _____

[ ] Enclosed

    [ ] Amendment/Reply

    [ ] Information Disclosure Statement (IDS)

    [ ] Affidavit(s)/ Declaration(s)

    [ ] Other

### MISCELLANEOUS

[ ] Suspension of action on the above-identified application is requested under 37 CFR 1.103(c) for a period of months _____
(Period of suspension shall not exceed 3 months; Fee under 37 CFR 1.17(i) required)

[ ] Other

### FEES

**The RCE fee under 37 CFR 1.17(e) is required by 37 CFR 1.114 when the RCE is filed.**
[ ] The Director is hereby authorized to charge any underpayment of fees, or credit any overpayments, to Deposit Account No _____

### SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED

[X] Patent Practitioner Signature
[ ] Applicant Signature

EFS - Web 2.1.5

NEONODE0000353

Doc code: RCEX
Doc description: Request for Continued Examination (RCE)

PTO/SB/30EFS (09-08)
Approved for use through 10/31/2008. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Signature of Registered U.S. Patent Practitioner | | | |
|---|---|---|---|
| Signature | /Marc A. Berger/ | Date (YYYY-MM-DD) | 2008-10-15 |
| Name | Marc A. Berger | Registration Number | 44029 |

This collection of information is required by 37 CFR 1.114. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

EFS - Web 2.1.5

NEONODE0000354

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS - Web 2.1.5

NEONODE0000355

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 10315250 |
| **Filing Date:** | 10-Dec-2002 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Filer:** | Marc Aron Berger |
| **Attorney Docket Number:** | NEONODE.P004 |

Filed as Large Entity

### Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

NEONODE0000356

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Request for continued examination | 1801 | 1 | 810 | 810 |
| **Total in USD ($)** | | | | **810** |

NEONODE0000357

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 4121130 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus  Goertz |
| **Customer Number:** | 75660 |
| **Filer:** | Marc Aron Berger |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | NEONODE.P004 |
| **Receipt Date:** | 15-OCT-2008 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 17:33:26 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $810 |
| RAM confirmation Number | 2961 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

NEONODE0000358

| 1 | Request for Continued Examination (RCE) | NeonodeP004RCE.pdf | 697150 ca2986bf4145018741de9c2f319d642ff82a 057d | no | 3 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 2 | Fee Worksheet (PTO-06) | fee-info.pdf | 29864 65d0586c07529883cd3a52375b89fd6bba3 9fc41 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | | | **Total Files Size (in bytes):** | 727014 | |
|---|---|---|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000359



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

75660      7590      12/23/2008
Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073

| EXAMINER |
|---|
| PITARO, RYAN F |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2174 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/23/2008 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

NEONODE0000360

| | Application No. | Applicant(s) |
|---|---|---|
| ***Office Action Summary*** | 10/315,250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** | |
| | RYAN F. PITARO | 2174 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *3* MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *15 October 2008*.

2a)☐ This action is **FINAL**.          2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) *1-18* is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) *1-18* is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All    b)☐ Some * c)☐ None of:

        1.☐ Certified copies of the priority documents have been received.

        2.☐ Certified copies of the priority documents have been received in Application No. _____.

        3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date _____.

4) ☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

NEONODE0000361

Application/Control Number: 10/315,250                                    Page 2
Art Unit: 2174

## *Response to Amendment*

1.      This action is in response to the amendment filed 10/15/2008. In the amendment claims 1-18 were amended. This action is non-final.

## *Continued Examination Under 37 CFR 1.114*

2.      A request for continued examination under 37 CFR 1.114, including the fee set forth in 37 CFR 1.17(e), was filed in this application after final rejection.  Since this application is eligible for continued examination under 37 CFR 1.114, and the fee set forth in 37 CFR 1.17(e) has been timely paid, the finality of the previous Office action has been withdrawn pursuant to 37 CFR 1.114.  Applicant's submission filed on 10/15/2008 has been entered.

## *Claim Rejections - 35 USC § 102*

3.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

NEONODE0000362

Application/Control Number: 10/315,250                                           Page 3

Art Unit: 2174

4.      Claim 1 is rejected under 35 U.S.C. 102(e) as being anticipated by Nakajima et al

("Nakajima", 6,346,935).

As per claim 1, Nakajima teaches a computer readable medium storing a

computer program with computer program code, which, when read by a mobile

handheld computer unit, allows the computer to present a user interface for the mobile

handheld computer unit, the user interface comprising: a touch sensitive area in which

representations of a plurality of functions are displayed (Column 15 lines 1-9, *function

signs*), and each function of said plurality of functions being mapped to a corresponding

location in the touch sensitive area at which the representation of the function is

displayed (Column 15 lines 1-9, *stops moving finger*), and being activated by an object

touching the corresponding location and then gliding along the touch sensitive area

away from the location (Column 15 lines 1-15, *stops moving finger then glides finger to

lightly press surface*).

**Claim Rejections - 35 USC § 103**

NEONODE0000363

Application/Control Number: 10/315,250                                                                Page 4

Art Unit: 2174

5.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

6.      Claims 2-11,14-18 rejected under 35 U.S.C. 103(a) as being unpatentable over

Nakajima et al ("Nakajima", 6,346,935) in view of Rogue ("Rogue", Palm Pilot: The

Ultimate Guide, 2nd Edition).


        As per claim 2, Nakajima fails to particularly disclose a function to display a

plurality of functions. However, Rogue teaches a computer readable medium of claim 1,

wherein one function from the plurality of functions, when activated, causes the user

interface to display icons representing different services or settings for a currently active

application (Figure 1.2, *Tap the application button to display your application launching

screen*).Therefore it would have been obvious to an artisan at the time of the invention

to combine the teaching of Rogue with the medium of Nakajima. Motivation to do so

would have been to provide a way to reduce screen clutter and only access the

applications when needed.


        As per claim 3, Nakajima-Rogue teaches a computer readable medium of claim

2, wherein the user interface is characterised in, that a selection of a preferred service

or setting is done by tapping on a display icon corresponding to the preferred service or

setting (Nakajima, Column 18 lines 30-40, tap).

NEONODE0000364

Application/Control Number: 10/315,250                                               Page 5
Art Unit: 2174

As per claim 4, Nakajima-Rogue teaches a computer readable medium of claim 1, wherein one function from the plurality of functions, when_activated, causes the user interface to display a keyboard and a text field (Figure 2.5, power stroke up, Figure 2.6).

As per claim 5, Nakajima-Rogue teaches a wherein said text field is used for inputting and editing of text through said keyboard (Nakajima, Figure 2.6).

As per claim 6, Nakajima-Rogue teaches a computer readable medium of claim 1, wherein one function from the plurality of functions, when activated, causes the user interface to display a list with a library of available applications and files on the mobile handheld computer unit (Rogue, Sidebar 1, Categories).

As per claim 7, Nakajima-Rogue teaches a computer readable medium of claim 6, wherein the user interface is characterised in, that a selection of an application or file is done by gliding the object along said touch sensitive area so that a representation of a desired one of said application or file is highlighted, raising said object from said touch sensitive area, and then tapping on said touch sensitive area (Nakajima, Column 18 lines 40-56).

NEONODE0000365

Application/Control Number: 10/315,250                                      Page 6
Art Unit: 2174

As per claim 8, Nakajima-Rogue teaches a computer readable medium of claim

7, wherein the user interface is characterised in, that at any given time said list presents

only files or only applications, and that an area of said list presents a field through which

the said list can be changed from presenting files to presenting applications, or from

presenting applications to presenting files (Rogue, Sidebar 1, Categories).

As per claim 9, Nakajima-Rogue teaches a computer readable medium of claim

7, wherein the user interface is characterised in, that, one item in said list is highlighted

by a moveable marking, and gliding the object along the touch sensitive area in a

direction towards the top of said list or towards the bottom of said list, causes said

marking to move in the same direction without scrolling the list (Rogue, Figure 1.4,

using the menu).

As per claim 10, Nakajima-Rogue teaches a computer readable medium of claim

9, wherein the user interface is characterised in, that, if the number of applications or

files in said list exceeds the number of applications or files that can be presented on

said touch sensitive area as content, and if the object is glided along said touch

sensitive area to the top or bottom position of said touch sensitive area, then raised,

replaced on said touch sensitive area, and again glided along said touch sensitive area

to the top or bottom of said touch sensitive area, the content of said touch sensitive area

will be replaced one whole page (Nakajima, Column 14 lines 45-57).

NEONODE0000366

Application/Control Number: 10/315,250                                    Page 7
Art Unit: 2174

As per claim 11, Nakajima-Rogue teaches a computer readable medium of claim 10, wherein the user interface is characterised in, that if the object is raised from any first position on said touch sensitive area and then replaced on any second position on said touch sensitive area, said navigation can be continued from said second position (Nakajima, Column 14 lines 45-57).

As per claim 14, while Nakajima-Rogue-O'Rourke fails to teach a touch sensitive area is 2-3 inches. OFFICIAL NOTICE is taken that screen sizes vary and screens with a touch sensitive area of 2-3 inches diagonally is well known in the art. Therefore it would have been obvious to an artisan at the time of the invention to combine the screen size with the medium of Nakajima-Rogue. Motivation to do so would have been to provide adequate size to operate the touch screen while keeping it small enough to fit in a pocket.

As per claim 15, Nakajima-Rogue teaches a enclosure adapted to cover the mobile handheld computer unit according to Claim 1, characterised in, that said enclosure is provided with an opening for said touch sensitive area (Rogue, Figure 1.1).

As per claim 16, Nakajima-Rogue fails to teach an enclosure is removable and exchangeable. OFFICIAL NOTICE is taken that an enclosure is removable and exchangeable is well known in the art. Therefore it would have been obvious to an

Application/Control Number: 10/315,250                                              Page 8

Art Unit: 2174

artisan at the time of the invention to combine the exchangeable enclosure with the

medium of Nakajima-Rogue. Motivation to do so would have been to provide a way to

style your mobile device so that it can be personalized to a user's taste.


As per claim 17, Nakajima-Rogue teaches a a computer readable medium, with a

computer program product stored therein, characterised in, that said computer program

product comprises computer readable code, which, when read by a computer, will make

it possible for said computer to present a user interface according to Claim 1 (Rogue,

1.1 Palm Pilot Basics).


As per claim 18, Nakajima-Rogue teaches a computer readable medium

according to Claim 17, characterised in, that said computer program product is adapted

to function as a shell upon an operations system (Rogue, 1.1 Palm Pilot Basics).


7.    Claims 12 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Nakajima et al ("Nakajima", 6,346,935) in view of Rogue ("Rogue", Palm Pilot: The

Ultimate Guide, 2nd Edition) in view of O'Rourke (O'Rourke, US 7,225,408).


NEONODE0000368

Application/Control Number: 10/315,250                                   Page 9
Art Unit: 2174

As per claim 12, Nakajima-Rogue teaches a computer readable medium of claim 1, wherein the user interface is characterized in, that an active application, function, service or setting is moved on one step by gliding the object along the touch sensitive area from left to right (Nakajima, Column 14 lines 45-57). However, Nakajima-Rogue fails to distinctly point out closing or backing one step. However, O'Rourke teaches that the active application, function, service or setting is closed or backed one step (Figure 13, right and left arrows). Therefore it would have been obvious to an artisan at the time of the invention to combine the glide functionality with the forward and backward functionality of O'Rourke. Motivation to do so would have been to provide an easy way to traverse the GUI.

As per claim 13, Nakajima-Rogue-O'Rourke teaches a computer readable medium of claim 1, wherein the user interface is characterised in, that said representations of said plurality of functions are located at the bottom of said touch sensitive area (O'Rourke, Figure 13, icons at bottom right) .

NEONODE0000369

Application/Control Number: 10/315,250                                      Page 10
Art Unit: 2174

## *Response to Arguments*

Applicant's arguments with respect to claims 1-18 have been considered but are
moot in view of the new ground(s) of rejection.

## *Conclusion*

Any inquiry concerning this communication or earlier communications from the
examiner should be directed to RYAN F. PITARO whose telephone number is
(571)272-4071. The examiner can normally be reached on 9:00am - 5:30pm Mondays
through Fridays.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's
supervisor, Stephen Hong can be reached on 571-272-4124. The fax phone number for
the organization where this application or proceeding is assigned is 571-273-8300.

NEONODE0000370

Application/Control Number: 10/315,250                                          Page 11
Art Unit: 2174

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/R. F. P./                                         /Stephen S. Hong/
Examiner, Art Unit 2174                            Supervisory Patent Examiner, Art
                                                   Unit 2178

NEONODE0000371

| | Notice of References Cited | Application/Control No. 10/315,250 | Applicant(s)/Patent Under Reexamination GOERTZ, MAGNUS | |
|---|---|---|---|---|
| | | Examiner RYAN F. PITARO | Art Unit 2174 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-7,225,408 | 05-2007 | O'Rourke, Kevin | 715/743 |
| * | B | US-2002/0171691 | 11-2002 | Currans et al. | 345/864 |
| * | C | US-6,346,935 | 02-2002 | Nakajima et al. | 345/173 |
| * | D | US-6,085,204 | 07-2000 | Chijiwa et al. | 715/246 |
| * | E | US-5,053,758 | 10-1991 | Cornett et al. | 345/174 |
| * | F | US-7,286,063 | 10-2007 | Gauthey et al. | 341/34 |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | Venoila et al, T-Cube: A Fast, Self Disclosing Pen-Based Alphabet, 1994, pages 265-270 |
| | V | Karlson et al, AppLens and LaunchTile:Two Designs for One-Handed Thumb Use on Small Devices, CHI 2005 |
| | W | Dulberg et al, An Imprecise Mouse Gesture for the FAst Activation of Controls, Interact 1999, pages 1-8 |
| | X | Rogue, Palm Pilot: The Ultimate Guide, 2nd Edition,1998,  O'Reilly and Associates, Inc. pages 1-17 |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**                    Part of Paper No. 20081221

NEONODE0000372

| | | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| **Index of Claims** | | 10315250 | GOERTZ, MAGNUS |
| | | Examiner | Art Unit |
| | | Ryan F Pitaro | 2174 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| ☐ Claims renumbered in the same order as presented by applicant | | ☐ CPA | ☐ T.D. | ☐ R.1.47 |
|---|---|---|---|---|

| CLAIM | | DATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | 06/23/2008 | 12/21/2008 | | | | | |
| | 1 | ✓ | ✓ | ✓ | | | | | |
| | 2 | ✓ | ✓ | ✓ | | | | | |
| | 3 | ✓ | ✓ | ✓ | | | | | |
| | 4 | ✓ | ✓ | ✓ | | | | | |
| | 5 | ✓ | ✓ | ✓ | | | | | |
| | 6 | ✓ | ✓ | ✓ | | | | | |
| | 7 | ✓ | ✓ | ✓ | | | | | |
| | 8 | ✓ | ✓ | ✓ | | | | | |
| | 9 | ✓ | ✓ | ✓ | | | | | |
| | 10 | ✓ | ✓ | ✓ | | | | | |
| | 11 | ✓ | ✓ | ✓ | | | | | |
| | 12 | ✓ | ✓ | ✓ | | | | | |
| | 13 | ✓ | ✓ | ✓ | | | | | |
| | 14 | ✓ | ✓ | ✓ | | | | | |
| | 15 | ✓ | ✓ | ✓ | | | | | |
| | 16 | ✓ | ✓ | ✓ | | | | | |
| | 17 | ✓ | ✓ | ✓ | | | | | |
| | 18 | ✓ | ✓ | ✓ | | | | | |
| | 19 | | ÷ | N | | | | | |
| | 20 | | ÷ | N | | | | | |
| | 21 | | ÷ | N | | | | | |
| | 22 | | ÷ | N | | | | | |
| | 23 | | ÷ | N | | | | | |
| | 24 | | ÷ | N | | | | | |
| | 25 | | ÷ | N | | | | | |
| | 26 | | ÷ | N | | | | | |
| | 27 | | ÷ | N | | | | | |
| | 28 | | ÷ | N | | | | | |
| | 29 | | ÷ | N | | | | | |
| | 30 | | ÷ | N | | | | | |
| | 31 | | ÷ | N | | | | | |
| | 32 | | ÷ | N | | | | | |
| | 33 | | ÷ | N | | | | | |
| | 34 | | ÷ | N | | | | | |
| | 35 | | ÷ | N | | | | | |
| | 36 | | ÷ | N | | | | | |

U.S. Patent and Trademark Office                                            Part of Paper No. : 20081221

NEONODE0000373

| Index of Claims | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 10315250 | GOERTZ, MAGNUS |
| | Examiner | Art Unit |
| | Ryan F Pitaro | 2174 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| ☐ Claims renumbered in the same order as presented by applicant | | | ☐ CPA | ☐ T.D. | ☐ R.1.47 |

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | 06/23/2008 | 12/21/2008 | | | | | | |
| | 37 | | ÷ | N | | | | | | |
| | 38 | | ÷ | N | | | | | | |
| | 39 | | ÷ | N | | | | | | |
| | 40 | | ÷ | N | | | | | | |
| | 41 | | ÷ | N | | | | | | |
| | 42 | | ÷ | N | | | | | | |
| | 43 | | ÷ | N | | | | | | |
| | 44 | | ÷ | N | | | | | | |
| | 45 | | ÷ | N | | | | | | |
| | 46 | | ÷ | N | | | | | | |
| | 47 | | ÷ | N | | | | | | |
| | 48 | | | | | | | | | |
| | 49 | | | | | | | | | |
| | 50 | | | | | | | | | |
| | 51 | | | | | | | | | |
| | 52 | | | | | | | | | |
| | 53 | | | | | | | | | |
| | 54 | | | | | | | | | |
| | 55 | | | | | | | | | |
| | 56 | | | | | | | | | |
| | 57 | | | | | | | | | |
| | 58 | | | | | | | | | |
| | 59 | | | | | | | | | |
| | 60 | | | | | | | | | |
| | 61 | | | | | | | | | |
| | 62 | | | | | | | | | |
| | 63 | | | | | | | | | |
| | 64 | | | | | | | | | |
| | 65 | | | | | | | | | |

NEONODE0000374

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 10315250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** |
| | Ryan F Pitaro | 2174 |

## SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| Update | Search | 11/8/2007 | RFP |
| Update | Search | 6/17/2008 | RFP |
| Update | Search | 12/21/2008 | RFP |

## SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| Update Search | 11/8/2007 | RFP |
| Update Search | 6/17/2008 | RFP |
| EAST | 12/21/2008 | RFP |
| Internet | 12/21/2008 | RFP |
| Safari Online Books | 12/21/2008 | RFP |
| IEEE | 12/21/2008 | RFP |
| ACM | 12/21/2008 | |

## INTERFERENCE SEARCH

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

U.S. Patent and Trademark Office

Part of Paper No. : 20081221

NEONODE0000375

EAST Search History

EAST Search History

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S1 | 2 | "7441196".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2008/12/08 17:03 |
| S2 | 394 | swipe with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/08 17:05 |
| S3 | 606 | (glide swipe) with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/08 17:05 |
| S4 | 2 | "7286063".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/08 17:10 |
| S5 | 263 | ("20010003845" \| "20010012286" \| "20010016947" \| "20010034647" \| "20010042002" \| "20010044751" \| "20010049824" \| "20010051903" \| "20020007309" \| "20020010642" \| "20020016750" \| "20020029339" \| "20020032782" \| "20020035174" \| "20020038256" \| "20020038259" \| "20020042914" \| "20020042921" \| "20020049631" \| "20020056098" \| "20020059590" \| "20020067376" \| "20020077177" \| "20020078006" \| "20020078453" \| "20020098834" \| "20020116292" \| "20020116320" \| "20020166122" \| "20030046182" \| "20030074661" \| "20030095525" \| "20030126607" \| "20030140017" \| "20030146940" \| "20030149628" \| "20030182195" \| "20040003412" \| "20040098747" \| "20040103439" \| "20040117831" \| "20040128137" \| "20040133848" \| "20040148625" \| "20040204116" \| | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:12 |

NEONODE0000376

"20040210824" | "20040260689" | "20050010949" |
"20050025550" | "20050075932" | "20050086690" |
"20050091118" | "20050160458" | "20050234895" |
"20050246231" | "20060155598" | "20060224987" |
"20070008332" | "3586771" | "4650977" | "4706121"
| "4992940" | "5041312" | "5064999" | "5119188" |
"5236199" | "5321749" | "5353016" | "5410326" |
"5479268" | "5532735" | "5553242" | "5559548" |
"5598523" | "5602596" | "5617570" | "5625781" |
"5710887" | "5727129" | "5734719" | "5758126" |
"5794210" | "5796252" | "5801702" | "5809204" |
"5819220" | "5822014" | "5828839" | "5832208" |
"5832459" | "5838314" | "5848396" | "5851149" |
"5874906" | "5878222" | "5890175" | "5893064" |
"5895454" | "5896133" | "5900905" | "5902353" |
"5903729" | "5911145" | "5918014" | "5918213").PN.
OR ("5925103" | "5931901" | "5935002" | "5946381" |
"5956681" | "5956693" | "5958012" | "5960411" |
"5961593" | "5978381" | "5990927" | "6002853" |
"6005562" | "6005631" | "6006257" | "6012049" |
"6014502" | "6018372" | "6025837" | "6028600" |
"6031537" | "6041312" | "6054989" | "6072483" |
"6072492" | "6075575" | "6078866" | "6091417" |
"6094156" | "6101473" | "6112186" | "6129274" |
"6138107" | "6142371" | "6151050" | "6151059" |
"6151596" | "6151630" | "6154205" | "6160552" |
"6167382" | "6172677" | "6177936" | "6193152" |
"6198481" | "6199050" | "6199077" | "6199098" |
"6205432" | "6205582" | "6211878" | "6212265" |
"6223215" | "6226623" | "6226642" | "6229540" |
"6237030" | "6243093" | "6253189" | "6260192" |
"6266060" | "6269343" | "6269361" | "6269403" |
"6271832" | "6282516" | "6285357" | "6285987" |
"6286017" | "6286043" | "6288716" | "6292779" |
"6292782" | "6292786" | "6292809" | "6295057" |
"6298330" | "6300947" | "6301566" | "6312336" |
"6314406" | "6317706" | "6330005" | "6330543" |
"6333753" | "6334108" | "6334145" | "6336131" |
"6337715" | "6345279" | "6356905" | "6381583" |

NEONODE0000377

EAST Search History

| | | | | | | |
|---|---|---|---|---|---|---|
| | | "6388714" \| "6396531" \| "6397387" \| "6401132" \| "6407779" \| "6411307" \| "6411337" \| "6415270" \| "6417873" \| "6418441" \| "6421066" \| "6421071" \| "6421724" \| "6438540" \| "6445398" \| "6460181" \| "6476825" \| "6477575" \| "6484149" \| "6487189" \| "6487586" \| "6490555" \| "6509913" \| "6516311" \| "6522342" \| "6532312" \| "6535888" \| "6570582" \| "6571279" \| "6583800" \| "6606103" \| "6606280" \| "6606347").PN. OR ("6608633" \| "6615247" \| "6615248" \| "6618039" \| "6631523" \| "6636246" \| "6647373" \| "6662224" \| "6680714" \| "6684062" \| "6692358" \| "6704727" \| "6711552" \| "6714534" \| "6728731" \| "6769989" \| "6804786" \| "6826572" \| "6829646" \| "6857102" \| "6868525" \| "6907556" \| "6925595" \| "6928610" \| "6938073" \| "6973669" \| "6978263" \| "7013435" \| "7020845" \| "7051281" \| "7174512" \| "7293276" \| "7383515").PN. | | | | |
| S6 | 112 | touch with slide with function | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/08 17:14 |
| S7 | 13 | ("4366475" \| "4686332" \| "4821030" \| "4914624" \| "5402151" \| "5563632" \| "5596346" \| "5638060" \| "5687331" \| "5736974" \| "5736976" \| "5761485" \| "5838973").PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:18 |
| S8 | 168267 | object near3 type | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:21 |
| S9 | 5 | (file item object) near3 type with open near3 respective | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:21 |
| S10 | 905 | open$3 with different with program | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:23 |
| S11 | 2 | multiple near3 file near3 selection with open | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/08 17:29 |
| S12 | 11 | applying with command with (plurality multiple) with files | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/08 17:29 |

NEONODE0000378

EAST Search History

| S13 | 29188 | (flick stroke) with (open application command) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2008/12/10 16:52 |
| S14 | 229 | (flick ) with (open application command) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:54 |
| S15 | 127 | (flick ) with (open application command) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:56 |
| S16 | 5 | (flick ) with (open application command) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:56 |
| S17 | 39 | (flick ) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:57 |
| S18 | 961 | (flick gesture) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:58 |
| S19 | 2324 | (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:58 |
| S20 | 77 | (flick gesture slide) and @ay<="2002" and "715"/702,864.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:59 |

NEONODE0000379

EAST Search History

| S21 | 6585 | finger near3 (flick gesture slide) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 17:07 |
| S22 | 86 | finger near3 (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 17:07 |
| S23 | 0 | "5543591,5943052,5907327,4686332".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 17:14 |
| S24 | 8 | ("5543591" "5943052" "5907327" "4686332").pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 17:15 |
| S25 | 93647 | (glide flick touch swipe) with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:18 |
| S26 | 13098 | (glide flick touch swipe) with screen with (applications functions) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:20 |
| S27 | 88 | (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:20 |
| S28 | 430 | (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:20 |

NEONODE0000380

EAST Search History

| S29 | 0 | (glide flick swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:21 |
|-----|---|---|---|---|---|---|
| S30 | 11 | (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:21 |
| S31 | 219 | (glide flick gesture swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:22 |
| S32 | 299 | (glide flick swipe) with screen and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:25 |
| S33 | 8 | (glide flick swipe) with screen with icon and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:26 |
| S34 | 16 | ("20010011308" \| "20030142138" \| "20040034801" \| "20050253817" \| "20050253817" \| "20050264833" \| "5821933" \| "5907327" \| "6633310").PN. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:30 |
| S35 | 451 | (glide flick swipe) with finger and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:32 |
| S36 | 3 | (glide flick swipe) with finger and @AY<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:32 |

NEONODE0000381

EAST Search History

| S37 | 13 | ("5250929" \| "5568604" \| "5579036" \| "5612719" \| "5661476" \| "5748185" \| "5767457" \| "5883617" \| "5928304" \| "5943043" \| "5943044" \| "5995083" \| "6049328").PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/17 14:01 |
|-----|-----|------|------|------|------|------|
| S38 | 918 | 715/716.ccls. | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/17 15:38 |
| S39 | 7 | 715/716.ccls. and dvd near menu | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/17 15:38 |
| S40 | 9 | 715/716.ccls. and dvd near menu | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:38 |
| S41 | 334 | 715/716.ccls. and dvd | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:47 |
| S42 | 461 | 715/716.ccls. and menu | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:47 |
| S43 | 39 | 715/716.ccls. and menu and theme | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:48 |
| S44 | 243 | 715/716.ccls. and menu and effects | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:52 |
| S45 | 4 | 715/716.ccls. and menu with theme | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:53 |
| S46 | 1 | "7200836".pn. | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:56 |
| S47 | 1 | "20080120546".pn. | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:57 |
| S48 | 433 | 715/864.ccls. | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/21 23:26 |
| S49 | 60 | 715/864.ccls. and keyboard and back and icons and files | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/21 23:27 |
| S50 | 25 | 715/864.ccls. and keyboard and back and icons and files and removable | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/21 23:27 |
| S51 | 42 | 715/864.ccls. and keyboard and icons and files and @ay<="2002" | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/21 23:28 |

NEONODE0000382

EAST Search History

12/22/08 10:38:01 AM
C:\Documents and Settings\RPitaro\My Documents\EAST\Workspaces\10315250.wsp

NEONODE0000383

Attorney's Docket No.: <u>NEONODE.P004</u>        *PATENT*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Patent Application of:                    )
                                                )
        Magnus Goertz                           )        Examiner:  Ryan F. Pitaro
                                                )
                                                )        Art Unit:    2174
Application No: 10/315,250                       )
                                                )
Filed:       December 10, 2002                   )
                                                )
For:      USER INTERFACE FOR                     )
          MOBILE HANDHELD                        )
          COMPUTER UNIT                          )
_____)

Mail Stop AMENDMENT
Commissioner for Patents
P. O. Box 1450
Alexandria, VA   22313-1450

## <u>AMENDMENT AND RESPONSE TO OFFICE ACTION</u>
## <u>UNDER 37 C.F.R. §1.111</u>

Sir:

        In response to the Office Action dated December 23, 2008, applicant respectfully requests that the above-identified application be amended as follows:

Atty. Docket No. NEONODE.P004        -1-

NEONODE0000384

IN THE CLAIMS:

Please cancel claims **17** and **19 – 47** without prejudice.

Please substitute the following claims for the pending claims with the same number:

**1.** (currently amended)    A computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

a touch sensitive area in which representations of ~~a plurality of functions~~ at least one function are displayed, and each function of said ~~plurality of functions~~ at least one function being mapped to a corresponding location in the touch sensitive area at which the representation of the function is displayed, and being activated by an object touching the corresponding location and then gliding along the touch sensitive area away from the touched location.

**2.** (currently amended)    The computer readable medium of claim **1**, wherein one function from the ~~plurality of functions~~ at least one function, when activated, causes the user interface to display icons representing different services or settings for a currently active application.

**3.** (previously presented)    The computer readable medium of claim **2**, wherein the user interface is characterised in, that a selection of a preferred service or setting is done by tapping on a display icon corresponding to the preferred service or setting.

NEONODE0000385

**4.** (currently amended)      The computer readable medium of claim **1**, wherein one function from the ~~plurality of functions~~ at least one function, when activated, causes the user interface to display a keyboard and a text field.

**5.** (previously presented)      The computer readable medium of claim **4**, wherein said text field is used for inputting and editing of text through said keyboard.

**6.** (currently amended)      The computer readable medium of claim **1**, wherein one function from the ~~plurality of functions~~ at least one function, when activated, causes the user interface to display a list with a library of available applications and files on the mobile handheld computer unit.

**7.** (previously presented)      The computer readable medium of claim **6**, wherein the user interface is characterised in, that a selection of an application or file is done by gliding the object along said touch sensitive area so that a representation of a desired one of said application or file is highlighted, raising said object from said touch sensitive area, and then tapping on said touch sensitive area.

**8.** (previously presented)      The computer readable medium of claim **7**, wherein the user interface is characterised in, that at any given time said list presents only files or only applications, and that an area of said list presents a field through which said list can be changed from presenting files to presenting applications, or from presenting applications to presenting files.

Atty. Docket No. NEONODE.P004      -3-

NEONODE0000386

**9.** (currently amended)        The computer readable medium of claim **7**, wherein the user interface is characterised in, that, one item in said list is highlighted by a moveable marking, and the user interface enables list navigation whereby gliding the object along the touch sensitive area in a direction towards the top of said list or towards the bottom of said list causes said marking to move in the same direction without scrolling the list.

**10.** (currently amended)        The computer readable medium of claim **9**, wherein the user interface is characterised in, that, if the number of applications or files in said list exceeds the number of applications or files that can be presented on said touch sensitive area as content, and if the object is (i) glided along said touch sensitive area to the top or bottom ~~position~~ of said touch sensitive area, then (ii) raised above said touch sensitive area, then (iii) replaced on said touch sensitive area, and then (iv) again glided along said touch sensitive area to the top or bottom of said touch sensitive area, said list navigation pages the content of said ~~touch sensitive area will be replaced~~ list up or down by one whole page.

**11.** (currently amended)        The computer readable medium of claim **10**, wherein the user interface is characterised in, that if the object is raised from any first position on said touch sensitive area and then replaced on any second position on said touch sensitive area, said list navigation can be continued from said second position.

**12.** (currently amended)        The computer readable medium of claim **1**, wherein the user interface is characterised in, that an active application, function, service or setting is ~~moved on~~ advanced one step by gliding the

Atty. Docket No. NEONODE.P004        -4-

NEONODE0000387

object along the touch sensitive area from left to right, and that the active application, function, service or setting is closed or backed one step by gliding the object along the touch sensitive area from right to left.

**13.** (currently amended)    The computer readable medium of claim **1**, wherein the user interface is characterised in, that said representations of said ~~plurality of functions~~ at least one function are located at the bottom of said touch sensitive area.

**14.** (previously presented)    The computer readable medium of claim **1**, wherein the touch sensitive area is 2-3 inches in diagonal dimension.

**15.** (previously presented)    An enclosure adapted to cover the mobile handheld computer unit according to Claim **1**, characterised in, that said enclosure is provided with an opening for said touch sensitive area.

**16.** (previously presented)    The enclosure according to Claim **15**, characterised in, that said enclosure is removable and exchangeable.

**17.** (cancelled)

**18.** (currently amended)    [[A]] The computer readable medium ~~according to Claim 17~~ of claim **1**, characterised in, that said computer program ~~product~~ code is adapted to function as a shell upon an ~~operations~~ operating system.

**19. – 47.** (cancelled)

NEONODE0000388

<u>REMARKS</u>

Applicant has carefully studied the outstanding Office Action. The present amendment is intended to place the application in condition for allowance and is believed to overcome all of the objections and rejections made by the Examiner. Favorable reconsideration and allowance of the application are respectfully requested.

Applicant has cancelled claims **17** and **19 – 47**, and amended claims **1**, **2**, **4**, **6**, **9** - **13** and **18** to properly claim the present invention. No new matter has been introduced. Claims **1 – 16** and **18** are presented for examination.

In Paragraphs 3 and 4 of the Office Action, the Examiner has rejected claim **1** under 35 U.S.C. §102(e) as being anticipated by Nakajima et al., US Patent No. 6,346,935 ("Nakajima").

In Paragraphs 5 and 6 of the Office Action, the Examiner has rejected claims **2 – 11** and **14 – 18** under 35 U.S.C. §103(a) as being unpatentable over Nakajima in view of Rogue, "Palm Pilot: The Ultimate Guide, 2nd Edition ("Rogue"). Applicant has canceled claim **17** without acquiescence to the Examiner's reasons for rejection and respectfully submits that rejection of those claims is thus rendered moot.

In Paragraph 7 of the Office Action, the Examiner has rejected claims **12** and **13** under 35 U.S.C. §103(a) as being unpatentable over Nakajima in view of Rogue, and further in view of O'Rourke, US Patent No. 7,225,408 ("O'Rourke").

Atty. Docket No. NEONODE.P004          -6-

NEONODE0000389

**Distinctions between Claimed Invention and U.S. Patent No. 6,346,935 to Nakajima et al., Rogue, Palm Pilot: The Ultimate Guide, 2nd Edition, and U.S. Patent No. 7,225,408 to O'Rourke**

Aspects of the subject invention concern a touch-based user interface with functionalities for running interactive applications using touch-based icons, for inputting text using a touch-based keypad, and for managing files using a touch-based file listing. User inputs include finger taps and movements. One such movement is a "rubbing" / "swiping" / "touch-and-glide" movement, whereby a finger touches a touch-sensitive screen at a location where an icon for a function is displayed, and then rubs / swipes / glides, along the touch screen away from the location without lifting the finger. The touch-and-glide movement of the subject claimed invention is illustrated in FIGS. 2, 7 and 10 of the original specification by a left-arrow and a thumb touching a touch-sensitive screen.

The touch-and-glide movement of the subject claimed invention is used to activate functions (original specification/ Abstract; page 2, lines 25 – 28; page 5, lines 24 – 27; FIG. 2; original claim **1**), and to scroll a selector forward and backward within a list to select a desired item in the list, and to page up and page down within a list (original specification/ page 3, lines 28 – page 4, line 2; page 7, lines 7 – 10; page 7, line 27 – page 9, line 14; FIGS. 7 and 10; original claims **7**, **9** and **10**). The touch-and-glide movement of the subject claimed invention activates a function that corresponds to the icon displayed at the touch point.

Nakajima teaches several touch pads for operating a notebook personal computer. The touch pads are designed efficiently so as to avoid waste of their touch-sensitive areas caused by raised frames

Atty. Docket No. NEONODE.P004          -7-

NEONODE0000390

that surround the touch-sensitive areas.  As shown in FIG. 13 of Nakajima, and described at col. 2, lines 52 – 65, for prior art touch pads, the regions of a touch-sensitive area that border the inner periphery of the frame, along a strip of width G, are blocked by the frame from access by a finger, F.  As such, these border regions of the prior art touch-sensitive area are wasted.

The touch pads of Nakajima have frames with inner peripheries that are designed to enable a user to access border regions of the touch-sensitive areas.  Examples of such designs are shown in FIGS. 5, 6 and 9 of Nakajima.  A no-sensor area, denoted Ans in FIG. 9, separates an effective sensor area, denoted Ls in FIG. 9, from the inner periphery of frame 6E.  Recesses and curvatures in the inner periphery of the frame make it possible for a finger to touch all portions of effective sensor area Ls, including the edges and corners thereof.  Moreover, the inner periphery of frame 6E serves as a convenient guide, to assist the finger in moving to a desired edge and corner of effective sensor area Ls. In distinction, these edge and corner regions are inaccessible with the prior art touch pad shown in FIG. 13 of Nakajima.

The edge and corner regions of the touch-sensitive areas, when touched, trigger activation of functions corresponding to the touched regions.  FIGS. 16 and 21 of Nakajima, and the description at col. 17, line 60 – col. 18, line 30, show an exemplary correspondence between border regions 2202 - 2207 of a touch-sensitive area 2101, and operations that they trigger when double-tapped.

Rogue is a user's guide for the PalmPilot device.  Rogue teaches how to operate the PalmPilot's touch-based user interface, and the various functions that are available.

Atty. Docket No. NEONODE.P004          -8-

NEONODE0000391

O'Rourke describes a medical information system and a user interface for medical staff to access, process and update patient record information via portable palmtop devices, and to transfer such information between portable devices. The user interface of O'Rourke is illustrated in FIGS. 9 – 20 of O'Rourke.

### Response to Examiner's Arguments

In rejecting independent claim **1**, the Examiner, citing Nakajima col. 15, lines 1 – 15, has indicated that Nakajima teaches activating a function by an object touching a location corresponding to the function and then gliding along the touch sensitive area away from the location.

Applicant respectfully submits that the <u>frame-guided movement</u> of Nakajima is of a fundamentally different nature than the <u>touch-and-glide movement</u> of the subject claimed invention. The frame-guided movement of Nakajima <u>glides over a non-touch sensitive portion of the screen</u>. Specifically, as shown in FIG. 9 of Nakajima and described at col. 16, line 4 – page 17, line 17, <u>the gliding movement occurs over the no-sensor area Ans</u>. As recited by Nakajima at col. 9, line 55: "*Between the inner periphery of the frame 6E and the effective sensor area Ls, there is an area including no sensors, that is, the non-sensor area Ans.*" Gliding an object over the no-sensor area Ans ensures that the edges and corners of the effective sensor area Ls are accessible and not wasted, which is the first objective of Nakajima (Nakajima/ col. 2, lines 52 – 65; col. 16, lines 19 – 24).

NEONODE0000392

The following table summarizes some of the relevant distinctions.

| TABLE I: Partial list of distinctions between frame-guided movements of Nakajima and touch-and-glide movements of the claimed invention | |
|---|---|
| **Frame-guided movement of Nakamura** | **Touch-and-glide movement of the claimed invention** |
| Glide is over non-touch sensitive portion of screen | Glide is over touch-sensitive portion of screen |
| Glide followed by touch | Touch followed by glide |
| Glide is toward touch point | Glide is away from touch point |
| Glide is along periphery of touch-sensitive area | Glide is along interior of touch-sensitive area |
| Glide movement is guided by inner periphery of raised frame | Glide movement is unguided |
| Only the touch point is processed by the user interface | Both the touch point and the glide are processed by the user interface |
| Frame-guided touch has the same effect as a touch alone | Touch-and-glide has a different effect than a touch alone |

In rejecting dependent claim **2**, the Examiner, citing Rogue, Figure 1.2, has indicated that Rogue teaches a function which, when activated, causes the user interface to display icons representing different services or setting for a currently active application. Applicant respectfully submits that the PalmPilot applications buttons is used to display icons representing installed programs, and does not relate to a currently active application. Moreover, the PalmPilot applications button is used to launch a not-currently active application.

In rejecting dependent claims **6** and **8**, the Examiner, citing Rogue, Sidebar 1, Categories, has indicated that Rogue teaches a function which, when activated, causes the user interface to display a list of available applications and files. Applicant respectfully submits that the PalmPilot category pages described in Rogue do not display files. They only display installed applications, as indicated by Rogue in Sidebar 1.

Atty. Docket No. NEONODE.P004        -10-

NEONODE0000393

Moreover, Rogue <u>does not describe changing the display from displaying only applications to displaying only files, and vice versa</u>.

In rejecting dependent claim **9**, the Examiner, citing Rogue, Figure 1.4, has indicated that Rogue teaches a gliding input that causes a marking to move up and down a list without scrolling the list. Applicant respectfully submits that the PalmPilot menus, as described in Rogue, are navigated via tapping and <u>not via gliding</u>.

In rejecting dependent claims **10** and **11**, the Examiner, citing Nakajima, col. 14, lines 45 – 57, has indicated that Nakajima teaches a compound movement, used to advance an entire page of a list, by (i) gliding an object along a touch-sensitive area to the top or bottom of the touch-sensitive area, (ii) raising the object from the touch-sensitive area, (iii) replacing the object on the touch-sensitive area, and (iv) gliding the object again along the touch-sensitive area to the top of bottom of the touch-sensitive area.  Applicant respectfully submits that Nakajima describes <u>an up/down scroll function</u>, which is not the glide-raise-replace-glide movement of the subject claimed invention. Moreover, the up/down scroll function causes a list to advance by one line, and <u>not by an entire page</u>.  Applicant further respectfully submits that Nakajima does not describe a list navigation movement that continues when the object is (i) raised from a first position on the touch-sensitive area, and (ii) replaced at a second position of the touch-sensitive area.

In order to further clarify these distinctions, applicant has amended claim **10** to elaborately list the four stages of the compound glide-raise-replace-glide list navigation movement.

In rejecting dependent claim **12**, the Examiner, citing Nakajima, col. 14, lines 45 – 57 and O'Rourke, Figure 13, has indicated

Atty. Docket No. NEONODE.P004          -11-

NEONODE0000394

that Nakajima and O'Rourke teach advancing an active application / function / service / setting forward and backward one step by gliding an object along a touch-sensitive area respectively from left to right and from right to left.  Applicant respectfully submits that the forward and backward operations described in Nakajima and O'Rourke are performed by <u>tapping on arrowheads</u>, and <u>not by gliding an object left to right, or right to left</u>.  Use of touch-based scroll bars is described in Rogue with reference to Figure 1.2: "*To scroll … tap one of the up/down triangle buttons on the scroll bar …*".  Moreover, the cited location of Nakajima recites "*The double-headed arrow 18a … is a sign of an up/down scroll function … the user can understand … the region assigned the function …*"; i.e., <u>tapping on sign 18a</u> causes a scroll up.

The rejections of the claims **1 – 18** in paragraphs 3 - 7 of the Office Action will now be dealt with specifically.

As to amended independent claim **1** for a computer readable medium, applicant respectfully submits, as indicated hereinabove, that the limitation in claim **1** of

"*each function … being activated by an object touching the corresponding location and then gliding along the touch sensitive area away from the touched location*"

is neither shown nor suggested in Nakajima, Rogue or O'Rourke.

Additionally, as indicated hereinabove, the limitation in amended dependent claim **2** of

"*one function … when activated, causes the user interface to display icons representing different services or settings for a currently active application*"

is neither shown nor suggested in Nakajima, Rogue or O'Rourke.

NEONODE0000395

Additionally, as indicated hereinabove, the limitation in amended dependent claim **6** of

"*one function … when activated, causes the user interface to display a list with a library of available applications and files on the mobile handheld computer unit*"

is neither shown nor suggested in Nakajima, Rogue or O'Rourke.

Additionally, as indicated hereinabove, the limitation in dependent claim **8** of

"*said list presents only files or only applications, and that an area of said list presents a field through which said list can be changed from presenting files to presenting applications, or from presenting applications to presenting files*"

is neither shown nor suggested in Nakajima, Rogue or O'Rourke.

Additionally, as indicated hereinabove, the limitation in amended dependent claim **9** of

"*list navigation whereby gliding the object along the touch sensitive area in a direction towards the top of said list or towards the bottom of said list causes said marking to move in the same direction without scrolling the list*"

is neither shown nor suggested in Nakajima, Rogue or O'Rourke.

Additionally, as indicated hereinabove, the limitation in amended dependent claim **10** of

"*if the object is (i) glided along said touch sensitive area to the top or bottom of said touch sensitive area, then (ii) raised above said touch sensitive area, then (iii) replaced on said touch sensitive area, and then (iv) again glided along said touch sensitive area to the top or bottom of said touch sensitive area, said list navigation pages the content of said list up or down by one whole page*"

NEONODE0000396

is neither shown nor suggested in Nakajima, Rogue or O'Rourke.

Additionally, as indicated hereinabove, the limitation in amended dependent claim **11** of

"*if the object is raised from any first position on said touch sensitive area and then replaced on any second position on said touch sensitive area, said list navigation can be continued from said second position*"

is neither shown nor suggested in Nakajima, Rogue or O'Rourke.

Additionally, as indicated hereinabove, the limitation in amended dependent claim **12** of

"*an active application, function, service or setting is advanced one step by gliding the object along the touch sensitive area from left to right, and that the active application, function, service or setting is closed or backed one step by gliding the object along the touch sensitive area from right to left*"

is neither shown nor suggested in Nakajima, Rogue or O'Rourke.

Because claims **2** – **16** and **18** depend from claim **1** and include additional features, applicant respectfully submits that claims **2** – **16** and **18** are not anticipated or rendered obvious by Nakajima, Rogue, O'Rourke, or a combination of Nakajima, Rogue or O'Rourke.

Accordingly claims **1** – **16** and **18** are deemed to be allowable.

Atty. Docket No. NEONODE.P004          -14-

NEONODE0000397

## Support for Amended Claims in Original Specification

        Dependent claim **10** has been amended to include the limitations of the object being (i) glided along the touch sensitive area to the top or bottom position of the touch sensitive area, then (ii) raised above said touch sensitive area, then (iii) replaced on said touch sensitive area, and then (iv) again glided along said touch sensitive area to the top or bottom of said touch sensitive area.  These limitations are supported in the original specification at least at page 7, line 32 – page 8, line 10; and FIG. 9.

        For the foregoing reasons, applicant respectfully submits that the applicable objections and rejections have been overcome and that the claims are in condition for allowance.

Respectfully submitted,

Dated: April 22, 2009

/Marc A. Berger/

Marc A. Berger
Reg. No. 44,029

P.O. Box 691
Soquel, CA   95073
(831) 426-8200

Atty. Docket No. NEONODE.P004        -15-

NEONODE0000398

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 10315250 |
| **Filing Date:** | 10-Dec-2002 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Filer:** | Marc Aron Berger |
| **Attorney Docket Number:** | NEONODE.P004 |

Filed as Large Entity

### Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| Petition fee- 37 CFR 1.17(h) (Group III) | 1464 | 1 | 130 | 130 |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

NEONODE0000399

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| Miscellaneous: | | | | |
| Total in USD ($) | | | | 130 |

NEONODE0000400

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 5194866 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus  Goertz |
| **Customer Number:** | 75660 |
| **Filer:** | Marc Aron Berger |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | NEONODE.P004 |
| **Receipt Date:** | 22-APR-2009 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 04:29:42 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 130 |
| RAM confirmation Number | 5840 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

NEONODE0000401

| 1 | | NEONODE_P004_Amendment_22_April_2009.pdf | 93970<br><br>6e949083a93ff831ca0790fb0ce228745ce2b4e7 | yes | 15 |
|---|---|---|---|---|---|
| | | **Multipart Description/PDF files in .zip description** | | | |
| | | **Document Description** | **Start** | **End** | |
| | | Amendment/Req. Reconsideration-After Non-Final Reject | 1 | 1 | |
| | | Claims | 2 | 5 | |
| | | Applicant Arguments/Remarks Made in an Amendment | 6 | 15 | |

**Warnings:**

**Information:**

| 2 | Fee Worksheet (PTO-06) | fee-info.pdf | 29822<br><br>9a7cb8d7b48f77e24a7dc5281634c6abc6c2ec40 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | **Total Files Size (in bytes):** | | 123792 | | |
|---|---|---|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000402

PTO/SB/06 (07-06)
Approved for use through 1/31/2007. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## PATENT APPLICATION FEE DETERMINATION RECORD
Substitute for Form PTO-875

| Application or Docket Number | Filing Date | |
|---|---|---|
| 10/315,250 | 12/10/2002 | ☐ To be Mailed |

### APPLICATION AS FILED – PART I

OTHER THAN

| | (Column 1) | (Column 2) | SMALL ENTITY ☒ | OR | SMALL ENTITY | |
|---|---|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) | RATE ($) | FEE ($) |
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | N/A | |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | N/A | |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | N/A | |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | X $ = | | OR  X $ = | |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | X $ = | | X $ = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | TOTAL | |

### APPLICATION AS AMENDED – PART II

OTHER THAN

| | (Column 1) | | (Column 2) | (Column 3) | SMALL ENTITY | | OR | SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|
| **AMENDMENT** **04/22/2009** | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | | RATE ($) | ADDITIONAL FEE ($) |
| Total (37 CFR 1.16(i)) | * 17 | Minus | ** 47 | = 0 | X $26 = | 0 | OR | X $ = | |
| Independent (37 CFR 1.16(h)) | * 1 | Minus | *** 8 | = 0 | X $110 = | 0 | OR | X $ = | |
| ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | OR | | |
| ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | 0 | OR | TOTAL ADD'L FEE | |

| | (Column 1) | | (Column 2) | (Column 3) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **AMENDMENT** | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | | RATE ($) | ADDITIONAL FEE ($) |
| Total (37 CFR 1.16(i)) | * | Minus | ** | = | X $ = | | OR | X $ = | |
| Independent (37 CFR 1.16(h)) | * | Minus | *** | = | X $ = | | OR | X $ = | |
| ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | OR | | |
| ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

\* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
\*\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Legal Instrument Examiner:
/MYRTLE B. LEIGH/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

NEONODE0000403

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (04-09)
Approved for use through 05/31/2009. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | 10315250 |
| Filing Date | | 2002-12-10 |
| First Named Inventor | | Magnus Goertz |
| Art Unit | | 2174 |
| Examiner Name | | Ryan F. Pitaro |
| Attorney Docket Number | | NEONODE.P004 |

**U.S.PATENTS** [Remove]

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button. [Add]

**U.S.PATENT APPLICATION PUBLICATIONS** [Remove]

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button. [Add]

**FOREIGN PATENT DOCUMENTS** [Remove]

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | 0 330 767 | EP | B1 | 1993-10-06 | PIONEER ELECTRONIC CORPORATION | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button [Add]

**NON-PATENT LITERATURE DOCUMENTS** [Remove]

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|

EFS Web 2.1.13

NEONODE0000404

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( **Not for submission under 37 CFR 1.99**) | Application Number | 10315250 |
|---|---|---|
| | Filing Date | 2002-12-10 |
| | First Named Inventor | Magnus Goertz |
| | Art Unit | 2174 |
| | Examiner Name | Ryan F. Pitaro |
| | Attorney Docket Number | NEONODE.P004 |

| | 1 | | ☐ |
|---|---|---|---|

| If you wish to add additional non-patent literature document citation information please click the Add button | Add |
|---|---|

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

NEONODE0000405

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 10315250 |
|---|---|---|
| | Filing Date | 2002-12-10 |
| | First Named Inventor | Magnus Goertz |
| | Art Unit | 2174 |
| | Examiner Name | Ryan F. Pitaro |
| | Attorney Docket Number | NEONODE.P004 |

**CERTIFICATION STATEMENT**

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☒ Fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☐ None

**SIGNATURE**

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Marc A. Berger/ | Date (YYYY-MM-DD) | 2009-05-04 |
|---|---|---|---|
| Name/Print | Marc A. Berger | Registration Number | 44029 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.13

NEONODE0000406

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

NEONODE0000407



**Europäisches Patentamt**

**European Patent Office**

**Office européen des brevets**



(11) Publication number: **0 330 767 B1**

(12) **EUROPEAN PATENT SPECIFICATION**

(45) Date of publication of patent specification: **06.10.93**   (51) Int. Cl.5: **G06K  11/08**

(21) Application number: **88301738.6**

(22) Date of filing: **29.02.88**

---

(54) **Touch panel control device with touch time and finger direction discrimination.**

---

| | |
|---|---|
| (43) Date of publication of application:<br>**06.09.89 Bulletin  89/36** | Inventor: **Mori, Shigeto Pioneer Elec. Corp.**<br>**Kawagoe Works**<br>**No. 25-1, Aza Nishimachi**<br>**Oaza Yamada**<br>**Kawagoe-shi Saitama(JP)**<br>Inventor: **Kaneko, Michihiro Pioneer Elec.**<br>**Corp. Kawagoe Work**<br>**No. 25-1, Aza Nishimachi**<br>**Oaza Yamada**<br>**Kawagoe-shi Saitama(JP)**<br>Inventor: **Go, Yasunao Pioneer Elec. Corp.**<br>**Kawagoe Works**<br>**No. 25-1, Aza Nishimachi**<br>**Oaza Yamada**<br>**Kawagoe-shi Saitama(JP)** |
| (45) Publication of the grant of the patent:<br>**06.10.93 Bulletin  93/40** | |
| (84) Designated Contracting States:<br>**DE FR GB** | |
| (56) References cited:<br>**EP-A- 0 150 904**<br>**WO-A-85/05477**<br><br>**IBM TECHNICAL DISCLOSURE BULLETIN, vol.<br>20, no. 4, September 1977, pages 1609-1611,<br>New York, US; T.F. CUMMINGS: "Transparent<br>keyless keyboard for variable terminal ap-<br>plications"** | |
| | (74) Representative: **Brunner, Michael John et al**<br>**GILL JENNINGS & EVERY,**<br>**Broadgate House,**<br>**7 Eldon Street**<br>**London EC2M 7LH (GB)** |
| (73) Proprietor: **PIONEER ELECTRONIC CORPORA-<br>TION**<br>**No. 4-1, Meguro 1-chome**<br>**Meguro-ku Tokyo 153(JP)** | |
| (72) Inventor: **Araki, Morio Pioneer Elec. Corp.**<br>**Kawagoe Works**<br>**No. 25-1, Aza Nishimachi**<br>**Oaza Yamada**<br>**Kawagoe-shi Saitama(JP)** | |

Note: Within nine months from the publication of the mention of the grant of the European patent, any person may give notice to the European Patent Office of opposition to the European patent granted. Notice of opposition shall be filed in a written reasoned statement. It shall not be deemed to have been filed until the opposition fee has been paid (Art. 99(1) European patent convention).

Rank Xerox (UK) Business Services<br>(3. 10 / 3.6 / 3.3. 1)

NEONODE0000408

**EP 0 330 767 B1**

Description

The invention relates to a touch panel control device for acoustic equipment.

Acoustic entertainment devices for vehicles, such as a cassette tape player, compact disk player and radio tuner are installed in considerably small space such as an in-dash console, and therefore must be small in size. Accordingly, the switches or push-buttons of the acoustic devices must also be small. These small switches or push-buttons are difficult to operate. Furthermore, the acoustic devices are used in different modes and operated in various manners. Therefore they employ a variety of switches, push-buttons, etc. Since the operator cannot easily locate them while driving, his attention to the road may be distracted when operating the acoustic devices causing a dangerous condition.

In this connection, a method has been disclosed in unexamined published Japanese Patent Application no. JP-A-61089720 in which, instead of switches or push-buttons for operating acoustic devices, there is provided a touch panel, the different controls of the devices being effected by touching different positions on the touch panel.

The conventional touch panel method will be described with reference to Figure 1. A touch panel 80 having interior detecting electrodes is scanned with a scanner 20 to detect when and at what point the touch panel 80 has been touched. The detection output data of the scanner 20 is applied to a first memory 30, where the detection output data of a scan is temporarily stored. The detection output data of one scan read out of the first memory 30 is supplied to a recognizing block 40. A touch on the touch panel is pattern-recognized by the recognizing block 40 for each scan of the scanner 20.

The output pattern data of the recognizing block 40 is applied to a second memory 50 and a data comparator 60. The second memory 50 temporarily stores the recognized pattern data produced during one scan and supplied thereto from the recognizing block 40. The data comparator 60 compares the output pattern data of the recognising block with the pattern data of the preceding scan read out of the second memory 50, to thereby detect any change in the pattern data. The comparison output data of the data comparator 60 is supplied to a decision block 70 which outputs control data corresponding to the comparison output data. In response to the comparison output data, the decision block 70 refers to a data table (not shown) and outputs predetermined control data according to the touch on the touch panel 80. A similar system is shown and described in WO-A-8505477 and the present invention is characterised thereover.

As is apparent from the above description, in the conventional touch panel control device, the touch data of the present scan is merely compared with that of the preceding scan. Therefore, if the scanning speed is increased, the control device may judge no change in the touch position between two successive scans because the distance the finger can move over a scanning period is related to the scanning speed. If, on the other hand, the scanning speed is decreased, the following error may be encountered. If a finger finely touches and is removed from the panel and the part of the panel touched has not yet been scanned (for instance the right part of the panel in the case of scanning the panel in the left-to-right direction), then that touch on the panel may not be detected.

Preferably, the entire panel surface should be scanned in about 10ms to prevent a detection miss. However. if the scanning speed is set to about 10ms, there may be an erroneous detection because, as mentioned above, finger speed cannot follow a rapid scanning speed.

Accordingly, an object of this invention is to eliminate the above-described difficulties with a conventional touch panel control device.

According to the invention there is provided a touch panel control device for outputting commands, according to how a finger touches a touch panel, the device comprising

touch position detecting means in a matrix form on said touch panel, for detecting a touch on the touch panel and providing output signals;

means for detecting the co-ordinates of the touch position from the said output signals of the said touch position detecting means and providing an output representative thereof;

scanning means for periodically providing a scanning signal to the touch position detecting means to enable touch detection;

duration timer means for providing a time measurement signal on receipt of a trigger signal from the touch position detecting means;

co-ordinate memory means for storing the co-ordinates of a current touch position on the touch panel detected by the co-ordinate detecting means;

co-ordinate comparing means for comparing, for each scan, the coordinates of the previously stored current touch position in the memory means with those of current touch position;

characterised by

2

NEONODE0000409

EP 0 330 767 B1

an operation discriminator for determining, according to the relationship between the timer measurement signals received from the timer means and the results of the comparison from the co-ordinate comparing means, which of a plurality of predetermined outputs to issue, whereby, by the user touching and/or moving a finger across the touch panel, an operational mode for an electronic device can be commanded, said operation discriminator including means for determining which output to issue from a plurality of predetermined outputs based upon the direction and distance the finger moves in a predetermined period of time and means for determining which output to issue from the said plurality of predetermined outputs based on the time duration that the finger touches the touch panel while moving less than a predetermined distance.

In the drawings:-

Fig. 1 is a block diagram showing a conventional touch panel control device;

Fig. 2 is a front view showing a touch panel in a touch panel control device according to the invention;

Fig. 3 is a block diagram showing the touch panel control device according to the invention;

Fig. 4 is a circuit diagram of one example of a touch position detecting means in the touch panel control device of the invention.

Fig. 5 is a timing chart for a description of the operation of the touch position detecting means shown in Fig. 4;

Figs. 6, 7 and 8 are three parts of a flow chart for describing the operation of the touch panel control device of the invention; and

Figs. 9(a) and 9(b) are illustrations of displays on the touch panel.

In Fig. 2, reference numeral 1 designates a touch panel. Along the four sides of the touch panel are LEDs (light emitting diodes) 101 through 114 and light receiving means, namely, photo-transistors 201 through 214. They are alternately arranged in such a manner that the photo-transistors 201 through 214 receive light beams from the LEDs 101 through 114. respectively. The photo-transistors 201 through 214 provide high level (H) outputs upon reception of the light beams. The LEDs and the photo-transistors are alternately arranged along the side of the touch panel to eliminate the possibility that a photo-transistor might erroneously detect the light beam emitted by an adjacent LED rather than its corresponding LED.

The control system (Fig. 3) includes a touch operation discriminator 2. The discriminator 2 determines which finger movement is being performed by determining the direction of finger movement (ie. operation by the user) and the time period over which the finger touches the touch panel. A respective operation output is applied to a command discriminator 12. The command discriminator 12 supplies an operation command to a system controller 13 in response to the operation discriminated by the operation discriminator 2. The operation command controls the operation of an electronic device such as a cassette player, radio tuner, or compact disk player, and data representing the operating condition thereof is fed back to the command discriminator 12.

The operation discriminator 2 also applies a scanning pulse signal (STB signal) to a timing circuit 3 with a period of about 10ms as shown in the timing chart of Fig. 5. The scanning time is not necessarily 10ms. It should be determined on the basis of the speed of the finger scanning the panel. During the generation of the STB signal, the timing circuit 3 produces pulses for activating the LEDs 101 through 114 in Fig. 2 so that turn-on input voltages are successively applied to the input terminals 301 through 314 of the LEDs 101 through 114. The light from the LEDs 101 through 114 is applied to the photo-transistors 201 through 214, respectively, the outputs of which are provided at an output terminal 400 in Fig. 4. The timing of these serial outputs is as indicated in Fig. 5. The serial outputs are applied to a serial-to-parallel converter 4, where they are converted into parallel outputs, which are latched by a data latch 5. One scanning operation is completed when the timing circuit 3 has applied the input voltages to all the LEDs. During a waiting time T, the data latched by the data latch 5 is transferred to the operation discriminator 2.

The timing chart of Fig. 5 represents the case where the finger touches the touch panel at a point marked with a circle in Fig. 2. In this case, the outputs of the LEDs 106 and 111 are blocked and therefore the outputs of photo-transistors 206 and 211 are maintained at a low level (L). Therefore, the data latched by the data latch circuit 5 is:

1 1 1 1 1 0 1 1 in the X-direction

1 1 0 1 1 1 in the Y direction

As apparent from the above, the coordinates of the touch position can be detected from the position of the "0" levels in the data latch.

During the waiting time T, the output of the data latch circuit 5 are simultaneously applied to a NOR gate 8, the output of which is raised to H when the finger touches the panel.

With further reference to Fig. 3. there is shown a coordinate memory 6 for storing the coordinates of a touch position at the start of a touch detecting operation or at the end of an operation (ie. it retains the touch

3

NEONODE0000410

**EP 0 330 767 B1**

position until the next operation); and a timer 7 which is reset in synchronism with the storing operation of the coordinate memory 6, to start its time counting operation. The control system further comprises an arithmetic circuit (not shown) for comparing the coordinates of the present touch position with those stored in the coordinate memory 6, to detect the direction of movement of the finger on the panel 1; a touch memory 10 for storing the touch and non-touch on the touch panel 1; and a command memory 11 for storing the user operation determining output which is discriminated by the operation discriminator 2 and applied to the command discriminator 12.

The operation discriminator 2 supplies a CMD signal representing the operation given to the touch panel 1 to the command discriminator 12. In response to the CMD signal the command discriminator 12 applies a command to the system controller 13 for operating the acoustic device.

In general, the following commands are required for acoustic devices used in vehicles:

(1) Tape deck

Fast forward, rewind, stop, repetitive playback, jump for station and playback.

(2) Tuner

Up sweep, down sweep, preset channel up, preset channel down, channel preset, and auto tuning

(3) Compact disk

Playback, partial repeat, whole repeat, skip, stop, jump for music, and disk take-out.

As is apparent from the above, six or seven different commands are required for each acoustic device used in vehicles.

These commands can be issued by utilisation of, for example, seven finger movements or operations on the touch panel; movements of the finger upwardly, downwardly, right and left (in, D, R, & L),keeping the finger at a point (KEEP), touching the panel briefly (HIT) and touching the panel briefly twice (2HIT). The above described operations are discriminated by the discriminator 2 which provides outputs to the command discriminator 12 which gives appropriate commands to the acoustic devices.

The above-described operations can be discriminated not only by the contents of the arithmetic circuit, but also based on the touch memory circuit 10 in which the touch condition of the preceding scan is stored, the content of the command memory 11 which stores the command or output given to the command discriminator 12 before the scan, and the time determined by the timer 7.

For instance, the commands can be issued as follows:

(1) When the co-ordinate changes are at least four a second, the commands corresponding to U, D, R and L operations (movements) are outputted separately;

(2) The command KEEP is outputted when the finger is kept on the touch panel for at least one second and moves three co-ordinate positions or less.

(3) The command HIT is outputted when the finger is kept on the panel for 0.5 second or less, and moves three coordinates or less.

(4) The command 2HIT is outputted when, within two seconds after the issue of the command HIT, the finger is moved (operated) in the same manner as in the case of outputting the command HIT.

A method of discriminating the above-described finger operations will be described with reference to the flow charts of Figs. 6, 7, and 8.

In these figures, steps 1 through 7 form a routine for starting, when the finger touches the panel, storage of the co-ordinates of that position and the operation of the timer. After the operation discriminator 2 outputs a scan instruction signal (STB) in step 1, in step 2 it is determined whether or not the finger touches the panel. When it is determined that the finger has touched the touch panel in step 3 the coordinates of that position are read. In step 4, the content of the touch memory 10, which stores the touch condition of the touch condition of the preceding scan, is read to determine whether or not the finger has touched the panel for the first time. If it is determined that the content of the touch memory 10 has been cleared, then in step 5 a "1" is written into the touch memory. In step 6 the above-described coordinates of the position are stored in the coordinate memory 6, and in step 7 the timer is reset and started.

(1) Discrimination of the finger operations U, D, R and L

Discrimination of the finger operations U. D, R and L is achieved in steps 8 through 17.

In step 8, the coordinates stored in the coordinate memory 10 are compared with the present coordinates to obtain the variations in the X- and Y-directions. In step 9, by referring to the command memory 11 which stores the operation content outputted previously, it is determined whether or not the upward, downward, rightward or leftward operation has been applied to the command discriminator 12. If it is determined that one of such operations has been applied thereto, then it is unnecessary to discriminate the movement in that direction again, and steps 11 and 11' are effected in which the movement in a

4

NEONODE0000411

**EP 0 330 767 B1**

direction perpendicular to the direction of that movement is detected so that the finger movement may not be regarded as "the finger is moved four coordinates twice", when the finger is moved eight coordinates or more. If no command is applied to the command discriminator 12, then in step 10 it is determined, from the above-described variations, whether the finger is moved horizontally or vertically.

In step 12, it is determined whether, in each of the X- and Y-directions, the finger is moved in the positive ( + ) direction or in the negative (-) direction, so that in step 13 the operation content corresponding to the direction of movement is provided.

In step 14, the operation content thus provided is applied to the command discriminator 12 (in this operation, the command discriminator 12 supplies the instruction to the system controller 13 which has been predetermined for the electronic equipment in use), and in step 15 the operation content is stored in the command memory 11.

In step 16, the coordinates stored in the coordinate memory are rewritten into those of the touch position obtained at the time of outputting the operation content, and in step 17, the timer is reset so that the following discrimination is carried out.

(2) Discrimination of the finger operation KEEP

The finger operations KEEP and HIT are distinguished from each other according to how long the finger touches the touch panel. Therefore, if the finger operation KEEP is determined merely from the time count data of the timer 7, then the determination may include the finger operation HIT. That is, in the following case:

| 0 to 0.5 second | HIT |
| 0.5 to 1 second | Not applicable |
| More than 1 second | KEEP |

while the finger operation KEEP is discriminated the finger operation HIT may occur. In the case where the touch time is 0.5 to 1 second, no action is taken, as was listed above. This is to prevent an erroneous operation which may be caused when the finger operations are not strictly defined. Therefore, the step may be eliminated as the case may be.

Therefore, in a routine consisting of steps 18 through 25 as shown in Fig. 7, when at step 20 the time count data of the timer exceeds one (1) second and in step 22 it is determined that the finger operation KEEP has not been supplied as the operation content to the command discriminator 12, then it is supplied as the operation content to the command discriminator 12 in step 24. The reason why, in step 22, it is detected whether or not the finger operation KEEP has been supplied as the operation content is to prevent the difficulty that, when the finger touches the touch panel for more than two seconds, the finger operation KEEP may be provided as the operation content two or more times.

When in step 18 the touch time is shorter than 0.5 second, in step 19 the finger operation HIT is provided as the operation content; however, it is not applied to the command discriminator 12 yet in the flow chart.

(3) Discrimination of the finger operations HIT and 2HIT

The finger operations HIT and 2HIT can be identified as shown in the flow chart of Fig. 8.

When in step 2 of Fig. 6 it is determined that the finger is not in touch with the touch panel, then in step 26 it can be determined by referring to the touch memory 10, adapted to store the touch or non-touch detected in the preceding scan, whether or not the touch was just now released. When it is determined that the touch was released just now, then the content of the touch memory 11 is "1". In step 27, the content of the touch memory 11 is cleared, and in step 29 it is determined whether or not the operation content is of the finger operation HIT. That is, if in step 19 of Fig. 7 the finger operation HIT is provided as the operation content, then step 30 is effected. In step 30, when it is determined from the content of the command memory 11 that nothing is provided, then the operation content, or HIT, is applied to the command discriminator 12. If the finger operation HIT is applied as the operation content in the command memory 11, then it is the second finger operation HIT, and therefore the finger operation 2HIT is applied as the operation content to the command discriminator 12. If the storage data of the command memory 11 is other than that, then in a routine of steps 36 through 38 the command memory and the operation content are cleared and the timer is stopped.

5

NEONODE0000412

**EP 0 330 767 B1**

When in step 26 it is determined that the content of the touch memory 10 has been cleared since the preceding scan, then step 28 is effected. If, in step 28, the timer shows the lapse of two seconds, i.e. nothing is operated for two seconds, then the routine of steps 36, 37 and 38 is effected.

The operation discriminator 2 can apply the seven operating modes to the command discriminator 12 in the above described manner.

In the operation discriminator 2, the above-described operation contents are converted into commands (outputs) suitable for the operations of the acoustic devices to be controlled in such a manner that any one of the commands can be used for a plurality of acoustic devices - for instance the finger operation R is used for the "up direction sweep" of a tuner and also for the "fast forward" of a tape deck. The commands are applied to the system controller 13 by the command discriminator 12. In response to the commands, the system controller 13 controls the operations of the acoustic devices.

In the above-described embodiment, the seven finger operations are discriminated, and in response to the seven finger operations thus discriminated the command discriminator outputs the commands. If the seven finger operations are utilised in combination, then more commands can be issued.

For instance, in the case of a tape deck, the finger operations may be combined as follows: When, after the "fast forward" operation is selected by the finger operation R, the finger operation U is carried out, a so-called "FF Scan" operation can be performed in which the "fast forward" operation of the tape is carried out to detect an intermusic region, and after the sound reproduction is performed, the "fast forward" operation is carried out again. When the finger operation R is followed by the finger operation D, the "FF music search" operation is carried out.

In this case, the system controller 13 applies data representing the operating condition of the acoustic device to the command discriminator 12 at all times, and the command provided by the command discriminator is determined according to the operating condition.

In the case of the tape deck described above, normally the finger operation R is used for the command "fast forward", and the finger operation U is for the command "volume up". However, during the "fast forward" operation, the finger operation U is used to output the command "FF scan".

If a plurality of operation outputs are combined to provide a command in the above-described manner, then the finger operations can be applied to a variety of operation modes of acoustic devices mounted in a vehicle.

The touch panel 1 may comprise a picture display unit such as a cathode ray tub (CRT). The system controller 13 applies display mode data to a CRT driver 14 in correspondence to an acoustic device in use, thereby to control the display on the touch panel 1.

Figs. 9(a) and 9(b) show examples of a CRT display. More specifically, the part (a) of Fig. 9 shows a CRT display in the "tape deck" mode, and the part (b) of Fig. 9 shows a CRT display in a "tuner" mode.

In Fig. 9, the finger operations U, D, R and L are indicated by the arrows which are extended upwardly, downwardly, rightwardly and leftwardly, respectively, and finger operations HIT, 2HIT and KEEP are indicated by one dot, two dots and a bar, respectively; and the compound finger operations are indicated by the bent arrows - for instance the compound finger operation R U is indicated by the arrow which is extended rightwardly and then upwardly.

Therefore, merely by moving the finger according to the indications or marks displayed on the touch panel, the commands corresponding to the finger operations can be applied to the system controller 13.

The contents of the display on the display unit can be changed according to the operation conditions of an acoustic device to be controlled. For instance, for the "fast forward" operation of a tape deck, the mark "▷▷" is caused to flicker or its colour is changed, so that the operator can detect whether or not the finger operation on the touch panel has been carried out correctly, to thereby prevent erroneous operation.

As shown in Fig. 9 the display mark "2nd" is provided for the finger operation KEEP. It can be utilized in the case where the number of finger operations is smaller than the number of commands to be issued. That is, in this case, the first picture display is switched over to the second picture display by one finger operation (KEEP in this case) so that the command discriminator 12 can provide commands different from those used when the first picture display is employed. That is, more intricate operations of electronic devices can be controlled.

As is apparent from the above description, the predetermined commands can be issued according to the distance of movement of the finger over the touch panel, the period of time for which the finger touches the touch panel, and the number of time the touch panel is touched with the finger, and one and the same touch panel can be used for a plurality of acoustic devices such as a cassette tape player and a radio tuner installed in a vehicle. Therefore, the limited space in the vehicle can be efficiently utilized, and the touch panel control device installed will never obstruct the operator's driving.

6

NEONODE0000413

EP 0 330 767 B1

Furthermore, since the touch panel serves as the display unit, the probability of erroneous operation is decreased.

**Claims**

1. A touch panel control device for outputting commands, according to how a finger touches a touch panel (1), the device comprising

   touch position detecting means (101,114,201,214) in a matrix form on said touch panel (1), for detecting a touch on the touch panel and providing output signals;

   means (4,5) for detecting the co-ordinates of the touch position from the said output signals of the said touch position detecting means and providing an output representative thereof;

   scanning means (2,3) for periodically providing a scanning signal to the touch position detecting means to enable touch detection;

   duration timer means (7) for providing a time measurement signal on receipt of a trigger signal from the touch position detecting means;

   co-ordinate memory means (6) for storing the co-ordinates of a current touch position on the touch panel detected by the co-ordinate detecting means (4,5);

   co-ordinate comparing means for comparing, for each scan, the coordinates of the previously stored current touch position in the memory means with those of a current touch position;

   characterised by

   an operation discriminator (2) for determining, according to the relationship between the timer measurement signals received from the timer means (7) and the results of the comparison from the co-ordinate comparing means, which of a plurality of predetermined outputs to issue, whereby, by the user touching and/or moving a finger across the touch panel (1), an operational mode for an electronic device can be commanded, said operation discriminator including means for determining which output to issue from a plurality of predetermined outputs based upon the direction and distance the finger moves in a predetermined period of time and means for determining which output to issue from the said plurality of predetermined outputs based on the time duration that the finger touches the touch panel while moving less than a predetermined distance.

2. A device according to claim 1, further including a command discriminator for receiving the outputs from the operation discriminator and for issuing respective operational commands to the electronic device.

3. A device as claimed in claim 1 or claim 2, wherein the touch position detecting means comprises light emitting elements (101-114) and light receiving elements (201-214) arranged along the sides of the touch panel (1) in such a manner that said light receiving elements receive light beams emitted by respective light emitting elements.

4. A device as claimed in claim 2, in which the touch panel (1) comprises a picture display unit, the display of which is changeable according to the operating conditions of the electronic device to be controlled.

**Patentansprüche**

1. Eine Berührungsschalttafel-Steuereinrichtung zum Ausgeben von Befehlen entsprechend einer Art und Weise, wie ein Finger eine Berührungsschalttafel (1) berührt, wobei die Vorrichtung umfaßt:
   die Berührstellen nachweisende Vorrichtungen (101, 114, 201, 214), die in der Form einer Matrix auf der Berührungsschalttafel (1) angeordnet sind, um eine Berührung auf der Berührungsschalttafel nachzuweisen und Ausgabesignale zu schaffen;
   Vorrichtungen (4, 5) zum Feststellen der Koordinaten der Berührungsstellen aus den Ausgabesignalen der, die Berührungsstellen nachweisenden Vorrichtungen und zum Schaffen einer Ausgabedarstellung davon;
   abrasternde Vorrichtungen (2, 3), um periodisch ein Abrastersignal für die, die Berührungslagen nachweisenden Vorrichtungen bereitzustellen, um einen Berührungsnachweis zu ermöglichen;
   eine Zeitdauermeßvorrichtung (7), um ein Zeitmeßsignal nach Empfang eines Auslösesignals von den, die Berührungslage nachweisenden Vorrichtungen zu schaffen;
   eine Koordinatenspeichervorrichtung (6) zum Speichern der Koordinaten einer vorliegenden Berührungsstelle auf der Berührungsschalttafel, die von den, die Koordinaten feststellenden Vorrichtungen (4,

7

NEONODE0000414

**EP 0 330 767 B1**

5) festgestellt wurden;

eine die Koordinaten vergleichende Vorrichtung zum Vergleichen der Koordinaten der vorher gespeicherten vorliegenden Berührungsstelle in der Speichervorrichtung mit denen einer gegenwärtig vorliegenden Berührungsstelle bei jedem Abrastervorgang;

**gekennzeichnet durch**

eine Betriebsunterscheidungsvorrichtung (2), um entsprechend der gegenseitigen Beziehung zwischen den von der Zeitmeßvorrichtung (7) empfangenen Zeitmeßsignalen und den Ergebnissen des Vergleichs von der die Koordinaten vergleichenden Vorrichtung zu bestimmen, welche Ausgaben aus einer Vielzahl von vorbestimmten Ausgaben auszugeben sind, wodurch, wenn der Benutzer die Berührungsschalttafel (1) berührt und/oder einen Finger darüber bewegt, eine Betriebsweise für eine elektronische Vorrichtung angewiesen werden kann, wobei die Betriebsunterscheidungsvorrichtung eine Vorrichtung einschließt, um zu bestimmen, welche Ausgabe von einer Vielzahl von vorbestimmten Ausgaben auf der Grundlage der Richtung und Entfernung des sich bewegenden Fingers während einer vorbestimmten Zeitdauer auszugeben ist, und die weiter eine Vorrichtung einschließt, um zu bestimmen, welche Ausgabe aus der Vielzahl von vorbestimmten Ausgaben auf der Grundlage der Zeitdauer, in der der Finger die Berührungsschalttafel berührt, wenn er weniger als eine vorbestimmte Strecke sich bewegt, auszugeben ist.

2. Eine Vorrichtung nach Anspruch 1, die weiter eine Befehlsunterscheidungsvorrichtung einschließt, um die Ausgaben von der Betriebsunterscheidungsvorrichtung zu empfangen und entsprechende Betriebsanweisungen an die elektronische Vorrichtung auszusenden.

3. Eine Vorrichtung nach Anspruch 1 oder 2, wobei die, die Berührungsstelle nachweisenden Vorrichtungen Licht emittierende Elemente (101-114) und Licht empfangende Elemente (201-214) umfassen, die entlang der Seiten der Berührungsschalttafel in einer solchen Weise angeordnet sind, daß die Licht empfangenden Elemente Lichtstrahlen empfangen, die von den entsprechenden Licht emittierenden Elementen emittiert wurden.

4. Eine Vorrichtung nach Anspruch 2, in der die Berührungsschalttafel (1) eine Bildanzeigeeinheit umfaßt, deren Anzeige sich gemäß dem Betriebszustand der zu steuernden elektronischen Vorrichtung ändern kann.

**Revendications**

1. Dispositif de commande de panneau tactile destiné à émettre des commandes conformément à la façon dont un doigt effleure un panneau tactile (1), le dispositif comprenant :

un moyen de détection de position d'effleurement (101, 114, 201, 214) sous forme matricielle situé sur ledit panneau tactile (1) pour détecter un effleurement sur le panneau tactile et pour produire des signaux de sortie ;

un moyen (4, 5) pour détecter les coordonnées de la position d'effleurement à partir desdits signaux de sortie dudit moyen de détection de position d'effleurement et pour produire une sortie représentative de celles-ci ;

un moyen de balayage (2, 3) pour produire périodiquement un signal de balayage pour le moyen de détection de position d'effleurement afin de permettre une détection d'effleurement ;

un moyen de minuterie de durée (7) pour produire un signal de mesure de temps suite à la réception d'un signal de déclenchement en provenance du moyen de détection de position d'effleurement ;

un moyen de mémoire de coordonnées (6) pour stocker les coordonnées d'une position d'effleurement courante sur le panneau tactile détecté par le moyen de détection de coordonnées (4, 5) ;

un moyen de comparaison de coordonnées pour comparer, pour chaque balayage, les coordonnées de la position d'effleurement courante stockées préalablement dans le moyen de mémoire à celles d'une position d'effleurement courante ;

caractérisé par :

un discriminateur de fonctionnement (2) pour déterminer, conformément à la relation qui lie les signaux de mesure de minuterie reçus depuis le moyen de minuterie (7) et les résultats de la comparaison en provenance du moyen de comparaison de coordonnées, laquelle d'une pluralité de sorties prédéterminées il convient de délivrer, d'où il résulte que, du fait de l'effleurement de l'utilisateur et/ou du déplacement d'un doigt sur le panneau tactile (1), un mode de fonctionnement pour

8

NEONODE0000415

**EP 0 330 767 B1**

un dispositif électronique peut être commandé, ledit discriminateur de fonctionnement incluant un moyen pour déterminer quelle sortie il convient de délivrer parmi une des sorties prédéterminées sur la base de la direction et de la distance selon lesquelles le doigt se déplace pendant une période temporelle prédéterminée et un moyen pour déterminer quelle sortie il convient de délivrer parmi lesdites pluralités de sorties prédéterminées sur la base de la durée temporelle pendant laquelle le doigt affleure le panneau tactile tout en se déplaçant sur une distance inférieure à une distance prédéterminée.

2.  Dispositif selon la revendication 1, incluant en outre un discriminateur de commande pour recevoir les sorties en provenance du discriminateur de fonctionnement et pour délivrer des commandes de fonctionnement respectives au dispositif électronique.

3.  Dispositif selon la revendication 1 ou 2, dans lequel le moyen de détection de position d'effleurement comprend des éléments émetteurs de lumière (101-114) et des éléments récepteurs de lumière (201-214) agencés le long des côtés du panneau tactile (1) d'une manière telle que lesits éléments récepteurs de lumière reçoivent des faisceaux lumineux émis par les éléments émetteurs de lumière respectifs.

4.  Dispositif selon la revendication 2, dans lequel le panneau tactile (1) comprend une unité d'affichage d'image dont l'affichage peut être modifié en relation avec les conditions de fonctionnement du dispositif électronique qui doit être commandé.

9

NEONODE0000416

EP 0 330 767 B1

## FIG. 1



CONTROL DATA

## FIG. 2



10

NEONODE0000417

EP 0 330 767 B1



FIG. 3

11

NEONODE0000418

EP 0 330 767 B1



FIG. 4



FIG. 5

12

NEONODE0000419

EP 0 330 767 B1

# FIG. 6



NEONODE0000420

EP 0 330 767 B1

# FIG. 7



# FIG. 9(a)    FIG. 9(b)



14

NEONODE0000421

EP 0 330 767 B1

# FIG. 8



NEONODE0000422

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 10315250 |
| **Filing Date:** | 10-Dec-2002 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Filer:** | Marc Aron Berger |
| **Attorney Docket Number:** | NEONODE.P004 |

Filed as Large Entity

### Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

NEONODE0000423

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Submission- Information Disclosure Stmt | 1806 | 1 | 180 | 180 |
| **Total in USD ($)** | | | | **180** |

NEONODE0000424

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 5265128 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Customer Number:** | 75660 |
| **Filer:** | Marc Aron Berger |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | NEONODE.P004 |
| **Receipt Date:** | 04-MAY-2009 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 09:58:36 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $180 |
| RAM confirmation Number | 6235 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

NEONODE0000425

| 1 | Information Disclosure Statement (IDS) Filed (SB/08) | NEONODE_P004_IDS_4_May_2 009.pdf | 608058<br>c778c8e6e1ab128465ca00f0e3eb08645d0 9775f | no | 4 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

A U.S. Patent Number Citation or a U.S. Publication Number Citation is required in the Information Disclosure Statement (IDS) form for autoloading of data into USPTO systems. You may remove the form to add the required data in order to correct the Informational Message if you are citing U.S. References. If you chose not to include U.S. References, the image of the form will be processed and be made available within the Image File Wrapper (IFW) system. However, no data will be extracted from this form. Any additional data such as Foreign Patent Documents or Non Patent Literature will be manually reviewed and keyed into USPTO systems.

| 2 | Foreign Reference | EP0330767.pdf | 894696<br>38b2b70ee97575a404c9671d5cc1baa3339 1d3df | no | 15 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 3 | Fee Worksheet (PTO-875) | fee-info.pdf | 29914<br>c5f0cf326fff54ac49d95594c23f88d2bae23 d43 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| Total Files Size (in bytes): | 1532668 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000426



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

| | |
|---|---|
| 75660    7590    07/08/2009 | EXAMINER |
| Soquel Group, LLC | PITARO, RYAN F |
| P.O. Box 691 | |
| Soquel, CA 95073 | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2174 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 07/08/2009 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

NEONODE0000427

| | Application No. | Applicant(s) |
|---|---|---|
| ***Office Action Summary*** | 10/315,250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** | |
| | RYAN F. PITARO | 2174 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE _3_ MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on _22 April 2009_.

2a)☐ This action is **FINAL**.          2b)☐ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) _1-16 and 18_ is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) _1-16,18_ is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☒ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date _5/4/2009_.

4) ☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

U.S. Patent and Trademark Office

PTOL-326 (Rev. 08-06)          **Office Action Summary**          Part of Paper No./Mail Date 20090706A

NEONODE0000428

Application/Control Number: 10/315,250                                    Page 2

Art Unit: 2174

### *Response to Amendment*

1.      This action is in response to the amendment filed 4/22/2009. This action is non-

final.

### *Claim Rejections - 35 USC § 102*

2.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

3.      Claim 1 is rejected under 35 U.S.C. 102(e) as being anticipated by Nakajima et al

("Nakajima", 6,346,935).

        As per claim 1, Nakajima teaches a computer readable medium storing a

computer program with computer program code, which, when read by a mobile

handheld computer unit, allows the computer to present a user interface for the mobile

handheld computer unit, the user interface comprising: a touch sensitive area in which

NEONODE0000429

Application/Control Number: 10/315,250                                              Page 3
Art Unit: 2174

representations of a plurality of functions are displayed (Column 15 lines 1-9, *function signs*), and each function of said plurality of functions being mapped to a corresponding location in the touch sensitive area at which the representation of the function is displayed (Column 15 lines 1-9, *stops moving finger*), and being activated by an object touching the corresponding location and then gliding along the touch sensitive area away from the location (Column 15 lines 1-15, *stops moving finger then glides finger to lightly press surface*).

## *Claim Rejections - 35 USC § 103*

4.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

5.      Claims 2-11,14-16,18 rejected under 35 U.S.C. 103(a) as being unpatentable over Nakajima et al ("Nakajima", 6,346,935) in view of Rogue ("Rogue", Palm Pilot: The Ultimate Guide, 2nd Edition).

NEONODE0000430

Application/Control Number: 10/315,250                                              Page 4
Art Unit: 2174

As per claim 2, Nakajima fails to particularly disclose a function to display a
plurality of functions. However, Rogue teaches a computer readable medium of claim 1,
wherein one function from the plurality of functions, when activated, causes the user
interface to display icons representing different services or settings for a currently active
application (Figure 1.2-1.3, *Preferences* ).Therefore it would have been obvious to an
artisan at the time of the invention to combine the teaching of Rogue with the medium of
Nakajima. Motivation to do so would have been to provide a way to reduce screen
clutter and only access the applications when needed.

As per claim 3, Nakajima-Rogue teaches a computer readable medium of claim
2, wherein the user interface is characterised in, that a selection of a preferred service
or setting is done by tapping on a display icon corresponding to the preferred service or
setting (Nakajima, Column 18 lines 30-40, tap).

As per claim 4, Nakajima-Rogue teaches a computer readable medium of claim
1, wherein one function from the plurality of functions, when_activated, causes the user
interface to display a keyboard and a text field (Figure 2.5, power stroke up, Figure 2.6).

As per claim 5, Nakajima-Rogue teaches a wherein said text field is used for
inputting and editing of text through said keyboard (Nakajima, Figure 2.6).

NEONODE0000431

Application/Control Number: 10/315,250                                                    Page 5
Art Unit: 2174

As per claim 6, Nakajima-Rogue fails to teach a computer readable medium of claim 1, OFFICIAL NOTICE is taken that file listing is well know in the art. It is extremely common to see a list of functions and files listed, as in directories. Therefore it would have been obvious to an artisan at the time of the invention to combine the teaching with the medium of Nakajima-Rogue. Motivation to do so would have been to provide a user with a list of options.

As per claim 7, Nakajima-Rogue teaches a computer readable medium of claim 6, wherein the user interface is characterised in, that a selection of an application or file is done by gliding the object along said touch sensitive area so that a representation of a desired one of said application or file is highlighted, raising said object from said touch sensitive area, and then tapping on said touch sensitive area (Nakajima, Column 18 lines 40-56).

As per claim 8, Nakajima-Rogue fails to teache presenting only files or only applications. However OFFICIAL NOTICE is taken that file sorting is well know in the art. It is extremely common to sort a list of functions and files listed by data type. Therefore it would have been obvious to an artisan at the time of the invention to combine the teaching with the medium of Nakajima-Rogue. Motivation to do so would have been to provide a user with a specific list of filtered options.

NEONODE0000432

Application/Control Number: 10/315,250                                          Page 6
Art Unit: 2174

As per claim 9, Nakajima-Rogue teaches a computer readable medium of claim 7, wherein the user interface is characterised in, that, one item in said list is highlighted by a moveable marking, and gliding the object along the touch sensitive area in a direction towards the top of said list or towards the bottom of said list, causes said marking to move in the same direction without scrolling the list (Rogue, Figure 1.4, using the menu).

As per claim 10, Nakajima-Rogue teaches a computer readable medium of claim 9, wherein the user interface is characterised in, that, if the number of applications or files in said list exceeds the number of applications or files that can be presented on said touch sensitive area as content, and if the object is (i) glided along said touch sensitive area to the top or bottom position of said touch sensitive area, then (ii) raised above said touch sensitive area, then (iii) replaced on said touch sensitive area, and then (iv) again glided along said touch sensitive area to the top or bottom of said touch sensitive area, said list navigation pages the content of said list up or down one whole page (Nakajima, Column 14 lines 45-57 and Column 2 lines 15-23, wherein Nakajima is an absolute pointing device and a swipe from the top of the page to the bottom will result in a refresh by a whole page ).

As per claim 11, Nakajima-Rogue teaches a computer readable medium of claim 10, wherein the user interface is characterised in, that if the object is raised from any first position on said touch sensitive area and then replaced on any second position on

NEONODE0000433

Application/Control Number: 10/315,250                                           Page 7
Art Unit: 2174

said touch sensitive area, said navigation can be continued from said second position

(Nakajima, Column 14 lines 45-57).

As per claim 14, while Nakajima-Rogue-O'Rourke fails to teach a touch sensitive

area is 2-3 inches. OFFICIAL NOTICE is taken that screen sizes vary and screens with

a touch sensitive area of 2-3 inches diagonally is well known in the art. Therefore it

would have been obvious to an artisan at the time of the invention to combine the

screen size with the medium of Nakajima-Rogue. Motivation to do so would have been

to provide adequate size to operate the touch screen while keeping it small enough to fit

in a pocket.

As per claim 15, Nakajima-Rogue teaches a enclosure adapted to cover the

mobile handheld computer unit according to Claim 1, characterised in, that said

enclosure is provided with an opening for said touch sensitive area (Rogue, Figure 1.1).

As per claim 16, Nakajima-Rogue fails to teach an enclosure is removable and

exchangeable. OFFICIAL NOTICE is taken that an enclosure is removable and

exchangeable is well known in the art. Therefore it would have been obvious to an

artisan at the time of the invention to combine the exchangeable enclosure with the

medium of Nakajima-Rogue. Motivation to do so would have been to provide a way to

style your mobile device so that it can be personalized to a user's taste.

NEONODE0000434

Application/Control Number: 10/315,250                                    Page 8
Art Unit: 2174

As per claim 18, Nakajima-Rogue teaches a computer readable medium

according to Claim 1, characterised in, that said computer program product is adapted

to function as a shell upon an operations system (Rogue, 1.1 Palm Pilot Basics).

6.      Claims 12 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Nakajima et al ("Nakajima", 6,346,935) in view of Rogue ("Rogue", Palm Pilot: The

Ultimate Guide, 2nd Edition) in view of O'Rourke (O'Rourke, US 7,225,408).

As per claim 12, Nakajima-Rogue teaches a computer readable medium of claim

1, wherein the user interface is characterized in, that an active application, function,

service or setting is moved on one step by gliding the object along the touch sensitive

area from left to right (Nakajima, Column 14 lines 45-57). However, Nakajima-Rogue

NEONODE0000435

Application/Control Number: 10/315,250                                     Page 9
Art Unit: 2174

fails to distinctly point out closing or backing one step. However, O'Rourke teaches that

the active application, function, service or setting is closed or backed one step (Figure

13, right and left arrows). Therefore it would have been obvious to an artisan at the time

of the invention to combine the glide functionality with the forward and backward

functionality of O'Rourke. Motivation to do so would have been to provide an easy way

to traverse the GUI.

As per claim 13, Nakajima-Rogue-O'Rourke teaches a computer readable

medium of claim 1, wherein the user interface is characterized in, that said

representations of said plurality of functions are located at the bottom of said touch

sensitive area (O'Rourke, Figure 13, icons at bottom right) .

### *Response to Arguments*

Applicant's arguments filed 4/22/2009 have been fully considered but they

are not persuasive.

The Applicant argues the following main points with regards to claim 1. As

summarized by the table on page 10 of the amendment, Nakamura differs for the

following reasons:

NEONODE0000436

Application/Control Number: 10/315,250                                    Page 10
Art Unit: 2174

- Glide is over non-touch sensitive portion of screen

- Glide is followed by touch

- Glide is toward touch point

- Glide is along periphery of  touch sensitive area

- Glide movement is guided by inner periphery of raised frame

- Only the touch point is process by the user interface

- Frame-guided touch has the same effect as touch alone

The Examiner disagrees; the Applicant has mis-categorized the inner
periphery of the frame of Nakajima. The purpose of the frame is to allow the user
to more easily glide the finger along the edge of the frame if desired. However,
this does not limit the users of Nakajima to only use the edge of the frame as
argued by the applicant. The frame of a usual touch tablet interferes with the
movement of the user's finger, in other words the effective operational area (the
touchable area) of the touch tablet is limited and produces waste of the
operational area. So while the Applicant has stated that the glide is over a non-
touch sensitive portion of the screen, this is in fact incorrect. The glide can now
start at the absolute edge of the screen since there is no frame to restrict the
user from the edges of the absolute pointing device. The glide as pointed out in
the office action is indeed a touch and glide action (Column 15 lines 1-9), *the
users then stops on the sign (icon) of a desired function and the glides the finger.*

NEONODE0000437

Application/Control Number: 10/315,250                                                      Page 11
Art Unit: 2174

This two step action is indicative of both the touch and glide being processed to execute the desired function. Whether or not the frame guided touch has a similar effect as touch alone is erroneous. Like the current application Nakajima eliminates the accidental touch performing a function, hence the reason for the touch then glide. While the two means may produced similar ends each has their advantages and cannot be combined as one.

The Examiner notes that the OFFICIAL NOTICE set forth in the previous office action has not been contested.

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to RYAN F. PITARO whose telephone number is (571)272-4071. The examiner can normally be reached on 9:00am - 5:30pm Mondays through Fridays.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Dennis Chow can be reached on 571-272-7767. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

NEONODE0000438

Application/Control Number: 10/315,250                                      Page 12
Art Unit: 2174

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/Ryan F Pitaro/
Examiner, Art Unit 2174

NEONODE0000439

| | | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| **Notice of References Cited** | | 10/315,250 | GOERTZ, MAGNUS |
| | | Examiner | Art Unit | Page 1 of 1 |
| | | RYAN F. PITARO | 2174 | |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-2005/0035956 | 02-2005 | Sinclair et al. | 345/184 |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN  PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

NEONODE0000440

| | Index of Claims | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| | | 10315250 | GOERTZ, MAGNUS |
| | | Examiner | Art Unit |
| | | Ryan F Pitaro | 2174 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| ☐ Claims renumbered in the same order as presented by applicant | | | ☐ CPA | ☐ T.D. | ☐ R.1.47 |

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | 06/23/2008 | 12/21/2008 | 07/06/2009 | | | | | |
| | 1 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 2 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 3 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 4 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 5 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 6 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 7 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 8 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 9 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 10 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 11 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 12 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 13 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 14 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 15 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 16 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 17 | ✓ | ✓ | ✓ | - | | | | | |
| | 18 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 19 | | ÷ | N | - | | | | | |
| | 20 | | ÷ | N | - | | | | | |
| | 21 | | ÷ | N | - | | | | | |
| | 22 | | ÷ | N | - | | | | | |
| | 23 | | ÷ | N | - | | | | | |
| | 24 | | ÷ | N | - | | | | | |
| | 25 | | ÷ | N | - | | | | | |
| | 26 | | ÷ | N | - | | | | | |
| | 27 | | ÷ | N | - | | | | | |
| | 28 | | ÷ | N | - | | | | | |
| | 29 | | ÷ | N | - | | | | | |
| | 30 | | ÷ | N | - | | | | | |
| | 31 | | ÷ | N | - | | | | | |
| | 32 | | ÷ | N | - | | | | | |
| | 33 | | ÷ | N | - | | | | | |
| | 34 | | ÷ | N | - | | | | | |
| | 35 | | ÷ | N | - | | | | | |
| | 36 | | ÷ | N | - | | | | | |

U.S. Patent and Trademark Office

Part of Paper No. : 20090706A

NEONODE0000441

| | Index of Claims | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| | | 10315250 | GOERTZ, MAGNUS |
| | | Examiner | Art Unit |
| | | Ryan F Pitaro | 2174 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| ☐ Claims renumbered in the same order as presented by applicant | | | ☐ CPA | ☐ T.D. | ☐ R.1.47 |

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | 06/23/2008 | 12/21/2008 | 07/06/2009 | | | | | |
| | 37 | | ÷ | N | - | | | | | |
| | 38 | | ÷ | N | - | | | | | |
| | 39 | | ÷ | N | - | | | | | |
| | 40 | | ÷ | N | - | | | | | |
| | 41 | | ÷ | N | - | | | | | |
| | 42 | | ÷ | N | - | | | | | |
| | 43 | | ÷ | N | - | | | | | |
| | 44 | | ÷ | N | - | | | | | |
| | 45 | | ÷ | N | - | | | | | |
| | 46 | | ÷ | N | - | | | | | |
| | 47 | | ÷ | N | - | | | | | |
| | 48 | | | | | | | | | |
| | 49 | | | | | | | | | |
| | 50 | | | | | | | | | |
| | 51 | | | | | | | | | |
| | 52 | | | | | | | | | |
| | 53 | | | | | | | | | |
| | 54 | | | | | | | | | |
| | 55 | | | | | | | | | |
| | 56 | | | | | | | | | |
| | 57 | | | | | | | | | |
| | 58 | | | | | | | | | |
| | 59 | | | | | | | | | |
| | 60 | | | | | | | | | |
| | 61 | | | | | | | | | |
| | 62 | | | | | | | | | |
| | 63 | | | | | | | | | |
| | 64 | | | | | | | | | |
| | 65 | | | | | | | | | |

U.S. Patent and Trademark Office

Part of Paper No. : 20090706A

NEONODE0000442

| Search Notes  | Application/Control No. 10315250 | Applicant(s)/Patent Under Reexamination GOERTZ, MAGNUS |
|---|---|---|
| | Examiner Ryan F Pitaro | Art Unit 2174 |

### SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| Update | Search | 11/8/2007 | RFP |
| Update | Search | 6/17/2008 | RFP |
| Update | Search | 12/21/2008 | RFP |
| Update | Search | 4/22/2009 | RFP |

### SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| Update Search | 11/8/2007 | RFP |
| Update Search | 6/17/2008 | RFP |
| EAST | 12/21/2008 | RFP |
| Internet | 12/21/2008 | RFP |
| Safari Online Books | 12/21/2008 | RFP |
| IEEE | 12/21/2008 | RFP |
| ACM | 12/21/2008 | RFP |
| Update Search | 4/22/2009 | RFP |

### INTERFERENCE SEARCH

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

| | |
|---|---|
| | |

NEONODE0000443

EAST Search History

EAST Search History

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L1 | 2 | "6346935".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 10:24 |
| L2 | 187 | files with applications with list with only | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 10:28 |
| L3 | 98 | (file near list) with (application near list) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 10:34 |
| L4 | 502 | (file near view) with application | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 10:36 |
| L5 | 15 | sort with application near files | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:14 |
| L6 | 613 | (programs application) with files with (sort show list) with only | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:18 |
| L7 | 55 | (programs application) with files with (sort show list) with only and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:18 |

NEONODE0000444

EAST Search History

| L8 | 0 | seperate with list with data near type | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:19 |
|---|---|---|---|---|---|---|
| L9 | 5796 | list with data near type | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:19 |
| L10 | 652 | list with data near type and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:19 |
| L11 | 596 | application near list and file near list | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:20 |
| L12 | 271 | application near list and file near list and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:22 |
| S1 | 2 | "7441196".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2008/12/08 17:03 |
| S2 | 394 | swipe with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/08 17:05 |
| S3 | 606 | (glide swipe) with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/08 17:05 |

NEONODE0000445

EAST Search History

| S4 | 2 | "7286063".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/08 17:10 |
|----|-----|---------------|------------------------------------|-----|-----|------------------|
| S5 | 263 | ("20010003845" \| "20010012286" \| "20010016947" \| "20010034647" \| "20010042002" \| "20010044751" \| "20010049824" \| "20010051903" \| "20020007309" \| "20020010642" \| "20020016750" \| "20020029339" \| "20020032782" \| "20020035174" \| "20020038256" \| "20020038259" \| "20020042914" \| "20020042921" \| "20020049631" \| "20020056098" \| "20020059590" \| "20020067376" \| "20020077177" \| "20020078006" \| "20020078453" \| "20020098834" \| "20020116292" \| "20020116320" \| "20020166122" \| "20030046182" \| "20030074661" \| "20030095525" \| "20030126607" \| "20030140017" \| "20030146940" \| "20030149628" \| "20030182195" \| "20040003412" \| "20040098747" \| "20040103439" \| "20040117831" \| "20040128137" \| "20040133848" \| "20040148625" \| "20040204116" \| "20040210824" \| "20040260689" \| "20050010949" \| "20050025550" \| "20050075932" \| "20050086690" \| "20050091118" \| "20050160458" \| "20050234895" \| "20050246231" \| "20060155598" \| "20060224987" \| "20070008332" \| "3586771" \| "4650977" \| "4706121" \| "4992940" \| "5041312" \| "5064999" \| "5119188" \| "5236199" \| "5321749" \| "5353016" \| "5410326" \| "5479268" \| "5532735" \| "5553242" \| "5559548" \| "5598523" \| "5602596" \| "5617570" \| "5625781" \| "5710887" \| "5727129" \| "5734719" \| "5758126" \| "5794210" \| "5796252" \| "5801702" \| "5809204" \| "5819220" \| "5822014" \| "5828839" \| "5832208" \| "5832459" \| "5838314" \| "5848396" \| "5851149" \| "5874906" \| "5878222" \| "5890175" \| "5893064" \| "5895454" \| "5896133" \| "5900905" \| "5902353" \| "5903729" \| "5911145" \| "5918014" \| "5918213").PN. OR ("5925103" \| "5931901" \| "5935002" \| "5946381" \| "5956681" \| "5956693" \| "5958012" \| "5960411" \| "5961593" \| "5978381" \| "5990927" \| "6002853" \| | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:12 |

NEONODE0000446

EAST Search History

"6005562" | "6005631" | "6006257" | "6012049" |
"6014502" | "6018372" | "6025837" | "6028600" |
"6031537" | "6041312" | "6054989" | "6072483" |
"6072492" | "6075575" | "6078866" | "6091417" |
"6094156" | "6101473" | "6112186" | "6129274" |
"6138107" | "6142371" | "6151050" | "6151059" |
"6151596" | "6151630" | "6154205" | "6160552" |
"6167382" | "6172677" | "6177936" | "6193152" |
"6198481" | "6199050" | "6199077" | "6199098" |
"6205432" | "6205582" | "6211878" | "6212265" |
"6223215" | "6226623" | "6226642" | "6229540" |
"6237030" | "6243093" | "6253189" | "6260192" |
"6266060" | "6269343" | "6269361" | "6269403" |
"6271832" | "6282516" | "6285357" | "6285987" |
"6286017" | "6286043" | "6288716" | "6292779" |
"6292782" | "6292786" | "6292809" | "6295057" |
"6298330" | "6300947" | "6301566" | "6312336" |
"6314406" | "6317706" | "6330005" | "6330543" |
"6333753" | "6334108" | "6334145" | "6336131" |
"6337715" | "6345279" | "6356905" | "6381583" |
"6388714" | "6396531" | "6397387" | "6401132" |
"6407779" | "6411307" | "6411337" | "6415270" |
"6417873" | "6418441" | "6421066" | "6421071" |
"6421724" | "6438540" | "6445398" | "6460181" |
"6476825" | "6477575" | "6484149" | "6487189" |
"6487586" | "6490555" | "6509913" | "6516311" |
"6522342" | "6532312" | "6535888" | "6570582" |
"6571279" | "6583800" | "6606103" | "6606280" |
"6606347").PN. OR ("6608633" | "6615247" |
"6615248" | "6618039" | "6631523" | "6636246" |
"6647373" | "6662224" | "6680714" | "6684062" |
"6692358" | "6704727" | "6711552" | "6714534" |
"6728731" | "6769989" | "6804786" | "6826572" |
"6829646" | "6857102" | "6868525" | "6907556" |
"6925595" | "6928610" | "6938073" | "6973669" |
"6978263" | "7013435" | "7020845" | "7051281" |
"7174512" | "7293276" | "7383515").PN.

NEONODE0000447

EAST Search History

| S6 | 112 | touch with slide with function | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/08 17:14 |
|----|-----|-------------------------------|------------------------|----|----|-------------------|
| S7 | 13 | ("4366475" \| "4686332" \| "4821030" \| "4914624" \| "5402151" \| "5563632" \| "5596346" \| "5638060" \| "5687331" \| "5736974" \| "5736976" \| "5761485" \| "5838973").PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:18 |
| S8 | 168267 | object near3 type | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:21 |
| S9 | 5 | (file item object) near3 type with open near3 respective | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:21 |
| S10 | 905 | open$3 with different with program | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:23 |
| S11 | 2 | multiple near3 file near3 selection with open | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/08 17:29 |
| S12 | 11 | applying with command with (plurality multiple) with files | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/08 17:29 |
| S13 | 29188 | (flick stroke) with (open application command) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2008/12/10 16:52 |
| S14 | 229 | (flick ) with (open application command) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:54 |
| S15 | 127 | (flick ) with (open application command) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:56 |
| S16 | 5 | (flick ) with (open application command) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:56 |

NEONODE0000448

EAST Search History

| S17 | 39 | (flick ) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:57 |
| S18 | 961 | (flick gesture) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:58 |
| S19 | 2324 | (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:58 |
| S20 | 77 | (flick gesture slide) and @ay<="2002" and "715"/702,864.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:59 |
| S21 | 6585 | finger near3 (flick gesture slide) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 17:07 |
| S22 | 86 | finger near3 (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 17:07 |
| S23 | 0 | "5543591,5943052,5907327,4686332".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 17:14 |
| S24 | 8 | ("5543591" "5943052" "5907327" "4686332").pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 17:15 |

NEONODE0000449

EAST Search History

| S25 | 93647 | (glide flick touch swipe) with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:18 |
|-----|-------|----------------------------------------|------------------------------------|-----|-----|-------------------|
| S26 | 13098 | (glide flick touch swipe) with screen with (applications functions) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:20 |
| S27 | 88 | (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:20 |
| S28 | 430 | (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:20 |
| S29 | 0 | (glide flick swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:21 |
| S30 | 11 | (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:21 |
| S31 | 219 | (glide flick gesture swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:22 |
| S32 | 299 | (glide flick swipe) with screen and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:25 |

NEONODE0000450

EAST Search History

| S33 | 8 | (glide flick swipe) with screen with icon and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:26 |
|-----|---|-----------------------------------------------------------|-----|----|----|------|
| S34 | 16 | ("20010011308" \| "20030142138" \| "20040034801" \| "20050253817" \| "20050253817" \| "20050264833" \| "5821933" \| "5907327" \| "6633310").PN. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:30 |
| S35 | 451 | (glide flick swipe) with finger and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:32 |
| S36 | 3 | (glide flick swipe) with finger and @AY<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:32 |
| S37 | 13 | ("5250929" \| "5568604" \| "5579036" \| "5612719" \| "5661476" \| "5748185" \| "5767457" \| "5883617" \| "5928304" \| "5943043" \| "5943044" \| "5995083" \| "6049328").PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/17 14:01 |
| S38 | 918 | 715/716.ccls. | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/17 15:38 |
| S39 | 7 | 715/716.ccls. and dvd near menu | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/17 15:38 |
| S40 | 9 | 715/716.ccls. and dvd near menu | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:38 |
| S41 | 334 | 715/716.ccls. and dvd | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:47 |
| S42 | 461 | 715/716.ccls. and menu | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:47 |
| S43 | 39 | 715/716.ccls. and menu and theme | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:48 |
| S44 | 243 | 715/716.ccls. and menu and effects | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:52 |

NEONODE0000451

EAST Search History

| S45 | 4 | 715/716.ccls. and menu with theme | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:53 |
|-----|---|-----------------------------------|------------------------|----|----|------------------|
| S46 | 1 | "7200836".pn. | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:56 |
| S47 | 1 | "20080120546".pn. | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:57 |
| S48 | 433 | 715/864.ccls. | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/21 23:26 |
| S49 | 60 | 715/864.ccls. and keyboard and back and icons and files | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/21 23:27 |
| S50 | 25 | 715/864.ccls. and keyboard and back and icons and files and removable | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/21 23:27 |
| S51 | 42 | 715/864.ccls. and keyboard and icons and files and @ay<="2002" | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/21 23:28 |
| S52 | 2 | "6346935".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2009/07/05 14:20 |
| S53 | 21 | (glide flick touch swipe) with (coordinat$7) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/05 14:24 |
| S54 | 437 | (touch finger) with (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/05 14:26 |
| S55 | 0 | (touch finger) with (glide flick swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/05 14:26 |
| S56 | 3 | (touch finger) with (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/05 14:27 |

NEONODE0000452

EAST Search History

| S57 | 2 | "6140936".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/05 23:13 |

7/6/09 11:45:24 AM
C:\ Documents and Settings\ RPitaro\ My Documents\ EAST\ Workspaces\ 10315250.wsp

NEONODE0000453

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (04-09)
Approved for use through 05/31/2009. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | 10315250 |
| Filing Date | | 2002-12-10 |
| First Named Inventor | | Magnus Goertz |
| Art Unit | | 2174 |
| Examiner Name | | Ryan F. Pitaro |
| Attorney Docket Number | | NEONODE.P004 |

**U.S.PATENTS**  Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button.  Add

**U.S.PATENT APPLICATION PUBLICATIONS**  Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.  Add

**FOREIGN PATENT DOCUMENTS**  Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| /R.P./ | 1 | 0 330 767 | EP | B1 | 1993-10-06 | PIONEER ELECTRONIC CORPORATION | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button  Add

**NON-PATENT LITERATURE DOCUMENTS**  Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|

EFS Web 2.1.13

NEONODE0000454

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 10315250 |
|---|---|---|
| | Filing Date | 2002-12-10 |
| | First Named Inventor | Magnus Goertz |
| | Art Unit | 2174 |
| | Examiner Name | Ryan F. Pitaro |
| | Attorney Docket Number | NEONODE.P004 |

| | 1 | | ☐ |
|---|---|---|---|

| If you wish to add additional non-patent literature document citation information please click the Add button | Add |
|---|---|

### EXAMINER SIGNATURE

| Examiner Signature | /Ryan Pitaro/ | Date Considered | 07/06/2009 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

NEONODE0000455

Attorney's Docket No.: <u>NEONODE.P004</u>    *PATENT*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In Re Patent Application of: ) | |
| ) | Examiner:  Ryan F. Pitaro |
| Magnus Goertz ) | |
| ) | Art Unit:    2174 |
| Application No: 10/315,250 ) | |
| ) | |
| Filed:    December 10, 2002 ) | |
| ) | |
| For:    USER INTERFACE FOR ) | |
|        MOBILE HANDHELD ) | |
|        COMPUTER UNIT ) | |
| _____ ) | |

Mail Stop AMENDMENT
Commissioner for Patents
P. O. Box 1450
Alexandria, VA   22313-1450


## <u>AMENDMENT AND RESPONSE TO OFFICE ACTION</u>
## <u>UNDER 37 C.F.R. §1.111</u>


Sir:

In response to the Office Action dated July 8, 2009, applicant respectfully requests that the remarks below be taken into consideration.

Atty. Docket No. NEONODE.P004        -1-

NEONODE0000456

IN THE CLAIMS:

        Please substitute the following claims for the pending claims with the same number:

**1.** (previously presented)     A computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

        a touch sensitive area in which representations of at least one function are displayed, and each function of said at least one function being mapped to a corresponding location in the touch sensitive area at which the representation of the function is displayed, and being activated by an object touching the corresponding location and then gliding along the touch sensitive area away from the touched location.

**2.** (previously presented)     The computer readable medium of claim **1**, wherein one function from the at least one function, when activated, causes the user interface to display icons representing different services or settings for a currently active application.

**3.** (previously presented)     The computer readable medium of claim **2**, wherein the user interface is characterised in, that a selection of a preferred service or setting is done by tapping on a display icon corresponding to the preferred service or setting.

Atty. Docket No. NEONODE.P004          -2-

NEONODE0000457

**4.** (previously presented)      The computer readable medium of claim **1**, wherein one function from at least one function, when activated, causes the user interface to display a keyboard and a text field.

**5.** (previously presented)      The computer readable medium of claim **4**, wherein said text field is used for inputting and editing of text through said keyboard.

**6.** (previously presented)      The computer readable medium of claim **1**, wherein one function from the at least one function, when activated, causes the user interface to display a list with a library of available applications and files on the mobile handheld computer unit.

**7.** (previously presented)      The computer readable medium of claim **6**, wherein the user interface is characterised in, that a selection of an application or file is done by gliding the object along said touch sensitive area so that a representation of a desired one of said application or file is highlighted, raising said object from said touch sensitive area, and then tapping on said touch sensitive area.

**8.** (previously presented)      The computer readable medium of claim **7**, wherein the user interface is characterised in, that at any given time said list presents only files or only applications, and that an area of said list presents a field through which said list can be changed from presenting files to presenting applications, or from presenting applications to presenting files.

Atty. Docket No. NEONODE.P004         -3-

NEONODE0000458

**9.** (previously presented)    The computer readable medium of claim **7**, wherein the user interface is characterised in, that, one item in said list is highlighted by a moveable marking, and the user interface enables list navigation whereby gliding the object along the touch sensitive area in a direction towards the top of said list or towards the bottom of said list causes said marking to move in the same direction without scrolling the list.

**10.** (previously presented)    The computer readable medium of claim **9**, wherein the user interface is characterised in, that, if the number of applications or files in said list exceeds the number of applications or files that can be presented on said touch sensitive area as content, and if the object is (i) glided along said touch sensitive area to the top or bottom of said touch sensitive area, then (ii) raised above said touch sensitive area, then (iii) replaced on said touch sensitive area, and then (iv) again glided along said touch sensitive area to the top or bottom of said touch sensitive area, said list navigation pages the content of said list up or down by one whole page.

**11.** (previously presented)    The computer readable medium of claim **10**, wherein the user interface is characterised in, that if the object is raised from any first position on said touch sensitive area and then replaced on any second position on said touch sensitive area, said list navigation can be continued from said second position.

**12.** (previously presented)    The computer readable medium of claim **1**, wherein the user interface is characterised in, that an active application, function, service or setting is advanced one step by gliding the object

Atty. Docket No. NEONODE.P004          -4-

NEONODE0000459

along the touch sensitive area from left to right, and that the active application, function, service or setting is closed or backed one step by gliding the object along the touch sensitive area from right to left.

**13.** (previously presented)    The computer readable medium of claim **1**, wherein the user interface is characterised in, that said representations of said at least one function are located at the bottom of said touch sensitive area.

**14.** (previously presented)    The computer readable medium of claim **1**, wherein the touch sensitive area is 2-3 inches in diagonal dimension.

**15.** (previously presented)    An enclosure adapted to cover the mobile handheld computer unit according to Claim **1**, characterised in, that said enclosure is provided with an opening for said touch sensitive area.

**16.** (previously presented)    The enclosure according to Claim **15**, characterised in, that said enclosure is removable and exchangeable.

**17.** (cancelled)

**18.** (previously presented)    The computer readable medium of claim **1**, characterised in, that said computer program code is adapted to function as a shell upon an operating system.

**19.** – **47.** (cancelled)

Atty. Docket No. NEONODE.P004         -5-

NEONODE0000460

REMARKS

Applicant expresses appreciation to the Examiner for the courtesy of an interview granted to applicant's representative Marc A. Berger (Reg. No. 44,029).  The interview was held by telephone on Monday, July 13, 2009.

As discussed during the interview, applicant wishes to point out that the signs **19a**, etc. of **FIG. 5** of Nakajima are not on the touch surface.  They are merely signs, outside of the touch surface **7B**, that indicate the functions assigned to adjacent regions of the touch surface.

As such, applicant respectfully submits that the present claim language "at least one function being mapped to a corresponding location in the touch sensitive area at which the representation of the function is displayed, and being activated by an object touching the corresponding location and then gliding along the touch sensitive area away from the touched location" is not anticipated by Nakajima.

For the foregoing reasons, applicant respectfully submits that the applicable objections and rejections have been overcome and that the claims are in condition for allowance.

Respectfully submitted,

Dated: July 13, 2009                    /Marc A. Berger/
                                        Marc A. Berger
                                        Reg. No. 44,029
P.O. Box 691
Soquel, CA   95073
(831) 426-8200

Atty. Docket No. NEONODE.P004          -6-

NEONODE0000461

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 5685763 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Customer Number:** | 75660 |
| **Filer:** | Marc Aron Berger |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | NEONODE.P004 |
| **Receipt Date:** | 13-JUL-2009 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 11:05:02 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | NEONODEP004Amendment_13July2009.pdf | 57953 <br> 2cf2c071c0360f4d6616db29d510db163751464c | yes | 6 |

NEONODE0000462

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| Document Description | Start | End |
| Amendment/Req. Reconsideration-After Non-Final Reject | 1 | 1 |
| Claims | 2 | 5 |
| Applicant Arguments/Remarks Made in an Amendment | 6 | 6 |

**Warnings:**

**Information:**

| | |
|---|---|
| Total Files Size (in bytes): | 57953 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000463



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

75660        7590        11/24/2009
Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073

| EXAMINER |
|---|
| PITARO, RYAN F |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2174 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/24/2009 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

NEONODE0000464

| | Application No. | Applicant(s) |
|---|---|---|
| ***Office Action Summary*** | 10/315,250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** | |
| | RYAN F. PITARO | 2174 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *3* MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *13 July 2009*.

2a)☐ This action is **FINAL**.    2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) *1-16 and 18* is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☐ Claim(s) *1-16,18* is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date _____.

4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____ .

U.S. Patent and Trademark Office
PTOL-326 (Rev. 08-06)    **Office Action Summary**    Part of Paper No./Mail Date 20091120

NEONODE0000465

Application/Control Number: 10/315,250                                        Page 2
Art Unit: 2174

### *Response to Amendment*

1.     This action is in response to the amendment filed 7/13/2009. This action is non-final.

### *Claim Rejections - 35 USC § 103*

2.     The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

3.     Claim 1 is rejected under 35 U.S.C. 103(a) as being unpatentable over Nakajima et al ("Nakajima", 6,346,935) in view of Hoshino et al ("Hoshino", US 20040021643).

       As per claim 1, Nakajima teaches a computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising: a touch sensitive area in which representations of a plurality of functions are displayed (Column 15 lines 1-9, *function signs*), and each function of said plurality of functions being mapped to a corresponding location in the touch sensitive area at which the representation of the function is displayed (Column 15 lines 1-9, *stops moving finger*). Nakajima teaches gliding over the

NEONODE0000466

Application/Control Number: 10/315,250                                    Page 3
Art Unit: 2174

icon Column 15 lines 1-15, *stops moving finger then glides finger to lightly press surface* but fails to distinctly point out touching the icon and gliding away. However, Hoshino teaches an icon being activated by an object touching the corresponding location and then gliding along the touch sensitive area away from the location ([0092]-[0093], drag and drop operation may be used in combination with a push in operation for activating a function). Therefore it would have been obvious at the time of the invention to combine the teaching of Hoshino with the medium of Nakajima. Motivation to do so would have been to apply a known technique to a known system in order to yield advantageous and predictable results.

4.      Claims 2-11,14-16,18 rejected under 35 U.S.C. 103(a) as being unpatentable over Nakajima et al ("Nakajima", 6,346,935) and Hoshino et al ("Hoshino", US 20040021643) in view of Rogue ("Rogue", Palm Pilot: The Ultimate Guide, 2nd Edition).

        As per claim 2, Nakajima-Hoshino fails to particularly disclose a function to display a plurality of functions. However, Rogue teaches a computer readable medium of claim 1, wherein one function from the plurality of functions, when activated, causes the user interface to display icons representing different services or settings for a currently active application (Figure 1.2-1.3, *Preferences* ).Therefore it would have been

NEONODE0000467

Application/Control Number: 10/315,250                                    Page 4
Art Unit: 2174

obvious to an artisan at the time of the invention to combine the teaching of Rogue with

the medium of Nakajima. Motivation to do so would have been to provide a way to

reduce screen clutter and only access the applications when needed.


As per claim 3, Nakajima-Hoshino-Rogue teaches a computer readable medium

of claim 2, wherein the user interface is characterised in, that a selection of a preferred

service or setting is done by tapping on a display icon corresponding to the preferred

service or setting (Nakajima, Column 18 lines 30-40, tap).


As per claim 4, Nakajima-Hoshino-Rogue teaches a computer readable medium

of claim 1, wherein one function from the plurality of functions, when activated, causes

the user interface to display a keyboard and a text field (Rogue, Figure 2.5, power

stroke up, Figure 2.6).


As per claim 5, Nakajima-Hoshino-Rogue teaches a wherein said text field is

used for inputting and editing of text through said keyboard (Nakajima, Figure 2.6).


As per claim 6, Nakajima-Hoshino-Rogue fails to teach a computer readable

medium of claim 1, OFFICIAL NOTICE is taken that file listing is well know in the art. It

is extremely common to see a list of functions and files listed, as in directories.

Therefore it would have been obvious to an artisan at the time of the invention to

NEONODE0000468

Application/Control Number: 10/315,250                                                    Page 5
Art Unit: 2174

combine the teaching with the medium of Nakajima-Hoshino -Rogue. Motivation to do

so would have been to provide a user with a list of options.


As per claim 7, Nakajima-Hoshino -Rogue teaches a computer readable medium

of claim 6, wherein the user interface is characterised in, that a selection of an

application or file is done by gliding the object along said touch sensitive area so that a

representation of a desired one of said application or file is highlighted, raising said

object from said touch sensitive area, and then tapping on said touch sensitive area

(Nakajima, Column 18 lines 40-56).


As per claim 8, Nakajima-Hoshino -Rogue fails to teach presenting only files or

only applications. However OFFICIAL NOTICE is taken that file sorting is well know in

the art. It is extremely common to sort a list of functions and files listed by data type.

Therefore it would have been obvious to an artisan at the time of the invention to

combine the teaching with the medium of Nakajima-Rogue. Motivation to do so would

have been to provide a user with a specific list of filtered options.


As per claim 9, Nakajima-Hoshino -Rogue teaches a computer readable medium

of claim 7, wherein the user interface is characterised in, that, one item in said list is

highlighted by a moveable marking, and gliding the object along the touch sensitive

area in a direction towards the top of said list or towards the bottom of said list, causes

NEONODE0000469

Application/Control Number: 10/315,250                                           Page 6
Art Unit: 2174

said marking to move in the same direction without scrolling the list (Rogue, Figure 1.4,

using the menu).

As per claim 10, Nakajima-Hoshino -Rogue teaches a computer readable

medium of claim 9, wherein the user interface is characterised in, that, if the number of

applications or files in said list exceeds the number of applications or files that can be

presented on said touch sensitive area as content, and if the object is (i) glided along

said touch sensitive area to the top or bottom position of said touch sensitive area, then

(ii) raised above said touch sensitive area, then (iii) replaced on said touch sensitive

area, and then (iv) again glided along said touch sensitive area to the top or bottom of

said touch sensitive area, said list navigation pages the content of said list up or down

one whole page (Nakajima, Column 14 lines 45-57 and Column 2 lines 15-23, wherein

Nakajima is an absolute pointing device and a swipe from the top of the page to the

bottom will result in a refresh by a whole page ).

As per claim 11, Nakajima-Hoshino -Rogue teaches a computer readable

medium of claim 10, wherein the user interface is characterised in, that if the object is

raised from any first position on said touch sensitive area and then replaced on any

second position on said touch sensitive area, said navigation can be continued from

said second position (Nakajima, Column 14 lines 45-57).

NEONODE0000470

Application/Control Number: 10/315,250                                                Page 7
Art Unit: 2174

As per claim 14, while Nakajima-Hoshino -Rogue fails to teach a touch sensitive area is 2-3 inches. OFFICIAL NOTICE is taken that screen sizes vary and screens with a touch sensitive area of 2-3 inches diagonally is well known in the art. Therefore it would have been obvious to an artisan at the time of the invention to combine the screen size with the medium of Nakajima-Hoshino -Rogue. Motivation to do so would have been to provide adequate size to operate the touch screen while keeping it small enough to fit in a pocket.

As per claim 15, Nakajima-Hoshino-Rogue teaches a enclosure adapted to cover the mobile handheld computer unit according to Claim 1, characterised in, that said enclosure is provided with an opening for said touch sensitive area (Rogue, Figure 1.1).

As per claim 16, Nakajima-Hoshino-Rogue fails to teach an enclosure is removable and exchangeable. OFFICIAL NOTICE is taken that an enclosure is removable and exchangeable is well known in the art. Therefore it would have been obvious to an artisan at the time of the invention to combine the exchangeable enclosure with the medium of Nakajima-Rogue. Motivation to do so would have been to provide a way to style your mobile device so that it can be personalized to a user's taste.

NEONODE0000471

Application/Control Number: 10/315,250                                   Page 8
Art Unit: 2174

As per claim 18, Nakajima-Hoshino-Rogue teaches a computer readable medium according to Claim 1, characterised in, that said computer program product is adapted to function as a shell upon an operations system (Rogue, 1.1 Palm Pilot Basics).

5.      Claims 12 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable over Nakajima et al ("Nakajima", 6,346,935) in view of Rogue ("Rogue", Palm Pilot: The Ultimate Guide, 2nd Edition) and Hoshino et al ("Hoshino", US 20040021643) in view of O'Rourke (O'Rourke, US 7,225,408).

As per claim 12, Nakajima-Hoshino-Rogue teaches a computer readable medium of claim 1, wherein the user interface is characterized in, that an active application, function, service or setting is moved on one step by gliding the object along the touch sensitive area from left to right (Nakajima, Column 14 lines 45-57). However, Nakajima-

NEONODE0000472

Application/Control Number: 10/315,250                                    Page 9
Art Unit: 2174

Rogue fails to distinctly point out closing or backing one step. However, O'Rourke

teaches that the active application, function, service or setting is closed or backed one

step (Figure 13, right and left arrows). Therefore it would have been obvious to an

artisan at the time of the invention to combine the glide functionality with the forward

and backward functionality of O'Rourke. Motivation to do so would have been to provide

an easy way to traverse the GUI.


As per claim 13, Nakajima-Hoshino-Rogue-O'Rourke teaches a computer

readable medium of claim 1, wherein the user interface is characterized in, that said

representations of said plurality of functions are located at the bottom of said touch

sensitive area (O'Rourke, Figure 13, icons at bottom right) .


### Response to Arguments

Applicant's arguments with respect to claims 1-16,18 have been considered but

are moot in view of the new ground(s) of rejection.


The Examiner notes that the OFFICIAL NOTICE set forth in the previous office

action has not been contested.


NEONODE0000473

Application/Control Number: 10/315,250                                    Page 10
Art Unit: 2174

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to RYAN F. PITARO whose telephone number is (571)272-4071. The examiner can normally be reached on 9:00am - 5:30pm Mondays through Fridays.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Dennis Chow can be reached on 571-272-7767. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Ryan F Pitaro/
Examiner, Art Unit 2174

NEONODE0000474

| *Notice of References Cited* | Application/Control No. 10/315,250 | Applicant(s)/Patent Under Reexamination GOERTZ, MAGNUS | |
|---|---|---|---|
| | Examiner RYAN F. PITARO | Art Unit 2174 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-2004/0021643 | 02-2004 | Hoshino et al. | 345/173 |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

NEONODE0000475

EAST Search History

file:///C|/Documents%20and%20Settings/RPitaro/My%20Documents/e-Red%20Folder/10315250/EASTSearchHistory.10315250_AccessibleVersion.htm (1 of 11)11/20/09 3:23:24 PM

## EAST Search History

## EAST Search History (Prior Art)

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L1 | 31 | icon with drag with activate | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2009/11/20 14:29 |
| L2 | 148 | icon with drag with activat$7 | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:29 |
| L3 | 68 | icon with drag with activat$7 and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:30 |
| L4 | 29 | bar with drag with activat$7 and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:36 |
| L5 | 81 | function with drag with activat$7 and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:37 |
| L11 | 26 | (dock bar) with (glide swipe) with activat$7 | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2009/11/20 14:43 |

NEONODE0000476

EAST Search History

| L12 | 34 | (dock bar) with (glide swipe) with activat$7 | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:43 |
|-----|-----|-----|-----|-----|-----|-----|
| L13 | 54 | (glide swipe) with activat$7 with (function application program) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:46 |
| L14 | 24 | (glide swipe) with activat$7 with (function application program) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:47 |
| L15 | 30 | (glide swipe drag) with icon with activat$7 with (function application program) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:48 |
| L16 | 2 | "7441196".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2009/11/20 15:14 |
| L17 | 503 | swipe with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L18 | 734 | (glide swipe) with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L19 | 2 | "7286063".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |

NEONODE0000477

EAST Search History

| L23 | 263 | ("20010003845" \| "20010012286" \| "20010016947" \| "20010034647" \| "20010042002" \| "20010044751" \| "20010049824" \| "20010051903" \| "20020007309" \| "20020010642" \| "20020016750" \| "20020029339" \| "20020032782" \| "20020035174" \| "20020038256" \| "20020038259" \| "20020042914" \| "20020042921" \| "20020049631" \| "20020056098" \| "20020059590" \| "20020067376" \| "20020077177" \| "20020078006" \| "20020078453" \| "20020098834" \| "20020116292" \| "20020116320" \| "20020166122" \| "20030046182" \| "20030074661" \| "20030095525" \| "20030126607" \| "20030140017" \| "20030146940" \| "20030149628" \| "20030182195" \| "20040003412" \| "20040098747" \| "20040103439" \| "20040117831" \| "20040128137" \| "20040133848" \| "20040148625" \| "20040204116" \| "20040210824" \| "20040260689" \| "20050010949" \| "20050025550" \| "20050075932" \| "20050086690" \| "20050091118" \| "20050160458" \| "20050234895" \| "20050246231" \| "20060155598" \| "20060224987" \| "20070008332" \| "3586771" \| "4650977" \| "4706121" \| "4992940" \| "5041312" \| "5064999" \| "5119188" \| "5236199" \| "5321749" \| "5353016" \| "5410326" \| "5479268" \| "5532735" \| "5553242" \| "5559548" \| "5598523" \| "5602596" \| "5617570" \| "5625781" \| "5710887" \| "5727129" \| "5734719" \| "5758126" \| "5794210" \| "5796252" \| "5801702" \| "5809204" \| "5819220" \| "5822014" \| "5828839" \| "5832208" \| "5832459" \| "5838314" \| "5848396" \| "5851149" \| "5874906" \| "5878222" \| "5890175" \| "5893064" \| "5895454" \| "5896133" \| "5900905" \| "5902353" \| "5903729" \| "5911145" \| "5918014" \| "5918213").PN. OR ("5925103" \| "5931901" \| "5935002" \| "5946381" \| "5956681" \| "5956693" \| "5958012" \| "5960411" \| "5961593" \| "5978381" \| "5990927" \| "6002853" \| "6005562" \| "6005631" \| "6006257" \| "6012049" \| "6014502" \| "6018372" \| "6025837" \| "6028600" \| "6031537" \| "6041312" \| "6054989" \| "6072483" \| "6072492" \| "6075575" \| "6078866" \| "6091417" \| | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |

NEONODE0000478

"6094156" | "6101473" | "6112186" | "6129274" |
"6138107" | "6142371" | "6151050" | "6151059" |
"6151596" | "6151630" | "6154205" | "6160552" |
"6167382" | "6172677" | "6177936" | "6193152" |
"6198481" | "6199050" | "6199077" | "6199098" |
"6205432" | "6205582" | "6211878" | "6212265" |
"6223215" | "6226623" | "6226642" | "6229540" |
"6237030" | "6243093" | "6253189" | "6260192" |
"6266060" | "6269343" | "6269361" | "6269403" |
"6271832" | "6282516" | "6285357" | "6285987" |
"6286017" | "6286043" | "6288716" | "6292779" |
"6292782" | "6292786" | "6292809" | "6295057" |
"6298330" | "6300947" | "6301566" | "6312336" |
"6314406" | "6317706" | "6330005" | "6330543" |
"6333753" | "6334108" | "6334145" | "6336131" |
"6337715" | "6345279" | "6356905" | "6381583" |
"6388714" | "6396531" | "6397387" | "6401132" |
"6407779" | "6411307" | "6411337" | "6415270" |
"6417873" | "6418441" | "6421066" | "6421071" |
"6421724" | "6438540" | "6445398" | "6460181" |
"6476825" | "6477575" | "6484149" | "6487189" |
"6487586" | "6490555" | "6509913" | "6516311" |
"6522342" | "6532312" | "6535888" | "6570582" |
"6571279" | "6583800" | "6606103" | "6606280" |
"6606347").PN. OR ("6608633" | "6615247" |
"6615248" | "6618039" | "6631523" | "6636246" |
"6647373" | "6662224" | "6680714" | "6684062" |
"6692358" | "6704727" | "6711552" | "6714534" |
"6728731" | "6769989" | "6804786" | "6826572" |
"6829646" | "6857102" | "6868525" | "6907556" |
"6925595" | "6928610" | "6938073" | "6973669" |
"6978263" | "7013435" | "7020845" | "7051281" |
"7174512" | "7293276" | "7383515").PN.

| L24 | 131 | touch with slide with function | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |

NEONODE0000479

EAST Search History

| L25 | 13 | ("4366475" \| "4686332" \| "4821030" \| "4914624" \| "5402151" \| "5563632" \| "5596346" \| "5638060" \| "5687331" \| "5736974" \| "5736976" \| "5761485" \| "5838973").PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |
| --- | --- | --- | --- | --- | --- | --- |
| L26 | 175604 | object near3 type | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |
| L27 | 5 | (file item object) near3 type with open near3 respective | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |
| L28 | 997 | open$3 with different with program | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |
| L29 | 2 | multiple near3 file near3 selection with open | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| L30 | 12 | applying with command with (plurality multiple) with files | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| L31 | 30944 | (flick stroke) with (open application command) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2009/11/20 15:14 |
| L32 | 261 | (flick ) with (open application command) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L33 | 131 | (flick ) with (open application command) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L34 | 5 | (flick ) with (open application command) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L35 | 39 | (flick ) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |

NEONODE0000480

EAST Search History

| L36 | 981 | (flick gesture) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L37 | 2372 | (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L38 | 78 | (flick gesture slide) and @ay<="2002" and "715"/702,864.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L39 | 6588 | finger near3 (flick gesture slide) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L40 | 87 | finger near3 (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L41 | 0 | "5543591,5943052,5907327,4686332".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L42 | 8 | ("5543591" "5943052" "5907327" "4686332").pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L43 | 113453 | (glide flick touch swipe) with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |

NEONODE0000481

EAST Search History

| L44 | 16322 | (glide flick touch swipe) with screen with (applications functions) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
|-----|-------|------|------|----|----|---------|
| L45 | 92 | (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L46 | 439 | (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L47 | 0 | (glide flick swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L48 | 11 | (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L49 | 219 | (glide flick gesture swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L50 | 302 | (glide flick swipe) with screen and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L51 | 8 | (glide flick swipe) with screen with icon and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |

NEONODE0000482

EAST Search History

| L52 | 16 | ("20010011308" \| "20030142138" \| "20040034801" \| "20050253817" \| "20050253817" \| "20050264833" \| "5821933" \| "5907327" \| "6633310").PN. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
|-----|-----|-----|-----|-----|-----|-----|
| L53 | 452 | (glide flick swipe) with finger and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L54 | 3 | (glide flick swipe) with finger and @AY<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L55 | 13 | ("5250929" \| "5568604" \| "5579036" \| "5612719" \| "5661476" \| "5748185" \| "5767457" \| "5883617" \| "5928304" \| "5943043" \| "5943044" \| "5995083" \| "6049328").PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |
| L56 | 1144 | 715/716.ccls. | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |
| L57 | 8 | 715/716.ccls. and dvd near menu | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |
| L58 | 10 | 715/716.ccls. and dvd near menu | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| L59 | 429 | 715/716.ccls. and dvd | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| L60 | 587 | 715/716.ccls. and menu | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| L61 | 55 | 715/716.ccls. and menu and theme | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| L62 | 311 | 715/716.ccls. and menu and effects | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| L63 | 6 | 715/716.ccls. and menu with theme | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |

NEONODE0000483

EAST Search History

| L64 | 1 | "7200836".pn. | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
|---|---|---|---|---|---|---|
| L65 | 1 | "20080120546".pn. | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| L66 | 504 | 715/864.ccls. | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| L67 | 69 | 715/864.ccls. and keyboard and back and icons and files | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| L68 | 29 | 715/864.ccls. and keyboard and back and icons and files and removable | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| L69 | 44 | 715/864.ccls. and keyboard and icons and files and @ay<="2002" | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| L70 | 2 | "6346935".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2009/11/20 15:14 |
| L71 | 21 | (glide flick touch swipe) with (coordinat$7) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L72 | 439 | (touch finger) with (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L73 | 0 | (touch finger) with (glide flick swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L74 | 3 | (touch finger) with (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |

NEONODE0000484

EAST Search History

| L75 | 2 | "6140936".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L76 | 2 | "6346935".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L77 | 195 | files with applications with list with only | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L78 | 102 | (file near list) with (application near list) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L79 | 535 | (file near view) with application | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L80 | 16 | sort with application near files | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L81 | 632 | (programs application) with files with (sort show list) with only | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L82 | 57 | (programs application) with files with (sort show list) with only and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |

NEONODE0000485

EAST Search History

| L83 | 0 | seperate with list with data near type | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
|---|---|---|---|---|---|---|
| L84 | 6088 | list with data near type | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L85 | 684 | list with data near type and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L86 | 635 | application near list and file near list | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| L87 | 273 | application near list and file near list and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |

**EAST Search History (Interference)**

< This search history is empty>

**11/20/09 3:23:19 PM
C:\Documents and Settings\RPitaro\My Documents\EAST\Workspaces\10315250.wsp**

NEONODE0000486

| Index of Claims | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 10315250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** |
| | Ryan F Pitaro | 2174 |

| ✓ | **Rejected** | - | **Cancelled** | **N** | **Non-Elected** | **A** | **Appeal** |
|---|---|---|---|---|---|---|---|
| = | **Allowed** | ÷ | **Restricted** | **I** | **Interference** | **O** | **Objected** |

| ☐ Claims renumbered in the same order as presented by applicant | | ☐ CPA | ☐ T.D. | ☐ R.1.47 |
|---|---|---|---|---|

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | 06/23/2008 | 12/21/2008 | 07/06/2009 | 11/20/2009 | | | | |
| | 1 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 2 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 3 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 4 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 5 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 6 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 7 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 8 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 9 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 10 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 11 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 12 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 13 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 14 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 15 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 16 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 17 | ✓ | ✓ | ✓ | - | - | | | | |
| | 18 | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| | 19 | | ÷ | N | - | | | | | |
| | 20 | | ÷ | N | - | | | | | |
| | 21 | | ÷ | N | - | | | | | |
| | 22 | | ÷ | N | - | | | | | |
| | 23 | | ÷ | N | - | | | | | |
| | 24 | | ÷ | N | - | | | | | |
| | 25 | | ÷ | N | - | | | | | |
| | 26 | | ÷ | N | - | | | | | |
| | 27 | | ÷ | N | - | | | | | |
| | 28 | | ÷ | N | - | | | | | |
| | 29 | | ÷ | N | - | | | | | |
| | 30 | | ÷ | N | - | | | | | |
| | 31 | | ÷ | N | - | | | | | |
| | 32 | | ÷ | N | - | | | | | |
| | 33 | | ÷ | N | - | | | | | |
| | 34 | | ÷ | N | - | | | | | |
| | 35 | | ÷ | N | - | | | | | |
| | 36 | | ÷ | N | - | | | | | |

NEONODE0000487

| | | |
|---|---|---|
| **Index of Claims**  ‖‖‖‖‖‖‖‖‖‖ | **Application/Control No.**  10315250 | **Applicant(s)/Patent Under Reexamination**  GOERTZ, MAGNUS |
| | **Examiner**  Ryan F Pitaro | **Art Unit**  2174 |

| ✓ | **Rejected** | | – | **Cancelled** | **N** | **Non-Elected** | **A** | **Appeal** |
|---|---|---|---|---|---|---|---|---|
| = | **Allowed** | | ÷ | **Restricted** | **I** | **Interference** | **O** | **Objected** |

| ☐ Claims renumbered in the same order as presented by applicant | | ☐ CPA | ☐ T.D. | ☐ R.1.47 |
|---|---|---|---|---|

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | 06/23/2008 | 12/21/2008 | 07/06/2009 | 11/20/2009 | | | | |
| | 37 | | ÷ | N | - | | | | | |
| | 38 | | ÷ | N | - | | | | | |
| | 39 | | ÷ | N | - | | | | | |
| | 40 | | ÷ | N | - | | | | | |
| | 41 | | ÷ | N | - | | | | | |
| | 42 | | ÷ | N | - | | | | | |
| | 43 | | ÷ | N | - | | | | | |
| | 44 | | ÷ | N | - | | | | | |
| | 45 | | ÷ | N | - | | | | | |
| | 46 | | ÷ | N | - | | | | | |
| | 47 | | ÷ | N | - | | | | | |
| | 48 | | | | | | | | | |
| | 49 | | | | | | | | | |
| | 50 | | | | | | | | | |
| | 51 | | | | | | | | | |
| | 52 | | | | | | | | | |
| | 53 | | | | | | | | | |
| | 54 | | | | | | | | | |
| | 55 | | | | | | | | | |
| | 56 | | | | | | | | | |
| | 57 | | | | | | | | | |
| | 58 | | | | | | | | | |
| | 59 | | | | | | | | | |
| | 60 | | | | | | | | | |
| | 61 | | | | | | | | | |
| | 62 | | | | | | | | | |
| | 63 | | | | | | | | | |
| | 64 | | | | | | | | | |
| | 65 | | | | | | | | | |

U.S. Patent and Trademark Office

Part of Paper No. : 20091120

NEONODE0000488

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 10315250 | GOERTZ, MAGNUS |
| ‖‖‖‖‖‖‖‖‖‖‖‖ | **Examiner** | **Art Unit** |
| | Ryan F Pitaro | 2174 |

## SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| Update | Search | 11/8/2007 | RFP |
| Update | Search | 6/17/2008 | RFP |
| Update | Search | 12/21/2008 | RFP |
| Update | Search | 4/22/2009 | RFP |
| Update | Search | 11/20/2009 | RFP |

## SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| Update Search | 11/8/2007 | RFP |
| Update Search | 6/17/2008 | RFP |
| EAST | 12/21/2008 | RFP |
| Internet | 12/21/2008 | RFP |
| Safari Online Books | 12/21/2008 | RFP |
| IEEE | 12/21/2008 | RFP |
| ACM | 12/21/2008 | RFP |
| Update Search | 4/22/2009 | RFP |
| Update Search | 11/20/2009 | RFP |

## INTERFERENCE SEARCH

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

| | |
|---|---|
| | |

U.S. Patent and Trademark Office

Part of Paper No. : 20091120

NEONODE0000489

Attorney's Docket No.: <u>NEONODE.P004</u>        *PATENT*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In Re Patent Application of: | ) | |
| | ) | Examiner:  Ryan F. Pitaro |
| Magnus Goertz | ) | |
| | ) | Art Unit:    2174 |
| Application No: 10/315,250 | ) | |
| | ) | |
| Filed:      December 10, 2002 | ) | |
| | ) | |
| For:      USER INTERFACE FOR | ) | |
|             MOBILE HANDHELD | ) | |
|             COMPUTER UNIT | ) | |
| | ) | |

Mail Stop AMENDMENT
Commissioner for Patents
P. O. Box 1450
Alexandria, VA   22313-1450

## AMENDMENT AND RESPONSE TO OFFICE ACTION
## UNDER 37 C.F.R. §1.111

Sir:

In response to the Office Action dated November 24, 2009, applicant respectfully requests that the remarks below be taken into consideration.

NEONODE0000490

IN THE CLAIMS:

Please substitute the following claims for the pending claims with the same number:

**1.** (currently amended)      A computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

a touch sensitive area in which representations of at least one function are displayed, and each function of said at least one function being mapped to a corresponding location in the touch sensitive area at which the representation of the function is displayed, and being activated by a multi-step operation comprising (i) an object touching the corresponding location and then (ii) the object gliding along the touch sensitive area away from the touched location.

**2.** (previously presented)      The computer readable medium of claim **1**, wherein one function from the at least one function, when activated, causes the user interface to display icons representing different services or settings for a currently active application.

**3.** (previously presented)      The computer readable medium of claim **2**, wherein the user interface is characterised in, that a selection of a preferred service or setting is done by tapping on a display icon corresponding to the preferred service or setting.

Atty. Docket No. NEONODE.P004        -2-

NEONODE0000491

**4.** (previously presented)      The computer readable medium of claim **1**, wherein one function from at least one function, when activated, causes the user interface to display a keyboard and a text field.

**5.** (previously presented)      The computer readable medium of claim **4**, wherein said text field is used for inputting and editing of text through said keyboard.

**6.** (previously presented)      The computer readable medium of claim **1**, wherein one function from the at least one function, when activated, causes the user interface to display a list with a library of available applications and files on the mobile handheld computer unit.

**7.** (previously presented)      The computer readable medium of claim **6**, wherein the user interface is characterised in, that a selection of an application or file is done by gliding the object along said touch sensitive area so that a representation of a desired one of said application or file is highlighted, raising said object from said touch sensitive area, and then tapping on said touch sensitive area.

**8.** (previously presented)      The computer readable medium of claim **7**, wherein the user interface is characterised in, that at any given time said list presents only files or only applications, and that an area of said list presents a field through which said list can be changed from presenting files to presenting applications, or from presenting applications to presenting files.

Atty. Docket No. NEONODE.P004        -3-

NEONODE0000492

**9.** (previously presented)    The computer readable medium of claim **7**, wherein the user interface is characterised in, that, one item in said list is highlighted by a moveable marking, and the user interface enables list navigation whereby gliding the object along the touch sensitive area in a direction towards the top of said list or towards the bottom of said list causes said marking to move in the same direction without scrolling the list.

**10.** (previously presented)    The computer readable medium of claim **9**, wherein the user interface is characterised in, that, if the number of applications or files in said list exceeds the number of applications or files that can be presented on said touch sensitive area as content, and if the object is (i) glided along said touch sensitive area to the top or bottom of said touch sensitive area, then (ii) raised above said touch sensitive area, then (iii) replaced on said touch sensitive area, and then (iv) again glided along said touch sensitive area to the top or bottom of said touch sensitive area, said list navigation pages the content of said list up or down by one whole page.

**11.** (previously presented)    The computer readable medium of claim **10**, wherein the user interface is characterised in, that if the object is raised from any first position on said touch sensitive area and then replaced on any second position on said touch sensitive area, said list navigation can be continued from said second position.

**12.** (previously presented)    The computer readable medium of claim **1**, wherein the user interface is characterised in, that an active application, function, service or setting is advanced one step by gliding the object

Atty. Docket No. NEONODE.P004        -4-

NEONODE0000493

along the touch sensitive area from left to right, and that the active application, function, service or setting is closed or backed one step by gliding the object along the touch sensitive area from right to left.

**13.** (previously presented)    The computer readable medium of claim **1**, wherein the user interface is characterised in, that said representations of said at least one function are located at the bottom of said touch sensitive area.

**14.** (previously presented)    The computer readable medium of claim **1**, wherein the touch sensitive area is 2-3 inches in diagonal dimension.

**15.** (previously presented)    An enclosure adapted to cover the mobile handheld computer unit according to Claim **1**, characterised in, that said enclosure is provided with an opening for said touch sensitive area.

**16.** (previously presented)    The enclosure according to Claim **15**, characterised in, that said enclosure is removable and exchangeable.

**17.** (cancelled)

**18.** (previously presented)    The computer readable medium of claim **1**, characterised in, that said computer program code is adapted to function as a shell upon an operating system.

**19.** – **47.** (cancelled)

Atty. Docket No. NEONODE.P004        -5-

NEONODE0000494

<u>REMARKS</u>

Applicant expresses appreciation to the Examiner for the courtesy of an interview granted to applicant's representative Marc A. Berger (Reg. No. 44,029) and to Yossi Shain. The interview was held by telephone on Monday, February 22, 2010. The substance of the interview concerned the amendments to claim **1**.

Applicant has carefully studied the outstanding Office Action. The present amendment is intended to place the application in condition for allowance and is believed to overcome all of the objections and rejections made by the Examiner. Favorable reconsideration and allowance of the application are respectfully requested.

Applicant has amended claim **1** to properly claim the present invention. No new matter has been introduced. Claims **1 – 16** and **18** are presented for examination.

In Paragraphs 2 and 3 of the Office Action, the Examiner has rejected claim **1** under 35 U.S.C. §103(a) as being unpatentable over Nakajima et al., U.S. Patent No. 6,346,935 ("Nakajima") in view of Hoshino et al., U.S. Publ. No. 2004/0021643 ("Hoshino").

In Paragraph 4 of the Office Action, the Examiner has rejected claims **2 – 11**, **14 – 16** and **18** under 35 U.S.C. §103(a) as being unpatentable over Nakajima in view of Hoshino, and in view of Rogue, Palm Pilot: The Ultimate Guide, 2nd Edition ("Rogue").

In Paragraph 5 of the Office Action, the Examiner has rejected claims **12** and **13** under 35 U.S.C. §103(a) as being unpatentable over Nakajima in view of Rogue, in view of Hoshino, and in view of O'Rourke, US Patent No. 7,225,408 ("O'Rourke").

NEONODE0000495

## Brief Discussion of Prior Art

Nakajima, Rogue and O'Rourke are discussed in applicant's response filed on July 13, 2009.

Hoshino describes a touch screen user interface with two distinct user operations; namely, (1) touch, and (2) drag. Since a drag operation begins with an initial touch, in order to distinguish between these operations (1) and (2), it is necessary to discriminate between a touch operation and the initial touch of a drag operation. To do so, Hoshino uses a pressure sensor, in addition to a touch sensor. The pressure sensor discriminates between three states; namely, (a) no touch, (b) a light touch, and (c) a hard touch, corresponding to respective pressure levels 0, P1 and P2 (Hoshino/ pars. 10, 57, 79 – 81, 91 and 92; step 103 of FIG. 7, step 205 of FIG. 12, step 305 of FIG. 15, step 406 of FIG. 18 and step 506 of FIG. 21).

Hoshino associates a drag operation with a soft initial touch, and associates a touch operation with a hard touch. Hoshino is thereby able to discriminate between a touch operation and the initial touch of a drag operation. Hoshino activates a function in response to a hard touch, but does not activate a function in response to a soft touch.

## Response to Examiner's Arguments

In rejecting independent claim **1** in Paragraph 3 of the Office Action, the Examiner has cited pars. 92 and 93 of Hoshino as teaching a function being activated in response to an object touching a corresponding location and then gliding along the touch sensitive area away from the location. Applicant respectfully submits that, unlike the claimed invention, Hoshino activates the function <u>solely in response to a</u>

Atty. Docket No. NEONODE.P004          -7-

NEONODE0000496

push-in operation; i.e., a hard touch, and not in response to a drag operation. Indeed, at par. 92 Hoshino recites

> When P >= P2, an operation for activating the function may be performed in a manner similar to steps 104 – 107 in FIG. 7.

Applicant notes that in FIG. 7, from step 100 (START) through step 107, function activation occurs solely in response to a hard touch on an associated icon, irrespective of whether or not a drag is performed.

In distinction, the claimed invention activates a function in response to a multi-step touch-and-glide operation. Thus in particular, referring to the illustration below, the claimed invention responds to a (hard) touch followed by a glide differently than Hoshino. Specifically, the claimed invention activates a function after the glide, whereas Hoshino activates the function after the (hard) touch.

| CLAIMED INVENTION | HOSHINO |
|---|---|
| TOUCH ⟹ GLIDE ⟹ ACTIVATE | TOUCH ⟹ ACTIVATE ⟹ GLIDE |

Function activation operation of claimed invention vs. that of Hoshino

The table below summarizes some of the salient distinctions between the claimed invention and Hoshino.

| Some distinctions between claimed invention and Hoshino | | |
|---|---|---|
| | **Claimed invention** | **Hoshino** |
| **Objective** | Novel touch-and-glide user interface operation | Discriminate between two conventional operations; namely, (1) touch, and (2) drag-and-drop |
| **Hardware** | Touch screen | Touch screen with pressure sensor |
| **Function Activation** | In response to both steps of a multi-step operation; namely, (1) touch, followed by (2) a glide | In response to hard touch |

Atty. Docket No. NEONODE.P004          -8-

NEONODE0000497

In order to further distinguish the claimed invention over the prior art, applicant has amended claim **1** to include the limitation of a multi-step operation comprising (1) a touch, followed by (2) a glide away from the touched position.

The rejections of the claims **1** – **16** and **18** in paragraphs 2 - 5 of the Office Action will now be dealt with specifically.

As to amended independent claim **1** for a computer readable medium, applicant respectfully submits, as indicated hereinabove, that the limitation in claim **1** of

"*each function … being activated by a multi-step operation comprising (i) an object touching the corresponding location and then (ii) the object gliding along the touch sensitive area away from the touched location*"

is neither shown nor suggested in Nakajima, Hoshino, Rogue or O'Rourke.

In Paragraph 3 of the Office Action, the Examiner has indicated that it would have been obvious to combine the teaching of Hoshino with the medium of Nakajima. Applicant respectfully disagrees. Hoshino does not teach gliding a finger away from an icon. Instead, Hoshino teaches a drag-and-drop operation for moving an icon. In Nakajima the icons are either carve-outs in a frame surrounding a touch pad, or icons on an overlay of the touch pad. It is not possible to move the icons of Nakajima. As such, even the combination of Hoshino and Nakajima does not suggest the touch-and-glide operation of the claimed invention.

Moreover, for the sake of argument, even if one were somehow able to introduce the drag operation of Hoshino into Nakajima, the lack of a pressure sensor in Nakajima would cause Nakajima to activate a function upon the initial touch of the drag, and ignore the drag

Atty. Docket No. NEONODE.P004        -9-

NEONODE0000498

altogether.  In fact Hoshino, at pars. 7 – 9, teaches away from trying to support a drag-and-drop operation on a touch screen that does not have a pressure sensor.

The table below summarizes reasons why it is non-obvious to combine Nakajima and Hoshino.

| Some reasons why it is non-obvious to combine Nakajima with Hoshino | |
|---|---|
| **Nakajima** | **Hoshino** |
| Touch sensitive surface is opaque and static | Requires dynamic video display to animate drag-and-drop of icons |
| Icon is stationary (carve-out in frame surrounding screen, or on overlay sheet) | Requires software generated icon |
| Touch screen does not have pressure sensor | Requires pressure sensor. |

Because claims **2 – 16** and **18** depend from claim **1** and include additional features, applicant respectfully submits that claims **2 – 16** and **18** are not anticipated or rendered obvious by Nakajima, Hoshino, Rogue, O'Rourke, or a combination of Nakajima, Hoshino, Rogue and O'Rourke.

Accordingly claims **1 – 16** and **18** are deemed to be allowable.


**Support for Amended Claims in Original Specification**

Independent claim **1** for a computer readable medium has been amended to include the limitation of a multi-step operation comprising (1) a touch, followed by (2) a glide.  This limitation is supported in the original specification at least by the Abstract, by FIG. 2, where the arrow at A indicates a touch and the arrow at B indicates a glide, and by the description thereof at par. 47.

Atty. Docket No. NEONODE.P004          -10-

NEONODE0000499

For the foregoing reasons, applicant respectfully submits that the applicable objections and rejections have been overcome and that the claims are in condition for allowance.

If any matters can be resolved by telephone, applicant requests that the Patent and Trademark Office please contact the applicant at the telephone number listed below.

Respectfully submitted,

Dated: February 22, 2010

/Marc A. Berger/
Marc A. Berger
Reg. No. 44,029

P.O. Box 691
Soquel, CA   95073
(831) 426-8200

Atty. Docket No. NEONODE.P004        -11-

NEONODE0000500

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 7053773 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Customer Number:** | 75660 |
| **Filer:** | Marc Aron Berger |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | NEONODE.P004 |
| **Receipt Date:** | 22-FEB-2010 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 08:32:48 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Amendment/Req. Reconsideration-After Non-Final Reject | NEONODEP004Amendment_02-22-2010.pdf | 98239<br>65a4aea7bebbefec6924c7b65b9e5010c56c21b2 | no | 11 |

**Warnings:**

**Information:**

NEONODE0000501

| Total Files Size (in bytes): | 98239 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000502

PTO/SB/06 (07-06)
Approved for use through 1/31/2007. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>10/315,250 | Filing Date<br>12/10/2002 | ☐ To be Mailed |
|---|---|---|---|

### APPLICATION AS FILED – PART I

| | (Column 1) | (Column 2) | SMALL ENTITY ☒ | | OR | OTHER THAN<br>SMALL ENTITY | |
|---|---|---|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) | | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | X $  = | | OR | X $  = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | X $  = | | | X $  = | |
| ☐ APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | | TOTAL | |

### APPLICATION AS AMENDED – PART II

| | | (Column 1) | | (Column 2) | (Column 3) | SMALL ENTITY | | OR | OTHER THAN<br>SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|---|
| **AMENDMENT** | 02/22/2010 | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 17 | Minus | ** 47 | = 0 | X $26 = | 0 | OR | X $  = | |
| | Independent (37 CFR 1.16(h)) | * 1 | Minus | *** 8 | = 0 | X $110 = | 0 | OR | X $  = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | OR | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | | TOTAL ADD'L FEE | 0 | OR | TOTAL ADD'L FEE | |

| | | (Column 1) | | (Column 2) | (Column 3) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **AMENDMENT** | | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | X $  = | | OR | X $  = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | X $  = | | OR | X $  = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | OR | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.

** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".

*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".

The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Legal Instrument Examiner:
/DESHONNE T. MARTINO/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

NEONODE0000503

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-10)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | 10315250 | |
| Filing Date | 2002-12-10 | |
| First Named Inventor | Magnus Goertz | |
| Art Unit | 2174 | |
| Examiner Name | Ryan F. Pitaro | |
| Attorney Docket Number | NEONODE.P004 | |

**U.S.PATENTS**   Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 6639584 | B1 | 2003-10-28 | Li | |

If you wish to add additional U.S. Patent citation information please click the Add button.   Add

**U.S.PATENT APPLICATION PUBLICATIONS**   Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.   Add

**FOREIGN PATENT DOCUMENTS**   Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T5 |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button   Add

**NON-PATENT LITERATURE DOCUMENTS**   Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|

NEONODE0000504

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( **Not for submission under 37 CFR 1.99**) | Application Number | 10315250 |
|---|---|---|
| | Filing Date | 2002-12-10 |
| | First Named Inventor | Magnus Goertz |
| | Art Unit | 2174 |
| | Examiner Name | Ryan F. Pitaro |
| | Attorney Docket Number | NEONODE.P004 |

| | 1 | | ☐ |
|---|---|---|---|

| If you wish to add additional non-patent literature document citation information please click the Add button | Add |
|---|---|

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

EFS Web 2.1.17

NEONODE0000505

| | | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | Application Number | 10315250 |
| | Filing Date | 2002-12-10 |
| | First Named Inventor | Magnus Goertz |
| | Art Unit | 2174 |
| | Examiner Name | Ryan F. Pitaro |
| | Attorney Docket Number | NEONODE.P004 |

| CERTIFICATION STATEMENT |
|---|

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☒ Fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☐ None

**SIGNATURE**

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Marc A. Berger/ | Date (YYYY-MM-DD) | 2010-03-16 |
|---|---|---|---|
| Name/Print | Marc A. Berger | Registration Number | 44029 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

NEONODE0000506

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.1.17

NEONODE0000507

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 10315250 |
| **Filing Date:** | 10-Dec-2002 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Filer:** | Marc Aron Berger |
| **Attorney Docket Number:** | NEONODE.P004 |

Filed as Large Entity

### Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

NEONODE0000508

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Submission- Information Disclosure Stmt | 1806 | 1 | 180 | 180 |
| **Total in USD ($)** | | | | **180** |

NEONODE0000509

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 7214152 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Customer Number:** | 75660 |
| **Filer:** | Marc Aron Berger |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | NEONODE.P004 |
| **Receipt Date:** | 16-MAR-2010 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 04:13:59 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $180 |
| RAM confirmation Number | 6843 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

NEONODE0000510

| 1 | Information Disclosure Statement (IDS) Filed (SB/08) | NEONODE_P004_IDS_16_Mar_2010.pdf | 761106 | no | 4 |
|---|---|---|---|---|---|
| | | | 40d3136259bd610cc05316378f2dabf285517753 | | |

**Warnings:**

**Information:**

| 2 | Fee Worksheet (PTO-875) | fee-info.pdf | 29923 | no | 2 |
|---|---|---|---|---|---|
| | | | 4a61a932625757780ec6f2f947c93e7dc09a3251 | | |

**Warnings:**

**Information:**

| | Total Files Size (in bytes): | 791029 |
|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000511

 UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

| | | |
|---|---|---|
| 75660       7590       05/28/2010 | | EXAMINER |
| Soquel Group, LLC | | PITARO, RYAN F |
| P.O. Box 691 | | |
| Soquel, CA 95073 | | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2174 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/28/2010 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

NEONODE0000512

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 10/315,250 | GOERTZ, MAGNUS |
| | Examiner | Art Unit | |
| | RYAN F. PITARO | 2174 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *3* MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on *22 February 2010*.

2a) ☒ This action is **FINAL**.        2b) ☐ This action is non-final.

3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4) ☒ Claim(s) *1-16 and 18* is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5) ☐ Claim(s) _____ is/are allowed.

6) ☒ Claim(s) *1-16 and 18* is/are rejected.

7) ☐ Claim(s) _____ is/are objected to.

8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9) ☐ The specification is objected to by the Examiner.

10) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All    b) ☐ Some *   c) ☐ None of:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____.

      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3) ☒ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date *3/16/2010*.

4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.

5) ☐ Notice of Informal Patent Application

6) ☐ Other: _____.

NEONODE0000513

Application/Control Number: 10/315,250                                                    Page 2
Art Unit: 2174

### *Response to Amendment*

1.    This action is in response to the amendment filed 2/22/2010. This action is final.

### *Claim Rejections - 35 USC § 103*

2.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

3.    Claim 1 is rejected under 35 U.S.C. 103(a) as being unpatentable over Nakajima

et al ("Nakajima", 6,346,935) in view of Hoshino et al ("Hoshino", US 20040021643) in

view of Hirshberg ("Hirshberg", US 2002/0027549).

    As per claim 1, Nakajima teaches a computer readable medium storing a

computer program with computer program code, which, when read by a mobile

handheld computer unit, allows the computer to present a user interface for the mobile

handheld computer unit, the user interface comprising: a touch sensitive area in which

representations of a plurality of functions are displayed (Column 15 lines 1-9, *function

signs*), and each function of said plurality of functions being mapped to a corresponding

location in the touch sensitive area at which the representation of the function is

displayed (Column 15 lines 1-9, *stops moving finger*). Nakajima teaches gliding over the

NEONODE0000514

Application/Control Number: 10/315,250                                         Page 3
Art Unit: 2174

icon Column 15 lines 1-15, *stops moving finger then glides finger to lightly press surface* but fails to distinctly point out touching the icon and gliding away. However, Hoshino teaches an icon being activated by an object touching the corresponding location and then gliding along the touch sensitive area away from the location ([0092]-[0093], drag and drop operation may be used in combination with a push in operation for activating a function). Therefore it would have been obvious at the time of the invention to combine the teaching of Hoshino with the medium of Nakajima. Motivation to do so would have been to apply a known technique to a known system in order to yield advantageous and predictable results.

Nakajima-Hoshino fails to distinctly point out an object touching a location then the object gliding along the area away from the location to activate a function. However, Hirshberg teaches a multi-step operation comprising an object touching the corresponding location and then the object gliding along the touch sensitive area away from the touched location ([0031]).

Therefore it would have been obvious to an artisan at the time of the invention to combine the teaching of Hirshberg with the medium of Nakajima-Hoshino.

Motivation to do so would have been to provide a compact multifunctional keypad which would not require great precision of use and which could be conveniently and effectively operated by use of the finger.

NEONODE0000515

Application/Control Number: 10/315,250                                     Page 4

Art Unit: 2174


4.      Claims 2-11,14-16,18 rejected under 35 U.S.C. 103(a) as being unpatentable

over Nakajima et al ("Nakajima", 6,346,935) and Hoshino et al ("Hoshino", US

20040021643) in view of Hirshberg ("Hirshberg", US 2002/0027549) in view of Rogue

("Rogue", Palm Pilot: The Ultimate Guide, 2nd Edition).


        As per claim 2, Nakajima-Hoshino-Hirshberg fails to particularly disclose a

function to display a plurality of functions. However, Rogue teaches a computer

readable medium of claim 1, wherein one function from the plurality of functions, when

activated, causes the user interface to display icons representing different services or

settings for a currently active application (Figure 1.2-1.3, *Preferences* ).Therefore it

would have been obvious to an artisan at the time of the invention to combine the

teaching of Rogue with the medium of Nakajima. Motivation to do so would have been

to provide a way to reduce screen clutter and only access the applications when

needed.


        As per claim 3, Nakajima-Hoshino-Hirshberg-Rogue teaches a computer

readable medium of claim 2, wherein the user interface is characterised in, that a

selection of a preferred service or setting is done by tapping on a display icon

corresponding to the preferred service or setting (Nakajima, Column 18 lines 30-40,

tap).


NEONODE0000516

Application/Control Number: 10/315,250                                                    Page 5

Art Unit: 2174

As per claim 4, Nakajima-Hoshino-Hirshberg-Rogue teaches a computer

readable medium of claim 1, wherein one function from the plurality of functions, when

activated, causes the user interface to display a keyboard and a text field (Rogue,

Figure 2.5, power stroke up, Figure 2.6).


As per claim 5, Nakajima-Hoshino-Hirshberg-Rogue teaches a wherein said text

field is used for inputting and editing of text through said keyboard (Nakajima, Figure

2.6).


As per claim 6, Nakajima-Hoshino-Hirshberg-Rogue fails to teach a computer

readable medium of claim 1, OFFICIAL NOTICE is taken that file listing is well know in

the art. It is extremely common to see a list of functions and files listed, as in directories.

Therefore it would have been obvious to an artisan at the time of the invention to

combine the teaching with the medium of Nakajima-Hoshino -Rogue. Motivation to do

so would have been to provide a user with a list of options.


As per claim 7, Nakajima-Hoshino-Hirshberg-Rogue teaches a computer

readable medium of claim 6, wherein the user interface is characterised in, that a

selection of an application or file is done by gliding the object along said touch sensitive

area so that a representation of a desired one of said application or file is highlighted,

NEONODE0000517

Application/Control Number: 10/315,250                                              Page 6

Art Unit: 2174

raising said object from said touch sensitive area, and then tapping on said touch

sensitive area (Nakajima, Column 18 lines 40-56).

As per claim 8, Nakajima-Hoshino-Hirshberg-Rogue fails to teach presenting only

files or only applications. However OFFICIAL NOTICE is taken that file sorting is well

know in the art. It is extremely common to sort a list of functions and files listed by data

type. Therefore it would have been obvious to an artisan at the time of the invention to

combine the teaching with the medium of Nakajima-Rogue. Motivation to do so would

have been to provide a user with a specific list of filtered options.

As per claim 9, Nakajima-Hoshino-Hirshberg-Rogue teaches a computer

readable medium of claim 7, wherein the user interface is characterised in, that, one

item in said list is highlighted by a moveable marking, and gliding the object along the

touch sensitive area in a direction towards the top of said list or towards the bottom of

said list, causes said marking to move in the same direction without scrolling the list

(Rogue, Figure 1.4, using the menu).

As per claim 10, Nakajima-Hoshino-Hirshberg-Rogue teaches a computer

readable medium of claim 9, wherein the user interface is characterised in, that, if the

number of applications or files in said list exceeds the number of applications or files

that can be presented on said touch sensitive area as content, and if the object is (i)

glided along said touch sensitive area to the top or bottom position of said touch

NEONODE0000518

Application/Control Number: 10/315,250                                    Page 7

Art Unit: 2174

sensitive area, then (ii) raised above said touch sensitive area, then (iii) replaced on

said touch sensitive area, and then (iv) again glided along said touch sensitive area to

the top or bottom of said touch sensitive area, said list navigation pages the content of

said list up or down one whole page (Nakajima, Column 14 lines 45-57 and Column 2

lines 15-23, wherein Nakajima is an absolute pointing device and a swipe from the top

of the page to the bottom will result in a refresh by a whole page ).


As per claim 11, Nakajima-Hoshino-Hirshberg-Rogue teaches a computer

readable medium of claim 10, wherein the user interface is characterised in, that if the

object is raised from any first position on said touch sensitive area and then replaced on

any second position on said touch sensitive area, said navigation can be continued from

said second position (Nakajima, Column 14 lines 45-57).


As per claim 14, while Nakajima-Hoshino-Hirshberg-Rogue fails to teach a touch

sensitive area is 2-3 inches. OFFICIAL NOTICE is taken that screen sizes vary and

screens with a touch sensitive area of 2-3 inches diagonally is well known in the art.

Therefore it would have been obvious to an artisan at the time of the invention to

combine the screen size with the medium of Nakajima-Hoshino -Rogue. Motivation to

do so would have been to provide adequate size to operate the touch screen while

keeping it small enough to fit in a pocket.

NEONODE0000519

Application/Control Number: 10/315,250                                                   Page 8
Art Unit: 2174

As per claim 15, Nakajima-Hoshino-Hirshberg-Rogue teaches a enclosure adapted to cover the mobile handheld computer unit according to Claim 1, characterised in, that said enclosure is provided with an opening for said touch sensitive area (Rogue, Figure 1.1).

As per claim 16, Nakajima-Hoshino-Hirshberg-Rogue fails to teach an enclosure is removable and exchangeable. OFFICIAL NOTICE is taken that an enclosure is removable and exchangeable is well known in the art. Therefore it would have been obvious to an artisan at the time of the invention to combine the exchangeable enclosure with the medium of Nakajima-Rogue. Motivation to do so would have been to provide a way to style your mobile device so that it can be personalized to a user's taste.

As per claim 18, Nakajima-Hoshino-Hirshberg-Rogue teaches a computer readable medium according to Claim 1, characterised in, that said computer program product is adapted to function as a shell upon an operations system (Rogue, 1.1 Palm Pilot Basics).

NEONODE0000520

Application/Control Number: 10/315,250                                    Page 9
Art Unit: 2174

5.      Claims 12 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable over Nakajima et al ("Nakajima", 6,346,935) in view of Rogue ("Rogue", Palm Pilot: The Ultimate Guide, 2nd Edition), Hoshino et al ("Hoshino", US 20040021643) and Hirshberg ("Hirshberg", US 2002/0027549) in view of O'Rourke (O'Rourke, US 7,225,408).

        As per claim 12, Nakajima-Hoshino-Hirshberg-Rogue teaches a computer readable medium of claim 1, wherein the user interface is characterized in, that an active application, function, service or setting is moved on one step by gliding the object along the touch sensitive area from left to right (Nakajima, Column 14 lines 45-57). However, Nakajima-Hoshino-Hirshberg-Rogue t fails to distinctly point out closing or backing one step. However, O'Rourke teaches that the active application, function, service or setting is closed or backed one step (Figure 13, right and left arrows). Therefore it would have been obvious to an artisan at the time of the invention to combine the glide functionality with the forward and backward functionality of O'Rourke. Motivation to do so would have been to provide an easy way to traverse the GUI.

NEONODE0000521

Application/Control Number: 10/315,250                                          Page 10
Art Unit: 2174

As per claim 13, Nakajima-Hoshino-Hirshberg-Rogue t-O'Rourke teaches a

computer readable medium of claim 1, wherein the user interface is characterized in,

that said representations of said plurality of functions are located at the bottom of said

touch sensitive area (O'Rourke, Figure 13, icons at bottom right) .


### *Response to Arguments*

Applicant's arguments with respect to claims 1-16,18 have been considered but

are moot in view of the new ground(s) of rejection.


The Examiner notes that the factual assertions set forth under OFFICIAL

NOTICE in the previous office action have not been contested.


### *Conclusion*

Applicant's amendment necessitated the new ground(s) of rejection presented in

this Office action. Accordingly, **THIS ACTION IS MADE FINAL**. See MPEP

§ 706.07(a). Applicant is reminded of the extension of time policy as set forth in 37

CFR 1.136(a).


NEONODE0000522

Application/Control Number: 10/315,250                                            Page 11
Art Unit: 2174

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.


Any inquiry concerning this communication or earlier communications from the

examiner should be directed to RYAN F. PITARO whose telephone number is

(571)272-4071.  The examiner can normally be reached on 9:00am - 5:30pm Mondays

through Fridays.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Dennis Chow can be reached on 571-272-7767.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

NEONODE0000523

Application/Control Number: 10/315,250                                          Page 12
Art Unit: 2174

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system. Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/Ryan F Pitaro/
Examiner, Art Unit 2174

NEONODE0000524

| | Notice of References Cited | Application/Control No. 10/315,250 | Applicant(s)/Patent Under Reexamination GOERTZ, MAGNUS | |
|---|---|---|---|---|
| | | Examiner RYAN F. PITARO | Art Unit 2174 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-2002/0027549 | 03-2002 | Hirshberg, David | 345/168 |
| * | B | US-7,159,763 | 01-2007 | Yap et al. | 235/375 |
| * | C | US-7,006,077 | 02-2006 | Uusimaki, Matti | 345/173 |
| * | D | US-6,597,345 | 07-2003 | Hirshberg, David | 345/168 |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

NEONODE0000525

| | Index of Claims | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| | | 10315250 | GOERTZ, MAGNUS |
| | | **Examiner** | **Art Unit** |
| | | Ryan F Pitaro | 2174 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

☐ Claims renumbered in the same order as presented by applicant     ☐ CPA     ☐ T.D.     ☐ R.1.47

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | 06/23/2008 | 12/21/2008 | 07/06/2009 | 11/20/2009 | 05/23/2010 | | | |
| | 1 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 2 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 4 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 5 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 6 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 7 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 8 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 9 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 10 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 11 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 12 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 13 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 14 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 15 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 16 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 17 | ✓ | ✓ | ✓ | - | - | - | | | |
| | 18 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| | 19 | | ÷ | N | - | | | | | |
| | 20 | | ÷ | N | - | | | | | |
| | 21 | | ÷ | N | - | | | | | |
| | 22 | | ÷ | N | - | | | | | |
| | 23 | | ÷ | N | - | | | | | |
| | 24 | | ÷ | N | - | | | | | |
| | 25 | | ÷ | N | - | | | | | |
| | 26 | | ÷ | N | - | | | | | |
| | 27 | | ÷ | N | - | | | | | |
| | 28 | | ÷ | N | - | | | | | |
| | 29 | | ÷ | N | - | | | | | |
| | 30 | | ÷ | N | - | | | | | |
| | 31 | | ÷ | N | - | | | | | |
| | 32 | | ÷ | N | - | | | | | |
| | 33 | | ÷ | N | - | | | | | |
| | 34 | | ÷ | N | - | | | | | |
| | 35 | | ÷ | N | - | | | | | |
| | 36 | | ÷ | N | - | | | | | |

U.S. Patent and Trademark Office                                      Part of Paper No. : 20100523

NEONODE0000526

| | Index of Claims | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| | | 10315250 | GOERTZ, MAGNUS |
| | | **Examiner** | **Art Unit** |
| | | Ryan F Pitaro | 2174 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| ☐ Claims renumbered in the same order as presented by applicant | | ☐ CPA | ☐ T.D. | ☐ R.1.47 |

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | 06/23/2008 | 12/21/2008 | 07/06/2009 | 11/20/2009 | 05/23/2010 | | | |
| | 37 | | ÷ | N | - | | | | | |
| | 38 | | ÷ | N | - | | | | | |
| | 39 | | ÷ | N | - | | | | | |
| | 40 | | ÷ | N | - | | | | | |
| | 41 | | ÷ | N | - | | | | | |
| | 42 | | ÷ | N | - | | | | | |
| | 43 | | ÷ | N | - | | | | | |
| | 44 | | ÷ | N | - | | | | | |
| | 45 | | ÷ | N | - | | | | | |
| | 46 | | ÷ | N | - | | | | | |
| | 47 | | ÷ | N | - | | | | | |
| | 48 | | | | | | | | | |
| | 49 | | | | | | | | | |
| | 50 | | | | | | | | | |
| | 51 | | | | | | | | | |
| | 52 | | | | | | | | | |
| | 53 | | | | | | | | | |
| | 54 | | | | | | | | | |
| | 55 | | | | | | | | | |
| | 56 | | | | | | | | | |
| | 57 | | | | | | | | | |
| | 58 | | | | | | | | | |
| | 59 | | | | | | | | | |
| | 60 | | | | | | | | | |
| | 61 | | | | | | | | | |
| | 62 | | | | | | | | | |
| | 63 | | | | | | | | | |
| | 64 | | | | | | | | | |
| | 65 | | | | | | | | | |

U.S. Patent and Trademark Office

Part of Paper No. : 20100523

NEONODE0000527

| **Search Notes**  | **Application/Control No.** 10315250 | **Applicant(s)/Patent Under Reexamination** GOERTZ, MAGNUS |
|---|---|---|
| | **Examiner** Ryan F Pitaro | **Art Unit** 2174 |

### SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| Update | Search | 11/8/2007 | RFP |
| Update | Search | 6/17/2008 | RFP |
| Update | Search | 12/21/2008 | RFP |
| Update | Search | 4/22/2009 | RFP |
| Update | Search | 11/20/2009 | RFP |
| Update | Search | 5/22/2010 | RFP |

### SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| Update Search | 11/8/2007 | RFP |
| Update Search | 6/17/2008 | RFP |
| EAST | 12/21/2008 | RFP |
| Internet | 12/21/2008 | RFP |
| Safari Online Books | 12/21/2008 | RFP |
| IEEE | 12/21/2008 | RFP |
| ACM | 12/21/2008 | RFP |
| Update Search | 4/22/2009 | RFP |
| Update Search | 11/20/2009 | RFP |
| Update Search | 5/22/2010 | RFP |
| Internet Search | 5/22/2010 | RFP |

### INTERFERENCE SEARCH

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

NEONODE0000528

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-10)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | 10315250 |
| Filing Date | | 2002-12-10 |
| First Named Inventor | | Magnus Goertz |
| Art Unit | | 2174 |
| Examiner Name | | Ryan F. Pitaro |
| Attorney Docket Number | | NEONODE.P004 |

### U.S.PATENTS       Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| /R.P./ | 1 | 6639584 | B1 | 2003-10-28 | Li | |

If you wish to add additional U.S. Patent citation information please click the Add button.       Add

### U.S.PATENT APPLICATION PUBLICATIONS       Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.       Add

### FOREIGN PATENT DOCUMENTS       Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button       Add

### NON-PATENT LITERATURE DOCUMENTS       Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|

EFS Web 2.1.17

NEONODE0000529

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 10315250 |
|---|---|---|
| | Filing Date | 2002-12-10 |
| | First Named Inventor | Magnus Goertz |
| | Art Unit | 2174 |
| | Examiner Name | Ryan F. Pitaro |
| | Attorney Docket Number | NEONODE.P004 |

| | 1 | | | ☐ |
|---|---|---|---|---|

| If you wish to add additional non-patent literature document citation information please click the Add button | Add |
|---|---|

**EXAMINER SIGNATURE**

| Examiner Signature | /Ryan Pitaro/ | Date Considered | 05/26/2010 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

NEONODE0000530

Doc code: RCEX
Doc description: Request for Continued Examination (RCE)

PTO/SB/30EFS (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

## REQUEST FOR CONTINUED EXAMINATION(RCE)TRANSMITTAL
### (Submitted Only via EFS-Web)

| Application Number | 10315250 | Filing Date | 2002-12-10 | Docket Number (if applicable) | NEONODE.P004 | Art Unit | 2174 |
|---|---|---|---|---|---|---|---|
| First Named Inventor | Magnus Goertz | | | Examiner Name | Ryan F. Pitaro | | |

**This is a Request for Continued Examination (RCE) under 37 CFR 1.114 of the above-identified application.**
Request for Continued Examination (RCE) practice under 37 CFR 1.114 does not apply to any utility or plant application filed prior to June 8, 1995, or to any design application. The Instruction Sheet for this form is located at WWW.USPTO.GOV

### SUBMISSION REQUIRED UNDER 37 CFR 1.114

Note: If the RCE is proper, any previously filed unentered amendments and amendments enclosed with the RCE will be entered in the order in which they were filed unless applicant instructs otherwise. If applicant does not wish to have any previously filed unentered amendment(s) entered, applicant must request non-entry of such amendment(s).

☐ Previously submitted. If a final Office action is outstanding, any amendments filed after the final Office action may be considered as a submission even if this box is not checked.

    ☐ Consider the arguments in the Appeal Brief or Reply Brief previously filed on _____

    ☐ Other _____

☒ Enclosed

    ☒ Amendment/Reply

    ☐ Information Disclosure Statement (IDS)

    ☐ Affidavit(s)/ Declaration(s)

    ☐ Other

### MISCELLANEOUS

☐ Suspension of action on the above-identified application is requested under 37 CFR 1.103(c) for a period of months _____
(Period of suspension shall not exceed 3 months; Fee under 37 CFR 1.17(i) required)

☐ Other _____

### FEES

**The RCE fee under 37 CFR 1.17(e) is required by 37 CFR 1.114 when the RCE is filed.**
☐ The Director is hereby authorized to charge any underpayment of fees, or credit any overpayments, to Deposit Account No _____

### SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED

☒ Patent Practitioner Signature
☐ Applicant Signature

EFS - Web 2.1.15

NEONODE0000531

Doc code: RCEX
Doc description: Request for Continued Examination (RCE)

PTO/SB/30EFS (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Signature of Registered U.S. Patent Practitioner | | | |
|---|---|---|---|
| Signature | /Marc A. Berger/ | Date (YYYY-MM-DD) | 2010-06-30 |
| Name | Marc A. Berger | Registration Number | 44029 |

This collection of information is required by 37 CFR 1.114. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

EFS - Web 2.1.15

NEONODE0000532

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

NEONODE0000533

Attorney's Docket No.: <u>NEONODE.P004</u>      *PATENT*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In Re Patent Application of: ) | |
| ) | Examiner:  Ryan F. Pitaro |
| Magnus Goertz ) | |
| ) | Art Unit:   2174 |
| Application No: 10/315,250 ) | |
| ) | |
| Filed:    December 10, 2002 ) | |
| ) | |
| For:    USER INTERFACE FOR ) | |
| MOBILE HANDHELD ) | |
| COMPUTER UNIT ) | |
| _____ ) | |

Mail Stop AMENDMENT
Commissioner for Patents
P. O. Box 1450
Alexandria, VA   22313-1450

## <u>AMENDMENT AND RESPONSE TO OFFICE ACTION</u>

## <u>UNDER 37 C.F.R. §1.111</u>

Sir:

        In response to the Final Office Action dated May 28,

2010, applicant respectfully requests that the above-identified application

be amended as follows.

Atty. Docket No. NEONODE.P004        -1-

NEONODE0000534

IN THE CLAIMS:

Please substitute the following claims for the pending claims with the same number:

**1.** (currently amended)    A <u>non-transitory</u> computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

a touch sensitive area in which ~~representations~~ <u>a representation</u> of ~~at least one~~ <u>a</u> function ~~are displayed, and each function of said at least one function being mapped to a corresponding location in the touch sensitive area at which the representation of the function is displayed, and being~~ <u>is provided, wherein the representation consists of only one option for activating the function and wherein the function is</u> activated by a multi-step operation comprising (i) an object touching the ~~corresponding~~ <u>touch sensitive area at a</u> location <u>where the representation is provided</u> and then (ii) the object gliding along the touch sensitive area away from the touched location.

**2.** (currently amended)    The computer readable medium of claim **1**, wherein ~~one function from~~ the ~~at least one~~ function, when activated, causes the user interface to display icons representing different services or settings for a currently active application.

**3.** (previously presented)    The computer readable medium of claim **2**, wherein the user interface is characterised in, that a selection of a

Atty. Docket No. NEONODE.P004        -2-

NEONODE0000535

preferred service or setting is done by tapping on a display icon corresponding to the preferred service or setting.

**4.** (currently amended)        The computer readable medium of claim **1**, wherein ~~one function from at least one~~ the function, when activated, causes the user interface to display a keyboard and a text field.

**5.** (previously presented)        The computer readable medium of claim **4**, wherein said text field is used for inputting and editing of text through said keyboard.

**6.** (currently amended)        The computer readable medium of claim **1**, wherein ~~one function from~~ the ~~at least one~~ function, when activated, causes the user interface to display a list with a library of available applications and files on the mobile handheld computer unit.

**7.** (previously presented)        The computer readable medium of claim **6**, wherein the user interface is characterised in, that a selection of an application or file is done by gliding the object along said touch sensitive area so that a representation of a desired one of said application or file is highlighted, raising said object from said touch sensitive area, and then tapping on said touch sensitive area.

**8.** (previously presented)        The computer readable medium of claim **7**, wherein the user interface is characterised in, that at any given time said list presents only files or only applications, and that an area of said list presents a field through which said list can be changed from presenting

Atty. Docket No. NEONODE.P004        -3-

NEONODE0000536

files to presenting applications, or from presenting applications to presenting files.

**9.** (previously presented)    The computer readable medium of claim **7**, wherein the user interface is characterised in, that, one item in said list is highlighted by a moveable marking, and the user interface enables list navigation whereby gliding the object along the touch sensitive area in a direction towards the top of said list or towards the bottom of said list causes said marking to move in the same direction without scrolling the list.

**10.** (previously presented)    The computer readable medium of claim **9**, wherein the user interface is characterised in, that, if the number of applications or files in said list exceeds the number of applications or files that can be presented on said touch sensitive area as content, and if the object is (i) glided along said touch sensitive area to the top or bottom of said touch sensitive area, then (ii) raised above said touch sensitive area, then (iii) replaced on said touch sensitive area, and then (iv) again glided along said touch sensitive area to the top or bottom of said touch sensitive area, said list navigation pages the content of said list up or down by one whole page.

**11.** (previously presented)    The computer readable medium of claim **10**, wherein the user interface is characterised in, that if the object is raised from any first position on said touch sensitive area and then replaced on any second position on said touch sensitive area, said list navigation can be continued from said second position.

NEONODE0000537

**12.** (previously presented)    The computer readable medium of claim **1**, wherein the user interface is characterised in, that an active application, function, service or setting is advanced one step by gliding the object along the touch sensitive area from left to right, and that the active application, function, service or setting is closed or backed one step by gliding the object along the touch sensitive area from right to left.

**13.** (currently amended)    The computer readable medium of claim **1**, wherein the user interface is characterised in, that said ~~representations~~ representation of said ~~at least one~~ function [[are]] is located at the bottom of said touch sensitive area.

**14.** (previously presented)    The computer readable medium of claim **1**, wherein the touch sensitive area is 2-3 inches in diagonal dimension.

**15.** (previously presented)    An enclosure adapted to cover the mobile handheld computer unit according to Claim **1**, characterised in, that said enclosure is provided with an opening for said touch sensitive area.

**16.** (previously presented)    The enclosure according to Claim **15**, characterised in, that said enclosure is removable and exchangeable.

**17.** (cancelled)

**18.** (previously presented)    The computer readable medium of claim **1**, characterised in, that said computer program code is adapted to function as a shell upon an operating system.

Atty. Docket No. NEONODE.P004        -5-

NEONODE0000538

**19.** – **47.** (cancelled)

Please add the following new claims.

**48.** (new)        The computer readable medium of claim **1**, wherein the representation is finger-sized.

**49.** (new)        The computer readable medium of claim **1**, wherein the location where the representation is provided does not provide touch functionality for a different function.

Atty. Docket No. NEONODE.P004        -6-

NEONODE0000539

REMARKS

Applicant has carefully studied the outstanding Office Action.  The present amendment is intended to place the application in condition for allowance and is believed to overcome all of the objections and rejections made by the Examiner.  Favorable reconsideration and allowance of the application are respectfully requested.

Applicant has amended claim **1**, **2**, **4**, **6** and **13** and added new claims **48** and **49** to properly claim the present invention.  No new matter has been introduced.  Support for the new and amended claims is provided hereinbelow.  Claims **1** – **16**, **18**, **48** and **49** are presented for examination.

In Paragraphs 2 and 3 of the Office Action, the Examiner has rejected claim **1** under 35 U.S.C. §103(a) as being unpatentable over Nakajima et al., U.S. Patent No. 6,346,935 ("Nakajima") in view of Hoshino et al., U.S. Publ. No. 2004/0021643 ("Hoshino") in view of Hirshberg, U.S. Publ. No. 2002/0027549 ("Hirshberg").

In Paragraph 4 of the Office Action, the Examiner has rejected claims **2** – **11**, **14** – **16** and **18** under 35 U.S.C. §103(a) as being unpatentable over Nakajima and Hoshino in view of Hirshberg in view of Pogue, Palm Pilot: The Ultimate Guide, 2nd Edition ("Pogue").

In Paragraph 5 of the Office Action, the Examiner has rejected claims **12** and **13** under 35 U.S.C. §103(a) as being unpatentable over Nakajima in view of Pogue, in view of Hoshino, in view of Hirshberg, in view of O'Rourke, US Patent No. 7,225,408 ("O'Rourke").

Atty. Docket No. NEONODE.P004          -7-

NEONODE0000540

**Brief Discussion of Prior Art**

Nakajima, Rogue and O'Rourke are discussed in applicant's response filed on July 13, 2009. Hoshino is discussed in applicant's response filed on February 22, 2010.

Hirshberg describes a touch screen user interface for a compact multi-functional keypad that is operated using a finger. Hirshberg addresses the problem of how to provide the 40 – 60 different keys required for a full alphanumeric keypad on a small surface that cannot reasonably accommodate so many keys (Hirschberg/ par. [0050]). Hirshberg describes grouping several characters (typically 4 – 6 characters) in a single key. As such, the number of required keys is reduced, and can fit in the available display area on a handheld device (Hirshberg/ par. [0051]).

To enter a character, a user first touches a key representing several characters, and then drags his finger in a specific direction to select one of the several characters. Thus, at par. [0055], Hirshberg recites:

> In multi-function key [sic] the first touch on the key activate [sic] the key and the relative trace ... is selecting the appropriate function among the functions associated with the selected key.

**Response to Examiner's Arguments**

In rejecting independent claim **1** in Paragraph 3 of the Office Action, the Examiner has cited par. [0031] of Hirshberg as teaching a multi-step operation comprising an object touching a corresponding location and then the object gliding along the touch sensitive area away from the touched location.

Applicant respectfully submits that Hirshberg teaches a touch and glide operation only for keys that comprise several characters.

Atty. Docket No. NEONODE.P004          -8-

NEONODE0000541

On the contrary, <u>for single character keys Hirshberg teaches using a conventional touch operation without a glide</u> (Hirshberg/ pars. [0055] and [0074]).  Thus, at par. [0055], Hirshberg recites:

> In the case of one function a regular touch operation activate [sic] the function.

Further, at par. [0074], Hirshberg recites:

> … a single-function mode wherein a single function is elected on contact with a given key, independent of the direction of motion.

In distinction, the claimed invention <u>uses a multi-step touch-and-glide operation for representations that consist of only one option for activating a function.</u>

In order to further distinguish the claimed invention over Hirshberg, applicant has amended claim **1** to include the limitation that the representation of the function consists of only one option for activating the function.

The rejections of the claims **1** – **16** and **18** in paragraphs 2 - 5 of the Office Action will now be dealt with specifically.

As to amended independent claim **1** for a computer readable medium, applicant respectfully submits, as indicated hereinabove, that the limitation in claim **1** of

*"wherein the representation **consists of only one option for activating the function** and wherein the function is activated by **a multi-step operation** comprising (i) an object **touching** the touch sensitive area at a location where the representation is provided and then (ii) the object **gliding along the touch sensitive area away from the touched location**"*

is neither shown nor suggested in Nakajima, Hoshino, Hirshberg, Pogue or O'Rourke.

Atty. Docket No. NEONODE.P004        -9-

NEONODE0000542

Because claims **2** – **16**, **18**, **48** and **49** depend from claim **1** and include additional features, applicant respectfully submits that claims **2** – **16**, **18**, **48** and **49** are not anticipated or rendered obvious by Nakajima, Hoshino, Hirshberg, Pogue, O'Rourke, or a combination of Nakajima, Hoshino, Hirshberg, Pogue and O'Rourke.

Accordingly claims **1**, **2** – **16**, **18**, **48** and **49** are deemed to be allowable.

## **Support for New and Amended Claims in Original Specification**

Independent claim **1** for a computer readable medium has been amended to include the limitation of a representation consisting of only one option for activating a function. This limitation is supported in the original specification at least by the Abstract, by representations 21 – 23 of FIG. 1, by FIG. 2 and its description at pars. [0045] – [0047] and by par. [0068].

Applicant notes that each representation 21 – 23, shown in FIG. 1 of the original specification, <u>consists of only one option</u> for activating its corresponding function. Indeed, element 21 consists of the one option of displaying icons as appropriate for a currently active application, as described at par. [0048] and shown in FIG. 3 of the original specification. Element 22 consists of the one option of opening a keypad and text window, as described at par. [0052] and shown in FIG. 5 of the original specification. Element 23 consists of the one option of opening a list of computer system applications and files, as described at par. [0058] and shown in FIG. 6 of the original specification. Moreover, each of these one-option elements is activated by a multi-step touch-and-glide operation, as described at pars. [0016] and [0047] of the original specification.

Atty. Docket No. NEONODE.P004        -10-

NEONODE0000543

New dependent claim **48** includes the limitation that the representation of the function is finger-sized.  This limitation is supported in the original specification at least at par. [0047] and FIG. 2, which shows that a representation 21, 22 or 23 is activated by a user's thumb; and at FIG. 5, which shows that representations 21, 22 and 23 are approximately the same size as the numeral keys of keyboard 221.

New dependent claim **49** includes the limitation that the location where the representation is provided does not provide touch functionality for a different function.  This limitation is supported in the original specification at least at FIG. 1, which shows that the locations of the representations 21, 22, 23 are non-overlapping.

For the foregoing reasons, applicant respectfully submits that the applicable objections and rejections have been overcome and that the claims are in condition for allowance.

If any matters can be resolved by telephone, applicant requests that the Patent and Trademark Office please contact the applicant at the telephone number listed below.

Respectfully submitted,

Dated: June 30, 2010                     /Marc A. Berger/_____
                                         Marc A. Berger
                                         Reg. No. 44,029
P.O. Box 691
Soquel, CA   95073
(831) 426-8200

Atty. Docket No. NEONODE.P004          -11-

NEONODE0000544

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 10315250 |
| **Filing Date:** | 10-Dec-2002 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Filer:** | Marc Aron Berger |
| **Attorney Docket Number:** | NEONODE.P004 |

Filed as Large Entity

### Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

NEONODE0000545

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Request for continued examination | 1801 | 1 | 810 | 810 |
| **Total in USD ($)** | | | | **810** |

NEONODE0000546

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 7922718 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus  Goertz |
| **Customer Number:** | 75660 |
| **Filer:** | Marc Aron Berger |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | NEONODE.P004 |
| **Receipt Date:** | 30-JUN-2010 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 10:48:58 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $810 |
| RAM confirmation Number | 20811 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

NEONODE0000547

| 1 | Request for Continued Examination (RCE) | NEONODEP004RCE_06-30-2010.pdf | 767940<br>a8f96a09a04f24517d988b5bd4362e13368cf08c | no | 3 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 2 | | NEONODEP004Amendment_06-30-2010.pdf | 84752<br>2e7240a4650f4127041d01fdad89d9af9ffdc513 | yes | 11 |
|---|---|---|---|---|---|

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| **Document Description** | **Start** | **End** |
| Amendment/Req. Reconsideration-After Non-Final Reject | 1 | 1 |
| Claims | 2 | 6 |
| Applicant Arguments/Remarks Made in an Amendment | 7 | 11 |

**Warnings:**

**Information:**

| 3 | Fee Worksheet (PTO-875) | fee-info.pdf | 29863<br>1385dd50828cd3accc63ccea08dfc0e4899ce2e6 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | Total Files Size (in bytes): | 882555 |
|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000548

PTO/SB/06 (07-06)
Approved for use through 1/31/2007. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>10/315,250 | Filing Date<br>12/10/2002 | ☐ To be Mailed |
| --- | --- | --- | --- |

## APPLICATION AS FILED – PART I

| | | | SMALL ENTITY ☒ | OR | OTHER THAN<br>SMALL ENTITY | |
| --- | --- | --- | --- | --- | --- | --- |
| | (Column 1) | (Column 2) | | | | |
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | X $ = | | X $ = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | X $ = | | X $ = | |
| ☐ APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | TOTAL | |

## APPLICATION AS AMENDED – PART II

| | | (Column 1) | | (Column 2) | (Column 3) | SMALL ENTITY | | OR | OTHER THAN<br>SMALL ENTITY | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **AMENDMENT** | **06/30/2010** | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 19 | Minus | ** 47 | = 0 | X $26 = | 0 | OR | X $ = | |
| | Independent (37 CFR 1.16(h)) | * 1 | Minus | *** 8 | = 0 | X $110 = | 0 | OR | X $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | OR | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | | TOTAL ADD'L FEE | 0 | OR | TOTAL ADD'L FEE | |

| | | (Column 1) | | (Column 2) | (Column 3) | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **AMENDMENT** | | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | X $ = | | OR | X $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | X $ = | | OR | X $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | OR | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.

** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".

*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".

The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Legal Instrument Examiner:
/EFREM WARREN/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

NEONODE0000549

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-10)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | 10315250 | |
| Filing Date | 2002-12-10 | |
| First Named Inventor | Magnus Goertz | |
| Art Unit | 2174 | |
| Examiner Name | PITARO, RYAN F | |
| Attorney Docket Number | NEONODE.P004 | |

### U.S.PATENTS  [Remove]

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 4790028 | B1 | 1988-12-06 | Ramage | |
| | 2 | 5053758 | B1 | 1991-10-01 | Cornett et al. | |
| | 3 | 5283558 | B1 | 1994-02-01 | Chan | |

If you wish to add additional U.S. Patent citation information please click the Add button.  [Add]

### U.S.PATENT APPLICATION PUBLICATIONS  [Remove]

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20010002694 | A1 | 2001-06-07 | Nakazawa et al. | |
| | 2 | 20010022579 | A1 | 2001-09-20 | Hirabayashi | |
| | 3 | 20010026268 | A1 | 2001-10-04 | Ito | |

EFS Web 2.1.17

<table>
<tr><td rowspan="3"><strong>INFORMATION DISCLOSURE STATEMENT BY APPLICANT</strong><br>( <strong>Not for submission under 37 CFR 1.99</strong>)</td><td>Application Number</td><td colspan="2">10315250</td></tr>
</table>

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | Application Number | 10315250 |
|---|---|---|
| | Filing Date | 2002-12-10 |
| | First Named Inventor | Magnus Goertz |
| | Art Unit | 2174 |
| | Examiner Name | PITARO, RYAN F |
| | Attorney Docket Number | NEONODE.P004 |

| | 4 | 20010028344 | A1 | 2001-10-11 | Iwamoto et al. | |
|---|---|---|---|---|---|---|
| | 5 | 20010055006 | A1 | 2001-12-27 | Sano et al. | |

If you wish to add additional U.S. Published Application citation information please click the Add button. [Add]

**FOREIGN PATENT DOCUMENTS** [Remove]

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button [Add]

**NON-PATENT LITERATURE DOCUMENTS** [Remove]

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| | 1 | | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button [Add]

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

NEONODE0000551

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( **Not for submission under 37 CFR 1.99**) | Application Number | 10315250 |
| --- | --- | --- |
| | Filing Date | 2002-12-10 |
| | First Named Inventor | Magnus Goertz |
| | Art Unit | 2174 |
| | Examiner Name | PITARO, RYAN F |
| | Attorney Docket Number | NEONODE.P004 |

### CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐  That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐  That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐  See attached certification statement.

☒  The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☐  A certification statement is not submitted herewith.

### SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Marc A. Berger/ | Date (YYYY-MM-DD) | 2010-12-21 |
| --- | --- | --- | --- |
| Name/Print | Marc A. Berger | Registration Number | 44029 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.17

NEONODE0000552

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

NEONODE0000553

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 10315250 |
| **Filing Date:** | 10-Dec-2002 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Filer:** | Marc Aron Berger |
| **Attorney Docket Number:** | NEONODE.P004 |

Filed as Large Entity

### Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

NEONODE0000554

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Submission- Information Disclosure Stmt | 1806 | 1 | 180 | 180 |
| **Total in USD ($)** | | | | **180** |

NEONODE0000555

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 9089252 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Customer Number:** | 75660 |
| **Filer:** | Marc Aron Berger |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | NEONODE.P004 |
| **Receipt Date:** | 21-DEC-2010 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 16:55:29 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $180 |
| RAM confirmation Number | 4428 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

NEONODE0000556

| 1 | Information Disclosure Statement (IDS) Filed (SB/08) | NEONODE_P004_IDS_21-21-2010.pdf | 612501<br>8ef76d2e00ddbb8597c930c2ddbcbb8540fffe87 | no | 4 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 2 | Fee Worksheet (PTO-875) | fee-info.pdf | 29922<br>49fe21e0e32f592761922206a1e56413a53a5a0b | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | | | **Total Files Size (in bytes):** | 642423 |
|---|---|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000557



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

75660          7590          05/11/2011
Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073

| EXAMINER |
|---|
| PITARO, RYAN F |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2171 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/11/2011 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

NEONODE0000558

| **Interview Summary** | Application No. | Applicant(s) |
|---|---|---|
| | 10/315,250 | GOERTZ, MAGNUS |
| | Examiner | Art Unit |
| | RYAN F. PITARO | 2171 |

All participants (applicant, applicant's representative, PTO personnel):

(1) *RYAN F. PITARO*.   (3)_____.

(2) *Marc Berger*.   (4)_____.

Date of Interview: *05 May 2011*.

Type:  a)☒ Telephonic   b)☐ Video Conference
c)☐ Personal [copy given to: 1)☐ applicant   2)☐ applicant's representative]

Exhibit shown or demonstration conducted:   d)☐ Yes   e)☐ No.
If Yes, brief description: _____.

Claim(s) discussed: *1*.

Identification of prior art discussed: *Nakajima,Hoshino,Hirshberg,Carlson, Venolia* .

Agreement with respect to the claims f)☒ was reached.   g)☐ was not reached.   h)☐ N/A.

Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments: *Differences between the prior art of record and the claimed application were discussed in view of the claim amendments. Agreement was reached that the prior art fails to teach the claimed amendments*.

(A fuller description, if necessary, and a copy of the amendments which the examiner agreed would render the claims allowable, if available, must be attached.  Also, where no copy of the amendments that would render the claims allowable is available, a summary thereof must be attached.)

THE FORMAL WRITTEN REPLY TO THE LAST OFFICE ACTION MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW. (See MPEP Section 713.04).  If a reply to the last Office action has already been filed, APPLICANT IS GIVEN A NON-EXTENDABLE PERIOD OF THE LONGER OF ONE MONTH OR THIRTY DAYS FROM THIS INTERVIEW DATE, OR THE MAILING DATE OF THIS INTERVIEW SUMMARY FORM, WHICHEVER IS LATER, TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.  See Summary of Record of Interview requirements on reverse side or on attached sheet.

/Ryan F Pitaro/
Primary Examiner, Art Unit 2171

U.S. Patent and Trademark Office
PTOL-413 (Rev. 04-03)   **Interview Summary**   Paper No. 20110509

NEONODE0000559

### Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

### Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews
Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

37 CFR §1.2 Business to be transacted in writing.
All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

_____

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
- Application Number (Series Code and Serial Number)
- Name of applicant
- Name of examiner
- Date of interview
- Type of interview (telephonic, video-conference, or personal)
- Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
- An indication whether or not an exhibit was shown or a demonstration conducted
- An identification of the specific prior art discussed
- An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
- The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
   (The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.

Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

NEONODE0000560

10315250

PLUS Search Results for S/N 10315250, Searched Thu May 12 15:25:52 EDT 2011
The Patent Linguistics Utility System (PLUS) is a USPTO automated search system
for U.S. Patents from 1971 to the present PLUS is a query-by-example search system which
produces a list of patents that are most closely related linguistically to the application
searched. This search was prepared by the staff of the Scientific and Technical Information
Center, SIRA.

| | |
|---|---|
| 5434777 99 | 7539864 99 |
| 5608624 99 | |
| 5625814 99 | |
| 6023779 99 | |
| 4490810 99 | |
| 5654529 99 | |
| 5949408 99 | |
| 4922237 99 | |
| 5257015 99 | |
| 5382962 99 | |
| 5496992 99 | |
| 5515052 99 | |
| 5536930 99 | |
| 5550650 99 | |
| 5615384 99 | |
| 5677952 99 | |
| 5923866 99 | |
| 5933478 99 | |
| 5970427 99 | |
| 5974238 99 | |
| 5983354 99 | |
| 6052120 99 | |
| 6084691 99 | |
| 6084584 99 | |
| 6094156 99 | |
| 6098095 99 | |
| 6106564 99 | |
| 6122216 99 | |
| 6128661 99 | |
| 6151015 99 | |
| 6166734 99 | |
| 6201199 99 | |
| 6236917 99 | |
| 6336137 99 | |
| 6377685 99 | |
| 6442570 99 | |
| 6468219 99 | |
| 6717572 99 | |
| 6889362 99 | |
| 6912659 99 | |
| 6965921 99 | |
| 7054487 99 | |
| 7123742 99 | |
| 7130980 99 | |
| 7203828 99 | |
| 7210032 99 | |
| 7302560 99 | |
| 7424588 99 | |
| 7430659 99 | |

NEONODE0000561

Attorney's Docket No.: <u>NEONODE.P004</u>    *PATENT*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In Re Patent Application of: | ) |
| | )     Examiner:  Ryan F. Pitaro |
|           Magnus Goertz | ) |
| | )     Art Unit:   2174 |
| Application No: 10/315,250 | ) |
| | ) |
| Filed:    December 10, 2002 | ) |
| | ) |
| For:    USER INTERFACE FOR | ) |
|        MOBILE HANDHELD | ) |
|        COMPUTER UNIT | ) |
| | ) |

Commissioner for Patents
P. O. Box 1450
Alexandria, VA   22313-1450

## SUMMARY OF INTERVIEW

Sir:

Applicant expresses appreciation to the Examiner for the courtesy of an interview granted to applicant's representative Marc A. Berger (Reg. No. 44,029).   The interview was held by telephone on Thursday, May 5, 2011.   The substance of the interview is contained in the Interview Summary, Form PTOL-413, prepared and entered by the Examiner on May 11, 2011.

> Respectfully submitted,
>
> SOQUEL GROUP LLC

Dated: May 29, 2011

/Marc A. Berger/
Marc A. Berger
Reg. No. 44,029

P.O. Box 691
Soquel, CA   95073
(831) 426-8200
Customer No. 75660

NEONODE0000562

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 10190005 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Customer Number:** | 75660 |
| **Filer:** | Marc Aron Berger |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | NEONODE.P004 |
| **Receipt Date:** | 29-MAY-2011 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 02:18:45 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Applicant summary of interview with examiner | NEONODE-P004_SummaryOfInterview.pdf | 40187<br>6af1a4526010a27c2e1f40a8043afc23d5d2aa83 | no | 1 |

| | |
|---|---|
| **Warnings:** | |
| **Information:** | |

NEONODE0000563

| Total Files Size (in bytes): | 40187 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000564



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

| | | | |
|---|---|---|---|
| 75660        7590        06/07/2011 | | EXAMINER | |
| Soquel Group, LLC | | PITARO, RYAN F | |
| P.O. Box 691 | | | |
| Soquel, CA 95073 | | ART UNIT | PAPER NUMBER |
| | | 2171 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/07/2011 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

NEONODE0000565

| | Application No. | Applicant(s) |
|---|---|---|
| ***Office Action Summary*** | 10/315,250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** | |
| | RYAN PITARO | 2171 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *3* MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *30 June 2010*.

2a)☐ This action is **FINAL.**  2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) *1-16,18,48 and 49* is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☒ Claim(s) *1-14,18,48 and 49* is/are allowed.

6)☒ Claim(s) *15 and 16* is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some *  c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☒ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date *12/21/2010*.

4) ☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____.
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

U.S. Patent and Trademark Office

PTOL-326 (Rev. 08-06)      **Office Action Summary**      Part of Paper No./Mail Date 20110606A

NEONODE0000566

Application/Control Number: 10/315,250                                                    Page 2
Art Unit: 2171

### *Continued Examination Under 37 CFR 1.114*

A request for continued examination under 37 CFR 1.114, including the fee set

forth in 37 CFR 1.17(e), was filed in this application after final rejection.  Since this

application is eligible for continued examination under 37 CFR 1.114, and the fee set

forth in 37 CFR 1.17(e) has been timely paid, the finality of the previous Office action

has been withdrawn pursuant to 37 CFR 1.114.  Applicant's submission filed on

6/30/2010 has been entered.

### *Allowable Subject Matter*

Claims 1-14,18,48-49 are allowed.

### *Claim Rejections - 35 USC § 112*

The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly
claiming the subject matter which the applicant regards as his invention.

Claims 15-16 are rejected under 35 U.S.C. 112, second paragraph, as being

indefinite in that it fails to point out what is included or excluded by the claim language.

This claim is an omnibus type claim.

### *Response to Arguments*

Applicant's arguments, filed 6/30/2010, with respect to claims 1-14,18 have been

fully considered and are persuasive.  The rejections of claims 1-14,18 have been

withdrawn.

NEONODE0000567

Application/Control Number: 10/315,250                                                Page 3
Art Unit: 2171

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the
examiner should be directed to RYAN PITARO whose telephone number is (571)272-
4071. The examiner can normally be reached on 9:00am - 5:30pm Mondays through
Fridays.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's
supervisor, Chat Do can be reached on 571-272-3721. The fax phone number for the
organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the
Patent Application Information Retrieval (PAIR) system. Status information for
published applications may be obtained from either Private PAIR or Public PAIR.
Status information for unpublished applications is available through Private PAIR only.
For more information about the PAIR system, see http://pair-direct.uspto.gov. Should
you have questions on access to the Private PAIR system, contact the Electronic
Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a
USPTO Customer Service Representative or access to the automated information
system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Ryan F Pitaro/
Primary Examiner, Art Unit 2171

NEONODE0000568

Application/Control Number: 10/315,250                                    Page 4
Art Unit: 2171

NEONODE0000569

| | | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| **_Notice of References Cited_** | | 10/315,250 | GOERTZ, MAGNUS |
| | | Examiner | Art Unit | Page 1 of 1 |
| | | RYAN PITARO | 2171 | |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-7,880,724 | 02-2011 | Nguyen et al. | 345/168 |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN  PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

NEONODE0000570

EAST Search History

file:///C|/Documents%20and%20Settings/RPitaro/My%20Documents/e-Red%20Folder/10315250/EASTSearchHistory.10315250_AccessibleVersion.htm (1 of 20)6/6/11 8:40:45 AM

# EAST Search History

## EAST Search History (Prior Art)

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L1 | 9854 | (glide flick touch swipe) with icon | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/06/06 08:26 |
| L2 | 47832 | (glide flick touch swipe) with (representation icon function) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/06/06 08:27 |
| L3 | 3314 | (glide flick touch swipe) with (representation icon function) with (activate activation open start) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/06/06 08:27 |
| L4 | 1037 | (glide flick touch swipe) with (representation icon function) with (activate activation open start) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/06/06 08:27 |
| L5 | 104 | (glide flick touch swipe) with (representation icon function) with (activate activation open start) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/06/06 08:27 |
| L6 | 121 | (glide flick touch swipe slide) with (representation icon function) with (activate activation open start) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/06/06 08:29 |
| L7 | 121 | (glide flick touch swipe slide) with (representation icon function) with (activate activation open start unlock) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/06/06 08:29 |
| L8 | 224 | (glide flick touch swipe slide drag) with (representation icon function) with (activate activation open start unlock) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/06/06 08:30 |
| L9 | 2 | touch near2 (flick slide swipe across glide) with activate and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/06/06 08:32 |

NEONODE0000571

EAST Search History

| L10 | 1 | touch near4 (flick slide swipe across glide) with activate with (icon button) and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/06/06 08:33 |
| L11 | 2422 | (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/06/06 08:33 |
| L12 | 11 | (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/06/06 08:33 |
| L13 | 1592 | 715/716.ccls. | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/06/06 08:33 |
| L14 | 659 | 715/864.ccls. | US-PGPUB; USPAT; USOCR | OR | ON | 2011/06/06 08:33 |
| L15 | 3 | (touch finger) with (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/06/06 08:34 |
| L16 | 33 | (touch finger) with (glide flick swipe slide ) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/06/06 08:34 |
| S1 | 2 | "7441196".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2008/12/08 17:03 |
| S2 | 394 | swipe with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/08 17:05 |
| S3 | 606 | (glide swipe) with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/08 17:05 |
| S4 | 2 | "7286063".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/08 17:10 |

NEONODE0000572

EAST Search History

| S5 | 263 | ("20010003845" \| "20010012286" \| "20010016947" \| "20010034647" \| "20010042002" \| "20010044751" \| "20010049824" \| "20010051903" \| "20020007309" \| "20020010642" \| "20020016750" \| "20020029339" \| "20020032782" \| "20020035174" \| "20020038256" \| "20020038259" \| "20020042914" \| "20020042921" \| "20020049631" \| "20020056098" \| "20020059590" \| "20020067376" \| "20020077177" \| "20020078006" \| "20020078453" \| "20020098834" \| "20020116292" \| "20020116320" \| "20020166122" \| "20030046182" \| "20030074661" \| "20030095525" \| "20030126607" \| "20030140017" \| "20030146940" \| "20030149628" \| "20030182195" \| "20040003412" \| "20040098747" \| "20040103439" \| "20040117831" \| "20040128137" \| "20040133848" \| "20040148625" \| "20040204116" \| "20040210824" \| "20040260689" \| "20050010949" \| "20050025550" \| "20050075932" \| "20050086690" \| "20050091118" \| "20050160458" \| "20050234895" \| "20050246231" \| "20060155598" \| "20060224987" \| "20070008332" \| "3586771" \| "4650977" \| "4706121" \| "4992940" \| "5041312" \| "5064999" \| "5119188" \| "5236199" \| "5321749" \| "5353016" \| "5410326" \| "5479268" \| "5532735" \| "5553242" \| "5559548" \| "5598523" \| "5602596" \| "5617570" \| "5625781" \| "5710887" \| "5727129" \| "5734719" \| "5758126" \| "5794210" \| "5796252" \| "5801702" \| "5809204" \| "5819220" \| "5822014" \| "5828839" \| "5832208" \| "5832459" \| "5838314" \| "5848396" \| "5851149" \| "5874906" \| "5878222" \| "5890175" \| "5893064" \| "5895454" \| "5896133" \| "5900905" \| "5902353" \| "5903729" \| "5911145" \| "5918014" \| "5918213").PN. OR ("5925103" \| "5931901" \| "5935002" \| "5946381" \| "5956681" \| "5956693" \| "5958012" \| "5960411" \| "5961593" \| "5978381" \| "5990927" \| "6002853" \| "6005562" \| "6005631" \| "6006257" \| "6012049" \| "6014502" \| "6018372" \| "6025837" \| "6028600" \| "6031537" \| "6041312" \| "6054989" \| "6072483" \| "6072492" \| "6075575" \| "6078866" \| "6091417" \| "6094156" \| "6101473" \| "6112186" \| "6129274" \| | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:12 |

NEONODE0000573

EAST Search History

| | | | | | | |
|---|---|---|---|---|---|---|
| | | "6138107" \| "6142371" \| "6151050" \| "6151059" \| "6151596" \| "6151630" \| "6154205" \| "6160552" \| "6167382" \| "6172677" \| "6177936" \| "6193152" \| "6198481" \| "6199050" \| "6199077" \| "6199098" \| "6205432" \| "6205582" \| "6211878" \| "6212265" \| "6223215" \| "6226623" \| "6226642" \| "6229540" \| "6237030" \| "6243093" \| "6253189" \| "6260192" \| "6266060" \| "6269343" \| "6269361" \| "6269403" \| "6271832" \| "6282516" \| "6285357" \| "6285987" \| "6286017" \| "6286043" \| "6288716" \| "6292779" \| "6292782" \| "6292786" \| "6292809" \| "6295057" \| "6298330" \| "6300947" \| "6301566" \| "6312336" \| "6314406" \| "6317706" \| "6330005" \| "6330543" \| "6333753" \| "6334108" \| "6334145" \| "6336131" \| "6337715" \| "6345279" \| "6356905" \| "6381583" \| "6388714" \| "6396531" \| "6397387" \| "6401132" \| "6407779" \| "6411307" \| "6411337" \| "6415270" \| "6417873" \| "6418441" \| "6421066" \| "6421071" \| "6421724" \| "6438540" \| "6445398" \| "6460181" \| "6476825" \| "6477575" \| "6484149" \| "6487189" \| "6487586" \| "6490555" \| "6509913" \| "6516311" \| "6522342" \| "6532312" \| "6535888" \| "6570582" \| "6571279" \| "6583800" \| "6606103" \| "6606280" \| "6606347").PN. OR ("6608633" \| "6615247" \| "6615248" \| "6618039" \| "6631523" \| "6636246" \| "6647373" \| "6662224" \| "6680714" \| "6684062" \| "6692358" \| "6704727" \| "6711552" \| "6714534" \| "6728731" \| "6769989" \| "6804786" \| "6826572" \| "6829646" \| "6857102" \| "6868525" \| "6907556" \| "6925595" \| "6928610" \| "6938073" \| "6973669" \| "6978263" \| "7013435" \| "7020845" \| "7051281" \| "7174512" \| "7293276" \| "7383515").PN. | | | | | |
| S6 | 112 | touch with slide with function | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/08 17:14 |
| S7 | 13 | ("4366475" \| "4686332" \| "4821030" \| "4914624" \| "5402151" \| "5563632" \| "5596346" \| "5638060" \| "5687331" \| "5736974" \| "5736976" \| "5761485" \| "5838973").PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:18 |

NEONODE0000574

EAST Search History

| S8 | 168267 | object near3 type | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:21 |
| S9 | 5 | (file item object) near3 type with open near3 respective | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:21 |
| S10 | 905 | open$3 with different with program | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/08 17:23 |
| S11 | 2 | multiple near3 file near3 selection with open | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/08 17:29 |
| S12 | 11 | applying with command with (plurality multiple) with files | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/08 17:29 |
| S13 | 29188 | (flick stroke) with (open application command) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2008/12/10 16:52 |
| S14 | 229 | (flick ) with (open application command) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:54 |
| S15 | 127 | (flick ) with (open application command) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:56 |
| S16 | 5 | (flick ) with (open application command) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:56 |
| S17 | 39 | (flick ) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:57 |
| S18 | 961 | (flick gesture) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:58 |
| S19 | 2324 | (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:58 |
| S20 | 77 | (flick gesture slide) and @ay<="2002" and "715"/702,864.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 16:59 |

NEONODE0000575

EAST Search History

| S21 | 6585 | finger near3 (flick gesture slide) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 17:07 |
|-----|------|---------------------------------------------------|------------------------------------|-----|-----|------------------|
| S22 | 86 | finger near3 (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 17:07 |
| S23 | 0 | "5543591,5943052,5907327,4686332".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 17:14 |
| S24 | 8 | ("5543591" "5943052" "5907327" "4686332").pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/10 17:15 |
| S25 | 93647 | (glide flick touch swipe) with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:18 |
| S26 | 13098 | (glide flick touch swipe) with screen with (applications functions) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:20 |
| S27 | 88 | (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:20 |
| S28 | 430 | (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:20 |
| S29 | 0 | (glide flick swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:21 |
| S30 | 11 | (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:21 |
| S31 | 219 | (glide flick gesture swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:22 |

NEONODE0000576

EAST Search History

| S32 | 299 | (glide flick swipe) with screen and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:25 |
|-----|-----|-------------------------------------------------|------------------------------------|----|----|------------------|
| S33 | 8 | (glide flick swipe) with screen with icon and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:26 |
| S34 | 16 | ("20010011308" \| "20030142138" \| "20040034801" \| "20050253817" \| "20050253817" \| "20050264833" \| "5821933" \| "5907327" \| "6633310").PN. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:30 |
| S35 | 451 | (glide flick swipe) with finger and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:32 |
| S36 | 3 | (glide flick swipe) with finger and @AY<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2008/12/17 13:32 |
| S37 | 13 | ("5250929" \| "5568604" \| "5579036" \| "5612719" \| "5661476" \| "5748185" \| "5767457" \| "5883617" \| "5928304" \| "5943043" \| "5943044" \| "5995083" \| "6049328").PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/17 14:01 |
| S38 | 918 | 715/716.ccls. | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/17 15:38 |
| S39 | 7 | 715/716.ccls. and dvd near menu | US-PGPUB; USPAT; USOCR | OR | OFF | 2008/12/17 15:38 |
| S40 | 9 | 715/716.ccls. and dvd near menu | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:38 |
| S41 | 334 | 715/716.ccls. and dvd | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:47 |
| S42 | 461 | 715/716.ccls. and menu | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:47 |
| S43 | 39 | 715/716.ccls. and menu and theme | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:48 |
| S44 | 243 | 715/716.ccls. and menu and effects | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:52 |

NEONODE0000577

EAST Search History

| S45 | 4 | 715/716.ccls. and menu with theme | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:53 |
|-----|----|-----------------------------------|------------------------|-----|-----|-------------------|
| S46 | 1 | "7200836".pn. | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:56 |
| S47 | 1 | "20080120546".pn. | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/17 15:57 |
| S48 | 433 | 715/864.ccls. | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/21 23:26 |
| S49 | 60 | 715/864.ccls. and keyboard and back and icons and files | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/21 23:27 |
| S50 | 25 | 715/864.ccls. and keyboard and back and icons and files and removable | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/21 23:27 |
| S51 | 42 | 715/864.ccls. and keyboard and icons and files and @ay<="2002" | US-PGPUB; USPAT; USOCR | OR | ON | 2008/12/21 23:28 |
| S52 | 2 | "6346935".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2009/07/05 14:20 |
| S53 | 21 | (glide flick touch swipe) with (coordinat$7) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/05 14:24 |
| S54 | 437 | (touch finger) with (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/05 14:26 |
| S55 | 0 | (touch finger) with (glide flick swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/05 14:26 |
| S56 | 3 | (touch finger) with (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/05 14:27 |
| S57 | 2 | "6140936".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/05 23:13 |

NEONODE0000578

EAST Search History

| S58 | 2 | "6346935".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 10:24 |
| S59 | 187 | files with applications with list with only | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 10:28 |
| S60 | 98 | (file near list) with (application near list) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 10:34 |
| S61 | 502 | (file near view) with application | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 10:36 |
| S62 | 15 | sort with application near files | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:14 |
| S63 | 613 | (programs application) with files with (sort show list) with only | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:18 |
| S64 | 55 | (programs application) with files with (sort show list) with only and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:18 |
| S65 | 0 | seperate with list with data near type | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:19 |
| S66 | 5796 | list with data near type | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:19 |
| S67 | 652 | list with data near type and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:19 |
| S68 | 596 | application near list and file near list | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:20 |

NEONODE0000579

| S69 | 271 | application near list and file near list and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/07/06 11:22 |
| S70 | 31 | icon with drag with activate | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2009/11/20 14:29 |
| S71 | 148 | icon with drag with activat$7 | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:29 |
| S72 | 68 | icon with drag with activat$7 and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:30 |
| S73 | 29 | bar with drag with activat$7 and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:36 |
| S74 | 81 | function with drag with activat$7 and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:37 |
| S75 | 26 | (dock bar) with (glide swipe) with activat$7 | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2009/11/20 14:43 |
| S76 | 34 | (dock bar) with (glide swipe) with activat$7 | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:43 |
| S77 | 54 | (glide swipe) with activat$7 with (function application program) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:46 |
| S78 | 24 | (glide swipe) with activat$7 with (function application program) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:47 |
| S79 | 30 | (glide swipe drag) with icon with activat$7 with (function application program) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 14:48 |

NEONODE0000580

EAST Search History

| S80 | 2 | "7441196".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2009/11/20 15:14 |
|---|---|---|---|---|---|---|
| S81 | 503 | swipe with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S82 | 734 | (glide swipe) with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S83 | 2 | "7286063".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S84 | 263 | ("20010003845" \| "20010012286" \| "20010016947" \| "20010034647" \| "20010042002" \| "20010044751" \| "20010049824" \| "20010051903" \| "20020007309" \| "20020010642" \| "20020016750" \| "20020029339" \| "20020032782" \| "20020035174" \| "20020038256" \| "20020038259" \| "20020042914" \| "20020042921" \| "20020049631" \| "20020056098" \| "20020059590" \| "20020067376" \| "20020077177" \| "20020078006" \| "20020078453" \| "20020098834" \| "20020116292" \| "20020116320" \| "20020166122" \| "20030046182" \| "20030074661" \| "20030095525" \| "20030126607" \| "20030140017" \| "20030146940" \| "20030149628" \| "20030182195" \| "20040003412" \| "20040098747" \| "20040103439" \| "20040117831" \| "20040128137" \| "20040133848" \| "20040148625" \| "20040204116" \| "20040210824" \| "20040260689" \| "20050010949" \| "20050025550" \| "20050075932" \| "20050086690" \| "20050091118" \| "20050160458" \| "20050234895" \| "20050246231" \| "20060155598" \| "20060224987" \| "20070008332" \| "3586771" \| "4650977" \| "4706121" \| "4992940" \| "5041312" \| "5064999" \| "5119188" \| "5236199" \| "5321749" \| "5353016" \| "5410326" \| "5479268" \| "5532735" \| "5553242" \| "5559548" \| "5598523" \| "5602596" \| "5617570" \| "5625781" \| "5710887" \| "5727129" \| "5734719" \| "5758126" \| | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |

NEONODE0000581

EAST Search History

file:///C|/Documents%20and%20Settings/RPitaro/My%20Documents/e-Red%20Folder/10315250/EASTSearchHistory.10315250_AccessibleVersion.htm

"5794210" | "5796252" | "5801702" | "5809204" |
"5819220" | "5822014" | "5828839" | "5832208" |
"5832459" | "5838314" | "5848396" | "5851149" |
"5874906" | "5878222" | "5890175" | "5893064" |
"5895454" | "5896133" | "5900905" | "5902353" |
"5903729" | "5911145" | "5918014" | "5918213").PN.
OR ("5925103" | "5931901" | "5935002" | "5946381" |
"5956681" | "5956693" | "5958012" | "5960411" |
"5961593" | "5978381" | "5990927" | "6002853" |
"6005562" | "6005631" | "6006257" | "6012049" |
"6014502" | "6018372" | "6025837" | "6028600" |
"6031537" | "6041312" | "6054989" | "6072483" |
"6072492" | "6075575" | "6078866" | "6091417" |
"6094156" | "6101473" | "6112186" | "6129274" |
"6138107" | "6142371" | "6151050" | "6151059" |
"6151596" | "6151630" | "6154205" | "6160552" |
"6167382" | "6172677" | "6177936" | "6193152" |
"6198481" | "6199050" | "6199077" | "6199098" |
"6205432" | "6205582" | "6211878" | "6212265" |
"6223215" | "6226623" | "6226642" | "6229540" |
"6237030" | "6243093" | "6253189" | "6260192" |
"6266060" | "6269343" | "6269361" | "6269403" |
"6271832" | "6282516" | "6285357" | "6285987" |
"6286017" | "6286043" | "6288716" | "6292779" |
"6292782" | "6292786" | "6292809" | "6295057" |
"6298330" | "6300947" | "6301566" | "6312336" |
"6314406" | "6317706" | "6330005" | "6330543" |
"6333753" | "6334108" | "6334145" | "6336131" |
"6337715" | "6345279" | "6356905" | "6381583" |
"6388714" | "6396531" | "6397387" | "6401132" |
"6407779" | "6411307" | "6411337" | "6415270" |
"6417873" | "6418441" | "6421066" | "6421071" |
"6421724" | "6438540" | "6445398" | "6460181" |
"6476825" | "6477575" | "6484149" | "6487189" |
"6487586" | "6490555" | "6509913" | "6516311" |
"6522342" | "6532312" | "6535888" | "6570582" |
"6571279" | "6583800" | "6606103" | "6606280" |
"6606347").PN. OR ("6608633" | "6615247" |
"6615248" | "6618039" | "6631523" | "6636246" |

NEONODE0000582

EAST Search History

| | | "6647373" \| "6662224" \| "6680714" \| "6684062" \| "6692358" \| "6704727" \| "6711552" \| "6714534" \| "6728731" \| "6769989" \| "6804786" \| "6826572" \| "6829646" \| "6857102" \| "6868525" \| "6907556" \| "6925595" \| "6928610" \| "6938073" \| "6973669" \| "6978263" \| "7013435" \| "7020845" \| "7051281" \| "7174512" \| "7293276" \| "7383515").PN. | | | | |
|---|---|---|---|---|---|---|
| S85 | 131 | touch with slide with function | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S86 | 13 | ("4366475" \| "4686332" \| "4821030" \| "4914624" \| "5402151" \| "5563632" \| "5596346" \| "5638060" \| "5687331" \| "5736974" \| "5736976" \| "5761485" \| "5838973").PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |
| S87 | 175604 | object near3 type | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |
| S88 | 5 | (file item object) near3 type with open near3 respective | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |
| S89 | 997 | open$3 with different with program | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |
| S90 | 2 | multiple near3 file near3 selection with open | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S91 | 12 | applying with command with (plurality multiple) with files | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S92 | 30944 | (flick stroke) with (open application command) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2009/11/20 15:14 |
| S93 | 261 | (flick ) with (open application command) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S94 | 131 | (flick ) with (open application command) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |

NEONODE0000583

EAST Search History

| S95 | 5 | (flick ) with (open application command) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
|------|------|------|------|------|------|------|
| S96 | 39 | (flick ) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S97 | 981 | (flick gesture) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S98 | 2372 | (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S99 | 78 | (flick gesture slide) and @ay<="2002" and "715"/702,864.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S100 | 6588 | finger near3 (flick gesture slide) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S101 | 87 | finger near3 (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S102 | 0 | "5543591,5943052,5907327,4686332".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S103 | 8 | ("5543591" "5943052" "5907327" "4686332").pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S104 | 113453 | (glide flick touch swipe) with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S105 | 16322 | (glide flick touch swipe) with screen with (applications functions) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |

NEONODE0000584

EAST Search History

| S106 | 92 | (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
|---|---|---|---|---|---|---|
| S107 | 439 | (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S108 | 0 | (glide flick swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S109 | 11 | (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S110 | 219 | (glide flick gesture swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S111 | 302 | (glide flick swipe) with screen and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S112 | 8 | (glide flick swipe) with screen with icon and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S113 | 16 | ("20100011308" \| "20030142138" \| "20040034801" \| "20050253817" \| "20050253817" \| "20050264833" \| "5821933" \| "5907327" \| "6633310").PN. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S114 | 452 | (glide flick swipe) with finger and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S115 | 3 | (glide flick swipe) with finger and @AY<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S116 | 13 | ("5250929" \| "5568604" \| "5579036" \| "5612719" \| "5661476" \| "5748185" \| "5767457" \| "5883617" \| "5928304" \| "5943043" \| "5943044" \| "5995083" \| "6049328").PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |

NEONODE0000585

EAST Search History

| S117 | 1144 | 715/716.ccls. | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |
| S118 | 8 | 715/716.ccls. and dvd near menu | US-PGPUB; USPAT; USOCR | OR | OFF | 2009/11/20 15:14 |
| S119 | 10 | 715/716.ccls. and dvd near menu | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S120 | 429 | 715/716.ccls. and dvd | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S121 | 587 | 715/716.ccls. and menu | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S122 | 55 | 715/716.ccls. and menu and theme | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S123 | 311 | 715/716.ccls. and menu and effects | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S124 | 6 | 715/716.ccls. and menu with theme | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S125 | 1 | "7200836".pn. | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S126 | 1 | "20080120546".pn. | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S127 | 504 | 715/864.ccls. | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S128 | 69 | 715/864.ccls. and keyboard and back and icons and files | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S129 | 29 | 715/864.ccls. and keyboard and back and icons and files and removable | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S130 | 44 | 715/864.ccls. and keyboard and icons and files and @ay<="2002" | US-PGPUB; USPAT; USOCR | OR | ON | 2009/11/20 15:14 |
| S131 | 2 | "6346935".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2009/11/20 15:14 |

NEONODE0000586

| S132 | 21 | (glide flick touch swipe) with (coordinat$7) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
|------|-----|---|---|----|----|---|
| S133 | 439 | (touch finger) with (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S134 | 0 | (touch finger) with (glide flick swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S135 | 3 | (touch finger) with (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S136 | 2 | "6140936".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S137 | 2 | "6346935".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S138 | 195 | files with applications with list with only | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S139 | 102 | (file near list) with (application near list) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S140 | 535 | (file near view) with application | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S141 | 16 | sort with application near files | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S142 | 632 | (programs application) with files with (sort show list) with only | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |

NEONODE0000587

EAST Search History

| S143 | 57 | (programs application) with files with (sort show list) with only and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
|------|-----|------|------|-----|-----|------|
| S144 | 0 | seperate with list with data near type | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S145 | 6088 | list with data near type | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S146 | 684 | list with data near type and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S147 | 635 | application near list and file near list | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S148 | 273 | application near list and file near list and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2009/11/20 15:14 |
| S149 | 2 | "20030160832".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2009/11/20 15:43 |
| S150 | 4858 | touch with (flick gesture slide swipe across) and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2010/05/23 17:18 |
| S151 | 4625 | touch with (flick slide swipe across) and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2010/05/23 17:19 |
| S152 | 2801 | touch with (flick slide swipe ) and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2010/05/23 17:19 |
| S153 | 2777 | touch with ( slide swipe ) and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2010/05/23 17:19 |

NEONODE0000588

EAST Search History

| S154 | 54 | touch with ( swipe ) and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2010/05/23 17:20 |
| S155 | 1011 | touch near2 (flick slide swipe across) and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2010/05/23 17:20 |
| S156 | 2 | touch near2 (flick slide swipe across) with activate and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2010/05/23 17:21 |
| S157 | 29 | touch near2 (flick slide swipe across) with function and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2010/05/23 17:21 |
| S158 | 2 | "5053758".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2010/05/23 17:33 |
| S159 | 32 | touch near2 (flick glide slide swipe across) with function and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2010/05/23 17:36 |
| S160 | 3 | touch near2 (glide) with function and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2010/05/23 17:36 |
| S161 | 8 | neonode.as. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2010/05/23 17:56 |

## EAST Search History (Interference)

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L17 | 0 | touch with glide with activat$7.clm. | USPAT; UPAD | OR | ON | 2011/06/06 08:36 |
| L18 | 9 | touch with glide .clm. | USPAT; UPAD | OR | ON | 2011/06/06 08:36 |
| L19 | 0 | touch with glide with away .clm. | USPAT; UPAD | OR | ON | 2011/06/06 08:37 |
| L20 | 91 | glide with away .clm. | USPAT; UPAD | OR | ON | 2011/06/06 08:37 |

NEONODE0000589

EAST Search History

| L21 | 27 | glide with activat$7.clm. | USPAT; UPAD | OR | ON | 2011/06/06 08:37 |
|-----|-----|---------------------------|-------------|-----|-----|------------------|
| L22 | 333 | slide with unlock.clm. | USPAT; UPAD | OR | ON | 2011/06/06 08:39 |
| L23 | 1 | slide with unlock with touch.clm. | USPAT; UPAD | OR | ON | 2011/06/06 08:40 |

**6/6/11 8:40:39 AM**
**C:\Documents and Settings\RPitaro\My Documents\EAST\Workspaces\10315250.wsp**

NEONODE0000590

| Index of Claims | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 10315250 | GOERTZ, MAGNUS |
| | Examiner | Art Unit |
| | Ryan F Pitaro | 2174 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

☐ Claims renumbered in the same order as presented by applicant      ☐ CPA   ☐ T.D.   ☐ R.1.47

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | 06/23/2008 | 12/21/2008 | 07/06/2009 | 11/20/2009 | 05/23/2010 | 06/06/2011 | | |
| | 1 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 2 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 4 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 5 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 6 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 7 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 8 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 9 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 10 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 11 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 12 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 13 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 14 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 15 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| | 16 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| | 17 | ✓ | ✓ | ✓ | - | - | - | - | | |
| | 18 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | | |
| | 19 | | ÷ | N | - | | | - | | |
| | 20 | | ÷ | N | - | | | - | | |
| | 21 | | ÷ | N | - | | | - | | |
| | 22 | | ÷ | N | - | | | - | | |
| | 23 | | ÷ | N | - | | | - | | |
| | 24 | | ÷ | N | - | | | - | | |
| | 25 | | ÷ | N | - | | | - | | |
| | 26 | | ÷ | N | - | | | - | | |
| | 27 | | ÷ | N | - | | | - | | |
| | 28 | | ÷ | N | - | | | - | | |
| | 29 | | ÷ | N | - | | | - | | |
| | 30 | | ÷ | N | - | | | - | | |
| | 31 | | ÷ | N | - | | | - | | |
| | 32 | | ÷ | N | - | | | - | | |
| | 33 | | ÷ | N | - | | | - | | |
| | 34 | | ÷ | N | - | | | - | | |
| | 35 | | ÷ | N | - | | | - | | |
| | 36 | | ÷ | N | - | | | - | | |

U.S. Patent and Trademark Office

Part of Paper No. : 20110606A

NEONODE0000591

| | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| **Index of Claims** | 10315250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** |
| | Ryan F Pitaro | 2174 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

☐ Claims renumbered in the same order as presented by applicant     ☐ CPA     ☐ T.D.     ☐ R.1.47

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | 06/23/2008 | 12/21/2008 | 07/06/2009 | 11/20/2009 | 05/23/2010 | 06/06/2011 | | |
| | 37 | | ÷ | N | - | | | - | | |
| | 38 | | ÷ | N | - | | | - | | |
| | 39 | | ÷ | N | - | | | - | | |
| | 40 | | ÷ | N | - | | | - | | |
| | 41 | | ÷ | N | - | | | - | | |
| | 42 | | ÷ | N | - | | | - | | |
| | 43 | | ÷ | N | - | | | - | | |
| | 44 | | ÷ | N | - | | | - | | |
| | 45 | | ÷ | N | - | | | - | | |
| | 46 | | ÷ | N | - | | | - | | |
| | 47 | | ÷ | N | - | | | - | | |
| | 48 | | | | | | | = | | |
| | 49 | | | | | | | = | | |
| | 50 | | | | | | | | | |
| | 51 | | | | | | | | | |
| | 52 | | | | | | | | | |
| | 53 | | | | | | | | | |
| | 54 | | | | | | | | | |
| | 55 | | | | | | | | | |
| | 56 | | | | | | | | | |
| | 57 | | | | | | | | | |
| | 58 | | | | | | | | | |
| | 59 | | | | | | | | | |
| | 60 | | | | | | | | | |
| | 61 | | | | | | | | | |
| | 62 | | | | | | | | | |
| | 63 | | | | | | | | | |
| | 64 | | | | | | | | | |
| | 65 | | | | | | | | | |

NEONODE0000592

| Search Notes | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 10315250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** |
| | Ryan F Pitaro | 2174 |

### SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| Update | Search | 11/8/2007 | RFP |
| Update | Search | 6/17/2008 | RFP |
| Update | Search | 12/21/2008 | RFP |
| Update | Search | 4/22/2009 | RFP |
| Update | Search | 11/20/2009 | RFP |
| Update | Search | 5/22/2010 | RFP |
| Update | Search | 6/5/2011 | RFP |

### SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| Update Search | 11/8/2007 | RFP |
| Update Search | 6/17/2008 | RFP |
| EAST | 12/21/2008 | RFP |
| Internet | 12/21/2008 | RFP |
| Safari Online Books | 12/21/2008 | RFP |
| IEEE | 12/21/2008 | RFP |
| ACM | 12/21/2008 | RFP |
| Update Search | 4/22/2009 | RFP |
| Update Search | 11/20/2009 | RFP |
| Update Search | 5/22/2010 | RFP |
| Internet Search | 5/22/2010 | RFP |
| Update Search | 6/5/2011 | RFP |
| STIC Search | 6/5/2011 | RFP |
| Fast and Focus Search | 6/5/2011 | RFP |

### INTERFERENCE SEARCH

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| Interference | Search | 6/5/2011 | RFP |

| | |
|---|---|
| | |

NEONODE0000593

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-10)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | 10315250 | |
| Filing Date | 2002-12-10 | |
| First Named Inventor | Magnus Goertz | |
| Art Unit | 2174 | |
| Examiner Name | PITARO, RYAN F | |
| Attorney Docket Number | NEONODE.P004 | |

| U.S.PATENTS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| /R.P./ | 1 | 4790028 | B1 | 1988-12-06 | Ramage | |
| /R.P./ | 2 | 5053758 | B1 | 1991-10-01 | Cornett et al. | |
| /R.P./ | 3 | 5283558 | B1 | 1994-02-01 | Chan | |

If you wish to add additional U.S. Patent citation information please click the Add button. | Add |

| U.S.PATENT APPLICATION PUBLICATIONS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| /R.P./ | 1 | 20010002694 | A1 | 2001-06-07 | Nakazawa et al. | |
| /R.P./ | 2 | 20010022579 | A1 | 2001-09-20 | Hirabayashi | |
| /R.P./ | 3 | 20010026268 | A1 | 2001-10-04 | Ito | |

EFS Web 2.1.17

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | Application Number | 10315250 | |
|---|---|---|---|---|
| | | Filing Date | 2002-12-10 | |
| | | First Named Inventor | Magnus Goertz | |
| | | Art Unit | 2174 | |
| | | Examiner Name | PITARO, RYAN F | |
| | | Attorney Docket Number | NEONODE.P004 | |

| /R.P./ | 4 | 20010028344 | A1 | 2001-10-11 | Iwamoto et al. | |
|---|---|---|---|---|---|---|
| /R.P./ | 5 | 20010055006 | A1 | 2001-12-27 | Sano et al. | |

If you wish to add additional U.S. Published Application citation information please click the Add button. | Add |

**FOREIGN PATENT DOCUMENTS** | Remove |

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button | Add |

**NON-PATENT LITERATURE DOCUMENTS** | Remove |

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| | 1 | | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button | Add |

**EXAMINER SIGNATURE**

| Examiner Signature | /Ryan Pitaro/ | Date Considered | 06/06/2011 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

NEONODE0000595

Attorney's Docket No.: <u>NEONODE.P004</u>        *PATENT*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In Re Patent Application of:    ) | |
| ) | Examiner:   Ryan F. Pitaro |
| Magnus Goertz     ) | |
| ) | Art Unit:    2174 |
| Application No: 10/315,250    ) | |
| ) | |
| Filed:     December 10, 2002   ) | |
| ) | |
| For:      USER INTERFACE FOR  ) | |
|         MOBILE HANDHELD    ) | |
|         COMPUTER UNIT     ) | |

Mail Stop AMENDMENT
Commissioner for Patents
P. O. Box 1450
Alexandria, VA   22313-1450

## <u>AMENDMENT AND RESPONSE TO OFFICE ACTION</u>
## <u>UNDER 37 C.F.R. §1.111</u>

Sir:

In response to the Office Action dated June 7, 2011, applicant respectfully requests that the above-identified application be amended as follows.

NEONODE0000596

<u>IN THE CLAIMS</u>:

Please cancel claims **15** and **16** without prejudice.

Please substitute the following claims for the pending claims with the same number:

**1.** (previously presented)    A    non-transitory    computer    readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location.

**2.** (previously presented)    The computer readable medium of claim **1**, wherein the function, when activated, causes the user interface to display icons representing different services or settings for a currently active application.

**3.** (previously presented)    The computer readable medium of claim **2**, wherein the user interface is characterised in, that a selection of a preferred service or setting is done by tapping on a display icon corresponding to the preferred service or setting.

Atty. Docket No. NEONODE.P004        -2-

NEONODE0000597

**4.** (previously presented)    The computer readable medium of claim **1**, wherein the function, when activated, causes the user interface to display a keyboard and a text field.

**5.** (previously presented)    The computer readable medium of claim **4**, wherein said text field is used for inputting and editing of text through said keyboard.

**6.** (previously presented)    The computer readable medium of claim **1**, wherein the function, when activated, causes the user interface to display a list with a library of available applications and files on the mobile handheld computer unit.

**7.** (previously presented)    The computer readable medium of claim **6**, wherein the user interface is characterised in, that a selection of an application or file is done by gliding the object along said touch sensitive area so that a representation of a desired one of said application or file is highlighted, raising said object from said touch sensitive area, and then tapping on said touch sensitive area.

**8.** (previously presented)    The computer readable medium of claim **7**, wherein the user interface is characterised in, that at any given time said list presents only files or only applications, and that an area of said list presents a field through which said list can be changed from presenting files to presenting applications, or from presenting applications to presenting files.

Atty. Docket No. NEONODE.P004        -3-

NEONODE0000598

**9.** (previously presented)    The computer readable medium of claim **7**, wherein the user interface is characterised in, that, one item in said list is highlighted by a moveable marking, and the user interface enables list navigation whereby gliding the object along the touch sensitive area in a direction towards the top of said list or towards the bottom of said list causes said marking to move in the same direction without scrolling the list.

**10.** (previously presented)    The computer readable medium of claim **9**, wherein the user interface is characterised in, that, if the number of applications or files in said list exceeds the number of applications or files that can be presented on said touch sensitive area as content, and if the object is (i) glided along said touch sensitive area to the top or bottom of said touch sensitive area, then (ii) raised above said touch sensitive area, then (iii) replaced on said touch sensitive area, and then (iv) again glided along said touch sensitive area to the top or bottom of said touch sensitive area, said list navigation pages the content of said list up or down by one whole page.

**11.** (previously presented)    The computer readable medium of claim **10**, wherein the user interface is characterised in, that if the object is raised from any first position on said touch sensitive area and then replaced on any second position on said touch sensitive area, said list navigation can be continued from said second position.

**12.** (previously presented)    The computer readable medium of claim **1**, wherein the user interface is characterised in, that an active application, function, service or setting is advanced one step by gliding the object

Atty. Docket No. NEONODE.P004        -4-

NEONODE0000599

along the touch sensitive area from left to right, and that the active application, function, service or setting is closed or backed one step by gliding the object along the touch sensitive area from right to left.

**13.** (previously presented)      The computer readable medium of claim **1**, wherein the user interface is characterised in, that said representation of said function is located at the bottom of said touch sensitive area.

**14.** (previously presented)      The computer readable medium of claim **1**, wherein the touch sensitive area is 2-3 inches in diagonal dimension.

**15. – 17.** (cancelled)

**18.** (previously presented)      The computer readable medium of claim **1**, characterised in, that said computer program code is adapted to function as a shell upon an operating system.

**19. – 47.** (cancelled)

**48.** (previously presented)      The computer readable medium of claim **1**, wherein the representation is finger-sized.

**49.** (previously presented)      The computer readable medium of claim **1**, wherein the location where the representation is provided does not provide touch functionality for a different function.

Atty. Docket No. NEONODE.P004          -5-

NEONODE0000600

## REMARKS

Applicant has carefully studied the outstanding Office Action.  The present amendment is intended to place the application in condition for allowance and is believed to overcome all of the objections and rejections made by the Examiner.  Favorable reconsideration and allowance of the application are respectfully requested.

Applicant has canceled claims **15** and **16**.  Claims **1 – 14**, **18**, **48** and **49** are presented for examination.

On page 2 of the Office Action, the Examiner has indicated that claims **1 – 14**, **18**, **48** and **49** are allowed.

On page 2 of the Office Action, the Examiner has rejected claims **15** and **16** under 35 U.S.C. 112, second paragraph, as being indefinite.  Applicant has cancelled these claims without acquiescence to the Examiner's reasons for rejection, and respectfully submits that rejection of these claims is thus rendered moot.

Atty. Docket No. NEONODE.P004         -6-

NEONODE0000601

For the foregoing reasons, applicant respectfully submits that the applicable objections and rejections have been overcome and that the claims are in condition for allowance.

If any matters can be resolved by telephone, applicant requests that the Patent and Trademark Office please contact applicant's representative at the telephone number listed below.

Respectfully submitted,
SOQUEL GROUP LLC

Dated: June 9, 2011                    /Marc A. Berger/
                                       Marc A. Berger
                                       Reg. No. 44,029
P.O. Box 691
Soquel, CA   95073
(831) 426-8200
Customer No. 75660

Atty. Docket No. NEONODE.P004          -7-

NEONODE0000602

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 10265265 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | User interface |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Customer Number:** | 75660 |
| **Filer:** | Marc Aron Berger |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | NEONODE.P004 |
| **Receipt Date:** | 09-JUN-2011 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 08:58:11 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | NEONODE-P004_Amendment_06-09-2011 .pdf | 63432<br>33616fd06dcba15b17916e3029cd6b9ed0d29acd | yes | 7 |

NEONODE0000603

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| Document Description | Start | End |
| Amendment/Req. Reconsideration-After Non-Final Reject | 1 | 1 |
| Claims | 2 | 5 |
| Applicant Arguments/Remarks Made in an Amendment | 6 | 7 |

| Warnings: | |
|---|---|
| Information: | |
| Total Files Size (in bytes): | 63432 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000604

PTO/SB/06 (07-06)
Approved for use through 1/31/2007. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| **PATENT APPLICATION FEE DETERMINATION RECORD** Substitute for Form PTO-875 | Application or Docket Number 10/315,250 | Filing Date 12/10/2002 | ☐ To be Mailed |
|---|---|---|---|

### APPLICATION AS FILED – PART I

|  | (Column 1) | (Column 2) | SMALL ENTITY ☒ | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) | RATE ($) | FEE ($) |
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | N/A | |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | N/A | |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | N/A | |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | X $ = | | X $ = | |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | X $ = | | X $ = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | TOTAL | |

### APPLICATION AS AMENDED – PART II

|  |  | (Column 1) | (Column 2) | (Column 3) | SMALL ENTITY | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|
| | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | RATE ($) | ADDITIONAL FEE ($) |
| **AMENDMENT** 06/09/2011 | Total (37 CFR 1.16(i)) | * 17 | Minus ** 47 | = 0 | X $26 = 0 | OR | X $ = | |
| | Independent (37 CFR 1.16(h)) | * 1 | Minus *** 8 | = 0 | X $110 = 0 | OR | X $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | OR | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | 0 | OR TOTAL ADD'L FEE | |

|  |  | (Column 1) | (Column 2) | (Column 3) | | | | |
|---|---|---|---|---|---|---|---|---|
| | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | RATE ($) | ADDITIONAL FEE ($) |
| **AMENDMENT** | Total (37 CFR 1.16(i)) | * | Minus ** | = | X $ = | OR | X $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus *** | = | X $ = | OR | X $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | OR | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR TOTAL ADD'L FEE | |

\* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.

\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".

\*\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".

The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Legal Instrument Examiner:
/JERMAINE MINOR/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

NEONODE0000605



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

75660    7590    12/01/2011

Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073

| EXAMINER |
| --- |
| PITARO, RYAN F |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 2171 | |

DATE MAILED: 12/01/2011

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

TITLE OF INVENTION: USER INTERFACE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | YES | $870 | $300 | $0 | $1170 | 03/01/2012 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

NEONODE0000606

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>  **Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
or <u>Fax</u>  **(571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

75660          7590          12/01/2011

Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

|  |  |
|---|---|
|  | (Depositor's name) |
|  | (Signature) |
|  | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

TITLE OF INVENTION: USER INTERFACE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | YES | $870 | $300 | $0 | $1170 | 03/01/2012 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| PITARO, RYAN F | 2171 | 715-716000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :    ☐ Individual  ☐ Corporation or other private group entity  ☐ Government

4a. The following fee(s) are submitted:

☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): (**Please first reapply any previously paid issue fee shown above**)

☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.    ☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____        Date _____

Typed or printed name _____        Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

NEONODE0000607



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

75660      7590      12/01/2011
Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073

| EXAMINER |
|---|
| PITARO, RYAN F |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2171 | |

DATE MAILED: 12/01/2011

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
### (application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 872 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 872 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

NEONODE0000608

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

NEONODE0000609

| | Application No. | Applicant(s) |
|---|---|---|
| **Notice of Allowability** | 10/315,250 | GOERTZ, MAGNUS |
| | Examiner | Art Unit | |
| | RYAN PITARO | 2171 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *the amendment filed 6/09/2011*.

2. ☒ The allowed claim(s) is/are *1-14,18,48 and 49*.

3. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All   b) ☐ Some*   c) ☐ None  of the:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

4. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

        1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____ .

    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☒ Notice of References Cited (PTO-892)

2. ☐ Notice of Draftperson's Patent Drawing Review (PTO-948)

3. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____

4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application

6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

7. ☒ Examiner's Amendment/Comment

8. ☒ Examiner's Statement of Reasons for Allowance

9. ☐ Other _____ .

NEONODE0000610

Application/Control Number: 10/315,250                                    Page 2

Art Unit: 2171

### EXAMINER'S AMENDMENT

An examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.

Authorization for this examiner's amendment was given in a telephone interview with Marc Berger on 10/6/2011.

The application has been amended as follows:

**1.** (currently amended)                A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

Claims 1-14,18,48-49 are allowed.

NEONODE0000611

Application/Control Number: 10/315,250                                                    Page 3
Art Unit: 2171

The following is an examiner's statement of reasons for allowance: The prior art

is silent in teaching a  non-transitory computer readable medium storing a computer

program with computer program code, which, when read by a mobile handheld

computer unit, allows the computer to present a user interface for the mobile handheld

computer unit, the user interface comprising: a touch sensitive area in which a

representation of a function is provided, wherein the representation consists of only one

option for activating the function and wherein the function is activated by a multi-step

operation comprising (i) an object touching the touch sensitive area at a location where

the representation is provided and then (ii) the object gliding along the touch sensitive

area away from the touched location wherein the representation of the function is not

relocated or duplicated during the gliding.

Any comments considered necessary by applicant must be submitted no later

than the payment of the issue fee and, to avoid processing delays, should preferably

accompany the issue fee.  Such submissions should be clearly labeled "Comments on

Statement of Reasons for Allowance."

### Conclusion

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to RYAN PITARO whose telephone number is (571)272-

NEONODE0000612

Application/Control Number: 10/315,250                                    Page 4
Art Unit: 2171

4071. The examiner can normally be reached on 9:00am - 5:30pm Mondays through
Fridays.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's
supervisor, Chat Do can be reached on 571-272-3721. The fax phone number for the
organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the
Patent Application Information Retrieval (PAIR) system. Status information for
published applications may be obtained from either Private PAIR or Public PAIR.
Status information for unpublished applications is available through Private PAIR only.
For more information about the PAIR system, see http://pair-direct.uspto.gov. Should
you have questions on access to the Private PAIR system, contact the Electronic
Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a
USPTO Customer Service Representative or access to the automated information
system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Ryan F Pitaro/
Primary Examiner, Art Unit 2171

NEONODE0000613

| | | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| ***Notice of References Cited*** | | 10/315,250 | GOERTZ, MAGNUS |
| | | Examiner | Art Unit | Page 1 of 1 |
| | | RYAN PITARO | 2171 | |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-7,030,861 | 04-2006 | Westerman et al. | 345/173 |
| * | B | US-5,603,053 | 02-1997 | Gough et al. | 710/5 |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                     **Notice of References Cited**                     Part of Paper No. 20110606

NEONODE0000614

EAST Search History

EAST Search History

EAST Search History (Prior Art)

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L1 | 2 | "7441196".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2011/08/28 22:50 |
| L2 | 818 | swipe with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L3 | 1099 | (glide swipe) with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L4 | 2 | "7286063".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L8 | 263 | ("20010003845" | "20010012286" | "20010016947" | "20010034647" | "20010042002" | "20010044751" | "20010049824" | "20010051903" | "20020007309" | "20020010642" | "20020016750" | "20020029339" | "20020032782" | "20020035174" | "20020038256" | "20020038259" | "20020042914" | "20020042921" | "20020049631" | "20020056098" | "20020059590" | "20020067376" | "20020077177" | "20020078006" | "20020078453" | "20020098834" | "20020116292" | "20020116320" | "20020166122" | "20030046182" | "20030074661" | "20030095525" | "20030126607" | "20030140017" | "20030146940" | "20030149628" | "20030182195" | "20040003412" | "20040098747" | "20040103439" | "20040117831" | "20040128137" | "20040133848" | "20040148625" | "20040204116" | "20040210824" | "20040260689" | "20050010949" | "20050025550" | "20050075932" | "20050086690" | "20050091118" | "20050160458" | "20050234895" | "20050246231" | "20060155598" | "20060224987" | "20070008332" | "3586771" | "4650977" | "4706121" | "4992940" | "5041312" | "5064999" | "5119188" | "5236199" | "5321749" | | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |

NEONODE0000615

EAST Search History

```
"5353016" | "5410326" | "5479268" |
"5532735" | "5553242" | "5559548" |
"5598523" | "5602596" | "5617570" |
"5625781" | "5710887" | "5727129" |
"5734719" | "5758126" | "5794210" |
"5796252" | "5801702" | "5809204" |
"5819220" | "5822014" | "5828839" |
"5832208" | "5832459" | "5838314" |
"5848396" | "5851149" | "5874906" |
"5878222" | "5890175" | "5893064" |
"5895454" | "5896133" | "5900905" |
"5902353" | "5903729" | "5911145" |
"5918014" | "5918213").PN. OR
("5925103" | "5931901" | "5935002" |
"5946381" | "5956681" | "5956693" |
"5958012" | "5960411" | "5961593" |
"5978381" | "5990927" | "6002853" |
"6005562" | "6005631" | "6006257" |
"6012049" | "6014502" | "6018372" |
"6025837" | "6028600" | "6031537" |
"6041312" | "6054989" | "6072483" |
"6072492" | "6075575" | "6078866" |
"6091417" | "6094156" | "6101473" |
"6112186" | "6129274" | "6138107" |
"6142371" | "6151050" | "6151059" |
"6151596" | "6151630" | "6154205" |
"6160552" | "6167382" | "6172677" |
"6177936" | "6193152" | "6198481" |
"6199050" | "6199077" | "6199098" |
"6205432" | "6205582" | "6211878" |
"6212265" | "6223215" | "6226623" |
"6226642" | "6229540" | "6237030" |
"6243093" | "6253189" | "6260192" |
"6266060" | "6269343" | "6269361" |
"6269403" | "6271832" | "6282516" |
"6285357" | "6285987" | "6286017" |
"6286043" | "6288716" | "6292779" |
"6292782" | "6292786" | "6292809" |
"6295057" | "6298330" | "6300947" |
"6301566" | "6312336" | "6314406" |
"6317706" | "6330005" | "6330543" |
"6333753" | "6334108" | "6334145" |
"6336131" | "6337715" | "6345279" |
"6356905" | "6381583" | "6388714" |
"6396531" | "6397387" | "6401132" |
"6407779" | "6411307" | "6411337" |
"6415270" | "6417873" | "6418441" |
"6421066" | "6421071" | "6421724" |
"6438540" | "6445398" | "6460181" |
"6476825" | "6477575" | "6484149" |
"6487189" | "6487586" | "6490555" |
"6509913" | "6516311" | "6522342" |
"6532312" | "6535888" | "6570582" |
"6571279" | "6583800" | "6606103" |
"6606280" | "6606347").PN. OR
("6608633" | "6615247" | "6615248" |
"6618039" | "6631523" | "6636246" |
"6647373" | "6662224" | "6680714" |
"6684062" | "6692358" | "6704727" |
"6711552" | "6714534" | "6728731" |
"6769989" | "6804786" | "6826572" |
"6829646" | "6857102" | "6868525" |
"6907556" | "6925595" | "6928610" |
"6938073" | "6973669" | "6978263" |
```

NEONODE0000616

EAST Search History

| | | | | | | |
|---|---|---|---|---|---|---|
| | | "7013435" \| "7020845" \| "7051281" \| "7174512" \| "7293276" \| "7383515").PN. | | | | |
| L9 | 206 | touch with slide with function | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L10 | 13 | ("4366475" \| "4686332" \| "4821030" \| "4914624" \| "5402151" \| "5563632" \| "5596346" \| "5638060" \| "5687331" \| "5736974" \| "5736976" \| "5761485" \| "5838973").PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |
| L11 | 190051 | object near3 type | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |
| L12 | 5 | (file item object) near3 type with open near3 respective | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |
| L13 | 1226 | open$3 with different with program | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |
| L14 | 2 | multiple near3 file near3 selection with open | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L15 | 19 | applying with command with (plurality multiple) with files | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L16 | 34800 | (flick stroke) with (open application command) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2011/08/28 22:50 |
| L17 | 379 | (flick ) with (open application command) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L18 | 132 | (flick ) with (open application command) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L19 | 5 | (flick ) with (open application command) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L20 | 40 | (flick ) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L21 | 1002 | (flick gesture) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; | OR | ON | 2011/08/28 22:50 |

NEONODE0000617

EAST Search History

| | | | EPO; JPO; DERWENT | | | |
|---|---|---|---|---|---|---|
| L22 | 2424 | (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L23 | 80 | (flick gesture slide) and @ay<="2002" and "715"/702,864.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L24 | 6603 | finger near3 (flick gesture slide) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L25 | 88 | finger near3 (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L26 | 0 | "5543591,5943052,5907327,4686332".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L27 | 9 | ("5543591" "5943052" "5907327" "4686332").pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L28 | 164921 | (glide flick touch swipe) with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L29 | 24800 | (glide flick touch swipe) with screen with (applications functions) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L30 | 100 | (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L31 | 450 | (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L32 | 0 | (glide flick swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L33 | 11 | (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; | OR | ON | 2011/08/28 22:50 |

NEONODE0000618

EAST Search History

| | | | EPO; JPO; DERWENT | | | |
|---|---|---|---|---|---|---|
| L34 | 222 | (glide flick gesture swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L35 | 308 | (glide flick swipe) with screen and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L36 | 8 | (glide flick swipe) with screen with icon and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L37 | 16 | ("20010011308" \| "20030142138" \| "20040034801" \| "20050253817" \| "20050253817" \| "20050264833" \| "5821933" \| "5907327" \| "6633310").PN. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L38 | 454 | (glide flick swipe) with finger and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L39 | 3 | (glide flick swipe) with finger and @AY<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L40 | 13 | ("5250929" \| "5568604" \| "5579036" \| "5612719" \| "5661476" \| "5748185" \| "5767457" \| "5883617" \| "5928304" \| "5943043" \| "5943044" \| "5995083" \| "6049328").PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |
| L41 | 1656 | 715/716.ccls. | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |
| L42 | 12 | 715/716.ccls. and dvd near menu | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |
| L43 | 15 | 715/716.ccls. and dvd near menu | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L44 | 673 | 715/716.ccls. and dvd | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L45 | 843 | 715/716.ccls. and menu | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L46 | 85 | 715/716.ccls. and menu and theme | US-PGPUB; | OR | ON | 2011/08/28 22:50 |

NEONODE0000619

EAST Search History

| | | | USPAT; USOCR | | | |
|---|---|---|---|---|---|---|
| L47 | 439 | 715/716.ccls. and menu and effects | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L48 | 9 | 715/716.ccls. and menu with theme | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L49 | 1 | "7200836".pn. | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L50 | 1 | "20080120546".pn. | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L51 | 682 | 715/864.ccls. | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L52 | 98 | 715/864.ccls. and keyboard and back and icons and files | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L53 | 48 | 715/864.ccls. and keyboard and back and icons and files and removable | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L54 | 46 | 715/864.ccls. and keyboard and icons and files and @ay<="2002" | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L55 | 2 | "6346935".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2011/08/28 22:50 |
| L56 | 22 | (glide flick touch swipe) with (coordinat$7) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L57 | 450 | (touch finger) with (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L58 | 0 | (touch finger) with (glide flick swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L59 | 3 | (touch finger) with (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |

NEONODE0000620

EAST Search History

| L60 | 2 | "6140936".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L61 | 2 | "6346935".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L62 | 250 | files with applications with list with only | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L63 | 151 | (file near list) with (application near list) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L64 | 672 | (file near view) with application | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L65 | 21 | sort with application near files | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L66 | 790 | (programs application) with files with (sort show list) with only | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L67 | 80 | (programs application) with files with (sort show list) with only and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L68 | 0 | seperate with list with data near type | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L69 | 7785 | list with data near type | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L70 | 933 | list with data near type and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L71 | 820 | application near list and file near list | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |

NEONODE0000621

EAST Search History

| L72 | 278 | application near list and file near list and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
|-----|-----|---------------------------------------------------------|-------------------------------------|----|-----|-------------------|
| L73 | 37 | icon with drag with activate | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2011/08/28 22:50 |
| L74 | 189 | icon with drag with activat$7 | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L75 | 70 | icon with drag with activat$7 and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L76 | 29 | bar with drag with activat$7 and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L77 | 83 | function with drag with activat$7 and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L78 | 31 | (dock bar) with (glide swipe) with activat$7 | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2011/08/28 22:50 |
| L79 | 42 | (dock bar) with (glide swipe) with activat$7 | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L80 | 72 | (glide swipe) with activat$7 with (function application program) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L81 | 24 | (glide swipe) with activat$7 with (function application program) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L82 | 30 | (glide swipe drag) with icon with activat$7 with (function application program) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L83 | 2 | "7441196".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2011/08/28 22:50 |

NEONODE0000622

EAST Search History

| L84 | 818 | swipe with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
|---|---|---|---|---|---|---|
| L85 | 1099 | (glide swipe) with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L86 | 2 | "7286063".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L90 | 263 | ("20010003845" \| "20010012286" \| "20010016947" \| "20010034647" \| "20010042002" \| "20010044751" \| "20010049824" \| "20010051903" \| "20020007309" \| "20020010642" \| "20020016750" \| "20020029339" \| "20020032782" \| "20020035174" \| "20020038256" \| "20020038259" \| "20020042914" \| "20020042921" \| "20020049631" \| "20020056098" \| "20020059590" \| "20020067376" \| "20020077177" \| "20020078006" \| "20020078453" \| "20020098834" \| "20020116292" \| "20020116320" \| "20020166122" \| "20030046182" \| "20030074661" \| "20030095525" \| "20030126607" \| "20030140017" \| "20030146940" \| "20030149628" \| "20030182195" \| "20040003412" \| "20040098747" \| "20040103439" \| "20040117831" \| "20040128137" \| "20040133848" \| "20040148625" \| "20040204116" \| "20040210824" \| "20040260689" \| "20050010949" \| "20050025550" \| "20050075932" \| "20050086690" \| "20050091118" \| "20050160458" \| "20050234895" \| "20050246231" \| "20060155598" \| "20060224987" \| "20070008332" \| "3586771" \| "4650977" \| "4706121" \| "4992940" \| "5041312" \| "5064999" \| "5119188" \| "5236199" \| "5321749" \| "5353016" \| "5410326" \| "5479268" \| "5532735" \| "5553242" \| "5559548" \| "5598523" \| "5602596" \| "5617570" \| "5625781" \| "5710887" \| "5727129" \| "5734719" \| "5758126" \| "5794210" \| "5796252" \| "5801702" \| "5809204" \| "5819220" \| "5822014" \| "5828839" \| "5832208" \| "5832459" \| "5838314" \| "5848396" \| "5851149" \| "5874906" \| "5878222" \| "5890175" \| "5893064" \| "5895454" \| "5896133" \| "5900905" \| "5902353" \| "5903729" \| "5911145" \| "5918014" \| "5918213").PN. OR ("5925103" \| "5931901" \| "5935002" \| "5946381" \| "5956681" \| "5956693" \| "5958012" \| "5960411" \| "5961593" \| | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |

NEONODE0000623

EAST Search History

| | | | | | | |
|---|---|---|---|---|---|---|
| | | "5978381" \| "5990927" \| "6002853" \| "6005562" \| "6005631" \| "6006257" \| "6012049" \| "6014502" \| "6018372" \| "6025837" \| "6028600" \| "6031537" \| "6041312" \| "6054989" \| "6072483" \| "6072492" \| "6075575" \| "6078866" \| "6091417" \| "6094156" \| "6101473" \| "6112186" \| "6129274" \| "6138107" \| "6142371" \| "6151050" \| "6151059" \| "6151596" \| "6151630" \| "6154205" \| "6160552" \| "6167382" \| "6172677" \| "6177936" \| "6193152" \| "6198481" \| "6199050" \| "6199077" \| "6199098" \| "6205432" \| "6205582" \| "6211878" \| "6212265" \| "6223215" \| "6226623" \| "6226642" \| "6229540" \| "6237030" \| "6243093" \| "6253189" \| "6260192" \| "6266060" \| "6269343" \| "6269361" \| "6269403" \| "6271832" \| "6282516" \| "6285357" \| "6285987" \| "6286017" \| "6286043" \| "6288716" \| "6292779" \| "6292782" \| "6292786" \| "6292809" \| "6295057" \| "6298330" \| "6300947" \| "6301566" \| "6312336" \| "6314406" \| "6317706" \| "6330005" \| "6330543" \| "6333753" \| "6334108" \| "6334145" \| "6336131" \| "6337715" \| "6345279" \| "6356905" \| "6381583" \| "6388714" \| "6396531" \| "6397387" \| "6401132" \| "6407779" \| "6411307" \| "6411337" \| "6415270" \| "6417873" \| "6418441" \| "6421066" \| "6421071" \| "6421724" \| "6438540" \| "6445398" \| "6460181" \| "6476825" \| "6477575" \| "6484149" \| "6487189" \| "6487586" \| "6490555" \| "6509913" \| "6516311" \| "6522342" \| "6532312" \| "6535888" \| "6570582" \| "6571279" \| "6583800" \| "6606103" \| "6606280" \| "6606347").PN. OR ("6608633" \| "6615247" \| "6615248" \| "6618039" \| "6631523" \| "6636246" \| "6647373" \| "6662224" \| "6680714" \| "6684062" \| "6692358" \| "6704727" \| "6711552" \| "6714534" \| "6728731" \| "6769989" \| "6804786" \| "6826572" \| "6829646" \| "6857102" \| "6868525" \| "6907556" \| "6925595" \| "6928610" \| "6938073" \| "6973669" \| "6978263" \| "7013435" \| "7020845" \| "7051281" \| "7174512" \| "7293276" \| "7383515").PN. | | | | |
| L91 | 206 | touch with slide with function | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L92 | 13 | ("4366475" \| "4686332" \| "4821030" \| "4914624" \| "5402151" \| "5563632" \| "5596346" \| "5638060" \| "5687331" \| "5736974" \| "5736976" \| "5761485" \| "5838973").PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |
| L93 | 190051 | object near3 type | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |

NEONODE0000624

EAST Search History

| L94 | 5 | (file item object) near3 type with open near3 respective | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |
|---|---|---|---|---|---|---|
| L95 | 1226 | open$3 with different with program | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |
| L96 | 2 | multiple near3 file near3 selection with open | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L97 | 19 | applying with command with (plurality multiple) with files | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L98 | 34800 | (flick stroke) with (open application command) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2011/08/28 22:50 |
| L99 | 379 | (flick ) with (open application command) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L100 | 132 | (flick ) with (open application command) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L101 | 5 | (flick ) with (open application command) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L102 | 40 | (flick ) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L103 | 1002 | (flick gesture) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L104 | 2424 | (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L105 | 80 | (flick gesture slide) and @ay<="2002" and "715"/702,864.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L106 | 6603 | finger near3 (flick gesture slide) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; | OR | ON | 2011/08/28 22:50 |

NEONODE0000625

EAST Search History

| | | | DERWENT | | | |
|---|---|---|---|---|---|---|
| L107 | 88 | finger near3 (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L108 | 0 | "5543591,5943052,5907327,4686332".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L109 | 9 | ("5543591" "5943052" "5907327" "4686332").pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L110 | 164921 | (glide flick touch swipe) with screen | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L111 | 24800 | (glide flick touch swipe) with screen with (applications functions) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L112 | 100 | (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L113 | 450 | (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L114 | 0 | (glide flick swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L115 | 11 | (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L116 | 222 | (glide flick gesture swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L117 | 308 | (glide flick swipe) with screen and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L118 | 8 | (glide flick swipe) with screen with icon and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; | OR | ON | 2011/08/28 22:50 |

NEONODE0000626

EAST Search History

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | DERWENT | | | |
| L119 | 16 | ("20010011308" \| "20030142138" \| "20040034801" \| "20050253817" \| "20050253817" \| "20050264833" \| "5821933" \| "5907327" \| "6633310").PN. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L120 | 454 | (glide flick swipe) with finger and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L121 | 3 | (glide flick swipe) with finger and @AY<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L122 | 13 | ("5250929" \| "5568604" \| "5579036" \| "5612719" \| "5661476" \| "5748185" \| "5767457" \| "5883617" \| "5928304" \| "5943043" \| "5943044" \| "5995083" \| "6049328").PN. | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |
| L123 | 1656 | 715/716.ccls. | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |
| L124 | 12 | 715/716.ccls. and dvd near menu | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |
| L125 | 15 | 715/716.ccls. and dvd near menu | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L126 | 673 | 715/716.ccls. and dvd | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L127 | 843 | 715/716.ccls. and menu | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L128 | 85 | 715/716.ccls. and menu and theme | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L129 | 439 | 715/716.ccls. and menu and effects | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L130 | 9 | 715/716.ccls. and menu with theme | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L131 | 1 | "7200836".pn. | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L132 | 1 | "20080120546".pn. | US-PGPUB; | OR | ON | 2011/08/28 22:50 |

NEONODE0000627

EAST Search History

| | | | USPAT; USOCR | | | |
|---|---|---|---|---|---|---|
| L133 | 682 | 715/864.ccls. | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L134 | 98 | 715/864.ccls. and keyboard and back and icons and files | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L135 | 48 | 715/864.ccls. and keyboard and back and icons and files and removable | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L136 | 46 | 715/864.ccls. and keyboard and icons and files and @ay<="2002" | US-PGPUB; USPAT; USOCR | OR | ON | 2011/08/28 22:50 |
| L137 | 2 | "6346935".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2011/08/28 22:50 |
| L138 | 22 | (glide flick touch swipe) with (coordinat$7) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L139 | 450 | (touch finger) with (glide flick touch swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L140 | 0 | (touch finger) with (glide flick swipe) with screen with (applications functions) and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L141 | 3 | (touch finger) with (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L142 | 2 | "6140936".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L143 | 2 | "6346935".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L144 | 250 | files with applications with list with only | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L145 | 151 | (file near list) with (application near list) | US- | OR | ON | 2011/08/28 |

NEONODE0000628

EAST Search History

| | | | PGPUB; USPAT; EPO; JPO; DERWENT | | | 22:50 |
|---|---|---|---|---|---|---|
| L146 | 672 | (file near view) with application | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L147 | 21 | sort with application near files | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L148 | 790 | (programs application) with files with (sort show list) with only | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L149 | 80 | (programs application) with files with (sort show list) with only and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L150 | 0 | seperate with list with data near type | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L151 | 7785 | list with data near type | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L152 | 933 | list with data near type and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L153 | 820 | application near list and file near list | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L154 | 278 | application near list and file near list and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L155 | 2 | "20030160832".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | OFF | 2011/08/28 22:50 |
| L156 | 4870 | touch with (flick gesture slide swipe across) and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L157 | 4635 | touch with (flick slide swipe across) and | US- | OR | ON | 2011/08/28 |

NEONODE0000629

EAST Search History

| | | | | | | |
|---|---|---|---|---|---|---|
| | | @ay<"2002" | PGPUB; USPAT; EPO; JPO; DERWENT | | | 22:50 |
| L158 | 2804 | touch with (flick slide swipe ) and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L159 | 2780 | touch with ( slide swipe ) and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L160 | 56 | touch with ( swipe ) and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L161 | 1015 | touch near2 (flick slide swipe across) and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L162 | 2 | touch near2 (flick slide swipe across) with activate and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L163 | 30 | touch near2 (flick slide swipe across) with function and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L164 | 2 | "5053758".pn. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L165 | 33 | touch near2 (flick glide slide swipe across) with function and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L166 | 3 | touch near2 (glide) with function and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L167 | 34 | neonode.as. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L168 | 10458 | (glide flick touch swipe) with icon | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L169 | 49984 | (glide flick touch swipe) with | US- | OR | ON | 2011/08/28 |

NEONODE0000630

EAST Search History

| | | | | | | |
|---|---|---|---|---|---|---|
| | | (representation icon function) | PGPUB; USPAT; EPO; JPO; DERWENT | | | 22:50 |
| L170 | 3457 | (glide flick touch swipe) with (representation icon function) with (activate activation open start) | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L171 | 1038 | (glide flick touch swipe) with (representation icon function) with (activate activation open start) and @ay<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L172 | 105 | (glide flick touch swipe) with (representation icon function) with (activate activation open start) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L173 | 122 | (glide flick touch swipe slide) with (representation icon function) with (activate activation open start) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L174 | 122 | (glide flick touch swipe slide) with (representation icon function) with (activate activation open start unlock) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L175 | 226 | (glide flick touch swipe slide drag) with (representation icon function) with (activate activation open start unlock) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L176 | 2 | touch near2 (flick slide swipe across glide) with activate and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L177 | 1 | touch near4 (flick slide swipe across glide) with activate with (icon button) and @ay<"2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L178 | 2424 | (flick gesture slide) and @ay<="2002" and "715"/$.ccls. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L179 | 11 | (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L180 | 1656 | 715/716.ccls. | US-PGPUB; USPAT; USOCR | OR | OFF | 2011/08/28 22:50 |
| L181 | 682 | 715/864.ccls. | US-PGPUB; | OR | ON | 2011/08/28 22:50 |

NEONODE0000631

EAST Search History

| | | | USPAT; USOCR | | | |
|---|---|---|---|---|---|---|
| L182 | 3 | (touch finger) with (glide flick swipe) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L183 | 33 | (touch finger) with (glide flick swipe slide ) with screen and "715"/$.ccls. and @AY<="2002" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L184 | 16 | ("20010002694" \| "20010022579" \| "20010026268" \| "20010028344" \| "20010055006" \| "4790028" \| "5053758" \| "5283558").PN. | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |
| L193 | 6 | "1459245" | US-PGPUB; USPAT; EPO; JPO; DERWENT | OR | ON | 2011/08/28 22:50 |

8/28/2011 10:58:20 PM
C:\Users\rpitaro\Documents\EAST\Workspaces\10315250.wsp

NEONODE0000632

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 10315250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** |
| | Ryan F Pitaro | 2174 |

| SEARCHED | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| Update | Search | 11/8/2007 | RFP |
| Update | Search | 6/17/2008 | RFP |
| Update | Search | 12/21/2008 | RFP |
| Update | Search | 4/22/2009 | RFP |
| Update | Search | 11/20/2009 | RFP |
| Update | Search | 5/22/2010 | RFP |
| Update | Search | 6/5/2011 | RFP |
| Update | Search | 8/25/2011 | RFP |
| Update | Search | 10/18/2011 | RFP |

| SEARCH NOTES | | |
|---|---|---|
| **Search Notes** | **Date** | **Examiner** |
| Update Search | 11/8/2007 | RFP |
| Update Search | 6/17/2008 | RFP |
| EAST | 12/21/2008 | RFP |
| Internet | 12/21/2008 | RFP |
| Safari Online Books | 12/21/2008 | RFP |
| IEEE | 12/21/2008 | RFP |
| ACM | 12/21/2008 | RFP |
| Update Search | 4/22/2009 | RFP |
| Update Search | 11/20/2009 | RFP |
| Update Search | 5/22/2010 | RFP |
| Internet Search | 5/22/2010 | RFP |
| Update Search | 6/5/2011 | RFP |
| STIC Search | 6/5/2011 | RFP |
| Fast and Focus Search | 6/5/2011 | RFP |
| Update Search | 8/25/2011 | RFP |
| Update Search | 10/18/2011 | RFP |

| INTERFERENCE SEARCH | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| Interference | Search | 6/5/2011 | RFP |
| Update | Search | 8/25/2011 | RFP |

| | |
|---|---|
| | |

U.S. Patent and Trademark Office                                    Part of Paper No. : 20110606

NEONODE0000633

| INTERFERENCE SEARCH | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| Update | Search | 10/18/2011 | RFP |

| | |
|---|---|
| | |

U.S. Patent and Trademark Office                                                                 Part of Paper No. : 20110606

NEONODE0000634

| Index of Claims | Application/Control No.  10315250 | Applicant(s)/Patent Under Reexamination  GOERTZ, MAGNUS |
|---|---|---|
| | Examiner  Ryan F Pitaro | Art Unit  2174 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

☐ Claims renumbered in the same order as presented by applicant     ☐ CPA     ☐ T.D.     ☐ R.1.47

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | 06/23/2008 | 12/21/2008 | 07/06/2009 | 11/20/2009 | 05/23/2010 | 06/06/2011 | 08/28/2011 | |
| | 1 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 2 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 4 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 5 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 6 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 7 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 8 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 9 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 10 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 11 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 12 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 13 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 14 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 15 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | - | |
| | 16 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | - | |
| | 17 | ✓ | ✓ | ✓ | - | - | - | - | - | |
| | 18 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | = | = | |
| | 19 | | ÷ | N | - | | | - | - | |
| | 20 | | ÷ | N | - | | | - | - | |
| | 21 | | ÷ | N | - | | | - | - | |
| | 22 | | ÷ | N | - | | | - | - | |
| | 23 | | ÷ | N | - | | | - | - | |
| | 24 | | ÷ | N | - | | | - | - | |
| | 25 | | ÷ | N | - | | | - | - | |
| | 26 | | ÷ | N | - | | | - | - | |
| | 27 | | ÷ | N | - | | | - | - | |
| | 28 | | ÷ | N | - | | | - | - | |
| | 29 | | ÷ | N | - | | | - | - | |
| | 30 | | ÷ | N | - | | | - | - | |
| | 31 | | ÷ | N | - | | | - | - | |
| | 32 | | ÷ | N | - | | | - | - | |
| | 33 | | ÷ | N | - | | | - | - | |
| | 34 | | ÷ | N | - | | | - | - | |
| | 35 | | ÷ | N | - | | | - | - | |
| | 36 | | ÷ | N | - | | | - | - | |

U.S. Patent and Trademark Office                                                                                     Part of Paper No. : 20110606

NEONODE0000635

| | Index of Claims | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| | | 10315250 | GOERTZ, MAGNUS |
| | | **Examiner** | **Art Unit** |
| | | Ryan F Pitaro | 2174 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ✓ | **Rejected** | - | **Cancelled** | N | **Non-Elected** | A | **Appeal** |
| = | **Allowed** | ÷ | **Restricted** | I | **Interference** | O | **Objected** |

☐ Claims renumbered in the same order as presented by applicant　　☐ CPA　☐ T.D.　☐ R.1.47

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 11/09/2007 | 06/23/2008 | 12/21/2008 | 07/06/2009 | 11/20/2009 | 05/23/2010 | 06/06/2011 | 08/28/2011 | |
| | 37 | | ÷ | N | - | | | - | - | |
| | 38 | | ÷ | N | - | | | - | - | |
| | 39 | | ÷ | N | - | | | - | - | |
| | 40 | | ÷ | N | - | | | - | - | |
| | 41 | | ÷ | N | - | | | - | - | |
| | 42 | | ÷ | N | - | | | - | - | |
| | 43 | | ÷ | N | - | | | - | - | |
| | 44 | | ÷ | N | - | | | - | - | |
| | 45 | | ÷ | N | - | | | - | - | |
| | 46 | | ÷ | N | - | | | - | - | |
| | 47 | | ÷ | N | - | | | - | - | |
| | 48 | | | | | | | = | = | |
| | 49 | | | | | | | = | = | |
| | 50 | | | | | | | | | |
| | 51 | | | | | | | | | |
| | 52 | | | | | | | | | |
| | 53 | | | | | | | | | |
| | 54 | | | | | | | | | |
| | 55 | | | | | | | | | |
| | 56 | | | | | | | | | |
| | 57 | | | | | | | | | |
| | 58 | | | | | | | | | |
| | 59 | | | | | | | | | |
| | 60 | | | | | | | | | |
| | 61 | | | | | | | | | |
| | 62 | | | | | | | | | |
| | 63 | | | | | | | | | |
| | 64 | | | | | | | | | |
| | 65 | | | | | | | | | |

NEONODE0000636

| *Issue Classification* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 10315250 | GOERTZ, MAGNUS |
| | **Examiner** | **Art Unit** |
| | RYAN PITARO | 2171 |

| ORIGINAL | | INTERNATIONAL CLASSIFICATION | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| CLASS | SUBCLASS | CLAIMED | | | | | | NON-CLAIMED | |
| 715 | 716 | G | 0 | 6 | F | 3 / 00 (2006.01.01) | | | |

**CROSS REFERENCE(S)**

| CLASS | SUBCLASS (ONE SUBCLASS PER BLOCK) | | | | |
|---|---|---|---|---|---|
| 715 | 864 | 702 | | | |
| | | | | | |

☒ Claims renumbered in the same order as presented by applicant    ☐ CPA    ☐ T.D.    ☐ R.1.47

| Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | 17 | | 33 | 17 | 49 | | | | | | | | |
| 2 | 2 | 15 | 18 | | 34 | | | | | | | | | | |
| 3 | 3 | | 19 | | 35 | | | | | | | | | | |
| 4 | 4 | | 20 | | 36 | | | | | | | | | | |
| 5 | 5 | | 21 | | 37 | | | | | | | | | | |
| 6 | 6 | | 22 | | 38 | | | | | | | | | | |
| 7 | 7 | | 23 | | 39 | | | | | | | | | | |
| 8 | 8 | | 24 | | 40 | | | | | | | | | | |
| 9 | 9 | | 25 | | 41 | | | | | | | | | | |
| 10 | 10 | | 26 | | 42 | | | | | | | | | | |
| 11 | 11 | | 27 | | 43 | | | | | | | | | | |
| 12 | 12 | | 28 | | 44 | | | | | | | | | | |
| 13 | 13 | | 29 | | 45 | | | | | | | | | | |
| 14 | 14 | | 30 | | 46 | | | | | | | | | | |
| | 15 | | 31 | | 47 | | | | | | | | | | |
| | 16 | | 32 | 16 | 48 | | | | | | | | | | |

| NONE | | **Total Claims Allowed:** | | |
|---|---|---|---|---|
| (Assistant Examiner) | (Date) | 17 | | |
| /RYAN PITARO/ Primary Examiner.Art Unit 2171 | 8/25/2011 | O.G. Print Claim(s) | O.G. Print Figure | |
| (Primary Examiner) | (Date) | 1 | 13 | |

U.S. Patent and Trademark Office

Part of Paper No.  20110606

NEONODE0000637

# PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** **Mail**  **Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
**or Fax** **(571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| | | |
|---|---|---|
| 75660 | 7590 | 12/01/2011 |

Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)
_____ (Signature)
_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

TITLE OF INVENTION: USER INTERFACE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | YES | $870 | $300 | $0 | $1170 | 03/01/2012 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| PITARO, RYAN F | 2171 | 715-716000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 Soquel Group LLC
2 _____
3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

Neonode Inc.

(B) RESIDENCE: (CITY and STATE OR COUNTRY)

Santa Clara, CA

Please check the appropriate assignee category or categories (will not be printed on the patent): ☐ Individual ☒ Corporation or other private group entity ☐ Government

4a. The following fee(s) are submitted:
☒ Issue Fee
☒ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): (**Please first reapply any previously paid issue fee shown above**)
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)
☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.
☒ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____  Date December 4, 2011

Typed or printed name Marc A. Berger  Registration No. 44029

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.     OMB 0651-0033     U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

NEONODE0000638

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 10315250 |
| **Filing Date:** | 10-Dec-2002 |
| **Title of Invention:** | USER INTERFACE |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Filer:** | Marc Aron Berger |
| **Attorney Docket Number:** | NEONODE.P004 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| Utility Appl issue fee | 1501 | 1 | 1740 | 1740 |
| Publ. Fee- early, voluntary, or normal | 1504 | 1 | 300 | 300 |

NEONODE0000639

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| Extension-of-Time: | | | | |
| Miscellaneous: | | | | |
| | | **Total in USD ($)** | | **2040** |

NEONODE0000640

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 11537889 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | USER INTERFACE |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Customer Number:** | 75660 |
| **Filer:** | Marc Aron Berger |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | NEONODE.P004 |
| **Receipt Date:** | 04-DEC-2011 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 07:58:27 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Miscellaneous Incoming Letter | NEONODE-P004_CommentsOnStatements OfReasonsForAllowance_12-04-2011.pdf | 55071<br>077a3bdbc7233a04a5a4b6ef464f75d72ef6 df54 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |

NEONODE0000641

| 2 | Issue Fee Payment (PTO-85B) | NEONODE-P004_FeeTransmittal_12-04-2011.pdf | 1639128<br><br>7bfec90db0f48a3a78303af2ba19fc80eb0a4a73 | no | 1 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 3 | Fee Worksheet (SB06) | fee-info.pdf | 31570<br><br>9442524ff45187f5e61bcaee13b0c6437dc4a4e6 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | Total Files Size (in bytes): | 1725769 |
|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000642

Attorney's Docket No.: <u>NEONODE.P004</u>      *PATENT*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Patent Application of:                  )
                                              )    Examiner:  Ryan F. Pitaro
            Magnus Goertz                     )
                                              )    Art Unit:    2171
Application No: 10/315,250                    )
                                              )
Filed:      December 10, 2002                 )
                                              )
For:        USER INTERFACE                    )
_____)
Commissioner for Patents
P. O. Box 1450
Alexandria, VA   22313-1450


## <u>COMMENTS ON STATEMENT OF REASONS FOR ALLOWANCE</u>


            In the Notice of Allowability mailed December 1, 2011, the Examiner allowed claims **1 – 14**, **18**, **48** and **49**.  Applicant acknowledges the Examiner's statements of Reasons for Allowance of the above-referenced patent application and agrees that the claimed subject matter is patentable.  However, applicant takes no position regarding the Reasons for Allowance presented by the Examiner other than the positions applicant may have previously taken during prosecution. Therefore, the Examiner's Reasons for Allowance should not be attributed to applicant as an indication of the basis for applicant's belief that the claims are patentable.  Furthermore, applicant respectfully asserts that there may also be additional reasons for patentability of the claimed subject matter not explicitly stated in this record and applicant does not waive his rights to such arguments by not further addressing such reasons herein.

-1-

NEONODE0000643

Respectfully submitted,

SOQUEL GROUP LLC

Dated: December 4, 2011

/Marc A. Berger/
Marc A. Berger
Reg. No. 44,029

P.O. Box 691
Soquel, CA   95073
(831) 426-8200
Customer No. 75660

Atty. Docket No. NEONODE.P004          -2-

NEONODE0000644

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>  **Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
or <u>Fax</u>  **(571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

75660       7590       12/01/2011

Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)
_____ (Signature)
_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

TITLE OF INVENTION: USER INTERFACE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | YES | $870 | $300 | $0 | $1170 | 03/01/2012 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| PITARO, RYAN F | 2171 | 715-716000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _Soquel Group LLC_

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

_Neonode Inc._

(B) RESIDENCE: (CITY and STATE OR COUNTRY)

_Santa Clara, CA_

Please check the appropriate assignee category or categories (will not be printed on the patent): ☐ Individual ☒ Corporation or other private group entity ☐ Government

4a. The following fee(s) are submitted:
☒ Issue Fee
☒ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): (**Please first reapply any previously paid issue fee shown above**)
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)
☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.
☒ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _Marc B_____     Date _December 4, 2011_

Typed or printed name _Marc A. Berger_     Registration No. _44029_

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.     OMB 0651-0033     U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

NEONODE0000645

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 10315250 |
| **Filing Date:** | 10-Dec-2002 |
| **Title of Invention:** | USER INTERFACE |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Filer:** | Marc Aron Berger |
| **Attorney Docket Number:** | NEONODE.P004 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| Utility Appl issue fee | 1501 | 1 | 1740 | 1740 |
| Publ. Fee- early, voluntary, or normal | 1504 | 1 | 300 | 300 |

NEONODE0000646

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| Extension-of-Time: | | | | |
| Miscellaneous: | | | | |
| | | **Total in USD ($)** | | **2040** |

NEONODE0000647

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 11537894 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | USER INTERFACE |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Customer Number:** | 75660 |
| **Filer:** | Marc Aron Berger |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | NEONODE.P004 |
| **Receipt Date:** | 04-DEC-2011 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 08:09:12 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

### File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Issue Fee Payment (PTO-85B) | NEONODE-P004_FeeTransmittal_12-04-2011.pdf | 1639128 <br> 7bfec90db0f48a3a78303af2ba19fc80eb0a4a73 | no | 1 |

| Warnings: |
|---|
| Information: |

NEONODE0000648

| 2 | Fee Worksheet (SB06) | fee-info.pdf | 31570<br><br>e9b615149a10803d89a941ef5424db36fce24010 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | | | |
|---|---|---|---|
| | | **Total Files Size (in bytes):** | 1670698 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000649

# PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>  Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
or <u>Fax</u>  (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

75660    7590    12/01/2011

Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)
_____ (Signature)
_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

TITLE OF INVENTION: USER INTERFACE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | YES | $870 | $300 | $0 | $1170 | 03/01/2012 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| PITARO, RYAN F | 2171 | 715-716000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1  _Soquel Group LLC_
2  _____
3  _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE  _Neonode Inc._

(B) RESIDENCE: (CITY and STATE OR COUNTRY)  _Santa Clara, CA_

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual  ☒ Corporation or other private group entity  ☐ Government

4a. The following fee(s) are submitted:
☒ Issue Fee
☒ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): (**Please first reapply any previously paid issue fee shown above**)
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)
☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.
☒ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _Marc Berger_    Date _December 4, 2011_

Typed or printed name _Marc A. Berger_    Registration No. _44029_

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

NEONODE0000650

# Electronic Patent Application Fee Transmittal

| Application Number: | 10315250 |
|---|---|
| Filing Date: | 10-Dec-2002 |
| Title of Invention: | USER INTERFACE |
| First Named Inventor/Applicant Name: | Magnus Goertz |
| Filer: | Marc Aron Berger |
| Attorney Docket Number: | NEONODE.P004 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| Utility Appl issue fee | 1501 | 1 | 1740 | 1740 |
| Publ. Fee- early, voluntary, or normal | 1504 | 1 | 300 | 300 |

NEONODE0000651

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| Extension-of-Time: | | | | |
| Miscellaneous: | | | | |
| | | **Total in USD ($)** | | **2040** |

NEONODE0000652

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 11538121 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | USER INTERFACE |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Customer Number:** | 75660 |
| **Filer:** | Marc Aron Berger |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | NEONODE.P004 |
| **Receipt Date:** | 04-DEC-2011 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 17:58:50 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Issue Fee Payment (PTO-85B) | NEONODE-P004_FeeTransmittal_12-04-2011.pdf | 1639128<br>7bfec90db0f48a3a78303af2ba19fc80eb0a4a73 | no | 1 |

| Warnings: |
|---|
| Information: |

NEONODE0000653

| 2 | Fee Worksheet (SB06) | fee-info.pdf | 31570<br><br>c73a229fc00d6bfe1cf1504e1d2035af7c84f<br>b98 | no | 2 |

**Warnings:**

**Information:**

| | Total Files Size (in bytes): | 1670698 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000654

## PART B - FEE(S) TRANSMITTAL



**Complete and send this form, together with applicable fee(s), to:** **Mail**   Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
**or Fax**   (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

```
75660      7590      12/01/2011
Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073
```



Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

### Certificate of Mailing or Transmission
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

| | |
|---|---|
| | (Depositor's name) |
| | (Signature) |
| | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

TITLE OF INVENTION: USER INTERFACE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | YES | $870 | $300 | $0 | $1170 | 03/01/2012 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| PITARO, RYAN F | 2171 | 715-716000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. Use of a Customer Number is required.

**2. For printing on the patent front page, list**

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1  _Soquel Group LLC_
2  _____
3  _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)**

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                  (B) RESIDENCE: (CITY and STATE OR COUNTRY)

_Neonode Inc._                         _Santa Clara, CA_

Please check the appropriate assignee category or categories (will not be printed on the patent): ☐ Individual ☒ Corporation or other private group entity ☐ Government

**4a. The following fee(s) are submitted:**
☒ Issue Fee
☒ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s): (Please first reapply any previously paid issue fee shown above)**
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status (from status indicated above)**
☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.    ☒ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____     Date _December 4, 2011_

Typed or printed name _Marc A. Berger_     Registration No. _44029_

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.         OMB 0651-0033         U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

```
12/05/2011 INTEFSW  00007645 10315250
01 FC:1501                              1740.00 OP
02 FC:1504                               300.00 OP
```

NEONODE0000655

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** **Mail**

Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
**or Fax** (571)-273-2885



INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

75660        7590        12/01/2011

Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073



Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

|  |  |
|---|---|
|  | (Depositor's name) |
|  | (Signature) |
|  | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

TITLE OF INVENTION: USER INTERFACE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | YES | $870 | $300 | $0 | $1170 | 03/01/2012 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| PITARO, RYAN F | 2171 | 715-716000 |

**1.** Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. Use of a Customer Number is required.

**2.** For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _Soquel Group LLC_

2 _____

3 _____

**3.** ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

_Neonode Inc._

(B) RESIDENCE: (CITY and STATE OR COUNTRY)

_Santa Clara, CA_

Please check the appropriate assignee category or categories (will not be printed on the patent): ☐ Individual ☒ Corporation or other private group entity ☐ Government

**4a.** The following fee(s) are submitted:

☒ Issue Fee
☒ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

**4b.** Payment of Fee(s): (Please first reapply any previously paid issue fee shown above)

☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5.** Change in Entity Status (from status indicated above)

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.        ☒ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _M. A. B_____        Date _December 4, 2011_

Typed or printed name _Marc A. Berger_        Registration No. _44029_

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

12/05/2011 INTFSW 00007645 10315250

01 FC:1501                1740.00 OP
02 FC:1504                 300.00 OP

NEONODE0000656

**PART B - FEE(S) TRANSMITTAL**

**Complete and send this form, together with applicable fee(s), to:** **Mail**  Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
**or Fax**  (571)-273-2885



INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| 75660 | 7590 | 12/01/2011 |
|---|---|---|

Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073

*OPAP DEC 0 4 2011 PATENT & TRADEMARK OFFICE AP25 stamp*

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)
_____ (Signature)
_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

TITLE OF INVENTION: USER INTERFACE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | YES | $870 | $300 | $0 | $1170 | 03/01/2012 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| PITARO, RYAN F | 2171 | 715-716000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. Use of a Customer Number is required.

2. For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1  *Soquel Group LLC*
2  _____
3  _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE    *Neonode Inc.*

(B) RESIDENCE: (CITY and STATE OR COUNTRY)    *Santa Clara, CA*

Please check the appropriate assignee category or categories (will not be printed on the patent): ☐ Individual ☒ Corporation or other private group entity ☐ Government

4a. The following fee(s) are submitted:
☒ Issue Fee
☒ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): (Please first reapply any previously paid issue fee shown above)
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. Change in Entity Status (from status indicated above)
☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.    ☒ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature *M. A. R___*    Date *December 4, 2011*

Typed or printed name *Marc A. Berger*    Registration No. *44029*

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

12/05/2011 INTEFSW    00007645 10315250

01 FC:1501    1740.00 OP
02 FC:1504    300.00 OP

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** **Mail**   Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
**or Fax**   (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

75660        7590        12/01/2011

Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 | Magnus Goertz | NEONODE.P004 | 1226 |

TITLE OF INVENTION: USER INTERFACE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | YES | $870 | $300 | $0 | $1170 | 03/01/2012 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| PITARO, RYAN F | 2171 | 715-716000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1  Soquel Group LLC

2  _____

3  _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

Neonode Inc.

(B) RESIDENCE: (CITY and STATE OR COUNTRY)

Santa Clara, CA

Please check the appropriate assignee category or categories (will not be printed on the patent):   ☐ Individual   ☒ Corporation or other private group entity   ☐ Government

4a. The following fee(s) are submitted:
☒ Issue Fee
☒ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): (**Please first reapply any previously paid issue fee shown above**)
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)
☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.   ☒ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _Marc B_____   Date _December 4, 2011_

Typed or printed name _Marc A. Berger_   Registration No. _44029_

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

NEONODE0000658

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 10315250 |
| **Filing Date:** | 10-Dec-2002 |
| **Title of Invention:** | USER INTERFACE |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Filer:** | Marc Aron Berger |
| **Attorney Docket Number:** | NEONODE.P004 |

Filed as Large Entity

### Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| Utility Appl issue fee | 1501 | 1 | 1740 | 1740 |
| Publ. Fee- early, voluntary, or normal | 1504 | 1 | 300 | 300 |

NEONODE0000659

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| Extension-of-Time: | | | | |
| Miscellaneous: | | | | |
| | | | **Total in USD ($)** | **2040** |

NEONODE0000660

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 11538511 |
| **Application Number:** | 10315250 |
| **International Application Number:** | |
| **Confirmation Number:** | 1226 |
| **Title of Invention:** | USER INTERFACE |
| **First Named Inventor/Applicant Name:** | Magnus Goertz |
| **Customer Number:** | 75660 |
| **Filer:** | Marc Aron Berger |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | NEONODE.P004 |
| **Receipt Date:** | 05-DEC-2011 |
| **Filing Date:** | 10-DEC-2002 |
| **Time Stamp:** | 05:20:43 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 2040 |
| RAM confirmation Number | 7645 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

NEONODE0000661

| 1 | Issue Fee Payment (PTO-85B) | NEONODE-P004_FeeTransmittal_12-04-2011.pdf | 1639128 7bfec90db0f48a3a78303af2ba19fc80eb0a4a73 | no | 1 |
|---|---|---|---|---|---|
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Fee Worksheet (SB06) | fee-info.pdf | 31570 94e7b8b5310f4c5e02bb9fd679b3a70bf27f3aff | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | | 1670698 | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

NEONODE0000662

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

Bib Data Sheet

**CONFIRMATION NO. 1226**

| SERIAL NUMBER 10/315,250 | FILING OR 371(c) DATE 12/10/2002 RULE | CLASS 715 | GROUP ART UNIT 2171 | ATTORNEY DOCKET NO. NEONODE.P004 |
|---|---|---|---|---|

**APPLICANTS**

Magnus Goertz, Stockholm, SWEDEN;

** CONTINUING DATA ***************************

** FOREIGN APPLICATIONS *********************

IF REQUIRED, FOREIGN FILING LICENSE GRANTED
** 01/16/2003

| Foreign Priority claimed ☐ yes ☐ no 35 USC 119 (a-d) conditions met ☐ yes ☐ no ☐ Met after Allowance Verified and Acknowledged ___ Examiner's Signature ___ Initials | STATE OR COUNTRY SWEDEN | SHEETS DRAWING 4 | TOTAL CLAIMS 18 | INDEPENDENT CLAIMS 1 |
|---|---|---|---|---|

**ADDRESS**
75660

**TITLE**
USER INTERFACE FOR MOBILE HANDHELD COMPUTER UNIT

| FILING FEE RECEIVED 1940 | FEES: Authority has been given in Paper No. _____ to charge/credit DEPOSIT ACCOUNT No. _____ for following: | ☐ All Fees ☐ 1.16 Fees ( Filing ) ☐ 1.17 Fees ( Processing Ext. of time ) ☐ 1.18 Fees ( Issue ) ☐ Other _____ ☐ Credit |
|---|---|---|

NEONODE0000663



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## BIB DATA SHEET

**CONFIRMATION NO. 1226**

| SERIAL NUMBER | FILING or 371(c) DATE | CLASS | GROUP ART UNIT | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 10/315,250 | 12/10/2002 **RULE** | 715 | 2171 | NEONODE.P004 |

**APPLICANTS**
   Magnus Goertz, Stockholm, SWEDEN;

** CONTINUING DATA ***************************

** FOREIGN APPLICATIONS ***************************

** IF REQUIRED, FOREIGN FILING LICENSE GRANTED ** ** SMALL ENTITY **
   01/16/2003

| Foreign Priority claimed ☐ Yes ☑ No | | STATE OR COUNTRY | SHEETS DRAWINGS | TOTAL CLAIMS | INDEPENDENT CLAIMS |
|---|---|---|---|---|---|
| 35 USC 119(a-d) conditions met ☐ Yes ☑ No | ☐ Met after Allowance | | | | |
| Verified and Acknowledged   ‾‾Examiner's Signature‾‾ | ‾‾Initials‾‾ | SWEDEN | 4 | 18 | 1 |

**ADDRESS**

   Soquel Group, LLC
   P.O. Box 691
   Soquel, CA 95073
   UNITED STATES

**TITLE**
   USER INTERFACE FOR MOBILE HANDHELD COMPUTER UNIT

| FILING FEE RECEIVED 1940 | FEES: Authority has been given in Paper No._____ to charge/credit DEPOSIT ACCOUNT No._____ for following: | ☐ All Fees |
|---|---|---|
| | | ☐ 1.16 Fees (Filing) |
| | | ☐ 1.17 Fees (Processing Ext. of time) |
| | | ☐ 1.18 Fees (Issue) |
| | | ☐ Other _____ |
| | | ☐ Credit |

BIB (Rev. 05/07).

NEONODE0000664



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/315,250 | 01/10/2012 | 8095879 | NEONODE.P004 | 1226 |

75660        7590        12/21/2011

Soquel Group, LLC
P.O. Box 691
Soquel, CA 95073

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 1228 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Application Assistance Unit (AAU) of the Office of Data Management (ODM) at (571)-272-4200.

APPLICANT(s) (Please see PAIR WEB site http://pair.uspto.gov for additional applicants):

Magnus Goertz, Stockholm, SWEDEN;

IR103 (Rev. 10/09)

NEONODE0000665

# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NEONODE SMARTPHONE LLC,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | No. 3:21-cv-08872-EMC<br><br>**EXPERT REPORT OF ANTHONY D. ANDRE, PH.D., CPE REGARDING CLAIM CONSTRUCTION** |

1

I, Anthony D. Andre, hereby declare as follows:

1.     I have been retained as an expert witness on behalf of Neonode Smartphone LLC ("Neonode" or "Plaintiff") in the above-referenced litigation. I understand that Neonode has alleged that Apple Inc. ("Apple" or "Defendant") infringes U.S. Patent No. 8,095,879 (the "'879 Patent"). I understand that this expert report is submitted in connection with the claim construction process in the litigation.

2.     This expert report sets forth the basis and reasons for my opinions as to how a person of ordinary skill in the art would understand certain claim terms of the '879 Patent. This expert report does not set forth all opinions I may have regarding the '879 Patent. I reserve the right to submit additional expert reports or declarations on other issues and to amend or supplement my opinions in the course of this litigation.

3.     This expert report is based on the information available and known to me as of the date of this report, including the '879 Patent, its file history and any other documents referenced in this report. I also reviewed and considered the parties' Joint Claim Construction Statement and the supporting evidence cited therein. I may use all or any of these materials, other materials that have been or will be produced during the course of this litigation, and supplemental charts, models, demonstratives, and other representations based on those materials, to support my testimony at a hearing, deposition, or other proceeding regarding my opinions related to claim construction. In reaching the opinions expressed in this report, I have also relied on my education, teaching, research, and product development experience, as well as my understanding of the applicable legal principles. It may be necessary for me to supplement this report based on material that subsequently comes to light in this case, including any expert report that Apple may provide, and I reserve the right to do so.

4.     I have no financial interest in the outcome of this case, in any of the parties of this case, or in any party that is related to the parties in this case. I am being compensated at the rate of $525.00 per hour. My compensation is unrelated to the outcome of this litigation.

2

## I.   BACKGROUND AND QUALIFICAITONS

5.   My opinions stated in this report are based on my own personal knowledge and professional judgment. In forming my opinions, I have relied on my knowledge and experience in human factors, user interface design, user interaction design, human-computer interaction, and software engineering.

6.   My qualifications to testify about the '879 Patent and the relevant technology are set forth in my curriculum vitae ("CV"), which I have included as Appendix A. My CV includes, among my other qualifications, a list of all publications authored by me in the previous ten years as well as a list of the cases in which I have testified as an expert at trial or by deposition in the preceding four years. In addition, a brief summary of my qualifications is included below:

7.   I earned a Bachelor of Science from the University of Illinois at Urbana-Champaign in Experimental and Cognitive Psychology with a minor in Human Factors and Ergonomics, in 1987. I continued my studies in Human Factors and Ergonomics (aka Engineering Psychology) at the University of Illinois at Urbana-Champaign, earning a Master of Arts in 1989, and Ph.D. degree in 1991, both in Human Factors and Ergonomics.

8.   In addition to my formal educational degrees, I am a Certified Professional Ergonomist (CPE), which is a credential issued by the Board of Certification in Professional Ergonomics (BCPE). A CPE certification requires demonstrating education and professional experience, and passing a qualification examination, in the fields of human factors and ergonomics.

9.   I have owned and led Interface Analysis Associates LLC, a successful Human Factors and Usability consultancy, for over 33 years, with a global list of clients. Interface Analysis Associates LLC provides user interface design, usability testing, usability evaluation, and user research services across a wide variety of product domains. Some of our former and/or current clients include Google, Abbott Labs, AT&T, Apple, Hewlett Packard, TiVO, ROKU, John Deere, McAfee, Intel, Thomson Reuters, NCR, BMW, Amtrak, Mercedes Benz, Phillips, 3M, Cisco, Hitachi, Dell, Epson, Genentech, Bloomberg, Realtor.com, Logitech, NASA, JPL, Applied Biosystems, Price Waterhouse Coopers, Samsung, Polycom, Kodak, Dole, Honeywell, Microsoft, Amgen, Eli Lilly, Johnson and Johnson,

3

Georgia Pacific, Pixar, and many others. Across our many projects we have designed and/or evaluated the user experiences for desktop software, web sites, smartphone apps, kiosks, ticket vending machines, scientific software, gaming applications, medical devices, electronic patient records interfaces, financial software, automotive interfaces, aerospace interfaces, point of sale (POS) interfaces, movie making software, computer input devices, business-to-business and enterprise software, consumer electronics, mobile devices, wearable devices and more. These interfaces have included various forms of interaction technology, including GUI point and click, touch screens, capacitive touch screens, gesture interfaces, verbal interfaces, heads-up displays, and 3D audio displays.

10.     Beyond my consulting work, I also have served as a Professor in (and founding faculty member of) the graduate Master's degree program in Human Factors/Ergonomics at San Jose State University (SJSU) since 1993, performing both teaching and thesis advising duties. In this program I taught courses on Human Cognition, Ergonomics, Human Factors, User Research Methods & Usability Testing, Cognitive Engineering, and Human Factors Research Methods. I also conducted research on various user interface design and methods topics with my students. These courses and research relate to various topics including user interface design and usability principles, common design and implementation practices and interface technology trends. I retired from SJSU in December 2025.

11.     Prior to starting Interface Analysis Associates LLC, I was a Principal Scientist in the Human Factors Division at the NASA Ames Research Center. There I worked on advanced technology vehicle-pilot interfaces and led the control-display evaluation lab.

12.     I am actively involved in and have been recognized by professional associations in the human factors and ergonomics field. I am a Past President, Titan and Elected Fellow of the Human Factors and Ergonomics Society and a Fellow of the International Ergonomics Association. I am the past Chair of the Forensics Professional Technical Group of the Human Factors and Ergonomics Society, and a Member of the Society of Forensic Engineers and Scientists and the Society of Product Safety Professionals. I also have founded two human factors conferences: 1) ErgoX and 2) The

4

EXPERT REPORT OF ANTHONY D. ANDRE, PH.D., CPE
REGARDING CLAIM CONSTRUCTION
CASE NO. 3:21-CV-08872-EMC

International Symposium on Human Factors and Ergonomics in Health Care. I am the founder and Editor in Chief of the journal "Human Factors in Healthcare," published by Elsevier.

13.    I have received several awards in recognition of my work for teaching, research, writing, presenting, designing, professional outreach, professional practice, and service over my career. Of note, I won the 2006 NASA Space Act Software Award for T-NASA, the 2008 Best New Life Science Product (Software) Award, the 2009 User Centered Design Award, the 2009 Outstanding Instructor of the Year Award (College of Engineering), and the 2019 Human Factors Presidential Distinguished Service Award.

14.    I have designed, evaluated, and usability tested numerous software applications, both stand alone and on devices, that include touch screens interfaces. I have also conducted research with my graduate students involving touch screen interfaces and gestures. Some examples of my work include:

    a.    Cidco iPhone Touchscreen Interface

    b.    Coinstar Touchscreen Interface

    c.    RedDotBox Touchscreen Interface

    d.    AMO iDesign Touchscreen Interface

    e.    NCR Touchscreen Interface

    f.    Verifone Touchscreen Interface

    g.    Smartphone Touchscreen applications for Bigfoot, Samsung, Proteus, Biocorp, Bluestar and Google

15.    I am qualified to analyze and discuss issues pertaining to, but not limited to: human factors/usability evidence-based principles of interaction design, user interface design technology and trends, user research methods, and common approaches/best practices to user interface design. I have been qualified to testify as an expert witness and have testified as an expert witness in numerous matters in several states and in federal court. By virtue of my education, training and professional experience, I am qualified to render expert testimony in this case. All of my opinions and conclusions are to a reasonable degree of human factors certainty.

5

## II.     LEGAL PRINCIPLES

16.     I am not a lawyer and offer no opinions on the law. However, I have been informed and am aware of the following legal principles that are relevant to my analysis.

17.     I have been informed that to determine the meaning of a patent's claims, courts consider the intrinsic evidence, which includes the patent's claims, written description, prosecution history (including post-issuance proceedings, such as *inter partes* review), materials incorporated by reference in the patent, and prior art cited in the patent or its prosecution history. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. A patentee may also define his or her own terms or disclaim claim scope. The intrinsic record may clarify the meaning of claim terms where the words used in the claims lack sufficient clarity, when considered alone, to permit the scope of the claim to be ascertained. I understand that claims generally are not limited to particular embodiments and examples appearing in the specification. I also understand that particular embodiments and examples appearing in the specification will not generally be read into the claims. A term's context in the asserted claims can also be helpful. Differences among the claims can also assist in understanding a term's meaning.

18.     I further understand that extrinsic evidence can be useful in determining the meaning of claim terms. For example, technical dictionaries may be useful to show the manner in which one skilled in the art might use claim terms.

19.     I understand that a claim term is generally given its plain and ordinary meaning in light of the specification, absent an explicit definition or disclaimer or disavowal, that would require a different meaning. I understand that, for prosecution disclaimer to attach, there must be a showing of a clear and unmistakable disclaimer that would have been evident to one of ordinary skill in the art.

20.     I have been informed that a patent specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his or her invention. I understand that a claim which fails to meet this standard is invalid as indefinite. I understand that patent claims are presumed valid, and clear and convincing evidence is required to establish that a patent claim is invalid as indefinite.

6

21.    I understand that indefiniteness is to be evaluated from the perspective of a person of ordinary skill in the art (a "POSITA") at the time of the patent's filing. I understand that a patent claim is invalid for indefiniteness if the claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the claimed invention. I further understand that absolute or mathematical precision in claim language is not required, and that claim language employing a term lacking a precise boundary will not be found indefinite where the patent provides sufficient certainty to a POSITA as to the scope and meaning of the claim.

### III.    THE '879 PATENT

#### A.  Summary of the '879 Patent

22.    The '879 Patent "relates to a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area." Ex. 1 ('879 Patent) at 1:6–8. The patent describes a computer unit that is adapted to run several applications simultaneously and to present any active application on top of any other application on the display area. '879 Patent at 1:10–13.

23.    The '879 Patent describes one embodiment with a touch sensitive area that is, divided into a menu area and a display area. '879 Patent at 2:1–2. The menu area is adapted to present a representation of a first, a second, and a third predefined function. *Id.* at 2:5–7; 4:1–3. As depicted in Figure 1, and described in associated text, the first function (element 21) is a general application dependent function, the second function (element 22) is a keyboard function, and the third function (element 23) is a task and file manager:

7



Fig. 1.

'879 Patent, 4:4–6; Fig. 1. As the patent describes, any one of the functions can be activated "when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3." '879 Patent at 4:8–11. As depicted in Figure 2, this gesture entails an object (such as a finger) touching the touch sensitive area at a location where the representation is provided and then gliding along the touch sensitive area away from the touched location:

EXPERT REPORT OF ANTHONY D. ANDRE, PH.D., CPE
REGARDING CLAIM CONSTRUCTION
CASE NO. 3:21-CV-08872-EMC



Fig. 2.

'879 Patent, Fig. 2.

### B. Level of Ordinary Skill in the Art

24. I have been informed that a POSITA is a hypothetical person who has full knowledge of all the pertinent prior art. I understand that courts may consider the following factors in determining the level of skill in the art:

a. Type of problems encountered in art;

b. Prior art solutions to those problems;

c. Rapidity with which innovations are made;

d. Sophistication of the technology; and

e. Educational level of active workers in the field.

25. In determining the characteristics of a POSITA at the time of the claimed invention, I considered each of these factors. Additionally, I understand that the level of ordinary skill in the art

9

must be assessed at the time of the invention and that I should place myself back at the priority date of the '879 Patent (December 10, 2002) to determine the level of ordinary skill in the art.

26.    It is my opinion that a POSITA as of December 10, 2002, would have at least a bachelor's degree in human factors, human-computer interaction, computer science or related disciplines, and at least two years of experience designing or programming graphical user interfaces. In my opinion, relevant work experience can substitute for formal education, and advanced degree studies could substitute for work experience. This is the definition of a POSITA that I have applied for the purposes of this report. As discussed above and as further illustrated by my CV, as of December 2002, I met this definition of a POSITA.

27.    It is my opinion that reasonable adjustments, such as the precise subject matter or the degree or the precise duration of experience or equivalent, would not materially change the analysis that I offer in this report. Nevertheless, I reserve the right to supplement my report if it is determined that the appropriate analysis should be performed through the lens of a person of ordinary skill in the art with qualifications different than those I set forth above.

28.    I consider myself to be a person with at least ordinary skill in the art with respect to the '879 Patent at the time of its priority date. I worked with POSITAs in 2002, and I am able to render opinions from the perspective of a POSITA based on my knowledge and experience. Although my qualifications and experience may exceed those of the hypothetical POSITA as defined above, my analysis and opinions regarding the '879 Patent have been based upon the perspective of a POSITA as of its priority date.

### IV.    CLAIM CONSTRUCTIONS

29.    The discussion below addresses some of the terms disputed between Neonode and Apple. I understand that Neonode and Apple may dispute additional claim terms, but I have not been asked to provide analysis or opinions on terms other than those discussed in this report.

10

EXPERT REPORT OF ANTHONY D. ANDRE, PH.D., CPE
REGARDING CLAIM CONSTRUCTION
CASE NO. 3:21-CV-08872-EMC

## A.   "gliding" (claims 1, 12)

| Neonode's Proposed Construction | Apple's Proposed Construction |
|---|---|
| Plain and ordinary meaning, not including a flick, drag, or drag-and-drop operation | "a smooth, continuous movement across or along a surface, not including dragging, flicking, or a drag and drop operation" |

30.     It is my opinion that, in view of the intrinsic record, the term "gliding" has a plain and ordinary meaning to a POSITA, which meaning does not include a flick, drag, or drag-and-drop operation, and that no further construction is necessary.

### i.   The Claims

31.     I have been informed that a term, like the present one, must be construed within the context of the claim as a whole. Claim 1 reads as follows:

> 1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
> a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

'879 Patent at 6:45–59.

32.     I further understand that the term "gliding" also appears in claim 12, which depends from claim 1, and reads as follows:

11

12. The computer readable medium of claim **1**, wherein the user interface is characterised in, that an active application, function, service or setting is advanced one step by gliding the object along the touch sensitive area from left to right, and that the active application, function, service or setting is closed or backed one step by gliding the object along the touch sensitive area from right to left.

'879 Patent at 8:13–19.

33.     A POSITA would understand the term "gliding," as used in these claims, consistently with its plain and ordinary meaning, to be a smooth, continuous and effortless motion that occurs along the touch sensitive area.

34.     A POSITA, reading the term in the context of claim 1,or claim 12, would understand that it does not include a flick, drag, or drag-and-drop operation. Because the parties agree on this aspect of the construction of "gliding," I will not address the point further herein, but reserve my right to do so or to respond to any assertions made by Apple or Apple's expert, Dr. Cockburn, with respect to this issue.

35.     In the human factors field, a "gliding" gesture is understood as a form of open loop control. That is, the gliding movement is performed without using sensory feedback to modify the movement to land in a precise location. Accordingly, a "gliding" gesture is typically a free-flowing movement.

### ii.   The Specification

36.     I understand that the specification is always highly relevant to claim construction analysis. The specification provides further context for the claimed "gliding" movement in the exemplary embodiment depicted in Figure 2 and the accompanying discussion in the body of the specification.

37.     Figure 2 depicts how the user interacts with the touch sensitive area such that the "three functions 21, 22, 23" can be activated. *Id.* at 4:7–8. As the patent describes, a function associated with a representation can be activated "when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within the representation of a function on the menu area 2 and with a direction

12

B from the menu area 2 to the display area 3." *Id.* at 4:8–12. A POSITA would understand Figure 2 to illustrate the claimed multi-step touch-and-glide operation that includes the object touching the touch sensitive area at a location where the representation is provided and then gliding "along the touch sensitive area" and "away from the touched location."



'879 Patent, Fig. 2.

38.     The specification specifies the location of the "starting point A" for the multi-step touch-and-glide operation. As illustrated in Figure 2, the object (e.g. finger) moves away from that location, in direction B.

39.     The movement illustrated in Figure 2 is "gliding" as I describe above—a smooth, effortless, and continuous movement along the touch sensitive area. It is not a flick, a drag, or a drag-and-drop operation.

40.     A POSITA would understand the relevant teachings of the specification to be consistent with the plain and ordinary meaning of the term "gliding."

13

### iii. The Prosecution File

41.     I understand that the prosecution file is also part of the intrinsic record. I have reviewed the original prosecution history of the application that issued as the '879 Patent.

42.     I understand that among the prosecution file documents cited by Apple is a March 14, 2008, Amendment and Response to Non-Final Office Action. That Amendment and Response discusses how embodiments of the invention called for the gliding operation to be able to performed one-handed using the fleshy part of the thumb. '879 File History, March 14, 2008, Amendment and Response to Non-Final Office Action at 30. To further understand the movements described in the '879 Patent, the Applicant submitted for review by the examiner a Neonode N2 Advertisement Video available on Neonode's website which illustrated the gliding gesture in a functioning embodiment practicing the patent. I have also reviewed the Neonode N2 Advertisement Video. It is my opinion that the gliding gestures shown therein are consistent with the plain and ordinary meaning of the term "gliding" as I describe above.

### B. "location where the representation is provided" / "the touched location" (claims 1, 17)

| Neonode's Proposed Construction | Apple's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "location within the representation"[1] |

43.     It is my opinion that, in view of the intrinsic record, the terms "location where the representation is provided" and "the touched location" have their plain and ordinary meaning.

---

[1] In its Joint Claim Construction Statement, Apple alleged this term was indefinite. I understand that Apple has now offered a proposed construction and "no longer intends to pursue an indefiniteness argument for this term." It is my opinion that a POSITA, in 2002 as today, would understand the meanings of "location where the representation is provided" and "the touched location" as used in claims 1 and 17 with reasonable certainty. Given Apple's representation, however, I will not respond further in this Report regarding indefiniteness, although I reserve my right to do so should it prove necessary.

14

### i. The Claim

44. I have been informed that a phrase, like the present one, must be construed within the context of the claim as a whole. Claim 1 reads as follows:

> 1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
> a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

'879 Patent at 6:45–59.

45. I further understand that the phrase "location where the representation is provided" also appears in dependent claim 17 as follows:

> 17. The computer readable medium of claim 1, wherein the location where the representation is provided does not provide touch functionality for a different function.

'879 Patent at 8:31–33.

46. The claim terms "location where the representation is provided" and "the touched location" appear in the portion of the claim discussing the claimed multi-step touch-and-glide operation. In part, this portion of the claim recites, "wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a *location where the representation is provided* and then (ii) the object gliding along the touch sensitive area away from the *touched location* . . . ." Thus, the patent requires the object to glide along the touch sensitive area and away from (i.e., out of) the touched location where the representation is provided.

47.    Apple contends that "location where the representation is provided" / "the touched location" should be construed as "location within the representation." I disagree that a POSITA would interpret the claim language in this way. First, the claim language is not so limited. The claim looks to the location "where" the representation is provided, not the location "within" the representation. The location "where" the representation is provided is broader than a "location within the representation" (which Apple does not define), so Apple's construction narrows the scope of the claim. There is no logic or structure within the claim that compels this narrowing of the phrase.

48.    Claim 17 also supports a similar understanding of the claim terms. "[T]he location where the representation is provided" of claim 17 looks for antecedent basis to "a location where the representation is provided" of claim 1.

### ii.   The Specification

49.    I understand that the specification is always highly relevant to claim construction analysis. The specification provides further context for the claimed "location" in the exemplary embodiment depicted in Figures 1 and 2 and the accompanying discussion of these figures.

50.    Specifically, Figure 1 depicts an exemplary user interface that is "adapted to present a representation of a first 21, a second 22 and a third 23 predefined function." '879 Patent at 4:1–3. The "first function 21 is a general application dependent function, the second function 22 is a keyboard function, and the third function 23 is a task and file manager." *Id.* at 4:4–6.

16



Fig. 1.

'879 Patent, Fig. 1.

51.    Figure 2 depicts how the user interacts with the touch sensitive area such that each of the "three functions 21, 22, 23" can be activated. *Id.* at 4:7–8. As noted above, a function can be activated "when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3." *Id.* at 4:8–12. A POSITA would understand Figure 2 to be illustrating the multi-step touch-and-glide operation that includes the object gliding "along the touch sensitive area" and "away from the touched location."



Fig. 2.

'879 Patent, Fig. 2.

52.    The specification states that the location of the "starting point A" for the multi-step touch-and-glide operation is "within the representation of a function on the menu area 2." '879 Patent at 4:9–10. This is consistent with understanding the "location" to refer to the area where the representation is provided. In addition, as explained below, a POSITA would understand that this language does not limit the "location" to solely the area within the visually-depicted bounds of the representation.

53.    The specification contemplates embodiments of the invention where the invention is "specifically adapted to be used with a small computer unit where the size of the touch sensitive area is in the order of 2–3 inches." '879 Patent at 3:1–3, 6:6–10. I further understand that dependent claim 14 includes the limitation "wherein the touch sensitive area is 2–3 inches in diagonal dimension." *Id.* at 8:24–25. Since dependent claim 14 depends from claim 1, I understand that claim 1 may include,

18

but is not necessarily limited to, embodiments "wherein the touch sensitive area is 2–3 inches in diagonal dimension."

54. The specification contemplates embodiments of the invention where the user interface of the invention may be "operated by one hand, where the object can be a finger, such as the thumb, of a user of the computer unit." *Id.* at 3:4–6, 6:4–13. I further understand that dependent claim 16 includes the limitation "wherein the representation is finger-sized." *Id.* at 8:29–30. Since dependent claim 16 depends from claim 1, I understand that claim 1 may include, but is not necessarily limited to, embodiments "wherein the representation is finger-sized." The figures in the specification, including at least Figures 1-2, 8-9, and 11-12 depict a preferred embodiment with relatively small representations (e.g., those associated with functions 21, 22, and 23) as compared to a user's thumb.

55. Given that the specification contemplates embodiments with small touch sensitive areas (e.g., in the magnitude of 2–3 inches in diagonal dimension), small representations (relative to a user's thumb), one handed operation, and the use of the user's thumb as the object used for the multi-step touch-and-glide operation, a POSITA would understand the claimed "location where the representation is provided" to be the location of the representation's visually detectable element (e.g., an icon and/or text), as well as the potentially somewhat larger "touch target" or "hotspot," associated with that element, which permits activation of the function. This location may be used as a starting point for activating the function associated with the representation by using the multi-step touch-and-glide operation. That is, a POSITA would understand the "location where the representation is provided" and "the touched location" to include the area of the entire "touch target" or "hotspot" at which the representation is provided, not just a location "within the representation" as proposed by Apple.

56. As a POSITA would understand, the graphical element and/or text of a representation of a function may have voids. For example, the representation of the keyboard function (22) is a grid or array of 12 dots with black voids between the dots. Another hypothetical example of a representation could be a large letter "W" which has voids of space within the area where the representation is provided. Accordingly, a POSITA would understand that here, again, the "location where the

19

representation is provided" is larger than just the "location within the representation" and "touched location."

### iii.  The Prosecution File

57.    I understand that the prosecution file is also part of the intrinsic record. I have reviewed the original prosecution history of the application that issued as the '879 Patent.

58.    I understand Apple cites to a portion of a June 30, 2010 Office Action and Response to Office Action allegedly supporting their claim construction position. I disagree with this characterization.

59.    The cited portion of the office action discusses the addition of new dependent claim 49, later granted as claim 17. Specifically, it notes this claim "includes the limitation that the location where the representation is provided does not provide touch functionality for a different function" and notes that "[t]his limitation is supported in the original specification at least at FIG. 1, which shows that the locations of the representations 21, 22, 23 are non-overlapping." '879 File History, June 30, 2010, Amendment and Response to Office Action at 11.

60.    As stated in the prosecution history, the location where a representation is provided does not overlap with locations where other representations are provided. In practical applications of user interface design, representations typically do not overlap, otherwise the display would appear cluttered and confusing. So the Applicant's explanation of the newly-added claim makes sense if the "location where the representation is provided" is not limited solely to a location "within the representation," but rather could extend to the small activatable zone around the representation.

### iv.  Federal Circuit Opinions

61.    I understand that Neonode previously filed a patent infringement action asserting infringement of the '879 Patent against multiple Samsung entities. I understand that some decisions from that litigation were appealed to the United States Court of Appeals for the Federal Circuit ("Federal Circuit"). I further understand that Apple has cited to *Neonode Smartphone LLC v. Samsung Elecs. Co., Ltd.*, No. 2023-2304, 2024 WL 3873566, at *4 (Fed. Cir. 2024) as purportedly offering support for their claim construction positions.

20

62. The portion of the Federal Circuit opinion cited by Apple is consistent with the plain and ordinary meaning of the "location where the representation is provided" and "the touched location" as I have described above. The portion of the Federal Circuit opinion cited by Apple discusses Figure 1 of the '879 Patent and notes "the specification states that 'any one of these three functions 21, 22, 23 can be activated' when an object touches the corresponding representation and moves away from menu area 2 to display area 3." *Neonode Smartphone LLC*, 2024 WL 3873566, at *4. This is consistent with my discussion of the exemplary embodiment shown in Figure 1of the '879 Patent which I include above. It does not require Apple's construction limiting the "location" to being solely "within the representation." In addition, a POSITA would understand that this portion of the opinion is not addressing the construction of "location where the representation is provided" or "the touched location," so it is of limited utility in any event.

### C. "representation of a function" (claim 1)

| Neonode's Proposed Construction | Apple's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning, which may include a graphical element and/or text that represents a function | "a graphical element that enables a user to activate a function, and also represents the function in a cognizable way" |

63. It is my opinion that, in view of the intrinsic record, the term "representation of a function" has a plain and ordinary meaning to a POSITA, which may include a graphical element and/or text that represents a function, and that no further construction is necessary.

### i. The Claim

64. I have been informed that a phrase, like the present one, must be construed within the context of the claim as a whole. Claim 1 reads as follows:

21

> 1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
>
> a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

'879 Patent at 6:45–59.

65. A POSITA would understand from the claim language that a "representation of a function" visually appears in the touch sensitive area.

### ii. The Specification

66. I understand that the specification is always highly relevant to claim construction analysis. The specification provides non-limiting examples of the claimed "representation of a function" in the exemplary embodiment depicted in Figure 1 and the accompanying discussion of these figures in the body of the specification.

67. For example, Figure 1 depicts an exemplary user interface that is "adapted to present a representation of a first 21, a second 22 and a third 23 predefined function." '879 Patent at 4:1–3. The "first function 21 is a general application dependent function, the second function 22 is a keyboard function, and the third function 23 is a task and file manager." *Id.* at 4:4–6. Figure 1 depicts these functions as associated with corresponding representations—a "cross" sign, a 3x4 plot or array, and a "folder" icon—that are graphical elements visually apparent in the touch sensitive area:

22



Fig. 1.

'879 Patent, Fig. 1. The specification teaches an embodiment in which such "representations" are "printed on top of" an enclosure. '879 Patent at 6:17–21. The patent also teaches that "representations" may be otherwise displayed. '879 Patent at 5:2–28.

68.     In this exemplary embodiment, when the first "general application dependent function" is activated, "then the display area 3 is adapted to display icons 211, 212, 213, 214, 215, 216 representing services or functions depending on the current active application." '879 Patent at 4:12–15. When the second "keyboard function" is activated, "then the display area 3 is adapted to display a keyboard 221 and a text field 222." *Id.* at 4:36–38. When the third "task and file manager" function is activated, "then the display area 3 is adapted to display a list 231 with a library of available applications and files on the computer unit." *Id.* at 4:63–65.

69.     The term "representation" is used in other contexts in the specification of the '879 Patent. These uses are probative to understanding the term "representation" and provide insight into how a POSITA would construe the term. For instance, the '879 Patent notes that "[a]n application or file is highlighted by placing some kind of marking 232 on the representation of the application or file. This marking can be done in different ways, for example by putting a frame around the representation

of the application or file, as shown in the figure, or by inverting the representation of the application or file." '879 Patent at 5:8–13. This is illustrated in Figure 6, as shown below:



'879 Patent, Fig. 6.

70.    As shown in Figure 6, a representation may include a graphical element and/or text. Similarly, a POSITA reviewing the entire intrinsic record would understand that a representation of a function may include a graphical element and/or text that represents a function.

71.    To the extent that Apple's proposed construction would limit the "representation" to icons or other visual elements and exclude text, I disagree with that interpretation. As discussed above, the patent teaches that "representations" may may include text. Again, a POSITA would not understand "representation" to have a meaning that is inconsistent with how the word is used in the specification to describe the preferred embodiment.

72.    Apple proposes as part of its proposed construction that a "representation of a function" must "also represent[] the function in a cognizable way." In my opinion, this language is unnecessary, may introduce confusion as to the scope of the term, and could be read to suggest that the term is

24

narrower than how a POSITA would understand the term. For example, it is possible that Apple may later attempt to use its proposed language to argue that "represent the function in a cognizable way" requires that the representation, based solely on its visual depiction and without any context, inform a user as to the associated activatable function; e.g., if the associated function is to transition to a "Help" screen, the representation must depict the word "Help" or the like. This is not how a POSITA would understand "representation of a function," for the reason, among others, that it would exclude the preferred embodiment. With respect to the embodiment shown in Figure 1, the first function (21) is represented by a "cross" graphic and represents a "general application dependent function." While a user of a device may learn through experience to associate the representation with a particular function (depending upon the currently active application), the graphical element representing the function does not inherently inform a user as to the associated function. Additionally, the second function (22) is represented by a 3x4 plot or array and represents a "keyboard function." Similar to the first function, this graphical element representing the keyboard function does not inherently inform a user as to the associated function.

73.    For at least these reasons, Apple's proposed construction of "representation of a function" is inconsistent with how a POSITA would understand the term.

### iii.   The IPRs

74.    I understand that there were two *inter partes* review (IPR) proceedings filed concerning the '879 Patent, one filed by Samsung and Apple Inc. (IPR2021-00144) and the other filed by Google LLC (IPR2021-01041). I understand that Apple has cited to a portion of these IPR proceedings as allegedly providing supporting evidence for their claim construction position. Specifically, Apple has cited to *Samsung Elecs. Co. Ltd., et al v. Neonode Smartphone LLC*, No. IPR2021-00144, Paper No. 23, at 56-66 (PTAB Mar. 17, 2021) ("Samsung IPR POPR"), which is a portion of Patent Owner Neonode's Preliminary Response.

75.    The specific discussion cited to by Apple is in the context of distinguishing the '879 Patent over the Jermyn prior art reference. In particular, Neonode was distinguishing the '879 Patent from a rectangular grid taught in Jermyn that was alleged by IPR Petitioners to be a representation of

25

a function. For context, I have reproduced a portion of Jermyn's rectangular grid that was excerpted in the Samsung IPR POPR:



(a) User inputs desired secret

Samsung IPR POPR at 64.

76.    In the IPR proceedings, Neonode alleged that IPR Petitioners failed to meet their burden in part because Petitioner's expert "never explains why or how the grid corresponds to a representation of a function other than to say one can draw a graphical password on it, which explains nothing." Samsung IPR POPR at 56.

77.    Neonode's statements made in the Samsung IPR POPR are consistent with how a POSITA would understand "representation of a function" as described above. For instance, Neonode noted that "[t]he specification of the '879 Patent provides examples of representations of functions, i.e., the first ("general application dependent function"), second ("keyboard function") and third ("task and file manager") predefined functions, identified in Figure 1 as items 21-23, respectively . . . ." Samsung IPR POPR at 58. Thus, Neonode pointed to the "cross" and "array" representations of the '879 Patent that do not, solely by means of their visual depiction and without any prior learning, inform a user as to the associated functions. Additionally, Neonode noted that "[a] POSA would further understand, upon reviewing the '879 Patent and its associated prosecution file, that a 'representation' may, in addition to icons and other similar images, comprise text and characters." *Id*.

26

78.     During the IPR proceedings, Neonode also stated: "[c]onsistent with the above, a POSA would have understood that a 'representation' represents something, in this case a function. The representation need not necessarily be an image or pictorial depiction of a function, but it must serve to represent the function in some cognizable way. A graphical element that merely enables a user to activate a function, without representing that function, would not have been considered to be a representation of a function." Samsung IPR POPR at 60 (citations omitted). The very next sentence was: "Accordingly, contrary to Dr. Bederson's assertion, a POSA would not have considered Jermyn's grid, or any type of password prompt or password entry field, to be a representation of a function." *Id*.

79.     With this context, a POSITA would understand that the Neonode was not defining "representation" to require that it "represent the function in some cognizable way," but rather was stating a characteristic of a representation that differentiated it from the password entry grid of Jermyn.

**D. "a touch sensitive area in which a representation of a function is provided" (claim 1)**

| Neonode's Proposed Construction | Apple's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a touch sensitive area, divided into a menu area and a display area, wherein a representation of a function is provided in the menu area" |

80.     It is my opinion that, in view of the intrinsic record, the term "a touch sensitive area in which a representation of a function is provided" has a plain and ordinary meaning to a POSITA, and that no construction is necessary.

**i.  Response to Apple's Proposal**

81.     As a preliminary matter, I note that Apple's proposed construction incorporates nearly all of the original claim language. To further illustrate this I have highlighted in yellow the language appearing in both the original claim term and Apple's proposed construction:

27

| Claim Term | Apple's Proposed Construction |
|---|---|
| "a touch sensitive area in which a representation of a function is provided" | "a touch sensitive area, divided into a menu area and a display area, wherein a representation of a function is provided in the menu area" |

82.     Considering the overlap between the original claim term and Apple's proposal, Apple's proposal consists of two principal changes.

83.     First, Apple's proposal replaces the language "in which" with "wherein." In my opinion this is nothing more than stylistic rewriting of the claim language. A POSITA would understand "in which" within the context of the claim term consistent with its plain and ordinary usage. This phrase is not lexicography specific to the patent. Moreover, replacing the phrase "in which" with "wherein" does nothing to further define, explain, or clarify the scope of the claim term. In my opinion, this proposed construction is superfluous and does nothing to actually construe the claim term.

84.     Second, Apple's proposed construction seeks to insert additional language ("divided into a menu area and a display area" and "in the menu area") seeking to attempt to narrow the scope of the claim. A POSITA would understand the plain language of claim 1 as written and not import these additional limitations into the claim. Apple's proposal seeks to insert language that imposes limitations from particular preferred embodiments disclosed in the specification. A POSITA would understand the claim language to be broader and not necessarily limited to the precise preferred embodiments disclosed in the specification.

### ii.  The Claim

85.     I have been informed that a phrase, like the present one, must be construed within the context of the claim as a whole. Claim 1 reads as follows:

28

> 1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
>
> a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

'879 Patent at 6:45–59.

86.     A POSITA would understand the phrase "a touch sensitive area in which a representation of a function is provided" within the context of the language of claim 1 to have its plain and ordinary meaning. That is, a POSITA would understand that the "representation of a function" is provided within the touch sensitive area. Particularly given that the terms "menu area" and "display area" appear nowhere in claim 1, a POSITA would perceive nothing in the claim to mandate that the "touch sensitive area" is "divided into a menu area and a display area" or that the "representation of a function" can only be provided in portion (e.g. a "menu area") of the "touch sensitive area."

### iii.    The Specification

87.     I understand that the specification is always highly relevant to claim construction analysis. As discussed with respect to the term "representation of a function," the specification provides non-limiting examples of the claimed "representation of a function" in the exemplary embodiment depicted in Figure 1 and the accompanying discussion of these figures in the body of the specification.

88.     For example, Figure 1 depicts an exemplary user interface comprising a touch sensitive area 1, which includes a "menu area 2" that is "adapted to present a representation of a first 21, a second 22 and a third 23 predefined function." '879 Patent at 4:1–3. The "first function 21 is a general application dependent function, the second function 22 is a keyboard function, and the third function 23 is a task and file manager." *Id.* at 4:4–6.

29

EXPERT REPORT OF ANTHONY D. ANDRE, PH.D., CPE
REGARDING CLAIM CONSTRUCTION
CASE NO. 3:21-CV-08872-EMC



Fig. 1.

'879 Patent, Fig. 1.

89.    While a preferred embodiment within the specification illustrates the representations of functions being provided in a "menu area," the narrative description of the preferred embodiment, including the description associated with the Figures, is contained within a section titled "DESCRIPTION OF EMBODIMENTS AT PRESENT PREFERRED." '879 Patent at 3:47–48. This section concludes by noting: "[i]t will be understood that the invention is not restricted to the aforedescribed and illustrated exemplifying embodiments thereof, and that these embodiments can be modified within the scope of the inventive concept illustrated in the accompanying Claims." *Id.* at 6:38–42. Thus, a POSITA would understand the patent's description of a preferred embodiment to be an exemplary use case for the invention, not a limitation on the invention's scope.

90.    In addition, when describing Figure 1, the specification expressly notes "[i]t should be understood that there are several different kinds of known touch sensitive displays and that the present invention does not depend on what kind of touch sensitive display that is used in relation to the inventive user interface." '879 Patent at 3:54–58. A POSITA would understand this description to indicate that the invention may be implemented with varying kinds of touch sensitive displays and is not limited to the "divided" display of the preferred embodiment.

30

91.    I further note that, although the "menu area" and "display area" are described in several exemplary embodiments described in the specification, such terminology does not appear in the claims. A POSITA would understand this to indicate that the the claimed invention was not intended to be limited only to embodiments having "a touch sensitive area, divided into a menu area and a display area."

### iv.   The Prosecution File

92.    I understand that the prosecution file is also part of the intrinsic record. I have reviewed the original prosecution history of the application that issued as the '879 Patent.

93.    I understand Apple cites to several portions of the prosecution file to support their claim construction position of adding the "menu area" and "display area" limitations. In my opinion, a POSITA would not understand the cited portions of the file history to suggest that the claimed "touch sensitive area" must be "divided into a menu area and a display area."

94.    First, Apple points to Applicant's August 22, 2006 Amendment to Claims and Remarks. The only independent claim under consideration in that amendment read as follows:

> A user interface for a mobile handheld computer unit, where said computer unit comprises a touch sensitive area, which touch sensitive area is divided into a ***menu area and a display area***, where said computer unit is adapted to run several applications simultaneously, and to present an active application on top of any other application on said ***display area***, characterised in, that said ***menu area*** is adapted to present a representation of a first, a second and a third predefined function, that said first function is a general application dependent function, that said second function is a keyboard function, that said third function is a task and file manager, and that any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said ***menu area*** and with a direction from said ***menu area*** to said ***display area***, said user interface allowing low precision navigation using a blunt object, whereby said user interface can be operated by one hand, where said object can be a finger.

31

'879 File History, August 22, 2006, Amendment at 4 (emphasis added).

95.     The August 22, 2006 Amendment recited multiple claim elements referencing a "menu area" and a "display area." These features were later omitted during prosecution and do not appear in the issued claims. A POSITA would understand that the removal of "menu area" and "display area" from the claims supports the conclusion that the issued claims do not require the claimed "touch sensitive area" to be "divided into a menu area and a display area."

96.     Next, Apple points to Applicant's March 15, 2007 Amendment to Claims and Remarks. The only independent claim under consideration in that amendment read as follows:

A user interface for a mobile handheld computer unit comprising:

a touch sensitive area that is simultaneously divided into a *menu area and a display area*,

the computer unit being adapted to run several applications simultaneously, and to present an active application on top of any other application on the *display area*, characterised in, that

the *menu area* being adapted to simultaneously present representations of a first function that is a general application dependent function, a second function that is a keyboard function, and a third function that is a task and file manager, and

each of the three functions simultaneously represented in the *menu area* being activated by the single step of an object moving in a direction from a starting point that is the representation of the function in the *menu area* to the *display area* being detected by the touch sensitive area, thereby allowing low precision navigation of the user interface using a blunt object, so that the user interface can be operated by one hand, where the blunt object is a finger.

'879 File History, March 15, 2007, Amendment at 2 (emphasis added).

97.     Similar to the prior version of the proposed claims, the March 15, 2007 Amendment recited multiple claim elements referencing a "menu area" and a "display area." A POSITA would understand that the later removal of such terms, and the omission of the concept of a "divided" touch

sensitive area, further supports the conclusion that the issued claims do not require the claimed "touch sensitive area" to be "divided into a menu area and a display area."

98.     Next, Apple points to Applicant's August 23, 2007 Amendment to Claims and Remarks. The only independent claim under consideration in that amendment read as follows:

A computer readable medium storing a computer program with computer program code, which code, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit., the user interface comprising:

a touch sensitive area that is simultaneously divided into a ***menu area and a display area***,

the computer unit being adapted to run several applications simultaneously, and to present an active application on top of any other application on the ***display area***, characterised in, that

the ***menu area*** simultaneously presenting representations of a first function that is a general application dependent function, a second function that is a keyboard function, and a third function that is a task and file manager, and

each of the three functions simultaneously represented in the ***menu area*** being activated by the single step of an object moving in a direction from a starting point that is the representation of the function in the ***menu area*** to the ***display area*** being detected by the touch sensitive area, thereby allowing low precision navigation of the user interface using a blunt object, so that the user interface can be operated by one hand, where the blunt object is a finger.

'879 File History, August 23, 2007, Amendment at 2 (emphasis added).

99.     Similar to the prior version of the proposed claims, the August 23, 2007 Amendment recited multiple claim elements referencing a "menu area" and a "display area." A POSITA would understand that the later removal of such terms, and the omission of the concept of a "divided" touch

33

sensitive area, further supports the conclusion that the issued claims do not require the claimed "touch sensitive area" to be "divided into a menu area and a display area."

100.    Next, Apple points to Applicant's March 14, 2008 Amendment to Claims and Remarks. The only independent claim cited as supporting evidence by Apple in that amendment read as follows:

> A computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
>
> a touch sensitive area that is simultaneously divided into a ***menu area and a display area***,
>
> the mobile handheld computer unit being adapted to run several applications simultaneously, and to present an active application on top of any other application on said ***display area***, characterised in, that:
>
> said ***menu area*** simultaneously presents representations of a first function that is a general application dependent function, a second function that is a keyboard function, and a third function that is a task and file manager, and
>
> each of said first. second, and third functions simultaneously represented in said ***menu area*** being activated by the single step of a blunt object moving in a direction from a starting point that is the representation of the corresponding one of said first, second, and third functions in said ***menu area*** to said ***display area*** being detected by said touch sensitive area, thereby allowing low precision navigation of the user interface using the blunt object, so that the user interface can be operated by one hand, where the blunt object is a finger.

'879 File History, March 14, 2008, Amendment at 2 (emphasis added).

101.    Similar to the prior version of the proposed claims, the March 14, 2008 Amendment recited multiple claim elements referencing a "menu area" and a "display area." A POSITA would understand that the later removal of such terms, and the omission of the concept of a "divided" touch

34

sensitive area, further supports the conclusion that the issued claims do not require the claimed "touch sensitive area" to be "divided into a menu area and a display area."

102.    Next, Apple points to a July 11, 2008 Final Office Action.[2] The portion cited by Apple specifically refers to the examiner's remarks in response to the applicant stating:

> The Examiner reviewed the demonstration as encouraged by the Applicant. In light of the video demonstration, the Examiner can now see the difference between the prior art of record and the present application. With that being said the Examiner feels that the limitations, as claimed, were reasonably interpreted and the current limitations are still too broad to suggest without research what was shown in the video demonstration. For instance Conrad teaches as pointed out by applicant clicking a window in a menu title bar, dragging the cursor and placing it in the display region (page 19 of 32), which is exactly activating by a single step of an object moving in a direction from a starting point that is a representation of the function in the menu area to the display area. The function being activating or parking the window in the display area. The combination of the references is what teaches the limitations of claim 1, not Conrad or Palm OS alone.

'879 File History, July 11, 2008, Final Office Action at 16.

103.    Subsequently, on September 8, 2008, the Applicant amended the sole pending independent claim to read as follows:

> A computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

---

[2] Apple's Joint Claim Construction Statement cites to a purported June 23, 2008 Final Office Action, which does not appear to exist. For purposes of discussion, I have assumed that Apple intended to refer to the July 11, 2008 Final Office Action.

35

a touch sensitive area in which representations of a plurality of functions are displayed, and each function of said plurality of functions being mapped to a corresponding location in the touch sensitive area at which the representation of the function is displayed, and being activated by an object touching the corresponding location and then gliding along the touch sensitive area away from the location.

'879 File History, September 8, 2008, Amendment and Response to Office Action at 5.

104. The September 8, 2008 Amendment removed all limitations restricting the scope of the claim to a "touch sensitive area" that is "divided" into a "menu area" and a "display area." The claims as ultimately allowed by the Examiner did not recite such features.

105. In my opinion, a POSITA would understand from the prosecution history that the "touch sensitive area in which a representation of a function is provided" does **not** require that the touch sensitive area be divided into a "menu area" and a "display area" as Apple asserts.

### E. "object gliding along the touch sensitive area away from the touched location" (claim 1)

| Neonode's Proposed Construction | Apple's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "object gliding along the touch sensitive area away from the touched location in the direction of the display area" |

106. It is my opinion that, in view of the intrinsic record, the term "object gliding along the touch sensitive area away from the touched location" has its plain and ordinary meaning.

#### i. Response to Apple's Proposal

107. As a preliminary matter, I note that Apple's proposed construction incorporates all of the original claim language. To further illustrate this I have highlighted in yellow the language appearing in both the original claim term and Apple's proposed construction:

36

EXPERT REPORT OF ANTHONY D. ANDRE, PH.D., CPE
REGARDING CLAIM CONSTRUCTION
CASE NO. 3:21-CV-08872-EMC

| Claim Term | Apple's Proposed Construction |
|---|---|
| "object gliding along the touch sensitive area away from the touched location" | "object gliding along the touch sensitive area away from the touched location in the direction of the display area" |

108.    Considering the overlap between the original claim term and Apple's proposal, Apple's proposal consists of one principal change. Apple's proposed construction seeks to insert additional language ("in the direction of the display area") seeking to attempt to narrow the scope of the claim. A POSITA would understand the plain language of claim 1 as written and not import these additional limitations into the claim. Apple's proposal seeks to insert language that imposes limitations from particular preferred embodiments disclosed in the specification. A POSITA would understand the claim language to be broader and not necessarily limited to the precise preferred embodiments disclosed in the specification.

### ii. The Claim

109.    I have been informed that a phrase, like the present one, must be construed within the context of the claim as a whole. Claim 1 reads as follows:

> 1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
> a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

'879 Patent at 6:45–59.

110.    A POSITA would understand the phrase "object gliding along the touch sensitive area away from the touched location" within the context of the language of claim 1 to have its plain and ordinary meaning. Nothing within the language of the claim suggests or mandates that the "touch

37

sensitive area" be divided into specific sections (e.g. a menu area and a display area) or that the gliding movement glide in the direction of a "display area." In fact the term "display area" appears nowhere in claim 1.

### iii.   The Specification

111.    I understand that the specification is always highly relevant to claim construction analysis. As discussed with respect to the term "representation of a function" and previously with the term "a touch sensitive area in which a representation of a function is provided," the specification provides non-limiting examples of the claimed "representation of a function" in the ***exemplary*** embodiment depicted in Figure 1 and the accompanying discussion of these figures in the body of the specification.

112.    For example, Figure 1 depicts an exemplary user interface that includes a "menu area 2" that is "adapted to present a representation of a first 21, a second 22 and a third 23 predefined function." '879 Patent at 4:1–3. The "first function 21 is a general application dependent function, the second function 22 is a keyboard function, and the third function 23 is a task and file manager." *Id.* at 4:4–6.



'879 Patent, Fig. 1.

38

113.    Figure 2 depicts an illustration to show how the user interacts with the touch sensitive area such that the "three functions 21, 22, 23" can be activated. *Id.* at 4:7–8. As noted above, the functions are activated "when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3." *Id.* at 4:8–12. A POSITA would understand Figure 2 to be illustrating the multi-step touch-and-glide operation that includes the object gliding "along the touch sensitive area" and "away from the touched location."

Fig. 2.

'879 Patent, Fig. 2.

114.    A POSITA would understand that the purpose of Figure 2 is to illustrate the touch-and-glide operation. That is Figure 2 helps illustrate the movement of a glide gesture. The specific location that the object must glide along and away from depends on the specific representation of the function in the particular embodiment. While the specification discusses "a movement of an object 4 with its starting point A within the representation of a function on the menu area 2 and with a direction B from

39

the menu area 2 to the display area 3," the locations of a "menu area" and "display area" are specific to the particular preferred embodiment described in the specification. *Id.* at 4:8–12.

115. While a preferred embodiment within the specification illustrates the representations of functions being provided in a "menu area," a POSITA would understand this be an exemplary use case for the invention, not a limitation on the invention's scope. For instance, the specification notes the purpose of the drawings is to "describe[] [the present invention] in more detail." '879 Patent at 3:20–21. The narrative description of these drawings within the specification is contained within a section titled "DESCRIPTION OF EMBODIMENTS AT PRESENT PREFERRED." '879 Patent at 3:47–48. This sections concludes by noting: "It will be understood that the invention is not restricted to the aforedescribed and illustrated exemplifying embodiments thereof, and that these embodiments can be modified within the scope of the inventive concept illustrated in the accompanying Claims." *Id.* at 6:38–42.

116. Indeed, when describing Figure 1, the specification expressly notes "[i]t should be understood that there are several different kinds of known touch sensitive displays and that the present invention does not depend on what kind of touch sensitive display that is used in relation to the inventive user interface." '879 Patent at 3:54–58. A POSITA would understand this description to suggest that the invention is flexible regarding both the hardware used for the touch sensitive area, as well as the visual presentation of the representations of functions within the touch sensitive area.

117. I further note that the "menu area" and "display area" are described in several exemplary embodiments described in the specification, however, this language is conspicuously absent from the claims. A POSITA would understand this intentional omission to indicate that the scope of the invention was not intended to be limited only to embodiments containing a menu and display area.

#### iv. The Prosecution File

118. I understand that the prosecution file is also part of the intrinsic record. I have reviewed the original prosecution history of the application that issued as the '879 Patent.

119. I understand Apple cites to several portions of the prosecution file as allegedly supporting its claim construction position of adding the additional "in the direction of the display area"

40

limitation. I note that the prosecution history evidence cited by Apple is identical to the prosecution history evidence cited by Apple for the term "a touch sensitive area in which a representation of a function is provided." For the same reasons as I explained with respect to "a touch sensitive area in which a representation of a function is provided," I disagree with Apple's position that these portions of the prosecution file support its proposed construction. In fact, the cited portions of the file history suggest to a POSITA that Apple's "in the direction of the display area" language improperly limits the scope of the claim and should not be incorporated into a construction of this phrase.

120.    I incorporate my prosecution history discussion with respect to "a touch sensitive area in which a representation of a function is provided" herein.

121.    As I explained with respect to "a touch sensitive area in which a representation of a function is provided," while earlier versions of claims proposed limitations requiring a menu area and a display area, the September 8, 2008 Amendment (and the ultimately issued claims) removed this limitation and instead focused on other novel aspects of the claimed invention (e.g. the touch-and-glide movement input method). Accordingly, the prosecution history supports my opinion that this term should be accorded its plain and ordinary meaning, and that a POSITA would not understand the phrase to have the meaning proposed by Apple.

### F.  "one step" (claim 12)

| Neonode's Proposed Construction | Apple's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

122.    It is my opinion that, in view of the intrinsic record, the term "one step" has a plain and ordinary meaning to a POSITA, and that no construction is necessary. It is further my opinion that a POSITA, in 2002 as today, would understand the meaning of "one step" as used in claim 12 with reasonable certainty.

### i.  The Claim

123.    I have been informed that a phrase, like the present one, must be construed within the context of the claim as a whole. Claim 12,which depends from claim 1, reads as follows:

41

> **12.** The computer readable medium of claim **1**, wherein the user interface is characterised in, that an active application, function, service or setting is advanced one step by gliding the object along the touch sensitive area from left to right, and that the active application, function, service or setting is closed or backed one step by gliding the object along the touch sensitive area from right to left.

'879 Patent at 8:13–19.

124.    A POSITA would understand the phrase "one step" within the context of the claim language to refer to a discrete unit within the context of the user interface.

### ii.    The Specification

125.    I understand that the specification is always highly relevant to claim construction analysis. The specification provides further context for the claimed "one step" in the exemplary embodiment depicted in Figures 11 and 12 and the accompanying discussing of these figures in the body of the specification.

126.    Specifically, the specification describes Figures 11 and 12 as follows:

> FIG. 11 shows that moving U the object 4 from the left of the display area 3 to the right of the display area 3 moves the active application, function, service or setting on one step forwards. FIG. 12 shows that, in a similar manner, the active application, function, service or setting is closed or backed one step by moving V the object 4 from the right of the display area 3 to the left of the display area 3.

'879 Patent at 5:57–63.

42



Fig. 11.



Fig. 12.

'879 Patent at Figs. 11–12.

127.    A POSITA would understand what is being described and shown in the specification to show that the active application, function, service or setting is advanced or moved backward one discrete unit. For instance, the arrows U and V shown in Figures 11 and 12 are shown across the entirety of the display rather than only a portion. A POSITA would understand that the movement being depicted is different from continuous scrolling, but instead must be a discrete action moving the active application, function, service or setting forward or backward by one discrete unit.

### iii.   The Prosecution File

128.    I understand that the prosecution file is also part of the intrinsic record. I have reviewed the original prosecution history of the application that issued as the '879 Patent.

43

129.    I understand Apple cites to a March 14, 2008 Response to Non-Final Office Action as allegedly supporting evidence for their position that "one step" is indefinite. I disagree with this characterization.

130.    The cited portion of the office action discusses distinguishing the TealDoc application discussed in the Carlson prior art publication. '879 File History, March 14, 2008, Response to Non-Final Office Action at 22–23. The Applicant noted that "the TealDoc application presents a horizontal conventional-type scroll bar near the bottom of the display screen." *Id.* The Applicant then distinguished the reference noting that "scrolling through a document, which is a continuous, flowing process during the drag of the slider, cannot reasonably be said to be 'moving on one step' or 'backed one step,' each of which is inherently a discrete action." *Id.*

131.    This is consistent with what I describe based on the specification's discussion of Figures 11 and 12. A POSITA would understand "one step" to refer to a discrete unit within the context of the user interface.

132.    I also note that in the March 14, 2008 Response to Non-Final Office Action, the Applicant directs the examiner to review a Neonode N2 Advertisement Demonstration Video that demonstrates several functions discussed in the patent application. '879 File History, March 14, 2008, Response to Non-Final Office Action at 15–16. I reviewed this video as well and have found it shows several features of '879 Patent, including advancing and backing "one step." For instance the video shows the Neonode N2 using "tabs" at the top of the display to advance or back one step through active applications.

### iv.    A POSITA Would Understand "One Step" With Reasonable Certainty

133.    I understand that in its invalidity contentions, Apple has asserted that "one step" is indefinite because "it is not reasonably clear what metric constitutes a 'step,' and may vary across subjective points of view." Apple has not further elaborated on the basis for its indefiniteness contentions, nor has Apple yet served any expert reports in support of this contention.

134.    I note that it is my understanding that Apple bears the burden of proof to show by clear and convincing evidence that a claim term is indefinite. It is my opinion that Apple's description

44

provided in its invalidity contentions and the supporting evidence cited by Apple in the Joint Claim Construction Statement fails to meet this burden. To the extent Apple provides supplemental evidence in support of its indefiniteness theory, including expert declarations, I reserve the right to rebut that evidence.

135.    A POSITA would understand, after reviewing the intrinsic record, that as of 2002 and as of today, the "one step" would be understood with reasonable certainty to have its plain and ordinary meaning. A POSITA would understand "one step" within the context of claim 12 to refers to a discrete unit. A POSITA would be able to identify "one step" with reasonable certainty.

136.    Apple contends that "it is not reasonably clear what metric constitutes a 'step,'. . ." It is unclear what Apple means by the term "metric" here. If Apple means a particular unit of measure (e.g., inches, centimeters, etc.), then the contention is misguided. The "step" is not directed or confined to any particular unit of measure, but rather refers to one unit within the context of the particular active application, function, service or setting. For example, in a camera application it could refer to advancing or backing through a series of images, one image at a time.

137.    Moreover, a POSITA would not find that the understanding of "one step" is subject to "subjective points of view." As discussed above, the specification and prosecution history provide clear examples of use cases showing "one step." Moreover, a POSITA would be able to identify functionality that advances or backs by one step (e.g. a discrete unit) and distinguish that functionality with certainty from continuous scrolling functionality.

45

Signed at Reno, Nevada on the 24th of February, 2026.

_____
Anthony D. Andre, Ph.D., CPE

46

# EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NEONODE SMARTPHONE LLC, | No. 3:21-cv-08872-EMC |
| Plaintiff, | |
| v. | **SUPPLEMENTAL EXPERT REPORT OF ANTHONY D. ANDRE, PH.D., CPE REGARDING CLAIM CONSTRUCTION** |
| APPLE INC., | |
| Defendant. | |

I, Anthony D. Andre, hereby declare as follows:

1.      I have been retained as an expert witness on behalf of Neonode Smartphone LLC ("Neonode" or "Plaintiff") in the above-referenced litigation. I understand that Neonode has alleged that Apple Inc. ("Apple" or "Defendant") infringes U.S. Patent No. 8,095,879 (the "'879 Patent"). I previously submitted a report dated February 24, 2026 regarding claim construction in this matter. I understand that the parties have exchanged updated claim construction positions regarding two terms. Accordingly, I submit this supplemental report to address the parties' updated claim construction positions as to those terms.

2.      Similar to my prior report, this expert report sets forth the basis and reasons for my opinions as to how a person of ordinary skill in the art would understand certain claim terms of the '879 Patent. This expert report does not set forth all opinions I may have regarding the '879 Patent. I reserve the right to submit additional expert reports or declarations on other issues and to amend or supplement my opinions in the course of this litigation.

3.      This expert report is based on the information available and known to me as of the date of this report, including the '879 Patent, its file history and any other documents and materials referenced in this report. I also reviewed and considered the parties' Joint Claim Construction Statement, updated claim construction disclosures, and the supporting evidence cited therein. I may use all or any of these materials, other materials that have been or will be produced during the course of this litigation, and supplemental charts, models, demonstratives, and other representations based on those materials, to support my testimony at a hearing, deposition, or other proceeding regarding my opinions related to claim construction. In reaching the opinions expressed in this report, I have also relied on my education, teaching, research, and product development experience, as well as my understanding of the applicable legal principles. It may be necessary for me to supplement this report based on material that subsequently comes to light in this case, including any expert report that Apple may provide, and I reserve the right to do so.

4.      I have no financial interest in the outcome of this case, in any of the parties to this case, or in any party that I understand to be related to the parties in this case. I am being compensated at the rate of $525.00 per hour. My compensation is unrelated to the outcome of this litigation.

## I.      SUPPLEMENTAL AND REVISED CLAIM CONSTRUCTIONS

5.      I understand that Apple has provided a revised construction for "location where the representation is provided" / "the touched location." I also understand that Apple has provided a supplemental construction for "comprising" as used in Claim 1 following "multi-step operation." Accordingly, I address these two terms in this supplemental report.

### A. "location where the representation is provided" / "the touched location" (claims 1, 17)

| Neonode's Proposed Construction | Apple's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | "starting location where the representation is provided, wherein the starting location determines what function to activate"[1] |

6.      For the reasons outlined in my initial report, as well as for the additional reasons outlined below, it remains my opinion that, in view of the intrinsic record, a POSITA would give the terms "location where the representation is provided" and "the touched location" their plain and ordinary meaning rather than the meaning Apple suggests.

7.      First, regarding Apple's proposal that the recited "location" is a "starting location," a POSITA would find nothing in the plain language of the claim that supports this interpretation or that

[1] In its Joint Claim Construction Statement, Apple alleged this term was indefinite. I understand that Apple has now offered a proposed construction and "no longer intends to pursue an indefiniteness argument for this term." It is my opinion that a POSITA, in 2002 as today, would understand the meanings of "location where the representation is provided" and "the touched location" as used in claims 1 and 17 with reasonable certainty. Given Apple's representation, however, I will not respond further in this Report regarding indefiniteness, although I reserve my right to do so should it prove necessary.

3

clearly restricts the activated function to the location of the start of contact with the touch sensitive area.

8.      Second, Apple's proposal is inconsistent with the plain and ordinary meaning of the claim language to a POSITA because it injects an additional limitation ("wherein the starting location determines what function to activate") that is not only absent from the claim but also would be irrelevant to a POSITA's understanding of the claim language. In my opinion, this added limitation does not shed light on a POSITA's understanding of the claimed "location," but rather it adds an unnecessary and unsupported additional limitation regarding what determines the function to be activated. A POSITA would understand "location" according to its plain meaning as a noun, not as a verb phrase directed to the operation of the handheld device recited in the preamble.

9.      In addition, Apple's additional language is unnecessary because the claim already specifies to a POSITA how the function is activated. Specifically, the claim language specifies that "the representation consists of only one option for activating the function" and that "the function is activated by a multi-step operation" comprising specified actions. '879 Patent at 6:45–59. Because this detail is already in the claim, a POSITA would not understand different claim language—the "location" terms at issue—to be burdened with Apple's proposed additional (but unrecited) limitation regarding function activation.

10.     My opinion is further supported by the prosecution history. In addition to portions of the prosecution history addressed in my initial report, I understand that Apple has cited to additional alleged supporting evidence in the prosecution history, including an April 22, 2009 Response to Office Action. *See* NEONODE0000390. There, the applicant noted that "[t]he touch-and-glide movement of the subject claimed invention activates a function that corresponds to the icon displayed at a touch point." *Id.* The applicant also noted that a "touch-and-glide" movement includes when "a finger touches a touch-sensitive screen at a location where an icon for a function is displayed, and then rubs/swipes/glides, along the touch screen away from the location without lifting the finger." *Id.* A POSITA would not understand this prosecution history to limit the "touched location" to strictly the

4

"starting location," or to require that any "starting location" must *determine* what function to activate."

11.     Apple further cites to a September 8, 2008 Response to Office Action distinguishing the Carlson reference.[2] *See* NEONODE0000339. There, the applicant distinguished the claimed invention from the "one-stroke pen drag" disclosed in Carlson. The context of this discussion is about distinguishing Carlson's pen drag, which could only activate one pre-designated function regardless of where the drag occurred on the display, from the invention as recited in the then-existing version of claim 1, which allowed for activation of different functions depending on what function was mapped to the touch point. That is, the applicant distinguished the claimed invention from the location-agnostic vertical dragging operation disclosed by Carlson.

### B.  "comprising" (Claim 1, after "multi-step operation")

| Neonode's Proposed Construction | Apple's Proposed Construction |
|---|---|
| "including but not limited to" | "consisting of" |

12.     It is my opinion that, in view of the intrinsic record, a POSITA would understand the term "comprising" (Claim 1, after "multi-step operation") in the context of Claim 1 to mean "including but not limited to." That is, the term "comprising" should be read as open claim language that permits, but does not require, additional steps as part of the multi-step operation.

### i.  The Claim

---

[2] Apple also cites to a September 3, 2008 examiner interview agenda containing a similar table.

SUPPLEMENTAL EXPERT REPORT OF ANTHONY D. ANDRE,
PH.D., CPE REGARDING CLAIM CONSTRUCTION
CASE NO. 3:21-CV-08872-EMC

13.     I have been informed that a phrase, like the present one, must be construed within the context of the claim as a whole. Claim 1 reads as follows:

> 1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
>
> a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

'879 Patent at 6:45–59.

14.     A POSITA would understand from the claim language that the inventor chose to use "comprising" rather than "consisting of." If the inventor intended "consisting of," a POSITA would expect that phrasing to have been used. It was not. Further, a POSITA would understand from the context that "comprising" is open claim language. That is, the two steps recited in claim 1 are required steps of the claimed operation, but that operations having one or more additional steps would still be within the scope of the claim.

15.     In particular, a POSITA would understand the term "multi-step" to be open-ended. "Multi" indicates to a POSITA that the recited operation includes at least the two recited steps, but that the operation could also include one or more additional steps. A POSITA would understand that, if the inventor intended for the claim language to be closed-ended—i.e., that the recited operation must consist *only* of the two recited steps, and that operations including one or more additional steps would be outside the scope of the claim—the inventor would have instead used a term like "two-step."

16.     In addition, a POSITA would understand that, during performance of the recited gesture on a mobile handheld computer unit, the recited "object" likely would be lifted off the touch sensitive surface at some point after the gliding. Considering liftoff (or other step following gliding) as part of the user interface design process could be useful to a POSITA in some contexts. For instance, a

6

POSITA might employ such an additional step in order to reduce unintended activations. So for this additional reason, a POSITA would not understand "comprising" after "multi-step operation" to exclude a multi-step operation in which activation occurs after a step following the gliding, such as liftoff of the object.

### ii.   The Specification

17.    I understand that the specification is always highly relevant to claim construction analysis. The specification provides further context regarding the meaning to a POSITA of "comprising" as used in claim 1.

18.    For instance, in its description of Figure 2, the specification notes that a function "***can be*** activated when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3." '879 Patent at 4:7–11 (emphasis added). The use of the language "***can be*** activated"—as compared to, for example, "*is* activated"—would suggest to a POSITA that touching and gliding are required but not necessarily sufficient steps to activate a function. That is, these two steps alone may be sufficient to activate the function, but in some cases one or more additional steps may needed for function activation. I note that the "can be activated" language appears in several places in the specification. *See* '879 Patent at Abstract, 2:12, 2:41, 4:51–52. If the specification alternatively said that a function "is activated" "when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3," that would more clearly suggest to a POSITA that activation always occurs upon performance of only the two recited steps (touching, then gliding away) and that additional steps are never needed.

19.    Furthermore, the specification does not suggest to a POSITA that activation ***must*** occur prior to any subsequent step, such as removal of the object from the touch sensitive area (e.g. "liftoff"). As discussed above, a POSITA would understand that the object (e.g. finger or stylus), must be removed or lifted off the touch sensitive area at some point after gliding. A POSITA would further

understand that this liftoff action may, but is not required, to be considered when determining whether to activate a function.

### iii.   The Prosecution File

20.    I understand that the prosecution file is also part of the intrinsic record. I have reviewed the original prosecution history of the application that issued as the '879 Patent.

21.    I reviewed the portion of the prosecution history where the applicant amended the claim to include "a multi-step operation comprising." NEONODE0000491. I understand that this claim language was added in part to distinguish the Hoshino prior art reference. NEONODE0000496–99. As the applicant explained, "the claimed invention responds to a (hard) touch followed by a glide differently than Hoshino. Specifically, the claimed invention activates a function after the glide, whereas Hoshino activates the function after the (hard) touch." A POSITA would understand that the applicant was clarifying that both the touch and glide steps must occur before activation of the function, but that the claim does not exclude from the scope of the claim possible additional steps needed to activate a function (such as lifting the object off the display).

22.    I understand that, during prosecution, the applicant referred the examiner to a Neonode N2 Advertisement Video available on Neonode's website as illustrating "features disclosed in the current patent application" (e.g., the gliding gesture of the invention). NEONODE0000214-15. In preparing this declaration, I reviewed the Neonode N2 Advertisement Video and assessed it from the perspective of a POSITA.

23.    A POSITA would understand that the Neonode N2 Advertisement Video shows functions being activated after an object (thumb) touches the touch sensitive area, glides away from the touched location, and then lifts off. A POSITA would understand this video, together with the applicant's assertions about it, to support the conclusion that "comprising" as used in the claim means including but not limited to. That is, a POSITA would understand the depicted activation gesture— touching, gliding, then lifting off—to be included within the scope of the claim.

24.    I further understand that earlier versions of the proposed claim during prosecution referenced "the single step of an object moving in a direction from a starting point that is the

8

representation of the function in the menu area to the display area being detected by the touch sensitive area . . . ." NEONODE0000107–108, 149–150, 201. During prosecution this "single step" language was removed. *See* NEONODE0000317–318. The applicant's removal of the "single step" language during prosecution would further indicate to a POSITA that the ultimately issued claim is open-ended because it uses the term "multi-step." Again, if the inventor intended the claim to be close-ended, the inventor knew how to do that (for example, by using "two-step" rather than "multi-step").

25. Apple cites to a September 8, 2008 Response to Office Action distinguishing the Carlson prior art reference.[3] *See* NEONODE0000339. In my opinion, a POSITA would understand those remarks by the applicant to be characterizing the movement required by the claimed invention's "touch-and-glide" movement, but not as prohibiting the inclusion of additional steps.

26. Apple further cites to an April 22, 2009 Response to Office Action. *See* NEONODE0000390–393. There, the applicant asserted that the "frame-guided movement of Nakajima is of a fundamentally different nature than the touch-and-glide movement of the subject claimed invention." NEONODE0000392. In my opinion a POSITA would understand the focus of this discussion to be distinguishing the movement required by the required steps of the multi-step operation from movements found in the prior art. A POSITA would not understand this cited portion of the prosecution history to exclude or foreclose optional additional steps as part of the operation for activating a function.

27. Finally, Apple cites to a February 22, 2010 Response to Office Action. *See* NEONODE0000496–499. There, the applicant distinguished the movement and the sequencing of operations in the Nakajima and Hoshino prior art references. A POSITA would understand the focus of this discussion to be distinguishing the movement required by the required steps of the multi-step operation from movements found in the prior art. In my opinion, a POSITA would not understand this cited portion of the prosecution history to exclude or foreclose optional additional steps as part of the operation for activating a function.

---

[3] Apple also cites to a September 3, 2008 examiner interview agenda containing a similar table.

9

Signed at Reno, Nevada on the 16th of March, 2026.

_____
Anthony D. Andre, Ph.D., CPE

SUPPLEMENTAL EXPERT REPORT OF ANTHONY D. ANDRE,
PH.D., CPE REGARDING CLAIM CONSTRUCTION
CASE NO. 3:21-CV-08872-EMC

# EXHIBIT 5

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| NEONODE SMARTPHONE LLC,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.<br><br>Defendant. | Case No. 3:21-cv-08872-EMC |

## SUPPLEMENTAL EXPERT WITNESS REPORT OF DR. ANDREW COCKBURN
### REGARDING CLAIM CONSTRUCTION

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 2

II.     BACKGROUND AND QUALIFICATIONS ...................................................... 2

III.    LEGAL PRINCIPLES ........................................................................................ 7

   A.   Person of Ordinary Skill in the Art ................................................................ 7

   B.   Claim Construction ........................................................................................ 8

   C.   Indefiniteness ................................................................................................. 9

IV.     PERSON OF ORDINARY SKILL IN THE ART .............................................. 9

V.      MATERIALS CONSIDERED .......................................................................... 10

VI.     THE ASSERTED PATENT .............................................................................. 11

VII.    THE DISPUTED CLAIM TERMS .................................................................. 13

VIII.   THE PARTIES' PROPOSED CONSTRUCTIONS .......................................... 14

IX.     ANALYSIS ....................................................................................................... 15

   A.   "Representation of a function" ..................................................................... 15

   B.   "A touch sensitive area in which a representation of a function is provided" ................. 22

   C.   "Object gliding along the touch sensitive area away from the touched location" ........... 30

   D.   "Duplicated" ................................................................................................. 34

   E.   "Location where the representation is provided" / "the touched location" ..................... 34

   F.   "Comprising" ................................................................................................ 38

   G.   The term "one step" is indefinite because the intrinsic record fails to inform a POSITA with reasonable certainty about the scope of this term ........................................... 44

X.      CLOSING REMARKS ...................................................................................... 48

I, Dr. Andrew Cockburn, declare as follows:

## I.    INTRODUCTION

1.    I have been retained as a technical expert by Defendant Apple, Inc. ("Apple") for this litigation.

2.    I understand that the parties have asked the Court to construe certain terms of the patent claims asserted by Plaintiff Neonode Smartphone LLC ("Neonode") against Apple.

3.    I understand that Neonode asserts claims 1–5, 12–13, 15–17 of U.S. Patent No. 8,095,879 (the "'879 patent").

4.    I am being compensated for my work in connection with this litigation at my customary hourly consulting rate of $600/hour plus reasonable expenses.  My compensation is not in any way contingent on the substance of my opinions or the outcome of this litigation.  I have no prior affiliation with Apple or Neonode.  I have no interest, financial or otherwise, in the outcome of the current patent infringement litigation between the parties.

5.    This report is based on the information available and known to me as of the date of this report.  It may be necessary for me to supplement this report based on material that subsequently comes to light in this case, and I reserve the right to do so.

## II.    BACKGROUND AND QUALIFICATIONS

6.    In formulating my opinions, I have relied on my knowledge, training, and experience in the relevant field.  My education and experience are described more fully in the attached *curriculum vitae* (Appendix A).  For ease of reference, I have highlighted certain information below.

7.    Until my recent retirement from teaching, I was a Professor at the Department of Computer Science and Software Engineering at the University of Canterbury, New Zealand.  I also

headed the HCI (which stands for "Human-Computer Interaction") and Multi-Media research group at the University of Canterbury.

8. In 1988, I was awarded a Bachelor of Science with Honors in Computer Science from the University of York, England.

9. In 1993, I was awarded a Ph.D. from the University of Stirling, Scotland. My thesis was on "Computer Supported Cooperative Work" which relates to forms of group interaction supported on computer.

10. In 1993, I joined the University of Canterbury as a Lecturer in the Department of Computer Science (now the Department of Computer Science and Software Engineering). I was subsequently promoted to a Senior Lecturer, and then an Associated Professor, before my appointment as a Professor in 2010.

11. I have over 30 years experience in the area of human-computer interaction ("HCI"). The field of HCI generally is concerned with ways of understanding and improving the interaction between humans and computers, with a view to understanding, evaluating, designing and building new styles of interactions that improve on one or more of the end goals of making computers (including mobile devices) faster to learn, more intuitive, and more efficient and satisfying to use. Advances in the field of HCI are commonly associated with the development of new hardware and/or software, such as exploring the interaction possibilities enabled by a new input/output device or sensor, and examining new ways to process human input or create new interactive effects in software.

12. Throughout my career, I have published the results of many research projects that have involved building new user interfaces or reviewing existing user interfaces for performing a particular task, and evaluating their effectiveness. This includes publications relating to:

3

- designing, implementing, and evaluating scrolling interactions that are activated at the edge of a display region, such as a window;

- developing and evaluating improved methods for pointing to and selecting small targets such as window edges;

- designing, implementing, and evaluating touchscreen interface for pen-based input of music notation;

- reviewing and improving various interface schemes for traversing through documents in computer applications, including zooming, scrolling, and other techniques;

- addressing the problems arising from the small form factor of mobile devices with touch-sensitive displays;

- evaluating the importance of spatially stable displays in user interfaces;

- analyzing new interfaces for text entry on mobile and touch-sensitive devices;

- examining the influence of haptic feedback on user performance with mouse and touchscreen input devices; and

- designing, implementing, and evaluating interfaces to better support transitions from novice to expert performance.

13.    I also have extensive experience in designing and building new user interfaces and reviewing existing user interfaces. This includes a number of projects regarding the design, development, and evaluation of user interfaces that I have undertaken with companies in the computing and HCI industry, such as:

4

- working with Airbus SAS from 2016-2019 on methods to assist pilot interaction with touchscreens in turbulent environments, including pan, slide, and zoom operations;

- working with Hewlett-Packard Research Labs from 2010-2012 on the design and evaluation of pointing techniques for remote displays, such as interactive TVs;

- a number of projects from 2006-2010 working with Logitech on the design, development, evaluation and improvement of user interfaces for next generation mice, including in relation to scrolling and window management tasks through overview displays, which relate to zooming;

- working with IBM Almaden Research in 2006 on the design, development and evaluation of user interfaces for touch-sensitive text entry on mobile devices;

- working with Digit Wireless in 2002 on the evaluation of user performance for user interfaces for digital text entry on mobile devices; and

- working with Microsoft Research in 1999 on the development, evaluation, and improvement of user interfaces for web browsing, in particular the mechanisms for revisiting pages (such as through the "back" button or bookmarks).

14. Below are some exemplary courses I taught while employed at the University of Canterbury:

- a course on introductory computer programming designed for first year students across disciplines;

- a course on computer science research methodology for postgraduate students;

5

- courses on HCI for computer science students at all university levels (including honors and masters level students).

15. I also managed an active research lab with a number of graduate level students. I have previously supervised sixteen students to successful completion of their Ph.D.'s in the field of HCI.

16. In 2015 I was elected to the Association of Computing Machinery (ACM) Computer Human Interaction (CHI) Academy, which honors the principal leaders of the field of HCI. I have been a continuous member of the ACM for over three decades.

17. Since the early 1990s, I have routinely attended annual conferences relating to the field of HCI and have regularly read journals that cover research in the field of HCI.

18. I have served on the editorial boards of leading journals in the HCI field (including ACM transactions on Computer-Human Interaction, Human-Computer Interaction Journal, and International Journal of Human-Computer Studies, Interacting with Computers, and Foundations and Trends In Human Computer Interaction), and have participated in the review process for numerous articles, including articles related to sliding interactions on touch-sensitive input devices.

19. I have served in senior leadership roles for the leading conference in the field of HCI—the ACM CHI Annual Conference on Human Factors in Computing Systems. I was technical program co-chair for CHI 2020, I served as paper and notes chair for CHI 2014 and 2015, and as subcommittee chair for CHI 2011. I served on the inaugural steering committee for the ACM CHI conference (2016-2020).

20. I have authored over one hundred and fifty publications related to HCI in international journals and conferences.

6

21.	Details of my professional qualifications and background are more fully set forth in my curriculum vitae, a copy of which is attached as Appendix A.

22.	I have previously offered testimony as an expert witness in the field of HCI.  A list of my prior engagements in which I testified as an expert at trial or by deposition is also included in my CV.

23.	Based on my background and experience, as set forth more fully in my CV, I am familiar with the state of the art in the field of user-interface design and development as of December 10, 2002, which I understand is the filing date of the application that issued as the '879 patent.  I was at those times and still am a technical expert in the fields relating to the '879 patent and other related fields, and I remain an active researcher in these fields.

24.	Based on my professional experience, I believe I am qualified to testify as an expert on matters related to the patent at issue.

## III.	LEGAL PRINCIPLES

25.	In expressing opinions on what I understand might be legal issues, I have applied the following legal standards conveyed to me by Apple's counsel.

### A.	Person of Ordinary Skill in the Art

26.	I understand that the factors considered in determining the ordinary level of skill in a field of art include: the level of education and experience of persons working in the field; the types of problems encountered in the field; the teachings of the prior art regarding solutions to such problems; and the sophistication of the technology at the time of the alleged invention.  I understand that a person of ordinary skill in the art (or a "POSITA") is not a specific real individual but rather a hypothetical individual having the qualities reflected by the factors above and knowledge of all relevant prior-art references, including the references I cite below.

7

B.      Claim Construction

27.      I understand that terms in patent claims must be read as they would have been understood by a person of ordinary skill in the art at the relevant time.  For purposes of this report, I have been advised by Apple's counsel that the relevant time is 2002 because the effective filing date of the '879 patent is December 10, 2002.

28.      I have been advised that the words of a claim are generally given their plain and ordinary meaning, which is the meaning that they would have to a person of skill in the art in light of the specification and prosecution history.  I understand that courts determine the plain and ordinary meaning of claim terms by considering the sources available to the public that show what a person of ordinary skill in the art would have understood the disputed claim language to mean, including the words of the claims themselves, the specification, the file history, and, in some circumstances, extrinsic evidence (i.e., evidence outside the patent and its file history).  I understand that extrinsic evidence includes evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

29.      I understand that when a patent describes features of the "present invention" as a whole, the patent's description limits the scope of the claimed invention.

30.      When "comprising" is used as a transitional phrase in the preamble, I understand that it is given special legal effect and presumed to be open-ended.  However, when "comprising" is instead recited in the body of the claim, I understand that "comprising" should be construed according to normal rules of claim interpretation.

31.      I also understand that the statements made by a patent owner during prosecution of a patent or in an *inter partes* review proceeding can be considered during claim construction, and may limit the scope of a term.

8

**C.      Indefiniteness**

32.      I understand that the patent statute requires patent claims to be definite.  I understand that, to meet this "definiteness" requirement, the claims must particularly point out and distinctly claim the subject matter the applicant regards as his or her invention.

33.      I understand that indefiniteness is evaluated from the perspective of a POSITA as of a patent's filing date.  I understand a patent claim is indefinite if, when read in light of the specification and the prosecution history, the claim fails to inform a POSITA of the scope of the invention with reasonable certainty.

34.      I understand that absolute or mathematical precision in claim language is not required, but it is not enough that some meaning can be ascribed to a patent's claims.

35.      I understand a claim is indefinite if claim language could mean different things and no informed and confident choice is available among the competing definitions.

## IV.      PERSON OF ORDINARY SKILL IN THE ART

36.      Based on my knowledge and experience in the field and my review of the '879 patent, and its respective file history, I believe that a POSITA would have had at least a bachelor's degree in computer science, computer engineering, or the equivalent education and at least two years of experience in user interface design and development.  Additional years of formal education could substitute for experience, and vice versa.

37.      My analysis and conclusions expressed in this report are based on the perspective of a POSITA having this level of knowledge and skill.  My education, technical expertise, and personal knowledge discussed in Section II meet the qualifications of a POSITA. Furthermore, I have significant experience training and educating persons meeting the qualifications of a POSITA, and I am familiar with the perspective of a POSITA.

9

## V.    MATERIALS CONSIDERED

38.    As part of my independent analysis for this report, I have considered the following materials:

- The '879 patent and its prosecution history, including the *inter partes* review proceedings relating to the '879 patent;

- The background knowledge and technologies that were commonly known to persons of ordinary skill in the art;

- My own knowledge and experience gained from my work in the field;

- My experience in teaching and advising others in the field;

- My experience working with others involved in the field;

- The intrinsic and extrinsic evidence identified in the parties' Patent Local Rule 4-2 disclosures;

- Dr. Andre's claim construction report;

- Neonode's infringement contentions;

- Any materials cited herein; and

- The claim construction opinions and orders in the following cases:

  o *Neonode Smartphone LLC v. Samsung Elecs. Co., Ltd.*, No. 6:20-CV-507-ADA (W.D. Tex.)

  o *Neonode Smartphone LLC v. Samsung Elecs. Co., Ltd.*, No. 2023-2304, 2024 WL 3873566 (Fed. Cir. 2024)

  o *Google LLC v. Neonode Smartphone LLC*, No. 2023-1638, 2024 WL 3451831 (Fed. Cir. 2024)

10

39.     My citations to patent literature use the column and line numbers or paragraph numbers.  Unless indicated otherwise, all emphasis (bold/italics/underline) in any quoted text are ones I have added.

## VI.     THE ASSERTED PATENT

40.     The '879 patent "relates to a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area." '879 patent at 1:6-8.

41.     As illustrated in Figure 1 below (which I have annotated), the '879 patent's user interface includes "a touch sensitive area 1, which is divided into a menu area 2 and a display area 3." *Id.* at 3:51-54.  The menu area 2 "present[s] a representation of a first 21, a second 22 and a third 23 predefined function." *Id.* at 4:1-3.



42.     As illustrated in Figure 2 below (which I have also annotated), "any one of these three functions 21, 22, 23 can be activated when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3." *Id.* at 4:7-11, Fig. 2.

11



43.    Claim 1 recites:

A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

44.    Claim 12 recites:

The computer readable medium of claim 1, wherein the user interface is characterized in, that an active application, function, service or setting is advanced one step by gliding the object along the touch sensitive area from left to right, and that the active application, function, service or setting is closed or backed one step by gliding the object along the touch sensitive area from right to left.

45.    Claim 13 recites:

The computer readable medium of claim 1, wherein the user interface is characterized in, that said representation of said function is located at the bottom of said touch sensitive area.

46.    Claim 17 recites:

The computer readable medium of claim 1, wherein the location where the representation is provided does not provide touch functionality for a different function.

## VII.    THE DISPUTED CLAIM TERMS

47.    I have been asked to opine on the meaning of the following claim terms, as they would be understood by a person of ordinary skill in the art having read the specification and prosecution history of the asserted patents:

- "location where the representation is provided" / "the touched location" ('879 patent, claims 1, 17)

- "one step" ('879 patent, claim 12)

- "duplicated" ('879 patent, claim 1)

- "representation of a function" ('879 patent, claims 1, 13)

- "a touch sensitive area in which a representation of a function is provided" ('879 patent, claim 1)

- "object gliding along the touch sensitive area away from the touched location" ('879 patent, claim 1)

- "comprising" ('879 patent, claim 1, following "multi-step operation")

48.    I also understand the parties have agreed that the preamble for claim 1 is limiting.

49.    I also understand the parties have proposed the following constructions for the term "wherein the representation consists of only one option for activating the function."  I have not been asked to provide my opinion for the proper construction of this term, but my opinions

13

regarding the proper constructions or indefiniteness of the other disputed terms remain the same regardless of whether Apple's or Neonode's proposed construction of this term is adopted.

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "wherein the representation consists of only one option for activating the function" ('879 patent, claim 1) | "wherein the representation consists of only one option for what function to activate at a given time (where the given time means the currently active application)" | "where the representation consists of only one option for what function to activate at a given time for a currently active application" |

50.    I also understand the parties have proposed the following constructions for the term "gliding."  I have not been asked to provide my opinion for the proper construction of this term, but my opinions regarding the proper constructions or indefiniteness of the other disputed terms remain the same regardless of whether Apple's or Neonode's proposed construction of this term is adopted.

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "gliding" ('879 patent, claims 1, 12) | "a smooth, continuous movement across or along a surface, not including dragging, flicking, or a drag and drop operation" | Plain and ordinary meaning, not including a flick, drag, or drag-and-drop operation |

## VIII.  THE PARTIES' PROPOSED CONSTRUCTIONS

51.    For ease of reference, I have included below a chart showing the constructions proposed by the parties for each disputed term.

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "wherein the representation consists of only one option for activating the function" ('879 patent, claim 1) | "wherein the representation consists of only one option for what function to activate at a given time (where the given time means the currently active application)" | "wherein the representation consists of only one option for what function to activate at a given time for a currently active application" |

14

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "gliding" ('879 patent, claims 1, 12) | "a smooth, continuous movement across or along a surface, not including dragging, flicking, or a drag and drop operation" | Plain and ordinary meaning, not including a flick, drag, or drag-and-drop operation |
| "location where the representation is provided" / "the touched location" ('879 patent, claims 1, 17) | "starting location where the representation is provided, wherein the starting location determines what function to activate" | Plain and ordinary meaning |
| "duplicated" ('879 patent, claim 1) | No construction necessary | "to make double or twofold, to make a copy of, or to produce something equal of" |
| "representation of a function" ('879 patent, claims 1, 13) | "a graphical element that enables a user to activate a function, and also represents the function in a cognizable way" | Plain and ordinary meaning, which may include a graphical element and/or text that represents a function |
| "a touch sensitive area in which a representation of a function is provided" ('879 patent, claim 1) | "a touch sensitive area, divided into a menu area and a display area, wherein a representation of a function is provided in the menu area" | Plain and ordinary meaning |
| "object gliding along the touch sensitive area away from the touched location" ('879 patent, claim 1) | "object gliding along the touch sensitive area away from the touched location in the direction of the display area" | Plain and ordinary meaning |
| "comprising" ('879 patent, claim 1, following "multi-step operation") | "consisting of" | "including but not limited to" |
| "one step" ('879 patent, claim 12) | Indefinite | Plain and ordinary meaning |

## IX.    ANALYSIS

### A.    "Representation of a function"

52.    I understand the parties have proposed the following constructions for this term:

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|

15

| "representation of a function" ('879 patent, claims 1, 13) | "a graphical element that enables a user to activate a function, and also represents the function in a cognizable way" | Plain and ordinary meaning, which may include a graphical element and/or text that represents a function |
|---|---|---|

53. When read in view of the specification and the prosecution history, a POSITA would have understood the term "representation of a function" to mean "a graphical element that enables a user to activate a function, and also represents the function in a cognizable way."

54. The plain meaning of a "representation of a function", in the context of the claim, refers to a graphical element that enables activation of a function, and also signals to a user the function that will be activated by interacting with the graphical element. Put differently, a representation of a function would have been understood by a POSITA to depict the function in a cognizable way, and the surrounding claim language makes clear that the "representation of a function" also enables activating a function.

55. For example, claim 1 indicates the function corresponding to the representation is activated when the device detects a touch-then-glide gesture beginning at the location where the representation is provided. A POSITA would have understood that the representation enables activating the function since the function is activated by first touching the representation.

56. My opinion is supported by the specification. For example, the '879 patent illustrates in Figure 1, and describes in the specification, that the user interface's menu area "is adapted to present a representation of a first 21, a second 22 and a third 23 predefined function" where "[t]he first function 21 is a general application dependent function, the second function 22 is a keyboard function, and the third function 23 is a task and file manager." '879 patent at 4:1-6. As described below, each of these representations communicates to a POSITA in a cognizable way the function enabled by the respective representation.

16

57.    Starting with representation 21, it is a + sign (a graphical element), which represents in a cognizable way that it will enable the activation of a function displaying additional services, functions, or settings for the active application.  For example, the specification discloses that representation 21 enables displaying additional services, functions, or settings for an application.  With reference to Figure 3, the specification discloses that "if the first function 21 is activated, then the display area 3 is adapted to display icons 211, 212, 213, 214, 215, 216 representing services or functions depending on the current active application."  '879 patent at Fig. 3, 4:13-16.  The '879 patent also explains that "[a]ny key that, because of lack of space on the display area, or because the key should be hidden from the active application, or because of any other reason is not shown on the display area of an active application, can be represented by one of the icons 212, 213, 214, 215, 216 that is shown when the first function 21 is activated."  *Id.* at 4:18-23.  In other words, an application may not be able to present all of its services, functions, or settings in the display area, for a number of possible reasons, and the first function 21 serves to present the additional functions, services, or settings that are not initially displayed for an active application.  Thus, the representation 21 enables activating the function it cognizably represents.

17

Fig. 3.

58.     Similarly, representation 22 is a picture of a keyboard (a graphical element).  It signals to a POSITA in a cognizable way that, when its function is activated, the user interface will display a keyboard.

59.     For example, as shown below in Figure 5 and as explained in the '879 patent, "if the second function 22 is activated, then the display area 3 is adapted to display a keyboard 221 and a text field 222."  '879 patent at Fig. 5, 4:36-38.  Thus, like representation 21, representation 22 enables activating the function it cognizably represents.

18



Fig. 5. 22

60.    As a third example, representation 23 is a picture of a folder (a graphical element). In my opinion, representation 23 communicates to a POSITA in a cognizable way that it enables activating a function directed to displaying and managing files.

61.    For example, as shown below in Figure 6, and as detailed in the '879 patent's written description, "if the third function 23 is activated, then the display area 3 is adapted to display a list 231 with a library of available applications and files on the computer unit." '879 patent at Fig. 6, 4:63-65.  Thus, like representation 21 and 22, representation 23 enables activating the function it represents in a cognizable way.

19



Fig. 6.

62. The patent does not disclose a contrary example—*i.e.*, a representation that does not resemble the function in a cognizable way.

63. Moreover, in the only embodiment describing how the associated functions are activated, the '879 patent explains that "any one of these three functions 21, 22, 23 can be activated when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3." '879 patent at 4:7-11. In my opinion, a POSITA would have understood from this embodiment that each representation enables activating a respective function.

64. Furthermore, a POSITA reviewing the specification would understand that a "representation of a function" does not comprise only a visual element, but also the underlying mechanisms enabling activation of a function. My opinion is supported by the parties' competing constructions for "wherein the representation consists of only one option for activating the

20

function," as well as the Federal Circuit's opinion construing the same term.  In particular, a **representation** could only **consist** of one option for activating the function, as held by the Federal Circuit and proposed by the parties here, if a "representation of a function" comprises the underlying functionality necessary to enable activation of the function.

65.    The '879 patent's specification further supports my opinion that a representation of a function not only comprises visual aspect of an element, but also the underlying mechanisms enabling activation of a function (*e.g.*, event listeners).  For example, Figure 1 of the '879 patent (shown below) illustrates three representations, where the visual aspects of these representations are labeled 21, 22, and 23, respectively.  But the specification also labels with 21, 22, and 23 **the functions** activated using the representations.  *See, e.g.*, '879 patent at 4:1-5:2, 5:64-6:3.  Thus, a POSITA reviewing the specification would have understood that a representation of a function includes both the element's visual aspect, as well as its underlying functionality enabling activation of a function.



21

66.     Moreover, the file history for the '879 Patent, including statements made by Neonode in *inter partes* review proceedings, is consistent with my opinion.  For example, in distinguishing prior art in Neonode's preliminary response, Neonode stated "Consistent with the above, a POSA would have understood that a 'representation' represents something, in this case a function.  The representation need not necessarily be an image or pictorial depiction of a function, but ***it must serve to represent the function in some cognizable way.  A graphical element that merely enables a user to activate a function, without representing that function***, would not have been considered to be a representation of a function."  APL-NEO_00928906 (Neonode POPR) at 972 (internal citations omitted, emphasis added).  Neonode also stated in its preliminary response: "One attribute of a representation of a function in a graphical user interface is that selection of the representation (e.g., an icon) is typically sufficient in itself to activate the associated function."  *Id.* at 973.  Thus, the file history is consistent with my opinion that a representation enables activation of a corresponding function and represents that function in a cognizable way.

67.     For these reasons, in my opinion, a POSITA would have understood a "representation of a function" to refer to "a graphical element that enables a user to activate a function, and also represents the function in a cognizable way."

**B.      "A touch sensitive area in which a representation of a function is provided"**

68.     I understand the parties have proposed the following constructions for this term:

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "a touch sensitive area in which a representation of a function is provided" ('879 patent, claim 1) | "a touch sensitive area, divided into a menu area and a display area, wherein a representation of a function is provided in the menu area" | Plain and ordinary meaning |

22

69.     I understand Apple contends that certain disclosures in the specification describing "the present invention" limit this term to require the touch sensitive area to be divided between a menu area and a display area, and to require a representation of a function to be provided in the menu area.  I am not a lawyer and do not have an understanding of the legal implications of using "the present invention" in the specification.

70.     However, in my opinion, a POSITA would have understood the intrinsic record to be consistent with and support Apple's proposed construction.  The intrinsic record consistently and exclusively refers to a (1) touch sensitive area that is divided between a menu area and a display area, where (2) the representation of the function is provided in the menu area.

71.     The specification repeatedly and exclusively describes its purportedly inventive user interface as comprising a touch sensitive area divided into a menu area and a display area.

72.     For example, the '879 patent's abstract begins by stating "The present invention relates to a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area (1), which is divided into a menu area (2) and a display area (3)." '879 patent at Abstract.

73.     Then, at the beginning of the section titled "Technical Field," the '879 patent's specification states: "The present invention relates to a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area, and which touch sensitive area is divided into a menu area and a display area." '879 patent at 1:6-9.

74.     Also, at the beginning of the section titled "Solution," the '879 patent's specification further states: "Taking these problems into consideration, and with the staring [sic] point from a user interface for a mobile handheld computer unit, which computer unit comprises

23

a touch sensitive area, which touch sensitive area is divided into a menu area and a display area…" '879 patent at 1:65-2:2.

75.    Then, at the beginning of the section titled "Description of Embodiments at Present Preferred," the specification states: "The user interface according to the present invention is specifically adapted to computer units comprising a touch sensitive area 1, which is divided into a menu area 2 and a display area 3." '879 patent at 3:51-54.

76.    In addition to each of these disclosures that refer to a touch sensitive area that is divided between a menu area and a display area, the specification also repeatedly and exclusively describes a representation of a function as being provided in the user interface's menu area.

77.    For example, the '879 patent's abstract states "The menu area (2) is adapted to present a representation of a first (21), a second (22) and a third predefined (23) function." '879 patent at Abstract.

78.    Also, in the section titled "Solution," the '879 patent's specification further states: "[t]he present invention teaches that the menu area is adapted to present a representation of a first, a second and a third predefined function…" '879 patent at 2:5-7.

79.    Then, in the section titled "Description of Embodiments at Present Preferred," the specification states: "According to the present invention the menu area is adapted to present a representation of a first 21, a second 22 and a third 23 predefined function." '879 patent at 4:1-3.

80.    Moreover, the '879 patent's figures exclusively illustrate a touch sensitive display being divided into a menu area and a display area, and a representation of a function being provided in the menu area. For example, as shown below, annotated Figure 1 illustrates the touch sensitive area 1 being divided into a menu area 2 and a display area 3, and providing representations 21, 22, 23 in menu area 2. '879 patent, Fig. 1; *see also id.* at 5:64-6:3 (explaining that the representations

24

of a first, second, and third function, respectively, are provided in the menu area). The same is true for the '879 patent's other relevant figures (*e.g.*, Figs. 3, 5, 6, 8, 9, 11, 12, 13).



81.    Figure 2 of the '879 patent, which is a "schematic side view illustrating the activation of a function," shown below, depicts the boundaries of the division between the menu area 2 and the display area 3. '879 patent at 3:24-25, 4:7-12, Fig. 2. Notably, the division between the display area 3 and menu area 2 is such that the menu area is distinct from the display area.



Fig. 2.

25

82.    There is no disclosure in the '879 patent that contradicts Apple's construction. Specifically, there is no other disclosure of the composition of the "touch sensitive area" or where the representation of the function is provided.

83.    My opinion is also based on the prosecution history for the '879 patent.  The patent applicant submitted original claims that all required that the "touch sensitive area is divided into a menu area and a display area" and that the "menu area is adapted to present a representation of a first, a second and a third predefined function."  NEONODE0000001 ('879 File History) at 17. The only independent, original claim (claim 1) is excerpted below.

CLAIMS

1.    User interface for a mobile handheld computer unit, where said computer unit comprises a touch sensitive area, which touch sensitive area is divided into a menu area and a display area, where said computer unit is adapted to run several applications simultaneously, and to present an active application on top of any other application on said display area, characterised in, that said menu area is adapted to present a representation of a first, a second and a third predefined function, that said first function is a general application dependent function, that said second function is a keyboard function, that said third function is a task and file manager, and that any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area.

84.    The claims were amended nearly six years after the filing of the application to no longer recite the limitations I highlight above, among others.  NEONODE0000001 at 317-318.  In my opinion, the prosecution history is unclear regarding the reason for the amendment or its impact on the proper scope of the term proposed for construction, including because the patent applicant's

26

September 2008 amendment effectively rewrote the entirety of claim 1, and the patent examiner's prior office action and the patentee's remarks accompanying the amendment do not clarify the patent applicant's reasoning and intent. *Id.* at 243-260 (patent examiner's rejection of prior claims), 317-318 (rewriting claim 1 entirely), 334-342 (unclear remarks accompanying amendment).

85.     My opinion is also supported by the state of the art in 2002. A POSITA would have understood that user interfaces at the time often comprised a distinct menu area and display area. For example, as shown below, well-known devices like the Palm Vx, the Palm Tungsten T2, the Newton MessagePad, and lesser-known devices like Neonode's N1 device, all comprised a distinct menu area and display area comprising its touch sensitive area. Dividing the interface between a menu area and display area, and providing representations in the menu area, was helpful for a user to access commonly used functions on the device. I have added annotations to each photo below to illustrate this point.



27



**Palm Tungsten T2, 2003**

Touch Sensitive Area

Display Area

Menu Area

28



**Apple Newton MessagePad, 1996**

29



Neonode N1, 2004

86.     Thus, in my opinion, a POSITA reviewing the '879 patent's specification and prosecution history would have understood the term "a touch sensitive area in which a representation of a function is provided" to refer to "a touch sensitive area, divided into a menu area and a display area, wherein a representation of a function is provided in the menu area."

C.     **"Object gliding along the touch sensitive area away from the touched location"**

87.     I understand the parties have proposed the following constructions for this term:

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "object gliding along the touch sensitive area away from the touched location" ('879 patent, claim 1) | "object gliding along the touch sensitive area away from the touched location in the direction of the display area" | Plain and ordinary meaning |

30

88.    I understand Apple contends that certain disclosures in the specification describing "the present invention" limit this term to require the touch sensitive area to be divided between a menu area and a display area, and to require a representation of a function to be provided in the menu area. I am not a lawyer and do not have an understanding of the legal implications of using "the present invention" in the specification.

89.    However, in my opinion, a POSITA would have understood the intrinsic record to be consistent with and support Apple's proposed construction. As it relates to gliding, the intrinsic record consistently and exclusively refers to gliding in the direction of the display area.

90.    The specification repeatedly and exclusively describes activating a function by gliding in the direction of the display area on the purportedly inventive user interface.

91.    For example, the '879 patent's abstract states "Any one of these three functions can be activated when the touch sensitive area (1) detects a movement of an object with its starting point within the representation of the function on the menu area (2) and with a direction from the menu area (2) to the display area (3)." '879 patent at Abstract.

92.    Also, in the section titled "Solution," the '879 patent's specification further states: "The present invention also teaches that any one of these three functions can be activated when the touch sensitive area detects a movement of an object with its starting point within the representation of the function on the menu area and with a direction from the menu area to the display area." '879 patent at 2:10-15.

93.    Further, as shown below, annotated Figure 2 illustrates a user gliding his finger from the menu area to the display area to activate a function. In describing Figure 2, the specification states: "FIG. 2 shows that any one of these three functions 21, 22, 23 can be activated when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within

31

the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3." '879 patent at 4:7-11.



94.     My opinion is also based on the prosecution history for the '879 patent, in which the patent applicant submitted original claims that all required "that any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area." NEONODE0000001 ('879 File History) at 17. The only independent, original claim (claim 1) is excerpted below.

CLAIMS

1.      User interface for a mobile handheld computer unit, where said computer unit comprises a touch sensitive area, which touch sensitive area is divided into a menu area and a display area, where said computer unit is adapted to run several applications simultaneously, and to present an active application on top of any other application on said display area, **characterised** in, that said menu area is adapted to present a representation of a first, a second and a third predefined function, that said first function is a general application dependent function, that said second function is a keyboard function, that said third function is a task and file manager, and that any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area.

95.     The claims were amended nearly six years after the filing of the application to no longer recite the limitation I highlight above, among others.  NEONODE0000001 at 317-318.  In my opinion, the prosecution history is unclear regarding the reason for the amendment or its impact on the proper scope of the term proposed for construction, including because the patent applicant's September 2008 amendment effectively rewrote the entirety of claim 1, and the patent examiner's prior office action and the patentee's remarks accompanying the amendment do not clarify the patent applicant's reasoning and intent.  *Id.* at 243-260 (patent examiner's rejection of prior claims), 317-318 (rewriting claim 1 entirely), 334-342 (unclear remarks accompanying amendment).

96.     In my opinion, a POSITA reviewing the '879 patent's specification and prosecution history would have understood the term "object gliding along the touch sensitive area away from the touched location" to refer to an "object gliding along the touch sensitive area away from the touched location in the direction of the display area."

33

**D.     "Duplicated"**

97.     I understand the parties have proposed the following constructions for this term:

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|------|------------------------------|--------------------------------|
| "duplicated" ('879 patent, claim 1) | No construction necessary | "to make double or twofold, to make a copy of, or to produce something equal of" |

98.     In my opinion, "duplicated" is a simple, straightforward term that would be readily understandable by a POSITA, as well as a layperson: attempting to define the term unnecessarily complicates the claim.

99.     More specifically, Neonode's construction calls for "produc[ing] something equal of," but a POSITA would have been uncertain how to measure this equality. For example, in analyzing and applying the claim's scope, should equality be measured in terms of size, shape, likeness, or something else? These questions are unnecessary, as the ordinary meaning of "duplicated" applies here.

100.     There is no contrary disclosure in the '879 patent. In fact, the only place the '879 patent uses the word "duplicated" is in the claims. The '879 patent does not include any description of how a representation could be "duplicated" in the context of a user interface, and also does not include any examples of an "object gliding . . . wherein the representation of the function is not relocated or duplicated during the gliding."

101.     Thus, in my opinion, "duplicated" is a simple, straightforward term that would not benefit from a construction, and certainly not Neonode's proposed construction.

**E.     "Location where the representation is provided" / "the touched location"**

102.     I understand the parties have proposed the following constructions for this term:

34

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
| --- | --- | --- |
| "location where the representation is provided" / "the touched location" ('879 patent, claims 1, 17) | "starting location where the representation is provided, wherein the starting location determines what function to activate" | Plain and ordinary meaning |

103.    When read in view of the specification and the prosecution history, a POSITA would have understood the term "location where the representation is provided" / "the touched location" to mean "starting location where the representation is provided, wherein the starting location determines what function to activate."

104.    In the context of the claims, a "location where the representation is provided" is the starting location for the claimed multi-step operation where the starting location determines what function to activate.

105.    For example, claim 1 describes activating a function with a multi-step operation where the first recited step is "an object touching the touch sensitive area at a location where the representation is provided," and so a POSITA would have understood the claimed location is the starting location for the claimed multi-step operation.

106.    Also, as construed by the Federal Circuit, claim 1 requires that a representation consists of only one option for what function to activate at a given time (where the given time means the currently active application).  Since the representation is for activating a function, and the function is activated by a multi-step operation that begins by touching a location where the representation is provided, a POSITA would have understood that the starting location determines what function to activate.  This would have been a natural result of conventional mapping between (1) a presented icon enabling the activation of a function and (2) the portion of the user interface detecting the initial touch and presenting the icon.

107. My opinion is also supported by the specification. For example, the '879 patent explains in the abstract that "[a]ny one of these three functions can be activated when the touch sensitive area (1) detects a movement of an object with its **starting point** within the representation of the function…" '879 patent at Abstract.

108. Also, in the section titled "Solution," the '879 patent describes the "present invention" as "teach[ing] that any one of these three functions can be activated when the touch sensitive area detects a movement of an object with its **starting point** within the representation of the function…" '879 patent at 2:10-14.

109. As another example, and as illustrated in Figure 2 below, the '879 patent teaches that "any one of these three functions 21, 22, 23 can be activated when the touch sensitive area 1 detects a movement of an object 4 with its **starting point A** within the representation of a function…" '879 patent at 4:7-11.



Fig. 2.

110. The above disclosures support my opinion that the touched location where the representation is provided is the starting point or "starting location" for the claimed multi-step operation.

36

111. There is no contrary disclosure in the '879 patent. For example, there is no disclosure in the '879 patent suggesting that any step in the claimed multi-step operation precedes the initial touch, nor any suggestion that any aspect of the multi-step operation other than the gesture's starting location determines what function to activate.

112. My opinion is also supported by the prosecution history. For example, in a September 8, 2008 response to an office action, the patent applicant provided the below table (which I have highlighted) summarizing the distinctions between the claimed invention and the Carlson prior art. NEONODE0000001 at 339. The patent applicant made clear that, unlike Carlson, **"[t]he starting location** determines which of the plurality of functions is activated." *Id.* at 339 (emphasis added). The patent applicant also explained that "[t]he function displayed at the **touch point** is activated" and the claimed user interface must "identify the function displayed at the **starting location** of the glide." *Id.* at 339 (emphases added).

| TABLE I: Partial list of distinctions between one-stroke drag of Carlson and location-based touch-and-glide movement of the claimed invention | |
| --- | --- |
| **One-stroke drag** | **Location-based touch-and-glide** |
| Default function is the onscreen keyboard; may be customized to activate a different pre-designated function. | The function displayed at the touch point is activated. |
| At any given time, may be used for activating only one pre-designated function. | At any given time, may be used for activating whichever function is touched, from among a plurality of functions. |
| The starting location has no bearing on the function that is activated. | The starting location determines which of the plurality of functions is activated. |
| Performed by a stylus. | Performed by the thumb. |
| Requires the user interface to recognize a vertical drag. | Requires the user interface to recognize a glide and identify the function displayed at the starting location of the glide. |
| Requires one hand to hold the device and another hand to perform the stylus movement. | The same hand may be used to hold the device and perform the thumb movement. |
| Not used for scrolling through a list. | Used for scrolling through a list. |

37

113.    Similarly, in a September 3, 2008 interview agenda, the patent applicant summarized the distinguishing features of the claimed invention, including that "[t]he touch-and-glide movement activates the function displayed at the touch point" and that "[p]rocessing the touch-and-glide movement requires that the user interface recognize a glide and identify the function displayed at the **starting location** of the glide."  NEONODE0000001 at 274 (emphasis added).

114.    A POSITA would have understood from the patent applicant's statements and distinctions made during prosecution that the claimed "location where the representation is provided" determines what function to activate.

115.    Thus, in my opinion, a POSITA reviewing the '879 patent's specification and prosecution history, as well as claim 1, would have understood the term "location where the representation is provided" / "the touched location" to refer to "starting location where the representation is provided, wherein the starting location determines what function to activate."

### F.    "Comprising"

116.    I understand the parties have proposed the following constructions for this term:

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "comprising" ('879 patent, claim 1, following "multi-step operation") | "consisting of" | "including but not limited to" |

117.    When read in view of claim 1, the specification, and the prosecution history, a POSITA would have understood the term "comprising," which follows "multi-step operation," to mean "consisting of."

118.    The plain meaning of "comprising" is "consisting of," and this meaning is further supported by the surrounding claim language.  For example, claim 1 describes activating a function

38

with a multi-step operation where two steps are recited: (1) a touch, and (2) a glide. No other steps are recited as being part of the claimed multi-step operation.

119.    A POSITA would have understood the claimed touch is the first step of the multi-touch operation for at least the reasons I explain for the term "location where the representation is provided" referring in relevant part to a "starting location…"

120.    Claim 1 requires that multi-step operation consists of a touch, and "then" a glide "along the touch sensitive area away from the touched location."  A POSITA would have understood the claimed glide directly follows the claimed touch, since claim 1 recites "then" between the touch and the glide, and because the glide travels away from the touched location.

121.    The specification also supports my opinion, which repeatedly teaches that the function is activated when the touch sensitive area detects a glide.  For example, in the Abstract, the '879 patent explains that "[a]ny one of these three functions can be **activated when the touch sensitive area (1) detects a movement of an object** with its starting point within the representation of the function on the menu area (2) and with a direction from the menu area (2) to the display area (3)."  '879 patent at Abstract (emphasis added).

122.    As another example, in the "Solution" section, the '879 patent describes the "present invention" as teaching that "any one of these three functions can be **activated when the touch sensitive area detects a movement** of an object with its starting point within the representation of the function on the menu area and with a direction from the menu area to the display area."  '879 patent at 2:10-15 (emphasis added).

123.    Further, in describing Figure 2 shown below, the '879 patent teaches that "any one of these three functions 21, 22, 23 can be **activated when the touch sensitive area 1 detects a movement** of an object 4 with its starting point A within the representation of a function on the

39

menu area 2 and with a direction B from the menu area 2 to the display area 3." '879 patent at 4:7-11 (emphasis added).



Fig. 2.

124.    In my opinion, a POSITA would have understood from the specification, including the portions I describe above, that activation of the function directly follows the claimed glide. Moreover, Figure 2 above shows a multi-step operation consisting of only an initial touch at location A, and a glide in the direction away from location A in direction B. Thus, a POSITA would have understood that the claimed "multi-step operation" is a touch followed by a glide, which is consistent with the plain meaning of "comprising."

125.    There is no contrary disclosure in the specification, *i.e.*, there is no suggestion in the specification that the claimed multi-step operation involves any steps beyond a touch and a glide.

126.    The prosecution history also supports my opinion. For example, in a March 15, 2007 amendment, the patent applicant amended its claims to indicate that the claimed function is activated in response to a "single step," and in particular, "an object moving in a direction from a starting point that is the representation of the function in the menu area to the display area being

40

detected by the touch sensitive area." NEONODE0000001 at 107. I have excerpted and highlighted this amendment below.

> that any one of said each of the three functions simultaneously represented in the menu area can being activated when said by the single step of an object moving in a direction from a starting point that is the representation of the function in the menu area to the display area being detected by the touch sensitive area, detects a movement of an object moving with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area, said user interface thereby allowing low precision navigation of the user interface using a blunt object, whereby said so that the user interface can be operated by

127. In its remarks accompanying the amendment, the patent applicant distinguished the prior art Carlson reference on the basis that claim 1 recites a "**single step function-launching movement**… where a function is launched by the single step of an object, such as a finger, moving from a function icon in the menu area to the display area." NEONODE0000001 at 117 (emphasis added). The patent applicant's statements support my opinion that the activation of a function happens upon detecting a glide.

128. Later in prosecution, in a November 20, 2009 Office Action, the patent examiner rejected claim 1 as rendered obvious by Nakajima in view of Hoshino. NEONODE0000001 at 466-467. As relevant here, the patent examiner asserted that "Hoshino teaches an icon being activated by an object touching the corresponding location and then gliding along the touch sensitive area away from the location ([0092]-[0093], drag and drop operation may be used in combination with a push in operation for activating a function)." *Id.* at 467.

129. In order to overcome the patent examiner's rejection, the patent applicant amended claim 1 as shown below. NEONODE0000001 at 491.

41

**1.** (currently amended)       A computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

a touch sensitive area in which representations of at least one function are displayed, and each function of said at least one function being mapped to a corresponding location in the touch sensitive area at which the representation of the function is displayed, and being activated by <u>a multi-step operation comprising (i)</u> an object touching the corresponding location and then <u>(ii) the object</u> gliding along the touch sensitive area away from the touched location.

130.    In its remarks accompanying the above amendment, the patent applicant "respectfully submit[ted] that, unlike the claimed invention, Hoshino activates the function solely in response to a push-in operation; i.e., a hard touch, and no in response to a drag operation." NEONODE0000001 at 496-497.  The patent applicant goes on to make clear that "the claimed invention activates a function in response to a multi-step **touch-and-glide operation**" and that "in particular, referring to the illustration below, **the claimed invention responds to a (hard) touch followed by a glide** differently than Hoshino.  Specifically, **the claimed invention activates a function after the glide**, whereas Hoshino activates the function after the (hard) touch."  *Id.* at 497 (emphases added).  The patent applicant provided and referenced the below illustrations to further clarify how the claimed invention concerns activating a function in response to both a touch and glide, whereas Hoshino activates after only the touch.  *Id.* at 497.  Notably, the illustration for the claimed invention only mentions a touch and a glide as making up the multi-step operation that activates a function.



Function activation operation of claimed invention vs. that of Hoshino

42

131.    The patent applicant also provided the following table distinguishing the claimed invention and Hoshino.  The patent applicant made clear that the claimed invention activates a function "[i]n response to **both steps** of a multi-step operation; **namely**, (1) touch, followed by (2) a glide."  NEONODE0000001 at 497 (emphases added).  A POSITA would have understood referring to the steps of the claimed multi-step operation as "both steps" necessarily means there are only two steps; "namely," as the patent applicant clarified, the touch and the glide.

| Some distinctions between claimed invention and Hoshino | | |
|---|---|---|
| | **Claimed invention** | **Hoshino** |
| **Objective** | Novel touch-and-glide user interface operation | Discriminate between two conventional operations; namely, (1) touch, and (2) drag-and-drop |
| **Hardware** | Touch screen | Touch screen with pressure sensor |
| **Function Activation** | In response to both steps of a multi-step operation; namely, (1) touch, followed by (2) a glide | In response to hard touch |

132.    The patent applicant also made clear that its amendment "to include the limitation of a multi-step operation comprising (1) a touch, followed by (2) a glide" was supported by the same portions of the specification I discuss above.  NEONODE0000001 at 499.

133.    In my opinion, the patent applicant's statements and arguments made during prosecution of the '879 patent support my opinion that the claimed multi-step operation consists of only a touch and a glide, rather than the "single step" movement previously claimed, which is consistent with the plain meaning of "comprising."

134.    Dictionaries from around the time of the '879 patent's filing date also support my opinion.  For example, dictionaries consistently define "comprise" as meaning "to consist of."  *See* APL-NEO_00935927 (Collins Concise Dictionary) at 929; APL-NEO_00935930 (American Heritage Dictionary) at 932; APL-NEO_00935933 (New Oxford American Dictionary) at 935.

43

These exemplary definitions confirm my opinion that the plain meaning of "comprising" is "consisting of."

135.    Thus, in my opinion, a POSITA reviewing claim 1, the specification, the prosecution history, and contemporaneous dictionaries, would have understood the term "comprising," which follows "multi-step operation," to mean "consisting of."

### G.    The term "one step" is indefinite because the intrinsic record fails to inform a POSITA with reasonable certainty about the scope of this term

136.    I understand the parties have proposed the following constructions for this term:

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "one step" ('879 patent, claim 12) | Indefinite | Plain and ordinary meaning |

137.    Claim 12 of the '879 patent recites the term "one step."  In particular, claim 12 depends on claim 1, and additionally requires that, by gliding an object (*e.g.*, a finger) along the touch sensitive area from left to right, "an active application, function, service or setting is advanced one step."  Conversely, by gliding an object (*e.g.*, a finger) along the touch sensitive area from right to left, "the active application, function, service or setting is closed or backed one step." In my opinion, the term "one step" is indefinite because the '879 patent and its prosecution history do not inform one of ordinary skill in the art with reasonable certainty the scope of the term.

138.    The '879 patent's specification mentions the term "one step" in the context of Figures 11 and 12.  Figures 11 and 12, and the relevant portion of the specification, are each excerpted below.  The specification effectively restates the claim language and does not provide any clarity around the meaning of "one step."  Similarly, Figures 11 and 12 show moving an application, function, service, or setting to the left or right, but do not clarify the meaning of "one step" or how much movement is necessary to constitute a "step."

44

FIG. **11** shows that moving U the object **4** from the left of the display area **3** to the right of the display area **3** moves the active application, function, service or setting on one step forwards. FIG. **12** shows that, in a similar manner, the active application, function, service or setting is closed or backed one step by moving V the object **4** from the right of the display area **3** to the left of the display area **3**.



Fig. 11.   Fig. 12.

139.     The '879 patent's prosecution history substantively addresses the meaning of the term only once.  In a March 14, 2008 Amendment and Response to Non-Final Office Action, the patent applicant attempted to distinguish a prior art TealDoc scrolling feature as not teaching claim 12.  In particular, the applicant argued that "scrolling through a document, which is a continuous, flowing process during the drag of the slider, cannot reasonably be said to be 'moving on one step' or 'backed one step,' each of which is inherently a discrete action."  NEONODE0000001 ('879 File History) at 222.

140.     Dictionary definitions also confirm that a POSITA would not have been able to discern with any reasonable clarity the scope of the term "one step."  For example, the New Oxford American Dictionary provides several definitions for "step," the most relevant here being "a stage in a gradual process… a particular position or grade on an ascending or hierarchical scale."  APL-

NEO_00928811 (New Oxford) at 813. Similarly, the Wiley Electrical and Electronics Engineering Dictionary defines "step" as "[o]ne within a series sequence, order, or process." APL-NEO_00928808 (Wiley) at 810. These definitions of "step" confirm my opinion that the measurement of a step is subjective and arbitrary; it does not have objective boundaries.

141. Apart from the intrinsic record and extrinsic evidence signaling that "one step" is a discrete action, it is unclear how much movement satisfies "one step." For example, should "one step" be measured in terms of a proportion of screen width, or should it be measured in terms of an absolute distance (*e.g.*, a certain number of inches or centimeters)?

142. If a "step" should be determined according to a proportion of screen width, is moving one pixel across a screen "one step"? Is moving a quarter-length across the screen enough? Is moving halfway across the screen enough? Does an application, function, or setting need to occupy the entire screen, and then fully move off the screen to constitute "one step"?

143. If a "step" should be determined according to an absolute distance, should the distance be measured in inches, centimeters, or some other metric? How many units of that metric equal one step? Does the answer change depending on the size of the user interface or touch-sensitive area?

144. Beyond the degree of movement itself, the surrounding claim language, like "advanc[ing]" and "back[ing]" signifies to a POSITA that claim 12 contemplates a series of applications, functions, services, or settings. This begs the additional question: does "advanc[ing]" or "back[ing]" one step require the order of the series to change in some way, or can the logical order remain unchanged while an application, function, service, or setting is being moved? Whether or not the order of the series must change, what must the application, function, service or setting be advancing to or backing away from?

145.    These are all questions posed by the language in claim 12, and particularly the term "one step," and for which a POSITA would not have any answers with reasonable certainty.  In my opinion, the term "one step," as recited in claim 12, is an ambiguous, subjective metric that depends on how any given individual decides to define it (*e.g.*, as a certain portion of a user interface, as a certain distance, as a logical change in the ordering of the series, etc.).

146.    Though the term "one step" is indefinite in view of the intrinsic record alone, Neonode's application of the claim language multiplies the uncertainty surrounding the claim language.  While my analysis above is at least somewhat cabined by the prosecution history's clear statement that "one step" is a discrete action that does not implicate continuous or scrolling actions, Neonode appears to apply the claim language to accused features involving continuous scrolling across alleged applications, functions, services, or settings.  *See, e.g.*, APL-NEO_00928623 (App Store Infringement Chart) at 678-680 (accusing scrolling continuously through photos), 682, 684 (accusing scrolling continuously through camera zoom ratios), 683 (accusing scrolling continuously through camera settings), 685 (accusing scrolling continuously through photo albums), 686-701, 703 (accusing scrolling continuously through alleged applications, functions, services, or settings), 706-709 (same), 715 (same).  Neonode's assertion that continuous movements of an alleged application, function, service, or setting can satisfy the alleged "one step" only raises further questions regarding what kind of movement satisfies the claim, and what magnitude of movement is required.

147.    Thus, one of ordinary skill reading the claims in light of the specification and prosecution history would not have been able to determine with reasonable certainty the objective bounds of the claimed "one step."

148.    It is therefore my opinion that the term "one step" renders claim 12 of the '879 patent indefinite.

## X.    CLOSING REMARKS

149.    I confirm that the contents of this report are true to the best of my knowledge and belief insofar as it states facts and that it contains my honest opinions on the matters upon which I have been asked to give them.

150.    This report is based on my study of the information available to me at the time of its writing.  My review and consideration of the asserted patent, its claims, and other materials discussed in this report are ongoing.  As my analysis continues, I may identify additional evidence supporting the opinions I have summarized in this report.  I reserve the opportunity to update, supplement, or amend this report in view of further analysis or additional information that may be obtained or become available at a later time to address new or different positions taken by Neonode.

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct.

Executed on March 16, 2026, in Lyttelton, New Zealand.

/s/
Dr. Andrew Cockburn

# Appendix A

# Andy Cockburn
**B.Sc.(Hons) Ph.D.**

**Curriculum Vitae**

| | |
|---|---|
| **Full legal name** | Andrew Jeremy Gavin Cockburn |
| **University Address** | Department of Computer Science and Software Engineering |
| | University of Canterbury |
| | Christchurch 8140 |
| | New Zealand |
| **Telephone** | +64 3 369 2119 |
| **Fax** | +64 3 364 2569 |
| **Email** | andy@cosc.canterbury.ac.nz |
| **URL** | http://www.cosc.canterbury.ac.nz/~andy |
| **Consultancy Address** | Cockburn Human Interface Consulting Ltd. |
| | 20 Gilmour Terrace, Lyttelton 8082 |
| | New Zealand |
| **Telephone** | +64 3 328 9043 |
| **Email** | ajc168@snap.net.nz |
| **Date of birth** | 23rd July 1966 |
| **Date** | July 8, 2020 |

## Brief Summary

**International research reputation**

- Over one hundred and fifty publications in international journals and conferences.

- Elected to the CHI Academy (2015), which is an honorary group of individuals who have made substantial contributions to the field of human-computer interaction.

- Recipient of the 2009 Chris Wallace award for the outstanding research contribution to Computer Science (2005-2007) in Australasia.

- Deputy Chair of the national panel for assessing Computer Science and Mathematics research quality (MIST PBRF panel, 2016-2019).

- Technical programme committee chair for ACM CHI 2020; Papers co-chair for ACM CHI 2014 and 2015.

- Editorial Board Member for: ACM Transactions on Computer-Human Interaction (2012-); Human-Computer Interaction Journal (2015-); Foundations and Trends in HCI (2015-); International Journal of Human-Computer Studies (2004-2013); Interacting with Computers (2003-2013).

- Best paper awards at CHI 2018, 2013, 2012, 2011 (awarded to the top 1% of submissions) and 11 Honourable Mention awards (top 5%) at ACM CHI.

- H-index impact factor of 51 (Google Scholar).

**Excellent educator and public speaker**

- Long track record of outstanding student evaluations.

- Nominated for the New Zealand National Tertiary Teaching Award, 2010. Recipient of a University of Canterbury Teaching Award (2004) and many nominations for student-elected 'lecturer of the year' award.

**Experienced expert witness and consultant**

- Testifying expert witness on behalf of industry leaders in various jurisdictions, including the Federal Court of Australia, Northern District of California, US Patent Trials and Appeals Board, and the US International Trade Commission.

# Education

Degree          PhD (June 1993)
Discipline      Computer Science — Computer Supported Cooperative Work
Location        University of Stirling, Scotland
Thesis Title    Groupware Design: Principles, Prototypes, and Systems

Degree          BSc(Hons) (July 1988)
Discipline      Computer Science
Location        University of York, England

# Employment History

Position        Professor (promoted through lecturer, senior lecturer, associate professor)
Location        University of Canterbury
                Christchurch
                New Zealand
Period          June 1993 — current

3

# Research Student Supervision

## PhD candidates

| | | |
|---|---|---|
| Pang Suwanaposee | 2020– | Cognitive Biases and the Subjective Experience of Interaction |
| Sarmad Soomro | 2017– | Interaction with In-Vehicle Touchscreens |
| Joshua Leung | 2013–2017 | Understanding the Noticeability and Distraction of Interactive Highlighting Techniques |
| Philip Quinn | 2012–2016 | Economic Behaviour & Psychological Biases in HumanComputer Interaction |
| Tham Piumsomboon | 2011–2015 | Adaptive and Multimodal Interfaces for Collaborative Augmented Reality |
| Joey Scarr | 2011–2014 | Improving Interaction with Spatial User Interfaces |
| Stephen Fitchett | 2010–2013 | Understanding and Improving Personal File Retrieval |
| Susanne Tak | 2008–2011 | Improving Interfaces for Window/Task Switching |
| Jason Alexander | 2006–2009 | Improving Interfaces for Document Navigation |
| Joerg Hauber | 2004–2008 | Understanding Remote Collaboration in Video Collaborative Virtual Environments |
| Julian Looser | 2003–2007 | AR Magic Lenses: Addressing the Challenge of Focus and Context in Augmented Reality |
| Volkert Buchmann (A. sup.) | 2004–2008 | Haptic Feedback in Augmented Reality |
| Carl Cook (A. sup.) | 2002–2006 | Collaborative Software Engineering |
| Tim Wright | 2000–2004 | Collaborative and Multiple-Notation Programming Environments for Children |
| Michael JasonSmith | 2000–2006 | User Interfaces for Temporal Awareness |

## M.Sc. candidates

| | | |
|---|---|---|
| Ben McDonald | 2010–2011 | Multiuser interaction with large public displays |
| Dominic Winkler | 2009–2011 | Interaction Techniques for Cross Context Activities |
| Taher Amer | 2005–2006 | Evaluating SwiftPoint |
| Trond Nilsen | 2004–2006 | Hybrid Interfaces in Augmented Reality |
| Joshua Savage | 2003–2004 | The Calibration and Evaluation of Speed-Dependent Automatic Zooming Interfaces |
| Ben Schmidt | 2001–2002 | A Study of Bimanual Interaction |
| Elizabeth Ng (A. sup.) | 1997–1998 | Pen-based music input |
| Aaron Tay | 1994–5 | End-User Tailorability in Workflow Design |

4

**Honours candidates and Honours-level interns**

| | | |
|---|---|---|
| Joel Harrison | 2012 | Improving Command Selection |
| Joshua Leung | 2012 | Improving File Access |
| J. Delamarche (Paris-Sud) | 2010 | Multiple Trajectory Pointing Methods |
| Joey Scarr | 2010 | Improving Expertise Development in User Interfaces |
| Stephen Fitchett | 2009 | Improved Mobile Scrolling Interfaces |
| Philip Quinn | 2007 | Improving Command Interfaces |
| Keith Humm | 2007 | Improving Interfaces for Task Switching |
| Jason Alexander | 2005 | Improving Document Navigation with Space-Filling Thumbnails |
| Philip Brock | 2005 | An Investigation of Target Acquisition with Visually Expanding Targets in Constant Motor-Space |
| David Mitchell | 2003 | Evaluating Focus+Context Screens |
| Andrew Wallace | 2003 | Calibrating Speed-Dependent Automatic Zooming |
| Andrew Barrett | 2002 | Implementing RSVP as an Image Browser |
| Julian Looser | 2002 | 3D Games as Motivation in Fitts' Law Experiments |
| Joshua Savage | 2002 | Implementing and Evaluating Speed-Coupled Scrolling |
| Amal Siresena | 2002 | Mobile Text Entry |
| Michael Moyle | 2001 | An Evaluation of Simple Gesture Based Controls |
| Lee Butts | 2001 | Mobile Phone Text Entry |
| Eddie Edwards | 2001 | Towards Scalable Interfaces Using Spatial Cues |
| Gene Thomas | 1997 | Smart Desktop |
| Olof Eilert | 1997 | User Interfaces for Object Oriented Literate Programming |
| Philip Weir | 1996 | Distortion Oriented Workspace Awareness |
| Carey Evans | 1996 | Assisting World Wide Web Navigation |
| Justin Macfarlane | 1995 | Mawd: A Collaborative Analysis Tool |
| Carl Cerecke | 1995 | TRAIL: An Email Based CSCW Toolkit |
| Andrew Bryant | 1995 | Leogo: An Equal Opportunity Programming Environment |
| Ian Bosely | 1994 | SPI: A Social Presence Indicator |

5

## Postgraduate Thesis Examinations

| | | | | |
|---|---|---|---|---|
| Ori Gagoni | PhD | Chair | University of Canterbury | 2019 |
| Alaeddin Nassani | PhD | Chair | University of Canterbury | 2019 |
| Veera Mandalika | PhD | Chair | University of Canterbury | 2018 |
| Jessalyn Alvina | PhD | Examiner | Université Paris Sud | 2017 |
| Hyungon Kim | PhD | Chair | University of Canterbury | 2017 |
| Thomas Young | PhD | Chair | University of Canterbury | 2017 |
| Craig Sutherland | PhD | Examiner | University of Auckland | 2016 |
| David Thompson | PhD | Chair | University of Canterbury | 2016 |
| Philip Quinn | PhD | Supervisor | University of Canterbury | 2016 |
| Daniel Bradley | PhD | Examiner | University of Queensland | 2016 |
| David Altimera | PhD | Chair | University of Canterbury | 2015 |
| Jakub Zlotowsky | PhD | Chair | University of Canterbury | 2015 |
| Thammathip Piumsomboon | PhD | Supervisor | University of Canterbury | 2015 |
| Robert Schattschnieder | PhD | Chair | University of Canterbury | 2014 |
| Hazel Bradshaw | PhD | Chair | University of Canterbury | 2014 |
| Amur Al Manji | PhD | Examiner | University of Auckland | 2014 |
| Amir Shareghi Najar | PhD | Chair | University of Canterbury | 2014 |
| Joey Scarr | PhD | Supervisor | University of Canterbury | 2014 |
| Stephen Fitchett | PhD | Supervisor | University of Canterbury | 2014 |
| Amali Weeseringhe | PhD | Chair | University of Canterbury | 2012 |
| Sayan Ray | PhD | Chair | University of Canterbury | 2012 |
| Christina Dicke | PhD | Chair | University of Canterbury | 2012 |
| Minkyung Lee | PhD | Chair | University of Canterbury | 2010 |
| Jason Alexander | PhD | Supervisor | University of Canterbury | 2009 |
| Leah Findlater | PhD | Examiner | University of British Colombia | 2009 |
| Judy Bowen | PhD | Examiner | University of Waikato | 2008 |
| Joerg Hauber | PhD | Supervisor | University of Canterbury | 2008 |
| Julian Looser | PhD | Supervisor | University of Canterbury | 2008 |
| Michael JasonSmith | PhD | Supervisor | University of Canterbury | 2006 |
| Tim Wright | PhD | Supervisor | University of Canterbury | 2005 |
| Beryl Plimmer | PhD | Examiner | University of Waikato | 2003 |
| Gorden Paynter | PhD | Examiner | University of Waikato | 2000 |
| Gitesh K Raikundalia | PhD | Examiner | Bond University | 1997 |
| Ramon Craig Standing | PhD | Examiner | University of Western Australia | 1997 |
| Ying Leung | PhD | Examiner | Massey University | 1995 |
| | | | | |
| Qi Min Ser | Masters | Examiner | University of Canterbury | 2016 |
| Taher Amer | Masters | Supervisor | University of Canterbury | 2006 |
| Trond Nilsen | Masters | Supervisor | University of Canterbury | 2006 |
| Akhil Mehra | Masters | Examiner | University of Auckland | 2005 |
| Aparna Krishnan | Masters | Examiner | University of Waikato | 2003 |
| Shaun Kaasten | Masters | Examiner | University of Calgary | 2001 |
| Boyd Ludlow | Masters | Examiner | University of Waikato | 1999 |
| Donald Cox | Masters | Examiner | University of Calgary | 1998 |
| Wallace Chigona | Masters | Examiner | Waikato University | 1997 |
| Simon Gianoutsos | Masters | Examiner | Waikato University | 1997 |
| Jing Deng | Masters | Examiner | Waikato University | 1996 and 1997 |
| Aaron Tay | Masters | Examiner | University of Canterbury | 1996 |

6

## Student glory

| | | | |
|---|---|---|---|
| Joey Scarr | PhD | 2016 | John Makepeace Bennett Award for the Distinguished Computer Science PhD thesis in Australasia. |
| Philip Quinn | PhD | 2015 | US Patent Awarded (Google Assignee). |
| Philip Quinn | PhD | 2014 | US Patent Awarded (Google Assignee). |
| Stephen Fitchett | PhD | 2014 | CHI Honourable Mention award. |
| Philip Quinn | PhD | 2013 | Google Mountain View Internship. |
| Stephen Fitchett | PhD | 2013 | CHI Best Paper award. |
| Joey Scarr | PhD | 2013 | CHI Honourable Mention award. |
| Joey Scarr | PhD | 2013 | CHI ReplicCHI award. |
| Joey Scarr | PhD | 2012 | CHI Best Paper award. |
| Stephen Fitchett | PhD | 2012 | CHI Honourable Mention award. |
| Philip Quinn | PhD | 2012 | Google Mountainview Internship. |
| Joey Scarr | PhD | 2012 | Google Sydney Internship. |
| Stephen Fitchett | PhD | 2011 | Outstanding reference from Darren Edge, Microsoft Research Asia. |
| Joey Scarr | PhD | 2012 | $3K for 2nd place in University 'PhD in 3' competition. |
| Joey Scarr | PhD | 2012 | $1K for 1st place in College 'PhD in 3' competition. |
| Stephen Fitchett | PhD | 2012 | $1K for 3rd place in College 'PhD in 3' competition. |
| Philip Quinn | PhD | 2011 | Honourable Mention award ACM CHI'11. |
| Joey Scarr | PhD | 2011 | Google Sydney Internship. |
| Susanne Tak | PhD | 2010 | $5K Google Anita Borg Scholarship |
| Susanne Tak | PhD | 2010 | $3K from ACM for participation at CHI's Doctoral Consortium |
| Jason Alexander | PhD | 2010 | PhD Thesis placed on "Dean's list for excellence" (top 10%) |
| Susanne Tak | PhD | 2009 | $2K award for 1st place in College Research Poster competition |
| Jason Alexander | PhD | 2008 | $1K award for 2nd place in College Research Poster competition |
| Jason Alexander | PhD | 2008 | Michael Sweeney award for best student paper, Graphics Interface '08. |
| Mark Hancock | PhD (Calgary) | 2007 | Best paper nomination at ACM CHI'07. |
| Josh Savage and Andrew Wallace | M.Sc. Hons | 2005 | Best paper nomination at ACM CHI'05. |
| Mike Moyle | Hons | 2005 | NZ Hi-Tech Young Achiever of the Year Award |

7

# Publications

## Edited Volumes

EV1  J McGrenere and A Cockburn (Eds.)   Proceedings of ACM CHI 2020 Conference on Human Factors in Computing Systems.

EV2  J McGrenere and A Cockburn (Eds.)   Extended Abstracts of ACM CHI 2020 Conference on Human Factors in Computing Systems.

EV3  M Billinghurst and A Cockburn (Eds.)   Proceedings of the Sixth Australasian User Interface Conference (AUIC2005). Volume 40 of the Conferences in Research and Practice in Information Technology, Australian Computer Society.

EV4  A Cockburn (Ed.)  Proceedings of the Fifth Australasian User Interface Conference (AUIC2004). Volume 28 of the Conferences in Research and Practice in Information Technology, Australian Computer Society.

## Papers in Refereed Journals and Collections

J1  A Cockburn, P Dragicevic, L Besançon and C Gutwin.  Threats of a Replication Crisis in Empirical Computer Science. *Communications of the ACM.* August 2020.

J2  M Claypool, A Cockburn and C Gutwin.   The Impact of Motion and Delay on Selecting Game Targets with a Mouse.  *ACM Transactions on Multimedia Computing, Communications, and Applications.* June 2020.

J3  A Cockburn, D Masson, C Gutwin, P Palanque, A Goguey, M Yung, C Gris and C Trask.  Design and Evaluation of Braced Touch for Touchscreen Input Stabilisation.  *International Journal of Human-Computer Studies.* 122:21-37. 2018.

J4  P Quinn and A Cockburn.  Loss Aversion and Preference in Interaction.  *Human-Computer Interaction Journal.* 2018.

J5  B Lafreniere, C Gutwin, and A Cockburn.  Investigating the Post-Training Persistence of Expert Interaction Techniques.  *ACM Transactions on Human-Computer Interaction.* 24(4): Article 29 (46 pages). 2017.

J6  A Cockburn, P Quinn and C Gutwin  The Effects of Interaction Sequencing on User Experience and Preference. *International Journal of Human-Computer Studies.* 108:89-104. 2017.

J7  J Aceituno, S Malacria, P Quinn, N Roussel, A Cockburn and G Casiez.  The Design, Use, and Performance of Edge-Scrolling Techniques.  *International Journal of Human-Computer Studies.* 97:58-76. 2017.

J8  J Scarr, C Gutwin, A Cockburn and A Bunt.  StencilMaps and EphemeralMaps: Spatially Stable Interfaces that Highlight Command Subsets. *Behaviour and Information Technology.* 34(11):1092-1106. 2015.

J9  S Fitchett and A Cockburn.  An Empirical Characterisation of File Retrieval. *International Journal of Human-Computer Studies.* 74:1-13. 2015.

8

J10 A Cockburn, C Gutwin, J Scarr and S Malacria. Supporting Novice to Expert Transitions in User Interfaces. *ACM Computing Surveys.* 47(2):31:1-36. 2014.

J11 J Scarr, A Cockburn and C Gutwin. Supporting and Exploiting Spatial Memory in User Interfaces. *Foundations and Trends in Human-Computer Interaction.* 6(1):1-84. 2013.

J12 P Quinn, A Cockburn and J Delamarche. Examining the Costs of Multiple Trajectory Pointing Techniques. *International Journal of Human-Computer Studies.* 71(4):492-509. 2013.

J13 S Tak and A Cockburn. Enhanced Spatial Stability with Hilbert and Moore Treemaps. *Transactions on Visualization and Computer Graphics.* 19(1):141-148. 2013.

J14 A Cockburn, D Ahlstrom and C Gutwin. Understanding Performance in Touch Selections: Tap, Drag, and Radial Pointing Drag with Finger, Stylus and Mouse. *International Journal of Human-Computer Studies.* 70(3):218-233. 2012.

J15 J Hauber, A Cockburn, M Billinghurst and H Regenbrecht. The Impact of Collaborative Style on the Perception of 2D and 3D Videoconferencing Interfaces. *Open Software Engineering Journal.* 6:1-20. 2012.

J16 A Cockburn, P Quinn, C Gutwin, G Ramos and J Looser. Air Pointing: Design and Evaluation of Spatial Target Acquisition with and without Visual Feedback. *International Journal of Human-Computer Studies.* 69:401-414. 2011.

J17 E Tanvir, A Bunt, A Cockburn and P Irani. Improving Cascading Menu Selections with Adaptive Activation Areas. *International Journal of Human-Computer Studies.* 69:769-785. 2011.

J18 A Cockburn and C Gutwin. A Model of Novice and Expert Navigation Performance in Constrained Input Interfaces. *ACM Transactions on Computer-Human Interaction.* ACM Press. 7(3):1-38. 2010.

J19 A Cockburn and C Gutwin. A Predictive Model of Human Performance with Scrolling and Hierarchical Lists. *Human-Computer Interaction Journal.* Taylor and Francis. 24(3): 273-314. 2009.

J20 A Cockburn, A Karlson and B Bederson. A Review of Overview+Detail, Zooming, and Focus+Context Interfaces. *ACM Computing Surveys.* ACM Press. 41(1): 1-31. 2008.

J21 J Alexander, A Cockburn and R Lobb. AppMonitor: A Tool for Recording User Actions in Unmodified Windows Applications. *Behavior Research Methods.* Psychonomic Society. 40(2): 413-421. 2008.

J22 G Casiez, D Vogel, R Balakrishnan and A Cockburn. The Impact of Control-Display Gain on User Performance in Pointing Tasks. *Human-Computer Interaction Journal.* Taylor and Francis. 23(3): 215-250. 2008.

J23 S Jones, M Jones, G Marsden, D Patel and A Cockburn. An Evaluation Of Integrated Zooming and Scrolling On Small Screens *International Journal of Human-Computer Studies.* 63(3): 271–303. Elsevier Science. 2005.

J24 A Cockburn and S Brewster. Multimodal Feedback for the Acquisition of Small Targets *Ergonomics.* Taylor & Francis. 48(9): 1129–1150. 2005.

9

J25 M Moyle and A Cockburn. A Flick in the Right Direction: A Case Study of Gestural Input *Behaviour and Information Technology*. 24(4): 275–288. Taylor & Francis. 2005.

J26 A Cockburn. Web Browsers *Berkshire Encyclopedia of Human-Computer Interaction*. Bainbridge, WS (Editor). Volume 1: 80–83. Berkshire Publishing. 2004.

J27 A Cockburn and B McKenzie. Evaluating Spatial Memory in Two and Three Dimensions *International Journal of Human-Computer Studies*. 61(3): 359–373. Elsevier Science. 2004.

J28 A Cockburn and M Smith. Hidden Messages: Evaluating the Efficiency of Code Elision in Program Navigation *Interacting with Computers: The Interdisciplinary Journal of Human-Computer Interaction*. 15(3): 387–407. 2003.

J29 A Cockburn, S Greenberg, S Jones, B McKenzie and M Moyle. Improving Web Page Revisitation: Analysis, Design, and Evaluation *Information Technology and Society: Special Issue on Web Navigation, editors B Shneiderman, J Lazar, M Ivory*. 3(1): 159–183. 2003.

J30 A Cockburn, B McKenzie and M JasonSmith. Pushing Back: Evaluating a New Behaviour for the Back and Forward Buttons in Web Browsers *International Journal of Human-Computer Studies*. 57(5):397–414. Elsevier Science. 2002.

J31 T Bell, A Cockburn, B McKenzie and J Vargo. Digital Lectures: If You Make Them, Will Students Use Them? Constraints on Effective Delivery of Flexible Learning Systems *International Multimedia Electronic Journal of Computer-Enhanced Learning*. 3(2). Association for the Advancement of Computing in Education. 2001 This paper was one of 25 (from 115 full papers) selected from the proceedings of ED-MEDIA 2001 for adaptation and inclusion in the journal.

J32 A Cockburn. Supporting Tailorable Program Visualisations with Literate Programming and Fisheye Views. *Information and Software Technology*. 43(13):745–758. Elsevier Science. 2001.

J33 A Cockburn, T Bell and B McKenzie. Death to the Office of the Nineties: An HCI Perspective on Some Problems in Modern Office Information Systems *Journal of Research and Practice in Information Technology, Special Issue on Human-Computer Interaction (HCI).*, 33(1):68–82. Australian Computer Society. 2001.

J34 A Cockburn and B McKenzie. What Do Web Users Do? An Empirical Analysis of Web Use. *International Journal of Human-Computer Studies*, 54(6):903–922. Academic Press. 2001.

J35 A Cockburn and S Greenberg. Issues of Page Representation and Organisation in Web Browser's Revisitation Tools. *Australian Journal of Information Systems*, 7(2):120–127. 2000.

J36 A Cockburn and P Weir. An Investigation of Groupware Support for Collaborative Awareness Through Distortion-Oriented Views. *International Journal of Human Computer Interaction*, 11(3):231–255. Lawrence Erlbaum Associates. 1999.

J37 A Cockburn and S Greenberg. The Design and Evolution of TurboTurtle, a Collaborative Microworld for Exploring Newtonian Physics. *International Journal of Human-Computer Studies*, 48(6):777-801. Academic Press. 1998.

J38 A Cockburn and A Bryant. Leogo: An Equal Opportunity User Interface for Programming. *Journal of Visual Languages and Computing*, 8(5–6):601–619. Academic Press. 1997.

10

J39   A Cockburn and S Jones. Which way now? Analysing and Easing Inadequacies in WWW Navigation. *International Journal of Human-Computer Studies*, 45(1):105–129. Academic Press. 1996.

J40   A Cockburn and S Jones. Four Principles for Groupware Design. *Interacting with Computers: The Interdisciplinary Journal of Human-Computer Interaction*, 7(2):195–210. Elsevier. 1995.

J41   HW Thimbleby, SP Marsh, SR Jones, and AG Cockburn. Trust in CSCW. In S Scrivener, editor, *Computer-Supported Cooperative Work*, pages 253–271. Ashgate Publishing, 1994.

J42   H Thimbleby, A Cockburn, and S Jones. Hypercard: An Object-Oriented Disappointment. In P Gray and R Took, editors, *Building Interactive Systems: Architectures and Tools*, pages 35–55. Springer-Verlag, 1992.

## Papers in Refereed Conference Proceedings

C1   P Schmid, S Malacria, A Cockburn and M Nancel. Interaction Interferences: Implications of Last-Instant System State Changes. *Proceedings of ACM UIST'2020 Symposium on User Interface Software and Technology*. Minneapolis, USA. *2020.*.

C2   P Palanque, A Cockburn and C Gutwin. A Classification of Faults Covering the Human-Computer Interaction Loop. *Proceedings of SafeComp 2020: 39th International Conference on Computer Safety, Reliability and Security*. Lisbon, Portugal. *2020.*.

C3   A Mairena, M Dechant, C Gutwin and A Cockburn. A Baseline Study of Emphasis Effects in Information Visualization. *Proceedings of Graphics Interface 2020*. Toronto, Canada. *2020.*

C4   C Gutwin, A Cockburn, M van der Kamp, J Storring and C Philips.. Testing the Limits of the Spatial Approach: Comparing Retrieval and Revisitation Performance of Spatial and Paged Data Organizations for Large Item Sets. *Proceedings of Graphics Interface 2020*. Toronto, Canada. *2020.*

C5   A Cockburn, B Lewis, P Quinn and C Gutwin. Framing Effects Influence Interface Feature Decisions. *Proceedings of ACM CHI 2020*. Hawai'i. *2020.*

C6   B Lewis, G d'Eon, A Cockburn and D Vogel. KeyMap: Improving Keyboard Shortcut Vocabulary Using Norman's Mapping. *Proceedings of ACM CHI 2020*. Hawai'i. *2020.*

C7   A Goguey, S Malacria, A Cockburn, and C Gutwin. Reducing Error Aversion to Support Novice-to-Expert Transitions with FastTap. *Proceedings of the 31st Francophone Conference on Human-Computer Interaction – IHM 2019*. Grenoble, France. *2019.* **Best paper award**

C8   P Palanque, A Cockburn, L Désert-Legendre, C Gutwin and Y Déléris. Brace Touch: a Dependable, Turbulence-Tolerant, Multi-Touch Interaction Technique for Interactive Cockpits. *Proceedings of the 38th International Conference on Computer Safety, Reliability and Security - SafeComp 2019*. Turku, Finland. *2019.*

C9   C Martinie, P Palanque, E Bouzekri, A Cockburn, A Canny and E Barboni. Analysing and Demonstrating Tool-Supported Customizable Task Notations. *Proceedings of the 11th ACM SIGCHI Symposium on Engineering Interactive Computing Systems*. Valencia, Spain. *2019.*

11

C10 Q Roy, C Zakaria, W Kim, M Nancel, ST Perrault, A Misra and A Cockburn. A Comparative Study of Pointing Techniques for Eyewear Using a Simulated Pedestrian Environment. *Proceedings of the 17th IFIP TC.13 International Conference on Human-Computer Interaction.* Cyprus. *2019.*

C11 A Cockburn and C Gutwin. Anchoring Effects and Troublesome Asymmetric Transfer in Subjective Ratings. *Proceedings of ACM CHI 2019.* Glasgow, Scotland. *2019.*

C12 AF Mairena, C Gutwin, A Cockburn and LJ Elias The Effects of Feature Combination and Task Demands on Peripheral Notifications in Large Displays. *Proceedings of ACM CHI 2019.* Glasgow, Scotland. *2019.*

C13 M Claypool, A Cockburn and C Gutwin. Game Input with Delay – Moving Target Selection Parameters. *Proceedings of ACM Multimedia Systems Conference 2019.* Amhurst, MA. *2019.*

C14 A Cockburn, D Woolley, K Tran Pham Thai, D Clucas, S Hoermann, and C Gutwin. Reducing the Attentional Demands of In-Vehicle Touchscreens with Stencil Overlays. *Proceedings of ACM Automotive UI 2018.* Toronto, Canada. *2018.*

C15 A Cockburn, C Gutwin and A Dix. HARK No More: On the Preregistration of CHI Experiments. *Proceedings of ACM CHI 2018.* Montreal, Canada. *2018.* Paper 141. **Best paper award**

C16 A Goguey, G Casiez, A Cockburn and C Gutwin. Storyboard-Based Empirical Modelling of Touch Interface Performance. *Proceedings of ACM CHI 2018.* Montreal, Canada. *2018.* Paper 445. **Honourable mention award**

C17 A Cockburn, C Gutwin, P Palanque, Y Deleris, C Trask, A Coveney, M Yung and K MacLean. Turbulent Touch: Touchscreen Input for Cockpit Flight Displays. *Proceedings of ACM CHI 2017.* Denver, CO. *2017.* 6742-6753.

C18 C Gutwin, A Cockburn and N Gough. A Field Experiment of Spatially-Stable Overviews for Document Navigation. *Proceedings of ACM CHI 2017.* Denver, CO. *2017.* 5905-5916.

C19 C Gutwin, A Cockburn and A Coveney. Peripheral Popout: The Influence of Visual Angle on Popout Effects. *Proceedings of ACM CHI 2017.* Denver, CO. *2017.* 208-219.

C20 S Uddin, C Gutwin and A Cockburn. The Effects of Artificial Landmarks on Learning and Performance in Spatial-Memory Interfaces. *Proceedings of ACM CHI 2017.* Denver, CO. *2017.* 3843-3855.

C21 P Quinn and A Cockburn. When Bad Feels Good: Assistance Failures and Interface Preferences. *Proceedings of CHI'2016.* San Jose, California. *2016.* 4005-4010.

C22 B Lafreniere, C Gutwin, A Cockburn and T Grossman. Faster Command Selection on Touchscreen Watches *Proceedings of CHI'2016.* San Jose, California. *2016.* 4663-4674.

C23 K Schramm, C Gutwin and A Cockburn. Supporting Transitions to Expertise in Hidden Toolbars *Proceedings of CHI'2016.* San Jose, California. *2016.* 4687-4698.

C24 C Gutwin, C Rooke, A Cockburn, R Mandryk and B Lafreniere. Peak-End Effects on Player Experience in Casual Games *Proceedings of CHI'2016.* San Jose, California. *2016.* 5608-5619. **Honourable mention award**

12

C25 C Gutwin, A Cockburn and B Lafreniere. Testing the Rehearsal Hypothesis with Two FastTap Interfaces. *Proceedings of GI'2015.* Halifax, Canada. *2015.* 223-231.

C26 A Cockburn, C Gutwin and P Quinn. Examining the Peak-End Effects of Subjective Experience. *Proceedings of CHI'2015.* Seoul, S. Korea. *2015.* 357-366.

C27 S Malacria, J Acetuno, P Quinn, G Casiez, A Cockburn, and N Roussel. Push-Edge and Slide-Edge: Scrolling by Pushing Against the Viewport Edge. *Proceedings of CHI'2015.* Seoul, S. Korea. *2015.* 2773-2776.

C28 S Fitchett, A Cockburn and C Gutwin. Finder Highlights: Field Evaluation and Design of an Augmented File Browser. *Proceedings of CHI'2014.* Toronto, Canada. *2014.* 3685-3694. **Honourable mention award**

C29 C Gutwin, A Cockburn, J Scarr and S Malacria. Faster Command Selection on Tablets with FastTap. *Proceedings of CHI'2014.* Toronto, Canada. *2014.* 2617-2626.

C30 M Nancel and A Cockburn. Causality: A Conceptual Model of Interaction History. *Proceedings of CHI'2014.* Toronto, Canada. *2014.* 1777-1786. **Honourable mention award**

C31 J Scarr, A Cockburn, C Gutwin, A Bunt, and J Cechanowicz. The Usability of CommandMaps in Realistic Tasks. *Proceedings of CHI'2014.* Toronto, Canada. *2014.* 2241-2250.

C32 SA Seah, DM Plasencia, P Bennet, A Karnik, V Ortocol, J Knibbe, A Cockburn, and S Submramanian. SensaBubble: A Chrono-Sensory Mid-Air Display of Sight and Smell. *Proceedings of CHI'2014.* Toronto, Canada. *2014.* 2863-2872. **Honourable mention award**

C33 P Quinn, S Malacria and A Cockburn. Touch Scrolling Transfer Functions. *Proceedings of ACM UIST'2013 Symposium on User Interface Software and Technology.* St Andrews, Scotland. *2013.* 61-71.

C34 S Malacria, J Scarr, A Cockburn, C Gutwin and T Grossman. Skillometers: Reflective Widgets that Motivate and Help Users to Improve Performance. *Proceedings of ACM UIST'2013 Symposium on User Interface Software and Technology.* St Andrews, Scotland. *2013.* 321-330.

C35 M Jain, A Cockburn, and S Madhvanath. Comparison of Phone-Based Distal Pointing Techniques for Point-Select Tasks. *Proceedings of INTERACT'13.* Cape Town, South Africa. *2013.* 714-721.

C36 S Malacria, G Bailly, J Harrison, A Cockburn, and C Gutwin. Promoting Hotkey Use through Rehearsal with ExposeHK. *Proceedings of CHI'2013.* Paris, France. *2013.* 573-582.

C37 J Scarr, A Cockburn, C Gutwin, and S Malacria. Testing the Robustness and Performance of Spatially Consistent Interfaces. *Proceedings of CHI'2013.* Paris, France. *2013.* 3139-3148. **Honourable mention award**

C38 S Fitchett, A Cockburn, and C Gutwin. Improving Navigation-Based File Retrieval. *Proceedings of CHI'2013.* Paris, France. *2013.* 2329-2338. **Best paper award**

C39 T Piumsomboon, A Clark, M Billinghurst, and A Cockburn. User-Defined Gestures for Augmented Reality. *Proceedings of INTERACT'13.* Cape Town, South Africa. *September.* *2013.* 282-299.

13

C40  P Quinn, A Cockburn, G Casiez, N Roussel, and C Gutwin. Exposing and Understanding Scrolling Transfer Functions. *Proceedings of ACM UIST'2012 Symposium on User Interface Software and Technology.* Cambridge, Massachusetts, October. *2012.* 341-350.

C41  A Cockburn, P Quinn, C Gutwin, and S Fitchett. Improving Scrolling Devices with Document-Length-Dependent Gain. *Proceedings of CHI'2012.* Austin, Texas, May. *2012.* 267-276.

C42  J Scarr, A Cockburn, C Gutwin, and A Bunt. Improving Command Selection with CommandMaps. *Proceedings of CHI'2012.* Austin, Texas, May. *2012.* 257-266. **Best paper award**

C43  S Fitchett and A Cockburn. AccessRank: Predicting What Users Will Do Next. *Proceedings of CHI'2012.* Austin, Texas, May. *2012.* 2239-2242. **Honourable mention award**

C44  J Scarr, A Cockburn, C Gutwin, and P Quinn. Dips and Ceilings: Understanding and Supporting Transitions to Expertise in User Interfaces. *Proceedings of CHI'2011.* Vancouver, Canada, May. *2011.* 2741-2750.

C45  V Levesque, L Oram, KE MacLean, A Cockburn, N Marchuk, D Johnson, JE Colgate, and M Peshkin. Enhancing Physicality in Touch Interaction with Programmable Friction. *Proceedings of CHI'2011.* Vancouver, Canada, May. *2011.* 2481-2490. **Best paper award**.

C46  P Quinn, A Cockburn, KJ Raiha, and J Delemarche. On the Costs of Multiple Trajectory Pointing Methods. *Proceedings of CHI'2011.* Vancouver, Canada, May. *2011.* 859-862. **Honourable mention award**

C47  R Xiao, M Nacenta, RL Mandryk, A Cockburn and C Gutwin. Ubiquitous Cursor: A Comparison of Direct and Indirect Pointing Feedback in Multi-Display Environments. *Proceedings of Graphics Interface '2011.* St Johns, Canada. *2011.* 135-142. **Michael A. J. Sweeney best student paper award.**

C48  S Bateman, A Doucette, C Gutwin, RL Mandryk and A Cockburn. Effects of View, Input Device, and Track Width on Video Game Driving. *Proceedings of Graphics Interface '2011.* St Johns, Canada. *2011.* 207-214.

C49  S Tak, J Scarr, C Gutwin and A Cockburn. Supporting Window Switching With Spatially Consistent Thumbnails Zones: Design and Evaluation. *Proceedings of INTERACT'2011.* Lisbon, Portugal. *2011.* 331-347.

C50  B Ens, D Ahlstroem, A Cockburn and P Irani. Characterizing User Performance with Assisted Direct Off-Screen Pointing. *Proceedings of Mobile HCI'2011.* Stockholm. *2011.* 331-347.

C51  D Ahlstroem, A Cockburn, C Gutwin, and P Irani. Why it's Quick to be Square: Modelling New and Existing Hierarchical Menu Designs. *Proceedings of CHI'2010.* Atlanta, GA, April. *2010.* 1371-1380. **Best paper nomination**.

C52  J Oosterman and A Cockburn. An Empirical Comparison of Tag Clouds and Tables. *Proceedings of OzCHI'2010.* Brisbane, Australia, 22-26 November. *2010.* 288-295.

C53  S Fitchett and A Cockburn. Using Multitouch Input to Support Hybrid Relative and Absolute Mobile Scrolling *People and Computers 24. Proceedings of the British HCI Conference.* Dundee, 6-10 September. *2010.*

14

C54 S Fitchett and A Cockburn. Evaluating Flick-Scrolling and Tilt Scrolling for Reading Tasks on Mobile Devices. *Proceedings of OzCHI'2009.* Melbourne, Australia, 23-27 November. *2009.* 225-232.

C55 P Quinn and A Cockburn. Zoofing! Faster List Selections with Pressure-Zoom-Flick-Scrolling. *Proceedings of OzCHI'2009.* Melbourne, Australia, 23-27 November. *2009.* 185–192.

C56 S Tak and A Cockburn. Window Watcher: A Visualisation Tool for Understanding Window Switching Activities. *Proceedings of OzCHI'2009.* Melbourne, Australia, 23-27 November. *2009.* 241–248.

C57 S Tak, A Cockburn, K Humm, D Ahlstroem, C Gutwin and J Scarr. Improving Window Switching Interfaces. *Proceedings of INTERACT'2009.* Uppsala, Sweden, 24-28 August. *2009.* 187-200.

C58 J Zucco, B Thomas, K Grimmer-Sommers and A Cockburn. A Comparison of Menu Configurations and Pointing Devices for use with Wearable Computers while Mobile and Stationary. *Proceedings of ACM ISWC'2009: 13th International Symposium on Wearable Computers.* Linz, Austria, 5-7 September. *2009.* 63–70.

C59 J Alexander, A Cockburn, S Fitchett, C Gutwin and S Greenberg. Revisiting Read Wear: Analysis, Design, and Evaluation of a Footprints Scrollbar. *Proceedings of ACM CHI'2009 Conference on Human Factors in Computing Systems.* Boston, MA, 5 April - 9 April. *2009.* 1665-1674.

C60 E Tanvir, J Cullen, P Irani and A Cockburn. Improving Selection in Cascading Pull-Down Menus. *Proceedings of ACM CHI'2008 Conference on Human Factors in Computing Systems.* Florence, Italy, 5 April - 10 April. *2008.* 1381-1384.

C61 J Alexander and A Cockburn. An Empirical Characterisation of Electronic Document Navigation. *Proceedings of Graphics Interface '08.* Windsor, Ontario, Canada, May 28-30. *2008.* 123-130. **Michael A. J. Sweeney best student paper award.**

C62 P Quinn, A Cockburn, Indratmo and C Gutwin An Investigation of Dynamic Landmarking Functions. *Proceedings of Advanced Visual Interfaces (AVI'08).* Napoli, Italy, May 28-30. *2008.* ACM Press.

C63 P Quinn and A Cockburn. The Effects of Menu Parallelism on Visual Search and Selection. *Proceedings of AUIC'08: Australasian User Interface Conference. 2008*, 79-84. ACM Press.

C64 V Buchmann, M Billinghurst and A Cockburn. Directional Interfaces for Wearable Augmented Reality. *Proceedings of CHINZ'08 2008*, 47-54. ACM Press.

C65 J Looser, M Billinghurst, R Grasset and A Cockburn. An Evaluation of Virutal Lenses for Object Selection in Augmented Reality. *Proceedings of GRAPHITE 2007.* Perth, Australia, 1–4 December. *2007*, 203-210. ACM Press.

C66 A Cockburn, C Gutwin and S Greenberg. A Predictive Model of Menu Performance *Proceedings of ACM CHI'2007 Conference on Human Factors in Computing Systems* San Jose, CA, 24–27 April. *2007*, 627–636. ACM Press.

C67 A Cockburn, PO Kristennson, J Alexander and S Zhai. Hard Lessons: Effort-Inducing Interfaces Benefit Spatial Learning *Proceedings of ACM CHI'2007 Conference on Human Factors in Computing Systems* San Jose, CA, 24–27 April. *2007*, 1571–1580. ACM Press.

15

C68  M Hancock, S Carpendale and A Cockburn.  Shallow Depth 3D Interaction: Design and Evaluation of One-, Two-, and Three-Touch Techniques *Proceedings of ACM CHI'2007 Conference on Human Factors in Computing Systems* San Jose, CA, 24–27 April. *2007*, 1147–1156. **Nominated for best paper award**.  ACM Press.

C69  G Ramos, A Cockburn, M Beaudouin-Lafon and R Balakrishnan.  Pointing Lenses *Proceedings of ACM CHI'2007 Conference on Human Factors in Computing Systems* San Jose, CA, 24–27 April. *2007*, 757–766..  ACM Press.

C70  T Bell, A Cockburn, A Wingkvist and R Green.  Podcasts as a supplement in tertiary education: an experiment with two Computer Science courses *Proceedings of MoLTA 2007: Conference on Mobile Learning Technologies and Applications* Auckland, New Zealand. *2007*, 70–77.

C71  T Amer, A Cockburn, R Green and G Odgers.  Evaluating Swiftpoint as a Mobile Device for Direct Manipulation Input *Proceedings of AUIC'2007 Australasian User Interface Conference* Ballarat, Australia. *2007*, 63–70.

C72  J Hauber, H Regenbrecht, M Billinghurst and A Cockburn.   Spatiality in Videoconferencing: Trade-offs between Efficiency and Social Presence *Proceedings of ACM CSCW'2006 Conference on Computer Supported Cooperative Work* Banff, Canada, November 4–8. *2006*, 413-422.

C73  V Jurgens, A Cockburn and M Billinghurst  Depth Cues For Augmented Reality Stakeout *Proceedings of CHINZ'2006: Conference of the New Zealand Chapter of the ACM Special Interest Group on Human-Computer Interaction* Canterbury, New Zealand *2006*, 117-124.

C74  C Gutwin and A Cockburn.   Improving List Revisitation with LispMaps *Proceedings of ACM AVI'2006 Conference on Advanced Visual Interfaces.*  Venice, Italy, May 23–26. *2006*, 396-403. 32 accepted from 127 submissions.

C75  A Cockburn and A Gin.    Faster Cascading Menu Selections with Enlarged Activation Areas *Proceedings of Graphics Interface 2006.*  Quebec City, Canada, June 7–9. *2006*, 65–71.

C76  A Cockburn and P Brock.    Human On-Line Response to Visual and Motor Target Expansion *Proceedings of Graphics Interface 2006.*  Quebec City, Canada, June 7–9. *2006*, 81–87.

C77  A Cockburn, C Gutwin and J Alexander.  Faster Document Navigation with Space-Filling Thumbnails *Proceedings of ACM CHI'2006 Conference on Human Factors in Computing Systems* Montreal, Canada, 24–27 April. *2006*, 1–10.  ACM Press.

C78  J Looser, A Cockburn and J Savage.   On the Validity of Using First-Person Shooters for Fitts' Law Studies Acceptance rate: 35%, 26 from 73. *People and Computers XVII (Volume 2): British Computer Society Conference on Human Computer Interaction* Edinburgh, Scotland, September *2005*, 33–36.  Springer-Verlag.

C79  J Savage and A Cockburn.  Comparing Automatic and Manual Zooming Methods for Acquiring Off-Screen Targets *People and Computers XIX: British Computer Society Conference on Human Computer Interaction* Edinburgh, Scotland*, September 2005*, 439–454.  Springer-Verlag. Acceptance rate: 34%, 31 from 92.

C80  J Hauber, H Regenbrecht, A Hills, A Cockburn and M Billinghurst.   Social Presence in Two- and Three-dimensional Videoconferencing *Proceedings of 8th Annual International Workshop on Presence* London, UK, September 21-23*, 2005*, 189–198.

16

C81   A Cockburn, J Savage and A Wallace.   Tuning and Testing Scrolling Interfaces that Automatically Zoom *Proceedings of ACM CHI'2005 Conference on Human Factors in Computing Systems* Portland, Oregon, 2–7 April. *2005*, 71–80.   ACM Press.   Acceptance rate: 25%, 93 from 371. **Nominated for best paper award**.

C82   T Wright and A Cockburn.  Evaluation of Two Textual Programming Notations for Children *Proceedings of the Sixth Australasian User Interface Conference (AUIC2005)* Newcastle, Australia, 2–3 February *2005*, 55–62.  Australian Computer Society.

C83   L Rennie and A Cockburn.   Aiding Text Entry of Foreign Alphabets with Visual Keyboard Plus *Proceedings of the Sixth Australasian User Interface Conference (AUIC2005)* Newcastle, Australia, 2–3 February *2005*, 119–125.  Australian Computer Society.

C84   S Blinmann and A Cockburn.  Program Comprehension: Investigating the effects of naming style and documentation *Proceedings of the Sixth Australasian User Interface Conference (AUIC2005)* Newcastle, Australia, 2–3 February *2005*, 73–78.  Australian Computer Society.

C85   J Looser, M Billinghurst and A Cockburn.  Through the Looking Glass: The Use of Lenses as an Interface Tool for Augmented Reality *Proceedings of Graphite'04: International Conference on Computer Graphics and Interactive Techniques* Singapore, 15–18 June *2004*, 204–211.

C86   V Buchmann, S Violich, M Billinghurst and A Cockburn.  FingARtips — Gesture Based Direct Manipulation in Augmented Reality *Proceedings of Graphite'04: International Conference on Computer Graphics and Interactive Techniques* Singapore, 15–18 June *2004*, pp 212–221.

C87   A Cockburn.   Revisiting 2D vs 3D Implications on Spatial Memory *Proceedings of the Fifth Australasian User Interface Conference (AUIC2004)* Dunedin, New Zealand, 18–22 January *2004*, pp 25–32.  Australian Computer Society.

C88   A Wallace, J Savage and A Cockburn.   Rapid Visual Flow: How Fast is Too Fast? *Proceedings of the Fifth Australasian User Interface Conference (AUIC2004)* Dunedin, New Zealand, 18–22 January *2004*, pp 117–122.  Australian Computer Society.

C89   A Cockburn, J Looser and J Savage.  Around the World in Seconds with Speed-Dependent Automatic Zooming *Paper and Video in the Conference Supplement of the ACM Conference on User Interface Software and Technology* Vancouver, Canada, November *2003*, pp 35–36.

C90   A Cockburn and J Savage.   Comparing Speed-Dependent Automatic Zooming with Traditional Scroll, Pan and Zoom Methods *People and Computers XVII: British Computer Society Conference on Human Computer Interaction* Bath, England, September *2003*, pages 87–102.  Springer-Verlag.

C91   A Cockburn and A Firth.  Improving the Acquisition of Small Targets *People and Computers XVII: British Computer Society Conference on Human Computer Interaction* Bath, England, September *2003*, pages 181–196.  Springer-Verlag.

C92   A Cockburn and A Siresena.  Evaluating Mobile Text Entry with the Fastap Keypad  Acceptance rate: 33%, 8 from 24. *People and Computers XVII (Volume 2): British Computer Society Conference on Human Computer Interaction* Bath, England, September *2003*, pages 77–80.  Springer-Verlag.

17

C93 T Wright and A Cockburn. A Language and Task-based Taxonomy of Programming Environments *Proceedings of IEEE Symposium on Visual Languages and Formal Methods.* Auckland, October 28–31 *2003*, pages 192–194. Acceptance rate: 33%, 8 from 24.

C94 T Wright and A Cockburn. An Evaluation of the Effects of Different Forms of Computer Supported Collaboration on Problem Solving Strategies *Proceedings of CHINZ'03. Annual conference of the New Zealand Chapter of the ACM Special Interest Group on Human-Computer Interaction.* Otago, July *2003*, pages 99-104. Acceptance rate: 59%, 19 from 32.

C95 T Wright and A Cockburn. A Framework for Evaluating Multiple Language Programming Environments *Proceedings of CHINZ'03. Annual conference of the New Zealand Chapter of the ACM Special Interest Group on Human-Computer Interaction.* Otago, July *2003*, pages 21–26. Acceptance rate: 59%, 19 from 32.

C96 M Apperley, P Carter, C Churcher, A Cockburn, M Jones, B Lobb, K Novins, C Phillips and W Wong. State of the Art: HCI in New Zealand (HCI Societies Worldwide Review) *Proceedings of INTERACT'03: Ninth IFIP TC13 International Conference on Human-Computer Interaction* Zurich, Switzerland, Sept 1–5 *2003*

C97 M Moyle and A Cockburn. The Design and Evaluation of a Flick Gesture for 'Back' and 'Forward' in Web Browsers *Proceedings of the Fourth Australasian User Interface Conference (AUIC2003)* Adelaide, Australia, 4–7 February *2003*, pages 39–46.

C98 M JasonSmith and A Cockburn. Get a Way Back: An Evaluation of Temporal Lists *Proceedings of the Fourth Australasian User Interface Conference (AUIC2003)* Adelaide, Australia, 4–7 February *2003*, pages 33–38.

C99 T Wright and A Cockburn. Mulspren: A MUltiple Language Simulation PRogramming ENvironment *Proceedings of the 2002 IEEE Symposia on Human Centric Computing Languages and Environments* Arlington, VA, Sept 3–6 *2002*, pages 101–103.

C100 T Wright and A Cockburn. Evaluating Computer-Supported Collaboration for Learning a Problem Solving Task, *Proceedings of the International Conference on Computers in Education,* Auckland, NZ *2002*, pages 266-267.

C101 M Moyle and A Cockburn. Analysing Mouse and Pen Flick Gestures *Proceedings of the SIGCHI-NZ Symposium On Computer-Human Interaction* Hamilton, New Zealand, 11–12 July. *2002*, pages 19–24.

C102 A Cockburn and B McKenzie. Evaluating the Effectiveness of Spatial Memory in 2D and 3D Physical and Virtual Environments *Proceedings of ACM CHI'2002 Conference on Human Factors in Computing Systems* Minneapolis, Minnesota, 20–25 April. *2002*, pages 203–210. Addison-Wesley. Acceptance rate: 15%, 61 from 409.

C103 A Cockburn, B McKenzie, and M JasonSmith. Evaluating a Temporal Behaviour for Web Browsers' Back and Forward Buttons *CD and on-line Proceedings of WWW2002, the 11th International World Wide Web Conference* Honolulu, May 7–11. *2002.* www2002.org

C104 M Moyle and A Cockburn. Gesture Navigation: An Alternative Back for the Future *Extended Abstracts of ACM CHI'2002 Conference on Human Factors in Computing Systems* Minneapolis, Minnesota, 20–25 April. *2002*, pages 822–823. ACM Press. Acceptance rate: 17%, 62 from 374.

18

C105 L Butts and A Cockburn. An Evaluation of Mobile Phone Text Input Methods *Proceedings of Australian User Interface Conference. 2002*, pages 55–59. Australian Computer Society Inc.

C106 T Wright and A Cockburn. Solo, Together, Apart: Evaluating Modes of CSCL for Learning a Problem Solving Task *Proceedings of ACM Computer Supported Collaborative Learning (CSCL) Conference 2002*. `newmedia.colorado.edu/cscl/06.pdf`

C107 T Bell, A Cockburn, B McKenzie and J Vargo. Flexible Delivery Damaging to Learning? Lessons from the Canterbury Digital Lectures Project *Proceedings of ED-MEDIA'2001: World Conference on Educational Multimedia, Hypermedia and Telecommunications* Tampere, Finland, June 25–30. *2001*, pages 117–122. Association for the Advancement of Computing in Education.

C108 A Cockburn and B McKenzie. 3D or Not 3D? Evaluating the Effect of the Third Dimension in a Document Management System *Proceedings of ACM CHI'2001 Conference on Human Factors in Computing Systems* Seattle, Washington, March 31–April 6. *2001*, pages 434–441. Addison-Wesley. Acceptance rate: 19%, 69 from 353.

C109 B McKenzie and A Cockburn. An Empirical Analysis of Web Page Revisitation *34th Hawaiian International Conference on System Sciences, HICSS34 2001*. IEEE Computer Society Press.

C110 T Wright and A Cockburn. Writing, Reading, Watching: A Task-Based Analysis and Review of Learners' Programming Environments *International Workshop on Advanced Learning Technologies, IWALT 2000*, pages 167–170. IEEE Computer Society Press.

C111 A Cockburn and B McKenzie. An Evaluation of Cone Trees *People and Computers XIV: British Computer Society Conference on Human Computer Interaction 2000*, pages 425–436. Springer-Verlag. Acceptance rate: 27 from 57.

C112 A Cockburn and S Greenberg. Issues of Page Representation and Organisation in Web Browser's Revisitation Tools *OzCHI'99: Australian Conference on Computer-Human Interaction,* Wagga Wagga, November 28–30, 1999, pages 7–14. Acceptance rate: 50%.

C113 A Cockburn, S Greenberg, B McKenzie, M JasonSmith and S Kaasten. WebView: A Graphical Aid for Revisiting Web Pages *OzCHI'99: Australian Conference on Computer-Human Interaction,* Wagga Wagga, November 28–30, 1999, pages 15–22. Acceptance rate: 50%.

C114 S Greenberg and A Cockburn. Getting Back to Back: Alternate Behaviors for a Web Browser's Back Button *5th Conference on Human Factors and the Web, Gaithersburg, Maryland. June 3, 1999*. Acceptance rate: 11 from 27.

C115 P Weir and A Cockburn. Distortion-Oriented Workspace Awareness in DOME *British Computer Society Conference on Human-Computer Interaction. Imperial College, London. 1–4 September, 1998.*, pages 239–252. Springer-Verlag. Acceptance rate: 21 from 89.

C116 E Ng, T Bell and A Cockburn. Improvements to a Pen-Based Musical Input System *OzCHI'98: The Australasian Conference on Computer-Human Interaction. Adelaide, Australia. 29th November to 4th December, 1998. 1998.*, pages 239–252. IEEE Computer Society Press.

C117 A Cockburn and T Bell. Extending HCI in the Computer Science Curriculum *ACM Australasian Computer Science Education Conference ACSE'98. Brisbane, Australia, 8–10 July, 1998,* pages 113–120. ACM Press. Acceptance rate: 28 from 59.

19

C118  A Cockburn and A Bryant.  Cleogo: Collaborative and Multi-Paradigm Programming for Kids *APCHI'98: Asia Pacific Conference on Computer Human Interaction.* Japan. July 15–17, 1998, pages 187–192. IEEE Computer Society Press.

C119  N Churcher, A Cockburn, B McMaster, J Horlor.  CUTE—The Design and Evolution of a First Year Programming Environment  Software Engineering: Education and Practice '98.  Dunedin. January, 1998, pages 142–148. IEEE Computer Society Press.

C120  A Cockburn and T Dale.  CEVA: A Tool for Collaborative Video Analysis  *ACM Group'97: International Conference on Supporting Group Work* Phoenix, Arizona, November 16–19, 1997, pages 47–55. ACM Press.  Acceptance rate: 44 from 104.

C121  A Cockburn and N Churcher.  Towards Literate Tools for Novice Programmers *ACM Australasian Computer Science Education Conference ACSE'97.* Melbourne, Australia, 2-4 July 1997, pages 163–169. ACM Press.  Acceptance rate: 31 from 46.

C122  N Churcher and A Cockburn.  An Immersion Model for Software Engineering Projects  *ACM Australasian Computer Science Education Conference ACSE'97.* Melbourne, Australia, 2-4 July 1997, pages 107–116. ACM Press.  Acceptance rate: 31 from 46.

C123  A Cockburn and S Jones.  Design Issues for World Wide Web Navigation Visualisation Tools *RIAO'97: The Fifth Conference on Computer-Assisted Research of Information.* McGill University, Montreal, Quebec, Canada, 25th-27th June 1997.  pages 55–74.  Acceptance rate: 35 from 90.

C124  J Anstice, T Bell, A Cockburn and M Setchell.  The Design of a Pen-Based Musical Input System. *OzCHI'96: The Sixth Australian Conference on Computer-Human Interaction,* Hamilton, New Zealand, November 24–27, 1996, pages 260–267. IEEE Press.  Acceptance rate: 38 from 79.

C125  A Cockburn and A Bryant. Do It This Way: Equal Opportunity Programming for Kids *OzCHI'96: The Sixth Australian Conference on Computer-Human Interaction,* Hamilton, New Zealand, November 24–27, 1996, pages 246–251. IEEE Press.  Acceptance rate: 38 from 79.

C126  A Tay and A Cockburn User Interfaces for Workflow Systems: Designing for End-User Tailorability  Short paper in *OzCHI'96: The Sixth Australian Conference on Computer-Human Interaction,* Hamilton, New Zealand, November 24–27, 1996, pages 301–302. IEEE Press.

C127  A Cockburn.  Collaborative Usability Analysis Using Video Protocols *APCHI'96: The First Asia Pacific Conference Human Computer Interaction,* Information Technology Institute Singapore, 25–28 June, 1996, pages 67–80.  Acceptance rate: lower than 50%.

C128  S Greenberg, C Gutwin, and A Cockburn.  Using Distortion-Oriented Displays to Support Workspace Awareness. *British Computer Society Conference on Human-Computer Interaction. Imperial College, London. 20–23 August, 1996.* Cambridge University Press.  Acceptance rate: 23 from 63.

C129  A Cockburn and S Greenberg.  Children's Collaboration Styles in a Newtonian Microworld.  In *Companion Proceedings of CHI'96. ACM Conference on Human Factors in Computing Systems* Vancouver, April 13–18 1996, pages 181–182. ACM Press.  Acceptance rate: 78 from 335.

C130  S Greenberg, C Gutwin, and A Cockburn.  Awareness Through Fisheye Views in Relaxed-WYSIWIS Groupware *Proceedings of Graphics Interface, May 21–24, 1996. Toronto,* pages 28–38. Morgan-Kauffman.  Acceptance rate: 29 from 73.

20

C131 SRA Jones and AJG Cockburn. A Study of Navigational Support Provided by Two World Wide Web Browsing Applications. In *Hypertext '96. Seventh ACM Conference on Hypertext. Washington DC March 16–20, 1996*, pages 161–169. ACM Press. Acceptance rate: 24 from 85.

C132 AJG Cockburn and SRA Jones. Trails, Trials, and Tribulations: Unravelling Navigational Problems in the World Wide Web. In *Proceedings of the 5th Workshop on Information Technologies and Systems (WITS '95). Nijenrode University, The Netherlands. 9–10 December.*, pages 46–55, 1995. Acceptance rate: 24 from 70.

C133 A Cockburn and S Greenberg. TurboTurtle: A Collaborative Microworld for Exploring Newtonian Physics. In *ACM Conference on Computer Supported Cooperative Learning (CSCL '95). Bloomington, Indiana. October 17–20, 1995*, pages 62–66. Lawrence Erlbaum Associates, Inc, October 1995.

C134 AJG Cockburn. TurboTurtle: Educating Children in an Alternative Reality Universe. In *Proceedings of the 1994 Computer Human Interaction Specialist Interest Group of the Ergonomics Society of Australia (OZCHI'94).* November 28 to December 1. *Melbourne.*, pages 99–105, 1994.

C135 A Cockburn and S Jones. Four Principles for Groupware Design. In *Proceedings of the 1994 Computer Human Interaction Specialist Interest Group of the Ergonomics Society of Australia (OZCHI'94).* November 28 to December 1. *Melbourne.*, pages 21–26, 1994.

C136 AJG Cockburn and S Greenberg. Making Contact: Getting the Group Communicating with Groupware. In *COOCS '93. The ACM Conference on Organisational Computing Systems. November 1st to 4th. Milpitas, California.*, pages 31–41, 1993.

C137 AJG Cockburn. Supporting Social Awareness in Distributed Work. In P *et al* Collings, editor, *Proceedings of OZCHI 1993. CHISIG Annual Conference.* Canberra. November., pages 224–241, 1993.

C138 AJG Cockburn and HW Thimbleby. Reducing User Effort in Collaboration Support. In WD Gray, WE Hefley, and D Murray, editors, *Proceedings of the 1993 International Workshop on Intelligent User Interfaces, Orlando, Florida. January 4–7.*, pages 215–218. New York: ACM Press, January 1993.

C139 AJG Cockburn and HW Thimbleby. Automatic Conversational Context: Avoiding Dependency on User Effort in Groupware. In MJ Rees and R Iannella, editors, *Interface Technology: Advancing Human-Computer Communication. Proceedings of OZCHI 1992. CHISIG Annual Conference.* Bond University Australia, Queensland. November 26–27, pages 142–149, 1992.

C140 AJG Cockburn. Reflexive CSCW and Managing Commitments. In *IEE Colloquium on CSCW: Some Fundamental Issues.* London, March 15, number 065 in 1991, pages 9/1–9/5. IEE, 1991.

## Patents and Patent Applications

P1 Andy Cockburn, Mark Billinghurst, Dinesh Mandalapu. User Interface Device. US Patent Application Number: PCT/IN2011/000897.

21

## Other: Refereed Videos, Media Reports and Non-Refereed Publications

O1 National Science Challenges report. 'Meet the researchers: Andy Cockburn, Turbulent touch'. 22/03/2019.

O2 Marsden update. 'Young researchers experience international science.' (PhD student Stephen Fitchett). February 2012.

O3 Magazine article. New Zealand Listener. "Charge of the tech brigade". Mar 31, 2012.

O4 Newspaper article. The Press. "Conference acceptance a coup". Dec 22, 2011.

O5 Newspaper article. The Press. "Intuitive Innovations". Feb 22, 2011.

O6 UC Communications. 'UC/Microsoft. internship opens up world for computer science student.' Mar 22, 2011.

O7 Marsden update. 'Highlights of the 2010 funding round.' November 2010.

O8 Magazine article. 'Profiling Excellence'. Royal Society of New Zealand. 'Thirty years of research in a single hit', March 2010.

O9 Newspaper article. Sydney Morning Herald. 'Computer mouse still rules, says expert', Jan 19, 2010. (Widely syndicated through AAP.)

    `http://news.smh.com.au/breaking-news-national/computer-mouse-still-rules-says-expert-20100119-mhnp.html`

O10 Newspaper article. Dominion Post. 'Next-step mouse on its way', Feb 1, 2010.

O11 Radio Interview (Live). ABC Perth. 'Drive Time' program. January 19th, 2010.

O12 Newspaper article. The Press. 'Boost for Computer Activation Project', Nov. 5, 2009.

O13 Radio interview (Sweden). 'Highlights of the INTERACT Conference', Sept 3 2009. `http://www.sr.se/cgi-bin/p1/program/artikel.asp?ProgramID=406&nyheter=1&artikel=3075930`

O14 Newspaper article. Dominion Post. 'Kiwi mouse comes out of hiding', March 10, 2008. `http://www.stuff.co.nz/4433363a28.html`

O15 Newspaper article. Christchurch Press. 'Fast Kiwi mouse attracts interest from big players', March 5, 2008. `http://www.stuff.co.nz/4425499a28.html`

O16 Newspaper article. The Age (Australia). 'Kiwi mouse attracts interest', March 5, 2008. `http://http://www.theage.com.au/news/biztech/kiwi-mouse-attracts-interest/2008/03/10/1204998342852.html`

O17 Magazine article. Marsden Update. 'Document Navigation', December 2008.

O18 Interview. IEEE Spectrum. 'A New Spin on the Computer Mouse', October 2006. `http://www.spectrum.ieee.org/oct06/4668`

O19 Video. Faster Document Navigation with Space-Filling Thumbnails *Video in the Video Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI2006)* Montreal, Canada, April *2006*. `http://www.cosc.canterbury.ac.nz/~andy/sft.mov`

22

O20 Video. Tuning and Testing Scrolling Interfaces that Automatically Zoom *Video in the Refereed Video Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI2005)* Portland, Oregon, April *2005*. `http://www.cosc.canterbury.ac.nz/~andy/tuning-n-testing.wmv`

O21 Video. Around the World in Seconds with Speed-Dependent Automatic Zooming *Video and Demonstration at the ACM Conference on User Interface Software and Technology* Vancouver, Canada, November *2003*. `http://www.cosc.canterbury.ac.nz/~andy/uist-sdaz.avi`

O22 Radio Interview. BBC World Service. 'Go Digital' program. January 14th, 2003 `http://news.bbc.co.uk/2/hi/technology/2677337.stm`

O23 Nature Journal's Science Update. 'Browsers go back to the future' `www.nature.com/nsu/021230/021230-3.html`

O24 'The Register' in the UK. 'Kiwis redesign the Back button'. `http://www.theregister.co.uk/content/6/28729.html`

O25 Canadian Broadcast Corporation. Programmers try out alternative to browser's back button. `http://cbc.ca/storyview/CBC/2002/12/30/back_button021230`

O26 Slashdot. 'Redesigning The "Back" Button' `slashdot.org/article.pl?sid=02/12/30/1727206&mode=thread&tid=95`

O27 NZOOM's Technology Page. `technology.nzoom.com/technology_subcategory/0,1610,113-116,00.html`

O28 Newspaper Interview. Christchurch Press. 'Better Going Back', Feb 11, 2003.

O29 University Chronicle. "Taking the frusturation out of the web", Feb 20, 2003.

O30 S Greenberg, C Gutwin, and A Cockburn. Applying Distortion-Oriented Displays to Groupware. Video Programme of the ACM Conference on Computer Supported Cooperative Work. 1996.

O31 S Greenberg, C Gutwin, and A Cockburn. Sharing fisheye views in relaxed-WYSIWIS groupware applications. Technical Report 95/577/29, Department of Computer Science, University of Calgary, Calgary, CANADA., 1996.

O32 S Greenberg, C Gutwin, and A Cockburn. Using distortion-oriented displays to support workspace awareness. Technical Report 96/581/01, Department of Computer Science, University of Calgary, Calgary, CANADA., 1996.

O33 S Greenberg, C Gutwin, M Roseman, and A Cockburn. From awareness to teamrooms, groupweb and turboturtle: Eight snapshots of recent work in the grouplab project. Technical Report 95/580/32, Department of Computing Science, University of Calgary, Canada, December 1995.

O34 A Cockburn and S Greenberg. The design and evolution of turboturtle: A collaborative microworld for exploring newtonian physics. Technical Report tr-cosc.03.95, University of Canterbury, Christchurch. New Zealand, 1995.

O35 AJG Cockburn. Social awareness without mega-bits. In *Proceedings of Uniforum. Rotoroa, New Zealand.*, 1994.

23

O36  AJG Cockburn. *Groupware design: principles, prototypes, and systems*. PhD thesis, Department of Computing Science and Mathematics, University of Stirling, Scotland. FK9 4LA, 1993. Available from British Libraries, or as Technical Report 107 from the University of Stirling.

O37  SRA Jones and AJG Cockburn. Reducing requirements in computer supported writing tasks, 1993. Paper presented at: 6th UK conference on computers and writing. University of Wales. April 13-15.

O38  AJG Cockburn and S Greenberg. Making contact: getting the group communicating. Technical Report 93/498/03, Department of Computer Science, University of Calgary, Alberta T2N 1N4 Canada, 1993.

O39  AJG Cockburn and HW Thimbleby. Reducing user effort in collaboration support. Technical Report 93, University of Stirling, Stirling, Scotland, FK9 4LA, 1992.

O40  AJG Cockburn and HW Thimbleby. A reflexive perspective of CSCW. *ACM SIGCHI Bulletin*, 23(3):63–68, July 1991.

O41  AJG Cockburn. A user's guide to TELEFREEK: a communication and social awareness environment. Technical Report 105, Department of Computing Science and Mathematics, University of Stirling, Stirling, Scotland, FK9 4LA, 1993.

O42  AJG Cockburn. A user's guide to *mona*: an enhanced email system. Technical Report 97, Department of Computing Science and Mathematics, University of Stirling, Stirling, Scotland, FK9 4LA, 1992.

## Grants and industry research/consulting

| Project | Source | Date | Amount |
|---|---|---|---|
| Understanding the human experience of intelligent user interfaces | Marsden. (19-UOC-021) | 2020-2022 | $530,000 |
| Travel expenses | Airbus & U. Paul Sabatier | 2018 | ≈ $7,000 |
| In-Vehicle Touchscreens | NZ Science for Innovation | 2017 | $200,000 |
| Travel expenses | ACM CHI Steering Committee | 2017 | ≈ $4,000 |
| Travel expenses | Australian National University | 2016 | ≈ $3,000 |
| Travel expenses | Airbus & U. Paul Sabatier | 2016 | ≈ $5,000 |
| Travel expenses | ACM CHI Academy Award (Seoul) | 2015 | ≈ $5,000 |
| Benjamin Meaker Visiting Professorship | University of Bristol | 2013 | £7,000 |
| Understanding and improving the novice to expert transition with user interfaces | Marsden. (10-UOC-020) | 2011-2014 | $496,000 |
| Dynamic Multimodal Affordances | HP Innovations Award | 2011-2012 | US$40,000 |
| Travel expenses | ACM UIST conference | June 2009 | ≈ $4,000 |
| Postdoctoral Fellow | BuildIT | 2011-2012 | $116,000 |
| Dynamic Multimodal Affordances | HP Innovations Award | 2010-2011 | US$40,000 |
| Travel expenses | ACM UIST conference | June 2009 | ≈ $4,000 |
| Scrolling device studies | Logitech Inc | 2010 | $10,000 |
| Canadian GRAND project | Canadian Centres of Excellence | 2010-2014 | C$25,000,000 |
| BuildIT Emerging Researcher Mentoring Fund | BuildIT | 2010 | $8,000 |
| Pythodogogical | UC Teaching and Learning | 2009-2010 | $15,000 |
| Dynamic Multimodal Affordances | HP Innovations Award | 2009-2010 | US$40,000 |
| Travel expenses | ACM UIST conference | June 2009 | ≈ $4,000 |
| Travel expenses | ACM CHI conference | Nov. 2008 | ≈ $4,000 |
| Improving document navigation interfaces | Marsden. (07-UOC-013) | 2007–2010 | $400,000 |
| Accessible AR on Everyday Devices | FRST (UOCX0704) | 2007–2011 | $1,875,000 |
| Usability training | Jade Software | 2007 | ≈ $2,000 |
| Usability training | AMI | 2007 | ≈ $2,000 |
| Expenses | Logitech Inc., California | April 2007 | ≈ $5,000 |
| Expenses | Logitech Inc., California | July 2006 | ≈ $2,000 |
| Grant in aid | University of Toronto | July 2006 | ≈ $8,000 |
| Grant in aid | University of Saskatoon | June 2006 | ≈ $6,000 |
| Grant in aid | University of Calgary | May 2006 | ≈ $3,000 |
| Grant in aid | IBM Almaden Research, California | April 2006 | ≈ $3,000 |
| NOKIA Pocket (Assoc. with HIT Lab). | Nokia Research Center | 2006. | ≈$100,000. |
| Speed-Dependent Automatic Zooming | Computer Science | 2003 | $3,000 |
| Evaluation of Speed-Coupled Scrolling | Computer Science | 2002 | $3,000 |
| Multimedia Learning of Graphics (Assoc.) | UoC Teaching and Learning Ctte. | 2002 | $5,000 |
| Fastap Evaluation | Digit Wireless LLC, MA, USA. | 2002 | $3,000 |
| Supermedia—The MagicBook Project (Assoc.) | NZ NERF (UOCX0204) | 2002 | $333,000 |
| Practical Flexible Delivery of Virtual Learning | UoC (U6360) | 1999–2002 | $40,000 |
| Collaborative Programming for Children | Marsden, Royal Soc. (UOC805) | 2000–2002 | $135,000 |
| Evaluation of Back/Forward in Web-browsers | Computer Science | 2001 | $3,000 |
| Interfaces for WWW navigation. | Microsoft Research, USA. | 1999 | ≈ $8,000 |
| HCI and multi-media research lab | Computer Science | 1999 | $7,400 |
| Video analysis and multi-media lab | UoC (2313728) | 1996 | $30,000 |
| Collaborative video analysis | Computer Science | 1996 | $3,000 |
| Collaborative microworlds | Computer Science | 1995 | $4,000 |
| Asynchronous groupware toolkits | Computer Science | 1994 | $2,000 |

# Academic Service

| | | |
|---|---|---|
| External assessor | 2019 | Promotion to Full Professor: University of Toronto. |
| External assessor | 2018 | Promotion to Full Professor: University of Cambridge. |
| Rapportuer | 2018 | Habilitation, Dr Eric Lecolinet, Université Paris Sud, France. |
| Rapportuer | 2018 | Habilitation, Dr Marcos Serrano, University Toulouse III Paul Sabbatier, France. |
| External assessor | 2017 | Promotion application: University of Waterloo. |
| Chair | 2018-2021 | Technical program chair for ACM CHI 2020 Conference |
| Committee member | 2016-2020 | Steering Committee for the ACM CHI Conference |
| Rapportuer | 2017 | Habilitation, Dr Caroline Appert, University Paris-Sud, France. |
| Chair | 2016-2018 | CORE Chris Wallace Research Award Panel |
| Deputy Chair | 2016-2018 | PBRF Mathematical and Information Sciences Panel |
| Editorial | 2015– | Editorial Board of Foundations and Trends in Human-Computer Interaction. |
| Editorial | 2015– | Editorial Board of Human-Computer Interaction. Taylor and Francis. |
| Chair | 2012–2015 | Papers co-chair for ACM CHI 2014 and 2015 (over 2000 submissions). |
| Service Award. | 2014. | ACM SIGCHI Recognition of Service Award. |
| Editorial | 2012– | Editorial Board of ACM Transactions on Computer-Human Interaction. ACM. |
| Panel member | 2011-2012 | Member of the Mathematics, Information Sciences and Technology PBRF panel. |
| Panel member | 2008–2009 | BuildIT Postdoctoral Award. |
| Governance board | 2008–2010 | Elected member of the governance board of BuildIT. |
| Panel member | 2009, 2011 | Member of the Mathematics and Information Sciences Marsden panel. |
| Panel member | 2008–2009 | BuildIT Postdoctoral Award. |
| Panel member | 2008–2010 | BuildIT Emerging Reseacher Travel Fund. |
| Mentor | 2009–2010 | BuildIT mentor for early career researchers. |
| External assessor | 2010 | Docent application advisor, University of Tampere, Finland. |
| External assessor | 2010 | Promotion application for University of Auckland. |
| External assessor | 2007, 2009 | Promotion applications for INRIA, University Paris-Sud. |
| External assessor | 2007 | Postdoctoral applicants for Ryerson Univerity, Canada. |
| Editorial | 2002–2013 | Associate Editor for International Journal of Human-Computer Studies. |
| Editorial | 2002–2013 | Member Editorial Board for Interacting with Computers Journal. |
| Chair | 2010–2011 | Subcommittee Chair ACM CHI'11. |
| Senior Reviewing | 2004– | Associate Chair (Papers) for ACM CHI'04, CHI'08, CHI'09. |
| Senior Reviewing | 2009 | Associate Chair (Papers) for ACM UIST 2009. |
| Senior Reviewing | 2007 | Short papers chair for INTERACT 2007 |
| Chair | 2004–2005 | Papers chair for Australasian User Interface Conferences |
| Competition judge | 2009 | Student Research Competition at CHI 2009. |
| Journal Reviewing | 1993– | Communications of the ACM, Human-Computer Interaction Journal, IEEE Transactions on Visualization and Computer Graphics, ACM Transactions on Computer-Human Interaction, Ergonomics, Information and Software Technology, Information Technology and Society, Interacting with Computers, Virtual Reality, Personal and Ubiquitous Computing, Journal of Computer-Mediated Communication, and International Journal of Human-Computer Studies. |
| Misc. | 2003 | Organised the 'Masterclass and Symposium on Interacting with and Through Next Generation Computer Systems', held at the University of Canterbury. |
| Organising committees | 1996, 1998 | OzCHI |
| Doctoral consortium | 2008 | CHI 2008 |
| Other reviewing | Ongoing | Graphics Interface 2009, 2010, 2011; UIST Demos 2009; ACM CHI 2007, 2006, 2005, 2004, 2003, 2002. AICCS-07; ACM UIST 2007, 2006, 2005, 2003; InfoVis 2006; BEyond time and errors: novel evaLuation methods for Information Visualization (BELIV'06); ACM Advanced Visual Interfaces (AVI) 2006; IEEE Tencon'05; CHINZ'05; Interact'05; MobileHCI'05; ACM CSCW 2004; ACM UIST 2003; INTERACT 2003; Australasian User Interface Conference, 2000–2003; The Active Web, '99; ACM Conference on Data Communications 1994; ACM Conference on Human Factors in Computing Systems 1996; OZCHI'94-97; APCHI'96 & '98; ACM Hypertext '97; Graphics Interface '97; InterAct '97; ACM Group '97. |

26

## Invited seminar presentations outside the University of Canterbury

| | |
|---|---|
| Keynote address, INTERACT Conference, Mumbai. | September, 2017. |
| Dean's Colloquium, ANU, Australia. | August, 2016. |
| Engineering & Computer Science, ANU, Australia. | August, 2016. |
| Institute of Advanced Studies, University of Bristol, UK. | August, 2013. |
| Department of Computer Science, University of Glasgow, UK. | August, 2013. |
| Colloquium Polaris, INRIA, Lille, France. | July, 2013. |
| Department of Computer Science, University of Manitoba, Canada. | August, 2010. |
| Department of Computer Science, University of Manitoba, Canada. | August, 2010. |
| Department of Computer Science, University of British Colombia, Canada. | August, 2010. |
| Keynote address, Australasian Computer Science Week. | January, 2010. |
| Department of Computer Science, University of British Colombia, Canada. | July, 2009. |
| Department of Computer Science, University of Calgary, Canada. | July, 2008. |
| Department of Computer Science, Swansea University, UK. | September, 2008. |
| INRIA, Universite Paris-Sud, France. | September, 2006. |
| Department of Computer Science, Swansea University, UK. | August, 2006. |
| Logitech Inc., California. | July, 2006. |
| Department of Computer Science, Dalhousie University, Nova Scotia. | July, 2006. |
| Digital Graphics Project Lab, University of Toronto. | June, 2006. |
| Department of Computer Science, University of Saskatoon. | June, 2006. |
| Department of Computer Science, University of Calgary. | April, 2006. |
| IBM Almaden Research Centre. | March, 2006. |
| Digital Fusion Inc.. | February, 2006. |
| Usability Professionals Association (UPA), Canterbury Innovation Incubator. | November, 2005. |
| Usability Professionals Association (UPA), Canterbury Innovation Incubator. | November, 2004. |
| Department of Computer Science, University of Calgary, Canada. | November, 2003. |
| Human-Computer Interaction Lab, Univ. of Maryland, College Park, USA. | October 2003. |
| Department of Computer Science, University of Glasgow. | September, 2003. |
| Department of Psychology, University of York. | September, 2003. |
| Interaction Centre, University College London. | September, 2003. |
| Department of Computer Science, University of Southampton. | September, 2003 |
| New Zealand Computer Society, Christchurch. | June, 2003. |
| Department of Computer Science, University of Waikato. | December, 2002. |
| Allied Telesyn Research. | November, 2002. |
| Department of Computer Science, University of Calgary, Canada. | October, 2001. |
| Institute for Info. Tech., National Research Center, Ottawa, Canada. | October, 2001. |
| Grouplab, University of Calgary, Canada. | October, 2001. |
| Department of Computer Science, University of Saskatchewan, Canada. | October, 2001. |
| Department of Computer Science, University of Cape Town, South Africa. | September, 2001. |
| Department of Computer Science, Victoria University of Wellington. | July, 2000. |
| Inaugural ACM SIGCHI_NZ meeting. Massey University. | June 2000. |
| Department of Computer Science, University of Waikato. | May, 2000. |
| Department of Computer Science, University of Calgary. | March, 1999. |
| Center for LifeLong Learning and Design, University of Colorado, Boulder. | November, 1998. |
| Norsk Regencentral (Norwegian Research Centre), Oslo, Norway. | August, 1998. |
| Department of Computer Science, University of Calgary. | January, 1996. |
| Department of Computer Science, Massey University. | January, 1993. |
| Department of Computer Science, University of Waikato. | January, 1993. |

27

## Visiting academics

I have attracted many world leaders in Human-Computer Interaction to the department. Most of them have presented several seminars while at Canterbury, including numerous 'Science Prestige Lectures' and Ben Sheiderman's Royal Society Evening Lecture.

| | | |
|---|---|---|
| Prof. Carl Gutwin | University of Saskatchewan, Saskatoon, Canada. | Four weeks, 2020. |
| Prof. Carl Gutwin | University of Saskatchewan, Saskatoon, Canada. | Seven weeks, 2015-2016. |
| Prof. Wolfgang Stuerzlinger | University of Waterloo, Canada | Three months, 2011-2012 |
| Prof. Kari-Jouko Raiha | University of Tampere, Finland | Nine months, 2009-2010 |
| Dr. Saila Ovaska | University of Tampere, Finland | Nine months, 2009-2010 |
| Dr. David Ahlstroem | Klagenfurt University, Austria. | Eighteen months, 2008-2010. |
| Prof. Carl Gutwin | University of Saskatchewan, Saskatoon, Canada. | Three months, 2008. |
| Prof. Karon MacLean | University of British Colombia, Canada. | Six months, 2007-2008. |
| Prof. Bob Kraut | Carnegie Mellon University. | Erskine Visitor. Three months, 2008. |
| Prof. Andrew Monk | University of York, UK. | Three months, 2008. |
| Dr. Gonzalo Ramos | University of Toronto, Canada. | One month, 2007. |
| Prof. Carl Gutwin | University of Saskatchewan, Saskatoon, Canada. | Erskine Fellow. Four months, 2007. |
| Prof. Alistair Sutcliffe | University of Manchester, UK. | One month, 2007. |
| Prof. Carl Gutwin | University of Saskatchewan, Saskatoon, Canada. | One week, 2005. |
| Prof. Ben Bederson | University of Maryland, Maryland, USA. | One week, 2004. |
| Prof. Ben Shneiderman | University of Maryland, Maryland, USA. | Erskine Fellow. One month, 2003. |
| Prof. Jenny Preece | University of Maryland, Baltimore County, Maryland. | Erskine Fellow. One month, 2003. |
| Prof. Stephen Brewster | University of Glasgow, UK. | Erskine Fellow. Six months, 2003. |
| Prof. Gerhard Fischer | University of Colorado, Boulder. | One year, 2002–2003. |
| Prof. Bob Spence | Imperial College London. | Erskine Fellow. One month, 2002. |
| Prof. Gerhard Fischer | University of Colorado, Boulder. | Erskine Fellow. One month, 2000. |
| Prof. Harold Thimbleby | Middlesex University, UK. | Erskine Fellow. One month, 1997. |
| Dr Allen Cypher | Apple Research, Cuppertino, California. | One week, 1996. |
| Dr Akihiko Machizawa | Communications Research Laboratory, Japan. | Three years, 1996–1998. |
| Professor Brian Wyvill | University of Calgary, Canada. | Erskine Fellow. Two months, 1996. |
| Professor Saul Greenberg | University of Calgary, Canada. | Erskine Fellow. Six months, 1995. |
| Carl Gutwin | University of Calgary, Canada. | Two months, 1995. |
| Dr Steve Jones | University of Abertay, Dundee. | Six months, 1995. |

# Expert Witness Consulting

Role    Expert witness for DLA Piper (counsel for Microsoft) and Morrison & Foerster (counsel for Amazon).
        (analysis).
Case    Neodron versus Microsoft, Amazon & others.
        *US International Trade Commission.* 337-TA-1193.
Dates   May 2020 –

Role    Expert witness for Desmarais, counsel for IBM.
        (analysis).
Case    IBM versus Zillow Group.
        *Central District of California.* 8:19-CV-01777.
Dates   October 2019 –

Role    Expert witness for DLA Piper (counsel for Microsoft and HP), Morrison & Foerster (counsel for Amazon),
        Finnegan, Henderson, Farabow, Garrett & Dunner (counsel for Motorola and Lenovo), Alston & Bird (counsel for Dell),
        O'Melveny & Myers (counsel for Samsung).
        (analysis, reports, deposition).
Case    Neodron versus Microsoft, HP, Amazon, Samsung, Dell, Motorola, Lenovo.
        *US International Trade Commission.* 337-TA-1162.
Dates   August 2019 –

Role    Expert witness for Jones Day, counsel for Google and Huawei.
        (analysis).
Case    American Patents versus Huawei.
Dates   April 2019 – July 2019

Role    Expert witness for Gilbert+Tobin, counsel for Aristocrat Technologies.
        (reports, testimony at trial).
Case    Aristocrat Technologies versus Commissioner of Patents.
        *Federal Court of Australia.* NSD 1343/2018.
Dates   September 2018 –

Role    Expert witness for Williams & Connolly and Alston & Bird, counsel for Google and ASUS Inc.
        (reports, deposition).
Case    Google versus Philips.
        *Northern District of California* 4:18-cv-01885-HSG.
Dates   March 2016 –

Role    Expert witness for Williams and Connolly, counsel for Google Inc.
        (reports, deposition).
Case    Google versus Philips.
        *Patent Trial and Appeal Board.* IPR2017-00386/387/388/389.
Dates   March 2016 – 2018

Role    Expert witness for DLA Piper, counsel for Apple Inc.
        (reports, deposition, testimony at trial).
Case    Immersion versus Apple.
        *US International Trade Commission.* 337-TA-1004 and 337-TA-990 (consolidated).
Dates   June 2016 – May 2017

Role    Expert witness for DLA Piper, counsel for Apple Inc.
        (reports).
Case    Apple versus Immersion.
        *Patent Trial and Appeal Board.* IPR2016-01777.
Dates   June 2016 – May 2017

29

| | |
|---|---|
| Role | Expert witness for Wilmer Cutler Pickering Hale and Dorr, counsel for Apple Inc. (analysis). |
| Case | Core Wireless Licensing S.a.r.l. v. Apple Inc. *Eastern District of Texas.* 6:14-cv-00751 and 6:14-cv-00752. |
| Dates | August 2015 – June 2016 |
| | |
| Role | Expert witness for Weil, Gotshal & Manges, counsel for Apple Inc. (analysis). |
| Case | Motorola Mobility Inc. versus Apple Inc. *Southern District of Florida.* 10-CV-23580-RNS-TEB and 12-CV-20271-RNS-TEB. |
| Dates | October 2013 – March 2014 |
| | |
| Role | Expert witness for Gibson, Dunn & Crutcher, counsel for Apple Inc. (reports, deposition, testimony at trial). |
| Case | Apple Inc. versus Samsung Electronics Co. Ltd. *Northern District of California.* 12-CV-0630-LHK. |
| Dates | June 2013 – June 2014 |
| | |
| Role | Expert witness for Herbert Smith Freehills, counsel for Apple Inc. (reports, testimony at trial). |
| Case | Apple Inc. versus Samsung Electronics Co. Ltd. *Federal Court of Australia.* NSD 1243 of 2011. |
| Dates | September 2011 – May 2013 |

## Other

- Member of the Association of Computing Machinery (ACM).

- Member of the ACM Special Interest Group of Computer-Human Interaction.

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NEONODE SMARTPHONE LLC,<br><br>               Plaintiff,<br><br>    v.<br><br>APPLE INC.<br><br>               Defendant. | Case No. 3:21-cv-08872-EMC |

**OPENING EXPERT WITNESS REPORT OF DR. ANDREW COCKBURN**
**<u>REGARDING CLAIM CONSTRUCTION</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 2

II.   BACKGROUND AND QUALIFICATIONS ....................................................... 2

III.  LEGAL PRINCIPLES ......................................................................................... 7

   A.  Person of Ordinary Skill in the Art .................................................................. 7

   B.  Claim Construction ........................................................................................... 8

   C.  Indefiniteness .................................................................................................... 8

IV.   PERSON OF ORDINARY SKILL IN THE ART ............................................... 9

V.    MATERIALS CONSIDERED ............................................................................. 9

VI.   THE ASSERTED PATENT ............................................................................... 10

VII.  THE DISPUTED CLAIM TERMS ................................................................... 13

VIII. THE PARTIES' PROPOSED CONSTRUCTIONS ........................................... 14

IX.   ANALYSIS ........................................................................................................ 15

   A.  "Representation of a function" ....................................................................... 15

   B.  "A touch sensitive area in which a representation of a function is provided" ................... 21

   C.  "Object gliding along the touch sensitive area away from the touched location" ............. 29

   D.  "Duplicated" ................................................................................................... 33

   E.  "Location where the representation is provided" / "the touched location" ....................... 33

   F.  The term "one step" is indefinite because the intrinsic record fails to inform a POSITA
       with reasonable certainty about the scope of this term ............................................. 36

X.    CLOSING REMARKS ....................................................................................... 40

1

I, Dr. Andrew Cockburn, declare as follows:

## I.    INTRODUCTION

1.    I have been retained as a technical expert by Defendant Apple, Inc. ("Apple") for this litigation.

2.    I understand that the parties have asked the Court to construe certain terms of the patent claims asserted by Plaintiff Neonode Smartphone LLC ("Neonode") against Apple.

3.    I understand that Neonode asserts claims 1–5, 12–13, 15–17 of U.S. Patent No. 8,095,879 (the "'879 patent").

4.    I am being compensated for my work in connection with this litigation at my customary hourly consulting rate of $600/hour plus reasonable expenses.  My compensation is not in any way contingent on the substance of my opinions or the outcome of this litigation.  I have no prior affiliation with Apple or Neonode.  I have no interest, financial or otherwise, in the outcome of the current patent infringement litigation between the parties.

5.    This report is based on the information available and known to me as of the date of this report.  It may be necessary for me to supplement this report based on material that subsequently comes to light in this case, and I reserve the right to do so.

## II.    BACKGROUND AND QUALIFICATIONS

6.    In formulating my opinions, I have relied on my knowledge, training, and experience in the relevant field.  My education and experience are described more fully in the attached *curriculum vitae* (Appendix A).  For ease of reference, I have highlighted certain information below.

7.    Until my recent retirement from teaching, I was a Professor at the Department of Computer Science and Software Engineering at the University of Canterbury, New Zealand.  I also

headed the HCI (which stands for "Human-Computer Interaction") and Multi-Media research group at the University of Canterbury.

8.    In 1988, I was awarded a Bachelor of Science with Honors in Computer Science from the University of York, England.

9.    In 1993, I was awarded a Ph.D. from the University of Stirling, Scotland. My thesis was on "Computer Supported Cooperative Work" which relates to forms of group interaction supported on computer.

10.    In 1993, I joined the University of Canterbury as a Lecturer in the Department of Computer Science (now the Department of Computer Science and Software Engineering). I was subsequently promoted to a Senior Lecturer, and then an Associated Professor, before my appointment as a Professor in 2010.

11.    I have over 30 years experience in the area of human-computer interaction ("HCI"). The field of HCI generally is concerned with ways of understanding and improving the interaction between humans and computers, with a view to understanding, evaluating, designing and building new styles of interactions that improve on one or more of the end goals of making computers (including mobile devices) faster to learn, more intuitive, and more efficient and satisfying to use. Advances in the field of HCI are commonly associated with the development of new hardware and/or software, such as exploring the interaction possibilities enabled by a new input/output device or sensor, and examining new ways to process human input or create new interactive effects in software.

12.    Throughout my career, I have published the results of many research projects that have involved building new user interfaces or reviewing existing user interfaces for performing a particular task, and evaluating their effectiveness. This includes publications relating to:

3

- designing, implementing, and evaluating scrolling interactions that are activated at the edge of a display region, such as a window;

- developing and evaluating improved methods for pointing to and selecting small targets such as window edges;

- designing, implementing, and evaluating touchscreen interface for pen-based input of music notation;

- reviewing and improving various interface schemes for traversing through documents in computer applications, including zooming, scrolling, and other techniques;

- addressing the problems arising from the small form factor of mobile devices with touch-sensitive displays;

- evaluating the importance of spatially stable displays in user interfaces;

- analyzing new interfaces for text entry on mobile and touch-sensitive devices;

- examining the influence of haptic feedback on user performance with mouse and touchscreen input devices; and

- designing, implementing, and evaluating interfaces to better support transitions from novice to expert performance.

13.     I also have extensive experience in designing and building new user interfaces and reviewing existing user interfaces. This includes a number of projects regarding the design, development, and evaluation of user interfaces that I have undertaken with companies in the computing and HCI industry, such as:

4

- working with Airbus SAS from 2016-2019 on methods to assist pilot interaction with touchscreens in turbulent environments, including pan, slide, and zoom operations;

- working with Hewlett-Packard Research Labs from 2010-2012 on the design and evaluation of pointing techniques for remote displays, such as interactive TVs;

- a number of projects from 2006-2010 working with Logitech on the design, development, evaluation and improvement of user interfaces for next generation mice, including in relation to scrolling and window management tasks through overview displays, which relate to zooming;

- working with IBM Almaden Research in 2006 on the design, development and evaluation of user interfaces for touch-sensitive text entry on mobile devices;

- working with Digit Wireless in 2002 on the evaluation of user performance for user interfaces for digital text entry on mobile devices; and

- working with Microsoft Research in 1999 on the development, evaluation, and improvement of user interfaces for web browsing, in particular the mechanisms for revisiting pages (such as through the "back" button or bookmarks).

14. Below are some exemplary courses I taught while employed at the University of Canterbury:

- a course on introductory computer programming designed for first year students across disciplines;

- a course on computer science research methodology for postgraduate students;

5

- courses on HCI for computer science students at all university levels (including honors and masters level students).

15. I also managed an active research lab with a number of graduate level students. I have previously supervised thirteen students to successful completion of their Ph.D.'s in the field of HCI.

16. In 2015 I was elected to the Association of Computing Machinery (ACM) Computer Human Interaction (CHI) Academy, which honors the principal leaders of the field of HCI. I have been a continuous member of the ACM for over three decades.

17. Since the early 1990s, I have routinely attended annual conferences relating to the field of HCI and have regularly read journals that cover research in the field of HCI.

18. I have served on the editorial boards of leading journals in the HCI field (including ACM transactions on Computer-Human Interaction, Human-Computer Interaction Journal, and International Journal of Human-Computer Studies, Interacting with Computers, and Foundations and Trends In Human Computer Interaction), and have participated in the review process for numerous articles, including articles related to sliding interactions on touch-sensitive input devices.

19. I have served in senior leadership roles for the leading conference in the field of HCI—the ACM CHI Annual Conference on Human Factors in Computing Systems. I was technical program co-chair for CHI 2020, I served as paper and notes chair for CHI 2014 and 2015, and as subcommittee chair for CHI 2011. I served on the inaugural steering committee for the ACM CHI conference (2016-2020).

20. I have authored over one hundred and fifty publications related to HCI in international journals and conferences.

21. Details of my professional qualifications and background are more fully set forth in my curriculum vitae, a copy of which is attached as Appendix A.

22. I have previously offered testimony as an expert witness in the field of HCI. A list of my prior engagements in which I testified as an expert at trial or by deposition is also included in my CV.

23. Based on my background and experience, as set forth more fully in my CV, I am familiar with the state of the art in the field of user-interface design and development as of December 10, 2002, which I understand is the filing date of the application that issued as the '879 patent. I was at those times and still am a technical expert in the fields relating to the '879 patent and other related fields, and I remain an active researcher in these fields.

24. Based on my professional experience, I believe I am qualified to testify as an expert on matters related to the patent at issue.

## III. LEGAL PRINCIPLES

25. In expressing opinions on what I understand might be legal issues, I have applied the following legal standards conveyed to me by Apple's counsel.

### A. Person of Ordinary Skill in the Art

26. I understand that the factors considered in determining the ordinary level of skill in a field of art include: the level of education and experience of persons working in the field; the types of problems encountered in the field; the teachings of the prior art regarding solutions to such problems; and the sophistication of the technology at the time of the alleged invention. I understand that a person of ordinary skill in the art (or a "POSITA") is not a specific real individual but rather a hypothetical individual having the qualities reflected by the factors above and knowledge of all relevant prior-art references, including the references I cite below.

7

### B.    Claim Construction

27.    I understand that terms in patent claims must be read as they would have been understood by a person of ordinary skill in the art at the relevant time.  For purposes of this report, I have been advised by Apple's counsel that the relevant time is 2002 because the effective filing date of the '879 patent is December 10, 2002.

28.    I have been advised that the words of a claim are generally given their plain and ordinary meaning, which is the meaning that they would have to a person of skill in the art in light of the specification and prosecution history.  I understand that courts determine the plain and ordinary meaning of claim terms by considering the sources available to the public that show what a person of ordinary skill in the art would have understood the disputed claim language to mean, including the words of the claims themselves, the specification, the file history, and, in some circumstances, extrinsic evidence (i.e., evidence outside the patent and its file history).  I understand that extrinsic evidence includes evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

29.    I understand that when a patent describes features of the "present invention" as a whole, the patent's description limits the scope of the claimed invention.

30.    I also understand that the statements made by a patent owner during an *inter partes* review proceeding can be considered during claim construction, and may limit the scope of a term.

### C.    Indefiniteness

31.    I understand that the patent statute requires patent claims to be definite.  I understand that, to meet this "definiteness" requirement, the claims must particularly point out and distinctly claim the subject matter the applicant regards as his or her invention.

32.    I understand that indefiniteness is evaluated from the perspective of a POSITA as of a patent's filing date.  I understand a patent claim is indefinite if, when read in light of the

8

specification and the prosecution history, the claim fails to inform a POSITA of the scope of the invention with reasonable certainty.

33.    I understand that absolute or mathematical precision in claim language is not required, but it is not enough that some meaning can be ascribed to a patent's claims.

34.    I understand a claim is indefinite if claim language could mean different things and no informed and confident choice is available among the competing definitions.

## IV.    PERSON OF ORDINARY SKILL IN THE ART

35.    Based on my knowledge and experience in the field and my review of the '879 patent, and its respective file history, I believe that a POSITA would have had at least a bachelor's degree in computer science, computer engineering, or the equivalent education and at least two years of experience in user interface design and development.  Additional years of formal education could substitute for experience, and vice versa.

36.    My analysis and conclusions expressed in this report are based on the perspective of a POSITA having this level of knowledge and skill.  My education, technical expertise, and personal knowledge discussed in Section II meet the qualifications of a POSITA. Furthermore, I have significant experience training and educating persons meeting the qualifications of a POSITA, and I am familiar with the perspective of a POSITA.

## V.    MATERIALS CONSIDERED

37.    As part of my independent analysis for this report, I have considered the following materials:

- The '879 patent and its prosecution history, including the *inter partes* review proceedings relating to the '879 patent;

- The background knowledge and technologies that were commonly known to persons of ordinary skill in the art;

9

- My own knowledge and experience gained from my work in the field;

- My experience in teaching and advising others in the field;

- My experience working with others involved in the field;

- The intrinsic and extrinsic evidence identified in the parties' Patent Local Rule 4-2 disclosures;

- Any materials cited herein; and

- The claim construction opinions and orders in the following cases:

  o *Neonode Smartphone LLC v. Samsung Elecs. Co., Ltd.*, No. 6:20-CV-507-ADA (W.D. Tex.)

  o *Neonode Smartphone LLC v. Samsung Elecs. Co., Ltd.*, No. 2023-2304, 2024 WL 3873566 (Fed. Cir. 2024)

  o *Google LLC v. Neonode Smartphone LLC*, No. 2023-1638, 2024 WL 3451831 (Fed. Cir. 2024)

38. My citations to patent literature use the column and line numbers or paragraph numbers. Unless indicated otherwise, all emphasis (bold/italics/underline) in any quoted text are ones I have added.

## VI.    THE ASSERTED PATENT

39. The '879 patent "relates to a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area." '879 patent at 1:6-8.

40. As illustrated in Figure 1 below (which I have annotated), the '879 patent's user interface includes "a touch sensitive area 1, which is divided into a menu area 2 and a display area 3." *Id.* at 3:51-54. The menu area 2 "present[s] a representation of a first 21, a second 22 and a third 23 predefined function." *Id.* at 4:1-3.

10



41.     As illustrated in Figure 2 below (which I have also annotated), "any one of these three functions 21, 22, 23 can be activated when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3." *Id.* at 4:7-11, Fig. 2.

11



42. Claim 1 recites:

A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

43. Claim 12 recites:

The computer readable medium of claim 1, wherein the user interface is characterized in, that an active application, function, service or setting is advanced one step by gliding the object along the touch sensitive area from left to right, and that the active application, function, service or setting is closed or backed one step by gliding the object along the touch sensitive area from right to left.

44. Claim 13 recites:

12

> The computer readable medium of claim 1, wherein the user interface is characterized in, that said representation of said function is located at the bottom of said touch sensitive area.

45.    Claim 17 recites:

> The computer readable medium of claim 1, wherein the location where the representation is provided does not provide touch functionality for a different function.

## VII.    THE DISPUTED CLAIM TERMS

46.    I have been asked to opine on the meaning of the following claim terms, as they would be understood by a person of ordinary skill in the art having read the specification and prosecution history of the asserted patents:

- "location where the representation is provided" / "the touched location" ('879 patent, claims 1, 17)

- "one step" ('879 patent, claim 12)

- "duplicated" ('879 patent, claim 1)

- "representation of a function" ('879 patent, claims 1, 13)

- "a touch sensitive area in which a representation of a function is provided" (claim 1)

- "object gliding along the touch sensitive area away from the touched location" (claim 1)

47.    I also understand the parties have agreed that the preamble for claim 1 is limiting.

48.    I also understand the parties have proposed the following constructions for the term "wherein the representation consists of only one option for activating the function."  I have not been asked to provide my opinion for the proper construction of this term, but my opinions

13

regarding the proper constructions or indefiniteness of the other disputed terms remain the same regardless of whether Apple's or Neonode's proposed construction of this term is adopted.

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "wherein the representation consists of only one option for activating the function" ('879 patent, claim 1) | "wherein the representation consists of only one option for what function to activate at a given time (where the given time means the currently active application)" | "where the representation consists of only one option for what function to activate at a given time for a currently active application" |

49.     I also understand the parties have proposed the following constructions for the term "gliding." I have not been asked to provide my opinion for the proper construction of this term, but my opinions regarding the proper constructions or indefiniteness of the other disputed terms remain the same regardless of whether Apple's or Neonode's proposed construction of this term is adopted.

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "gliding" ('879 patent, claims 1, 12) | "a smooth, continuous movement across or along a surface, not including dragging, flicking, or a drag and drop operation" | Plain and ordinary meaning, not including a flick, drag, or drag-and-drop operation |

## VIII.  THE PARTIES' PROPOSED CONSTRUCTIONS

50.     For ease of reference, I have included below a chart showing the constructions proposed by the parties for each disputed term.

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "wherein the representation consists of only one option for activating the function" ('879 patent, claim 1) | "wherein the representation consists of only one option for what function to activate at a given time (where the given time means the currently active application)" | "wherein the representation consists of only one option for what function to activate at a given time for a currently active application" |

14

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "gliding" ('879 patent, claims 1, 12) | "a smooth, continuous movement across or along a surface, not including dragging, flicking, or a drag and drop operation" | Plain and ordinary meaning, not including a flick, drag, or drag-and-drop operation |
| "location where the representation is provided" / "the touched location" ('879 patent, claims 1, 17) | "location within the representation" | "the area in which the representation is provided" |
| "duplicated" ('879 patent, claim 1) | No construction necessary | "to make double or twofold, to make a copy of, or to produce something equal of" |
| "representation of a function" ('879 patent, claims 1, 13) | "a graphical element that enables a user to activate a function, and also represents the function in a cognizable way" | Plain and ordinary meaning, which may include a graphical element and/or text that represents a function |
| "a touch sensitive area in which a representation of a function is provided" ('879 patent, claim 1) | "a touch sensitive area, divided into a menu area and a display area, wherein a representation of a function is provided in the menu area" | Plain and ordinary meaning |
| "object gliding along the touch sensitive area away from the touched location" ('879 patent, claim 1) | "object gliding along the touch sensitive area away from the touched location in the direction of the display area" | "object gliding along the touch sensitive area away from the area at which the representation is provided" |
| "one step" ('879 patent, claim 12) | Indefinite | Plain and ordinary meaning |

## IX.    ANALYSIS

### A.    "Representation of a function"

51.    I understand the parties have proposed the following constructions for this term:

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "representation of a function" ('879 patent, claims 1, 13) | "a graphical element that enables a user to activate a function, and also represents the function in a cognizable way" | Plain and ordinary meaning, which may include a graphical element and/or text that represents a function |

15

52.     When read in view of the specification and the prosecution history, a POSITA would have understood the term "representation of a function" to mean "a graphical element that enables a user to activate a function, and also represents the function in a cognizable way."

53.     The plain meaning of a "representation of a function", in the context of the claim, refers to a graphical element that enables activation of a function, and also clearly signals to a user the function that will be activated by interacting with the graphical element. Put differently, a representation of a function would have been understood by a POSITA to depict the function in a cognizable way, and the surrounding claim language makes clear that the "representation of a function" also enables activating a function.

54.     For example, claim 1 indicates the function corresponding to the representation is activated when the device detects a touch-then-glide gesture beginning at the location where the representation is provided. A POSITA would have understood that the representation enables activating the function since the function is activated by first touching the representation.

55.     My opinion is supported by the specification. For example, the '879 patent illustrates in Figure 1, and describes in the specification, that the user interface's menu area "is adapted to present a representation of a first 21, a second 22 and a third 23 predefined function" where "[t]he first function 21 is a general application dependent function, the second function 22 is a keyboard function, and the third function 23 is a task and file manager." '879 patent at 4:1-6. As described below, each of these representations communicates to a POSITA in a cognizable way the function enabled by the respective representation.

56.     Starting with representation 21, it is a + sign (a graphical element), which represents in a cognizable way that it will enable the activation of a function displaying additional services, functions, or settings for the active application. For example, the specification discloses that

16

representation 21 enables displaying additional services, functions, or settings for an application. With reference to Figure 3, the specification discloses that "if the first function 21 is activated, then the display area 3 is adapted to display icons 211, 212, 213, 214, 215, 216 representing services or functions depending on the current active application." '879 patent at Fig. 3, 4:13-16. The '879 patent also explains that "[a]ny key that, because of lack of space on the display area, or because the key should be hidden from the active application, or because of any other reason is not shown on the display area of an active application, can be represented by one of the icons 212, 213, 214, 215, 216 that is shown when the first function 21 is activated." *Id.* at 4:18-23. In other words, an application may not be able to present all of its services, functions, or settings in the display area, for a number of possible reasons, and the first function 21 serves to present the additional functions, services, or settings that are not initially displayed for an active application. Thus, the representation 21 enables activating the function it cognizably represents.



Fig. 3.

17

57. Similarly, representation 22 is a picture of a keyboard (a graphical element). It signals to a POSITA in a cognizable way that, when its function is activated, the user interface will display a keyboard.

58. For example, as shown below in Figure 5 and as explained in the '879 patent, "if the second function 22 is activated, then the display area 3 is adapted to display a keyboard 221 and a text field 222." '879 patent at Fig. 5, 4:36-38. Thus, like representation 21, representation 22 enables activating the function it cognizably represents.



Fig. 5. 22

59. As a third example, representation 23 is a picture of a folder (a graphical element). In my opinion, representation 23 communicates to a POSITA in a cognizable way that it enables activating a function directed to displaying and managing files.

60. For example, as shown below in Figure 6, and as detailed in the '879 patent's written description, "if the third function 23 is activated, then the display area 3 is adapted to display a list 231 with a library of available applications and files on the computer unit." '879 patent at Fig. 6, 4:63-65. Thus, like representation 21 and 22, representation 23 enables activating the function it represents in a cognizable way.

18



Fig. 6.

61.    The patent does not disclose a contrary example—*i.e.*, a representation that does not resemble the function in a cognizable way.

62.    Moreover, in the only embodiment describing how the associated functions are activated, the '879 patent explains that "any one of these three functions 21, 22, 23 can be activated when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3." '879 patent at 4:7-11. In my opinion, a POSITA would have understood from this embodiment that each representation enables activating a respective function.

63.    Furthermore, a POSITA reviewing the specification would understand that a "representation of a function" does not comprise only a visual element, but also the underlying mechanisms enabling activation of a function. My opinion is supported by the parties' competing constructions for "wherein the representation consists of only one option for activating the

19

function," as well as the Federal Circuit's opinion construing the same term. In particular, a **representation** could only **consist** of one option for activating the function, as held by the Federal Circuit and proposed by the parties here, if a "representation of a function" comprises the underlying functionality necessary to enable activation of the function.

64.    The '879 patent's specification further supports my opinion that a representation of a function not only comprises visual aspect of an element, but also the underlying mechanisms enabling activation of a function (*e.g.*, event listeners). For example, Figure 1 of the '879 patent (shown below) illustrates three representations, where the visual aspects of these representations are labeled 21, 22, and 23, respectively. But the specification also labels with 21, 22, and 23 **the functions** activated using the representations. *See, e.g.*, '879 patent at 4:1-5:2, 5:64-6:3. Thus, a POSITA reviewing the specification would have understood that a representation of a function includes both the element's visual aspect, as well as its underlying functionality enabling activation of a function.



65.     Moreover, the file history for the '879 Patent, including statements made by Neonode in *inter partes* review proceedings, is consistent with my opinion. For example, in distinguishing prior art in Neonode's preliminary response, Neonode stated "Consistent with the above, a POSA would have understood that a 'representation' represents something, in this case a function. The representation need not necessarily be an image or pictorial depiction of a function, but *it must serve to represent the function in some cognizable way. A graphical element that merely enables a user to activate a function, without representing that function*, would not have been considered to be a representation of a function." APL-NEO_00928906 (Neonode POPR) at 972 (internal citations omitted, emphasis added). Neonode also stated in its preliminary response: "One attribute of a representation of a function in a graphical user interface is that selection of the representation (e.g., an icon) is typically sufficient in itself to activate the associated function." *Id.* at 973. Thus, the file history is consistent with my opinion that a representation enables activation of a corresponding function and represents that function in a cognizable way.

66.     For these reasons, in my opinion, a POSITA would have understood a "representation of a function" to refer to "a graphical element that enables a user to activate a function, and also represents the function in a cognizable way."

**B.     "A touch sensitive area in which a representation of a function is provided"**

67.     I understand the parties have proposed the following constructions for this term:

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "a touch sensitive area in which a representation of a function is provided" ('879 patent, claim 1) | "a touch sensitive area, divided into a menu area and a display area, wherein a representation of a function is provided in the menu area" | Plain and ordinary meaning |

68.    I understand Apple contends that certain disclosures in the specification describing "the present invention" limit this term to require the touch sensitive area to be divided between a menu area and a display area, and to require a representation of a function to be provided in the menu area.  I am not a lawyer and do not have an understanding of the legal implications of using "the present invention" in the specification.

69.    However, in my opinion, a POSITA would have understood the intrinsic record to be consistent with and support Apple's proposed construction.  The intrinsic record consistently and exclusively refers to a (1) touch sensitive area that is divided between a menu area and a display area, where (2) the representation of the function is provided in the menu area.

70.    The specification repeatedly and exclusively describes its purportedly inventive user interface as comprising a touch sensitive area divided into a menu area and a display area.

71.    For example, the '879 patent's abstract begins by stating "The present invention relates to a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area (1), which is divided into a menu area (2) and a display area (3)."  '879 patent at Abstract.

72.    Then, at the beginning of the section titled "Technical Field," the '879 patent's specification states: "The present invention relates to a user interface for a mobile handheld computer unit, which computer unit comprises a touch sensitive area, and which touch sensitive area is divided into a menu area and a display area."  '879 patent at 1:6-9.

73.    Also, at the beginning of the section titled "Solution," the '879 patent's specification further states: "Taking these problems into consideration, and with the staring [sic] point from a user interface for a mobile handheld computer unit, which computer unit comprises

22

a touch sensitive area, which touch sensitive area is divided into a menu area and a display area…" '879 patent at 1:65-2:2.

74.     Then, at the beginning of the section titled "Description of Embodiments at Present Preferred," the specification states: "The user interface according to the present invention is specifically adapted to computer units comprising a touch sensitive area 1, which is divided into a menu area 2 and a display area 3." '879 patent at 3:51-54.

75.     In addition to each of these disclosures that refer to a touch sensitive area that is divided between a menu area and a display area, the specification also repeatedly and exclusively describes a representation of a function as being provided in the user interface's menu area.

76.     For example, the '879 patent's abstract states "The menu area (2) is adapted to present a representation of a first (21), a second (22) and a third predefined (23) function." '879 patent at Abstract.

77.     Also, in the section titled "Solution," the '879 patent's specification further states: "[t]he present invention teaches that the menu area is adapted to present a representation of a first, a second and a third predefined function…" '879 patent at 2:5-7.

78.     Then, in the section titled "Description of Embodiments at Present Preferred," the specification states: "According to the present invention the menu area is adapted to present a representation of a first 21, a second 22 and a third 23 predefined function." '879 patent at 4:1-3.

79.     Moreover, the '879 patent's figures exclusively illustrate a touch sensitive display being divided into a menu area and a display area, and a representation of a function being provided in the menu area.  For example, as shown below, annotated Figure 1 illustrates the touch sensitive area 1 being divided into a menu area 2 and a display area 3, and providing representations 21, 22, 23 in menu area 2.  '879 patent, Fig. 1; *see also id.* at 5:64-6:3 (explaining that the representations

23

of a first, second, and third function, respectively, are provided in the menu area). The same is true for the '879 patent's other relevant figures (*e.g.*, Figs. 3, 5, 6, 8, 9, 11, 12, 13).



80.    Figure 2 of the '879 patent, which is a "schematic side view illustrating the activation of a function," shown below, depicts the boundaries of the division between the menu area 2 and the display area 3. '879 patent at 3:24-25, 4:7-12, Fig. 2. Notably, the division between the display area 3 and menu area 2 is such that the menu area is distinct from the display area.



Fig. 2.

24

81.     There is no disclosure in the '879 patent that contradicts Apple's construction. Specifically, there is no other disclosure of the composition of the "touch sensitive area" or where the representation of the function is provided.

82.     My opinion is also based on the prosecution history for the '879 patent.  The patent applicant submitted original claims that all required that the "touch sensitive area is divided into a menu area and a display area" and that the "menu area is adapted to present a representation of a first, a second and a third predefined function."  NEONODE0000001 ('879 File History) at 17. The only independent, original claim (claim 1) is excerpted below.

CLAIMS

1.     User interface for a mobile handheld computer unit, where said computer unit comprises a touch sensitive area, which touch sensitive area is divided into a menu area and a display area, where said computer unit is adapted to run several applications simultaneously, and to present an active application on top of any other application on said display area, characterised in, that said menu area is adapted to present a representation of a first, a second and a third predefined function, that said first function is a general application dependent function, that said second function is a keyboard function, that said third function is a task and file manager, and that any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area.

83.     The claims were amended nearly six years after the filing of the application to no longer recite the limitations I highlight above, among others.  NEONODE0000001 at 317-318.  In my opinion, the prosecution history is unclear regarding the reason for the amendment or its impact on the proper scope of the term proposed for construction, including because the patent applicant's

25

September 2008 amendment effectively rewrote the entirety of claim 1, and the patent examiner's prior office action and the patentee's remarks accompanying the amendment do not clarify the patent applicant's reasoning and intent. *Id.* at 243-260 (patent examiner's rejection of prior claims), 317-318 (rewriting claim 1 entirely), 334-342 (unclear remarks accompanying amendment).

84.     My opinion is also supported by the state of the art in 2002. A POSITA would have understood that user interfaces at the time often comprised a distinct menu area and display area. For example, as shown below, well-known devices like the Palm Vx, the Palm Tungsten T2, the Newton MessagePad, and lesser-known devices like Neonode's N1 device, all comprised a distinct menu area and display area comprising its touch sensitive area. Dividing the interface between a menu area and display area, and providing representations in the menu area, was helpful for a user to access commonly used functions on the device. I have added annotations to each photo below to illustrate this point.



26



**Palm Tungsten T2, 2003**

Display Area

Touch Sensitive Area

Menu Area



**Apple Newton MessagePad, 1996**



85.    Thus, in my opinion, a POSITA reviewing the '879 patent's specification and prosecution history would have understood the term "a touch sensitive area in which a representation of a function is provided" to refer to "a touch sensitive area, divided into a menu area and a display area, wherein a representation of a function is provided in the menu area."

**C.    "Object gliding along the touch sensitive area away from the touched location"**

86.    I understand the parties have proposed the following constructions for this term:

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "object gliding along the touch sensitive area away from the touched location" ('879 patent, claim 1) | "object gliding along the touch sensitive area away from the touched location in the direction of the display area" | "object gliding along the touch sensitive area away from the area at which the representation is provided" |

29

87.     I understand Apple contends that certain disclosures in the specification describing "the present invention" limit this term to require the touch sensitive area to be divided between a menu area and a display area, and to require a representation of a function to be provided in the menu area. I am not a lawyer and do not have an understanding of the legal implications of using "the present invention" in the specification.

88.     However, in my opinion, a POSITA would have understood the intrinsic record to be consistent with and support Apple's proposed construction.  As it relates to gliding, the intrinsic record consistently and exclusively refers to gliding in the direction of the display area.

89.     The specification repeatedly and exclusively describes activating a function by gliding in the direction of the display area on the purportedly inventive user interface.

90.     For example, the '879 patent's abstract states "Any one of these three functions can be activated when the touch sensitive area (1) detects a movement of an object with its starting point within the representation of the function on the menu area (2) and with a direction from the menu area (2) to the display area (3)." '879 patent at Abstract.

91.     Also, in the section titled "Solution," the '879 patent's specification further states: "The present invention also teaches that any one of these three functions can be activated when the touch sensitive area detects a movement of an object with its starting point within the representation of the function on the menu area and with a direction from the menu area to the display area." '879 patent at 2:10-15.

92.     Further, as shown below, annotated Figure 2 illustrates a user gliding his finger from the menu area to the display area to activate a function.  In describing Figure 2, the specification states: "FIG. 2 shows that any one of these three functions 21, 22, 23 can be activated when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within

30

the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3." '879 patent at 4:7-11.



93.    My opinion is also based on the prosecution history for the '879 patent, in which the patent applicant submitted original claims that all required "that any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area."   NEONODE0000001 ('879 File History) at 17.   The only independent, original claim (claim 1) is excerpted below.

## CLAIMS

1.    User interface for a mobile handheld computer unit, where said computer unit comprises a touch sensitive area, which touch sensitive area is divided into a menu area and a display area, where said computer unit is adapted to run several applications simultaneously, and to present an active application on top of any other application on said display area, **characterised** in, that said menu area is adapted to present a representation of a first, a second and a third predefined function, that said first function is a general application dependent function, that said second function is a keyboard function, that said third function is a task and file manager, and that any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area.

94.    The claims were amended nearly six years after the filing of the application to no longer recite the limitation I highlight above, among others.  NEONODE0000001 at 317-318.  In my opinion, the prosecution history is unclear regarding the reason for the amendment or its impact on the proper scope of the term proposed for construction, including because the patent applicant's September 2008 amendment effectively rewrote the entirety of claim 1, and the patent examiner's prior office action and the patentee's remarks accompanying the amendment do not clarify the patent applicant's reasoning and intent.  *Id.* at 243-260 (patent examiner's rejection of prior claims), 317-318 (rewriting claim 1 entirely), 334-342 (unclear remarks accompanying amendment).

95.    In my opinion, a POSITA reviewing the '879 patent's specification and prosecution history would have understood the term "object gliding along the touch sensitive area away from the touched location" to refer to an "object gliding along the touch sensitive area away from the touched location in the direction of the display area."

32

### D.    "Duplicated"

96.    I understand the parties have proposed the following constructions for this term:

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "duplicated" ('879 patent, claim 1) | No construction necessary | "to make double or twofold, to make a copy of, or to produce something equal of" |

97.    In my opinion, "duplicated" is a simple, straightforward term that would be readily understandable by a POSITA, as well as a layperson: attempting to define the term unnecessarily complicates the claim.

98.    More specifically, Neonode's construction calls for "produc[ing] something equal of," but a POSITA would have been uncertain how to measure this equality. For example, in analyzing and applying the claim's scope, should equality be measured in terms of size, shape, likeness, or something else? These questions are unnecessary, as the ordinary meaning of "duplicated" applies here.

99.    There is no contrary disclosure in the '879 patent. In fact, the only place the '879 patent uses the word "duplicated" is in the claims. The '879 patent does not include any description of how a representation could be "duplicated" in the context of a user interface, and also does not include any examples of an "object gliding . . . wherein the representation of the function is not relocated or duplicated during the gliding."

100.    Thus, in my opinion, "duplicated" is a simple, straightforward term that would not benefit from a construction, and certainly not Neonode's proposed construction.

### E.    "Location where the representation is provided" / "the touched location"

101.    I understand the parties have proposed the following constructions for this term:

33

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "location where the representation is provided" / "the touched location" ('879 patent, claims 1, 17) | "location within the representation" | "the area in which the representation is provided" |

102.    I understand Apple contends that certain disclosures in the specification describing "the present invention" limit this term to require the claimed location to be within the representation.  I am not a lawyer and do not have an understanding of the legal implications of using "the present invention" in the specification.

103.    However, in my opinion, a POSITA would have understood the intrinsic record to be consistent with and support Apple's proposed construction.  The intrinsic record consistently and exclusively refers to activating a function on a device by detecting an initial touch within the representation of the function (and then gliding in the direction of the display area).

104.    For example, the Abstract states that any of the three described functions "can be activated when the touch sensitive area (1) detects a movement of an object **with its starting point within the representation of the function** on the menu area…"  '879 Patent at Abstract.

105.    Also, in the "Solution" section, the specification states: "The present invention also teaches that any one of these three functions can be activated when the touch sensitive area detects a movement of an object **with its starting point within the representation of the function** on the menu area…"  '879 Patent at 2:10-13.

106.    Then, in the section "Description of Embodiments at Present Preferred," the specification describes the glide illustrated in Figure 2.  In particular, the specification explains that "any one of these three functions 21, 22, 23 can be activated when the touch sensitive area 1 detects a movement of an object 4 **with its starting point A within the representation of a function** on the menu area 2…"  '879 Patent at 4:7-11.

34

107. There is no contrary disclosure in the '879 patent.

108. My opinion is also based on the prosecution history for the '879 patent, in which the patent applicant submitted original claims that all required "that any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area." NEONODE0000001 ('879 File History) at 17. The only independent, original claim (claim 1) is excerpted below.

CLAIMS

1. User interface for a mobile handheld computer unit, where said computer unit comprises a touch sensitive area, which touch sensitive area is divided into a menu area and a display area, where said computer unit is adapted to run several applications simultaneously, and to present an active application on top of any other application on said display area, **characterised** in, that said menu area is adapted to present a representation of a first, a second and a third predefined function, that said first function is a general application dependent function, that said second function is a keyboard function, that said third function is a task and file manager, and that any one of said three functions can be activated when said touch sensitive area detects a movement of an object with its starting point within the representation of said function on said menu area and with a direction from said menu area to said display area.

109. The claims were amended nearly six years after the filing of the application to no longer recite the limitation I highlight above, among others. NEONODE0000001 at 317-318. In my opinion, the prosecution history is unclear regarding the reason for the amendment or its impact on the proper scope of the term proposed for construction, including because the patent applicant's September 2008 amendment effectively rewrote the entirety of claim 1, and the patent examiner's

35

prior office action and the patentee's remarks accompanying the amendment do not clarify the patent applicant's reasoning and intent. *Id.* at 243-260 (patent examiner's rejection of prior claims), 317-318 (rewriting claim 1 entirely), 334-342 (unclear remarks accompanying amendment).

110.    In remarks accompanying the amendment, the patent applicant made clear with respect to the claimed invention that "[t]he function displayed at the touch point is activated" and the claimed invention "[r]equires the user interface to recognize a glide and identify the function displayed at the starting location of the glide."  The patent applicants' remarks further support my opinion that the initial touch of the claimed touch-then-glide gesture must contact a touch-sensitive area within the representation of the function.

111.    Moreover, a POSITA would have understood "location where the representation is provided" to refer to contacting the touch sensitive area within the representation, and not merely touching an area near the representation.

112.    Thus, in my opinion, a POSITA reviewing the '879 patent's specification and prosecution history would have understood the term "location where the representation is provided" / "the touched location" to refer to "location within the representation."

**F.      The term "one step" is indefinite because the intrinsic record fails to inform a POSITA with reasonable certainty about the scope of this term**

113.    I understand the parties have proposed the following constructions for this term:

| Term | Apple's Proposed Construction | Neonode's Proposed Construction |
|---|---|---|
| "one step" ('879 patent, claim 12) | Indefinite | Plain and ordinary meaning |

114.    Claim 12 of the '879 patent recites the term "one step."  In particular, claim 12 depends on claim 1, and additionally requires that, by gliding an object (*e.g.*, a finger) along the

36

touch sensitive area from left to right, "an active application, function, service or setting is advanced one step." Conversely, by gliding an object (*e.g.*, a finger) along the touch sensitive area from right to left, "the active application, function, service or setting is closed or backed one step." In my opinion, the term "one step" is indefinite because the '879 patent and its prosecution history do not inform one of ordinary skill in the art with reasonable certainty the scope of the term.

115. The '879 patent's specification mentions the term "one step" in the context of Figures 11 and 12. Figures 11 and 12, and the relevant portion of the specification, are each excerpted below. The specification effectively restates the claim language and does not provide any clarity around the meaning of "one step." Similarly, Figures 11 and 12 show moving an application, function, service, or setting to the left or right, but do not clarify the meaning of "one step" or how much movement is necessary to constitute a "step."

> FIG. **11** shows that moving U the object **4** from the left of the display area **3** to the right of the display area **3** moves the active application, function, service or setting on one step forwards. FIG. **12** shows that, in a similar manner, the active application, function, service or setting is closed or backed one step by moving V the object **4** from the right of the display area **3** to the left of the display area **3**.



Fig. 11.    Fig. 12.

116.    The '879 patent's prosecution history substantively addresses the meaning of the term only once.  In a March 14, 2008 Amendment and Response to Non-Final Office Action, the patent applicant attempted to distinguish a prior art TealDoc scrolling feature as not teaching claim 12.  In particular, the applicant argued that "scrolling through a document, which is a continuous, flowing process during the drag of the slider, cannot reasonably be said to be 'moving on one step' or 'backed one step,' each of which is inherently a discrete action." NEONODE0000001 ('879 File History) at 222.

117.    Dictionary definitions also confirm that a POSITA would not have been able to discern with any reasonable clarity the scope of the term "one step."  For example, the New Oxford American Dictionary provides several definitions for "step," the most relevant here being "a stage in a gradual process… a particular position or grade on an ascending or hierarchical scale."  APL-NEO_00928811 (New Oxford) at 813.    Similarly, the Wiley Electrical and Electronics Engineering Dictionary defines "step" as "[o]ne within a series sequence, order, or process."  APL-NEO_00928808 (Wiley) at 810.    These definitions of "step" confirm my opinion that the measurement of a step is subjective and arbitrary; it does not have objective boundaries.

118.    Apart from the intrinsic record and extrinsic evidence signaling that "one step" is a discrete action, it is unclear how much movement satisfies "one step."  For example, should "one step" be measured in terms of a proportion of screen width, or should it be measured in terms of an absolute distance (*e.g.*, a certain number of inches or centimeters)?

119.    If a "step" should be determined according to a proportion of screen width, is moving one pixel across a screen "one step"?  Is moving a quarter-length across the screen enough?  Is moving halfway across the screen enough?  Does an application, function, or setting need to occupy the entire screen, and then fully move off the screen to constitute "one step"?

38

120.    If a "step" should be determined according to an absolute distance, should the distance be measured in inches, centimeters, or some other metric? How many units of that metric equal one step? Does the answer change depending on the size of the user interface or touch-sensitive area?

121.    Beyond the degree of movement itself, the surrounding claim language, like "advanc[ing]" and "back[ing]" signifies to a POSITA that claim 12 contemplates a series of applications, functions, services, or settings. This begs the additional question: does "advanc[ing]" or "back[ing]" one step require the order of the series to change in some way, or can the logical order remain unchanged while an application, function, service, or setting is being moved? Whether or not the order of the series must change, what must the application, function, service or setting be advancing to or backing away from?

122.    These are all questions posed by the language in claim 12, and particularly the term "one step," and for which a POSITA would not have any answers with reasonable certainty. In my opinion, the term "one step" is an ambiguous, subjective metric that depends on how any given individual decides to define it (*e.g.*, as a certain portion of a user interface, as a certain distance, as a logical change in the ordering of the series, etc.).

123.    Though the term "one step" is indefinite in view of the intrinsic record alone, Neonode's application of the claim language multiplies the uncertainty surrounding the claim language. While my analysis above is at least somewhat cabined by the prosecution history's clear statement that "one step" is a discrete action that does not implicate continuous or scrolling actions, Neonode appears to apply the claim language to accused features involving continuous scrolling across alleged applications, functions, services, or settings. *See, e.g.*, APL-NEO_00928623 (App Store Infringement Chart) at 678-680 (accusing scrolling continuously through photos), 682, 684

39

(accusing scrolling continuously through camera zoom ratios), 683 (accusing scrolling continuously through camera settings), 685 (accusing scrolling continuously through photo albums), 686-701, 703 (accusing scrolling continuously through alleged applications, functions, services, or settings), 706-709 (same), 715 (same). Neonode's assertion that continuous movements of an alleged application, function, service, or setting can satisfy the alleged "one step" only raises further questions regarding what kind of movement satisfies the claim, and what magnitude of movement is required.

124. Thus, one of ordinary skill reading the claims in light of the specification and prosecution history would not have been able to determine with reasonable certainty the objective bounds of the claimed "one step."

125. It is therefore my opinion that the term "one step" renders claim 12 of the '879 patent indefinite.

## X.    CLOSING REMARKS

126. I confirm that the contents of this report are true to the best of my knowledge and belief insofar as it states facts and that it contains my honest opinions on the matters upon which I have been asked to give them.

127. This report is based on my study of the information available to me at the time of its writing. My review and consideration of the asserted patent, its claims, and other materials discussed in this report are ongoing. As my analysis continues, I may identify additional evidence supporting the opinions I have summarized in this report. I reserve the opportunity to update, supplement, or amend this report in view of further analysis or additional information that may be obtained or become available at a later time to address new or different positions taken by Neonode.

40

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 24, 2026, in Lyttelton, New Zealand.

/s/

Dr. Andrew Cockburn

41

# Appendix A

# Andy Cockburn
**B.Sc.(Hons) Ph.D.**

**Curriculum Vitae**

| | |
|---|---|
| **Full legal name** | Andrew Jeremy Gavin Cockburn |
| **University Address** | Department of Computer Science and Software Engineering |
| | University of Canterbury |
| | Christchurch 8140 |
| | New Zealand |
| **Email** | andy.cockburn@canterbury.ac.nz |
| **URL** | https://profiles.canterbury.ac.nz/andy-cockburn |
| **Consultancy Address** | Cockburn Human Interface Consulting Ltd. |
| | 20 Gilmour Terrace, Lyttelton 8082 |
| | New Zealand |
| **Telephone** | +64 21 296 2307 |
| **Email** | ajc168@snap.net.nz |
| **Date** | January 23, 2026 |

## Brief Summary

### International research reputation

- Over two hundred publications in international journals and conferences.

- Elected to the CHI Academy (2015), which is an honorary group of individuals who have made substantial contributions to the field of human-computer interaction.

- Recipient of the 2009 Chris Wallace award for the outstanding research contribution to Computer Science (2005-2007) in Australasia.

- Deputy Chair of the national panel for assessing Computer Science and Mathematics research quality (MIST PBRF panel, 2016-2019).

- Technical programme committee chair for ACM CHI 2020; Papers co-chair for ACM CHI 2014 and 2015.

- Editorial Board Member for: ACM Transactions on Computer-Human Interaction (2012-2021); Human-Computer Interaction Journal (2015-); Foundations and Trends in HCI (2015-2023); International Journal of Human-Computer Studies (2004-2013); Interacting with Computers (2003-2013).

- Best paper awards at CHI 2018, 2013, 2012, 2011 (awarded to the top 1% of submissions) and 13 Honourable Mention awards (top 5%) at ACM CHI.

- H-index impact factor of 62 (Google Scholar).

### Excellent educator and public speaker

- Long track record of outstanding student evaluations.

- Nominated for the New Zealand National Tertiary Teaching Award, 2010. Recipient of a University of Canterbury Teaching Award (2004) and many nominations for student-elected 'lecturer of the year' award.

### Experienced expert witness and consultant

- Testifying expert witness on behalf of industry leaders in various jurisdictions, including the Federal Court of Australia, US Federal Court, US Patent Trial and Appeal Board, and the US International Trade Commission.

2

# Education

| | |
|---|---|
| Degree | PhD (June 1993) |
| Discipline | Computer Science — Computer Supported Cooperative Work |
| Location | University of Stirling, Scotland |
| Thesis Title | Groupware Design: Principles, Prototypes, and Systems |

| | |
|---|---|
| Degree | BSc(Hons) (July 1988) |
| Discipline | Computer Science |
| Location | University of York, England |

# Employment History

| | |
|---|---|
| Position | Emeritus Professor |
| | Computer Science and Software Engineering |
| | University of Canterbury |
| | Christchurch |
| | New Zealand |
| Employment Period | June 1993 — June 2025 |
| | (promoted through lecturer, senior lecturer, associate professor, to professor) |

3

# Research Student Supervision

## PhD candidates

| | | |
|---|---|---|
| Stewart Dowding | 2021–2025 | Interaction Pace and User Preferences |
| Pang Suwanaposee | 2020–2024 | Cognitive Biases and the Subjective Experience of Interaction |
| Sarmad Soomro | 2017–2021 | Interaction with In-Vehicle Touchscreens |
| Joshua Leung | 2013–2017 | Interactive Highlighting Techniques: Noticeability and Distraction |
| Philip Quinn | 2012–2016 | Econ. Behaviour & Psych.l Biases in Human-Computer Interaction |
| Tham Piumsomboon | 2011–2015 | Adaptive and Multimodal Interfaces for Collaborative Augmented Reality |
| Joey Scarr | 2011–2014 | Improving Interaction with Spatial User Interfaces |
| Stephen Fitchett | 2010–2013 | Understanding and Improving Personal File Retrieval |
| Susanne Tak | 2008–2011 | Improving Interfaces for Window/Task Switching |
| Jason Alexander | 2006–2009 | Improving Interfaces for Document Navigation |
| Joerg Hauber | 2004–2008 | Remote Collaboration in Video Collaborative Virtual Environments |
| Julian Looser | 2003–2007 | AR Magic Lenses: Focus and Context in Augmented Reality |
| V. Buchmann (A. sup.) | 2004–2008 | Haptic Feedback in Augmented Reality |
| Carl Cook (A. sup.) | 2002–2006 | Collaborative Software Engineering |
| Tim Wright | 2000–2004 | Collab. Multiple-Notation Programming Environments for Children |
| Michael JasonSmith | 2000–2006 | User Interfaces for Temporal Awareness |

## M.Sc. candidates

| | | |
|---|---|---|
| Ben McDonald | 2010–2011 | Multiuser interaction with large public displays |
| Dominic Winkler | 2009–2011 | Interaction Techniques for Cross Context Activities |
| Taher Amer | 2005–2006 | Evaluating SwiftPoint |
| Trond Nilsen | 2004–2006 | Hybrid Interfaces in Augmented Reality |
| Joshua Savage | 2003–2004 | Calibration & Evaluation of Speed-Dependent Automatic Zooming Interfaces |
| Ben Schmidt | 2001–2002 | A Study of Bimanual Interaction |
| Elizabeth Ng (A. sup.) | 1997–1998 | Pen-based music input |
| Aaron Tay | 1994–1995 | End-User Tailorability in Workflow Design |

4

**Honours candidates and Honours-level interns**

| | | |
|---|---|---|
| Joel Harrison | 2012 | Improving Command Selection |
| Joshua Leung | 2012 | Improving File Access |
| Jerome Delamarche | 2010 | Multiple Trajectory Pointing Methods |
| Joey Scarr | 2010 | Improving Expertise Development in User Interfaces |
| Stephen Fitchett | 2009 | Improved Mobile Scrolling Interfaces |
| Philip Quinn | 2007 | Improving Command Interfaces |
| Keith Humm | 2007 | Improving Interfaces for Task Switching |
| Jason Alexander | 2005 | Improving Document Navigation with Space-Filling Thumbnails |
| Philip Brock | 2005 | Target Acquisition with Visually Expanding Targets |
| David Mitchell | 2003 | Evaluating Focus+Context Screens |
| Andrew Wallace | 2003 | Calibrating Speed-Dependent Automatic Zooming |
| Andrew Barrett | 2002 | Implementing RSVP as an Image Browser |
| Julian Looser | 2002 | 3D Games as Motivation in Fitts' Law Experiments |
| Joshua Savage | 2002 | Implementing and Evaluating Speed-Coupled Scrolling |
| Amal Siresena | 2002 | Mobile Text Entry |
| Michael Moyle | 2001 | An Evaluation of Simple Gesture Based Controls |
| Lee Butts | 2001 | Mobile Phone Text Entry |
| Eddie Edwards | 2001 | Towards Scalable Interfaces Using Spatial Cues |
| Gene Thomas | 1997 | Smart Desktop |
| Olof Eilert | 1997 | User Interfaces for Object Oriented Literate Programming |
| Philip Weir | 1996 | Distortion Oriented Workspace Awareness |
| Carey Evans | 1996 | Assisting World Wide Web Navigation |
| Justin Macfarlane | 1995 | Mawd: A Collaborative Analysis Tool |
| Carl Cerecke | 1995 | TRAIL: An Email Based CSCW Toolkit |
| Andrew Bryant | 1995 | Leogo: An Equal Opportunity Programming Environment |
| Ian Bosely | 1994 | SPI: A Social Presence Indicator |

5

## Postgraduate Thesis Examinations

| | | | | |
|---|---|---|---|---|
| Stewart Dowding | PhD | Supervisor | University of Canterbury | 2025 |
| Pang Suwanaposee | PhD | Supervisor | University of Canterbury | 2024 |
| Sarmad Soomro | PhD | Supervisor | University of Canterbury | 2021 |
| Katherine Fennedy | PhD | External Examiner | Singapore University of Tech. & Design | 2021 |
| Praveenkumar Kanithi | PhD | Chair | University of Canterbury | 2020 |
| Ori Gagoni | PhD | Chair | University of Canterbury | 2019 |
| Alaeddin Nassani | PhD | Chair | University of Canterbury | 2019 |
| Veera Mandalika | PhD | Chair | University of Canterbury | 2018 |
| Jessalyn Alvina | PhD | Examiner | Université Paris Sud | 2017 |
| Hyungon Kim | PhD | Chair | University of Canterbury | 2017 |
| Thomas Young | PhD | Chair | University of Canterbury | 2017 |
| Craig Sutherland | PhD | Examiner | University of Auckland | 2016 |
| David Thompson | PhD | Chair | University of Canterbury | 2016 |
| Philip Quinn | PhD | Supervisor | University of Canterbury | 2016 |
| Daniel Bradley | PhD | Examiner | University of Queensland | 2016 |
| David Altimera | PhD | Chair | University of Canterbury | 2015 |
| Jakub Zlotowsky | PhD | Chair | University of Canterbury | 2015 |
| Thammathip Piumsomboon | PhD | Supervisor | University of Canterbury | 2015 |
| Robert Schattschnieder | PhD | Chair | University of Canterbury | 2014 |
| Hazel Bradshaw | PhD | Chair | University of Canterbury | 2014 |
| Amur Al Manji | PhD | Examiner | University of Auckland | 2014 |
| Amir Shareghi Najar | PhD | Chair | University of Canterbury | 2014 |
| Joey Scarr | PhD | Supervisor | University of Canterbury | 2014 |
| Stephen Fitchett | PhD | Supervisor | University of Canterbury | 2014 |
| Amali Weeseringhe | PhD | Chair | University of Canterbury | 2012 |
| Sayan Ray | PhD | Chair | University of Canterbury | 2012 |
| Christina Dicke | PhD | Chair | University of Canterbury | 2012 |
| Minkyung Lee | PhD | Chair | University of Canterbury | 2010 |
| Jason Alexander | PhD | Supervisor | University of Canterbury | 2009 |
| Leah Findlater | PhD | Examiner | University of British Colombia | 2009 |
| Judy Bowen | PhD | Examiner | University of Waikato | 2008 |
| Joerg Hauber | PhD | Supervisor | University of Canterbury | 2008 |
| Julian Looser | PhD | Supervisor | University of Canterbury | 2008 |
| Michael JasonSmith | PhD | Supervisor | University of Canterbury | 2006 |
| Tim Wright | PhD | Supervisor | University of Canterbury | 2005 |
| Beryl Plimmer | PhD | Examiner | University of Waikato | 2003 |
| Gorden Paynter | PhD | Examiner | University of Waikato | 2000 |
| Gitesh K Raikundalia | PhD | Examiner | Bond University | 1997 |
| Ramon Craig Standing | PhD | Examiner | University of Western Australia | 1997 |
| Ying Leung | PhD | Examiner | Massey University | 1995 |
| | | | | |
| Qi Min Ser | Masters | Examiner | University of Canterbury | 2016 |
| Taher Amer | Masters | Supervisor | University of Canterbury | 2006 |
| Trond Nilsen | Masters | Supervisor | University of Canterbury | 2006 |
| Akhil Mehra | Masters | Examiner | University of Auckland | 2005 |
| Aparna Krishnan | Masters | Examiner | University of Waikato | 2003 |
| Shaun Kaasten | Masters | Examiner | University of Calgary | 2001 |
| Boyd Ludlow | Masters | Examiner | University of Waikato | 1999 |
| Donald Cox | Masters | Examiner | University of Calgary | 1998 |
| Wallace Chigona | Masters | Examiner | Waikato University | 1997 |
| Simon Gianoutsos | Masters | Examiner | Waikato University | 1997 |
| Jing Deng | Masters | Examiner | Waikato University | 1996 and 1997 |
| Aaron Tay | Masters | Examiner | University of Canterbury | 1996 |

6

## Student glory

| | | | |
|---|---|---|---|
| Pang Suwanaposee | PhD | 2022 | Google PhD Fellowship Award AUD$15,000. |
| Pang Suwanaposee | PhD | 2021 | CHI Honourable Mention award. |
| Joey Scarr | PhD | 2016 | Bennett Award for Distinguished C.S. PhD thesis in Australasia. |
| Philip Quinn | PhD | 2015 | US Patent Awarded (Google Assignee). |
| Philip Quinn | PhD | 2014 | US Patent Awarded (Google Assignee). |
| Stephen Fitchett | PhD | 2014 | CHI Honourable Mention award. |
| Philip Quinn | PhD | 2013 | Google Mountain View Internship. |
| Stephen Fitchett | PhD | 2013 | CHI Best Paper award. |
| Joey Scarr | PhD | 2013 | CHI Honourable Mention award. |
| Joey Scarr | PhD | 2013 | CHI ReplicCHI award. |
| Joey Scarr | PhD | 2012 | CHI Best Paper award. |
| Stephen Fitchett | PhD | 2012 | CHI Honourable Mention award. |
| Philip Quinn | PhD | 2012 | Google Mountainview Internship. |
| Joey Scarr | PhD | 2012 | Google Sydney Internship. |
| Stephen Fitchett | PhD | 2011 | Outstanding reference from Darren Edge, Microsoft Research Asia. |
| Joey Scarr | PhD | 2012 | $3K for 2nd place in University 'PhD in 3' competition. |
| Joey Scarr | PhD | 2012 | $1K for 1st place in College 'PhD in 3' competition. |
| Stephen Fitchett | PhD | 2012 | $1K for 3rd place in College 'PhD in 3' competition. |
| Philip Quinn | PhD | 2011 | Honourable Mention award ACM CHI'11. |
| Joey Scarr | PhD | 2011 | Google Sydney Internship. |
| Susanne Tak | PhD | 2010 | $5K Google Anita Borg Scholarship |
| Susanne Tak | PhD | 2010 | $3K from ACM for participation at CHI's Doctoral Consortium |
| Jason Alexander | PhD | 2010 | PhD Thesis placed on "Dean's list for excellence" (top 10%) |
| Susanne Tak | PhD | 2009 | $2K award for 1st place in College Research Poster competition |
| Jason Alexander | PhD | 2008 | $1K award for 2nd place in College Research Poster competition |
| Jason Alexander | PhD | 2008 | Sweeney best student paper award, Graphics Interface '08. |
| Mark Hancock | PhD | 2007 | Best paper nomination at ACM CHI'07. |
| J. Savage & A. Wallace | M.Sc. | 2005 | Best paper nomination at ACM CHI'05. |
| Mike Moyle | Hons | 2005 | NZ Hi-Tech Young Achiever of the Year Award |

7

## Publications

### Edited Volumes

EV1 J McGrenere and A Cockburn (Eds.)   Proceedings of ACM CHI 2020 Conference on Human Factors in Computing Systems.

EV2 J McGrenere and A Cockburn (Eds.)   Extended Abstracts of ACM CHI 2020 Conference on Human Factors in Computing Systems.

EV3 M Billinghurst and A Cockburn (Eds.)   Proceedings of the Sixth Australasian User Interface Conference (AUIC2005). Volume 40 of the Conferences in Research and Practice in Information Technology, Australian Computer Society.

EV4 A Cockburn (Ed.) Proceedings of the Fifth Australasian User Interface Conference (AUIC2004). Volume 28 of the Conferences in Research and Practice in Information Technology, Australian Computer Society.

### Papers in Refereed Journals and Collections

J1 A Cockburn, D Hills, Z Che, and C Gutwin. User Interface Evaluation Through Implicit-Association Tests. *Proceedings of the ACM on Human-Computer Interaction.* EICS, Article v8eics262. 2024.

J2 A Cockburn, A Goguey, C Gutwin, Z Chen, P Suwanaposee, and S Dowding.   Automatically Adapting System Pace Towards User Pace – Empirical Studies. *International Journal of Human-Computer Studies.* 185:103228. May. 2024.

J3 S Dowding, C Gutwin, and A Cockburn.   User Speech Rates and Preferences for System Speech Rates. *International Journal of Human-Computer Studies.* 184:103222. April. 2024.

J4 P Suwanaposee, C Gutwin, and A Cockburn.   The Influence of Audio Effects and Attention on the Perceived Duration of Interaction. *International Journal of Human-Computer Studies.* 159:102756. March. 2022.

J5 J Leung and A Cockburn.   Design Framework for Interactive Highlighting Techniques. *Foundations and Trends in Human-Computer Interaction.* 14(2-3):96-271. 2021.

J6 AF Mairena, C Gutwin, and A Cockburn. Which Emphasis Technique to Use? Perception of Emphasis Techniques with Varying Distractors, Backgrounds, and Visualization Types. *Information Visualization.* 21(2):95-129. 2022.

J7 A Cockburn, P Dragicevic, L Besançon and C Gutwin. Threats of a Replication Crisis in Empirical Computer Science. *Communications of the ACM.* 63(8):70-79. August 2020.

J8 M Claypool, A Cockburn and C Gutwin.   The Impact of Motion and Delay on Selecting Game Targets with a Mouse. *ACM Transactions on Multimedia Computing, Communications, and Applications.* 16(2s):73, 1-14. June 2020.

J9 P Quinn and A Cockburn.  Loss Aversion and Preference in Interaction. *Human-Computer Interaction Journal.* 35(2):143-190. 2020. (Online from 2018).

8

J10  A Cockburn, D Masson, C Gutwin, P Palanque, A Goguey, M Yung, C Gris and C Trask. Design and Evaluation of Braced Touch for Touchscreen Input Stabilisation. *International Journal of Human-Computer Studies.* 122:21-37. 2018.

J11  B Lafreniere, C Gutwin, and A Cockburn. Investigating the Post-Training Persistence of Expert Interaction Techniques. *ACM Transactions on Human-Computer Interaction.* 24(4): Article 29 (46 pages). 2017.

J12  A Cockburn, P Quinn and C Gutwin The Effects of Interaction Sequencing on User Experience and Preference. *International Journal of Human-Computer Studies.* 108:89-104. 2017.

J13  J Aceituno, S Malacria, P Quinn, N Roussel, A Cockburn and G Casiez. The Design, Use, and Performance of Edge-Scrolling Techniques. *International Journal of Human-Computer Studies.* 97:58-76. 2017.

J14  J Scarr, C Gutwin, A Cockburn and A Bunt. StencilMaps and EphemeralMaps: Spatially Stable Interfaces that Highlight Command Subsets. *Behaviour and Information Technology.* 34(11):1092-1106. 2015.

J15  S Fitchett and A Cockburn. An Empirical Characterisation of File Retrieval. *International Journal of Human-Computer Studies.* 74:1-13. 2015.

J16  A Cockburn, C Gutwin, J Scarr and S Malacria. Supporting Novice to Expert Transitions in User Interfaces. *ACM Computing Surveys.* 47(2):31:1-36. 2014.

J17  J Scarr, A Cockburn and C Gutwin. Supporting and Exploiting Spatial Memory in User Interfaces. *Foundations and Trends in Human-Computer Interaction.* 6(1):1-84. 2013.

J18  P Quinn, A Cockburn and J Delamarche. Examining the Costs of Multiple Trajectory Pointing Techniques. *International Journal of Human-Computer Studies.* 71(4):492-509. 2013.

J19  S Tak and A Cockburn. Enhanced Spatial Stability with Hilbert and Moore Treemaps. *Transactions on Visualization and Computer Graphics.* 19(1):141-148. 2013.

J20  A Cockburn, D Ahlstrom and C Gutwin. Understanding Performance in Touch Selections: Tap, Drag, and Radial Pointing Drag with Finger, Stylus and Mouse. *International Journal of Human-Computer Studies.* 70(3):218-233. 2012.

J21  J Hauber, A Cockburn, M Billinghurst and H Regenbrecht. The Impact of Collaborative Style on the Perception of 2D and 3D Videoconferencing Interfaces. *Open Software Engineering Journal.* 6:1-20. 2012.

J22  A Cockburn, P Quinn, C Gutwin, G Ramos and J Looser. Air Pointing: Design and Evaluation of Spatial Target Acquisition with and without Visual Feedback. *International Journal of Human-Computer Studies.* 69:401-414. 2011.

J23  E Tanvir, A Bunt, A Cockburn and P Irani. Improving Cascading Menu Selections with Adaptive Activation Areas. *International Journal of Human-Computer Studies.* 69:769-785. 2011.

J24  A Cockburn and C Gutwin. A Model of Novice and Expert Navigation Performance in Constrained Input Interfaces. *ACM Transactions on Computer-Human Interaction.* ACM Press. 7(3):1-38. 2010.

9

J25 A Cockburn and C Gutwin. A Predictive Model of Human Performance with Scrolling and Hierarchical Lists. *Human-Computer Interaction Journal*. Taylor and Francis. 24(3): 273-314. 2009.

J26 A Cockburn, A Karlson and B Bederson. A Review of Overview+Detail, Zooming, and Focus+Context Interfaces. *ACM Computing Surveys*. ACM Press. 41(1): 1-31. 2008.

J27 J Alexander, A Cockburn and R Lobb. AppMonitor: A Tool for Recording User Actions in Unmodified Windows Applications. *Behavior Research Methods*. Psychonomic Society. 40(2): 413-421. 2008.

J28 G Casiez, D Vogel, R Balakrishnan and A Cockburn. The Impact of Control-Display Gain on User Performance in Pointing Tasks. *Human-Computer Interaction Journal*. Taylor and Francis. 23(3): 215-250. 2008.

J29 S Jones, M Jones, G Marsden, D Patel and A Cockburn. An Evaluation Of Integrated Zooming and Scrolling On Small Screens *International Journal of Human-Computer Studies*. 63(3): 271–303. Elsevier Science. 2005.

J30 A Cockburn and S Brewster. Multimodal Feedback for the Acquisition of Small Targets *Ergonomics*. Taylor & Francis. 48(9): 1129–1150. 2005.

J31 M Moyle and A Cockburn. A Flick in the Right Direction: A Case Study of Gestural Input *Behaviour and Information Technology*. 24(4): 275–288. Taylor & Francis. 2005.

J32 A Cockburn. Web Browsers *Berkshire Encyclopedia of Human-Computer Interaction*. Bainbridge, WS (Editor). Volume 1: 80–83. Berkshire Publishing. 2004.

J33 A Cockburn and B McKenzie. Evaluating Spatial Memory in Two and Three Dimensions *International Journal of Human-Computer Studies*. 61(3): 359–373. Elsevier Science. 2004.

J34 A Cockburn and M Smith. Hidden Messages: Evaluating the Efficiency of Code Elision in Program Navigation *Interacting with Computers: The Interdisciplinary Journal of Human-Computer Interaction*. 15(3): 387–407. 2003.

J35 A Cockburn, S Greenberg, S Jones, B McKenzie and M Moyle. Improving Web Page Revisitation: Analysis, Design, and Evaluation *Information Technology and Society: Special Issue on Web Navigation, editors B Shneiderman, J Lazar, M Ivory*. 3(1): 159–183. 2003.

J36 A Cockburn, B McKenzie and M JasonSmith. Pushing Back: Evaluating a New Behaviour for the Back and Forward Buttons in Web Browsers *International Journal of Human-Computer Studies*. 57(5):397–414. Elsevier Science. 2002.

J37 T Bell, A Cockburn, B McKenzie and J Vargo. Digital Lectures: If You Make Them, Will Students Use Them? Constraints on Effective Delivery of Flexible Learning Systems *International Multimedia Electronic Journal of Computer-Enhanced Learning*. 3(2). Association for the Advancement of Computing in Education. 2001 This paper was one of 25 (from 115 full papers) selected from the proceedings of ED-MEDIA 2001 for adaptation and inclusion in the journal.

J38 A Cockburn. Supporting Tailorable Program Visualisations with Literate Programming and Fisheye Views. *Information and Software Technology*. 43(13):745–758. Elsevier Science. 2001.

10

J39  A Cockburn, T Bell and B McKenzie.   Death to the Office of the Nineties:  An HCI Perspective on Some Problems in Modern Office Information Systems *Journal of Research and Practice in Information Technology, Special Issue on Human-Computer Interaction (HCI).*, 33(1):68–82. Australian Computer Society. 2001.

J40  A Cockburn and B McKenzie.   What Do Web Users Do?  An Empirical Analysis of Web Use. *International Journal of Human-Computer Studies*, 54(6):903–922. Academic Press. 2001.

J41  A Cockburn and S Greenberg.  Issues of Page Representation and Organisation in Web Browser's Revisitation Tools. *Australian Journal of Information Systems*, 7(2):120–127. 2000.

J42  A Cockburn and P Weir.   An Investigation of Groupware Support for Collaborative Awareness Through Distortion-Oriented Views.   *International Journal of Human Computer Interaction*, 11(3):231–255. Lawrence Erlbaum Associates. 1999.

J43  A Cockburn and S Greenberg.   The Design and Evolution of TurboTurtle, a Collaborative Microworld for Exploring Newtonian Physics.  *International Journal of Human-Computer Studies*, 48(6):777-801. Academic Press. 1998.

J44  A Cockburn and A Bryant.  Leogo: An Equal Opportunity User Interface for Programming. *Journal of Visual Languages and Computing*, 8(5–6):601–619. Academic Press. 1997.

J45  A Cockburn and S Jones.  Which way now? Analysing and Easing Inadequacies in WWW Navigation. *International Journal of Human-Computer Studies*, 45(1):105–129. Academic Press. 1996.

J46  A Cockburn and S Jones.   Four Principles for Groupware Design.  *Interacting with Computers: The Interdisciplinary Journal of Human-Computer Interaction*, 7(2):195–210. Elsevier. 1995.

J47  HW Thimbleby, SP Marsh, SR Jones, and AG Cockburn.  Trust in CSCW.  In S Scrivener, editor, *Computer-Supported Cooperative Work*, pages 253–271. Ashgate Publishing, 1994.

J48  H Thimbleby, A Cockburn, and S Jones.   Hypercard: An Object-Oriented Disappointment.   In P Gray and R Took, editors, *Building Interactive Systems: Architectures and Tools*, pages 35–55. Springer-Verlag, 1992.

**Papers in Refereed Conference Proceedings**

C1  J Harrison, S Malacria, A Cockburn.  Further Testing the Performance of ExposeHK in CommandMaps-like Interfaces and a Semi-Realistic Task. *Proceedings of IHM 2025: 36e Conférence Internationale Francophone sur l'Interaction Humain-Machine.* Toulouse, France. *2025.*

C2  CD Beattie, C Gutwin, A Cockburn, E Redekopp.  Understanding and Improving the Performance of Action Pointing. *Proceedings of ACM CHI 2025.* Yokohama, Japan. *2025.*

C3  K Kargut, C Gutwin, A Cockburn.  Effects of Device Environment and Information Layout on Spatial Memory and Performance in VR Selection Tasks. *Proceedings of ACM CHI 2024.* Hawai'i. *2024.*

C4  P Suwanaposee, C Gutwin, Z Chen, A Cockburn.  'Specially For You' – Examining the Barnum Effect's Influence on the Perceived Quality of System Recommendations. *Proceedings of ACM CHI 2023.* Hamburg, Germany. *2023.*

11

C5 A Cockburn, P Quinn, C Gutwin, Z Chen, P Suwanaposee. Probability Weighting in Interactive Decisions: Evidence for Overuse of Bad Assistance, Underuse of Good Assistance. *Proceedings of ACM CHI 2022*. New Orleans, USA. *2022*.

C6 K Lam, C Gutwin, M Klarkowski, and A Cockburn. More Errors vs. Longer Commands: The Effects of Repetition and Reduced Expressiveness on Input Interpretation Error, Learning, and User Preference. *Proceedings of ACM CHI 2022*. New Orleans, USA. *2022*.

C7 A Goguey, C Gutwin, Z Chen, P Suwanaposee, and A Cockburn. Interaction Pace and User Preferences. *Proceedings of ACM CHI 2021*. Yokohama, Japan. *2021*. **Honourable mention award**

C8 K Lam, C Gutwin, M Klarkowski, and A Cockburn. The Effects of System Interpretation Errors on Learning New Input Mechanisms. *Proceedings of ACM CHI 2021*. Yokohama, Japan. *2021*. **Honourable mention award**

C9 S Liu, M Claypool, A Cockburn, R Eg, C Gutwin, and K Raaen. Datasets – Moving Target Selection with Delay. *Proceedings of the 12th ACM Multimedia Systems Conference (MMSys '21),* Istanbul, Turkey. *2021*.

C10 N Bandeira Romao Tome, M Klarkowski, C Phillips, RL Mandryk, A Cockburn, and C Gutwin. Risking Treasure: Testing Loss Aversion in an Adventure Game. *Proceedings of ACM CHI PLAY 2020 Symposium on Computer-Human Interaction in Play*. Ottawa, Canada. *2020*.

C11 P Schmid, S Malacria, A Cockburn and M Nancel. Interaction Interferences: Implications of Last-Instant System State Changes. *Proceedings of ACM UIST'2020 Symposium on User Interface Software and Technology*. Minneapolis, USA. *2020*.

C12 P Palanque, A Cockburn and C Gutwin. A Classification of Faults Covering the Human-Computer Interaction Loop. *Proceedings of SafeComp 2020: 39th International Conference on Computer Safety, Reliability and Security*. Lisbon, Portugal. *2020*.

C13 A Mairena, M Dechant, C Gutwin and A Cockburn. A Baseline Study of Emphasis Effects in Information Visualization. *Proceedings of Graphics Interface 2020*. Toronto, Canada. *2020*.

C14 C Gutwin, A Cockburn, M van der Kamp, J Storring and C Philips. Testing the Limits of the Spatial Approach: Comparing Retrieval and Revisitation Performance of Spatial and Paged Data Organizations for Large Item Sets. *Proceedings of Graphics Interface 2020*. Toronto, Canada. *2020*.

C15 A Cockburn, B Lewis, P Quinn and C Gutwin. Framing Effects Influence Interface Feature Decisions. *Proceedings of ACM CHI 2020*. Hawai'i. *2020*.

C16 B Lewis, G d'Eon, A Cockburn and D Vogel. KeyMap: Improving Keyboard Shortcut Vocabulary Using Norman's Mapping. *Proceedings of ACM CHI 2020*. Hawai'i. *2020*.

C17 A Goguey, S Malacria, A Cockburn, and C Gutwin. Reducing Error Aversion to Support Novice-to-Expert Transitions with FastTap. *Proceedings of the 31st Francophone Conference on Human-Computer Interaction – IHM 2019*. Grenoble, France. *2019*. **Best paper award**

12

C18  P Palanque, A Cockburn, L Désert-Legendre, C Gutwin and Y Déléris. Brace Touch: a Dependable, Turbulence-Tolerant, Multi-Touch Interaction Technique for Interactive Cockpits. *Proceedings of the 38th International Conference on Computer Safety, Reliability and Security - SafeComp 2019.* Turku, Finland. *2019.*

C19  C Martinie, P Palanque, E Bouzekri, A Cockburn, A Canny and E Barboni. Analysing and Demonstrating Tool-Supported Customizable Task Notations. *Proceedings of the 11th ACM SIGCHI Symposium on Engineering Interactive Computing Systems.* Valencia, Spain. *2019.*

C20  Q Roy, C Zakaria, W Kim, M Nancel, ST Perrault, A Misra and A Cockburn. A Comparative Study of Pointing Techniques for Eyewear Using a Simulated Pedestrian Environment. *Proceedings of the 17th IFIP TC.13 International Conference on Human-Computer Interaction.* Cyprus. *2019.*

C21  A Cockburn and C Gutwin. Anchoring Effects and Troublesome Asymmetric Transfer in Subjective Ratings. *Proceedings of ACM CHI 2019.* Glasgow, Scotland. *2019.*

C22  AF Mairena, C Gutwin, A Cockburn and LJ Elias The Effects of Feature Combination and Task Demands on Peripheral Notifications in Large Displays. *Proceedings of ACM CHI 2019.* Glasgow, Scotland. *2019.*

C23  M Claypool, A Cockburn and C Gutwin. Game Input with Delay – Moving Target Selection Parameters. *Proceedings of ACM Multimedia Systems Conference 2019.* Amhurst, MA. *2019.*

C24  A Cockburn, D Woolley, K Tran Pham Thai, D Clucas, S Hoermann, and C Gutwin. Reducing the Attentional Demands of In-Vehicle Touchscreens with Stencil Overlays. *Proceedings of ACM Automotive UI 2018.* Toronto, Canada. *2018.*

C25  A Cockburn, C Gutwin and A Dix. HARK No More: On the Preregistration of CHI Experiments. *Proceedings of ACM CHI 2018.* Montreal, Canada. *2018.* Paper 141. **Best paper award**

C26  A Goguey, G Casiez, A Cockburn and C Gutwin. Storyboard-Based Empirical Modelling of Touch Interface Performance. *Proceedings of ACM CHI 2018.* Montreal, Canada. *2018.* Paper 445. **Honourable mention award**

C27  A Cockburn, C Gutwin, P Palanque, Y Deleris, C Trask, A Coveney, M Yung and K MacLean. Turbulent Touch: Touchscreen Input for Cockpit Flight Displays. *Proceedings of ACM CHI 2017.* Denver, CO. *2017.* 6742-6753.

C28  C Gutwin, A Cockburn and N Gough. A Field Experiment of Spatially-Stable Overviews for Document Navigation. *Proceedings of ACM CHI 2017.* Denver, CO. *2017.* 5905-5916.

C29  C Gutwin, A Cockburn and A Coveney. Peripheral Popout: The Influence of Visual Angle on Popout Effects. *Proceedings of ACM CHI 2017.* Denver, CO. *2017.* 208-219.

C30  S Uddin, C Gutwin and A Cockburn. The Effects of Artificial Landmarks on Learning and Performance in Spatial-Memory Interfaces. *Proceedings of ACM CHI 2017.* Denver, CO. *2017.* 3843-3855.

C31  P Quinn and A Cockburn. When Bad Feels Good: Assistance Failures and Interface Preferences. *Proceedings of CHI'2016.* San Jose, California. *2016.* 4005-4010.

13

C32 B Lafreniere, C Gutwin, A Cockburn and T Grossman. Faster Command Selection on Touchscreen Watches *Proceedings of CHI'2016.* San Jose, California. *2016.* 4663-4674.

C33 K Schramm, C Gutwin and A Cockburn. Supporting Transitions to Expertise in Hidden Toolbars *Proceedings of CHI'2016.* San Jose, California. *2016.* 4687-4698.

C34 C Gutwin, C Rooke, A Cockburn, R Mandryk and B Lafreniere. Peak-End Effects on Player Experience in Casual Games *Proceedings of CHI'2016.* San Jose, California. *2016.* 5608-5619. **Honourable mention award**

C35 C Gutwin, A Cockburn and B Lafreniere. Testing the Rehearsal Hypothesis with Two FastTap Interfaces. *Proceedings of GI'2015.* Halifax, Canada. *2015.* 223-231.

C36 A Cockburn, C Gutwin and P Quinn. Examining the Peak-End Effects of Subjective Experience. *Proceedings of CHI'2015.* Seoul, S. Korea. *2015.* 357-366.

C37 S Malacria, J Acetuno, P Quinn, G Casiez, A Cockburn, and N Roussel. Push-Edge and Slide-Edge: Scrolling by Pushing Against the Viewport Edge. *Proceedings of CHI'2015.* Seoul, S. Korea. *2015.* 2773-2776.

C38 S Fitchett, A Cockburn and C Gutwin. Finder Highlights: Field Evaluation and Design of an Augmented File Browser. *Proceedings of CHI'2014.* Toronto, Canada. *2014.* 3685-3694. **Honourable mention award**

C39 C Gutwin, A Cockburn, J Scarr and S Malacria. Faster Command Selection on Tablets with FastTap. *Proceedings of CHI'2014.* Toronto, Canada. *2014.* 2617-2626.

C40 M Nancel and A Cockburn. Causality: A Conceptual Model of Interaction History. *Proceedings of CHI'2014.* Toronto, Canada. *2014.* 1777-1786. **Honourable mention award**

C41 J Scarr, A Cockburn, C Gutwin, A Bunt, and J Cechanowicz. The Usability of CommandMaps in Realistic Tasks. *Proceedings of CHI'2014.* Toronto, Canada. *2014.* 2241-2250.

C42 SA Seah, DM Plasencia, P Bennet, A Karnik, V Ortocol, J Knibbe, A Cockburn, and S Submramanian. SensaBubble: A Chrono-Sensory Mid-Air Display of Sight and Smell. *Proceedings of CHI'2014.* Toronto, Canada. *2014.* 2863-2872. **Honourable mention award**

C43 P Quinn, S Malacria and A Cockburn. Touch Scrolling Transfer Functions. *Proceedings of ACM UIST'2013 Symposium on User Interface Software and Technology.* St Andrews, Scotland. *2013.* 61-71.

C44 S Malacria, J Scarr, A Cockburn, C Gutwin and T Grossman. Skillometers: Reflective Widgets that Motivate and Help Users to Improve Performance. *Proceedings of ACM UIST'2013 Symposium on User Interface Software and Technology.* St Andrews, Scotland. *2013.* 321-330.

C45 M Jain, A Cockburn, and S Madhvanath. Comparison of Phone-Based Distal Pointing Techniques for Point-Select Tasks. *Proceedings of INTERACT'13.* Cape Town, South Africa. *2013.* 714-721.

C46 S Malacria, G Bailly, J Harrison, A Cockburn, and C Gutwin. Promoting Hotkey Use through Rehearsal with ExposeHK. *Proceedings of CHI'2013.* Paris, France. *2013.* 573-582.

14

C47  J Scarr, A Cockburn, C Gutwin, and S Malacria.  Testing the Robustness and Performance of Spatially Consistent Interfaces.  *Proceedings of CHI'2013*.  Paris, France.  *2013*.  3139-3148. **Honourable mention award**

C48  S Fitchett, A Cockburn, and C Gutwin.  Improving Navigation-Based File Retrieval.  *Proceedings of CHI'2013*.  Paris, France.  *2013*.  2329-2338. **Best paper award**

C49  T Piumsomboon, A Clark, M Billinghurst, and A Cockburn.  User-Defined Gestures for Augmented Reality.  *Proceedings of INTERACT'13*.  Cape Town, South Africa.  *September*.  *2013*. 282-299.

C50  P Quinn, A Cockburn, G Casiez, N Roussel, and C Gutwin.  Exposing and Understanding Scrolling Transfer Functions.  *Proceedings of ACM UIST'2012 Symposium on User Interface Software and Technology*.  Cambridge, Massachusetts, October.  *2012*.  341-350.

C51  A Cockburn, P Quinn, C Gutwin, and S Fitchett.  Improving Scrolling Devices with Document-Length-Dependent Gain.  *Proceedings of CHI'2012*.  Austin, Texas, May.  *2012*.  267-276.

C52  J Scarr, A Cockburn, C Gutwin, and A Bunt.  Improving Command Selection with CommandMaps. *Proceedings of CHI'2012*.  Austin, Texas, May.  *2012*.  257-266. **Best paper award**

C53  S Fitchett and A Cockburn.  AccessRank: Predicting What Users Will Do Next.  *Proceedings of CHI'2012*.  Austin, Texas, May.  *2012*.  2239-2242. **Honourable mention award**

C54  J Scarr, A Cockburn, C Gutwin, and P Quinn.  Dips and Ceilings: Understanding and Supporting Transitions to Expertise in User Interfaces.  *Proceedings of CHI'2011*.  Vancouver, Canada, May. *2011*.  2741-2750.

C55  V Levesque, L Oram, KE MacLean, A Cockburn, N Marchuk, D Johnson, JE Colgate, and M Peshkin.  Enhancing Physicality in Touch Interaction with Programmable Friction.  *Proceedings of CHI'2011*.  Vancouver, Canada, May.  *2011*.  2481-2490. **Best paper award**.

C56  P Quinn, A Cockburn, KJ Raiha, and J Delemarche.  On the Costs of Multiple Trajectory Pointing Methods.  *Proceedings of CHI'2011*.  Vancouver, Canada, May.  *2011*.  859-862. **Honourable mention award**

C57  R Xiao, M Nacenta, RL Mandryk, A Cockburn and C Gutwin.  Ubiquitous Cursor: A Comparison of Direct and Indirect Pointing Feedback in Multi-Display Environments. *Proceedings of Graphics Interface '2011*.  St Johns, Canada.  *2011*.  135-142. **Michael A. J. Sweeney best student paper award.**

C58  S Bateman, A Doucette, C Gutwin, RL Mandryk and A Cockburn.  Effects of View, Input Device, and Track Width on Video Game Driving.  *Proceedings of Graphics Interface '2011*.  St Johns, Canada.  *2011*.  207-214.

C59  S Tak, J Scarr, C Gutwin and A Cockburn.  Supporting Window Switching With Spatially Consistent Thumbnails Zones: Design and Evaluation.  *Proceedings of INTERACT'2011*.  Lisbon, Portugal.  *2011*.  331-347.

C60  B Ens, D Ahlstroem, A Cockburn and P Irani.  Characterizing User Performance with Assisted Direct Off-Screen Pointing.  *Proceedings of Mobile HCI'2011*.  Stockholm.  *2011*.  331-347.

15

C61 D Ahlstroem, A Cockburn, C Gutwin, and P Irani. Why it's Quick to be Square: Modelling New and Existing Hierarchical Menu Designs. *Proceedings of CHI'2010.* Atlanta, GA, April. *2010.* 1371-1380. **Best paper nomination**.

C62 J Oosterman and A Cockburn. An Empirical Comparison of Tag Clouds and Tables. *Proceedings of OzCHI'2010.* Brisbane, Australia, 22-26 November. *2010.* 288-295.

C63 S Fitchett and A Cockburn. Using Multitouch Input to Support Hybrid Relative and Absolute Mobile Scrolling *People and Computers 24. Proceedings of the British HCI Conference.* Dundee, 6-10 September. *2010.*

C64 S Fitchett and A Cockburn. Evaluating Flick-Scrolling and Tilt Scrolling for Reading Tasks on Mobile Devices. *Proceedings of OzCHI'2009.* Melbourne, Australia, 23-27 November. *2009.* 225-232.

C65 P Quinn and A Cockburn. Zoofing! Faster List Selections with Pressure-Zoom-Flick-Scrolling. *Proceedings of OzCHI'2009.* Melbourne, Australia, 23-27 November. *2009.* 185–192.

C66 S Tak and A Cockburn. Window Watcher: A Visualisation Tool for Understanding Window Switching Activities. *Proceedings of OzCHI'2009.* Melbourne, Australia, 23-27 November. *2009.* 241–248.

C67 S Tak, A Cockburn, K Humm, D Ahlstroem, C Gutwin and J Scarr. Improving Window Switching Interfaces. *Proceedings of INTERACT'2009.* Uppsala, Sweden, 24-28 August. *2009.* 187-200.

C68 J Zucco, B Thomas, K Grimmer-Sommers and A Cockburn. A Comparison of Menu Configurations and Pointing Devices for use with Wearable Computers while Mobile and Stationary. *Proceedings of ACM ISWC'2009: 13th International Symposium on Wearable Computers.* Linz, Austria, 5-7 September. *2009.* 63–70.

C69 J Alexander, A Cockburn, S Fitchett, C Gutwin and S Greenberg. Revisiting Read Wear: Analysis, Design, and Evaluation of a Footprints Scrollbar. *Proceedings of ACM CHI'2009 Conference on Human Factors in Computing Systems.* Boston, MA, 5 April - 9 April. *2009.* 1665-1674.

C70 E Tanvir, J Cullen, P Irani and A Cockburn. Improving Selection in Cascading Pull-Down Menus. *Proceedings of ACM CHI'2008 Conference on Human Factors in Computing Systems.* Florence, Italy, 5 April - 10 April. *2008.* 1381-1384.

C71 J Alexander and A Cockburn. An Empirical Characterisation of Electronic Document Navigation. *Proceedings of Graphics Interface '08.* Windsor, Ontario, Canada, May 28-30. *2008.* 123-130. **Michael A. J. Sweeney best student paper award.**

C72 P Quinn, A Cockburn, Indratmo and C Gutwin An Investigation of Dynamic Landmarking Functions. *Proceedings of Advanced Visual Interfaces (AVI'08).* Napoli, Italy, May 28-30. *2008.* ACM Press.

C73 P Quinn and A Cockburn. The Effects of Menu Parallelism on Visual Search and Selection. *Proceedings of AUIC'08: Australasian User Interface Conference. 2008*, 79-84. ACM Press.

C74 V Buchmann, M Billinghurst and A Cockburn. Directional Interfaces for Wearable Augmented Reality. *Proceedings of CHINZ'08 2008*, 47-54. ACM Press.

16

C75 J Looser, M Billinghurst, R Grasset and A Cockburn. An Evaluation of Virutal Lenses for Object Selection in Augmented Reality. *Proceedings of GRAPHITE 2007.* Perth, Australia, 1–4 December. *2007,* 203-210. ACM Press.

C76 A Cockburn, C Gutwin and S Greenberg. A Predictive Model of Menu Performance *Proceedings of ACM CHI'2007 Conference on Human Factors in Computing Systems* San Jose, CA, 24–27 April. *2007,* 627–636. ACM Press.

C77 A Cockburn, PO Kristennson, J Alexander and S Zhai. Hard Lessons: Effort-Inducing Interfaces Benefit Spatial Learning *Proceedings of ACM CHI'2007 Conference on Human Factors in Computing Systems* San Jose, CA, 24–27 April. *2007,* 1571–1580. ACM Press.

C78 M Hancock, S Carpendale and A Cockburn. Shallow Depth 3D Interaction: Design and Evaluation of One-, Two-, and Three-Touch Techniques *Proceedings of ACM CHI'2007 Conference on Human Factors in Computing Systems* San Jose, CA, 24–27 April. *2007,* 1147–1156. **Nominated for best paper award**. ACM Press.

C79 G Ramos, A Cockburn, M Beaudouin-Lafon and R Balakrishnan. Pointing Lenses *Proceedings of ACM CHI'2007 Conference on Human Factors in Computing Systems* San Jose, CA, 24–27 April. *2007,* 757–766.. ACM Press.

C80 T Bell, A Cockburn, A Wingkvist and R Green. Podcasts as a supplement in tertiary education: an experiment with two Computer Science courses *Proceedings of MoLTA 2007: Conference on Mobile Learning Technologies and Applications* Auckland, New Zealand. *2007,* 70–77.

C81 T Amer, A Cockburn, R Green and G Odgers. Evaluating Swiftpoint as a Mobile Device for Direct Manipulation Input *Proceedings of AUIC'2007 Australasian User Interface Conference* Ballarat, Australia. *2007,* 63–70.

C82 J Hauber, H Regenbrecht, M Billinghurst and A Cockburn. Spatiality in Videoconferencing: Trade-offs between Efficiency and Social Presence *Proceedings of ACM CSCW'2006 Conference on Computer Supported Cooperative Work* Banff, Canada, November 4–8. *2006,* 413-422.

C83 V Jurgens, A Cockburn and M Billinghurst Depth Cues For Augmented Reality Stakeout *Proceedings of CHINZ'2006: Conference of the New Zealand Chapter of the ACM Special Interest Group on Human-Computer Interaction* Canterbury, New Zealand *2006,* 117-124.

C84 C Gutwin and A Cockburn. Improving List Revisitation with LispMaps *Proceedings of ACM AVI'2006 Conference on Advanced Visual Interfaces.* Venice, Italy, May 23–26. *2006,* 396-403. 32 accepted from 127 submissions.

C85 A Cockburn and A Gin. Faster Cascading Menu Selections with Enlarged Activation Areas *Proceedings of Graphics Interface 2006.* Quebec City, Canada, June 7–9. *2006,* 65–71.

C86 A Cockburn and P Brock. Human On-Line Response to Visual and Motor Target Expansion *Proceedings of Graphics Interface 2006.* Quebec City, Canada, June 7–9. *2006,* 81–87.

C87 A Cockburn, C Gutwin and J Alexander. Faster Document Navigation with Space-Filling Thumbnails *Proceedings of ACM CHI'2006 Conference on Human Factors in Computing Systems* Montreal, Canada, 24–27 April. *2006,* 1–10. ACM Press.

17

C88 J Looser, A Cockburn and J Savage. On the Validity of Using First-Person Shooters for Fitts' Law Studies Acceptance rate: 35%, 26 from 73. *People and Computers XVII (Volume 2): British Computer Society Conference on Human Computer Interaction* Edinburgh, Scotland, September *2005*, 33–36. Springer-Verlag.

C89 J Savage and A Cockburn. Comparing Automatic and Manual Zooming Methods for Acquiring Off-Screen Targets *People and Computers XIX: British Computer Society Conference on Human Computer Interaction* Edinburgh, Scotland*, September 2005*, 439–454. Springer-Verlag. Acceptance rate: 34%, 31 from 92.

C90 J Hauber, H Regenbrecht, A Hills, A Cockburn and M Billinghurst. Social Presence in Two- and Three-dimensional Videoconferencing *Proceedings of 8th Annual International Workshop on Presence* London, UK, September 21-23*, 2005*, 189–198.

C91 A Cockburn, J Savage and A Wallace. Tuning and Testing Scrolling Interfaces that Automatically Zoom *Proceedings of ACM CHI'2005 Conference on Human Factors in Computing Systems* Portland, Oregon, 2–7 April. *2005*, 71–80. ACM Press. Acceptance rate: 25%, 93 from 371. **Nominated for best paper award**.

C92 T Wright and A Cockburn. Evaluation of Two Textual Programming Notations for Children *Proceedings of the Sixth Australasian User Interface Conference (AUIC2005)* Newcastle, Australia, 2–3 February *2005*, 55–62. Australian Computer Society.

C93 L Rennie and A Cockburn. Aiding Text Entry of Foreign Alphabets with Visual Keyboard Plus *Proceedings of the Sixth Australasian User Interface Conference (AUIC2005)* Newcastle, Australia, 2–3 February *2005*, 119–125. Australian Computer Society.

C94 S Blinmann and A Cockburn. Program Comprehension: Investigating the effects of naming style and documentation *Proceedings of the Sixth Australasian User Interface Conference (AUIC2005)* Newcastle, Australia, 2–3 February *2005*, 73–78. Australian Computer Society.

C95 J Looser, M Billinghurst and A Cockburn. Through the Looking Glass: The Use of Lenses as an Interface Tool for Augmented Reality *Proceedings of Graphite'04: International Conference on Computer Graphics and Interactive Techniques* Singapore, 15–18 June *2004*, 204–211.

C96 V Buchmann, S Violich, M Billinghurst and A Cockburn. FingARtips — Gesture Based Direct Manipulation in Augmented Reality *Proceedings of Graphite'04: International Conference on Computer Graphics and Interactive Techniques* Singapore, 15–18 June *2004*, pp 212–221.

C97 A Cockburn. Revisiting 2D vs 3D Implications on Spatial Memory *Proceedings of the Fifth Australasian User Interface Conference (AUIC2004)* Dunedin, New Zealand, 18–22 January *2004*, pp 25–32. Australian Computer Society.

C98 A Wallace, J Savage and A Cockburn. Rapid Visual Flow: How Fast is Too Fast? *Proceedings of the Fifth Australasian User Interface Conference (AUIC2004)* Dunedin, New Zealand, 18–22 January *2004*, pp 117–122. Australian Computer Society.

C99 A Cockburn, J Looser and J Savage. Around the World in Seconds with Speed-Dependent Automatic Zooming *Paper and Video in the Conference Supplement of the ACM Conference on User Interface Software and Technology* Vancouver, Canada, November *2003*, pp 35–36.

18

C100  A Cockburn and J Savage.  Comparing Speed-Dependent Automatic Zooming with Traditional Scroll, Pan and Zoom Methods *People and Computers XVII: British Computer Society Conference on Human Computer Interaction* Bath, England, September *2003*, pages 87–102.  Springer-Verlag.

C101  A Cockburn and A Firth.  Improving the Acquisition of Small Targets *People and Computers XVII: British Computer Society Conference on Human Computer Interaction* Bath, England, September *2003*, pages 181–196.  Springer-Verlag.

C102  A Cockburn and A Siresena.  Evaluating Mobile Text Entry with the Fastap Keypad  Acceptance rate: 33%, 8 from 24. *People and Computers XVII (Volume 2): British Computer Society Conference on Human Computer Interaction* Bath, England, September *2003*, pages 77–80.  Springer-Verlag.

C103  T Wright and A Cockburn.  A Language and Task-based Taxonomy of Programming Environments *Proceedings of IEEE Symposium on Visual Languages and Formal Methods.* Auckland, October 28–31 *2003*, pages 192–194.  Acceptance rate: 33%, 8 from 24.

C104  T Wright and A Cockburn.  An Evaluation of the Effects of Different Forms of Computer Supported Collaboration on Problem Solving Strategies *Proceedings of CHINZ'03. Annual conference of the New Zealand Chapter of the ACM Special Interest Group on Human-Computer Interaction.* Otago, July *2003*, pages 99-104.  Acceptance rate: 59%, 19 from 32.

C105  T Wright and A Cockburn.  A Framework for Evaluating Multiple Language Programming Environments *Proceedings of CHINZ'03. Annual conference of the New Zealand Chapter of the ACM Special Interest Group on Human-Computer Interaction.* Otago, July *2003*, pages 21–26. Acceptance rate: 59%, 19 from 32.

C106  M Apperley, P Carter, C Churcher, A Cockburn, M Jones, B Lobb, K Novins, C Phillips and W Wong.  State of the Art: HCI in New Zealand (HCI Societies Worldwide Review) *Proceedings of INTERACT'03: Ninth IFIP TC13 International Conference on Human-Computer Interaction* Zurich, Switzerland, Sept 1–5 *2003*

C107  M Moyle and A Cockburn.  The Design and Evaluation of a Flick Gesture for 'Back' and 'Forward' in Web Browsers *Proceedings of the Fourth Australasian User Interface Conference (AUIC2003)* Adelaide, Australia, 4–7 February *2003*, pages 39–46.

C108  M JasonSmith and A Cockburn. Get a Way Back: An Evaluation of Temporal Lists *Proceedings of the Fourth Australasian User Interface Conference (AUIC2003)* Adelaide, Australia, 4–7 February *2003*, pages 33–38.

C109  T Wright and A Cockburn.  Mulspren: A MUltple Language Simulation PRogramming ENvironment *Proceedings of the 2002 IEEE Symposia on Human Centric Computing Languages and Environments* Arlington, VA, Sept 3–6 *2002*, pages 101–103.

C110  T Wright and A Cockburn. Evaluating Computer-Supported Collaboration for Learning a Problem Solving Task, *Proceedings of the International Conference on Computers in Education,* Auckland, NZ *2002*, pages 266-267.

C111  M Moyle and A Cockburn.  Analysing Mouse and Pen Flick Gestures *Proceedings of the SIGCHI-NZ Symposium On Computer-Human Interaction* Hamilton, New Zealand, 11–12 July. *2002*, pages 19–24.

19

C112 A Cockburn and B McKenzie. Evaluating the Effectiveness of Spatial Memory in 2D and 3D Physical and Virtual Environments *Proceedings of ACM CHI'2002 Conference on Human Factors in Computing Systems* Minneapolis, Minnesota, 20–25 April. *2002*, pages 203–210. Addison-Wesley. Acceptance rate: 15%, 61 from 409.

C113 A Cockburn, B McKenzie, and M JasonSmith. Evaluating a Temporal Behaviour for Web Browsers' Back and Forward Buttons *CD and on-line Proceedings of WWW2002, the 11th International World Wide Web Conference* Honolulu, May 7–11. *2002*. www2002.org

C114 M Moyle and A Cockburn. Gesture Navigation: An Alternative Back for the Future *Extended Abstracts of ACM CHI'2002 Conference on Human Factors in Computing Systems* Minneapolis, Minnesota, 20–25 April. *2002*, pages 822–823. ACM Press. Acceptance rate: 17%, 62 from 374.

C115 L Butts and A Cockburn. An Evaluation of Mobile Phone Text Input Methods *Proceedings of Australian User Interface Conference. 2002*, pages 55–59. Australian Computer Society Inc.

C116 T Wright and A Cockburn. Solo, Together, Apart: Evaluating Modes of CSCL for Learning a Problem Solving Task *Proceedings of ACM Computer Supported Collaborative Learning (CSCL) Conference 2002*. newmedia.colorado.edu/cscl/06.pdf

C117 T Bell, A Cockburn, B McKenzie and J Vargo. Flexible Delivery Damaging to Learning? Lessons from the Canterbury Digital Lectures Project *Proceedings of ED-MEDIA'2001: World Conference on Educational Multimedia, Hypermedia and Telecommunications* Tampere, Finland, June 25–30. *2001*, pages 117–122. Association for the Advancement of Computing in Education.

C118 A Cockburn and B McKenzie. 3D or Not 3D? Evaluating the Effect of the Third Dimension in a Document Management System *Proceedings of ACM CHI'2001 Conference on Human Factors in Computing Systems* Seattle, Washington, March 31–April 6. *2001*, pages 434–441. Addison-Wesley. Acceptance rate: 19%, 69 from 353.

C119 B McKenzie and A Cockburn. An Empirical Analysis of Web Page Revisitation *34th Hawaiian International Conference on System Sciences, HICSS34 2001*. IEEE Computer Society Press.

C120 T Wright and A Cockburn. Writing, Reading, Watching: A Task-Based Analysis and Review of Learners' Programming Environments *International Workshop on Advanced Learning Technologies, IWALT 2000*, pages 167–170. IEEE Computer Society Press.

C121 A Cockburn and B McKenzie. An Evaluation of Cone Trees *People and Computers XIV: British Computer Society Conference on Human Computer Interaction 2000*, pages 425–436. Springer-Verlag. Acceptance rate: 27 from 57.

C122 A Cockburn and S Greenberg. Issues of Page Representation and Organisation in Web Browser's Revisitation Tools *OzCHI'99: Australian Conference on Computer-Human Interaction,* Wagga Wagga, November 28–30, 1999, pages 7–14. Acceptance rate: 50%.

C123 A Cockburn, S Greenberg, B McKenzie, M JasonSmith and S Kaasten. WebView: A Graphical Aid for Revisiting Web Pages *OzCHI'99: Australian Conference on Computer-Human Interaction,* Wagga Wagga, November 28–30, 1999, pages 15–22. Acceptance rate: 50%.

C124 S Greenberg and A Cockburn. Getting Back to Back: Alternate Behaviors for a Web Browser's Back Button *5th Conference on Human Factors and the Web, Gaithersburg, Maryland. June 3, 1999*. Acceptance rate: 11 from 27.

20

C125  P Weir and A Cockburn. Distortion-Oriented Workspace Awareness in DOME *British Computer Society Conference on Human-Computer Interaction. Imperial College, London. 1–4 September, 1998.*, pages 239–252. Springer-Verlag. Acceptance rate: 21 from 89.

C126  E Ng, T Bell and A Cockburn. Improvements to a Pen-Based Musical Input System *OzCHI'98: The Australasian Conference on Computer-Human Interaction. Adelaide, Australia. 29th November to 4th December, 1998. 1998.*, pages 239–252. IEEE Computer Society Press.

C127  A Cockburn and T Bell. Extending HCI in the Computer Science Curriculum *ACM Australasian Computer Science Education Conference ACSE'98. Brisbane, Australia, 8–10 July, 1998,* pages 113–120. ACM Press. Acceptance rate: 28 from 59.

C128  A Cockburn and A Bryant. Cleogo: Collaborative and Multi-Paradigm Programming for Kids *APCHI'98: Asia Pacific Conference on Computer Human Interaction.* Japan. July 15–17, 1998, pages 187–192. IEEE Computer Society Press.

C129  N Churcher, A Cockburn, B McMaster, J Horlor. CUTE—The Design and Evolution of a First Year Programming Environment Software Engineering: Education and Practice '98. Dunedin. January, 1998, pages 142–148. IEEE Computer Society Press.

C130  A Cockburn and T Dale. CEVA: A Tool for Collaborative Video Analysis *ACM Group'97: International Conference on Supporting Group Work* Phoenix, Arizona, November 16–19, 1997, pages 47–55. ACM Press. Acceptance rate: 44 from 104.

C131  A Cockburn and N Churcher. Towards Literate Tools for Novice Programmers *ACM Australasian Computer Science Education Conference ACSE'97.* Melbourne, Australia, 2-4 July 1997, pages 163–169. ACM Press. Acceptance rate: 31 from 46.

C132  N Churcher and A Cockburn. An Immersion Model for Software Engineering Projects *ACM Australasian Computer Science Education Conference ACSE'97.* Melbourne, Australia, 2-4 July 1997, pages 107–116. ACM Press. Acceptance rate: 31 from 46.

C133  A Cockburn and S Jones. Design Issues for World Wide Web Navigation Visualisation Tools *RIAO'97: The Fifth Conference on Computer-Assisted Research of Information.* McGill University, Montreal, Quebec, Canada, 25th-27th June 1997. pages 55–74. Acceptance rate: 35 from 90.

C134  J Anstice, T Bell, A Cockburn and M Setchell. The Design of a Pen-Based Musical Input System. *OzCHI'96: The Sixth Australian Conference on Computer-Human Interaction,* Hamilton, New Zealand, November 24–27, 1996, pages 260–267. IEEE Press. Acceptance rate: 38 from 79.

C135  A Cockburn and A Bryant. Do It This Way: Equal Opportunity Programming for Kids *OzCHI'96: The Sixth Australian Conference on Computer-Human Interaction,* Hamilton, New Zealand, November 24–27, 1996, pages 246–251. IEEE Press. Acceptance rate: 38 from 79.

C136  A Tay and A Cockburn User Interfaces for Workflow Systems: Designing for End-User Tailorability Short paper in *OzCHI'96: The Sixth Australian Conference on Computer-Human Interaction,* Hamilton, New Zealand, November 24–27, 1996, pages 301–302. IEEE Press.

C137  A Cockburn. Collaborative Usability Analysis Using Video Protocols *APCHI'96: The First Asia Pacific Conference Human Computer Interaction,* Information Technology Institute Singapore, 25–28 June, 1996, pages 67–80. Acceptance rate: lower than 50%.

21

C138  S Greenberg, C Gutwin, and A Cockburn. Using Distortion-Oriented Displays to Support Workspace Awareness. *British Computer Society Conference on Human-Computer Interaction. Imperial College, London. 20–23 August, 1996.* Cambridge University Press. Acceptance rate: 23 from 63.

C139  A Cockburn and S Greenberg. Children's Collaboration Styles in a Newtonian Microworld. In *Companion Proceedings of CHI'96. ACM Conference on Human Factors in Computing Systems* Vancouver, April 13–18 1996, pages 181–182. ACM Press. Acceptance rate: 78 from 335.

C140  S Greenberg, C Gutwin, and A Cockburn. Awareness Through Fisheye Views in Relaxed-WYSIWIS Groupware *Proceedings of Graphics Interface, May 21–24, 1996. Toronto*, pages 28–38. Morgan-Kauffman. Acceptance rate: 29 from 73.

C141  SRA Jones and AJG Cockburn. A Study of Navigational Support Provided by Two World Wide Web Browsing Applications. In *Hypertext '96. Seventh ACM Conference on Hypertext. Washington DC March 16–20, 1996*, pages 161–169. ACM Press. Acceptance rate: 24 from 85.

C142  AJG Cockburn and SRA Jones. Trails, Trials, and Tribulations: Unravelling Navigational Problems in the World Wide Web. In *Proceedings of the 5th Workshop on Information Technologies and Systems (WITS '95). Nijenrode University, The Netherlands. 9–10 December.*, pages 46–55, 1995. Acceptance rate: 24 from 70.

C143  A Cockburn and S Greenberg. TurboTurtle: A Collaborative Microworld for Exploring Newtonian Physics. In *ACM Conference on Computer Supported Cooperative Learning (CSCL '95). Bloomington, Indiana. October 17–20, 1995*, pages 62–66. Lawrence Erlbaum Associates, Inc, October 1995.

C144  AJG Cockburn. TurboTurtle: Educating Children in an Alternative Reality Universe. In *Proceedings of the 1994 Computer Human Interaction Specialist Interest Group of the Ergonomics Society of Australia (OZCHI'94).* November 28 to December 1. *Melbourne.*, pages 99–105, 1994.

C145  A Cockburn and S Jones. Four Principles for Groupware Design. In *Proceedings of the 1994 Computer Human Interaction Specialist Interest Group of the Ergonomics Society of Australia (OZCHI'94).* November 28 to December 1. *Melbourne.*, pages 21–26, 1994.

C146  AJG Cockburn and S Greenberg. Making Contact: Getting the Group Communicating with Groupware. In *COOCS '93. The ACM Conference on Organisational Computing Systems. November 1st to 4th. Milpitas, California.*, pages 31–41, 1993.

C147  AJG Cockburn. Supporting Social Awareness in Distributed Work. In P *et al* Collings, editor, *Proceedings of OZCHI 1993. CHISIG Annual Conference.* Canberra. November., pages 224–241, 1993.

C148  AJG Cockburn and HW Thimbleby. Reducing User Effort in Collaboration Support. In WD Gray, WE Hefley, and D Murray, editors, *Proceedings of the 1993 International Workshop on Intelligent User Interfaces, Orlando, Florida. January 4–7.*, pages 215–218. New York: ACM Press, January 1993.

C149  AJG Cockburn and HW Thimbleby. Automatic Conversational Context: Avoiding Dependency on User Effort in Groupware. In MJ Rees and R Iannella, editors, *Interface Technology: Advancing Human-Computer Communication. Proceedings of OZCHI 1992. CHISIG Annual Conference.* Bond University Australia, Queensland. November 26–27, pages 142–149, 1992.

22

C150 AJG Cockburn. Reflexive CSCW and Managing Commitments. In *IEE Colloquium on CSCW: Some Fundamental Issues.* London, March 15, number 065 in 1991, pages 9/1–9/5. IEE, 1991.

## Patents and Patent Applications

P1 Andy Cockburn, Mark Billinghurst, Dinesh Mandalapu. User Interface Device. US Patent Application Number: PCT/IN2011/000897.

## Other: Refereed Videos, Media Reports and Non-Refereed Publications

O1 L Besanon, Y Jansen, A Cockburn, and P Dragicevic. Definitely Maybe: Hedges And Boosters in the HCI Literature. OSF Preprints. https://osf.io/mjg7h/, 2021.

O2 National Science Challenges report. 'Meet the researchers: Andy Cockburn, Turbulent touch'. 22/03/2019.

O3 Marsden update. 'Young researchers experience international science.' (PhD student Stephen Fitchett). February 2012.

O4 Magazine article. New Zealand Listener. "Charge of the tech brigade". Mar 31, 2012.

O5 Newspaper article. The Press. "Conference acceptance a coup". Dec 22, 2011.

O6 Newspaper article. The Press. "Intuitive Innovations". Feb 22, 2011.

O7 UC Communications. 'UC/Microsoft internship opens up world for computer science student.' Mar 22, 2011.

O8 Marsden update. 'Highlights of the 2010 funding round.' November 2010.

O9 Magazine article. 'Profiling Excellence'. Royal Society of New Zealand. 'Thirty years of research in a single hit', March 2010.

O10 Newspaper article. Sydney Morning Herald. 'Computer mouse still rules, says expert', Jan 19, 2010. (Widely syndicated through AAP.)

    `http://news.smh.com.au/breaking-news-national/computer-mouse-still-rules-says-expert-20100119-mhnp.html`

O11 Newspaper article. Dominion Post. 'Next-step mouse on its way', Feb 1, 2010.

O12 Radio Interview (Live). ABC Perth. 'Drive Time' program. January 19th, 2010.

O13 Newspaper article. The Press. 'Boost for Computer Activation Project', Nov. 5, 2009.

O14 Radio interview (Sweden). 'Highlights of the INTERACT Conference', Sept 3 2009. `http://www.sr.se/cgi-bin/p1/program/artikel.asp?ProgramID=406&nyheter=1&artikel=3075930`

O15 Newspaper article. Dominion Post. 'Kiwi mouse comes out of hiding', March 10, 2008. `http://www.stuff.co.nz/4433363a28.html`

O16 Newspaper article. Christchurch Press. 'Fast Kiwi mouse attracts interest from big players', March 5, 2008. `http://www.stuff.co.nz/4425499a28.html`

23

O17  Newspaper article. The Age (Australia). 'Kiwi mouse attracts interest', March 5, 2008. `http://http://www.theage.com.au/news/biztech/kiwi-mouse-attracts-interest/2008/03/10/1204998342852.html`

O18  Magazine article. Marsden Update. 'Document Navigation', December 2008.

O19  Interview. IEEE Spectrum. 'A New Spin on the Computer Mouse', October 2006. `http://www.spectrum.ieee.org/oct06/4668`

O20  Video.   Faster Document Navigation with Space-Filling Thumbnails  *Video in the Video Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI2006)* Montreal, Canada, April *2006*. `http://www.cosc.canterbury.ac.nz/~andy/sft.mov`

O21  Video.  Tuning and Testing Scrolling Interfaces that Automatically Zoom  *Video in the Refereed Video Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI2005)* Portland, Oregon, April *2005*. `http://www.cosc.canterbury.ac.nz/~andy/tuning-n-testing.wmv`

O22  Video.   Around the World in Seconds with Speed-Dependent Automatic Zooming  *Video and Demonstration at the ACM Conference on User Interface Software and Technology* Vancouver, Canada, November *2003*. `http://www.cosc.canterbury.ac.nz/~andy/uist-sdaz.avi`

O23  Radio Interview. BBC World Service. 'Go Digital' program. January 14th, 2003 `http://news.bbc.co.uk/2/hi/technology/2677337.stm`

O24  Nature Journal's Science Update. 'Browsers go back to the future' `www.nature.com/nsu/021230/021230-3.html`

O25  'The Register' in the UK. 'Kiwis redesign the Back button'. `http://www.theregister.co.uk/content/6/28729.html`

O26  Canadian Broadcast Corporation. Programmers try out alternative to browser's back button. `http://cbc.ca/storyview/CBC/2002/12/30/back_button021230`

O27  Slashdot. 'Redesigning The "Back" Button' `slashdot.org/article.pl?sid=02/12/30/1727206&mode=thread&tid=95`

O28  NZOOM's Technology Page.  `technology.nzoom.com/technology_subcategory/0,1610,113-116,00.html`

O29  Newspaper Interview. Christchurch Press. 'Better Going Back', Feb 11, 2003.

O30  University Chronicle. "Taking the frusturation out of the web", Feb 20, 2003.

O31  S Greenberg, C Gutwin, and A Cockburn.  Applying Distortion-Oriented Displays to Groupware. Video Programme of the ACM Conference on Computer Supported Cooperative Work. 1996.

O32  S Greenberg, C Gutwin, and A Cockburn.   Sharing fisheye views in relaxed-WYSIWIS groupware applications.  Technical Report 95/577/29, Department of Computer Science, University of Calgary, Calgary, CANADA., 1996.

24

O33  S Greenberg, C Gutwin, and A Cockburn. Using distortion-oriented displays to support workspace awareness. Technical Report 96/581/01, Department of Computer Science, University of Calgary, Calgary, CANADA., 1996.

O34  S Greenberg, C Gutwin, M Roseman, and A Cockburn. From awareness to teamrooms, groupweb and turboturtle: Eight snapshots of recent work in the grouplab project. Technical Report 95/580/32, Department of Computing Science, University of Calgary, Canada, December 1995.

O35  A Cockburn and S Greenberg. The design and evolution of turboturtle: A collaborative microworld for exploring newtonian physics. Technical Report tr-cosc.03.95, University of Canterbury, Christchurch. New Zealand, 1995.

O36  AJG Cockburn. Social awareness without mega-bits. In *Proceedings of Uniforum. Rotoroa, New Zealand.*, 1994.

O37  AJG Cockburn. *Groupware design: principles, prototypes, and systems*. PhD thesis, Department of Computing Science and Mathematics, University of Stirling, Scotland. FK9 4LA, 1993. Available from British Libraries, or as Technical Report 107 from the University of Stirling.

O38  SRA Jones and AJG Cockburn. Reducing requirements in computer supported writing tasks, 1993. Paper presented at: 6th UK conference on computers and writing. University of Wales. April 13-15.

O39  AJG Cockburn and S Greenberg. Making contact: getting the group communicating. Technical Report 93/498/03, Department of Computer Science, University of Calgary, Alberta T2N 1N4 Canada, 1993.

O40  AJG Cockburn and HW Thimbleby. Reducing user effort in collaboration support. Technical Report 93, University of Stirling, Stirling, Scotland, FK9 4LA, 1992.

O41  AJG Cockburn and HW Thimbleby. A reflexive perspective of CSCW. *ACM SIGCHI Bulletin*, 23(3):63–68, July 1991.

O42  AJG Cockburn. A user's guide to TELEFREEK: a communication and social awareness environment. Technical Report 105, Department of Computing Science and Mathematics, University of Stirling, Stirling, Scotland, FK9 4LA, 1993.

O43  AJG Cockburn. A user's guide to *mona*: an enhanced email system. Technical Report 97, Department of Computing Science and Mathematics, University of Stirling, Stirling, Scotland, FK9 4LA, 1992.

25

## Grants and industry research/consulting

| Project | Source | Date | Amount |
|---|---|---|---|
| The human experience of intelligent UIs | Marsden, NZ R. Soc. (19-UC-021) | 2020-2023 | $530,000 |
| Travel expenses | Airbus & U. Paul Sabatier | 2018 | ≈ $7,000 |
| In-Vehicle Touchscreens | NZ Science for Innovation | 2017 | $200,000 |
| Travel expenses | ACM CHI Steering Committee | 2017 | ≈ $4,000 |
| Travel expenses | Australian National University | 2016 | ≈ $3,000 |
| Travel expenses | Airbus & U. Paul Sabatier | 2016 | ≈ $5,000 |
| Travel expenses | ACM CHI Academy Award (Seoul) | 2015 | ≈ $5,000 |
| Benjamin Meaker Visiting Professorship | University of Bristol | 2013 | £7,000 |
| Novice to expert transitions with UIs | Marsden, NZ R. Soc. (10-UC-020) | 2011-2014 | $496,000 |
| Dynamic Multimodal Affordances | HP Innovations Award | 2011-2012 | US$40,000 |
| Travel expenses | ACM UIST conference | June 2009 | ≈ $4,000 |
| Postdoctoral Fellow | BuildIT | 2011-2012 | $116,000 |
| Dynamic Multimodal Affordances | HP Innovations Award | 2010-2011 | US$40,000 |
| Travel expenses | ACM UIST conference | June 2009 | ≈ $4,000 |
| Scrolling device studies | Logitech Inc | 2010 | $10,000 |
| Canadian GRAND project (int. collab.) | Canadian Centres of Excellence | 2010-2014 | C$25,000,000 |
| BuildIT Emerging Researcher Mentoring Fund | BuildIT | 2010 | $8,000 |
| Pythodogogical | UC Teaching and Learning | 2009-2010 | $15,000 |
| Dynamic Multimodal Affordances | HP Innovations Award | 2009-2010 | US$40,000 |
| Travel expenses | ACM UIST conference | June 2009 | ≈ $4,000 |
| Travel expenses | ACM CHI conference | Nov. 2008 | ≈ $4,000 |
| Improving document navigation interfaces | Marsden, NZ R. Soc. (07-UC-13) | 2007–2010 | $400,000 |
| Accessible AR on Everyday Devices | FRST (UOCX0704) | 2007–2011 | $1,875,000 |
| Usability training | Jade Software | 2007 | ≈ $2,000 |
| Usability training | AMI | 2007 | ≈ $2,000 |
| Expenses | Logitech Inc., California | April 2007 | ≈ $5,000 |
| Expenses | Logitech Inc., California | July 2006 | ≈ $2,000 |
| Grant in aid | University of Toronto | July 2006 | ≈ $8,000 |
| Grant in aid | University of Saskatoon | June 2006 | ≈ $6,000 |
| Grant in aid | University of Calgary | May 2006 | ≈ $3,000 |
| Grant in aid | IBM Almaden Research, California | April 2006 | ≈ $3,000 |
| NOKIA Pocket (Assoc. with HIT Lab). | Nokia Research Center | 2006. | ≈$100,000 |
| Speed-Dependent Automatic Zooming | Computer Science | 2003 | $3,000 |
| Evaluation of Speed-Coupled Scrolling | Computer Science | 2002 | $3,000 |
| Multimedia Learning of Graphics (Assoc.) | UoC Teaching and Learning Ctte. | 2002 | $5,000 |
| Fastap Evaluation | Digit Wireless LLC, MA, USA. | 2002 | $3,000 |
| Supermedia—The MagicBook Project (Assoc.) | NZ NERF (UOCX0204) | 2002 | $333,000 |
| Practical Flexible Delivery of Virtual Learning | UoC (U6360) | 1999–2002 | $40,000 |
| Collaborative Programming for Children | Marsden, NZ Roy. Soc. (UC805) | 2000–2002 | $135,000 |
| Evaluation of Back/Forward in Web-browsers | Computer Science | 2001 | $3,000 |
| Interfaces for WWW navigation. | Microsoft Research, USA. | 1999 | ≈ $8,000 |
| HCI and multi-media research lab | Computer Science | 1999 | $7,400 |
| Video analysis and multi-media lab | UoC (2313728) | 1996 | $30,000 |
| Collaborative video analysis | Computer Science | 1996 | $3,000 |
| Collaborative microworlds | Computer Science | 1995 | $4,000 |
| Asynchronous groupware toolkits | Computer Science | 1994 | $2,000 |

26

# Academic Service

| | | |
|---|---|---|
| Grant reviewer | 2024/5 | European Research Council. ERC Advanced Grants. |
| Grant reviewer | 2024 | Swiss National Science Foundation. |
| EiC Cttee. | 2024 | Search committee for ACM ToCHI Editor in Chief. |
| Grant reviewer | 2024 | French National Research Agency (ANR). |
| Grant reviewer | 2024 | Israel Science Foundation (ISF). |
| External assessor | 2019 | Promotion to Full Professor: University of Toronto. |
| External assessor | 2018 | Promotion to Full Professor: University of Cambridge. |
| Rapporteur | 2018 | Habilitation, Dr Eric Lecolinet, Université Paris Sud, France. |
| Rapporteur | 2018 | Habilitation, Dr Marcos Serrano, Univ. Toulouse III Paul Sabatier, France. |
| External assessor | 2017 | Promotion application: University of Waterloo. |
| Chair | 2018-2021 | Technical program chair for ACM CHI 2020 Conference |
| Committee member | 2016-2020 | Steering Committee for the ACM CHI Conference |
| Rapporteur | 2017 | Habilitation, Dr Caroline Appert, University Paris-Sud, France. |
| Chair | 2016-2018 | CORE Chris Wallace Research Award Panel |
| Deputy Chair | 2016-2018 | PBRF Mathematical and Information Sciences Panel |
| Editorial | 2015–2023 | Editorial Board of Foundations and Trends in Human-Computer Interaction. |
| Editorial | 2015– | Editorial Board of Human-Computer Interaction. Taylor and Francis. |
| Chair | 2012–2015 | Papers co-chair for ACM CHI 2014 and 2015 (over 2000 submissions). |
| Service Award. | 2014. | ACM SIGCHI Recognition of Service Award. |
| Editorial | 2012–2021 | Editorial Board of ACM Transactions on Computer-Human Interaction. ACM. |
| Panel member | 2011-2012 | Member of the Mathematics, Information Sciences & Technology PBRF panel. |
| Panel member | 2008–2009 | BuildIT Postdoctoral Award. |
| Governance board | 2008–2010 | Elected member of the governance board of BuildIT. |
| Panel member | 2009, 2011 | Member of the Mathematics and Information Sciences Marsden panel. |
| Panel member | 2008–2009 | BuildIT Postdoctoral Award. |
| Panel member | 2008–2010 | BuildIT Emerging Reseacher Travel Fund. |
| Mentor | 2009–2010 | BuildIT mentor for early career researchers. |
| External assessor | 2010 | Docent application advisor, University of Tampere, Finland. |
| External assessor | 2010 | Promotion application for University of Auckland. |
| External assessor | 2007, 2009 | Promotion applications for INRIA, University Paris-Sud. |
| External assessor | 2007 | Postdoctoral applicants for Ryerson Univerity, Canada. |
| Editorial | 2002–2013 | Associate Editor for International Journal of Human-Computer Studies. |
| Editorial | 2002–2013 | Member Editorial Board for Interacting with Computers Journal. |
| Chair | 2010–2011 | Subcommittee Chair ACM CHI'11. |
| Senior Reviewing | 2004– | Associate Chair (Papers) for ACM CHI'04, CHI'08, CHI'09. |
| Senior Reviewing | 2009 | Associate Chair (Papers) for ACM UIST 2009. |
| Senior Reviewing | 2007 | Short papers chair for INTERACT 2007 |
| Chair | 2004–2005 | Papers chair for Australasian User Interface Conferences |
| Competition judge | 2009 | Student Research Competition at CHI 2009. |
| Journal Reviewing | 1993– | Communications of the ACM, Human-Computer Interaction Journal, IEEE Transactions on Visualization and Computer Graphics, ACM Transactions on Computer-Human Interaction, Ergonomics, Information and Software Technology, Information Technology and Society, Interacting with Computers, Virtual Reality, Personal and Ubiquitous Computing, Journal of Computer-Mediated Communication, and International Journal of Human-Computer Studies. |
| Misc. | 2003 | Organised the 'Masterclass and Symposium on Interacting with and Through Next Generation Computer Systems', held at the University of Canterbury. |
| Organising committees | 1996, 1998 | OzCHI |
| Doctoral consortium | 2008 | CHI 2008 |
| Other reviewing | Ongoing | Graphics Interface 2009, 2010, 2011; UIST Demos 2009; ACM CHI 2007, 2006, 2005, 2004, 2003, 2002. AICCS-07; ACM UIST 2007, 2006, 2005, 2003; InfoVis 2006; BEyond time and errors: novel evaLuation methods for Information Visualization (BELIV'06); ACM Advanced Visual Interfaces (AVI) 2006; IEEE Tencon'05; CHINZ'05; Interact'05; MobileHCI'05; ACM CSCW 2004; ACM UIST 2003; INTERACT 2003; Australasian User Interface Conference, 2000–2003; The Active Web, '99; ACM Conference on Data Communications 1994; ACM Conference on Human Factors in Computing Systems 1996; OZCHI'94-97; APCHI'96 & '98; ACM Hypertext '97; Graphics Interface '97; InterAct '97; ACM Group '97. |

## Invited seminar presentations outside the University of Canterbury

| | |
|---|---|
| Keynote address, ACM Interactive Surfaces and Spaces Conference, Wellington, NZ. | November, 2022. |
| Keynote address, INTERACT Conference, Mumbai. | September, 2017. |
| Dean's Colloquium, ANU, Australia. | August, 2016. |
| Engineering & Computer Science, ANU, Australia. | August, 2016. |
| Institute of Advanced Studies, University of Bristol, UK. | August, 2013. |
| Department of Computer Science, University of Glasgow, UK. | August, 2013. |
| Colloquium Polaris, INRIA, Lille, France. | July, 2013. |
| Department of Computer Science, University of Manitoba, Canada. | August, 2010. |
| Department of Computer Science, University of British Colombia, Canada. | August, 2010. |
| Keynote address, Australasian Computer Science Week. | January, 2010. |
| Department of Computer Science, University of British Colombia, Canada. | July, 2009. |
| Department of Computer Science, University of Calgary, Canada. | July, 2008. |
| Department of Computer Science, Swansea University, UK. | September, 2008. |
| INRIA, Universite Paris-Sud, France. | September, 2006. |
| Department of Computer Science, Swansea University, UK. | August, 2006. |
| Logitech Inc., California. | July, 2006. |
| Department of Computer Science, Dalhousie University, Nova Scotia. | July, 2006. |
| Digital Graphics Project Lab, University of Toronto. | June, 2006. |
| Department of Computer Science, University of Saskatoon. | June, 2006. |
| Department of Computer Science, University of Calgary. | April, 2006. |
| IBM Almaden Research Centre. | March, 2006. |
| Digital Fusion Inc.. | February, 2006. |
| Usability Professionals Association (UPA), Canterbury Innovation Incubator. | November, 2005. |
| Usability Professionals Association (UPA), Canterbury Innovation Incubator. | November, 2004. |
| Department of Computer Science, University of Calgary, Canada. | November, 2003. |
| Human-Computer Interaction Lab, Univ. of Maryland, College Park, USA. | October 2003. |
| Department of Computer Science, University of Glasgow. | September, 2003. |
| Department of Psychology, University of York. | September, 2003. |
| Interaction Centre, University College London. | September, 2003. |
| Department of Computer Science, University of Southampton. | September, 2003 |
| New Zealand Computer Society, Christchurch. | June, 2003. |
| Department of Computer Science, University of Waikato. | December, 2002. |
| Allied Telesyn Research. | November, 2002. |
| Department of Computer Science, University of Calgary, Canada. | October, 2001. |
| Institute for Info. Tech., National Research Center, Ottawa, Canada. | October, 2001. |
| Grouplab, University of Calgary, Canada. | October, 2001. |
| Department of Computer Science, University of Saskatchewan, Canada. | October, 2001. |
| Department of Computer Science, University of Cape Town, South Africa. | September, 2001. |
| Department of Computer Science, Victoria University of Wellington. | July, 2000. |
| Inaugural ACM SIGCHI_NZ meeting. Massey University. | June 2000. |
| Department of Computer Science, University of Waikato. | May, 2000. |
| Department of Computer Science, University of Calgary. | March, 1999. |
| Center for LifeLong Learning and Design, University of Colorado, Boulder. | November, 1998. |
| Norsk Regencentral (Norwegian Research Centre), Oslo, Norway. | August, 1998. |
| Department of Computer Science, University of Calgary. | January, 1996. |
| Department of Computer Science, Massey University. | January, 1993. |
| Department of Computer Science, University of Waikato. | January, 1993. |

## Visiting academics

| | | |
|---|---|---|
| Prof. Joanna McGrenere | University of British Columbia, Vancouver, Canada. | One month, 2023. |
| Prof. Carl Gutwin | University of Saskatchewan, Saskatoon, Canada. | Two months, 2023. |
| Dr. Philip Quinn | Google Research, Mountain View, California. | One year, 2020-2021. |
| Prof. Carl Gutwin | University of Saskatchewan, Saskatoon, Canada. | Four weeks, 2020. |
| Prof. Carl Gutwin | University of Saskatchewan, Saskatoon, Canada. | Seven weeks, 2015-2016. |
| Prof. Wolfgang Stuerzlinger | University of Waterloo, Canada | Three months, 2011-2012 |
| Prof. Kari-Jouko Raiha | University of Tampere, Finland | Nine months, 2009-2010 |
| Dr. Saila Ovaska | University of Tampere, Finland | Nine months, 2009-2010 |
| Dr. David Ahlstroem | Klagenfurt University, Austria. | Eighteen months, 2008-2010. |
| Prof. Carl Gutwin | University of Saskatchewan, Saskatoon, Canada. | Three months, 2008. |
| Prof. Karon MacLean | University of British Colombia, Canada. | Six months, 2007-2008. |
| Prof. Bob Kraut | Carnegie Mellon University. | Erskine Visitor. Three months, 2008. |
| Prof. Andrew Monk | University of York, UK. | Three months, 2008. |
| Dr. Gonzalo Ramos | University of Toronto, Canada. | One month, 2007. |
| Prof. Carl Gutwin | University of Saskatchewan, Saskatoon, Canada. | Erskine Fellow. Four months, 2007. |
| Prof. Alistair Sutcliffe | University of Manchester, UK. | One month, 2007. |
| Prof. Carl Gutwin | University of Saskatchewan, Saskatoon, Canada. | One week, 2005. |
| Prof. Ben Bederson | University of Maryland, Maryland, USA. | One week, 2004. |
| Prof. Ben Shneiderman | University of Maryland, Maryland, USA. | Erskine Fellow. One month, 2003. |
| Prof. Jenny Preece | University of Maryland, Baltimore County, Maryland. | Erskine Fellow. One month, 2003. |
| Prof. Stephen Brewster | University of Glasgow, UK. | Erskine Fellow. Six months, 2003. |
| Prof. Gerhard Fischer | University of Colorado, Boulder. | One year, 2002–2003. |
| Prof. Bob Spence | Imperial College London. | Erskine Fellow. One month, 2002. |
| Prof. Gerhard Fischer | University of Colorado, Boulder. | Erskine Fellow. One month, 2000. |
| Prof. Harold Thimbleby | Middlesex University, UK. | Erskine Fellow. One month, 1997. |
| Dr Allen Cypher | Apple Research, Cuppertino, California. | One week, 1996. |
| Dr Akihiko Machizawa | Communications Research Laboratory, Japan. | Three years, 1996–1998. |
| Professor Brian Wyvill | University of Calgary, Canada. | Erskine Fellow. Two months, 1996. |
| Professor Saul Greenberg | University of Calgary, Canada. | Erskine Fellow. Six months, 1995. |
| Carl Gutwin | University of Calgary, Canada. | Two months, 1995. |
| Dr Steve Jones | University of Abertay, Dundee. | Six months, 1995. |

# Expert Witness Consulting

Role    Expert witness for Finnegan, Henderson, Farabow, Garrett & Dunner, counsel for Samsung.
        (analysis, reports).
Case    Samsung v. PayGeo.
        *Patent Trial and Appeal Board.* IPR.
Dates   July 2025 –

Role    Expert witness for O'Melveny & Myers, counsel for Samsung.
        (analysis, reports, deposition).
Case    Mullen Industries versus Samsung.
        *Eastern District of Texas.* 2:24-CV-00049-JRG.
Dates   December 2024 – July 2025

Role    Expert witness for Fish & Richardson, counsel for LG.
        (analysis, reports).
Case    LG Electronics, Inc v. Maxell.
        *Patent Trial and Appeal Board.* IPR × 2.
Dates   October 2024 – July 2025

Role    Expert witness for White and Case, counsel for TikTok and ByteDance.
        (analysis, reports).
Case    DiStefano Website Innovations v. ByteDance et al.
        *Patent Trial and Appeal Board.* IPR × 2 and EPR × 2.
Dates   August 2024 –

Role    Expert witness for Pillsbury Winthrop Shaw Pittman, counsel for Slack Technologies and Salesforce.
        (analysis, reports).
Case    Wrinkl, Inc v. Slack Technologies/Salesforce.
        *Patent Trial and Appeal Board.* IPR × 2; Re-exam declaration.
Dates   August 2024 –

Role    Expert witness for SBM Legal, counsel for New Zealand Te Whatu Ora  Waitemata.
        (analysis, reports).
Case    Vinod Chand v. Health New Zealand Te Whatu Ora  Waitemata.
        *Employment relations authority (regarding text auto-correct functionality).*
Dates   May 2024 – June 2024.

Role    Expert witness for Fish & Richardson, counsel for Apple.
        (analysis, reports, deposition × 6).
Case    Smith Interface Technologies v. Apple.
        *Patent Trial and Appeal Board.* IPR × 6; Re-exam declaration.
Dates   December 2023 – September 2025

Role    Expert witness for Fish & Richardson, counsel for Apple.
        (analysis, reports, deposition × 4).
Case    Masimo v. Apple.
        *Patent Trial and Appeal Board.* IPR × 2.
Dates   July 2023 – June 2025

Role    Expert witness for Finnegan, Henderson, Farabow, Garrett & Dunner, counsel for Samsung.
        (analysis).
Case    Smith Interface Technologies v. Samsung.
        *Eastern District of Texas.* 2:22-cv-00290-JRG
Dates   November 2022 – June 2023

Role    Expert witness for Morrison Foerster, counsel for Apple.

30

(analysis, reports, deposition).

| | |
|---|---|
| Case | Firstface Co. Ltd. v. Apple Inc.<br>*Northern District of California.* 3:18-cv-02245-JD. |
| Dates | June 2022 – March 2024 |

| | |
|---|---|
| Role | Expert witness for Finnegan, Henderson, Farabow, Garrett & Dunner, counsel for Samsung.<br>(analysis). |
| Case | Village Green Technologies v. Samsung.<br>*Eastern District of Texas.* 2:21-cv-00323-JRG-RSP |
| Dates | January 2022 – March 2022 |

| | |
|---|---|
| Role | Expert witness for Desmarais, counsel for IBM.<br>(analysis, reports, deposition). |
| Case | Chewy, Inc. v. IBM.<br>*Southern District of New York.* 1:21-cv-01319-JSR. |
| Dates | August 2021 – Jan 2023 |

| | |
|---|---|
| Role | Expert witness for Farella, Braun & Martel, counsel for Google.<br>(analysis, reports, testimony at trial). |
| Case | Profectus Technology versus Google.<br>*Western District of Texas.* 6:20-cv-101-ADA. |
| Dates | March 2021 – October 2021 |

| | |
|---|---|
| Role | Expert witness for Latham & Watkins and Allen & Overy, counsel for Facebook/Instagram/WhatsApp/Meta.<br>(analysis, reports, deposition). |
| Case | Facebook/Meta Platforms *et al.* versus Wrinkl<br>*Patent Trial and Appeal Board.* IPR2021-00882, -00883 |
| Dates | February 2021 – November 2022 |

| | |
|---|---|
| Role | Expert witness for Morrison & Foerster, counsel for Renesas.<br>(analysis). |
| Case | Neodron versus Renesas Electronics Corp.<br>*Western District of Texas.* 6:20-CV-00529. |
| Dates | December 2020 – August 2021 |

| | |
|---|---|
| Role | Expert witness for DLA Piper, counsel for Samsung.<br>(analysis, declaration). |
| Case | Neonode versus Samsung.<br>*Western District of Texas.* 6:20-CV-00507. |
| Dates | September 2020 – June 2025 |

| | |
|---|---|
| Role | Expert witness for DLA Piper (counsel for Apple, Microsoft and ASUS), Morrison & Foerster (counsel for Amazon), Finnegan, Henderson, Farabow, Garrett & Dunner (counsel for LG), O'Melveny & Myers (counsel for Samsung), Vasquez Benisek & Lindgren (counsel for ASUS).<br>(analysis). |
| Case | Neodron versus Apple, Microsoft, Amazon & others.<br>*US International Trade Commission.* 337-TA-1193. |
| Dates | May 2020 – November 2020 |

| | |
|---|---|
| Role | Expert witness for Desmarais, counsel for IBM.<br>(analysis, reports). |
| Case | IBM versus Zillow Group.<br>*Central District of California.* 8:19-CV-01777. |
| Dates | October 2019 – May 2020 |

| | |
|---|---|
| Role | Expert witness for DLA Piper (counsel for Microsoft, HP, Lenovo), Morrison & Foerster (counsel for Amazon), Finnegan, Henderson, Farabow, Garrett & Dunner (counsel for Motorola and Lenovo), Alston & Bird (counsel for Dell), |

31

|   |   |
|---|---|
|   | O'Melveny & Myers (counsel for Samsung). |
|   | (analysis, reports, deposition). |
| Case | Neodron versus Microsoft, HP, Amazon, Samsung, Dell, Motorola, Lenovo. |
|   | *US International Trade Commission.* 337-TA-1162. |
| Dates | August 2019 – December 2020 |
| | |
| Role | Expert witness for Jones Day, counsel for Google and Huawei. |
|   | (analysis). |
| Case | American Patents versus Huawei. |
| Dates | April 2019 – July 2019 |
| | |
| Role | Expert witness for Gilbert+Tobin, counsel for Aristocrat Technologies. |
|   | (reports, testimony at trial). |
| Case | Aristocrat Technologies versus Commissioner of Patents. |
|   | *Federal Court of Australia.* NSD 1343/2018. |
| Dates | September 2018 – June 2020 |
| | |
| Role | Expert witness for Williams & Connolly and Alston & Bird, counsel for Google and ASUS Inc. |
|   | (reports, deposition). |
| Case | Koninklijke Philips versus ASUS. |
|   | *Northern District of California* 4:18-cv-01885-HSG. |
| Dates | March 2016 – March 2020 |
| | |
| Role | Expert witness for Williams and Connolly, counsel for Google Inc. |
|   | (reports, deposition). |
| Case | Google versus Philips. |
|   | *Patent Trial and Appeal Board.* IPR2017-00386/387/388/389. |
| Dates | March 2016 – March 2020 |
| | |
| Role | Expert witness for DLA Piper, counsel for Apple Inc. |
|   | (reports, deposition, testimony at trial). |
| Case | Immersion versus Apple. |
|   | *US International Trade Commission.* 337-TA-1004 and 337-TA-990 (consolidated). |
| Dates | June 2016 – May 2017 |
| | |
| Role | Expert witness for DLA Piper, counsel for Apple Inc. |
|   | (reports). |
| Case | Apple versus Immersion. |
|   | *Patent Trial and Appeal Board.* IPR2016-01777. |
| Dates | June 2016 – May 2017 |
| | |
| Role | Expert witness for Wilmer Cutler Pickering Hale and Dorr, counsel for Apple Inc. |
|   | (analysis). |
| Case | Core Wireless Licensing S.a.r.l. v. Apple Inc. |
|   | *Eastern District of Texas.* 6:14-cv-00751 and 6:14-cv-00752. |
| Dates | August 2015 – June 2016 |
| | |
| Role | Expert witness for Weil, Gotshal & Manges, counsel for Apple Inc. |
|   | (analysis). |
| Case | Motorola Mobility Inc. versus Apple Inc. |
|   | *Southern District of Florida.* 10-CV-23580-RNS-TEB and 12-CV-20271-RNS-TEB. |
| Dates | October 2013 – March 2014 |
| | |
| Role | Expert witness for Gibson, Dunn & Crutcher, counsel for Apple Inc. |
|   | (reports, deposition, testimony at trial). |
| Case | Apple Inc. versus Samsung Electronics Co. Ltd. |
|   | *Northern District of California.* 12-CV-0630-LHK. |

32

| | |
|---|---|
| Dates | June 2013 – June 2014 |
| Role | Expert witness for Herbert Smith Freehills, counsel for Apple Inc. (reports, testimony at trial). |
| Case | Apple Inc. versus Samsung Electronics Co. Ltd. *Federal Court of Australia.* NSD 1243 of 2011. |
| Dates | September 2011 – May 2013 |

## Other

- Member of the Association of Computing Machinery (ACM).

- Member of the ACM Special Interest Group of Computer-Human Interaction.

33

# EXHIBIT 7

# In the Matter Of:

*NEONODE SMARTPHONE LLC vs*

*APPLE INC.*

*ANDREW COCKBURN, PH.D.*

*March 19, 2026*

**1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
-------------------------X
NEONODE SMARTPHONE LLC,   )
                          )
        Plaintiff,        )
                          )  No.  3:21-cv-08872-EMC
    v.                    )
                          )
APPLE INC.,               )
                          )
        Defendant.        )
-------------------------X

REMOTE VIDEOTAPED DEPOSITION OF
ANDREW JEREMY GAVIN COCKBURN, PH.D.
Thursday, March 19, 2026
12:09 p.m. PDT to 5:30 p.m. PDT

Reported by:  Cindy L. Sebo, RMR, CRR, CLR, RPR, CCR, CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460, NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime Court Reporter, NY Association Certified Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778, WA CSR 23005926, Remote Counsel Reporter, LiveLitigation Authorized Reporter, Notary Public
Job No. 2026-1016638

**2**

Remote Videotaped Deposition of ANDREW JEREMY GAVIN COCKBURN, PH.D., stenographically reported remotely by Cindy L. Sebo, Registered Merit Court Reporter, Certified Real-Time Reporter, Certified LiveNote Reporter, Registered Professional Reporter, Certified Court Reporter, Certified Shorthand Reporter, Real-Time Systems Administrator, California Shorthand Reporter 14409, New Jersey Certified Court Reporter 30XI00244600, New Jersey Certified Realtime Reporter 30XR00019500, New Mexico CSR 589, New York Realtime Certified Reporter, New York Association Certified Reporter, Oregon CSR 230105, Tennessee CSR 998, Texas CSR 12778, Washington CSR 23005926, Remote Counsel Reporter, LiveLitigation Authorized Reporter and Notary Public, reported by machine shorthand in realtime translation on Thursday, the 19th day of March 2026 from 12:09 p.m. PDT to 5:30 p.m. PDT, when were present on behalf of the respective parties:

**3**

A P P E A R A N C E S:

(All via Zoom Video Communications)

Attorneys for Plaintiff:

GRAVES & SHAW LLP
PHILIP GRAVES, ESQUIRE
355 S. Grand Avenue, Suite 2450
Los Angeles, California 90071
213.204.5101
gshaw@gravesshaw.com

Attorneys for Defendant:

FISH & RICHARDSON P.C.
RYAN PATRICK O'CONNOR, ESQUIRE
12860 El Camino Real, Suite 400
San Diego, California 92130
858.678.4358
oconnor@fr.com

Also present:

JOEL RAMOS, Video Technician

**4**

--oOo--

INDEX OF EXAMINATION
ANDREW JEREMY GAVIN COCKBURN, PH.D.
Neonode Smartphone v. Apple Inc.
Thursday, March 19, 2026
--oOo--

EXAMINATION BY                          PAGE
Attorney P. Graves                   12, 117

COURT STENOGRAPHER'S OFFICIAL NOTE
STIPULATIONS
AFTERNOON SESSION
CERTIFICATE OF REPORTER
INSTRUCTIONS TO WITNESS
ERRATA
ACKNOWLEDGMENT OF WITNESS

## 5

--oOo--

INDEX TO EXHIBITS

ANDREW JEREMY GAVIN COCKBURN, PH.D.

Neonode Smartphone v. Apple Inc.

Thursday, March 19, 2026

--oOo--

(Exhibits Provided Electronically to Reporter.)

COCKBURN DEPOSITION

EXHIBIT NUMBER    DESCRIPTION              PAGE

Exhibit 1    Opening Expert Witness Report

of Dr. Andrew Cockburn

Regarding Claim Construction    14

Exhibit 2    Supplemental Expert Witness

Report of Dr. Andrew Cockburn

Regarding Claim Construction    14

Exhibit 3    U.S. Patent 8,095,879    14

Exhibit 4    Prosecution file for U.S.

Patent 8,095,879, Bates

stamped NEONODE0000001

through NEONODE0000665    14

## 6

--oOo--

INDEX TO EXHIBITS (Continued)

ANDREW JEREMY GAVIN COCKBURN, PH.D.

Neonode Smartphone v. Apple Inc.

Thursday, March 19, 2026

--oOo--

COCKBURN DEPOSITION

EXHIBIT NUMBER    DESCRIPTION              PAGE

Exhibit 5    Excerpt of The American

Heritage Dictionary of the

English Language, FOURTH

EDITION, Bates stamped

APL-NEO_00935930 through

APL-NEO_00935932    27

Exhibit 6    Image    131

## 7

COURT STENOGRAPHER'S OFFICIAL NOTE

Any quotations from exhibits appearing in this transcript reflect the manner in which the material was read into the record and may not reflect a verbatim or exact quotation from the original documents. Such quotations may differ from original documents due to imprecise or inaccurate reading by counsel, a party and/or a witness.

## 8

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and among counsel for the parties that this proceeding shall be taken remotely, and that no party will object to the administration of the oath by the certified stenographic court reporter on the grounds that the reporter is not physically present with the witness or that the oath administered is from a different jurisdiction.

FURTHER STIPULATED AND AGREED that, in lieu of the oath administered in person, the witness affirms and declares that the testimony given in this matter is under the penalty of perjury.

FURTHER STIPULATED AND AGREED that the certified stenographic court reporter is reporting these proceedings remotely and is not physically present in the same location as the witness.

FURTHER STIPULATED AND AGREED that all parties and their counsel consent to the remote taking of this proceeding and waive any objection to the manner in which the proceeding is conducted and reported.

9

* * *

PROCEEDINGS

* * *

Remote Deposition

Thursday, March 19, 2026; 12:09 p.m. PDT

VIDEO TECHNICIAN RAMOS:  The time is 12:09 p.m. on March 19th, 2026, and we are now on the record for the remote video deposition of Andrew Cockburn, in the matter of Neonode Smartphone verse Apple Inc.

My name is Joel Ramos, and I am the remote videographer on behalf of Lexitas.

Can the taking attorney and witness attorney only identify themselves for the record?

All others will be noted in the stenographic record.

ATTORNEY P. GRAVES:  Philip Graves for Plaintiff.

ATTORNEY R. O'CONNOR:  Ryan O'Connor from Fish & Richardson on behalf of the Defendant, Apple Inc.,

10

and the witness, Dr. Cockburn.

VIDEO TECHNICIAN RAMOS:  Will the court reporter please swear or affirm in the witness?

CERTIFIED STENOGRAPHER:  Before administering the oath, I note for the record that this deposition is being stenographically reported by Cindy L. Sebo, Merit Certified Realtime Reporter.

The oath will be administered remotely via audiovisual technology.

Any audio or video recording of this proceeding is not the official record and shall not be used or relied upon in lieu of the transcript.  The certified stenographic transcript constitutes the sole official record pursuant to applicable law.  My certification applies exclusively to the transcript I prepare.

Any transcript requested will be prepared in strict compliance with applicable law, ensuring a complete, accurate and legally authoritative

11

record of the proceeding.

Absent any objection to the administration of the oath or the manner of reporting, I will now administer the oath.

--oOo--

ANDREW JEREMY GAVIN COCKBURN, PH.D., after having been duly sworn or affirmed under penalty of perjury by the certified stenographer, the oath having been administered remotely via videoconference, to tell the truth, the whole truth and nothing but the truth, testified remotely as follows:

--oOo--

CERTIFIED STENOGRAPHER:  Thank you.

The witness is duly sworn.

I will remain present on camera, muted for the duration.

Counsel, you may proceed.

ATTORNEY P. GRAVES:  Thank you.

12

--oOo--

EXAMINATION BY COUNSEL FOR PLAINTIFF

--oOo--

BY ATTORNEY P. GRAVES:

Q.    Good morning.  I think it's morning your time, Dr. Cockburn.

A.    That's correct.  It's Friday morning at 10 past 8 in the morning.

Q.    Is there any reason that you cannot give full, complete and truthful testimony today?

A.    No.

Q.    Are you on any drugs, medications that might impair your ability to recall events or testify accurately?

A.    None.

Q.    Do you have any medical conditions that might impair your recollection or affect your ability to testify accurately?

A.    No.

Q.    So, Dr. Cockburn, have you been engaged as a -- an expert witness by one of the parties to this litigation?

A.    I've been engaged by Fish & Richardson LLC [sic] on behalf of Apple.

13

Q. When were you engaged by Fish & Richardson for that purpose?

A. I don't recall the exact date. It was a few months ago.

Q. And what is your rate for the work that you're doing in connection with this case?

A. It's 600 U.S. dollars an hour.

Q. And is that your standard hourly rate for this type of work?

A. It -- it -- it -- it was at the time that I signed the contract. I have since increased my rate very slightly.

Q. Have you served as an expert witness in litigation for Apple prior to this case?

A. Yes.

Q. How many separate engagements have you been engaged on for Apple in litigation?

A. I don't recall the exact number. It would be in the CV of my opening declaration. It must be on the order of seven, but that's a very rough estimate.

Q. All right. So I've marked four exhibits, which you have available to you now.

14

--oOo--
(Cockburn Deposition Exhibit Number 1, Opening Expert Witness Report of Dr. Andrew Cockburn Regarding Claim Construction, marked for identification for purposes of the record.)
--oOo--
--oOo--
(Cockburn Deposition Exhibit Number 2, Supplemental Expert Witness Report of Dr. Andrew Cockburn Regarding Claim Construction, marked for identification for purposes of the record.)
--oOo--
--oOo--
(Cockburn Deposition Exhibit Number 3, U.S. Patent 8,095,879, marked for identification for purposes of the record.)
--oOo--
--oOo--
(Cockburn Deposition Exhibit Number 4, Prosecution file for U.S. Patent

15

8,095,879, Bates stamped NEONODE0000001 through NEONODE0000665, marked for identification for purposes of the record.)
--oOo--
BY ATTORNEY P. GRAVES:

Q. Exhibit 1 is an expert report that you signed and that was served in this case on February 24th, 2026.

Exhibit 2 is a supplemental expert report that you signed and that was served in this litigation on March 16th, 2026.

Exhibit 3 is a copy of the patent at issue in this case. That's U.S. Patent 8,095,879.

And Exhibit 4 is a copy of the prosecution file for that patent.

Do you have all of those exhibits available to you?

A. They are available to me. I have downloaded each of those to my local machine, and I have them all open.

Q. All right. So I'm going to refer to the patent at issue in this litigation as the

16

'879 patent.

Do you understand that?

A. Yes.

Q. Okay. And I'm going to refer to Exhibit 4 as the prosecution file for the '879 patent.

Do you understand that?

A. Yes.

Q. Do you have an understanding as to what a prosecution file is in the context of U.S. patents?

A. Broadly, yes, I do.

Q. What is that understanding?

A. Essentially, it encapsulates the communications between an applicant and the examiner in determining whether a application for a patent can be awarded.

Q. Okay. How many times, roughly, have you been deposed?

A. On the order of 20 times. I think it's slightly over 20.

Q. Okay. So you're familiar with the process, yes?

A. That's fair.

Q. So if -- if at any time today -- I

17

expect we're going to be going several hours -- if you need to take a break, just ask me.  And at a convenient point, I will allow you to take a break.

Do you understand?

A.   Okay.  Thank you.

Q.   If there's a question pending, I will not allow you to take a break.  You will need to answer the question.  You don't get to take a break in between a question and an answer.

Do you understand that?

A.   That's normal procedure.  I understand.

Q.   Okay.  And at some point, I imagine we're -- you know, we're going to get to a -- a -- a stage where you might want to break for lunch.  If we get there, just let me know, and I'll do my best to accommodate you.

A.   Thank you.

Q.   All right.  Oh.  And one other thing.

Your -- your attorney may object -- probably will object at some point during the -- the deposition.  Unless your attorney instructs

18

you not to answer -- even though -- even though the attorney objects, you are required to provide an answer to the best of your ability.

Do you understand?

A.   Understood.

Q.   Okay.

All right.  Let's take a look at your supplemental report, which is Exhibit 2.  And let's turn to Paragraph 36.

Let me know when you're there, please.

A.   I'm there.  Thanks.

Q.   Certainly.

Before we drill down, do you have any papers related to the case with you right now?

A.   None --

Q.   Okay.  You don't have --

A.   -- sorry --

Q.   -- any -- go ahead.

A.   -- sorry -- the exhibits you made available to me -- you may be referring to these as papers.  They're electronic versions of the papers.  That's all I have available to me at this point.

19

Q.   Fair enough.

You don't have any hard copy printouts of the patent or any of your reports or the prosecution file in front of you right now?

A.   None.

Q.   Okay.  Do you have any notes concerning the litigation with you right now?

A.   None.  I have a blank Post-it note pad in front of me just in case I feel the need to record some component of a question in preparation for an answer, but I expect not to use it.

Q.   All right.  So turning to Paragraph 36 of -- of your report, you provide your understanding of the qualifications of a person of skill in the art, correct?

A.   The qualifications and experience of a person with skill in the art.  That's how I would characterize it.

Q.   Okay.  And I'm going to refer to the person of skill in the art as a POSITA.

Do you understand that?

A.   I've used the same term, so yes.

Q.   All right.  So on what are you

20

basing your opinion concerning the qualifications and experience of a POSITA, as expressed in Paragraph 36?

A.   I think that's directly stated in Paragraph 36, based on my knowledge and experience in the field and my review of the '879 patent and its respective file history.

And then I go on to characterize the knowledge, qualifications and experience of a POSITA.

Q.   All right.  Are you basing your opinion concerning the knowledge and qualifications of a POSITA on anything other than what you've expressly referenced in Paragraph 36?

A.   Paragraph 36 provides my summary of the knowledge and experience of a person of skill in the art for this matter.

Q.   Are you basing your opinion concerning the knowledge and experience of a person of skill in the art in this matter on anything other than what you have expressly set forth in Paragraph 36?

(The witness reviews the material presented.)

21

THE WITNESS: Paragraph 36 provides my expression of the knowledge and experience of a person of skill in the art. That's the extent of my disclosure regarding the person of skill in the art.

BY ATTORNEY P. GRAVES:

Q. Okay. I understand that, but you're not answering my question.

I'm not asking what your opinion is concerning the knowledge and -- and experience of a person of skill in the art; I'm asking what you're basing your opinion on, right, and whether you're basing your opinion concerning the knowledge and experience of a person of skill in the art on anything other than what you have expressly set forth in Paragraph 36.

So please answer my question.

So I'll ask the question again.

All right?

Is your opinion concerning the knowledge and experience of a person of skill in the art, as expressed in Paragraph 36, based on anything other than what you have expressly set forth in Paragraph 36?

22

A. I think I did answer that question already.

Paragraph 36 provides the basis for the knowledge and experience, in my opinion, that a person of skill in the art would have with respect to the '879 patent.

Q. All right. Let's turn to Page 38 of your supplemental report, Exhibit 2.

Let me know when you're there.

A. I'm there. Thanks.

Q. Okay. So we're going to discuss your opinions concerning the -- the term comprising.

Is comprising a term of art in the field of user interface design?

A. The word comprising is used by researchers in the field of human computer interaction. It has no special meaning in -- in that field other than its plain and ordinary meaning in -- as used in English language.

Q. And what is your understanding of what that plain and ordinary meaning is?

A. It describes the things that something consists of.

Q. And on what do you base this plain

23

and ordinary meaning -- strike that.

On what do you base your opinion concerning the plain and ordinary meaning of comprising?

A. That's expressed in Section F of my supplemental report covering Paragraphs 116 through to 135.

Q. Well, I'm asking about your understanding of the plain and ordinary meaning of the term, not your understanding of your term in light of the intrinsic evidence --

A. As I stated --

Q. -- so --

A. -- in Paragraph --

Q. -- go ahead.

A. Sorry.

As I state in Paragraph 118, the plain meaning of comprising is consisting of. And this meaning is further supported by the surrounding claim language, and I continue.

Q. Okay. And I understand that your opinion is that your articulation of the plain and ordinary meaning is supported by additional items in the intrinsic record. So let's put the intrinsic record to one side.

24

In Paragraph 118 of your report, you state what your opinion is concerning the plain meaning of comprising, correct?

(The witness reviews the material presented.)

THE WITNESS: Sure.

And putting the intrinsic record aside, at Paragraph 134, I provide entries from dictionaries, part of the extrinsic record, that show that the meaning of the term comprising is essentially synonymous with consists of.

BY ATTORNEY P. GRAVES:

Q. Okay. And apart from the dictionaries that you cite in Paragraph 134, is your opinion concerning the plain meaning of comprising supported by any other evidence or bases of which you are aware?

A. Yes, the bases covered in that Section F. And it includes the claims themselves; the specification for the '879 patent; its ex- -- its intrinsic record in the file history; and the extrinsic record through definitions, such as dictionaries.

25

Q. And, again, I'm just asking about your understanding of the plain meaning of comprising. I'm not unders- -- I'm not asking about the intrinsic record at this point.

Okay?

So apart from the dictionaries that you cite at Paragraph 134, is your understanding of the plain meaning of the word comprising supported by any other evidence or knowledge of which you are aware?

A. The definitions provided by the def- -- by the dictionaries are consistent with my decades of experience in writing and, similarly, a person of skill in the art experience with communicating in English language.

Q. So do you use the word comprises in normal parlance as meaning includes?

ATTORNEY R. O'CONNOR: Objection: vague.

THE WITNESS: It would depend on context.

BY ATTORNEY P. GRAVES:

Q. So in what context would you use the word comprises in normal parlance as meaning includes?

26

A. Are you asking for a specific example -- one specific example of a sentence in which I might use the word comprises?

Q. As meaning includes, yes.

Why don't you give me an example?

A. How about water includes hydrogen and oxygen -- sorry -- water comprises hydrogen and oxygen atoms?

Q. So do you use comprises in normal parlance as meaning includes some portion of a larger universe of constituents?

ATTORNEY R. O'CONNOR: Objection: vague.

THE WITNESS: I don't recall using it that way.

BY ATTORNEY P. GRAVES:

Q. Do you recall ever having used comprises in that sense?

A. I don't recall any sentence that I have communicated other than the one I just re- -- recited regarding water and its constituent atoms. I don't recall any sentence that I've uttered that included the word comprises.

I'm sure I have used the -- the

27

term, but I haven't got a perfect recollection of all the sentences I've uttered.

ATTORNEY P. GRAVES: All right. I'm dropping into the Chat Exhibit 5, which is a document that is initial Bates APL-NEO_00935930.

BY ATTORNEY P. GRAVES:

Q. All right.

--oOo--

(Cockburn Deposition Exhibit Number 5, Excerpt of The American Heritage Dictionary of the English Language, FOURTH EDITION, Bates stamped APL-NEO_00935930 through APL-NEO_00935932, marked for identification for purposes of the record.)

--oOo--

BY ATTORNEY P. GRAVES:

Q. Let me know when you have Exhibit 5 open.

A. I have it now. Thanks.

ATTORNEY R. O'CONNOR: I'm sorry. Can we get that exhibit marked as well?

CERTIFIED STENOGRAPHER: Do you

28

want me to go off the record and do that?

ATTORNEY P. GRAVES: No. Let's -- let's -- let's just do this: So all of the exhibits -- as I'm dropping them into the Chat, they're identified with an exhibit number. So I think we can probably mark the exhibits either during a break or after the conclusion of the deposition.

ATTORNEY R. O'CONNOR: I agree we can do it at the break.

BY ATTORNEY P. GRAVES:

Q. Okay. So, sir, Exhibit 5 is an excerpt from The American Heritage Dictionary. Do you see that?

A. I do.

Q. And this is one of the exhibits that you cited -- one of the dictionary excerpts that you cited in Paragraph 134 of your report, right?

A. That's correct.

Q. Okay. And the definition -- does this dictionary contain a definition of the word comprising that is different from the definition

29

that you have provided in your report?

A.   Can you repeat the question, please?

Q.   Does The American Heritage Dictionary, Exhibit 5, contain a definition of the word comprising or comprise -- I'll strike.

Does The American Heritage Dictionary, Exhibit 5, contain a definition of the word comprise that is different from the definition that you have provided in your report?

A.   The definition provide -- of comprise provided by this dictionary begins to consist of, and that is consistent with the definition that I am summarizing in Paragraph 134 and throughout Section F of my supplemental report.

Q.   Are there any additional definitions of comprise that are provided in this dictionary?

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  There are other definitions --

BY ATTORNEY P. GRAVES:

Q.   And what are those definitions?

30

A.   Well, Definition 1 is to con- -- begins to consist of.

Definition 2 is, to include, contain and -- with examples.

And Definition 3 is essentially constitute.

I relied primarily on Definition 1, consist of.

Q.   And did you consider Definition Number 2, which is to include; contain, in connection with arriving at your opinion concerning the meaning of the word comprising?

A.   I considered the definitions as a whole, including the first definition, to consist of.

Q.   So is it your understanding that the plain meaning of comprise includes all three of the definitions that are provided in The American Heritage Dictionary excerpt that you cited in your report?

A.   As I stated in Paragraph 117 of Section F:

When read in view of Claim 1 of the specification and the prosecution history, a person of skill in the art would have

31

understood the term comprising, which follows the multi-step operation, to mean consisting of.

Q.   I'm not asking about the intrinsic record; I'm asking about the plain meaning, as reflected in this dictionary definition.

So I'll ask it again.

Is it your understanding that the plain meaning of comprise includes all three of the definitions that are provided in The American Heritage Dictionary excerpt that you cited in your report?

A.   Outside the context of Claim 1 of the '879 patent, the meaning of the term comprising would include all of those definitions in the dictionary we're certainly examining.

However, the plain meaning that I'm examining, as stated in Paragraph 118 of my supplemental report -- this meaning is within the context of the '879 patent, and the meaning there is consist of.

Q.   And the definition that's set forth in this dictionary excerpt includes a synonym, right?

32

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  Under Definition 2, yes.  It says: See synonyms at include.

The definition that I relied on was primarily Definition 1, which is the definition that's appropriate in light of the '879 patent and its meaning, and that is to consist of.

BY ATTORNEY P. GRAVES:

Q.   Okay.  So then would it be accurate to say that you did not rely on Definition 2, as set out in this excerpt from The American Heritage Dictionary, in connection with arriving at your opinion concerning the meaning of comprising?

A.   I examined the entirety of the -- this dictionary and other dictionaries' disclosures, and the plain meaning defined -- provided by these dictionaries is consistent with the plain meaning with respect to the '879 patent of comprising, which is consisting of.

Q.   Is Definition Number 2 in Exhibit 5 consistent with the definition of comprising

33

that you set out in your report?

A. I didn't rely on Definition 2. I primarily relied on Definition 1. I examined the entire definition provided by this dictionary and others and saw support for the construction of consisting of for the word comprising.

Q. So is Definition Number 2 in Exhibit 5 consistent with the definition of comprising that you provided in your report?

A. It is at least partially consistent.

Q. To what extent is it partially consistent?

A. Well, returning to my earlier example, water includes hydrogen and oxygen atoms, for example, and, therefore, water that consists of hydrogen and oxygen atoms also includes hydrogen and oxygen atoms.

Q. So addressing your example, would it also be proper usage of the word comprise as provided in Definition 2 of Exhibit 5 to say that water consists -- excuse me -- that water includes hydrogen atoms, period?

ATTORNEY R. O'CONNOR: Objection; vague; scope.

34

BY ATTORNEY P. GRAVES:

Q. Yeah, I'll ask the question again.

So addressing your example you just provided, would it also be proper usage of the word comprise as provided in Definition 2 of Exhibit 5 to say that water includes hydrogen atoms, period?

ATTORNEY R. O'CONNOR: Same objection.

THE WITNESS: If we're simply analyzing the components of water and we're not using terms as they are presented in the '879 patent, then it is reasonable to say that water includes hydrogen atoms, which I think was the example you gave me.

BY ATTORNEY P. GRAVES:

Q. All right. Let's return to Exhibit 2.

So at Paragraph 121, you state that the specification supports your opinion and that the specification, quote, repeatedly teaches that the function is activated when the touch-sensitive area detects a glide, period, closed quote.

35

Q. Do you see that statement?

A. Yes, I do.

Q. And the language of the abstract that you cite in this paragraph states that any of the functions, quote, can be activated, closed quote, when the touch-sensitive area detects the movement of an object from the menu area to the display area.

I'm paraphrasing a little bit there.

Do you see that?

A. I do.

Q. Did you consider whether the phrase can be activated has a different meaning from the phrase is activated in arriving at your opinion?

(The witness reviews the material presented.)

THE WITNESS: Can you repeat the question, please?

BY ATTORNEY P. GRAVES:

Q. Did you consider whether the phrase, quote, can be activated, closed quote, has a different meaning from the phrase, quote, is activated, closed quote, in arriving at your opinion?

36

A. I don't recall making that exact determination; however, as I state at the end of Paragraph 124, from that series of disclosures in the specification of when a function is activated, a POSITA would have understood that the claimed multi-step operation is a touch followed by a glide, which is consistent with the plain meaning of comprising.

Q. Is it your opinion that Claim 1 requires that activation of the function be effected exclusively by touching the display at the location of the representation and gliding away?

A. I don't recall offering any opinion on exclusivity; however, the claims -- the specification and the intrinsic record -- excuse me -- show that the function is activated in response to a touch and a glide away.

Q. So my question is: In your opinion, concerning the meaning of the term comprising, does Claim 1 exclude any operation in which an additional step is required for activation?

A. Your -- your question referred to an additional step.

Can you characterize or clarify what

37

you mean by an additional step?

Q. Well, for example, does Claim 1 exclude an operation in which an object touches down on a representation of a function, glides away from the touch location and lifts off the display with the activation of the function following the liftoff of the object from the display?

ATTORNEY R. O'CONNOR: Objection: vague; scope.

THE WITNESS: The claims, the specification, the file history provide no written description or disclosure of activating the function in response to a liftoff event, which I think is what your question was directed to.

BY ATTORNEY P. GRAVES:

Q. Well, no, that's -- that's not an answer to my question.

So you've been presented as an expert concerning various claim construction issues by Apple, and you've submitted a report, and one of the claim terms referenced in your report as to which you provide opinions is the term comprising. So I'm exploring your opinion

38

concerning the meaning of the term comprising and scope of the claim in light of your opinion concerning the meaning of comprising.

So I'll ask the question again.

Does Claim 1, as an example, exclude an operation in which an object touches down on a representation of a function, glides away from the touched location and lifts off the display with the activation of the function following the liftoff of the object from the display?

ATTORNEY R. O'CONNOR: Objection: vague; scope.

THE WITNESS: I think I just answered exactly that question as clearly as I could.

The claims, the file history, the specification make no contemplation of activating a function in response to a liftoff.

Furthermore, the applicant characterized the components of activating a function as, quote, in response to both steps of a multi-step operation; namely, one, touch followed by two, a glide. And that was in

39

contrast to Hoshino, that activated the response -- the function in response to a hard touch.

All of these disclosures, as described in Section F of my report, are consistent with there being two parts to the activation of the function. So the process for activating the function consists of a touch followed by a glide, and there is no contemplation of a response to a liftoff.

BY ATTORNEY P. GRAVES:

Q. So is Claim 1 limited to devices that implement operations containing only those two steps in connection with activating a function and no others?

A. Well, Claim 1 has several limitations, all of which would need to be met. The process for activating the function is a response to both steps of a multi-step operation; namely, a touch followed by a glide.

Q. And is Claim 1 -- strike that.

Does Claim 1 exclude devices that implement a process for activating the function

40

in response to a touch, a glide and then a subsequent step or act, such as lifting the object off of the display?

ATTORNEY R. O'CONNOR: Objection: vague; asked and answered.

THE WITNESS: The question is -- is vague because it did not embed any point at which the activation occurred.

The activation would occur in response to both steps of a multi-step operation; namely, a touch followed by a glide.

BY ATTORNEY P. GRAVES:

Q. And if in the example that you just provided, the activation occurs in response to a touch at the location of a representation, followed by a glide, followed by lifting the object off of the display, the object that was gliding along the display, would the device that implements that functionality be within the scope of Claim 1, as you understand it?

ATTORNEY R. O'CONNOR: Objection: vague; scope; asked and answered.

THE WITNESS: This hypothetical would require detailed analysis to know

41

exactly how the activation of the function is occurring.

I've already tried to clarify my views regarding the activation of the function; namely, it's a response to both steps of a multi-step operation of a touch followed by a glide.

BY ATTORNEY P. GRAVES:

Q.    Is there any teaching in the specification of the '879 patent that denigrates, or criticizes, an activation sequence in which steps in addition to a touch and a glide are required in order to activate a function?

A.    There's simply no contemplation in the claims, the specification or the file history of any action beyond a touch and a glide for activating the function.  So if there's no contemplation, there's no denigration.

Q.    Turn to Page -- or rather Paragraph 126 of your report.

So there is --

A.    I'm there.

Q.    -- so there is an excerpt of an earlier version of Claim 1 on Page 41, the top

42

of Page 41.

Do you see that?

A.    I do.

Q.    And there is some highlighted language in that excerpt, correct?

A.    I see that.

Q.    Why is that language highlighted?

A.    I provide that clarification at Paragraphs 126 and 127, which I'm happy to read for you, if you wish.

Q.    So an earlier version of the claim -- strike that.

So an earlier version of Claim 1 included the highlighted language, correct?

A.    That's fair.

Q.    Does this earlier version of Claim 1 require that each of the three functions recited in this earlier version of Claim 1 be activated by a single step of an object moving in a direction from a starting point that is a representation of the function in the menu area to the display area?

A.    I think you essentially read a component of that earlier version of Claim 1; so, yes, I agree that that was a fair reading.

43

Q.    So did this version of Claim 1 require that an object start its movement after representation?

A.    It recites from a starting point that is the representation of the function in the menu area to the display area being detected.

Q.    And did this version of -- strike that.

And did this version of Claim 1 require that the object move from the representation to the display area?

A.    It recites an object moving in either -- in a direction from a starting point that is in -- sorry.

I'll start again.

-- object moving in a direction from a starting point that is the representation of the function in the menu area to the display area.  So I think that encapsulates the -- the -- the question you were asking.

Q.    And did this earlier version of Claim 1 require that the activation occurs as a result of this single sequence of events?

A.    This is an extract from the entirety

44

of the claim.  I don't recall the remainder of the claim as it was drafted at that time.  And in order to properly answer your question, I would need to see the entire recitation of this version of the claim.

Q.    Well, let's turn to the page that's marked NEONODE00000107 in Exhibit 4, and that is the page that you cite in Paragraph 126 of your report, at the top of Page 41.  So let's turn to that page, please, Exhibit 4, NEONODE107.

Let me know when you're there.

A.    I'm there.  Thanks.

Q.    Okay.  So this has the entirety of this earlier version of Claim 1, correct?

A.    It's an earlier version of a claim in the patent.  It was Claim 1 at that time.

Q.    And you'll see toward the bottom of the page is the language that you excerpted into your report, yes?

A.    That's correct.

Q.    Okay.  So you can read the entire -- the entirety, in this earlier version, of Claim 1.  So why don't you take a moment and do that and then answer the question that I asked?

(The witness reviews the material

45

presented.)

THE WITNESS: I've read it.

Can you repeat the question, please?

BY ATTORNEY P. GRAVES:

Q. Certainly.

Does this earlier version of Claim 1 require that the activation occurs as a result of the -- the single sequence of events that is recited in the last paragraph of this earlier version of the claim?

A. I'm sorry. I'm going to have to hear the question one more time. I apologize.

Q. Yeah.

Does this earlier version of Claim 1 require that the activation occur as a result of the sequence of events that is recited in the last paragraph of this earlier version of the claim?

A. It states that each of the three functions is activated by -- by the single-step operation --

Q. And what is --

(Multiple speakers talking simultaneously; portions not

46

reflected in the record.)

BY ATTORNEY P. GRAVES:

Q. -- and what is that single-step operation as recited in the claim?

A. It is a single step of an object moving in a direction from a starting point that is the representation of the function in the menu area to the display area.

Q. Was Claim 1 later amended to drop this language?

A. As I state --

ATTORNEY R. O'CONNOR: Objection: vague.

THE WITNESS: Sorry.

-- as I state in Paragraph 128, the patent examiner rejected Claim 1 as it was recited there as rendered obvious by Nakajima in view of Hoshino.

BY ATTORNEY P. GRAVES:

Q. So was the language in the excerpt that you cited in your report -- strike that.

Was Claim 1 later amended to drop the language that you excerpted into your report at Paragraph 126?

47

A. No. I describe in Paragraphs 128 through to essentially the remainder of that section the modifications to the claims that were made in order to overcome various rejections by the examiner.

Q. And Claim 1 ultimately issued without the language that you cite and excerpt at Paragraph 126 of your report, correct?

A. Claim 1 no longer recites a single-step operation, that's correct.

Q. Could a POSITA reasonably understand that sequence of events to suggest that the issued claim, the issued version of Claim 1, does not include the functionality that is recited in this portion of the earlier version of Claim 1 that you have excerpted into your report at Paragraph 126?

A. Can you repeat the question, please?

Q. Could a POSITA reasonably understand that sequence of events to suggest that the issued version of Claim 1 does not include the functionality that is recited in this portion of the earlier version of Claim 1 that you've excerpted into your report at Paragraph 126?

ATTORNEY R. O'CONNOR: Objection:

48

vague.

THE WITNESS: The intrinsic record includes communications between the applicant and the examiner that attempt to overcome the examiner's rejections based on other elements of prior art, and these communications could, and should, influence a person of skill in the art's understanding of the scope of claim terms.

The single-step operation was removed as part of the process of trying to overcome the examiner's rejections, and the communications in that regard would inform a person of skill in the art's understanding of both the meaning of the multi-step operation as recited in the issued version of Claim 1 and the distinction that was being overcome in the original version of the -- or the earlier version of the claim that recited the single step.

BY ATTORNEY P. GRAVES:

Q. So would a POSITA conclude from the

49

fact that the language that's excerpted in your report at Paragraph 126 was subsequently dropped from Claim 1 before the claim issued that the functionality recited in this earlier version of Claim 1 is no longer included in the issued -- in Claim 1 as issued?

ATTORNEY R. O'CONNOR: Objection: vague.

THE WITNESS: A POSITA would understand that modifications to the claims were made in order to overcome the patent examiner's rejections of the claims.

Whether or not the single-step operation would still be covered within the multi-step operation, I -- I haven't contemplated that, and I'd need to conduct a new analysis, carefully examining the intrinsic record to make that determination.

BY ATTORNEY P. GRAVES:

Q. In Paragraph 127 of your report, in the last sentence, you state your opinion that the activation of a function happens upon detecting a glide.

50

Do you see that?

A. I see that.

Q. So is it your opinion that Claim 1 requires that a function be activated upon the device detecting a glide?

A. As stated earlier, my opinion is that the function needs to be activated in response to both steps of a multi-step operation; namely, a touch followed by a glide.

Q. So I'm asking about your statement in Paragraph 127. You state that it is your opinion that the activation of a function happens upon detecting a glide.

That is still your opinion, correct?

A. The sentence reads:

The patent applicant's statements support my opinion that the activation of a function happens upon detecting a glide.

Q. So what do you mean by upon detecting a glide?

A. That's -- essentially, that's recited through the entirety of Section F, that there are two steps -- the multi-step process consists of two steps.

Q. So is it your opinion that the

51

activation of the function happens at the commencement of a glide?

A. I don't think I've provided that opinion.

Q. Well --

A. Please direct me to the portion of my report that I state that, if I do so, but I have no recollection of stating that.

Q. -- well, I'm trying to understand better what you mean by the words you used in Paragraph 127.

You state that it is your opinion that the activation of a function happens upon detecting a glide.

So does that mean that the activation of the function happens when the glide commences or in the middle of the glide or at the conclusion of the glide?

What do you mean by the words that you used?

(The witness reviews the material presented.)

THE WITNESS: I think your question goes to what a personal -- person of skill in the art would

52

understand as being the detection of a glide.

And a person of skill in the art understands that software products have certain forms of event listeners associated with them and they can detect certain types of gestures, including the detection of a glide, and when a glide has been detected, it can call software associated with the detection of that glide and trigger functions as a result of the detection of the glide.

BY ATTORNEY P. GRAVES:

Q. So would a POSITA understand that a glide can be detected based on an event that reflects the termination of the glide?

ATTORNEY R. O'CONNOR: Objection: vague.

THE WITNESS: It's unclear what you mean by the termination of the glide.

The -- it could be the determination of the glide is the point at which the software determines

53

that a glide has occurred.

BY ATTORNEY P. GRAVES:

Q. So by termination of the glide, I mean, the termination of the gliding movement of an object along the touch-sensitive display.

ATTORNEY R. O'CONNOR: Same objection.

THE WITNESS: Again, this question is vague, because I don't -- there are different potential interpretations of what you mean by termination of the glide.

You could mean the point at which the glide ceases motion. You could mean the point at which the glide has been detected. You could mean the point at which a finger is lifted off the display. And I'm unsure which one or others you intend.

BY ATTORNEY P. GRAVES:

Q. So are -- are all of those examples that you just provided possible events that an event listener would look for on which to base a determination that a glide has ended?

ATTORNEY R. O'CONNOR: Objection:

54

vague; scope.

THE WITNESS: There are various ways in which a glide can be detected.

Generally, a person of skill in the art would not understand the lifting of a finger -- or an action-up -- event, as it might be reported in certain software systems, or a touchends event, as reported in other software systems. They would not understand those up or lifting of the finger as being a glide.

Those would be release events, essentially.

BY ATTORNEY P. GRAVES:

Q. Let's turn to Paragraph 130.

A. I'm there. Thanks.

Q. So you point to language in the applicant's remarks that, quote:

The claimed invention activates a function after the glide; whereas Hoshino activates the function after the (hard) touch period, closed quote.

Do you see that?

A. I see that.

55

Q. So are you reading after the line glide -- strike that.

So are you reading, open quote, after the glide, closed quote, to resolve -- to require that function activation occur solely upon a touch followed by a glide?

A. This paragraph is essentially contrasting the claimed invention from Hoshino and the statements made regarding that contrast.

The figure at the bottom of Paragraph 130 from the intrinsic record shows that the claimed invention detects a touch, detects a glide and then activates; whereas Hoshino detects a touch, activates and then has -- detects a glide.

Q. So the applicant here is telling the examiner that the claimed invention activates a function after the glide, right?

A. Those words are used, yes.

Q. So could a POSITA reasonably understand this statement to mean that the claimed invention activates a function following the conclusion of the glide?

A. I would characterize that as after the detection of the glide.

56

Q. Well, the applicant doesn't actually state that the claimed invention activates a function after the detection of the glides -- the glide, correct?

A. At Paragraph 131, I go on to elaborate on this contrast with Hoshino. Specifically, the patent applicant -- applicant made clear that the claimed invention activates a function, quote, in response to both steps of a multi-step operation; namely, (one), touch followed by (two), a glide.

So this is consistent with activation of the function once the detection of the glide has occurred.

Q. So returning your focus to Paragraph 130, could a POSITA reasonably understand this statement that the claimed invention activates a function after the glide to mean that the claimed invention activates a function following the conclusion of the glide?

ATTORNEY R. O'CONNOR: Objection: asked and answered.

THE WITNESS: Paragraphs 130 and 131 are both directed to the applicant's statements with regards to

57

the contrast between the claimed invention and Hoshino.

I think it's improper to divide the statements in 130 and exclude the clarifications provided in 131 --

BY ATTORNEY P. GRAVES:

Q. Well --

A. -- both are saying the same thing.

Q. -- so looking at the -- the table that you're referring to on Page 43 -- it looks like that's at the bottom of your Paragraph 131 -- the applicant includes language, which you highlighted, stating or indicating the function activation occurs, quote, in response to both steps of, closed quote. And then it proceeds on.

Do you see that?

A. I see that it states:

In response to both steps of a multi-step operation; namely, (one), touch, followed by (two), a glide.

Q. So are you reading that language to mean in response to only the two steps of a multi-step operation; namely, one touch followed by two, a glide?

58

A. The language is clear. It says:

In response to both steps -- both steps.

Both steps are then -- implies two. It's then clarified by reciting two specific steps; so in response to two steps, a touch, followed by a glide. That's when the activation occurs.

Q. Is it your understanding that a POSITA would read this language to mean that function activation must occur in response to only those two steps --

ATTORNEY R. O'CONNOR: Objection: asked and answered.

BY ATTORNEY P. GRAVES:

Q. -- without -- without any additional step required for the function activation?

ATTORNEY R. O'CONNOR: Same objection: vague.

THE WITNESS: It seems the question is broadening its context to the -- to Claim 1 as a whole.

BY ATTORNEY P. GRAVES:

Q. It's not. I'm focusing on this language in the cell adjacent to the cell that

59

says: Function Activation.

A. This analysis is just part of my analysis of the construction for comprising as being consists of. And this is just yet another example from the intrinsic record of how the function activation occurs in response to two steps of a multi-step operation; namely, one, a touch, followed by two, a glide.

Q. So as you believe a POSITA would understand this language in the table that you've highlighted underneath Paragraph 131 of your report, at what point, in connection with a glide, would the function activation occur?

A. A person of skill in the art would understand that once both steps of the multi-step operation, the two -- two steps being detection of a touch and detection of a glide -- once the glide is detected, the function will be activated.

Q. So it's your understanding that a POSITA would understand this language -- well, strike that.

So would a POSITA understand this language to suggest that function activation could occur as soon as the object has started

60

moving along the touch-sensitive surface away from the touched location?

ATTORNEY R. O'CONNOR: Objection: vague.

THE WITNESS: This is a hypothetical. It goes to a person of skill in the art's understanding of the conditions that enable the detection of a glide. And that detection of a glide could be dependent on a variety of factors. So it really depends on the hypothetical in question.

BY ATTORNEY P. GRAVES:

Q. And you're not expressing and haven't expressed any opinion concerning the construction of the term glide or gliding, as used in the '879 patent, correct?

A. I wasn't asked to provide an opinion regarding the construction of the term gliding or glide.

Q. Do you have an understanding of what the term glide means, as used in this table that you excerpted into your report at Paragraph 131?

A. I understand that a person of skill in the art would understand what -- or how a

61

glide might be detected in a software system.

Q. And so what would a POSITA understand concerning how a glide might be detected in a software system as of 2002?

ATTORNEY R. O'CONNOR: Objection: vague; scope.

THE WITNESS: A person of skill in the art would understand that a variety of -- for instance, event listeners might be used in order to detect a glide.

BY ATTORNEY P. GRAVES:

Q. And would a person -- would a POSITA incorporate that understanding into their review of the intrinsic record in connection with arriving at a construction of the term comprising, as used in the '879 patent?

A. A person of skill in the art would have a broad understanding of how gliding could be detected. If they didn't have that understanding, I don't think they would be a person of skill in the art.

And that might inform or influence their understanding of the claim terms. I don't think it would change their construction for

62

comprising as being synony- -- synon- -- sorry -- comprising in this case being essentially synonymous with consists of.

Q. Are you aware that the applicant submitted to the examiner a reference to a URL that linked to an instructional video depicting the operation of the applicant's Neonode N2 phone during the prosecution?

A. I know that there was a reference to the -- a video of the Neonode phone in the file history.

Q. And did you review that N2 video that was submitted to the examiner in the course of arriving at your opinion concerning comprising?

A. Can you repeat the question, please?

Q. Did you review that N2 video that was submitted to the examiner in the course of arriving at your opinion concerning the word comprising?

A. I don't recall reviewing that video for the purposes of constructing the term comprising.

Q. Did you review that video for any purpose in connection with any opinions

63

expressed in your report?

A. I don't recall reviewing the video. It's possible that I did. I was aware of the reference to the video in the file history.

Q. Did you consider the content of that video in arriving at any of the opinions that you express in your report?

A. As I just said, I don't recall viewing the video, and therefore, other than the reference to the video in the file history, I don't recall any influence of the content of that video on the opinions expressed in my supplemental or opening reports.

Q. Turn to Paragraph 139 of your report.

A. I'm there. Thanks.

We've been going about an hour and a half, I think. Now would be a good time for a break if we're changing topic, but I'm -- I can proceed if there is -- if you're about to present a question.

ATTORNEY P. GRAVES: We can take a break. I'll just caution you not to discuss any of your testimony with your counsel.

64

How --

THE WITNESS: Understood.

ATTORNEY P. GRAVES: -- how long a break would you like? Five minutes?

THE WITNESS: Sorry. How many minutes?

ATTORNEY P. GRAVES: Five minutes? Ten minutes? What --

ATTORNEY R. O'CONNOR: Whatever you need, Andy.

THE WITNESS: Five minutes sound good --

ATTORNEY P. GRAVES: Okay.

THE WITNESS: -- should we start again at 45 -- quarter to the hour?

ATTORNEY P. GRAVES: Sounds good.

ATTORNEY R. O'CONNOR: Sounds good.

THE WITNESS: Thanks.

CERTIFIED STENOGRAPHER: We're still on the record.

VIDEO TECHNICIAN RAMOS: We are going off the record. The time is 1:39.

--oOo--

65

(A recess was taken at 1:39 p.m. PDT.)

--oOo--
--oOo--

(The proceedings resumed at 1:49 p.m. PDT.)

--oOo--

VIDEO TECHNICIAN RAMOS:  We are back on the record.  The time is 1:49 p.m., and this begins Media Number 2.

BY ATTORNEY P. GRAVES:

Q.    So turning to Paragraph 139 of your report -- your supplemental report.

Are you there?

A.    Yes.

Q.    So in the second sentence of Paragraph 139, you quote some language from the prosecution file, yes?

A.    That's correct.

Q.    Does the language that you quoted from the prosecution file inform a POSITA that a step, as the term is used in the '879 patent, is a discrete action?

A.    The statement is a contrast between continuous flowing processes, such as an

66

assertion that scrolling meets that continuous and flowing process and a discrete action.

Q.    So does the language that you quoted from the prosecution file in Paragraph 139 inform a POSITA that a step, as the term is used in the '879 patent, is a discrete action?

A.    That statement provides a contrast between a continuous flowing process, which the applicant asserted scrolling is an example of, and a discrete action.

Q.    Okay.  So I understand that you're characterizing, but the statement provides a contrast between two things.

I'd like you to answer my question.

Does the language that you quoted from the prosecution file in Paragraph 139 inform a POSITA that a step, as the term is used in the '879 patent, is a discrete action?

A.    I think it informs the POSITA that there is an intention that it be a discrete action.  It does not provide any clarity for the person of skill in the art regarding what a discrete action could be.

For example, scrolling can be a pixel-by-pixel movement.  Scrolling, for

67

example, can be a line-by-line movement. Scrolling, for example, can be a paragraph-by-paragraph movement.

So even this statement -- the contrast provided in this statement does not provide good clarity regarding the scope and boundaries of a asserted discrete action.

Q.    And does the language that you quoted from the prosecution file in Paragraph 139 inform a POSITA that a step, as the term is used in the patent -- the '879 patent, does not include scrolling through a document?

A.    I think the applicant's intention was to contrast scrolling, which they characterized as a continuous flowing process, with an intention to describe an inherently discrete action.  So there's an intention to provide a characterization of the contrast between something that is continuous, or allegedly continuous, and something that is discrete.

It doesn't provide clarity to a person of skill in the art what the boundaries of a discrete thing are, especially as scrolling

68

can be discrete -- can -- discrete in some ways, such as pixel-by-pixel movement, line-by-line movement, paragraph-by-paragraph movement.

Q.    So turning to Paragraph 140 of your report, you cite to several dictionaries, correct?

A.    That's correct.

Q.    Do you agree with the definition that's stated in the Wiley Electrical and Electronics Engineering Dictionary which defines step as, quote, one within a series, sequence, order, or process, period, closed quote?

A.    That definition seems reasonable, and that definition of step confirm -- confirms my opinion that the measurement of step is subjective and arbitrary.  It does not have objective boundaries.

Q.    So if a POSITA were to refer to a sequence of 10 steps -- and let's -- let's assume that we're using a step in the sense of the steps that a person takes when they're walking.

If I take one step in that series of 10 steps, does it change the POSITA's understanding of whether that step is, in fact,

69

a step if the step is 1 foot in length, as opposed to 2 feet?

ATTORNEY R. O'CONNOR:  Objection: vague.

THE WITNESS:  The question goes to human paces, I believe, which is very different from a touch-sensitive device in the context of the '879 patent.

The length of a step -- a pace -- a step can be of varied lengths.  There were no subject -- there were no objective boundaries on the length of a human pace.

BY ATTORNEY P. GRAVES:

Q.   Now, the claim, Claim 12 -- strike that.

The one-step phrase is found in Claim 12 of the '879 patent, yes?

A.   That's correct.

Q.   And Claim 12 recites, in relevant part, that an active application, function, service or setting -- and here I'm paraphrasing -- is advanced one step or backed one step by gliding the object along the

70

touch-sensitive surface.

Correct?

A.   That's a reasonable paraphrasing.

Q.   Does that language in Claim 12 provide any guidance to a POSITA as to the parameters of the step recited in the claim?

A.   Your question referred to any guidance?  It provides guidance towards the direction of the step.  The step is directed to an application, function, service or setting.

So I guess this -- and it can be back or advanced.

Other than that, the one-step term itself is fundamentally subjective and offers no clear boundaries.

Q.   So turn to Exhibit 3, which is the '879 patent.

A.   I'm there.  Thanks.

Q.   Are you there?

A.   Yes.

Q.   Okay.  At Column 3, Lines 59 to 61, the specification teaches that:

The computer unit of the invention is adapted to present, quote, an active application on top of any other

71

application on the display area, period, closed quote.

Is that correct?

A.   Not quite.  I think you added the words of the invention into the quote.

The actual quote is:

The computer unit is adapted to run several applications simul- -- simultaneously and to present an activate -- active application on top of any other application on the display area 3.

Q.   Okay.

So would a POSITA understand, in light of this teaching in the specification, that at least in the case of an application, advancing or backing one step involves presenting a different active application on the display?

A.   Can you repeat the question, please?

Q.   Would a POSITA understand, in light of this teaching in the specification, that at least in the case of an application, advancing or backing one step involves presenting a different active application on the display?

72

A.   I don't recall providing that analysis in my -- either of my reports.  If I did so, please direct me to the portion where I make that statement.

But I think this requires consideration of a particular embodiment or particular device and examination of the scope of the claims accordingly.

Q.   Did you consider this teaching at Column 3, Lines 59 to 61 in the specification in connection with arriving at your conclusion concerning the -- the phrase one step, as used in the '879 patent?

A.   I considered the specification as a whole with respect to the disclosures of Claim 12.

Q.   Did you consider how this teaching that we've just reviewed at Column 3, Lines 59 to 61 in the specification might impact your opinion concerning the phrase one step?

A.   I don't recall this specific disclosure.  The -- the unit can run several applications, influencing my interpretation of Claim 12.

In particular, Claim 12 says:

73

An active application is advanced one step.

And whether that applies across applications or within applications is something I have not yet considered. I may do so in the future, if asked to do so.

Q. Have you heard the term step applied to iterations in a process in the course of your work in the field of user interface design?

A. I'm sure I have at some point, for example, in processing through flow charts.

Q. And how would a POSITA understand the meaning of the word step in processing through flow charts?

A. Flow charts, which are often presented on paper or displayed on computer screens, contain a series of discrete boxes, and you can step between those boxes.

The boxes provide clear boundaries between steps in a flow chart process and -- whereas, on a touchscreen device, such as Claim 12, the steps recited provide no clear boundaries.

Now --

Q. What kind of -- do you -- do you own

74

a smartphone?

A. Yes, I do, several.

Q. What model -- what models?

A. I have a Samsung S25 Ultra. I have a iPhone 13 Pro Max. I've recently bought a iPhone 15 Pro Max for my wife, an iPhone 14 Pro Max for my son.

I have a Sam- -- a collection of Samsung S10s --

Q. That's -- that's good enough. Thank you.

Okay. So -- so the iPhone 13 Pro Max -- you -- you use that phone, correct?

A. Yes.

Q. Okay. Have you ever looked at images -- saved images in the camera application?

A. I've looked at saved images through the Photos app, which can be accessed through the camera app.

Q. Okay.

All right. And have you ever swiped left or swiped right in order to advance or back up through the series of images that are -- that are saved in the Photos app?

75

A. Sure. Enjoying those swiping actions, I've scrolled between -- scrolled between the photos presented.

Q. So when you say you've scrolled between the photos, are you referring to the image scroll toward the bottom of the display?

A. I was actually thinking of the scrolling action where you place your finger on a photo, drag it one way or the other and use that dragging action to scroll between different photos.

Q. Okay.

All right. And so in your mind, the action of moving from one photo to another by putting your finger directly on the -- on the photo and swiping left or swiping right is a scrolling action; is that correct?

ATTORNEY R. O'CONNOR: Objection: scope.

THE WITNESS: I think it's reasonable to characterize that action as a scrolling action, scrolling between different photos in a series of photos.

76

BY ATTORNEY P. GRAVES:

Q. Is there anything in the -- in Claim 12 or in the specification of the '879 patent or the prosecution file suggesting that the term step, as used in Claim 12, should be determined by absolute distance?

A. I don't recall any reference to absolute distance, but a person of skill in the art would have no guidance regarding how to apply the one-step claim element.

Q. Is there anything in Claim 12 or the specification of the '879 patent or the prosecution file suggesting that the term step, as used in Claim 12, should be determined by a proportion of screen width?

A. The problem with Claim 12 is that there's a lack of guidance regarding the boundaries associated with the one-step process. So the file history has no disclosure regarding how to apply that one-step element.

It could be distance. It could be a number of pixels. It's contrasted with a -- what's asserted to be a continuous process of scrolling where that process of scrolling may not actually be continuous.

77

It's hard to know how to apply the term one step due to the lack of guidance.

Q. So let's turn to Paragraph 146 of your report.

Let me know when you're there.

A. I'm there. Thanks.

Q. Did you rely on Neonode Smartphone's infringement contentions in arriving at the conclusion that the phrase one step is indefinite?

A. Well, the term is indefinite in view of the intrinsic record alone. When I looked at Neo- -- Ne- -- Neonode's apparent application of the claim language, it just amplified the extent to which it's clear that one step -- the term one step is ambiguous, subjective and indefinite.

Q. Are Neonode Smartphone's infringement contentions part of the evidence on which you relied in arriving at the conclusion that one step means indefinite?

A. I wouldn't characterize it that way.

The term one step, as I state in Paragraph 146, is indefinite in view of the intrinsic record alone. However, viewing

78

Neonode's application of the claim language multiplies the uncertainty surrounding the claim.

Q. In your opinion, are Neonode Smartphone's infringement contentions useful evidence as to how a POSITA would have understood the phrase one step in 2002?

A. I would rather put it as the inverse. Neonode's application -- or apparent application of the claim language multiplies the uncertainty surrounding the claim.

Q. So do you understand that evidence concerning how a party -- strike that.

Is it your understanding that evidence concerning how a party -- strike that.

Yeah. I'm going to go back to my original question because you didn't answer it. Lets try it again.

In your opinion, are Neonode Smartphone's infringement contentions useful evidence as to how a POSITA would have understood the phrase one step in 2002?

ATTORNEY R. O'CONNOR: Objection: asked and answered.

THE WITNESS: I'm unclear how my

79

previous answer didn't already cover that.

BY ATTORNEY P. GRAVES:

Q. Try to answer the question again.

ATTORNEY R. O'CONNOR: Same objection.

THE WITNESS: In view of the intrinsic record alone, the term one step is clearly indefinite.

Neonode's apparent application of the claim terms multiplies the uncertainty surrounding the claim language.

So specifically directed to your question, the application of the claim language would not help a person of skill in the art understand the boundaries of the claim term.

BY ATTORNEY P. GRAVES:

Q. Okay. Let's turn to Paragraph 70 of your report.

A. I'm there. Thanks.

Q. So you state that it is your opinion that a POSITA would have understood the intrinsic record to be consistent with and

80

support Apple's proposed construction.
Yes?

A. I think that's a direct quote from my report at Paragraph 70 -- 70. Yes.

Q. Would a POSITA understand the intrinsic record to require Apple's proposed construction?

A. My understanding is that if the Court were to adopt Apple's proposed construction, then in order to meet the claims, that construction would need to be met.

Q. That wasn't my question.

Would a POSITA understand the intrinsic record to require Apple's construction?

A. I don't think it's my job to determine what is required by the constructions.

Q. No -- sir -- sir -- sir, stop -- stop.

That -- that's -- that's not my question.

Are you -- I'm having a little difficulty here because you -- you don't -- I don't know if it's that you don't understand the question or maybe I'm not asking it clearly,

81

although I think I am.

But here, let's try to do it this way: So remember I pointed you to language at Paragraph 70?

This is the first sentence in your report, right?

You state that:

A POSITA would have understood the intrinsic record to be consistent with and support Apple's proposed construction.

That's a quote, right?

So the words that I'm kind of focusing on here with my question are differentiating consistent with and support, contrasting that with the word require, which I'm using in my question.

So maybe it will be easier for you if you just look at this first sentence, right, in Paragraph 70 of your report. And what I'm doing is I'm substituting require or consistent with and support.

I'm not asking you to opine regarding whether there might be infringement under some possible construction.

Okay? I'm asking a question that's

82

tied to this sentence in your report.

So with that explanation, I will ask the question again.

So, again, thinking about your statement in Paragraph 70 of your report, would a POSITA understand the intrinsic record to require -- require Apple's proposed construction?

(The certified stenographer requesting clarification; colloquy will not be captured on the written record.)

CERTIFIED STENOGRAPHER: Counsel, I'm not sure your whole question came out. You got cut out there.

ATTORNEY P. GRAVES: All right. Can you hear me now?

CERTIFIED STENOGRAPHER: Yes, we can. But you did get cut out for a few seconds.

ATTORNEY P. GRAVES: Okay.

BY ATTORNEY P. GRAVES:

Q. All right. Would a POSITA understand the intrinsic record to require Apple's proposed construction?

83

A. I hope I'll be allowed to complete my answer this time.

I haven't provided an opinion on requirement. I provided an opinion that the intrinsic record is consistent with and supports Apple's proposed construction.

Q. Okay. So is the intrinsic record also consistent with proposed constructions of this phrase in Section B of your report that are different from Apple's proposed construction?

ATTORNEY R. O'CONNOR: Objection: vague.

THE WITNESS: Can you repeat -- can you repeat the question?

BY ATTORNEY P. GRAVES:

Q. Sure. So -- yeah. So we're in the section of your report addressing the phrase, quote, a touch-sensitive area in which a representation of a function is provided, closed quote.

Correct?

A. That's correct.

Q. Okay. And I'm -- I'm going to refer to this as the touch-sensitive area phrase just to make it easier.

84

So is the intrinsic record consistent with constructions of touch-sensitive area, the touch-sensitive area phrase, that are different from Apple's proposed construction?

ATTORNEY R. O'CONNOR: Objection: vague.

THE WITNESS: I'm not sure I caught all of the question. Can you repeat it, please?

BY ATTORNEY P. GRAVES:

Q. Yeah. Sure.

Is the intrinsic record -- again, we're going to -- focusing on Paragraph 70 of your report. So is the intrinsic record consistent with constructions of the touch-sensitive area phrase that are different from Apple's proposed construction?

ATTORNEY R. O'CONNOR: Objection: vague; scope.

THE WITNESS: As I say at Paragraph 69, the use of the term present invention limits that term to require the touch-sensitive area to be divided between a menu area and a display area and to require a

85

representation of a function to be provided in the menu area; however, I'm not a lawyer, and I don't know the full scope of the implications of the use of the term the present in -- invention.

BY ATTORNEY P. GRAVES:

Q.   So I'll ask the question again.

Is the intrinsic record consistent with constructions of the touch-sensitive area phrase that are different from Apple's proposed construction?

ATTORNEY R. O'CONNOR:  Objection: vague; scope.

THE WITNESS:  As stated at Paragraph 69, on the assumption that the use of the term present invention limits the term to require -- to make those requirements, then those requirements would have to be filled by a device in order to meet the claim.

BY ATTORNEY P. GRAVES:

Q.   Okay.  So you're not answering my question.

So in Paragraph 69, I believe you state that you do not have an understanding of

86

the legal implications of using, quote, the present invention, closed quote, in the specification, right?

A.   That's correct.

Q.   So are you relying on the specification's use of the term the present invention in connection with arriving at any of your opinions that you express in your report?

A.   I'm relying it -- relying on it insofar as I make that statement at Paragraph 6- -- 69, that Apple contends that the disclosures limit the term to require a touch-sensitive area to be divided between a menu area and a display area, and so on.

Q.   Okay.  And you do not have an understanding of whether Apple's contention in that regard is correct, yes?

A.   As I say, I'm not a lawyer.

Q.   And, therefore, what?

You're not a lawyer, so . . .

A.   So on the assumption that Apple's contentions are correct about the present invention limiting the term to require the touch-sensitive area to be divided between a menu area and a display area, and so on, then

87

those requirements are in place.

Q.   Okay.  So you're relying on Apple's contention concerning the effective use of the phrase the present invention in the specification in arriving at the conclusions that you -- or rather the opinions that you express in your report, correct?

ATTORNEY R. O'CONNOR:  Objection --

THE WITNESS:  No, that --

ATTORNEY R. O'CONNOR:  -- vague; mischaracterizes the report.

THE WITNESS:  -- that's not correct.

I prefaced my Section B regarding the construction of the term a touch-sensitive area in which a representation of a function is provided with the content of Paragraph 69 that describes the implications of the use of the term the present invention.

The remainder of the section, how -- however, begins at Paragraph 70 with:

88

However, in my opinion, a POSITA would have understood the intrinsic record to be consistent with and support Apple's proposed construction.

BY ATTORNEY P. GRAVES:

Q.   Yeah.  I'm just trying to get at whether you relied on Apple's contention concerning the present invention in arriving at your opinions that are expressed in your report.  Okay?

So my question is:  Did you rely on Apple's contention that certain disclosures in the specification describing the present invention limit this term in a particular way described in Paragraph 69 in arriving at your opinions as expressed in your report?

ATTORNEY R. O'CONNOR:  Objection: asked and answered.

THE WITNESS:  My opinions expressed in my report include Paragraph 69.  And, thereafter, from Paragraph 70 through the remainder of Paragraph B, I'm addressing a person of skill in the art's understanding, irrespective of Apple's contention

89

regarding requirements due to the use of the term the present invention limiting scope.

ATTORNEY P. GRAVES:  Okay. Brian, I'm going to ask you to stop giving these leading objections; just object -- either object or object to form, but do not lead.

ATTORNEY R. O'CONNOR:  Which objection was leading, in your opinion?

ATTORNEY P. GRAVES:  Most of them.

ATTORNEY R. O'CONNOR:  I'm looking at --

ATTORNEY P. GRAVES:  You are --

(Simultaneous speech; as a result, portions of the testimony could not be reflected in the record.)

ATTORNEY P. GRAVES:  -- you are -- you are objecting -- objecting to scope, objecting: asked and answered, and so on.  That's inappropriate.  Just confine yourself to object or object to form.  Don't lead.

ATTORNEY R. O'CONNOR:  Well, in

90

California, I'm allowed to include a brief, concise reason for my objection. I'll continue to do so.

BY ATTORNEY P. GRAVES:

Q.    So let's take a look at Exhibit 3, which is the patent --

A.    I'm there.  Thanks.

Q.    -- and go to Column 6 --

A.    Okay.

Q.    -- Column 6, Lines 38 to 42.

Do you see that portion of the specification?

A.    Yes, I do.

Q.    Okay.  So here, the patent teaches that, quote:

The invention is not restricted to the aforedescribed and illustrated exemplifying embodiments thereof, and these embodiments can be modified within the scope of the inventive concept illustrated in the accompanying claims, period, closed quote.

How would a POSITA understand this teaching in the specification?

A.    That certain modifications within

91

the scope of the inventive concept could be modified.

Q.    And did you consider this teaching in the specification in arriving at the opinions that you express in your report?

A.    I relied on the entirety of this specification.

Q.    Did you consider this portion of the specification specifically in arriving at the opinions that you express in your report?

A.    I relied on the specification as a whole.  That includes this portion.

Q.    And do you recall considering this paragraph of the specification in connection with arriving at any of the conclusions expressed in your report?

A.    I don't recall any specific resort to this particular extract in arriving at my opinions expressed in my report.

Q.    So let's turn to Paragraph 76 of your report.

You state that the specification also repeatedly and exclusively describes a representation of a function as being provided in the user interface's menu area.

92

Do you see that sentence?

A.    I do.

Q.    Okay.  Now let's turn to -- back to Exhibit 3, which is the patent.  And I'd like you to take a look at Column 5, Lines 3 to 14 and Figure 6.  Let me know when you've reviewed those portions of the specification.

(The witness reviews the material presented.)

THE WITNESS:  You referred me to Figure 6.  I believe Figure 6 is not within the segment of Column 5 that you --

BY ATTORNEY P. GRAVES:

Q.    No, that is the -- that is the figure I'm referring you to, Figure 6.

The numbered items in these two paragraphs of the specification refer back to numbered items in Figure 6.

A.    And you said Column 5, Lines 3 to where?

Q.    Fourteen.

(The witness continues reviewing the material presented.)

THE WITNESS:  Yes, I'm -- I've

93

read -- reviewed that. Thanks.

BY ATTORNEY P. GRAVES:

Q.   Okay.  All right.  So you'll see in the -- in the first of the two paragraphs in Column 5 that I referred you to, there's a reference to a representation of desired application.

Do you see that?

A.   I see that.

Q.   Okay.  Is an application a type of function?

ATTORNEY R. O'CONNOR:  Objection: vague.

THE WITNESS:  In certain contexts, an application can be a type of function; however, the term representation of a function as used in Claim 1 refers to different elements than the applications that are described here.

BY ATTORNEY P. GRAVES:

Q.   So as you understand the term representation of a function, does a representation of a function encompass a -- a representation of an application?

94

ATTORNEY R. O'CONNOR:  Objection: vague.

THE WITNESS:  That would depend on context.

BY ATTORNEY P. GRAVES:

Q.   In the context of Claim 1 of the '879 patent.

A.   For example, if the representation of an application was provided within the menu area, such that the representation of the application was also a representation of a function, then that representation of an application could be a representation of a function.

Q.   Are there other examples within the context of the '879 patent in which the term representation of a function would encompass a representation of an application?

A.   You referred to other disclosures in the specification of a representation of an application being a representation of a function.

I didn't provide an example in which that was the case in the specification.  So I believe there is no disclosure in the

95

specification of the '879 patent of a representation of an application also being a representation of a function.

Q.   So I'm not asking about specifically a disclosure in the '879 patent.  I'm asking whether there are any other examples, in addition to the example that you provided in your answer two answers ago, within the context of the '879 patent in which the term representation of a function would encompass a representation of an application?

A.   I don't understand the question because it seems to be saying outside the scope of the '879 patent whilst also being within the scope of the '879 patent.

Q.   The question is directed to the use of the term representation of a function as that term is used in the '879 patent.

So are there other examples in which the term representation of a function -- strike that.

Are there other examples within the context of the '879 patent in which the term representation of a function would encompass a representation of an application?

96

A.   I'm unclear about the use of the word other within the question because -- I don't think we've already identified one example.

Q.   Okay.  Is it your understanding that the only instance in which a representation of a function would encompass a representation of an application within the scope of those terms, as used in the '879 patent --

A.   Was that a complete --

Q.   -- is the -- the -- yeah -- is the three representations that are identified in the menu area referenced in the specification?

A.   That was a complex, compound question.

Can we break it up into pieces?

Q.   Yeah.

Well, is it your understanding that the only instance in which a representation of a function would encompass a representation of an application as those terms are used in the '879 patent is the three representations that are referenced in the menu area?

A.   The three representations of a function that are identified in the

97

specification of the '879 patent are a first function for additional -- additional actions, a keyboard function and a file manager. None of these are described as applications.

Applications are described as other entities that are presented outside of the menu area.

Q.    So is it your understanding that the phrase representation of a function as used in the '879 patent does not include a representation of an application?

A.    That's not my opinion.

There is no explicit disclosure of a representation of a function being an application. The three representations of functions disclosed in the '879 patent are disclosed as additional activities, a -- a keyboard function and a file manager.

Q.    So I understand that you're telling me that there's no explicit disclosure with respect to, you know, this specific issue in the '879 patent, but that's not my question.

I'm asking -- I'm asking for your opinion. You've opined regarding the construction of a representation of a function.

98

So I want to understand, is it your opinion -- strike that.

Is it your understanding that the phrase representation of a function as used in the '879 patent does not include a representation of an application?

A.    No. That's not my opinion.

The --

Q.    Okay.

A.    -- representations of functions in the menu area could provide a representation of an application. There's no explicit disclosure of that, but I think a person of skill in the art would understand that the representations of functions in the menu area could provide access to an application.

Q.    Are there any other instances with disclosure in the '879 patent of a representation of an application?

A.    Again, the question referred to other examples, and I don't think we've already found a disclosure of a single application disclosed in the specification.

CERTIFIED STENOGRAPHER: Excuse me, Counsel. Did you just object?

99

ATTORNEY R. O'CONNOR: I did. I said, Objection: vague.

CERTIFIED STENOGRAPHER: We couldn't hear you here.

ATTORNEY R. O'CONNOR: I know. It was the same time. Apologies.

CERTIFIED STENOGRAPHER: Just wanted to make sure.

ATTORNEY R. O'CONNOR: I appreciate that.

BY ATTORNEY P. GRAVES:

Q.    Are there any other -- are there any other instances of disclosure in the '879 patent of a representation of a function that could provide access to an application?

A.    Again, the question referred to other, and it's unclear to me that we've already identified one. And for the question to make sense, we would have needed to provide or identify a single instance of disclosure.

Q.    Well, I think that you testified just a moment -- a few moments ago that a person of skill in the art would understand that the representations of functions in the menu area could provide access to an application.

100

Do you recall that testimony?

A.    I recall that testimony, but I think there's a difference between disclosure and what a person of skill in the art might find obvious.

Q.    So are there any other instances of disclosure in the '879 patent that a person of skill in the art might determine to disclose that a representation of a function that could provide access to an application?

A.    Again, the question began with other disclosures, I believe. And for that question to make sense, we would need to have at least one disclosure, and I don't think we have that.

Q.    At least one disclosure of what?

CERTIFIED STENOGRAPHER: I think you're getting cut out again, Counsel.

BY ATTORNEY P. GRAVES:

Q.    Yeah, at least one disclosure of -- okay. At least one disclosure of -- of what?

A.    At least one disclosure of a representation of a function where the function is an application.

Q.    Okay. And you're saying that a person -- that a POSITA would not understand

101

that the '879 patent provides any such disclosure; is that correct?

A. My understanding -- I'm not a lawyer, but my understanding is that disclosure and obviousness are distinct issues. There is no disclosure in the '879 patent of a representation of a function in the menu area, having a function where that function is an application.

It would be obvious to a person of skill in the art, however, for a representation of a function in the menu area to provide access to an application.

Q. Okay. Did you consider the two paragraphs to which I referred you at Column 5, Lines 3 to 14, in connection with arriving at your opinion concerning the touch-sensitive area phrase?

A. I didn't provide a construction for the phrase a touch-sensitive area alone. I would understand, however, that the region displayed in Figure 7, for instance, includes a touch-sensitive area.

Q. Okay. Do you recall earlier that I explained that by referring to touch-sensitive

102

area, I'm referring to the entire phrase that you're addressing in Section B of your report?

Yes?

A. Sorry. I don't recall that. Maybe I was thinking about something else while the question was being asked.

So we go --

Q. Okay.

A. -- going forward, we refer to a touch-sensitive area as being a touch-sensitive area in which a representation is a function is provided; is that correct?

Q. That is -- that is correct.

A. I think the record might be clearer if we recite the entire limitation.

Q. So did you consider the two paragraphs to which I referred you at Column 5, Lines 3 to 14 in connection with your arriving at the opinion that you express in your report concerning, quote, a touch-sensitive area in which a representation of a function is provided, closed quote?

A. I considered the entire specification, which includes those paragraphs.

Q. Do you recall specifically

103

considering those two paragraphs in connection with arriving at your opinion in that respect?

A. I don't recall specifically relying on those paragraphs in forming my opinions. If I cite to them in this section, then obviously, I did.

(The certified stenographer requesting clarification; colloquy will not be captured on the written record.)

CERTIFIED STENOGRAPHER: I think you got cut off.

BY ATTORNEY P. GRAVES:

Q. So let's turn to Paragraphs 83 to 84.

A. I'm there. Thanks.

Q. Okay. So you excerpted the originally filed version of Claim 1 at Paragraph 83 of your report, correct?

A. That's correct.

Q. So the originally filed version of Claim 1 included an element reciting a separate menu area and display area, correct?

A. That's correct.

Q. And this version of Claim 1 also

104

includes a first, second and third representation of a function presented in the menu area, correct?

A. That seems fair.

Q. And later, the claims were amended to drop this recitation of a separate menu area and display area, correct?

A. The September 2008 amendment effectively rewrote the entirety of Claim 1. That's correct.

Q. And the claims were also amended to drop the recitation of a specific first, second and third representation of a function presented in the menu area, correct?

A. The claim was effectively rewritten entirely, and that component was removed.

Q. Do you have any opinion as to how a POSITA would understand that sequence of events to bear on the construction of Claim 1?

A. As I say in Paragraph 84, the amendments do not clarify the patent applicant's reasoning or intent, so a person of skill in the art wouldn't move the needle for them.

Q. Could a POSITA reasonably understand that sequence of events to suggest that Claim 1

105

as issued does not require a separate menu area and a display area?

A.    I think a person of skill in the art would still read the claims and the specifications and take the interpretation I describe throughout this section based on the disclosures within the claims -- the specification and the intrinsic record.

Q.    Yeah.  Well, let's just focus on this element of the prosecution file for the purpose of my question just now.  So -- so it's a more narrowly focused question than the answer that you gave back to me.

Could a POSITA reasonably understand the sequence of events that we just discussed concerning this earlier version of Claim 1 to suggest that Claim 1, as issued, does not require a separate menu area and display area?

ATTORNEY R. O'CONNOR:  Objection: vague; incomplete hypothetical.

THE WITNESS:  As I say in Paragraph 84, the prosecution history is unclear regarding the reasoning for this change.  So I don't think a person of skill in the art would be able to

106

take an interpretation of what was intended.  They would resort to the specification and the claims themselves to help them understand the scope of the claim.

BY ATTORNEY P. GRAVES:

Q.    Okay.  So you state in your report and you testified that the September 2008 amendment effectively rewrote the entirety of Claim 1.

Is that accurate?

A.    Yes.

Q.    Could a POSITA reasonably conclude that by rewriting the entirety of the claim, the applicant wanted to change the scope of the claim?

A.    The absence of any accompanying clarification for the intent of the rewriting, I think a person of skill in the art would be ambivalent to the changes here.  The claim essentially fundamentally changed due to its rewriting in its entirety.

Q.    So it's your view that without an explanation from the applicant concerning the applicant's intent, that a -- a POSITA lacks a

107

basis to understand what effect the -- the claim amendment had on the scope of the claim?

A.    The claim basically changed in its entirety, without any accompanying explanation.  So the person of skill in the art reading the new version of the claim would resort to the claim itself and the specification.

This particular amendment wouldn't move the needle one way or the other in terms of their understanding of the scope.

Q.    So in Paragraph 85 of your claim, from Page 27 to Page 30, you state that a --

Your opinion is supported by the state of the art in 2002, and that a POSITA would have understood that user interfaces at the time often comprise the distinct menu area and display area.

Do you see that?

A.    Yes.

Q.    Okay.  Now, you use the word often.  You don't say always; you say often.

A POSITA would have understood that the user interfaces at the time often comprised the distinct menu area and display area.

108

Is there a reason that you used the term -- or the word often instead of always?

A.    I used the term often because this was often the case and not always.

Q.    Okay.  So there were user interfaces at the time, referring to 2002, that comprised a -- a display area without a distinct menu area?

A.    I'm sure there were.

Q.    Are you aware of any?

ATTORNEY R. O'CONNOR:  Objection: vague.

THE WITNESS:  I wouldn't want to provide any specific example, but I'm sure there were.

BY ATTORNEY P. GRAVES:

Q.    Did you undertake any investigation, in the course of your work for Apple in this case, to try to determine whether there were any well-known, available mobile devices in or before 2002 that had a touch-sensitive display that was not segregated into the distinct display and menu areas?

A.    The question was directed to touch-sensitive mobile displays that -- the

109

sentence we're scrutinizing at the moment states:

A person of skill in the art would have understood that user interfaces at the time often comprised a distinct menu area and display area.

It's not specifically directed to touch- -- touch-sensitive mobile devices --

Q. Okay --

A. -- in that sentence.

Q. -- right. That's -- yeah, that's -- that's fair.

Did you undertake any investigation to try to determine whether there were any well-known, available mobile devices in or before 2002 that had a user interface that was not segregated into distinct display and menu areas?

A. I didn't conduct that specific analysis; however, my broad recollection was that not all devices would have that division.

Q. Did you consider the Palm Tungsten in connection with your evaluation of the state of the art in 2002, as referenced in Paragraph 85?

110

A. I used the Palm Tungsten T2 from 2003 at the end of Paragraph 85 as one example of a device that included a touch-sensitive area divided between the display area and a menu area.

Q. And did you consider the -- the Palm Tungsten -- Tungsten T, rather than the T2?

A. The devices that I directly considered and used in Paragraph 85 are the Palm Vx, the Palm Tungsten T2, the Newton MessagePad and the -- and Neonode's N1 device.

That's the limit of the devices I relied on in -- specifically in that paragraph.

Q. And if you were to learn that the Tungsten T2 was released after December 2002, would that impact your opinion?

A. As I labeled the figure of the Tungsten T2, I identified that it was a 2003 device -- wouldn't have -- I've already considered that it wouldn't influence my opinion.

This is simply exemplars of things a person of skill in the art would be well aware of in that vicinity of time.

Q. Okay. So it's your testimony that a

111

person of skill in the art would have been aware of the Tungsten T2 as reflecting the state of the art in 2002?

A. No, that's not my testimony.

The Palm Tungsten T2, I believe, was released in 2003. It shows a person of skill in the art -- it and the other device -- devices identified in Paragraph 85 broadly exemplify a person of skill in the art's understanding at that time period.

Q. And what's the time period you're referring to?

A. In the case of the Palm Vx, that's 1999 and onwards.

In the case of the Palm Tungsten T2, it's 2003 an onwards.

In the case of the Apple Newton MessagePad, it's at least 1996 and onwards, although there were earlier versions of the same device -- the -- the -- of the MessagePad device.

And the Neonode N1 -- that's 2004 onwards.

Q. Was the -- have you heard of the -- the iPAQ mobile device?

112

A. Yes.

Q. Was the iPAQ mobile device a well-known device even before 2002?

A. I don't recall the exact date at which the iPAQ was well-known. I believe it was 2000 that it was released. I could be off by a year or two, but I'm near certain it was well-known by 2002.

Q. And was the iPAQ a representative of the state of the art in or around 2002?

A. Earlier than 2002? Yes.

Q. Was it represented -- was the iPAQ representative of the state of the art in 2002?

A. In 2002 and beforehand, according to my recollection, I think the i- -- I don't remember the exact date at which the iPAQ came out. I think it was 2000, or thereabouts. And from that point onwards, it was a well-known device that was representative of the state of the art.

I could be off by a couple of years in terms of when the first version of the iPAQ came out. It could have been as early as 1998. My recollection here is imperfect.

Q. Did you consider any iPAQ model in

113

connection with arriving at the opinions you express in your report?

A.    I don't recall relying on an iPAQ anywhere in my report.

Q.    Did you, personally, first identify any of the devices depicted at Pages 26 to 29 of your report as evidence supporting the opinion you express at Paragraph 85?

A.    Can you clarify what you mean by first identify?

Q.    I mean you -- you, personally -- did you identify these devices as being representative of the state of the art in 2002, or did Apple's counsel provide this information to you to be incorporated in your report?

A.    I presented this information to Apple's counsel.

Q.    Okay.  Let's turn to Paragraph 89. Are you there?

A.    I'm there.  Thanks.

Q.    So kind of, you know, similar set of questions to what we went over with -- earlier -- concerning an earlier paragraph in your report.

You state that:

114

A POSITA would have understood the intrinsic record to be consistent with and support Apple's proposed construction.

My question is:  Would a POSITA understand the intrinsic record to require Apple's proposed construction?

A.    As before, the issue regarding requirement is substantially covered at Paragraph 88 of my report, but that is based on my understanding that the term the presentation invention limits the term.  But I'm not a lawyer.

Q.    Let's turn to Paragraphs 94 and 95.

A.    I'm there.  Thanks.

Q.    So there's some highlights --

A.    You cut out.

Could you repeat the question, please?

Q.    Okay.  So this, again, is the originally filed version of Claim 1, right?

A.    By this, you're -- you're referring to the extract at the bottom of Paragraph 94?

Q.    Correct; yes.

A.    Yes, that's the case.

Q.    And the language that you

115

highlighted in this original version of the Claim 1 dropped out of the claim as a result of a series of amendments, correct?

A.    That's correct.

Q.    Okay.  Could a POSITA reasonably understand that sequence of events to suggest that the -- that Claim 1, as issued, does not require the functionality that is recited in the highlighted text here on Page 33 of your report?

A.    Given that the prosecution history is unclear regarding the reasoning behind the amendment or its impact on the proper scope, I don't think there's a -- the amendment would move the needle in terms of the POSITA's understanding one way or the other.

Q.    And why do you believe that the prosecution history is unclear in that regard?

A.    Because there's no statement regarding the reasoning for the amendment or its impact on the proper scope of the term.

Q.    Okay.  So put your supplemental report aside for -- for a little bit and turn to your opening report.

A.    Sure.

THE WITNESS:  And if we're about

116

to start another line of questioning, I -- we've been going about another hour and a half.

Could we take a short break again?

ATTORNEY R. O'CONNOR:  Of course.

ATTORNEY P. GRAVES:  Yeah, that's -- that's fine.

How much time would you like?

THE WITNESS:  How about 10 minutes and come back at 25 past the hour?

ATTORNEY P. GRAVES:  Sounds good.

THE WITNESS:  Great.  Thanks.

ATTORNEY P. GRAVES:  Yep.

CERTIFIED STENOGRAPHER:  Off the record, Mr. Videographer.

VIDEO TECHNICIAN RAMOS:  We are going off the record.  The time is 3:15 p.m.

--oOo--

(A luncheon recess was taken at 3:15 p.m. PDT.)

--oOo--

117

AFTERNOON SESSION

--oOo--

(The proceedings resumed at 3:52 p.m. PDT.)

--oOo--

--oOo--

ANDREW JEREMY GAVIN COCKBURN, PH.D., having been previously duly sworn or having affirmed under penalty of perjury by the certified stenographer to tell the truth, the whole truth and nothing but the truth, further remotely testified herein as follows:

--oOo--

VIDEO TECHNICIAN RAMOS: We are back on the record. The time is 3:52 p.m., and this begins Media Number 3.

--oOo--

EXAMINATION (CONTINUED) BY COUNSEL FOR PLAINTIFFS

--oOo--

BY ATTORNEY P. GRAVES:

Q. So let's turn to Paragraph 102 of your opening report. That's Exhibit 1.

A. I'm there. Thanks.

ATTORNEY R. O'CONNOR: Can you

118

say the paragraph number again?

ATTORNEY P. GRAVES: 102.

ATTORNEY R. O'CONNOR: 102. Thank you.

BY ATTORNEY P. GRAVES:

Q. So Apple's construction of the phrase -- phrases location where the representation is provided and the touched location, at that time, was location within the representation, correct?

A. Yes, at that time.

Q. Okay. I'm going to refer to these two phrases as the --

CERTIFIED STENOGRAPHER: I think you got cut out there again, Counsel.

ATTORNEY P. GRAVES: I'm sorry.

BY ATTORNEY P. GRAVES:

Q. Okay. I'm going to refer to these two terms in the far left box at the top of Page 34 of your opening report, those terms being location where the representation is provided and the touched location -- I'm going to refer to those as the location phrases. Do you understand?

A. Okay.

119

Q. All right. So at Paragraph 102, you opined that a POSITA would have understood the intrinsic record to be consistent with and support Apple's proposed construction, correct? I'm sorry. At Paragraph 103 -- let me ask the question again. At Paragraph 103, you opined that a POSITA would have understood the intrinsic record to be consistent with and support Apple's proposed construction, correct?

A. I see that. Yes.

Q. Is that still your opinion?

A. The construction proposed by Apple has changed, and because that construction has changed, my opinion has changed. There is a new Section E in my supplemental report that addresses the construction for location where the representation is provided and the touched location.

Q. Okay. So looking down at the next sentence in Paragraph 103 of your opening report, you state your opinion about what the intrinsic record contains there, correct?

A. That's brutally fair.

Q. Okay. Is it still your opinion that

120

the intrinsic record consistently and exclusively refers to activating a function on a device by detecting ini- -- an initial touch within the representation of the function (and then gliding in the direction of the display area)?

A. Well, my opinions regarding the constructions have changed because the proposed constructions have changed.

Q. Okay. Now, at Paragraphs 108 and 109, you excerpt and discuss a portion of the originally filed Claim 1, correct?

A. I see that at Paragraph 108. Yes.

Q. Okay. Do you currently believe that the portion of original Claim 1 that you highlighted here has some bearing on the construction of the location phrases?

A. That segment of the file history is no longer included in my analysis of the proposed constructions for the terms in my supplemental report.

Q. Okay. So I didn't ask what's in your -- your supplemental report. So I'll try the question again. Do you currently believe that the

121

portion of original Claim 1 that you highlighted here at Paragraph 108 of your original report has some bearing on the construction of the location phrases?

A.    The constructions have changed, and, therefore, the opinions that I express related to the constructions are somewhat different. The paragraphs contained in my supplemental report are different than the paragraphs contained in my opening report because the constructions have changed.

Q.    And if you currently believed that this portion of original Claim 1 had any bearing on the construction of the location phrases, you would have included this content in your supplemental report, correct?

A.    The supplemental report contains the information I relied on for presenting the modified constructions proposed by Apple, and that does not include this claim, as recited at Paragraph 108 of my opening report.

Q.    Okay.  So the opinions you express in Section E of your opening report are -- strike that.

Okay.  Let's go to your supplemental

122

report and turn to Paragraph 103.

A.    I'm there.  Thanks.

Q.    Okay.  So this is Section E of your supplemental report, and it concerns the location phrases, correct?

A.    That's fair, yeah.

Q.    So Section E of your supplemental report reflects your current opinions concerning the construction of the location phrases, correct?

A.    The opinions that I express in the supplemental report are essentially a superset of those that I expressed in the opening report, but it contains my opinions regarding the new proposed construction.

Q.    So in Paragraph 104, you state that:

The location is the starting location for the claimed multi-step operation.

You see that?

A.    I see that.  And it goes on to state:

Where the starting location determines what location to activate.

Q.    Yes.

123

So what does starting location refer to in this sentence?

A.    It refers to the starting location where the representation is provided.

Q.    Well -- so what does the word starting connote, as you're using it here?

A.    I didn't provide a separate construction for the word starting, but essentially, this is the location at which the two-step operation begins.

Q.    Well, you used the term -- you used the word starting, so I'm going to have to assume that you had an understanding of that word within the context of this sentence when you used it.

Okay.  So I'm not asking for a construction of starting.  I just want to know what that word connotes, as you were using it in this sentence.

A.    As I just said in the second part of my previous answer, this is essentially the location at which the multi-step operation begins.

Q.    And what is the action that initiates the multi-step operation, as you

124

understand it?

A.    As I state in Paragraph 106:

Since the representation is for activating a function, and the function is activated by a multi-step operation that begins by touching a location where the representation is provided, a POSITA would have understood that the starting location determines what function to activate.

Q.    Is it your opinion that a POSITA would understand the location phrases to exclude an operation which the glide starts somewhere other than the representation?

ATTORNEY R. O'CONNOR:  Objection: vague.

THE WITNESS:  The multi-step operation is described as having two components: a touch and a glide.  The touch needs to begin at a starting location where the representation is provided.

BY ATTORNEY P. GRAVES:

Q.    So if an object touches down in the touch-sensitive display at a location that is not on the representation of the function,

125

glides into the representation of the function and then glides away, is that within the scope of the location phrases, as you understand it?

ATTORNEY R. O'CONNOR:  Objection: vague.

THE WITNESS:  I haven't considered that hypothetical.

BY ATTORNEY P. GRAVES:

Q.    So you don't have an opinion as to -- as to that scenario?

A.    For that particular hypothetical, I'd want to have time to analyze the full details of the hypothetical and consider it with respect to the claims.

Q.    Would a POSITA understand that the multi-step operation of Claim 1 begins by touching a location where the representation is provided?

A.    That's essentially what I state in Paragraph 106:

Since the representation is for activating a function and the function is activated by a multi-step operation that begins by touching a location where the representation is provided --

126

And so on.

Q.    Do you consider a scenario, in connection with arriving at your opinions, in which a representation is for activating a function, but the ending location of the glide determines what function to activate?

A.    Can you repeat the question, please?

Q.    Did you consider a scenario in which a representation is for activating a function, but the ending location of the glide determines what function to activate?

ATTORNEY R. O'CONNOR:  Objection: vague.

THE WITNESS:  When you say did I consider, do you mean did I consider that for the purposes of this supplemental or opening report?

BY ATTORNEY P. GRAVES:

Q.    Yes.

A.    I don't recall making that consideration.

Q.    For the purpose of arriving at the opinions that you've expressed in your sup- -- supplemental report, did you consider a scenario in which a representation is for activating a

127

function, but the combination of the starting location and ending location of the glide determines what function to activate?

ATTORNEY R. O'CONNOR:  Objection: vague.

THE WITNESS:  I did consider the combination of the starting location and a glide in interpreting the claims and offering opinions in my supplemental report.  In particular, I considered the fact that the location phrases, as we're referring to them, require a starting location where the representation is provided wherein the starting location determines what function to activate.  However --

BY ATTORNEY P. GRAVES:

Q.    My --

A.    -- a glide is necessary.

Q.    -- my question is a little different.

Did you consider a scenario in which a representation is for activating a function -- strike that.

In connection with arriving at

128

the -- the opinions that you express in your supplemental report concerning the location phrases, did you consider a scenario in which a representation is for activating a function, but the combination of the starting location and ending location of the glide determines what function to activate?

ATTORNEY R. O'CONNOR:  Objection: vague.

THE WITNESS:  For purposes of my supplemental report, I don't recall making such a consideration.

BY ATTORNEY P. GRAVES:

Q.    If the glide component of the multi-step operation of Claim 1 must start on a representation and end in a particular area of the display in order to activate the function associated with the representation, would that satisfy your construction of the location phrases?

ATTORNEY R. O'CONNOR:  Objection: vague; scope.

THE WITNESS:  This is a hypothetical that I have not yet considered and did not consider for the

129

purpose of my opening or supplemental reports.

BY ATTORNEY P. GRAVES:

Q.    So let's turn to Page -- the page that's Bates numbered NEONODE317 in Exhibit 4.

A.    You said 317?

Q.    Correct.

Let me know when you're there.

A.    I'm there.  Thanks.

Q.    Okay.  So NEONODE317 shows an earlier version of Claim 1, right?

(Whereupon, the witness reviews the material provided.)

THE WITNESS:  It's an earlier version of a claim that was currently, at that time, Claim 1.

BY ATTORNEY P. GRAVES:

Q.    And this earlier version of -- of Claim 1 includes language reciting that:

Each function of said plurality of functions being mapped to a corresponding location in the touch-sensitive area at which the representation and function is displayed, comma --

And so on.

130

Do you see that?

A.    I see that.

Q.    In connection with arriving at the opinions you express in your supplemental report concerning the location phrases, did you consider the fact that this earlier version of Claim 1 recited this language concerning functions being mapped to a corresponding location?

A.    I don't recall specifically relying on this version of Claim 1 as it was at the time.

Q.    Did you consider it?

A.    I considered the whole of the file history in forming my opinions.  I read the file history carefully.

Q.    Did you consider -- so I'm not asking whether you relied on it.  I'm asking whether you considered this language.  So let me ask the question again.

In connection with arriving at the opinions you express in your supplemental report concerning the -- the location phrases, did you consider the fact that this earlier version of Claim 1 recited this language concerning

131

functions being mapped to a corresponding location?

A.    The difficulty with my response is that the question is directed to the specific construction for the location phrases as well as encapsulating the broad consideration of this component of the file history.

I considered the entirety of the file history in forming my opinions.  That included this particular version of the claims.  I didn't rely on this particular version of the claim in my opinions expressed in Section VIII of my supplemental report.

Q.    In connection with arriving at the opinions that you express in your supplemental report concerning the -- the location phrases, did you consider the impact, if any, of the fact that this earlier version of Claim 1 recited the language concerning functions being mapped to a corresponding location and that subsequently, that language was amended out of the claim?

(The witness reviews the material presented.)

THE WITNESS:  The opinions that I've expressed in my supplemental

132

report regarding the location phrases are set out in Section E.  They make no direct reference to this particular component of the file history at NEONODE317.  But I did consider the entirety of the file history in forming my opinions.

They don't -- this particular extract does not feature as something I specifically relied on.

BY ATTORNEY P. GRAVES:

Q.    Do you recall considering this specific portion of the process -- of the prosecution file in connection with arriving at the opinions you express in your supplemental report?

A.    I don't recall any specific reliance on this particular extract.

Q.    Okay.

ATTORNEY P. GRAVES:  Can we take about a two-minute break?

THE WITNESS:  Sure.

VIDEO TECHNICIAN RAMOS:  We are going off the record.  The time is 4:19 p.m.

133

--oOo--

(A recess was taken at 4:19 p.m. PDT.)

--oOo--

--oOo--

(The proceedings resumed at 4:21 p.m. PDT.)

--oOo--

VIDEO TECHNICIAN RAMOS:  We are back on the record.  The time is 4:21 p.m.

BY ATTORNEY P. GRAVES:

Q.    Okay.  Let's go to Paragraph 112 of your report.

A.    Which report would that be, supplemental or --

Q.    Supplemental, yeah.

A.    I'm there.  Thanks.

ATTORNEY R. O'CONNOR:  Sorry.  Can you say the paragraph number again?

ATTORNEY P. GRAVES:  112.

ATTORNEY R. O'CONNOR:  112.  Thank you.

BY ATTORNEY P. GRAVES:

Q.    Okay.  So you believe that the

134

applicant's September 8th, 2008 remarks support your opinion regarding construction of the location phrases, right?

A.    Yes.

Q.    Okay.  And you point to a table setting forth a partial list of distinctions between the one-stroke drag of Carlson and the location-based touch-and-glide movement of the claimed invention, right?

A.    I see that in the heading of Table 1.

Q.    And that's Table 1 at Paragraph -- at Page 37 of your report, right?

A.    Yes.

Q.    So let's turn to Exhibit 4, which is the prosecution file.  And we're going to go to Page NEONODE339.

Let me know when you're there.

A.    I'm there.  Thanks.

Q.    Okay.  And so this page of the prosecution file is where the table that you excerpted at Page 37 of your report is located, correct?

A.    That's correct.  It's in NEONODE Page 339 of the file history.

135

Q.    And then if we go to Page NEONODE340, in about the middle of the page, there is a paragraph that reads -- well, I'm not going to read it into the record, but you can read it yourself.

Let me know when you're finished.

A.    You mean the paragraph:  In order to clarify these distinctions?

Q.    Correct.

(The witness reviews the material presented.)

THE WITNESS:  I've read the paragraph.

BY ATTORNEY P. GRAVES:

Q.    Did you consider what impact this explanation by the applicant might have on your opinion concerning the construction of the location phrases?

A.    I considered the entirety of the file history, including this paragraph.

Q.    Do you recall considering the impact that this explanation by the applicant might have on your opinion concerning the construction of the location phrases in the course of arriving at your opinion?

136

A.    I don't recall making any specific reliance on this paragraph; however, it seems to support the interpretation that I've taken that, for instance, the starting location determines which of the plurality of functions is activated.

Q.    All right.  Let's turn to Paragraph 53 of your report.

A.    Again, supplemental report, I assume?

Q.    Supplemental, yes.

So unless I refer specifically to your opening or original report, I'm referring to your supplemental report.

A.    Sure.

And I'm at Paragraph 53.  Thanks.

Q.    Now, here you state your opinion that a POSITA would have understood the term representation of a function to mean a graphical element that enables a user to activate a function and also represents the function in a cognizable way.

Do I understand that correctly?

A.    Yes.

Q.    Okay.  As you are using the phrase

137

represents the function in a cognizable way, what does that mean?

A.    I provide several examples of how the representation of function is disclosed as being cognizable to the user.

I also note that the term cognizable is not only my term; it's also a term that Neonode used to -- for purposes in inter partes review proceedings.

Q.    So in order to satisfy this requirement of your construction of representation of a function, does the representation have to represent the function in a way that a user would intuitively understand what function is associated with the representation based solely on the visual depiction of the representation?

ATTORNEY R. O'CONNOR:  Objection: vague; scope.

THE WITNESS:  I didn't provide an opinion regarding intuitiveness of these representations, but there must be some meaning associated with it, which is consistent with Neonode's use of the phrase, when they state that the

138

-- the representation must serve to represent the function in some cognizable way, a graphical element that merely enables a user to activate a function without representation -- without representing that function would not have been considered to be a representation of a function.

BY ATTORNEY P. GRAVES:

Q.    As you are using the term cognizable here, does the representation have to signal the function that will be activated independent of any prior knowledge on the part of the user concerning how to operate the device?

A.    I haven't provided an opinion regarding independence from prior experience.

The representation must be cognizable.  It must communicate some meaning to the user.

Q.    Well, but you're using the term in your construction, so I'm entitled to explore what you mean by this word that you are using.

So my question is:  Does cognizable, as you are using the term, require that the function associated with the representation be

139

communicated to the user independent of any prior knowledge on the part of the user concerning how to operate the device?

ATTORNEY R. O'CONNOR:  Objection: vague; asked and answered.

THE WITNESS:  I'm not sure what you mean by independent of any prior knowledge.

I think it's obvious that in order for something to convey meaning to the user, the user must have had some basis for that communication of meaning.

BY ATTORNEY P. GRAVES:

Q.    So I think my question is not directed to a user with no knowledge.

I'll try the question again.

As you are using the term cognizable, does that term require that the function associated with the representation be communicated to the user independent of any prior knowledge on the part of the user concerning how to operate the device?

ATTORNEY R. O'CONNOR:  Objection: vague; scope.

140

THE WITNESS:  The question refers to any prior knowledge, and I think my previous answer was directed to the fact that users need to have some prior knowledge in order to be able to interpret, essentially, anything.

BY ATTORNEY P. GRAVES:

Q.    Okay.  So prior knowledge of what?

A.    Prior knowledge that is related to the meaning that makes the representation of a function cognizable.

Q.    Okay.  So -- so My question is: directed to prior knowledge -- not in general -- prior knowledge that the sun rises in the East and sets in the West, right?

My question is directed to prior knowledge concerning how to operate the device.

Do you understand?

So I'll try the question again.

As you're using the term cognizable in your report, does that term require that the function associated with the representation be communicated to the user independent of any prior knowledge on the part of the user concerning how to operate the device?

141

ATTORNEY R. O'CONNOR:  Objection: vague; scope; asked and answered.

THE WITNESS:  The question is extremely vague because it includes prior knowledge of the user, whether the user has knowledge of a certain device or not and is directed to what makes a particular representation cognizable or not.

I'll give you a concrete example from the specification of the '879 patent that provides one example of several of why a representation in this case is cognizable.

The plus item inside the menu area, on the left-hand side of the menu area -- a person of skill in the art would understand that a user has knowledge, prior knowledge, associated with plus symbols.

Plus symbols are cognizable as something that represents addition or extra, additional, and so on; that is, that makes the representation of a function through the presentation of a

142

plus symbol cognizable as being related to addition or additional things.  Without any prior knowledge of the device, that symbol is cognizable.

BY ATTORNEY P. GRAVES:

Q.    So in your opinion, what is the information that is communicated to the user by the plus symbol that is referenced in the '879 patent?

A.    The details of that particular example are presented in Paragraph 57 of my supplemental report --

Q.    Now --

A.    -- I'm happy to summarize that, if you wish.

Q.    That's okay.

Are there other meanings that the plus symbol could convey to a user of a handheld computer device as described in the '879 patent other than the specific functions that are referenced in Paragraph 57 of your report?

A.    Can you repeat the question, please?

Q.    Are there other meanings that the plus symbol could convey to a user of a handheld

143

computer device as described in the '879 patent other than the specific functions that are referenced in Paragraph 57 of your report?

A.    In contexts other than the '879 patent, there would be other potential meanings associated with a plus symbol.

Q.    In the context of a handheld mobile device and the display of a handheld mobile device, what are some of those other potential meanings?

A.    I'll give you a couple of examples. These are not in my report, but dependent on context, a couple of examples would be, for instance, if a mobile device is running a calculator application, a plus symbol -- that's any plus symbol -- might be associated with the function of addition.

In the context of a mobile device that's providing an application that has a list of countries, a plus symbol might be associated with a country, such as Switzerland.

These are entirely different contexts from the '879 patent.

Q.    So why do you believe that the examples that you just provided are in entirely

144

different contexts than the one provided in the '879 patent?

A.    Well, for example, the '879 patent is displaying a menu area that has the representation of three functions, where those three representations are a plus symbol, a symbol that looks like a keyboard and a symbol that looks like a folder.  And those three symbols are directed to functions associated with additional stuff for the plus symbol, a keyboard for the symbol that looks like a keyboard, and a folder function for the symbol that looks like a folder.

These are clear depictions that are cognizable to a user.

Q.    Is it your opinion that a user reviewing the touch-sensitive area of a mobile device incorporating the teaching of the '879 patent, who had never used a phone before and had not read an owner's manual, would understand just based on the visual presentation of the plus symbol what functions were associated with that representation?

ATTORNEY R. O'CONNOR:  Objection: vague.

145

THE WITNESS:  The question referred to functions.  I wonder if you meant function.

BY ATTORNEY P. GRAVES:

Q.    Well, will that make it easier for you to answer the question?

A.    Yes.

Q.    Is it your opinion that a user reviewing the -- strike that.

Is it your opinion that a user viewing the touch-sensitive area of a mobile device incorporating the teaching of the '879 patent, who had never used a phone -- the -- that phone before and had not read an owner's manual for the phone, would understand just based on the visual presentation of the plus symbol what function was associated with that representation?

ATTORNEY R. O'CONNOR:  Objection: vague.

THE WITNESS:  I think a user looking at a representation such as that provided by Figure 3 of the '879 patent and looking at the plus symbol that's denoted Item 21 would

146

have a reasonable interpretation of that graphic as being associated with additional things.

BY ATTORNEY P. GRAVES:

Q.    What additional things?

A.    Additional things -- on the assumption that they have never encountered this device before, which I think your question was directed to, in that case, the user would have a cognizable impression of the plus symbol that is -- that is associated with additional things.

Once the user has gained experience, they would know exactly what additional things. Either way, the plus symbol is cognizable.

Q.    In the area that I posited, would the user have an understanding of what specific additional things were associated with that representation?

ATTORNEY R. O'CONNOR:  Objection: vague.

THE WITNESS:  As I just stated, in the case that the user has some experience with the device, they would know exactly what items are associated with the function depicted by the plus

147

symbol of, say, Figure 3 of the '879 patent.

BY ATTORNEY P. GRAVES:

Q.    But my question was directed to a user with no such experience.  So I'll ask the question again.

Would a user viewing the touch-sensitive area of a mobile device incorporating the teaching of the '879 patent who had never used that mobile device before and had not read an owner's manual for the mobile device understand, just based on the visual presentation of the plus symbol, what additional things were associated with that representation?

ATTORNEY R. O'CONNOR:  Objection: vague.

THE WITNESS:  On the assumption that the user has no prior experience, no prior knowledge of this particular device, the user seeing the cognizable representation of a plus symbol, such as Item 21 of Figure 3, the user with no prior experience would have an idea due to its cognizable -- cognizable representation that the plus symbol

148

would be associated with additional things.

BY ATTORNEY P. GRAVES:

Q.    But the user in this scenario that I posited would not know what those additional things were, correct?

A.    In this specific scenario, the user may not know precisely what additional things are associated with the plus symbol, but the plus symbol would be still cognizable as being associated with additional things.

Q.    Now, what is your opinion that the plus symbol would be associated with additional things based on?

A.    This again goes to the details that I provide at Paragraph 57 of my supplemental report.

Q.    Okay.  So your opinion that the plus symbol would be understood by a user to be associated with additional things is based in part on the teaching of the specification that you outline at Paragraph 57 of your supplemental report?

A.    In part, it's based on that.  It's also based on, for instance, Neonode's use of

149

exactly the same term, cognizable, for the elements associated with the representation of a function.

Q. Now, in connection with arriving at your opinion concerning the representation of a function phrase, did you review any surveys of mobile device users concerning icon design or understanding of icons?

A. I didn't need to conduct any such review because the teachings of human-computer interaction, the field that this patent would be within, comprehensively analyzes and reviews and understands the importance of what's called affordances, or the ways in which elements of user interfaces communicate the associated functions to users, there's a broad and extensive set of teachings that is exceptionally well known by persons of skill in the art regarding the cognizable impressions that are provided by graphical and other elements.

Q. And in the course of arriving at your opinion concerning representation of a function, did you conduct any research concerning how users understand symbols in user interfaces on mobile devices?

150

A. I have conducted research on how users understand symbols and other representations in user interfaces. I didn't do any specific research for this particular matter. These are extremely well-known components of the field of human-computer interaction.

Q. Let's take a look at Paragraph 58. Now, you say here that Representation 22 signals to a POSITA in a cognizable way that when its function is activated, the user interface will display a keyboard.

Do I understand that correctly?

A. Yes, that's what -- more or less what Paragraph 58 says.

Q. Okay. Are there any other meanings that a user of a handheld device might associate with a grid of dots similar to that depicted by Representation 22?

ATTORNEY R. O'CONNOR: Objection: vague.

THE WITNESS: Can you repeat the question, please?

151

BY ATTORNEY P. GRAVES:

Q. Are there any other meanings, other than what you referenced in Paragraph 58 of your supplemental report, that a user of a handheld device might associate with a grid of dots similar to that depicted by Representation 22?

ATTORNEY R. O'CONNOR: Same objection.

THE WITNESS: I think that depends on context.

With respect to the '879 patent, the set of dots provided by function -- by representation of a function, Item 22 in Figure 5, that shows a 3x4 grid of dots that exactly maps to the 3x4 arrangement of a -- a ISO standard keyboard. So the representation provided by 22 looks like an ISO standard keyboard.

This is on a mobile device that commonly had, at 2002, an ISO standard keyboard on board. So the predominant cognizable meaning associated with the Item 22 would be an ISO standard keyboard, particularly around 2002.

152

Whether there are other contexts in which a field of 3x4 white dots in an icon might represent other meanings, I haven't analyzed that.

BY ATTORNEY P. GRAVES:

Q. Turn to Paragraph 59.

A. I'm there. Thanks.

Q. So what does Representation 23 depict?

I'm sorry. Let's -- Paragraph 60.

You say that Representation 23 is a picture of a folder.

Do I understand that correctly?

A. Yes.

Q. Would a user of a mobile device presenting a display as taught by the '879 patent understand Representation 23 to represent a library of applications?

ATTORNEY R. O'CONNOR: Objection: vague.

THE WITNESS: In the case that the user has previously interacted with Item 23, which represents a folder, and seeing that that representation of a folder opens a set of applications, the

153

user would understand the meaning associated with Item 23 was to open a set of applications.

In the case that the user has interacted with Item 23 and it is -- opened a set of files, the user would understand the Representation 23 allows access to a set of files.

In the case that the user has had no prior experience with Item 23, Item 23 would represent in a cognizable way that there is information associated with the -- the function from Item 23 where that information could be, for instance, files.

Q. Or the information could be something other than files, correct?

A. I think that's reasonable. The information could be, for example, a listing of applications that are contained within a folder.

Q. But without having interacted with Item 23, the user would not know what specific type or category of information would be accessible by activating the function associated

154

with Representation 23, correct?

ATTORNEY R. O'CONNOR: Objection: vague.

THE WITNESS: I think a user with no prior experience, looking at Item 23, would find that Item 23 represents in a cognizable way the fact that information contained within a folder will be presented to the user.

Whether that information would be a set of applications which are commonly housed within a folder or a set of files independent from applications within the folder, the user may not know initially, but it is still representing in a cognizable way that information within a folder will be presented to the user.

BY ATTORNEY P. GRAVES:

Q. All right. Go to Paragraph 64.

A. I'm there. Thanks.

Q. All right. You state in the first sentence of Paragraph 64 that a POSITA reviewing the specification would understand that a representation of a function does not comprise

155

only a visual element but also the underlying mechanisms enabling activation of a function.

Do I understand that correctly?

A. I think you read it more or less correctly.

Q. What underlying mechanisms are you referring to here?

A. I go on to characterize that in Paragraph 65, for example, event listeners. A person of skill in the art would understand that event listeners are used in order to activate functions associated with representations.

Q. What is an event listener?

A. Well, event listeners can be used. Sorry.

Q. Yeah.

Is an event listener an -- an application?

A. An event listener is a mechanism that people of skill in the art use to implement user interfaces. When the user carries out a particular type of interaction or gesture associated with a graphical element in a user interface, event listeners are attached to those representations in order to listen for and

156

respond to user interactions or particular forms. It's a programming mechanism.

Q. Are there other mechanisms enabling activation of a function, as you are using the term in Paragraph 64, in addition to event listeners?

A. There are other ways of programming graphical user interfaces beyond event listeners, but the technology is equivalent to the use of event listeners.

At 2002, or thereabouts, event listeners would be the predominant way of programming graphical user interfaces in order to respond to a user event on representations.

Q. So do the mechanisms enabling activation of a function that you are referring to in Paragraphs 64 and 65 include software?

A. Event listeners, for example, are part of software.

Q. And do the mechanisms enabling activation of a function, as you're using the term in Paragraphs 64 and 65, include hardware?

A. Hardware is necessary to detect events, such as interactions on a touchscreen, in order to communicate to the software that

157

events have occurred on the representations.

Q. So does a POSITA understand that a representation of a function, as used in Claim 1 of the '879 patent, include the hardware and software for accepting user input and activating the associated function?

A. As I say at Paragraph 64:

A POSITA reviewing the specification would understand that a representation of a function does not comprise only a visual el- -- element, but also the underlying mechanisms enabling activation of a function.

And those underlying mechanisms include the capacity or capability of a touchscreen and the machinery, such as event listeners, that detect the interaction with a representation and responds to it in activating a function.

Q. Now let's turn to Paragraph 66 of your report.

A. I'm there. Thanks.

Q. And here, you quote some language from one of the briefs filed by Neonode Smartphone in one of the

158

inter partes reviews that was filed against the '879 patent, right?

A. I believe that's correct. I'm not certain that Neonode was Neonode Smartphone at that time. It could have been a -- a preceding name for the company, but I -- I've just referred to it as Neonode.

Q. Now, what was the context in which this snippet that you have quoted in Paragraph 66 of your report was -- was made in that IPR proceeding?

A. As I say in the second sentence of Paragraph 66:

In distinguishing prior art in Neonode's preliminary response, Neonode stated --

And then I go on to the quotes.

Q. What was the prior art that Neonode was distinguishing in its preliminary response in connection with the language that you quoted?

A. I don't recall at this point. I'd need to go check the document.

Q. Did you review that piece of prior art?

A. I reviewed the file history. I may

159

have reviewed the prior art.

As I say, I don't recall exactly which element of prior art it was at this -- at this moment.

Q. Okay. So you don't recall whether you reviewed the prior art that was being addressed by the quoted language in Paragraph 66 of your report, correct?

A. In Paragraph 66, my purpose is to show that Neonode used the phrase cognizable way in order to characterize properties of the representation.

I don't recall exactly what prior art this was used by Neonode in purpose against, but that doesn't change my opinions regarding Neonode's use of cognizable in order to characterize properties of the representation of a function.

Q. Okay. So this is really just a yes-or-no question.

Do you recall whether you reviewed the prior art that was being addressed by the quoted language in Paragraph 66 of your report?

A. I think I've already answered that.

I don't recall at this moment

160

exactly what element of prior art was being addressed here with Neonode's statements regarding cognizable properties at the representation of a function.

Q. So I'm not asking whether you reviewed what prior art was being addressed; I'm asking whether you recall reviewing that prior art.

So I'll ask the question again.

Do you recall whether you reviewed the prior art that was being addressed by the quoted language in Paragraph 66 of your report?

A. I can't say one way or the other. I don't recall.

Q. Okay. Did you consider the actual icons used in the menu area of the Neonode N2 device in the course of arriving at your opinions concerning the construction of representation of a function?

A. Paragraph 38 lists my Materials Considered, and it does not include a Neonode N2 device. And I don't recall inspecting a Neonode N2 device for this purpose.

ATTORNEY P. GRAVES: All right. Let's take a 10-minute break. I'm

161

pretty close to being finished.

THE WITNESS: Sure.

VIDEO TECHNICIAN RAMOS: Cindy, are -- are you okay? Good.

ATTORNEY P. GRAVES: Let's go off the record.

VIDEO TECHNICIAN RAMOS: Okay.

THE WITNESS: I appreciate it.

VIDEO TECHNICIAN RAMOS: Okay. We are going off the record. The time is 5:08.

--oOo--

(A recess was taken at 5:08 p.m. PDT.)

--oOo--

--oOo--

(The proceedings resumed at 5:20 p.m. PDT.)

--oOo--

VIDEO TECHNICIAN RAMOS: We are going back on the record. The time is 5:20 p.m.

--oOo--

(Cockburn Deposition Exhibit Number 6, Image, marked for identification

162

for purposes of the record.)

--oOo--

BY ATTORNEY P. GRAVES:

Q. So I dropped Exhibit 7 [sic] into the Chat.

Do you see that in front of you?

A. I've just downloaded it, and I have it open.

ATTORNEY R. O'CONNOR: Was there an Exhibit 6?

ATTORNEY P. GRAVES: You know what? You're right.

So this will be Exhibit 6.

BY ATTORNEY P. GRAVES:

Q. All right. Sir, does the icon that is depicted in Exhibit 6 represent a function in a cognizable way?

ATTORNEY R. O'CONNOR: Objection: vague; scope.

(Whereupon, the witness reviews the material provided.)

THE WITNESS: I haven't provided an opinion on whether this icon is cognizable or not.

To me, it communicates some

163

meaning.

BY ATTORNEY P. GRAVES:

Q. What does it -- what meaning does it communicate to you?

A. I've seen this icon in reference to Neonode in the past.

Q. Okay. And is that the reason why this icon communicates some meaning to you?

A. Because I have some prior knowledge associated with this particular icon, it has some cognizable meaning to me.

Q. So as you were using the term -- or the phrase represents the function in a cognizable way, does that encompass a scenario in which the graphical element communicates a meaning to a user, in part, because the user has previous experience in interacting with the representation?

ATTORNEY R. O'CONNOR: Objection: vague; scope.

THE WITNESS: It depends what you mean by interacting with. The user would need to have had some basis on which to form the cognitions associated with the representation.

164

In the example you just gave me, I have some prior experience with Neonode's icons. And therefore, that icon has some cognizable properties for me.

Similarly, a person who has had some experience with a plus symbol would have a basis upon which to form a cognizable impression of a representation that uses a plus symbol.

ATTORNEY P. GRAVES: No further questions.

ATTORNEY R. O'CONNOR: Can we go off the record for five minutes? I just want to check my notes.

ATTORNEY P. GRAVES: Sure.

CERTIFIED STENOGRAPHER: We have to go off the record, Mr. Videographer.

VIDEO TECHNICIAN RAMOS: I'm sorry?

CERTIFIED STENOGRAPHER: We have to go off the record. We're taking a break.

VIDEO TECHNICIAN RAMOS: Okay.

165

Stand by.

We're going off the record.  The time is 5:25 p.m.

--oOo--

(A recess was taken at 5:25 p.m. PDT.)

--oOo--

--oOo--

(The proceedings resumed at 5:29 p.m. PDT.)

--oOo--

VIDEO TECHNICIAN RAMOS:  We are back on the record.  The time is 5:29 p.m.

ATTORNEY R. O'CONNOR:  All right. I have no further questions.

Thank you, Dr. Cockburn, for your time today.

Thank you, Philip, for being efficient.

And, Cindy, thank you very much for your patience.

ATTORNEY P. GRAVES:  Certainly.

And thank you, Dr. Cockburn.  We appreciate your -- your time today.

166

THE WITNESS:  Thank you.

ATTORNEY R. O'CONNOR:  We can go off -- we can go off the record.

VIDEO TECHNICIAN RAMOS:  The time is 5:30.  We are going off the record.

(Witness excused.)

(Deposition concluded at 5:30 p.m. PDT.)

* * *

167

CERTIFICATE

I, Cindy L. Sebo, Nationally Certified Court Reporter herein, do hereby certify the foregoing deposition of ANDREW JEREMY GAVIN COCKBURN, PH.D. was taken before me pursuant to notice at the time and place indicated; that said witness duly swore to tell the truth, the whole truth and nothing but the truth under penalties of perjury; that said testimony of witness was correctly recorded to the best of my abilities in machine shorthand, thereafter transcribed under my supervision with computer-aided transcription; that deposition is a true and accurate record of the testimony given by the witness; that I am neither counsel, nor kin to any party in said action, nor interested in the outcome; that a copy of this transcript obtained from a source other than the court reporting firm, including an adversary or cocounsel in the matter, is uncertified and may not be used or circulated at trial.

CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460, NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime Court Reporter, NY Association Certified Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778, WA CSR 23005926, Notary Public

168

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

169

E R R A T A  S H E E T

CAPTION:  Neonode Smartphone v. Apple Inc.
ANDREW JEREMY GAVIN COCKBURN, PH.D.    2026-1016638
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:
_____
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:
_____
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:
_____
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:
_____

---

171

ACKNOWLEDGMENT OF WITNESS

    I, ANDREW JEREMY GAVIN COCKBURN, PH.D., do
hereby certify that I have read the foregoing pages
herein, and that the same is a correct transcription
of the answers given by me of the proceedings taken
remotely to the questions therein propounded under
penalty of perjury, except for the corrections or
changes in form or substance, if any, noted in the
attached errata sheet.




_____        _____
DATE                    SIGNATURE




Subscribed and sworn to before me
  this _____ day of_____, 20____.

    My Commission expires:

_____

_____

    Notary Public

---

170

E R R A T A  S H E E T

CAPTION:  Neonode Smartphone v. Apple Inc.
ANDREW JEREMY GAVIN COCKBURN, PH.D.    2026-1016638
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:
_____
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:
_____
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:
_____
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____

PAGE_____ LINE_____ CHANGE _____

REASON FOR CHANGE:
_____
PAGE_____ LINE_____ CHANGE _____
REASON FOR CHANGE:
_____

---

**-**

---

**--ooo--** 11:7,15 12:1,3 14:1,8,9,16, 17,22,23 15:6 27:9,18 64:25 65:3,4,7 116:21,24 117:2,5,6,13,18,20 133:1, 4,5,8 161:12,15,16,19,23 162:2 165:4,7,8,11

---

**1**

---

**1** 14:3 15:8 30:1,7,23 31:13 32:6 33:3 36:9,21 37:2 38:5 39:14,18,23,24 40:21 41:25 42:13,16,18,24 43:1,10, 23 44:14,16,23 45:7,15 46:9,16,23 47:6,9,13,16,21,23 48:19 49:3,5,6 50:3 58:22 69:1 93:18 94:6 103:18, 22,25 104:9,19,25 105:16,17 106:10 114:20 115:2,7 117:23 120:12,15 121:1,13 125:16 128:15 129:11,16,19 130:7,11,25 131:18 134:11,12 157:3

**10** 12:8 68:19,24 116:11

**10-minute** 160:25

**102** 117:22 118:2,3 119:1

**103** 119:5,7,21 122:1

**104** 122:16

**106** 124:2 125:20

**108** 120:10,13 121:2,21

**109** 120:11

**112** 133:13,21,22

**116** 23:6

**117** 30:21

**118** 23:17 24:1 31:19

**12** 69:16,19,21 70:4 72:16,24,25 73:22 76:3,5,11,14,16

**121** 34:20

**124** 36:3

**126** 41:21 42:9 44:8 46:25 47:8,17,24 49:2

**127** 42:9 49:22 50:11 51:11

**128** 46:15 47:1

**12:09** 9:5,8

**13** 74:5,12

**130** 54:16 55:11 56:16,23 57:4

**131** 56:5,24 57:5,12 59:11 60:23

**134** 24:8,16 25:7 28:20 29:15

**135** 23:7

**139** 63:14 65:12,17 66:4,16 67:10

**14** 74:6 92:5 101:16 102:18

**140** 68:4

**146** 77:3,24

**15** 74:6

**16th** 15:13

**19** 9:5

**1996** 111:18

**1998** 112:23

**1999** 111:14

**19th** 9:8

**1:39** 64:24 65:1

**1:49** 65:5,9

---

**2**

---

**2** 14:11 15:11 18:8 22:8 30:3,10 32:3, 12,24 33:2,8,21 34:5,19 65:10 69:2

**20** 16:20,21

**2000** 112:6,17

**2002** 61:4 78:7,22 107:14 108:6,21 109:16,24 110:15 111:3 112:3,8,10, 11,13,14 113:13 151:21,25 156:11

**2003** 110:2,18 111:6,16

**2004** 111:22

**2008** 104:8 106:8 134:1

**2026** 9:5,8 15:10,13

**21** 145:25 147:22

**22** 150:10,20 151:6,14,18,24

**23** 152:8,11,17,23 153:2,5,7,10,11,14, 23 154:1,6

**24th** 15:10

**25** 116:11

**26** 113:6

**27** 107:12

**29** 113:6

---

**3**

---

**3** 14:19 15:14 30:5 70:16,21 71:12 72:10,18 90:5 92:4,5,20 101:16 102:18 117:17 145:23 147:1,22

**30** 107:12

**317** 129:6

**33** 115:9

**339** 134:25

**34** 118:20

**36** 18:9 19:15 20:3,5,15,16,23 21:1, 17,23,25 22:3

**37** 134:13,22

**38** 22:7 90:10 160:20

**3:15** 116:20,23

**3:52** 117:3,16

**3x4** 151:14,16 152:2

---

**4**

---

**4** 14:25 15:17 16:5 44:7,10 129:5 134:15

**41** 41:25 42:1 44:9

**42** 90:10

**43** 57:10

**45** 64:15

**4:19** 132:25 133:2

**4:21** 133:6,11

---

**5**

---

**5** 27:4,11,20 28:14 29:4,7 32:24 33:9, 21 34:6 92:5,12,20 93:5 101:15 102:17 151:14

**53** 136:8,16

**57** 142:12,22 143:3 148:16,22

**58** 150:8,16 151:3

**59** 70:21 72:10,18 152:6

**5:08** 161:11,13

**5:20** 161:17,22

**5:25** 165:3,5

**5:29** 165:9,14

**5:30** 166:5,8

---

**6**

**6** 90:8,10 92:6,11,16,19 161:25 162:10,13,16

**6-** 86:10

**60** 152:10

**600** 13:7

**61** 70:21 72:10,19

**64** 154:20,23 156:5,17,22 157:7

**65** 155:9 156:17,22

**66** 157:20 158:10,13 159:7,9,23 160:12

**69** 84:21 85:15,24 86:11 87:20 88:15, 21

---

**7**

**7** 101:22 162:4

**70** 79:20 80:4 81:4,19 82:5 84:13 87:24 88:22

**76** 91:20

---

**8**

**8** 12:8

**8,095,879** 14:19 15:1,16

**83** 103:14,19

**84** 103:15 104:20 105:22

**85** 107:11 109:25 110:2,9 111:8 113:8

**879** 16:1,6 20:7 22:6 24:23 31:14,21 32:8,22 34:13 41:10 60:17 61:17 65:22 66:6,18 67:12 69:9,19 70:17 72:13 76:4,12 94:7,16 95:1,5,9,14,15, 18,23 96:9,22 97:1,10,16,22 98:5,18 99:13 100:6 101:1,6 141:12 142:10, 20 143:1,5,23 144:2,3,19 145:13,24 147:2,9 151:11 152:17 157:4 158:2

**88** 114:9

**89** 113:18

**8th** 134:1

---

**9**

**94** 114:13,22

**95** 114:13

---

**A**

**ability** 12:14,19 18:3

**absence** 106:17

**Absent** 11:2

**absolute** 76:6,8

**abstract** 35:3

**accepting** 157:5

**access** 98:15 99:15,25 100:9 101:12 153:8

**accessed** 74:19

**accessible** 153:25

**accommodate** 17:19

**accompanying** 90:21 106:17 107:4

**accurate** 10:25 32:11 106:11

**accurately** 12:15,19

**act** 40:2

**action** 41:17 65:23 66:2,6,10,18,21, 23 67:7,18 75:8,10,14,17,21,22 123:24

**action-up** 54:7

**actions** 75:2 97:2

**activate** 41:13 71:10 122:24 124:9 126:6,11 127:3,16 128:7,17 136:20 138:4 155:11

**activated** 34:23 35:5,13,14,22,24 36:5,17 39:1 42:18 45:21 50:4,7 59:19 124:5 125:23 136:6 138:12 150:12

**activates** 54:20,22 55:13,14,17,22 56:2,8,18,19

**activating** 37:14 38:18,22 39:9,16, 20,25 41:18 120:2 124:4 125:22 126:4,9,25 127:23 128:4 153:25 157:5,18

**activation** 36:10,22 37:6 38:9 39:7 40:8,9,15 41:1,4,11 43:23 45:8,16 49:24 50:12,17 51:1,13,16 55:5 56:13

57:14 58:7,11,17 59:1,6,13,24 155:2 156:4,16,21 157:13

**active** 69:22 70:24 71:10,18,25 73:1

**activities** 97:17

**actual** 71:6 160:15

**adapted** 70:24 71:7

**added** 71:4

**addition** 41:12 95:7 141:22 142:2 143:17 156:5

**additional** 23:23 29:17 36:22,24 37:1 58:16 97:2,17 141:23 142:2 144:10 146:3,5,6,11,13,17 147:13 148:1,5,8,11,13,20

**addressed** 159:7,22 160:2,6,11

**addresses** 119:17

**addressing** 33:19 34:3 83:17 88:23 102:2

**adjacent** 58:25

**administer** 11:5

**administered** 10:11 11:12

**administering** 10:6

**administration** 11:3

**adopt** 80:9

**advance** 74:23

**advanced** 69:24 70:12 73:1

**advancing** 71:17,23

**affect** 12:18

**affirm** 10:3

**affirmed** 11:9 117:9

**affordances** 149:14

**aforedescribed** 90:17

**agree** 28:11 42:25 68:8

**ahead** 18:20 23:15

**allegedly** 67:21

**allowed** 83:1 90:1

**ambiguous** 77:16

**ambivalent** 106:20

**amended** 46:9,23 104:5,11 131:21

**amendment** 104:8 106:9 107:2,8 115:12,13,19

**amendments** 104:21 115:3

**American** 27:11 28:15 29:3,6 30:19 31:11 32:14

**amplified** 77:14

**analysis** 40:25 49:18 59:2,3 72:2 109:20 120:19

**analyze** 125:12

**analyzed** 152:4

**analyzes** 149:12

**analyzing** 34:11

**Andrew** 9:10 11:8 14:4,12 117:7

**Andy** 64:10

**answering** 21:9 85:22

**answers** 95:8

**APL-NEO_00935930** 27:6,14

**APL-NEO_00935932** 27:15

**Apologies** 99:6

**apologize** 45:13

**app** 74:19,20,25

**apparent** 77:13 78:9 79:10

**Apple** 9:12,25 12:25 13:14,17 37:22 86:11 108:18 111:17 119:13 121:19

**Apple's** 80:1,6,9,14 81:10 82:7,25 83:6,10 84:4,17 85:10 86:16,21 87:2 88:3,7,12,25 113:14,17 114:3,6 118:6 119:4,9

**applicable** 10:19,24

**applicant** 16:15 38:20 48:4 55:16 56:1,7 57:12 62:4 66:9 106:15,24 135:16,22

**applicant's** 50:16 54:19 56:25 62:7 67:14 104:21 106:25 134:1

**application** 16:16 69:22 70:10,25 71:1,10,11,16,18,23,25 73:1 74:17 77:13 78:1,9,10 79:10,15 93:7,10,15, 25 94:9,11,13,18,21 95:2,11,25 96:8, 21 97:11,15 98:6,12,16,19,22 99:15, 25 100:9,23 101:9,13 143:15,19 155:18

**applications** 71:8 72:23 73:4 93:19 97:4,5 152:18,25 153:3,21 154:11,14

**applied** 73:7

**applies** 10:20 73:3

**apply** 76:10,20 77:1

**arbitrary** 68:16

**area** 34:24 35:6,8 42:21,22 43:6,12, 19,20 46:8 71:1,12 83:18,24 84:3,16, 23,24,25 85:2,9 86:12,13,14,24,25 87:17 91:25 94:10 96:13,23 97:7 98:11,15 99:24 101:7,12,17,20,23 102:1,10,11,20 103:23 104:3,6,7,14 105:1,2,18 107:17,24,25 108:7,8 109:6 110:3,4,5 120:6 128:16 129:22 141:16,17 144:4,17 145:11 146:15 147:8 160:16

**areas** 108:23 109:18

**arrangement** 151:16

**arriving** 30:11 32:15 35:14,24 61:16 62:14,19 63:6 72:11 77:8,20 86:7 87:5 88:8,15 91:4,9,15,18 101:16 102:18 103:2 113:1 126:3,22 127:25 130:3,21 131:14 132:14 135:25 149:4,21 160:17

**art** 19:17,19,22 20:18,21 21:4,6,12, 16,23 22:5,14 25:14 30:25 48:7 51:25 52:3 54:5 59:14 60:25 61:8,18,22 66:22 67:24 76:9 79:17 98:14 99:23 100:4,7 101:11 104:23 105:3,25 106:19 107:5,14 109:3,24 110:23 111:1,3,7 112:10,13,20 113:13 141:18 149:18 155:10,20 158:14,18, 24 159:1,3,6,14,22 160:1,6,8,11

**art's** 48:9,16 60:7 88:24 111:9

**articulation** 23:22

**asserted** 66:9 67:7 76:23

**assertion** 66:1

**associate** 150:18 151:5

**assume** 68:20 123:13 136:10

**assumption** 85:15 86:21 146:7 147:17

**atoms** 26:8,22 33:16,17,18,23 34:7, 15

**attached** 155:24

**attempt** 48:5

**attorney** 9:16,17,21,23 11:22 12:4 15:7 17:23,25 18:2 21:7 24:14 25:18, 22 26:12,16 27:3,7,19,23 28:3,11,13 29:24 32:10 33:24 34:1,8,17 35:20 37:9,17 38:11 39:13 40:4,13,22 41:8 45:5 46:2,12,20 47:25 48:24 49:7,21 52:14,18 53:2,6,20,25 54:15 56:21

57:6 58:13,15,18,23 60:3,13 61:5,12 63:22 64:3,7,9,13,16,17 65:11 69:3, 15 75:18 76:1 78:23 79:3,5,19 82:16, 21,22 83:11,15 84:5,10,18 85:6,12,21 87:8,11 88:5,17 89:4,9,11,13,15,19, 25 90:4 92:14 93:2,12,21 94:1,5 99:1, 5,9,11 100:17 103:13 105:19 106:6 108:11,16 116:6,7,13,15 117:21,25 118:2,3,5,16,17 124:14,22 125:4,8 126:12,18 127:4,17 128:8,13,21 129:3,17 132:11,20 133:12,19,21,22, 24 135:14 137:18 138:9 139:4,14,24 140:7 141:1 142:6 144:24 145:4,19 146:4,19 147:3,15 148:3 150:21 151:1,7 152:5,19 154:2,19 160:24 161:5 162:3,9,11,14,18 163:2,19 164:12,14,17 165:15,23 166:2

**audio** 10:13

**audiovisual** 10:12

**authoritative** 10:25

**awarded** 16:17

**aware** 24:19 25:10 62:4 63:3 108:10 110:23 111:1

---

**B**

**back** 65:9 70:12 74:23 78:16 92:3,18 105:13 116:11 117:15 133:10 161:21 165:13

**backed** 69:24

**backing** 71:17,24

**base** 22:25 23:2 53:23

**based** 20:5 21:23 48:6 52:16 105:6 114:9 137:16 144:21 145:16 147:12 148:14,20,24,25

**bases** 24:19,20

**basically** 107:3

**basing** 20:1,11,19 21:13,14

**basis** 22:3 107:1 139:12 163:23 164:8

**Bates** 15:1 27:6,13 129:5

**bear** 104:19

**bearing** 120:16 121:3,13

**began** 100:10

**begin** 124:19

**begins** 29:12 30:2 65:10 87:24

117:16 123:10,23 124:6 125:16,24

**behalf** 9:14,25 12:25

**believed** 121:12

**bit** 35:9 115:22

**blank** 19:9

**board** 151:22

**bottom** 44:17 55:10 57:11 75:6 114:22

**bought** 74:5

**boundaries** 67:7,24 68:17 69:13 70:15 73:19,23 76:18 79:18

**box** 118:19

**boxes** 73:17,18,19

**break** 17:2,4,8,10,17 28:9,12 63:19, 23 64:4 96:16 116:4 132:21 160:25 164:24

**Brian** 89:5

**briefs** 157:24

**broad** 61:19 109:20 131:6 149:16

**broadening** 58:21

**broadly** 16:12 111:8

**brutally** 119:24

### C

**calculator** 143:15

**California** 90:1

**call** 52:10

**called** 149:13

**camera** 11:19 74:16,20

**capability** 157:15

**capacity** 157:15

**captured** 82:11 103:9

**carefully** 49:19 130:16

**Carlson** 134:7

**carries** 155:21

**case** 13:6,14 15:9,15 18:15 19:10 62:2 71:16,23 94:24 108:4,19 111:13, 15,17 114:24 141:14 146:9,22 152:21 153:4,9

**category** 153:24

**caught** 84:8

**caution** 63:23

**ceases** 53:14

**cell** 58:25

**certification** 10:20

**certified** 10:5,9,17 11:10,16 27:25 64:20 82:9,13,18 98:24 99:3,7 100:15 103:7,11 116:16 117:10 118:14 164:18,22

**change** 61:25 68:24 105:24 106:15 159:15

**changed** 106:21 107:3 119:14,15 120:8,9 121:5,11

**changing** 63:19

**characterization** 67:19

**characterize** 19:20 20:8 36:25 55:24 75:21 77:22 155:8 159:11,17

**characterized** 38:21 67:16

**characterizing** 66:12

**chart** 73:20

**charts** 73:11,14,15

**Chat** 27:4 28:6 162:5

**check** 158:22 164:16

**Cindy** 10:8 161:3 165:21

**cite** 24:16 25:7 35:4 44:8 47:7 68:5 103:5

**cited** 28:19,20 30:20 31:12 46:22

**claim** 14:4,13 23:20 30:23 31:13 36:9,21 37:2,21,23 38:2,5 39:14,18, 23,24 40:21 41:25 42:12,13,16,18,24 43:1,10,23 44:1,2,5,14,15,16,23 45:7, 11,15,19 46:4,9,16,23 47:6,9,13,16, 21,23 48:10,19,22 49:3,5,6 50:3 58:22 61:24 69:16,19,21 70:4,6 72:16,24,25 73:22 76:3,5,10,11,14,16 77:14 78:1,3,10,11 79:11,12,15,18 85:20 93:18 94:6 103:18,22,25 104:9, 15,19,25 105:16,17 106:5,10,14,16, 20 107:1,2,3,6,7,11 114:20 115:2,7 120:12,15 121:1,13,20 125:16 128:15 129:11,15,16,19 130:7,11,25 131:12, 18,21 157:3

**claimed** 36:6 54:20 55:8,12,17,22 56:2,8,17,19 57:1 122:18 134:9

**claims** 24:21 36:15 37:11 38:16 41:16 47:3 49:11,13 72:8 80:10 90:21 104:5,11 105:4,7 106:3 125:14 127:8 131:10

**clarification** 42:8 82:10 103:8 106:18

**clarifications** 57:5

**clarified** 58:5

**clarify** 36:25 41:3 104:21 113:9 135:8

**clarity** 66:21 67:6,23

**clear** 56:8 58:1 70:15 73:19,22 77:15 144:14

**clearer** 102:14

**close** 161:1

**closed** 34:25 35:6,22,24 54:23 55:4 57:15 68:12 71:2 83:19 86:2 90:22 102:22

**cockburn** 9:10 10:1 11:8 12:6,21 14:2,4,10,12,18,24 27:10 117:7 161:24 165:17,24

**cognitions** 163:24

**cognizable** 136:22 137:1,5,6 138:3, 10,18,23 139:19 140:11,20 141:9,14, 21 142:1,5 144:15 146:10,14 147:20, 24 148:10 149:1,19 150:11 151:23 153:12 154:7,16 159:10,16 160:3 162:17,24 163:11,14 164:4,9

**collection** 74:8

**colloquy** 82:10 103:8

**Column** 70:21 72:10,18 90:8,10 92:5,12,20 93:5 101:15 102:17

**combination** 127:1,7 128:5

**comma** 129:24

**commencement** 51:2

**commences** 51:17

**commonly** 151:21 154:12

**communicate** 138:18 149:15 156:25 163:4

**communicated** 26:20 139:1,21 140:23 142:8

**communicates** 162:25 163:8,15

**communicating** 25:15

**communication** 139:12

**communications** 16:15 48:3,7,14

**company** 158:6

**complete** 10:24 12:10 83:1 96:10

**complex** 96:14

**compliance** 10:23

**component** 19:11 42:24 104:16 128:14 131:7 132:4

**components** 34:11 38:21 124:18 150:6

**compound** 96:14

**comprehensively** 149:12

**comprise** 29:5,8,12,18 30:17 31:9 33:20 34:5 107:16 154:25 157:11

**comprised** 107:24 108:6 109:5

**comprises** 25:16,24 26:3,7,9,18,24

**comprising** 22:13,14,16 23:4,18 24:3,11,18 25:3,8 28:25 29:5 30:12 31:1,15 32:16,22,25 33:7,10 36:8,20 37:25 38:1,3 59:3 61:17 62:1,2,15,20, 23

**computer** 22:17 70:23 71:7 73:16 142:20 143:1

**con-** 30:1

**concept** 90:20 91:1

**concerns** 122:4

**concise** 90:2

**conclude** 48:25 106:13

**concluded** 166:8

**conclusion** 28:9 51:18 55:23 56:20 72:11 77:9,20

**conclusions** 87:5 91:15

**concrete** 141:10

**conditions** 12:17 60:8

**conduct** 49:18 109:19 149:9,23

**conducted** 150:1

**confine** 89:23

**confirm** 68:14

**confirms** 68:14

**connection** 13:6 30:11 32:14 39:16 59:12 61:15 62:25 72:11 86:7 91:14

101:16 102:18 103:1 109:23 113:1 126:3 127:25 130:3,21 131:14 132:14 149:4 158:20

**connote** 123:6

**connotes** 123:18

**consideration** 72:6 126:21 128:12 131:6

**considered** 30:13 72:14 73:5 102:23 110:9,20 125:7 127:11 128:25 130:14,19 131:8 135:19 138:7 160:21

**consist** 29:13 30:2,8,15 31:22 32:9

**consistent** 25:12 29:13 32:20,25 33:9,11,13 36:7 39:6 56:12 79:25 81:9,14,20 83:5,8 84:2,15 85:8 88:3 114:2 119:3,9 137:24

**consistently** 120:1

**consisting** 23:18 31:3 32:22 33:6

**consists** 22:24 24:12 33:17,22 39:9 50:24 59:4 62:3

**constituent** 26:22

**constituents** 26:11

**constitute** 30:6

**constitutes** 10:18

**constructing** 62:22

**construction** 14:5,13 33:6 37:21 59:3 60:16,19 61:16,25 80:1,7,10,11, 15 81:10,24 82:8,25 83:6,10 84:4,17 85:11 87:16 88:4 97:25 101:19 104:19 114:3,6 118:6 119:4,10,13,14, 17 120:17 121:3,14 122:9,15 123:8, 17 128:19 131:5 134:2 135:17,23 137:11 138:21 160:18

**constructions** 80:17 83:8 84:2,15 85:9 120:8,9,20 121:5,7,11,19

**contained** 121:8,10 153:21 154:8

**contemplated** 49:17

**contemplation** 38:18 39:11 41:15, 19

**contends** 86:11

**content** 63:5,11 87:19 121:15

**contention** 86:16 87:3 88:7,12,25

**contentions** 77:8,19 78:5,20 86:22

**context** 16:10 25:21,23 31:13,21 58:21 69:8 94:4,6,16 95:8,23 123:14

143:7,13,18 151:10 158:8

**contexts** 93:15 143:4,23 144:1 152:1

**continue** 23:20 90:3

**CONTINUED** 117:19

**continues** 92:23

**continuous** 65:25 66:1,8 67:16,20, 21 76:23,25

**contract** 13:11

**contrast** 39:1 55:9 56:6 57:1 65:24 66:7,13 67:5,15,19

**contrasted** 76:22

**contrasting** 55:8 81:15

**convenient** 17:3

**convey** 139:10 142:19,25

**copy** 15:14,17 19:2

**correct** 12:7 19:17 24:3 28:22 42:5, 14 44:14,20 47:8,10 50:14 56:4 60:17 65:19 68:6,7 69:20 70:2 71:3 74:13 75:17 83:21,22 86:4,17,22 87:7,14 101:2 102:12,13 103:19,20,23,24 104:3,7,10,14 114:23 115:3,4 118:10 119:4,10,23 120:12 121:16 122:5,10 129:7 134:23,24 135:9 148:6 153:18 154:1 158:3 159:8

**correctly** 136:23 150:14 152:13 155:3,5

**counsel** 11:21 12:2 63:25 82:13 98:25 100:16 113:14,17 117:19 118:15

**countries** 143:20

**country** 143:21

**couple** 112:21 143:11,13

**court** 10:3 80:9

**cover** 79:1

**covered** 24:20 49:15 114:8

**covering** 23:6

**criticizes** 41:11

**current** 122:8

**cut** 82:15,19 100:16 103:12 114:16 118:15

**CV** 13:19

**D**

**date** 13:3 112:4,16

**decades** 25:13

**December** 110:15

**declaration** 13:19

**def-** 25:11

**Defendant** 9:25

**defined** 32:19

**defines** 68:10

**definition** 28:23,24,25 29:4,7,9,11, 14 30:1,3,5,7,9,14 31:6,23 32:3,5,6,7, 12,24,25 33:2,3,4,8,9,21 34:5 68:8, 13,14

**definitions** 24:25 25:11 29:17,23,25 30:13,18 31:10,16

**denigrates** 41:11

**denigration** 41:19

**denoted** 145:25

**depend** 25:20 94:3

**dependent** 60:10 143:12

**depends** 60:11 151:10 163:21

**depict** 152:9

**depicted** 113:6 146:25 150:19 151:6 162:16

**depicting** 62:6

**depiction** 137:17

**depictions** 144:14

**deposed** 16:19

**deposition** 9:4,10 10:7 14:2,10,18, 24 17:25 27:10 28:10 161:24 166:8

**describe** 47:1 67:17 105:6

**describes** 22:23 87:20 91:23

**describing** 88:13

**description** 37:13

**design** 22:15 73:9 149:7

**desired** 93:6

**detailed** 40:25

**details** 125:13 142:11 148:15

**detect** 52:7 61:11 156:23 157:17

**detected** 43:7 52:9,16 53:16 54:3 59:18 61:1,4,20

**detecting** 49:25 50:5,13,18,20 51:14 120:3

**detection** 52:1,8,11,12 55:25 56:3, 13 59:17 60:8,9

**detects** 34:24 35:7 55:12,13,14,15

**determination** 36:2 49:20 52:24 53:24

**determine** 80:17 100:7 108:19 109:14

**determined** 76:6,14

**determines** 52:25 122:24 124:9 126:6,10 127:3,15 128:6 136:4

**determining** 16:16

**device** 40:19 50:5 69:8 72:7 73:21 85:20 110:3,11,19 111:7,20,21,25 112:2,3,19 120:3 138:14 139:3,23 140:17,25 141:7 142:4,20 143:1,8,9, 14,18 144:18 145:12 146:8,23 147:8, 10,12,20 149:7 150:18 151:5,20 152:15 160:17,22,23

**devices** 39:14,24 108:20 109:8,15, 21 110:8,12 111:7 113:6,12 149:25

**dictionaries** 24:9,16,25 25:6,12 32:20 68:5

**dictionaries'** 32:18

**dictionary** 27:12 28:15,19,24 29:4,7, 12,19 30:19 31:6,11,16,24 32:14,18 33:5 68:10

**difference** 100:3

**differentiating** 81:14

**difficulty** 80:23 131:3

**direct** 51:6 72:3 80:3 132:3

**directed** 37:16 56:24 70:9 79:14 95:16 108:24 109:7 131:4 139:16 140:3,13,16 141:7 144:9 146:9 147:4

**direction** 42:20 43:14,17 46:6 70:9 120:5

**directly** 20:4 75:15 110:8

**disclose** 100:7

**disclosed** 97:16,17 98:23 137:4

**disclosure** 21:5 37:13 72:22 76:19

94:25 95:5 97:13,20 98:12,18,22 99:13,20 100:3,6,13,14,18,19,21 101:2,4,6

**disclosures** 32:19 36:3 39:4 72:15 86:11 88:12 94:19 100:11 105:7

**discrete** 65:23 66:2,6,10,18,20,23 67:7,18,22,25 68:1 73:17

**discuss** 22:11 63:24 120:11

**discussed** 105:15

**display** 35:8 36:11 37:6,8 38:8,10 40:3,18,19 42:22 43:6,12,19 46:8 53:5,18 71:1,11,19,25 75:6 84:25 86:13,25 103:23 104:7 105:2,18 107:17,25 108:7,21,23 109:6,17 110:4 120:5 124:24 128:17 143:8 150:12 152:16

**displayed** 73:16 101:22 129:24

**displaying** 144:4

**displays** 108:25

**distance** 76:6,8,21

**distinct** 101:5 107:17,24 108:7,22 109:5,17

**distinction** 48:19

**distinctions** 134:6 135:8

**distinguishing** 158:14,19

**divide** 57:3

**divided** 84:24 86:13,24 110:4

**division** 109:21

**document** 27:5 67:13 158:22

**dollars** 13:7

**dots** 150:19 151:5,12,15 152:2

**downloaded** 15:22 162:7

**drafted** 44:2

**drag** 75:9 134:7

**dragging** 75:10

**drill** 18:14

**drop** 46:9,23 104:6,12

**dropped** 49:2 115:2 162:4

**dropping** 27:4 28:5

**drugs** 12:13

**due** 77:2 89:1 106:21 147:24

**duly** 11:9,18 117:8

**duration** 11:20

---

**E**

---

**earlier** 33:14 41:25 42:11,13,16,18, 24 43:22 44:14,15,22 45:7,10,15,18 47:15,23 48:22 49:4 50:6 101:24 105:16 111:19 112:11 113:23 129:11, 14,18 130:6,24 131:18

**early** 112:23

**easier** 81:17 83:25 145:5

**East** 140:14

**EDITION** 27:13

**effect** 107:1

**effected** 36:11

**effective** 87:3

**effectively** 104:9,15 106:9

**efficient** 165:20

**el-** 157:11

**elaborate** 56:6

**Electrical** 68:9

**electronic** 18:23

**Electronics** 68:10

**element** 76:10,20 103:22 105:10 136:20 138:3 155:1,23 157:11 159:3 160:1 163:15

**elements** 48:6 93:18 149:2,14,20

**embed** 40:7

**embodiment** 72:6

**embodiments** 90:18,19

**enable** 60:8

**enables** 136:20 138:4

**enabling** 155:2 156:3,15,20 157:12

**encapsulates** 16:14 43:20

**encapsulating** 131:6

**encompass** 93:24 94:17 95:10,24 96:7,20 163:14

**encountered** 146:7

**end** 36:2 110:2 128:16

**ended** 53:24

**ending** 126:5,10 127:2 128:6

**engaged** 12:22,24 13:1,17

**engagements** 13:16

**Engineering** 68:10

**English** 22:20 25:15 27:12

**Enjoying** 75:1

**ensuring** 10:24

**entire** 33:4 44:4,21 102:1,15,23

**entirety** 32:17 43:25 44:13,22 50:22 91:6 104:9 106:9,14,22 107:4 131:8 132:6 135:19

**entities** 97:6

**entitled** 138:21

**entries** 24:9

**equivalent** 156:9

**essentially** 16:14 24:12 30:5 42:23 47:2 50:21 54:14 55:7 62:3 106:21 122:12 123:9,21 125:19 140:6

**estimate** 13:21

**evaluation** 109:23

**event** 37:15 52:5,16 53:23 54:7,9 61:9 155:9,11,13,14,17,19,24 156:5, 8,10,11,14,18 157:16

**events** 12:14 43:24 45:9,17 47:12,20 53:22 54:13 104:18,25 105:15 115:6 156:24 157:1

**evidence** 23:11 24:18 25:9 77:19 78:6,12,15,21 113:7

**ex-** 24:23

**exact** 13:3,18 36:1 112:4,16

**examination** 12:2 72:7 117:19

**examined** 32:17 33:3

**examiner** 16:16 46:16 47:5 48:4 55:17 62:5,13,18

**examiner's** 48:5,13 49:12

**examining** 31:17,19 49:19

**examples** 30:4 53:21 94:15 95:6,19, 22 98:21 137:3 143:11,13,25

**exceptionally** 149:17

**excerpt** 27:11 28:15 30:19 31:11,24 32:13 41:24 42:5 46:21 47:7 120:11

**excerpted** 44:18 46:24 47:16,24 49:1 60:23 103:17 134:22

**excerpts** 28:19

**exclude** 36:21 37:3 38:5 39:24 57:4 124:11

**exclusively** 10:20 36:11 91:23 120:2

**exclusivity** 36:15

**excuse** 33:22 36:16 98:24

**excused** 166:6

**exemplars** 110:22

**exemplify** 111:8

**exemplifying** 90:18

**exhibit** 14:2,10,18,24 15:8,11,14,17 16:5 18:8 22:8 27:4,10,20,24 28:7,14 29:4,7 32:24 33:9,21 34:6,19 44:7,10 70:16 90:5 92:4 117:23 129:5 134:15 161:24 162:4,10,13,16

**exhibits** 13:23 15:19 18:21 28:5,8,18

**expect** 17:1 19:12

**experience** 19:18 20:2,6,9,17,20 21:3,11,15,22 22:4 25:13,14 138:16 146:12,23 147:5,18,23 153:10 154:5 163:17 164:2,7

**expert** 12:22 13:13 14:3,11 15:8,11 37:21

**explained** 101:25

**explanation** 82:2 106:24 107:4 135:16,22

**explicit** 97:13,20 98:12

**explore** 138:21

**exploring** 37:25

**express** 63:7 86:8 87:7 91:5,10 102:19 113:2,8 121:6,22 122:11 128:1 130:4,22 131:15 132:15

**expressed** 20:3 21:23 23:5 60:15 63:1,12 88:9,16,20 91:16,19 122:13 126:23 131:12,25

**expressing** 60:14

**expression** 21:2

**expressly** 20:14,22 21:17,24

**extensive** 149:17

**extent** 21:4 33:12 77:14

**extra** 141:23

**extract** 43:25 91:18 114:22 132:9,18

**extremely** 141:4 150:5

**extrinsic** 24:10,24

---

**F**

---

**fact** 49:1 68:25 127:11 130:6,24 131:17 140:4 154:7

**factors** 60:11

**fair** 16:24 19:1 42:15,25 104:4 109:12 119:24 122:6

**familiar** 16:22

**feature** 132:9

**February** 15:10

**feel** 19:10

**feet** 69:2

**field** 20:6 22:15,17,19 73:9 149:11 150:6 152:2

**figure** 55:10 92:6,11,16,19 101:22 110:17 145:23 147:1,22 151:14

**file** 14:25 15:18 16:5,10 19:4 20:7 24:24 37:12 38:16 41:16 62:10 63:4, 10 65:18,21 66:4,16 67:9 76:4,13,19 97:3,18 105:10 120:18 130:14,15 131:7,9 132:4,6,14 134:16,21,25 135:20 158:25

**filed** 103:18,21 114:20 120:12 157:24 158:1

**files** 153:6,8,16,18 154:13

**filled** 85:19

**find** 100:4 154:6

**fine** 116:8

**finger** 53:17 54:6,12 75:8,15

**finished** 135:6 161:1

**Fish** 9:24 12:25 13:2

**flow** 73:11,14,15,20

**flowing** 65:25 66:2,8 67:16

**focus** 56:15 105:9

**focused** 105:12

**focusing** 58:24 81:13 84:13

**folder** 144:8,12,13 152:12,23,25 153:21 154:9,12,14,17

**foot** 69:1

**form** 89:8,24 163:24 164:8

**forming** 103:4 130:15 131:9 132:6

**forms** 52:5 156:2

**forward** 102:9

**found** 69:18 98:22

**Fourteen** 92:22

**FOURTH** 27:13

**Friday** 12:7

**front** 19:4,10 162:6

**full** 12:10 85:3 125:12

**function** 34:23 36:4,10,17 37:4,6,14 38:7,9,18,22 39:2,8,9,17,20,25 41:2, 5,14,18 42:21 43:5,19 46:7 49:24 50:4,7,12,18 51:1,13,16 54:21,22 55:5,18,22 56:3,9,13,18,20 57:14 58:11,17 59:1,6,13,18,24 69:22 70:10 83:19 85:1 87:18 91:24 93:11,16,17, 23,24 94:12,14,17,22 95:3,10,17,20, 24 96:7,20,25 97:2,3,9,14,18,25 98:4 99:14 100:8,22 101:7,8,12 102:11,21 104:2,13 120:2,4 124:4,9,25 125:1,22 126:5,6,9,11 127:1,3,16,23 128:4,7, 17 129:20,23 136:19,21 137:1,4,12, 13,15 138:2,5,6,8,12,25 139:20 140:11,22 141:25 143:17 144:12 145:3,17 146:25 149:3,6,23 150:11 151:12,13 153:14,25 154:25 155:2 156:4,16,21 157:3,6,10,13,19 159:18 160:4,19 162:16 163:13

**functionality** 40:20 47:14,22 49:4 115:8

**functions** 35:5 42:17 45:21 52:12 97:16 98:10,15 99:24 129:21 130:8 131:1,19 136:5 142:21 143:2 144:5,9, 22 145:2 149:16 155:12

**fundamentally** 70:14 106:21

**future** 73:6

---

**G**

---

**gained** 146:12

**gave** 34:16 105:13 164:1

**GAVIN** 11:8 117:7

**general** 140:13

**Generally** 54:4

**gesture** 155:22

**gestures** 52:7

**give** 12:10 26:5 141:10 143:11

**giving** 89:6

**glide** 34:24 36:7,18 38:25 39:10,22 40:1,12,17 41:7,13,17 49:25 50:5,9, 13,18,20 51:2,14,17,18 52:2,8,9,11, 13,16,17,22,24 53:1,3,12,14,16,24 54:3,12,21 55:2,4,6,13,15,18,23,25 56:4,11,14,18,20 57:21,25 58:7 59:8, 13,17,18 60:9,16,20,22 61:1,3,11 124:12,18 126:5,10 127:2,8,19 128:6, 14

**glides** 37:4 38:7 56:3 125:1,2

**gliding** 36:12 40:19 53:4 60:16,19 61:19 69:25 120:5

**good** 12:5 63:18 64:12,16,18 67:6 74:10 116:13 161:4

**graphic** 146:2

**graphical** 136:19 138:3 149:20 155:23 156:8,13 163:15

**Graves** 9:21,22 11:22 12:4 15:7 21:7 24:14 25:22 26:16 27:3,7,19 28:3,13 29:24 32:10 34:1,17 35:20 37:17 39:13 40:13 41:8 45:5 46:2,20 48:24 49:21 52:14 53:2,20 54:15 57:6 58:15,23 60:13 61:12 63:22 64:3,7, 13,16 65:11 69:15 76:1 79:3,19 82:16,21,22 83:15 84:10 85:6,21 88:5 89:4,11,15,19 90:4 92:14 93:2,21 94:5 99:11 100:17 103:13 106:6 108:16 116:7,13,15 117:21 118:2,5, 16,17 124:22 125:8 126:18 127:17 128:13 129:3,17 132:11,20 133:12, 21,24 135:14 138:9 139:14 140:7 142:6 145:4 146:4 147:3 148:3 151:1 152:5 154:19 160:24 161:5 162:3,11, 14 163:2 164:12,17 165:23

**Great** 116:14

**grid** 150:19 151:5,15

**guess** 70:11

**guidance** 70:5,8 76:9,17 77:2

---

**H**

---

**half** 63:18 116:3

**handheld** 142:19,25 143:7,8 150:18 151:4

**happy** 42:9 142:15

**hard** 19:2 39:3 54:22 77:1

**hardware** 156:22,23 157:4

**heading** 134:10

**hear** 45:13 82:17 99:4

**heard** 73:7 111:24

**Heritage** 27:11 28:15 29:3,6 30:19 31:11 32:14

**highlighted** 42:4,7,14 57:13 59:11 115:1,9 120:16 121:1

**highlights** 114:15

**history** 20:7 24:24 30:24 37:12 38:16 41:17 62:11 63:4,10 76:19 105:22 115:10,17 120:18 130:15,16 131:7,9 132:4,6 134:25 135:20 158:25

**hope** 83:1

**Hoshino** 39:1 46:19 54:21 55:8,14 56:6 57:2

**hour** 13:7 63:17 64:15 116:3,12

**hourly** 13:8

**hours** 17:1

**housed** 154:12

**human** 22:17 69:6,14

**human-computer** 149:10 150:6

**hydrogen** 26:6,7 33:15,17,18,23 34:6,15

**hypothetical** 40:24 60:6,12 105:20 125:7,11,13 128:24

---

**I**

**i-** 112:15

**icon** 149:7 152:3 162:15,23 163:5,8, 10 164:4

**icons** 149:8 160:16 164:3

**idea** 147:23

**identification** 14:6,14,20 15:4 27:16 161:25

**identified** 28:6 96:3,12,25 99:18 110:18 111:8

**identify** 9:17 99:20 113:5,10,12

**illustrated** 90:17,21

**image** 75:6 161:25

**images** 74:16,18,24

**imagine** 17:15

**impact** 72:19 110:16 115:12,20 131:17 135:15,21

**impair** 12:14,18

**imperfect** 112:24

**implement** 39:15,25 155:20

**implements** 40:20

**implications** 85:4 86:1 87:21

**implies** 58:4

**importance** 149:13

**impression** 146:10 164:9

**impressions** 149:19

**improper** 57:3

**inappropriate** 89:22

**include** 30:3,10 31:15 32:4 47:14,21 67:12 88:20 90:1 97:10 98:5 121:20 156:17,22 157:4,15 160:21

**included** 26:23 42:14 49:5 103:22 110:3 120:19 121:15 131:10

**includes** 24:21 25:17,25 26:4,6,10 30:17 31:9,24 33:15,18,23 34:6,15 48:3 57:12 91:12 101:22 102:24 104:1 129:19 141:4

**including** 30:14 52:8 135:20

**incomplete** 105:20

**incorporate** 61:14

**incorporated** 113:15

**incorporating** 144:18 145:12 147:9

**increased** 13:12

**indefinite** 77:10,11,17,21,24 79:9

**independence** 138:16

**independent** 138:12 139:1,7,21 140:23 154:13

**indicating** 57:14

**influence** 48:8 61:23 63:11 110:20

**influencing** 72:23

**inform** 48:15 61:23 65:21 66:5,17 67:10

**information** 113:14,16 121:18 142:8 153:13,15,17,20,24 154:8,10,17

**informs** 66:19

**infringement** 77:8,19 78:5,20 81:23

**inherently** 67:17

**ini-** 120:3

**initial** 27:5 120:3

**initially** 154:15

**initiates** 123:25

**input** 157:5

**inside** 141:15

**inspecting** 160:22

**instance** 61:9 96:6,19 99:20 101:22 136:4 143:14 148:25 153:15

**instances** 98:17 99:13 100:5

**instructional** 62:6

**instructs** 17:25

**intend** 53:19

**intended** 106:2

**intent** 104:22 106:18,25

**intention** 66:20 67:14,17,18

**inter** 137:8 158:1

**interacted** 152:22 153:5,22

**interacting** 163:17,22

**interaction** 22:18 149:11 150:7 155:22 157:17

**interactions** 156:1,24

**interface** 22:15 73:9 109:16 150:12 155:24

**interface's** 91:25

**interfaces** 107:16,23 108:5 109:4 149:15,25 150:3 155:21 156:8,13

**interpret** 140:6

**interpretation** 72:23 105:5 106:1 136:3 146:1

**interpretations** 53:11

**interpreting** 127:8

**intrinsic** 23:11,24,25 24:7,23 25:4

31:4 36:16 48:2 49:19 55:11 59:5 61:15 77:12,25 79:8,25 80:6,14 81:9 82:6,24 83:5,7 84:1,12,14 85:8 88:2 105:8 114:2,5 119:3,8,23 120:1

**intuitively** 137:14

**intuitiveness** 137:21

**invention** 54:20 55:8,12,17,22 56:2, 8,18,19 57:2 70:23 71:5 84:22 85:5, 16 86:2,7,23 87:4,22 88:8,14 89:2 90:16 114:11 134:9

**inventive** 90:20 91:1

**inverse** 78:9

**investigation** 108:17 109:13

**involves** 71:17,24

**ipaq** 111:25 112:2,5,9,12,16,22,25 113:3

**iphone** 74:5,6,12

**IPR** 158:11

**irrespective** 88:25

**ISO** 151:16,18,21,24

**issue** 15:15,25 97:21 114:7

**issued** 47:6,13,21 48:18 49:3,5,6 105:1,17 115:7

**issues** 37:22 101:5

**item** 141:15 145:25 147:22 151:14,24 152:23 153:2,5,10,11,14,23 154:6

**items** 23:24 92:17,19 146:24

**iterations** 73:8

**J**

**JEREMY** 11:8 117:7

**job** 80:16

**Joel** 9:13

**K**

**keyboard** 97:3,18 144:7,11,12 150:13 151:17,19,22,25

**kind** 73:25 81:12 113:21

**knowledge** 20:5,9,12,17,20 21:2,11, 15,22 22:4 25:9 138:13 139:2,8,16,22 140:2,5,8,9,13,14,17,24 141:5,6,19 142:3 147:19 163:9

**L**

**labeled** 110:17

**lack** 76:17 77:2

**lacks** 106:25

**language** 22:20 23:20 25:15 27:12 35:3 42:5,7,14 44:18 46:10,21,24 47:7 49:1 54:18 57:13,22 58:1,10,25 59:10,21,24 65:17,20 66:3,15 67:8 70:4 77:14 78:1,10 79:13,16 81:3 114:25 129:19 130:7,19,25 131:19,21 157:23 158:20 159:7,23 160:12

**larger** 26:11

**law** 10:19,24

**lawyer** 85:3 86:18,20 101:4 114:12

**lead** 89:8,24

**leading** 89:6,10

**learn** 110:14

**left** 74:23 75:16 118:19

**left-hand** 141:16

**legal** 86:1

**legally** 10:25

**length** 69:1,10,14

**lengths** 69:12

**Lets** 78:18

**Lexitas** 9:15

**library** 152:18

**lieu** 10:16

**lifted** 53:18

**lifting** 40:2,17 54:6,11

**liftoff** 37:7,15 38:10,19 39:12

**lifts** 37:5 38:8

**light** 23:11 32:7 38:2 71:15,21

**limit** 86:12 88:14 110:12

**limitation** 102:15

**limitations** 39:19

**limited** 39:14

**limiting** 86:23 89:3

**limits** 84:22 85:17 114:11

**line-by-line** 67:1 68:2

**Lines** 70:21 72:10,18 90:10 92:5,20 101:16 102:18

**linked** 62:6

**list** 134:6 143:19

**listen** 155:25

**listener** 53:23 155:13,17,19

**listeners** 52:5 61:10 155:9,11,14,24 156:6,9,10,12,18 157:17

**listing** 153:20

**lists** 160:20

**litigation** 12:23 13:14,17 15:13,25 19:8

**LLC** 12:25

**local** 15:22

**located** 134:22

**location** 36:12 37:5 38:8 40:16 60:2 118:7,9,21,22,23 119:17,19 120:17 121:4,14 122:5,9,17,18,23,24 123:1, 3,9,22 124:6,8,11,20,24 125:3,17,24 126:5,10 127:2,7,11,13,15 128:2,5,6, 19 129:22 130:5,9,23 131:2,5,16,20 132:1 134:3 135:18,24 136:4

**location-based** 134:8

**long** 64:3

**longer** 47:9 49:5 120:19

**looked** 74:15,18 77:12

**lunch** 17:18

**luncheon** 116:22

**M**

**machine** 15:22

**machinery** 157:16

**made** 18:21 47:4 49:11 55:9 56:8 158:10

**make** 38:17 49:20 72:4 83:25 85:17 86:10 99:8,18 100:12 132:2 145:5

**makes** 140:10 141:8,24

**making** 36:1 126:20 128:12 136:1

**manager** 97:3,18

**manner** 11:4

**manual** 144:20 145:15 147:11

**mapped** 129:21 130:8 131:1,19

**maps** 151:15

**March** 9:5,8 15:13

**mark** 28:8

**marked** 13:22 14:5,14,19 15:3 27:15, 24 44:7 161:25

**material** 20:24 24:4 29:21 32:2 35:16 44:25 51:21 92:8,24 129:13 131:22 135:10 162:21

**Materials** 160:20

**matter** 9:11 20:18,21 150:5

**Max** 74:5,6,7,13

**meaning** 22:18,20,22 23:1,3,9,18,19, 23 24:3,11,17 25:2,8,17,24 26:4,10 30:12,17 31:5,9,14,18,20,21 32:8,15, 19,21 35:13,23 36:8,20 38:1,3 48:17 73:13 137:23 138:18 139:10,13 140:10 151:23 153:1 163:1,3,8,11,16

**meanings** 142:18,24 143:6,10 150:17 151:2 152:4

**means** 60:22 77:21

**meant** 145:3

**measurement** 68:15

**mechanism** 155:19 156:2

**mechanisms** 155:2,6 156:3,15,20 157:12,14

**Media** 65:10 117:16

**medical** 12:17

**medications** 12:13

**meet** 80:10 85:20

**meets** 66:1

**menu** 35:7 42:21 43:6,19 46:8 84:24 85:2 86:13,25 91:25 94:9 96:13,23 97:6 98:11,15 99:24 101:7,12 103:23 104:3,6,14 105:1,18 107:17,24 108:7, 23 109:5,17 110:4 141:15,17 144:4 160:16

**Merit** 10:9

**Messagepad** 110:11 111:18,21

**met** 39:19 80:11

**middle** 51:17 135:2

**mind** 75:13

**minutes** 64:4,6,8,11 116:11 164:15

**mischaracterizes** 87:12

**mobile** 108:20,25 109:8,15 111:25 112:2 143:7,8,14,18 144:17 145:11 147:8,10,11 149:7,25 151:20 152:15

**model** 74:3 112:25

**models** 74:3

**modifications** 47:3 49:10 90:25

**modified** 90:19 91:2 121:19

**moment** 44:23 99:22 109:1 159:4,25

**moments** 99:22

**months** 13:4

**morning** 12:5,7,8

**motion** 53:14

**move** 43:11 104:23 107:9 115:14

**movement** 35:7 43:2 53:4 66:25 67:1,3 68:2,3 134:8

**moving** 42:19 43:13,17 46:6 60:1 75:14

**multi-step** 31:2 36:6 38:23 39:21 40:10 41:6 48:17 49:16 50:8,23 56:10 57:20,24 59:7,16 122:18 123:22,25 124:5,16 125:16,23 128:15

**multiple** 45:24

**multiplies** 78:2,10 79:11

**muted** 11:20

### N

**N1** 110:11 111:22

**N2** 62:7,12,17 160:16,21,23

**Nakajima** 46:18

**narrowly** 105:12

**Ne-** 77:13

**needed** 99:19

**needle** 104:23 107:9 115:14

**Neo-** 77:13

**Neonode** 9:11 62:7,10 77:7,18 78:5, 20 111:22 134:24 137:8 157:25 158:4,7,15,18 159:10,14 160:16,21, 23 163:6

**Neonode's** 77:13 78:1,9 79:10 110:11 137:24 148:25 158:15 159:16 160:2 164:3

**NEONODE0000001** 15:2

**NEONODE00000107** 44:7

**NEONODE0000665** 15:3

**NEONODE107** 44:10

**NEONODE317** 129:5,10 132:5

**NEONODE339** 134:17

**NEONODE340** 135:2

**Newton** 110:10 111:18

**normal** 17:13 25:17,24 26:9

**note** 10:6 19:9 137:6

**noted** 9:19

**notes** 19:7 164:16

**number** 13:18 14:2,10,18,24 27:10 28:7 30:10 32:24 33:8 65:10 76:22 117:17 118:1 133:20 161:24

**numbered** 92:17,19 129:5

### O

**O'CONNOR** 9:23,24 25:18 26:12 27:23 28:11 33:24 34:8 37:9 38:11 40:4,22 46:12 47:25 49:7 52:18 53:6, 25 56:21 58:13,18 60:3 61:5 64:9,17 69:3 75:18 78:23 79:5 83:11 84:5,18 85:12 87:8,11 88:17 89:9,13,25 93:12 94:1 99:1,5,9 105:19 108:11 116:6 117:25 118:3 124:14 125:4 126:12 127:4 128:8,21 133:19,22 137:18 139:4,24 141:1 144:24 145:19 146:19 147:15 150:21 151:7 152:19 154:2 162:9,18 163:19 164:14 165:15 166:2

**oath** 10:6,11 11:3,5,11

**object** 17:23,24 35:7 37:3,7 38:6,10 40:3,18 42:19 43:2,11,13,17 46:5 53:5 59:25 69:25 89:7,23 98:25 124:23

**objecting** 89:20,21

**objection** 11:2 25:18 26:12 33:24 34:9 37:9 38:11 40:4,22 46:12 47:25 49:7 52:18 53:7,25 56:21 58:13,19 60:3 61:5 69:3 75:18 78:23 79:6 83:11 84:5,18 85:12 87:8 88:17 89:10 90:2 93:12 94:1 99:2 105:19 108:11 124:14 125:4 126:12 127:4 128:8,21

137:18 139:4,24 141:1 144:24 145:19 146:19 147:15 150:21 151:8 152:19 154:2 162:18 163:19

**objections** 89:6

**objective** 68:17 69:13

**objects** 18:2

**obvious** 46:18 100:4 101:10 139:9

**obviousness** 101:5

**occur** 40:9 45:16 55:5 58:11 59:13, 25

**occurred** 40:8 53:1 56:14 157:1

**occurring** 41:2

**occurs** 40:15 43:23 45:8 57:14 58:8 59:6

**offering** 36:14 127:9

**offers** 70:14

**official** 10:14,18

**one-step** 69:18 70:13 76:10,18,20

**one-stroke** 134:7

**onwards** 111:14,16,19,23 112:18

**open** 15:23 27:21 55:3 153:2 162:8

**opened** 153:6

**opening** 13:19 14:3 63:13 115:23 117:23 118:20 119:21 121:10,21,23 122:13 126:17 129:1 136:13

**opens** 152:25

**operate** 138:14 139:3,23 140:17,25

**operation** 31:2 36:6,21 37:3 38:6,24 39:22 40:11 41:6 45:22 46:4 47:10 48:11,18 49:15,16 50:9 56:10 57:20, 24 59:7,16 62:7 122:19 123:10,22,25 124:5,12,17 125:16,23 128:15

**operations** 39:15

**opine** 81:22

**opined** 97:24 119:2,7

**opinion** 20:1,12,19 21:10,13,14,21 22:4 23:2,22 24:2,17 30:11 32:15 34:21 35:15,25 36:9,14,19 37:25 38:2 49:23 50:3,6,12,14,17,25 51:4,12 60:15,18 62:14,19 68:15 72:20 78:4, 19 79:23 83:3,4 88:1 89:10 97:12,24 98:1,7 101:17 102:19 103:2 104:17 107:13 110:16,21 113:7 119:12,15, 22,25 124:10 125:9 134:2 135:17,23,

25 136:17 137:21 138:15 142:7 144:16 145:8,10 148:12,18 149:5,22 162:23

**opinions** 22:12 37:24 62:25 63:6,12 86:8 87:6 88:9,16,19 91:4,10,19 103:4 113:1 120:7 121:6,22 122:8,11, 14 126:3,23 127:9 128:1 130:4,15,22 131:9,12,15,24 132:7,15 159:15 160:18

**opposed** 69:2

**order** 13:20 16:20 41:13 44:3 47:4 49:11 61:10 68:12 74:23 80:10 85:20 128:17 135:7 137:10 139:10 140:5 155:11,25 156:13,25 159:11,16

**ordinary** 22:19,22 23:1,3,9,23

**original** 48:21 78:17 115:1 120:15 121:1,2,13 136:13

**originally** 103:18,21 114:20 120:12

**outline** 148:22

**overcome** 47:4 48:5,13,20 49:11

**owner's** 144:20 145:15 147:11

**oxygen** 26:7,8 33:15,17,18

**P**

**p.m.** 9:5,8 65:1,6,10 116:20,23 117:4, 16 132:25 133:2,7,11 161:13,18,22 165:3,5,10,14 166:8

**pace** 69:11,14

**paces** 69:6

**pad** 19:10

**Pages** 113:6

**Palm** 109:22 110:1,7,10 111:5,13,15

**paper** 73:16

**papers** 18:15,23,24

**paragraph** 18:9 19:15 20:3,5,15,16, 23 21:1,17,23,25 22:3 23:14,17 24:1, 8,16 25:7 28:20 29:15 30:21 31:19 34:20 35:4 36:3 41:21 44:8 45:10,18 46:15,25 47:8,17,24 49:2,22 50:11 51:11 54:16 55:7,11 56:5,16 57:12 59:11 60:23 63:14 65:12,17 66:4,16 67:10 68:4 77:3,24 79:20 80:4 81:4, 19 82:5 84:13,21 85:15,24 86:10 87:20,24 88:15,21,22,23 91:14,20 103:19 104:20 105:22 107:11 109:25 110:2,9,13 111:8 113:8,18,23 114:9,

22 117:22 118:1 119:1,5,7,21 120:13 121:2,21 122:1,16 124:2 125:20 133:13,20 134:12 135:3,7,13,20 136:2,8,16 142:12,22 143:3 148:16, 22 150:8,16 151:3 152:6,10 154:20, 23 155:9 156:5 157:7,20 158:10,13 159:7,9,23 160:12,20

**paragraph-by-paragraph** 67:3 68:3

**paragraphs** 23:6 42:9 47:1 56:23 92:18 93:4 101:15 102:17,24 103:1,4, 14 114:13 120:10 121:8,9 156:17,22

**parameters** 70:6

**paraphrasing** 35:9 69:24 70:3

**parlance** 25:17,24 26:10

**part** 24:9 48:12 59:2 69:22 77:19 123:20 138:13 139:2,22 140:24 148:21,24 156:19 163:16

**partes** 137:8 158:1

**partial** 134:6

**partially** 33:11,12

**parties** 12:23

**parts** 39:7

**party** 78:13,15

**past** 12:8 116:11 163:6

**patent** 14:19,25 15:14,16,18,25 16:1, 6,17 19:3 20:7 22:6 24:23 31:14,21 32:8,22 34:13 41:10 44:16 46:16 49:12 50:16 56:7 60:17 61:17 65:22 66:6,18 67:11,12 69:9,19 70:17 72:13 76:4,12 90:6,14 92:4 94:7,16 95:1,5, 9,14,15,18,23 96:9,22 97:1,10,16,22 98:5,18 99:13 100:6 101:1,6 104:21 141:12 142:10,20 143:1,5,23 144:2,3, 19 145:13,24 147:2,9 149:11 151:11 152:17 157:4 158:2

**patents** 16:11

**patience** 165:22

**PDT** 9:5 65:2,6 116:23 117:4 133:3,7 161:14,18 165:6,10 166:8

**penalty** 11:10 117:9

**pending** 17:7

**people** 155:20

**perfect** 27:1

**period** 33:23 34:7,24 54:23 68:12

71:1 90:22 111:10,11

**perjury** 11:10 117:9

**person** 19:17,19,22 20:17,21 21:3,5, 12,15,22 22:5 25:14 30:25 48:8,15 51:25 52:3 54:4 59:14 60:6,24 61:7, 13,18,22 66:22 67:24 68:21 76:8 79:16 88:23 98:13 99:22 100:4,6,25 101:10 104:22 105:3,24 106:19 107:5 109:3 110:23 111:1,6,9 141:17 155:10 164:6

**personal** 51:24

**personally** 113:5,11

**persons** 149:18

**PH.D.** 11:8 117:7

**Philip** 9:21 165:19

**phone** 62:8,10 74:13 144:19 145:13, 14,15

**photo** 75:9,14,16

**photos** 74:19,25 75:3,5,11,23,24

**phrase** 35:12,14,21,23 69:18 72:12, 20 77:9 78:7,22 83:9,17,24 84:3,16 85:10 87:4 97:9 98:4 101:18,20 102:1 118:7 136:25 137:25 149:6 159:10 163:13

**phrases** 118:7,13,23 120:17 121:4, 14 122:5,9 124:11 125:3 127:12 128:3,20 130:5,23 131:5,16 132:1 134:3 135:18,24

**picture** 152:12

**piece** 158:23

**pieces** 96:16

**pixel-by-pixel** 66:25 68:2

**pixels** 76:22

**place** 75:8 87:1

**plain** 22:19,22,25 23:3,9,18,22 24:2, 17 25:2,8 30:17 31:5,9,18 32:19,21 36:8

**Plaintiff** 9:22 12:2

**PLAINTIFFS** 117:19

**plurality** 129:20 136:5

**point** 17:3,15,24 18:25 25:4 40:8 42:20 43:4,14,18 46:6 52:25 53:13, 15,17 54:18 59:12 73:10 112:18 134:5 158:21

**pointed** 81:3

**portion** 26:10 47:15,22 51:6 72:3 90:11 91:8,12 120:11,15 121:1,13 132:13

**portions** 45:25 89:17 92:7

**POSITA** 19:22 20:2,10,13 36:5 47:11,19 48:25 49:9 52:15 55:20 56:16 58:10 59:9,21,23 61:2,13 65:21 66:5,17,19 67:10 68:18 70:5 71:14,21 73:12 78:6,21 79:24 80:5,13 81:8 82:6,23 88:1 90:23 100:25 104:18,24 105:14 106:13,25 107:15,22 114:1,4 115:5 119:2,8 124:7,10 125:15 136:18 150:10 154:23 157:2,8

**POSITA's** 68:24 115:14

**posited** 146:15 148:5

**Post-it** 19:9

**potential** 53:10 143:5,9

**preceding** 158:5

**precisely** 148:8

**predominant** 151:22 156:12

**prefaced** 87:15

**preliminary** 158:15,19

**preparation** 19:12

**prepare** 10:21

**prepared** 10:23

**present** 11:19 63:21 70:24 71:9 84:22 85:5,16 86:2,6,22 87:4,22 88:8, 13 89:2

**presentation** 114:10 141:25 144:21 145:16 147:13

**presented** 20:25 24:5 34:13 35:17 37:20 45:1 51:22 73:16 75:3 92:9,24 97:6 104:2,13 113:16 131:23 135:11 142:12 154:9,18

**presenting** 71:18,24 121:18 152:16

**pretty** 161:1

**previous** 79:1 123:21 140:3 163:17

**previously** 117:8 152:22

**primarily** 30:7 32:6 33:3

**printouts** 19:3

**prior** 13:14 48:7 138:13,16 139:2,7, 22 140:2,4,8,9,13,14,16,24 141:5,19 142:3 147:18,19,23 153:10 154:5

158:14,18,23 159:1,3,6,13,22 160:1, 6,7,11 163:9 164:2

**Pro** 74:5,6,7,13

**problem** 76:16

**procedure** 17:13

**proceed** 11:21 63:20

**proceeding** 10:14 11:1 158:11

**proceedings** 65:5 117:3 133:6 137:9 161:17 165:9

**proceeds** 57:16

**process** 16:23 39:8,20,25 48:12 50:23 66:2,8 67:16 68:12 73:8,20 76:18,23,24 132:13

**processes** 65:25

**processing** 73:11,13

**products** 52:4

**programming** 156:2,7,13

**proper** 33:20 34:4 115:12,20

**properly** 44:3

**properties** 159:11,17 160:3 164:4

**proportion** 76:15

**proposed** 80:1,6,9 81:10 82:7,25 83:6,8,10 84:4,17 85:10 88:4 114:3,6 119:4,10,13 120:8,20 121:19 122:15

**prosecution** 14:25 15:18 16:5,10 19:4 30:24 62:8 65:18,21 66:4,16 67:9 76:4,13 105:10,22 115:10,17 132:14 134:16,21

**provide** 18:3 19:15 24:8 29:11 37:12, 24 42:8 60:18 66:21 67:6,19,23 70:5 73:19,22 94:23 98:11,15 99:15,19,25 100:9 101:12,19 108:14 113:14 123:7 137:3,20 148:16

**provided** 25:11 29:1,9,12,18,21 30:18 31:10 32:2,20 33:4,10,21 34:4, 5 40:15 51:3 53:22 57:5 67:5 83:3,4, 19 85:2 87:19 91:24 94:9 95:7 102:12,22 118:8,22 119:18 123:4 124:7,21 125:18,25 127:14 129:13 138:15 143:25 144:1 145:23 149:20 151:12,18 162:21,22

**providing** 72:1 143:19

**purpose** 13:2 62:25 105:11 126:22 129:1 159:9,14 160:23

**purposes** 14:6,15,20 15:4 27:16 62:22 126:16 128:10 137:8 162:1

**pursuant** 10:19

**put** 23:24 78:8 115:21

**putting** 24:7 75:15

**Q**

**qualifications** 19:16,18 20:2,9,13

**quarter** 64:15

**question** 17:7,9,10 19:11 21:9,18,19 22:1 29:2 34:2 35:19 36:19,23 37:16, 19 38:4,14 40:6 43:21 44:3,24 45:3, 13 47:18 51:24 53:9 58:21 60:12 62:16 63:21 66:14 69:5 70:7 71:20 78:17 79:4,15 80:12,21,25 81:13,16, 25 82:3,14 83:14 84:8 85:7,23 88:11 95:12,16 96:2,15 97:22 98:20 99:16, 18 100:10,11 102:6 105:11,12 108:24 114:4,17 119:6 120:24 126:7 127:20 130:20 131:4 138:23 139:15,17 140:1,12,16,19 141:3 142:23 145:1,6 146:8 147:4,6 150:24 159:20 160:9

**questioning** 116:1

**questions** 113:22 164:13 165:16

**quote** 34:22,25 35:5,6,22,23,24 38:22 54:19,23 55:3,4 56:9 57:15,16 65:17 68:11,12 70:24 71:2,5,6 80:3 81:11 83:18,20 86:1,2 90:15,22 102:20,22 157:23

**quoted** 65:20 66:3,15 67:9 158:9,20 159:7,23 160:12

**quotes** 158:17

**R**

**Ramos** 9:7,13 10:2 64:22 65:8 116:18 117:14 132:23 133:9 161:3,7, 9,20 164:20,25 165:12 166:4

**rate** 13:5,9,12

**re-** 26:21

**read** 30:23 42:9,23 44:21 45:2 58:10 93:1 105:4 130:15 135:4,5,12 144:20 145:14 147:11 155:4

**reading** 42:25 55:1,3 57:22 107:5

**reads** 50:15 135:3

**Realtime** 10:9

**reason** 12:9 90:2 108:1 163:7

**reasonable** 34:14 68:13 70:3 75:21 146:1 153:19

**reasoning** 104:22 105:23 115:11,19

**recall** 12:14 13:3,18 26:14,17,19,22 36:1,14 44:1 62:21 63:2,8,11 72:1,21 76:7 91:13,17 100:1,2 101:24 102:4, 25 103:3 112:4 113:3 126:20 128:11 130:10 132:12,17 135:21 136:1 158:21 159:2,5,13,21,25 160:7,10,14, 22

**recently** 74:5

**recess** 65:1 116:22 133:2 161:13 165:5

**recitation** 44:4 104:6,12

**recite** 102:15

**recited** 26:21 42:17 45:10,17 46:4,17 47:15,22 48:18,23 49:4 50:22 70:6 73:22 115:8 121:20 130:7,25 131:18

**recites** 43:4,13 47:9 69:21

**reciting** 58:5 103:22 129:19

**recollection** 12:18 27:1 51:8 109:20 112:15,24

**record** 9:9,18,20 10:7,15,18 11:1 14:7,15,21 15:5 19:11 23:24,25 24:7, 10,23,24 25:4 27:17 28:1 31:5 36:16 46:1 48:3 49:20 55:11 59:5 61:15 64:21,23 65:9 77:12,25 79:8,25 80:6, 14 81:9 82:6,12,24 83:5,7 84:1,12,14 85:8 88:2 89:18 102:14 103:10 105:8 114:2,5 116:17,19 117:15 119:3,9,23 120:1 132:24 133:10 135:4 161:6,10, 21 162:1 164:15,19,23 165:2,13 166:3,5

**recording** 10:13

**refer** 15:24 16:4 19:21 68:18 83:23 92:18 102:9 118:12,18,23 123:1 136:12

**reference** 62:5,9 63:4,10 76:7 93:6 132:3 163:5

**referenced** 20:14 37:23 96:13,23 109:24 142:9,22 143:3 151:3

**referred** 36:23 70:7 92:10 93:5 94:19 98:20 99:16 101:15 102:17 145:2 158:7

**referring** 18:22 57:10 75:5 92:16 101:25 102:1 108:6 111:12 114:21 127:12 136:13 155:7 156:16

**refers** 93:18 120:2 123:3 140:1

**reflected** 31:6 46:1 89:18

**reflecting** 111:2

**reflects** 52:17 122:8

**regard** 48:15 86:17 115:17

**region** 101:21

**rejected** 46:16

**rejections** 47:5 48:6,14 49:12

**related** 18:15 121:6 140:9 142:2

**release** 54:13

**released** 110:15 111:6 112:6

**relevant** 69:21

**reliance** 132:17 136:2

**relied** 10:15 30:7 32:5 33:3 77:20 88:7 91:6,11 110:13 121:18 130:18 132:10

**rely** 32:12 33:2 77:7 88:11 131:11

**relying** 86:5,9 87:2 103:3 113:3 130:10

**remain** 11:19

**remainder** 44:1 47:2 87:23 88:22

**remarks** 54:19 134:1

**remember** 81:3 112:16

**remote** 9:4,9,14

**remotely** 10:12 11:12,14 117:12

**removed** 48:12 104:16

**rendered** 46:17

**repeat** 29:2 35:18 45:3 47:18 62:16 71:20 83:13,14 84:9 114:17 126:7 142:23 150:23

**repeatedly** 34:22 91:23

**report** 14:3,12 15:8,12 18:8 19:15 22:8 23:6 24:1 28:20 29:1,10,16 30:20 31:12,20 33:1,10 37:22,24 39:5 41:21 44:9,19 46:22,24 47:8,17,24 49:2,22 51:7 59:12 60:23 63:1,7,15 65:13 68:5 77:4 79:21 80:4 81:6,19 82:1,5 83:9,17 84:14 86:8 87:7,12 88:9,16,20 91:5,10,16,19,21 102:2,19 103:19 106:7 113:2,4,7,15,24 114:9

115:9,22,23 117:23 118:20 119:16,22 120:21,23 121:2,9,10,16,17,21,23 122:1,4,8,12,13 126:17,24 127:10 128:2,11 130:4,22 131:13,16 132:1, 16 133:14,15 134:13,22 136:8,9,13, 14 140:21 142:13,22 143:3,12 148:17,23 151:4 157:21 158:10 159:8,23 160:12

**reported** 10:8 54:8,9

**reporter** 10:3,10

**reporting** 11:4

**reports** 19:3 63:13 72:2 129:2

**represent** 137:13 138:2 152:3,18 153:11 162:16

**representation** 36:12 37:4 38:7 40:16 42:21 43:3,5,12,18 46:7 83:19 85:1 87:18 91:24 93:6,17,23,24,25 94:8,10,11,12,13,17,18,20,21 95:2,3, 10,11,17,20,24,25 96:6,7,19,20 97:9, 11,14,25 98:4,6,11,19 99:14 100:8,22 101:7,11 102:11,21 104:2,13 118:8, 10,21 119:18 120:4 123:4 124:3,7,13, 20,25 125:1,17,21,25 126:4,9,25 127:14,23 128:4,16,18 129:23 136:19 137:4,12,13,16,17 138:1,5,8,11,17,25 139:20 140:10,22 141:8,13,24 144:5, 23 145:18,22 146:18 147:14,21,25 149:2,5,22 150:10,20 151:6,13,17 152:8,11,17,24 153:7 154:1,25 157:3, 10,18 159:12,17 160:4,19 163:18,25 164:10

**representations** 96:12,22,24 97:15 98:10,14 99:24 137:22 144:6 150:3 155:12,25 156:14 157:1

**representative** 112:9,13,19 113:13

**represented** 112:12

**representing** 138:6 154:16

**represents** 136:21 137:1 141:22 152:23 154:7 163:13

**requested** 10:22

**requesting** 82:10 103:8

**require** 40:25 42:17 43:2,11,23 45:8, 16 55:5 80:6,14 81:15,20 82:7,24 84:23,25 85:17 86:12,23 105:1,18 114:5 115:8 127:13 138:24 139:19 140:21

**required** 18:2 36:22 41:13 58:17 80:17

**requirement** 83:4 114:8 137:11

**requirements** 85:18,19 87:1 89:1

**requires** 36:10 50:4 72:5

**research** 149:23 150:1,4

**researchers** 22:17

**resolve** 55:4

**resort** 91:17 106:2 107:6

**respect** 22:6 32:21 72:15 97:21 103:2 125:14 151:11

**respective** 20:7

**respond** 156:1,14

**responds** 157:18

**response** 36:18 37:14 38:19,23 39:2,3,11,21 40:1,10,15 41:5 50:8 56:9 57:15,19,23 58:2,6,11 59:6 131:3 158:15,19

**restricted** 90:16

**result** 43:24 45:8,16 52:12 89:16 115:2

**resumed** 65:5 117:3 133:6 161:17 165:9

**return** 34:18

**returning** 33:14 56:15

**review** 20:6 61:14 62:12,17,24 137:9 149:6,10 158:23

**reviewed** 72:18 92:6 93:1 158:25 159:1,6,21 160:6,10

**reviewing** 62:21 63:2 92:23 144:17 145:9 154:23 157:8 160:7

**reviews** 20:24 24:4 29:20 32:1 35:16 44:25 51:21 92:8 129:12 131:22 135:10 149:12 158:1 162:20

**rewriting** 106:14,18,22

**rewritten** 104:15

**rewrote** 104:9 106:9

**Richardson** 9:24 12:25 13:2

**rises** 140:14

**rough** 13:21

**roughly** 16:18

**run** 71:7 72:22

**running** 143:14

**Ryan** 9:23

---

**S**

---

**S10s** 74:9

**S25** 74:4

**Sam-** 74:8

**Samsung** 74:4,9

**satisfy** 128:19 137:10

**saved** 74:16,18,25

**scenario** 125:10 126:2,8,24 127:22 128:3 148:4,7 163:14

**scope** 33:25 37:10 38:2,12 40:21,23 48:10 54:1 61:6 67:6 72:7 75:19 84:19 85:4,13 89:3,21 90:20 91:1 95:13,15 96:8 106:4,15 107:2,10 115:12,20 125:2 128:22 137:19 139:25 141:2 162:19 163:20

**screen** 76:15

**screens** 73:17

**scroll** 75:6,10

**scrolled** 75:2,4

**scrolling** 66:1,9,24,25 67:2,12,15,25 75:8,17,22 76:24

**scrutinizing** 109:1

**Sebo** 10:9

**seconds** 82:20

**section** 23:5 24:21 29:15 30:22 39:5 47:3 50:22 83:9,17 87:15,23 102:2 103:5 105:6 119:16 121:23 122:3,7 131:12 132:2

**segment** 92:12 120:18

**segregated** 108:22 109:17

**sense** 26:18 68:20 99:19 100:12

**sentence** 26:2,19,22 49:23 50:15 65:16 81:5,18 82:1 92:1 109:1,10 119:21 123:2,14,19 154:23 158:12

**sentences** 27:2

**separate** 13:16 103:22 104:6 105:1, 18 123:7

**September** 104:8 106:8 134:1

**sequence** 41:12 43:24 45:9,17 47:12,20 68:11,19 104:18,25 105:15 115:6

**series** 36:3 68:11,23 73:17 74:24 75:23 115:3

**serve** 138:1

**served** 13:13 15:9,12

**service** 69:23 70:10

**set** 20:22 21:17,24 31:23 32:13 33:1 113:21 132:2 149:17 151:12 152:25 153:3,6,8 154:11,13

**sets** 140:15

**setting** 69:23 70:10 134:6

**short** 116:4

**show** 24:10 36:17 159:10

**shows** 55:11 111:6 129:10 151:14

**sic** 12:25 162:4

**side** 23:25 141:16

**signal** 138:11

**signals** 150:10

**signed** 13:11 15:9,12

**similar** 113:21 150:19 151:6

**similarly** 25:13 164:6

**simply** 34:10 41:15 110:22

**simul-** 71:8

**simultaneous** 89:16

**simultaneously** 45:25 71:9

**single** 42:19 43:24 45:9 46:5 48:23 98:22 99:20

**single-step** 45:21 46:3 47:10 48:11 49:14

**sir** 28:14 80:18 162:15

**skill** 19:17,19,22 20:18,21 21:3,6,12, 16,22 22:5 25:14 30:25 48:9,16 51:25 52:3 54:4 59:14 60:7,24 61:7,18,22 66:22 67:24 76:8 79:17 88:24 98:13 99:23 100:4,7 101:11 104:22 105:3, 25 106:19 107:5 109:3 110:23 111:1, 6,9 141:17 149:18 155:10,20

**slightly** 13:12 16:21

**smartphone** 9:11 74:1 157:25 158:4

**Smartphone's** 77:7,18 78:5,20

**snippet** 158:9

**software** 52:4,10,25 54:8,10 61:1,4 156:17,19,25 157:5

**sole** 10:18

**solely** 55:5 137:16

**son** 74:7

**sound** 64:11

**Sounds** 64:16,17 116:13

**speakers** 45:24

**special** 22:18

**specific** 26:1,2 58:5 72:21 91:17 97:21 104:12 108:14 109:19 131:4 132:13,17 136:1 142:21 143:2 146:16 148:7 150:4 153:23

**specifically** 56:7 79:14 91:9 95:4 102:25 103:3 109:7 110:13 130:10 132:10 136:12

**specification** 24:22 30:24 34:21,22 36:4,16 37:12 38:17 41:10,16 70:22 71:15,22 72:10,14,19 76:3,12 86:3 87:5 88:13 90:12,24 91:4,7,9,11,14, 22 92:7,18 94:20,24 95:1 96:13 97:1 98:23 102:24 105:8 106:3 107:7 141:11 148:21 154:24 157:9

**specification's** 86:6

**specifications** 105:5

**speech** 89:16

**stage** 17:17

**stamped** 15:1 27:13

**Stand** 165:1

**standard** 13:8 151:16,19,21,24

**start** 43:2,16 64:14 116:1 128:15

**started** 59:25

**starting** 42:20 43:4,14,18 46:6 122:17,23 123:1,3,6,8,12,17 124:8,19 127:1,7,13,15 128:5 136:4

**starts** 124:12

**state** 23:17 24:2 34:20 36:2 46:11,15 49:23 50:11 51:7,12 56:2 77:23 79:23 81:7 85:25 91:22 106:7 107:12,14 109:23 111:2 112:10,13,19 113:13,25 119:22 122:16,22 124:2 125:19 136:17 137:25 154:22

**stated** 20:4 23:12 30:21 31:19 50:6 68:9 85:14 146:21 158:16

**statement** 35:1 50:10 55:21 56:17 65:24 66:7,12 67:4,5 72:4 82:5 86:10 115:18

**statements** 50:16 55:9 56:25 57:4 160:2

**states** 35:4 45:20 57:18 109:2

**stating** 51:8 57:13

**stenographer** 10:5 11:11,16 27:25 64:20 82:9,13,18 98:24 99:3,7 100:15 103:7,11 116:16 117:10 118:14 164:18,22

**stenographic** 9:20 10:17

**stenographically** 10:8

**step** 36:22,24 37:1 40:2 42:19 46:5 48:23 58:17 65:22 66:5,17 67:10 68:11,14,15,20,23,25 69:1,10,11,24, 25 70:6,9 71:17,24 72:12,20 73:2,7, 13,18 76:5,13 77:2,9,15,16,21,23 78:7,22 79:9

**steps** 38:23 39:16,21 40:10 41:6,12 50:8,23,24 56:9 57:15,19,23 58:2,3,4, 6,12 59:7,15,16 68:19,21,24 73:20,22

**stop** 80:18,19 89:5

**strict** 10:23

**strike** 23:1 29:5 39:23 42:12 43:8 46:22 55:2 59:22 69:16 78:13,15 95:20 98:2 121:24 127:24 145:9

**stuff** 144:10

**subject** 69:12

**subjective** 68:16 70:14 77:16

**submitted** 37:22 62:5,13,18

**subsequent** 40:2

**subsequently** 49:2 131:20

**substantially** 114:8

**substituting** 81:20

**suggest** 47:12,20 59:24 104:25 105:17 115:6

**suggesting** 76:4,13

**summarize** 142:15

**summarizing** 29:14

**summary** 20:16

**sun** 140:14

**sup-** 126:23

**superset** 122:12

**supplemental** 14:11 15:11 18:8 22:8 23:6 29:16 31:20 63:13 65:13

115:21 119:16 120:21,23 121:8,16, 17,25 122:4,7,12 126:17,24 127:10 128:2,11 129:1 130:4,22 131:13,15, 25 132:15 133:16,17 136:9,11,14 142:13 148:16,22 151:4

**support** 33:5 50:17 80:1 81:10,14,21 88:3 114:3 119:4,9 134:1 136:3

**supported** 23:19,23 24:18 25:9 107:13

**supporting** 113:7

**supports** 34:21 83:5

**surface** 60:1 70:1

**surrounding** 23:20 78:2,11 79:12

**surveys** 149:6

**swear** 10:3

**swiped** 74:22,23

**swiping** 75:1,16

**Switzerland** 143:21

**sworn** 11:9,18 117:8

**symbol** 142:1,4,9,19,25 143:6,15,16, 20 144:6,7,10,11,12,22 145:17,25 146:10,14 147:1,13,21,25 148:9,10, 13,19 164:7,11

**symbols** 141:20,21 144:9 149:24 150:2

**synon-** 62:1

**synony-** 62:1

**synonym** 31:24

**synonymous** 24:12 62:3

**synonyms** 32:4

**system** 61:1,4

**systems** 54:8,10

---

**T**

**T2** 110:1,7,10,15,18 111:2,5,15

**table** 57:9 59:10 60:22 134:5,11,12, 21

**takes** 68:21

**taking** 9:16 164:23

**talking** 45:24

**taught** 152:16

**teaches** 34:22 70:22 90:14

**teaching** 41:9 71:15,22 72:9,17 90:24 91:3 144:18 145:12 147:9 148:21

**teachings** 149:10,17

**TECHNICIAN** 9:7 10:2 64:22 65:8 116:18 117:14 132:23 133:9 161:3,7, 9,20 164:20,25 165:12 166:4

**technology** 10:12 156:9

**telling** 55:16 97:19

**Ten** 64:8

**term** 19:24 22:12,14 23:10 24:11 27:1 31:1,14 36:20 37:25 38:1 60:16, 19,22 61:16 62:22 65:22 66:5,17 67:11 70:13 73:7 76:5,13 77:2,11,15, 23 79:8,18 84:21,22 85:5,16,17 86:6, 12,23 87:16,21 88:14 89:2 93:16,22 94:16 95:9,17,18,20,23 108:2,3 114:10,11 115:20 123:11 136:18 137:6,7 138:10,20,24 139:18,19 140:20,21 149:1 156:5,22 163:12

**termination** 52:17,21 53:3,4,12

**terms** 34:12 37:23 48:10 61:24 79:11 96:8,21 107:9 112:22 115:14 118:19, 20 120:20

**testified** 11:14 99:21 106:8 117:12

**testify** 12:15,19

**testimony** 12:10 63:24 89:17 100:1, 2 110:25 111:4

**text** 115:9

**thereabouts** 112:17 156:11

**thereof** 90:18

**thing** 17:22 57:8 67:25

**things** 22:23 66:13 110:22 142:3 146:3,5,6,11,13,17 147:14 148:2,6,8, 11,14,20

**thinking** 75:7 82:4 102:5

**Thursday** 9:5

**tied** 82:1

**time** 9:7 12:6 13:10 16:25 44:2,16 45:13 63:18 64:23 65:9 83:2 99:6 107:16,23 108:6 109:5 110:24 111:10,11 116:9,19 117:15 118:9,11 125:12 129:16 130:12 132:24 133:10 158:5 161:10,21 165:3,13,18,25 166:4

**times** 16:18,20

**today** 12:11 16:25 165:18,25

**top** 41:25 44:9 70:25 71:10 118:19

**topic** 63:19

**touch** 36:6,18 37:5 38:24 39:3,10,22 40:1,11,16 41:7,12,17 50:9 54:23 55:6,12,14 56:10 57:21,24 58:6 59:8, 17 120:3 124:18,19

**touch-** 109:8

**touch-and-glide** 134:8

**touch-sensitive** 34:24 35:6 53:5 60:1 69:7 70:1 83:18,24 84:2,3,16,23 85:9 86:12,24 87:17 101:17,20,23,25 102:10,20 108:21,25 109:8 110:3 124:24 129:22 144:17 145:11 147:8

**touched** 38:8 60:2 118:8,22 119:18

**touchends** 54:9

**touches** 37:3 38:6 124:23

**touching** 36:11 124:6 125:17,24

**touchscreen** 73:21 156:24 157:16

**transcript** 10:16,17,21,22

**trigger** 52:11

**truth** 11:13,14 117:10,11

**truthful** 12:10

**Tungsten** 109:22 110:1,7,10,15,18 111:2,5,15

**turn** 18:9 22:7 41:20 44:6,9 54:16 63:14 70:16 77:3 79:20 91:20 92:3 103:14 113:18 114:13 115:22 117:22 122:1 129:4 134:15 136:7 152:6 157:20

**turning** 19:14 65:12 68:4

**two-minute** 132:21

**two-step** 123:10

**type** 13:9 93:10,15 153:24 155:22

**types** 52:7

---

**U**

**U.S.** 13:7 14:19,25 15:16 16:11

**ultimately** 47:6

**Ultra** 74:4

**uncertainty** 78:2,11 79:12

**unclear** 52:20 78:25 96:1 99:17 105:23 115:11,17

**underlying** 155:1,6 157:12,14

**underneath** 59:11

**unders-** 25:3

**understand** 16:2,7 17:5,12,14 18:4 19:23 21:8 23:21 40:21 47:11,19 49:10 51:9 52:1,15 54:5,11 55:21 56:17 59:10,15,21,23 60:24,25 61:3,8 66:11 71:14,21 73:12 78:12 79:17 80:5,13,24 82:6,24 90:23 93:22 95:12 97:19 98:1,14 99:23 100:25 101:21 104:18,24 105:14 106:4 107:1 114:5 115:6 118:24 124:1,11 125:3,15 136:23 137:14 140:18 141:18 144:21 145:15 147:12 149:24 150:2,14 152:13,17 153:1,7 154:24 155:3,10 157:2,9

**understanding** 16:9,13 19:16 22:21 23:9,10 25:2,7 30:16 31:8 48:9,16 58:9 59:20 60:7,21 61:14,19,21,24 68:25 78:14 80:8 85:25 86:16 88:24 96:5,18 97:8 98:3 101:3,4 107:10 111:9 114:10 115:15 123:13 146:16 149:8

**understands** 52:4 149:13

**understood** 18:5 31:1 36:5 64:2 78:7,22 79:24 81:8 88:2 107:15,22 109:4 114:1 119:2,8 124:8 136:18 148:19

**undertake** 108:17 109:13

**unit** 70:23 71:7 72:22

**universe** 26:11

**unsure** 53:19

**URL** 62:5

**usage** 33:20 34:4

**user** 22:15 73:9 91:25 107:15,23 108:5 109:4,16 136:20 137:5,14 138:4,13,19 139:1,2,11,16,21,22 140:23,24 141:5,6,18 142:8,19,25 144:15,16 145:8,10,21 146:9,12,16, 22 147:5,7,18,20,22 148:4,7,19 149:15,24 150:3,12,18 151:4 152:15, 22 153:1,4,6,9,23 154:4,9,15,18 155:21,23 156:1,8,13,14 157:5 163:16,22

**users** 140:4 149:7,16,24 150:2

**uttered** 26:23 27:2

---

**V**

**vague** 25:19 26:13 33:25 37:10 38:12 40:5,7,23 46:13 48:1 49:8 52:19 53:9 54:1 58:19 60:4 61:6 69:4 83:12 84:6,19 85:13 87:11 93:13 94:2 99:2 105:20 108:12 124:15 125:5 126:13 127:5 128:9,22 137:19 139:5, 25 141:2,4 144:25 145:20 146:20 147:16 150:22 152:20 154:3 162:19 163:20

**varied** 69:11

**variety** 60:10 61:9

**verse** 9:11

**version** 41:25 42:11,13,16,18,24 43:1,8,10,22 44:5,14,15,22 45:7,11, 15,18 47:13,15,21,23 48:19,21,22 49:4 103:18,21,25 105:16 107:6 112:22 114:20 115:1 129:11,15,18 130:6,11,24 131:10,11,18

**versions** 18:23 111:19

**vicinity** 110:24

**video** 9:7,10 10:2,13 62:6,10,12,17, 21,24 63:2,4,6,9,10,12 64:22 65:8 116:18 117:14 132:23 133:9 161:3,7, 9,20 164:20,25 165:12 166:4

**videoconference** 11:12

**view** 30:23 46:18 77:11,24 79:7 106:23

**viewing** 63:9 77:25 145:11 147:7

**views** 41:4

**VIII** 131:12

**visual** 137:16 144:21 145:16 147:12 155:1 157:11

**Vx** 110:10 111:13

---

**W**

**walking** 68:22

**wanted** 99:8 106:15

**water** 26:6,7,21 33:15,16,22 34:6,11, 14

**ways** 54:3 68:1 149:14 156:7

**well-known** 108:20 109:15 112:3,5, 8,18 150:5

**West** 140:15

**whilst** 95:14

**white** 152:2

**width** 76:15

**wife** 74:6

**Wiley** 68:9

**word** 22:16 25:8,16,24 26:3,23 28:24 29:5,8 30:12 33:6,20 34:5 62:19 73:13 81:15 96:2 107:20 108:2 123:5, 8,12,14,18 138:22

**words** 51:10,19 55:19 71:5 81:12

**work** 13:5,9 73:9 108:18

**writing** 25:13

**written** 37:13 82:11 103:9

---

**Y**

**year** 112:7

**years** 112:21

**yes-or-no** 159:20

# EXHIBIT 8

Philip J. Graves
(SBN 153441 | pgraves@gravesshaw.com)
Greer N. Shaw
(SBN 197960 | gshaw@gravesshaw.com
GRAVES & SHAW LLP
355 S. Grand Ave., Suite 2450
Los Angeles, CA 90071
Telephone: (213) 204-5101

Kalpana Srinivasan
(SBN 237460 | ksrinivasan@susmangodfrey.com)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029)
Telephone: (310) 789-3100
Facsimile:  (310) 789-3150

Brian D. Melton
SUSMAN GODFREY L.L.P.
*(Admitted PHV* | bmelton@susmangodfrey.com)
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

*Attorneys for Plaintiff Neonode Smartphone LLC*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| NEONODE SMARTPHONE LLC,<br><br>                 Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>                 Defendant. | No.  3:21-cv-08872-EMC<br><br>**MANUEL FILING NOTIFICAITON REGARDING EXHIBIT 8 TO THE DECLARATION OF COREY M. LIPSCHUTZ IN SUPPORT OF PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF** |

This filing is a video file that is not supported by CM/ECF upload, and is being maintained in the case file in the Clerk's office.

If you are a participant in this case, this filing will be served shortly by link to a cloud file hosting service.

For information on retrieving this filing directly from the court, please see the court's main web site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

___ Voluminous Document (PDF file size larger than e-filing system allowances)

___ Unable to Scan Documents

___ Physical Object (description): _____

_X_ Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

___ Item Under Seal

___ Conformance with the Judicial Conference Privacy Policy (General Order 53).

___ Other (description): _____

_____

2     MANUAL FILING NOTIFICATION REGARDING EXHIBIT 8
TO THE DECLARATION OF COREY M. LIPSCHUTZ IN
SUPPORT OF PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF
CASE NO. 3:21-CV-08872-EMC

Date: March 27, 2026

Respectfully submitted,

By: */s/ Corey M. Lipschutz*
Philip J. Graves
(SBN 153441 | pgraves@gravesshaw.com)
Greer N. Shaw
(SBN 197960 | gshaw@gravesshaw.com)
GRAVES & SHAW LLP
355 S. Grand Ave., Suite 2450
Los Angeles, CA 90071
Telephone: (213) 204-5101

Kalpana Srinivasan
(SBN 237460 |
ksrinivasan@susmangodfrey.com)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029)
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Brian D. Melton
SUSMAN GODFREY L.L.P.
*(Admitted PHV* |
bmelton@susmangodfrey.com)
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

*Counsel for Plaintiff Neonode Smartphone LLC*

3    MANUAL FILING NOTIFICATION REGARDING EXHIBIT 8
TO THE DECLARATION OF COREY M. LIPSCHUTZ IN
SUPPORT OF PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF
CASE NO. 3:21-CV-08872-EMC

# EXHIBIT 9

Trials@uspto.gov
571-272-7822

Paper 59
Date: December 15, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

SAMSUNG ELECTRONICS CO. LTD,
SAMSUNG ELECTRONICS AMERICA, INC., and APPLE INC.,
Petitioner,

v.

NEONODE SMARTPHONE LLC,
Patent Owner.

IPR2021-00144
Patent 8,095,879 B2

Before KARA L. SZPONDOWSKI, CHRISTOPHER L. OGDEN, and
SCOTT B. HOWARD, *Administrative Patent Judges*.

OGDEN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2021-00144
Patent 8,095,879 B2

## I. INTRODUCTION

Petitioners Samsung Electronics Co. Ltd., Samsung Electronics America, Inc., and Apple Inc. (collectively, "Petitioner") filed a Petition (Paper 6, "Pet.") for *inter partes* review of claims 1–6 and 12–17 of U.S. Patent No. 8,095,879 B2 (Ex. 1001, "the '879 patent"). The Board initially denied the Petition (Paper 24, "Dec."). However, after Petitioner filed a Request for Rehearing (Paper 25, "Reh'g Req."), the Board reconsidered its position and granted *inter partes* review. (Paper 26, "Reh'g Dec."). The parties later agreed, by stipulation, to limit the scope of the Petition to four grounds challenging claims 1–6 and 12–17. Paper 50.

Patent Owner Neonode Smartphone LLC ("Neonode") filed a Patent Owner Response under seal (Paper 37, "PO Resp."; public redacted version as Ex. 1048), Petitioner filed a Reply to the Patent Owner Response (Paper 41, "Pet. Reply"), and Neonode filed a Sur-reply under seal (Paper 49, "PO Sur-reply"; public redacted version as Ex. 1073).

We held an oral hearing on Sept. 6, 2022, and the transcript is entered on the record. Paper 55 ("Tr.").

This is a final written decision under 35 U.S.C. § 318(a) as to whether the claims challenged in the *inter partes* review are unpatentable. For the reasons below, we conclude that Petitioner has not shown that any claims of the '879 patent are unpatentable.

IPR2021-00144
Patent 8,095,879 B2

## II. BACKGROUND

### A.    RELATED PROCEEDINGS

The parties identify the following as related matters: *Neonode Smartphone LLC v. Apple Inc.*, No. 6:20-cv-00505 (W.D. Tex. filed June 8, 2020); and *Neonode Smartphone LLC v. Samsung Electronics Co. Ltd.*, No. 6:20-cv-00507 (W.D. Tex. filed June 8, 2020). Pet. 92–93; Paper 7, 2.

### B.    THE '879 PATENT (EX. 1001)

The '879 patent relates to a user interface on a mobile handheld computer device that has a touch-sensitive display screen divided into a menu area and a display area. *See* Ex. 1001, 1:6–9, code (57). The user interface is "specifically adapted to be used with a small computer unit where the size of the touch sensitive area is in the order of 2–3 inches" and the interface can "be operated by one hand." *Id.* at 3:1–6.

Figure 1 of the '879 patent, reproduced below, illustrates such a user interface:



*Fig. 1.*

Figure 1 depicts touch-sensitive area 1 on a mobile handheld device. Ex. 1001, 3:22–23, 3:51–53. It is divided into menu area 2 and display area

3

IPR2021-00144
Patent 8,095,879 B2

3. *Id.* at 3:53–54. Menu area 2 is a narrow strip along the lower part of touch-sensitive area 1 that contains predefined functions 21 (a general application-dependent function), 22 (a keyboard), and 23 (a task and file manager). *Id.* at 4:1–6; *see also id.* at 2:7–10.

Functions 21, 22, and 23 in menu area 2 "can be activated when the touch sensitive area detects a movement of an object with its starting point within the representation of the function on the menu area and with a direction from the menu area to the display area." *Id.* at 1:65–2:5, 2:11–14. This method of activation is shown in Figure 2, reproduced below:



*Fig. 2.*

Figure 2, above, illustrates a touch gesture by which a user may activate functions 21, 22, or 23 in area 2. *See* Ex. 1001, 3:24–25. This gesture begins when object 4 (a thumb as shown in Figure 2, but it could be any finger, a pen, or another pointing device, *id.* at 6:11–15) touches the display at point A within representation 21, 22, or 23, and moves in direction B away from menu area 2 into display area 3. *Id.* at 4:7–11.

When a user activates the first function, display area 3 displays icons representing services or settings, depending on the current active application.

4

IPR2021-00144
Patent 8,095,879 B2

*Id.* at 2:18–20. Figure 3, reproduced below, illustrates the touch screen after function 21 has been activated:



Fig. 3.

Ex. 1001, 3:26. Figure 3, above, shows that after a user activates function 21 with the gesture as illustrated in Figure 2, display area 3 displays icons 211–216, which each represent services or functions depending on the currently active application. *Id.* at 4:12–15. If, for example, the active application handles a picture, then the icons showing on display area 3 after a user activates the first function can include services such as "save to disk," "send as SMS," or "delete," or settings such as "resolution," "colour," or "brightness." *Id.* at 4:24–28.

Analogously, selecting function 22 activates a keyboard, and selecting function 23 activates a library of available applications and files on the device. *Id.* at 4:36–38, 4:63–65, Figs. 5–6. If there is no currently active application, the icons may "represent services or settings of the operations system of the computer unit, such as background picture, clock alarm 215, users 213, help 211, etc." *Id.* at 4:29–32.

5

IPR2021-00144
Patent 8,095,879 B2

### C.    CHALLENGED CLAIMS AND GROUNDS

Claim 1, the only independent claim, is as follows:

1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:

[a]   a touch sensitive area in which a representation of a function is provided,

[b]    wherein the representation consists of only one option for activating the function

[c]    and wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location,

[d]    wherein the representation of the function is not relocated or duplicated during the gliding.

Ex. 1001, 6:45–59 (Petitioner's reference letters added).

Petitioner initially argued ten grounds for *inter partes* review, as shown in the following table:

6

IPR2021-00144
Patent 8,095,879 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 14–17 | 103(a)[1] | Ren,[2] Tanaka[3] |
| 2–5 | 103(a) | Ren, Tanaka, Hirayama307[4] |
| 3 | 103(a) | Ren, Tanaka, Hirayama307 Hirayama878[5] |
| 6, 13 | 103(a) | Ren, Tanaka, Allard[6] |
| 12 | 103(a) | Ren, Tanaka, Henckel[7] |
| 1, 2, 4, 5, 14–17 | 103(a) | Hirayama307, Ren |
| 3 | 103(a) | Hirayama307, Ren, Hirayama878 |
| 6, 13 | 103(a) | Hirayama307, Ren, Allard |
| 12 | 103(a) | Hirayama307, Henckel |
| 1, 14, 15 | 103(a) | Jermyn[8] |

Pet. 1–2.

---

[1] 35 U.S.C. § 103(a) (2006), *amended by* Leahy–Smith America Invents Act, Pub. L. No. 112-29 § 103, sec. (n)(1), 125 Stat. 284, 287, 293 (2011) (effective Mar. 16, 2013). The '879 patent issued from an application filed on December 10, 2002, which is before the effective date of this amendment to section 103. *See* Ex. 1001, code (22).

[2] Xiangshi Ren & Shinji Moriya, *Improving Selection Performance on Pen-Based Systems: A Study of Pen-Based Interaction for Selection Tasks*, 7 ACM Transactions on Computer-Human Interaction, Sept. 2000, at 384 (Ex. 1004).

[3] Tanaka, US 5,249,296, issued Sept. 28, 1993 (Ex. 1005).

[4] Hirayama et al., US 5,406,307, issued Apr. 11, 1995 (Ex. 1006) (Hirayama307").

[5] Hirayama, US 6,100,878, issued Aug. 8, 2000 (Ex. 1009) ("Hirayama878").

[6] Allard et al., US 5,615,384, issued Mar. 25, 1997 (Ex. 1010).

[7] Henckel et al., US 5,463,725, issued Oct. 31, 1995 (Ex. 1013).

[8] Ian Jermyn et al., *The Design & Analysis of Graphical Passwords*, in Proceedings of the 8th USENIX Security Symposium (1999) (Ex. 1014).

IPR2021-00144
Patent 8,095,879 B2

With our authorization (Ex. 2037), the parties later stipulated to limit the scope of the Petition to the sixth through ninth grounds based on Hirayama307. Paper 50; *see also* Reh'g Req. 1 n.1; PO Resp. 1 n.1.

### D. DECLARATORY TESTIMONY

Petitioner submits two declarations of Dr. Benjamin B. Bederson as expert testimony. Exs. 1002, 1051; *see also* Ex. 1002, App'x A (curriculum vitae). Petitioner also relies on a declaration of Jacob Robert Munford as to Ren's public availability. Ex. 1031.

Neonode submits a declaration of Dr. Craig Rosenberg. Ex. 2007; *see also* Ex. 2002 (curriculum vitae). Neonode also submits declarations of Ulf Mårtensson (Ex. 2022), Joseph Shain (Ex. 2023), Marcus Bäcklund (Ex. 2024), and Per Bystedt (Ex. 2026 under seal; redacted public version as Ex. 1049) relating to alleged objective indicia of non-obviousness and the early development of touch-screen phones that, according to Neonode, embody the challenged claims.

## III. GROUNDS OF THE PETITION

For the reasons below, we determine that Petitioner has not shown, by a preponderance of the evidence, that claims 1–6 and 12–17 of the '879 patent are unpatentable under the extant grounds of the Petition. Before analyzing these grounds in detail, we address two matters that will underlie our analysis: the level of ordinary skill in the art and the construction we will apply to the claim terms.

8

IPR2021-00144
Patent 8,095,879 B2

### A.    LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the pertinent art at the time of the invention is a factor in how we construe patent claims. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). It is also one of the factors we consider when determining whether a patent claim would have been obvious over the prior art. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

To assess the level of ordinary skill, we construct a hypothetical "person of ordinary skill in the art," from whose vantage point we assess obviousness and claim interpretation. *See In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998). This legal construct "presumes that all prior art references in the field of the invention are available to this hypothetical skilled artisan." *Id.* (citing *In re Carlson*, 983 F.2d 1032, 1038 (Fed. Cir. 1993)).

For Petitioner, Dr. Bederson testifies that a person of ordinary skill "would have had at least a bachelor's degree in computer science, computer engineering, or the equivalent education and at least two years of experience in user-interface design and development," but "[a]dditional years of experience could substitute for formal education, and vice versa." Ex. 1002 ¶ 49.

Testifying for Neonode, Dr. Rosenberg states that for his declaration, he "will apply the same definition of the level of skill of a [person of ordinary skill in the art]" as Dr. Bederson. Ex. 2007 ¶ 28.

We find Dr. Bederson's uncontested articulation to be reasonable in light of the subject matter involved in the '879 patent and the asserted prior art. *See, e.g.*, Ex. 1001, 1:49–61 (stating that the '879 patent addresses

9

IPR2021-00144
Patent 8,095,879 B2

technical problems including "to provide a user-friendly interface . . . on a small handheld computer unit"). Thus, we adopt it for our decision.

### B.    CLAIM CONSTRUCTION

In an *inter partes* review, we construe a patent claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2020). This generally includes "construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* The ordinary and customary meaning of a claim term "is its meaning to the ordinary artisan after reading the entire patent," and "as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313, 1321. There are only two circumstances in which a construction departs from the ordinary and customary meaning: "1) when a patentee sets out a definition and acts as [their] own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Any such special meaning of a term "must be sufficiently clear in the specification that any departure from common usage would be so understood by a person of experience in the field of the invention." *Multiform Desiccants Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

To construe the claim terms, "we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006).

10

IPR2021-00144
Patent 8,095,879 B2

Petitioner does not propose any explicit claim constructions in its Petition. *See* Pet. 5–6. Neonode does not propose any explicit constructions either, but in its Response, Neonode raises a number of claim construction arguments to distinguish the term *gliding* as it appears in limitation 1c from a "drag-and-drop" operation as known in the prior art, to which Petitioner responds in its Reply. *See* PO Resp. 19–33; Pet. Reply 1–9; *see also* PO Surreply 7–15. We do not need to construe this term explicitly for our decision, and to the extent any terms need construction, we address the terms below in the context of the prior art. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy' . . . ." (quoting *Vivid Techs., Inc. v. Am. Sci & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

C.      CHALLENGE TO CLAIM 1

In the first extant ground of the Petition, Petitioner argues that claims 1, 2, 4, 5, and 14–17 are unpatentable under 35 U.S.C. § 103(a) as obvious over Hirayama307 in view of Ren. Pet. 49–70. For this ground, we focus on Petitioner's challenge to sole independent claim 1 and particularly limitation 1d (Pet. 60–62), after which we address the remaining claims and the remaining grounds.

A claim is unpatentable under § 103(a) for obviousness if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406

11

IPR2021-00144
Patent 8,095,879 B2

(2007). When a ground in a petition is based on a combination of references, we consider "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *Id.* at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

We base our obviousness inquiry on factual considerations including (1) the scope and content of the prior art, (2) any differences between the claimed subject matter and the prior art, (3) the level of skill in the art, and (4) any objective indicia of obviousness or non-obviousness that may be in evidence. *See Graham*, 383 U.S. at 17–18.

Considering these factors, we determine that Petitioner has not shown, by a preponderance of the evidence, that claim 1 is unpatentable under 35 U.S.C. § 103(a) as obvious over Hirayama307 in view of Ren. We begin with an overview of Hirayama307 and Ren.

### 1.   *Hirayama307*

Hirayama307 relates to a small data electronic device comprising a pen, a display panel, and a transparent touch sensor mounted on the device. Ex. 1006, 1:7–10, 2:64–3:6. A user interface shown on the display panel of this device is shown in Figure 3A, reproduced below:

12

IPR2021-00144
Patent 8,095,879 B2



FIG. 3A

Ex. 1006, 2:48–51. Figure 3A, shown above, illustrates how a user selects
and activates, via touch-sensor (input tablet) 2, a telephone dialer operation
on the display portion 1 of the device. *See* Ex. 1006, 4:61–63. The user first
touches telephone icon 41 (having a picture of a telephone to represent a
dialer operation) with the point of pen 3. *Id.* at 4:63–65. As the point of pen
3 approaches the surface of input sensor 2 on the way towards touching icon
41, *x*-shaped cursor 42 appears on the screen of display portion 1 so the user
"can visually confirm the exact position of the point of pen 3 on the input
tablet 2 very clearly." *Id.* at 4:65–5:3.

After the user touches dialer icon 41 with the point of pen 3, "the user
moves (i.e. drags) the point of the pen 3 to the display position on the
surface of the input tablet 2 without being separated therefrom." Ex. 1006,
5:3–6. At some point during this pen movement, "an icon [43] (hereinafter

13

IPR2021-00144
Patent 8,095,879 B2

. . . referred to as a window) enlarged in the form of the processing display mode of the desired icon 41 is automatically displayed on the display portion 1 as shown in FIG. 3B." *Id.* at 5:9–12.

Figure 4A, reproduced below, is a flowchart of what happens during this process:

FIG. 4A

The flowchart in Figure 4A, above, begins when a processor loops until the point of pen 3 is touching the surface of input tablet 2 within a predetermined area of icon group 40 and until the point of pen 3 has, before

14

IPR2021-00144
Patent 8,095,879 B2

the user lifts the pen from the surface, either (a) shifted by a "large" reference amount or (b) moved outside a designated area such as hatched area 45 (steps S1–S5). Ex. 1006, 5:16–63. If one of these things occurs, then in step S6, "icon 41 . . . is enlarged as a window 43 shown in FIG. 3B." *Id.* at 5:59–66.[9] Then, the processor continues to move enlarged icon/window 43 along with the tip of pen 3 until the user lifts pen 3 from the surface, at which time "the icon is activated so that various processing menus within the window 43 can be executed" (steps S7–S9). *Id.* at 6:3–21.

Figure 3B, reproduced below, depicts among other things the continued dragging of enlarged icon/window 43 along with pen 3 prior to the dialer application being activated:

---

[9] Elsewhere, Hirayama also suggests an embodiment in which this enlargement of icon 41 to window 43 does not occur until the user "takes the point of the pen 3 off from the surface of the input tablet 2." Ex. 1006, 5:3–9; *see also id.* at 2:10–13 ("[A] circuit converts the icon into a window when it is detected that the point of the pen is apart from the display device . . . .").

IPR2021-00144
Patent 8,095,879 B2



FIG. 3B

Figure 3B, above, illustrates later stages of the same user interface as Figure 3A. *See* Ex. 1006, 2:48–51, 5:3–12. In the above illustration, arrow B depicts the movement of window 43 as "the user moves the point of the pen 3 in the arrow B direction and drags the pen 3 to the position shown by the broken line," thus causing "the large display icon, i.e. the window 43 [to be] moved to the position shown by the broken line in FIG. 3B." *Id.* at 6:10–14.

Hirayama307 also describes a reverse operation in which the user can "bring the large icon, i.e. the window 43 displayed on the display portion 1 as shown in FIG. 3B back to the original position." Ex. 1006, 6:22–24. To do this, the user touches hatched portion 44 of window 43 and "drags the point of the pen 3 back to the telephone icon 41 of the original icon group 40 without being apart from the tablet," or alternatively, the user may return icon/window 43 to a different "predetermined icon in the icon group 40" and

16

IPR2021-00144
Patent 8,095,879 B2

then "the window can automatically be stored in the vacant icon position." *Id.* at 6:24–35.

In what appears to be another embodiment for returning the dialer icon to icon group 40, icon/window 43 is "reduced in size" to icon 41 if the user drags the pen either (a) by a "large" amount or (b) outside a designated area, after which "the icon displayed as the reduced icon [41] is moved" until "the user holds the pen 3 up from the panel surface of the input tablet 2," after which "the icon is deactivated" and "moved to the predetermined vacant position." *Id.* at 6:66–7:6, Fig. 4B.

### 2. *Ren*

Ren is a journal article comparing different pen-based selection strategies for use on small, touch-sensitive screens. Ex. 1006, 384–85. One of these strategies, called *Slide Off*, has a variation reproduced below in an extracted portion of Figure 3:



Ex. 1006, 390. In Figure 3 above, "[t]he arrows show the direction of pen-tip movement," "the dashed lines indicate that the pen-tip is not in contact with the screen surface (either before or after contact), and the solid lines . . . show that the pen-tip is in contact with the screen surface." *Id.* at 389. An ellipse represents the target. *See id.* at 387 & Fig. 1.

This variation of the *Slide Off* strategy, described as "$a{\to}c{\to}b{\to}a$," is where the pen touches a target ($a{\to}c$), slides off the target ($c{\to}a$), and then

17

IPR2021-00144
Patent 8,095,879 B2

lifts off the screen outside the target ($b{\to}a$). *See id.* at 390, Fig. 3. "The target is highlighted only while the pen is in contact with it" and "the selection is made when the pen is removed from any point on the screen . . . outside the target area." *Id.* at 391.

### 3. Preamble and Limitations 1a–1c

Petitioner argues that Hirayama307 alone discloses the preamble of claim 1 and limitations 1a–1c. Pet. 49–60. The preamble recites "[a] non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface." Ex. 1001, 6:45–49. To the extent that the preamble is limiting, which Petitioner does not take a position on, Petitioner contends that Hirayama307 discloses such a medium. Pet. 49–51.

Limitations 1a and 1b recite "a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function." Ex. 1001, 6:50–52. Petitioner contends that this "representation of a function" corresponds to Hirayama307's icon 41 as shown in Hirayama307's Figures 3A and 3B, which represents a single option for activating a phone dialer function. Pet. 51–58; *see supra* Section III.C.1.

Limitation 1c recites "wherein the function is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation [of a function] is provided and then (ii) the object gliding along the touch sensitive area away from the touched location." *Id.* at 6:54–57. An example of this operation is the gesture illustrated in Figure 2 of the '879 patent, which we discuss above. *See supra*

18

IPR2021-00144
Patent 8,095,879 B2

Section II.B. Petitioner contends that in Hirayama307, this recited gesture corresponds to the user touching icon 41 on display portion 1 and moving the pen downward, away from the touched location, until the function is activated by opening up dialer window 43 (as shown in Hirayama307's Figure 3B). *See* Pet. 58–60.

Neonode does not contest Petitioner's arguments about the preamble or limitations 1a or 1b, but contests Petitioner's arguments as to limitation 1c. PO Resp. 19–33. However, because we find that Petitioner has failed to meet its burden of persuasion as to limitation 1d, particularly in light of our determination that the objective indicia of non-obviousness weigh in favor of nonobviousness (*see infra* Section III.C.5), we need not address Petitioner's contentions as to the preamble or limitations 1a–1c in detail, or Neonode's responsive arguments about limitation 1c. We discuss the contested issues relating to limitation 1d below.

### 4. Limitation 1d

Limitation 1d recites "wherein the representation of the function is not relocated or duplicated during the gliding." Ex. 1001, 6:57–59. Petitioner argues, alternatively, (1) that Hirayama307 would have suggested limitation 1d to a person of ordinary skill in the art, and (2) that Hirayama307 teaches the limitation in view of the teachings of Ren. Pet. 60–62. We address each of these arguments in turn.

### (a)    Whether Hirayama307 Teaches Limitation 1d

Limitation 1d is a negative limitation because it requires the *absence* of any "relocat[ion] or duplicat[ion] during the gliding" gesture. Ex. 1001, 6:57–59. As with any claim limitation, the burden of persuasion rests on

19

IPR2021-00144
Patent 8,095,879 B2

Petitioner to show that the negative limitation is present in Hirayama307 or that this negative limitation would have been an obvious variation based on Hirayama307's disclosure, a burden that never shifts to Neonode. *Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1379–81 (Fed. Cir. 2015).

As discussed above, Petitioner contends that Hirayama307's icon 41 is the "representation of the function" recited in claim 1, and that the recited gliding gesture occurs when "the user 'moves (*i.e.* drags) the point of the pen 3.'" Pet. 60 (quoting Ex. 1006, 5:3–4) (citing Ex. 1006, 1:52–55); *see supra* Section III.C.3. According to Petitioner, "[i]t would have been obvious, given Hirayama307's disclosure[,] to implement the user interface such that the icon is not relocated or duplicated during the gliding of the pen." Pet. 60 (citing Ex. 1002 ¶ 157). In support for its arguments, Petitioner relies on the testimony of Dr. Bederson and focuses primarily on Figures 3A and 3B, and text associated with these figures. *See* Pet. 60–62; Pet. Reply 10–18, 21–26.

Below, we address the disputed issues regarding Petitioner's argument. For the reasons below, we find that the evidence is insufficient to establish by a preponderance of the evidence that Hirayama307 teaches the lack of any relocation or duplication of icon 41 during the pen movement as limitation 1d requires.

### (1) Hirayama307's Summary of the Invention

In response to Petitioner's general arguments in the Petition, Neonode argues that Hirayama307's "Objects and Summary of the Invention" section discloses that after a user selects an icon such as icon 41 in Figure 3A, the input device 2 has a circuit that "controls the icon display coordinate position such that the icon display coordinate position is moved in

20

IPR2021-00144
Patent 8,095,879 B2

accordance with the movement of the position coordinate of the point of the pen" and then after some distance "converts the icon into a window." PO Resp. 39–40 (quoting Ex. 1006, 2:5–11) (citing Ex. 2007 ¶ 73). This, according to Neonode, suggests that icon 41 is dragged along with the tip of pen 3 during the dragging operation that Petitioner relies on as disclosing limitation 1d. *See id.* at 29.

In its Reply, Petitioner acknowledges that "it would have been at least obvious" to implement Hirayama307's user interface in "a way in which icon 41 is dragged during gliding of the pen," but Hiryama307 also teaches implementing the user interface in "a way that does not drag icon 41." Pet. Reply 18 (citing Ex. 1051 ¶ 82). Petitioner also contends that Hirayama307's summary section describes a different embodiment than the rest of the disclosure. *See id.* at 10–12 (citing Ex. 1006, 2:5–13, 4:61–65, 5:3–12, 5:26–44, 5:63–66, Figs. 3A, 3B, 4A; Ex. 2007 ¶ 59; Ex. 1051 ¶¶ 61–64); *id.* at 17–18 (citing Ex. 1006, 1:64, 7:49–56, Fig. 3A; Ex. 1051 ¶¶ 80–81).

In its Sur-reply, Neonode disagrees that the summary section of Hirayama307 reflects a different embodiment from the rest of the disclosure, as its intent was to provide a summary "of the invention." PO Sur-reply 24 (emphasis omitted). Neonode argues that the summary refers to different "aspects" of that invention only because it summarizes both icon-opening and icon-closing operations. *Id.*

We agree with the parties that a person of ordinary skill in the art, reading Hirayama307 and in particular its summary section, would have understood that icon 41 can move along with the tip of pen 3 during the dragging operation. However, the language in the summary section adds

21

IPR2021-00144
Patent 8,095,879 B2

ambiguity by referring to movement of "the icon display coordinate position" rather than simply the "icon." Ex. 1006, 2:6; *see* Ex. 1051 ¶ 81 (implying that there is a distinction between moving an icon and moving the icon's "display coordinate position").

So, while the summary passage teaches dragging an icon's "display coordinate position," this passage does not necessarily teach that the icon is visually dragged with the pen. And we acknowledge Petitioner's point that this disclosure would not rule out other embodiments in Hirayama307 (to the extent they exist) in which the icon is not moved during the dragging gesture. Pet. Reply 17–18. Nevertheless, the passage provides at least some evidence that a person of ordinary skill in the art would have understood that the icon is visually dragged with the pen in Hirayama307's disclosure, and Dr. Rosenberg's testimony on this point is entitled to at least some weight in our § 103 analysis. Ex. 2007 ¶¶ 72–73.

### (2)    Figure 4A

In its Reply, Petitioner argues that we can interpret Figure 4A and its associated text as disclosing, or at least rendering obvious, that icon 41 is not dragged along with pen 3. Pet. Reply 10–15. In particular, Petitioner argues that "[d]uring the shifting/gliding of the pen in step S4 [of Figure 4A] there is no movement or dragging of icon 41." Pet. Reply 12 (citing Ex. 1006, 6:3–6, 6:16–21, Figs. 4A, 3B; Ex. 1051 ¶¶ 63–64). Petitioner relies on Dr. Bederson's testimony that "[n]either the flowchart of FIG. 4A nor the corresponding description tell a [person of ordinary skill in the art] to relocate, duplicate, or otherwise drag icon 41 during the movement of the pen," yet Figure 4A expressly "teaches when to move/drag the window 43 . . . , which is not a relocation or duplication of icon 41." *Id.* (citing

22

IPR2021-00144
Patent 8,095,879 B2

Ex. 1006, 6:7–14, Fig. 4A; Ex. 1053, 94:10–95:12). According to Petitioner, a person of ordinary skill in the art would have been left "to assume that where no such movement is described, none should be implemented." *Id.* (citing Ex. 1051 ¶ 65).

Instead, Petitioner argues that in Hirayama307's Figure 4A, although a user moves the pen from its original touch point at icon 41, the icon stays at its original location while the interface shows only cursor 42 at the location of the pen tip until the pen tip either leaves hatched area 45 or shifts some greater distance from that original position, at which time window 43 will appear at the location of the pen tip. *See* Pet. Reply 13–15 (citing Ex. 1006, 5:41–53, 5:61–63, Fig. 4A; Ex. 1051 ¶¶ 66–69).

We find Petitioner's argument as to the flowchart in Figure 4A and the accompanying textual description unpersuasive. First, Petitioner has not pointed to any explicit disclosure of limitation 1d in Hirayama307's Figure 4A or elsewhere within Hirayama307. At best, Petitioner shows that in Figure 4A there is "[n]o discussion of movement of icon 41." Pet. Reply 11 (emphasis omitted); *see also id.* at 15 (arguing that "nothing about [step S4 in Figure 4A] instructs a [person of ordinary skill in the art] that icon 41 is dragged during movement of the pen").

And we find that Petitioner has not shown, by a preponderance of the evidence, that the absence in Figure 4A of any step of moving icon 41 would have suggested to a person of ordinary skill in the art that no such movement or duplication of icon 41 occurs. We acknowledge Dr. Bederson's point that Figure 4A omits any explicit reference to moving icon 41 prior to its enlargement to icon/window 43, while at the same time explicitly mentioning the movement of enlarged icon/window 43. *See* Ex. 1051 ¶ 65.

23

IPR2021-00144
Patent 8,095,879 B2

But Dr. Bederson does not factually support his inference, from this, that a person of ordinary skill in the art would have interpreted that omission as a teaching *not* to drag icon 41. Ex. 1051 ¶ 65.

### (3)    Curved Arrows in Figures 3A and 3B

Petitioner contends that Hirayama307's Figure 3A is evidence that icon 41 is not dragged with pen 3 because the curved arrow from icon 41 to the location of pen 3 depicts a gliding gesture without showing a relocated or duplicated icon 41. *See* Pet. 60–61 (citing Ex. 1006, 4:66–5:3, Fig. 3A; Ex. 1002 ¶ 158).

In response, Neonode argues that Petitioner misinterprets Figure 3A as showing the state of a pen tip *after* the user has selected icon 41. PO Resp. 43–45 (citing Ex. 2007 ¶¶ 80–81). According to Dr. Rosenberg, a person of ordinary skill in the art "would understand that Fig. 3A represents the state of the device *before* icon 41 is being dragged" because Hirayama307 discloses that icon 41 is "enlarged as a window 43 as shown in Fig. 3B" as soon as the pen tip "is considerably shifted" from its original touch location or leaves hatched area 45. *Id.* (quoting Ex. 1006, 5:60, 5:65–66) (citing Ex. 1006, 5:59–66). He points out that "[i]n Fig. 3A, . . . the tip of the pen is both outside of the hatched area, and has considerably shifted as it is well into the active screen area, *but* there is no enlarged window." *Id.* (citing Ex. 1006, 5:59–66).

Thus, according to Dr. Rosenberg, a person of ordinary skill in the art would have understood "that if Fig. 3A was intended to show the state of the screen during a drag-and-drop operation, then it should have also shown an enlarged window 43. Instead, Fig. 3A only shows 'a cross-shaped position designating cursor 42,'" which would be consistent with Hirayama307's

24

IPR2021-00144
Patent 8,095,879 B2

disclosure that cursor 42 is shown "'as the point of the pen 3 approaches the panel surface of the display portion 1'—*i.e.*, before the pen has selected the icon 41 to initiate the process of drag-and-drop." PO Resp. 44 (quoting Ex. 1006, 4:65–68); *see also* Ex. 2007 ¶ 81 (opining that a person of ordinary skill in the art would have understood Figure 3A to refer to the state of the system after power-on and before selecting icon 41) (citing Ex. 1006, 4:58–61); Pet. 43–45.

In its Reply, Petitioner argues that "[t]he only reason to show the curved arrow in FIG. 3A is to illustrate the movement of the pen described in the corresponding text." Pet. Reply 15–16 (citing Ex. 1006, 4:61–5:7; Ex. 1051 ¶¶ 70–74); *see also* Pet. 60 (citing Ex. 1006, 1:52–55, 5:3–4, 7:10; Ex. 1002 ¶ 157).

Although we agree with Petitioner that the curved arrow in Hirayama307's Figure 3A appears to depict a dragging operation that occurs after selecting icon 41 (Pet. Reply 15), we also credit Dr. Rosenberg's testimony that Figure 3A depicts, in the same figure, the state of the user interface immediately after power-on and before selecting icon 41 (Ex. 2007 ¶ 81). This is clear from the text accompanying Figure 3A. Ex. 1006, 4:58–61 ("when the power switch 10 shown in FIG. 1 is depressed, icon groups 40 which make various processings possible are displayed on the display portion 1 as shown in FIG. 3A"). Because Figure 3A simultaneously depicts the state of the user interface at two distinct time periods (immediately after power-on and during a dragging operation), the fact that icon 41 appears at its original location rather than at the pen location does not necessarily mean that icon 41 is stationary while pen 3 is being dragged across the surface of the device, or that a duplication of icon 41 is not being dragged along with

25

IPR2021-00144
Patent 8,095,879 B2

the pen. An equally plausible interpretation is that the figure is simply depicting the dragging operation in less detail than the state of the user interface at power-on.

We also find persuasive Neonode's argument, and credit Dr. Rosenberg's testimony, that the arrow in Figure 3A reflects a large distance from the original location of icon 41 within icon group 40, and Hirayama307 suggests that, at this stage in the dragging operation, enlarged icon/window 43 should be visible but that's not what is depicted in Figure 3A. *See* PO Resp. 43; PO Sur-reply 25; Ex. 2007 ¶ 80. This suggests that Hirayama307 is merely omitting any representation of what is being dragged at the location of cursor 42.

Moreover, we note that Figure 3B likewise shows a curved arrow and a bare cursor for the reverse operation of reducing icon/window 43 and returning it to icon group 40, yet Hirayama307 explicitly discloses that during at least the latter part of this reverse operation, "the icon displayed as the reduced icon [41] is moved" with the tip of pen 3. Ex. 1006, 6:66–67, Fig. 4B step ST8. In other words, even though pen 3 has moved a significant distance toward icon group 40, Figure 3B does not depict the dragging of icon 41 at this point as Hirayama307's disclosure would suggest, thus further evincing that Figures 3A and 3B do not depict the dragging operations in full detail.

Thus, because of the unclarity of what is depicted in Figures 3A and 3B, Petitioner has not made a persuasive showing that the presence of curved arrows in Figure 3A, without an explicit depiction of a dragged icon, would have suggested limitation 1d to a person of ordinary skill in the art.

26

IPR2021-00144
Patent 8,095,879 B2

> > > (4)    *Presence of Icon 41 at Original Location in*
> > > *Figures 3A and 3B*

Petitioner contends that in Figures 3A and 3B, icon 41 is in its original location within icon group 40, even though Figure 3B also shows window 43, suggesting that icon 41 will remain "in the same location it started at the beginning of the dragging operation." *See* Pet. 62 (citing Ex. 1002 ¶ 159); *see also* Pet. Reply 12.

In response, Neonode contends, as we discuss above, that Figure 3A depicts icon 41 in its original location simply because that is where icon 41 is when device is powered on. *See* PO Resp. 43–45. Neonode also argues that the presence of icon 41 in Figure 3B "at most shows that the icon was duplicated (not relocated), which still does not disclose the claims that require neither relocation nor duplication." PO Sur-reply 25; *see also* PO Reply 45 n.8.

Relying on the testimony of Dr. Rosenberg, Neonode also provides an interpretation of Figures 3A and 3B that, Neonode contends, is clear from the textual disclosure. PO Resp. 35–40. According to Neonode, after the user touches the pen tip to icon 41, the icon moves some distance along with the tip of pen 3, at least until the pen tip leaves hatched area 45, after which icon 41 becomes enlarged into icon/window 43, which also moves along with the tip of pen 3 until its final location where the user lifts the pen away from the screen surface. PO Resp. 36–40 (citing Ex. 1006, 2:1–13, 5:30–32, 5:39–53, 5:59–66, Fig. 3A; Ex. 2007 ¶¶ 71–73).

Dr. Rosenberg also testifies that Hirayama307 "routinely states that the application window 43 is created by 'enlarging' the dragged application icon 41," and "[i]f the icon 41 did not move with the movement of the pen to

27

IPR2021-00144
Patent 8,095,879 B2

then be 'enlarged' or 'converted' into window 43, Hirayama-307 would have referred to the process as 'creating' or 'opening' a window." Ex. 2007 ¶ 78; PO Resp. 42.

Dr. Rosenberg provides a modified version of Hirayama307's Figure 3A, reproduced below, to illustrate the alleged initial state in which icon 41 is dragged within hatched area 45:



Ex. 2007 ¶ 74; PO Resp. 40. Modified Figure 3A, above, is similar to original Figure 3A except that it depicts a duplicate version of icon 41 (in green) moving with the tip of pen 3 in the direction of a red arrow to an intermediate position within hatched area 45. Ex. 2007 ¶ 74; PO Resp. 40. The modified figure also shows a greyed-out version of icon 41 at the original location.

In its Reply, Petitioner relies on Dr. Bederson to provide an alternative to Dr. Rosenberg's interpretation of Figures 3A and 3B in which icon 41

28

IPR2021-00144
Patent 8,095,879 B2

remains at its original location during the dragging operation and instead, only cursor 42 accompanies the tip of pen 3 until the tip has moved a "large" amount, at which time window 43 immediately comes into existence under cursor 42. Pet. Reply 23–25 (citing Ex. 1051 ¶ 105–111). This is depicted in two annotated versions of Figure 3A provided by Dr. Bederson, reproduced below.



Ex. 1051 ¶ 105 (textual on the right captions omitted). In both images, icon 41 is highlighted in color and the tip of pen 3 has been dragged some distance from the original touch location over icon 41. In both images, cursor 42 (highlighted in green) has followed, and is under, the tip of pen 3. In the second image, pen 3 has been dragged slightly further than in the first

29

IPR2021-00144
Patent 8,095,879 B2

image, and window 43 (highlighted in pink) has appeared underneath cursor 42.

Petitioner also argues that when window 43 is returned to icon group 40, Hirayama307 states that the user "drags the point of the pen 3 *back to the telephone icon 41*," suggesting that icon 41 remains at its original location. Pet. Reply 21–22 (quoting Ex. 1006, 6:22–31) (citing Ex. 1006, 8:34–45, 6:24–35; Ex. 1051 ¶¶ 97–98).

As we discuss above, the evidence suggests that Hirayama307's Figures 3A and 3B do not depict the dragging operations in full detail. *See supra* Section III.C.4(a)(2). Given the lack of an explicit disclosure of whether icon 41 is visually dragged during these operations, we find Dr. Rosenberg's interpretation of how a person of ordinary skill in the art would have interpreted the dragging process as shown in his proposed modifications to Figure 3A (shown above) to be at least as likely as that proposed by Dr. Bederson in his proposed modifications to Figure 3A (also shown above).

We also find persuasive Dr. Rosenberg's observation that Hirayama307 uses the word "enlarging" to describe the transition from icon 41 to enlarged icon/window 43, and that this choice of words suggests that window 43 is not just appearing at the cursor but that icon 41 is visually being enlarged at the cursor location. Ex. 2007 ¶ 78.

### (5)    *Vacant Icon Position*

As evidence that a person of ordinary skill in the art would have understood that icon 41 is dragged along with the tip of pen 3, Neonode argues that in the reverse operation in which window 43 is closed by reducing it and returning it as icon 41 to icon group 40, "the open window is

IPR2021-00144
Patent 8,095,879 B2

dragged and dropped 'to the predetermined *vacant* position,' referring to the position of the application icon corresponding to the window." PO Resp. 41 (quoting Ex. 2007 ¶ 75 (quoting Ex. 1006, 7:3–6, Fig. 4B step S10)); *see also* PO Sur-reply 24 (noting that the passage in Hirayama307 uses the definite article in referring to "*the* predetermined *vacant* position," which according to Neonode "confirm[s] that the original icon was moved during the prior drag-and-drop operation to open the window").

According to Dr. Rosenberg, "[t]his disclosure confirms that application icon 41 was 'relocated' when it was opened by the drag-and-drop operation as its location is now 'vacant.' The location would not be 'vacant' if the icon had not moved." Ex. 2007 ¶ 75. Dr. Rosenberg opines that, to a person of ordinary skill in the art, this would have been the common-sense interpretation of Hirayama307, since otherwise, "it may be challenging for the user to determine which specific one of the numerous application icons 40 corresponds to the currently open window" so that the user knows where to drag window 43 to close it. *Id.* ¶ 77; PO Resp. 41.

As further evidence that the original location of icon 41 becomes vacant after it is expanded into icon/window 43, Neonode refers to Hirayama878 (Ex. 1009), which Petitioner relies on for its arguments for claim 3 and acknowledges that it "has the same inventor and assignee as Hirayama307, and the figures present a similar user interface" (Pet. 70 (citing Ex. 1006, Figs. 3A–B; Ex. 1009, Figs. 5A, 5D)). According to Neonode, Hirayama878's Figures 5A and 5B clearly show that after an icon is moved from icon group 40, the original location of the icon becomes vacant. PO Resp. 45–56 (citing Ex. 1006, 7:4–6, Fig. 4B step ST10; Ex. 1009, Figs. 5A–B).

31

IPR2021-00144
Patent 8,095,879 B2

In its Reply, Petitioner acknowledges that Hirayama878 "presents a similar user interface" to Hirayama307, but argues that Hirayama878 "is a different disclosure supporting a different system," and "there is no basis for assuming any of the teachings in Hirayama-878 about how to implement its icons rise to the high bar of a 'teaching away' (*e.g.*, nowhere does Hirayama-878 discourage alternative interface interpretations)." Pet. Reply 22.

We do not understand Neonode to be making a teaching-away argument. Rather, Neonode is arguing that we should consider Hirayama878's teachings about a vacant icon position for guidance in how to interpret the similar disclosure in Hirayama307, which is consistent with Petitioner's argument in the Petition that, "[g]iven the similarities of disclosure, a [person of ordinary skill in the art] would have looked to Hirayama878 for teachings on how to implement the window 43 and related functionality of Hirayama307." Pet. 72 (citing Ex. 1002 ¶ 172). We agree that Hirayama878 is relevant to how a person of ordinary skill in the art would have interpreted or implemented Hirayama307.

Petitioner also contends that Hirayama878 shows that the original icon is not deleted to make a vacant space in icon group 40 until after the entire gesture is complete and the user has lifted the pen off the surface, which does not suggest that the icon is dragged along with the pen tip. Pet. Reply 22 (citing Ex. 1009, 4:46–54, Fig. 5A; Ex. 1051 ¶ 99).

We disagree. Rather than deleting icon 54 at the *conclusion* of the dragging operation, Hirayama878 indicates that icon 54 is converted to enlarged shredder image 74 when the tip of stylus 3 is moved from the original touch location into an active area, which occurs while the pen is still touching the surface, as shown in Figure 5A. Ex. 1009, 4:47–55. The

32

IPR2021-00144
Patent 8,095,879 B2

passage does not explicitly say whether icon 54 has, in the meantime, moved along with pen tip 3. *See id.*; *but see id.* at 7:8–14 (a similar but more explicit example in which an icon for a copying function "remains small in size in an area positioned [outside an active area]" and "[w]hen the tip of the stylus 3 is moved into an active area . . . as shown in FIG. 6B, the copying window is enlarged and displayed as a copy image 91 in an image frame 90").

In view of all the evidence, we regard Hirayama307's reference to a "vacant" icon position as at least mild evidence that Hirayama307's icon-activation process involves relocating or duplicating icon 41. The disclosure in Hirayama878 further supports this interpretation.

### (6)    *Motivation to Modify Hirayama307*

Petitioner argues that Hirayama307 teaches a need to clearly and naturally determine the starting and ending of the dragging operation for icon 41. Pet. 61 (citing Ex. 1006, 7:10–24). Thus, according to Petitioner, a person of ordinary skill in the art would have had reason to use cursor 42 for that purpose rather than using a relocated or duplicated icon 41. Pet. 61–62 (citing Ex. 1002 ¶ 159).

In response, Neonode argues that Petitioner has failed to show any plausible motivation to modify Hirayama307 without relocating or duplicating icon 41 during the drag process. PO Resp. 46–50. Neonode points to Dr. Rosenberg's testimony that a person of ordinary skill in the art would have understood that "in graphical user interfaces, it is important to provide feedback to the user during an operation," which was "generally provided by visually showing the icon being moved or duplicated across the screen," as was "common in both the Microsoft Windows and Macintosh

33

IPR2021-00144
Patent 8,095,879 B2

MacOS environments." *Id.* at 47 (quoting Ex. 2007 ¶¶ 83–84). Thus, "there simply is no reason for a [person of ordinary skill in the art] to implement Hirayama-307's drag-and-drop process, but avoid the industry-standard method of providing user feedback by 'relocating or duplicating' the icon during the drag-and-drop operation." *Id.* at 48 (quoting Ex. 2007 ¶ 85).

Relying further on Dr. Rosenberg's testimony, Neonode disagrees with Petitioner and Dr. Bederson that cross-shaped cursor 42 would have been considered sufficient to provide this user feedback, because Hirayama307 only teaches that cursor 42 "is used to assist the user in moving the pen to the location of the icon, just as a mouse cursor on a desktop display moves on the screen to assist the user in locating the mouse pointer." PO Resp. 49 (quoting Ex. 2007 ¶ 86). Moreover, according to Dr. Rosenberg, even if cursor 42 is also present during the dragging operation, "the appearance of the cross-shaped cursor does not denote to the user anything about the drag-and-drop operation, but simply that the pen is communicating with the screen, and the location of the tip of the pen." *Id.* (quoting Ex. 2007 ¶ 87). Thus, "the user would not know if the drag-and-drop operation is being successfully performed as the user drags the pen." *Id.*

In its Reply, Petitioner responds that "a cursor was a well-known way to provide a user with feedback as to the location of their finger or pen during a drag/glide movement," and that in Hirayama307, the cursor would have indicated where the user intends to open window 43 or return icon 41 to icon group 40, or whether the pen was close to the panel surface. Pet. Reply 16–17 (citing Ex. 1006, 6:22–31, 7:16–24, 7:58–8:3, Fig. 3B; Ex. 1012, 17, 19; Ex. 2007 ¶ 76; Ex. 1051 ¶¶ 75–78). And according to

34

IPR2021-00144
Patent 8,095,879 B2

Petitioner, "[i]f the icon is dragged during gliding of the pen as Neonode suggests, there would be no reason to also display cursor 42." *Id.* at 17; *see also id.* at 21 (citing Ex. 1051 ¶ 96). Petitioner contends that a person of ordinary skill in the art would have understood that the use of a cursor, without dragging an icon, would provide sufficient feedback because it shows exactly where the point of pen 3 is during the movement. *Id.* at 22–25 (citing Ex. 1006, 4:66–5:3; Ex. 1012, 19; Ex. 1051 ¶¶ 100–111).

Petitioner also argues in its Reply[10] that, in comparison to showing a bare cursor, a person of ordinary skill in the art at the time of the claimed invention would have understood dragging an icon to be disadvantageous because such dragging "was computationally expensive at the time," and "would have likely produced a flickering of the icon due to the processing needed for continuous display of the icon at the different pen positions, leading to a poor user experience." Pet. Reply 25 (citing Ex. 1051 ¶¶ 107–112). And according to Petitioner, to the extent that any dragging of icon 41 must occur over hatched region 45 of Figure 3A, such dragging would occur over other icons and "would be confusing and visually undesirable," and would be unnecessary to show icon 41 dragging for just a few millimeters "[i]f the window 43 is displayed when the pen leaves the hatched area." *Id.* at 21 (citing Ex. 1051 ¶ 96). Petitioner also relies on Sears (Ex. 1012) for the teachings that there were numerous ways to provide feedback to a user, such

_____

[10] Neonode contends that these new motivation-to-combine arguments are untimely. PO Sur-reply 27. Because we find the arguments unpersuasive, we need not decide whether they are untimely under 37 C.F.R. § 42.23(b).

35

IPR2021-00144
Patent 8,095,879 B2

as the use of flashing colors, and that it would have been obvious to use a cursor for feedback during dragging. Pet. Reply 22–23 (citing Ex. 2012, 19).

We find unpersuasive Petitioner's argument that a person of ordinary skill in the art would have considered Hirayama307's cursor 42 to provide sufficient feedback to the user during the dragging operation. First, we note that even in Petitioner's proposed modification to Figure 3A based on Dr. Bederson's testimony, the modified drawing continues to include *both* cursor 42 and window 43 after the expansion of icon 41 has taken place and window 43 is continuing to be dragged. *See* Pet. Reply 25; Ex. 1051 ¶ 103; *supra* Section III.C.4(a)(4). Thus, underlying this modification of Figure 3A is the recognition that a cursor and a representation of an item being dragged serve different purposes. The purpose of cursor 42, as Hirayama307 explains, is so that "the user can visually confirm the exact position of the point of pen 3 on the input tablet 2 very clearly." Ex. 1006, 5:1–3.

We also credit Dr. Rosenberg's testimony that although a cursor conveys the precise location of pen 3, a cursor, alone, would have failed to convey to a user that the dragging operation is being performed successfully, particularly since this was the industry-standard way to convey the idea of dragging an icon from one location to another. Ex. 2007 ¶¶ 83–87. We find this more credible than Dr. Bederson's testimony that an ordinarily skilled artisan would have considered a reproduction of icon 41 to be superfluous if cursor 42 was already present. Ex. 1051 ¶¶ 75–78, 104–106.

We do not find credible Dr. Bederson's testimony that visually dragging an icon would have been too computationally expensive at the time of the claimed invention. Ex. 1051 ¶ 107. This testimony is inconsistent with the disclosure in Hirayama307 that, in the reverse operation in which

36

IPR2021-00144
Patent 8,095,879 B2

window 43 is reduced to window 41, a "reduce icon" 41 is visually dragged along with the pen tip. Ex. 1006, 6:66–67, Fig. 4B step ST8.

We also do not credit Dr. Bederson's testimony that a person of ordinary skill in the art would have been deterred from using a relocated or duplicated icon 41 as feedback during the dragging operation because it would be confusing, or because the distance the icon would move before being enlarged into icon/window 43 is relatively small. Ex. 1006 ¶ 96. Dr. Bederson's testimony on this point is conclusory and does not disclose any underlying factual basis. *See* 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."); *Apple Inc. v. MPH Technologies Oy*, 28 F.4th 254 (Fed. Cir. 2022) (The Board is free to reject expert testimony that lacks factual support).

Finally, we do not find persuasive Petitioner's reliance on Sears (Ex. 2012) in its Reply to show additional ways to provide feedback or to establish that it would have been obvious to use a cursor for feedback during dragging. Pet. Reply 22–23 (citing Ex. 2012, 19; Ex. 1051 ¶¶ 100–104). Petitioner cited Sears for other purposes in its Petition, so this is a new argument in the Reply. *See, e.g.*, Pet. 66, 68, 73 (citing Sears as evidence in the context of dependent claims 13, 14 and 16). Sears states that, when users can select a target area by "drag[ging] their fingers onto a target,"[11] "it is

---

[11] Sears appears to be describing something similar to the "$a{\rightarrow}b{\rightarrow}c{\rightarrow}a$" variation of the *Slide Off* strategy taught in Ren. *Compare* Ex. 1012, 17 ("[T]he finger touch may produce a cursor that can be dragged across the screen, and activation occurs when the finger is lifted off the surface."), *with* Ex. 1004, 391 ("The target is highlighted only while the pen is in contact

37

IPR2021-00144
Patent 8,095,879 B2

often advantageous to provide a cursor near the user's fingers showing exactly where a selection will be made if they lift their fingers" off the screen. Ex. 1012, 19. In other words, the "dragging" that Sears refers to occurs before selection of a fixed target when the user slides the finger onto the target and lifts the finger from the target. *Id.* However, Petitioner did not include Sears in its grounds of the Petition. Nor has Petitioner specifically explained, even in its Reply, how a person of ordinary skill in the art would have applied the teachings in Sears to the teachings in Hirayama307 and Ren. Thus, even if we were to accept Petitioner's argument about Sears as timely, it is not persuasive.

> (7)    *Conclusion as to Whether Hirayama307 Teaches Limitation 1d*

Having considered all the evidence of record about Petitioner's contention that Hirayama307 teaches limitation 1d, we do not find the evidence, as a whole, persuasive by a preponderance of the evidence.

> (b)    Whether Hirayama307 Teaches Limitation 1d in Light of Ren

Petitioner alternatively argues that Hirayama307 teaches limitation 1d in light of the teachings of Ren. Pet. 62. According to Petitioner, "Ren and Hirayama307 both are directed to solutions to the same problem, namely target selection techniques in pen-based tablet systems," and an ordinarily skilled artisan would have recognized that there are only small number of selection techniques in a pen-based graphical user interface, and would have

---

with it; however, the selection is made when the pen is removed from any point on the screen . . . inside . . . the target area.").

IPR2021-00144
Patent 8,095,879 B2

tried to implement Ren's selection strategies on Hirayama307's device with predictable results. *Id.* (citing Ex. 1002 ¶¶ 160–162); *see also* Pet. Reply 27–28 (clarifying that it is Ren's *Slide Off* gesture that a person of ordinary skill in the art would have incorporated into Harayama307's interface, and that it is the "sliding" part of Ren's *Slide Off* gesture that would correspond to the gliding portion of the gesture recited in claim 1).

We agree with Neonode that, while the argument in the Petition may establish that Hirayama307 and Ren are analogous references, Petitioner failed to specifically articulate how a person of ordinary skill in the art would have combined Ren's *Slide Off* or any other selection strategies with Hirayama307's user interface. *See* PO Resp. 53–54; *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." (citing *KSR*, 550 U.S. at 418)). Also, as Neonode points out, Ren describes selection strategies, but the Petition does not clearly explain how an ordinarily skilled artisan would have applied teachings about the *selection* of a target area, such as by Ren's *Slide Off* gesture, to the dragging operation in Hirayama307. PO Sur-reply 29 (citing Ex. 1004, 1).

In its Reply, Petitioner argues for the first time that an ordinarily skilled artisan would have used Ren's *Slide Off* gesture to "designat[e] the position where the window 43 would be opened." Pet. Reply 27 (citing Ex. 1006, 5:1–12, 7:7–15). But Petitioner still does not explain how this belated argument relates to limitation 1d's requirement that there is no relocation or duplication of icon 41 during a gliding movement.

39

IPR2021-00144
Patent 8,095,879 B2

Also, in support of its obvious-to-try argument, Petitioner does not direct us to any "design need or market pressure to solve a problem," or any particular reason that an ordinarily skilled artisan would have selected a particular strategy from Ren to produce the claimed invention. Pet. Reply 27; *see also In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litig.*, 676 F.3d 1063, 1072 (Fed. Cir. 2012).

Thus, we find Petitioner's argument regarding the combination of Hirayama307 and Ren to be insufficiently specific to meet its burden of persuasion, and Petitioner did not remedy that deficiency in its Reply. *See* 35 U.S.C. § 322(a)(3) (requiring a petition to identify, "with particularity, . . . the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim").

### (c)   Conclusion Regarding Limitation 1d

For the above reasons, we determine that Petitioner has not shown, by a preponderance of the evidence, that Hirayama307, either itself or in combination with Ren, teaches limitation 1d.

### 5.   *Objective Indicia of Non-obviousness*

Neonode argues that, as objective indicia of nonobviousness, we should consider evidence of industry praise, commercial success, and licensing of Neonode's N1 device and its later N2 iteration, released in 2007. PO Resp. 4–5. According to Neonode, the industry and at least one licensor recognized that the N1 and N2 phones had a unique user interface that allowed easy access to all the device's content through a small number of simple sweeping gestures. *Id.* at 5 (citing Ex. 2008 (promotional video)). Neonode contends that these gestures embodied the swipe-based user

40

IPR2021-00144
Patent 8,095,879 B2

interface disclosed in the '879 patent and recited in the challenged claims. *Id.* at 5–6 (citing Ex. 1001, 1:49–61; Ex. 2023 ¶¶ 4–6; Ex. 2007 ¶¶ 40–41).

For us to give substantial weight to objective indicia of nonobviousness, a proponent must establish a nexus between the evidence and the merits of the claimed invention. *ClassCo, Inc., v. Apple, Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016). "[T]here is no nexus unless the evidence presented is 'reasonably commensurate with the scope of the claims.'" *Id.* (quoting *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013)).

A patentee is entitled to a presumption of nexus "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). As we discuss below, Neonode does not contend that it is entitled to a presumption of nexus. *See infra* Section III.C.5(a).

Even without the presumption, a proponent of objective indicia "is still afforded an opportunity to prove nexus by showing that the evidence of [objective indicia] is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74 (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)). The nexus must be "to some aspect of the claim not already in the prior art." *In re Kao*, 639 F.3d 1057, 1069 (Fed. Cir. 2011).

Once the patentee has presented a prima facie case of nexus, the burden shifts to the patent challenger "to adduce evidence to show that the [objective indicium] was due to extraneous factors other than the patented invention." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d

41

IPR2021-00144
Patent 8,095,879 B2

1387, 1393 (Fed. Cir. 1988). "Ultimately, the fact finder must weigh the [objective indicia] evidence presented in the context of whether the claimed invention as a whole would have been obvious to a skilled artisan." *See Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB Jan. 24, 2020) (precedential) (citing *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1331–32 (Fed. Cir. 2016)).

For the reasons below, we find that evidence of industry praise and licensing[12] have a nexus to challenged claim 1 and weigh significantly in favor of nonobviousness.

(a)     The N1 and N2 phones

According to Joseph Shain, who testifies he is familiar with the N1 and N2 phones, the devices "presented three icons in a strip along the lower edge of the display immediately following unlocking the phone." Ex. 2023 ¶¶ 4, 6. He states that these three icons each "consisted of only one option for activating the [icon's] associated function," such as to activate a start menu, a keyboard, or a tools menu. *Id.* ¶ 6. He testifies that "[e]ach of the icons were activatable by a gesture in which a thumb or finger touches the icon, and swipes up toward the center of the screen before lifting off of the screen. None of the icons were relocated or duplicated during the swiping gesture." *Id.*

Mr. Shain also testifies that an advertising video, which Neonode has submitted as Exhibit 2008, reflects the operation of the N2 phone and "was

---

[12] In light of our other findings, we need not address Neonode's evidence of commercial success.

42

IPR2021-00144
Patent 8,095,879 B2

produced during the ordinary course of Neonode's business." Ex. 2023 ¶ 7. We have reviewed this video and it describes a phone device with a user interface consistent with Mr. Shain's description.

Also, Dr. Rosenberg testifies, based on his review of Exhibit 2008, Mr. Shain's testimony, and other materials, that "the 'swipe' gesture of Neonode's user interfaces in the N1 and N2 phones is covered by claim 1." Ex. 2007 ¶ 40.

In its Reply, Petitioner argues that Neonode does not "analyze the Neonode devices on a limitation-by-limitation basis." Pet. Reply 29 (citing Ex. 1053, 119:17–120:1, 124:9–18, 134:9–17 (Dr. Rosenberg's cross-examination testimony stating that he did not physically analyze an N1 or N2 phone in preparing his testimony, although he considered at least the video of Exhibit 2008)).

We disagree. Although Neonode did not provide a claim chart comparing claim 1 with the N1 or N2 phones, Neonode cited to Mr. Shain's testimony on this point. PO Resp. 5; *see also* PO Sur-reply 1–2. Under the circumstances, Mr. Shain sufficiently compared the N1 and N2 devices to each of the limitations of claim 1 within two short paragraphs. Ex. 2023 ¶¶ 5–6. Also, Neonode does direct our attention to a portion of the video in Exhibit 2008 and explains how the video demonstrates a gliding gesture on the N2 device's user interface. PO Resp. 7–8.

Although Neonode should have provided a more complete comparison between the N1 or N2 devices and claim 1 in its Response, the Response was well under the applicable word-count limitations. *See* PO Resp., Certificate of Compliance with Type-Volume Limits. Because Mr. Shain's comparison is short, Neonode's reliance on that comparison, under

43

IPR2021-00144
Patent 8,095,879 B2

the circumstances, does not circumvent Neonode's length limitations and does not constitute such a violation of 37 C.F.R. § 42.6(a)(3) that it would be appropriate for us to disregard his testimony.

Petitioner also contends that during the glide gesture performed on the N2 device, a representation of the function (an arrow) is duplicated during the gliding as depicted in a photograph that we reproduce below:



Pet. Reply 30–31 (citing Ex. 2013, 2; Ex. 1057, 151:20–152:14, 153:2–13). The above photograph appears to be a screenshot that Petitioner obtained from a Pen Computing Magazine review of the N2 phone (Ex. 2013, 2), which shows a thumb making a gliding gesture on a touch screen, and it also shows a series of arrows pointing in the direction of the gesture. According to Petitioner, limitation 1d "is not met because these arrows duplicate during the gliding motion." *Id.* at 31. Petitioner also argues that "[t]he N1/N2 devices also include icons printed on the device, *i.e.*, not displayed on the screen," which therefore could not be the "representation of the function" recited in claim 1. *Id.*

Neonode responds, and we agree, that the printed icons on the N2 device correspond to the "representation of the function" recited in limitation 1d because the icons are located within the touch-sensitive area of

44

IPR2021-00144
Patent 8,095,879 B2

the screen. Claim 1 does not explicitly preclude the "representation of the function" from being printed on the touch-sensitive screen, and Petitioner has not pointed to any evidence to suggest otherwise. *See* PO Sur-reply 2–3. We also agree with Neonode that, based on the video of Exhibit 2008, these arrows appear during the initial touch (the first part of the recited multi-step gesture) rather than during the subsequent gliding part of the gesture, thus, to the extent that the arrows could be considered the "representation of the function," they are "not . . . duplicated during the gliding" part of the gesture as recited in limitation 1d. *See* PO Sur-reply 3–4.

Neonode does not argue that the N1 or N2 devices are coextensive with claim 1, and Neonode has not raised the question of whether its evidence of objective indicia of nonobviousness is entitled to presumption of nexus. *See* Pet. Reply 32 (arguing that the evidence is not entitled to a presumption of nexus). However, for the reasons below, we determine that there is a nexus between the evidence and the N1 or N2 phones, and that evidence weighs in favor of nonobviousness.

(b)    Industry Praise

Neonode argues that its N1 and N2 devices received wide praise in industry publications. PO Resp. 9. According to Neonode, Pen Computing Magazine called the user interface of the N1 phone "simple and brilliant," particularly because the swiping gestures "let you hold a phone in the palm of your hand and operate it entirely with your thumb," and contrasted other solutions that involved pushing buttons or pulling out a tiny stylus. *Id.*

45

IPR2021-00144
Patent 8,095,879 B2

(emphasis omitted) (quoting Ex. 2012, 2–3[13]). It also described the N1
phone as "unique," and the user interface as "compelling" and "simpler than
pretty much anything else that comes to mind, and praised the interface's
speed. *Id.* at 9–10 (emphasis omitted) (quoting Ex. 2012, 5). Neonode points
to other articles praising the swipe-based user interface as being simple and
intuitive. Ex. 2014, 1; Ex. 2016, 1; Ex. 2021.

Neonode also points to testimony of Per Bystedt, who says he was
aware of industry buzz and read numerous articles praising the N1 device in
Swedish and international magazines after the device was demonstrated at
the CeBit trade show in Germany in the spring of 2002. PO Resp. 11; Ex.
2026 ¶ 3 (redacted version at Ex. 1049). Mr. Bystedt (who became an
investor and later a director and CEO of Neonode, *see* Ex. 2026 ¶ 7) also
testified that he had private interactions with senior leaders of Vodaphone
and Samsung, who praised the N1 device's user interface. PO Resp. 11–12
(citing Ex. 2026 ¶¶ 3, 8–9, 11–12).

In addition, Neonode points to later articles, around the introduction
of Apple's iPhone in 2007, making the case that swiping and tapping
elements of Apple's user interface were not original and had been introduced
earlier in Neonode's N1 phones. PO Resp. 12 (citing Ex. 2013, 1, 9; Ex.
2036 (a user-produced video); Ex. 2029 (video review of the Neonode N1m
(an iteration of the N1 released in 2005)); Ex. 2019 (an Ars Technical article

---

[13] Petitioner objected to Exhibit 2012 and other exhibits we discuss below on
grounds including lack of authentication and hearsay. *See* Paper 38.
However, Petitioner has not filed a motion to exclude any evidence of record
in this proceeding. *See* 37 C.F.R. § 42.64(c) (objections to evidence may
only be preserved by filing a motion to exclude).

IPR2021-00144
Patent 8,095,879 B2

comparing the N1m's swiping gestures to Apple's later "slide to unlock" gesture)). Neonode also points to a 2019 Ph.D. dissertation that identified the N1 as "the first smartphone to use a touchscreen as primary input and to support touch gestures for several functions," *id.* at 14 (emphasis omitted) (citing Ex. 2018, 9), and a 2015 dissertation describing the N1 as "the first mobile to use swipe gestures" and "to make extensive use of swipe gestures appropriate for one-handed use" (*id.* at 14–15 (emphasis omitted) (citing Ex. 2020, 8 & Fig. 3)). Neonode also points to user posts praising the swiping features of the interface. *Id.* at 16–17 (citing Exs. 2030–2032).

In its Reply, Petitioner argues that the "alleged praise stemming from the 2002 CeBit demonstration should be disregarded" because, based on testimony from Thomas Eriksson who had knowledge about Neonode's demonstration of the device at the conference, "[t]he demonstrated device did not have a working touch interface and did not practice the '879 patent." Pet. Reply 31 (citing Ex. 1058, 66:10–15, 105:10–106:11 (testifying that the N1 prototype displayed at CeBit was not fully functional); Ex. 1051 ¶ 137).

We disagree that this evidence should be entirely disregarded because, as Neonode points out in its Sur-reply, "Petitioner disregards the witness's testimony that the prototype had 'a display' and 'a moving video showing different things you could do with the device.'" PO Sur-reply 6 (citing Ex. 1058, 105:15–18, 107:3–6). Nevertheless, we give that evidence little weight because (1) Mr. Eriksson was unable to recall whether the N1 prototype displayed at CeBit had swiping gestures, although development of such gestures had begun before the conference (Ex. 1058, 105:22–108:6); and (2) Mr. Bystedt's testimony that there was praise specifically related to

47

IPR2021-00144
Patent 8,095,879 B2

the CeBit conference is not supported by citations to corroborating evidence on the record (*see* Ex. 2026 ¶ 3).

Petitioner also argues that Magnus Goertz, the inventor, "admitted the claimed gesture-based interface was not new." Pet. Reply 32 (citing Ex. 1057, 37:2–13, 18:9–17; Ex. 1051 ¶ 138). We agree with Neonode that this misrepresents his testimony because he was simply stating that other devices had touch screens and that a prior device had a stylus-based sliding gesture for "reverse texting." PO Sur-reply 6 (citing Ex. 1057, 18:7–17, 37:2–13).

Next, Petitioner argues that Mr. Bystedt's cross-examination testimony contradicts Mr. Eriksson's declaratory testimony that Samsung's upper management praised the N1 device, because Mr. Eriksson did not recall the same statements, and during the discussions in which Mr. Bystedt says he heard the statements, "[t]he Samsung contingent spoke amongst themselves in Korean." Pet. Reply 32 (citing Ex. 1058, 74:12–14, 75:4–14).[14] We agree with Neonode that the testimony is not contradictory. PO Sur-reply 4. Although Mr. Eriksson did not recall hearing the same things in English that Mr. Bystedt says he heard during these discussions with Samsung, Mr. Eriksson did testify that a senior Samsung representative patted him on the back and said, "good work." Ex. 1058, 73:24–14, 75:15–76:2. Thus, both Messrs. Bystedt and Eriksson testify that Samsung

---

[14] Petitioner also argues that Mr. Bystedt's testimony is hearsay. Pet. Reply 32. Neonode characterizes the evidence as a party admission offered to show the speaker's state of mind. PO Sur-reply 4. Because Petitioner has not preserved its hearsay objection by a motion to exclude, we do not need to decide this issue. *See supra* note 13.

48

IPR2021-00144
Patent 8,095,879 B2

representatives praised Neonode's technology during the discussions, and Mr. Bystedt specifically tied the praise to the phone's "intuitive user interface." Ex. 2026 ¶ 9. Also, as Neonode points out, Samsung licensed Neonode's technology soon after the discussions. PO Sur-reply 4.

Finally, Petitioner argues that Neonode's evidence of industry praise has no nexus with limitation 1d. Pet. Reply 30. In particular, Petitioner argues that Neonode's evidence "relies on praise for prior art and unclaimed features" such as the absence of a physical keypad or keyboard, and Neonode's zForce optical sensing technology. Pet. Reply 32 (citing Ex. 2012, 2; Ex. 1051 ¶ 138); *see also id.* at 30 (citing Ex. 1001, 6:14–16, 6:45–59 (claim 1); Ex. 1053, 23:19–21; Ex. 1051 ¶¶ 131–132). According to Petitioner, zForce technology "was the subject of a different patent application and not mentioned in the challenged claims." *Id.* (citing *Samsung Electronics Co. v. Neonode Smartphone LLC*, IPR2021-00145, Paper 68 at 45 (PTAB June 15, 2022)).

We find these arguments unpersuasive. Although some of the industry praise was directed to these other features such as zForce, the evidence we have outlined above also clearly includes substantial industry praise of the N1 or N2 phone's swiping gestures that are the subject of claim 1.

Although a nexus must be "to some aspect of the claim *not already in the prior art.*" *Kao*, 639 F.3d at 1069 (emphasis added), there is no requirement that "objective evidence must be tied exclusively to claim elements that are not disclosed in a particular prior art reference in order for that evidence to carry substantial weight." *WBIP*, 829 F.3d at 1331. A patent owner may show, for example, "that it is the claimed combination as a whole that serves as a nexus for the objective evidence; proof of nexus is not

49

IPR2021-00144
Patent 8,095,879 B2

limited to only when objective evidence is tied to the supposedly 'new' feature(s)." *Id.* at 1330. Thus, although our § 103 analysis focuses primarily on limitation 1d, we need not limit the scope of our inquiry only to industry praise of limitation 1d alone, when the evidence suggests that limitation 1d is part of what would have made the recited swiping gesture, as a whole, nonobvious over the asserted prior art.

Neonode's evidence of industry praise is directed largely to the user interface's swiping gestures, which allowed a user to control the device in an intuitive way using just a thumb. *See, e.g.*, Ex. 2008; Ex. 1012, 2–3; Ex. 2021, 2; Ex. 2013, 1; Ex. 2020, 8. That the gestures do not relocate or duplicate representation of the function during the swiping operation, as per limitation 1d, is part of what distinguishes the swiping gestures as a whole from "drag-and-drop" gestures in the prior art, because with a swiping gesture that includes limitation 1d, the user can control the device without the complexity of dragging an item or dropping it to a particular destination on the screen. *See* PO Resp. 29–30 (quoting Ex. 2007 ¶ 65 (testifying that "[i]n the field of human computer interaction, even small differences between gestures can have substantial consequences," and "[i]t is most unlikely that Neonode's phones would have received such praise if they replaced their seamless gliding functionality with a cumbersome drag-and-drop operation as shown in Hirayama-307")); Ex. 1003, 170–171 (applicant during prosecution distinguishing the swiping gesture from a "drag-and-drop operation for moving an icon" known in the prior art); Ex. 2007 ¶ 65.

Thus, we find that Neonode has shown evidence of industry praise, and that praise has a substantial nexus to the swiping gesture of claim 1 as a whole, of which limitation 1d is a significant part.

50

IPR2021-00144
Patent 8,095,879 B2

(c)    Licensing

Neonode argues that the fact Samsung entered a license agreement on July 2005 for the technology associated with the N1 and N2 phones is objective evidence of nonobviousness. PO Resp. 17–18 (citing Ex. 2028 (license agreement)).

In response, Petitioner argues that Neonode has failed to show a nexus between the Samsung license agreement and the challenged claims because the agreement "covers multiple patent applications and other technology" such as zForce. Pet. Reply 33. Also, Petitioner argues that the challenged claims did not exist when Samsung entered its agreement with Neonode. *Id.* (citing Ex. 1052, 202, 257).

Neonode responds that this "was not a license to a bundled product or hundreds of applications. Rather, the license concerned two specifically identified applications, the zForce application (concerning the light beam controlled touch-screen) and the '879's application [No. 10/315,250] (concerning the software for interaction with the operating system." PO Sur-reply 5 (citing Ex. 2028, 1–2; *id.* at 2 (referring to "Neno" as the technology disclosed in the '879 patent)). According to Neonode, "Samsung was clearly interested in both zForce and Neno and, indeed, licensed Neonode's technology exclusively" and without being "prompted by a threat of litigation, a prior business relationship or other economic reason that might discount Samsung's undeniable interest in exclusively licensing the technology." *Id.* at 5–6 (citing Ex. 2028, 4).

Although Samsung would not have known the precise scope of claim 1 when it issued, Samsung would have been aware of the overall technology that the application encompassed, including the disclosed swiping gestures.

51

IPR2021-00144
Patent 8,095,879 B2

Moreover, as we discuss above in the context of industry praise, there is evidence that at least some of Samsung's interest in taking a license related to the intuitive, swipe-based gestures. *See supra* Section III.C.5(b); Ex. 2026 ¶ 9. We find that the evidence of record suggests a nexus between the allegedly unique features of claim 1 and the Samsung–Neonode license agreement, and the evidence weighs in favor of nonobviousness.

### 6.    *Conclusion as to claim 1*

As discussed above, the evidence of record supporting Petitioner's argument that Hirayama307 teaches limitation 1d is mixed but does not, on balance, show that a person of ordinary skill in the art would have had reason to include limitation 1d, and the addition of Ren's teachings does not alter that assessment. Also, the evidence of objective indicia weighs in favor of nonobviousness. Considering the *Graham* factors as a whole, which weigh in favor of nonobviousness, we determine that Petitioner has not shown, by a preponderance of the evidence, that claim 1 is unpatentable under § 103 as obvious over the combination of Hirayama307 and Ren.

### D.    CHALLENGE TO DEPENDENT CLAIMS 2–6 AND 12–17

As part of its first ground, Petitioner argues that dependent claims 2, 4, 5, and 14–17 are unpatentable under § 103(a) as obvious over Hirayama307 in view of Ren. Pet. 63–70. Petitioner also challenges claims 3, 6, 12, and 13 on other grounds based on the combination of Hirayama307 with either (a) Ren and Hirayama878 (claim 3), (b) Ren and Allard (claims 6 and 13), or (c) Henckel (claim 12). Pet. 70–74.

The remaining challenged claims depend from claim 1, and Petitioner's arguments regarding those claims address the specific

52

IPR2021-00144
Patent 8,095,879 B2

limitations added to claim 1 without specifically revisiting the issues we discuss above as to limitation 1d. *See* Pet. 63–74. Although Petitioner addresses specific issues about claims 6 and 15 in its Reply, Petitioner does not otherwise raise arguments that would alter our analysis of claim 1. *See* Pet. Reply 28–29.

Thus, we determine that Petitioner has not shown, by a preponderance of the evidence, that any of claims 2–6 or 12–17 are unpatentable under § 103(a) as obvious over the respective prior art combinations.

## IV. CONCLUSION

For the reasons above, Petitioner has not shown by a preponderance of the evidence that any challenged claim of the '879 patent is unpatentable under any ground of the Petition.

## V. ORDER

In consideration of the foregoing, it is

ORDERED that claims 1–6 and 12–17 of the '879 patent have not been shown to be unpatentable;

FURTHER ORDERED that the parties may, within 10 business days of the entry of this decision, file a joint motion to seal this decision, which must include, as an exhibit, a proposed redacted public version of this decision that will be open to the public, and in the absence of such motion, this decision will be made open to the public; and

FURTHER ORDERED that parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

53

IPR2021-00144
Patent 8,095,879 B2

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 14–17 | 103(a) | Ren, Tanaka[15] | | |
| 2–5 | 103(a) | Ren, Tanaka, Hirayama307 | | |
| 3 | 103(a) | Ren, Tanaka, Hirayama307 Hirayama878 | | |
| 6, 13 | 103(a) | Ren, Tanaka, Allard | | |
| 12 | 103(a) | Ren, Tanaka, Henckel | | |
| 1, 2, 4, 5, 14–17 | 103(a) | Hirayama307, Ren | | 1, 2, 4, 5, 14–17 |
| 3 | 103(a) | Hirayama307, Ren, Hirayama878 | | 3 |
| 6, 13 | 103(a) | Hirayama307, Ren, Allard | | 6, 13 |
| 12 | 103(a) | Hirayama307, Henckel | | 12 |
| 1, 14, 15 | 103(a) | Jermyn | | |
| **Overall Outcome** | | | | 1–6, 12–17 |

---

[15] The grounds based primarily on Ren and Jermyn have been withdrawn and we do not reach these grounds. *See* Paper 50.

54

IPR2021-00144
Patent 8,095,879 B2


For PETITIONER:

Walter Renner
David Holt
FISH & RICHARDSON P.C.
axf-ptab@fr.com
holt2@fr.com


Tiffany Miller
James Heintz
DLA PIPER LLP (US)
tiffany.miller@dlapiper.com
jim.heintz@dlapiper.com



For PATENT OWNER:

Kenneth Weatherwax
Parham Hendifar
Patrick Maloney
Vinson Lin
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
lin@lowensteinweatherwax.com


Philip Graves
GRAVES & SHAW LLP
philipg@hbsslaw.com

# EXHIBIT 10

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

_____

SAMSUNG ELECTRONICS CO. LTD., SAMSUNG ELECTRONICS

AMERICA, INC. AND APPLE, INC.,

Petitioners

v.

NEONODE SMARTPHONE LLC,

Patent Owner

_____

Case IPR2021-00144

U.S. Patent No. 8,095,879

---

**PATENT OWNER NEONODE SMARTPHONE LLC'S
PRELIMINARY RESPONSE**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION.................................................................................... 1

II.   PETITIONERS HAVE FAILED TO SHOW THAT ANY
      CLAIM IS UNPATENTABLE............................................................ 3

      A.    Grounds 1A – 1E:  Petitioners Fail to Show that Claim 1
            is Obvious Over the Combination of Ren and Tanaka......................... 3

            1.    A POSA Would Not have been Motivated to
                  Incorporate the a→c→b→a Variant of Ren's *Slide
                  Off* Target Selection Strategy into Tanaka ............................... 3

                  a.    Ren Teaches Away from the Slide Off
                        Strategy............................................................................. 4

                  b.    The Ren-Tanaka Combination Would have
                        been Unworkable, Would have Addressed
                        No Deficiency, and Would have Provided No
                        Benefit to Tanaka ............................................................ 15

                        i.    Ren's *Slide Off* Strategy....................................... 15

                        ii.   Ren's Stationary Targets...................................... 19

                  c.    A Ren-Tanaka Combination Would Require
                        Significant Alteration in Either Ren or
                        Tanaka ........................................................................... 21

                  d.    Implementing a Single Activation Technique
                        Would have Undermined the Purpose of
                        Tanaka ........................................................................... 23

                  e.    Petitioners' Purported Bases for Motivation
                        to Combine are Conclusory, Improper and
                        Inaccurate ...................................................................... 23

i.    Petitioners' Generalized Assertions of Motivation to Combine are Insufficient and Incorrect ........................................ 23

1)    "Solutions to the Same Problem" is Insufficient............................ 24

2)    Ren's *Slide Off* Strategy Would Not have been Obvious to Try with Tanaka ................................................ 24

3)    Petitioners' Generalized Assertions are Insufficient........................ 26

ii.    Bederson's Additional Arguments, Not Referenced in the Petition, Are Improper as well as Misdirected and Inaccurate ............................................ 27

2.    Petitioners' Generalized Assertions of Motivation to Incorporate Ren's "Selection Targets" into Tanaka's Device Would Not Result in the Claimed Invention.................................................. 35

3.    Grounds 1B-E:  Petitioners Fail to Satisfy their Burden with Respect to Claims 2-6 and 12-17 ...................... 36

B.    Grounds 2A – 2D:  Petitioners Fail to Show that Claim 1 is Obvious Over the Combination of Ren and Hirayama307........................... 36

1.    A POSA Would Not have been Motivated to Modify Hirayama307 to Produce Limitation 1[d] ................... 37

2.    A POSA Would Not have been Motivated to Incorporate the a→c→b→a Variant of Ren's *Slide Off* Target Selection Strategy into Hirayama307 .................... 43

a.    Petitioners' Generalized Assertions regarding Motivation to Combine Fail to Satisfy Their Burden ............................................................ 43

b.    Ren Teaches Away from the *Slide Off*
Strategy............................................................... 47

c.    A Ren-Hirayama307 Combination Would
have Addressed No Deficiency in
Hirayama307, and the Detriments Would
have Outweighed Any Benefits........................................ 48

3.    Grounds 2B-D:  Petitioners Fail to Satisfy their
Burden with Respect to Claims 2-6 and 12-17 ....................... 50

C.    Ground 3:  Petitioners Fail to Show that Claims 1, 14 and 15
are Obvious over Jermyn ................................................ 50

1.    Jermyn is Not Analogous Art.................................... 50

a.    Jermyn is Not in the Same Field of Endeavor
as the '879 Patent ............................................. 51

b.    Jermyn is Not Reasonably Pertinent to the
Problems Addressed by the '879 Patent......................... 53

1.    Jermyn Does Not Disclose Limitation 1[a]........................ 56

2.    Jermyn Does Not Disclose Limitation 1[b]........................ 66

3.    Jermyn Does Not Disclose Limitation 1[c]........................ 70

4.    Claims 14-15 are Not Obvious over Jermyn....................... 71

CONCLUSION ................................................................... 71

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adidas AG v. Nike, Inc.*,
  963 F.3d 1355 (Fed. Cir. 2020)...........................................................22, 23, 27

*Apple Inc. v. Voip-Pal.com, Inc.*,
  976 F.3d 1316 (Fed. Cir. 2020)................................................................ 19, 27

*Arctic Cat Inc. v. Polaris Indus., Inc.*,
  795 Fed. Appx. 827 (Fed. Cir. 2019) .............................................................. 19

*Cisco Sys., Inc. v. C-Cation Techs., LLC*,
  IPR2014-00454, Paper 12 (PTAB Aug. 29, 2014) .....................................28, 56

*In re Clay*,
  966 F.2d 656 (Fed. Cir. 1992)......................................................................... 54

*Dynamic Drinkware, LLC v. National Graphics, Inc.*,
  800 F.3d 1375 (Fed. Cir. 2015).................................................................50, 51

*Fluor Tec, Corp. v. Kappos*,
  499 Fed. Appx. 35 (Fed. Cir. 2012) ................................................................ 15

*Henny Penny Corp. v. Frymaster LLC*,
  938 F.3d 1324 (Fed. Cir. 2019)....................................................................... 19

*In re Klein*,
  647 F.3d 1343 (Fed. Cir. 2011).................................................................50, 55

*Microsoft Corp. v. Enfish, LLC*,
  662 Fed.Appx. 981 (Fed. Cir. 2016) ..........................................................24, 43

*Personal Web Techs., LLC v. Apple, Inc.*,
  848 F.3d 987 (Fed. Cir. 2017)...................................................................... 4, 27

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
  882 F.3d 1056 (Fed. Cir. 2018)....................................................................... 14

*Polygroup Ltd. MCO v. Willis Elec. Co.*,
    759 Fed. Appx. 934 (Fed. Cir. 2019) ................................................................. 50

*Rolls-Royce, PLC v. United Techs. Corp.*,
    603 F.3d 1325 (Fed. Cir. 2010) ....................................................................... 26

*Securus Techs., Inc. v. Global Tel\*Link Corp.*,
    701 Fed.Appx. 971 (Fed. Cir. 2017) ..................................................... 24, 27, 43

*Smith & Nephew, Inc. v. Hologic, Inc.*,
    721 Fed. Appx. 943 (Fed. Cir. 2018) ................................................................. 54

*St. Jude Med., LLC v. Snyders Heart Valve LLC*,
    977 F.3d 1232 (Fed. Cir. 2020) ......................................................................... 3

## OTHER AUTHORITIES

37 C.F.R. § 42.6(a)(3) ........................................................................................ 28

37 C.F.R. § 42.24(a)(1) ...................................................................................... 73

37 C.F.R. § 42.24(d) ........................................................................................... 73

## TABLE OF EXHIBITS

| NEO Exhibit Number | Description |
|---|---|
| 2001 | Declaration of Craig Rosenberg, Ph.D. |
| 2002 | CV of Craig Rosenberg, Ph.D. |
| 2003 | Microsoft Press Computer Dictionary, p. 243 (3d ed. 1997). |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

## I.    INTRODUCTION

Petitioners assert that claims 1-6 and 12-17 of U.S. Patent No. 8,095,879 ("the '879 Patent") are unpatentable as obvious on three grounds.  They bear the burden of proving their case.  They fail to do so.

First, Petitioners contend that claim 1 is obvious over two combinations: Ren-Tanaka, and Ren-Hirayama307.  Petitioners assert that a POSA would have been motivated to incorporate a subset of one of the six target selection strategies discussed in Ren – the a→c→b→a variant of Ren's *Slide Off* target selection strategy – into the devices of Tanaka and Hirayama307.  However, Petitioners fail to proffer any explanation rooted in evidence as to why a POSA would have been motivated to incorporate this particular selection strategy into either Tanaka or Hirayame307.  In fact, a POSA would not have been motivated to make their proposed combinations, because:

- Ren teaches away from Petitioners' *Slide Off* strategy, concluding that a different selection strategy is preferred and expressly denigrating the *Slide Off* strategy.  Indeed, Ren does so with particular force with respect to displays of the type used in both Tanaka and Hirayama307;

- A POSA would have seen no deficiency in either Tanaka or Hirayama307 would have been remedied by Ren, and Petitioners'

1

proposed combinations would have provided no benefit in exchange

for substantial detriments; and

- Petitioners' proposed Ren-Tanaka combination would have required substantial alteration of either Ren or Tanaka.

Rather than grapple with Ren's contrary teachings and the failings of their specific proposed combination, Petitioners offer little more than conclusory assertions that are facially insufficient and in some cases untrue – e.g., that Ren's selection strategies were "well known" and "obvious to try" when Ren itself as well as the evidence of record makes clear that at least three of them, including the Petitioners' preferred *Slide Off* strategy, were recent innovations by Ren and were not common icon selection strategies at the time.  And what little more they do offer is procedurally improper (consisting of argument by their expert going beyond what is contained in the Petition) as well as misdirected or categorically false – e.g., that Tanaka does not teach dragging an icon when Tanaka expressly states that the icon is dragged in at least ten passages in the patent.  Petitioners therefore fail to satisfy their burden to prove any motivation to combine Ren with either Tanaka or Hirayama307, or to modify Hirayama307 along similar lines.

Second, Petitioners contend that claim 1 is obvious over Jermyn.  However, Jermyn is not analogous art – it is an article proposing a graphical password scheme, having nothing to do with the '879 Patent's concern with providing an

2

easily navigable user interface for a small handheld computer unit. Moreover, even if Jermyn were analogous, they would still fail to carry their burden of proving that Jermyn discloses several elements of claim 1 because (i) Jermyn's password entry grid is just a field for entry of a password and not a "representation of a function," (ii) Jermyn's grid does not "consist[] of only one option for activating the function," and (iii) the user's pen in Jermyn does not touch the display to begin a tap or stroke "at a location where the representation is provided."

Accordingly, Petitioners fail to carry their burden with respect to claim 1 and, therefore, all of the dependent claims as well. The Board should therefore deny institution.

## II. PETITIONERS HAVE FAILED TO SHOW THAT ANY CLAIM IS UNPATENTABLE

### A. Grounds 1A – 1E: Petitioners Fail to Show that Claim 1 is Obvious Over the Combination of Ren and Tanaka

#### 1. A POSA Would Not have been Motivated to Incorporate the a→c→b→a Variant of Ren's *Slide Off* Target Selection Strategy into Tanaka

Petitioners bear the burden of proving that a POSA would have been motivated to make their proposed combination. *St. Jude Med., LLC v. Snyders Heart Valve LLC,* 977 F.3d 1232, 1242 (Fed. Cir. 2020). They fail to meet that burden.

3

Petitioners' Ground 1 rests on Tanaka as a primary reference, with Ren as a secondary reference.  While they refer generally to a variety of reasons why a POSA would have been motivated to incorporate Ren's "selection targets" or "selection techniques" into Tanaka's device, they rely on only one of these selection techniques to purportedly satisfy limitations 1[c] and 1[d]:  the a→c→b→a variant of Ren's *Slide Off* target selection strategy.  Pet., 29-31.  So, in order to meet their burden, they must explain why and how a POSA would have been motivated to incorporate that element of Ren into Tanaka's device.  *Personal Web Techs., LLC v. Apple, Inc*., 848 F.3d 987, 993-94 (Fed. Cir. 2017).  They fail to do so; in fact, a POSA would not have been motivated to incorporate Ren's *Slide Off* strategy into Tanaka, for several independent reasons.

### a.    Ren Teaches Away from the Slide Off Strategy

First, Ren taught away from the *Slide Off* strategy for use with mobile handheld devices, concluding that a different strategy – *Slide Touch* – was superior to *Slide Off* and all of the other strategies disclosed in the article for such devices.  EX2001, ¶ 40; EX1004, 384, 402-03, 409, 412.  In fact, Ren denigrated the *Slide Off* strategy with particular force when used with mobile handheld devices with a dense display.  EX2001, ¶40; EX1004, 403.  This is exactly the type of display taught by Tanaka, the reference into which they seek to incorporate Ren's *Slide Off* strategy.  EX2001, ¶¶55-57; EX1005, Figs. 1, 5.

4

Ren disclosed two experiments comparing six different pen-based strategies for selecting targets on a touchscreen.  EX1004, p. 384.  Ren repeatedly stated its conclusion, beginning with the Abstract:

> We determined the best strategy of the six to be the "*Slide Touch*" strategy, where the target is selected at the moment the pen-tip touches the target for the first time after landing on the screen surface.

EX1004, p. 384.

The *Slide Touch* strategy, in which a target was selected "when the pen touches it for the first time," EX1004, 390, was essentially the opposite of the *Slide Off* strategy, in which "the selection is made when the pen is removed from any point on the screen either inside or outside the target area."  EX1004, 391.  The two strategies (*Slide Touch* and *Slide Off*), of the six illustrated in Ren's Figure 3, are highlighted below:



EX1004, 390, Fig. 3.[1]

Two experiments were run using a portable Wacom touchscreen/display linked to an NEC PC.  EX1004, p. 393.  The results were unambiguous.  With respect to mean selection time, the *Slide Touch* strategy was the clear winner, with *Slide Off* coming in a distant third:

---

[1] Ren's three "In-Out" strategies appear to include operations defining the separately-evaluated "In" strategies, and would to that extent have been considered to be ambiguous and confusing by a POSA.  A POSA would likely have interpreted the data and conclusions provided in Ren for the three "In-Out" strategies as excluding data and conclusions for other "incorporated" strategies, i.e., *Direct On*, *Direct Off*, and *Space On*, because this would have been the most logical way of resolving this ambiguity.  EX2001, ¶¶ 46-47.



EX1004, 395-96.

The *Slide Off* strategy, again, came in third place with respect to mean error

rate, although the difference among the top three was not statistically significant:

7



Fig. 6.    Mean error rates for each individual strategy in Experiment One.

EX1004, 397-98.

Accordingly, in the first experiment Ren concluded that:

*Best Selection Strategies*.  The results showed that the *Slide Touch* strategy was the best of the six, in terms of selection time (Figure 5), error rate (Figure 6), and subject preference (Figure 9).  The analyses showed that the *Slide Touch* strategy had a lower error rate, and was faster than the *Direct Off* and *Space On* strategies.  There was no significant difference in selection time between the *Slide Touch* strategy and the *Direct On* strategy, but the *Slide Touch* strategy had a lower error rate than the *Direct On* strategy.  No significant differences were found in error rate between the *Slide Touch* and either the *Slide Off* or *Space Touch* strategies, but the *Slide Touch* strategy was faster than both of them (see Table II).  <u>Thus, the *Slide Touch* strategy was significantly better overall than the other individual strategies.</u>  An

analysis of subject preferences also showed that the *Slide Touch* strategy was the most preferred (large targets, mean = 4.75, small targets, mean = 3.08). EX1004, 402-03 (emphasis added).

In Ren's second experiment, he added two additional target sizes to the three provided in the first experiment. Here again, Petitioners' *Slide Off* strategy performed very poorly, showing fifth worst (out of six) for mean selection time and third best for mean error rates. EX1004, 397-98, Figs. 11-12. Ren concluded, for experiment two:

> Since each of the *Slide Touch*, *Slide Off*, and *Space Touch* strategies had lower error rates than each of the *Direct On* and *Space On* strategies, and since the *Direct On* was faster than the *Direct Off* strategy, we concluded that the *Slide Touch, Slide Off*, and *Space Touch* are better than the other three strategies. However, according to Experiment One the *Slide Touch* is better than the other five strategies.

EX1004, 409.

Ren's overall conclusion was clear:

> 4.4.2 *The Best Individual Strategy and Best Strategy Group*. The *Slide Touch* strategy is the best of the individual strategies. When the results for Experiment One and Experiment Two were compared in simple pairs we found that the *Slide Touch* Strategy was the best strategy [Ren and Moriya 1997b; 1999]. The post hoc Tukey HSD test showed that, in Experiment One, the *Slide Touch* was indeed the best strategy.

EX1004, 412.  In sum:  Ren taught away from the use of the *Slide Off* strategy for target selection on mobile devices.  EX2001, ¶¶40, 59.

Moreover, Ren's teaching was particularly pointed with respect to the use of the "In-Out" strategies (including both *Slide Off* and *Slide Touch*) on what Ren characterized as "dense displays."  Ren stated that while the *In-Out* group could be used "in situations where other targets do not exist near the target, or in situations where targets are not too close together, or where other targets do not exist near one side of the target (e.g., the upper part)," the *In-Out* group "would not be efficient in dense displays."  EX1004, 403.

Yet that is exactly the type of display presented in Tanaka.  EX2001, ¶57. For example, in Tanaka's Figure 1, to which Petitioners point to support their assertions, icons exist near other icons, the icons are close together, and the icons exist near the sides of the target, such as the upper and right sides of the display:

10

IPR2021-00144
Preliminary Response



EX1005, Fig. 1.

And the display of the actual Tanaka invention is even worse as far as the density of the Tanaka display and the proximity to all four sides as seen in Figure 5 below:

11

# F I G. 5



EX1005, Fig. 5.

Figures 1 and 5 of Tanaka illustrate the types of dense displays, with many icons packed closely together, that Ren states would be particularly unsuited for the *Slide Off* strategy. EX2001, ¶57; EX1004, 403. There is no embodiment disclosed in Tanaka that appears to fit the narrow criteria articulated in Ren for "more efficient" implementation of the *Slide Off* strategy. EX2001, ¶57. Accordingly, a POSA would have understood that Ren teaches away, with

12

particular force, from the use of the *Slide Off* strategy in the device of Tanaka. EX2001, ¶¶40, 59.

Petitioners assert that "Ren teaches the *Slide Off* strategy is desirable 'because selection does not depend on the point of removal from the screen,' and '[t]herefore the pen may pass through the target which will not be selected until the pen is removed from any point on the screen.'" Pet., 27-28. This assertion is false. As shown above, Ren did <u>not</u> teach that the *Slide Off* strategy is desirable; to the contrary, Ren taught that the *Slide Touch* strategy is the best, and taught away from *Slide Off* with particular force as applied to dense displays of the type used in Tanaka. Petitioners' assertion here is particularly egregious in light of the fact that in their co-pending IPR2021-00145, <u>they and Bederson acknowledge the falsity of their position here</u>, stating: "Ren also teaches the desirability of using the tap or *Direct Off* technique, for example, in dense displays where targets are close together." *Apple, Inc. et al. v. Neonode Smartphone LLC*, IPR2021-00145, Paper 1 at 38 (PTAB Nov. 6, 2020). Moreover, the text to which they cite is lifted from the paragraph in Ren addressing "situations where other targets do not exist near the target, or . . . where targets are not too close together, or where other targets do not exist near one side of the target (e.g., the upper part)." EX1004, p. 403. In other words, the opposite of Tanaka's display.

13

In addition, Petitioners omit a key clause from their quotation, which is set out in full with the omitted portion underlined:

> In this situation [i.e., of sparse displays], the *Slide Off* strategy can be used because selection does not depend on the point of removal from the screen, and the last target highlighted will be selected. Therefore, the pen may pass through the target which will not be selected until the pen is removed from any point on the screen.

EX1004, p. 403 (emphasis added). As explained below, the fact that in Ren's *Slide Off* strategy the last-touched target is the one that is activated upon lifting the pen from the display renders this strategy ill-suited for combination with the interface of Tanaka. EX2001, ¶58.

"A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *Polaris Indus., Inc. v. Arctic Cat, Inc*., 882 F.3d 1056, 1069 (Fed. Cir. 2018) (internal quotes omitted). Moreover, "even if a reference is not found to teach away, its statements regarding preferences are relevant to a finding regarding whether a skilled artisan would be motivated to combine that reference with another reference." *Id*.

For at least the reasons set forth above, a POSA would have understood from the teaching of Ren that the *Slide Off* teaching of Ren would have been

14

undesirable within the context of the user interface used by Tanaka.  He would have been led by Ren to favor the *Direct On* or *Direct Off* strategies for Tanaka's dense display, or at the very least to favor *Slide Touch* rather than *Slide Off* if using one of the In-Out strategies.  To whatever extent a POSA would have found Ren relevant to Tanaka, he would not have seen any motivation to use the multiply-denigrated *Slide Off* strategy in the dense display of Tanaka.  EX2001, ¶59.  Ren, therefore, taught away from Petitioners' proposed incorporation of *Slide Off* into Tanaka, undermining any motivation to combine.  *Fluor Tec, Corp. v. Kappos*, 499 Fed. Appx. 35, 42 (Fed. Cir. 2012).

> ### b.    The Ren-Tanaka Combination Would have been Unworkable, Would have Addressed No Deficiency, and Would have Provided No Benefit to Tanaka
>
> #### i.  Ren's *Slide Off* Strategy

Second, a POSA would have understood that Ren's *Slide Off* strategy would have been poorly suited for combination with the interface of Tanaka.  EX2001, ¶ 60.

Ren's *Slide Off* strategy activates the last "target" touched by the pen prior to liftoff from the display.  EX2001, ¶61; EX1004, 391, 403.  Thus, as explained by Ren, it would not be efficient for use on dense displays; this is so because in dragging the pen across a screen filled with other icons the user would likely cause an icon different from the one at which the dragging motion commenced to be

activated upon liftoff from the display. EX2001, ¶61. That is exactly what would happen with Tanaka's Figure 1; multiple icons in the top and far right of the display would be blocked by icons located inward on the display over which the pen would have to drag in order to reach the working area of the display:



EX1005, Fig. 1.

Tanaka's preferred embodiment would also suffer from this problem – indeed, it is difficult to see how an icon could be activated at all using Ren's *Slide Off* strategy, since a movement away from nearly any icon in nearly any direction would likely intersect with another icon, thereby ensuring that the last-touched icon, and not the first, was activated upon the user lifting the pen from the display:

16

IPR2021-00144
Preliminary Response

## F I G. 5



EX2001, ¶62; EX1005, Fig. 5. This is so because, as noted above, Ren's *Slide Off* strategy activates the last "target" touched by the pen prior to liftoff from the display. EX2001, ¶62; EX1004, 391, 403.

Petitioners assert that a POSA would have been motivated to implement the *Slide Off* strategy exclusive of the *Direct Off* strategy on "pocket-sized pen-based applications with small targets," rather than both for the same target, because the *Slide Off* strategy scored better in two metrics than did the *Direct Off* strategy.

17

Pet., 28. However, to a POSA evaluating how to efficiently present information and activatable icons on a display of a mobile handheld device in 2002, the question of whether *Direct Off* was superior to *Slide Off*, or whether to attempt to implement one as opposed to both of these strategies for a target, would not have been considered to be productive inquiries within the context of the dense display of Tanaka, because an entirely different strategy – *Slide Touch* – was identified as the overall optimal strategy and strategies such as *Slide Off* were (and were taught by Ren to be) particularly unsuitable for dense displays. EX2001, ¶63. Therefore, the teaching of Ren to which Petitioners point would have provided no motivation to combine.

While resulting in significant detriments to Tanaka, as outlined above, incorporating the *Slide Off* strategy into Tanaka would not have been seen as offering any countervailing benefit. EX2001, ¶64. Tanaka's "check" and drag and drop icon selection techniques were well-known and well-accepted in the field of user interface design in 2002. *Id*. A POSA would have been familiar with both of them, and would have understood that users were familiar with both of them. *Id*. There was no general belief in the field of user interface design that these two icon selection techniques would have been deficient for the purposes for which they were used in Tanaka, or that there was a need to develop additional means of user interaction with an interface of a mobile computer unit. *Id*. Accordingly, a POSA

18

would not have seen Tanaka's icon selection techniques as ripe for further development. *Id.* So, for this reason as well, a POSA would not have been motivated to incorporate Ren's *Slide Off* strategy into the display of Tanaka. *Id.*

The prior art should be considered for all of its teachings, and "[t]he benefits, *both lost and gained*, should be weighed against one another." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1331-32 (Fed. Cir. 2019) (emphasis in original). Here, the benefits lost via Petitioners' combination clearly outweigh those gained. This further undermines any motivation to combine. *Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1325 (Fed. Cir. 2020); *Arctic Cat Inc. v. Polaris Indus., Inc.*, 795 Fed. Appx. 827, 832-34 (Fed. Cir. 2019).

### ii.  Ren's Stationary Targets

Petitioners assert that a POSA would understand that duplicating or relocating the target during gliding would fail to achieve the operation of Ren's a→c→b→a *Slide Off* variant. Pet., 31. Petitioners never explain why a POSA would want to graft Ren's a→c→b→a *Slide Off* variant into Tanaka in the first place. In fact, a POSA would not have done so, for several reasons.

First, a POSA would have seen no reason to substitute Ren's stationary targets for the icons of Tanaka, because the stationary nature of Ren's targets would have detracted from the utility of Tanaka's drag and drop functionality. As explained by Tanaka, the "dragging" operation enables a user to designate where

19

on the display a new window will open. EX1005, col. 4:52-54; 5:9-28; 6:55-60; Fig. 4 [101, 103, 104]. Eliminating the presentation of a "dragged icon" while the user's finger or pointing device glided along the display away from a touched icon would not have improved the user experience or functioning of Tanaka's device in any way and would likely have degraded the user experience. EX2001, ¶75.

There was no deficiency in the user experience or functioning of Tanaka's device that would have been remedied by the removal of the "dragged icon" presentation. *Id.* To the contrary, removing the "dragged icon" presentation would have been detrimental to the user experience, making it more difficult for a user to quickly and easily identify where on the display an associated window would be likely to open. *Id.*

In addition, given the ubiquity of the "drag and drop" operation in computer user interfaces in 2002, it would have been considered odd by a POSA to have modified Tanaka's device to eliminate it. EX2001, ¶76.

Accordingly, modifying the references as Petitioners suggest would have introduced a detriment to Tanaka for no offsetting benefit. EX2001, ¶77.

And, Ren provides no motivation to substitute its stationary targets for the icons of Tanaka, for at least the reason that Ren's stationary targets are explicitly intended for an experimental design to test different selection strategies; while the purpose of the experiments was to develop data and conclusions concerning

20

optimal target selection strategies, the use of stationary targets across all of the strategies would have been understood as intended to provide a controlled and bias-free environment in which to conduct the experiment rather than as a means of optimizing user interactions with an interface. EX2001, ¶78. In other words, to a POSA, regardless of whether Ren taught that an interface could be coded to present such a display (presenting, e.g., stationary targets randomly relocated upon each use), Ren did not teach that an interface should be coded to present such a display. EX2001, ¶79.

Moreover, Petitioners' own arguments and evidence support this conclusion. Petitioners (and Dr. Bederson) characterize Ren's *Direct Off* strategy as similar to Tanaka's "check" technique, and Ren's *Slide Off* strategy (the a→c→b→a variant) as similar to Tanaka's drag and drop technique. Pet., 24; EX1002, ¶100. Petitioners do not explain how this supports their case; in any event, it undermines it, because if these selection techniques of Ren and Tanaka were so similar, any motivation to substitute either of those selection techniques of Ren with those of Tanaka would be significantly diminished. EX2001, ¶65.

### c. A Ren-Tanaka Combination Would Require Significant Alteration in Either Ren or Tanaka

A POSA would not have been motivated to combine Ren's *Slide Off* strategy with Tanaka's interface or icons for the additional reason that to do so would have

21

required a significant alteration in the mode of operation of either Tanaka's interface or Ren's *Slide Off* strategy.

As to Tanaka's drag and drop technique, it is inconsistent with Ren's *Slide Off* strategy. The *Slide Off* strategy was designed such that the targets remained stationary, and in which the last target highlighted (touched) by the pen prior to liftoff from the display was deemed to be selected. EX1004, p. 403. In Tanaka, conversely, a selected icon is dragged with the pen to a desired location on a display having numerous other icons on that display, and upon liftoff a window opens at the location to which the icon was dragged. E.g., EX1005, col. 3:3-12. The stationary Ren target cannot be dragged to a desired location, and the movement of the pen over other icons would nullify the user's desired and intended selection, thereby defeating the purpose of Tanaka's drag and drop technique. EX2001, ¶81. Combining Ren and Tanaka would require alteration of Ren's *Slide Off* strategy in multiple respects, or, if not altered, would eliminate Tanaka's drag and drop capability altogether and defeat Tanaka's purpose of enabling an interface providing both the "check" and drag and drop activation functionalities. *Id*. This further undermines any motivation to incorporate Ren's *Slide Off* strategy into Tanaka. *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1359-60 (Fed. Cir. 2020).

22

### d. Implementing a Single Activation Technique Would have Undermined the Purpose of Tanaka

Petitioners argue for motivation to incorporate Ren's a→c→b→a variant of the *Slide Off* strategy into the display of Tanaka because having a single interaction technique would be easier for users. Pet., 28-29. However, Tanaka's expressed concern was to enable multiple activation techniques rather than only a single technique. EX1005, col. 2:33-38, 6:55 to 7:6. Accordingly, a POSA looking to implement a single activation technique would not have attempted to combine Tanaka with Ren, as to do so would have undermined the primary purpose of Tanaka. EX2001, ¶66. Petitioners' "single technique" argument does not support a motivation to combine. *Adidas*, 963 F.3d at 1359-60.

### e. Petitioners' Purported Bases for Motivation to Combine are Conclusory, Improper and Inaccurate

#### i. Petitioners' Generalized Assertions of Motivation to Combine are Insufficient and Incorrect

As discussed above, the rationales for motivation to combine advanced at pages 27-28 of the Petition (e.g., "Ren teaches the *Slide Off* strategy is desirable") are false. Other than that, Petitioners proffer only a handful of generalized assertions as to why a POSA would have been motivated to incorporate Ren's "selection targets" or "selection techniques" into Tanaka's device. These are conclusory and incorrect, and therefore insufficient.

23

### 1) "Solutions to the Same Problem" is Insufficient

First, Bederson asserts that Ren and Tanaka are directed to solutions to the same problem, namely target selection techniques in pen-based tablet systems. EX1002, ¶¶74, 87, 107.  This conclusory boilerplate fails to articulate a sufficient motivation to combine.  *Microsoft Corp. v. Enfish, LLC*, 662 Fed.Appx. 981, 989-90 (Fed. Cir. 2016); *Securus Techs., Inc. v. Global Tel\*Link Corp.*, 701 Fed.Appx. 971, 976-77 (Fed. Cir. 2017).

### 2) Ren's *Slide Off* Strategy Would Not have been Obvious to Try with Tanaka

Petitioners assert that several of their references, including Ren, "reflect well-known selection techniques and features of user interfaces," Pet., 14, and that a "POSA would have recognized Ren as disclosing a handful of selection techniques that would have been obvious to try and implement with pen-based GUI interaction systems, such as those in Tanaka." Pet., 19.  Petitioners also assert that a POSA would have been motivated to "try and implement Ren's selection techniques on [Tanaka's] device" with predictable results.  *Id*.  The first two statements are not true; the third is inapposite.

First, according to Ren, only two of the six strategies surveyed – *Direct On* and *Direct Off* – were in common use as of Ren's publication.  EX1004, p. 391. The *Slide Touch* strategy corresponded to a strategy disclosed in 1988, and the others – including *Slide Off* – were "new strategies designed by Ren and Moriya

24

[1997a]." (Id.)  In fact, Ren's *Slide Off* strategy was <u>not</u> a common selection strategy for icons on mobile handheld devices in or prior to 2002.  EX2001, ¶ 69. The most common icon selection strategies in use at that time for such devices were the touch, the tap, and the drag and drop.  *Id*.  The tap selection technique was not at all similar to Ren's *Slide Off* strategy.  *Id*.  The drag and drop technique, while sharing the "drag" movement of the pen with the *Slide Off* strategy, was materially different in a number of respects, including that Ren's "targets" remained stationary and were not duplicated during the dragging operation, and that the *Slide Off* strategy activated the last-touched target even if it was different from the first-touched target (i.e., the target that would be dragged in a drag and drop operation).  *Id*.

Accordingly, while some of the selection strategies disclosed in Ren may have been "well known" to a POSA in 2002, at least the *Slide Off* strategy was not. EX2001, ¶70.  Yet that is the strategy that Petitioners say would have been "obvious to try" with Tanaka.  As the evidence shows, it would not have been.

In addition, regardless of how many selection techniques were disclosed by Ren, a POSA would not have been motivated to "try" to implement the *Slide Off* strategy on Tanaka's device because it was so heavily disparaged for such an application, would not have been workable, and there was no deficiency in Tanaka

25

that would have been remedied by Ren.  See § II(A)(1)(b) above.  As the Federal

Circuit has explained:

> A particular course or selection is not obvious to try unless some design
> need or market pressure or other motivation would suggest to one of
> ordinary skill to pursue the claimed course or selection. In other words, one
> of ordinary skill must have good reason to pursue the known options within
> his or her technical grasp.

*Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1339 (Fed. Cir. 2010)

(quotes omitted).  Here, a POSA would have had no reason to incorporate Ren's

*Slide Off* strategy into Tanaka, and every reason not to do so.

 Finally, Petitioners' "predictable results" assertion does not get them across

the finish line, because Ren taught away from the use of the *Slide Off* strategy (and

therefore predictability would lead to the use of a different selection technique),

and a POSA would have understood that the result of the combination on Tanaka's

dense display would have been unworkable, for the reasons outlined above.

EX2001, ¶59.

### 3)  Petitioners' Generalized Assertions are Insufficient

Petitioners' generalized assertions fail to satisfy their burden.  Even were all

of these statements true (which, as shown above, they are not), this amounts to

little more than suggesting that Ren and Tanaka *could* have been combined.  More

is required.  *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1359 (Fed. Cir. 2020);

*Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 993-94 (Fed. Cir. 2017).

Petitioners proffer no reasoned explanation as to why a POSA would have been motivated to incorporate a specific element from one reference (the a→c→b→a variant of Ren's *Slide Off* strategy) into the disclosure of another reference (the device of Tanaka) in a way that would have resulted in the touch and glide functionality of limitation 1[c].  Petitioners must provide "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness," *Securus*, 701 Fed. Appx. at 977, but they provide none. Talismanically incanting generalized bromides in the place of a rationale does not satisfy Petitioners' burden of proving that it is "more probable than not" that a POSA would have been motivated to make their proposed combination.  *E.g., Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1324-25 (Fed. Cir. 2020).

### ii.  Bederson's Additional Arguments, Not Referenced in the Petition, Are Improper as well as Misdirected and Inaccurate

Petitioners proffer no other rationale in the Petition as to why a POSA would have been motivated to incorporate Ren's selection targets or techniques, or more specifically the a→c→b→a *Slide Off* variant, into Tanaka's device.  As shown above, Petitioners' assertions regarding motivation to combine fall far short of

27

what is required to satisfy their burden, and in fact the evidence demonstrates that a POSA would not have been motivated to make their proposed combination.

In implicit recognition of the insufficiency of their showing, Petitioners attempt an end-run around this tribunal's procedural rules, cramming additional arguments for motivation to combine into the declaration of their expert, Bederson, and then citing to those paragraphs of the expert declaration.  EX1002, ¶¶115-16. The Board should reject these additional purported rationales, for multiple independently sufficient reasons.

First, Petitioners' tactic constitutes improper incorporation by reference.  37 C.F.R. § 42.6(a)(3); *Cisco Sys., Inc. v. C-Cation Techs., LLC*, IPR2014-00454, Paper 12 at 10 (PTAB Aug. 29, 2014) (Informative).

Second, even were the Board inclined to consider these additional arguments, they are frivolous.  Bederson begins by offering a rebuttal to an argument that no one is making – that *Tanaka* teaches away from Ren.  *Id.*  In support of his thesis, Bederson states that "Tanaka teaches that some embodiments of a window controlling apparatus "permit[] the window corresponding to a selected icon to appear over the entire screen" and concludes from this that "it would have been obvious to a POSA to try and implement the combination of Ren and Tanaka in a device that does not relocate or duplicate the icon disclosed by Tanaka."  EX1002, ¶ 115.  Bederson's conclusion is a non sequitur.

28

As an initial matter, a POSA would not have considered Tanaka's offhand observation concerning some unspecified conventional "window controlling apparatus[es]," EX1005, col. 1:26-35, to be useful in connection with any motivation to combine Ren and Tanaka, as claim 1 is not limited to devices in which a window for an activated function covers the entire display and neither Ren nor the embodiment disclosed in Tanaka teach such a device.  EX2001, ¶84.

In any event, Bederson's premise is flawed.  While Tanaka recognizes the existence of such whole-screen window embodiments, Tanaka's disclosure is directed to a different embodiment – one in which each window does not cover the entire screen:

> Window controlling apparatuses come in two types: one that permits the window corresponding to a selected icon to appear over the entire screen. and the other type having each icon-associated window displayed partially on the screen. The present invention proposes an information processing apparatus for controlling window positions which belongs to the latter type.

EX1005, col. 1:29-36. (emphasis added).

Consistent with this, Tanaka explains that "[t]he present invention relates to an information processing apparatus for controlling window positions," EX1005, col. 1:7-8, and the object of Tanaka was "to provide an information processing apparatus for controlling window positions, the apparatus allowing the user to employ any one of the two icon-selecting methods, "check" and "drag," to control

29

window positions as desired on the screen." EX1005, col. 2:33-38. The entire point of the "drag" technique of Tanaka was to enable a user to control window position by dragging an icon to a particular location on the display. Moreover, Tanaka suggests that the dragging technique may be used to open a window in a device in which a window does not cover the entire screen, because if the window covered the entire screen there would be no point in dragging the icon to "a new position where a new window is to be opened." EX1005, col. 1:36-47. Accordingly, it would have made no sense to combine Tanaka with a disclosure that did not permit dragging an icon because a single window filled the entire screen. EX2001, ¶86.

> Next, Bederson affirmatively undermines Petitioners' case. He states:
> A POSA would have recognized that, in an implementation of the selection techniques of Ren in combination with such devices, it would not be desirable or necessary to drag the pen or input device to the desired location for the opening of a window.

EX1002, ¶ 115. It is true that, in 2002, a POSA would not have considered it desirable or necessary to drag an input device from an icon to a desired location for the opening of a window in devices in which a window appears over the entire screen. EX2001, ¶87. In 2002, a POSA would have preferred the "check" technique of Tanaka for such implementations. *Id*. However, this highlights why a POSA would not have been motivated to incorporate Ren's a→c→b→a variant

30

of the *Slide Off* strategy – which involves "drag[ging] the pen or input device" –

into such a device.

Finally, Bederson states:

[A] POSA having considered the entire disclosure of Tanaka would have understood the disclosed "dragging" to refer to movement of a *contour* of the icon, where the icon itself (*representation of the function*) is neither relocated or duplicated during the gliding of the pen (*object*), as illustrated in FIGS. 8, 9.

EX1002, ¶ 116.  Here, Bederson is categorically false.  In fact, Tanaka teaches dragging the icon that the user seeks to activate across the display:

a.  "First. the pen is put down onto the icon in the icon area of the display means, the pen is <u>dragged together with the icon</u> to a desired position outside the icon area, and the pen is then lifted off the tablet."  EX1005, Abstract (emphasis added).

b.  "The present invention relates to an information processing apparatus for controlling window positions, the apparatus allowing the window corresponding to a selected icon on a display screen to be opened in the position in which the icon is checked with a pointing device, <u>or in the position to which the icon is dragged with the pointing device</u> and from which the pointing device is lifted up."  EX1005, col. 1:7-14 (emphasis added.

31

c. "The other way to select the icon is to "drag" it." EX1005, col. 1:43-47

(emphasis added).

d. "[S]econd display control means for opening in a desired position outside

the icon area a new window corresponding to the icon selected by a

dragging operation of the pen means, the dragging operation being

executed by three actions, the first action involving putting the pen means

down onto the icon in the icon area displayed on the display means, the

second action involving dragging the pen means together with the icon

up to the desired position outside the icon area, . . . ." EX1005, col. 2:58-

67 (emphasis added).

e. "When an icon is dragged with the pointing pen, the apparatus opens a

new window in the position to which the icon is dragged and from which

the pointing pen is lifted up." EX1005, col. 3:3-12 (emphasis added).

f. "As described earlier, there are two ways to open a window: either to

"check" the necessary icon with the pointing pen by putting the pen down

to the icon and then lifting up the pen therefrom; or to "drag" the pen

together with the selected icon as the pen is held down onto the tablet, the

icon being released by lifting up the pen when a desired position is

reached. When the icon is "checked," a new window is allowed to open

in a predetermined position (with this embodiment, the position where

the old window was previously being opened); <u>when the icon is "dragged,"</u> a new window opens in the position where the pointing pen after dragging operation is lifted up." EX1005, col. 4:42-54 (emphasis added).

g. "Steps 103 and 104 constitute the second display control means for opening a new window in the position <u>to which an icon is dragged</u> with the pointing pen and from which the pointing pen is lifted up." EX1005, col. 5:25-28 (emphasis added).

h. "While the pointing pen <u>together with an icon is being dragged</u> (in pen-down state), the corresponding window is not displayed." EX1005, col. 6:38-40 (emphasis added).

i. "As described, the information processing apparatus for controlling window positions according to the invention opens a window in a predetermined position when an icon is checked with the pointing pen, or in the position to which <u>the icon is dragged</u> and from which the pointing pen is lifted up." EX1005, col. 6:55-60 (emphasis added).

j. "[T]he first action involving putting said pen means down onto said icon in said icon area displayed on said display means, the second action involving <u>dragging said pen means together with said icon</u> up to said

33

desired position outside said icon area, . . . ."  EX1005, col. 8:7-12

(emphasis added).

So, Tanaka's purpose was to describe an apparatus in which a user could use either the "check" or drag and drop techniques to open a window, and that is what Tanaka did.  Tanaka simply provided a way of using either of these two techniques on a single device, rather than one or the other.  Contrary to Bederson's assertion, Tanaka did not purport to provide a new, third way of opening a window, by dragging a "contour" across the display.  EX2001, ¶92.

Tanaka explains that the "contour" to which Bederson refers is not a contour of an icon, but rather a contour "indicating the position in which to open a window following a dragging operation on the embodiment."  EX1005, col. 3:35-42, 6:4-5.  As displayed, the contour is simply that – an outline.  EX2001, ¶93; EX1005, Fig. 8.  If the pen is not dragged out of the "icon area," i.e., the area of the display in which icons are displayed, then the contour is displayed in the same size as the icon at which the dragging motion commenced.  EX2001, ¶93; EX1005, col. 6:5-9.  If the pen is dragged out of the icon area, the contour expands to the size of the window to be displayed upon termination of the dragging motion.  EX2001, ¶93; EX1005, col. 6:9-12.  But in either case, the icon is dragged along with the pen.  EX2001, ¶93; EX1005, col. 6:38-42.  Accordingly, a POSA would have

understood Tanaka to disclose a dragging operation in which an icon, as well as a contour of varying size, is dragged by the pen. EX2001, ¶93.

So, Bederson's improper, extra-Petition attempt to provide a motivation to combine Tanaka and Ren fails on its own terms, as it is based on false premises and irrelevancies. As Petitioners point to nothing else, for this separate and independent reason, they fail to satisfy their burden with respect to Ground 1. EX2001, ¶94.

### 2. Petitioners' Generalized Assertions of Motivation to Incorporate Ren's "Selection Targets" into Tanaka's Device Would Not Result in the Claimed Invention

Petitioners only attempt to read their Ren-Tanaka combination on limitations 1[c] and 1[d] via the a→c→b→a variant of Ren's *Slide Off* strategy. They do not contend that any other aspect of Ren, or Tanaka, would disclose those limitations. Indeed, they disclaim any such effort, stating that "a POSA would have been motivated to implement the *Slide Off* strategy exclusively of the *Direct Off* strategy," Pet., 28, i.e., stating that only the a→c→b→a variant would do. This makes sense, as none of Ren's other selection strategies even arguably disclose the "touch and glide" operation of limitations 1[c]. EX1004, 390, Fig. 3.

Accordingly, even were they not insufficient for the reasons pointed out above, Petitioners' generalized assertions of a motivation to incorporate Ren's "selection targets" into Tanaka's device would fail because they would not disclose

at least limitation 1[c].  A POSA looking to Ren's teaching would incorporate other selection strategies – likely *Direct On* or *Direct Off*, or if not one of them then *Slide Touch* – rather than *Slide Off* for dense displays such as Tanaka's. EX2001, ¶59.

### 3.  Grounds 1B-E:  Petitioners Fail to Satisfy their Burden with Respect to Claims 2-6 and 12-17

Claims 2-6 and 12-17 depend from claim 1.  Petitioners assert that a congeries of other references supply the additional elements necessary to render claims 2-6 and 12-17 obvious.  However, they do not assert that these references supply the missing elements of limitations 1[c] and 1[d].  Accordingly, Ground 1 fails with respect to the dependent claims as well.

### B.  Grounds 2A – 2D:  Petitioners Fail to Show that Claim 1 is Obvious Over the Combination of Ren and Hirayama307

Petitioners assert that element [1d] is rendered obvious by Hirayama307, or alternatively is disclosed by Ren.  As with Ground 1, Ground 2 fails for lack of support and due to the weight of evidence compelling the opposite conclusion.

### 1.   A POSA Would Not have been Motivated to Modify Hirayama307 to Produce Limitation 1[d]

Petitioners first assert that it would have been obvious to a POSA to implement the user interface of Hirayama307 such that the icon is not relocated or duplicated during the gliding of the pen." Pet., 60-62.  Their stated rationale for this assertion is that Hirayama307 does not show the icon being dragged during movement of the pen, and that an object of the invention was to "provide a data processing apparatus in which a starting or ending position of a dragging operation can be designated in natural fashion."  Pet., 61.  However, the first of these is false, and the second a red herring.

First, far from "suggesting" that the icons are not dragged, Hirayama307 in fact discloses that the icons of group 40 in Fig. 3A are dragged during the gliding of the pen and cursor across the display.  EX2001, ¶99.  A POSA reading Hirayama307 would have understood that the cursor dragged the icon down into the display area, because that is how drag and drop operations were typically performed in computer user interfaces as of 2002.  EX2001, ¶100.  Similar to today using Windows 10 on a desktop, in 2002 a user could manipulate a mouse to move a cursor onto an icon, and then left-click the mouse to drag the icon from one location to another on a desktop.  *Id*.  In this action, the icon is duplicated during the gliding, as the original icon remains stationary and a duplicate icon is

37

instantiated during the gliding, with the original icon disappearing and the duplicate icon remaining in its new "dragged" location upon release of the mouse button. *Id.* Hirayama307 was directed to replacing a second mouse click (for releasing the icon in a particular location on the desktop) with the action of lifting a pen from a touch display. *Id*; EX1006, col. 1:13-43, 47-63. There is nothing in Hirayama307 suggesting a departure from the typical operation in which a duplicate icon, along with a cursor, was dragged across a desktop. EX2001, ¶100.

Hirayama307 confirms that the icon is dragged with the pen and converted into a window at the location to which it has been dragged:

> A circuit detects whether or not the position coordinate of the point of the pen is moved to a predetermined area and <u>a circuit converts the icon into a window</u> when it is detected that the point of the pen is apart from the display device within the predetermined area.

EX1006, col. 2:8-13 (emphasis added).

Petitioners point to Figure 3A and to text in Hirayama307 stating: "[s]ince as the point of the pen 3 approaches the panel surface of the display portion 1 serving as the input tablet 2 a cross-shaped position designating cursor 42 is displayed on the picture screen of the display portion 1, the user can visually confirm the exact position of the point of pen 3 on the input tablet 2 very clearly." EX1006, col. 4:65 – 5:3. However, the text here is referring to the initial process of selecting an icon by touching it with the pen and relates back to a problem identified in the prior art

("the mouse is too large to move the cursor to the exact position of the desired icon properly," EX1006, col. 1:41-43); it says nothing concerning what happens after the icon has been selected. EX2001, ¶102. The next sentence makes this clear, indicating that after the pen point has been dragged into the display area the icon enlarges into a window:

> Then, if the user moves (i.e. drags) the point of the pen 3 to the display position on the surface of the input tablet 2 without being separated therefrom after having touched the desired icon 41 with the point of the pen 3, and takes the point of the pen 3 off from the surface of the input tablet 2, <u>an icon (hereinafter be referred to as a window) enlarged in the form of the processing display mode of the desired icon 41 is automatically displayed on the display portion 1 as shown in FIG. 3B.</u>

EX1006, col. 5:3-12 (emphasis added).

While Figure 3A does not depict icon 41 as duplicated at the point of the cursor, Figure 4A – which states that after the pen is moved "outside of the designated area" the device "enlarge[s the] icon as a window," EX1006, Fig. 4A [S4, S6] – makes clear that it was not intended to depict the appearance of the icon following the touch and glide movement of the cursor, as the flow chart of Figure 4A states that at that point the enlarged icon should be apparent on the display. Item S6 in the flow chart of Fig. 4A makes it clear that the icon is duplicated because the pen has already been shifted by a large amount (S4) and then the

39

system "Enlarge(s) icon as a window" in S6.  A POSA would understand that this implies that the icon was dragged.  EX2001, ¶103.

Second, even were a POSA to read Hirayama307 in the manner suggested by Petitioners, there would have been no motivation for a POSA to take the additional step they posit.  EX2001, ¶104.  Notably, neither Petitioners nor Bederson supply any explanation as to why a POSA would be motivated to modify the device disclosed in Hirayama307 to eliminate the "drag and drop" visual presentation that was commonly used in mobile computing devices in 2002.

In fact, there was no such motivation.  EX2001, ¶105.  Eliminating the presentation of a "dragged icon" while the user's finger or pointing device glided along the display away from a touched icon would not have improved the user experience or functioning of Hirayama307's device in any way.  *Id*.  There was no deficiency in the user experience or functioning of Hirayama307's device that would have been remedied by the removal of the "dragged icon" presentation.  *Id*. To the contrary, removing the "dragged icon" presentation would have been detrimental to the user experience, making it more difficult for a user to quickly and easily identify where on the display an associated window would be likely to open.  *Id*.

40

In fact, were the concept of a "dragged icon" not already present in Hirayama307, a POSA would have been motivated to <u>add</u> it for a number of reasons, including the following:

    a.   The visual presentation of a "dragging" icon was a commonly-understood and well-accepted functionality in 2002 for providing users of mobile computing devices with visual feedback concerning the location at which a window would be opened when the user lifted the pointing device from the display.

    b.   The visual presentation of a "dragging" icon was an effective and intuitive means for providing users of mobile computing devices with visual feedback concerning the location at which a window would be opened when the user lifted the pointing device from the display.

    c.   The visual presentation of a "dragging" icon was also common in the Microsoft Windows environment in 2002, so providing the same type of visual presentation in the environment of a mobile computing device helped provide novice users with a comfortable experience navigating mobile devices, which were not nearly so ubiquitous in 2002 as they are today.  EX2001, ¶107.

Petitioners also assert that "FIG. 3B also shows both window 43 for the dialler icon and icon 41 in the same position on the screen it was located for the dragging operation illustrated in FIG. 3A," and conclude that "[a] POSA would

41

have understood this as at least a suggestion the icon is not relocated or duplicated during the gliding of the pen because the icon was still in the same location it started at the beginning of the dragging operation." Pet., 62. However, this is a non sequitur. Limitation 1[d] requires that the representation "is not relocated or duplicated during the gliding." EX1001, col. 6:57-59. Figure 3B depicts the appearance of Hirayama307's display after the gliding (from icon 41 into the display area) has been completed. EX1006, Fig. 3B. Even were a POSA to have understood the juxtaposition of Figures 3A and 3B to suggest that icon 41 had not been relocated, there is no reason that a POSA would have read these figures to suggest that icon 41 had not been duplicated during the dragging operation. EX2001, ¶109. As explained above, it was common for a dragged icon to be duplicated during a dragging operation. Neither Petitioners nor Bederson provide any explanation as to why a POSA would have understood Hirayama307 as they suggest, and there is nothing in Hirayama307 or the knowledge of a POSA as of 2002 that would support their assertion. *Id*.

So, Petitioners fail to support their assertion that a POSA would have been motivated to modify Hirayama307 as recited in limitation 1[d]. In fact, there was no such motivation. EX2001, ¶110.

42

2.    **A POSA Would Not have been Motivated to Incorporate the a→c→b→a Variant of Ren's *Slide Off* Target Selection Strategy into Hirayama307**

Petitioners next assert that Ren discloses limitation 1[d], and that it a POSA would have been "motivated to combine the teaching or Ren with Hirayama307." Pet., 62. As above, Petitioners fail to provide any reasoned explanation as to why a POSA would have been motivated to make their proposed combination. In fact, a POSA would not have been so motivated.

a.    **Petitioners' Generalized Assertions regarding Motivation to Combine Fail to Satisfy Their Burden**

Petitioners support their proposed combination of Ren's a →c→b→a *Slide Off* variant and Hirayama307 only with generalized assertions. As shown above, such boilerplate is insufficient to satisfy Petitioners' burden. In any event, Petitioners' argument fails on its own terms.

First, Petitioners state that "Ren and Hirayama307 both are directed to solutions to the same problem, namely target selection techniques in pen-based tablet systems." Pet., 62. This does not state a motivation to combine. *Enfish,* 662 Fed.Appx. at 989-90; *Securus*, 701 Fed.Appx. at 976-77. It is also not true. While Hirayama307 does discuss a technique for selecting an icon, the focus of the disclosure is on solving a different problem, that of reducing the number of operations a user must perform in order to activate an icon. EX2001, ¶113. The disclosure is not directed to an improved operation for selecting an icon, but rather

43

to improved functionality for delivering data resulting from the operation performed by the user to the CPU. *Id.* This is reflected, for example, in the description of the prior art, in which a user specifies a desired icon by depressing a button on a mouse or keyboard, and:

> when the user wants to enlarge the window of the desired icon, the button on the mouse is depressed one more time, or the mouse is moved to the position at which the window is enlarged on the tablet and the button on the mouse is depressed one more time at that position, the window of the icon being thus enlarged as is instructed by the user.

EX1006, col. 1:29-35.

Hirayama307 saw this two-step mouse click process as a problem, being "very cumbersome for the user," and also lamented that the "mouse is too large to move the cursor to the exact position of the desired icon properly." EX1006, col. 1:36-43. So, Hirayama307 introduced the invention by describing the shortcomings of using a mouse to designate an icon to be dragged. EX2001, ¶115.

Hirayama307 then describes the objects of the invention as being to "provide an improved data processing apparatus which can substantially eliminate the aforenoted short comings and disadvantages encountered with the prior art," to "provide a data processing apparatus in which the user can activate or deactivate a designated function by the user when the user drags a pen," to "provide a data processing apparatus in which a starting or ending position of a dragging operation

44

can be designated in natural fashion," and to "provide a data processing apparatus in which a position of a window, i.e. a position of an enlarged icon, can be determined with ease." EX1006, col. 1:52-63. Hirayama307 accomplishes this by teaching the use of a pen, rather than a mouse, to designate and drag an icon. EX1006, col. 4:61 to 5:12, Figs. 3A, 4A. Instead of a "cumbersome" second click of a mouse, the user simply lifts the pen from the display in order to communicate to the CPU that the user wishes to enlarge a window. EX1006, col. 5:3-12, Fig. 4A[S7, S9].

So Hirayama307, unlike Ren, is not interested in determining an optimal selection strategy, but is instead focused on optimizing the hardware means for communicating the user's desired selection to the CPU. EX2001, ¶118.

Moreover, even were Petitioners' characterization of Hirayama307 entirely accurate, the mere fact that both references were directed to solutions to the problem of target selection techniques in pen-based tablet systems does not in itself suggest a motivation to combine the specific aspects of the references he identifies to arrive at the solution recited in claim 1 of the '879 Patent. EX2001, ¶119. Without more, there is simply no reason to conclude that of the six selection techniques addressed in Ren, a POSA would have been motivated to incorporate Ren's denigrated *Slide Off* technique into Hirayama307's display. *Id.* In fact,

45

given the teachings of Ren, a POSA would have been discouraged from incorporating the *Slide Off* technique into Hirayama307's display. *Id.*

Second, Petitioners state that "a POSA would have recognized Ren as disclosing a small number of selection techniques that would have been obvious to try and implement with pen-based GUI interaction systems." However, regardless of the number of selection techniques disclosed in Ren, a POSA would not have been motivated to attempt to implement the sole selection technique that Petitioners rely on – the a→c→b→a *Slide Off* variant – in the device of Hirayama307 because, as shown below, Ren taught away from the *Slide Off* strategy. EX2001, ¶¶120-21.

Third, Petitioners state that "[a] POSA would have been motivated to try and implement Ren's selection techniques on such a device, and would have done so with predictable results." Pet., 62. But, predictability would drive a POSA to use a different strategy than *Slide Off* given Ren's teaching, and the result of such a combination would have been seen by a POSA as poor in relation to the unaltered Hirayama307 device. EX2001, ¶125.

Thus, here as above, Petitioners fail to proffer any reasoned explanation as to why a POSA would have been motivated to combine Ren and Hirayama307. They therefore fail to satisfy their burden with respect to Ground 2.

IPR2021-00144
Preliminary Response

### b. Ren Teaches Away from the *Slide Off* Strategy

Moreover, there are good reasons why a POSA would not have been motivated to make Petitioners' proposed combination.  As explained in section II(A)(1)(a), a POSA would have understood that Ren denigrated and taught away from the *Slide Off* strategy for use with mobile handheld devices, in particular when used with mobile handheld devices with a dense display.

Hirayama307 has such a display.  EX2001, ¶124.  Hirayama307's display is what Ren characterized as a dense display, EX1004, p. 403, in which icons exist near other icons, the icons are close together, and the icons exist near the sides of the target, such as the upper and right sides of the display:



FIG. 3A

EX1006, Fig. 3A. This is the type of display that Ren stated would be particularly unsuited to the *Slide Off* strategy. As with Tanaka, there is no embodiment disclosed in Hirayama307 that appears to fit the narrow criteria articulated in Ren for "more efficient" implementation of the *Slide Off* strategy. EX2001, ¶124. To whatever extent a POSA would have found Ren relevant to Hirayama307, he would not have seen any motivation to use the multiply-denigrated *Slide Off* strategy in the display of Hirayama307. EX2001, ¶125.

### c. A Ren-Hirayama307 Combination Would have Addressed No Deficiency in Hirayama307, and the Detriments Would have Outweighed Any Benefits

As noted above with respect to the Ren-Tanaka combination, a POSA would have understood that the purpose of Ren was to report on the design and results of two experiments concerning target selection strategies on a touchscreen display rather than to suggest a particular interface design. A POSA would not have understood Ren to be teaching that the interface of a commercial device (i.e., not for strictly experimental use) such as that described in Hirayama307 should be coded to present a display with stationary targets randomly relocated upon each use. EX2001, ¶¶126, 128.

In addition, a POSA would have seen no reason to substitute Ren's stationary, non-draggable targets for the icons of Hirayama307, for at least the reason that the stationary nature of Ren's targets would have detracted from the

utility of Hirayama307's "drag and drop" functionality and would have been considered odd and less useful by a POSA as of 2002. EX2001, ¶127. Eliminating the presentation of a "dragged icon" while the user's finger or pointing device glided along the display away from a touched icon would not have improved the user experience or functioning of Hirayama307's device in any way. *Id*. There was no deficiency in the user experience or functioning of Hirayama307's device that would have been remedied by the removal of the "dragged icon" presentation. *Id*. Modifying Hirayama307 as Petitioners suggest would have introduced a detriment to Hirayama307, making it more difficult for a user to quickly and easily identify where on the display an associated window would be likely to open, for no offsetting benefit. EX2001, ¶¶127, 129.

In addition, as noted above with respect to Petitioners' Ren-Tanaka combination, Petitioners' characterization of Ren's *Slide Off* strategy (the a→c→b→a variant) as similar to Tanaka's (and, therefore, Hirayama307's) drag and drop technique undermines their case, as the purported similarity of these selection techniques undercuts a POSA's motivation to alter one for the other. EX2001, ¶130.

Accordingly, for these additional reasons, Petitioners fail to satisfy their burden with respect to Ground 2.

### 3. Grounds 2B-D: Petitioners Fail to Satisfy their Burden with Respect to Claims 2-6 and 12-17

Petitioners assert that additional references supply the additional elements necessary to render claims 2-6 and 12-17 obvious. However, they do not assert that these references supply the missing elements of limitation 1[d]. Accordingly, Ground 2 fails with respect to the dependent claims as well.

### C. Ground 3: Petitioners Fail to Show that Claims 1, 14 and 15 are Obvious over Jermyn

#### 1. Jermyn is Not Analogous Art

"A reference qualifies as prior art for an obviousness determination under § 103 only when it is analogous to the claimed invention." *In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011). "Prior art is analogous where either (1) 'the art is from the same field of endeavor, regardless of the problem addressed' or (2) even if the reference is not within the same field of endeavor, 'the reference still is reasonably pertinent to the particular problem with which the inventor is involved.'" *Polygroup Ltd. MCO v. Willis Electric Co.*, 759 Fed. Appx. 934, 941-42 (Fed. Cir. 2019) (quoting *In re Ethicon, Inc.*, 844 F.3d 1344, 1349 (Fed. Cir. 2017)).

Petitioners assert that Jermyn renders claims 1, 14 and 15 obvious. Petitioners therefore bear the burden of showing that Jermyn is analogous art. *See Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1378-79

50

(Fed. Cir. 2015).  Despite the fact that Jermyn is obviously in a different field of endeavor than the '879 Patent, they do not even make an effort to do so.  In fact, Jermyn is not analogous art, for the reasons set forth below.

### a.    Jermyn is Not in the Same Field of Endeavor as the '879 Patent

The field of endeavor of the '879 Patent is that of user interfaces for handheld mobile computer units.  This is evident from the patent itself.  The title of the patent is:  "USER INTERFACE FOR MOBILE HANDHELD COMPUTER UNIT."  EX1001.  The Abstract begins:  "The present invention relates to a user interface for a mobile handheld computer unit, . . . ."  EX1001, Abstract.  The figures illustrating the invention all depict a display of a handheld computer unit, or the front of the handheld computer unit, or a user's thumb or finger interacting with the display.  EX1001, Figs. 1-14.  The specification explains that "[t]he present invention relates to a user interface for a mobile handheld computer unit, describes "[m]obile handheld computers" in the description of background art and identifies the "[t]echnical problems" as including that of providing "a simple way to make the most commonly used functions for navigation and management available in the environment of a small handheld computer unit."  EX1001, col. 1:6-9, 24-43, 58-61.  The "Solution" is addressed "with the staring [sic] point from a user interface for a mobile handheld computer unit," (EX1001, col. 1:65-67) and

51

the "Advantages" are described as "primarily associated with a user interface or a computer readable medium according to the present invention reside in the ability to establish a user friendly interface for small handheld computers, . . . ." EX1001, col. 3:10-14. The description of the preferred embodiments is directed to "a user interface for a mobile handheld computer unit." EX1001, col. 3:50-51. Claim 1 recites that the invention claimed is "[a] non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, . . . ." EX1001, col. 6:44-49. There is no question but that the field of endeavor of the '879 Patent is that of user interfaces for handheld mobile computer units.

The field of endeavor of Jermyn is that of computer security, and more specifically password schemes. EX1014, p. 2. The Abstract states: "In this paper we propose and evaluate new *graphical* password schemes . . . ." EX1014, p. 2 (emphasis in original). In the introduction, the authors describe problems with the use of passwords to authenticate computer users, and describe their solution – "*graphical passwords*, which can be input by the user to any device with a graphical input interface." EX1014, p. 2 (emphasis in original). They then state: "In this paper we considerably advance the theory and practice of graphical passwords." EX1014, p. 3. They then describe in detail two "graphical password

52

schemes" that they "believe to be more secure than textual passwords," and describe an implementation of one of the schemes on a Palm Pilot. EX1014, pp. 3-11. They then conclude: "We have presented graphical password schemes that achieve better security than conventional textual passwords." EX1014, p. 12.

Jermyn states that the authors are "primarily motivated by devices such as personal digital assistants (PDAs) that offer graphical input capabilities via a stylus, . . . ." EX1014, p. 2. In addition, they describe an implementation of their "Draw-a-Secret" graphical password scheme on a Palm Pilot. EX1014, pp. 6-7. However, their paper is directed not to the user interface itself but rather to a particular functionality that may (like most or all other functionalities) be interacted with via the user interface. At no point do the authors propose a new type of user interface for handheld mobile devices; they merely accept the interface provided by those devices and propose a new way of implementing computer security for such devices. So, the field of endeavor of Jermyn was computer security, a different field from that of the invention described and claimed in the '879 Patent. EX2001, ¶144.

### b. Jermyn is Not Reasonably Pertinent to the Problems Addressed by the '879 Patent

"A reference is reasonably pertinent if, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter

53

with which it deals, logically would have commended itself to an inventor's attention in considering his problem." *In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992); *Smith & Nephew, Inc. v. Hologic, Inc*., 721 Fed. Appx. 943, 949 (Fed. Cir. 2018). Petitioners could not have met this standard, even had they tried.

The principal problem the '879 Patent sought to solve was that of providing an easily navigable user interface for a small handheld computer unit. This may be discerned from the description of the background art, in which the inventor notes that the "need to manage more information has led the development towards new solutions regarding user interfaces and navigation." EX1001, col 1:34-36. As a result, "[t]he PDA's and mobile phones are getting larger and larger in order to provide a user-friendly interface." EX1001, col 1:36-37. However, "[s]ince the users have gotten used to small handheld units, it is hard to move towards larger units." EX1001, col 1:38-39. This has "led to foldable keyboards, different kinds of joysticks and different kinds of touch sensitive displays and pads intended to help in providing a user interface that is suitable for Small handheld computer units." EX1001, col 1:39-43. These attempted solutions all provide means to navigate a user interface. Yet, these solutions did not address the problem troubling the inventor.

The patent then lists four problems, all of which are described in terms of the inventor's high-level aspirations – to provide a user interface that is "user-

54

friendly," or "simple to use," etc. – for, principally, a small handheld computer unit. EX1001, col. 1:49-61. The specification then provides a solution, from "the staring [sic] point from a user interface for a mobile handheld computer unit," EX1001, col. 1:65-67, to the problem of providing an easily navigable user interface for a small handheld computer unit, focusing on graphic elements presented by the interface and particular gestures the user may use to interact with the interface.

The problem Jermyn sought to solve was entirely different: that of providing a password entry scheme that would be more secure than a text-based password. EX1014, p. 2. Jermyn is devoid of any suggestion that it is focused on a solution to efficient user interface design for small handheld computer units. Jermyn is wholly focused on a problem relevant to the field of computer security – enhancing the effectiveness of password schemes – but that has nothing to say to a POSA attempting to solve the problem of providing an easily navigable user interface for a small handheld computer unit. EX2001, ¶146. Accordingly, a POSA would not reasonably have sought out, consulted or considered Jermyn in the course of attempting to solve the problem of providing an easily navigable user interface for a small handheld computer unit. EX2001, ¶147.

Jermyn is therefore not analogous art. Accordingly, Petitioners' Ground 3 fails as a matter of law. *Klein*, 647 F.3d at 1348.

### 1.      Jermyn Does Not Disclose Limitation 1[a]

Even were Jermyn cognizable for Petitioners' Ground 3, it would still fail on its own terms.  Petitioners assert that "a POSA would have found it obvious that successful entry of [Jermyn's] graphical password grants access to PDA resources," and that therefore Jermyn's rectangular grid is a representation of a function.  Pet., 76.  Petitioners offer no explanation; instead, they cite to paragraphs 188-89 of Bederson's declaration.  The Board should disregard Bederson's arguments here, as they should have been made in the Petition.  *Cisco Sys.,* IPR2014-00454, Paper 12 at 10.  However, even if the Board considers Bederson's statements he offers nothing but the usual mixture of conclusory and misdirected assertions, and in any event Bederson is wrong – Jermyn's grid is not a representation of a function.

Bederson claims that "the rectangular grid corresponds to the recited 'representation of a function,'" and that "[t]he user would have recognized Jermyn's password grid as one variation of a password entry prompt, and would have understood such password prompts as a representation of the function of gaining access to the mobile device's resources."  EX1002, ¶ 188.  The first statement is simply ipse dixit – Bederson never explains why or how the grid corresponds to a representation of a function other than to say one can draw a graphical password on it, which explains nothing.  The second statement focuses

on the wrong referent – the question is not what a generalized user would have recognized, but what a POSA would have recognized – and in any event yields a non sequitur. Regardless of whether a user or POSA would have recognized Jermyn's grid as a type of password entry prompt, a POSA would not have recognized Jermyn's grid as a representation of any function, for the reasons set forth below.

A POSA in 2002 would have understood a "representation of a function," in the user interface context, to refer to an icon or other image that represented a function. EX2001, ¶148. Icons were well known in the field of user interface design in 2002, and would have been immediately recognized as a type of representation of a function. *Id*. In fact, icons – typically understood to be small images displayed on the screen to represent objects that could be manipulated by the user – would have been understood by a POSA in 2002 as practically synonymous with a "representation" in the user interface context. *Id*. A definition and illustration of an "icon" from the 1997 edition of the Microsoft Press Computer Dictionary is typical:

**icon** \ī´kon\ *n.* A small image displayed on the screen to represent an object that can be manipulated by the user. By serving as visual mnemonics and allowing the user to control certain computer actions without having to remember commands or type them at the keyboard, icons are a significant factor in the user-friendliness of graphical user interfaces. See the illustration. *See also* graphical user interface.



Recycle Bin

*Icon.*

EX2003.

A POSA would further understand, upon reviewing the '879 Patent and its associated prosecution file, that a "representation" may, in addition to icons and other similar images, comprise text and characters. EX2001, ¶150. The specification of the '879 Patent provides examples of representations of functions, i.e., the first ("general application dependent function"), second ("keyboard function") and third ("task and file manager") predefined functions, identified in Figure 1 as items 21-23, respectively:



EX1001, Fig. 1; col. 2:5-10, 4:1-6, 5:65 to 6:3.  These are clearly icons.

In addition, item 233 of Figure 6 constitutes a "representation" of the task

and file manager (i.e., a function) in textual and graphical form:



59

EX1001, Fig. 6; col. 5:19-28. Item 233 is not a text field, but is a field that may be "selected" by the user. EX1001, Fig. 6; col. 5:19-28. And, the patent explains how the fields of Figure 6 are selected – by "tapping G, H on the touch sensitive area 1." EX1001, col. 5:3-7 (referring to Figure 7, depicting the scrolling and tapping operation used to select an application or file depicted in Figure 6). So, while the "representation" of the task and file manager depicted at item 233 may be a representation in textual and graphical form, item 233 is not a text entry field. EX2001, ¶151.

Consistent with the above, a POSA would have understood that a "representation" represents something, in this case a function. EX2001, ¶152. The representation need not necessarily be an image or pictorial depiction of a function, but it must serve to represent the function in some cognizable way. *Id.* A graphical element that merely enables a user to activate a function, without representing that function, would not have been considered to be a representation of a function. *Id.*

Accordingly, contrary to Dr. Bederson's assertion, a POSA would not have considered Jermyn's grid, or any type of password prompt or password entry field, to be a representation of a function. EX2001, ¶153. Password entry fields were well known in 2002. *Id.* For example, a password entry field on the login screen of a Windows GUI as of 2002 would enable a user, upon entry of a correct

60

password, to obtain access to the resources of a computer presenting that screen. *Id.* Entering characters into that field would, if the correct characters were entered, enable the user to obtain access to system resources. *Id.* However, no POSA would have considered the password text entry field to be a "representation" of the function of obtaining access to system resources, because the password entry field does not in fact represent any function. *Id.*

One attribute of a representation of a function in a graphical user interface is that selection of the representation (e.g., an icon) is typically sufficient in itself to activate the associated function. EX2001, ¶154. This attribute is lacking in a password entry field, because if a user inputs text that is different from the password, she will not authenticate and will not be permitted access to the device's resources. *Id.* This reflects the fact that a password entry field is intended to enable a user to provide input to a function, but does not itself represent the function, and illustrates why a POSA would not have considered a password entry field to be a representation of a function. *Id.*

Another example would be online data entry forms, which were well known in 2002. EX2001, ¶155. Typically, such forms included text entry fields enabling the user to provide input, and at least one button labeled "SUBMIT" or the like for the user to click when finished entering data into the text fields. *Id.* While a POSA might potentially have considered the SUBMIT button of such a form to

61

constitute a representation of a function (although it would be necessary to consider the totality of the circumstances in order to definitively state whether that would be true in any particular case), a POSA would not have considered the text entry fields of the form to constitute "representations" of any function. *Id*.

Nothing in the common understanding of the term "representation" within the context of user interface design, or the intrinsic record of the '879 Patent, would have suggested to a POSA in 2002 that the grid of Jermyn was a representation of a function. EX2001, ¶156. In fact, a POSA would not have understood the grid of Jermyn to be a representation of a function, because no function is "represented" by the square grid lines. *Id*. The grid is simply a character entry field, with the characters generated by pen strokes through the grid, just as the password entry field of a Windows user interface is just a character entry field and not a representation of the function of obtaining access to system resources, or the text entry fields of an online data entry form is just a character entry field and not a representation of some function associated with the form. *Id*. It is the space within which an action (e.g., drawing a password or entering text) may be executed, not a representation of the function resulting when the action is performed. *Id*. A POSA would have understood the grid of Jermyn to be the interface for entering a password, nothing more. *Id*.

In fact, it would be clear to a POSA from Jermyn itself that the rectangular grid is not a representation of a function. EX2001, ¶157. Jermyn's Figure 3 presents four illustrations of a display running the programming for presenting Jermyn's grid (illustrations (a), (b), (e) and (f)). Figure 3(a) shows the grid with the user's initial password input. EX1014, Fig. 3. There are two buttons in the upper right of the display, above the grid: "Clr" and "Save:"



(a) User inputs desired secret    (b) Internal representation    (c) Raw bit string

(d) Interface to database    (e) Re-entry of (incorrect) secret    (f) Authorization failed

Figure 3: A password is created by drawing the secret on the display as shown in (a). Both the internal representation of the input password showing the cells covered by the user's drawing and the derived key are depicted in (b) and (c) respectively. To apply a symmetric cryptographic function to records in the database (shown in (d)), the user selects the records and then re-inputs the DAS password. If the encryption of a known cleartext with the input password matches the stored ciphertext created during initialization, then the symmetric cryptographic routine, $E_k(x)$, is applied to the selected records. Otherwise, the user is prompted to re-enter the DAS secret.

EX1014, Fig. 3.  A POSA would have interpreted this illustration as indicating that

touching or tapping the Save button was the necessary final step to saving the

desired password.  EX2001, ¶157.

Similarly, Figures 3(e) and 3(f) show the grid during and immediately after

entry of an incorrect password.  EX1014, Fig. 3.  In the upper portion of the

display, above the grid, there are two buttons: "clear" and "done:"



(a) User inputs desired secret     (b) Internal representation     (c) Raw bit string

(d) Interface to database     (e) Re-entry of (incorrect) secret     (f) Authorization failed

Figure 3: A password is created by drawing the secret on the display as shown in (a). Both the internal representation of the input password showing the cells covered by the user's drawing and the derived key are depicted in (b) and (c) respectively. To apply a symmetric cryptographic function to records in the database (shown in (d)), the user selects the records and then re-inputs the DAS password. If the encryption of a known cleartext with the input password matches the stored ciphertext created during initialization, then the symmetric cryptographic routine, $E_k(x)$, is applied to the selected records. Otherwise, the user is prompted to re-enter the DAS secret.

EX1014, Fig. 3.  Figure 5 depicts the same buttons:



Figure 5: The drawings above have complexities 15, 17, 24, 26, 39, and 42, respectively (recall that final pen-ups have zero cost).

A POSA would have interpreted these illustrations as indicating that touching or tapping the "done" button was the necessary final step to enter a password. EX2001, ¶158. A POSA would have interpreted these illustrations in that way at least because (i) there is no other plausible explanation for the functionality of the

"done" button, and (ii) the use of a button to indicate that the user was finished inputting a drawn password would have been desirable given that a drawn password could include combinations of multiple strokes and taps. *Id*.; see EX1014, Figs. 3, 5. Activation of the function by a "pen-up" operation rather than by the use of a separate "done" button or the like, as depicted in Figures 3 and 5, would have resulted in repeated inaccurate password entry failures during the drawing of a password and a great deal of user frustration. EX2001, ¶158.

So, to the extent that any element of Jermyn discloses a representation of the function of obtaining access to device resources, a POSA would have been more likely to recognize the "done" button, rather than the grid, as constituting such a representation. EX2001, ¶159. A POSA would not have read Jermyn's grid as disclosing a representation of a function, because it doesn't. EX2001, ¶160.

### 2.    Jermyn Does Not Disclose Limitation 1[b]

Petitioners fail even more egregiously to make their case with respect to limitation 1[b]. First, they contend that Jermyn teaches only strokes, not taps, as password inputs to the grid, reasoning from this that Jermyn teaches "only one option for activating" the function. Pet., 78. Bederson says the same. EX1002, ¶¶ 192-93. They are wrong; in fact, these statements are demonstrably false. Jermyn expressly teaches using tap inputs on the grid as part of the drawn password, or even as the entire password. For instance, Jermyn states:

66

IPR2021-00144
Preliminary Response

[T]he passwords generated by programs of complexity three are simply those <u>consisting of a single tap on one of the grid squares.</u>

EX1014, p. 10 (emphasis added).  Similarly, a drawn password consisting of both strokes and taps is shown in Figure 3:



Figure 3: A password is created by drawing the secret on the display as shown in (a). Both the internal representation of the input password showing the cells covered by the user's drawing and the derived key are depicted in (b) and (c) respectively.  To apply a symmetric cryptographic function to records in the database (shown in (d)), the user selects the records and then re-inputs the DAS password. If the encryption of a known cleartext with the input password matches the stored ciphertext created during initialization, then the symmetric cryptographic routine, $E_k(x)$, is applied to the selected records. Otherwise, the user is prompted to re-enter the DAS secret.

EX1014, Fig. 3.  And, passwords consisting of both strokes and taps, solely strokes, or solely taps, are shown in Figure 5:



Figure 5: The drawings above have complexities 15, 17, 24, 26, 39, and 42, respectively (recall that final pen-ups have zero cost).

EX1014, Fig. 5.

The dots depicted in Figure 3(a) and 3(b) at cells (3, 1) and (5, 4) would have been understood by a POSA to indicate taps, as suggested by the statement at page 10 of Jermyn. EX2001, ¶166. And they are integral to the drawn password, as shown by the fact that a tap in the wrong cell in section (e) of Figure 3 (cell (4,

1)) results in an "Authentication failed" message. *Id*. The dots depicted in Figure 5(e) and 5(f) would be understood by a POSA in the same way. *Id*.

Therefore, Jermyn discloses the use of taps as well as strokes to draw a pattern on the grid. EX2001, ¶167. Petitioners' (and Bederson's) insistence to the contrary is simply wrong.

Bederson also asserts that "Jermyn teaches and a POSA would have understood that the rectangular grid for entering the graphical password is the only mechanism for entering a password that is displayed by the PDA device, and therefore, the rectangular grid consists of only one option of gaining access to PDA resources (i.e., by drawing a graphical password pattern on the rectangular grid)." EX1002, ¶ 193. Petitioners assert the same, relying on Bederson. Pet., 78. Here again, they are incorrect. As shown above, Jermyn does not teach that the grid is the only mechanism for entering a password that is displayed by a device. Rather, Jermyn teaches that the grid, and a set of touch or tap activatable buttons along the upper portion of the display, are necessary for entering a password. EX2001, ¶¶157-58; EX1014, Figs. 3, 5.

In addition, Petitioners' assertion fails on its own terms. If Jermyn's grid were the "representation of a function," as Petitioners (incorrectly) assert, then it would not matter whether other mechanisms for entering a password were displayed on the PDA, because limitation 1[b] speaks only to what "the

representation" (per Petitioners, the grid) consists of, not whatever else is presented on the display. EX2001, ¶170. Bederson's linking "therefore" clause is, therefore, a non sequitur.

Moreover, even had Petitioners proffered some well-founded evidence in support of their contention, they would still lose. Assuming for the sake of argument that Jermyn's grid were a representation of a function (which it is not), the representation would "consist of" multiple options for activating the function of obtaining access to PDA resources. EX2001, ¶171. The grid would depict at least sixteen different "options for activating the function," one for each of the sixteen squares defining the grid, because a stroke or tap could be input in or through each of those squares. *Id*.

So, both of the premises underlying Petitioners' argument are false, and in any event the grid would not "consist[] of only one option for activating the function." Petitioners therefore fail to carry their burden with respect to limitation 1[b]; for this reason as well, Ground 3 fails.

### 3.    Jermyn Does Not Disclose Limitation 1[c]

In addition, Jermyn does not disclose the pen touching the display "at a location where the representation is provided" and then gliding away, as required by limitation 1[c]. Instead, Jermyn teaches touching the display in the blank space defined by a grid square, i.e., between the grid lines at the start of a tap or stroke.

70

EX1014, 6 & Figs. 2, 3, 5; Pet. 80-82. Petitioners contend that the grid as a whole is the "location where the representation is provided," but whatever they point to as satisfying the "representation" element must be something more than a blank space on the display. Here, assuming that the grid was actually a representation of a function (which it is not), that could only be the grid lines. Yet, per Jermyn, the stroke must begin in a cell defined by the grid lines. So for this reason as well, Petitioners' Ground 3 fails.

### 4. Claims 14-15 are Not Obvious over Jermyn

Petitioners assert no addition references with respect to claims 14-15. Their showing with respect to claim 1 fails. Accordingly, Ground 3 fails with respect to the dependent claims as well.

### CONCLUSION

Petitioners have failed to establish a reasonable likelihood of prevailing as to any of the Challenged Claims of the '879 Patent. The Board should therefore deny institution on their Petition.

71

Dated: March 17, 2021        Respectfully submitted,

<u>/Robert M. Asher, #30,445 /</u>
Robert M. Asher
Reg. No. 30,445
rasher@sunsteinlaw.com
Sunstein LLP
100 High Street
Boston, MA 02110-2321
(617) 443 9292 (phone)
(617) 443 0004 (fax)

Philip J. Graves (*pro hac vice*)
philipg@hbsslaw.com
Hagens Berman Sobol Shapiro LLP
301 North Lake Avenue, Suite 920
Pasadena, CA
213 330 7150 (phone)
213 330 7152 (fax)

72

## CERTIFICATION OF COMPLIANCE

Pursuant to 37 C.F.R. § 42.24(d), it is certified that this Preliminary

Response of the Patent Owner contains 13,992 words, excluding those portions

identified in 37 C.F.R. § 42.24(a)(1), as measured by the word-processing system

used to prepare this Preliminary Response.


Dated: March 17, 2021          Respectfully submitted,

                               /Robert M. Asher, #30,445 /
                               Robert M. Asher
                               Reg. No. 30,445
                               rasher@sunsteinlaw.com
                               Sunstein LLP
                               100 High Street
                               Boston, MA 02110-2321
                               (617) 443 9292 (phone)
                               (617) 443 0004 (fax)

                               Philip J. Graves (*pro hac vice*)
                               philipg@hbsslaw.com
                               Hagens Berman Sobol Shapiro LLP
                               301 North Lake Avenue, Suite 920
                               Pasadena, CA
                               213 330 7150 (phone)
                               213 330 7152 (fax)

IPR2021-00144
Preliminary Response

## CERTIFICATE OF SERVICE

It is certified that on March 17, 2021, the foregoing document has been

served on Petitioners as provided in 37 C.F.R. § 42.6(e) via electronic mail at

IPR50095-0015P1@fr.com.

Dated: March 17, 2021                Respectfully submitted,

/Robert M. Asher, #30,445 /
Robert M. Asher
Reg. No. 30,445
rasher@sunsteinlaw.com
Sunstein LLP
100 High Street
Boston, MA 02110-2321
(617) 443 9292 (phone)
(617) 443 0004 (fax)

74

# EXHIBIT 11

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

SAMSUNG ELECTRONICS CO. LTD., SAMSUNG ELECTRONICS
AMERICA, INC., AND APPLE, INC.,
Petitioner,

v.

NEONODE SMARTPHONE LLC,
Patent Owner.

————————

Case IPR2021-00144
Patent 8,095,879

————————

**PATENT OWNER'S SUR-REPLY**

EXHIBIT 1073
Samsung et al. v. Neonode
IPR2021-00144

# TABLE OF CONTENTS

I.    SECONDARY CONSIDERATIONS STRONGLY SUPPORT A FINDING OF NONOBVIOUSNESS. ...........................................................................1

II.    PETITIONER FAILS TO SHOW ACTIVATION BY "GLIDING … AWAY" (ALL CLAIMS). ..................................................................................6

    A.    The Plain Meaning And The Intrinsic Record Confirm That "Gliding … Away" Is Distinct From A Drag-And-Drop. ....................7

        1.    The Plain Meaning Confirms "Gliding" And "Dragging" Are Distinct. ......................................................................7

        2.    The Applicant Disclaimed "Drag-and-Drop."............................9

        3.    Petitioner's Position That Any Movement Constitutes "Gliding" Is Unsubstantiated And Contrary To The Intrinsic Record. ...................................................................12

    B.    Petitioner's Argument That Hirayama-307's Operation Is Not Drag-And-Drop Is Incorrect...............................................................15

III.    PETITIONER'S GROUNDS FAIL TO DISCLOSE OR RENDER OBVIOUS "WHEREIN THE REPRESENTATION OF THE FUNCTION IS NOT RELOCATED OR DUPLICATED" (ALL CLAIMS). ...................23

    A.    Petitioner's Belated Claim That Hirayama-307 Discloses No Duplication Or Relocation Contradicts Hirayama-307's Express Disclosure. ......................................................................................23

    B.    Petitioner Fails To Present Any Proper Motivation To Modify Hirayama-307 So As Not To Duplicate Or Relocate The Icon. .........25

    C.    Petitioners Fail To Provide Any Motivation To Modify Hirayama-307 In View Of Ren............................................................28

IV.    PETITIONER'S CLAIM 6 ARGUMENTS ARE UNTIMELY. ..................29

V.    PETITIONER FAILS TO SHOW DISCLOSURE OF CLAIM 15..............30

VI.    IMPROPERLY INCORPORATED PORTIONS OF DR. BEDERSON'S REPLY DECLARATION SHOULD BE DISREGARDED........................31

VII.    CONCLUSION........................................................................................31

i

# TABLE OF AUTHORITIES

**Page(s)**

## COURT DECISIONS

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ......................................................................9

*Uship Intellectual Props., LLC v. United States*,
  714 F.3d 1311 (Fed. Cir. 2013) ......................................................................9

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
  853 F.3d 1272 (Fed. Cir. 2017) ....................................................................27


## ADMINISTRATIVE DECISIONS

*Dish Network L.L.C. v. Sound View Innovations LLC*,
  IPR2020-01276, Paper 40 (PTAB Feb. 8, 2022) ..........................................27

*Ericsson Inc. v. Intellectual Ventures II LLC*,
  IPR2014-00919, Paper 37 (PTAB, Dec. 7, 2015) .........................................13

*Merial Limited v. Virbac*,
  IPR2014-01279, Paper 13 (Jan. 22, 2015) ....................................................13


## OTHER AUTHORITIES

FED. R. EVID. § 801(d)(2) ....................................................................................4

FED. R. EVID. § 803(3) .........................................................................................4

ii

| EXHIBIT LIST ||
|---|---|
| 2001 | Declaration of Craig Rosenberg, Ph.D. [Rosenberg-Decl.] |
| 2002 | CV of Craig Rosenberg, Ph.D. [Rosenberg CV] |
| 2003 | Microsoft Press Computer Dictionary, p. 243 (3d ed. 1997) [Microsoft-Dictionary] |
| 2004 | Declaration of Nathan Lowenstein in Support of Motion for *Pro Hac Vice* Admission [Lowenstein-Decl.] |
| 2005 | First Deposition Transcript of Petitioner's Expert, Benjamin B Bederson, Feb. 28, 2022 [Bederson-Depo.] |
| 2006 | Amy K. Karlson, Benjamin B. Bederson, and John SanGiovanni, *Applens And Launchtile: Two Designs For One-Handed Thumb Use On Small Devices*, CHI 2005 ׀ PAPERS: Small Devices 1 [Bederson-Paper] |
| 2007 | Second Declaration of Craig Rosenberg, Ph.D. [Rosenberg-2nd-Decl.] |
| 2008 | N2 Advertisement Video (uploaded Oct. 18, 2007) (available at https://www.youtube.com/watch?v=Hq3S8Crxf2s) [N2-Advertisement-Video] |
| 2009 | Non-Final Rejection of Application No. 10/315,250 (later issued as U.S. Patent 8,095,879), mailed Mar. 23, 2006.  [2006-03-23 Non-Final Rejection] |
| 2010 | U.S. Publication No. 2004/0021643 [Hoshino] |
| 2011 | Reserved |
| 2012 | Conrad H. Blickenstorfer, *NeoNode N1, Can A Unique Interface Put This Compelling Smart Phone On The Map?* Pen Computing Magazine [Pen-Computing-Magazine-N1-Phone-Review] |

iii

| 2013 | Conrad H. Blickenstorfer, *Neonode N2, A New Version Of The Phone That Pioneered Touchscreens*, Pen Computing Magazine, Nov. 4, 2007 [Pen-Computing-Magazine-N2-Phone-Review] |
|---|---|
| 2014 | Bill Hennessy, *The Neonode N2*, Trend Hunter, Aug. 18, 2008 [Trend-Hunter-Article] |
| 2015 | Trend Hunter, About page [Trend-Hunter-About] |
| 2016 | Neonode N1m First Impression [tnkgrl-Media-post] |
| 2017 | Tnkgrl About Page [tnkgrl-Media-About] |
| 2018 | Jurek Breuninger PhD Dissertation, Nov. 13, 2019 [PhD-Dissertation] |
| 2019 | Timothy B. Lee, *If Android Is A "Stolen Product," Then So Was The Iphone*, Ars Technica, Feb. 23, 2012 [Ars-Technica-Article] |
| 2020 | Andreas Hollatz Dissertation, Oct. 2015 [Hollatz-Dissertation] |
| 2021 | *Hunting The iPhone Killer; Swedish Neonode Generates Buzz For Device*, RCR Wireless, Apr. 7, 2007 [iPhone-Killer] |
| 2022 | Declaration of Ulf Martensson [Martensson-Decl.] |
| 2023 | Declaration of Joseph Shain [Shain-Decl.] |
| 2024 | Declaration of Marcus Backlund [Backlund-Decl.] |
| 2025 | Excel Spreadsheet documenting Neonode sales [Neonode-Sales] |
| 2026 | CONFIDENTIAL Declaration of Per Bystedt [Bystedt-Decl.] |
| 2027 | Neonode Confidential Investment Memorandum, Jan. 2004 [Neonode-Investment-Memo] |

iv

| 2028 | CONFIDENTIAL Samsung License Agreement [Samsung-License-Agreement] |
|------|--------------------------------------------------------------------|
| 2029 | Neonode N1m review, Jun. 29, 2007 (available at https://www.youtube.com/watch?v=Tj-KS2kfIr0) [Neonode-N1m-review] |
| 2030 | User Online Comments of Neonode N2 instructions film [Neonode-Comments-1] |
| 2031 | User Online Comments of Neonode N2 Overview [Neonode-Comments-2] |
| 2032 | User Online Comments of Neonode N2 unbox and review video [Neonode-Comments-3] |
| 2033 | Wikipedia – Apple iPhone release dates [Wikipedia-iPhone-Release-Dates] |
| 2034 | Wikipedia – Samsung Galaxy release dates [Wikipedia-Samsung Galaxy-Release-Dates] |
| 2035 | Response to Non-Final Office Action of Application No. 10/315,250 (later issued as U.S. Patent 8,095,879), submitted Mar. 14, 2008.  [2008-03-14 Office-Action-Response] |
| 2036 | Neonode the only original, Sep. 13, 2007 (available at https://www.youtube.com/watch?v=D9N3H1rSxHk) [User-Video] |
| 2037 | Email by the Board, Feb. 25, 2022 [Board-Email] |
| 2038 | IEEE Dictionary Definition of "Shell" [IEEE Dictionary] |
| 2039 | US Inflation Calculator (available at https://www.usinflationcalculator.com/) [Inflation-Calculator] |
| 2040 | Euro Dollar Exchange Rate (EUR USD) - Historical Chart (available at https://www.macrotrends.net/2548/euro-dollar-exchange-rate-historical-chart) [Euro-Dollar-Exchange-Rate] |

v

6

| 2041 | Smartphone Shipments Declined in the Fourth Quarter But 2021 Was Still a Growth Year with a 5.7% Increase in Shipments, According to IDC, Jan. 27, 2021 (available at https://www.idc.com/getdoc.jsp?containerId=prUS48830822) [Smartphone-Shipments] |
|------|---|
| 2042 | Declaration of Parham Hendifar |
| 2043 | David Pogue, *Mac OS 9: The Missing Manual*, First Edition, March 2000 [NOT FILED] |
| 2044 | Second Deposition Transcript of Petitioner's Expert, Benjamin B Bederson, July 22, 2022 [Bederson-2nd-Depo.] |
| 2045 | Final Office Action in Application No. 10/315,250 (later issued as U.S. Patent 8,095,879), mailed July 11, 2008 [Final-Office-Action] |

vi

## I.    SECONDARY CONSIDERATIONS STRONGLY SUPPORT A FINDING OF NONOBVIOUSNESS.

Petitioner fails to meaningfully challenge Neonode's showing that Neonode's innovative, swipe-based user interface was effusively-praised by industry observers, academia and the users.  POR, 3-17.  Tellingly, Samsung's representatives presciently referred to Neonode's swiping user interface as "the future of mobile phones" and recognized "we need this" before licensing the '879's application.  POR, 11-12; Ex. 2026 [Bystedt-Decl.] ¶9.  Praise and licensing of this sort is hen's teeth rare, particularly when it comes from a sophisticated party who now, 20 years after the fact, claims the inventions were obvious.

Contrary to Petitioner's claim of a lack of nexus (Reply, 30), the praise is specifically directed towards the swiping interface captured by the "gliding ... away" limitation lying at the heart of the claims.  *See, e.g.*, Ex. 2008 (touting swipe gestures); Ex. 2012, 2-3 ("Swipe, swipe, swipe"); Ex. 2021, 2 (praising "intuitive passage of the finger over the screen"); Ex. 2013, 1 ("if the iPhone's swipes and taps seem futuristic, they are not," referencing the Neonode's previously-developed interface); Ex. 2020, 8 (Neonode was "the first mobile to use swipe gestures").

Petitioner claims that "[n]either Neonode's response nor its cited declarations analyze the Neonode devices on a limitation-by-limitation basis."  Reply, 29.  This is incorrect.  Mr. Shain and Dr. Rosenberg explained how the

1

N1/N2 phones practiced each element of claim 1.  Ex. 2023 [Shain-Decl.] ¶¶4-6; Ex. 2007 [Rosenberg-2nd-Decl.] ¶¶40-41.  The POR, moreover, explained how Neonode's N1/N2 practiced the claims and how the praise corresponded to the core "gliding ... away" limitation.  POR, 5-17.

The only limitation Petitioner contends was not shown is the "representation of the function is not relocated or duplicated during the gliding."  Reply, 30-31. This too is incorrect.  Mr. Shain testified that "[b]oth the Neonode N1 and N2 presented three icons in a strip along the lower edge of the display" and that "[n]one of the icons were relocated or duplicated during the swiping gesture."  Ex. 2023 [Shain-Decl.] ¶6; Ex. 1057 [Goertz] 151:20-152:7 (N1 and N2 each have three printed icons).  These icons are readily visible:



Three icons that are not relocated or duplicated

Ex. 2018 [PhD-Dissertation] 9; Ex. 2020 [Hollatz-Dissertation ] 8.

Petitioner incorrectly contends that the icons cannot meet the claims because they are "printed" on the device.  Reply, 31.  But claim 1 only requires that the

2

representation of a function "is provided," and does not preclude printed icons.  It is undisputed that the printed icons are not relocated or duplicated during swiping.

Even if the printed icons were to be ignored, the arrows, contrary to Petitioner's contention, likewise are not "duplicate[d] *during* the gliding motion." Reply, 31.  The video provided to the Examiner confirms that additional arrows appear upon touching without regard to whether a swipe later occurs.  Ex. 2008 [N2-Advertisement-Video] 0:00:15, 0:00:25-26, 0:00:34-35.



| | |
|---|---|
| Ex. 2008, 0:00:40 | *Id.*, 0:00:41 |
| *Id.*, 0:00:43 | |

3

The arrows, like lights on a runway, are meant to show a potential pathway for swiping.  Indeed, the additional arrows may appear in a direction orthogonal to the ensuing sweep, further indicating the arrows are not duplicated *during* the sweep.  For instance, at 0:01:03-1:05, the arrows multiply vertically upon a touch despite a later horizontal swipe:



| *Id.*, 0:01:04 | *Id.*, 0:01:05 |

Petitioner alleges that Samsung's praise of Neonode's phones is "hearsay" (Reply, 32), but party admissions are not "hearsay" particularly when proffered to show state of mind.  *See* FED. R. EVID. §§ 801(d)(2), 803(3).  Moreover, Petitioner does not deny that its representatives praised Neonode's user interface, much less proffer testimony of its own to contradict Mr. Bystedt's account.  Even if Samsung's executives had a sidebar in Korean, it does not change what they said to Mr. Bystedt or the fact that they licensed Neonode's technology soon thereafter.  Ex. 1058 [Eriksson-Depo.] 75:25-76:2.  Petitioner's contemporaneous words and actions belie their 20-year-later attorney arguments.

4

11

Petitioner attempts to downplay its own licensing of the '879's application ▇

▇▇▇▇, arguing that "Neonode has not shown the agreement, which covers

multiple patent applications and other technology, is the direct result of the unique

characteristics of the claimed invention, as opposed to the other licensed

technology, such as zForce."  Reply, 33.  But this was not a license to a bundled

product or hundreds of applications.  Rather, the license concerned *two* specifically

identified applications, the zForce application (concerning the light beam

controlled touch-screen) and the '879's application (concerning the software for

interaction with the operating system).  Ex. 2028 [Samsung-Agreement] 1-2.

Moreover, the '879 application itself was specifically named "Neno" (*id.*) which

was specifically referenced in the Background of the agreement:

> The [Neonode] mobile handsets are based on the light beam controlled
> touch-screen, "zForce", ***and software for interaction with the***
> ***operating system of the device, "Neno".***  Neonode is in possession of
> technology, - including zForce ***and Neno*** – intellectual property rights
> and know-how for development of mobile handsets (the '"Neonode
> IPR").

Ex. 2028, 2; *id.* ("Neonode Licensed Technology" included rights to the '879

application and Neno).  Samsung was clearly interested in both zForce and Neno

and, indeed, licensed Neonode's technology exclusively.  *Id.*, 4.  Nor was the

agreement prompted by a threat of litigation, a prior business relationship or other

5

12

economic reason that might discount Samsung's undeniable interest in exclusively licensing the technology. Indeed, the agreement was for a joint product development program because Samsung saw Neonode's technology as the "future of mobile phones" and recognized "we need this." Tellingly, Petitioner provides no testimony or other evidence concerning its own motivation.

Petitioner also incorrectly contends that Goertz "admitted the claimed gesture-based interface was not new." Reply, 32. Wrong. Goertz merely stated a palm pilot used a stylus-based sliding for "making a reverse texting" (Ex. 1057 [Goertz] 37:2-13) and other devices had a touch-based system (18:7-17). Goertz did not suggest the patented inventions were not "new." Petitioner also contends the 2002 CeBIT demonstration should be disregarded because the device allegedly did not have a working touch interface. Petitioner disregards the witness's testimony that the prototype had "a display" and "a moving video showing different things you could do with the device." Ex. 1058 [Eriksson] 105:15-18, 107:3-6 (Neonode's development of sweeping/swiping/gliding interface started before CeBIT).

## II. PETITIONER FAILS TO SHOW ACTIVATION BY "GLIDING … AWAY" (ALL CLAIMS).

The claims require "activating [a] function" via an operation wherein "the object glid[es] along the touch sensitive area away from the touched location." Ex. 1001 ['879] cl. 1. Hirayama-307, however, discloses a "dragging" motion, not a

6

13

"gliding" motion.  Petitioner contends that "gliding … away" encompasses a "drag-and-drop" and, indeed, any movement away from the represented function. Petitioner's position is contrary to the plain meaning and the intrinsic record.  *See* Section II.A.  Petitioner's alternative position that Hirayama-307 does not disclose a "drag-and-drop" also fails.  *See* Section II.B.

>    **A.    The Plain Meaning And The Intrinsic Record Confirm That "Gliding … Away" Is Distinct From A Drag-And-Drop.**
>
>    1.    The Plain Meaning Confirms "Gliding" And "Dragging" Are Distinct.

Petitioner relies solely on Hirayama-307 to show "gliding … away" (Pet., 58-59), but Hirayama-307 does not disclose a glide/swipe.  Instead, Hirayama-307 makes clear, *at least 14 times*, that its movement is a *dragging* movement.  Ex. 1006 [Hirayama-307] 5:3-12 (pen "moves (*i.e., drags*)" on the screen); Abstract ("If the user touches an icon ... with a point of the pen and *drags the pen* ... if the user touches the window with the point of the pen and *drags* the pen ..."); 1:52-55 ("it is an object of the present invention ... in which the user can activate ... a designated function ... when the user *drags* a pen."); 1:56-59 ("It is another object of the present invention ... in which a starting or ending position of a *dragging operation* can be designated ..."); 6:10-11, 6:27-29, 7:9-24, cls. 1, 3, 5; POR, 26-30.  Indeed, Hirayama-307 makes clear that a "user can activate or deactivate the

7

designated function ***only*** *by **dragging*** the pen 3." *Id.*, 7:9-10. That is, a drag is required and a glide/swipe will not do..

"Dragging," *e.g.,* a sack of bricks, is not "gliding," *e.g.*, a figure skater.

 

"Dragging" and "gliding" are near opposites and connote entirely different movements. Notably, Petitioner does not address the plain meaning, nor explain why a "***dragging***" movement would be a "gliding" movement. Tellingly, Petitioner's expert has not performed ***any*** analysis on the difference between the plain meaning of "gliding" and "dragging":

> Q.   What is the difference between the plain meaning of gliding a pen as opposed to dragging a pen?
>
> A.   I don't recall performing an analysis distinguishing between any possible difference in the meanings of the terms "gliding" and "dragging" in my reports.

Ex. 2044 [Bederson-2nd-Depo.] 25:10-17; 24:5-18 (refusing to explain understanding of "gliding"); 33:3-25; 34:2-9.

8

15

Because Petitioner and its expert have not demonstrated that a "drag" is "gliding ... away," Petitioner fails to prove *any* of the claims are obvious under the plain meaning.

### 2.    The Applicant Disclaimed "Drag-and-Drop."

This conclusion is confirmed by the prosecution history.  The Applicant made *expressly* clear that "gliding ... away" is distinct from a "drag-and-drop operation":

> ***Hoshino does not teach gliding*** a finger ***away*** from an icon.  ***Instead***, ***Hoshino teaches a drag-and-drop operation*** for moving an icon.

Ex. 1003 [Prosecution-History] 171; POR, §III.A.1.

| Some distinctions between claimed invention and Hoshino | | |
|---|---|---|
| | **Claimed invention** | **Hoshino** |
| **Objective** | Novel touch-and-glide user interface operation | Discriminate between two conventional operations; namely, (1) touch, and (2) drag-and-drop |

Ex. 1003, 170.  These clear statements operate as a prosecution disclaimer that the claimed "gliding ... away" limitation does not encompass "drag-and-drop" operations.  POR, 21-23 (citing cases).  Notably, Petitioner does not distinguish Patent Owner's cases.  Petitioner only cites *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) which provides that an ambiguous statement does not operate as a disclaimer.  *See* Reply, 8.  But the Applicant's clear statements above are not ambiguous.

9

Petitioner and its expert wholly ignored this prosecution history.  Pet., 58-60.
Its expert did not conduct any analysis of drag-and-drop.  POR, 31-33.  The
Reply's untimely arguments concerning the prosecution history fail.  Petitioner
contends that Neonode misrepresents Hoshino's disclosure and applicant's related
arguments (Reply, 6), but this is false.  First, Petitioner's general arguments about
the precise nature of the difference between Hoshino and the claims are irrelevant.
The Federal Circuit has rejected the proposition "that prosecution disclaimer
applies only when applicants attempt to overcome a claim rejection."  *Uship
Intellectual Props., LLC v. United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013).
Next, Petitioner cites the Examiner's rejection over Hoshino (Ex. 1003
[Prosecution-History] 179-180), but that was before the Applicant distinguished
the claimed gliding from Hoshino's "drag-and-drop" operation.  Petitioner also
cites the Applicant's discussion of Hoshino's "push-in operation" and its "drag
operation" but there, the Applicant merely made clear that neither of Hoshino's
operations satisfied the claims (*id.*, 170).  As to the table distinguishing the claimed
"novel touch-and-glide" from Hoshino's "conventional … drag-and-drop",
Petitioner claims that the "primary" distinction is activation in response to a "hard
touch" (Reply, 7), ignoring that this distinction is listed last.

Petitioner makes three arguments of questionable relevance concerning the
Applicant's statement:

10

17

> Hoshino does not teach gliding a finger away from an icon.  Instead, Hoshino teaches a drag-and-drop operation for moving an icon.  In

Ex. 1003 [Prosecution-History] 171.  Petitioner first imagines a distinction between "gliding … away from an icon" and the limitation "gliding … away from the touched location."  But the pending claim language at the time was in fact gliding away "from the touched location," and not "gliding away from an icon." *Id.*, 164.  Furthermore, the touched location is "where the representation [*e.g.*, an icon] is provided" so this is a distinction without a difference.  Petitioner next emphasizes the "moving an icon" portion of the phrase "a drag-and-drop operation for moving an icon" ignoring that the Applicant clearly distinguished "gliding … away" from "drag-and-drop."  If the only distinction were that the icon is moved, there was no need to mention, and underline, that Hoshino's is a "drag-and-drop operation."  And in any event, Hirayama-307 involves the icon being moved.  *See* Section III.  Finally, Petitioner contends that the Applicant was arguing against a combination of Hoshino with Nakajima but that does not alter the clear distinction made between the inventive "gliding … away" and a "drag-and-drop" operation.

The Reply, 9 also argues that "[t]he claim amendments … do not amount to disclaimer."  But the disclaimer arises from the Applicant's statements.  In accord, the claim amendments confirm that not all "movements" are "gliding … away."  *See* Section II.B.3.  The Reply, 9 further argues that amending the claims to require

11

18

"the representation of the function is not relocated or duplicated during the gliding" suggests a drag-and-drop is encompassed by "gliding."  To the contrary, this limitation reinforces that a drag-and-drop is excluded.

### 3.    Petitioner's Position That Any Movement Constitutes "Gliding" Is Unsubstantiated And Contrary To The Intrinsic Record.

Petitioner's argument that Hirayama-307 discloses "gliding … away" is based on the premise that "gliding … away" is satisfied by any movement away from the represented function.  Reply, 3 ("*regardless of whether Hirayama-307's icon 41 is dragged* ... the pen still *moves away* ..."); 19 ("Hirayama-307 similarly describes: the user touches the pen down [and] *moves the pen to the display area* …."); 16 (referring to a "drag/glide *movement*.").  Petitioner does not explain how any movement—let alone Hirayama-307's "dragging"—could be "gliding," and Petitioner's position is contrary to the plain meaning and the prosecution history.

In prosecution, the limitation originally read:

*moving* in a direction *from* a starting point that is the representation [of a function] … *to* said display area.

Ex. 1003 [Prosecution-History] 326.  In further prosecution after the claims were rejected, the Applicant "encouraged" the Examiner to "watch the video demonstration of the N2 mobile phone/personal digital assistance device" "prior to reviewing Applicant's arguments."  Ex. 2035 [2008-03-14 Office-Action-

12

19

Response] 15-16; Ex. 2008 [N2-Advertisement-Video].  As the video shows, the

"gliding … away" gesture is a seamless "swiping" gesture:



Ex. 2008 [N2-Advertisement-Video] (00:26-00:27).

The Examiner acknowledged the "swiping" gesture, but determined that the

"moving … from … to" language was too broad to so limit the claims:

> The Examiner reviewed the demonstration as encouraged by the Applicant. ***In light of the video demonstration, the Examiner can now see the difference between the prior art of record and the present application.***  With that being said the Examiner feels that the limitations, as claimed, were reasonably interpreted and the current limitations are still too broad to suggest without research what was shown in the video demonstration.

Ex. 2045 [Final-Office-Action] 16.[1]

---

[1] Petitioner purported to include the file history (Ex. 1003) but omitted

material office actions, including ones directly contrary to its arguments, such as

Exhibit 2045.  To the extent Petitioner objects to the filing of Exhibit 2045, the

13

In response and following an Examiner-interview, the Applicant amended the claim from "***moving*** in a direction ***from*** a starting point … ***to*** said display area" to "***gliding*** along the touch sensitive area ***away*** from the location."   Ex. 1003 [Prosecution-History] 326-327, 343 (amendment "to properly claim the present invention.").  The Applicant repeatedly emphasized that the claimed "gliding … away" is not just any movement but a "gliding" or "swiping" gesture.  *Id.*, 357, 269.

While Petitioner's position depends upon any type of movement being a "glide," Petitioner did not substantiate this position under the plain meaning.  Dr. Bederson, did not perform any "analysis of any potential distinction between the term gliding a pen and moving a pen in any of my reports, so that's not an opinion I have."  Ex. 2044 [Bederson-2nd-Depo.] 25:25-26:8; *see also id.*, 33:3-25; 34:2-9 (no analysis of a swipe gesture vis-à-vis a drag-and-drop).

---

Board should take official notice of the omitted office action.  *Merial Limited v. Virbac*, IPR2014-01279, Paper 13, 13-14 (Jan. 22, 2015) (taking notice of European patent application even though neither party had made it of record); *Ericsson Inc. v. Intellectual Ventures II LLC*, IPR2014-00919, Paper 37, 16 n.10 (PTAB, Dec. 7, 2015) (same).

14

21

Petitioner contends a drag-and-drop operation discloses "gliding away" because "[t]he claimed 'gliding … away' focuses on how and where a pen/finger interacts with the touch sensitive area, whereas 'drag-and-drop' is about how the system reacts to that interaction." Reply, 2. This is incorrect. First, it relies on the unsupported assumption that Hirayama-307's drag-and-drop operation discloses the claimed "gliding … away" simply because the user "moves (*i.e.* drags) the point of the pen." Ex. 1006 [Hirayama-307] 5:3-12. Second, a drag-and-drop operation "refer[s] *to a combination of a user action and a system response* …." Ex. 2005 [Bederson-Depo.] 140:25-141:12.

### B.  Petitioner's Argument That Hirayama-307's Operation Is Not Drag-And-Drop Is Incorrect.

Petitioner also argues that Hirayama-307's operation is not a drag-and-drop. Reply, 11-12, 18-20.[2] This is absurd. As discussed in Section II.A.1, Hirayama-307 makes repeatedly clear that its motion is a "dragging" motion, often referring to a "dragging operation." Ex. 1006 [Hirayama-307] 1:56-59; 7:22-24. Hirayama-307 is not just a "dragging operation," it is one in which an icon is moved (and enlarged or reduced) from one location to a *specific* location chosen by the user.

---

[2] Regardless of whether Hirayama-307's operation is a drag-and-drop, its moving/dragging of the pen is not shown to disclose "gliding … away" under its plain meaning. *See* Section II.A.1, 3.

15

*Id.*, 1:56-59 ("starting or ending position … can be designated ..."); 1:60-63 ("a position of a window, *i.e.*, a position of an enlarged icon, can be determined with ease."). Hirayama-307, thus, in its own clear terms, is a "dragging operation" in which an icon is dropped at a specific, user-chosen, location. What is more, Hirayama-307 makes clear that the icon displayed is shown as being moved during the "drag-and-drop." *Id.*, 2:5-8 ("***the icon display coordinate position is moved*** in accordance with the movement of the position coordinate of the point of the pen."). Hirayama-307 is a quintessential "drag-and-drop."

Petitioner's arguments to the contrary fly in the face of Hirayama-307's clear teachings. Petitioner contends that a "drag-and-drop" must display an icon being visibly moved, further contending that Hirayama-307's icon is not shown to be moved. Reply, 10, 12. This is entirely contrary to Hirayama-307 which makes clear the "icon ***display coordinate position is moved***" with the pen's movement. Ex. 1006 [Hirayama-307] 2:6-8; Section III.A, *infra*. But even if, *arguendo*, Hirayama-307's icon were not visibly dragged, that too would be immaterial because a drag-and-drop operation does not require a specific visual feedback. Ex. 2007 [Rosenberg-2nd-Decl.] ¶¶59, 61. So long as the object is logically dragged and dropped where the finger/stylus leaves the screen, the operation is a classic drag-and-drop. *Id*. Indeed, Petitioner elsewhere argues a drag-and-drop operation

16

23

may occur without visually duplicating or relocating the dragged icon.  *See* Reply, 22-25.

To avoid the inevitable conclusion that Hirayama-307 is a "drag-and-drop," Petitioner pretends not to understand (Reply, 4) what it means for "some form of an object" to be logically dragged or "behave[] as if it is being logically dragged." But such a phenomenon is familiar to even casual computer users.  Ex. 2007 [Rosenberg-2nd-Decl.] ¶¶60-61 (providing familiar examples).  And, despite Petitioner's alleged confusion, it cannot undo Hirayama-307's clear description of its "dragging" movement and "dragging operation."

Petitioner proceeds from alleged confusion to minutiae, arguing a drag-and-drop operation must "include specific programming of the underlying system to define items as a source/selection objects, and target/destination objects that receive the source via the 'drop.'"  Reply, 5.  Such newfound requirements cannot erase Hirayama-307's unmistakable characterization of its "dragging" movement and operation, and Petitioner does not explain why a "drag-and-drop" is defined by a particular source code implementation.  *Contra* Ex. 2007 [Rosenberg-2nd-Decl.] ¶¶60-61, 67.  In any event, Hirayama-307 includes even these alleged prerequisites.  Hirayama-307's "source/selection object" is its icon, its specific target is the user-specified location there the enlarged icon is dropped.  POR, 26-

17

24

28; Ex. 2005 [Bederson-Depo.] 141:10-12 ("for example, you ***drop*** an icon onto the screen.").

Petitioner relies on Hirayama-307's Fig. 4A, arguing that Hirayama-307's icons are not activated by a drag-and-drop, but by a simple moving gesture larger than a pre-defined distance.  Reply, 9-10, 13-14, 18-20.  The Reply,14 also presents an incorrect annotation of Hirayama-307's Fig. 3A to suggest that implementation of Hirayama-307's Fig. 4 activates an icon by a long swipe:



EX1006, FIG. 3A (annotated)

But Hirayama-307 has nothing to do with swiping or gliding.  It refers to its motion as a "dragging" motion/operation 14 times and never once as a "gliding" or "swiping" motion.  Hirayama-307 can "only" "activate" or "deactivate" an icon by "dragging the pen," in a classic drag-and-drop fashion. Ex. 1006 [Hirayama-307] 7:9-10; POR, 35-45; Section III.A.  Nor is the fact that Hirayama-307 may implement a drag-and-drop, in part, by measuring the distance of movement of the pen of any relevance.  Hirayama-307 explains that determining the distance of

18

25

movement of the pen is merely an alternative way for determining whether "the pen coordinate is outside of the predetermined designated area (*e.g.*, the hatched area in this embodiment)." Ex. 1006 [Hirayama-307] 5:61-63; *accord* Ex. 1051 [Bederson-Reply-Decl.] 44-45 n. 2 ("A POSA would most likely program the minimum *y* shift amount to be calculated at the time the pen touches the icon as the distance between the point touched within the icon and the bottom of the hatched area."); Ex. 2007 [Rosenberg-2nd-Decl.] 23 n.1. Fig. 4A itself confirms the same:



Hirayama-307's Figure 4A is consistent with the balance of Hirayama-307's disclosure. In step 2 (S2), the pen is placed within the "predetermined area of [an] icon group." Thereafter, the pen shifts, *i.e.*, is "dragged," by a "large amount"

19

26

(S4), so the pen is outside of the designated area, after which the dragged icon

(5:65-66) is "enlarged ... as a window" (S6).



FIG. 4A

The same process works in reverse as shown in Figure 4B, where the pen

touches the enlarged icon (ST2), and once the pen and the enlarged icon are

dragged by a large amount (ST4) it is reduced (ST6) and moved to the

"predetermined vacant position" (ST10):

20

27



FIG. 4B

Thus, Hirayama-307's Figures 4A-B are entirely consistent with Hirayama-307 being a "drag-and-drop" operation wherein the icon is selected with a pen and dragged outside of the designated area, after which the icon is enlarged as a window with a similar process occurring in reverse. ***Nothing*** in Figures 4A-B suggests the icon is moved/activated based upon a gliding motion, particularly when Hirayama-307 confirms, ***14 times***, that it is a "dragging" motion/operation.

Petitioner's attempt to analogize Hirayama-307 to Neonode's phones/specification is preposterous and belied by secondary considerations. Neonode's effortless swipe-based user interface was a massive improvement over

21

28

the drag-and-drop interfaces like Hirayama-307.  Attempting to characterize Hirayama-307 as a swipe, Petitioner claims that Hirayama-307's drag-and-drop does not determine "whether a target object is contacted," but instead, at the end of the dragging of the pen, "the same event occurs."  Reply, 19.  That is incorrect. Hirayama-307 can "only" activate a function via a "drag" to the particular location within the non-hatched area where the user wishes to place the enlarged window, not a swipe/glide.  Ex. 1006 [Hirayama-307] 7:9-10.  Moreover, "the same event" does not occur in Hirayama-307 regardless of the characteristics of the drag, but the user specifically dictates by dragging and lifting the pen where the enlarged icon is placed:



Relatedly, the Reply, 20 also claims Hirayama-307's drag-and-drop operation is "indistinguishable" from Neonode's claimed invention.  Not so.  The

22

claims activate a function by "gliding," not "dragging" the icon to a chosen location.

| Neonode's Swipe Gesture | Hirayama-307's Drag-And-Drop |
|---|---|
|  Ex. 2008 [N2-Advertisement-Video] (00:26-00:27). | Ex. 2007 [Rosenberg-2nd-Decl.] ¶¶71-72. |

## III.   PETITIONER'S GROUNDS FAIL TO DISCLOSE OR RENDER OBVIOUS "WHEREIN THE REPRESENTATION OF THE FUNCTION IS NOT RELOCATED OR DUPLICATED" (ALL CLAIMS).

The POR (at 34-60) explained why Petitioner's grounds fail to disclose

"wherein the representation of [a] function is not relocated or duplicated." The

Reply fails to rebut any of Patent Owner's arguments.

### A.   Petitioner's Belated Claim That Hirayama-307 Discloses No Duplication Or Relocation Contradicts Hirayama-307's Express Disclosure.

As the POR (at 35-46) explained, Hirayama-307 expressly states that the

dialer icon 41 is "relocated or duplicated" during the drag-and-drop operation. Ex.

23

1006 [Hirayama-307] 2:5-8.  Hirayama-307 repeatedly states that its icon is "enlarged" during the dragging operation, confirming the icon is moved with the pen prior to being enlarged.  *Id.*, 5:39-40, 5:64-66, 7:14-15, 2:10-11.  Hirayama-307 provides that an open window is dragged back "to *the* predetermined *vacant* position," confirming that the original icon was moved during the prior drag-and-drop operation to open the window.  *Id.*, 7:3-6; Fig. 4B.  Notably, Hirayama-307's text contains no disclosure that contradicts Patent Owner's understanding.

In response, Petitioner inexplicably argues that Hirayama-307's express statement that the icon is moved (*id.*, 2:5-9), in the summary of the invention, is somehow a distinct embodiment from that described in the "Detailed Description," which supposedly discloses a different embodiment that does not relocate or duplicate the icon.  First, Petitioner does not explain why Hirayama-307's summary *of the invention* would disclose a different system than its detailed description *of the invention*.  Second, Hirayama-307's reference to "a first aspect of the present invention" is not to different embodiments where the icon may or may not be relocated/duplicated with the movement of the pen.  Rather, Hirayama-307 presents only one embodiment to open an icon, as discussed above.  The "second aspect of the present invention" in Hirayama-307 relates to the reverse operation of moving and closing an already open window, which also relocates/duplicates the window during the drag.  *Id.*, 2:14-33.  Finally, the Reply

24

ignores that Hirayama-307's other disclosures confirm that its icon is relocated/duplicated during its dragging operation.

Petitioner also relies upon Figures 3A-B, arguing that 3A does not show icon 41 being duplicated or relocated.  But Fig. 3A is prior to a drag-and-drop operation as *inter alia*, Fig. 3A does not show an enlarged icon.  POR, 43-45.  In fact, Dr. Bederson concedes that Hirayama-307's icon should "most likely" be enlarged once the pen moves outside the hatched region.  Ex. 1051 [Bederson-Reply-Decl.] 44-45, n. 2.  And even if Fig. 3B (contrary to Hirayama-307's text) shows icon 41 present in its original position during the drag-and-drop, that at most shows that the icon was duplicated (not relocated), which still does not disclose the claims that require neither relocation nor duplication.  POR, 45, n.8.

### B.    Petitioner Fails To Present Any Proper Motivation To Modify Hirayama-307 So As Not To Duplicate Or Relocate The Icon.

As explained (POR, 46-50), the Petition failed to present any motivation to modify Hirayama-307 (in Petition's single-reference obviousness ground) so that icon-41 is not relocated or duplicated.  Petitioner responses are incorrect and untimely.

Petitioner argues that Hirayama-307's icons are not relocated or duplicated during the drag because "[i]f the window 43 is displayed when the pen leaves the hatched area, there would be no reason to drag the icon downward with the pen for the few millimeters between where the pen touches the icon and the pen leaves the

25

hatched area." Reply, 21. This is contrary to Hirayama-307, which confirms the icon moves with the pen prior to being "enlarged" into a window. *See*, *e.g.*, Ex. 1006 [Hirayama-307] 2:5-8. Petitioner's conclusory assertion that there is "no reason" for Hirayama-307 to do this does not provide a motivation to modify Hirayama-307. Furthermore, Dr. Rosenberg explained the importance of providing feedback so the user knows the drag-and-drop operation is being performed as the user moves the pen. Ex. 2007 [Rosenberg-2nd-Decl.] ¶¶83-85. Petitioner does not explain why it is beneficial to modify Hirayama-307 in a way that likely frustrates the user by not providing feedback during the first few seconds of the operation. *See also* Ex. 1051 [Bederson-2nd-Decl.] ¶110 (Sony Palm-Pilot provided feedback from the beginning of the movement).

Petitioner next argues that Hirayama-307 can be modified to not relocate or duplicate its icon during a drag-and-drop because "[t]here were numerous known ways to provide the user feedback that they have touched down on the desired icon." Reply, 22. Notably, Petitioner originally contended that Hirayama-307 already provided sufficient feedback even without relocating or duplicating its icons during the movement of the pen by virtue of showing the location of the pen on the screen with a cursor. Pet., 60-61. As explained (POR, 48-50), however, the cursor only provides feedback regarding the location and movement of the pen, not whether the drag-and-drop operation is being successfully performed.

26

Apparently conceding the point, the Reply now presents possible further modifications of Hirayama-307 to provide feedback during the drag-and-drop operation, by, for example, changing icon-41's color.  Reply, 23-25.  These new further modifications of Hirayama-307 are untimely.  Moreover, that there may have been various alternatives to implementing Hirayama-307 does not provide a motivation as to why a POSITA would have modified Hirayama-307's express disclosures of moving/relocating the icon with the movement of the pen in favor of a different implementation.

Finally, the Reply argues for the first time that "a POSA would have been motivated to not visually drag the icon with the pen because doing so was computationally expensive at the time."  Reply, 25.  This argument is untimely and unsupported.  Petitioner may not present a new motivation in reply.  *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1286 (Fed. Cir. 2017); *Dish Network L.L.C. v. Sound View Innovations LLC*, IPR2020-01276, Paper 40, 33 (PTAB Feb. 8, 2022).  Moreover, there is no support for Petitioner's claim that it was too computationally expensive to provide visual feedback as disclosed in Hirayama-307.  Petitioner's expert highlights the importance of relying on an operating system that is "representative of the 2002 time frame" (Ex. 1051 [Bederson-Reply-Decl.] ¶112), but relies on ancient Mac OS 7 and 8 systems from 1984-1997.  Tellingly, Dr. Bederson reluctantly admitted Mac OS 9 was released

27

34

in 2000 and duplicated a dragged icon—without any hint of "computational" challenges.  Ex. 2044 [Bederson-2nd-Depo.] 8:9-24; 9:8-25; 10:2-19; 10:25-11:3; 11:12-22; 15:5-15; 16:22-17:23.



### C.   Petitioners Fail To Provide Any Motivation To Modify Hirayama-307 In View Of Ren.

As explained (POR, 51-61), and as the Board found (ID, 20), Petitioner failed to provide any motivation to modify Hirayama-307 in view of Ren to activate Hirayama-307's icons through Ren's Slide-Off selection method. Petitioner does not suggest this modification would address any deficiency in or improve upon Hirayama-307.  Reply, 26-27.

Petitioner argues a POSITA "would have looked for the gesture most consistent with Hirayama-307's disclosure and goal of designating the position where the window 43 would be opened."  Reply, 27.  This new motivation is untimely and Petitioner still does not explain *why* a POSITA would abandon

28

Hirayama-307's system in favor of Ren's selection techniques. Moreover, Ren discloses *selection* techniques, not techniques to drag an icon and drop it at a desired location. Ex. 1004 [Ren] 1 (discussing "pen-based *selection* strategies ….").

Similarly, the Reply, 27 is incorrect that "[a] POSA would not have chosen Slide-Touch because activation occurs when the pen contacts the target after gliding of the pen, and is therefore inconsistent with the Hirayama-307 gesture." Ren simply discloses the preferred *selection* technique, which it discloses to be a Slide-Touch, not Petitioner's Slide-Off. POR, 51-61. Furthermore, even if there were a motivation to combine, the POSITA would have Hirayama-307's icon selected through Slide-Touch a➔b➔c, and then, starting with point c where the pen is on the icon, dragged to the desired location on the screen.

## IV.   PETITIONER'S CLAIM 6 ARGUMENTS ARE UNTIMELY.

While the Petition relied on Allard's tool function, that function did not disclose "*a* list of available *files*," but only available *applications*. POR, 62. Petitioner responds that once the user chooses the FAX application and goes to the FAX screen 130, Allard discloses a list of "different fax files." Reply, 28 (*citing* Ex. 1010 [Allard] 6:17-18.) However, a separate list for available files in a specific application does not disclose "*a*" list with *both* available "applications and files."

29

Petitioner also fails to provide a motivation to combine Hirayama-307 and Allard.  Hirayama-307 identifies its available applications on its menu bar.  POR, 62.  Petitioner now alleges that "a POSA would have appreciated the importance to retain fewer icons, such as for commonly used applications, rather than populating the icon group with icons for all applications."  Reply, 28.  This untimely and unsubstantiated motivation should be disregarded.  We are not told how many applications would be included in Hirayama-307, or why it would be preferable to open a list as opposed to accessing applications from the menu bar.  Ex. 2044 [Bederson-2nd-Depo.] 28:4-12.

## V.    PETITIONER FAILS TO SHOW DISCLOSURE OF CLAIM 15.

The POR, 64-65, supported by technical dictionary definitions, explained a shell is "a software interface between the user and the operating system" which "interprets commands and communicates them to the operating system of the computer."  Petitioner does not challenge this definition but alleges that Hirayama-307's dialer is a shell because it is a "function[] that communicate[s] *through an interface* to the operating system of the device."  Reply, 28.  The Reply misapprehends the meaning of shell.  A shell *is* the software interface.  Even if Hirayama-307's dialer communicated with the operating system *through* some interface, the dialer application is not itself the software interface and, therefore, is not a shell.

30

37

Petitioner also repeats its conclusory assertion that "it would have been obvious to implement Hirayama-307 as a 'shell.'" Reply, 29. But Petitioner does not present any analysis or reason as to why a POSITA would have implemented Hirayama-307's as a shell, at the expense of consuming more memory and CPU, and requiring more coding. POR, 66.

## VI.  IMPROPERLY INCORPORATED PORTIONS OF DR. BEDERSON'S REPLY DECLARATION SHOULD BE DISREGARDED.

Petitioner has submitted a *97-page reply declaration* in its attempt to fill the Petition's numerous holes. At ~18,700 words, it is 3.3x the reply word count, making a mockery of the Board's rules. Petitioner's Reply improperly incorporates Dr. Bederson's declaration with little if any meaningful discussion of the cited portions. Consequently, at least the following paragraphs should be disregarded because they are (i) not cited (Ex. 1051 [Bederson-Reply-Decl.] ¶47), (ii) not meaningfully discussed (¶¶38-42, 55-56, 58-59, 69, 71-74, 90-94, 100, 103, 108-110, 120, 130, 132-133), or (iii) are partially discussed and, thus, the unmentioned portions should not be considered (¶¶112, 119, 122).

## VII.  CONCLUSION

For the foregoing reasons, the claims should be confirmed.

31

Date:  August 5, 2022

Respectfully submitted,

_____ / Kenneth J. Weatherwax / _____

Kenneth J. Weatherwax, Reg. No. 54,528
Nathan Lowenstein (*pro hac vice*)
Parham Hendifar, Reg. No. 71,470
Lowenstein & Weatherwax LLP

32

39

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS

This Sur-Reply (the "Sur-Reply") consists of 5,577 words, excluding table of contents, table of authorities, certificate of service, this certificate, or table of exhibits.  The Sur-Reply complies with the type-volume limitation of 5,600 words as mandated in 37 C.F.R. §42.24.  In preparing this certificate, counsel has relied on the word count of the word-processing system used to prepare the paper (Microsoft Word).

Respectfully submitted,

/ Parham Hendifar /
_____

Date:  August 5, 2022

1

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that the following documents were served by electronic service, by consent between the parties, on the date signed below:

## PATENT OWNER'S SUR-REPLY
## EXHIBITS 2044 - 2045

The names and address of the parties being served are as follows:

| | |
|---|---|
| W. Karl Renner | IPR50095-0015IP1@fr.com |
| David Holt | holt@fr.com |
| Tiffany C. Miller | tiffany.miller@dlapiper.com |
| James M. Heintz | jim.heintz@dlapiper.com |
| | axf-ptab@fr.com |
| | PTABInbound@fr.com |

Respectfully submitted,

/ Keith Moore /

Date:  August 5, 2022

# EXHIBIT 12

Trials@uspto.gov
571-272-7822

Paper 55
Entered: October 12, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SAMSUNG ELECTRONICS CO. LTD.,
SAMSUNG ELECTRONICS AMERICA, INC. & APPLE, INC.,
Petitioner

v.

NEONODE SMARTPHONE LLC,
Patent Owner.

_____

IPR2021-00144
Patent 8,095,879 B2

_____

Record of Oral Hearing
Held: September 6, 2022

_____

Before KARA L. SZPONDOWSKI, CHRISTOPHER L. OGDEN, and
SCOTT B. HOWARD, *Administrative Patent Judges*.

IPR2021-00144
Patent 8,095,879 B2


APPEARANCES:

ON BEHALF OF THE PETITIONER:

    KARL RENNER, ESQ.
    DAVID HOLT, ESQ.
    Fish & Richardson
    axf-ptab@fr.com
    holt2@fr.com

    TIFFANY MILLER, ESQ.
    DLA Piper
    tiffany.miller@dlapiper.com


ON BEHALF OF THE PATENT OWNER:

    NATHAN LOWENSTEIN, ESQ.
    KENNETH WEATHERWAX, ESQ.
    PARHAM HENDIFAR, ESQ.
    ROBERT PISTONE, ESQ.
    Lowenstein & Weatherwax, LLP
    lowenstein@lowensteinwatherwax.com
    weatherwax@lowensteinweatherwax.com
    hendifar@lowensteinweatherwax.com
    pistone@lowensteinweatherwax.com


    The above-entitled matter came on for hearing Tuesday, September 6, 2022, commencing at 1:00 p.m. EDT, via Videoconference.

2

IPR2021-00144
Patent 8,095,879 B2

P-R-O-C-E-E-D-I-N-G-S

1:00 p.m.

JUDGE OGDEN: Hello, everybody. Welcome to the Patent Trial and Appeal Board. This is the oral hearing in IPR2021-00144 between Petitioner Samsung Electronics Co. Ltd., Samsung Electronics America, Inc. and Apple, Inc. and between Patent Owner Neonode Smartphone, LLC. The challenged patent is US patent number 8,095,879. I am Judge Ogden and with me today are Judges Szpondowski and Howard.

So let's start with counsel introductions. Who is appearing today for Petitioner?

MR. HOLT: Thank you, Your Honor. This is David Holt from Fish & Richardson. I'm joined by lead counsel Karl Renner and Ms. Tiffany Miller on behalf of Petitioner.

JUDGE OGDEN: Okay, thank you.

And who is appearing on behalf of Patent Owner? Do we have Patent Owner on the line?

MR. LOWENSTEIN: Can you hear me?

JUDGE OGDEN: Yes.

MR. LOWENSTEIN: Okay, my apologies. Good morning, Your Honors, Nathan Lowenstein of Lowenstein & Weatherwax on behalf of Patent Owner. I'm joined by my colleagues, Parham Hendifar, I believe Kenneth Weatherwax is dialed in, and my new colleague as of one hour ago, Robert Pistone, is also in the room.

JUDGE OGDEN: Okay, thank you, Mr. Lowenstein.

3

IPR2021-00144
Patent 8,095,879 B2

This hearing, as usual, is open to the public but the parties have indicated that there might arise a need to discuss matters that are under seal yet under the protective order.

So we've indicated to the parties by email that if the need arises for either party to discuss such information that's covered by the protective order then the party can raise the issue with the panel during the hearing and can reserve up to 10 minutes of the party's remaining time that would be used during a closed portion at the end of the hearing that will be open only to people who are authorized under the protective order.

So do either party at this time have any questions or comments about that that they'd like to raise at this point? First, Petitioner?

MR. HOLT: No, Your Honor.

JUDGE OGDEN: For Patent Owner?

MR. LOWENSTEIN: No, Your Honor.

JUDGE OGDEN: Okay, thank you. Let me just go over a few preliminary matters. I'd like to thank the parties for adapting to our video procedures during the pandemic which, you know, I mean, there's some special things to think about. One is that we want to make sure that each of the parties is able to hear and observe what's happening during the hearing and also to have the opportunity to be heard.

So if there are any technical problems please let us know as soon as possible, possibly by calling the PTAB staff so that we can fix the problem or if you're disconnected so that we can get you connected again. And if necessary we'll pause the hearing so that we can work out any technical problems.

4

IPR2021-00144
Patent 8,095,879 B2

And also the panel and the parties should have copies of all of the record and of all the demonstrative exhibits but it would be helpful to us and to the court reporter to please identify the particular slide that you're on and the particular place in the record, including the paper or exhibit number and the page within the records so that we could, everyone can go along with you while you're discussing the demonstrative or the record.

So according to the terms of the oral hearing order each side has a total of 60 minutes to present their arguments. And since Petitioner is the party with the burden of proof, Petitioner will proceed first followed by Patent Owner. And then if the party has reserved rebuttal time Petitioner can make rebuttal arguments and then Patent Owner can also make surrebuttal arguments.

And I will be keeping track of the time on a stopwatch and I'll try to give you a warning as your allotted time draws to a close.

So first we'll go to Petitioner. Petitioner, how much of your 60 minutes would you like to reserve for rebuttal, if any?

MR. HOLT: We would like to reserve 15 minutes, Your Honor, please.

JUDGE OGDEN: Fifteen you said?

MR. HOLT: Yes, Your Honor.

JUDGE OGDEN: Okay. So 45 minutes in your initial time and then 15?

MR. HOLT: Yes, Your Honor.

JUDGE OGDEN: Okay. You can begin when you're ready.

5

IPR2021-00144
Patent 8,095,879 B2

MR. HOLT: May it please the Board, my name is David Holt. My colleague Ms. Tiffany Miller and I will be presenting on behalf of Petitioners this afternoon.

As you see on Slide 3 of Petitioners' demonstratives, there is a single independent claim in the '879 patent and this is the claim on which we'll be focusing most this afternoon. I'll be digging into the details of Claim 1 in just a moment.

Before I do though, I wanted to have you turn to Slide 6 and note briefly that the parties have agreed to focus the proceeding on grounds 2A through 2D, which are based on the Hirayama 307 reference.

At times you may hear us refer to this reference more generally as simply Hirayama, though as you can see here, there is also a Hirayama 878 that was used as part of ground 2B against Dependent Claim 3.

Grounds 2A through 2D were the focus of Petitioners' rehearing request and were the focus of the subsequent institutional decision.

Before diving into the grounds though, let's set the stage a bit. To start, I'd like to briefly talk about the '879 patent and what it describes starting with Claim 1 on Slide 8. Here we see that the '879 patent claims aspects of a user interface for a mobile handheld computer unit.

Beyond the preamble, the claim has four relatively straightforward limitations as we see here. Limitation 1A is a touch sensitive area in which a representation of a function is provided. There is no argument that the Hirayama grounds we'll be discussing today teach this limitation.

Limitation 1B is that the representation consists of only one option for activating the function. Here again there is no argument that the Hirayama grounds teach this limitation.

6

IPR2021-00144
Patent 8,095,879 B2

Limitation 1C is a bit longer but still reasonably straightforward. This limitation states that "the function is activated by a multi-step operation comprising step one, an object touching the touch sensitive area at a location where the representation is provided." There is no dispute that Hirayama grounds teach this first step.

Step two of the multi-step gesture is that "the object glides along the touch sensitive area away from the touch location." Here Patent owner has raised an issue regarding the meaning of this limitation. To be clear, there is no dispute that the object recited here is, for example, a user's finger or a pen-type stylus. It is a physical object used to contact the touch sensitive area of the mobile handheld computer unit.

So the question being asked is what does it mean in the context of these claims and this patent for a finger or stylus to glide along the touch sensitive area away from the touch location?

Finally, limitation 1D recites that "the representation of the function is not relocated or duplicated during the gliding." Clearly, this final wherein clause is a negative limitation and is about what is not done with the representation that is provided on the touch sensitive area.

Petitioners submit that the second step of limitation 1C is about physical contact with the touch sensitive area and limitation 1D is about what is and is not displayed as a result, but we'll discuss that in greater detail in a few slides.

Obviously, it's important to understand the context in which these claims are presented so let's take a brief look at the broader disclosure alleged to support these claims limitations.

7

IPR2021-00144
Patent 8,095,879 B2

On Slide 9 we see Figure 1 of the patent and excerpts of the associated description. Here the '879 patent tells us that the mobile handheld computer unit for which its user interface is intended includes a touch sensitive area 1, which is divided into a menu area 2 highlighted in blue and a display area 3 highlighted in red.

In this example implementation the menu area is shown at the bottom of the computer unit's touch sensitive area 1 and it presents three representations of functions 21, 22 and 23. These can represent things like a keyboard function, which is number 22 in the middle.

If you could please turn to Slide 10 you'll see Figures 1 and 2 shown next to each other on the left. The '879 patent says that Figure 2 illustrates the activation of a function. Neonode agrees that the illustration provided in Figure 2 and associated description in Column 4 that is here on Slide 13 is the support in the '879 patent for the claimed multi-step operation.

What we see on the right is the totality of the relevant description and it's quite brief. The patent says that "any one of these three functions 21, 22, 23 can be activated when the touch sensitive area 1 detects a movement of an object 4 with its starting point A within the representation of a function on the menu area 2 and with the direction B from the menu area to the display area 3."

Note that the patent describes what is shown in Figure 2 as a movement. Neither here nor anywhere else in the patent outside of the claims will you find the word glide. That's because glide was the word brought into the claims after the patent application was filed as part of the prosecution history.

8

IPR2021-00144
Patent 8,095,879 B2

The first time we see it used is as part of an amendment in the Office Action Response submitted in September of 2008, more than six years after the patent application was filed.

As Ms. Miller will describe in greater detail, the applicant interchangeably used a number of different words to characterize the movement described here in Column 4, such as sweep, swipe, rub and glide.

So let's take stock. What are we actually shown here in Figure 2? We are shown the user's finger, which is labeled object 4, touches and physically interacts with the touch sensitive area of the mobile computer unit. We are not shown how the user interface that's displayed on the touch sensitive area reacts to the user's touch.

We are also not told any more than what we see here about how the system distinguishes this movement, like whether the speed or distance of the movement matters.

If we turn to Slide 11, we see where the patent actually describes what is displayed after activating the functions in the menu area. Each figure illustrates its -- what is displayed in the display area after one of the three example functions is activated.

Importantly, none of these nor any other figures illustrate what is or is not displayed during the claimed multi-step operation. Thus, the final wherein clause of Claim 1 rests on the absence of disclosure. That is the '879 patent does not actually explicitly teach that the representation of the function is not relocated or duplicated during the gliding.

Let's keep that in the back of our mind as we later evaluate Hirayama and the grounds. Before turning to Hirayama though, let's talk about the

9

IPR2021-00144
Patent 8,095,879 B2

claim construction issue raised by Neonode so that we make sure we're on the same page about the proper scope of the claims.

Highlighted in red on Slide 13 is the limitation I noted earlier as giving rise to Neonode's claim construction argument. The limitation at issue recites, "the object," which can be either a finger or stylus, "gliding along the touch sensitive area away from the touch location." These are pretty straightforward terms, and we've already seen what little the '879 patent has to say about them so let's see what the Patent Owner says.

As we see on Slide 14, Neonode has made two subtly different arguments between the POR and its Sur-reply. In the POR Neonode argues that through remarks applicant made during the prosecution history the applicant allegedly established that the claimed gliding-away gesture is different from a conventional drag-and-drop operation. Thus, Neonode is arguing that a conventional drag-and-drop operation was disavowed or disclaimed from the scope of the claim's gliding-away gesture.

In so doing Neonode seeks to invoke the high bar of prosecution disavowal

Then for the first time in the Sur-reply Neonode focuses exclusively on the word "glide," not the broader phrase "gliding away," and it tends to simply contrast connotations of the word "gliding" and "dragging." I'm going to walk you through the first of these arguments, and my colleague Ms. Miller will talk on the second.

To address Neonode's arguments from the POR about disavowal, let's turn to Slide 15. But instead of immediately sorting through the extensive prosecution history let's first determine whether the distinction that Neonode is seeking to draw actually makes any sense in the first place, because even

10

IPR2021-00144
Patent 8,095,879 B2

if we accept that Neonode successfully disavowed a conventional drag-and-drop operation as they allege, we would still need to understand what it means in order to be able to consider it with respect to the prior art.

So what's the difference between gliding away and conventional drag and drop? Well, as we can see here, that's a bit murky. The only difference between gliding away and conventional drag and drop that Neonode's expert Dr. Rosenberg is able to identify is that "a drag and drop, that with a drag and drop a user generally perceives some form of an object/function as behaving as if it is being dragged by the movement of the stylus/pen."

As Dr. Rosenberg admits at the top of this excerpt the user's actual physical gesture for each of these can be the same, but the user nonetheless perceives some difference with respect to how the system responds.

JUDGE OGDEN: Mr. Holt, does this to some extent invoke the last limitation of Claim 1 that deals with what is represented during the gliding operation? So, in other words, could the perception that a user has in the course of performing this gesture be affected by what they see on the screen and whether there is an icon that is actually relocated or duplicated?

MR. HOLT: Yes, that could be one of the ways of the perception certainly, but Neonode has made clear in their arguments, as has Dr. Rosenberg, their expert, that the movement of the icon itself is not actually required. So if you see at the bottom sentence of Paragraph 67 it says, "sometimes an operating system provides visual feedback by actually showing the object moving on a screen together with the stylus /pen."

That would be the wherein clause at the end of the claim. But they're actually saying that this perception could be broader and instead of visually displaying the icon being relocated or duplicated during the movement there

11

IPR2021-00144
Patent 8,095,879 B2

may be some other not moving of the icon that would somehow be perceived by the user as dragging, and yet it's not at all clear what that thing is beyond an actual visual feedback that's talked about with respect to the wherein clause.

Does that answer your question, Your Honor?

JUDGE OGDEN: Yes, thank you. So just so I understand, I take it then that you're discussing the parts of Claim 1 other than 1D and the issue of whether Steps 1A, or parts 1A through 1C themselves are, you know, when it would encompass a drag-and-drop operation?

MR. HOLT: That's correct, Your Honor. 1D we view as separate and still required, certainly, as needing to be shown, but we actually believe that 1D is there for a reason in order to actually be able to designate what is or is not displayed, whereas the gesture multi -step operation as it's described in the claim in 1C actually doesn't have anything to do with the response of the system but is instead about simply how the user physically interacts with the device.

JUDGE OGDEN: Okay, thank you.

MR. HOLT: So to touch on that, if we turn to Slide 16 we see that Petitioners and their expert Dr. Bederson propose a much simpler and easier to evaluate plain reading of this language that's consistent with the specification of the '879 patent.

The second step of the multi-step operation, which we see in the first line of the boxed language at the top, is about how the object physically touches the mobile handheld computer unit. This leaves determining the limitation's metes and bounds simple and straightforward.

12

IPR2021-00144
Patent 8,095,879 B2

A POSITA would simply evaluate whether the claimed object, such as a finger or stylus, is in contact with the touch sensitive area as it moves from the location where the object touched the display to another location on the display.

The wherein clause of limitation 1D that is shown in the second line of the boxed text at the top is left equally easy to evaluate. During the physical touch of a computer unit, a POSITA would determine whether the icon is visually duplicated or relocated on a touch sensitive area.

In contrast, Neonode's construction of the second step of the multi-step gesture would actually render the final wherein clause superfluous. If the "gliding away" limitation already excludes even the perception of dragging as Neonode contends, then it certainly excludes actual dragging.

Thus, there would have been no need for the examiner to have required this final wherein clause to have been added in order to allow the claims.

So Neonode's proposal would not only lead to a construction that has uncertain metes and bounds but would also render a key portion of the claim that led to allowance duplicative.

But as it turns out, Your Honors don't even need to grapple with all of that because as you'll see starting on Slide 17, none of the statements from the prosecution history actually meet the high bar of disavowal.

As we see here from the precedential *Thorner* case, the words of a claim were generally given their ordinary and customary meaning as understood by a POSITA when read in the context of the specification of prosecution history. But the POR does not try to establish that the ordinary and customary meaning of the phrase "gliding away" would have otherwise

13

IPR2021-00144
Patent 8,095,879 B2

been understood by a POSITA as excluding drag and drop, nor does the Patent Owner suggest that the phrase gliding away is defined in this specification.

And as we noted earlier, the word gliding is nowhere to be found in the '879 patent. Rather the POR is arguing outright that the scope of the claim is shaped by disclaimer, but the case law tells us that the disclaimer rises from clear and unmistakable statements by the applicant during prosecution.

None of the statements Neonode points to here are so unambiguous, particularly when taken into context. Most of the statements to which Neonode points in their POR to support their disclaimer argument are from an Office Action response submitted in February 2010, which is at Pages 163 to 173 of Exhibit 1003.

We invite Your Honors to read the entire response as the broader context makes clear the distinctions applicant was actually making, however, the excerpts we provide on the next few slides are representative.

As you see starting at the top of this excerpt on Slide 18, applicant sought to distinguish the Hoshino reference by focusing on the fact that Hoshino required a hard press to activate the function of an icon. Quote, "Applicant respectfully submits that unlike the claimed invention, Hoshino activates the function solely in response to a push-in operation, i.e., a hard touch and not in response to a drag operation," end quote.

The applicant even illustrated the key distinction as we see at the bottom. There applicant notes that it is the hard press prior to dragging that leads to activation. I also want to note here that applicant admitted that Hoshino teaches gliding.

14

IPR2021-00144
Patent 8,095,879 B2

As you see on the lower right, the applicant characterized Hoshino as teaching a touch which leads to an activation and then a glide after the activation. In other words, the applicant used the word gliding to describe Hoshino's dragging but now is arguing that Hoshino's dragging is somehow disclaimed from the word gliding.

Is that really a clear and unmistakable disavowal? No. What we see here actually illustrates the opposite of their position. It shows the applicant was using the words gliding and dragging interchangeably.

On Slide 19 we see the entire table from the -- which the POR excerpted a single row. Here again, when we look at the whole table in context, we see it was really the hard touch for a function activation that allegedly differentiates Hoshino from the claims.

If we assume Neonode is correct and the distinctions drawn in this table necessarily rise to the level of disclaimer, why wouldn't it also apply to the second row of the table? In the second row of alleged distinctions, the hardware is a touchscreen in the claimed invention and a touch screen with a pressure sensor in Hoshino.

Does that mean that this table disavows touchscreens with pressure sensors? Of course not, neither does the first row disavow drag and drop.

Turning to Slide 20, we see another part of the response Neonode has attempted to rely upon for their alleged disclaimer. Here, after having argued that Hoshino does not teach the claimed multi-step gesture, the response is arguing that such a gesture also would not have been obvious based on the combination with Nakajima.

What we know about cases where disclaimer is found is that the applicant directly and clearly distinguishes specific claim language from an

15

IPR2021-00144
Patent 8,095,879 B2

alleged distinct teaching in the prior art. That's not what we see here. These sentences don't distinguish the claim language.

Instead, as we see in the full context, they distinguish Hoshino from Nakajima and thus demonstrate that the two references cannot be combined in the manner contemplated by the examiner. These arguments are not clear and unambiguous statements of disavowal. They're arguments against the combinability of two references that aren't otherwise part of this IPR.

Do Your Honors have any questions about Patent Owner's alleged disavowal? Okay. Then I will hand things off to my colleague, Ms. Miller.

MS. MILLER: Thank you, Mr. Holt.

Good afternoon, Your Honors. I'm Tiffany Miller, and I'll pick up where Mr. Holt left off to address Patent Owner's second claim construction argument which is, again, with respect to the second step of limitation 1C of the claim.

If I could ask you to turn to Slide 21 in Petitioners' demonstratives, Patent Owner argues in their Sur-reply for the first time in this proceeding that Hirayama's disclosure of movement or dragging of the pen along the surface of the touchscreen does not disclose the claimed gliding.

First off, this argument should be rejected as untimely and unsupported by any evidence. Substantively, Patent Owner latches onto the repetition of the word drag in the Hirayama reference. But Petitioners need not show that Hirayama uses the same language as the challenged claim.

The Federal Circuit has acknowledged this, for example, in the *In re Gleave* case, which is at 560 F.3d. 1331. Patent Owner, excuse me, argues there is allegedly some difference between dragging and the plain meaning of gliding, but they fail to articulate any specific meaning for the term

16

IPR2021-00144
Patent 8,095,879 B2

gliding. They also fail to articulate any relevant distinction between gliding a pen or finger and dragging a pen or finger.

Instead, Patent Owner uses an analogy to support their claim construction argument of dragging a sack of bricks compared with the gliding of a figure skater. But this shows how misplaced Neonode's argument is because it bears no relevance to the context of the claims, which is the movement of a pen or finger along the surface of a touch sensitive area.

Relatedly, Patent Owner's new argument points to a claim amendment at Page 326 in the file history. We have this at Petitioners' Slide 56. Now, Patent Owner alleges that changing the word moving to the word gliding presumes that gliding has a different meaning, but Neonode fails to articulate any relevant difference between moving and gliding for this proceeding.

Also, the amendment did not simply change the word moving to the word gliding. You can see this on Slide 56 at the previous claim line which recited a single step of an object moving in a direction.

But that was changed to add not just the term gliding but also that the gliding occurs along the touch sensitive area. This is something that Neonode emphasized throughout the remainder of the file history.

And with that emphasis in mind, if I could have you turn to Slide 37? Here you can see from comparison of the '879 patent disclosure on the left and the Hirayama prior art on the right, that they were both concerned with the same thing for this gesture that's going to activate a function.

The start of the gesture, underlined in blue in both disclosures, is touching an object such as a pen down onto a representation of the function

17

IPR2021-00144
Patent 8,095,879 B2

or desired icon in the menu area in blue. Referring to the underlying language in red, both disclosures talk about then movement of the finger or pen along the surface of the touch sensitive area, the display area, without being separated from the touch sensitive surface.

So in both disclosures this is how the user interface, or excuse me, this is how the user interacts with the device to activate a function, that is the finger pen is moved along the surface of the touch sensitive area while maintaining contact with that surface.

Now as mentioned earlier, the '879 patent does not use the term gliding or glide. And Neonode agrees that the excerpt from the '879 patent on the left of this demonstrative discloses the claimed gliding. If that is the case, then the almost identical disclosure in Hirayama must also disclose the claimed gliding.

If I could have you turn to Slide 22, Patent Owner's new argument about dragging versus gliding is actually contrary to the opinion of their own expert, who admitted that the user's action when dragging a pen finger is the same as gliding a pen or finger. That's at Pages 134 through 135 of his deposition.

Patent Owner's arguments also misrepresent and are contrary to the file history. Patent Owner argues the applicant allegedly emphasized the claimed gliding away is not just any movement but a gliding or swiping gesture.

But the statements in the file history relied on by Patent Owner do not distinguish gliding from dragging or any other kind of movement, and, in fact, equate gliding with dragging.

18

IPR2021-00144
Patent 8,095,879 B2

In the file history at Pages 357 and 269, which were cited by Patent Owner, the applicant uses the terms moving, gliding, swiping and also rubbing and sliding to refer to the same action shown in the patent's Figure 2.

So here we have the applicant throwing around a bunch of terms, none of which the applicant attempts to distinguish from the dragging of a pen, such as that disclosed by Hirayama.

And as mentioned by my colleague during prosecution of the '879 patent, Neonode called Hoshino's drag action a glide. That's at Pages 169 through 170. And you will also see at Page 127 of the file history Neonode characterizing what they called a drag action in the Hirshberg reference as the claimed touch and glide operation.

So here we have in applicant's own words an admission that dragging a finger is the same as the claimed gliding. So it is disingenuous for Neonode to now take issue with any alleged difference between gliding and dragging of an object such as a pen along the surface of a touchscreen.

If there are no questions on this claim construction issue, I'll move on to Hirayama. If I could draw your attention to Slide 27, I have an excerpt of Hirayama's from Column 1 and Hariyama's Figures 3A and 3B showing the disclosed user interface.

Now, note that Hirayama is a US patent that claims priority to a Japanese patent application. You can see this on the cover sheet of the patent, which means the US specification is a translation of that Japanese priority application. And I point this out because the grammar in the Hirayama reference can be somewhat challenging at times.

19

IPR2021-00144
Patent 8,095,879 B2

Now as you can see in the excerpt of Hirayama on the slide in the center, one of the stated objectives of Hirayama is to activate or deactivate a designated function by the user when the user drags a pen. So this activation of a designated function when the user drags a pen, that is the multi-step operation of the challenged claim.

The second objective of Hirayama is the ability to designate the starting or ending position of a dragging operation in natural fashion. This is achieved with the pen and the cursor 42, shown in the figures, which is shown at the position of the pen tip on the tablet in both Figures 3A and 3B as the pen moves along the surface of the tablet to activate or deactivate a function.

Turning to Slide 29, I'd like to dig into activation of a function. Here we have Hirayama's user interface at Figure 3A on the right with the icon group in the hatched area the top and the pen three colored in light blue that's going to provide the input.

On the left is Hirayama's specification at Columns 4 through 5 which tell us that for desired processing, such as a dialer, these are touches in icon 41 on which a picture of a telephone is drawn. Here the desired icon 41 with a telephone on it, which we've emphasized in yellow, that is the claim representation of a function. Patent Owner does not dispute this.

Hirayama also provides what they call a cross-shaped position-designating cursor 42 so that the user can visually confirm the exact position of the point of the pen on the input tablet very clearly. And here you can see in the figure that cursor 42 at the point of the pen.

Then if the user moves, i.e., drags the point of the pen to the display area, which we've shown in red, after having touched the desired icon 41, an

20

IPR2021-00144
Patent 8,095,879 B2

icon hereinafter be referred to as a window enlarged in the form of the processing display mode of the desired icon 41 is displayed.

JUDGE OGDEN: Ms. Miller, do we know from Hirayama 307's Figure 3A whether icon 41 is displayed under the -- at the location of the pen touch during this movement? Or is it possible that this figure is just omitting to depict that?

MS. MILLER: I'm not sure I understand the question.

JUDGE OGDEN: I'm saying are -- is it your position that in this Figure 3A of Hirayama 307 that this is what's actually displayed on the screen, the little cross-shaped cursor and no icon? Or is it possible that there could be an icon, an actual operation, but it's just not depicted in this particular figure?

MS. MILLER: Well, it's our position consistent with Figure 4A that there's no icon under the tip of the pen where it's shown in Figure 3B. The description of 3A says put the pen tip down onto the icon in icon group 40, which is the hatched area, and then drag the pen. And that's consistent with what's shown in the Figure 3A where the arrow starts at the icon and then proceeds into the display area.

So consistent with that in Figure 4A, which never talks about moving or dragging an icon, I think it's fair to say that Hirayama does not disclose that the icon remains at the tip of the pen as it moves.

JUDGE OGDEN: Because if you look at Hirayama's Figure 3B, and I understand that this depicts, kind of, the opposite operation as in 3A where you click on the expanded dialer window 43 and then you're moving it back up into the tray at the top.

21

IPR2021-00144
Patent 8,095,879 B2

But in this Figure 3B it also shows that little cross-shaped cursor 42, but it's not my understanding that that's literally what happens during this operation because it sounds like in the operation depicted in Figure 3B the user is actually moving the dialer window which may at some point convert into the original window 41 in the process of moving it up to the tray.

Yet it just shows the cross here and it doesn't show either the window or the icon under the pen position. So I wonder if you could help me, kind of, reconcile these two figures?

MS. MILLER: Sure. So I think part of the issue is that there is some disconnect between Figure 3B and the flowchart described with respect to Figure 4B, which is I think what you're referencing, so the description of 3B talks about deactivating this function by dragging the pen from the window back to the telephone icon or back towards the telephone icon.

And it's only talking about dragging the pen. It never talks about dragging the icon or moving a reduced version of the icon, which is something that's separately described in reference to Figure 4B.

So you could --

JUDGE OGDEN: Yes. That is described in Figure 4B, but I understand that Figure 4B corresponds in the description to Figure 3B in which it doesn't actually show dialer 43 being moved or this reduced icon 41 being moved in Figure 3B, yet it does describe that in the corresponding flowchart Figure 4B.

So my question is if you agree with that and, if it is true that Figure 3B is describing a movement of an icon while dragging, why isn't Figure A likewise describing an operation in which the original small icon 41 is dragged while the pen is touching the display?

22

IPR2021-00144
Patent 8,095,879 B2

MS. MILLER: Right, so a couple things. I don't think there is a direct correspondence between Figure 3B and the flowchart of Figure 4B. If you look at the detailed description they seem to describe slightly different ways of deactivating the window.

And I will say that Figure 3B actually does show movement of the window 43 by that little outline area, so it does show consistent with 4A when it explicitly talks about moving something it shows that in Figure 3D where you can move the window.

With regards to the correspondence between 3A --

JUDGE OGDEN: Sorry. Sorry to interrupt you. Is that really what it's depicting here because the window 43 seems to be depicted as moving directly to the right as shown by arrow B, whereas it seems like it's depicting the pen and the cursor moving in an upward and rightward direction. Was that really what this is depicting in Figure 3B?

MS. MILLER: I think it's a combination. If you look at the end of the text when it's talking about, at the top of Column 5 when it says you can find this window in Figure 3B that's been opened, and then if you go to through the flow chart of Figure 4A at the bottom of those steps, including I think it's S9, I believe, it talks about moving or being able to move the icon, or sorry the window. And I think, I believe that that's what's being shown in Figure 3B so it kind of conflates those two descriptions a bit.

So Figure 3B is showing the ability of the user to move that window by referencing that dotted outline. And then if you also refer to Figure 3B as it talks about in, I believe it's Column 6, where it says now if the user wants to deactivate the function it's going to drag the pen from the window back towards the telephone icon.

23

IPR2021-00144
Patent 8,095,879 B2

And while admittedly that's not the direction of the arrow, that's essentially what it's trying to depict. But I think it's not a, of course, direct correspondence but it's also not a direct correspondence to Figure 4B flowchart which, as you pointed out, does actually reference moving a reduced icon.

So I will note that. So it's not a perfect match in either of those scenarios.

JUDGE OGDEN: Okay, thank you. One thing you may be planning to address this a little bit later, but I wanted to get to before the end of your time is your thoughts on a passage in Column 2 of Hirayama 307, Lines 5 through 8 that seems to say that during this movement of the pen that the icon position coordinates are moved, which, you know, could be read to suggest that during the movement of the pen in the operation shown in Figure 3A that the icon is also moved.

MS. MILLER: Right. So first thing I'll point out is, as you noted, it's not entirely clear what this reference to the icon display coordinate positions even means. That section references a circuit so is it even something displayed on the tablet or is it merely something stored in memory?

We don't know because the icon display coordinate position is never mentioned again in the Hirayama reference. This feature is not shown in the figures. It's not mentioned the flowcharts, and it's not in the claims.

If it was an important feature it would have been discussed again, but it is not. And the summary does not describe this feature as important or critical to the invention. Accordingly, there's no justification to incorporate this feature which is mentioned nowhere else in the reference into the implementation, for example, of the flowchart of Figure 4A which doesn't

24

IPR2021-00144
Patent 8,095,879 B2

show any movement of the icon during the movement of the pen that activates a function.

Most notably in Figure 4A, Petitioners have established the implementation of that flowchart as it is written would not move or duplicate the touch icon. It would have been at least obvious to implement that flowchart as written.

That is all that is required from a legal standpoint because this is not an anticipation grounds, and this is at least an obviousness grounds and it would have been obvious to implement that flow chart of Figure 4A as written.

JUDGE OGDEN: And as Mr. Holt mentioned earlier, this limitation 1D is a negative limitation and so it's Petitioners' burden to show that Hirayama 307 discloses the absence of this limitation or that the absence of this limitation would have been an obvious variation over Hirayama 307.

So I don't see anything in Figure 4B or 4A that specifically shows the movement of an icon before it's enlarged or reduced, but does that mean that it's not there? Is that proof that's not there or is that just an absence of any discussion?

MS. MILLER: Well as explained by Dr. Bederson, you can interpret that flow chart as a person of ordinary skill where it says explicitly when you're supposed to move a visual element on the screen. So that flowchart explicitly tells you, for example, for the window in step S9 it has a box in that flowchart where it explicitly tells you to move that window. And I'll actually, you were talking about Figure 4B, excuse me, and moving a reduced icon, that's another example.

25

IPR2021-00144
Patent 8,095,879 B2

If you look in that flowchart Hirayama explicitly includes a box that says move the reduced icon. So a person of ordinary skill would interpret Hirayama's disclosure such that if Hirayama -- if the flowchart doesn't tell you to move the icon, it doesn't include such a box, then you should not move that visual element on the screen.

JUDGE OGDEN: Okay, thank you. And you have about five minutes in your initial 45 minutes.

MS. MILLER: Thank you. I want to turn to Patent Owner's argument regarding the cursor. Now, Dr. Bederson explained that Hirayama uses the cursor 42 shown in the figures for feedback to the user as to the gliding movement of the pen for activation or deactivation of the window.

Patent Owner argues that that cursor would have been insufficient to provide feedback and that it would have been necessary to drag the icon. But this is again, this is an example of Patent Owner rewriting the disclosure of Hirayama to incorporate something that isn't there.

The expressed disclosure of Hirayama tells us that a cursor, not a duplication of an icon, is used for feedback. In contrast to the unsupported arguments of Patent Owner's expert, Petitioners' expert, Dr. Bederson, supported his opinion with additional evidence.

The Sears paper corroborates the use of a cursor as feedback during touch interface gliding gestures. The Sears reference also identifies other forms of feedback that do not provide the icon, including audible feedback. Neither Neonode nor Dr. Rosenberg respond to the Sears evidence.

I also want touch on Patent Owner's argument regarding the vacant icon position. And I have on Slide 42 an excerpt from Hirayama.

26

IPR2021-00144
Patent 8,095,879 B2

Now, Patent Owner argues that Hirayama's reference to a vacant icon position means the icon must have been relocated or moved with a pen then during that action that activated the window. But this is contrary to Hirayama's expressed disclosure that I have on the slide and I was referencing earlier that explains when a user wants to close the window they touch a portion of the window and drag the pen back to the telephone icon 41.

Because the icon is still displayed in its original location, as referenced in this text and also shown in the figure, this means it was not relocated or moved during that initial pen gliding operation that opened the window.

In both of these sentences also in this paragraph talking about the operation to close or deactivate the window, you can see that the icon is still in its original position. The second sentence references something in addition to that still displayed telephone icon. That is something they call a pre-determined icon in a vacant icon position.

Now at the end of that paragraph, it seems to be talking about moving the pen to an icon or some position in that hatched area at the top of the user interface other than the still displayed telephone icon 41.

Now, admittedly, this is not totally clear what they're talking about here with regard to the vacant icon position, but what is stated clearly is that the telephone icon 41 was not moved or duplicated during the gliding that opened the window.

To the extent Patent Owner is suggesting a reference to the vacant icon position means that the icon was erased when the window 43 is activated. What Patent Owner is suggesting happens is something that

27

IPR2021-00144
Patent 8,095,879 B2

occurs after the relevant gliding of Claim 1, that is after the gliding that activates the window.

And that interpretation is also contrary to Figure 3E that shows the telephone icon was still in the original position.

In summary, Petitioners rely on the claim disclosure, particularly in Figure 4A, for example, with no modifications, bells or whistles. Petitioners are not asking the Board to read anything into this disclosure.

On the other hand, Patent Owner asks this Board to add into those disclosures a feature that is only vaguely mentioned once in the summary. Doing so requires the Board to disregard the explicit figures of Hirayama that show a cursor, not movement of the icon, provides feedback when activating a function.

If there any questions here I'm happy to them, otherwise I have a few notes on secondary consideration.

JUDGE OGDEN: I don't have any questions, but you're about at the end of your initial 45 minutes. You can continue as long as you'd like.

MS. MILLER: Sure, thank you. So with regard to secondary consideration, Patent Owner only presents evidence as to challenged Claim 1. It is Patent Owner's burden to show a nexus, and they have not done so in this proceeding.

Nothing in the papers or anything in their slides show even an attempt to tie any of the praise to the not relocated or duplicated limitation in Claim 1. Petitioners are therefore comfortable resting on the papers on this issue, but I'm happy to answer any questions.

28

IPR2021-00144
Patent 8,095,879 B2

JUDGE OGDEN: Okay. I don't think we have any further questions. Thank you, Ms. Miller. Looks like you have about, we'll say you have 15 minutes for your rebuttal time.

MS. MILLER: Thank you, Your Honor.

JUDGE OGDEN: Okay.

For Patent Owner, Mr. Lowenstein, will you be arguing on behalf of Patent Owner?

MR. LOWENSTEIN: So Mr. Hendifar and I will be splitting the argument. Let's start with our Slide 3 and I'll be addressing secondary indicia probably rather briefly, and I'll be addressing Petitioners' failure of proof under the "gliding away" limitation. And Mr. Hendifar will handle the balance of the argument, including most of the issues that you raised, Judge Ogden, in your pertinent questions about Hirayama 307.

But let's start with secondary considerations. I think we should start there because I think the secondary clear considerations, if we take a step back, they're meant to guard against hindsight. And I think the risk of hindsight bias in this case is unusually elevated, and we need to go back, all of us, to December 2002.

JUDGE OGDEN: I'm sorry, Mr. Lowenstein, I forgot to ask you would you like to reserve some --

MR. LOWENSTEIN: Yes.

JUDGE OGDEN: -- rebuttal time? How much?

MR. LOWENSTEIN: So we will aim for 15 minutes, but I will bet you it will end up being 10.

JUDGE OGDEN: Okay.

MR. LOWENSTEIN: So --

29

IPR2021-00144
Patent 8,095,879 B2

JUDGE OGDEN: Thank you.

MR. LOWENSTEIN: -- let's go back to 2002, and I'm sure you're all much younger than me, but let's try to think about the very primitive devices you may have had or your friends may have had back in 2002. This is five years before the iPhone, seven years before the Samsung Galaxy, and Neonode, our client, didn't just get a patent. It had an actual phone where the user interface was based upon the swiping.

We directly, Slide 5, directly related swiping to the gliding movement during prosecution. In fact, we actually asked the examiner to view a video demonstration of the N2 to better understand what the claimed gliding movement was.

Slide 6 please? It is undisputed that Neonode had the first mobile to use swipe gestures. That's confirmed by two dissertations not made for litigation, two dissertations.

Pen Computing, quote, "If the iPhone swipes and taps seem futuristic they are not. Neonode has been using them since the first N1 came out. In fact, Neonode's user interface, Neonode's user interface is based entirely on swipes and taps. It must be vexing to see Apple," the Petitioner in this case, "essentially claim ownership of concepts that Neonode icon -- the Neonode phone has been using for at least five years."

Let's go to the next slide, Slide 7. There were actual users who were making videos pointing out that Neonode came first, shown as the copycat, noting Neonode N1 launched in 2003 with sweeping touchscreen patented technology.

Let's go to Slide 8.

IPR2021-00144
Patent 8,095,879 B2

JUDGE SZPONDOWSKI: Counsel, can I -- I have a question. So what you've talked about so far seems to be generally talking about swiping and sweeping in the touchscreen. Where does any of this talk about, you know, whether a representation of a function is relocated or duplicated during the sweeping or gliding or what have you?

MR. LOWENSTEIN: So I think we have to, first of all, I reject the premise that the phrase has to be dedicated to that one limitation. What this claim is about is a claim to a user interface. We're activating a function, representation of a function, by gliding away. And in that gliding away you're not relocating or duplicating the icon or the representation of a function.

And so when see the praise that we, for example on Slide 8, it's all talking about the seamless swiping interface where everything is just seamless, which was completely revolutionary in 2002.

And if you look at, for example, the Pen Computing article that we cited, they said this is -- Neonode's not like this dreaded pen-based computing system, that this is all a seamless swiping. And you have praise after praise after praise directed to the user interface.

And so I reject the premise that Petitioner is saying it has to be somehow related to that relocated or duplicated limitation. But even if it did, that's inherent in this seamless swiping interface.

And so I think even if that is some sort of a requirement it's met if you make a reasonable inference from the praise that we're about to look at. So if that answers your question, Your Honor, let's look into some of the --

JUDGE OGDEN: Mr. Lowenstein, I have a related question. Some of the praise comes to -- it seems to be directed to the distinction between older

31

IPR2021-00144
Patent 8,095,879 B2

pen-based systems and finger-based systems, but the claims in this patent seemed to encompass both pen or finger-based touch systems. So it would seem to include those older, at least the aspect of touching with a pen.

MR. LOWENSTEIN: I understand your question, Your Honor, and I think -- oh, I'm sorry did you finish your question?

JUDGE OGDEN: No, that's all. Thank you.

MR. LOWENSTEIN: Okay. So I think that's both true, but perhaps misleading. So you were -- I fully agree that the object of Claim 1 can be a pen, but when we're talking about a seamless swiping it's distinct. This praise it's thinking in terms of patent claims. It's saying this wasn't like those old drag-and-drop tapping established phones that drove us all insane back in 2002 and 2005.

It was a seamless swiping. So it happened to be -- yes, that was with a phone, but if you had a seamless swiping with a pen that, too, would have been, you know, the same thing.

So I agree, Your Honor, that the claims are not limited to a finger, but I think there's still a distinction to be found between the, sort of, dreaded pen-based systems of that era with the seamless gliding-away swiping interface that's claimed in the claim. So if that answers your question?

JUDGE OGDEN: Yes, thank you.

MR. LOWENSTEIN: So I think we can, time is short, but I would just, Your Honors have seen a lot of patents. You've seen a lot of patent litigation. I would just ask you to just look at the sort of claims specifically directed towards the swiping user interface that you see on Slide 8, for example, that you see in our briefs, that is not normal.

32

IPR2021-00144
Patent 8,095,879 B2

That is not the sort of praise that you see in ordinary claims. Usually there's nothing. Here there is effusive praise, "Simple and brilliant, simply convenient, again simplicity, the strongest contender for iPhone killer, obviously unique, the user interface is compelling." That's the sort of praise that we're talking about and let's not overlook it.

Let's go to Slide 9. Users -- and you say, well, who cares what users think? Well, this is a user interface. For all practical purposes they are first. And they love -- they love the user interface of the Neonode phones.

Slide 10. Now, Petitioner, the other Petitioner, Samsung here in 2022 is telling you, pah, this is obvious. This is obvious. But that's not what they said in December of 2004, I believe. I'm sorry. That's not what they said in 2004 or 2005, whatever it was.

They said this is the future of mobile phones. We need this. We need this. Please let us exclusively license, Neonode, your technology because we need this. They didn't say, oh, this is just obvious. This is just like Hirayama 307.

They realized that Neonode's patented technology was revolutionary and it was the future of mobile phones. And by the ubiquitous swiping that we all do each and every day, day in and day out for last 15 years, we can see that that was the future. It was the future of mobile phones.

Slide 11. This is not some massive portfolio license strung out under a threat of litigation where you, the good Lord intellectual inventors please get off our back. Give us a portfolio license and 10,000 patents go away.

This is a license, exclusive license to two patents and they're not separate. They're interrelated. They both, one is to the zForce that sort of

33

IPR2021-00144
Patent 8,095,879 B2

enables the user interface on the hardware side and the software enables the swiping user interface.

So it's not like you've got a patent to, you know, an electric car motor and the other one is to a steering wheel. These are two directly related aspects. Both were valuable and Samsung wanted them not under threat of litigation. Please let us exclusively license this technology that we need.

Slide 12, we showed limitation by limitation how this is met in the N1 phone is met. I don't think there's any dispute except as to the relocated or duplicated limitation.

Slide 13, Craig Rosenberg agreed through his analysis that the Neonode phones practice the claims.

Now, Slide 14 Petitioner points to these arrows that are multiplying. But if you look at Slide 15 there are three credit icons that you actually see more or less in the patent figures themselves. Those are neither relocated your duplicated when you're -- and it's the only way of activating a function. That's confirmed by Mr. Shain's declaration, by the testimony of Mr. Goertz.

Slide 16 --

JUDGE SZPONDOWSKI: Counsel, can I stop you for a minute? So is the representation of the function in the N1 or N2 device, is it those three icons or is it the arrows?

MR. LOWENSTEIN: It's the three icons.

JUDGE SZPONDOWSKI: Okay. And are those icons on the touchscreen?

MR. LOWENSTEIN: So the testimony from Mr. Shain is that the Neonode N1 and N2 presented three icons, a strip along the lower edge, I

34

IPR2021-00144
Patent 8,095,879 B2

think, if we go to Slide 12, on the lower edge of the display immediately following a mockup of the phone.

And so I don't actually tell it, so I think that's what he has said. But secondly, if you look at the videos you'll see there's a point where you tap on the icon and the arrows start to multiply.

And so I think would tell us that the icons are yon the touch sensitive portion of the display screen, if that was your question, Your Honor.

JUDGE SZPONDOWSKI: Yes, that was my question. I found it a little difficult to tell from the video if they were actually on the touchscreen or somewhere else.

MR. LOWENSTEIN: Yeah. So I believe, because the video is rather dark it's a little bit hard to see the icons, but the icons are there. The fact that -- well, also, another thing that Mr. Shain says is he says you have touch the icon and then swipe away. And so if it wasn't touch sensitive I don't see why you would have to do that, in other words.

So I believe the evidence, I mean, I haven't held the phone myself, but I think the way that the evidence is that the icons are on the touch sensitive portion of the screen. And I'm not sure that that's been disputed, but I could be mistaken.

Okay. So let's --

JUDGE OGDEN: Mr. Lowenstein, looking at your Slide 14 and the triangles that appear when a user touches the representation at the bottom, are these triangles a representation of the function that the user could perform?

MR. LOWENSTEIN: I don't believe so, Your Honor. We did make an imprecise statement in our POR, but I believe what we actually pointed to in

35

IPR2021-00144
Patent 8,095,879 B2

the Shain declaration, in the Rosenberg declaration, in the patent and it is about the icons not the arrows.

Okay. So may I proceed?

JUDGE OGDEN: Thank you. Go ahead.

MR. LOWENSTEIN: Yeah, just very quickly on Slide 17 the, I think this is what we were talking about, Your Honor. The arrows you can see upon the touch the arrows multiply. It's not during the gliding.

And then on Slide 18, even if you do a horizontal swipe the arrows will appear vertically. And so those arrows that they're multiplying they're not occurring during the gliding, but I also think that that tends to show that icon is on the touch sensitive area of the screen.

So now I'd like to go to Slide 19 and we're going to talk about gliding away. And Mr. Hendifar is going to answer any questions you may have about a disclaimer or a lot of the intricate questions you were asking about Hirayama's disclosure and so on and so forth, Judge Ogden.

But I'm going to talk about Petitioners' failure to prove. So again, Slide 20, I think we all know that the claim requires the object gliding away.

Slide 21. Actually, before I talk about the content of Slide 21, what I will say to the very capable presentation for Mr. Holt and Ms. Miller, if you are an alien and you came here from outer space and you didn't know anything about the law of IPRs, you might think that Patent Owner has the burden of proof. You might think that it's our burden to show that Hirayama's dragging is not gliding. You might think it's our burden to show claim construction, but we know that's not true. We know that's not true.

We know under *Intelligent Bio-Systems*, Petitioner must make its case in the petition. They cannot prove it in their reply brief, and we know that

36

IPR2021-00144
Patent 8,095,879 B2

Petitioner, under the regulation which for some reason I can't -- I think it's 42.104(b)(3) perhaps it is, they have to set forth their claim constructions in their petition.

Now, let's look at what Petitioner showed in the petition, in the place where it must prove its case. They quote Hirayama 307, Slide 21, "if the user moves, i.e., drags," now we all know what i.e. means, "but what's the express? That it's if the user drags the point of the pen."

So they have to prove. We don't have to prove anything. The Petitioner has to prove to you by preponderance of the evidence that dragging is gliding. We don't need to prove anything.

I would submit to you that if we said nothing at all they should lose their case based upon their insufficient disclosure on Page 58 of their petition.

But let's go to Slide 22. Notice they took the one portion which says movement drags because every other time Hirayama just says drags -- 14 times, drags, drags, drags, drags, drags.

Look at Slide 22. I would direct Your Honors to the one, two, three, fourth excerpt. Let's read that from Column 7, Lines 8 to 10.

JUDGE HOWARD: This is Judge Howard. Is it if I'm only looking at, like, the finger or the stylus, how can I tell if somebody is gliding or dragging? Or do they look the same?

MR. LOWENSTEIN: So when -- and so all we have is what Hirayama says. And he makes clear drag, drag, drag, drag, drag. Now the question becomes --

JUDGE HOWARD: I'm not asking about what Hirayama says. You've used the term gliding. You said that gliding is not dragging and

37

IPR2021-00144
Patent 8,095,879 B2

dropping. I want to know if all I can go is I can see the stylus or the finger moving and I can't see what's going on in this screen, how do I tell whether it's gliding or dragging?

MR. LOWENSTEIN: Okay. So the question is, is Hirayama's dragging a glide?

JUDGE HOWARD: That is not the question I'm asking. That's not the question I have asked you so please answer my question. You've used the term saying that gliding is not dragging. I want to, for claim construction purposes.

So when I want to understand what something means, I don't look at infringement. I wouldn't look at the accused device to figure out what it means, and for invalidity purposes I'm not looking at the piece of prior art. I just want to know what your understanding is that if gliding doesn't mean -- means not dragging, all I'm doing is looking at the object, how can I tell whether something is engaging in gliding or dragging?

MR. LOWENSTEIN: So we have not offered a claim construction of gliding. But if you consult your basic English, gliding and dragging are closer to opposites than the same thing. I've dragged my son to school is not the same he glided merrily on his way to school.

Dragging --

JUDGE HOWARD: And neither of those are on a display where, again, I'm -- you've said -- are you saying there is no difference between gliding along a display and dragging along a display in terms of the motion of the object? Or is there a difference? I just want to know.

38

IPR2021-00144
Patent 8,095,879 B2

MR. LOWENSTEIN: No. Yes. There is a difference. Now, if we see from testimony from Mr. Rosenberg, Dr. Rosenberg, and I think we all know this, minute details in the user interface, they are everything.

Minute details in a user interface are everything. Okay? So we need to go back to 2002. Dragging, like drag and drop, like the stunted, sort of, movement you had if you were -- did I click it? Did I get it with my stylus and did I move it to the precise location?

Yeah, that's miles different from gliding. That's not the same thing. And even if it may be hypothetically possible, could it, pardon me, possibly be the same thing? It is not our burden.

JUDGE HOWARD: But again, I don't understand. Because I'm not seeing a difference if I touch on an object and I drag it to somewhere else and I take in an object and I glide it to somewhere else if all you've done is looked at my finger and I'm doing the same exact motion how can you tell?

MR. LOWENSTEIN: Okay. So we have to go to the prosecution history because we're not writing on a blank slate. And the prosecution history the claims originally said moving from to, and the examiner would reject those claims. And we said examiner, please look at our N2 video. Please look at the video to figure out what we're talking about.

And the examiner said okay. I can see it now. I can see what you're talking about. I see why it's different from the prior of record, but that's not what your claim says. Your claim just says moving from to. And we said fine. We'll change the claim language to moving from to to gliding away.

So therefore moving from to it can't be any movement. It has to be a gliding movement. There's no evidence in the record whatsoever, none, that --

39

IPR2021-00144
Patent 8,095,879 B2

JUDGE HOWARD: But at the end of the day even that amendment wasn't enough. It wasn't until the examiner issued his examiner's amendment at the end ending in the last wherein clause that the claims got allowed.

You see, I'm -- so I'm trying to figure out is gliding just that last wherein clause? Is that the difference?

MR. LOWENSTEIN: I don't think so.

JUDGE HOWARD: Or is it just there's nothing that you could actually do to describe the difference to me?

MR. LOWENSTEIN: It's a seamless, effortless movement, gliding away like a figure skater. It's not dragging something. And I think if we all think back to the style of the old 1990s, I'm trying to drag the icon get it into the right space, that's not the same sort of movement.

That's why in prosecution we showed the examiner the video. And we encourage Your Honors to please watch the video because it will tell you as it told the examiners precisely what sort of seamless, effortless movement we are talking about as opposed to the drag. Did I select the icon? Did I move it to the precise location? Because that's the difference between an iPhone and, you know, some reference like Hirayama. It's all about a seamless user interface.

That's what was getting praised. And so if you overlook that distinction we just assume that a dragging, drag, drag, drag, drag, drag in Hirayama, a user can only -- can only activate what you activate by dragging the pen. That's what Hirayama says.

JUDGE HOWARD: Well, I think at the time you were, the applicant was trying to distinguish over Hoshino. How does Hoshino describe its motion?

40

IPR2021-00144
Patent 8,095,879 B2

MR. LOWENSTEIN: Okay. So --

JUDGE HOWARD: And Petitioner showed where you, in fact, I'm looking now at Page 170 in the file history, where you've offered a thing where you've described Hoshino as glide and that the difference seemed to be the argument that you were making is does the glide become before activation or after activation, not that it was a glide was the distinguishing point.

MR. LOWENSTEIN: May I defer the question on Hoshino to my colleague Mr. Hendifar because he is going to address the disclaimer? And we will address that just momentarily, Your Honor, so just bear with me. I will try to get through my slides very quickly and then I'll turn it over to Mr. Hendifar who will ask -- answer that question, if I may?

So let's go to Slide 23. We can skip 23. Let's go to 24. Again, you can't just assume dragging and gliding are the same thing. They have to prove it. They have not.

They have, Slide 25, no claim construction of gliding away. They have no claim construction of gliding away. They say dragging is gliding but they don't say why. They don't offer you a claim construction.

And let's go to Slide 26. We asked Dr. Bederson through his reply declaration, question, "What is the difference between the plain meaning of gliding a pen opposed to dragging the pen? Answer, "I don't recall performing an analysis distinguishing between any possible difference in the meanings of the terms gliding and dragging in my reports."

They have the burden of proof. They must prove to you that dragging in Hirayama is gliding. They did not explain why in their petition. They did

41

IPR2021-00144
Patent 8,095,879 B2

not grapple with the fact that the only movement disclosed in Hirayama 307 is dragging. That's the only way.

They did not offer you a claim construction. And when we asked their expert in deposition is there any reason why these are not the same thing? He said I didn't do any analysis. That's a complete failure of proof. I think they lose the case right now.

JUDGE HOWARD: Isn't it possible, sorry. This is Judge Howard again. Isn't it possible he's saying I didn't do anything to distinguish them because they're the same?

MR. LOWENSTEIN: Well --

JUDGE HOWARD: That's just, sort of, one way of reading what he just said.

MR. LOWENSTEIN: Well but go back to their petition. Let's see what they say. Gliding away, drags with -- why is it dragging away? We're not going to tell you.

Well, what exactly is making that in Hirayama.

JUDGE HOWARD: Again, you're looking at one part of what they said in their petition and then you don't read the rest. You read everything it says, it says Hirayama 307 further discloses quote, "then if the user moves, i.e., drags the point of pen three to the display position on the surface of the input tablet without being separated therefrom and having touched the desired icon 41 with the point of the pen three and takes the point of the pen three off from the surface of the input tablet two." And it goes on from there.

So they've described more than dragging. They've described putting the stylus down, moving it to the location that you want it and picking it up. They described the motion. They said that's a glide.

42

IPR2021-00144
Patent 8,095,879 B2

Now, it's up for us to go and determine whether or not that is a glide or not, but isn't it a little disingenuous to say they haven't done anything besides just say drag?

MR. LOWENSTEIN: No. Oh, okay. So whatever they say, Hirayama is clear about what it says because it says drag, drag, drag, drag, drag, 14 times. I don't care they say because that's what Hirayama discloses.

JUDGE HOWARD: But that wasn't, again, that's not what they said. They were quoting Hirayama. It's describing the movement, the drag, as a movement without the stylus being separated.

Now, it's for us as the judges to go determine whether or not that's a glide, but they have done more than just say drag.

MR. LOWENSTEIN: Okay. Let me address that, and I touched upon it a bit, but if we go to 27, I think they moved in their reply to more of a movement, any movement is glide.

Well, first of all, why would that be? Why do -- we would have just said movement if we meant any movement. We said gliding away specifically.

Now, we talked about this a bit, but Slide 28 the claims originally said moving from to. Slide 29, we said, no. Please watch the video. That's what we're talking about. Pease watch video. That's, sort of, that's what we're trying to get here.

Slide 30 the examiner said and when I did the video I can see the difference. But your limitations are too broad.

Slide 31, we change moving from to to gliding away. So that's what we're talking about gliding away, not any movement.

43

IPR2021-00144
Patent 8,095,879 B2

Slide 32, the Federal Circuit says, quote, "[W]hen a word is changed during prosecution, [like moving from to to gliding away,] the change tends to suggest that the new word differs in meaning in some way from the original word."

So --

JUDGE OGDEN: Mr. Lowenstein, my question is, are you trying to make a distinction in order to say that in a drag-and-drop operation you're saying that the beginning and ending point is significant, whereas in a glide operation the endpoint is not significant?

MR. LOWENSTEIN: That's an aspect of it. I think first and foremost I'm arguing a failure of proof, but I think you're making a point, Judge Ogden, that my colleague Mr. Hendifar will touch upon which is a major distinction between Hirayama 307 and just a simple glide as you're selecting an icon then you're moving it to a precise location.

And I do think that is a distinction because it makes it, it's hard to say that's a seamless glide where you're selecting icon then you're moving to a precise location. So I don't want to steal his thunder, but I do believe that's a point we're going to address as well.

So Slide 33, additionally we equated the touch and glide thumb movement to swiping so I think that's another touchstone of what it is we're talking about. So we showed the examiner the video. I really do encourage, it sounds like you've all watched it anyways but I encourage you to just watch it again.

We equated it with swiping. And again, I would submit to Your Honors that there's a fundamental failure of proof as we, sort of, sum up in

44

IPR2021-00144
Patent 8,095,879 B2

Slide 35. And I'm aware of my time, so unless there are further questions for me, I will turn it over to my colleague Mr. Hendifar.

MR. HENDIFAR: Good afternoon, Your Honors. Parham Hendifar for Patent Owner. And I want to follow up on where Your Honor asked a question about if the glide and the drag is really about what the screen shows or whether there is an actual difference in the movement.

And it has in our position two sides. One is that first Petitioner has to show when it's relying on plain and ordinary meaning why is the plain and order meaning of glide is the same as a drag? And Mr. Lowenstein pointed out that they haven't shown and on that basis alone Your Honors don't actually need to construe a glide and drag.

The point of the Petitioner should be Petitioner uses two different words where which they have different plain and ordinary meanings and they haven't shown why they're the same. And that's the end of the inquiry.

But if you want to go further, the difference between a glide and a drag is not just what is shown on the screen but is in the nature of the movement. So if you go to Slide 33, the applicant during prosecution, it's what we go because some things are not really easy to explain in words, such as what is a swipe. And if you would go back to 2002, which is when the patent was filed, many people may not have known what a swipe is.

Today you have swipe left, swipe right, all the stuff. But in 2002, if you recall, you had the Nokia phones with the keypad. You didn't have swipe phones really so it may have been hard to describe it, but we showed the examiner through a video and we actually just said that the gliding can be the slide or a swipe.

45

IPR2021-00144
Patent 8,095,879 B2

So and I submit that a person of ordinary skill wouldn't think that a swipe motion of a finger is the same as a dragging motion. A dragging is much more intensive, harder and laborious, whereas a glide is much more seamless and effortless.

So it's not really just about what's shown on the screen but it's also about the nature of a movement. And again, the applicant said the gliding is a swipe, so I request that you would just consult is a swipe the same as a drag? It's really not.

Now, we didn't have to actually provide a construction per se because that's not our burden, but even based on a plain and ordinary meaning of swipe or a glide, which is anonymous based on what the applicant said, are not really a dragging motion regardless of what may or may not be shown on the screen. Does that answer Your Honors questions on this point?

JUDGE HOWARD: This is Judge Howard. I guess it doesn't answer mine because I still don't know how to look at the description of the actual movement in the reference and determine whether it's a slider or a glide or not.

MR. HENDIFAR: Then may I submit --

JUDGE HOWARD: And in that you're trying to destroy distinction between a glide and a drag.

MR. LOWENSTEIN: Let me just say, Your Honor, briefly if you can't tell, if the record doesn't allow you to tell that should mean that they lose because they --

JUDGE HOWARD: Yeah. Well, it could just be that they mean the same thing, that the description of the glide that is a movement of something along the touchscreen is a glide. That seems like the plain and ordinary

46

IPR2021-00144
Patent 8,095,879 B2

meaning. I mean, you're telling me that's a drag and I'm trying to figure out, well, how is that not a glide?

MR. HENDIFAR: Let me just --

JUDGE HOWARD: They've described a motion. The motion, you know, will determine whether or not it is, but it's something that at least plausibly could be implied. If you're telling me that there's some distinction I can look at to determine whether based on the prosecution history that, no, glides aren't meant to cover drags and this is what a drag is so you could tell the difference, then that would be, you know, potentially useful.

If there's not a specific difference between the two then they're synonymous, which is helpful in a different way.

MR. HENDIFAR: So let me then approach it differently, Your Honor. Judge Howard you mentioned that look at the petition. They say dragging discloses gliding. It can be two things.

One is that they're both the same thing because they are movements, or two, they're different thing but the petition fails to show what the distinction is and they fail on the basis of failure to prove.

Now, we can eliminate conclusively the first possibility which is simply because glide and a drag are both movements then they are the same thing. We can conclusively eliminate that.

So then we are left with Petitioners failing to show what the distinction is. And the way we can conclusively eliminate --

JUDGE HOWARD: Conclusively distinguished it. I might see that if there's a difference. I'm just trying to understand what the difference is.

MR. HENDIFAR: There is.

47

IPR2021-00144
Patent 8,095,879 B2

JUDGE HOWARD: Glide is not drag but the point in the prosecution history describes the same reference that you were describing as using a drag and drop as using a glide. So that to me at least shows that the prosecution history considers those two the same.

MR. HENDIFAR: I want to add with -- and I'm going to go back to this point, the prosecution history does not consider drag and glide the same thing. So as a preliminary matter, none of Petitioners' papers actually make the argument. I mean, we didn't have an opportunity to respond to that.

But the applicant during prosecution considered dragging and gliding to be synonymous. This is the first time at oral argument I've heard it so we really haven't had an opportunity to respond. And on that basis, we submit that that point is untimely.

But going to Slide Number 36, I submit that the applicant actually did not equate gliding and a drag operation. So if you'd go to Slide 36, the applicant described a gliding as a novel movement. If gliding, all it was was that it was a part of a drag and drop or the first portion of a drag and drop and the applicant wouldn't have described it as a novel movement.

So I take issue with the proposition that applicant equated it but if the Petitioners are pointing to some statement somewhere else in the prosecution really that's the first time they're raising it, and we haven't had an opportunity to respond to that. But that premise is incorrect.

Because again, if gliding was a part of a drag and drop or just the same portion as the drag aspect, the applicant wouldn't have described it as a novel movement.

JUDGE HOWARD: I understand that you've described it as a novel movement, but at the end of the day, that use of the word glide wasn't

48

IPR2021-00144
Patent 8,095,879 B2

enough to go and distinguish over the prior art. At the end of the day it required the last amendment, which is the last wherein clause. And isn't the better reading is that the difference is that it's actually those last two clauses need to be read together, both the gliding motion and then the wherein clause is, sort of, giving the definition of what it is as compared to what the prior art had?

MR. HENDIFAR: Yes. And the answer is no. So I don't believe the record reflects that the examiner required it as a reason for allowance in the sense that we'd argued the last amendments of duplication. You' are not going to be able to distinguish over Hoshino.

I don't believe the record reflects that. What happened was there was an interview. The parties agreed that the claim is novel. Then later on when the examiner was issuing the claims he had a telephonic request from the applicant, "Can I add this last limitation?"

My review of the prosecution history is that essentially it's a clarification more so than we'd necessarily require this because otherwise gliding is a drag and drop.

JUDGE HOWARD: Okay. I think the examiner didn't allow it without it. He required it to be put in and when he gives his reasons of allowance it's right there in the reasons for allowance.

MR. HENDIFAR: Along with the gliding so that the --

JUDGE HOWARD: Right, and that's, sort of, my point though is that even when you go and look at it, and I think what's actually useful is looking at Page 35 from the prosecution history in the reasons of the allowance and the examiner was, sort of, reciting the claim and then it says, you know, towards the end of the first paragraph and then to the object gliding along

49

IPR2021-00144
Patent 8,095,879 B2

the touch sensitive area away from the touch location wherein the representation of the function is not relocated or duplicated during the gliding.

It, sort of, removes the difference between the different paragraphs for each of the wherein clauses. And if you look at it just as the examiner has put it here, it seems to me that the difference between the gliding and the dragging and dropping that he's pointing to is, well, in one you just, sort of, move your finger or the object along and something happens because of it without anything being on the display, as opposed to dragging and dropping where you're putting your finger down and you're dragging a representation or you made a copy of the representation that you then drag along with you.

Isn't that reasonable view of the entirety of the prosecution history?

MR. HENDIFAR: No, and allow me to get back to you in our reply time, but I also want to point you to Page 14 of Exhibit 1003 where the applicant actually states the examiner has a reason for allowance that may differ from what you have explained to be the difference between the invention and the prior art. We disagree with that.

But if you'd allow me, because my understanding of the last telephonic amendment was not that as a requirement but this is more of a clarification, but if you would allow me I'll get back to you in our reply time.

JUDGE HOWARD: Okay.

MR. HENDIFAR: Now going to Slide Number 38, as we already -- actually it's Slide Number 37. I apologize. The applicant also, regardless of whether a gliding is the same moment or is not the same movement, the applicant unambiguously said that gliding away is not a conventional drag-and-drop operation.

50

IPR2021-00144
Patent 8,095,879 B2

And we have cited the *DivX* case which is, we believe, very on point here because the applicant in that case used almost identical language to the applicant here, especially the word instead. There like here or here like there, the applicant is saying Hoshino does not teach gliding your finger away. Instead, Hoshino teaches a drag and drop, and the Board in that case said we find no other way to interpret the applicant's arguments.

I'm going to Slide 38. The operation of Hoshino is functionally identical to the operation of Hirayama 307. In both of them when you want to open the window for an icon you put up another window, you drag that icon to a desired location and you lift the finger and your window is there.

So they are functionally identical, so even if Your Honors were on the fence about, okay, is gliding, dragging not dragging, the applicant expressly disclaimed a drag-and-drop operation from the scope of the claim.

JUDGE SZPONDOWSKI: But counsel, where specifically does Hirayama show that the icon is moved during the drag operation? Because my understanding is that the figure that's shown on Slide 38 on the left was created by Dr. Rosenberg and it's not a figure from Hirayama.

MR. HENDIFAR: That's correct, and I'll address that in a few minutes in connection with our not duplicated or relocated argument. We will actually point to specifically to where in Hirayama it shows that an icon is duplicated and relocated.

Now, Petitioner makes a number of arguments against the prosecution disclaimer. I'll quickly go through them. In Slide Number 39, Petitioners' reply makes the argument that the specific basis on which the applicant overcame Hoshino was not gliding versus a drag and drop.

51

IPR2021-00144
Patent 8,095,879 B2

But going to Slide 40, the Federal Circuit has held that there is no support -- no support for the proposition that a prosecution disclaimer applies only when applicants attempt to overcome a claim rejection. Rather, any statement that the applicant makes to characterize the invention may give rise to prosecution disclaimer.

Going to Slide 41, the --

JUDGE OGDEN: Counsel, Mr. Hendifar, just to let you know, you've got about five minutes in your initial time.

MR. HENDIFAR: Yes.

JUDGE HOWARD: This is Judge Howard again. I'm not necessarily disagreeing with your point that drag and drop has been disclaimed. My whole point is I'm trying to understand what the difference is between the drag and drop that's been disclaimed, if it has been disclaimed, and what's left besides the fact that in drag and drop, as the name implies, you're physically or electronically in this case dragging something along and dropping it in new location which is then what eventually got incorporated in by the wherein clause.

I'm just trying to understand is there a difference between the disclaimer and the wherein clause?

MR. HENDIFAR: Yes, because the wherein clause does not necessarily mean a drag and drop. It only includes a drag. It doesn't address an issue of a drop operation.

Also, you could hypothetically, and I'd have to think about it, but you could have a gliding motion where the icon moves with you. I think the issue with the drag in terms of the nature of movement is that in other devices

52

IPR2021-00144
Patent 8,095,879 B2

when you are dragging you have to really do an effort, go really slowly, pick a specific location, whereas a glide was a much more seamless effort.

Now, I need to think about whether you could have a gliding that also has an icon moving with it or not. But the --

JUDGE HOWARD: So I think I've now got an answer that I've been trying to get to. So the difference is in the type of the effort that's being applied, so it's something that would be visible, for example. You could --

MR. HENDIFAR: One aspect is --

JUDGE HOWARD: -- look at something and determine if it's, sort of, sweeping along that's a glide and if it's a more harder, slower movement that would be --

MR. HENDIFAR: Absolutely.

JUDGE HOWARD: -- not a glide. So is that what you're trying to get to?

MR. HENDIFAR: That's one aspect, absolutely. Also other aspects maybe there. As Judge Ogden said there may be an aspect about the specific location in a drag that you have to choose whereas a swipe or a glide is a much more generic movement. But again, it comes out to Petitioners have to point out what is a glide on whether drag discloses it, but that aside, Your Honor is correct that the nature of the movement is distinct between the two.

JUDGE HOWARD: Right. And I understand Petitioners' eventual burden, but if you're claiming there's a disclaimer I need to, sort of, understand what the distinction, or the panel needs to understand what that disclaimer is so that we could go and see whether or not Petitioner met its burden.

MR. HENDIFAR: Thank you.

53

IPR2021-00144
Patent 8,095,879 B2

JUDGE HOWARD: And those are two different things.

MR. HENDIFAR: Yes, they are. And our argument under disclaimer is different from the plain meaning argument. What Mr. Lowenstein was explaining was what Your Honor just explained about a dragging is a much more laborious movement versus a glide, much more simpler.

The disclaimer specifically disclaims the drag-and-drop operation like Hoshino, like Hirayama. So they are slightly different but they're related.

Now, I want to briefly go to Slide Number 45, if I may? So Petitioner says Figure 4 of Hirayama discloses a claim because it shows that the pen is moved and that's all that's required. Now, I want to highlight in Slide 45. Figure 4A does not talk about the nature of the movement being a drag versus a glide. It just says that the pen is shifted.

To the contrary, Hirayama itself as you can see on Slide 45, it's clear that the movement through which the pen is shifted is a dragging movement. And a function can be only activated by a dragging.

And also Your Honor pointed that Hirayama talks about dragging connection with the pen only. That's not necessarily true. On Slide 45 Hirayama refers to the overall operation is a dragging operation.

Now going to Slide 46 I also want to emphasize that even Hirayama's Figure 4A, where it says, "is the pen coordinate shifted by a sufficient amount," the intention of Figure 4A is as admitted by Petitioners' own expert to decide if the icon is moved outside of the hatched area.

Now, I want to go to Slide 53 because we are short on time. I want to address the relocation or duplication argument. Yeah. So I want to first quickly address Judge Ogden's point about the connection between Figures

54

IPR2021-00144
Patent 8,095,879 B2

3B and 4B. And I believe Petitioners' counsel mentioned that they are not really connected.

I want to point Your Honors to Hirayama in Exhibit 1006, Column 6, Lines 22 through 37. And in that column Hirayama expressly says that the algorithm of Figure 4B is the detailed description of what happens in Figure 3B. There's really no ambiguity that those two are related.

And as Judge Ogden mentioned, the figures of Hirayama are not accurate, the same way that Figure 3B shows the cursor not with a window with it, and the text of Hirayama shows that the window actually moves with the cursor. The same is true for Figure 3A, and I'm going to go into more detail about that now.

Now, first going through --

JUDGE OGDEN: Just to let you know, you're about a half a minute over your time but you can continue as long as you'd like.

MR. HENDIFAR: Thank you. If you'll go to Slide 56, and I'm going to go through the evidence on how we made these annotations, but Hirayama's operation essentially is, and I'll go through the evidence that Your Honors have, Slide 1, you put the finger on the icon 41.

Slide 2 you drag the icon and while the icon and the pen are within the hatched area the icon moves with the pen. Slide -- I'm sorry, box three when the pen moves outside of the hatched area the icon converts into a window. And box number four you place the window at a location where you want.

Going to Slide 57, Your Honors asked where in Hirayama does it say that the icon moves with the movement of the pen? And Slide 47 is where that evidence exists.

55

IPR2021-00144
Patent 8,095,879 B2

Hirayama expressly said, "A circuit controls the icon and the icon display coordinate position is moved with the movement of the pen." Now, Petitioners' counsel said, oh, this is ambiguous. I want to highlight their expert submitted a second declaration and in Paragraph 62 of his declaration, Exhibit 1051, he addressed this sentence. He never disputed our assessment of what this statement says.

Petitioners' expert nor Petitioner in their papers disputed that what this section of Hirayama in the first aspect of invention disclosures is that the icon is actually moved with the movement of the pen.

What do they think that? They said, and I'm going to go to Slide Number 65, if you would, how they responded to that is, oh, that's just a summary of the invention of Hirayama and it's the first aspect of the invention.

Now, I want to explain why that's wrong. First, Petitioners don't explain why Hirayama's summary of the invention, which is supposed to highlight the important aspects of it would be different from the different embodiments.

But even beyond that, the first aspect of invention in the summary of the invention is not express aspect where you have the icon moving and there's supposedly there is a second aspect where the icon does not move.

If you go to Slide 66, the second aspect of the invention discussed in the summary of the invention is the reverse for closing a window where the window still moves with the icon -- with the pen and then it moves to the vacant position. So they really have no response to Hirayama's summary of the invention expressly unambiguously saying that the icon is moved with the movement of the pen.

56

IPR2021-00144
Patent 8,095,879 B2

Now, but that's not the only support we have. If we go to Slide 58, the text of Hirayama routinely and repeatedly explain that the icon is enlarged into a window and it's converted into a window. Now, if the icon was not moving with the pen it wouldn't be enlarged into a window, and it wouldn't be converted into a window.

What Hirayama would have said is a window appears when you lift up the pen. But it says that the icon is enlarged and converted into the window, and it's not just a one-off. You have four examples of it on Slide 58.

And not only that, going to Slide 59, for the reverse of the operation for closing the window Hirayama says that you would drag the open window back to the vacant position. Now, if the original icon 41 had been moved and disappear there wouldn't have been a vacant position for you to put back the window.

Going to Slide 60, and I want to emphasize this, there is nothing, not even one word in the text of Hirayama that contradicts our reading of it, nothing. All that Petitioners are relying on are the Figures 3A and 3B, which are inaccurate or at least incomplete.

And I want to first emphasize Figure 3A on Slide 62. Figure 3A is not even intended to show the dragging aspect of the operation. If you would read Hirayama's description of Figure 3, Figure 3 is intended to show the display on startup. And you actually put the code from Hirayama actually saying that.

And nowhere does Hirayama say that Figure 3A is intended to show the dragging operation. And Slides 63 and 64 provide additional evidence of why that's the case.

57

IPR2021-00144
Patent 8,095,879 B2

Now, I want to now point to Slide 71. Petitioners make various arguments about, oh, at the time of -- sorry, strike that. Petitioners make points about, okay, there were other methods that you could have provided feedback to the user other than relocation or duplication, but they provide no reason why a POSITA would deviate from the express teaching of Hirayama with duplication and then go to other methods of feedback.

Now, in their reply, and that's in Slide 74, for the first time they explained that, or they claim that it was computationally expensive at the time to provide actual visual feedback during dragging.

Now, going to Slide 75, first, this is an untimely new motivation that they describe, but going to Slide 76 it's also incorrect. Petitioners' expert in his declaration of why anti-credit systems from early '80s to late '80s about why maybe providing visual feedback during gliding was computationally intensive, but he admitted at his deposition, and that's Slide 76, that by the time of the invention the systems actually provided visual feedback during dragging by showing the icon being dragged.

And with that, if there -- let me just make sure I've answered all of Your Honors questions. I believe I've addressed the. If there are any questions I'll be happy to answer. If not, I'll reserve the rest of my time. Okay?

JUDGE OGDEN: Okay.

MR. HENDIFAR: Thank you very much.

JUDGE OGDEN: Thank you, Mr. Hendifar and Mr. Lowenstein. You've used about, let's see, about 51 and a half minutes of your time so that will leave about eight and a half, I believe, for your surrebuttal time if I calculated that correctly.

58

IPR2021-00144
Patent 8,095,879 B2

Okay. Ms. Miller, you can go ahead when you're ready.

MS. MILLER: Thank you, Your Honor. So I want to turn to Petitioner, or excuse me, Patent Owner's arguments regarding Hirayama there that we heard at the end, and they, I will say that they emphasize very heavily that there's nothing in the text in Hirayama that contradicts the reading. And I think they're playing a game here with what's between, between what's in --

[Audio goes out]

MS. MILLER: You've already opened the window in step S6 in the flowchart and that's the end of the gliding that activates the function that's relevant to Claim 1. After that, the window can be moved around with the pen according to those steps S7 and S8 in the figure for a flowchart and also as shown with the arrow B in Figure 3B.

Returning to Patent Owner's statements there at the end that reference user feedback in their Slide 76, they allege that Petitioners rely on antiquated systems and that's just not true. Dr. Bederson relied on the Sears reference, which has not been rebutted.

And that's consistent with actually what's in the explicit disclosure of Hirayama that a cursor was used for feedback. It is Patent Owner that asks you to disregard and remove that cursor from the disclosure. And that just can't be correct.

JUDGE OGDEN: Ms. Miller, I understand that as part of Hirayama 307's disclosure that cursor in some instances appear before the user actually touches the screen with the stylus, so couldn't that be the purpose of that

59

IPR2021-00144
Patent 8,095,879 B2

cursor? And then couldn't there also be an additional need to represent the fact that you are in the process of --

MS. MILLER: -- and tells us to consider the pen 2 have already contacted the tablet when it gets within a certain distance and perform the processing essentially as if the pen has already contacted the tablet.

So in that scenario it certainly would be true that you would definitely use this cursor as feedback to the user as to when and where they're contacting on the display.

JUDGE OGDEN: Thank you.

MS. MILLER: I want to return to Petitioners' Slide 10 and Patent Owner's arguments regarding gliding. So on Slide 10 we have '879 patent, and this is what the specification tells us about the movement of the finger or object that's going to activate a function.

There's nothing here about the effort of the user for this gesture so this should tell you all you need to know about what is required to meet the claimed gliding limitation.

That's all I had for rebuttal, but I'm happy to answer any questions questions.

JUDGE OGDEN: I don't think we have any questions. Thank you, Ms. Miller. Thank you, Mr. Holt.

MS. MILLER: Thank you, Your Honors.

MR. LOWENSTEIN: Are we on, Your Honor?

JUDGE OGDEN: Yes, go ahead.

MR. LOWENSTEIN: So first of all --

JUDGE OGDEN: You have about eight and a half minutes.

60

IPR2021-00144
Patent 8,095,879 B2

MR. LOWENSTEIN: Thank you, Your Honor. First and foremost I want to make sure I answered or re-answered all of the questions that Your Honors had. Is there any pending question that you believe we have not answered to your satisfaction?

Okay. With that, I will speak very briefly and then I will turn it to my colleague, Mr. Hendifar, who will handle most of the rebuttal.

I just want to make some high-level observations that we didn't hear about, which were our secondary indicia evidence which is, I think, almost unprecedented, at least in my time as a patent litigator. I believe that there's a clear nexus between that piece and user interface, the swiping user interface which we directly correlated to the claim limitation at issue.

Ms. Miller pointed to this portion from the specification about movement, but she did not address our intrinsic, well, the entirety of the intrinsic record where we directed the examiner to the video to show the seamless swiping movement where we constantly equated gliding with swiping.

And so she asked you to --

[Audio went out.]

MR. LOWENSTEIN: -- argument that essentially they have failed to prove their case in their petition. And I did not hear any disagreement with that from the other side.

With that, I will turn it to my colleague Mr. Hendifar.

MR. HENDIFAR: Thank you, Your Honor. So first I would like to point you to Hirayama Figure 4A because that has been the topic of our discussion.

61

IPR2021-00144
Patent 8,095,879 B2

And Petitioner argued that Figure 4A in and of itself discloses the claim, but it does not. So first of all, as I mentioned, the text of Hirayama is clear that the icon is relocated or duplicated during the dragging of the pen so long as the pen is within the hashed area.

Now, Figure 4A is meant to be an algorithm to highlight the important parts of that movement. It's not intended to show every detail. But even Figure 4A contradicts what Petitioner says because, if you will go to step S4, you determine if the pen has moved and then in step S6 the icon is enlarged as a window.

And I want to emphasize this. When the icon is enlarged as a window and you pause that the icon was moving with the pen and then once you move out of the hatched area it enlarges. If the icon was not moving with the pen it wouldn't be enlarged. It would just appear or it would show up on the screen or some other verbiage.

And we actually point this out in our slide that we have a lot of instances of that verbiage and that's Slide 58. It's not the only instance, as I mentioned. Hirayama consistently says that the icon is enlarged and converted into a window.

So we will say with that Figure 4A contradicts what we say, at best is somewhat silent, but it clearly implies that the icon is moved and the text of Hirayama that accompanies that figure makes it clear that the icon has moved with the movement of the pen.

JUDGE OGDEN: Mr. Hendifar --

MR. HENDIFAR: Yes?

JUDGE OGDEN: -- I'm wondering what your thoughts are on the fact that Figure 4A of Hirayama 307 does make it a point of showing in steps S7

62

IPR2021-00144
Patent 8,095,879 B2

through S8 that after the icon is enlarged into a window that it is moved along with the pen. So why wouldn't they also include that during the time period before the icon is enlarged as a window? Could a person of ordinary skill in the art infer from that that it's not moving with, that the original icon is not moving with the pen during that period?

MR. HENDIFAR: I have two things. One is the text of Hirayama as we explained in the summary of the invention expresses that the icon does move.

Two is the use of the words such as enlarge and converted. And in the text of Hirayama that actually explains the steps S1 and S6, Hirayama says that the icon is converted into a window. So that text also contradicts that reading, but also the fact that it's not shown in this actual algorithm, there is a reason for it.

So step S7 and S8 are integral to the operation in the sense that once the icon is enlarged into a window it has to move with the pen so you know where you're going to place the icon, or the window, I apologize.

Whereas the beginning aspect of it where the pen has just moved within the hatched area, the purpose of the icon moving with the pen is the visual feedback to the user to show that the icon is being dragged. It's not about I'm going to place the icon in the hatched area. The user cannot place the icon in the hatched area.

So steps S7 and S8 have to say that the window is moving with the pen because the user has to see where he's going to place the window. But prior to Step S6 the algorithm will actually have to say that the icon is moving because that's just a visual feedback. It's not the actual user placing the icon at that stage.

63

IPR2021-00144
Patent 8,095,879 B2

Does that answer your question?

JUDGE OGDEN: Thank you, yes.

MR. HENDIFAR: Thank you. I also want to emphasize so Petitioners submitted an Exhibit 1067, which is a video, and they claimed in their briefing that the video is intended to show how Hirayama operates. They don't refer to it for two reasons. One is that it's not authenticated so it's not admissible. But also, that video that they say is intended to show how Hirayama operates actually shows the icon moving with the movement of the pen in the hatched area and then converting into a window exactly as how we say it operates.

So if Your Honors want to also look at that video let me also confirm this, but it also the way Hirayama operates, let's take a step backward, if you would.

We are all familiar with how the system work in a drag and drop. You put your pen on an icon, you move it around and then you drop it at the location that you want.

In a Windows operating system at some point the icon may become larger, it may become grayed out, it may change shape, but the icon always moves with the pen. That's just how these things work.

Now, I also want to point you to Slide 73 because I have just two minutes left, about the cursor providing feedback. And I want to make two points on that.

So in the petition Petitioners relied only on the cursor for providing feedback. We explained, and I'll elaborate on that, why the cursor is not sufficient by itself to provide feedback.

64

IPR2021-00144
Patent 8,095,879 B2

In their reply they didn't come back and say, oh, yes, the cursor is sufficient to provide feedback. If you go to their reply, and we have addressed that in our Sur-reply Page 26, in their reply they essentially concede that the cursor is not sufficient to provide feedback for a drag-and-drop operation.

And they go on to say, well, a POSITA could have used other feedback mechanisms such as highlighting the icon or linking the icon or whatever. But the point is that in their reply, as we explain in our Sur-reply on Page 26, they concede that the cursor is not sufficient.

Now, why the cursor not sufficient? If you look at Slide 73, Hirayama is clear, and Judge Ogden also pointed out, the cursor is like a mass cursor. It's intended to show where that pen is on the screen. As the pen move, the cursor moves with it or not, you're doing a drag and drop.

Now, if you look at Slide 73, so imagine that a user wants to perform a drag and drop but it doesn't have a visual feedback other than the cursor. So the pen now approaches the screen the cursor appears because it shows where the pen is, the user in item two instead of three moves the pen to the icon and the cursor moves with it.

And in item number three the user is trying to do a drag and drop and moving the pen and the cursor moves with the pen, but in Section 3 on Slide 73 the user has no way of knowing whether he's successfully performing a drag-and-drop operation.

All the user knows is that the pen is moving with the cursor. He has no idea whether he's successfully selected icon 41 and whether icon 41 is moving with the pen. So the cursor by itself is not sufficient and they effectively considered that in their reply.

65

IPR2021-00144
Patent 8,095,879 B2

Now, if there are any questions I will be happy to answer.

JUDGE OGDEN: Okay, thank you, Mr. Hendifar. Thank you both sides for your very helpful presentations. This concludes the hearing for IPR2021-00144. And we will consider the issues and issue a final written decision in due course.

I'd like to ask the parties to stay online up after we go off the record in case the court reporter has any questions. So we are adjourned.

(Whereupon the above-entitled proceeding went off the record at 3:01 p.m.)

IPR2021-00144
Patent 8,095,879 B2


PETITIONER:

Walter Renner
David Holt
FISH & RICHARDSON
axf-ptab@fr.com
holt2@fr.com

Tiffany Miller
James Heintz
DLA PIPER
tiffany.miller@dlapiper.com
jim.heintz@dlapiper.com

PATENT OWNER:

Kenneth Weatherwax
Parham Hendifar
Patrick Maloney
Vinson Lin
LOWENSTEIN & WEATHERWAX, LLP
weatherwax@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
lin@lowensteinweatherwax.com

Philip Graves
philipg@hbsslaw.com

67

# EXHIBIT 13

# WILEY ELECTRICAL AND ELECTRONICS ENGINEERING DICTIONARY

**Steven M. Kaplan**
Lexicographer



**IEEE PRESS**



**A JOHN WILEY & SONS, INC., PUBLICATION**

APL-NEO_00928808

Copyright © 2004 by John Wiley & Sons, Inc. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, 978-750-8400, fax 978-646-8600, or on the web at www.copyright.com. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax (201) 748-6008.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in preparing this book, they make no representation or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of | merchantability or fitness for a particular purpose. No warranty may be created or extended by sales representatives or written sales materials. The advice and strategies contained herein may not be suitable for your situation. You should consult with a professional where appropriate. Neither the publisher nor author shall be liable for any loss of profit or any other commercial damages, including but not limited to special, incidental, consequential, or other damages.

For general information on our other products and services please contact our Customer Care Department within the U.S. at 877-762-2974, outside the U.S. at 317-572-3993 or fax 317-572-4002.

Wiley also publishes its books in a variety of electronic formats. Some content that appears in print, however, may not be available in electronic format.

*Library of Congress Cataloging-in-Publication Data is available.*

Kaplan, Steven M.

Wiley Electrical and Electronics Engineering Dictionary

ISBN 0-471-40224-9

Printed in the United States of America.

10 9 8 7 6 5 4 3 2 1

APL-NEO_00928809

**stator plate** A plate, such as that in a variable capacitor, that does not move. Also called **stationary plate**.

**stator winding** Same as **stator coil**.

**statS** Abbreviation of **statsiemens**.

**statsiemens** The unit of conductance in the cgs electrostatic system. There are approximately $1.11265 \times 10^{-12}$ siemens in a statsiemen. Its abbreviation is **statS**. Also called **stat-mho**.

**statT** Abbreviation of **stattesla**.

**stattesla** The unit of magnetic flux density in the cgs electrostatic system. There are approximately $2.99793 \times 10^6$ teslas in a stattesla. Its abbreviation is **statT**.

**status** The state or condition of something at a given moment. For example, the availability of a device connected to a network, or the on/off status of a piece of equipment.

**status bar** A bar, usually located at the bottom of a window, which provides information pertaining to specific aspects of an application. For example, a browser may indicate via the status bar that a given page has been fully loaded, and whether there is a secure connection or not.

**status code** A code, such as that sent through a network, indicating the state or condition of a device, system, process, or the like.

**status register** A register whose content indicates aspects of the internal status of a CPU, or a part of a CPU such as an arithmetic-logic unit. Also called **flag register**.

**statV** Abbreviation of **statvolt**.

**statvolt** The unit of potential difference in the cgs electrostatic system. There are approximately 299.793 volts in a statvolt. Its abbreviation is **statV**.

**statW** Abbreviation of **statwatt**.

**statwatt** The unit of power in the cgs electrostatic system. There is $10^{-7}$ watt in a statwatt. Its abbreviation is **statW**.

**statWb** Abbreviation of **statweber**.

**statweber** The unit of magnetic flux in the cgs electrostatic system. There are approximately 299.793 webers in a statwebber. Its abbreviation is **statWb**.

**statΩ** Abbreviation of **statohm**.

**STB** Abbreviation of **set-top box**.

**STC** Abbreviation of **sensitivity-time control**.

**std** Abbreviation of **standard**.

**steady state** 1. For a given component, circuit, device, piece of equipment, system, mechanism, or body, a state which is attained after transients, fluctuations, and other changes have died down or otherwise disappeared. 2. For a given component, circuit, device, piece of equipment, system, mechanism, or body, a state which does not oscillate, alternate, increase, or otherwise vary.

**steady-state current** A current which does not vary.

**steady-state error** In a control system, any error that remains after any changes in the system have died down or otherwise disappeared.

**steady-state operation** Operation of a component, circuit, device, piece of equipment, system, or mechanism, once transients, fluctuations, and other changes have died down or otherwise disappeared.

**steady-state oscillation** For an oscillating system, oscillation occurring once transients, fluctuations, and other changes have died down or otherwise disappeared. Also called **stable oscillation (2)**.

**steady-state voltage** A voltage which does not vary.

**stealth virus** A virus which effectively conceals its presence. Such a virus, for instance, may alter the data of the disk directory it is located in, so as to hide the additional bytes it adds.

**steerable antenna** A directional antenna that can be rotated, or which can otherwise change the direction of its major lobe.

**Stefan-Boltzmann constant** A constant, pertaining to blackbody radiation, whose value is approximately $5.6704 \times 10^{-8}$ $W/m^2K^4$. Its symbol is $\sigma$.

**Stefan-Boltzmann law** A law stating that the energy radiated by a blackbody per second per unit area is proportional to the fourth power of its absolute temperature.

**steganography** The utilization of unused data or locations within a file or data to hide additional information, such as concealed messages. A message hidden in this manner may or may not be encrypted, with its key security feature being its undetectability. For instance, steganography may use redundant bits within a given file format, such as that of an image, to embed the data in an imperceptible manner. When utilized to hold bit patterns which identify the sources of digital intellectual property, such as voice, video, or data, known as **watermark**.

**Steinmetz coefficient** A constant, unique to each material, which is utilized when calculating hysteresis losses. Also called **hysteresis coefficient**.

**STEM** 1. Acronym for **scanning transmission electron microscope**. 2. Acronym for **scanning transmission electron microscopy**.

**step** 1. One within a series, sequence, order, or process. 2. To cause to proceed one **step (1)** at a time, or from one step to another. 3. The interval encompassing a single **step (1)**. 4. Within a computer program, a single instruction. May also refer to a single statement, which can contain multiple instructions. Also called **program step**. 5. To cause to execute a single **step (4)**.

**step attenuator** A circuit or device which reduces the amplitude of a signal, ideally without introducing distortion, in precise steps.

**step-by-step execution** Same as **single-step operation**.

**step-by-step operation** Same as **single-step operation**.

**step change** The process of proceeding from one **step (1)** to another. Also, the interval between these steps.

**step counter** A circuit, device, register, mechanism, or system utilized for counting steps, such as those in arithmetic processes.

**step-down** 1. To decrease in precise steps. Also, pertaining to that which decreases in precise steps. 2. To decrease a voltage. Also, pertaining to that which decreases a voltage, such as a step-down transformer.

**step-down ratio** For transformer, a turns ratio of greater than one. A step-down transformer has such a ratio.

**step-down transformer** A transformer whose output voltage is lower than its input voltage. A secondary winding of such a transformer has fewer turns than the primary. Such a transformer may have multiple secondary windings. Used, for instance, to decrease the voltage of electricity as it leaves the transmission system and enters the distribution system. The output voltage of a **step-up transformer** is higher than its input voltage. Also spelled **stepdown transformer**.

**step frame** The capturing of video images a single frame at a time. Used, for instance, when there is not enough bandwidth or system resources for real-time video.

**step function** A function which has a value of zero before a given instant, and a fixed non-zero value after said instant. When the non-zero value is one, also called **unit-step function**.

**step-index fiber** An optical fiber whose core has a uniform refractive index.

**step-recovery diode** A diode in which a charge is stored when forward biased, and which briefly conducts when it becomes reverse biased, after which it returns to a high-

APL-NEO_00928810

# EXHIBIT 14

Case 3:21-cv-08872-EMC    Document 181-1    Filed 03/27/26    Page 1218 of 1245

# The New Oxford
# American Dictionary

EDITED BY

Elizabeth J. Jewell
Frank Abate



OXFORD
UNIVERSITY PRESS
2001

APL-NEO_00928811

# OXFORD
UNIVERSITY PRESS

New York   Oxford

Athens  Auckland  Bangkok  Bogotá  Buenos Aires  Cape Town
Chennai  Dar es Salaam  Delhi  Florence  Hong Kong  Istanbul  Karachi
Kolkata  Kuala Lumpur  Madrid  Melbourne  Mexico City  Mumbai  Nairobi
Paris  São Paulo  Singapore  Taipei  Tokyo  Toronto  Warsaw

and associated companies in
Berlin  Ibadan

The *New Oxford American Dictionary* is based on the *New Oxford
Dictionary of English*, published in the United Kingdom in 1998.

Copyright © 2001 by Oxford University Press, Inc.

Published by Oxford University Press, Inc.,
198 Madison Avenue,         ¢
New York, New York 10016

*www.oup-usa.org*
*www.askoxford.com*

Oxford is a registered trademark of Oxford University Press.
All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted in any form or by any means,
electronic, mechanical, photocopying, recording, or otherwise, without
the prior permission of Oxford University Press.

Library of Congress Cataloging in Publication Data
Data available
ISBN 0-19-511227-X  (thumb index)

This book includes some words that are, or are asserted to be, proprietary
names or trademarks. Their inclusion does not imply that they have
acquired for legal purposes a nonproprietary or general significance, nor is
any other judgment implied concerning their legal status. In cases where
the editor has some evidence that a word is used as a proprietary name
or trademark, this is indicated by the designation trademark, but no
judgment concerning the legal status of such words is made or implied
thereby.

10 9 8 7 6 5 4 3 2 1

Printed in the United States of America on acid-free paper

APL-NEO_00928812

**5** informal a pipe used for smoking crack or opium.
▸v. (stemmed, stemming) 1 [intrans.] (stem from) originate in or be caused by: *many of the universities' problems stem from rapid expansion.*
**2** [trans.] remove the stems from (fruit or tobacco leaves).
**3** [trans.] (of a boat) make headway against (the tide or current).
-PHRASES from stem to stern from the front to the back, esp. of a ship: *surges of water rocked their boats from stem to stern.* ■ along the entire length of something; throughout: *the album is a joy from stem to stern.*
-DERIVATIVES stem•less adj.; stem•like |-,lik| adj.
-ORIGIN Old English *stemn, stefn,* of Germanic origin; related to Dutch *stam* and German *Stamm.* Sense 4 is related to Dutch *steven,* German *Steven.*

**stem²** ▸v. (stemmed, stemming) 1 [trans.] stop or restrict (the flow of something): *a nurse did her best to stem the bleeding* | figurative *an attempt to stem the rising tide of unemployment.*
**2** [intrans.] Skiing slide the tail of one ski or both skis outward in order to turn or slow down.
-ORIGIN Middle English (in the sense 'to stop, delay'): from Old Norse *stemma,* of Germanic origin. The skiing term (early 20th cent.) is from the German verb *stemmen.*

**stem cell** ▸n. Biology an undifferentiated cell of a multicellular organism that is capable of giving rise to indefinitely more cells of the same type, and from which certain other kinds of cell arise by differentiation.

**stem chris•tie** |'kristē| ▸n. Skiing a turn made by stemming with the upper ski and then lifting the other one parallel to it for most of the turn.

**stem•ma** |'stemə| ▸n. (pl. stemmata) a recorded genealogy of a family; a family tree.
■ a diagram showing the relationship between a text and its various manuscript versions.
-ORIGIN mid 17th cent.: via Latin from Greek *stemma* 'wreath,' from *stephein* 'wreathe, crown.'

**stem•ma•tics** |stem'ætiks| ▸plural n. [treated as sing.] the branch of study concerned with analyzing the relationship of surviving variant versions of a text to each other, esp. so as to reconstruct a lost original.

**stemmed** |stemd| ▸adj. [attrib.] 1 [in combination] having a stem of a specified length or kind: *red-stemmed alder bushes.*
**2** (of a glass, cup, or dish) having a slender supportive section between the base and bowl: *a stemmed goblet.*
**3** (of fruit or leaves) having had the stems removed.

**stem stitch** ▸n. an embroidery stitch forming a continuous line of long, overlapped stitches, typically used to represent narrow stems.

**stem turn** ▸n. Skiing a turn made by stemming with the upper ski and lifting the lower one parallel to it toward the end of the turn.

**stem•ware** |'stem,wer| ▸n. goblets and stemmed glasses regarded collectively.

**stem-wind•er** |,windər| (also stemwinder) ▸n. 1 informal an entertaining and rousing speech: *the speech was a classic stem-winder in the best southern tradition.*
**2** dated a watch wound by turning a knob on the end of a stem.
-ORIGIN sense 1 from the notion of "winding up" or causing a lively reaction from those listening.

**sten.** ▸abbr. ■ stenographer. ■ stenography.

**stench** |stenCH| ▸n. a strong and very unpleasant smell: *the stench of rotting fish.*
-ORIGIN Old English *stenc* 'smell,' of Germanic origin; related to Dutch *stank,* German *Gestank,* also to the verb STINK.

**sten•cil** |'stensəl| ▸n. a thin sheet of cardboard, plastic, or metal with a pattern or letters cut out of it, used to produce the cut design on the surface below by the application of ink or paint through the holes.
■ a design produced by such a sheet: *a floral stencil around the top of the room.*
▸v. (stenciled, stenciling |'stens(ə)liNG|; Brit. sten•cilled, stencilling) [trans.] decorate (a surface) with such a design: *the walls had been stenciled with designs* | [as n.] (stenciling) *the art of stenciling.*
■ produce (a design) with a stencil: *stencil a border around the door* | [as adj.] (stenciled) *the stenciled letters.*
-ORIGIN early 18th cent.: from earlier *stansel* 'ornament with various colors' (based on Latin *scintilla* 'spark').

# STENCIL
stenciled lettering

**Sten•dhal** |sten'däl; sten-| (1783–1842), French novelist; pseudonym of *Marie Henri Beyle.* His two best-known novels are *Le Rouge et le noir* (1830), relating the rise and fall of a young man from the provinces, and *La Chartreuse de Parme* (1839).

**Sten•gel** |'steNGgəl|, Casey (c. 1890–1975) US baseball player and manager; full name *Charles Dillon Stengel.* An outfielder 1910–31 and a manager 1931–48 for various minor and major league teams, he managed the New York Yankees 1949–60, guiding them to ten American League pennants and seven World Series. He also managed the New York Mets 1962–65. Baseball Hall of Fame (1966).

**Sten gun** |'sten| ▸n. a type of lightweight British submachine gun.
-ORIGIN 1940s: from the initials of the inventors' surnames, Shepherd and Turpin, suggested by BREN.

**Sten•o** |'stänō|, Nicolaus (1638–86), Danish anatomist and geologist; Danish name *Niels Steensen.* His ideas are now regarded as fundamental—that fossils are the petrified remains of living organisms, that many rocks arise from consolidation of sediments and occur in layers in the order in which they were laid down.

**sten•o** |'stenō| ▸n. (pl. -os) informal a stenographer: *it was written by the steno herself.*
■ [as adj.] short for STENOGRAPHY: *the steno pool* | *I carry a steno pad and two pens.*

**stenog.** ▸abbr. ■ stenographer. ■ stenographic. ■ stenography.

**ste•nog•ra•phy** |stə'nägrəfē| ▸n. the action or process of writing in shorthand or taking dictation.
-DERIVATIVES ste•nog•ra•pher |-fər| n.; sten•o•graph•ic |,stenə'græfik| adj.
-ORIGIN early 17th cent.: from Greek *stenos* 'narrow' + -GRAPHY.

**sten•o•ha•line** |,stenə'halin; -hælin| ▸adj. Ecology (of an aquatic organism) able to tolerate only a narrow range of salinity. Often contrasted with EURYHALINE.
-ORIGIN 1930s: from Greek *stenos* 'narrow' + *halinos* 'of salt.'

**ste•no•sis** |stə'nōsis| ▸n. (pl. stenoses |-,sēz|) Medicine the abnormal narrowing of a passage in the body.
-DERIVATIVES ste•nosed |stə'nōst; -nōzd| adj.; ste•nos•ing |-'nōsiNG; -'nōz-| adj.; ste•not•ic |stə'nätik| adj.
-ORIGIN late 19th cent.: modern Latin, from Greek *stenōsis* 'narrowing,' from *stenoun* 'make narrow,' from *stenos* 'narrow.'

**sten•o•ther•mal** |,stenə'THərmə| ▸adj. Ecology (of an organism) able to tolerate only a small range of temperature. Often contrasted with EURYTHERMAL.
-ORIGIN late 19th cent.: from Greek *stenos* 'narrow' + THERMAL.

**sten•o•top•ic** |,stenə'täpik| ▸adj. Ecology (of an organism) able to tolerate only a restricted range of habitats or ecological conditions. Often contrasted with EURYTOPIC.
-ORIGIN 1940s: from Greek *stenos* 'narrow' + *topos* 'place' + -IC.

**sten•o•type** |'stenə,tip| ▸n. a machine resembling a typewriter that is used for recording speech in syllables or phonemes.
-DERIVATIVES sten•o•typ•ist |-,tipist| n.; sten•o•typ•y |-,tipē| n.
-ORIGIN late 19th cent.: from STENOGRAPHY + TYPE.

**stent** |stent| ▸n. Medicine a tubular support placed temporarily inside a blood vessel, canal, or duct to aid healing or relieve an obstruction.
■ an impression or cast of a part or body cavity, used to maintain pressure so as to promote healing, esp. of a skin graft.
-ORIGIN late 19th cent.: from the name of Charles T. Stent (1807–85), English dentist. The sense 'tubular support' dates from the 1960s.

**sten•tor** |'sten,tôr; 'stentər| ▸n. 1 poetic/literary a person with a powerful voice.
**2** Zoology a sedentary trumpet-shaped single-celled animal that is widespread in fresh water.
•Genus *Stentor,* phylum Ciliophora, kingdom Protista.
-ORIGIN early 17th cent.: from Greek *Stentōr,* the name of a herald in the Trojan War.

**sten•to•ri•an** |sten'tôrēən| ▸adj. (of a person's voice) loud and powerful: *he introduced me to the staff with a stentorian announcement.*

**step** |step| ▸n. 1 an act or movement of putting one leg in front of the other in walking or running: *Ron took a step back* | *she turned and retraced her steps.*
■ the distance covered by such a movement: *Richard came a couple of steps nearer.* ■ [usu. in sing.] a person's particular way of walking: *she left the room with a springy step.* ■ one of the sequences of movement of the feet that make up a dance. ■ a short or easily walked distance: *the market is only a short step from the end of the lake.*
**2** a flat surface, esp. one in a series, on which to place one's foot when moving from one level to another: *the bottom step of the staircase* | *a flight of marble steps.*
■ a doorstep: *there was a pint of milk on the step.* ■ a rung of a ladder. ■ (steps) (or a pair of steps) Brit. a stepladder. ■ Climbing a foothold cut in a slope of ice. ■ a block, typically fixed to the vessel's keel, on which the base of a mast is seated. ■ Physics an abrupt change in the value of a quantity, esp. voltage.
**3** a measure or action, esp. one of a series taken in order to deal with or achieve a particular thing: *the government must take steps to discourage age discrimination* | *a major step forward in the fight against terrorism.*
■ a stage in a gradual process: *sales are up, which is a step in the right direction.* ■ a particular position or grade on an ascending or hierarchical scale: *the first step on the managerial ladder.*
**4** Music an interval in a scale; a tone (whole step) or semitone (half step).
**5** step aerobics: [as adj.] *a step class.*
▸v. (stepped, stepping) 1 [no obj, with adverbial] lift and set down one's foot or one foot after the other in order to walk somewhere or move to a new position: *Claudia tried to step back* | *I accidentally stepped on his foot.*
■ [as imperative] used as a polite or deferential way of asking someone to walk a short distance for a particular purpose: *please step this way.* ■ (step it) dated perform a dance: *they stepped it down the room between the lines of dancers.* ■ take a particular course of action: *young men have temporarily stepped out of the labor market.*
**2** [trans.] Nautical set up (a mast) in its step.
-PHRASES break step stop walking or marching in step with others. fall into step change the way one is walking so that one is walking in step with another person. in (or out of) step putting (or not putting) one's feet forward alternately in the same rhythm as the people one is walking, marching, or dancing with. ■ figurative conforming (or not conforming) to what others are doing or thinking: *the party is clearly out of step with voters.* ■ Physics (of two or more oscillations or other cyclic phenomena) having (or not having) the same frequency and always in the same phase. keep step remain walking, marching, or dancing in step. one step ahead managing to avoid competition or danger from someone or something: *I try to keep one step ahead of the rest of the staff.* step by step so as to progress gradually and carefully from one stage to the next: *I'll explain it to you step by step* | [as adj.] *a step-by-step guide.* step into the breach see BREACH. step into someone's shoes take control of a task or job from another person. step on it (or step on the gas) informal go faster, typically in a motor vehicle. step (or tread) on someone's toes offend someone by encroaching on their area of responsibility. step out of line behave inappropriately or disobediently.
▸step aside another way of saying step down below.
step back mentally withdraw from a situation in order to consider it objectively.
step down withdraw or resign from an important position or office: *Mr. Krenz stepped down as party leader a week ago.*
step something down decrease voltage by using a transformer.
step forward offer one's help or services: *a company has stepped forward to sponsor the team.*
step in become involved in a difficult or problematic situation, esp. in order to help or prevent something from happening. ■ act as a substitute for someone: *Lucy stepped in at very short notice to take Joan's place.*
step out 1 leave a room or building, typically for a short time. 2 informal go out with: *he was stepping out with a redheaded waitress.* 3 walk with long or vigorous steps: *she enjoyed the outing, stepping out manfully.*
step something up increase the amount, speed, or intensity of something: *police decided to step up security plans for the game.* ■ increase voltage using a transformer.
-DERIVATIVES step•like |-,lik| adj.
-ORIGIN Old English *stæpe, stepe* (noun), *stæppan, steppan* (verb), of Germanic origin; related to Dutch *steppen* and German *stapfen.*

**step-** ▸comb. form denoting a relationship resulting from a remarriage: *stepmother.*
-ORIGIN Old English *stēop-,* from a Germanic base meaning 'bereaved, orphaned.'

**step aer•o•bics** ▸plural n. a type of aerobics that involves stepping up onto and down from a portable block.

**Ste•pa•na•kert** |,stepənə'kert; sti,pänə-| Russian name for XANKÄNDI.

**step•broth•er** |'step,brəTHər| ▸n. a son of one's stepparent, by a marriage other than that with one's own father or mother.

APL-NEO_00928813

# EXHIBIT 15

# *The*
# American
# Heritage®Dictionary
## *of the English Language*

FOURTH EDITION





HOUGHTON MIFFLIN COMPANY
Boston   New York

APL-NEO_00935930

Words are included in this Dictionary on the basis of their usage.
Words that are known to have current trademark registrations are
shown with an initial capital and are also identified as trademarks. No
investigation has been made of common-law trademark rights in any
word, because such investigation is impracticable. The inclusion of any
word in this Dictionary is not, however, an expression of the
Publisher's opinion as to whether or not it is subject to proprietary
rights. Indeed, no definition in this Dictionary is to be regarded as
affecting the validity of any trademark.

American Heritage® and the eagle logo are registered trademarks of
Forbes Inc. Their use is pursuant to a license agreement with
Forbes Inc.

Copyright © 2000 Houghton Mifflin Company. All rights reserved.

No part of this work may be reproduced or transmitted in any form or
by any means, electronic or mechanical, including photocopying and
recording, or by any information storage or retrieval system without
the prior written permission of Houghton Mifflin Company unless
such copying is expressly permitted by federal copyright law. Address
inquiries to Reference Permissions, Houghton Mifflin Company,
222 Berkeley Street, Boston, MA 02116.

Visit our Web site: www.hmco.com/trade.

*Library of Congress Cataloging-in-Publication Data*

The American Heritage dictionary of the English language.—4th ed.
    p.    cm.
    ISBN 0-395-82517-2 (hardcover) — ISBN 0-618-08230-1
(hardcover with CD ROM)
    1. English language–Dictionaries
PE1628 .A623 2000
423–dc21

00-025369

Manufactured in the United States of America

**com·po·sure** (kəm-pō′zhər) *n.* A calm or tranquil state of mind; self-possession. [From COMPOSE.]

**com·pote** (kŏm′pōt) *n.* **1.** Fruit stewed or cooked in syrup. **2.** A long-stemmed dish used for holding fruit, nuts, or candy. [French, from Old French *composte*, mixture, from Latin *composita*, feminine past participle of *compōnere*, to put together. See COMPONENT.]

**com·pound**[1] (kŏm-pound′, kəm-, kŏm′pound′) *v.* **-pound·ed, -pound·ing, -pounds** *—tr.* **1.** To combine so as to form a whole; mix. **2.** To produce or create by combining two or more ingredients or parts: *pharmacists compounding prescriptions.* **3.** To settle (a debt, for example) by agreeing on an amount less than the claim; adjust. **4.** To compute (interest) on the principal and accrued interest. **5.** To add to; increase: *High winds compounded the difficulties of the firefighters.* *—intr.* **1.** To combine in or form a compound. **2.** To come to terms; agree. ❖ *adj.* (kŏm′pound′, kŏm-pound′, kəm-) **1.** Consisting of two or more substances, ingredients, elements, or parts. **2.** *Botany* Composed of more than one part. ❖ *n.* (kŏm′pound′) **1.** A combination of two or more elements or parts. See synonyms at **mixture.** **2.** *Linguistics* A word that consists either of two or more elements that are independent words, such as *loudspeaker, baby-sit,* or *high school,* or of specially modified combining forms of words, such as Greek *philosophia,* from *philo-,* "loving," and *sophia,* "wisdom." **3.** *Chemistry* A pure, macroscopically homogeneous substance consisting of atoms or ions of two or more different elements in definite proportions that cannot be separated by physical means. A compound usually has properties unlike those of its constituent elements. **4.** *Botany* **a.** A leaf whose blade is divided into two more distinct leaflets. **b.** A pistil composed of two or more united carpels. [Alteration of Middle English *compounen,* from Old French *componre, compondre,* to put together, from Latin *compōnere.* See COMPONENT.] —**com·pound′a·ble** *adj.* —**com·pound′er** *n.*

**com·pound**[2] (kŏm′pound′) *n.* **1.** A building or buildings, especially a residence or group of residences, set off and enclosed by a barrier. **2.** An enclosed area used for confining prisoners of war. [Alteration of Malay *kampong,* village.]

**com·pound-com·plex sentence** (kŏm′pound-kŏm′plěks) *n.* A sentence consisting of at least two coordinate independent clauses and one or more dependent clauses.

**compound eye** *n.* The eye of most insects and some crustaceans, which is composed of many light-sensitive elements, each having its own refractive system and each forming a portion of an image.

**compound fraction** *n.* See **complex fraction.**

**compound fracture** *n.* A fracture in which broken bone fragments lacerate soft tissue and protrude through an open wound in the skin.

**compound gland** *n.* A gland composed of branching duct systems that combine, eventually to open into a secretory duct.

**compound interest** *n.* Interest computed on the accumulated unpaid interest as well as on the original principal.

**compound lens** *n.* See **lens** (sense 2).

**compound microscope** *n.* A microscope consisting of an objective and an eyepiece at opposite ends of an adjustable tube.

**compound number** *n.* A quantity that is expressed in terms of two or more different units, such as 10 pounds 5 ounces or 3 feet 4 inches.

**compound sentence** *n.* A sentence of two or more coordinate independent clauses, often joined by a conjunction or conjunctions, as *The problem was difficult, but I finally found the answer.*

**compound sugar** *n.* A sugar that yields two or more monosaccharides on hydrolysis.

**com·pra·dor** also **com·pra·dore** (kŏm′prə-dôr′) *n.* **1.** An intermediary; a go-between. **2.** A native-born agent in China and certain other Asian countries formerly employed by a foreign business to serve as a collaborator or intermediary in commercial transactions. [Portuguese, from Late Latin *comparātor,* buyer, from Latin *comparāre,* to buy : *com-,* com- + *parāre,* to get; see **perə-**[1] in Appendix I.]

**com·pre·hend** (kŏm′prĭ-hĕnd′) *tr.v.* **-hend·ed, -hend·ing, -hends** **1.** To take in the meaning, nature, or importance of; grasp. See synonyms at **apprehend. 2.** To take in as a part; include. See synonyms at **include.** [Middle English *comprehenden,* from Latin *comprehendere* : *com-,* com- + *prehendere,* to grasp; see **ghend-** in Appendix I.] —**com′pre·hend′i·ble** *adj.* —**com′pre·hend′ing·ly** *adv.*

**com·pre·hen·si·ble** (kŏm′prĭ-hĕn′sə-bəl) *adj.* Readily comprehended or understood; intelligible. [Latin *comprehēnsibilis,* from *comprehēnsus,* past participle of *comprehendere,* to comprehend. See COMPREHEND.] —**com′pre·hen′si·bil′i·ty** *n.* —**com′pre·hen′si·bly** *adv.*

**com·pre·hen·sion** (kŏm′prĭ-hĕn′shən) *n.* **1a.** The act or fact of grasping the meaning, nature, or importance of; understanding. **b.** The knowledge that is acquired in this way. **2.** Capacity to include. **3.** *Logic* The sum of meanings and corresponding implications inherent in a term. [Middle English *comprehensioun,* from Latin *comprehēnsiō, comprehēnsiōn-,* from *comprehēnsus,* past participle of *comprehendere,* to comprehend. See COMPREHEND.]

**com·pre·hen·sive** (kŏm′prĭ-hĕn′sĭv) *adj.* **1.** So large in scope or content as to include much: *a comprehensive history of the revolution.* **2.** Marked by or showing extensive understanding: *comprehensive knowledge.* ❖ *n.* **1.** Examinations covering the entire field of major study, given in the final undergraduate or graduate year of college. Often used in the plural. **2.** A preliminary layout showing all the elements planned for an advertisement. [Late Latin *comprehēnsīvus,* conceivable, from Latin *comprehēnsus,* past participle of *comprehendere,* to comprehend. See COMPREHEND.] —**com′pre·hen′sive·ly** *adv.* —**com′pre·hen′sive·ness** *n.*

**com·press** (kəm-prĕs′) *tr.v.* **-pressed, -press·ing, -press·es 1.** To press together: *compressed her lips.* **2.** To make more compact by or as if by pressing. **3.** *Computer Science* To transform (data) to minimize the space required for storage or transmission: *compressed the file so that it could be downloaded efficiently.* ❖ *n.* (kŏm′prĕs′) **1.** *Medicine* A soft pad of gauze or other material applied with pressure to a part of the body to control hemorrhage or to supply heat, cold, moisture, or medication to alleviate pain or reduce infection. **2.** A machine for compressing material. [Middle English *compressen,* from Old French *compresser,* from Late Latin *compressāre,* frequentative of Latin *comprimere* : *com-,* com- + *premere,* to press; see **per-**[4] in Appendix I.]

**com·pressed** (kəm-prĕst′) *adj.* **1.** Pressed together or into less volume or space. **2.** *Biology* Flattened, especially laterally or lengthwise, as certain leafstalks or the bodies of many fishes.

**compressed air** *n.* Air under greater than atmospheric pressure, especially when used to power a mechanical device or to provide a portable supply of oxygen.

**com·press·i·ble** (kəm-prĕs′ə-bəl) *adj.* That can be compressed: *compressible packing materials; a compressible box.* —**com·press′i·bil′i·ty, com·press′i·ble·ness** *n.*

**com·pres·sion** (kəm-prĕsh′ən) *n.* **1a.** The act or process of compressing. **b.** The state of being compressed. **2a.** The process by which the working substance in a heat engine, such as the vapor mixture in the cylinder of an internal-combustion engine, is compressed. **b.** The engine cycle during which this process occurs. **3.** *Computer Science* The process by which data is compressed into a form that minimizes the space required to store or transmit it. —**com·pres′sion·al** *adj.*

**compression ratio** *n.* In an internal combustion engine, the ratio of the maximum to the minimum volume within the cylinder, between the piston and cylinder head.

**compression wave** *n.* A wave propagated by means of the compression of a fluid, as a sound wave in air is.

**com·pres·sive** (kəm-prĕs′ĭv) *adj.* Serving to or able to compress. —**com·pres′sive·ly** *adv.*

**com·pres·sor** (kəm-prĕs′ər) *n.* One that compresses, especially: **a.** *Mechanics* A pump or other machine that increases the pressure of a gas. **b.** *Medicine* An instrument or device that compresses, such as a forceps or clamp. **c.** *Anatomy* A muscle that causes compression of a body part.

**com·prise** (kəm-prīz′) *tr.v.* **-prised, -pris·ing, -pris·es 1.** To consist of; be composed of: *"The French got . . . French Equatorial Africa, comprising several territories"* (Alex Shoumatoff). **2.** To include; contain: *"The word 'politics' . . . comprises, in itself, a difficult study of no inconsiderable magnitude"* (Charles Dickens). See synonyms at **include. 3.** *Usage Problem* To compose; constitute: *"Put together the slaughterhouses, the steel mills, the freight yards . . . that comprised the city"* (Saul Bellow). [Middle English *comprisen,* from Old French *compris,* past participle of *comprendre,* to include, from Latin *comprehendere, comprēndere.* See COMPREHEND.] —**com·pris′a·ble** *adj.*

**Usage Note** The traditional rule states that the whole *comprises* the parts and the parts *compose* the whole. In strict usage: *The Union comprises 50 states. Fifty states compose* (or *constitute* or *make up*) *the Union.* Even though careful writers often maintain this distinction, *comprise* is increasingly used in place of *compose,* especially in the passive: *The Union is comprised of 50 states.* Our surveys show that opposition to this usage is abating. In the 1960s, 53 percent of the Usage Panel found this usage unacceptable; in 1996, only 35 percent objected. See Usage Note at **include.**

**com·pro·mise** (kŏm′prə-mīz′) *n.* **1a.** A settlement of differences in which each side makes concessions. **b.** The result of such a settlement. **2.** Something that combines qualities or elements of different things: *The incongruous design is a compromise between high tech and early American.* **3.** A concession to something detrimental or pejorative: *a compromise of morality.* ❖ *v.* **-mised, -mis·ing, -mis·es** *—tr.* **1.** To settle by concessions. **2.** To expose or make liable to danger, suspicion, or disrepute: *an embassy that was compromised by hidden listening devices.* **3.** *Obsolete* To pledge mutually. *—intr.* To make a compromise. [Middle English *compromis,* from Old French, from Latin *comprōmissum,* mutual promise, from neuter past participle of *comprōmittere,* to promise mutually : *com-,* com- + *prōmittere,* to promise; see PROMISE.] —**com′pro·mis′er** *n.*

**comp time** *n.* *Informal* Compensatory time.

**Comp·ton** (kŏmp′tən) A city of southern California, a residential and industrial suburb between Los Angeles and Long Beach. Population: 90,454.

**Compton, Arthur Holly** 1892–1962. American physicist. He shared a 1927 Nobel Prize for his discovery of the Compton effect.

**Compton effect** *n.* The increase in wavelength of electromagnetic radiation, especially of an x-ray or a gamma-ray photon, scattered by an electron. [After Arthur Holly COMPTON.]

**comp·trol·ler** (kŏmp′trō′lər, kŏmp-trō′-, kən-trō′-) *n.* Variant of **controller** (sense 2).

**com·pul·sion** (kəm-pŭl′shən) *n.* **1a.** The act of compelling. **b.** The state of being compelled. **2a.** An irresistible impulse to act, regardless of the rationality of the motivation: *"The compulsion to protect the powerful from the discomfort of public disclosure feeds further abuse and neglect"* (Boston Globe). **b.** An act or acts performed in response to such an impulse. [Middle English, from Old French, from Late Latin *compulsiō, compulsiōn-,* from Latin *compulsus,* past participle of *compellere,* to compel. See COMPEL.]

**com·pul·sive** (kəm-pŭl′sĭv) *adj.* **1.** Having the capacity to compel: *a frightening, compulsive novel.* **2.** *Psychology* Caused or conditioned by



**compound**[1]
*left:* pinnate compound leaf
*right:* palmate compound leaf





**compound eye**
close-up of the eyes of a horsefly

| | |
|---|---|
| ă pat | oi boy |
| ā pay | ou out |
| âr care | ŏŏ took |
| ä father | ōō boot |
| ĕ pet | ŭ cut |
| ē be | ûr urge |
| ĭ pit | th thin |
| ī pie | th this |
| îr pier | hw which |
| ŏ pot | zh vision |
| ō toe | ə about, item |
| ô paw | ♦ regionalism |

Stress marks: ′ (primary); ′ (secondary), as in dictionary (dĭk′shə-nĕr′ē)

379

# EXHIBIT 16

# Paperback
# Oxford
# English
# Dictionary

**The world's most
trusted dictionaries**



*wherever you are*

CONFIDENTIAL

NEONODE0018632

# OXFORD
UNIVERSITY PRESS

Great Clarendon Street, Oxford, OX2 6DP,
United Kingdom

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide. Oxford is a registered trade mark of
Oxford University Press in the UK and in certain other countries

© Oxford University Press 1979, 1983, 1988, 1994, 2002, 2006, 2012

Database right Oxford University Press (makers)

First Edition published in 1979
Second Edition published in 1983
Third Edition published in 1988
Fourth Edition published in 1994
Fifth Edition published in 2002
Sixth Edition published in 2006
Seventh Edition published in 2012

Impression: 11

All rights reserved. No part of this publication may be reproduced, stored in
a retrieval system, or transmitted, in any form or by any means, without the
prior permission in writing of Oxford University Press, or as expressly permitted
by law, by licence or under terms agreed with the appropriate reprographics
rights organization. Enquiries concerning reproduction outside the scope of the
above should be sent to the Rights Department, Oxford University Press, at the
address above

You must not circulate this work in any other form
and you must impose this same condition on any acquirer

British Library Cataloguing in Publication Data

Data available

Library of Congress Cataloguing in Publication Data

Data available

ISBN 978-0-19-964094-2

Printed and bound in Great Britain by Clays Ltd, Elcograf S.p.A.

Neonode Smartphone LLC, Exhibit 2049
Page 2049 - 2
IPR2021-01041, Google LLC v. Neonode Smartphone LLC

CONFIDENTIAL                                    NEONODE0018633

**flautist** /flaw-tist/ n. a flute player.

**flavour** (US **flavor**) n. **1** the distinctive taste of a food or drink. **2** a particular quality: *balconies gave the building a Spanish flavour*. ● v. give flavour to food or drink by adding an ingredient. □ **flavour of the month** a person or thing that has recently become very popular. – ORIGIN Old French *flaor* 'a smell'.

**flavouring** (US **flavoring**) n. a substance used to give more flavour to food or drink.

**flaw** n. **1** a mark or fault that spoils something. **2** a weakness or mistake. ● v. (usu. as adj. **flawed**) spoil or weaken. ■ **flawless** adj. **flawlessly** adv. – ORIGIN perh. from Old Norse, 'stone slab'.

**flax** n. **1** a blue-flowered plant that is grown for its seed (linseed) and for thread made from its stalks. **2** thread made from flax, used to make linen.

**flaxen** adj. literary (of hair) pale yellow.

**flay** v. **1** strip the skin from a body or carcass. **2** whip or beat very harshly. **3** criticize harshly.

**flea** n. a small wingless jumping insect which feeds on the blood of mammals and birds. □ **a flea in your ear** a sharp reprimand.

**flea market** n. a street market selling second-hand goods.

**fleapit** n. Brit. informal a run-down, dirty cinema.

**fleck** n. **1** a very small patch of colour or light. **2** a small particle. ● v. mark or dot with flecks.

**fled** past and past part. of **flee**.

**fledge** /flej/ v. (**fledges, fledging, fledged**) **1** (of a young bird) develop wing feathers that are large enough for flight. **2** (as adj. **fledged**) having just taken on a particular role: *a newly fledged Detective Inspector*. – ORIGIN Old English, 'ready to fly'.

**fledgling** (also **fledgeling**) n. a young bird that has just acquired the ability to fly. ● adj. new and inexperienced: *fledgling democracies*.

**flee** v. (**flees, fleeing, fled**) run away.

**fleece** n. **1** the wool coat of a sheep. **2** a soft, warm fabric with a pile, or a garment made from this. ● v. (**fleeces, fleecing, fleeced**) informal swindle someone by charging them too much money. ■ **fleecy** adj.

**fleet**[1] n. **1** a group of ships, vehicles, or aircraft travelling together or having the same owner. **2** (**the fleet**) a country's navy.

**fleet**[2] adj. fast and nimble. □ **fleet of foot** able to walk or move swiftly.

**fleeting** adj. lasting for a very short time. ■ **fleetingly** adv.

**Fleming** /flem-ing/ n. **1** a Flemish person. **2** a member of the Flemish-speaking people living in northern and western Belgium.

**Flemish** /flem-ish/ n. **1** (**the Flemish**) the people of Flanders, a region divided between Belgium, France, and the Netherlands. **2** the Dutch language as spoken in Flanders. ● adj. relating to Flanders or the Flemish.

**flesh** n. **1** the soft substance in the body consisting of muscle and fat. **2** the edible soft part of a fruit or vegetable. **3** (**the flesh**) the physical aspects and needs of the body: *pleasures of the flesh*. ● v. (**flesh something out**) make something more detailed. □ **your flesh and blood** a close relative; your family. **in the flesh** in person or (of a thing) in its actual state.

**fleshly** adj. relating to the body and its needs.

**fleshpots** pl. n. places where people can satisfy their sexual desires. – ORIGIN from the *fleshpots of Egypt* mentioned in the Bible (Book of Exodus).

**flesh wound** n. a wound that breaks the skin but does not damage bones or organs.

**fleshy** adj. (**fleshier, fleshiest**) **1** having much flesh; plump. **2** (of leaves or fruit) soft and thick. ■ **fleshiness** n.

**fleur-de-lis** /fler-duh-lee/ (also **fleur-de-lys**) n. (pl. **fleurs-de-lis** /fler-duh-lee/) a representation of a lily made up of three petals tied together near their bases. – ORIGIN Old French *flour de lys* 'flower of the lily'.

**flew** past of **fly**[1].

**flex**[1] v. **1** bend a limb or joint. **2** tighten a muscle. **3** warp or bend and then return to shape.

**flex**[2] n. Brit. a flexible insulated cable used for carrying electric current to an appliance. – ORIGIN from **flexible**.

**flexible** adj. **1** able to bend easily without breaking. **2** able to change or be changed to adapt to different circumstances. ■ **flexibility** n. **flexibly** adv.

**flexion** /flek-sh'n/ n. the action of bending or the state of being bent.

**flexitime** n. a system allowing some flexibility as to when employees start and finish work, as long as they work a set number of hours.

**flibbertigibbet** /flib-ber-ti-jib-bit/ n. a person who is not interested in serious things.

**flick** v. **1** make a sudden sharp movement. **2** hit or remove with a quick light movement. **3** (**flick through**) look quickly through a book, magazine, etc. ● n. **1** a sudden sharp movement up and down or from side to side. **2** (**the flicks**) Brit. informal the cinema.

**flicker** v. (**flickers, flickering, flickered**) **1** shine or burn unsteadily. **2** appear briefly: *amusement flickered in his eyes*. **3** make small, quick movements. ● n. **1** a flickering movement or light. **2** a brief stirring of a feeling. – ORIGIN Old English, 'to flutter'.

**flick knife** n. Brit. a knife with a blade that springs out from the handle when a button is pressed.

**flier** n. var. of **flyer**.

**flight** n. **1** the action of flying. **2** a journey made in an aircraft or in space. **3** the path of something through the air. **4** the action of escaping from something; flight. **5** a

Neonode Smartphone LLC, Exhibit 2049
Page 2049 - 3
IPR2021-01041, Google LLC v. Neonode Smartphone LLC

**glass** n. **1** a hard transparent substance made by fusing sand with soda and lime. **2** a drinking container made of glass. **3** esp. Brit. a mirror. •v. cover or enclose with glass.
■ **glassful** n. **glassware** n.

**glass-blowing** n. the craft of making glassware by blowing semi-liquid glass through a long tube.

**glass ceiling** n. a situation in which certain groups, especially women and minorities, find that progress in a profession is blocked although there are no official barriers to advancement.

**glasses** pl. n. a pair of lenses set in a frame that rests on the nose and ears, used to correct eyesight.

**glass fibre** n. esp. Brit. a strong material containing embedded glass filaments for reinforcement.

**glasshouse** n. Brit. a greenhouse.

**glasspaper** n. paper covered with powdered glass, used for smoothing and polishing.

**glassy** adj. (**glassier, glassiest**) **1** resembling glass. **2** (of a person's eyes or expression) showing no interest.
■ **glassily** adv.

**Glaswegian** /glaz-wee-j'n/ n. a person from Glasgow. •adj. relating to Glasgow.

**glaucoma** /glaw-koh-muh/ n. Med. a condition of increased pressure within the eyeball, causing gradual loss of sight.

**glaze** v. (**glazes, glazing, glazed**) **1** fit panes of glass into a window frame or similar structure. **2** enclose or cover with glass. **3** cover with a glaze. **4** lose brightness and liveliness: *her eyes glazed over.* •n. **1** a glass-like substance fused on to the surface of pottery to form a hard coating. **2** a liquid such as milk or beaten egg, used to form a shiny coating on food.
– ORIGIN from **glass**.

**glazier** /glay-zi-er/ n. a person whose trade is fitting glass into windows and doors.

**gleam** v. shine brightly with reflected light. •n. **1** a faint or brief light. **2** a brief or faint sign of a quality or emotion: *a gleam of humour.*

**glean** v. **1** collect things gradually from various sources. **2** hist. gather grain that is left over from a harvest.
■ **gleaner** n.

**gleanings** pl. n. things gathered from various sources.

**glebe** /gleeb/ n. hist. a piece of land serving as part of a clergy benefice and providing income.
– ORIGIN Latin *gleba* 'land, soil'.

**glee** n. **1** great delight. **2** a song for men's voices in three or more parts.
– ORIGIN Old English, 'entertainment, music'.

**gleeful** adj. very happy, often in a gloating way.
■ **gleefully** adv.

**glen** n. a narrow valley, especially in Scotland or Ireland.

**glib** adj. (**glibber, glibbest**) using words easily, but without much thought or sincerity.

■ **glibly** adv. **glibness** n.

**glide** v. (**glides, gliding, glided**) **1** move with a smooth, quiet motion. **2** fly without power or in a glider. •n. an instance of gliding.

**glider** n. a light aircraft designed to fly without using an engine.

**glimmer** v. (**glimmers, glimmering, glimmered**) shine faintly with a wavering light. •n. **1** a faint or wavering light. **2** a faint sign of a feeling or quality: *a glimmer of hope.*

**glimpse** n. a brief or partial view. •v. (**glimpses, glimpsing, glimpsed**) see briefly or partially.

**glint** v. give out or reflect small flashes of light. •n. a small flash of reflected light.

**glissando** /glis-san-doh/ n. (pl. **glissandi** /glis-san-di/ or **glissandos**) Music a slide upwards or downwards between two notes.

**glisten** v. (of something wet or greasy) shine or sparkle. •n. a sparkling light reflected from something wet.

**glitch** n. informal **1** a sudden fault or failure of equipment. **2** an unexpected setback.

**glitter** v. (**glitters, glittering, glittered**) **1** shine with a shimmering reflected light. **2** (as adj. **glittering**) impressively successful or glamorous: *a glittering career.* •n. **1** a shimmering reflected light. **2** tiny pieces of sparkling material used for decoration. **3** an attractive but superficial quality.
■ **glittery** adj.

**glitterati** /glit-tuh-rah-ti/ pl. n. informal fashionable people involved in show business or another glamorous activity.
– ORIGIN from **glitter** and **literati**.

**glitz** n. informal showy but superficial display.
■ **glitzy** adj.
– ORIGIN from **glitter**.

**gloaming** n. (**the gloaming**) literary twilight; dusk.

**gloat** v. be smug or pleased about your own success or another person's misfortune.

**glob** n. informal a lump of a semi-liquid substance.
– ORIGIN perh. from **blob** and **gob**.

**global** adj. **1** relating to the whole world; worldwide. **2** relating to or including the whole of something, or of a group of things. **3** Computing operating or applying through the whole of a file or program.
■ **globalist** n. **globally** adv.

**globalization** (or **globalisation**) n. the process by which businesses start operating on a global scale.
■ **globalize** v.

**global warming** n. the gradual increase in the overall temperature of the earth's atmosphere due to increased levels of carbon dioxide and other pollutants.

**globe** n. **1** a spherical or rounded object. **2** (**the globe**) the earth. **3** a spherical model of the earth with a map on the surface.

**globetrotter** n. informal a person who travels widely.
■ **globetrotting** n. & adj.

**globular** adj. **1** spherical. **2** composed of globules.

Neonode Smartphone LLC, Exhibit 2049
Page 2049 - 4
IPR2021-01041, Google LLC v. Neonode Smartphone LLC

CONFIDENTIAL                NEONODE0018635

# EXHIBIT 17

# THE

# AMERICAN HERITAGE COLLEGE

## *dic·tion·ar·y*



## THIRD EDITION

Neonode Smartphone LLC, Exhibit 2050
Page 2050 - 1
IPR2021-01041, Google LLC v. Neonode Smartphone LLC

CONFIDENTIAL

NEONODE0018636

Words are included in this Dictionary on the basis of their usage. Words that are known to have current trademark registrations are shown with an initial capital and are also identified as trademarks. No investigation has been made of common-law trademark rights in any word, because such investigation is impracticable. The inclusion of any word in this Dictionary is not, however, an expression of the Publisher's opinion as to whether or not it is subject to proprietary rights. Indeed, no definition in this Dictionary is to be regarded as affecting the validity of any trademark.

American Heritage® and the eagle logo are registered trademarks of Forbes Inc. Their use is pursuant to a license agreement with Forbes Inc.

Copyright © 1997, 1993 by Houghton Mifflin Company. All rights reserved.

No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying and recording, or by any information storage or retrieval system without the prior written permission of Houghton Mifflin Company unless such copying is expressly permitted by federal copyright law. Address inquiries to Reference Permissions, Houghton Mifflin Company, 222 Berkeley Street, Boston MA 02116.

0-395-67161-2 (UPC)

Library of Congress Cataloging-in-Publication Data
The American heritage college dictionary. —3rd ed.
    p.    cm.
    ISBN 0-395-66917-0 (plain edge). —ISBN 0-395-44638-4 (thumb edge). —ISBN 0-395-66918-9 (deluxe binding).
    1. English language—Dictionaries.   2. Americanisms.
PE1628.A6227   1993
423—dc20
                                        92-42124
                                          CIP

Manufactured in the United States of America

For information about this and other Houghton Mifflin trade and reference books and multimedia products, visit The Bookstore at Houghton Mifflin on the World Wide Web at http://www.hmco.com/trade/.

Neonode Smartphone LLC, Exhibit 2050
Page 2050 - 2
IPR2021-01041, Google LLC v. Neonode Smartphone LLC

**520**

**fleece**

**flight²**

flee from. [ME *flen* < OE *flēon*. See pleu-*.] — **fle′er** *n.*

**fleece** (flēs) *n.* **1.a.** The coat of wool of a sheep or similar animal. **b.** The wool shorn from a sheep at one time. **2.** A soft woolly covering or mass. **3.** Fabric with a soft deep pile. — *tr.v.* **fleeced, fleec·ing, fleec·es. 1.** To defraud of money or property; swindle. **2.** To shear the fleece from. **3.** To cover with or as if with fleece. [ME *fles* < OE *flēos.*] — **fleec′er** *n.*

**fleec·y** (flē′sē) *adj.* **-i·er, -i·est.** Of, resembling, or covered with fleece: *fleecy clouds.* — **fleec′i·ly** *adv.* — **fleec′i·ness** *n.*

**fleer** (flir) *intr.v.* **fleered, fleer·ing, fleers.** To smirk or laugh in contempt or derision. — *n.* A taunting, scoffing, or derisive look or gibe. [ME *flerien*, of Scand. orig.] — **fleer′ing·ly** *adv.*

**fleet¹** (flēt) *n.* **1.** A number of warships operating together under one command. **2.** A group of vessels or vehicles, such as taxicabs, owned or operated as a unit. [ME *flete* < OE *flēot* < *flēotan*, to float. See pleu-*.]

**fleet²** (flēt) *adj.* **fleet·er, fleet·est. 1.** Moving swiftly; rapid or nimble. See Syns at **fast¹. 2.** Fleeting; evanescent. — *v.* **fleet·ed, fleet·ing, fleets.** — *intr.* **1.** To move or pass swiftly. **2.** To fade out; vanish. **3.** *Archaic.* To flow. **4.** *Obsolete.* To drift. — *tr.* **1.** To cause (time) to pass quickly. **2.** *Naut.* To alter the position of (tackle or rope, for example). [Prob. < ON *fljótr.* V. < ME *fleten*, to drift, float < OE *flēotan*. See pleu-*.] — **fleet′ly** *adv.* — **fleet′ness** *n.*

**Fleet Admiral** (flēt) *n.* See **Admiral of the Fleet.**

**fleet·ing** (flē′tĭng) *adj.* Passing quickly; ephemeral. — **fleet′ing·ly** *adv.* — **fleet′ing·ness** *n.*

**Fleet Street** *n.* British journalism. [After *Fleet Street* in central London, long the headquarters of many British newspapers.]

**flei·shig** (flā′shĭk) *adj.* Consisting of, prepared with, or relating to meat or meat products. [Yiddish *fleyshik* < *fleysh*, meat < MHGer. *vleisch*, meat < OHGer. *fleisk*, flesh.]

**Flem.** *abbr.* Flemish.

**Flem·ing** (flĕm′ĭng) *n.* **1.** A native or inhabitant of Flanders. **2.** A Belgian who speaks Flemish. [ME < MDu. *Vlāming.*]

**Fleming, Sir Alexander.** 1881–1955. British bacteriologist who discovered penicillin in 1928 and shared a 1945 Nobel Prize.

**Fleming, Ian Lancaster.** 1908–64. British writer noted for his spy novels featuring the secret agent James Bond.

**Fleming, Peggy Gale.** b. 1948. Amer. figure skater who won the women's title at the 1968 Olympics.

**Flem·ish** (flĕm′ĭsh) *adj.* Of or relating to Flanders, the Flemings, or their language or culture. — *n.* **1.** The West Germanic language of the Flemings. **2.** The Flemings.

**Flens·burg** (flĕnz′bûrg, flĕns′boŏrk′). A city of N Germany on Flensburg Fjord, an arm of the Baltic Sea. Pop. 86,873.

**flense** (flĕns) *tr.v.* **flensed, flens·ing, flens·es.** To strip the blubber or skin from (a whale, for example). [Dan.] — **flens′er** *n.*

**flesh** (flĕsh) *n.* **1.a.** The soft tissue of the body of a vertebrate, consisting mainly of skeletal muscle and fat. **b.** The surface or skin of the human body. **2.** The meat of animals as distinguished from the edible tissue of fish or fowl. **3.** *Bot.* The pulpy, usu. edible part of a fruit or vegetable. **4.** Excess fatty tissue; plumpness. **5.a.** The body as opposed to the mind or soul. **b.** The physical or carnal nature of humankind. **c.** Sensual appetites. **6.** Humankind in general; humanity. **7.** One's family; kin. **8.** Substance; reality. — *v.* **fleshed, flesh·ing, flesh·es.** — *tr.* **1.** To give substance or detail to; fill out: *fleshed out the story.* **2.** To clean (a hide) of adhering flesh. **3.** To encourage (a falcon, for example) to participate in the chase by feeding it flesh from a kill. **4.** To inure to battle or bloodshed. **5.** To plunge or thrust (a weapon) into flesh. — *intr.* To become plump or fleshy; gain weight. — *idiom.* **in the flesh. 1.** Alive. **2.** In person; present. [ME < OE *flæsc.*] — **flesh′less** *adj.*

**flesh and blood** *n.* **1.** Human nature or physical existence, together with its weaknesses. **2.** A person's blood relatives; kin. **3.** Substance and depth in artistic portrayal; lifelikeness.

**flesh fly** *n.* Any of various flies of the family Sarcophagidae whose larvae are parasitic in animal tissue or feed on carrion.

**flesh·ly** (flĕsh′lē) *adj.* **-li·er, -li·est. 1.** Of or relating to the body; corporeal. See Syns at **bodily. 2.** Of, relating to, or inclined to carnality; sensual. **3.** Not spiritual; worldly. **4.** Tending to plumpness; fleshy. — **flesh′li·ness** *n.*

**flesh·pot** (flĕsh′pŏt′) *n.* **1.** A district or an establishment offering sensual pleasures or entertainment. Often used in the plural. **2.** Physical or sensual gratification.

**flesh wound** (woŏnd) *n.* A wound that penetrates the flesh but does not damage underlying bones or vital organs.

**flesh·y** (flĕsh′ē) *adj.* **-i·er, -i·est. 1.a.** Relating to, consisting of, or resembling flesh. **b.** Having abundant flesh; plump. See Syns at **fat. 2.** Having a juicy or pulpy texture. **3.** Fleshly; carnal. — **flesh′i·ness** *n.*

**fleshy fruit** *n.* A fruit that has a soft, pulpy wall.

**fletch** (flĕch) *tr.v.* **fletched, fletch·ing, fletch·es.** To feather (an arrow). [Prob. back-formation < FLETCHER.]

**fletch·er** (flĕch′ər) *n.* One who makes arrows. [ME *fleccher* < OFr. *flechier* < *fleche*, arrow, of Gmc. orig. See pleu-*.]

**Fletch·er** (flĕch′ər), **John.** 1579–1625. English playwright who collaborated with Francis Beaumont on romantic tragicomedies, including *The Maid's Tragedy* (1611).

**fleur-de-lis** or **fleur-de-lys** (flûr′də-lē′, floŏr′-) *n., pl.* **fleurs-de-lis** or **fleurs-de-lys** (flûr′də-lēz′, floŏr′-). **1.** An iris, esp. a white-flowered form of *Iris germanica.* **2.** *Her.* A device consisting of a stylized three-petaled iris flower, used as the armorial emblem of the kings of France. [ME *flour de lice* < OFr. *flor de lis* : *flor*, flower + *de*, of + *lis*, lily.]

**Fleu·ry** (flœ-rē′), **André Hercule de.** 1653–1743. French prelate who served as prime minister (1726–43) to Louis XV.

**flew** (floŏ) *v.* P.t. of **fly¹.**

**flews** (floŏz) *pl.n.* The pendulous corners of the upper lip of certain dogs, such as the bloodhound. [?]

**flex** (flĕks) *v.* **flexed, flex·ing, flex·es.** — *tr.* **1.** To bend (something pliant or elastic). **2.a.** To bend (a joint). **b.** To bend (a joint) repeatedly. **3.a.** To contract (a muscle, for example). **b.** To move by muscular control: *flexes his brow.* **4.** To exhibit or show off the strength of. — *intr.* To bend. — *n.* **1.** *Chiefly British.* Flexible insulated electric cord. **2.** The act or an instance of flexing; a bending. **3.** Pliancy; flexibility. — *idiom.* **flex (one's) muscles.** *Informal.* To exhibit or show off one's strength. [Lat. *flectere*, *flex-*, to bend.]

**flex·a·gon** (flĕk′sə-gŏn′) *n.* A paper construction that can be flexed along its folds to reveal and conceal its faces.

**flexi–** or **flex–** *pref.* Flexible: *flexitime.* [< FLEXIBLE.]

**flex·i·ble** (flĕk′sə-bəl) *adj.* **1.a.** Capable of being bent or flexed; pliable. **b.** Capable of being bent repeatedly without injury or damage. **2.** Susceptible to influence or persuasion; tractable. **3.** Responsive to change; adaptable. [< Lat. *flexibilis* < *flexus*, p.part. of *flectere*, to bend.] — **flex′i·bil′i·ty, flex′i·ble·ness** *n.* — **flex′i·bly** *adv.*

**flex·ile** (flĕk′səl, -sīl′) *adj.* Flexible.

**flex·ion** (flĕk′shən) *n.* **1.** Also **flec·tion.** *Anat.* **a.** The bending of a joint or limb by the action of flexors. **b.** The resulting condition of being bent. **2.** A part that is bent. [Lat. *flexiō, flexiōn-*, a bending < *flexus*, p.part. of *flectere*, to bend.]

**flex·i·time** (flĕk′si-tīm′) *n.* See **flextime.**

**flex·og·ra·phy** (flĕk-sŏg′rə-fē) *n.* A system of printing on a rotary press employing water-based ink, used esp. for printing on plastic or cardboard. — **flex′og′ra·pher** *n.* — **flex′o·graph′ic** (-sə-grăf′ĭk) *adj.* — **flex′o·graph′i·cal·ly** *adv.*

**flex·or** (flĕk′sər) *n.* A muscle that when contracted acts to bend a joint or limb in the body. [NLat. < Lat. *flexus*, p.part. of *flectere*, to bend.]

**flex·time** (flĕks′tīm′) *n.* A system by which employees may schedule their work, esp. their starting and finishing hours.

**flex·u·ous** (flĕk′shoŏ-əs) *adj.* Bending or winding alternately from side to side; sinuous. [< Lat. *flexuōsus* < *flexus*, a bending, a turning < *flectere*, to bend.] — **flex′u·os′i·ty** (-ŏs′i-tē) *n.* — **flex′u·ous·ly** *adv.*

**flex·ure** (flĕk′shər) *n.* **1.** A curve, turn, or fold. **2.** The act or an instance of bending or flexing; flexion. — **flex′ur·al** *adj.*

**fley** (flā) *tr.v.* **fleyed, fley·ing, fleys.** *Scots.* To frighten. [ME *fleien* < OE *flȳgan, flēgan*. See pleu-*.]

**flib·ber·ti·gib·bet** (flĭb′ər-tē-jĭb′ĭt) *n.* A silly, scatterbrained, or garrulous person. [ME *flipergebet.*]

**flic** (flĭk) *n.* *Slang.* A police officer, esp. in France. [Fr.]

**flick¹** (flĭk) *n.* **1.a.** A light quick blow, jerk, or touch. **b.** The sound accompanying this motion. **2.** A light splash, dash, or daub. — *v.* **flicked, flick·ing, flicks.** — *tr.* **1.** To touch or hit with a light quick blow. **2.** To cause to move with a light blow; snap. **3.** To remove with a light quick blow. — *intr.* To twitch or flutter. [Imit.] — **flick′a·ble** *adj.*

**flick²** (flĭk) *n.* *Slang.* A movie. [Short for FLICKER¹.]

**flick·er¹** (flĭk′ər) *v.* **-ered, -er·ing, -ers.** — *intr.* **1.** To move waveringly; flutter. **2.** To burn unsteadily. — *tr.* To cause to move waveringly. — *n.* **1.** A brief movement; a tremor. **2.** An inconstant or wavering light. **3.** A brief or slight sensation. **4.** *Slang.* A movie. [ME *flikeren*, to flutter < OE *flicerian.*]

**flick·er²** (flĭk′ər) *n.* Any of various large North American woodpeckers of the genus *Colaptes*, esp. *C. auratus*, the common flicker, which has a brown back, spotted breast, and white rump. [Perh. < FLICK¹.]

**flied** (flīd) *intr.v.* P.t. and p.part. of **fly¹** 7.

**fli·er** also **fly·er** (flī′ər) *n.* **1.** One, such as an insect or a bird, that flies with wings. **2.** The pilot of an aircraft. **3.** A passenger in an aircraft. **4.** A pamphlet or circular for mass distribution. **5.** A step in a straight stairway. **6.** *Informal.* A daring venture.

**flies** (flīz) *v.* Third pers. sing. pr.t. of **fly¹.**

**flight¹** (flīt) *n.* **1.a.** The motion of an object in or through a medium, esp. through the earth's atmosphere or through space. **b.** An instance of such motion. **c.** The distance covered in such motion. **2.a.** The act or process of flying through the air by means of wings. **b.** The ability to fly. **3.** A swift passage or movement. **4.** A scheduled airline run or trip. **5.** A group, esp. of birds or aircraft, flying together. **6.** A number of aircraft in the U.S. Air Force forming a subdivision of a squadron. **7.** An exuberant or transcendent effort or display: *flights of oratory.* **8.** A series of stairs rising from one landing to another. — *intr.v.* **flight·ed, flight·ing, flights.** To migrate or fly in flocks. [ME < OE *flyht.* See pleu-*.]

**flight²** (flīt) *n.* The act or an instance of running away; an escape. [ME < OE *flyht.* See pleu-*.]

**flight** a
**flight** l
pered
**flight** d
a ru
used
**flight** d
chan
**flight**
of a
**flight**-
birds
**flight**
ed, d
**flight**
pref
**flight** 
aero
**flight**-
(an a
**flight** d
aircr
**flight**
unst
skitt
**flim·**
**2.** ⟨
–flar
flam
**flim·**
stan
ity;
mak
per.
**flinch**
or w
as fi
act
orig
**flin·**d
flen
**Flin·**
Aus
**Flinde**
837
**fling**
thro
sudd
tivit
— ii
The
puls
effo
**flint**
stru
**b.** A
igni
hun
**Flint**
on t
**flint**
sma
**flint**
tica
**flint·**
**flint·**
flin
the
**Flint**
the
**flint·**
flin
**flip** (f
wit
spir
mo
ly;
**1.**
ersa
qui
bro
rea
flip
**c.**
mi
anc
Ma
(on
thu
**flip·**
im
the

Neonode Smartphone LLC, Exhibit 2050
Page 2050 - 3
IPR2021-01041, Google LLC v. Neonode Smartphone LLC

NEONODE0018638

*fleur-de-lis*
On a gold florin

ict; **ass·ful** (glăs'fŏŏl') *n.* The quantity that a glass can hold.
tion **ss harmonica** *n. Mus.* An instrument consisting of a set of
; see graduated glass bowls on a rotating spindle that produce nes when a finger is pressed to their moistened rims.

lliant **ss·house** (glăs'hous') *n.* **1.** See **glasswork** 3. **2.** *Chiefly* Ger, *itish.* A greenhouse.

**ss·ine** (glă-sēn') *n.* A nearly transparent resilient glazed pacted r resistant to the passage of air and grease.

**ss jaw** *n. Sports.* Vulnerability of a boxer to a punch.

that **ss·mak·er** (glăs'mā'kər) *n.* One that makes glass, the **glass'mak'ing** *n.*

that **ss snake** *n.* Any of several slender snakelike lizards of the tion nus *Ophisaurus*, having a tail that breaks or snaps off read. [Fr. and later regenerates. [< the brittleness of its tail.]

. of **ss·ware** (glăs'wâr') *n.* Objects, esp. containers, made of ss.

ffings **ss wool** *n.* Fine-spun fibers of glass used esp. for insulation wing d in air filters.

**ss·work** (glăs'wûrk') *n.* **1.a.** The manufacture of glassware r glass. **b.** The cutting and fitting of glass panes; glaziery. onta- See **glassware. 3. glassworks.** *(used with a sing. v.)* An rium stablishment where glass is manufactured.

mph **ss·wort** (glăs'wûrt', -wôrt') *n.* Any of various plants of and e genus *Salicornia*, growing in salt marshes and having , pl alelike leaves. [< its former use in making glass.]

**ss·y** (glăs'ē) *adj.* **-i·er, -i·est. 1.** Characteristic of or re-z, or mbling glass. **2.** Lifeless; expressionless. — **glass'i·ly** *adv.* and. **-glass'i·ness** *n.*

ual **s·ton·bur·y** (glăs'tən-bĕr'ē). **1.** A municipal borough of , See W England SSW of Bristol; traditional site of King Arthur's le of Avalon. Pop. 6,773. **2.** A city of central CT SE of artford; settled in 1650. Pop. 27,901.

enis. **s·we·gian** (glăs-wē'jən, glăz-) *adj.* Of or relating to Glas-aw, Scotland. — *n.* A native or resident of Glasgow, Scot-s of nd. [Glas(gow) + *Galwegian*, person from Galloway (Med. ridis at. *Galuidia*, Galloway, a region of SW Scotland + -ian).]

oris **u·ber's salt** (glou'bərz) *n.* A sodium sulfate, a₂SO₄·10H₂O, used in paper and glass manufacturing and enis s a cathartic. [After Johann Rudolf *Glauber* (1604–68), ] erman chemist.]

tare **u·co·ma** (glou-kō'mə, glô-) *n.* Any of a group of eye dis-. To ses characterized by abnormally high intraocular fluid pres-s by re, damaged optic disk, and partial to complete loss of vi-i in on. [Lat. *glaucōma*, cataract < Gk. *glaukōma* < *glaukos*, ess. ray.] — **glau·co'ma·tous** (-kō'mə-təs) *adj.*

See **u·co·nite** (glô'kə-nīt') *n.* A dark to yellowish green clay ineral, a hydrous silicate of variable composition, ery K,Na)(Al,Fe,Mg)₂(Al,Si)₄O₁₀(OH)₂, found in greensand. Gk. *glaukon*, neut. of *glaukos*, gray + -ite¹.] — **glau'co·** gly. it'ic (-nit'ik) *adj.*

bvi- **u·cous** (glô'kəs) *adj.* **1.** Of a pale grayish or bluish green. ar· l *Bot.* Covered with a grayish, bluish, or whitish coating that easily rubbed off. [Lat. *glaucus* < Gk. *glaukos*.] — **glau'-** ous·ness *n.*

the **ze** (glāz) *n.* **1.** A thin smooth shiny coating. **2.** A thin glassy oating of ice. **3.a.** A coating of material applied to ceramics iter efore firing. **b.** A coating, as of syrup, applied to food. **c.** A ransparent coating applied to the surface of a painting to viet odify the color tones. **4.** A glassy film, as one over the eyes. ob- — *v.* **glazed, glaz·ing, glaz·es.** — *tr.* **1.** To fit, furnish, or das, ecure with glass: *glaze a window.* **2.** To apply a glaze to: aze pottery. **3.** To coat or cover thinly with ice. **4.** To give are i smooth lustrous surface to. — *intr.* **1.** To be or become um azed or glassy. **2.** To form a glaze. [< ME *glasen* < *glas*, ttle, ass < OE *glæs.* See **ghel-²·**.] — **glaz'er** *n.*

su- **zier** (glā'zhər) *n.* One that cuts and fits glass. [ME *glasier* me- < *glas*, glass. See GLAZE.] — **gla'zier·y** (-zhə-rē) *n.*

. A **z·ing** (glā'zĭng) *n.* **1.a.** Glasswork. **b.** Glass set or made to ine. e set in frames. **2.a.** A glaze. **b.** The act or process of ap-sed lying a glaze.

r or **zu·nov** (glăz'ə-nôf', -nôv', glə-zŏŏ-nôf'), **Aleksandr Kon-** is a tantinovich. 1865–1936. Russian composer who worked l as ith Rimski-Korsakov to complete Borodin's opera *Prince* ing gor (1890).

— v. abbr. Guilder.

ase am (glēm) *n.* **1.** A brief beam or flash of light. **2.** A steady ith ut subdued shining; a glow. **3.** A brief or dim indication; a see race. — *v.* **gleamed, gleam·ing, gleams.** — *intr.* **1.** To emit of gleam; flash or glow. **2.** To be manifested or indicated brief-To y or faintly. — *tr.* To cause to emit a flash of light. [ME *glem* ing < OE *glæm.* See ghel-²·.] — **gleam'er** *n.*

an (glēn) *v.* **gleaned, glean·ing, gleans.** — *intr.* To glean an grain. — *tr.* **1.** To gather (grain) left behind by reapers. **2.** To h a ollect bit by bit. [ME *glenen* < OFr. *glener* < LLat. *glennāre*, rob. of Celt. orig.] — **glean'er** *n.*

nen **an·ings** (glē'nĭngz) *pl.n.* Things collected bit by bit. un- **ea·son** (glē'sən), **Herbert John ("Jackie").** 1916–87. Amer. ntertainer best remembered for his portrayal of Ralph Kram-ass. den on *The Honeymooners* (1952–57).

ebe (glēb) *n.* **1.** A plot of land belonging or yielding profit to eye n English parish church or an ecclesiastical office. **2.** *Archa-* ic. The soil or earth; land. [Lat. *glēba*, clod.]

---

**glede** (glēd) *n.* Any of several birds of prey, esp. a European kite (*Milvus milvus*). [ME < OE *glida.* See **ghel-²·**.]

**glee** (glē) *n.* **1.** Jubilant delight; joy. **2.** *Mus.* An unaccompanied part song for three or more male voices that was popular in the 18th century. [ME *gle*, entertainment < OE *glēo.* See **ghel-²·**.]

**glee club** *n. Mus.* A group of singers who perform usu. short pieces of choral music.

**gleed** (glēd) *n. Archaic.* A glowing coal; an ember. [ME *glede* < OE *glēd.* See **ghel-²·**.]

**glee·ful** (glē'fəl) *adj.* Full of jubilant delight; joyful. — **glee'-ful·ly** *adv.* — **glee'ful·ness** *n.*

**glee·man** (glē'mən) *n. Mus.* A medieval itinerant singer; a minstrel. [ME *gleman* < OE *glēoman* : *glēo*, minstrelsy; see GLEE + *man*, man; see MAN.]

**glee·some** (glē'səm) *adj. Archaic.* Gleeful.

**gleet** (glēt) *n.* **1.** Inflammation of the urethra resulting from chronic gonorrhea and characterized by a mucopurulent discharge. **2.** The discharge characteristic of gleet. [ME *glet*, slime < OFr. *glette* < Lat. *glittus*, sticky.] — **gleet'y** *adj.*

**gleg** (glĕg) *adj. Scots.* Alert and quick to respond. [ME, clear-sighted < ON *glöggr.* See **ghel-²·**.]

**glen** (glĕn) *n.* A valley. [ME < Sc.Gael. *gleann* < OIr. *glenn.*]

**Glen Bur·nie** (glĕn bûr'nē). A community of N-central MD S of Baltimore. Pop. 37,305.

**Glen Cove.** A city of SE NY on NW Long I. N of Mineola. Pop. 24,149.

**Glen·dale** (glĕn'dāl'). **1.** A city of S-central AZ, a suburb of Phoenix. Pop. 148,134. **2.** A city of S CA, a suburb of Los Angeles; located on part of the first Spanish land grant in the area (1784). Pop. 180,038.

**Glendale Heights.** A village of NE IL, a suburb of Chicago. Pop. 27,973.

**Glen·do·ra** (glĕn-dôr'ə, -dōr'ə). A city of S CA at the foot of the San Gabriel Mts. ENE of Los Angeles. Pop. 47,828.

**Glen·dow·er** (glĕn'dou'ər, glĕn-dou'-), **Owen.** 1359?–1416? Welsh rebel who led a revolt against Henry IV (1400) and summoned a parliament (1405) before being crushed by English forces (1409).

**Glen El·lyn** (ĕl'ĭn). A village of NE IL, a suburb of Chicago. Pop. 24,944.

**Glen·gar·ry** (glĕn-găr'ē) *n., pl.* **-ries.** A woolen cap that is creased lengthwise and often has short ribbons at the back. [After *Glengarry*, a valley of central Scotland.]

**Glenn** (glĕn), **John Herschel, Jr.** b. 1921. Amer. politician who was the first U.S. astronaut to orbit the earth (Feb. 20, 1962).

**Glen·view** (glĕn'vyōŏ'). A village of NE IL, a suburb of Chicago. Pop. 37,093.

**gley** (glā) *n.* A sticky, bluish-gray subsurface layer of clay found in some waterlogged soils. [Russ. dial. *glei*, clay.]

**gli·a** (glē'ə, glī'ə) *n.* See **neuroglia.** — **gli'al** (glē'əl, glī'əl) *adj.*

**gli·a·din** (glī'ə-dĭn) *n.* Any of several simple proteins derived from rye or wheat gluten. [Ital. *gliadina* < Med.Gk. *glia*, glue. See ZOOGLEA.]

**glib** (glĭb) *adj.* **glib·ber, glib·best. 1.a.** Performed with a natural offhand ease: *glib conversation.* **b.** Showing little thought, preparation, or concern. **2.** Marked by ease and fluency of speech or writing that often suggests or stems from insincerity, superficiality, or deceitfulness. [Poss. of LGer. orig. See **ghel-²·**.] — **glib'ly** *adv.* — **glib'ness** *n.*

**glide** (glīd) *v.* **glid·ed, glid·ing, glides.** — *intr.* **1.** To move in a smooth, effortless manner. See Syns at **slide. 2.** To move silently and furtively. **3.** To occur or pass imperceptibly. **4.** To fly without propulsion. Used of an aircraft. **5.** *Mus.* To blend one tone into the next; slur. **6.** *Ling.* To articulate a glide in speech. — *tr.* To cause to move or pass smoothly, silently, or imperceptibly. — *n.* **1.** The act of gliding. **2.** *Mus.* A slur. **3.** *Ling.* **a.** The transitional sound made in passing between the articulatory positions of two speech sounds. **b.** See **semivowel.** [ME *gliden* < OE *glidan.* See **ghel-²·**.]

**glide path** *n.* The path of descent of an aircraft, delineated by a radio beam that directs the pilot in landing the craft.

**glid·er** (glī'dər) *n.* **1.** A light aircraft that glides after being towed aloft or launched from a catapult. **2.** A swinging couch suspended from a vertical frame. **3.** A device that aids gliding.

**glim** (glĭm) *n.* **1.** A source of light, as a candle. **2.** The illumination given off by such a source. [Perh. short for GLIMMER.]

**glim·mer** (glĭm'ər) *n.* **1.** A dim or intermittent flicker or flash of light. **2.** A faint manifestation or indication; a trace. — *intr.v.* **-mered, -mer·ing, -mers. 1.** To emit a dim or intermittent light. **2.** To appear faintly or indistinctly. [< ME *glimeren*, to glitter, glimmer. See **ghel-²·**.]

**glimpse** (glĭmps) *n.* **1.** A brief incomplete view or look. **2.** *Archaic.* A brief flash of light. — *v.* **glimpsed, glimps·ing, glimps·es.** — *tr.* To obtain a brief incomplete view of. — *intr.* To look briefly; glance. [< ME *glimsen*, to glisten, glance. See **ghel-²·**.] — **glimps'er** *n.*

**Glin·ka** (glĭng'kə, glyĕn'kə), **Mikhail Ivanovich.** 1804–57. Russian composer of the opera *A Life for the Czar* (1836).

**glint** (glĭnt) *n.* **1.** A momentary flash of light; a sparkle. **2.** A faint or fleeting indication; a trace. — *v.* **glint·ed, glint·ing,**

---

579

glassful

—

glint



John Glenn

| | |
|---|---|
| ă pat | oi boy |
| ā pay | ou out |
| âr care | ŏŏ took |
| ä father | ōō boot |
| ĕ pet | ŭ cut |
| ē be | ûr urge |
| ĭ pit | th thin |
| ī pie | th this |
| îr pier | hw which |
| ŏ pot | zh vision |
| ō toe | ə about, |
| ô paw | item |

**Stress marks:**
' (primary);
' (secondary), as in
dictionary (dĭk'shə-nĕr'ē)

IPR2021-01041, Google LLC v. Neonode Smartphone LLC, Exhibit 2006
Page 2000 - 4

# EXHIBIT 18



DO NOT LOAN
HOLD I. D.

Neonode Smartphone LLC, Exhibit 2052
Page 2052_1
IPR2021-01041, Google LLC v. Neonode Smartphone LLC



### A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1993 by Merriam-Webster, Incorporated

Philippines Copyright 1993 by Merriam-Webster, Incorporated

First Printing 1993

Library of Congress Cataloging in Publication Data
Main entry under title:

Merriam-Webster's collegiate dictionary. — 10th ed.
    p.    cm.
  Includes index.
  ISBN 0-87779-708-0 (unindexed). — ISBN 0-87779-709-9 (indexed).
— ISBN 0-87779-710-2 (deluxe)
  1. English language—Dictionaries.   I. Merriam-Webster, Inc.
PE1628.M36    1993
423—dc20                        93-20206
                                   CIP

COLLEGIATE is a registered trademark of Merriam-Webster, Incorporated

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

123456RMcN93

Neonode Smartphone LLC, Exhibit 2052
Page 2052 - 2
IPR2021-01041, Google LLC v. Neonode Smartphone LLC

**flea·hop·per** \-,hä-pər\ n (1902) : any of various small jumping bugs that feed on cultivated plants

**flea market** n [trans. of F Marché aux Puces, a market in Paris] (1922) : a usu. open-air market for secondhand articles and antiques

**flea·pit** \-,pit\ n (1937) Brit : a dilapidated building usu. housing a movie theater

**flea·wort** \'fle-,wərt, -,wort\ n (bef. 12c) : any of three Old World plants (esp. Plantago psyllium) whose seeds are sometimes used as a mild laxative — compare PSYLLIUM SEED

**fleche** \'flash, 'flesh\ n [F, lit., arrow, fr. OF fleche, of Gmc origin; akin to MD vlieke arrow, OE fleogan to fly] (1848) : SPIRE; esp : a slender spire above the intersection of the nave and transepts of a church

**fle·chette** \fla-'shet, fle-\ n [F, fr. dim. of fleche arrow] (1915) : a small dart-shaped projectile that is clustered in an explosive warhead, dropped as a missile from an airplane, or fired from a handheld gun

**fleck** \'flek\ vt [back-formation fr. flecked spotted, fr. ME, prob. fr. ON flekkōttr, fr. flekkr spot] (14c) 1 : STREAK, SPOT ⟨whitecaps ~ed the blue sea⟩ 2 : to color as if by sprinkling with flecks ⟨his wit is ~ed with sarcasm —James Atlas⟩

**fleck** n (1598) 1 : SPOT, MARK ⟨a brown tweed with ~s of yellow⟩ 2 : FLAKE, PARTICLE ⟨~s of snow drifted down⟩

**fledge** \'flej\ vb **fledged; fledg·ing** [fledge capable of flying, fr. ME flegge, fr. OE -flycge; akin to OHG flucki capable of flying, OE fleogan to fly — more at FLY] vt (1566) of a bird : to acquire the feathers necessary for flight or independent activity ~ vi 1 : to rear until ready for flight or independent activity 2 : to cover with or as if with feathers or down 3 : to furnish (as an arrow) with feathers

**fledg·ling** \'flej-lin\ n (1830) 1 : a young bird just fledged 2 : an immature or inexperienced person 3 : one that is new ⟨a ~ company⟩

**flee** \'fle\ vb fled \'fled\; **flee·ing** [ME flen, fr. OE fleon; akin to OHG fliohan to flee] vi (bef. 12c) 1 : a : to run away often from danger or evil : FLY b : to hurry toward a place of security 2 : to pass away swiftly : VANISH ~ vt : to run away from : SHUN

**fleece** \'fles\ n [ME flees, fr. OE fleos; akin to MHG vlius fleece and perh. to L pluma feather, down] (bef. 12c) 1 : a : the coat of wool covering a wool-bearing animal (as a sheep) b : the wool obtained from a sheep at one shearing 2 : a : any of various soft or woolly coverings b : a soft bulky deep-piled knitted or woven fabric used chiefly for clothing

**fleece** vt **fleeced; fleec·ing** (1537) 1 : a : to strip of money or property by fraud or extortion b : to charge excessively for goods or services 2 : to remove the fleece from : SHEAR 3 : to dot or cover with fleecy masses

**fleeced** \'flest\ adj (1580) 1 : covered with or as if with a fleece 2 of a textile : having a soft nap

**fleech** \'flech\ vb [ME (Sc) flechen] (14c) dial : COAX, WHEEDLE

**fleecy** \'fle-se\ adj **fleec·i·er; -est** (1590) : covered with, made of, or resembling fleece ⟨a ~ winter coat⟩

**fleer** \'flir\ vi [ME fleryen, of Scand origin; akin to Norw flire to giggle] (15c) : to laugh or grimace in a coarse derisive manner : SNEER syn see SCOFF — **fleer·ing·ly** \-in-le\ adv

**fleer** n (1604) : a word or look of derision or mockery

**fleet** \'flet\ vb [ME fleten, fr. OE fleotan; akin to OHG fliozzan to float, OE flowan to flow] vi (bef. 12c) 1 obs : DRIFT 2 a archaic : FLOW b : to fade away : VANISH 3 [fleet] : to fly swiftly ~ vt : to cause (time) to pass usu. quickly or imperceptibly

**fleet** n [ME flete, fr. OE fleot ship, fr. fleotan] (13c) 1 : a number of warships under a single command; specif : an organization of ships and aircraft under the command of a flag officer 2 : GROUP 2a, b; esp : a group (as of ships, planes, or trucks) operated under unified control

**fleet** adj [prob. fr. 3fleet] (ca. 1529) 1 : swift in motion : NIMBLE 2 : EVANESCENT, FLEETING syn see FAST — **fleet·ly** adv — **fleet·ness** n

**fleet admiral** n (1946) : an admiral of the highest rank in the navy whose insignia is five stars

**fleet-foot·ed** \-,fu-təd\ adj (ca. 1743) : able to run fast

**fleet·ing** adj (1563) : passing swiftly : TRANSITORY syn see TRANSIENT — **fleet·ing·ly** \-tin-le\ adv — **fleet·ing·ness** n

**Fleet Street** \'flet-\ n [Fleet Street, London, England, center of the London newspaper district] (1882) : the London press

**fleish·ig** \'fla-shik\ adj [Yiddish fleyshik, fr. MHG vleische meaty, fr. vleish flesh, meat, fr. OHG fleisk] (1943) : made of, prepared with, or used for meat or meat products — compare MILCHIG, PAREVE

**Flem·ing** \'fle-min\ n [ME Flaming (akin to MD Vlander Flanders)] (12c) : a member of the Germanic people inhabiting northern Belgium and a small section of northern France

**Flem·ish** \'fle-mish\ adj (14c) : of, relating to, or characteristic of Flanders or the Flemings or their language

**Flemish** n (ca. 1741) 1 : the Germanic language of the Flemings that is made up of dialects of Dutch 2 pl in constr : FLEMINGS

**Flemish giant** n (1898) : any of a breed of very large solid-colored rabbits prob. of Belgian origin

**flense** \'flen(t)s\ vt **flensed; flens·ing** [D flensen or Dan & Norw flense] (1820) : to strip (as a whale) of blubber or skin

**flesh** \'flesh\ n [ME, fr. OE flæsc; akin to OHG fleisk flesh and perh. to ON flā to flay — more at FLAY] (bef. 12c) 1 : a : the soft parts of the body of an animal and esp. of a vertebrate; esp : the parts composed chiefly of skeletal muscle as distinguished from visceral structures, bone, and integuments b : sleek well-fatted condition of body c : SKIN 2 a : edible parts of an animal b : flesh of a mammal or fowl eaten as food 3 a : the physical nature of human beings ⟨the spirit indeed is willing, but the ~ is weak —Mt 26:41 (AV)⟩ b : HUMAN NATURE 4 a : human beings : MANKIND b : living beings c : STOCK, KINDRED 5 : a fleshy plant part used as food; also : the fleshy part of a fruit 6 Christian Science : an illusion that matter has sensation 7 : SUBSTANCE ⟨insights buried in the ~ of the narrative —Jan Carew⟩ — **in the flesh** : in person and alive

**flesh** vt (1530) 1 : to initiate or habituate esp. by giving a foretaste 2 archaic : GRATIFY 3 : to clothe or cover with or as if with flesh — usu. used with out 4 : to free from flesh ~ vi : to become fleshy — often used with up or out

**flesh and blood** n (bef. 12c) 1 : corporeal nature as composed of flesh and of blood 2 : near kindred — used chiefly in the phrase one's own flesh and blood 3 : SUBSTANCE, REALITY

**fleshed** \'flesht\ adj (15c) : having flesh esp. of a specified kind — often used in combination ⟨pink-fleshed⟩ ⟨thick-fleshed⟩

**flesh fly** n (14c) : a dipteran fly whose maggots feed on flesh; esp : any of a family (Sarcophagidae) of flies some of which cause myiasis

**flesh·ings** \'fle-shinz\ n pl (1860) : material removed in fleshing a hide

**flesh·ly** \'flesh-le\ adj (bef. 12c) 1 a : CORPOREAL, BODILY b : of, relating to, or characterized by indulgence of bodily appetites; esp : LASCIVIOUS ⟨~ desires⟩ c : not spiritual : WORLDLY 2 : FLESHY, PLUMP 3 : having a sensuous quality ⟨~ art⟩ syn see CARNAL

**flesh·ment** \'flesh-mənt\ n [flesh] (1605) obs : excitement associated with a successful beginning

**flesh out** vt (1880) : to make fuller or more nearly complete ⟨museums fleshing out their collections with borrowed works⟩ — **fleshed-out** adj

**flesh·pot** \'flesh-,pät\ n (1592) 1 pl : bodily comfort : LUXURY 2 : a place of lascivious entertainment — usu. used in pl.

**flesh wound** n (ca. 1674) : an injury involving penetration of the body musculature without damage to bones or internal organs

**fleshy** \'fle-she\ adj **flesh·i·er; -est** (14c) 1 a : marked by, consisting of, or resembling flesh b : marked by abundant flesh; esp : CORPULENT 2 a : SUCCULENT, PULPY ⟨the ~ texture of a melon⟩ b : not thin, dry, or membranous ⟨~ fungi⟩ — **flesh·i·ness** n

**fleshy fruit** n (1929) : a fruit (as a berry, drupe, or pome) consisting largely of soft succulent tissue

**fletch** \'flech\ vt [back-formation fr. fletcher] (ca. 1656) : FEATHER ⟨~ an arrow⟩

**fletch·er** \'fle-chər\ n [ME flecchar, fr. OF flechier, fr. fleche arrow — more at FLECHE] (14c) : a maker of arrows

**fletch·ing** \-chin\ n (ca. 1930) : the feathers on an arrow; also : the arrangement of such feathers

**fleur de coin** \,flər-də-'kwaⁿ\ adj [F a fleur de coin, lit., with the bloom of the die] (ca. 1889) : being in the preserved mint condition

**fleur-de-lis** or **fleur-de-lys** \,flər-d'l-'e, -,flər\ n, pl **fleurs-de-lis** or **fleur-de-lis** or **fleurs-de-lys** or **fleur-de-lys** \,flər-d'l-'e(z), -,flər-\ [ME flourdelis, fr. MF flor de lis, lit., lily flower] (14c) 1 : IRIS 3 2 : a conventionalized iris in artistic design and heraldry

**fleury** \'flər-e\ adj [alter. of ME flory, fr. OF flore, fr. flor flower — more at FLOWER] (15c) of a heraldic cross : having the ends of the arms broadening out into the heads of fleurs-de-lis — see CROSS illustration

**flew** past of FLY

**flews** \'flüz\ n pl [origin unknown] (1575) : the pendulous lateral parts of a dog's upper lip — see DOG illustration

fleur-de-lis 2

**flex** \'fleks\ vb [L flexus, pp. of flectere to bend] vt (ca. 1521) 1 : to bend esp. repeatedly 2 a : to move muscles so as to cause flexion of (a joint) b : to move or tense (a muscle) by contraction ~ vi : BEND — **flex one's muscles** : to demonstrate one's strength ⟨an exaggerated need to flex his political muscles —J. P. Tash⟩

**flex** n [short for flexible cord] (1905) chiefly Brit : an electric cord

**flex** n (ca. 1934) : an act or instance of flexing

**flex·i·ble** \'flek-sə-bəl\ adj (15c) 1 : capable of being flexed : PLIANT 2 : yielding to influence : TRACTABLE 3 : characterized by a ready capability to adapt to new, different, or changing requirements ⟨a foreign policy⟩ ⟨a ~ schedule⟩ syn see ELASTIC — **flex·i·bil·i·ty** \,flek-sə-'bil-ə-te\ n — **flex·i·bly** \'flek-sə-ble\ adv

**flex·ile** \'flek-səl, -,sīl\ adj (1631) : FLEXIBLE

**flex·ion** \'flek-shən\ n [L flexion-, flexio, fr. flectere] (1615) 1 : the act of flexing or bending 2 : a part bent : BEND 3 : INFLECTION 3 4 a : a bending movement around a joint in a limb (as the knee or elbow) that decreases the angle between the bones of the limb at the joint — compare EXTENSION 3b b : a forward raising of the arm or leg by a movement at the shoulder or hip joint

**flex·og·ra·phy** \flek-'sä-grə-fe\ n [flexible + -o- + -graphy] (1954) : a process of rotary letterpress printing using flexible plates and fast-drying inks — **flexo·graph·ic** \,flek-sə-'grä-fik\ adj — **flexo·graph·i·cal·ly** \-fi-k(ə-)le\ adv

**flex·or** \'flek-sər, -,sor\ n (1615) : a muscle serving to bend a body part (as a limb)

**flex·time** \'flek-,stīm\ or **flexi-time** \'flek-si-,tīm\ n (1972) : a system that allows employees to choose their own times for starting and finishing work within a broad range of available hours

**flex·u·ous** \'flek-shə-wəs\ adj [L flexuosus, fr. flexus bend, fr. flectere] (1605) 1 : having curves, turns, or windings 2 : lithe or fluid in action or movement

**flex·ur·al** \'flek-shə-rəl\ adj (1879) 1 : of, relating to, or resulting from flexure 2 : characterized by flexure

**flex·ure** \'flek-shər\ n (1592) 1 : the quality or state of being flexed : FLEXION 2 : TURN, BEND, FOLD

**fley** \'fla\ vt [ME flayen, fr. OE aflegan, fr. a-, perfective prefix + flegan to put to flight] (13c) Scot : FRIGHTEN

**flib·ber·ti·gib·bet** \,fli-bər-te-'ji-bət\ n [ME flepergebet] (15c) : a silly flighty person — **flib·ber·ti·gib·bety** \-bə-te\ adj

**flic** \'flek\ n [F] (1899) : a French police officer

**flick** \'flik\ n [imit.] (15c) 1 : a light sharp jerky stroke or movement 2 : a sound produced by a flick 3 : FLICKER 1

**flick** vt (1816) 1 a : to move or propel with or as if with a flick ⟨~ed her hair back over her shoulder⟩ ⟨~ a switch⟩ b : to activate, deactivate, or change by or as if by flicking a switch ⟨~ on a cigarette lighter⟩ ⟨~ off the radio⟩ 2 a : to strike lightly with a quick sharp motion ⟨~ed the horse with a whip⟩ b : to remove with light blows ⟨~ed an

\ə\ abut  \⁰\ kitten, F table  \ər\ further  \a\ ash  \ā\ ace  \ä\ mop, mar  \aú\ out  \ch\ chin  \e\ bet  \ē\ easy  \g\ go  \i\ hit  \ī\ ice  \j\ job  \ŋ\ sing  \ō\ go  \ó\ law  \oi\ boy  \th\ thin  \th\ the  \ü\ loot  \ú\ foot  \y\ yet  \zh\ vision  \a, k, ⁿ, œ, œ, ü, ᵫ\ see Guide to Pronunciation

Neonode Smartphone LLC, Exhibit 2052
Page 2052 - 3
IPR2021-01041, Google LLC v. Neonode Smartphone LLC

NEONODE0018672

**flick** *n* [short for *flicker*] (1920) : MOVIE

**flick·er** \ˈfli-kər\ *vb* **flick·ered; flick·er·ing** \-k(ə-)riŋ\ [ME *flikeren*, fr. OE *flicorian*] *vi* (bef. 12c) 1 : to move irregularly or unsteadily : FLUTTER 2 : to burn or shine fitfully or with a fluctuating light 3 : to appear briefly ~ *vt* 1 : to cause to flicker 2 : to produce by flickering — **flick·er·ing·ly** \-k(ə-)riŋ-lē\ *adv*

**flicker** *n* (1849) 1 a : an act of flickering b : a sudden brief movement c : a momentary quickening (a ~ of anger) d : a slight indication : HINT (a ~ of recognition) 2 : a wavering light 3 : MOVIE — often used in pl. — **flick·ery** \ˈfli-k(ə-)rē\ *adj*

**flicker** *n* [prob. imit. of its call] (1809) : a large barred and spotted No. American woodpecker (*Colaptes auratus*) with a brown back that commonly forages on the ground for ants — compare RED-SHAFTED FLICKER, YELLOW-SHAFTED FLICKER

**flick–knife** \ˈflik-ˌnīf\ *n* (1957) *Brit* : SWITCHBLADE

**flied** *past of* FLY

**fli·er** \ˈflī-ər\ *n* (15c) 1 : one that flies; *specif* : AIRMAN 2 : a reckless or speculative venture — usu. used in the phrase *take a flier* 3 usu. **flyer** : an advertising circular

**flight** \ˈflīt\ *n, often attrib* [ME, fr. OE *flyht*; akin to MD *vlucht* flight, OE *fleogan* to fly] (bef. 12c) 1 a : an act or instance of passing through the air by the use of wings (the ~ of a bee) b : the ability to fly (~ is natural to birds) 2 a : a passing through the air or through space outside the earth's atmosphere (~ of an arrow) (~ of a rocket to the moon) b : the distance covered in such a flight c : swift movement 3 a : a trip made by or in an airplane or spacecraft b : a scheduled airplane trip 4 : a group of similar beings or objects flying through the air together 5 : a brilliant, imaginative, or unrestrained exercise or display (a ~ of fancy) 6 a : a continuous series of stairs from one landing or floor to another b : a series (as of terraces or conveyors) resembling a flight of stairs 7 : a unit of the U.S. Air Force below a squadron — **flight·less** \-ləs\ *adj*

**flight** *vi* (1873) 1 : to rise, settle, or fly in a flock (geese ~ing on the marsh) ~ *vt* : FLUSH

**flight** *n* [ME *fluht, fliht*; akin to OHG *fluht* flight, OE *fleon* to flee] (13c) : an act or instance of running away

**flight attendant** *n* (1947) : a person who attends passengers on an airplane

**flight bag** *n* [*flight*] (1943) 1 : a lightweight traveling bag with zippered outside pockets 2 : a small canvas satchel

**flight deck** *n* (1924) 1 : the uppermost complete deck of an aircraft carrier 2 : the forward compartment in some airplanes

**flight engineer** *n* (1938) : a flight crewman responsible for mechanical operation

**flight feather** *n* (1735) : one of the quills of a bird's wing or tail that support it in flight — compare CONTOUR FEATHER

**flight lieutenant** *n* (1914) : a commissioned officer in the British air force who ranks with a captain in the army

**flight line** *n* (1943) : a parking and servicing area for airplanes

**flight path** *n* (1911) : the path in the air or space made or followed by something (as a particle, an airplane, or a spacecraft) in flight

**flight pay** *n* (1928) : an additional allowance paid to military personnel who take part in regular authorized aircraft flights

**flight plan** *n* (ca. 1936) : a usu. written statement (as by a pilot) of the details of an intended flight (as of an airplane or spacecraft) usu. filed with an authority

**flight recorder** *n* (1939) : a crashworthy instrument for recording flight data (as airspeed and altitude)

**flight suit** *n* (1944) : a usu. one-piece garment esp. of fire-resistant fabric worn esp. by military aircrews

**flight surgeon** *n* (1925) : a military medical officer trained in aerospace medicine

**flight–test** \ˈflīt-ˌtest\ *vt* (1930) : to test (as an airplane or spacecraft) in flight

**flighty** \ˈflī-tē\ *adj* **flight·i·er; -est** (1552) 1 : SWIFT 2 : lacking stability or steadiness a : easily upset; VOLATILE (a ~ temper) b : easily excited : SKITTISH (a ~ horse) c : CAPRICIOUS, SILLY — **flight·i·ly** \ˈflī-tə-lē\ *adv* — **flight·i·ness** \ˈflī-tē-nəs\ *n*

**flim–flam** \ˈflim-ˌflam\ *n* [prob. of Scand origin; akin to ON *flim* mockery] (ca. 1538) 1 : DECEPTION, FRAUD 2 : deceptive nonsense

**flimflam** *vt* **flim·flammed; flim·flam·ming** (1660) : to subject to a flimflam — **flim·flam·mer** *n* — **flim·flam·mery** \-mə-rē\ *n*

**flim·sy** \ˈflim-zē\ *adj* **flim·si·er; -est** [perh. alter. of *film* + -sy (as in *tricksy*)] (1702) 1 a : lacking in physical strength or substance (~ silks) b : of inferior materials and workmanship 2 : having little worth or plausibility — **flim·si·ly** \-zə-lē\ *adv* — **flim·si·ness** \-zē-nəs\ *n*

**flimsy** *n, pl* **flim·sies** (1857) *chiefly Brit* : a lightweight paper used esp. for multiple copies; *also* : a document printed on flimsy

**flinch** \ˈflinch\ *vi* [MF *flenchir* to bend, of Gmc origin; akin to MHG *lenken* to bend, OHG *hlanca* flank — more at LANK] (1579) 1 : to withdraw or shrink from or as if from pain : WINCE; *also* : to tense the muscles involuntarily in anticipation of discomfort — **syn** see RECOIL — **flinch** *n* — **flinch·er** *n*

**flin·ders** \ˈflin-dərz\ *n pl* [ME *flendris*] (15c) : SPLINTERS, FRAGMENTS

**fling** \ˈfliŋ\ *vb* **flung** \ˈfləŋ\; **fling·ing** \ˈfliŋ-iŋ\ [ME, perh. of Scand origin; akin to ON *flengja* to whip] *vi* (14c) 1 : to move in a brusque or headlong manner (*flung* out of the room in a rage) 2 *of an animal* : to kick or plunge vigorously 3 *Scot* : CAPER ~ *vt* 1 a : to throw forcefully, impetuously, or casually (*flung* herself down on the sofa) (clothes were *flung* on the floor) b : to cast as if by throwing (*flung* off all restraint) 2 : to place or send suddenly and unceremoniously (was arrested and *flung* into prison) 3 : to give unrestrainedly (*flung* himself into music) — **syn** see THROW — **fling·er** \ˈfliŋ-ər\ *n*

**fling** *n* (1589) 1 : an act or instance of flinging 2 a : a casual try or involvement b : a casual or brief love affair 3 : a period devoted to self-indulgence

**flint** \ˈflint\ *n* [ME, fr. OE; akin to OHG *flins* pebble, hard stone] (bef. 12c) 1 : a massive hard quartz that produces a spark when struck by steel 2 : an implement of flint used in prehistoric culture 3 : a piece of flint b : a material used for producing a spark (as of iron and cerium) used in lighters 4 : something resembling flint in hardness — **flint–like** \-ˌlīk\ *adj*

**flint corn** *n* (1705) : an Indian corn (*Zea mays indurata*) having hard horny usu. rounded kernels with the soft endosperm enclosed by a hard outer layer

**flint glass** *n* (1683) : heavy brilliant glass that contains lead oxide, has a relatively high index of refraction, and is used in lenses and prisms

**flint·lock** \ˈflint-ˌläk\ *n* (1683) 1 : a lock for a gun or pistol having a flint in the hammer for striking a spark to ignite the charge 2 : a firearm fitted with a flintlock

**flinty** \ˈflin-tē\ *adj* **flint·i·er; -est** (1536) 1 : resembling flint; *esp* : STERN, UNYIELDING 2 : composed of or covered with flint — **flint·i·ly** \ˈflin-tᵊl-ē\ *adv* — **flint·i·ness** \ˈflin-tē-nəs\ *n*

**flip** \ˈflip\ *vb* **flipped; flip·ping** [prob. imit.] *vt* (1616) 1 : to toss so as to cause to turn over in the air (~ a coin); *also* : TOSS (~ me the ball) (~ one end of the scarf over your shoulder) 2 a : to cause to turn and esp. to turn over (*flipped* the car) (*flipping* the pages of) b : to move with a small quick motion (~ a switch) ~ *vi* 1 : to make a twitching or flicking movement (the fish *flipped* and flopped on the deck); *also* : to change from one position to another and esp. turn over (the car *flipped*) 2 : LEAF 2 (*flipped* through the pages) 3 *slang* : to lose one's mind or composure — often used with *out* b : to become very enthusiastic

**flip** *n* (1695) 1 : a mixed drink usu. consisting of a sweetened spiced liquor with beaten eggs 2 : an act or instance of flipping 3 : the motion used in flipping 4 : a somersault esp. in the air

**flip** *adj* (ca. 1847) : FLIPPANT, IMPERTINENT

**flip–flop** \ˈflip-ˌfläp\ *n* (1600) 1 : the sound or motion of something flapping loosely 2 a : a backward handspring b : a sudden reversal (as of direction or point of view) 3 : a usu. electronic device or a circuit (as in a computer) capable of assuming either of two stable states 4 : a rubber sandal loosely fastened to the foot by a thong — **flip–flop** *vi*

**flip·pan·cy** \ˈfli-pən(t)-sē\ *n, pl* **-cies** (1746) : unbecoming levity or pertness esp. in respect to grave or sacred matters

**flip·pant** \ˈfli-pənt\ *adj* [prob. fr. *flip*] (1605) 1 *archaic* : GLIB, TALKATIVE 2 : lacking proper respect or seriousness — **flip·pant·ly** *adv*

**flip·per** \ˈfli-pər\ *n* (1822) 1 a : a broad flat limb (as of a seal or cetacean) adapted for swimming b : a flat rubber shoe with the front expanded into a paddle used in skin diving 2 : one that flips

**flip·py** \ˈfli-pē\ *adj* (1967) : loose and flaring at the bottom (a ~ skirt)

**flip side** *n* (1949) 1 : the reverse and usu. less popular side of a phonograph record 2 : a reverse or opposite side, aspect, or result (the *flip side* of deficient saving . . . is overconsumption — R. S. Gay)

**flirt** \ˈflərt\ *vb* [origin unknown] *vt* (1583) 1 : FLICK 2 : to move in a jerky manner ~ *vi* 1 : to move erratically : FLIT 2 a : to behave amorously without serious intent b : to show superficial or casual interest or liking (~ed with the idea); *also* : EXPERIMENT (a novelist ~ing with poetry) 3 : to come close to — used with *with* (the temperature ~ed with 100°) — **syn** see TRIFLE — **flir·ta·tion** \ˌflər-ˈtā-shən\ *n* — **flirt·er** *n* — **flirty** \ˈflər-tē\ *adj*

**flirt** *n* (ca. 1590) 1 : an act or instance of flirting 2 : a person who flirts

**flir·ta·tious** \ˌflər-ˈtā-shəs\ *adj* (1834) : inclined to flirt : COQUETTISH — **flir·ta·tious·ly** *adv* — **flir·ta·tious·ness** *n*

**flit** \ˈflit\ *vi* **flit·ted; flit·ting** [ME *flitten*, of Scand origin; akin to ON *flytjask* to move, OE *fleotan* to float] (13c) 1 : to pass quickly or abruptly from one place or condition to another 2 *archaic* : ALTER, SHIFT 3 : to move in an erratic fluttering manner — **flit** *n*

**flitch** \ˈflich\ *n* [ME *flicche*, fr. OE *flicce*; akin to OHG *fleisk* flesh — more at FLESH] (bef. 12c) 1 : a side of cured meat; *esp* : a side of bacon 2 a : a longitudinal section of a log b : a bundle of sheets of veneer laid together in sequence

**flit·ter** \ˈfli-tər\ *vi* [freq. of *flit*] (1534) : FLUTTER, FLICKER

**flitter** *n* (1554) : one that flits

**fliv·ver** \ˈfli-vər\ *n* [origin unknown] (1910) : a small cheap usu. old automobile

**float** \ˈflōt\ *n* [ME *flote* boat, float, fr. OE *flota* ship; akin to OHG *flōz* raft, stream, OE *fleotan* to float — more at FLEET] (bef. 12c) 1 : an act or instance of floating 2 : something that floats in or on the surface of a fluid: as a : a device (as a cork) buoying up the baited end of a fishing line b : a floating platform anchored near a shoreline for use by swimmers or boats c : a hollow ball that floats at the end of a lever in a cistern, tank, or boiler and regulates the liquid level d : a sac containing air or gas and buoying up the body of a plant or animal — compare PNEUMATOPHORE 1 e : a watertight structure giving an airplane buoyancy on water 3 : a tool or apparatus for smoothing a surface (as of wet concrete) 4 : a government grant of a fixed amount of land not yet located by survey out of a larger specific tract 5 a : a vehicle with a platform used to carry an exhibit in a parade b : the vehicle and exhibit together 6 a : an amount of money represented by checks outstanding and in process of collection b : the time between a transaction (as the writing of a check or a purchase on credit) and the actual withdrawal of funds to cover it c : the volume of a company's shares available for active trading in the auction market 7 : a soft drink with ice cream floating in it — **floaty** \ˈflō-tē\ *adj*

**float** *vi* (bef. 12c) 1 : to rest on the surface of or be suspended in a fluid 2 a : to drift on or through or as if on or through a fluid (yellow leaves ~ed down) b : WANDER 3 *of a currency* : to find a level in the international exchange market in response to the law of supply and demand and without any restrictive effect of artificial support or control ~ *vt* 1 a : to cause to float in or on the surface of a fluid b : to cause to float as if in a fluid 2 : FLOOD (~ a cranberry bog) 3 : to smooth (as plaster or cement) with a float 4 a : to put forth (as a proposal) for acceptance b : to place (an issue of securities) on the market c : to obtain money for the establishment or development of (an enterprise) by issuing and selling securities d : NEGOTIATE (~ a loan)

**flo·ta·tion** *var of* FLOTATION

floats something 2 : a person who floats . . . b : a person who . . . in various polling places 3 a : a person without . . . residence or regular employment . . .

Neonode Smartphone LLC, Exhibit 2052
Page 2052 - 4
IPR2021-01041, Google LLC v. Neonode Smartphone LLC

    NEONODE0018673

glarier • gliding    495

cheap showy brilliance : GARISHNESS  2 : an angry or fierce stare  3 : a surface or sheet of smooth and slippery ice

**glar-ing** \'glar-iŋ, 'gler-\ adj (14c)  1 : having a fixed look of hostility, fierceness, or anger  2 **a** : shining with or reflecting an uncomfortably bright light  **b** (1) : GARISH  (2) : vulgarly ostentatious (a ~ error).  **syn** see FLAGRANT — **glar-ing-ly** \-iŋ-lē\ adv — **glar-ing-ness** n

**gla-ry** \'glar-ē, 'gler-\ adj **glar-i-er; -est** (1632) : having a dazzling brightness : GLARING

**glas-nost** \'glaz-ˌnȯst, 'gläs-, 'glas-, 'gläz-, 'gläs-\ n [Russ glasnost', lit., publicity, fr. glasnyĭ public, fr. glas voice, fr. OCS glasŭ — more at CALL] (1986) : a Soviet policy permitting open discussion of political and social issues and freer dissemination of news and information

**glass** \'glas, 'glàs\ n, often attrib [ME glas, fr. OE glæs; akin to OE geolu yellow — more at YELLOW] (bef. 12c)  1 : any of various amorphous materials formed from a melt by cooling to rigidity without crystallization: as  **a** : a usu. transparent or translucent material consisting esp. of a mixture of silicates  **b** : a material (as obsidian) produced by fast cooling of magma  2  **a** : something made of glass: as  (1) : TUMBLER; also : GLASSWARE  (2) : MIRROR  (3) : BAROMETER  (4) : HOURGLASS  (5) : BACKBOARD  **b** (1) : an optical instrument or device that has one or more lenses and is designed to aid in the viewing of objects not readily seen  (2) : FIELD GLASSES, BINOCULARS — usu. used in pl.  **c** pl : a device used to correct defects of vision or to protect the eyes that consists typically of a pair of glass or plastic lenses and the frame by which they are held in place — called also eyeglasses, spectacles  3 : the quantity held by a glass container  4 : FIBERGLASS — **glass-ful** \'glas-ˌfül\ n — **glass-less** \-los\ adj

**glass** vt (14c)  1  **a** : to provide with glass : GLAZE  1  **b** : to enclose, case, or wall with glass (the sunroom was ~ed in)  2 : to make glassy  3  **a** : REFLECT  **b** : to see mirrored  4 : to look at through an optical instrument (as binoculars) ~ vi : GLAZE 1

**glass-blow-ing** \-ˌblō-iŋ\ n (ca. 1829) : the art of shaping a mass of glass that has been softened by heat by blowing air into it through a tube — **glass-blow-er** \-ˌblō-ər\ n

**glass ceiling** n (1986) : an intangible barrier within the hierarchy of a company that prevents women or minorities from obtaining upper-level positions

**glass eye** n (1687)  1 : an artificial eye made of glass  2 : an eye having a pale, whitish, or colorless iris — **glass-eyed** \-ˌid\ adj

**glass fiber** n (1882) : FIBERGLASS

**glass harmonica** n (ca. 1909) : a musical instrument consisting of a series of rotating glass bowls of differing sizes played by touching the dampened edges with a finger

**glass-house** \'glas-ˌhaus\ n (14c)  1 : a place where glass is made  2 chiefly Brit : GREENHOUSE  3 Brit : a military prison

**glass-ie** \'gla-sē\ or **glassy** n, pl **glass-ies** (1887) : a playing marble made of glass

**glass-ine** \gla-'sēn\ n (1916) : a thin dense transparent or semitransparent paper highly resistant to the passage of air and grease

**glass jaw** n (1940) : vulnerability (as of a boxer) to knockout punches

**glass-mak-er** \'glas-ˌmā-kər\ n (1576) : one that makes glass — **glass-mak-ing** \-kiŋ\ n

**glass-pa-per** \'gläs-ˌpā-pər\ n (1815) Brit : abrasive paper coated with powdered glass and used like sandpaper — **glasspaper** vb

**glass snake** n (1709) : any of a genus (Ophisaurus) of limbless snakelike lizards of the southern U.S., Eurasia, and Africa with a fragile tail that readily breaks into pieces

**glass sponge** n (1875) : any of a class (Hexactinellida syn. Hyalospongiae) of chiefly deep-water siliceous sponges with 6-rayed spicules and a skeleton often resembling glass when dried

**glass-ware** \'glas-ˌwar, -ˌwer\ n (1745) : articles made of glass

**glass wool** n (1879) : glass fibers in a mass resembling wool and being used esp. for thermal insulation and air filters

**glass-work** \'glas-ˌwərk\ n (1611)  1 **a** : the manufacture of glass or glassware; also : glaziers' work  **b** pl : GLASSHOUSE 1  2 : GLASSWARE — **glass-work-er** \-ˌwər-kər\ n

**glass-wort** \-ˌwȯrt, -ˌwȯrt\ n [fr. its former use in the manufacture of glass] (1597) : any of a genus (Salicornia) of woody jointed succulent herbs of the goosefoot family with leaves reduced to fleshy sheaths

**glassy** \'gla-sē\ adj **glass-i-er; -est** (14c)  1 : resembling or made of glass  2 : having little animation : DULL, LIFELESS (~ eyes) — **glass-i-ly** \'gla-sə-lē\ adv — **glass-i-ness** \'gla-sē-nəs\ n

**glassy-eyed** \-ˌid\ adj (1895) : marked by or having glassy eyes

**Glau-ber's salt** \'glau-bər(z)-\ n [Johann R. Glauber †1668 Ger. chemist] (1736) : a colorless crystalline sulfate of sodium $Na_2SO_4\cdot10H_2O$ used esp. in dyeing, as a cathartic, and in solar energy systems — called also Glauber salt; sometimes used in pl.

**glau-co-ma** \glau-'kō-mə, glȯ-\ n [L, cataract, fr. Gk glaukōma, fr. glaukos to have a cataract, fr. glaukos] (1885) : a disease of the eye marked by increased pressure within the eyeball that can result in damage to the optic disk and gradual loss of vision

**glau-co-nite** \'glȯ-kə-ˌnit\ n [G Glaukonit, irreg. fr. Gk glaukos] (1836) : a mineral consisting of a dull green earthy iron potassium silicate occurring in greensand — **glau-co-nit-ic** \ˌglȯ-kə-'ni-tik\ adj

**glau-cous** \'glȯ-kəs\ adj [L glaucus, fr. Gk glaukos gleaming, gray] (1671)  1  **a** : of a pale yellow-green color  **b** : of a light bluish gray or bluish white color  2 : having a powdery or waxy coating that gives a frosted appearance and tends to rub off — **glau-cous-ness** n

**glaze** \'glāz\ vb **glazed; glaz-ing** [ME glasen, fr. glas glass] vt (14c)  1 : to furnish or fit with glass  2  **a** : to coat with or as if with a glaze (the storm glazed trees with ice)  **b** : to apply a glaze to (~ doughnuts)  3 : to give a smooth glossy surface to ~ vi  1 : to become glazed or glassy (my eyes glazed over)  2 : to form a glaze — **glaz-er** n

**glaze** n (1752)  1 : a smooth slippery coating of thin ice  2  **a** (1) : a liquid preparation applied to food on which it forms a firm glossy coating  (2) : a mixture mostly of oxides (as silica and alumina) applied to the surface of ceramic wares to form a moisture-impervious and often ornamental coating  **b** : a transparent or translucent color applied to modify the effect of a painted surface  **c** : a smooth glossy lustrous surface or finish  3 : a glassy film

**glazed** vt **glazed; glaz-ing** [prob. blend of glare and gaze] (1601) archaic : STARE

**glazed** \'glāzd\ adj (15c)  1 : covered with or as if with a glassy film (~ eyes)  2 : marked by lack of expression

**gla-zier** \'glā-zhər, -zē-ər\ n (14c) : one who sets glass — **gla-ziery** \'glā-zhə-rē, 'glā-zē-ə-rē\ n

**glaz-ing** \'glā-ziŋ\ n (1677)  1 : the action, process, or trade of fitting windows with glass  2  **a** : GLASSWORK  **b** : GLAZE  3 : transparent material (as glass) used for windows

**gleam** \'glēm\ n [ME gleem, fr. OE glæm; akin to OE geolu yellow — more at YELLOW] (15c)  1  **a** : a transient appearance of subdued or partly obscured light (the ~ of dawn in the east)  **b** (1) : a small bright light (the ~ of a match)  (2) : GLINT (a ~ in his eyes)  2 : a brief or faint appearance (a ~ of hope) — **gleamy** \'glē-mē\ adj

**gleam** vi (1508)  1 : to shine with or as if with subdued steady light or moderate brightness  2 : to appear briefly or faintly (a light ~ed in the distance) ~ vt : to cause to gleam  **syn** see FLASH

**glean** \'glēn\ vb [ME glenen, fr. MF glener, fr. LL glennare, of Celtic origin; akin to OIr doglenn he selects] vt (14c)  1 : to gather grain or other produce left by reapers  2 : to gather information or material bit by bit ~ vi  1 : to pick up grain after a reaper  **b** : to strip (as a field) of the leavings of reapers  2  **a** : to gather (as information) bit by bit  **b** : to pick over in search of relevant material (~ing old files for information)  3 : FIND OUT — **glean-able** \'glē-nə-bəl\ adj — **glean-er** n

**glean-ings** \'glē-niŋz\ n pl (15c) : things acquired by gleaning

**glebe** \'glēb\ n [L gleba clod, land] (14c)  1 archaic : LAND; specif : a plot of cultivated land  2 : land belonging or yielding revenue to a parish church or ecclesiastical benefice

**glede** \'glēd\ n [ME, fr. OE glida; akin to OE glidan to glide] (bef. 12c) : any of several birds of prey (as a kite of Europe)

**glee** \'glē\ n [ME, fr. OE glēo entertainment, music; akin to ON glȳ joy, and perh. to Gk chleuē joke] (bef. 12c)  1 : exultant high-spirited joy : MERRIMENT  2 : a part-song for usu. male voices

**glee club** n (1844) : a chorus organized for singing usu. short pieces

**gleed** \'glēd\ n [ME, fr. OE glēd; akin to OE glōwan to glow] (bef. 12c) archaic : a glowing coal

**glee-ful** \'glē-fəl\ adj (1586) : full of glee : MERRY — **glee-ful-ly** \-fə-lē\ adv — **glee-ful-ness** n

**gleek** \'glēk\ vi [origin unknown] (1590) archaic : GIBE, JOKE

**glee-man** \'glē-mən\ n [ME gleman, fr. OE glīoman, fr. glēo + man man] (bef. 12c) : JONGLEUR

**glee-some** \'glē-səm\ adj (1603) archaic : GLEEFUL

**gleet** \'glēt\ n [ME glet slimy or mucous matter, fr. MF glete, fr. L glittus viscous; akin to L gluten glue — more at CLAY] (14c) : a chronic inflammation (as gonorrhea) of a bodily orifice usu. accompanied by an abnormal discharge; also : the discharge itself

**gleg** \'gleg\ adj [ME, fr. ON gleggr clear-sighted] (14c) Scot : marked by quickness of perception or movement

**glei-za-tion** \ˌglī-'zā-shən\ n (1938) : development of or conversion into gley

**glen** \'glen\ n [ME (Sc), valley, fr. (assumed) ScGael glenn; akin to MIr glend valley] (15c) : a secluded narrow valley

**glen-gar-ry** \glen-'gar-ē\ n, pl **-ries** often cap [Glengarry, valley in Scotland] (1845) : a woolen cap of Scottish origin — called also glengarry bonnet

**glen plaid** \'glen-\ n [short for glenurquhart plaid, fr. Glen Urquhart, valley in Inverness-shire, Scotland] (1926) : a twill pattern of broken checks; also : a fabric woven in this pattern — called also glen check

**gley** \'glā\ n, often attrib [Ukrainian glei clayey earth; akin to OE clæg clay — more at CLAY] (1927) : a sticky clay soil or soil layer formed under the surface of some waterlogged soils — **gleyed** adj

**gley-ing** \'glā-iŋ\ n (1949) : GLEIZATION

**glia** \'glē-ə, 'glī-ə\ n [NL, fr. MGk, glue — more at CLAY] (1891) : NEUROGLIA — **gli-al** \-əl\ adj

**gli-a-din** \'glī-ə-dən\ n [It xliadina, fr. MGk glia] (ca. 1828) : PROLAMIN; esp : one obtained by alcoholic extraction of gluten from wheat and rye

**glib** \'glib\ adj **glib-ber; glib-best** [prob. modif. of LG glibberig slippery] (1593)  1 : marked by ease and informality : NONCHALANT  **b** : showing little forethought or preparation : OFFHAND (~ answers)  **c** : lacking depth and substance : SUPERFICIAL (~ solutions to knotty problems)  2 archaic : SMOOTH, SLIPPERY  3 : marked by ease and fluency in speaking or writing often to the point of being insincere or deceitful (a ~ politician) — **glib-ly** adv — **glib-ness** n

**glide** \'glīd\ vb **glid-ed; glid-ing** [ME, fr. OE glīdan; akin to OHG glītan to glide] vi (bef. 12c)  1 : to move smoothly, continuously, and effortlessly (swans gliding over the lake)  2 : to go or pass imperceptibly (hours glided by)  3  **a** of an airplane : to descend gradually in controlled flight  **b** : to fly in a glider  4 : to produce a glide (as in music or speech) ~ vt : to cause to glide

**glide** n (1596)  1 : the act or action of gliding  2 : a calm stretch of shallow water flowing smoothly  3 : PORTAMENTO  4  **a** : a less prominent vowel sound produced by the passing of the vocal organs to or from the articulatory position of a speech sound — compare DIPHTHONG  **b** : SEMIVOWEL  5 : a device for facilitating movement of something; esp : a circular usu. metal button attached to the bottom of furniture legs to provide a smooth surface

**glide path** n (1936) : GLIDE SLOPE

**glid-er** \'glī-dər\ n (15c)  1 : one that glides: as  **a** : an aircraft similar to an airplane but without an engine  **b** : a porch seat suspended from an upright framework  2 : something that aids gliding

**glide slope** n (ca. 1949)  1 : the proper path of descent for an aircraft preparing to land; esp : such a path indicated by a radio beam  2 : the radio beam that marks a glide slope



glengarry

\ə\ abut  \ʲ\ kitten, F table  \ər\ further  \a\ ash  \ā\ ace  \ä\ mop, mar
\au\ out  \ch\ chin  \e\ bet  \ē\ easy  \g\ go  \i\ hit  \ī\ ice  \j\ job
\ŋ\ sing  \ō\ go  \ȯ\ law  \ȯi\ boy  \th\ thin  \th\ the  \ü\ loot
\ụ\ yet

Neonode Smartphone LLC, Exhibit 2052
Page 2052 - 5
IPR2021-01041, Google LLC v. Neonode Smartphone LLC

# EXHIBIT 19

# Concise
# Oxford
# ENGLISH
# Dictionary

## REVISED TENTH EDITION

Over 240,000 words, phrases and definitions

THE WORLD'S MOST TRUSTED DICTIONARIES

Neonode Smartphone LLC Ex. 2057
Page 2057 - 1
IPR2021-01041, Google LLC v. Neonode Smartphone LLC

NEONODE0018699

# OXFORD
## UNIVERSITY PRESS

Great Clarendon Street, Oxford OX2 6DP

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide in

Oxford  New York

Auckland  Bangkok  Buenos Aires  Cape Town
Chennai  Dar es Salaam  Delhi  Hong Kong  Istanbul  Karachi
Kolkata  Kuala Lumpur  Madrid  Melbourne  Mexico City  Mumbai  Nairobi
São Paulo  Shanghai  Singapore  Taipei  Tokyo  Toronto

and an associated company in Berlin

Oxford is a registered trade mark of Oxford University Press
in the UK and in certain other countries

Published in the United States
by Oxford University Press Inc., New York

© Oxford University Press 1924, 1952, 1964, 1976, 1982, 1990, 1995, 1999, 2001, 2002

Database right Oxford University Press (makers)

First edition 1911
Second edition (revised) 1929
Third edition (with addenda) 1934
Fourth edition 1951
Fifth edition 1964
Sixth edition 1976
Seventh edition 1982
Eighth edition 1990
Ninth edition 1995
Tenth edition 1999
Tenth (with addenda) edition 2001
Tenth (with addenda) edition reissued with new title and jacket 2002

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
without the prior permission in writing of Oxford University Press,
or as expressly permitted by law, or under terms agreed with the appropriate
reprographics rights organization. Enquiries concerning reproduction
outside the scope of the above should be sent to the Rights Department,
Oxford University Press, at the address above

You must not circulate this book in any other binding or cover
and you must impose this same condition on any acquirer

British Library Cataloguing in Publication Data
Data available

Library of Congress Cataloging in Publication Data
Data available

ISBN 0-19-860872-2
ISBN 0-19-860838-2  (thumb index)
ISBN 0-19-860470-X  (dictionary with CD-ROM)

10 9 8 7 6 5 4 3 2 1

Typeset in Arial, Nimrod, and Minion
by Interactive Sciences Ltd, Gloucester
Printed in Great Britain by
Clays Ltd, Bungay, Suffolk

Neonode Smartphone LLC, Exhibit 2057
Page 2057 - 2
IPR2021-01041, Google LLC v. Neonode Smartphone LLC

CONFIDENTIAL                                    NEONODE0018700

**flesher | flight recorder**
542

with the mind or the soul. ▶v. **1** (**flesh out**) make more substantial. **2** give (a hound or hawk) a piece of flesh in order to stimulate it to hunt. **3** remove the flesh from (a hide). **4** *poetic/literary* initiate in bloodshed or warfare.
– PHRASES **all flesh** all human and animal life. **in the flesh** in person or (of a thing) in its actual state. **make someone's flesh creep** (or **crawl**) cause someone to feel fear, horror, or disgust. **put flesh on** (**the bones of**) **something** flesh something out.
– DERIVATIVES **-fleshed** adj. **fleshless** adj.
– ORIGIN OE *flæsc*, of Gmc origin.

**flesher** ▶n. **1** *chiefly Scottish* a butcher. **2** N. Amer. a knife for fleshing hides.

**flesh fly** ▶n. a fly that breeds in carrion. [Family Sarcophagidae: many species.]

**fleshly** ▶adj. (**-ier, -iest**) **1** of or relating to the body; sensual. **2** having an actual physical presence.
– ORIGIN OE *flæsclic* (see FLESH, -LY).

**fleshpots** ▶pl. n. places providing a hedonistic experience.
– ORIGIN C16: with biblical allusion to the *fleshpots of Egypt* (Exod. 16:3).

**flesh wound** ▶n. a wound that breaks the skin but does not damage bones or vital organs.

**fleshy** ▶adj. (**-ier, -iest**) **1** having a substantial amount of flesh; plump. **2** (of plant or fruit tissue) soft and thick. **3** resembling flesh.
– DERIVATIVES **fleshiness** n.

**fletch** /flɛtʃ/ ▶v. provide (an arrow) with feathers.
– ORIGIN C17: alt. of FLEDGE, prob. influenced by *fletcher*.

**fletcher** ▶n. *chiefly historical* a person who makes and sells arrows.
– ORIGIN ME: from OFr. *flechier*, from *fleche* 'arrow'.

**fletching** ▶n. the feathers of an arrow.

**fleur-de-lis** /ˌflɜːdəˈliː/ (also **fleur-de-lys**) ▶n. (pl. **fleurs-de-lis** *pronunc. same*) **1** Art & Heraldry a stylized lily composed of three petals bound together near their bases. **2** a variety of iris.
– ORIGIN ME: from OFr. *flour de lys* 'flower of the lily'.

**fleuron** /ˈflʊərɒn, ˈflɜː-/ ▶n. a flower-shaped piece of ornamentation.
– ORIGIN ME: from OFr. *floron*, from *flour* 'flower'.

**fleury** /ˈfluəri/ ▶adj. variant spelling of FLORY.

**flew** past of FLY¹.

**flews** /fluːz/ ▶pl. n. the thick hanging lips of a bloodhound or similar dog.
– ORIGIN C16: of unknown origin.

**flex¹** ▶v. **1** bend (a limb or joint). **2** contract or tense (a muscle). **3** warp or bend and then revert to shape. **4** (as adj. **flexed**) Archaeology place (a corpse) with the legs drawn up under the chin.
– ORIGIN C16: from L. *flex-*, *flectere* 'bend'.

**flex²** ▶n. *chiefly Brit.* a flexible insulated cable used for carrying electric current to an appliance.
– ORIGIN C20: abbrev. of FLEXIBLE.

**flexible** ▶adj. **1** capable of bending easily without breaking. **2** readily adaptable.
– DERIVATIVES **flexibility** n. **flexibly** adv.
– ORIGIN ME: from OFr., or from L. *flexibilis*, from *flectere* 'to bend'.

**flexile** /ˈflɛksaɪl/ ▶adj. *archaic* pliant and flexible.
– DERIVATIVES **flexility** n.
– ORIGIN C17: from L. *flexilis*, from *flectere* 'to bend'.

**flexion** /ˈflɛkʃ(ə)n/ (also **flection**) ▶n. the action of bending or the condition of being bent.
– ORIGIN C17: from L. *flexio(n-)*, from *flectere* 'to bend'.

**flexitime** (N. Amer. also **flextime**) ▶n. a system allowing some flexibility in when workers put in their allotted hours.

**flexography** /flɛkˈsɒɡrəfi/ ▶n. a rotary relief printing method using rubber or plastic plates and fluid inks or dyes, for printing on impervious materials such as plastics, as well as on fabrics and paper.
– DERIVATIVES **flexographic** adj.

**flexor** /ˈflɛksə/ ▶n. Anatomy a muscle whose contraction bends a limb or other part of the body.

**flexuous** /ˈflɛksjʊəs/ ▶adj. full of bends and curves.

– DERIVATIVES **flexuosity** n. **flexuously** adv.

**flexure** /ˈflɛkʃə/ ▶n. *chiefly Anatomy & Geology* **1** the action of bending or curving, or the condition of being bent or curved. **2** a bent or curved part.
– DERIVATIVES **flexural** adj.
– ORIGIN C16: from L. *flexura*, from *flectere* 'to bend'.

**flexwing** ▶n. a flexible fabric wing, as used in hang-gliders.

**flibbertigibbet** /ˌflɪbətɪˈdʒɪbɪt/ ▶n. a frivolous and restless person.
– ORIGIN ME: prob. imitative of idle chatter.

**flic** ▶n. Computing a data file containing computer animations.
– ORIGIN C20: based on the cinematographic sense of FLICK.

**flick** ▶n. **1** a sudden smart movement up and down or from side to side. **2** the sudden release of a finger or thumb held bent against another finger. **3** *informal* a cinema film. ▶ (**the flicks**) the cinema. ▶v. **1** make or cause to make a sudden sharp movement. **2** propel with a flick of the fingers. **3** (**flick through**) look quickly through (a volume or a collection of papers).
– PHRASES **give someone the flick** *informal, chiefly Austral.* reject in a casual or offhand way.
– ORIGIN ME: symbolic; *fl-* freq. beginning words denoting sudden movement.

**flicker¹** ▶v. **1** shine or burn unsteadily and fitfully. **2** (of a feeling) be briefly perceptible. **3** make small, quick movements. ▶n. an instance of flickering.
– DERIVATIVES **flickering** adj. & n.
– ORIGIN OE *flicorian*, *flycerian* 'to flutter', prob. of Gmc origin.

**flicker²** ▶n. an American woodpecker that often feeds on ants on the ground. [*Colaptes auratus* (**common** or **northern flicker**) and related species.]
– ORIGIN C19: imitative of its call.

**flick knife** ▶n. *Brit.* a knife with a blade that springs out from the handle when a button is pressed.

**flick roll** ▶n. another term for SNAP ROLL.

**flier** ▶n. variant spelling of FLYER.

**flight** ▶n. **1** the action or process of flying. ▶ a journey made in an aircraft or in space. ▶ the movement or trajectory of a projectile through the air. **2** a flock of birds or body of insects flying in the air. **3** a group of aircraft operating together, especially an RAF or USAF unit of about six aircraft. **4** the action of fleeing. **5** a series of steps between floors or levels. ▶ a sequence of locks by which a canal ascends an incline. ▶ a series of hurdles across a racetrack. **6** an uninhibited mental journey: *a flight of fancy*. **7** the tail of an arrow or dart. ▶v. **1** *Sport* (in soccer, cricket, etc.) deliver (a ball) with well-judged trajectory and pace. **2** provide (an arrow or dart) with a flight. **3** shoot (wildfowl) in flight.
– PHRASES **in full flight** having gained optimum momentum. **take flight 1** (of a bird) take off and fly. **2** flee.
– ORIGIN OE *flyht*, of Gmc origin; rel. to FLY¹.

**flight capital** ▶n. capital which has been moved from an area in economic difficulties to a more stable region.

**flight control** ▶n. **1** the activity of directing the movement of aircraft. **2** a control surface on an aircraft.

**flight deck** ▶n. **1** the cockpit of a large aircraft. **2** the deck of an aircraft carrier, used for take-off and landing.

**flight envelope** ▶n. the range of combinations of speed, altitude, angle of attack, etc., within which a flying object is aerodynamically stable.

**flight feather** ▶n. any of the large primary or secondary feathers in a bird's wing, supporting it in flight.

**flightless** ▶adj. (of a bird or insect) naturally unable to fly.
– DERIVATIVES **flightlessness** n.

**flight lieutenant** ▶n. a rank of officer in the RAF, above flying officer and below squadron leader.

**flightline** ▶n. the part of an airport around the hangars where aircraft can be parked and serviced.

**flight path** ▶n. the course of an aircraft or spacecraft.

**flight recorder** ▶n. a device in an aircraft to record

CONSONANTS  b **b**at | d **d**og | f **f**ew | g **g**et | h **h**e | j **y**es | k **c**at | l **l**eg | m **m**an | n **n**o | p **p**en | r **r**ed

Neonode Smartphone LLC, Exhibit 2057
Page 2057 - 3
IPR2021-01041, Google LLC v. Neonode Smartphone LLC

CONFIDENTIAL

NEONODE0018701

**Glaswegian** /glæzˈwiːdʒən, glas-, glɛz-, glɑs-/ ● n. a native of Glasgow. ● adj. of or relating to Glasgow.

**Glauber's salt** /ˈglaʊbəz, ˈglɔː-/ ● n. a crystalline hydrated form of sodium sulphate, used chiefly as a laxative.
– ORIGIN C18: named after the Ger. chemist Johann R. Glauber (1604–1668).

**glaucoma** /glɔːˈkəʊmə/ ● n. Medicine a condition of increased pressure within the eyeball, causing gradual loss of sight.
– DERIVATIVES **glaucomatous** adj.
– ORIGIN C17: via L. from Gk glaukōma, based on glaukos 'bluish green or grey' (because of the grey-green haze in the pupil).

**glauconite** /ˈglɔːkənaɪt/ ● n. a greenish clay mineral found chiefly in marine sands.
– ORIGIN C19: from Ger. Glaukonit, from Gk glaukon (neut. of glaukos 'bluish-green') + -ITE.

**glaucophane** /ˈglɔːkəfeɪn/ ● n. a bluish sodium-containing mineral found chiefly in schists and other metamorphic rocks.
– ORIGIN C19: from Ger. Glaukophan, from Gk glaukos 'bluish-green' + phainein 'shining'.

**glaucous** /ˈglɔːkəs/ ● adj. technical or literary 1 of a dull greyish-green or blue colour. 2 covered with a powdery bloom like that on grapes.
– ORIGIN C17: via L. from Gk glaukos + -OUS.

**glaucous gull** ● n. a large white and pale grey Arctic gull. [Larus hyperboreus.]

**glaze** ● v. 1 fit panes of glass into (a window frame or similar structure). ▸ enclose or cover with glass. 2 cover with a glaze. 3 (often **glaze over**) lose brightness and animation. ● n. 1 a vitreous substance fused on to the surface of pottery to form a hard, impervious decorative coating. 2 a thin topcoat of transparent paint used to modify the tone of an underlying colour. 3 a liquid such as milk or beaten egg, used to form a smooth shiny coating on food. 4 N. Amer. a thin, glassy coating of ice on the ground or water.
– DERIVATIVES **glazer** n. **glazing** n.
– ORIGIN ME glase, from GLASS.

**glazed frost** ● n. a glassy coating of ice, typically caused by rain freezing on impact.

**glazier** /ˈgleɪziə/ ● n. a person whose trade is fitting glass into windows and doors.

**GLC** ● abbrev. 1 Chemistry gas–liquid chromatography. 2 Greater London Council.

**gleam** ● v. shine brightly, especially with reflected light. ● n. 1 a faint or brief light. 2 a brief or faint show of a quality or emotion.
– PHRASES **a gleam in someone's eye** see EYE.
– DERIVATIVES **gleaming** adj. **gleamingly** adv. **gleamy** adj. (archaic).
– ORIGIN OE glæm 'brilliant light', of Gmc origin.

**glean** /gliːn/ ● v. 1 collect gradually from various sources. 2 historical gather (leftover grain) after a harvest.
– DERIVATIVES **gleaner** n.
– ORIGIN ME: from OFr. glener, from late L. glennare, prob. of Celtic origin.

**gleanings** ● pl. n. things gleaned from various sources rather than acquired as a whole.

**glebe** /gliːb/ ● n. 1 historical a piece of land serving as part of a clergyman's benefice and providing income. 2 poetic/literary land; fields.
– ORIGIN ME: from L. gleba, glaeba 'clod, land, soil'.

**glee** ● n. 1 great delight. 2 a song for men's voices in three or more parts, usually unaccompanied.
– DERIVATIVES **gleesome** adj. (archaic).
– ORIGIN OE glēo 'entertainment, music, fun', of Gmc origin.

**glee club** ● n. a society for singing part-songs.

**gleeful** ● adj. exuberantly or triumphantly joyful.
– DERIVATIVES **gleefully** adv. **gleefulness** n.

**gleeman** ● n. (pl. -men) archaic a professional entertainer, especially a singer.

**gleet** /gliːt/ ● n. Medicine a watery discharge from the urethra caused by gonorrhoeal infection.
– DERIVATIVES **gleety** adj.

– ORIGIN ME: from OFr. glette 'slime, secretion', of unknown origin.

**Gleichschaltung** /ˈglaɪxˌʃaltʊŋ, German ˈglaɪçˌʃaltʊŋ/ ● n. the standardization of political, economic, and social institutions as carried out in authoritarian states.
– ORIGIN Ger., from gleich 'same' + schalten 'force or bring into line'.

**glen** ● n. a narrow valley, especially in Scotland or Ireland.
– ORIGIN ME: from Sc. Gaelic and Ir. gleann (earlier glenn).

**glengarry** ● n. (pl. -ies) a brimless boat-shaped hat with a cleft down the centre, worn as part of Highland dress.
– ORIGIN C19: from Glengarry, the name of a valley in the Highlands of Scotland.

**glenoid cavity** /ˈgliːnɔɪd/ (also **glenoid fossa**) ● n. Anatomy a shallow depression on a bone into which another bone fits to form a joint, especially that on the scapula into which the head of the humerus fits.
– ORIGIN C18: glenoid from Fr. glénoïde, from Gk glēnoeidēs, from glēnē 'socket'.

**gley** /gleɪ/ ● n. Soil Science a sticky waterlogged soil lacking in oxygen, typically grey to blue in colour.
– ORIGIN 1920s: from Ukrainian, 'sticky blue clay'; rel. to CLAY.

**glia** /ˈglaɪə, ˈgliːə/ ● n. Anatomy the connective tissue of the nervous system, consisting of several different types of cell associated with neurons.
– DERIVATIVES **glial** adj.
– ORIGIN C19: from Gk, lit. 'glue'.

**glib** ● adj. (glibber, glibbest) articulate and voluble but insincere and shallow.
– DERIVATIVES **glibly** adv. **glibness** n.
– ORIGIN C16: alt. of Gmc origin.

**glide** ● v. 1 move with a smooth, quiet, continuous motion. 2 fly without power or in a glider. ● n. 1 an instance of gliding. 2 Phonetics a sound produced as the vocal organs move towards or away from articulation of a vowel or consonant, for example /j/ in duke /djuːk/. 3 Cricket a glancing stroke which slightly deflects the ball, especially towards the leg side.
– DERIVATIVES **gliding** n.
– ORIGIN OE glīdan, of Gmc origin.

**glide path** ● n. an aircraft's line of descent to land, especially as indicated by ground radar.

**glider** ● n. 1 a light aircraft designed to fly without using an engine. 2 a person or thing that glides. 3 another term for FLYING PHALANGER. 4 US a long swinging seat suspended from a frame in a porch.

**glimmer** ● v. shine faintly with a wavering light. ● n. 1 a faint or wavering light. 2 a faint sign of a feeling or quality, especially a desirable one: a glimmer of hope.
– DERIVATIVES **glimmering** adj. & n. **glimmeringly** adv.
– ORIGIN ME: prob. of Scand. origin; rel. to Swed. glimra and Dan. glimre.

**glimpse** ● n. a momentary or partial view. ● v. see briefly or partially.
– ORIGIN ME (in the sense 'shine faintly'): prob. of Gmc origin; rel. to GLIMMER.

**glint** ● v. give out or reflect small flashes of light. ● n. a small flash of light, especially a reflected one.
– ORIGIN ME (in the sense 'move quickly or obliquely'): var. of dial. glent, prob. of Scand. origin and rel. to Swed. dial. glänta, glinta 'to slip, slide, gleam'.

**glioblastoma** /ˌglaɪəʊblæˈstəʊmə/ ● n. (pl. **glioblastomas** or **glioblastomata** /-mata/) Medicine a highly invasive glioma in the brain.

**glioma** /glaɪˈəʊmə/ ● n. (pl. **gliomas** or **gliomata** /-mata/) Medicine a malignant tumour of the glial tissue of the nervous system.
– ORIGIN C19: from Gk glia 'glue' + -OMA.

**glissade** /glɪˈsɑːd, -ˈseɪd/ ● n. 1 a slide down a steep slope of snow or ice, typically on the feet with the support of an ice axe. 2 Ballet a movement in which one leg is brushed outwards from the body and then takes the weight while the second leg is brushed in to meet it. ● v. perform or move by means of a glissade.
– ORIGIN C19: Fr., from glisser 'to slip, slide'.

CONSONANTS   b but | d dog | f few | g get | h he | (j) yes | k cat | l leg | m man | n no | ŋ sing | p pen | r red

Neonode Smartphone LLC, Exhibit 2057
Page 2057 - 4
IPR2021-01041, Google LLC v. Neonode Smartphone LLC

CONFIDENTIAL

NEONODE0018702